# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
### EASTERN DIVISION

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BREZINSKI, and LAURA WAXWEILER, <br><br> Plaintiffs, <br> v. <br><br> ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLZ, and ERNEST L. GOWEN, <br><br> Defendants. | Case No. 1:11-cv-05065 <br><br> Judge Joan Humphrey Lefkow <br><br> Magistrate Judge Arlander Keys |

## PLAINTIFFS' MOTION FOR A PRELIMINARY INJUNCTION AND EXPEDITED DISCOVERY

Tyrone C. Fahner
John A. Janicik
Lori E. Lightfoot
Joshua D. Yount
Dana S. Douglas
Thomas V. Panoff
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for Plaintiffs*

Plaintiffs hereby move this Court, pursuant to Federal Rule of Civil Procedure 65(a), for a preliminary injunction restraining Defendants, as well as their agents, employees, and those acting in concert with them, including local and county election officials, from taking any immediate action to enforce or implement Illinois P.A. 97-14 (formerly SB 1178), including any actions under 10 ILCS 5/7-10 and 10 ILCS 5/7-12(1) related to the creation, circulation, or acceptance of petitions for nomination to serve in the United States House of Representatives.[1] Plaintiffs also request that the Court set forth a revised schedule for circulation and acceptance of petitions for nomination to commence on November 5, 2011 or pursuant to whatever timetable the Court deems appropriate. Plaintiffs further request that the Court order expedited discovery and other proceedings to resolve this matter.

## INTRODUCTION

1.      As the Complaint alleges, the State of Illinois has recently adopted a new map for the state's congressional districts (the "Proposed Congressional Plan") that uses deliberate and unlawful gerrymandering to discriminate against Latino and Republican voters. The Proposed Congressional Plan unlawfully: (1) uses racial gerrymandering to create a majority Latino district; (2) disenfranchises Latino voters by packing them into a single congressional district; and (3) is gerrymandered to discriminate against Republican voters.

2.      Despite the substantial legal problems facing the Proposed Congressional Plan, *beginning on September 6, 2011*, the Defendants will enforce Illinois statute 10 ILCS 5/7-10 and permit prospective candidates to circulate petitions collecting the signatures from voters within a candidate's prospective district that are required to place the candidate on the ballot for the 2012

---

[1]      Plaintiffs intend to seek to permanently enjoin enforcement of P.A. 97-14 in its entirety after the completion of discovery as set forth herein.

1

Illinois primary elections for the United States House of Representatives.[2]  There is no prospect that the discovery, motion practice, hearings, and rulings needed to resolve Plaintiffs' claims will be completed before September 6, 2011.  Accordingly, in the absence of the preliminary injunction requested in this motion, the period for circulating petitions will commence while the legality of the Proposed Congressional Plan and the congressional districts it creates is still (very much) in doubt.

3.     Furthermore, local and county election authorities throughout the State of Illinois are vested with the responsibility to take specific actions at the direction of the State Board of Elections (the "Board") to implement P.A. 97-14.  *See, e.g.*, 10 ILCS 5/11-1; 10 ILCS 5/11-2. On information and belief, at the direction of the Board, local and county election authorities are in fact engaged in a variety of activities aimed at implementing the Proposed Congressional Plan, including but not limited to drawing precinct lines and sending out voter registration cards to registered voters of their district and precinct locations.

4.     To avoid irreparable injuries to voters and candidates forced to temporarily operate under a discriminatory congressional map that likely will be deemed invalid, Plaintiffs ask the Court to preliminarily enjoin the Defendants from enforcing nomination petition deadlines or otherwise enforcing the Proposed Congressional Plan.  *See Connor v. Johnson*, 402 U.S. 690, 693 (1971) (extending filing deadline for legislative candidates to an "appropriate date").  Plaintiffs also request that the Court set forth a revised schedule for circulation and acceptance of petitions for nomination to commence November 5, 2011 or pursuant to whatever schedule the Court deems appropriate.  Plaintiffs further ask that the Court order expedited

---

[2]     The first day to circulate petitions for party nominations for the United States House of Representatives for the 2012 Illinois primary election is ninety days before the last day to file petitions, *i.e.*, September 6, 2011.  10 ILCS 5/7-10.

discovery and other proceedings to facilitate a prompt resolution of this matter before the current December 5, 2011 deadline to submit petitions for congressional primary elections.

## BACKGROUND

5.      Under Illinois law, the Illinois General Assembly and Governor have a duty to enact a plan for dividing the state into congressional districts based on the results of decennial federal censuses.  The current state government—which had to adopt congressional districts in the wake of the 2010 Census—is under the unified partisan control of the Democratic Party.

6.      As set forth more fully in the Complaint (at ¶¶ 38-46), the Democratic leadership of the state Senate and House Redistricting Committees released a proposed congressional district map at approximately 4:00 a.m. on Friday, May 27, 2011, only hours before the start of the Memorial Day weekend.  No public hearings were held on the released map.  In committee and on the House floor, Republican state legislators questioned why the Democratic leadership failed to have public hearings on the map, failed to explain why there was only one majority-Latino district, why the proposed districts appeared less compact than the current districts, and why the proposed districts divided recognized communities of interest.  Nevertheless, on Memorial Day, May 30, 2011, the Illinois House of Representatives passed the Proposed Congressional Plan on a straight party line vote.  The  Illinois Senate passed the bill the next day, again on a straight party line vote.  On Friday, June 24, 2011, Governor Pat Quinn signed P.A. 97-14 into law.

7.      The Board and its eight members are charged with enforcing the Proposed Congressional Plan in connection with their responsibility to "[s]upervise the administration of the registration and election laws throughout the State."  10 ILCS 5/1A-8(12).  Pursuant to 10

ILCS 5/7-10, the Board will permit circulation of petitions for candidacy for the United States House of Representatives on September 6, 2011.

A. **The Proposed Congressional Plan Dilutes Latino Votes And Uses Racial And Partisan Gerrymandering.**

8. The Proposed Congressional Plan packs excessive numbers of Latino voters into the proposed fourth congressional district, unnecessarily "wasting" the supermajority of Latino votes in that district, while also diluting the influence of Latino voters in proposed Districts 3 and 5. At 15.8% of Illinois' total population, Latinos are now the largest minority group in the state of Illinois. Despite Illinois' large and growing Latino population, the Proposed Congressional Plan contains only one majority-Latino district, District 4, out of the 18 districts created. Latinos make up 65.92% of the proposed District 4 voting age population ("VAP"), far more than is necessary to allow the election of a candidate who is the choice of Latino voters. *See* Compl. Ex. E. No other district in the Proposed Congressional Plan has a Latino VAP that exceeds 25%, but 7 other districts have a Latino VAP that exceeds 10%. *See id.*

9. The district with the next largest Latino population in the Proposed Congressional Plan is proposed District 3. Its VAP is 24.64% Latino, which represents a reduction in the 29.31% Latino VAP in current District 3. *See id.* Proposed District 5's VAP is 16.05% Latino, a reduction from the 24.56% Latino VAP in current District 5. *See id.* Thus, the Proposed Congressional Plan dilutes the votes of Latino voters in proposed Districts 3, 4, and 5 by unnecessarily packing Latino voters into proposed District 4, thereby reducing the Latino voter population in proposed Districts 3 and 5.

10. In addition, the State of Illinois used race as the predominant factor in shaping proposed District 4. Proposed District 4 is gerrymandered in an "earmuff" shape with the two "muffs" capturing two predominately Latino neighborhoods. *See* Compl. Ex. B. Those

4

neighborhoods are connected only by the earmuff's "headband," a narrow strip running along U.S. Interstate 294. In judicial proceedings following the 1990 census, a Latino-majority district with a strikingly similar shape was created in the same location. *Hastert v. State Bd. of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991). At the time, the number of Latinos living in Cook County was roughly half of its current number, and it was believed that the "earmuff" district was the only way to create a Latino-majority congressional district in Illinois. In subsequent judicial proceedings, this Court held that race was the predominant consideration in the creation of District 4. *King v. State Bd. of Elections*, 979 F. Supp. 582, 607 (N.D. Ill. 1996). Likewise, Latino ethnicity was the predominant consideration in the creation of proposed District 4 of the Proposed Congressional Plan. No other factor explains the "earmuff" shape of the proposed district or the extremely high concentration of Latino voters in the proposed district.

11. Proposed District 4 is far less compact than other proposed districts. *See* Compl. ¶¶ 63-66. A more compact and less bizarrely shaped majority-Latino district that respects traditional redistricting principles could have been created, but was not.

12. The Proposed Congressional Plan also is a partisan gerrymander aimed at creating a Democratic majority in the Illinois congressional delegation. The proposed map fractures traditional areas of Republican influence, such as DuPage County, across multiple districts, many connected to traditional areas of Democratic strength. Proposed Districts 3 and 11 are especially blatant examples of gerrymandering. Those two districts dismantle current District 13, represented by seven-term, Republican Congresswoman Judy Biggert, the only woman in the current Republican congressional delegation. The Proposed Congressional Plan slices current District 13 into six proposed Districts (1, 3, 5, 6, 11, and 14) in order to dilute the influence of Republican voters. It places Congresswoman Biggert into proposed District 5 with incumbent

Democratic Congressman Mike Quigley while it weights proposed District 5 to favor a Democratic candidate and draws the proposed district to contain 72% of Congressman Quigley's current district, compared to only 1.43% of Congresswoman Biggert's current district.

13.     Further evidencing its partisan animus, the Proposed Congressional Plan draws some Republican incumbents into the same districts, forcing them to run against each other or move, while it also places Republican incumbents in Democratic-leaning districts with Democratic incumbents.  The Proposed Congressional Plan does not place a single Democratic incumbent in the same Congressional district as another Democratic incumbent.

14.     As a result of the gerrymander, despite the 2010 congressional election results that installed 11 Republicans and only 8 Democrats, the Proposed Congressional Plan creates a situation in which the Illinois Congressional delegation is likely to favor Democrats 12 to 6 (with Illinois having lost one seat due to the results of the 2010 Census).

**B.     The Fair Map Represents A Superior Redistricting Alternative.**

15.     Plaintiffs propose the attached redistricting map (the "Fair Map") that redresses the numerous statutory and constitutional violations in the Proposed Congressional Plan.  *See* Ex. A (statewide map); Ex. B (Northeast Illinois map); Ex. C (Chicago area map); Ex. D (comparison to Proposed Congressional Plan); Ex. E (population analysis).  The Fair Map remedies the Proposed Congressional Plan's intentional dilution of Latino voters, respects traditional race-neutral criteria while complying with Section 2 of the Voting Rights Act (the "VRA"), and rectifies the Democrats' backroom partisan gerrymander.  The Fair Map is far more compact than the Proposed Congressional Plan.  The average Circularity Ratio of the Fair Map's

districts is 0.37, while the average of the Proposed Congressional Plan is only 0.16.[3]  In addition, the Fair Map eliminates the tortured "earmuff" shape of proposed District 4 while preserving a Latino VAP majority of 59.45% in Fair District 4.  *See* Ex. E.  Unpacking proposed District 4 also produces a 46.51% Latino VAP in Fair District 3.  *See id.*

>        C.        **Plaintiffs Challenge The Proposed Congressional Plan.**

>        16.        On July 27, 2011, Plaintiffs filed this six-count action against Defendants. Plaintiffs allege that the Proposed Congressional Plan intentionally dilutes Latino votes, in violation of Section 2 of the VRA (Count I), the Equal Protection Clause of the Fourteenth Amendment (Count II), and the Fifteenth Amendment (Count III).  Plaintiffs also allege that the Proposed Congressional Plan discriminates on the basis of race without being narrowly tailored to further a compelling state interest, in violation of the Equal Protection Clause of the Fourteenth Amendment (Count IV).  Finally, Plaintiffs allege that the Proposed Congressional Plan is an unconstitutional political gerrymander, in violation of the First Amendment (Count V) and the Equal Protection Clause of the Fourteenth Amendment (Count VI).

## ARGUMENT

**I.        A Preliminary Injunction Is Necessary To Prevent Irreparable Harm To Plaintiffs.**

>        17.        To prevail on a motion for a preliminary injunction, "a party must show that it has (1) no adequate remedy at law and will suffer irreparable harm if a preliminary injunction is denied and (2) some likelihood of success on the merits."  *Ezell v. City of Chicago*, --- F.3d ---, 2011 WL 2623511, at *5 (7th Cir. July 6, 2011).  If a "moving party meets these threshold requirements, the district court weighs the factors against one another, assessing whether the

---

[3]        The Circularity Ratio measures the area of a district to the area of a circle having the same perimeter.  Larger numbers indicate more compactness.

balance of harms favors the moving party or whether the harm to the nonmoving party or the public is sufficiently weighty that the injunction should be denied." *Id.*

### A. Without A Preliminary Injunction, Plaintiffs Will Suffer Irreparable Harm For Which There Is No Adequate Remedy At Law.

18.     If a preliminary injunction is not granted, Plaintiffs will suffer irreparable harm for which they have no adequate remedy at law.  By permitting circulation of candidate petitions based on, or otherwise implementing, the Proposed Congressional Plan, Defendants will be enforcing an unconstitutional redistricting plan that racially discriminates against Latino voters and constitutes a blatant and unlawful political gerrymander.  There is no remedy at law for the irreparable harm that the Plaintiff voters will suffer in having their constitutional right to vote compromised as a result of the implementation of the Proposed Congressional Plan.  *See, e.g.*, *Spirit Lake Tribe v. Benson County, N.D.*, 2010 WL 4226614, at *4 (D.N.D. Oct. 21, 2010) ("An official action that has a disparate impact on the right to vote of a protected class under the Voting Rights Act, needs to be closely scrutinized as there is simply no remedy at law for such harm other than an injunction.").

19.     Furthermore, if the Board continues with its present schedule and permits circulation of congressional candidate petitions on September 6, 2011, the Plaintiffs who are potential congressional candidates face the burden of petitioning in congressional districts that may not exist after this Court's ruling on the merits of Plaintiffs' Complaint.  These prospective candidates will be forced to accept the unlawful Proposed Congressional Plan to avoid being left behind while other candidates circulate petitions for party nominations.  In addition, potential candidates' petition efforts will be for naught if the Court later determines that the Proposed Congressional Plan is illegal and must be redrawn.

20.     Allowing candidates to circulate petitions before the Court rules on the merits will cause great confusion to voters.  County and local election boards may incorrectly inform voters of their district and precinct locations, and have to re-contact voters once this case concludes. Signatures from voters whose districts later change will also be defective.  10 ILCS 5/7-10 (signatures required from "electors residing in the political division").  Prospective candidates may end up running in different districts.  With all of these harms, candidates will be forced to scrutinize every past signature and likely start the petitioning process anew, causing voters to face a second round of petitions for different candidates.  Unnecessary confusion is certain.

21.     No remedy at law exists to address these injuries.  Money damages are plainly inadequate to compensate for an unconstitutional redistricting plan.  *See Spirit Lake Tribe*, 2010 WL 4226614, at *4.  Thus, the preliminary injunction is necessary to protect the rights of all Illinois voters as well as prospective Illinois congressional candidates.

**B.     Plaintiffs Have A Reasonable Likelihood Of Success On The Merits.**

22.     Even now, before Plaintiffs have had the opportunity to take the discovery needed to definitely prove all of their allegations, there is ample publicly available information for Plaintiffs to establish the necessary "some likelihood of success" to obtain a preliminary injunction.  *See Ezell*, 2011 WL 2623511, at *5.

23.     *First*, the Proposed Congressional Plan is an unlawful racial gerrymander that violates the Equal Protection Clause.  To prove that claim, Plaintiffs must show that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district."  *Miller v. Johnson*, 515 U.S. 900, 916 (1995). Such a showing triggers strict scrutiny, with *Defendants* bearing the burden of proving that the map is narrowly tailored to achieve a compelling state interest.  *Shaw v. Hunt*, 517 U.S. 899, 915

(1996). A map drawn to comply with Section 2 of the VRA is not narrowly tailored unless its use of racial discrimination is no more than "reasonably necessary to cure the anticipated § 2 violation." *Bush v. Vera*, 517 U.S. 952, 997 (1996) (Kennedy, J., concurring); *accord League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 519 (2006) (Scalia, J., concurring in the judgment in part and dissenting in part) ("a State cannot use racial considerations to achieve results beyond those that are required to comply with the statute").

24. Even without discovery it is clear that race was the predominant factor behind the creation of proposed District 4. No other reasonable explanation accounts for that district's tortured earmuff shape, which connects a predominantly Latino community on Chicago's near northwest side with a predominantly Latino community on Chicago's near southwest side through a narrow band that runs along Interstate 294. Plus, proposed District 4 is substantially similar to the district that this Court created after the 1990 census to enfranchise Latinos when that community was half its current size. *Hastert v. State Bd. of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991). This Court has already concluded that race predominated in the creation of that district. *King v. State Bd. of Elections*, 979 F. Supp. 582, 607 (N.D. Ill. 1996). The same conclusion is warranted here.

25. Defendants cannot show that the Proposed Congressional Plan is narrowly tailored to comply with the VRA. The Proposed Congressional Plan disregards substantial gains in the Latino population over the last two decades and abandons traditional race-neutral principles such as compactness. It is possible to draw a far more narrowly tailored map that complies with Section 2 of the VRA.

26. The attached Fair Map is such a map. Fair District 4, with a 59.45% Latino VAP, readily allows Latino voters to elect a candidate of their choice. *See* Ex. E. Moreover, the Fair

Map adheres to traditional race-neutral criteria such as compactness. While proposed District 4 has a circularity ratio of 0.05, Fair District 4 has a circularity ratio of 0.32. The substantially higher circularity ratio of Fair District 4 indicates that the Fair Map is far more compact than the challenged map.

27. Because the Proposed Congressional Plan discriminates on the basis of race more than is reasonably necessary to comply with Section 2 of the VRA, it violates the Constitution.

28. *Second,* the Proposed Congressional Plan intentionally discriminates against Latinos by diluting their votes. To succeed on the merits, Plaintiffs must show that that "'under the totality of the circumstances, . . . the political processes leading to nomination or election . . . are not equally open to participation by members of a class of citizens'" because of intentional discrimination. *United States v. Brown*, 561 F.3d 420, 432-33 (5th Cir. 2009); *see also Rogers v. Lodge*, 458 U.S. 613, 617 (1982). "'[R]acial discrimination need only be one purpose, and not even a primary purpose, of an official act' for a violation to occur." *Brown*, 561 F.3d at 433.

29. Although discovery into the process by which the State of Illinois developed the Proposed Congressional Plan will supply additional evidence, there already is "some likelihood" that Plaintiffs will satisfy this test. Latinos comprise Illinois' largest minority group at 15.8% of the total population, but the Proposed Congressional Plan affords them with only one majority Latino district out of 18 total districts. That one district, packed with a supermajority of 65.92% Latino VAP, isolates far more Latino voters than necessary and thereby wastes Latinos' votes. Packing Latino voters into proposed District 4 also allowed the State to intentionally reduce Latino VAP in neighboring districts and preserve them as white-dominated enclaves. Latino VAP dropped from 29.31% in current District 3 to 24.64% in proposed District 3 and plummeted from 24.56% in current District 5 to 16.05% in proposed District 5. Intentional discrimination

11

against Latinos likely caused this substantial dilution in Latino voting power. *See Brown*, 561 F.3d at 433 (discriminatory intent provable through "direct or indirect circumstantial evidence").

30. Numerous "'[d]epartures from the normal procedural sequence'" further suggest that the Proposed Congressional Plan is a product of racial discrimination. *See Brown*, 561 F.3d at 433. The State Redistricting Committees promised public hearings but blocked public questioning of its members at those hearings. The Senate Redistricting Committee chairman further promised to release the proposed map before public hearings but instead released the map after public hearings had concluded and at 4:00 a.m. on the Friday before Memorial Day weekend. The Proposed Congressional Plan cleared the Illinois legislature by the following Tuesday, ensuring the public's attention was diverted over the holiday weekend.

31. *Third*, the Proposed Congressional Plan is an unconstitutional political gerrymander. By deftly redrawing congressional district boundaries, the Democratic-controlled political branches reversed the results of the 2010 election, turning Illinois from a State with 11 Republican and 8 Democratic representatives into a State with a likely 6 to 12 Republican disadvantage. The proposed map fractures traditional Republican communities of interest, such as DuPage County, pits Republican incumbents against one another, and places other Republican incumbents in safe Democratic districts. No Republican state legislator voted for the Proposed Congressional Plan, and no Democratic state legislator voted against it.

32. Plaintiffs expect that discovery will reveal a wealth of additional lay and expert evidence that the Proposed Congressional Plan is an unconstitutional political gerrymander.

33. Although the proper standard for judging political gerrymander claims has yet to be articulated, the undeniable aggressiveness of the gerrymander enacted by the Proposed Congressional Plan violates the Constitution in at least two ways. It penalizes Republican voters

for their expression of political views and exercise of associational rights in violation of the First Amendment. It also discriminates against Republican voters in violation of the Equal Protection Clause of the Fourteenth Amendment. *See Vieth v. Jubelirer*, 541 U.S. 267, 306-17 (2004) (Kennedy, J., concurring in judgment); *Davis v. Bandemer*, 478 U.S. 109 (1986).

34. Because "some likelihood of success on the merits" exists under any of Plaintiffs' causes of action, a preliminary injunction is necessary. *Ezell*, 2011 WL 2623511, at *5.

**C.      The Balance Of Harms Weighs In Favor Of Plaintiffs.**

35. The final consideration in ruling on a motion for preliminary injunctive relief requires balancing "the irreparable harm the non-moving party will suffer if preliminary relief is granted . . . against the irreparable harm to the moving party if relief is denied; and . . . the public interest, meaning the consequences of granting or denying the injunction to non-parties." *Abbott Labs. v. Mead Johnson & Co.*, 971 F.2d 6, 11-12 (7th Cir. 1992).

36. Here, the balance of harms weighs greatly in favor of a preliminary injunction. The harm to Defendants or the voters from a preliminary injunction is minimal. Entry of a preliminary injunction will serve only to temporarily delay the circulation of petitions and will avoid duplicative work and confusion if the district boundaries are changed. With expedited discovery and case management, there will be ample time for Defendants and prospective candidates to obtain signatures for petitions for primary elections, for those elections to be held, and for a subsequent general election that complies with federal and state law.

37. Whatever modest harms, if any, are visited on Defendants, they pale in comparison to those resulting if no injunction issues. As the Supreme Court has recognized, "No right is more precious in a free country than that of having a voice in the election of those who make the laws under which, as good citizens, we must live. Other rights, even the most basic,

are illusory if the right to vote is undermined. Our Constitution leaves no room for classification of people in a way that unnecessarily abridges this right." *Wesberry v. Sanders*, 376 U.S. 1, 17-18 (1964). The Proposed Congressional Plan abridges this right through intentional vote dilution, unconstitutional racial gerrymandering, and unlawful partisan gerrymandering. Given the momentous interests at stake in this litigation, the harm to Plaintiffs and to the public of implementing an unconstitutional and unlawful redistricting plan is extreme.

## II.    Expediting Discovery And Other Proceedings Is Necessary To Resolve This Matter Efficiently And Completely.

38.    Courts have inherent power to control their docket and manage discovery to further the interests of justice. *See, e.g., A. Bauer Mech., Inc. v. Joint Arbitration Bd.*, 562 F.3d 784, 790 (7th Cir. 2009). Expedited discovery can provide "a fuller record for the court when deciding whether to issue a preliminary injunction." *Nobel Biocare USA, Inc. v. Lynch*, 1999 WL 958501, at *4 (N.D. Ill. Sept. 15, 1999); *see also VMS/PCA Ltd. P'ship v. PCA Partners Ltd. P'ship*, 727 F. Supp. 1167, 1168-69 (N.D. Ill. 1989) (parties engaged in expedited discovery pending hearing on preliminary injunction).

39.    Here, expedited discovery clearly is warranted in light of the looming 2012 election season, which is directly impacted by the Proposed Congressional Plan at issue in this action. Pursuant to 10 ILCS 5/7-12, as recently amended by Public Act 96-1008, the first day to file completed petitions for party nominations for United States Congress for the 2012 Illinois primary election is November 28, 2011. The last day to file petitions for party nominations for United States Congress for the 2012 Illinois primary election is December 5, 2011.

40.    Given the close proximity of these petition deadlines, Plaintiffs request that the Court order expedited discovery and other proceedings needed to resolve this case. Expediting discovery and other proceedings will facilitate a prompt resolution to this matter, ensuring that

potential candidates will have sufficient time to comply with petition requirements and make necessary campaign arrangements for the primary season to proceed.[4]

## CONCLUSION

WHEREFORE, Plaintiffs respectfully request this Court grant this Motion for a Preliminary Injunction and Expedited Discovery, and enter an Order:

(a)     Enjoining Defendants, as well as their agents, employees, and those acting in concert with them, including local and county election officials, from enforcing Illinois Statutes 10 ILCS 5/7-10 or 10 ILCS 5/7-12(1) as they relate to the creation, circulation, and acceptance of petitions for nomination to serve in the United States House of Representatives;

(b)     Enjoining Defendants, as well as their agents, employees, and those acting in concert with them, including local and county election officials, from taking any action to enforce or implement P.A. 97-14, including publishing maps of the proposed congressional districts or creating forms for congressional petitions for nomination;

(d)     Directing Defendants to notify local and county election authorities through written communication to immediately stop taking any action designed to effectuate the implementation of P.L. 97-14 pending further order of the Court;

(e)     Setting forth a revised schedule for circulation and acceptance of petitions for nomination to commence on November 5, 2011 or pursuant to whatever schedule the Court deems appropriate;

(f)     Expediting discovery and other proceedings in this matter; and

(g)     Granting such other and further relief as this Court may deem just and proper.

---

[4]     Plaintiffs will work with counsel for Defendants to submit an agreed discovery schedule three days after the Court grants expedited discovery. If the parties cannot agree, each side shall submit its own schedule for the Court's evaluation.

Dated:  Aug. 4, 2011                        Respectfully submitted,

/s/ Lori E. Lightfoot

Tyrone C. Fahner
John A. Janicik
Lori E. Lightfoot
Joshua D. Yount
Dana S. Douglas
Thomas V. Panoff
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois  60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for Plaintiffs*

# Exhibit A:
# Fair Map, Statewide



Jo Daviess
Stephenson
Winnebago
Boone
McHenry
10
Lake
8
9
Carroll
Ogle
Kane
3
5
6
Cook
DeKalb
DuPage
7
4
16
Whiteside
Lee
14
13
1
Kendall
Will
Rock Island
Bureau
Henry
LaSalle
Grundy
Mercer
Putnam
2
Kankakee
Stark
Marshall
Knox
Livingston
Henderson
Warren
Peoria
Woodford
11
Iroquois
Ford
Tazewell
McLean
McDonough
Fulton
Hancock
17
Mason
Schuyler
De Witt
18
Logan
Champaign
Vermilion
Menard
Piatt
Adams
Brown
Cass
Macon
Douglas
Sangamon
Morgan
Edgar
Pike
Scott
Moultrie
Christian
Coles
Shelby
Greene
Clark
Macoupin
Cumberland
Calhoun
Montgomery
Effingham
Jersey
Fayette
Jasper
Crawford
Bond
Madison
Clay
15
Richland
Lawrence
Clinton
Marion
St. Clair
Wabash
Wayne
Edwards
Washington
Jefferson
Monroe
Perry
Hamilton
White
Randolph
Franklin
12
Jackson
Williamson
Saline
Gallatin
Union
Johnson
Hardin
Pope
Alexander
Pulaski
Massac

# Exhibit B:
# Fair Map, Northeast Illinois



# Exhibit C:
# Fair Map, Chicago Area



# Exhibit D:
# Comparison Between Proposed
# Congressional Plan And Fair Map

**Democrats' Proposal (P.A. 97-14)**

**The Fair Congressional Map**



**Democrats' Proposal (P.A. 97-14)**          **The Fair Congressional Map**



# Exhibit E:
# Fair Map's Population Analysis

| Fair Map District | Population | African-American Total Pop. | VAP | Latino Total Pop. | VAP | Asian Total Pop. | VAP |
|---|---|---|---|---|---|---|---|
| 1 | 712,813 | 51.18% | 50.04% | 7.98% | 6.67% | 1.84% | 2.00% |
| 2 | 712,813 | 52.03% | 50.11% | 14.25% | 12.40% | 0.65% | 0.70% |
| 3 | 712,813 | 8.14% | 7.70% | 51.80% | 46.51% | 4.16% | 4.55% |
| 4 | 712,813 | 7.64% | 7.95% | 65.04% | 59.45% | 2.48% | 2.76% |
| 5 | 712,813 | 6.53% | 6.22% | 14.18% | 12.35% | 9.49% | 9.34% |
| 6 | 712,813 | 3.96% | 3.53% | 16.59% | 13.92% | 11.19% | 11.16% |
| 7 | 712,812 | 53.76% | 50.14% | 6.74% | 6.11% | 6.57% | 7.39% |
| 8 | 712,813 | 2.61% | 2.28% | 17.18% | 14.34% | 5.40% | 5.31% |
| 9 | 712,813 | 5.52% | 5.23% | 12.09% | 10.13% | 12.76% | 12.86% |
| 10 | 712,812 | 6.89% | 6.54% | 19.67% | 16.75% | 6.26% | 6.24% |
| 11 | 712,813 | 7.69% | 6.86% | 5.89% | 4.78% | 3.84% | 4.08% |
| 12 | 712,813 | 16.94% | 15.56% | 2.92% | 2.44% | 0.99% | 1.02% |
| 13 | 712,813 | 6.32% | 5.86% | 11.24% | 9.38% | 6.20% | 6.26% |
| 14 | 712,813 | 7.28% | 6.93% | 21.44% | 18.60% | 6.05% | 5.93% |
| 15 | 712,813 | 3.15% | 3.21% | 1.88% | 1.61% | 0.59% | 0.58% |
| 16 | 712,813 | 7.37% | 6.59% | 9.01% | 7.05% | 1.53% | 1.51% |
| 17 | 712,813 | 4.62% | 4.29% | 4.28% | 3.44% | 1.01% | 0.97% |
| 18 | 712,813 | 10.21% | 8.93% | 2.26% | 1.86% | 1.33% | 1.30% |