**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) | |
| Plaintiffs, | ) | Case No. 11-C-5065 |
| v. | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) | Hon. John D. Tinder<br>Hon. Joan H. Lefkow<br>Hon. Robert L. Miller, Jr.<br>(3-judge court convened pursuant to 28 U.S.C. § 2284) |
| Defendants. | ) | |

**MEMORANDUM OF LAW IN SUPPORT OF**
**DEFENDANTS' MOTION TO DISMISS**

Defendants, by their attorney Lisa Madigan, Attorney General for the State of Illinois, respectfully move this Court pursuant to Fed. R. Civ. P. 12(b)(6) for an order dismissing Plaintiffs' Complaint. In support of this motion, Defendants submit this memorandum.

## Introduction

Plaintiffs – including 10 Republican U.S. Representatives – have filed a complaint containing four counts concerning purported harm to Latino voters in three Chicago-area Congressional Districts (Counts I-IV) and two counts concerning alleged political gerrymandering across the State (Counts V-VI). Most of the Complaint focuses on alleged partisan gerrymandering, but every court to address such claims – including the U.S. Supreme Court – has rejected them. When the allegations in support of these meritless claims are stripped away, the few remaining allegations fall well short of pleading claims for racial gerrymandering or vote dilution. As such, the entire Complaint should be dismissed.

## **Argument**

A motion under Rule 12(b)(6) challenges the sufficiency of the complaint to state a claim upon which relief may be granted. *Hallinan v. Fraternal Order of Police of Chicago Lodge No. 7*, 570 F.3d 811, 820 (7th Cir. 2009). To survive a Rule 12(b)(6) motion, a plaintiff's "factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007) (quoting *Conley v. Gibson*, 355 U.S. 41, 47 (1957)). Put differently, a "complaint must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, ___U.S. ___, 129 S.Ct. 1937, 1949 (2009) (quoting *Twombly*, 550 U.S. at 570). "A pleading that offers 'labels and conclusions' or 'a formulaic recitation of the elements of a cause of action will not do.'" *Iqbal*, 129 S. Ct. at 1949 (quoting *Twombly*, 550 U.S. at 555). "Nor does a complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" *Id*. (quoting *Twombly*, 550 U.S. at 557).[1]

### I. Plaintiffs Fail to State a Claim Under the Voting Rights Act of 1965

In Count I of the Complaint, the Racial Dilution Plaintiffs claim that Districts 3, 4, and 5 intentionally dilute Latinos' votes in violation of Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973 ("VRA"). Specifically, Plaintiffs claim the Congressional Map dilutes the votes of Latino voters by "packing" them into District 4 and thereby "reducing" their percentages in Districts 3 and 5. (Compl. ¶¶ 1-2, 52-54, 58, 110, 115.) This count should be dismissed for failure to allege facts sufficient to state a claim for relief.

---

[1] Plaintiffs "who merely parrot the statutory language of the claims that they are pleading … rather than providing some specific facts to ground those legal claims … have not provided the 'showing' required by Rule 8." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009); *see also Giannopoulos v. Iberia Lineas Aereas de Espana, S.A.*, 2011 WL 3166159, at *2 (N.D. Ill. July 27, 2011); *Norington v. Daniels*, 2011 WL 2214128, at *1 (N.D. Ind. June 6, 2011).

**A. Section 2 of The Voting Rights Act**

Section 2 of the VRA prohibits the "denial or abridgement of the right of any citizen of the United States to vote on account of race or color." 42 U.S.C. § 1973. An electoral mechanism violates Section 2 if it operates to minimize or cancel out a racial group's ability to elect its preferred candidates. *Thornburg v. Gingles*, 478 U.S. 30, 48 (1986). To establish a Section 2 Voting Right Act violation, a plaintiff must first allege as a threshold matter the existence of three facts: (1) the minority group is sufficiently large and geographically compact to constitute a majority in a single-member district; (2) the minority group is politically cohesive; and (3) the white majority votes sufficiently as a bloc to enable it usually to defeat the minority group's preferred candidate. *Id.* at 48-51. "Unless these points are established, there neither has been a wrong nor can [there] be a remedy." *Growe v. Emison*, 507 U.S. 25, 40-41 (1993). In addition, when applied to a claim that single-member districts dilute minority votes, the first *Gingles* precondition requires "the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 429-30 (2006) ("*LULAC*"). Only where the plaintiff has established the three *Gingles* requirements does a court proceed to analyze whether a violation has occurred based on the totality of the circumstances. *LULAC*, 548 U.S. at 425-26.

**B. Count I Fails to Allege the First *Gingles* Requirement**

Plaintiffs fail to state a claim under Section 2 because they nowhere plead the first *Gingles* requirement. Districts 3, 4, and 5 are single-member districts, and Plaintiffs do not allege that another district beyond District 4 could be created from among those districts with a sufficiently large and compact Latino population for Latino voters to elect candidates of their

choice. *See De Grandy*, 512 U.S. at 1008 (first precondition requires ability to create more than existing number of majority-minority districts). Instead, Plaintiffs make only a sweeping generalization about a growing Latino population across Illinois and in Cook County. (Compl. ¶ 51.)

Significantly, Plaintiffs not only fail to plead the first *Gingles* precondition, but the facts Plaintiffs do plead make it impossible for them to satisfy it. Plaintiffs allege that Latino voters represent only 24.64% and 16.05% of the voting age population in District 3 and District 5, respectively, and 65.92% of the voting age population in District 4. (Compl. ¶¶ 52-54.) Regardless of how the Latino populations could be configured, Plaintiffs' own numbers demonstrate that there is no way a second district can be drawn with over a 50% Latino voting age population, as required under the first *Gingles* requirement. *See Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct. 1231, 1245-46 (2009); *LULAC*, 548 U.S. at 445 (Kennedy, J.). Thus, Plaintiffs cannot allege the first *Gingles* precondition.

In addition, Plaintiffs are alleging only that Latino voters in Districts 3 and 5 will be prevented from "having any significant *influence* in choosing primary and general election candidates of their choice." (Compl. ¶¶ 2, 110.) While they attempt to cast their VRA claim otherwise, Plaintiffs leap from the former statement to the conclusion that "[a]s a result, the Proposed Congressional Plan … affords the Racial Dilution Plaintiffs less opportunity to participate in the political process and to elect representatives of their choice." (Compl. ¶ 111.) Section 2 is not violated, however, where a minority group is only large enough to *influence* election results, as opposed to *elect* candidates of their choice. *LULAC*, 548 U.S. at 445-46 (Kennedy, J.); *McNeil v. Springfield Park Dist.*, 851 F.2d 937, 947 (7th Cir. 1988). In sum,

because Plaintiffs fail to allege the first requirement of *Gingles* – and cannot do so – Count I should be dismissed for failure to state a claim.

### C. Count I Fails to Sufficiently Plead *Gingles* Requirements 2 and 3

Plaintiffs' allegations with respect to the second and third *Gingles* requirements fail to state a claim under Rule 8 of the Federal Rules of Civil Procedure because Plaintiffs simply parrot those requirements and fail to allege the third requirement with respect to Cook County or Chicago, let alone Districts 3, 4, and 5, specifically. The sole allegation regarding the second *Gingles* requirement is that "Latino voters traditionally and consistently vote cohesively in the State of Illinois, particularly in Cook County." The sole allegation as to the third requirement is that "[t]raditionally, elections in Illinois" have been racially and ethnically polarized and white non-Latinos and African-Americans have voted sufficiently as blocks to defeat Latino voters' preferred candidates. (Compl. ¶¶ 56-57.) These allegations only restate the *Gingles* requirements and only discuss Illinois broadly. But, "[t]he inquiry into the existence of vote dilution . . . is district specific." *Gingles*, 478 U.S. at 59 n. 28. And Plaintiffs' conclusory allegations and the failure to sufficiently allege bloc voting along racial lines in the challenged districts are fatal pleading defects. *See Iqbal*, __ U.S. __, 129 S. Ct. at 1949.

### D. Plaintiffs Fail to Make Any Allegations Relevant to a Totality-of-the-Circumstances Analysis

Plaintiffs' VRA claim fails even if the *Gingles* preconditions were pled in the Complaint. Plaintiffs fail to allege any facts to support their claim of intent to dilute or to allege a single factor relevant to *LULAC*'s totality-of-the-circumstances analysis under Section 2. In assessing the totality of the circumstances under Section 2, the Supreme Court has focused on the following factors:

> the history of voting-related discrimination in the State or political subdivision; the extent to which voting in the elections of the State or political subdivision is racially polarized; the extent to which the State or political subdivision has used voting practices or procedures that tend to enhance the opportunity for discrimination against the minority group ...; the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, which hinder their ability to participate effectively in the political process; the use of overt or subtle racial appeals in political campaigns; and the extent to which members of the minority group have been elected to public office in the jurisdiction.

*LULAC*, 548 U.S. at 425-26 (*citing Gingles*) (also noting the proportionality of majority-minority districts to a minority group's population in the relevant area as a consideration).

Plaintiffs fail to allege any of these factors in a manner favorable to their claim. The closest Plaintiffs come are their conclusory, non-district-specific polarization allegations and their allegation that "[d]espite Illinois's large and growing Latino population, the Proposed Congressional Plan contains only one majority district, District 4, out of the eighteen districts created." (Compl. ¶¶ 52, 57.) Again, however, vote dilution is a district-specific, not statewide inquiry. *Gingles,* 478 U.S. at 59 n. 28. While Plaintiffs fail to allege any of the above factors in a manner favorable to their claim, they do include an allegation defeating their claim: Plaintiffs allege that District 4 was originally drawn to *provide* Latino voters an opportunity to elect candidates of their choice. (Compl. ¶¶ 2, 60).

Because Plaintiffs fail to allege sufficient allegations to state a claim for relief under either the *Gingles* preconditions or a totality-of-the-circumstances analysis, Plaintiffs have failed to state a claim for vote dilution under Section 2 of the VRA, and Count I should be dismissed.

## II. Count II Fails to State a Claim for Intentional Vote Dilution Under the Fourteenth Amendment

The Racial Dilution Plaintiffs likewise fail to state a claim in Count II for vote dilution under the Fourteenth Amendment. To state a Fourteenth Amendment claim for vote dilution,

Plaintiffs must allege that the challenged districting was "conceived or operated as [a] purposeful devic[e] to further racial discrimination by minimizing, cancelling out or diluting the voting strength of racial elements of the voting population." *City of Mobile v. Bolden*, 446 U.S. 55, 66 (1980) (Stewart, J., plurality opinion); *Ketchum v. Byrne,* 740 F.2d 1398, 1406 (7th Cir. 1984). In evaluating claims of vote dilution under the Fourteenth Amendment, courts have applied a totality-of-the-circumstances analysis focusing on factors set out in *Zimmer v. McKeithen,* 485 F.2d 1297 (5th Cir. 1973). *See, e.g., Rogers v. Lodge,* 458 U.S. 613, 620-22 (1982). The factors courts have focused on when considering Fourteenth Amendment vote dilution claims mirror the VRA totality-of-the-circumstances factors because the VRA factors were also based on *Zimmer*. *See Gingles*, 478 U.S. at 36 n. 4.

Plaintiffs do not make any allegations in support of their Fourteenth Amendment claim distinct from their VRA claim. Thus, Plaintiffs fail to state a claim for vote dilution under the Fourteenth Amendment for the same reasons they have failed to state a claim for intentional vote dilution under the VRA. *See* Section I.D., *supra*.

## III. Count IV Fails to State a Claim for Racial Gerrymandering Under the Fourteenth Amendment

In Count IV, the Racial Gerrymander Plaintiff alleges that District 4 was impermissibly racially gerrymandered to create a majority Latino district in violation of the Fourteenth Amendment. This count also should be dismissed for failure to state a claim.

The Complaint fails to make sufficient factual allegations to support the claim that traditional districting principles were subordinated to racial considerations. In fact, the Complaint demonstrates that traditional districting principles were respected, as "[a] Latino majority district with a very similar shape was created in the same location after the 1990 census in judicial proceedings over redistricting." (Compl. at ¶ 60.) In other words, District 4 has

essentially retained its configuration for over two decades. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983) (preserving the core of prior districts is a traditional districting principle). As such, Plaintiff fails to sufficiently allege that traditional districting principles were disregarded. Thus, because Plaintiff fails to state a claim for relief, Count IV should be dismissed.

## IV. Count III Fails Because the Fifteenth Amendment Does Not Apply to Vote Dilution

The Supreme Court has limited the reach of the Fifteenth Amendment to instances of a purposeful and discriminatory denial or abridgment of the right to vote, specifically refusing to extend its reach to cover allegations of vote dilution. Because Count III alleges vote dilution, and not the denial or abridgement of the right to vote, it should be dismissed.

The Fifteenth Amendment provides that the "right of citizens of the United States to vote shall not be denied or abridged by the United States or by any State on account of race, color or previous condition of servitude." U.S. CONST. amend. XV, § 1. The Fifteenth Amendment "prohibits only purposefully discriminatory denial or abridgment by government of the *freedom to vote*...." *Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality opinion) (emphasis added). The Fifteenth Amendment applies to those governmental actions that seek to "deny the vote," "confine and restrict the voting franchise," or "exclude … from voting" a class of voters on the basis of race. *See Rice v. Cayetano*, 528 U.S. 495, 513-14 (2000).

The crux of Racial Dilution Plaintiffs' claim is not that the Congressional Map denies their, or anyone else's, right to vote, but rather that it "*dilutes*" it. (Compl. ¶ 120) (emphasis added). Specifically, Count III alleges that Latinos in District 4 "will see their votes *wasted*" and that Latinos in Districts 3 and 5 will not have "any significant *influence* in choosing" candidates to their liking. *Id.* (emphasis added). Even taken as true, however, these allegations of vote dilution do not state a valid cause of action under the Fifteenth Amendment.

The Supreme Court has repeatedly declined to recognize an allegation of vote dilution as a Fifteenth Amendment claim. *See Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 334 n. 3 (2000) ("It is established that the Supreme Court has "never held that vote dilution violates the Fifteenth Amendment … [it] never even 'suggested' as much") (citations omitted); *Bolden*, 446 U.S. at 65 (because African-Americans could "register and vote without hindrance," the protection of the Fifteenth Amendment was not implicated) (plurality opinion); *Beer v. United States*, 425 U.S. 130, 142 n. 14 (1976); *Osburn v. Cox*, 369 F.3d 1283, 1288 (11th Cir. 2004) ("The Supreme Court has recognized that the Fifteenth Amendment protects the right to register and to vote, but it has never held or even suggested that vote dilution violates the Fifteenth Amendment").

Accordingly, district courts have applied this analysis to dismiss Fifteenth Amendment dilution claims. *See Polish Am. Congress v. City of Chicago*, 211 F. Supp. 2d 1098, 1107 (N.D. Ill. 2002) (Fifteenth Amendment racial dilution claim dismissed because Fifteenth Amendment "has been successfully invoked only by plaintiffs who allege government interference with their abilities to register to vote or to cast ballots in elections because of their race or color"); *see also Arizona Minority Coalition for Fair Redistricting v. Arizona Independent Redistricting Com'n*., 366 F. Supp. 2d 887, 911 (D. Ariz. 2005) (Fifteenth Amendment claim dismissed where plaintiffs did "not claim that they have been denied such [ballot] access; rather, they allege that the 2002 Plan does not give them as much *influence* as they would like in a single legislative district").

Plaintiffs attempt to remedy this fatal defect in Count III by grafting a single sentence onto that count: "As a result, the Proposed Congressional Plan denies or abridges the right of the Racial Dilution Plaintiffs to vote, on account of their race or color." (Compl. ¶ 121.) But the

Complaint includes no factual support for the proposition that anyone's right to vote has been or will be denied. Further, this single conclusory and entirely unsupported sentence is not enough to save the claim. *See Iqbal*, __ U.S. __, 129 S. Ct. at 1949 (formulaic recitation of elements and bald assertions without factual support are insufficient). For the foregoing reasons, Count III should be dismissed.

## V. The Partisan Gerrymander Claims in Counts V and VI Should Be Dismissed

### A. These Claims Fail to State a Claim for Which Relief May be Granted

In Counts V and VI, the Partisan Gerrymander Plaintiffs allege that the Congressional Map violates their First Amendment and Equal Protection rights, respectively. Both claims rest on the assertion that the Map, on a statewide basis and with regard to Districts 3 and 11, "intentionally and unreasonably dilutes the votes of Republican voters in a manner that gives Republicans a far smaller chance of electing candidates of their choice than would result from traditional, non-partisan redistricting." (Compl. ¶¶ 131, 136.)

Partisan gerrymandering has existed since this country was founded. *See Vieth v. Jubelirer*, 541 U.S. 267, 274-76 (2004) (plurality opinion). Since partisan gerrymander claims were considered by the Supreme Court 25 years ago in *Davis v. Bandemer,* 478 U.S. 109 (1986), however, no court anywhere in the country has ever invalidated a legislative redistricting plan as a partisan gerrymander, while over a dozen decisions have rejected such claims. *See, e.g., Vieth*, 267, 279-80 n. 6 (plurality opinion); *Smith v. Boyle*, 144 F.3d 1060 (7th Cir. 1998) (affirming dismissal of political claim against Illinois's Supreme Court election districts); *La Porte County Republican Central Comm. v. Board of Comm'rs of County of La Porte*, 43 F.3d 1126, 1128 (7th Cir. 1994) (affirming dismissal of partisan gerrymander claim); *Illinois Legislative Redistricting Comm'n v. LaPaille*, 782 F. Supp. 1272, 1276 (N.D. Ill. 1992) (dismissing claim); *Hastert v.*

*State Bd. of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991) (three judge panel) (rejecting claim following trial).

Plaintiffs do not explicitly offer any standard by which the Court may judge their claims. Instead, they just allege certain facts that they contend are enough to invalidate the Congressional Map. Specifically, the Complaint alleges that:

> (1) Democrats controlled the process and did not allow for review, comment, and debate in the manner preferred by Republicans prior to passage (Compl. ¶¶ 38-46);
> (2) Illinois is "relatively evenly divided between Republican and Democratic Voters"[2] (Compl. ¶¶ 70-74);
> (3) the Congressional Map "slices," "packs," and adds "Democratic enclaves" and "suburban neighborhoods" to create Democratic-friendly districts (Compl. ¶¶ 75-86);
> (4) Republican lawmakers are now placed in the same district as each other or in new, less electorally-friendly, districts than their Democratic counterparts (Compl. ¶¶ 87-95);
> (5) the Congressional Map "unnecessarily splits a significant number of prominent and populous communities" and "significant Chicago suburbs" (Compl. ¶ 96); and
> (6) the Congressional Map is less compact than the present congressional map. (Compl. ¶¶ 97-100).

There is nothing new or novel about Plaintiffs' approach, however. In essence and in fact, they are utilizing Justice Powell's "fairness standard," set forth in *Davis*, 478 U.S. at 175-78 (1986) (concurring in part and dissenting in part). In *Davis*, Justice Powell identified the following allegations as relevant to his proposed standard: (1) A suspect legislative process (the exclusion of the minority party from the legislative process and mapmaking decisions, the majority party's broken promises regarding public hearings, less than two days for the minority party to review the map, and the fact that the map was passed on party line vote on the last day of session) (*Id.* at 175-76); (2) disregard of traditional political subdivisions (counties, cities, and townships are "carved up" to create oddly-shaped districts in an effort to benefit the majority

[2] The Racial Dilution Plaintiffs also cherry pick certain electoral results over the last 15 years to paint a picture of an evenly-divided political environment, though they do acknowledge that as recently as 2010 there were 12 Democratic Congressman to 7 Republicans. The 12-7 Democratic-Republican split that existed last year alone casts substantial doubt on the viability of the partisan gerrymander claims' central premise: that there is something constitutionally infirm about a map that "creates a situation" that "is likely" to result in a 12-6 Democratic-Republican split in the Congressional delegation. (Compl. ¶ 73.)

party) (*Id.* at 176-77); and (3) process governed by partisan motivations (a map is created with the purpose of creating many safe seats for the majority party at the expense of the minority party) (*Id.* at 177-78).

The Partisan Gerrymander Plaintiffs follow precisely the same script here. But the Supreme Court has already considered and rejected Justice Powell's "fairness" approach to partisan gerrymander claims. *See Vieth*, 541 U.S. at 290-91 (plurality opinion). Specifically, Justice Scalia's plurality opinion affirming the dismissal of the partisan gerrymander claim in *Vieth* rejected the fairness standard as being judicially unmanageable:

> "Fairness" does not seem to us a judicially manageable standard. Fairness is compatible with noncontiguous districts, it is compatible with districts that straddle political subdivisions, and it is compatible with a party's not winning the number of seats that mirrors the proportion of its vote. Some criterion more solid and more demonstrably met than that seems to us necessary to enable the state legislatures to discern the limits of their districting discretion, to meaningfully constrain the discretion of the courts, and to win public acceptance for the courts' intrusion into a process that is the very foundation of democratic decisionmaking.

*Vieth*, 541 U.S. at 291. Justice Kennedy's concurrence in *Vieth*, which joined Justice Scalia's four-member plurality decision dismissing the partisan gerrymander claim, agreed that the fairness standard (along with all other proposed standards discussed in *Vieth*) was an insufficient basis on which to grant relief: "The failings of the many proposed standards for measuring the burden a gerrymander imposes on representational rights make our intervention improper." *Vieth*, 541 U.S. at 317 (plurality opinion).[3] As a result, five Justices in *Vieth* held all previously-proposed standards – including Justice Powell's fairness standard – to be judicially

---

[3] Following *Vieth*, the Supreme Court has made it clear that even an allegation (which the Partisan Gerrymander Plaintiffs do not make here) that a map drawn *solely* for the purpose of partisan political gain is insufficient to state a claim for relief. *See LULAC*, 548 U.S. at 416-420. In *LULAC*, the district court had found that an unusual mid-decade redistricting was done "solely for the purpose of seizing between five and seven seats from Democratic incumbents" and that "political gain for the Republicans was 110% of the motivation for the Plan, that it was 'the entire motivation,'" *see Session v. Perry*, 298 F. Supp. 2d 451, 472-473 (E.D. Tex. 2004) (per curiam), and the Supreme Court still rejected the partisan-gerrymander claim.

unmanageable. For this reason, Plaintiffs fail to state to state a claim for relief, and this Court should dismiss Counts V and VI.

### B. The Partisan Gerrymander Plaintiffs' Claims Should Be Dismissed as Non-Justiciable Political Questions

In *Vieth*, a plurality of the Supreme Court concluded that partisan gerrymander claims were non-justiciable. *Vieth,* 541 U.S. at 278-81. The plurality opinion in *Vieth* concluded that partisan gerrymander claims, which had produced "[e]ighteen years of judicial effort with virtually nothing to show for it," are non-justiciable. *Id.* at 281. To the extent that Justice Kennedy's concurrence in the dismissal of the partisan gerrymander claims in *Vieth* may be construed to have been based on non-justiciability, *id.* at 301, Counts V and VI should be dismissed as non-justiciable political questions.

In the seven years since *Vieth*, no party has offered a standard any more manageable than those that the Court rejected over the previous 25. Plaintiffs do not even attempt to do so, and this Court should dismiss the partisan gerrymander claims as non-justiciable political questions.

For all the foregoing reasons, Plaintiffs' claims in Count V and VI should be dismissed.

## VI. Plaintiffs Have Pled Themselves Out of Court on All Counts Other than the Partisan Gerrymandering Counts

To the extent that Plaintiffs allege that Districts 3, 4, and 5 *intentionally* dilute or gerrymander Latinos' votes in violation of Section 2 of the VRA, they plead themselves out of court. In its most recent decisions considering a claim of intentional discrimination in the voting context, the Supreme Court has required plaintiffs to show that race was the predominant factor motivating districting, such that a facially neutral law is "unexplainable on grounds other than race." *See Easley v. Cromartie*, 532 U.S. 234, 241, 242 (2001). Plaintiffs spend nearly half of

the Complaint propounding an alternate explanation, that the Congressional Map, generally, and Districts 3, 4, and 5, in particular, were drawn to protect Democratic interests and incumbents.

The Complaint provides this Court with ample allegations that, accepted as true, establish it was political considerations, not race, which dictated the shape of the statewide map. (Compl. ¶¶ 4-6, 37-45, 69-101, 129-138). Plaintiffs also make allegations specific to District 3, 4, and 5, the subjects of all race-based claims in the Complaint. Plaintiffs call District 3 an "especially blatant example of partisan gerrymandering … *created to dilute Republican voters* by dismantling current District 13, represented by seven-term, Republican Congresswoman Judy Biggert . . . ." (Compl. ¶ 75) (emphasis added). Plaintiffs highlight District 5 as another district designed to dismantle current District 13, as well as a district "significantly weighted in favor of a Democratic candidate" and designed to protect the incumbent in that it contains "72% of Congressman Quigley's current district." (Compl. ¶ 77, 85-86, 91.) The Complaint also specifically references political concern for protecting Democrats as driving the shape of District 4. (Compl. at ¶¶ 5, 85) (discussing District's 4 role in the "dismantling" of a Republican incumbent's district); (Compl. at ¶ 95) (citing District 4's role in protecting a Democratic incumbent); (Compl. at ¶ 96) (the "significant Chicago suburbs" allegedly divided due to partisan motivations include Cicero and Melrose Park, two communities that make up a sizeable portion of District 4).

In so doing, the Racial Gerrymander Plaintiffs have pled themselves out of court. *See Massey v. Merrill Lynch & Co., Inc.*, 464 F.3d 642, 650 (7th Cir. 2006) (A "party may plead itself out of court by … including factual allegations that establish an impenetrable defense to its claims"); *Tamayo v. Blagojevich*, 526 F.3d 1074, 1086 (7th Cir. 2008) (A plaintiff "pleads himself out of court when it would be necessary to contradict the complaint in order to prevail on

the merits …. If the plaintiff voluntarily provides unnecessary facts in her complaint, the defendant may use those facts to demonstrate that she is not entitled to relief") (citations omitted). In alleging that politics is an explanation for the shape of Districts 3, 4, and 5, and statewide redistricting generally, Plaintiffs have contradicted themselves and alleged a "ground other than race." *Cromartie*, 526 U.S. at 546. For these reasons, Count I-IV should be dismissed.

**Conclusion**

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice.

Date: August 31, 2011

Respectfully submitted,
LISA MADIGAN,
Attorney General for the State of Illinois

*/s/* Jon Rosenblatt
Attorney for Defendants

Brent D. Stratton
Carl Bergetz
Jon Rosenblatt
Office of the Illinois Attorney General
100 West Randolph, 12th Floor
Chicago, Illinois 60601
312-814-3000