IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BREZINSKI, and LAURA WAXWEILER,<br><br>Plaintiffs,<br>v.<br><br>ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLZ, and ERNEST L. GOWEN,<br><br>Defendants. | Case No. 1:11-cv-05065<br><br>Hon. John D. Tinder<br>Hon. Joan H. Lefkow<br>Hon. Robert L. Miller, Jr.<br>(3-judge court convened pursuant to 28 U.S.C. § 2284) |

**PLAINTIFFS' RESPONSE IN OPPOSITION TO
DEFENDANTS' MOTION TO DISMISS**

Tyrone C. Fahner
John A. Janicik
Lori E. Lightfoot
Joshua D. Yount
Dana S. Douglas
Thomas V. Panoff
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for Plaintiffs*

Despite the fact that discovery is already well underway and a final merits hearing in this matter is already set for November 17, 2011, Defendants have filed a rote motion to dismiss that misreads Plaintiffs' Complaint, mischaracterizes the law governing Rule 12(b)(6), and ignores the controlling voting rights authorities. Nothing in the motion to dismiss requires that any of the well-pleaded causes of action in the Complaint be dismissed.

The Complaint alleges with significant factual detail that the congressional redistricting plan adopted by the State of Illinois is a product of intentional vote dilution of Latino voters in Districts 3, 4, and 5, in violation of Section 2 of the Voting Rights Act (Count I), the Fourteenth Amendment (Count II), and the Fifteenth Amendment (Count III); that District 4 is an obvious racial gerrymander that is not narrowly tailored to accomplish a compelling state interest, in violation of the Fourteenth Amendment (Count IV); and that the redistricting plan is a blatant partisan gerrymander against Republican voters, in violation of the First Amendment (Count V) and the Fourteenth Amendment (Count VI). Such serious and well-supported allegations—that the State of Illinois effectively disenfranchised Latino and Republican voters—should not be dismissed on threadbare arguments before all of the facts have even been gathered.

## LEGAL STANDARD

Although Defendants clearly pine for the bygone days of fact pleading, a complaint need only contain "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). "Under the notice pleading standard, of course, a complaint need not contain legal theories." *Aaron v. Mahl*, 550 F.3d 659, 666 (7th Cir. 2008). Even after *Iqbal* and *Twombly*, "[c]omplaints need not do more than narrate a plausible claim for relief." *Morrison v. YTB Int'l, Inc.*, 649 F.3d 533, 2011 WL 3132398, at *5 (7th Cir. 2011). To be plausible, "the plaintiff must give enough details about the subject-matter of the case to present a

story that holds together." *Swanson v. Citibank, N.A.*, 614 F.3d 400, 404 (7th Cir. 2010). It must "provide notice to defendants of [a plaintiff's] claims," and the Court "must accept a plaintiff's factual allegations as true." *Brooks v. Ross*, 578 F.3d 574, 581 (7th Cir. 2009).

## ARGUMENT

**I. The Complaint States Claims For Intentional Discrimination In Violation Of Section 2 Of The Voting Rights Act, The Fourteenth Amendment, and The Fifteenth Amendment.**

The Complaint alleges that Illinois's redistricting plan is the product of intentional discrimination against Latinos aimed at diluting their votes in Districts 3, 4, and 5, in violation of Section 2 of the Voting Rights Act (Count I), the Fourteenth Amendment (Count II), and the Fifteenth Amendment (Count III). Compl. ¶¶ 108-122. In the face of detailed factual allegations supporting those claims, Defendants advance a series of meritless arguments for dismissal.

**A. A Section 2 Claim Of Intentionally Discriminatory Vote Dilution Need Not Satisfy The *Gingles* Requirements.**

Defendants spend more than a quarter of their motion (at 2-5) explaining why Plaintiffs' Section 2 claim fails to satisfy requirements that do *not* apply to Plaintiffs' claim. Defendants incorrectly assume that *all* claims under Section 2 of the Voting Rights Act must satisfy the three "*Gingles* requirements." See *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986) ((1) minority group is "sufficiently large and geographically compact to constitute a majority in a single-member district"; (2) minority group is "politically cohesive"; and (3) majority votes "sufficiently as a bloc to enable it . . . usually to defeat the minority's preferred candidate"). While *Gingles* governs Section 2 cases alleging discriminatory *effects* alone, it does not apply where, as here, plaintiffs allege discriminatory *intent*.

Courts around the country—including the Seventh Circuit—widely recognize that Section 2 of "the Voting Rights Act can be violated by both intentional discrimination in the

2

drawing of district lines and facially neutral apportionment schemes that have the effect of diluting minority votes." *Garza v. County of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990); *accord Barnett v. City of Chicago*, 141 F.3d 699, 701 (7th Cir. 1998) (intentionally discriminatory "plan would violate . . . section 2 of the Voting Rights Act"); *United States v. Brown*, 561 F.3d 420 (5th Cir. 2009) (affirming finding of intentional discrimination in violation of Section 2). And the Supreme Court has been careful to distinguish intentional discrimination from other forms of vote dilution in applying the *Gingles* requirements, recognizing the compelling reasons for not applying those requirements to intentional discrimination claims. *Bartlett v. Strickland*, 129 S. Ct. 1231, 1246 (2009) (noting view of United States that "evidence of discriminatory intent 'tends to suggest that the jurisdiction is not providing an equal opportunity to minority voters'" even where certain *Gingles* factors are not present).

The Ninth Circuit has expressly held that the *Gingles* framework does not govern intentional discrimination cases. *Garza*, 918 F.2d at 769-71; *id.* at 778-79 (Kozinski, J., concurring). The *Garza* court explained that "[t]he *Gingles* requirements were articulated in a much different context." *Id.* at 770. Imposing the *Gingles* requirements on an intentional dilution claim, the court reasoned, "would prevent any redress for districting which was deliberately designed to prevent minorities from electing representatives in future elections governed by that districting," a result that is "wholly contrary to Congress' intent in enacting Section 2 of the Voting Rights Act." *Id.* at 771.

Other courts have likewise bypassed any consideration of the *Gingles* factors when faced with Section 2 claims for intentionally discriminatory vote dilution. *See Brown*, 561 F.3d at 432-33; *Dillard v. Baldwin County Bd. of Educ.*, 686 F. Supp. 1459, 1467-69 (M.D. Ala. 1988); *see also Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 360 (7th Cir. 1992) (even where

3

plaintiffs have not satisfied the effects test under Section 2, "proof of intentional discrimination under § 2(a) remains an option").

None of the cases on which Defendants rely (at 3-5) in arguing that *Gingles* governs are to the contrary. Each such decision addressed allegations of discriminatory effects, not intentional discrimination. Defendants' citations are therefore inapt. *See Garza*, 918 F.2d at 771 (distinguishing, among others, *McNeil v. Springfield Park*, 851 F.2d 937 (7th Cir. 1988)).

In short, any supposed failure to plead a *Gingles* factor is not a basis to dismiss Plaintiffs' claim of intentional discrimination under Section 2 of the Voting Rights Act.

**B. The Complaint Properly Alleges Intentional Discrimination In Violation Of Section 2, The Fourteenth Amendment, And The Fifteenth Amendment.**

Defendants also argue (at 5-7) that Counts I and II fail because Plaintiffs supposedly did not "allege any facts to support their claim of intent to dilute" or "allege a single factor relevant to [the] totality-of-the-circumstances analysis." Defendants must not have read Plaintiffs' Complaint, for it is replete with precisely those kinds of allegations.

As Defendants recognize (at 6), proportionality is a key factor in the totality analysis. *See League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 436 (2006) ("We proceed now to the totality of the circumstances, and first to the proportionality inquiry") ("*LULAC*"). The Complaint alleges that Latinos comprise 15.8% of Illinois's population and 24.0% of Cook County's population. Compl. ¶ 51. It further alleges that "[d]espite Illinois's large and growing Latino population, the Proposed Congressional Plan contains only one majority Latino district, District 4, out of the eighteen districts created." *Id.* ¶ 52 (*i.e.*, 5.6%).[1]

---

[1] Defendants incredibly contend (at 6) that this disproportionality is not "favorable to [Plaintiffs'] claim" because vote dilution claims are "district-specific." That argument makes no sense at all. For proportionality to mean anything, it must be broader than a "district-specific" concept since each district only elects one representative. Indeed, the Supreme Court has instructed lower courts to "look at proportionality statewide." *LULAC*, 548 U.S. at 437.

4

In addition, contrary to Defendants' baseless assertions (at 5), the Complaint pleads racial polarization in the electorate. *See LULAC*, 548 U.S. at 426 (listing "extent to which voting in the elections of the State or political subdivision is racially polarized" as a totality factor). The Complaint expressly alleges that "elections in Illinois have been racially and ethnically polarized" (Compl. ¶ 57), that "Latino voters traditionally and consistently vote cohesively in the State of Illinois, particularly in Cook County" (*id.* ¶ 56), and that non-Latino voters "have often voted sufficiently as blocks that, in the absence of special circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated" (*id.* ¶ 57).

The Complaint addresses other totality factors as well. The Complaint references "judicial proceedings over redistricting" after "the 1990 census" (Compl. ¶ 60) in which this District found a "history of discrimination against Chicago Hispanics in housing, education and services, which the [Seventh Circuit] regarded as a cause of the historically low Hispanic voter registration and turnout." *Hastert v. State Bd. of Elections*, 777 F. Supp. 634, 650 (N.D. Ill. 1991) (citing *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir. 1984)). The *Hastert* decision likewise recognized the long history of federal courts throwing out unconstitutional redistricting plans in Illinois that discriminated against Latinos. *See id.* at 641, 650 (noting "judicially recognized history of discrimination, both past and recent, against the Chicago Hispanic community" and "politically discriminatory practices at both the state and local level").

Furthermore, the totality factors that Defendants list (at 5-6) are *nonexclusive*. Courts analyzing intentional discrimination claims also routinely look to the factors set out in *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252 (1977). *See Brown*, 561 F.3d at 433; *Garza*, 918 F.2d at 771; *see also Barnett v. Daley*, 32 F.3d 1196, 1198-99 (7th Cir. 1994) (citing *Washington v. Davis*, 426 U.S. 229 (1976)). Under *Arlington Heights*,

5

"[a]dditional circumstantial evidence of discriminatory intent may include the impact of an action 'bear[ing] more heavily on one race than another,' 'the historical background of the decision,' the 'specific sequence of events leading up to the challenged decision,' '[d]epartures from the normal procedural sequence,' and 'statements by members of the decisionmaking body.'" *Brown*, 561 F.3d at 433 (quoting *Arlington Heights*).

The Complaint is full of circumstantial evidence of discriminatory intent. It describes how the State packed District 4 with a 65.92% Latino voting age population ("VAP"), a materially greater number than the 59.18% Latino VAP found to be sufficient to allow Latino voters to elect a candidate of choice in the predecessor district created after the 1990 census. Compl. ¶¶ 52, 60. At the same time, the Complaint explains how the State materially reduced the Latino VAP in adjacent districts represented by white congressmen despite the growing Latino population in Illinois and Cook County. *Id.* ¶ 53 (new District 3 lowers Latino VAP from 29.31% to 24.64%); *id.* ¶ 54 (new District 5 lowers Latino VAP from 24.56% to 16.05%).

The Complaint also details the telling process by which the State adopted the congressional redistricting plan. In public hearings on redistricting, the chairpersons of the state legislature's Redistricting Committees "controlled the conduct" of the hearings, forbade the public from "ask[ing] questions of the members of the Redistricting Committees," and presented no "draft or proposed congressional maps or redistricting plan for the public to consider." Compl. ¶ 38. Chairman Raoul "pledged" "to release proposed maps at least one or two weeks before any vote would be taken" and then "reneged on that pledge." *Id.* ¶ 39. Then the Redistricting Committees finally released an initial version of the map at 4:00 a.m. on the Friday of Memorial Day weekend and the Illinois legislature passed the congressional map within days, while the public's attention was diverted over the holiday. *Id.* ¶¶ 41-45.

Taken together, these allegations are easily sufficient to survive a motion to dismiss. They clearly offer "enough details" that are suggestive of intentionally discriminatory vote dilution "to present a story that holds together." *Swanson*, 614 F.3d at 404.

C.  **The Fifteenth Amendment Prohibits Intentional Vote Dilution.**

Claiming that the Supreme Court has "specifically refus[ed] to extend [the Fifteenth Amendment's] reach to cover allegations of vote dilution," Defendants further argue (at 8) that Count III should be dismissed. Defendants are wrong. The Supreme Court "has not decided whether the Fifteenth Amendment applies to vote-dilution claims." *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993).[2]

To be sure, some nonbinding lower court decisions have taken the lack of Supreme Court precedent to mean that vote dilution does not violate the Fifteenth Amendment. But other decisions—including the *Hastert* decision from this District—have recognized that intentionally discriminatory redistricting may violate the Fifteenth Amendment. *E.g.*, *Hastert*, 777 F. Supp. at 645 ("Racial gerrymandering violates . . . the Fifteenth Amendment"); *Page v. Bartels*, 248 F.3d 175, 193 & n.12 (3d Cir. 2001) ("a redistricting scheme may also violate the Fifteenth Amendment, at least if done with the purpose of depriving a racial minority group of the right to vote"). What is more, the Supreme Court has observed that the language of Section 2—which forbids intentional vote dilution—"track[s], in part, the text of the Fifteenth Amendment." *Bartlett*, 129 S. Ct. at 1240. These similar provisions should be interpreted similarly. *See Northcross v. Bd. of Educ. of Memphis City Schs.*, 412 U.S. 427, 428 (1973) (interpreting two provisions similarly because one "tracks the wording" of the other and has the same "'*raison d'être*'").

---

[2] Although dicta in *Reno v. Bossier Parish School Board*, 528 U.S. 320, 334 n.3 (2000), disputes that prior Supreme Court decisions made vote dilution a Fifteenth Amendment violation, that decision does nothing more than keep the issue undecided.

Count III pleads a viable Fifteenth Amendment claim and thus should not be dismissed.

**II.     The Complaint States A Claim Of Racial Gerrymandering In Violation Of The Fourteenth Amendment.**

Defendants' argument for dismissing Count IV—which alleges that District 4 is an unconstitutional racial gerrymander—is utterly meritless. To state a racial gerrymander claim, a plaintiff must plead that race was "the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995); *see Shaw v. Reno*, 509 U.S. 630 (1993).

The Complaint undeniably makes that allegation with respect to District 4. It alleges that "Latino ethnicity was the predominant consideration in the creation of proposed District 4." Compl. ¶ 62. And the Complaint does not stop there. It further describes how the "tortured 'earmuff' shape" of the district—which scores low on every measure of compactness while it "captur[es] predominately Latino neighborhoods to the north and south of proposed District 7" to produce an "extremely high concentration of Latino voters" in the district—can be explained only by the use of race as the predominant factor in drawing the district. *Id.* ¶¶ 3, 59-66, 125. The Complaint also explains that previous litigation in this District "established that race—that is, Latino ethnicity—was the predominant consideration in the creation of" a predecessor District 4 that had a "very similar shape" and was "in the same location" as the newly adopted District 4. *Id.* ¶ 60-61; *see King v. State Bd. of Elections*, 979 F. Supp. 582, 607 (N.D. Ill. 1996).

Defendants surprisingly respond (at 7-8) that District 4 cannot be unconstitutional because it resembles the prior racially gerrymandered district. For support they cite *Karcher v. Daggett*, 462 U.S. 725, 740 (1983), which stated that "preserving the cores of prior districts" may be a "legitimate objective[]" justifying population deviance among congressional districts where there is "a proper showing" that the objective is "nondiscriminatory." But here, of course,

8

Plaintiffs allege that the prior district *did* discriminate on the basis of race (Compl. ¶¶ 60-61), and this District found that to be the case as a matter of fact. *King*, 979 F. Supp. at 607. The upshot of Defendants' argument is that *entrenched* racial discrimination does not violate the Constitution. That pernicious argument flies in the face of the Fourteenth Amendment's purpose to eradicate such racial discrimination. Because long-standing racial gerrymanders, no less than newly minted ones, can violate the Constitution, Count IV should not be dismissed.

**III. The Complaint States A Claim Of Partisan Gerrymandering In Violation Of The First And Fourteenth Amendments.**

    **A.    Partisan Gerrymandering Claims Are Justiciable.**

The Supreme Court held in *Davis v. Bandemer* that partisan gerrymandering claims are justiciable. 478 U.S. 109, 118-27 (1986). In *Vieth v. Jubelirer*, 541 U.S. 267 (2004), Justice Kennedy (in concurrence) and four other Justices (in dissent) agreed that that partisan gerrymander claims remain justiciable, over the objections of the remaining four Justices. As Justice Kennedy later explained, "[a] plurality of the Court in *Vieth* would have held such challenges to be nonjusticiable political questions, but a majority declined to do so." *LULAC*, 548 U.S. at 414 (Kennedy, J.).

Defendants incredibly argue (at 13) that Plaintiffs' partisan gerrymander claims (Counts V and VI) should be dismissed as nonjusticiable "[t]o the extent that Justice Kennedy's concurrence . . . in *Vieth* may be construed to have been based on non-justiciability." But construing Justice Kennedy's concurrence in that manner would be absurd. As Justice Kennedy himself wrote in *LULAC*, his concurrence in *Vieth* "declined" to hold "such challenges to be nonjusticiable political questions." 548 U.S. at 414. Defendants provide no reason to question Justice Kennedy's understanding of his own opinion. This Court should adjudicate Plaintiffs' partisan gerrymandering claims on the merits.

9

### B. The Complaint Alleges Sufficient Facts To Survive A Motion To Dismiss.

While Defendants laud the fact that "[p]artisan gerrymandering has existed since this country was founded" (at 10), it is equally true that the Supreme Court has recognized that some partisan gerrymandering violates the Constitution. *See, e.g.*, *Vieth*, 541 U.S. at 312 (Kennedy, J.) ("If a State passed an enactment that declared 'All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles,' we would surely conclude the Constitution had been violated.").

Defendants (at 11) nevertheless seek dismissal because the Complaint does not "explicitly offer any standard" to determine whether a gerrymander is unconstitutional.[3] That stance grossly misunderstands a plaintiff's pleading burden. "Under the notice pleading standard . . . a complaint need not contain legal theories." *Aaron*, 550 F.3d at 666. Indeed, "[o]n a motion to dismiss, defendants have the burden of demonstrating the legal insufficiency of the complaint—not the plaintiffs or the court." *Reyes v. City of Chicago*, 585 F. Supp. 2d 1010, 1017 (N.D. Ill. 2008). Defendants may not shift that burden to Plaintiffs. If anything, it is *Defendants* who must offer an acceptable standard that the Complaint fails to meet. They have not done so. That alone should preclude dismissal of Plaintiffs' partisan gerrymandering claims.

In any event, Plaintiffs have pleaded sufficient facts to show that an unlawful political gerrymander exists under any plausible standard the Court might adopt. The Complaint alleges with overwhelming factual detail how the State's redistricting plan tramples the constitutional rights of Republican voters. It alleges that the Democratic-controlled Redistricting Committees

---

[3] Contradicting themselves, Defendants also say (at 11-12) that Plaintiffs propose a standard akin to Justice Powell's since-rejected "fairness" standard. But the Complaint does not say anything about a standard; it pleads facts. That the partisan gerrymander allegations satisfy Justice Powell's standard—and many other potential standards—is not an endorsement of any particular standard.

prohibited the public from questioning committee members and reneged on their promises for transparency. Compl. ¶¶ 38-40. It alleges how the proposed congressional district map was released for public scrutiny at 4:00 a.m. on the Friday of the Memorial Day weekend and how within days it cleared both Democratic-controlled houses of the Illinois legislature on straight party-line votes. *Id.* ¶¶ 41-45. It alleges how the map packs Republican voters into certain districts and slices other traditionally Republican areas, like DuPage County, into districts with reliable majorities of Democratic voters. *Id.* ¶¶ 4, 74, 78-81, 90-92. It alleges how the map pits Republican incumbents against one another while sparing all Democratic incumbents from similar contests (*id.* ¶¶ 87-89), and how Democratic incumbents have a 77.52% average population overlap between their present and proposed constituents while the Republican incumbents' average is only 34.20% (*id.* ¶¶ 93-95). It alleges how the map abandons time-honored principles of compactness in favor of "snake-shaped" districts and districts with "curving hook[s]." *Id.* ¶¶ 5, 81, 96-100. It alleges how these boundary changes will transform Illinois from a state with an 11-to-8 Republican majority in its congressional delegation into a state with a 6-to-12 Republican minority. *Id.* ¶¶ 1, 73. It even alleges how the *New York Times* reported that the congressional redistricting plan takes "aggressive" partisan "maneuvering" to the extreme (*id.* ¶ 1) by "activat[ing] every switch at [Democrats'] disposal: clout, secrecy and spools of electronic data that guided block-by-block precision" (*id.* ¶ 6).

   These factual allegations state a claim under the First Amendment. As Justice Kennedy observed in *Vieth*, the First Amendment prohibits "burdening or penalizing citizens because of their participation in the electoral process, their voting history, their association with a political party, or their expression of political views." 541 U.S. at 314; *see Cal. Democratic Party v. Jones*, 530 U.S. 567 (2000); *Elrod v. Burns*, 427 U.S. 347 (1976) (plurality). The amendment is

11

violated where "a State enacts a law that has the purpose and effect of subjecting a group of voters or their party to disfavored treatment by reason of their views." *Vieth*, 541 U.S. at 314. Plaintiffs' Complaint makes those allegations. *See* Compl. ¶¶ 131-132.

Plaintiffs' allegations likewise state a claim under the Fourteenth Amendment. Classifications that limit the right to cast an undiluted vote and the right to express partisan preferences can violate the Equal Protection Clause. *Gaffney v. Cummings*, 412 U.S. 735, 751 (1973); *Whitcomb v. Chavis*, 403 U.S. 124, 143 (1971). To succeed on an equal protection claim, a plaintiff must plead and ultimately prove intentional discrimination against an identifiable group and an actual discriminatory effect on that group. *Davis*, 478 U.S. at 127 (plurality); *id.* at 161 (Powell, J., joined by Stevens, J., concurring in part); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (describing a showing of purpose and effect as "the standard of proof generally applicable to Equal Protection Clause cases"). Plaintiffs' allegations show that the Democratic-controlled Illinois government adopted a partisan gerrymander that intentionally and successfully discriminates against Republican voters because of their political affiliations. Compl. ¶¶ 136-138. Plaintiffs therefore state a claim under the Equal Protection Clause.

Given the Supreme Court's continued recognition that partisan gerrymandering can violate the Constitution, the only real question is *whether*, *as a matter of fact*, the political gerrymander here crosses the line dividing constitutional uses of partisanship in redistricting from unconstitutional ones. That question is best reserved for an adjudication at trial once all relevant evidence has been gathered. The Federal Rules of Civil Procedure afford Plaintiffs the opportunity to gather additional facts, and that opportunity should be respected.

In sum, neither of Plaintiffs' partisan gerrymandering claims—Count V and Count VI—should be dismissed.

### IV. Plaintiffs Have Not Pleaded Themselves Out Of Court.

Finally, Defendants claim (at 13-15) that Plaintiffs have pleaded themselves out of court on Counts I through IV by alleging that some districts were drawn to protect Democratic interests and incumbents. Once again, Defendants misread the Complaint and misstate the law.

With respect to District 4, Defendants are flat wrong in claiming the Complaint alleges that anything other than race played any role in drawing the district. None of the Complaint paragraphs that Defendants invoke remotely support that claim. Paragraph 5 alleges that *District 5* sweeps from Lake Michigan "around the Latino enclaves on Chicago's west side that are packed into proposed District 4" to capture Congresswoman Biggert's home, and Paragraph 85 alleges that *District 5* "swings south around proposed District 4." These allegations in no way undermine Plaintiffs' claim that race was the predominant factor motivating *District 4's* shape. The allegation in Paragraph 95 that District 4 has the *lowest* population overlap of all Democratic incumbents' districts actually supports the idea that race, not politics, was the driving force behind the shape of District 4. Finally, Paragraph 96 merely lists Illinois communities that the State unnecessarily divided in drawing congressional districts; it makes no allegation as to whether it was partisanship or race that motivated the division of any particular community.

The Complaint's express allegation that the State's redistricting plan "intentionally made race—namely, Latino ethnicity—the predominant factor in the creation of proposed District 4" thus stands uncontradicted. Compl. ¶ 125; *see also id.* ¶¶ 62, 110, 115, 120. Accordingly, Plaintiffs have not pleaded themselves out of court on either their racial gerrymander (Count IV) or intentional vote dilution (Counts I-III) claims as to District 4.

As for District 3 and District 5—which, along with District 4, are alleged in Counts I through III to intentionally discriminate against Latinos by diluting their votes—the Complaint does plead that partisan considerations played some role in the creation of those districts. But

Plaintiffs need not show that the State's sole purpose was to discriminate against Latinos in order to press a claim for intentional discrimination. The authorities are unequivocal that "'[r]acial discrimination need only be one purpose, and not even a primary purpose, of an official act' for a violation to occur." *Brown*, 561 F.3d at 433; *accord Garza*, 918 F.2d at 771 ("discrimination need not be the sole goal in order to be unlawful"). As the Seventh Circuit has explained, even where the "[d]esire to protect incumbents" is "the dominant desire actuating the redistricting plan," such a goal may not be accomplished through intentional racial discrimination. *Barnett*, 32 F.3d at 1199. "The fact that discrimination may have an ulterior motive that is not discriminatory does not make it any the less intentional." *Id.*[4] Because Plaintiffs need not rule out other motivations when alleging intentional discrimination, they come nowhere close to pleading themselves out of court as to the claims based on Districts 3 and 5 (Counts I through III).

Furthermore, in *Tamayo v. Blagojevich*, 526 F.3d 1074 (7th Cir. 2008), on which Defendants surprisingly rely (at 14-15), the Seventh Circuit held that the plaintiff did not plead herself out of court by alleging "additional facts that suggest that the defendants' actions were motivated by a political power struggle rather than by gender-based animus." *Id.* at 1086. The court concluded that while her additional allegations may "make her success on the merits less likely," that was not enough to dismiss her complaint. "[O]ur pleading rules . . . do permit inconsistencies in legal theories," the Court noted. *Id.* Here too, even if the Complaint's allegations about partisan gerrymandering were in tension with the allegations about racial discrimination and somehow make it more difficult for Plaintiffs to prevail at trial, that does not mean that Plaintiffs have pleaded themselves out of court. Plaintiffs may "state as many separate

---

[4] Defendants' reliance (at 13) on *Easley v. Cromartie*, 532 U.S. 234 (2001), is completely misplaced with respect to Counts I through III because *Easley* concerned only a racial gerrymander claim, not a claim for intentionally discriminatory racial vote dilution.

claims or defenses as it has, regardless of consistency" (Fed. R. Civ. P. 8(d)(3)) and "[p]leadings must be construed so as to do justice" (Fed. R. Civ. P. 8(e)).

### V. If The Complaint's Allegations Are Deemed Deficient, Plaintiffs Should Be Given Leave to File An Amended Complaint.

The Complaint's allegations are more than sufficient under the relevant case law to survive the Defendants' motion to dismiss. To the extent that the Court reaches a different conclusion, however, Plaintiffs ask for leave to file an amended complaint. "Generally, if a district court dismisses for failure to state a claim, the court should give the party one opportunity to try to cure the problem, even if the court is skeptical about the prospects for success." *Bausch v. Stryker Corp.*, 630 F.3d 546, 562 (7th Cir. 2010). Such an opportunity is especially appropriate here because additional evidence supporting Plaintiffs' claims has been developed since the filing of the Complaint.[5]

### CONCLUSION

Defendants' motion to dismiss should be denied. Alternatively, the Court should allow Plaintiffs the opportunity to file an amended complaint to cure any deficiencies.

---

[5] *See* Rich Miller (Sept. 22, 2011), http://capitolfax.com/2011/09/22/black-delegation-takes-step-back-from-new-map/ (quoting Rep. Jesse Jackson, Jr. as stating: "To gain a Democratic majority and partisan advantage, some Democrats may be prepared to tamper with and possibly violate the VRA, rather than support strict enforcement of its provisions."); Abdon M. Pallasch, *Illinois Congressional Democrats Told to Pay for Remap Lawyers*, CHI. SUN-TIMES, Aug. 31, 2011 (reporting that Illinois's Attorney General asked each Illinois Democratic member of Congress to "pony up a check for $10,000 and then start raising more money" to pay Defendants' costs, even though those Congressmen are not parties to this case).

Dated: September 28, 2011     Respectfully submitted,

/s/ Lori E. Lightfoot

Tyrone C. Fahner
John A. Janicik
Lori E. Lightfoot
Joshua D. Yount
Dana S. Douglas
Thomas V. Panoff
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for Plaintiff*