**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, et al. | ) )  |
| Plaintiffs, | ) Case No. 1:11-cv-05065 ) |
| v. | ) Judge Joan Humphrey Lefkow ) Judge John Daniel Tinder |
| ILLINOIS STATE BOARD OF ELECTIONS, et al., | ) Judge Robert L. Miller, Jr. ) ) |
| Defendants. | ) ) |

**PLAINTIFFS' SUPPLEMENTAL FILING IN SUPPORT OF THEIR MOTION TO
COMPEL THE ILLINOIS GENERAL ASSEMBLY PARTIES
AND IN OPPOSITION TO THE MOTION TO QUASH**

Plaintiffs are compelled to make this Supplemental Filing because the Defendants have submitted expert reports that contradict the positions taken by the Subpoena Respondents in opposing the Plaintiffs' request for discovery into the intent behind and the data underlying the State of Illinois's Congressional Redistricting Plan. On the evening of October 4, the Defendants provided the Plaintiffs with a series of reports by their experts, Allan J. Lichtman and Gerald R. Webster, that (1) rely extensively on data provided by staff of the Office of the Illinois Speaker of the House of Representatives—the very same body that has refused to produce *any* information to the Plaintiffs on the ground of legislative "immunity"; and (2) fault the Plaintiffs for failing to provide evidence of Respondents' discriminatory intent, which is exactly what the Plaintiffs seek from the Respondents through their Subpoenas. As explained below, the expert reports show precisely why the Court should grant Plaintiffs' Motion to Compel [Dkt. 52] and deny the Respondents' Motion to Quash and for a Protective Order [Dkt. 58]. In the alternative, the Court should strike the expert reports in their entirety.

In their reports, Lichtman and Webster disclose that they obtained and relied on information provided by Respondents. In one of his reports, Lichtman states, "The election and demographic data and the racial identification of candidates were obtained from the staff of the Redistricting Office of the Illinois Speaker of the House of Representatives."[1]  *See* Lichtman Resp. to Engstrom, at ¶ 6 (Ex. A). In another report, Lichtman states that all of the "data and maps" on which he relied "were obtained from the staff of the Redistricting Office of the Illinois Speaker of the House of Representatives." *See* Lichtman Resp. to Morrison at ¶ 10 (Ex. B); *see also id*. at ¶ 14 n.1 (providing results of calculations performed on "data provided by the Illinois Redistricting Office"). And Lichtman's third report expressly states that the data he uses is described in his other two reports. Lichtman Rep. at 4 (Ex. C). Finally, the Defendants' other expert, Webster, likewise acknowledges that "Congressional district shape files for the 1990s, 2000s, and the 2011 Adopted Plan provided by the staff of the Redistricting Office of the Speaker of the Illinois House of representatives" were among the "facts or data relied upon in reaching [his] conclusions." Webster Rep. at 3 (Ex. D).

As the Court is aware, the Office of the Speaker of the Illinois House of Representatives is one of the parties to whom Plaintiffs' Subpoenas were directed, and that Office has refused to produce any maps, data, or other documents whatsoever on the ground of legislative "immunity." Now, however, it appears that the Officer of the Speaker is funneling cherry-picked information to the Defendants' experts in an effort to rebut Plaintiffs' allegations and expert evidence.

Adding insult to injury, Lichtman faults the Plaintiffs for failing to present "any direct or indirect evidence that decision-makers feared that the white majority's preferred candidates would be defeated by the candidates of choice for Latino voters." Lichtman Rep. at 7 (Ex. C).

---

[1] Before receiving Lichtman's reports, Plaintiffs were unaware that Speaker Madigan's office even contained a stand-alone "Redistricting Office."

Yet such evidence of the decision-makers intent is precisely what the Subpoena Respondents swore was irrelevant to the case and privileged from discovery. Indeed, counsel for the Respondents insisted that the Court's analysis would be "an expert-driven, data-driven process." Transcript of September 29, 2011 Proceedings at 15:10-18 (Ex. E).[2] Lichtman's report confirms that Respondents were wrong and that evidence of legislative intent is a central element of proof. *See, e.g. Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 265-268 (1977) ("Proof of racially discriminatory intent or purpose is required to show a violation of the Equal Protection Clause. * * * Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available.").[3] By criticizing the Plaintiffs for not presenting evidence of legislators' intent, the Defendants seek to improperly use the legislative privilege as a "sword" to prejudice the Plaintiffs' case.

The Defendants should not be permitted to use the legislative and deliberative process privileges "as both a shield and a sword." *United Auto Ins. Co. v. Veluchamy*, 747 F. Supp. 2d 1021, 1030 (N.D. Ill. 2010). As such, the Respondents should not be permitted to claim privilege over broad swaths of information, while the Defendants simultaneously and selectively use information from the Respondents in making their defense and fault the Plaintiffs for not having such information. *See Robinson v. Morgan Stanley*, No. 06-cv-5158, 2010 WL 1050288, at *6 (N.D. Ill. March 17, 2010) ("[a] defendant may not use the privilege to prejudice his

---

[2] Counsel for the Democratic Congressional Candidate Committee ("DCCC") has likewise argued to the U.S. District Court for the District of Columbia that the Panel had not even determined whether evidence of the intent behind the passage of the Plan (which Plaintiffs are also seeking from the DCCC) was relevant. The transcript of this hearing is not yet available.

[3] *See also Garza v. County of Los Angeles*, 918 F.2d 763, 770-771 (9th Cir. 1990) (plaintiff may establish violation of Voting Rights Act by proving intentional discrimination on the part of the legislature).

opponent's case or to disclose some selected communications for self-serving purposes")).[4]  Yet that is what the Respondents and the Defendants are doing.  Lichtman's report relies on selected "data" and "maps" provided by the Respondents to support the Defendants' claim that the Congressional Plan passes muster, and Lichtman criticizes the Plaintiffs for supposedly failing to present intent evidence.  At the same time, however, the Respondents refuse to produce *any* evidence to the Plaintiffs about the creation and adoption of the Plan.  These litigation tactics are improper and unfair.

At the hearing on the pending motions, Judge Tinder agreed that the Plaintiffs "do make a good point that to the extent they resist your opponents and third parties resist disclosing certain things, they can't then bring that witness in to testify."  9/29/11 Tr. at 24:24-25:2 (Ex. E).  Instead of apprising the Plaintiffs and the Court that the Respondents were then in the process of sharing data and other information with the Defendants' experts, counsel for the Respondents stated at the hearing that "I think it's a little early for motions *in limine*."  *Id.* at 28:15-16.  That lack of candor was improper.  And certainly it is no longer too early to bar the Defendants from relying on any information obtained from the Respondents.

Indeed, it would be fundamentally unfair to allow the Respondents to selectively disclose documents that help the Defendants' case, while simultaneously allowing the Respondents to refuse to produce any other documents on privilege grounds.  It is for this reason that the intentional disclosure of an otherwise privileged document waives the privilege as to other documents that concern the same subject matter.  *See Lerman v. Turner*, 2011 WL 494623, at *2 (N.D. Ill. Feb. 4, 2011) (Lefkow, J.) (*citing* Fed. R. Evid. 502(a)).  The subject-matter waiver

---

[4] *See also Brown v. City of Detroit*, 259 F. Supp. 2d 611, 623-24 (E.D. Mich. 2003) (government may not selectively disclose information and then rely on deliberative process privilege to withhold other information, such an attempt would be an improper use of the privilege "as a sword rather than a shield."); *Pacific Gas and Elec. Co. v. Lynch*, No. C-01-3023, 2002 WL 32812098, at *4 (N.D. Cal. Aug. 19, 2002) (same).

doctrine appropriately applies in situations like this, in which "the privilege holder seeks to use the disclosed material for advantage in the litigation but to invoke the privilege to deny its adversary access to additional materials that could provide an important context for proper understanding of the privileged materials," *In re Aftermarket Filters Litigation,* 08-cv-4883, 2010 WL 4622527, at *6 (N.D. Ill. Nov. 4, 2010) (*quoting* Charles Alan Wright et al., *Federal Practice and Procedure* vol. 8, § 2016.2 (3d ed. 1995, Suppl. 2010)), and when "fairness requires a further disclosure of related, protected information, in order to prevent a selective and misleading presentation of evidence to the disadvantage of the adversary." *Id*.[5] The Respondents should not be permitted to disclose cherry-picked materials that they consider helpful to the defense of the Congressional Plan, and yet assert privilege over other documents that they would rather not produce. Having voluntarily injected "data" and "maps" into the litigation by providing it to the Defendants' experts, the Respondents have opened themselves to all of the discovery sought in the Subpoenas. *See Powell v. Ridge*, 247 F.3d 520, 525-26 (3d Cir. 2001) (refusing to recognize a doctrine of "partial legislative immunity," that would allow legislators to actively participate in the litigation while refusing to provide discovery).

For the foregoing reasons and those stated in the Plaintiffs' prior filings on this subject, the Plaintiffs ask that the Court grant Plaintiffs' Motion to Compel [Dkt. 52] and deny the Respondents' Motion to Quash and for a Protective Order [Dkt. 59]. In the alternative, the Plaintiffs ask that the Court strike the Defendants' expert reports in their entirety, because they rely on cherry-picked data and documents provided by the Respondents.

---

[5] While Rule 502(a) concerns the attorney-client and work product privileges, there is no reason why the "fairness" concerns underlying the rule are not equally applicable in this context. *See* FED. R. EVID. 502 advisory comm. nn; *see also Bobkoski v. Board of Educ.,* 141 F.R.D. 88, 91 (N.D. Ill. 1992) (noting that the primary rationales for the deliberative process privilege and the attorney client privilege are analogous).

Dated: October 6, 2011

Respectfully Submitted,

By: <u>Lori E. Lightfoot</u>

Tyrone C. Fahner
John A. Janicik
Lori E. Lightfoot
Joshua D. Yount
Dana S. Douglas
Thomas V. Panoff
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for Plaintiffs*

# EXHIBIT A

EXPERT REPORT OF ALLAN J. LICHTMAN: RESPONSE TO THE REPORT OF
DR. RICHARD L. ENGSTROM

OCTOBER 4, 2011

with Ken DeCell), <u>The Keys to the White House</u>, and <u>White Protestant Nation: The Rise of the American Conservative Movement</u>. My most recent book, <u>White Protestant Nation</u>, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America.

5.      I have worked as a consultant or expert witness for both plaintiffs and defendants in more than seventy-five voting and civil rights cases. These include several cases in the state of Illinois. Among other cases, I testified for the prevailing parties in *King v. Board of Elections*, regarding the Latino Congressional district in Illinois and also in *Campuzano v. Illinois Board of Election* the statewide challenge to the post-2000 redistricting plan for state legislative positions. In *King*, I testified on behalf of plaintiffs and in *Campuzano* on behalf of defendants. I was also an expert witness in the landmark case of *Garza v. City of Los Angeles*, 756 F. Supp. 1298 (1990), on Latino vote dilution. In many cases, I have analyzed the demography of Congressional redistricting plans. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness in defending enacted plans from voting rights challenges. A copy of my resume and a table of cases are attached as Appendix I of this report.

**Data and Methods**

6.      The voting analysis in this report relies on standard data utilized in social science: precinct by precinct election returns for each candidate in elections, with candidates identified by race and precinct by precinct breakdowns of voting age Latinos, African-Americans, and Whites, which includes a small number of Asians and members of other races. The election and demographic data and the racial identification of candidates were obtained from the staff of the Redistricting Office of the Illinois Speaker of the House of Representatives. This information

was obtained electronically. I also obtained election results from the websites of the Illinois State Board of Elections, the Cook County Board of Elections, and the City of Chicago Board of Elections.  To estimate the voting of Latinos, African-Americans, and whites (a group that also includes some Asians and members of other races) the analysis utilizes the standard methodology of ecological regression that I have employed in some 75 previous voting rights cases and applied to the analysis of many thousands of elections and the study of numerous redistricting plans.  The ecological regression procedure estimates the voting behavior of demographic groups such as non-Latinos and Latinos by comparing the racial composition of voting precincts to the division of the vote among competing candidates in each precinct. It produces an equation that estimates both the turnout and voting for each candidate by each voter group. The procedure was accepted by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30 (1986), and applied by the Court to single-member districts plans in *Quilter v. Voinovich,* 113 S. Ct 1149 (1993). My analysis based on these methods was cited authoritatively several times by the United States Supreme Court in the Congressional redistricting case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006).[1]

7.      The results of ecological regression analysis were also checked and verified in several ways. First, the analysis was checked and verified to make sure that the estimates of voting behavior by demographic groups accurately represented the actual votes for candidates in the election. Second, the analysis was checked as verified by the method of extreme case or

---

[1] For a scholarly analysis of ecological regression and why it works well in the context of analyzing the voting of racial groups., especially Latinos and non-Latinos, see, Allan J. Lichtman, "Passing the Test: Ecological Regression in the *Garza* Case and Beyond," *Evaluation Review*  15 (1991). This article also shows why Dr. Engstrom is incorrect in his critique that ecological regression depends on linearity of voting by demographic groups in all precincts. Following my standard practice, I utilized the two equations and weighted ecological regression procedure that adjusts for turnout and for differences in the voting-age populations of precincts. Bernard Grofman, the expert witness in the *Gingles* case, and myself were co-originators of this statistical methodology which I have since refined, to introduce a method of bounds see, Bernard Grofman, Lisa Handley, Richard G. Niemi, *Minority Representation and the Quest for Voting Equality* (New York: Cambridge University Press, 1992), pp. 102, 146.

6

# EXHIBIT B


EXPERT REPORT OF ALLAN J. LICHTMAN: RESPONSE TO THE REPORT OF DR.
PETER A. MORRISON, PH.D.

OCTOBER 4, 2011

1

against Latinos. In many cases, I have analyzed the demography of congressional redistricting plans. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness in defending enacted plans from voting rights challenges. A copy of my resume and a table of cases are attached as Appendix I of this report.

**Data and Methods**

10.     The analysis in this report relies on standard data utilized in social science. This data includes reports showing the total population, Latino population, voting age population and Latino voting age population for existing districts, districts in the state passed plan, and districts in plaintiffs' alternative plan. It includes core retention reports showing the inflow and outflow of these demographic groups from existing districts to new districts in the state passed plan and plaintiffs' plan. It includes reports on split precincts in districts of the state passed plan and the plaintiffs' plan. It includes maps showing the flow of voting age population and Latino voting age population into an out of congressional districts. All data and maps were obtained from the staff of the Redistricting Office of the Illinois Speaker of the House of Representatives. This information was obtained electronically.

**I.     PROBLEMS IN MORRISON'S ANALYSIS OF CD 4 IN THE ADOPTED PLAN.**

11.     The Morrison report violates an essential requirement of scientific study: that an investigator not alter his methodology either to avoid certain results or to generate others. The Morrison report alters its methodological approach to analyzing changes in district populations and also alters the standards set by Dr. Morrison in his published scholarship.

12.     Dr. Morrison applies different methodologies to studying population changes in CD 3 and CD 5 as compared to CD 4 in the state adopted Congressional plan. This is not a minor

5

adjustment, but a shift in procedure that shapes his analyses and conclusions. In analyzing CD 3 and CD 5, Dr. Morrison properly uses the benchmark 2002 plan for comparing changes in the districts' percentage of Hispanic voting age population. For example, with respect to CD 3 he states, "The 2002 CD 3 has a voting-age population (VAP) that is 29.3% Latino, based on 2010 census figures. In the Adopted CD 3, Latinos comprise 24.6% of the VAP." (p. 8). However, with respect to CD 4, Dr. Morrison ignores the 2002 benchmark district, and instead compares the Latino voting age population in CD 4 under the state adopted plan to the Latino voting age population in CD 4 in the post-1990 plan, stating, "The Latino share of voting-age population ("VAP") in CD 4 has increased from 59.2% in the post-1990 CD4 to 65.9% in Adopted CD4." (p. 8). If Dr. Morrison had consistently followed his methodology and compared the Latino concentration in adopted CD 4 to the benchmark CD 4 in the 2002 plan he would have reached the contrary finding that the state reduced the Latino share of the voting age population in this district from 68.1% to 65.9%.   Thus, the rise in the Latino concentration in adopted CD 4 occurred prior to the drawing of the 2011 congressional redistricting plan.

13.    Dr. Morrison also shifts his analysis of CD 4 as compared to CD 3 and CD 5 in yet another way. For CD 3 and CD 5 he provides a border analysis, complete with maps showing the Latino concentrations of territory shifted in and out of these districts from other districts in the benchmark 2002 plan. However, Dr. Morrison provides no border analysis and no maps for CD 4 under the state's plan, even though the alleged concentration of Latinos CD 4 is the focus of plaintiffs' complaint. Thus, his analysis of CD 4 in the Adopted Plan is incomplete according to Dr. Morrison's own methodology.

14.    Further, with respect to CD 4, Morrison concludes only that, "The territory added to Adopted CD4 had a 47.2% Latino share of VAP. The territory formerly in 2002 CD4 that was

6

removed had a 40.6% Latino share of VAP." (p. 8). He does not, however, present the data or calculations that produced his findings about the inflow and outflow of Latino voting age population in state passed CD 4. Given that only about 30.6 percent of new CD4 comes from outside the 2002 version, this small differential of 6.6 percent amounts to only a two percentage point difference in the Hispanic VAP percentage within new CD4 (6.6%*.306=2.0%).[1]

15.     After analyzing the changes in CD 3, CD 4 and CD 5 in the Adopted Plan, Dr. Morrison reaches an erroneous conclusion. He no longer assesses the changes in District 4 by comparing the Adopted Plan to the post-1990 plan. Rather, he incorrectly concludes without any qualification that the Latino voting age population in CD 4 in the Adopted Plan increased.

## II.     DR. MORRISON'S EXAMINATION OF THE CONCENTRATIONS OF LATINO VOTERS ONLY IN CD 3, CD 4 AND CD 5 OF THE ADOPTED PLAN AND IN CD 3 AND CD 4 OF PLAINTIFFS' PLAN IS INCOMPLETE AND DOES NOT INCLUDE THE PROPER GEOGRAPHIC AREA FOR ANALYSIS.

16.     In analyzing the concentrations of Latino voters in the Adopted Plan and in plaintiffs' plan, Dr. Morrison improperly limits the districts in each plan that he considers. The proper geographic area for analysis of concentrations of Latinos voters is broader and includes districts in Cook County and bordering Cook County, given that the Latino populations in a number of the excluded districts is larger than 21% and given that plaintiffs' plan fundamentally redraws Congressional Districts in this region of the state, which impacts concentrations of Latino populations beyond just CD 3, CD 4 and CD 5.

17.     Dr. Morrison focuses on reductions of Latino voting age population in CD 3 and CD 5. However, he fails to indicate that the Adopted Plan also increased the Latino

---

1 Dr. Morrison's results cannot be replicated because he provides no data and calculations. My own calculations indicate that that the Latino voting percentage in the outflow from existing CD 4 is 41.2 percent, not 40.6 percent, slightly narrowing the gap reported by Dr. Morrison. According to data provided by the Illinois Redistricting Office, 83,442 persons of voting age moved out of existing CD 4, including 34,377 Latinos, for a percentage of 41.2% Latino.

# EXHIBIT C

EXPERT REPORT OF ALLAN J. LICHTMAN RE: PLAINTIFFS' ALLEGATIONS OF
INTENTIONAL VOTE DILUTION & RACIAL PREDOMINANCE IN REDISTRICTING

OCTOBER 4, 2011

analyses also ground my books, Prejudice and the Old Politics: The Presidential Election of 1928, The Thirteen Keys to the Presidency (co-authored with Ken DeCell), The Keys to the White House, and White Protestant Nation: The Rise of the American Conservative Movement. My most recent book, White Protestant Nation, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than seventy-five voting and civil rights cases. These include several cases in the state of Illinois. Among other cases, I testified for the prevailing parties in *King v. Board of Elections*, regarding the Latino congressional district in Illinois and also in *Campuzano v. Illinois Board of Election* the statewide challenge to the post-2000 redistricting plan for state legislative positions.  In *King*, I testified on behalf of plaintiffs and in *Campuzano* on behalf of defendants. I was also an expert witness in the landmark case of *Garza v. City of Los Angeles*, 756 F. Supp. 1298 (1990)*,* on Latino vote dilution. In many cases, I have analyzed the demography of congressional redistricting plans. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness in defending enacted plans from voting rights challenges.  A copy of my resume and a table of cases are attached as Appendix I of this report.

**Data and Methods**

This report relies on standard data and methods used in social science. The methods and data used for voting analysis are described in my Reply Report to the Report of Dr. Richard L. Engstrom. Methods and data used for the analysis of districts and population flows are described in my Reply Report to the Report of Dr. Peter A. Morrison. This report also relies on standard methods of historical and political analysis that I have applied in my scholarship as a political

historian and in my writing on quantitative and non-quantitative methods in historical and social science study. That scholarship is described above.

## SECTION I:   CLAIMS OF VOTE DILUTION IN COUNTS I, II, AND III

### A.        Plaintiffs' General Allegations of Intent

Proof of an intentional discrimination claim requires an exacting and stringent expert analysis of circumstantial evidence.  Such requirements are explained in a 142 page scholarly article by California Institute of Technology Professor J. Morgan Kousser, the intent expert in *Garza v. Los Angeles County* that plaintiffs cite as the case in which a court found intentional discrimination against Latinos in the crafting of a legislative redistricting plan.[1] There is, however, no analysis of intentional discrimination in either of the expert reports submitted by plaintiffs or any other material submitted by plaintiffs.  Rather, plaintiffs' expert reports and the material developed in this case offer no facts, data, or opinions, unlike in the *Garza* case, which allow an inference of racial discrimination to be drawn.  Unlike in *Garza*, in this case:

- The Illinois State legislature charged with redistricting had a substantial number of Latinos.

- Substantial facts and data explained below show that the Illinois State legislature has acted affirmatively to expand minority opportunities to participate in the political process. Democrats nearly universally backed such initiatives, whereas Republicans mostly opposed them. No special rules that militate against the interests of minorities exist for the redistricting process in Illinois.

---

[1] J. Morgan Kousser, "How to Determine Intent: Lessons From L. A.," *Journal of Law & Politics,* VII (1991).

Plan.  Furthermore, as I explain below my analysis of CD 4 of the Adopted Plan shows that drafters did not maximize the Latino concentration in that district.

As an additional matter, Plaintiffs have alleged in paragraphs 53 and 54 of their Complaint that CD 3 and CD 5 in the Adopted Plan were drawn to protect the ability of the white majority to defeat candidates of choice for Latino voters.  Plaintiffs have not presented any direct or indirect evidence that decision-makers feared that the white majority's preferred candidates would be defeated by the candidates of choice for Latino voters.  These allegations are based on a demonstrably false presumption that Latino voters and white voters differ in their preferred candidates in these districts.  As indicated in the electoral analysis presented in my Response to the Report of Engstrom, Rep. Lipinski and Rep. Quigley were in fact the candidates of choice for Latinos in CD 3 and CD 5, respectively.   Lipinski in CD 3 and Quigley in CD 5 have been the candidates of choice of Latino and non-Latino voters in elections against Latino competitors. This was the case for Representative Lipinski in two Democratic primary elections in CD 3 held in 2008 and 2010, when Lipinski defeated Latino opponents.  He was the candidate of choice of Latinos as well as of African Americans and whites.  He then won both follow up general elections, likewise with unified support from all three voter groups (see Response to the Report of Engstrom).  In the special 2009 general election for the Congressional seat in CD 5 vacated by former Representative Emanuel, Quigley, with unified support from Latinos and non-Latinos, defeated a Latino opponent. (There was insufficient African American population and concentration in CD 5 to estimate separately African American voting.)

In addition to these readily disprovable allegations about CD 3 and CD 5 contained in paragraphs 53 and 54 of their Complaint, Plaintiffs fail to consider the districts drawn by the state in Cook County and bordering regions in the Adopted Plan.  Plaintiffs fail to note that while

# EXHIBIT D

**Report on the Geographic Compactness of Illinois Congressional District 4**

My name is Gerald R. Webster, and I currently reside in Laramie, Wyoming. I am a Professor of Geography in the Department of Geography at the University of Wyoming, where I also serve as departmental chair. I am beginning my fifth year in my present position. Prior to assuming my duties at Wyoming in the fall of 2007, I was a faculty member in the Department of Geography at the University of Alabama for 18 years, and served as departmental chair from 2000 to 2007. I am a member of the Association of American Geographers (AAG), Southeastern Division of the AAG, Great Plains-Rocky Mountain Division of the AAG and National Council for Geographic Education. I presently serve on the editorial board of *Political Geography*.

My formal education includes an undergraduate degree in political science from the University of Colorado at Denver (1975), a Masters of Science degree in geography from Western Washington University (1981) and a Ph.D. in geography from the University of Kentucky (1984). My primary research and teaching interests are in political geography, including a focus on redistricting. I have authored or co-authored over 70 book chapters and articles in refereed journals. I have also served as a consultant and expert witness in a number of redistricting cases in the states of Alabama, Mississippi, North Carolina, Virginia, Florida, Louisiana and Illinois. In 2001, I provided testimony via affidavit to the Illinois Supreme Court pertaining to the geographic compactness of the state's 118 House and 59 Senate districts.

The purpose of the present report is to evaluate the geographic compactness of Illinois Congressional District 4 in the 2011 Adopted Plan. Before proceeding it is important to explain my procedures for evaluating the geographic compactness of representational districts. There are several different methods that have been proposed to evaluate geographic compactness over the past few decades. The two measures employed here are the geographic dispersion or Reock Measure, and the perimeter or Polsby-Popper Measure. The geographic dispersion and perimeter measures focus on different aspects of geographic compactness and are most appropriately considered in tandem (Webster 2004: 44-5). These two measures were highlighted in a 1993 *Michigan Law Review* article by Richard Pildes and Richard Niemi, and have become the most commonly employed measures for evaluating district compactness. Adding to the relevance of both measures was the citation of the Pildes and Niemi article in the Supreme Court's 1996 decision in *Bush v. Vera*.

The geographic dispersion compactness measure focuses on the level of spatial concentration of a district's geographic area. To calculate this indicator the smallest possible circle is circumscribed around a district. The reported coefficient is the proportion of the area in the circle that is also included in the district. The coefficient ranges from 1.0 (most compact) to 0.0 (least compact). Notably, a perfect square has a geographic dispersion coefficient of 0.64, and a typical rectangle has a score of approximately 0.40.

The perimeter compactness measure focuses on the length of a district's perimeter relative to the quantity of area included in the district. The reported coefficient is the proportion of the area in the district relative to a circle with the same perimeter. The coefficient also theoretically ranges from 1.0 (most compact) to 0.0 (least compact). A perfect square has a perimeter compactness coefficient of 0.78, and a typical rectangle has a coefficient of approximately 0.60.

The above noted Pildes and Niemi (1993: 565) article provides guidance for evaluating the two compactness measures. Paying substantial attention to the Court's language in *Shaw v. Reno* (1993), they propose cutoff levels for low compactness. With respect the geographic dispersion compactness measure they suggest low is equal to or less than 0.15. On the perimeter measure they suggest that low is equal to or less than 0.05. With regard to this guidance they state that "In choosing the cutoff points used . . . [here] . . . we do not imply that all districts below these points or only those districts are vulnerable after *Shaw*" (Pildes and Niemi 1993: 564).

New redistricting plans are typically compared to the plans they replace. Here I compare CD 4 in the Adopted Plan with the same district in the 2001 benchmark plan and 1991 plan. The district compactness calculations included in this evaluation were performed by the Cartographic Research Laboratory at the University of Alabama, Tuscaloosa, Alabama, using the Maptitude redistricting software. The calculations are based upon district shape files provided by the state of Illinois.

As noted earlier, Pildes and Niemi (1993: 565) provide guidance for cutoff points indicating low geographic compactness on both measures. On the Reock or geographic dispersion measure they suggest that low compactness is equal to or less than 0.15. In the 1991 plan CD 4 had a geographic dispersion compactness coefficient of 0.20, which rose to 0.21 in the 2001 benchmark plan. In the 2011 Adopted Plan, the coefficient rose further to 0.30, fully twice the suggested cut off level for low compactness. Notably this coefficient is also well above that calculated by Professor Engstrom in his Expert Report (p. 11). Due to this contrast in calculations, the University of Alabama Cartographic Research Laboratory undertook their analysis a second time and confirmed their initial results.

Pildes and Niemi (1993: 565) suggest that low compactness on the perimeter or Polsby-Popper compactness measure is equal to or less than 0.05. In the 1991 plan CD 4 had a perimeter compactness score of 0.02, below the suggested benchmark. In the 2001 plan CD 4's perimeter compactness score doubled to 0.04, and rose again to 0.05 in the 2011 plan. Thus, CD 4's score in the Approved Plan is more compact than it was in either of the past two decadal congressional districting plans.

**Conclusions**

This report has three principal findings.

1. Professor Engstrom's calculation of the geographic dispersion or Reock Compactness measure for CD 4 in the 2011 Adopted Plan is incorrect. In the Adopted Plan the coefficient for CD 4's level of geographic dispersion compactness is 0.30.
2. The compactness scores for CD 4 on the geographic dispersion and perimeter compactness measures are at or above the Pildes and Niemi (1993: 565) suggested cut off levels for low compactness.
3. CD 4's level of geographic compactness increased in the Adopted Plan on both measures when comparing the district to its predecessors in the 1991 plan and 2001 benchmark plan.

**References**

Pildes, R.H. and Niemi, R.G. 1993. "Expressive Harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances After *Shaw v. Reno*," *Michigan Law Review*, 92: 483-587.

Webster, G.R. 2004. "Evaluating the Geographic Compactness of Representational Districts," in *WorldMinds: Geographical Perspectives on 100 Problems*, eds. D.G. Janelle, B. Warf, and K. Hansen, pp. 43-48. Boston: Kluwer Academic.

**Facts or Data Relied Upon in Reaching My Conclusions**

1) Congressional district shape files for the 1990s, 2000s and the 2011 Adopted Plan provided by the staff of the Redistricting Office of the Speaker of the Illinois House of Representatives. These were used by the University of Alabama Cartographic Research Laboratory to calculate the compactness coefficients for CD 4.

2) Maps of congressional districts in Illinois in the 1990s, 2000s and in the 2011 Adopted Plan produced by the University of Alabama Cartographic Research Laboratory.

3) The two references listed above in the "References" section.

**Additional Information**

1) My Curriculum Vita accompanies this report and lists all publications and court cases I have worked on in the past.

2) My compensation is $150 per hour.

Executed on October 4, 2011:

Gerald R. Webster

# EXHIBIT E

1

08:27:54     1                 IN THE UNITED STATES DISTRICT COURT
                          NORTHERN DISTRICT OF ILLINOIS
           2                        EASTERN DIVISION

           3

           4   COMMITTEE FOR A FAIR AND BALANCED    )   Docket No. 11 C 5065
              MAP, et al.,                      )
           5                               )
                          Plaintiffs,   )
           6                               )
                     vs.                  )
           7                               )   Chicago, Illinois
              ILLINOIS STATE BOARD OF ELECTIONS,   )   September 29, 2011
           8   et al.,                        )   9:00 o'clock a.m.
                                     )
           9                      Defendants.   )

10                 TRANSCRIPT OF PROCEEDINGS - MOTION
                                 BEFORE
11             THE HONORABLE JOHN DANIEL TINDER
               THE HONORABLE ROBERT LOWELL MILLER, JR.
12             THE HONORABLE JOAN HUMPHREY LEFKOW

13   APPEARANCES:

14

15   For the Plaintiffs:     MAYER BROWN LLP
                               BY:   MS. LORI E. LIGHTFOOT
16                               MR. THOMAS V. PANOFF
                              71 South Wacker Drive
17                              Chicago, IL   60606
                              (312) 782-0600
18

19   For Defendant          OFFICE OF THE ATTORNEY GENERAL
             Illinois State Board   BY:   MR. CARL T. BERGETZ
20   Of Elections:                MR. BRENT D. STRATTON
                              100 West Randolph Street
21                              Chicago, IL   60601
                              (312) 814-5194
22

23

24   Court Reporter:        MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                              Official Court Reporter
           25                    219 S. Dearborn Street, Suite 1854-B
                              Chicago, Illinois   60604
                              (312) 435-5639

2

1   APPEARANCES CONTINUED:

2

3   For Third-Party          RICHARD J. PRENDERGAST, LTD
    Defendants:              BY:   MR. RICHARD J. PRENDERGAST
4                                  MR. MICHAEL THOMAS LAYDEN
                             111 West Washington Street, Suite 1100
5                            Chicago, IL  60602
                             (312) 641-0881
6

7
    For State                MICHAEL J. KASPER, ATTORNEY AT LAW
8   Defendants:              BY:   MR. MICHAEL J. KASPER
                             222 North LaSalle Street, Suite 300
9                            Chicago, IL  60601
                             (312) 704-3292
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

15

09:28:08  1      JUDGE MILLER:  What kind of reports?

09:28:10  2      MR. PRENDERGAST:  Well, reports concerning the --

09:28:12  3  what the whole process -- there were like 20 hearings around

09:28:18  4  the state.  Every one of those hearings involved both the

09:28:22  5  state map and Congressional map.  There were reports relating

09:28:24  6  to those.  There were hearing transcripts themselves.  I mean,

09:28:28  7  I don't have, your Honor, a list of all the documents.

09:28:30  8      JUDGE MILLER:  No, I'm not -- I'm looking for a

09:28:32  9  genre.

09:28:34  10     MR. PRENDERGAST:  It's clearly in the thousands.  And

09:28:36  11 when you combine that with information that they are going to

09:28:40  12 seek -- are seeking from Congresspersons and other third

09:28:42  13 parties and you combine that with the fact that this is an

09:28:46  14 expert-driven, data-driven process, and you combine that with

09:28:50  15 the fact that there is no case that has ever allowed anybody

09:28:54  16 to ask what's the motivation or intent of a Congressperson or

09:28:58  17 a legislator in passing a bill, there is nothing here that

09:29:00  18 warrants exception to the legislative privilege.

09:29:04  19     JUDGE MILLER:  Just to finish my question, everything

09:29:06  20 you have given them so far, these thousands of pages, are all

09:29:10  21 public records; is that what you have described?

09:29:12  22     MR. PRENDERGAST:  I think they are largely public

09:29:14  23 records.  I don't -- I think they are publicly available under

09:29:18  24 the Freedom of Information Act.  I mean, I don't think you can

09:29:20  25 just go find them in the archives.  But they pursued every way

24

| | | |
|---|---|---|
| 09:40:00 | 1 | MS. LIGHTFOOT: I think it matters, your Honor, |
| 09:40:02 | 2 | because it goes to several points that we're trying to |
| 09:40:04 | 3 | demonstrate in our claims: One, whether or not there was some |
| 09:40:08 | 4 | kind of partisan animus improperly so that was injected into |
| 09:40:14 | 5 | this process. |
| 09:40:14 | 6 | JUDGE TINDER: I am going to assume there is partisan |
| 09:40:18 | 7 | animus. |
| 09:40:18 | 8 | MS. LIGHTFOOT: But improper. I don't know how we |
| 09:40:20 | 9 | get at that other data knowing who the drawers of the map |
| 09:40:24 | 10 | were. |
| 09:40:24 | 11 | JUDGE LEFKOW: What could possibly be improper about |
| 09:40:28 | 12 | that? Most of the state houses are controlled by people -- |
| 09:40:32 | 13 | the same party you represent. So that's the way politics |
| 09:40:38 | 14 | goes. |
| 09:40:38 | 15 | JUDGE TINDER: And then the measure, the test, is the |
| 09:40:42 | 16 | product, was it a fair product. |
| 09:40:44 | 17 | MS. LIGHTFOOT: For sure. |
| 09:40:44 | 18 | JUDGE TINDER: Regardless of who writes it. |
| 09:40:46 | 19 | MS. LIGHTFOOT: I think we'd like to have some |
| 09:40:48 | 20 | definitive -- a document that shows whether, in fact, any |
| 09:40:50 | 21 | expert actually was involved in opining about the map as |
| 09:40:56 | 22 | passed. We still don't know that definitively. All we know |
| 09:41:00 | 23 | is that -- |
| 09:41:00 | 24 | JUDGE TINDER: Well, you do make a good point that to |
| 09:41:04 | 25 | the extent they resist your opponents and third parties resist |

09:41:08  1  disclosing certain things, they can't then bring that witness

09:41:14  2  in to testify.

09:41:14  3       MS. LIGHTFOOT:  I think that's right.

09:41:16  4       JUDGE TINDER:  Kind of surprising you with it.  I

09:41:18  5  understand that.

09:41:18  6       MS. LIGHTFOOT:  And then beyond those two categories,

09:41:20  7  your Honor, what we'd like is essentially what was the data

09:41:24  8  that was used, was there any specific racial bloc voting

09:41:28  9  analysis that was done ahead of time to justify the way in

09:41:32  10 which the end product.  That information I think we are

09:41:34  11 entitled to, and we still don't have that.

09:41:36  12       Now, one response might be, well, for example -- and

09:41:40  13 this is an issue that we want to talk to the court about -- we

09:41:44  14 are going to get expert reports from the other side relatively

09:41:46  15 soon.  We have no idea if it's one expert report or multiple,

09:41:50  16 but let's assume that it's expert reports that analyze the map

09:41:56  17 as passed.  Certainly, I think that will be helpful, but I

09:42:00  18 think we are also entitled to know whether or not any of those

09:42:04  19 experts or some other experts were engaged to analyze anything

09:42:10  20 about that map before it was passed, and we still don't know

09:42:12  21 that.

09:42:14  22       JUDGE TINDER:  Well, now, you're confusing me again.

09:42:16  23       MS. LIGHTFOOT:  Sorry.

09:42:18  24       JUDGE TINDER:  The test here is not were there other

09:42:20  25 maps that might be better.  It's whether this map

26

09:42:22　1　discriminates.

09:42:24　2　　　　MS. LIGHTFOOT:  And I apologize if I'm confusing you,

09:42:28　3　your Honor, and I agree with you, that is the test, it's

09:42:32　4　whether it's this particular map.

09:42:34　5　　　　What we are interested in knowing, however, is

09:42:34　6　whether or not there was expert involvement in helping craft

09:42:36　7　that map on the front end before it was passed or whether or

09:42:40　8　not the expert analysis was done in an ad hoc basis after the

09:42:44　9　fact.

09:42:44　10　　　　Now, we will learn some of that when we sit down with

09:42:46　11　the expert reports that are produced, we will learn some of

09:42:48　12　that when we have the opportunity, presumably, to depose those

09:42:52　13　experts, but there's still going to be a piece of information

09:42:54　14　that's missing.

09:42:56　15　　　　The defendant in our case is the State Board of

09:42:58　16　Elections.  We know now, based upon the discovery that they

09:43:00　17　provided to us, that they effectively didn't get involved in

09:43:04　18　any of this process until after the map was passed.

09:43:06　19　　　　What we're interested in is what the data inputs were

09:43:10　20　that went into the drafting of this map.  And if the experts

09:43:14　21　were only retained post the passage of the map, we are not

09:43:18　22　going to know that information because they are not going to

09:43:20　23　know it, frankly.

09:43:22　24　　　　JUDGE LEFKOW:  I still don't really see why that

09:43:24　25　matters; that is, if they had the good luck of producing a

27

09:43:28   1   valid map without engaging an expert, then that's good for

09:43:36   2   them, right?

09:43:36   3        MS. LIGHTFOOT:  Well, I think it speaks to whether or

09:43:40   4   not, in fact, this map was valid.  It would be -- it would

09:43:44   5   certainly be good luck, maybe even more than that, if they

09:43:48   6   produced this map without having a single expert weigh in on

09:43:52   7   the map before it was passed, and that would be an interesting

09:43:56   8   data point, frankly.

09:43:58   9        But I think what we are looking for is the basic

09:44:02  10   inputs into that map.  That information is not readily

09:44:06  11   available in another source.  We do think if you look at very

09:44:10  12   established case law that talks -- speaks to the issue of

09:44:14  13   balancing the qualified privilege in an evidentiary context,

09:44:20  14   that the balancing weighs in favor of disclosure of the very

09:44:24  15   information that we are seeking, and we'd ask the court to so

09:44:28  16   rule.

09:44:30  17        On a related point, if the court were to determine --

09:44:32  18   and we put this in as an alternative with respect to our

09:44:34  19   argument -- if the court were to determine either that there

09:44:38  20   is absolute immunity -- and I really don't believe that that's

09:44:42  21   a test, and, frankly, as a citizen of the state, I would

09:44:44  22   encourage the court not to adopt that because I think it would

09:44:48  23   make it virtually impossible for any plaintiff seeking to

09:44:52  24   vindicate an important federal right like the Voting Rights

09:44:56  25   Act to be able to come into court and prosecute their case.  I

28

09:45:04  1  think the better test is qualified privilege.  If the court
09:45:06  2  were to determine that the information is shielded from
09:45:14  3  some -- from view for some reason, what we would ask is that
09:45:18  4  part of that order, the court indicate that the State Board of
09:45:22  5  Elections, or no other party, frankly, can then come back and
09:45:26  6  use that information as a shield -- or, sorry, as a sword in
09:45:30  7  this case.  I don't think they can have it both ways.  If they
09:45:32  8  are saying, We can legislate in a black box, you are not
09:45:36  9  entitled to any information, fair enough, and if that's what
09:45:40  10  the court determines, we will respect that determination.  But
09:45:44  11  I don't think on the back end, it's appropriate for them to
09:45:46  12  say, Wait, wait, wait, but, but, but let us bring in this
09:45:50  13  staffer, this piece of evidence, this expert.
09:45:52  14          Thank you, your Honor.
09:45:54  15          MR. PRENDERGAST:  May I respond to that one point?  I
09:45:56  16  just think it's a little early for motions in limine.
09:45:58  17          JUDGE LEFKOW:  Pardon me?
09:46:00  18          MR. PRENDERGAST:  I think it's a little early for
09:46:02  19  motions in limine.
09:46:02  20          JUDGE LEFKOW:  All right.  I think we have heard
09:46:04  21  enough.  Thank you all for your help today.
09:46:06  22          MS. LIGHTFOOT:  Thank you, your Honor.
09:46:18  23          MR. BERGETZ:  Your Honor, Carl Bergetz for the
09:46:20  24  defendant.  We do have one -- the parties to the case have
09:46:24  25  come to an agreement on a few things.  There was one thing