## UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BRENZINSKI, and LAURA WAXWEILER | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) ) | |
| v. | ) ) | No. 11 C 5065 |
| ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLTZ, and ERNEST L. GOWEN, | ) ) ) ) ) ) ) ) | Judge John Daniel Tinder Judge Robert L. Miller Judge Joan Humphrey Lefkow |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the court on plaintiffs' motion to compel enforcement of third party subpoenas [Dkt. No. 52] and certain non-parties' motion to quash subpoenas and for a protective order [Dkt. No. 58]. The motions raise legislative privilege issues rarely addressed by the courts because they pertain to the redistricting activity that follows each decennial census. For this reason, this opinion is more lengthy than the typical ruling on discovery issues.

## BACKGROUND

The United States Constitution requires Illinois lawmakers to redraw the state's congressional district boundaries after each decennial census. U.S. CONST. ART. I, § 2; *id.* amend. XIV, §§ 1 & 2; *id.* AMEND. XV; *Ryan* v. *State Bd. of Elections of State of Ill.*, 661 F.2d 1130, 1132 (7th Cir. 1981). Pursuant to this authority, the Illinois General Assembly drafted, debated, and passed the Illinois Congressional Redistricting Act of 2011 (the "Redistricting Act") (P.A. 97-14). The Redistricting Act eliminates one congressional seat, as required by the 2010 United States Census results, and establishes boundaries for the state's eighteen remaining congressional districts.

Beginning on March 28, 2011, and continuing through May 2, 2011, members of the Illinois House of Representatives and the Illinois Senate held a series of public hearings at locations around the state where members of the public were allowed to comment on the redistricting process. *See* 10 Ill. Comp. Stat. 125/10-5. On May 27, 2011, the Democratic leadership of the Illinois House and Senate Redistricting Committees released the congressional redistricting plan ("2011 Map") on its website. Three days later, the Illinois House of Representatives passed the Redistricting Act, and the next day the Illinois Senate followed suit. On June 24, 2011, the Governor signed the Redistricting Act into law, and the present litigation ensued.

The plaintiffs comprise three groups: The Committee for a Fair and Balanced Map, a not-for-profit organization created by Illinois citizens concerned about the congressional redistricting process in Illinois; nine Republican Congressmen and one Republican Congresswoman; and six registered voters, four of whom are identified as Latino and two as Republican (collectively

"plaintiffs"). The defendants include the Illinois State Board of Elections, the agency charged with implementing the 2011 Map, and its individual members (collectively "defendants").

Plaintiffs allege that the 2011 Map discriminates against Latino and Republican voters, and they seek to invalidate the redistricting plan in whole or in part. Specifically, plaintiffs allege that the 2011 Map violates the Voting Rights Act of 1965, 42 U.S.C. § 1973 ("VRA") (Count I), the Fourteenth Amendment (Count II) and the Fifteenth Amendment (Count III) by diluting the voting strength of Latino voters. Plaintiffs also claim that the 2011 Map constitutes an impermissible racial gerrymander in violation of the Fourteenth Amendment (Count IV) and a partisan gerrymander in violation the First Amendment (Count V) and Fourteenth Amendment (Count VI).

The parties have engaged in expedited discovery. Pursuant to Federal Rule of Civil Procedure 45, plaintiffs served thirty subpoenas *duces tecum*[1] on a number of non-party entities and individuals, including the (i) Illinois House of Representatives (through Tim Mapes, Chief of Staff); (ii) Office of the Speaker of the Illinois House of Representatives (through Tim Mapes, Chief of Staff); (iii) Illinois House Redistricting Committee (through Barbara Flynn Currie, Chairperson); (iv) Illinois Senate (through Jillayne Rock, Secretary of the Senate); (v) Office of the Senate President (through Andrew Manar, Chief of Staff); (vi) Illinois Senate Redistricting Committee (through Kwame Raoul, Chairperson); and (vii) various legislative staffers with knowledge of the reapportionment scheme (collectively "Non-Parties"). The subpoenas contain

---

[1] The United States District Court for the Central District of Illinois issued twenty-five of the thirty subpoenas served by plaintiffs because most of subpoenaed witnesses reside in Springfield, Illinois. The remaining five subpoenas were issued by the United States District Court for the Northern District of Illinois. According to Non-Parties, the Northern District of Illinois subpoenas capture all of the documents within the scope of the Central District of Illinois subpoenas, including those possessed by the Illinois House and Senate Redistricting Committees and individual staff members.

twenty-one requests for production encompassing documents and communications related to the 2011 Map. Non-Parties refused to comply with plaintiffs' requests, claiming that legislative immunity, the deliberative process privilege, the attorney-client privilege and/or the work-product doctrine protect the documents from disclosure.

On September 15, 2011, plaintiffs filed a motion to compel enforcement of the third party subpoenas. The next day, the President of the Illinois Senate, the Speaker of the Illinois House of Representatives, and the chairpersons of the Illinois House and Senate Redistricting Committees moved to quash. Each party was allowed to file a response and this three-judge court heard arguments on September 29, 2011.

## ANALYSIS

### I. Relevance of Requested Discovery

Plaintiffs have served Non-Parties with twenty-one document requests.

### A. Requested Documents

Plaintiffs seek a plethora of documents concerning the planning, development, negotiation, and drawing of the 2011 Map.[2] These documents can be broadly categorized as

---

[2] Plaintiffs' document requests include:

1.  All documents related to the state of Illinois legislative and/or congressional redistricting process which led to the planning, development, negotiation, drawing, revision or re-drawing of the 2011 Map.
2.  All documents, including, but not limited to, reports, analyses, election results or other election data, and communications pertaining or relating to the planning, development, negotiation, drawing, revision or re-drawing of the 2011 Map.
3.  All documents regarding any communications, discussions, meetings and/or conversations, pertaining or relating to the planning, development, negotiation, drawing, revision or re-drawing of the 2011 Map with any of the following: Defendants; Democratic Congressional Campaign Committee or anyone else acting on its behalf; Illinois House and Senate Redistricting Committees; any member of the Illinois General Assembly or anyone acting on their behalf; any current or former member of Congress

(continued...)

4

---

[2](...continued)
and anyone acting on their behalf; any interest groups that testified at the redistricting hearings.

4.  All documents, communications or other matter, including all data files or other data type related to election and/or voter data; election redistricting software; and all 2010 Census data used for the purpose of planning and drawing the 2011 Map or any other potential congressional plan that was not adopted.

5.  All documents, communications or other matter, that constitute, refer or relate to data files and drafts of data files used to formulate the composition of Districts 3, 4, 5 of the 2011 Map.

6.  Any draft drawings of any Districts of the 2011 Map.

7.  All documents which reflect the identity of any and all persons who assisted in the drawing of Districts 3, 4, and 5 of the 2011 Map.

8.  All documents which reflect when the planning and drawing of Districts 3, 4, and 5 of the 2011 Map were finalized.

9.  All documents which reflect the identity of person(s) who made or participated in the decision to have the Latino Voting Age Population ("VAP") in District 3 as 24.64%.

10.  All documents which reflect the identity of person(s) who made or participated in the decision to have the Latino VAP in District 4 as 65.92%.

11.  All documents which reflect the identity of person(s) who made or participated in the decision to have the Latino VAP in District 5 as 16.05%.

12.  All documents which reflect the identity of any expert or consultant who reviewed, commented on, advised or otherwise rendered any advice or opinion concerning the 2011 Map.

13.  All documents which reflect the identity of any expert or consultant who conducted any racial bloc voting or racial polarization analysis concerning the 2011 Map.

14.  Documents which reflect any racial bloc voting or racial polarization analysis conducted by any expert or consultant.

15.  All documents or communications pertaining or relating to any analysis, review, study or consideration undertaken by any expert, consultant, scholar or other person regarding whether the 2011 Map complies with the VRA, the U.S. Constitution, or the Illinois Constitution.

16.  All documents which consist of reports or opinions of any expert or consultant used to support the composition of the entire 2011 Map.

17.  All documents which reflect any and all analysis concerning the viability of drawing two Latino congressional Districts, whether the Districts be considered majority or influence districts.

18.  Any engagement letters provided to experts or consultants engaged for the purposes of planning, preparing, drawing, and analyzing or providing supporting evidence for the 2011 Map.

19.  All records of payment to any experts or consultants.

20.  All documents identifying any person(s) involved in the decision to post the proposed congressional plan on the Illinois Senate website during the early morning hours of May 27, 2011.

21.  All documents identifying any person(s) who actually posted the congressional plan on

(continued...)

(1) information concerning the motives, objectives, plans, reports, and/or procedures used by lawmakers to draw the 2011 Map;[3] (2) information concerning the identities of persons who participated in decisions regarding the 2011 Map;[4] (3) the identities of experts and/or consultants retained to assist in drafting the 2011 Map and contractual agreements related thereto;[5] and (4) objective facts upon which lawmakers relied in drawing the 2011 Map.[6]

### B. Relevancy of Requested Documents

Under Rule 26 of the Federal Rules of Civil Procedure, parties may obtain discovery of any nonprivileged matter that is relevant to any party's claim or defense. Plaintiffs make six claims related to the 2011 Map. *See* Compl. ¶¶ 108–38. Proof of discriminatory intent is required for plaintiffs to prevail on their Fourteenth and Fifteenth Amendment racial discrimination claims.[7] It has also been found sufficient, though not necessary, to sustain a VRA claim. *See United States* v. *Irvin*, 127 F.R.D. 169, 171 (C.D. Cal. 1989) (after the 1982 amendments to the VRA, "plaintiffs may carry their burden by fulfilling *either* the more restrictive intent test or the results test") (internal quotation marks and citations omitted); *accord Garza* v. *County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990).

---

[2](...continued)
the Illinois Senate website during the early morning hours of May 27, 2011.

[3]*See* Req. Nos. 1–6, 8, 14–17. [Doc. No. 52-1.]

[4]*See* Req. Nos. 7, 9–11, 20–21. [Doc. No. 52-1.]

[5]*See* Req. Nos. 12–13, 18–19. [Doc. No. 52-1.]

[6] *See* Req. Nos. 2 & 4. [Doc. No. 52-1.]

[7] The test for plaintiffs' partisan gerrymandering claims is unsettled. *See Vieth* v. *Jubelirer*, 541 U.S. 267, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004).

To demonstrate intentional discrimination, however, plaintiffs need not offer direct evidence of discriminatory intent. Direct evidence includes statements made by the decision making body or members thereto. *See, e.g., ACORN* v. *County of Nassau*, No. 05-2301, 2007 WL 2815810, at *3 (E.D.N.Y. Sept. 25, 2007) (*ACORN I*) ("testimony regarding a legislator's stated motivation might be the most direct form of evidence" of discriminatory intent.) Instead, plaintiffs may rely on circumstantial evidence to show that lawmakers purposefully discriminated against Latino and/or Republican voters in enacting the 2011 Map. *See Ketchum* v. *Byrne*, 740 F.2d 1398, 1406 (7th Cir. 1984) ("In *Rogers*, the [Supreme] Court affirmed the district court's finding of intentional discrimination based on indirect and circumstantial evidence and endorsed its reliance on a 'totality of the circumstances' approach.") (citing *Rogers* v. *Lodge*, 458 U.S. 613, 622–27, 102 S. Ct. 3272, 73 L. Ed. 2d 1012 (1982)).

For example, to evaluate claims of racial vote dilution under the Fourteenth Amendment, courts rely on the totality of the circumstances test. *See Rogers*, 458 U.S. at 618. Under this test, courts may infer discriminatory intent from a variety of circumstantial factors. These factors include, but are not limited to, bloc voting along racial lines; low minority voter registration; exclusion from the political process; unresponsiveness of elected officials to needs of minorities; and depressed socio-economic status attributable to inferior education and employment and housing discrimination. *Ketchum*, 740 F.2d at 1406 (citing *Rogers*, 458 U.S. at 622–27). Other factors include the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; minority retrogression (i.e. a decrease in the voting strength of a cohesive voting bloc over time); and manipulation of district boundaries to adjust the relative size of minority groups, including

7

the "packing" of minority voters.  *See Village of Arlington Heights* v. *Metro. Housing Dev. Corp.*, 429 U.S. 252, 267–68, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977); *Rybicki* v. *State Bd. of Elections*, 574 F. Supp. 1082, 1108–12 (N.D. Ill. 1982).  Thus, under the totality of the circumstances test, the court may infer an "invidious discriminatory purpose . . . from the totality of the relevant facts," including the discriminatory effect of the redistricting scheme.  *Rogers*, 458 U.S. at 618 (citation omitted).

Plaintiffs allege many of these circumstantial factors in their Complaint.  *See* Compl. ¶¶ 38–45 (events leading up to enactment); ¶ 60 (history of discrimination); ¶¶ 52–54 (manipulating district boundaries); ¶ 57 (racial polarization of elections).  Yet many of plaintiffs' document requests solicit direct, not circumstantial, evidence of legislative intent, by demanding documents that contain communications between lawmakers and their staff.  *See, e.g.,* Req. Nos. 1–5 & 8.  These documents are likely to contain the motives, impressions and/or opinions of those responsible for drafting the 2011 Map.  Other requests seek the identities of those who made or participated in key decisions, suggesting an attempt by plaintiffs to gain insight to the thought processes of these individuals, if not now, then perhaps later through depositions.  *See, e.g.,* Req. Nos. 7, 9–13.

To be sure, statements made by members of the decision-making body are relevant to show discriminatory intent.  *See Village of Arlington Heights*, 429 U.S. at 268.  But this is but one factor among many that plaintiffs may use to prove their claims.  As acknowledged by the Supreme Court,

> Inquiries into congressional motives or purposes are a hazardous matter.  When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the

8

> possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*Hunter* v. *Underwood*, 471 U.S. 222, 228, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985) (quoting

*United States* v. *O'Brien*, 391 U.S. 367, 383–84, 88 S. Ct. 1673, 1682–1683, 20 L. Ed. 2d 672

(1968)); *see also Palmer* v. *Thompson*, 403 U.S. 217, 224, 91 S. Ct. 1940, 29 L. Ed. 2d 438

(1971) ("no case in this Court has held that a legislative act may violate equal protection solely

because of the motivations of the men who voted for it"); *Hispanic Coalition on*

*Reapportionment* v. *Legislative Reapportionment Comm.*, 536 F. Supp 578, 586 (D. Pa. 1982)

(holding that discriminatory statements made by the chairman of a city redistricting committee

were insufficient to prove discriminatory intent absent a showing that the state legislative body

adopted the chairman's views). Thus, the individual motivations and objectives of those who

drafted the 2011 Map, although relevant, are not critical to the outcome of this case.

The remainder of plaintiffs' document requests pertain to facts, plans, reports or

procedures created, formulated or used by lawmakers to draft the 2011 Map. Objective facts,

such as United States Census reports and election returns, are highly relevant to plaintiffs' claims

and necessary to prove many of the totality of the circumstances factors, including racial bloc

voting, retrogression and manipulation of district boundaries. The actual facts upon which

lawmakers relied, however, are less relevant because they say little as to whether the overall

effect of the 2011 Map is discriminatory. Lawmakers may have considered a lot of facts and

drawn a discriminatory map, or considered no facts and drawn a perfectly constitutional map.

The proof, so they say, is in the pudding; and the pudding is the 2011 Map.

Finally, to the extent that the plans, reports and procedures used by lawmakers to draw the 2011 Map shed light on the sequence of events leading up to its enactment, this information may be relevant to plaintiffs' claims. The most important events, however, are those undertaken by the legislative body, such as public hearings, committee meetings and floor debates. The deliberations of individual lawmakers, even those who helped draw the 2011 Map, are less probative of the totality of the circumstances test. Nevertheless, because most of plaintiffs' requests seek material relevant within Rule 26, the court will consider whether any of these documents are privileged from disclosure.

## II.     Identification of Nonprivileged Matter

The issue before this court is the extent to which legislative immunity shields non-party state lawmakers from providing evidence in a civil lawsuit related to their legislative activities. Plaintiffs argue that the privilege is qualified and narrow. Non-Parties argue that it is absolute.

### A.     Absolute Legislative Immunity

The Speech or Debate Clause of the United States Constitution grants federal lawmakers absolute legislative immunity from civil suit for their legitimate legislative activities. The Clause states that "for any Speech or Debate in either House," Senators and Representatives "shall not be questioned in any other Place." U.S. CONST. ART. I, § 6, cl. 1. When applied, this provision shields federal lawmakers "engaged in the sphere of legitimate legislative activity" from being sued for prospective relief or damages. *Supreme Ct. of Va.* v. *Consumers Union of U.S.*, 446 U.S. 719, 732, 100 S. Ct. 1967, 64 L. Ed. 2d 641 (1980) (quoting *Tenney* v. *Branhove*, 341 U.S. 367, 376, 71 S. Ct. 783, 95 L. Ed. 1019 (1951)). It also mandates an evidentiary privilege that  prevents the legislative acts of a member of Congress from being used against him

or her in court. *See United States* v. *Helstoski*, 442 U.S. 477, 488–89, 99 S. Ct. 2432, 61 L. Ed. 2d 12 (1979). Finally, it provides a testimonial privilege that protects a member or the member's aides from judicial questioning regarding the member's legislative acts. *Gravel* v. *United States*, 408 U.S. 606, 616, 92 S. Ct. 2614, 33 L. Ed. 2d 583 (1972). "In sum, the Speech or Debate Clause prohibits inquiry . . . into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts." *United States* v. *Brewster*, 408 U.S. 501, 512, 92 S. Ct. 2531, 33 L. Ed. 2d 507 (1972).

The Speech or Debate Clause, by its terms, does not apply at all to state and local legislators. *See, e.g., Fla. Ass'n of Rehab. Fac., Inc.* v. *State of Fla. Dep't of Health & Rehab. Servs.,* 164 F.R.D. 257, 266 (N.D. Fla. 1995). Instead, the federal common law applies.[8] Applying the federal common law, the Supreme Court in *Tenney* held that members of a state legislative committee were immune from civil liability for allegedly violating an individual's civil rights by calling him before the committee to testify in an effort to interfere with his First Amendment rights. 341 U.S. at 376–77. Since *Tenney*, it is clear that under the federal common law "state and local officials are absolutely immune from federal suit for personal damages for their legitimate legislative activities." *Empress Casino Joliet Corp.* v. *Blagojevich*, 638 F.3d 519, 527 (7th Cir. 2011) (citations omitted), *partially vacated and decided on unrelated grounds by Empress Casino Joliet Corp.* v. *Balmoral Racing Club, Inc.*, 651 F3d 799 (7th Cir. 2011); *see also Tenney*, 341 U.S. at 376–77. This immunity also extends to "legislative staff members, officers, or other employees of a legislative body, although it is considered less absolute as

---

[8] This case presents federal questions and therefore the federal common law applies. Fed. R. Evid. 501; *see generally* 3 Weinstein's Evidence § 501.02[2][b][i] (1997) (in federal question cases, federal privilege law, rather than the privilege law of the forum state, generally applies).

11

applied to these individuals." *Marylanders for Fair Representation, Inc.* v. *Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992) (internal quotation marks and citations omitted).

The scope of the federal common law is not entirely settled, however. The Supreme Court has held that in a federal criminal prosecution, a state legislator did not have an absolute evidentiary privilege based in legislative immunity from introduction of evidence of his legislative acts. *United States* v. *Gillock*, 445 U.S. 360, 373, 100 S. Ct. 1185, 63 L. Ed. 2d 454 (1980). *Gillock* carved out an exception from *Tenney*, reasoning that "the cases in this court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." 445 U.S. at 372. *See Fla. Ass'n of Rehab. Fac., Inc*, 164 F.R.D. at 267 ("legislators and some of their staff members may be immune to civil process in a suit directly against them . . . [but this immunity] is not an evidentiary privilege").

Since *Gillock*, a number of courts have "rejected the notion that the common law immunity of state legislators gives rise to a general evidentiary privilege." *Manzi* v. *DiCarlo*, 982 F. Supp. 125, 129 (E.D.N.Y. 1997) (citations omitted); *see Cano* v. *Davis*, 193 F. Supp. 2d 1177, 1180 (C.D. Cal. 2002) ("state legislators do not enjoy the type of absolute protection afforded members of the Congress under the Speech or Debate Clause"); *In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987) ("Neither the threat of harassment, the dangers of distraction, nor the potential disruption of confidential communications justifies a qualified privilege for the full range of legislative activities normally protected by the Speech or Debate Clause.").

The issue before this court is whether common law legislative immunity absolutely shields non-party state lawmakers from providing evidence in a civil lawsuit related to their

legislative activities. Given the federal interests at stake in redistricting cases, this court

concludes that common law legislative immunity does not entirely shield Non-Parties here. In

*Gillock*, the Supreme Court noted that "where important federal interests are at stake, such as in

the enforcement of federal criminal statutes, comity yields." 445 U.S. at 373. The federal

government's interest in enforcing voting rights statutes is, without question, important. *See,*

*e.g.*, *Irvin*, 127 F.R.D. at 174 ("The federal interest in the present case is compelling. The

Voting Rights Act forbids local practices that abridge the fundamental right to vote. This Act

requires vigorous and searching federal enforcement."); *Bartlett* v. *Strickland*, 556 U.S. 1, ----,

129 S. Ct. 1231, 1240, 173 L. Ed. 2d 173 (2009) ("Passage of the Voting Rights Act of 1965 was

an important step in the struggle to end discriminatory treatment of minorities who seek to

exercise one of the most fundamental rights of our citizens: the right to vote."). Voting rights

cases, although brought by private parties, seek to vindicate public rights. In this respect, they

are akin to criminal prosecutions. Thus, much as in *Gillock*, "recognition of an evidentiary

privilege for state legislators for their legislative acts would impair the legitimate interest of the

Federal government." *Gillock*, 445 U.S. at 373.

Moreover, the Supreme Court has stated that evidentiary privileges must be "strictly

construed" and accepted "only to the very limited extent that permitting a refusal to testify or

excluding relevant evidence has a public good transcending the normally predominant principle

of utilizing all rational means for ascertaining truth." *Trammel* v. *United States*, 445 U.S. 40, 50,

100 S. Ct. 906, 63 L. Ed. 2d 186 (1980) (citation omitted). This court therefore does not find in

the common law an absolute immunity for non-party state lawmakers that protects them from

13

producing documents in federal redistricting cases. Instead, Non-Parties' privilege claims are best analyzed under the doctrine of legislative privilege.

### B. Legislative Privilege

Other courts in different contexts have applied a qualified legislative privilege to protect state lawmakers from producing documents related to their legislative activities. This privilege is similar to the deliberative process privilege, which is also qualified, but the deliberative process privilege applies to the executive branch, not the legislature. The legislative privilege does not shield lawmakers from being sued, but rather protects them from producing documents in certain cases. *See Lindley* v. *Life Ins. Co. of Am.*, No. 08-CV-379, 2009 WL 2245565, at *9 (N.D. Okla. Jul. 24, 2009) ("Generally, legislators' immunity from suit is referred to as 'legislative immunity,' and the evidentiary privilege accorded legislators is referred to as the 'legislative privilege.'"). Under the federal common law, legislative privilege is qualified, not absolute, and may be overcome by a showing of need. *In re Grand Jury*, 821 F.2d at 958; *Joseph's House & Shelter, Inc*. v. *City of Troy, N.Y.*, 641 F. Supp. 2d 154, 158 n.3 (N.D.N.Y. 2009).

In determining whether and to what extent a state lawmaker may invoke legislative privilege, the court will consider the following factors: (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *Rodriguez* v. *Pataki*, 280 F. Supp. 2d 89, 101 (S.D.N.Y. 2003) (citing *In re Franklin Nat'l Bank Secs. Litig*., 478 F. Supp. 577, 583 (E.D.N.Y. 1979)); *see also ACORN* v. *County of*

14

*Nassau*, No.05-2301, 2009 WL 2923435, at *2 (E.D.N.Y. Sept. 10, 2009) (*ACORN II*); *Joseph's*

*House & Shelter, Inc*, 641 F. Supp. 2d at 158 n.3.  In considering these factors, the court's goal is

to determine whether the need for disclosure and accurate fact finding outweighs the

legislature's "need to act free of worry about inquiry into [its] deliberations."  *ACORN II*, 2009

WL 2923435, at *2 n.2.[9]

### C.    Balancing of Interests

#### 1.    The Seriousness of the Litigation and the Issues Involved, and the Role of the Government in the Litigation

In balancing the relevant interests, the first two factors weigh in favor of disclosure.

There can be little doubt that plaintiffs' allegations are serious.  Plaintiffs raise profound

---

[9] These factors are also used by some courts to evaluate the availability and scope of the deliberative process privilege.  *See, e.g., Doe* v. *Nebraska*, Nos. 8:09CV456, 4:09CV3266, 4:10CV3005, ----F. Supp. 2d----, 2011 WL 1480483, at *7 (D. Neb. Apr. 19, 2011).  The deliberative process privilege prohibits discovery of communications that are used by governmental bodies in formulating policy. *United States* v. *Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993).  The key difference between the deliberative process privilege and the legislative privilege is that the former protects executive and administrative deliberations, and the latter safeguards legislative independence.  *See Kay* v. *City of Rancho Palos Verdes*, No. CV 02-3922, 2003 WL 25294710, at *15 (C.D. Cal. Oct. 10, 2003).

Some courts considering the scope of the deliberative process privilege have applied the same legislative privilege factors discussed herein.  *See, e.g, Doe*, 2011 WL 1480483, at *7; *Kay*, 2003 WL 25294710, at *18.  In this respect, "the balancing tests that courts have suggested for challenges to both the legislative privilege and the deliberative process privilege are quite similar and functionally interchangeable."  *Kay*, 2003 WL 25294710, at *17 (collecting cases).

Several cases in the Northern District of Illinois, however, have required a particularized showing to invoke the deliberative process privilege.  *See, e.g., Buonauro* v. *City of Berwyn*, No. 08-C-6687, 2011 WL 2110133, at *2 (N.D. Ill. May 25, 2011) ("In order to invoke the privilege, a party must show three elements: (1) the department head with control over the information has made a formal claim of privilege; (2) the responsible official must demonstrate, usually by affidavit, the reasons for preserving the confidentiality of the documents; and, (3) the official must specifically identify and describe the documents in question.") (citing *Ferrell* v. *U.S. Dep't Hous. & Urban Dev.*, 177 F.R.D. 425, 428 (N.D. Ill.1998)); *see also Parvati Corp.* v. *City of Oak Forest,* No. 08-C-702, 2010 WL 2836739, at *5 (N.D. Ill. July 19, 2010).

Because Non-Parties are members of the legislative branch, not the executive branch, and because they have not made the particularized showing required to invoke the deliberative process privilege, the deliberative process privilege does not apply.  This court will consider cases in other courts analyzing the deliberative process privilege only to the extent that they bear on the scope of the legislative privilege.

questions about the legitimacy of the redistricting process and the viability of the 2011 Map.

Moreover, the legislators' role in the allegedly unlawful conduct is direct. The General

Assembly, through its members, aides and consultants, was primarily responsible for drafting,

revising and approving the 2011 Map. These actions are under scrutiny. This is not, then, "the

usual 'deliberative process' case in which a private party challenges governmental action . . . and

the government tries to prevent its decision-making process from being swept up unnecessarily

into [the] public [domain]." *United States* v. *Bd. of Ed. of City of Chicago*, 610 F. Supp 695, 700

(N.D. Ill. 1985). Rather, "the decisionmaking process . . . [itself] *is* the case," at least to the

extent that plaintiffs allege that the General Assembly intentionally discriminated against Latino

and/or Republican voters. *Id.* (emphasis in original). The seriousness of the litigation and the

role of Non-Parties militate in favor of disclosure.

### 2. The Relevance of the Evidence Sought to be Protected and the Availability of Other Evidence

As discussed in Part I.B. the evidence plaintiffs seek is relevant, although it is not central

to the outcome of this case. Moreover, the availability of other evidence favors non-disclosure.

Plaintiffs already have considerable information at their fingertips. This includes public hearing

minutes, special interest group position papers, statements made by lawmakers during debate,

committee reports, press releases, newspaper articles, census reports, registered voter data and

election returns. These documents and data are a matter of public record. As such, these factors

weigh against disclosure.

### 3. The Possibility of Future Timidity by Government Employees

Finally, the need to encourage frank and honest discussion among lawmakers favors non-

disclosure. Plaintiffs claim that disclosure of the subpoenaed documents will not unduly chill

16

legislators in their future communications because Non-Parties are not defendants in the present litigation and there is little danger that any discovered material would be used against them in a later criminal prosecution. Plaintiffs also claim that because this case involves redistricting—a task not oft performed by legislators—permitting discovery will not work to chill the day-to-day functioning of the legislature.

The Redistricting Act, however, evolved from the same legislative process as any other law. Legislators negotiated the law in private and debated it in public. Infrequency is therefore irrelevant. In addition, the need for confidentiality between lawmakers and their staff is of utmost importance. Legislators face competing demands from constituents, lobbyists, party leaders, special interest groups and others. They must be able to confer with one another without fear of public disclosure.

In this respect, the legislature is not unlike other branches of government. As noted by the Third Circuit, a "legislator's need for confidentiality is similar to the need for confidentiality in communications between judges, between executive officials, and between a President and his aides." *In re Grand Jury*, 821 F.2d at 957 (citations omitted); *see also Certain Complaints Under Investigation by an Investigating Comm. of the Judicial Council of the Eleventh Circuit*, 783 F.2d 1488, 1520 (11th Cir. 1986) (judicial privilege applies where matters under inquiry implicate communications among a judge and his staff concerning official judicial business such as "the framing and researching of opinions, orders and rulings"); *N.L.R.B.* v. *Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975) (executive privilege for agency officials applies to documents "reflecting advisory opinions, recommendations and deliberations

comprising part of a process by which governmental decisions and policies are formulated")
(citation omitted).

Failure to protect confidential communications between lawmakers and their staff will
not only chill legislative debate, it will also discourage "earnest discussion within governmental
walls." *Doe*, 2011 WL 1480483, at *6 (citations omitted). In the redistricting context, full
public disclosure would hinder the ability of party leaders to synthesize competing interests of
constituents, special interest groups and lawmakers, and draw a map that has enough support to
become law. This type of legislative horse trading is an important and undeniable part of the
legislative process.

Courts have recognized that disclosure of confidential documents concerning intimate
legislative activities should be avoided. *See Rodriguez*, 280 F. Supp. 2d at 102; *Kay*, 2003 WL
25294710, at *14. Courts applying this approach have held that a qualified privilege protects
documents "created prior to the passage and implementation [of a bill] that involve opinions,
recommendations or advice about legislative decisions between legislators or between legislators
and their aides." *Doe*, 2011 WL 1480483, at *8; *see generally City of Las Vegas* v. *Foley*,
747 F.2d 1294, 1297 (9th Cir. 1984) ("The Court prevents inquiry into the motives of legislators
because it recognizes that such inquiries are a hazardous task.") (citations omitted).

By limiting privileged documents to those that contain "opinions, recommendations or
advice," courts have allowed discovery of "documents containing factually based information
used in the decision-making process or disseminated to legislators or committees, such as
committee reports and minutes of meetings." *Id.* at *6 (citations omitted). Courts have also
required disclosure of "the materials and information available [to lawmakers] at the time a

18

decision was made." *ACORN I*, 2007 WL 2815810, at *4 (citing *Village of Arlington Heights*, 429 U.S. at n.20).

This approach strikes the proper balance between the need for public accountability and the desire to avoid future timidity of lawmakers. Although always accountable to the public, lawmakers must be able to confer in private. This court therefore concludes that the legislative privilege shields from disclosure pre-decisional, non-factual communications that contain opinions, recommendations or advice about public policies or possible legislation. It does not protect facts or information available to lawmakers at the time of their decision.

In terms of the categories identified above, (1) information concerning the motives, objectives, plans, reports and/or procedures used by lawmakers to draw the 2011 Map; and (2) information concerning the identities of persons who participated in decisions regarding the 2011 Map, the need for the information is outweighed by the purposes of the qualified privilege. The contrary is true of (3) the identities of experts and/or consultants retained to assist in drafting the 2011 Map and contractual agreements related thereto; and (4) objective facts upon which lawmakers relied in drawing the 2011 Map. Indeed, much of this information is discoverable under Rule 26(a)(2)(B)(ii) should defendants' experts chose to rely on it.

### D.    Waiver

As with any privilege, the legislative privilege can be waived when the parties holding the privilege share their communications with an outsider. *See ACORN I*, 2007 WL 2815810, at *4 ("the legislative privilege may be waived as to communications made in the presence of third parties") (citation omitted). "Where a legislative aide or staff member performs functions that

would be deemed legislative if performed by the legislator himself, the staff member is entitled to the same privilege that would be available to the legislator." *Id.* (citation omitted). Thus, communications between Non-Parties and their staff retain their privileged status. *See id.* at *5.

Communications between Non-Parties and outsiders to the legislative process, however, do not. This includes lobbyists, members of Congress and the Democratic Congressional Campaign Committee ("DCCC"). Although these groups may have a heightened interest in the outcome of the redistricting process, they could not vote for or against the Redistricting Act, nor did they work for someone who could. As such, the legislative privilege does not apply. *See Rodriguez*, 280 F. Supp. 2d at 101 ("a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation [is] a session for which no one could seriously claim privilege").

The same rule applies to experts and/or consultants retained or utilized by Non-Parties to assist in the redistricting process. "While legislators are certainly free to seek information from outside sources, they may not assume that every such contact is forever shielded from view. . . . [A] contrary ruling would allow a legislator to cloak any communication with legislative privilege by simply retaining an outsider in some capacity." *ACORN I*, 2007 WL 2815810, at *6. Thus, to the extent that Non-Parties relied on reports or recommendations generated by outside consultants to draft the 2011 Map, they waived their legislative privilege as to these documents.

Finally, Non-Parties cannot invoke the privilege as to themselves yet allow others to use the same information against plaintiffs at trial. *See, e.g., Brown* v. *City of Detroit*, 259 F. Supp. 2d 611, 623–24 (E.D. Mich. 2003); *Pacific Gas & Elec. Co.* v. *Lynch*, No. C-01-3023, 2002 WL

32812098, at *3 (N.D. Cal. Aug. 19, 2002).  As such, any communications disclosed by Non-Parties to defendants or their trial experts, upon which defendants or their experts intend to rely, must be disclosed to plaintiffs.  *See* Fed. R. Civ. P. 26(a)(2)(B)(ii).[10]

## ORDER

Plaintiffs' motion to compel enforcement of third party subpoena [Dkt. No. 52] and certain non-parties' motion to quash subpoenas and for a protective order [Dkt. No. 58] are granted in part and denied in part, respectively. Non-parties are directed to comply with this order by October 19, 2011, specifically as follows:

To the extent that plaintiffs seek documents containing the (1) motives, objectives, plans, reports and/or procedures created, formulated or used by lawmakers to draw the 2011 Map prior to the passage of the Redistricting Act;[11] or (2) identities of persons who participated in decisions regarding the 2011 Map,[12] their requests are denied and the subpoenas are quashed. Plaintiffs are also prohibited from subpoenaing the aforementioned documents from individual members of the General Assembly unless the member affirmatively waives his or her legislative privilege in writing.

---

[10] Non-Parties indicated that to the extent the legislative privilege did not shield them from discovery, they would likely assert attorney-client privilege or work product immunity.  This decision addresses only the legislative privilege raised in the motions.  If Non-Parties have a serious basis for asserting any other privilege, this decision does not foreclose them.

[11] *See* Req. Nos. 1– 6, 8, 14–17. [Doc. No. 52-1.]

[12] *See* Req. Nos. 7, 9–11, 20–21. [Doc. No. 52-1.]

The motion to compel is granted and the motion to quash is denied as to documents containing objective facts upon which lawmakers relied in drawing the 2011 Map;[13] documents available to members of the General Assembly at the time the Redistricting Act was passed; the identities of experts and/or consultants retained by Non-Parties to assist in drafting the 2011 Map and contractual agreements related thereto;[14] and any documents that do not contain information concerning categories (1) or (2) above or to which Non-Parties have waived their legislative privilege.  This order is applicable only to those parties served with subpoenas issued by the Northern District of Illinois.

All documents withheld as privileged under this order shall be identified in a privilege log that contains (1) the name and capacity of each individual from whom or to whom a document was communicated; (2) the date of the document and attachments; (3) the type of document; (4) Bates number identification; and (5) a description of the subject matter in sufficient detail to allow the receiving parties to determine whether the privilege claim should be challenged.  *See Petrovic* v. *City of Chicago*, No. 06-C-611, 2007 WL 2410336, at *2 (N.D. Ill. Aug. 21, 2007).


Enter: October 12, 2011


\_\_\_/s/ John Daniel Tinder_____
JUDGE JOHN DANIEL TINDER
United States Court of Appeals

---

[13] *See* Req. Nos. 2 & 4. [Doc. No. 52-1.]

[14] *See* Req. Nos. 12–13, 18–19.  [Doc. No. 52-1.]

for the Seventh Circuit

_____

JUDGE ROBERT L. MILLER
United States District Court
for the Northern District of Indiana

_____

JUDGE JOAN HUMPHREY LEFKOW
United States District Court
for the Northern District of Illinois