**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11-C-5065 |
| v. | ) ) | Hon. John D. Tinder |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) ) ) | Hon. Joan H. Lefkow Hon. Robert L. Miller, Jr. (3-judge court convened pursuant to |
| Defendants. | ) | 28 U.S.C. § 2284) |

**DEFENDANTS' REPLY IN SUPPORT OF THE MOTION TO DISMISS**

Defendants, by their attorney Lisa Madigan, Attorney General for the State of Illinois, respectfully provide the following Reply in support of their Motion to Dismiss. As explained in this Reply, Plaintiffs' Response does not effectively refute Defendants' arguments in their Motion to Dismiss that the Complaint fails to state any claims for which relief can be granted. As a result, the Complaint should be dismissed.

**I.    Plaintiffs Have Conceded That They Cannot Establish the *Gingles* Preconditions for a Claim Under Section 2 of the Voting Rights Act and Therefore Fail to State a Voting Rights Act Claim**

Plaintiffs appear to concede that they cannot establish the "necessary preconditions" for a claim under Section 2 of the Voting Rights Act of 1965 (VRA), originally set out in *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). (*See* Pls.' Resp. 2.) Plaintiffs instead insist that they need not meet the *Gingles* requirements because they have used the word "intentional" in their Complaint. With no analysis as to what test is appropriate, Plaintiffs then simply assume that a claim of intentional race dilution under Section 2 is subject to the same standard as constitutional claims of vote dilution.

Plaintiffs' assumption is false. A Section 2 claim is a claim that a voting practice or procedure "results in a denial or abridgment of the right of any citizen of the United States to vote on account of race or color . . . ," and *Gingles* concluded that redistricting (as opposed to other voting practices or procedures) may result in the denial or abridgment of the right to vote under Section 2 only when the *Gingles* requirements are met. 42 U.S.C. § 1973; *Gingles,* 478 U.S. at 48 ("unless there is a conjunction of the following circumstances [the *Gingles* requirements], the use of multimember districts generally will not impede the ability of minority voters to elect representatives of their choice"); *see also Growe v. Emison*, 507 U.S. 25, 40-41 (1993) (extending the *Gingles* requirements to single member districting schemes and concluding that "[u]nless these points are established, there neither has been a wrong nor can [there] be a remedy" under Section 2). The Supreme Court has applied these requirements in every challenge to redistricting under Section 2 since *Gingles*, and has never found vote dilution where the requirements have not been met. There is no reason why allegations of intent should change the definition of when redistricting may *result* in the denial or abridgment of the right to vote. Plaintiffs have not provided a supportable one and nothing in the Supreme Court's jurisprudence suggests one.[1]

Indeed, the Eleventh Circuit has held that discriminatory intent does not eliminate or lessen the effects showing required for a Section 2 claim. *Johnson v. DeSoto County Bd. of Comm'rs*, 72 F.3d 1556, 1564 (11th Cir. 1996). Only one of the cases Plaintiffs cite is to the contrary, and that case, *Garza v. County of Los Angeles*, 918 F.2d 763, 769 (9th Cir. 1990), holds

---

[1] To the extent Plaintiffs assume that the *Gingles* requirements do not apply to intentional dilution claims under the VRA based on jurisprudence under the Equal Protection Clause, Defendants note first that the Court has not considered an intentional dilution claim under the Equal Protection Clause since the Court decided *Gingles*, and second, that a vote dilution claim under the Equal Protection Clause focuses on differential treatment on the basis of race, not discriminatory effect.

only that the first *Gingles* requirement – the majority showing – does not apply when intentional discrimination has been alleged.  Further, *Garza* has been criticized.  *See Meza v. Galvin*, 322 F. Supp. 2d 52, 62-63 n.13 (D. Mass. 2004) (noting that the Ninth Circuit's holding "'that, to the extent that *Gingles* does require a majority showing, it does so only in a case where there has been no proof of intentional dilution of minority voting strength' . . . is a bit puzzling" because "the principal difference in proof between a § 2 vote dilution case and one brought under the 14th Amendment resides in the necessity to prove intent in the latter but not the former").  The *Garza* court's holding is also questionable because its rationale – that application of the *Gingles* requirements would prevent redress for redistricting deliberately designed to prevent minorities from electing representatives in future elections – forgets that relief for intentional discrimination is potentially available under the Equal Protection Clause.

Nor did the Supreme Court recognize "compelling reasons" for not applying *Gingles* to intentional vote dilution claims in *Bartlett v. Strickland*, 129 S. Ct. 1231, 1246 (2009), as Plaintiffs claim; rather, the Court concluded that because the case did not involve allegations of intentional conduct, it did not need to "consider whether intentional discrimination affects the *Gingles* analysis" – indicating a presumption that *Gingles* would apply.  In addition, to the extent that *Bartlett* noted the view of the United States, that view only pertained to the first *Gingles* requirement, not *Gingles* as a whole.  *Id.*  *United States v. Brown*, 561 F.3d 420, 427 (5th Cir. 2009), did not involve redistricting, and thus the *Gingles* requirements were irrelevant. Similarly, *Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 359-60 (7th Cir. 1992), involved only an effects claim and not an intentional claim, and the statement Plaintiffs quote was dicta and considered discrimination by means other than redistricting.  Finally, *Dillard v. Baldwin*, 686 F. Supp. 1459 (M.D. Ala. 1988), considered an intentional claim under the VRA

unnecessarily – having already found the VRA was violated under an effects analysis – and its analysis of intent is not based on the redistricting case law.

Finally, Defendants do not argue that a claim for intentional vote dilution cannot be brought under the VRA, as Plaintiffs' contend (Pls.' Resp. 2-3); intent may be considered as additional evidence of dilution in the totality-of-circumstances analysis. *See Johnson*, 72 F.3d at 1564-65 (11th Cir. 1996) (holding that "proof of intent . . . is circumstantial evidence of discriminatory results that should be considered in assessing the 'totality of the circumstances'"); *accord Meza*, 322 F. Supp. 2d at 74.

In sum, Plaintiffs have failed either to show that a mere allegation of intent relieves Plaintiffs of establishing the *Gingles* preconditions for a Section 2 claim or to explain why it should. Plaintiffs' failure to allege the first *Gingles* requirement, that another majority Latino district beyond District 4 could be created, and to sufficiently allege the second and third *Gingles* requirements, and now their concession that they cannot meet the *Gingles* requirements, defeat their Section 2 claim. They do not vault over those required preconditions merely by using the word "intentional."

II.     **Plaintiffs Have Not Alleged Sufficient Facts to Support a Dilution Claim Under the Fourteenth Amendment or Section 2 of the Voting Rights Act**

Plaintiffs contend that they have alleged sufficient facts relevant to a totality-of-the-circumstances analysis to support a dilution claim under the Fourteenth Amendment Equal Protection Clause or Section 2 (relevant only if Plaintiffs meet the *Gingles* preconditions), arguing that they have alleged a lack of proportionality, racial polarization in voting, a history of discrimination, packing, and irregular procedure. Plaintiffs' allegations in each of these areas are flawed, however.

4

Plaintiffs mischaracterize their allegations respecting two of these factors. First, Plaintiffs claim to have alleged a history of discrimination, but in reality, the full extent of Plaintiffs' allegations is that "A Latino majority district with a very similar shape was created in the same location after the 1990 census in judicial proceedings over redistricting" and "Judicial proceedings concerning the post-1990 District 4 established that race – that is, Latino ethnicity – was the predominant consideration in the creation of that district." (Compl. ¶¶ 60-61.) Plaintiffs' Complaint does not even cite the cases that constitute the large majority of this paragraph of their Response, let alone allege a history of discrimination against Latinos affecting voter turnout or a history of electoral discrimination. (*See* Pls.' Resp. 5.)

Second, Plaintiffs likewise claim that they allege irregularities in the redistricting process suggestive of intentional discrimination against Latino voters, when in fact not one of their allegations regarding the redistricting process even mentions Latino voters. Rather, their allegations about irregular procedure relate pointedly to Plaintiffs' partisan gerrymander claims. For example: "State Senator Kwame Raoul, a *Democrat*, and House Majority Leader Barbara Flynn Currie, also a *Democrat* – controlled the conduct of the hearings"; "pursuant to a rule established by the *Democratic* chairpersons of the committees, members of the public were not permitted to ask questions"; "*Republican* legislators . . . implored the *Democratic* leadership of the committees to release proposed maps . . ."; and before the start of Memorial Day weekend, "the *Democratic* leadership of the Redistricting Committees released a proposed Congressional Map, SB 1178, for the first time." (Compl. ¶¶ 38-45, emphasis added.)

Defendants' Motion to Dismiss explained flaws in the other two factors – proportionality and polarized voting – to which Plaintiffs fail to offer any effective response. Plaintiffs argue that they alleged proportionality, pointing to their allegation that Latinos constitute 15.8% of

Illinois's population and 24.0% of Cook County's population, but the "proper benchmark" for measuring proportionality is citizen voting-age population (CVAP), and Plaintiffs nowhere allege a lack of proportionality considering CVAP. Quoted in full, the statement Plaintiffs point to in *League of United Latin American Citizens v. Perry,* 548 U.S. 399 (2006) (LULAC), reads: "We proceed now to the totality of the circumstances, and first to the proportionality inquiry, *comparing the percentage of total districts that are Latino opportunity districts with the Latino share of the citizen voting-age population.*" 548 U.S. at 436 (emphasis added); s*ee also Barnett v. City of Chicago,* 141 F.3d 699, 704 (7th Cir. 1998). As for polarized voting, the Motion to Dismiss pointed out that the Complaint failed to allege polarized voting specific to Cook County, an inquiry the Court has explicitly required to be district specific. Further, Plaintiffs simply restate the required showing in a conclusory fashion: "Traditionally, elections in Illinois have been racially and ethnically polarized." (Compl. ¶ 57.) Plaintiffs' Response does not give a reason to overlook these flaws. Finally, Plaintiffs point to their allegations that the State packed District 4 with Latino voters and reduced Latino voters in Districts 3 and 5, but these allegations amount to no more than the minimum circumstances that underlie a dilution claim.

Plaintiffs thus have not alleged any facts relevant to the totality-of-the-circumstances analysis employed under the Equal Protection Clause or Section 2 of the Voting Rights Act. Considered as a whole, their allegations could not support a plausible conclusion that the Congressional Map operates to further racial discrimination by diluting Latino voting strength or that Latino voters' right to vote is denied or abridged under the Map. Consequently, Counts I and II should be dismissed.

**III.     The Racial Gerrymander Plaintiff Has Not Stated a Sufficient Claim**

The Motion to Dismiss explained that the Racial Gerrymander Plaintiff fails to state a claim because the Complaint contains an allegation that in fact undermines the plausibility that race was the predominant factor motivating the crafting of District 4—the allegation that the Congressional Map has preserved the core of District 4 since the 1990 census. (Defs.' Mot. to Dismiss 7-8.) In his response, Plaintiff attempts to discount the force of this fact by arguing that respect of this traditional districting principle – preserving existing districts – continues "entrenched racial discrimination," citing *King v. State Board of Elections*, 979 F. Supp. 582 (N.D. Ill. 1996). (Pls.' Resp. 9.) But the *King* court concluded that District 4 remedied a VRA violation, rather than discriminated against Latinos or any other ethnicity. *King*, 979 F. Supp. at 617. Moreover, Plaintiff entirely fails to respond to the fact that preservation of the core of District 4 explains the shape and demographics of the District. As he highlights in his response, Plaintiff's only allegation relevant to a racial gerrymander, other than his allegations regarding the shape and demographics of District 4, is the fact that it was drawn over two decades ago, a remotely probative allegation at best. It is Plaintiff's burden to allege facts sufficient to state a plausible racial gerrymander claim, and Plaintiff has failed to do so; consequently, Count IV should be dismissed for failure to state a claim. *See Miller v. Johnson*, 515 U.S. 900, 916-17 (1995).

**IV.     Plaintiffs' Racial Dilution Claim is not Actionable under the Fifteenth Amendment**

Regarding Count III, Plaintiffs' Response ignores the central focus of Defendants' Motion to Dismiss: Over five decades of Supreme Court jurisprudence has established that, unless a redistricting scheme seeks to "deny the vote," "confine and restrict the voting franchise," or "exclude . . . from voting" a class of voters on the basis of race, no cause of action

7

lies under the Fifteenth Amendment. *See Rice v. Cayetano*, 528 U.S. 495, 513-14 (2000); *Reno v. Bossier Parish School Bd.*, 528 U.S. 320, 334 n. 3 (2000) ("It is established that the Supreme Court has "never held that vote dilution violates the Fifteenth Amendment . . . [it] never even 'suggested' as much") (citations omitted); *Mobile v. Bolden*, 446 U.S. 55, 65 (1980) (plurality opinion) (stating that the Fifteenth Amendment does not entail the right to have candidates of any certain race elected; once finding that African Americans in Mobile, Alabama "'register and vote without hindrance,' the District Court and Court of Appeals were in error in believing that the appellants invaded the protection of [the Fifteenth] Amendment in the present case") (citations omitted).

Neither of the cases cited by Plaintiffs (which both rely primarily on *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), the lodestar for all Fifteenth Amendment redistricting litigation) sustains their Fifteenth Amendment claim. As Plaintiffs' Response highlights, *Hastert v. State Board of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991), states only that *racial gerrymandering* – not an alleged vote dilution – could be actionable under the Fifteenth Amendment. 777 F.Supp. at 645.[2] And *Page v. Bartels*, 248 F.3d 175 (3rd Cir. 2001), stands only for the self-evident proposition that a redistricting scheme that intends to deprive a minority group of the *right to vote* may violate the Fifteenth Amendment. 248 F.3d at 193.[3]

---

[2] *Hastert* was decided nearly a decade before the Supreme Court's decisions in *Rice* and *Bossier Parrish* confirmed that a vote dilution claim cannot lie under the Fifteenth Amendment. The court in *Polish American Congress v. City of Chicago*, 211 F. Supp. 2d 1098 (N.D. Ill. 2002), explicitly acknowledged these cases when it dismissed plaintiffs' vote dilution claim because the Fifteenth Amendment "has been successfully invoked only by plaintiffs who allege government interference with their abilities to register to vote or to cast ballots in elections because of their race or color." 211 F. Supp. at 1107 (citations omitted).

[3] Furthermore, *Bartels* involved only whether a Fifteenth Amendment claim was so "frivolous or insubstantial" that there would be no jurisdiction for a three-judge panel to hear a redistricting-related claim. *Bartels*, 248 F.3d at 192-93 ("Even were we to interpret the Court's statement in its bench opinion that 'there is no likelihood that plaintiffs will ultimately prevail on the merits' as a comment on the constitutional, as well as the statutory, claims, it cannot properly be characterized as a ruling that

*Gomillion* itself had nothing to do with vote dilution. Instead, it related to legislation that was "solely concerned with segregating white and colored voters by fencing Negro citizens out of town so as to *deprive them of their pre-existing municipal vote.*" 364 U.S. at 341 (emphasis added). Plaintiffs here allege no such deprivation of their right to vote, which remains entirely intact. As such, Count III is insufficient to state a claim under the Fifteenth Amendment.

## V. Plaintiffs' Refusal to Provide *Any* Standard by Which to Analyze Their Partisan Gerrrymander Claims Mandates Their Dismissal

As argued at length in the Motion to Dismiss, unless Plaintiffs identify a reliable standard by which this Court can judge their partisan gerrymander claims, these claims should be dismissed. Rather than argue that they meet this requirement in their response, Plaintiffs admit that the Complaint does not offer *any* standard (let alone a reliable one) by which to measure their claims. (*See* Pls.' Resp. 10, n.3) ("[T]he Complaint does not say anything about a standard"). This admission alone is fatal to their partisan gerrymander claims.[4]

Simply put, unless a plaintiff provides a reliable standard by which to measure a partisan gerrymander claim, that claim must be dismissed. In *Vieth v. Jubelirer*, 541 U.S. 267 (2004), the Supreme Court upheld the dismissal of plaintiffs' *complaint* because it did not properly plead a reliable standard by which to measure a partisan gerrymander claim. 541 U.S. at 313 (Kennedy, J., concurring) (absent "a standard by which to measure the burden [plaintiffs] claim has been imposed on their representational rights, [they] cannot establish that the alleged political

---

Plaintiffs' constitutional claims are insubstantial, as it is well-established that a district court's conclusion that a party will lose [or is likely to lose] on the merits of a claim is not equivalent to a conclusion of frivolousness for the purposes of establishing jurisdiction") (citations omitted).

[4] Plaintiffs also contend that, "[i]f anything, it is *Defendants* who must offer an acceptable standard that the Complaint fails to meet." (Pls.' Resp. 10, emphasis original.) The cases cited by Plaintiffs offer no support for this claim, which would revolutionize federal pleading standards. More importantly, however, it is precisely Plaintiffs' failure to provide this Court with *any* standard (let alone a reliable one) that is the "legal insufficiency" that dooms their partisan gerrymander claims.

classifications burden those same rights");[5] *accord LULAC v. Perry,* 548 U.S. 399, 418 (2006) (opinion of Kennedy, J.) ("[A] successful claim attempting to identify unconstitutional acts of partisan gerrymandering must . . . show a burden, as measured by a reliable standard, on the complainants' representational rights"). To credit Plaintiffs' argument, this Court would also have to ignore *Vieth* and *LULAC*.

In any event, Plaintiffs are not the first to argue that they need not provide a reliable standard in support of their partisan gerrymander claims. As in this case, the plaintiffs in *Perez v. Texas* alleged that a redistricting plan was a partisan gerrymander in violation of both the Equal Protection Clause and the First Amendment. *See Perez v. Texas,* No. 11-CA-360-OLG-JES-XR, slip op. at 19-20 (W.D. Tex. Sept. 2, 2011) (attached as Exhibit A). And as in this case, when faced with a motion to dismiss for failing to plead a reliable standard by which to measure their partisan gerrymander claims, the plaintiffs in *Perez* argued that they did not have to offer such a standard. *Id.* at 21-22. And as in *Perez,* Plaintiffs' failure to do so here is fatal. *Id.* ("The [plaintiffs] were given an opportunity, but they have not, as required by *Vieth* and *LULAC*, identified a reliable standard by which to measure the redistricting plan's alleged burden on their representational rights . . . . Because [plaintiffs] have failed to enunciate a reliable standard, their political gerrymandering claims should be dismissed on the pleadings").

The reasoning in *Perez* was clear (and applied even though some plaintiffs in *Perez* argued – as Plaintiffs here *do not* – that they should be given an opportunity to develop such a standard at a later date): "[The Supreme] Court dismissed the claim at issue in *Vieth* based on the insufficiency of the complaint, because it did not allege a manageable standard." *Perez v. Texas,*

---

[5] Justice Kennedy's opinion is the "position taken by those Members [of the Court] who concurred in the judgments on the narrowest grounds" and therefore controls. *DiMa Corp. v. Town of Hallie*, 185 F.3d 823, 830 n.5 (7th Cir. 1999) (quoting *Marks v. United States*, 430 U.S. 188, 193 (1977)).

No. 11-CA-360-OLG-JES-XR, slip op. at 19-20 (W.D. Tex. Sept. 2, 2011) (citing *Vieth* at 313) (Kennedy, J., concurring) (citing Fed. R. Civ. P. 12(b)(6)). As in *Perez*, this Court is "bound by . . . the black-letter principle that a complaint must state a valid claim for relief for litigation to move forward. Providing a 'reliable standard' for measuring the burden on plaintiffs's representational rights is necessary to state a claim for relief for political gerrymandering . . . . plaintiffs' failure to provide one requires dismissal of their claim." *Id.* (citing *LULAC*, 548 U.S. at 418).

As discussed in the Motion to Dismiss, given the Supreme Court decisions in *Vieth* and *LULAC*, it undoubtedly would have been difficult for Plaintiffs to be the first litigants since *Davis v. Bendemer*, 478 U.S. 109 (1986), first opened the door for partisan gerrymander claims 25 years ago to provide a reliable standard that would allow these claims to succeed. However, by admitting that their Complaint does not – and contending that it need not – do so here, Plaintiffs have ensured that there is no possibility that these claims can survive. As a result, Counts V and VI should be dismissed.

## VI. Plaintiffs Have Alleged an Explanation for District 4 Other than Race and Consequently Have Pleaded Themselves Out of Court on Count IV

Plaintiffs argue unpersuasively that they have not pleaded themselves out of court on Count IV because they have not alleged that anything other than race played a role in drawing District 4. As a preliminary matter, Plaintiffs nowhere respond to the fact that the Complaint alleges that the Congressional Map, as a whole, represents a partisan gerrymander. (Compl. ¶¶ 131, 136; Defs.' Mot. to Dismiss 13-14.) Regardless of their arguments regarding the specific allegations in Paragraphs 5, 85, 95, and 96 of the Complaint, therefore, Plaintiffs have alleged that partisanship explains the shape of the district. Moreover, Plaintiffs' arguments that the specific allegations do not provide an alternate explanation for District 4 lack credibility.

Plaintiffs' claim that the allegations regarding District 5 do not undermine the required showing that race was the predominant factor in the drawing of District 4 fails to acknowledge that, as a bordering district, District 5's shape by definition affects the shape of District 4. Plaintiffs assert that their allegation that District 4 protects a Democratic incumbent actually supports the idea that race and not politics motivated District 4 because it was the lowest population overlap of all Democratic incumbents' districts, but Plaintiffs nonetheless still have alleged an alternate political explanation, and moreover, the "lowest" overlap remains substantial at 69.38%. (Compl. ¶ 95.) Finally, Plaintiffs' claim that their allegation regarding the division of two communities making up a sizeable portion of District 4 does not allege whether partisanship or race motivated the divisions is similarly wishful, in that the allegation is within Section IV.D of the Complaint, entitled "The Proposed Congressional Plan is Gerrymandered to Disproportionately Favor *Democratic Candidates*." (Compl. 16, emphasis added.) As Plaintiffs have clearly alleged an explanation other than race for the crafting of District 4, Plaintiffs have pleaded themselves out of court on Count IV.

**VII.    Plaintiffs' Contingent Request for Leave to File Amended Complaint**

Without an opportunity to analyze any Amended Complaint's legal and factual contours, as well as the impact it would have on the scheduling and discovery timeline upon which Plaintiffs have been insistent, it is impossible for Defendants to take a position on the issue at this time. Defendants therefore reserve the right to respond in full if, and when, Plaintiffs formally request leave to file it.

## Conclusion

WHEREFORE, Defendants respectfully request that this Court dismiss Plaintiffs' Complaint with prejudice.

Date: October 12, 2011                    Respectfully submitted,

                                                       LISA MADIGAN,
Attorney General for the State of Illinois

                                         */s/* Brent D. Stratton
                                            Attorney for Defendants

Brent D. Stratton
Carl Bergetz
Jon Rosenblatt
Office of the Illinois Attorney General
100 West Randolph, 12th Floor
Chicago, Illinois 60601
312-814-3000

13