1

08:27:54

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COMMITTEE FOR A FAIR AND BALANCED     )     Docket No. 11 C 5065
MAP, et al.,                          )
                                      )
                    Plaintiffs,       )
                                      )
          vs.                         )
                                      )     Chicago, Illinois
ILLINOIS STATE BOARD OF ELECTIONS,    )     September 29, 2011
et al.,                               )     9:00 o'clock a.m.
                                      )
                    Defendants.       )

TRANSCRIPT OF PROCEEDINGS - MOTION
BEFORE
THE HONORABLE JOHN DANIEL TINDER
THE HONORABLE ROBERT LOWELL MILLER, JR.
THE HONORABLE JOAN HUMPHREY LEFKOW

APPEARANCES:

For the Plaintiffs:     MAYER BROWN LLP
                        BY:  MS. LORI E. LIGHTFOOT
                             MR. THOMAS V. PANOFF
                        71 South Wacker Drive
                        Chicago, IL  60606
                        (312) 782-0600


For Defendant           OFFICE OF THE ATTORNEY GENERAL
Illinois State Board    BY:  MR. CARL T. BERGETZ
Of Elections:                MR. BRENT D. STRATTON
                        100 West Randolph Street
                        Chicago, IL  60601
                        (312) 814-5194


Court Reporter:         MS. CAROLYN R. COX, CSR, RPR, CRR, FCRR
                        Official Court Reporter
                        219 S. Dearborn Street, Suite 1854-B
                        Chicago, Illinois  60604
                        (312) 435-5639



EXHIBIT
E

2

1   APPEARANCES CONTINUED:

2

3   For Third-Party          RICHARD J. PRENDERGAST, LTD
    Defendants:              BY:  MR. RICHARD J. PRENDERGAST
4                                 MR. MICHAEL THOMAS LAYDEN
                             111 West Washington Street, Suite 1100
5                            Chicago, IL  60602
                             (312) 641-0881
6

7

    For State                MICHAEL J. KASPER, ATTORNEY AT LAW
8   Defendants:              BY:  MR. MICHAEL J. KASPER
                             222 North LaSalle Street, Suite 300
9                            Chicago, IL  60601
                             (312) 704-3292
10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

| | |
|---|---|
| 09:11:10 | 1 |

(The following proceedings were had in open court:)

       THE CLERK:  11 C 5065, Committee for Fair and Balanced Map v. Illinois State Board of Elections.

       MS. LIGHTFOOT:  Good morning, your Honor; Lori Lightfoot and Tom Panoff on behalf of the plaintiffs.

       MR. BERGETZ:  Good morning, your Honor; Carl Bergetz and Brent Stratton on behalf of the State Board of Elections and other defendants.

       MR. PRENDERGAST:  Good morning, your Honor; Richard Prendergast on behalf of third parties.

       MR. LAYDEN:  Mike Layden also for third parties.

       MR. KASPER:  Michael Kasper, K-a-s-p-e-r, on behalf of the state defendants.

       JUDGE LEFKOW:  All right.  Lots of lawyers.

       I welcome Judges Tinder and Miller to join the panel today and talk about the discovery.  It comes down mostly to the issue of how far does immunity extend.  We have read all the materials and have an idea of where we want to go, but I have a few questions for you, and then others may jump in.

       As for the plaintiffs, what information do you need that is not already available from public sources?

       MS. LIGHTFOOT:  Your Honor, we still as we sit here today several months into this case have no idea of some basic information.  For example, we have no idea who actually drafted any of the particular districts that are in the plan

4

| | |
|---|---|
| 09:12:38 | 1 |
| 09:12:42 | 2 |
| 09:12:44 | 3 |
| 09:12:50 | 4 |
| 09:12:54 | 5 |
| 09:13:00 | 6 |
| 09:13:02 | 7 |
| 09:13:08 | 8 |
| 09:13:12 | 9 |
| 09:13:14 | 10 |
| 09:13:18 | 11 |
| 09:13:24 | 12 |
| 09:13:28 | 13 |
| 09:13:28 | 14 |
| 09:13:32 | 15 |
| 09:13:36 | 16 |
| 09:13:38 | 17 |
| 09:13:42 | 18 |
| 09:13:46 | 19 |
| 09:13:50 | 20 |
| 09:13:54 | 21 |
| 09:14:00 | 22 |
| 09:14:02 | 23 |
| 09:14:06 | 24 |
| 09:14:10 | 25 |

1  that was signed into law earlier this year.  We have no

2  information about what decisions were made as to how the lines

3  were drawn on any particular district.  We have no specific

4  information as to what information was used as a source,

5  whether, for example, any racial bloc voting analysis was

6  done, whether or not there was any considerations with respect

7  to respecting communities of interest.  Any of the basic

8  information, for example, that we have provided to the State

9  Board of Elections with respect to the alternative map which

10  we have tendered to the court back in early August, we have

11  none of that information with respect to how the

12  reapportionment plan for Congressional district was drawn.  We

13  know nothing.

14        We are frankly -- we have a little bit of

15  information, but we have virtually nothing that would allow us

16  to do any kind of analysis with respect to intent.  We have no

17  specific information regarding what was done in the

18  construction, for example, of Congressional District 4, the

19  so-called earmuff district.  We have no specific information

20  from them because it's not publicly available about how

21  Districts 3 and 5 that abut the city for the earmuff district,

22  how those districts were changed and whether or not specific

23  populations moved into those districts; for example, whether

24  or not the Latino populations from those existing districts

25  pre -- of the pre-districting were carved out of those

5

09:14:14   1    districts and moved into that.  That's information that we

09:14:16   2    have a little bit of analysis for, but we have nothing from

09:14:20   3    their side.  And the concern, obviously, is we have challenged

09:14:24   4    this map as an unconstitutional racial and political

09:14:28   5    gerrymander.  I think we are entitled to basic information

09:14:32   6    about how it was that the people who actually drew the map

09:14:36   7    made their decisions, who they were, how it was done, and none

09:14:40   8    of that information is available.

09:14:40   9         For example, if you have looked at our briefs, I

09:14:44   10   think we point out there were weeks of public hearings that

09:14:48   11   were held across the state ostensibly to talk about issues

09:14:54   12   related to redistricting.  If you look at the transcripts from

09:14:56   13   those public hearings, by and large, the discussion was about

09:15:00   14   the state legislative map, very little commentary from any

09:15:04   15   direction with respect to the Congressional map.  So those

09:15:08   16   publicly available transcripts frankly yield next to no

09:15:10   17   information.

09:15:12   18        We are told in our back and forth with counsel for

09:15:16   19   the respondents that, for example, no expert actually looked

09:15:20   20   at the map that was passed before it was passed.  Now, we

09:15:26   21   obviously take them at their word, but no expert that they

09:15:30   22   have identified that is working on the state map -- for

09:15:32   23   example, expert Lickman (phonetic) and two others that were

09:15:36   24   identified -- frankly, it's impossible for us to believe that

09:15:40   25   no expert actually looked at, opined on, or helped with this

6

09:15:46    1   map.

09:15:46    2          Now, it could very well be that there was another

09:15:50    3   expert, and we suspect that there was, but it wasn't somebody

09:15:52    4   that was under the possession and control of the Springfield

09:15:56    5   democrats who controlled this map --

09:16:00    6          JUDGE TINDER:  Well, you have a subpoena out, don't

09:16:02    7   you, to this DCCC organization --

09:16:04    8          MS. LIGHTFOOT:  We do, your Honor.

09:16:06    9          JUDGE TINDER:  -- who you suspect are, in your view,

09:16:08   10   the culprits here?

09:16:10   11          MS. LIGHTFOOT:  What we believe, frankly, your Honor,

09:16:10   12   is this.  We believe that part of the map was drawn by folks

09:16:16   13   in Springfield, but we also believe that another part of it,

09:16:18   14   and perhaps maybe the lion's share of that map, were drawn by

09:16:24   15   either the DCCC or their agents.  There is another entity that

09:16:28   16   we have identified.

09:16:28   17          The difficulty is it's like a comedy sketch routine.

09:16:32   18   We have on the one hand the respondent saying, Well, this

09:16:36   19   information is available someplace else, go see the DCCC.  We

09:16:38   20   get the DCCC on the other hand saying, This information is

09:16:42   21   available someplace else, go see the respondents.  That issue

09:16:46   22   hopefully will get sorted out, we have a status on Monday in

09:16:50   23   the district court in Washington, D.C., that hopefully will

09:16:52   24   move that process along, but I don't think we are required to

09:16:56   25   choose one versus the other because the truth is, neither side

7

| | |
|---|---|
| 09:16:58 | 1 |
| 09:17:04 | 2 |
| 09:17:08 | 3 |
| 09:17:12 | 4 |
| 09:17:14 | 5 |
| 09:17:18 | 6 |
| 09:17:20 | 7 |
| 09:17:24 | 8 |
| 09:17:28 | 9 |
| 09:17:30 | 10 |
| 09:17:34 | 11 |
| 09:17:36 | 12 |
| 09:17:38 | 13 |
| 09:17:40 | 14 |
| 09:17:48 | 15 |
| 09:17:52 | 16 |
| 09:17:54 | 17 |
| 09:17:56 | 18 |
| 09:17:58 | 19 |
| 09:18:02 | 20 |
| 09:18:08 | 21 |
| 09:18:10 | 22 |
| 09:18:10 | 23 |
| 09:18:12 | 24 |
| 09:18:12 | 25 |

today has acknowledged much of anything about what their
specific role is in drawing this particular map.  What they
have -- what the DCCC has done, frankly not unlike what has
happened here, is they have cloaked themselves in the First
Amendment privilege and this is a gross intrusion on their
proprietary information.  We are still no further than we were
when we filed this lawsuit in finding out the particulars
about how it was drafted, who drafted it, and why certain
decisions were made.  That's why we think that this issue
that's before the court today is so important.  If there was
an alternative source, your Honor, believe me, we would be
seeking it, but the truth is --

     JUDGE TINDER:  I guess I have a lot of concern about
this why certain decisions were made.  A legislator can have
in her mind that she is going to vote for certain legislation
to discriminate, right?

     MS. LIGHTFOOT:  Sure.

     JUDGE TINDER:  But you measure that by what the
result of the legislation is.  Exploring the individual
thought process does not seem to be an appropriate -- in light
of things --

     MS. LIGHTFOOT:  Sure.

     JUDGE TINDER:  -- legislative immunity and other
concerns.

     MS. LIGHTFOOT:  Well, let me be clear about that.

09:18:14  1   One, we don't believe that this was a case that involves
09:18:16  2   legislative immunity because the respondents are not named
09:18:20  3   parties.  We believe that the proper analysis --
09:18:24  4             JUDGE TINDER:  Well, at least legislative privilege.
09:18:26  5             MS. LIGHTFOOT:  Under privilege.  And I think that's
09:18:28  6   an important distinction, your Honor, because as your Honor is
09:18:30  7   well aware, clearly if this were an instance where individual
09:18:34  8   member's liability was at stake, whether it be legislators or
09:18:38  9   their staff, then we would be having a very different
09:18:42 10   conversation, and frankly we might not even be having this
09:18:44 11   conversation, because the case law is clear about absolute
09:18:46 12   immunity in those circumstances.
09:18:46 13         What the respondents have done is essentially
09:18:48 14   conflate the broad legislative immunity case law and
09:18:54 15   protection it's afforded for litigants in a case versus the
09:18:58 16   privilege.  But back to you --
09:19:00 17             JUDGE TINDER:  I understand.  I understand.  But this
09:19:02 18   why is proven in the pudding, isn't it, in what they did,
09:19:08 19   that's how it's generally proven?
09:19:10 20             MS. LIGHTFOOT:  I want to be clear that we are not
09:19:14 21   and we have no intention of asking individual legislators what
09:19:20 22   was in their head when they voted for the particular map.
09:19:22 23   That's frankly of no consequence --
09:19:24 24             JUDGE TINDER:  It sure sounds like you're getting to
09:19:26 25   that, or what was in the staffer's head or what was in the

9

| | |
|---|---|
| 09:19:30 | 1 |
| 09:19:34 | 2 |

1   consultant's head when they did this or that.  It sure sounds

2   like you're headed that way.

3       MS. LIGHTFOOT:  Well, I think that under Shaw, we are

4   entitled in the context of an intentional discrimination

5   claim, which is what we have alleged in several of our counts

6   in the complaint, to understand what was the purpose in mind

7   in drafting the particular plan.  And what we have sought is

8   specific documents that provide information, objective

9   information, about what facts they looked at, what data they

10   considered, and other things that I think are objective facts

11   that again don't get into the specific mindset of a particular

12   legislator or a staff person in order to help us prove up our

13   intent phase.  That certainly is the distinction that we think

14   we were trying to draw with our subpoena, and we are happy to

15   clarify that.

16       But I think looking at those objective facts, the

17   what that went into the map, I think is something that we are

18   entitled to inquire about, and the qualified privilege, the

19   evidentiary privilege, allows us to make exactly that kind of

20   inquiry.

21       JUDGE LEFKOW:  Okay.  Let's take a break here.  We

22   don't have a lot of time here, and nobody else had to speak.

23   So I am thinking let's hear from the defense, and then if you

24   have any more points you'd like to make, and then we will hear

25   from the defense and then the non-parties and third parties.

09:21:00  1   If some of you would like to be seated, you'd probably be more
09:21:02  2   comfortable.
09:21:04  3           MR. PRENDERGAST:  Good morning, your Honor.  Richard
09:21:06  4   Prendergast.
09:21:06  5           Your Honor, I was looking at the reply brief last
09:21:12  6   night and the pros as well as the allegations in the
09:21:20  7   complaint, and what is also lurking just below the surface of
09:21:22  8   this dark, bottomless pool is the role of the National
09:21:26  9   Democratic and Congressional Campaign Committee, which we call
09:21:30  10  the DCCC, who the Springfield democrats invited into the
09:21:34  11  process.
09:21:34  12          The DCCC has been subpoenaed for every single piece
09:21:38  13  of paper that they have having anything to do with this
09:21:42  14  process.  They have maintained in their complaint and their
09:21:46  15  papers --
09:21:46  16          JUDGE TINDER:  This isn't part of your motion to
09:21:48  17  quash, is it?
09:21:50  18          MR. PRENDERGAST:  Well, I was just responding to
09:21:52  19  counsel.
09:21:54  20          JUDGE TINDER:  I was kind of hoping we'd focus on the
09:21:56  21  issues that are before us.
09:22:00  22          MR. PRENDERGAST:  Well, I think that they are
09:22:02  23  essentially cross-motions.  I mean, the bases for the motion
09:22:04  24  to quash is very much the same.  For example, one of the bases
09:22:06  25  for the motion to quash is that you have a legislative

09:22:12  1   privilege on the one hand and an argument on the other hand
09:22:16  2   that their hands are tied, and I am simply saying that in the
09:22:20  3   course -- in the complaint and in the papers they filed, they
09:22:24  4   make an allegation, a clear allegation, that this map was
09:22:26  5   drawn by the DCCC and the members of the Illinois
09:22:34  6   Congressional delegation.  In fact, they have subpoenas
09:22:38  7   scheduled for the entire Illinois Congressional delegation
09:22:42  8   starting with yesterday, and I think Congressman Shimkus is
09:22:48  9   scheduled for today, and then it goes on through Saturday, the
09:22:52  10  15th of October.
09:22:52  11       So they scheduling depositions of Congresspeople who
09:22:56  12  they believe were involved in the -- they obviously believe
09:23:00  13  they were involved in drawing the map, they have the DCCC, we
09:23:04  14  have produced thousands of documents in response to the
09:23:06  15  Freedom of Information Act, there are hearing transcripts.
09:23:10  16       So to answer the question, there all kinds of sources
09:23:12  17  of information here that are available to them, on top of the
09:23:14  18  fact that these cases are, in the final analysis, driven by
09:23:18  19  expert testimony.  And that expert testimony takes in the
09:23:20  20  data, and the experts take in the -- consider all the data
09:23:26  21  affecting where the lines were drawn, and they provide, based
09:23:30  22  upon the data that's publicly available, their opinions with
09:23:34  23  respect to whether or not the map was fair or not, whether it
09:23:36  24  satisfies the Section 2 of the Voting Rights Act of the
09:23:42  25  protection clause or any other legal requirement.

09:23:44   1       So to answer the question -- and it's a question

09:23:46   2   that's pertinent to our motion to quash, your Honor, because

09:23:50   3   part of our motion to quash rests on the fact that this isn't

09:23:54   4   the only place they have to go and you have this

09:23:56   5   long-established going back to English common law certainly

09:24:02   6   incorporated within the American system of jurisprudence since

09:24:08   7   the beginning of legislative immunity and legislative

09:24:10   8   privilege.  And so that point, to the extent that they argue

09:24:16   9   the legislative privilege doesn't apply here because this

09:24:18  10   isn't a speech and debate clause issue, there are cases that

09:24:22  11   we have cited that make it clear that the speech and debate

09:24:24  12   clause and the common law privilege applies to state

09:24:32  13   legislators, that common law privilege applies to state

09:24:36  14   legislators and is coextensive with the speech and debate

09:24:40  15   clause as the cases have been cited in our brief.

09:24:42  16      So the privilege itself is an extraordinarily

09:24:44  17   important one.  I mean, if you imagine, it's a separation of

09:24:48  18   powers issue.  And not to be too dramatic about it, but it's

09:24:52  19   not uncommon for a legislature, Congress or a state

09:24:56  20   legislature, to take up a bill that reviews law that has been

09:25:00  21   found by a court decision, the outcome has been determined by

09:25:06  22   a court decision, and the legislature wants to change it.

09:25:10  23      No one would even envision the possibility that a

09:25:14  24   senate committee could subpoena your law clerk or your papers

09:25:18  25   or inquire into your intent and motivation.  In fact, there is

09:25:22   1   no case cited and there is no case that we have found where a

09:25:26   2   court has upheld -- either under a qualified privilege or an

09:25:30   3   absolute privilege has upheld the right of a party to inquire

09:25:34   4   into the motivations or intent of a legislator in the course

09:25:38   5   of preparing or in the course of deliberating or voting on a

09:25:42   6   bill.

09:25:44   7            And as far as the -- -

09:25:44   8            JUDGE TINDER:  So how would that apply to information

09:25:48   9   coming in to the legislature, data that it receives, and on

09:25:52   10  the other end information that goes out, public statements

09:25:56   11  made, meetings with those who are not part of the legislative

09:26:00   12  process?  How would it apply on both ends of the information?

09:26:06   13           I understand what you are saying about the kind of

09:26:08   14  internal workings where the legislators work with staff where

09:26:12   15  there are those deliberative things that legislators do.  But

09:26:18   16  in the data coming in and the information going out, how does

09:26:22   17  it apply there?

09:26:22   18           MR. PRENDERGAST:  It's part of the deliberative

09:26:24   19  process.  There is substantial case law upholding that view,

09:26:28   20  and for a good reason.

09:26:30   21           If you take a look at the opening page or two of

09:26:32   22  their reply brief, you would think that this was some kind of

09:26:36   23  a Draconian unusual process by which this legislation was

09:26:40   24  passed.  The fact of the matter -- you know the old sausage in

09:26:44   25  legislation bromide.  The fact of the matter is that it's very

| | | |
|---|---|---|
| 09:26:48 | 1 | common in Springfield and in other state legislatures and in |
| 09:26:52 | 2 | Congress for a bill to be worked on by interest groups, |
| 09:26:56 | 3 | lobbyists, sponsors, all working together.  It goes to the |
| 09:27:00 | 4 | rules committee, the rules committee without a hearing sends |
| 09:27:02 | 5 | it to a substantive committee.  The substantive committee, |
| 09:27:06 | 6 | often without much of a hearing, sends it to the floor.  And |
| 09:27:10 | 7 | most of the time, with far less debate than this bill got, the |
| 09:27:14 | 8 | bill passes.  The description that they have on the first page |
| 09:27:16 | 9 | or two of their reply brief is a description of the |
| 09:27:20 | 10 | legislative process generally. |
| 09:27:22 | 11 | Now, this is not a situation where everybody was kept |
| 09:27:24 | 12 | in the dark.  There was a lot of public hearing -- there were |
| 09:27:28 | 13 | a lot of public hearings, we have turned over thousands of |
| 09:27:30 | 14 | documents to them to the extent that the DCCC was the crafter |
| 09:27:34 | 15 | of this, they have them under subpoena, they have all the |
| 09:27:38 | 16 | Congresspersons under subpoena, they do not need to violate or |
| 09:27:44 | 17 | ask this court to violate or take exception to an |
| 09:27:46 | 18 | extraordinarily important privilege in immunity that has |
| 09:27:52 | 19 | existed in common law and throughout the United States |
| 09:27:56 | 20 | history. |
| 09:27:56 | 21 | JUDGE MILLER:  When you say you "turned over |
| 09:27:58 | 22 | thousands of documents," what sorts of documents do those |
| 09:28:00 | 23 | consist of? |
| 09:28:02 | 24 | MR. PRENDERGAST:  They consist of hearing |
| 09:28:02 | 25 | transcripts, they consist of reports, they consist of -- |

| | | |
|---|---|---|
| 09:28:08 | 1 | JUDGE MILLER: What kind of reports? |
| 09:28:10 | 2 | MR. PRENDERGAST: Well, reports concerning the -- |
| 09:28:12 | 3 | what the whole process -- there were like 20 hearings around |
| 09:28:18 | 4 | the state. Every one of those hearings involved both the |
| 09:28:22 | 5 | state map and Congressional map. There were reports relating |
| 09:28:24 | 6 | to those. There were hearing transcripts themselves. I mean, |
| 09:28:28 | 7 | I don't have, your Honor, a list of all the documents. |
| 09:28:30 | 8 | JUDGE MILLER: No, I'm not -- I'm looking for a |
| 09:28:32 | 9 | genre. |
| 09:28:34 | 10 | MR. PRENDERGAST: It's clearly in the thousands. And |
| 09:28:36 | 11 | when you combine that with information that they are going to |
| 09:28:40 | 12 | seek -- are seeking from Congresspersons and other third |
| 09:28:42 | 13 | parties and you combine that with the fact that this is an |
| 09:28:46 | 14 | expert-driven, data-driven process, and you combine that with |
| 09:28:50 | 15 | the fact that there is no case that has ever allowed anybody |
| 09:28:54 | 16 | to ask what's the motivation or intent of a Congressperson or |
| 09:28:58 | 17 | a legislator in passing a bill, there is nothing here that |
| 09:29:00 | 18 | warrants exception to the legislative privilege. |
| 09:29:04 | 19 | JUDGE MILLER: Just to finish my question, everything |
| 09:29:06 | 20 | you have given them so far, these thousands of pages, are all |
| 09:29:10 | 21 | public records; is that what you have described? |
| 09:29:12 | 22 | MR. PRENDERGAST: I think they are largely public |
| 09:29:14 | 23 | records. I don't -- I think they are publicly available under |
| 09:29:18 | 24 | the Freedom of Information Act. I mean, I don't think you can |
| 09:29:20 | 25 | just go find them in the archives. But they pursued every way |

| 09:29:26 | 1 | to go after information. The Freedom of Information Act |
|---|---|---|
| 09:29:30 | 2 | inquiry was made, I don't know, five or six weeks ago, and it |
| 09:29:34 | 3 | was responded to. |
| 09:29:36 | 4 | So, you know, publicly available, yes, if you follow |
| 09:29:38 | 5 | the FOIA process, which they followed and which we responded |
| 09:29:44 | 6 | to. |
| 09:29:44 | 7 | JUDGE LEFKOW: It seems to me that the issue is |
| 09:29:48 | 8 | whether the common law legislative immunity absolutely shields |
| 09:29:54 | 9 | the non-party lawmakers from state lawmakers in providing |
| 09:30:02 | 10 | evidence in a lawsuit. I mean, they are not parties to the |
| 09:30:04 | 11 | lawsuit, and usually immunity is cast in terms of you don't |
| 09:30:08 | 12 | have to appear as a defendant in a lawsuit. |
| 09:30:12 | 13 | MR. PRENDERGAST: Your Honor, one of the cases we |
| 09:30:14 | 14 | cite is a D. C. Circuit decision, 1988. It's Minpeco, |
| 09:30:20 | 15 | M-i-n-p-e-c-o, v. Conticommodity Services, 844 F.2d 856, a |
| 09:30:30 | 16 | subpoena to non-party subpoena and staff protected by absolute |
| 09:30:34 | 17 | legislative privilege. That case recognized or held the very |
| 09:30:44 | 18 | point that you're referring to. |
| 09:30:46 | 19 | JUDGE LEFKOW: Okay. |
| 09:30:46 | 20 | MR. PRENDERGAST: I think that's also true of the |
| 09:30:48 | 21 | EEOC v. Washington Suburban, which is a Fourth Circuit |
| 09:30:52 | 22 | decision. And I think we had cited one other case as well. |
| 09:30:56 | 23 | It's at page 12 of our position to the motion to compel. I |
| 09:31:04 | 24 | think that's pretty well settled. |
| 09:31:08 | 25 | And it also addresses the issue of whether a |

17

| | | |
|---|---|---|
| 09:31:12 | 1 | non-party -- if there is any distinction between a party and |
| 09:31:14 | 2 | non-party.  This court has decided cases on that subject, and |
| 09:31:20 | 3 | they come back and say, Well, those are party cases.  Minpeco |
| 09:31:28 | 4 | is not, I think -- Minpeco is not a party case. |
| 09:31:28 | 5 | JUDGE LEFKOW:  But those are decided under the speech |
| 09:31:30 | 6 | and debate clause. |
| 09:31:32 | 7 | MR. PRENDERGAST:  That's true. |
| 09:31:34 | 8 | MS. LIGHTFOOT:  Yes. |
| 09:31:34 | 9 | MR. PRENDERGAST:  But what the cases that we have |
| 09:31:36 | 10 | cited have indicated is that while the speech and debate |
| 09:31:40 | 11 | clause applies to Congress, the common law immunity applies to |
| 09:31:44 | 12 | state legislators and it's coextensive with the speech and |
| 09:31:48 | 13 | debate clause. |
| 09:31:48 | 14 | JUDGE LEFKOW:  Maybe they are and maybe they are not. |
| 09:31:50 | 15 | Okay.  All right. |
| 09:31:52 | 16 | MS. LIGHTFOOT:  Your Honor, may I? |
| 09:31:54 | 17 | JUDGE LEFKOW:  Does anyone for the defense want to |
| 09:31:56 | 18 | add to this? |
| 09:32:04 | 19 | MR. BERGETZ:  No, your Honor. |
| 09:32:04 | 20 | MS. LIGHTFOOT:  May I respond, your Honor. |
| 09:32:04 | 21 | JUDGE LEFKOW:  Yes. |
| 09:32:04 | 22 | MS. LIGHTFOOT:  There are a number of points that |
| 09:32:06 | 23 | need clarification.  Judge asked, What specific documents have |
| 09:32:10 | 24 | the state provided when we talked about the authentication of |
| 09:32:10 | 25 | transcripts.  I go back to the point that I made earlier, your |

09:32:14  1  Honor.  Yes, those transcripts were provided.  Frankly, we had
09:32:16  2  them already.  But those are transcripts for public hearings
09:32:20  3  in which no member of the public was allowed to ask any panel
09:32:24  4  member a single question and which, for the most part, there
09:32:26  5  was no reference whatsoever to any Congressional plan.  And I
09:32:32  6  think an important point for this court to consider is that
09:32:34  7  during the course of those public hearings, there was no
09:32:38  8  Congressional plan that had been put forward to the public.
09:32:42  9       We emphasized in our papers the fact that the first
09:32:46  10  time that any member of the public had an opportunity to see
09:32:48  11  the actual Congressional -- a version of the actual
09:32:52  12  Congressional plan that subsequently was passed was on the
09:32:56  13  early-morning hours of the Friday of Memorial weekend.  There
09:33:00  14  was no public hearing that was held on it.  Unlike what
09:33:02  15  happened with the state map, which was subject to public
09:33:06  16  hearings after it was released.  Despite the promises that
09:33:10  17  that would happen with the Congressional map, it did not
09:33:12  18  happen.
09:33:14  19       So the transcripts that Mr. Prendergast has talked
09:33:18  20  about, the thousands of pages that he produced, are frankly an
09:33:20  21  empty set because they don't contain any discussion of the
09:33:24  22  actual map that was passed.  What they contain is commentary
09:33:28  23  from various citizens groups about what they would like to see
09:33:32  24  in a particular map, but there is no back and forth of
09:33:36  25  colloquy between the members of the redistricting committees

09:33:38 1    and the public which would identify specific parts of an

09:33:44 2    actual plan that would have been passed.

09:33:46 3            So, yes, they are available, yes, they were produced,

09:33:48 4    we sought them through FOIA, and we appreciate the production,

09:33:52 5    but they are effectively useless in providing any information

09:33:58 6    with respect to the basic facts of what was done, what were

09:34:02 7    the data inputs into the plan that was eventually passed.

09:34:06 8    There is nothing in those transcripts that bears any evidence

09:34:08 9    about that.

09:34:10 10           JUDGE MILLER:  Can I ask you a follow-up on one thing

09:34:12 11   that Mr. Prendergast said --

09:34:14 12           MS. LIGHTFOOT:  Yes, your Honor.

09:34:16 13           JUDGE MILLER:  -- about the cases of this sort

09:34:16 14   usually being decided on the basis of expert testimony.  And

09:34:20 15   the cases that I have read seem to be primarily expert

09:34:24 16   testimony based on publicly-available information.

09:34:28 17           Has nobody thought of this before?  Is there

09:34:30 18   something unique about this case that gives rise to a greater

09:34:32 19   need for additional evidence?

09:34:34 20           MS. LIGHTFOOT:  No, I think the cases actually end up

09:34:38 21   doing both.  They end up certainly with a lot of expert

09:34:44 22   testimony about the viability of maps, the viability of

09:34:46 23   particular districts, how lines are drawn, whether or not

09:34:50 24   there is racial bloc voting.  All that information certainly

09:34:52 25   plays out, but it's usually also in the context of actually

| | | |
|---|---|---|
| 09:34:54 | 1 | receiving information from the other side about how it was |
| 09:34:58 | 2 | that they went about constructing their map, the data that |
| 09:35:00 | 3 | they used, expert testimony that was used in constructing the |
| 09:35:04 | 4 | map, how particular lines were drawn.  And in many instances, |
| 09:35:08 | 5 | for example, the actual people who drew the lines end up |
| 09:35:12 | 6 | providing testimony. |
| 09:35:12 | 7 | All we're asking for, your Honor, under the qualified |
| 09:35:16 | 8 | privilege, which does apply in this case, and I submit doesn't |
| 09:35:22 | 9 | keep the legislative immunity from suit and liability is an |
| 09:35:24 | 10 | absolute misnomer in this case.  What we are asking for is the |
| 09:35:28 | 11 | basic information about how the map was drawn, what were the |
| 09:35:32 | 12 | data points that were used, what were the objective |
| 09:35:36 | 13 | considerations that were used.  That is information that I |
| 09:35:40 | 14 | think we are entitled to.  We do not have it, we sought it |
| 09:35:42 | 15 | from a number of different instances, and we still stand here |
| 09:35:46 | 16 | today at the end of September, several months into having |
| 09:35:48 | 17 | filed our lawsuit, several months into having attempted on a |
| 09:35:52 | 18 | number of different fronts to be sure to obtain that |
| 09:35:56 | 19 | information, and we still don't have it. |
| 09:35:56 | 20 | The cases that they have cited which purport to apply |
| 09:36:02 | 21 | this blanket absolute legislative immunity in the context of |
| 09:36:06 | 22 | either city council members or state legislatures, every |
| 09:36:10 | 23 | single one of those cases can be tied to either the speech and |
| 09:36:12 | 24 | debate clause itself because they are federal legislatures or |
| 09:36:16 | 25 | because the particular state constitution at issue or in the |

| | | |
|---|---|---|
| 09:36:22 | 1 | instance of the couple D.C. circuit cases -- D.C. cases that |
| 09:36:24 | 2 | they cited, the D.C. charter actually adopts wholesale the |
| 09:36:30 | 3 | speech and debate clause there. |
| 09:36:32 | 4 | JUDGE TINDER: Are you saying there is no federal |
| 09:36:34 | 5 | common law of legislative immunity or legislative privilege? |
| 09:36:38 | 6 | MS. LIGHTFOOT: No, I'm saying in fact there is a |
| 09:36:40 | 7 | common law, a federal common law of legislative immunity and |
| 09:36:42 | 8 | privilege. |
| 09:36:42 | 9 | What we are suggesting, your Honor, and consistent |
| 09:36:44 | 10 | with the Irvin case that we cited, the Pataki case that we |
| 09:36:48 | 11 | cited, the Rodriguez case, in the instance where a third party |
| 09:36:52 | 12 | is not a named defendant in a suit, that the proper analysis |
| 09:36:56 | 13 | is the balancing test that courts all over the country have |
| 09:37:00 | 14 | used in weighing what the interests are in short strokes, what |
| 09:37:06 | 15 | the interests are at stake in the underlying suit, whether |
| 09:37:08 | 16 | there is an opportunity and an obligation to vindicate an |
| 09:37:12 | 17 | important federal interest in right such as there is here in |
| 09:37:16 | 18 | the Voting Rights Act and the other Constitutional provisions |
| 09:37:18 | 19 | that we have cited versus whether that's going to have a |
| 09:37:20 | 20 | chilling effect or undue intrusion on the part of the |
| 09:37:24 | 21 | legislature. |
| 09:37:24 | 22 | And the cases that we believe are more important in |
| 09:37:26 | 23 | terms of their facts and more consistent with the facts in |
| 09:37:30 | 24 | this case have come down universally to say it's a qualified |
| 09:37:34 | 25 | privilege, not a blanket absolute immunity, and that that |

09:37:38  1    privilege must give way when there is important and federal
09:37:42  2    interest at stake such as vindicating the rights of the Voting
09:37:46  3    Rights Act.  We think that those are the line of cases that
09:37:48  4    are most apt in this circumstance again.  We cited in our
09:37:52  5    brief Irvin, Pataki, Rodriguez, and a number of others.  And
09:37:56  6    when that balancing is done here, and that's -- unfortunately,
09:38:00  7    that is not an issue that the respondents have even addressed
09:38:02  8    because they believe that they are entitled to cloak
09:38:04  9    themselves in absolute immunity.
09:38:06  10        But when that balancing is done, we believe that in
09:38:08  11   this instance, there can be crafted a narrow order that
09:38:14  12   requires the respondents to provide the various data inputs
09:38:18  13   that we have sought through our subpoena, and we think that's
09:38:22  14   appropriate.
09:38:22  15        JUDGE TINDER:  If your subpoenas were limited to
09:38:26  16   data, I think it would be a much simpler project for us to
09:38:30  17   address.  I think your subpoenas are vastly broader than
09:38:34  18   simply seeking data points.
09:38:36  19        MS. LIGHTFOOT:  Your Honor, that may be so, and we
09:38:38  20   are happy to --
09:38:40  21        JUDGE TINDER:  Had you written them more narrowly --
09:38:42  22        MS. LIGHTFOOT:  And we are happy to amend the
09:38:44  23   subpoena in that instance because --
09:38:46  24        JUDGE TINDER:  How would you amend it?  To limit it
09:38:50  25   to what you really say you're arguing for, give us the generic

09:38:54    1    description of what it is you feel you need that you can't get

09:38:56    2    from some other source without which your case will fail.

09:39:00    3        MS. LIGHTFOOT:  We would like a piece of paper that

09:39:02    4    reflects the identity of the people who were actually

09:39:06    5    responsible for drawing either the entire map if it was one

09:39:10    6    person or the district.  We would like --

09:39:12    7        JUDGE TINDER:  I wonder why.  Why does it matter who

09:39:18    8    drew it or who considered it?  It's what the product was.

09:39:22    9        MS. LIGHTFOOT:  Well, I think it does matter in the

09:39:22    10   instance --

09:39:24    11       JUDGE TINDER:  Let's say Joe Jones did it and he is a

09:39:26    12   notorious discriminator.  Is that what you are getting at?

09:39:30    13   Everybody knows that Joe Jones --

09:39:30    14       MS. LIGHTFOOT:  No, I don't even think it's -- I

09:39:32    15   don't even think we're going in that direction.  I think we

09:39:36    16   are entitled to know who it was that was responsible, i.e.,

09:39:38    17   was it somebody --

09:39:40    18       JUDGE TINDER:  What it will demonstrate is that those

09:39:44    19   who were involved in the drawing have democratic affiliations.

09:39:48    20   I think we can probably take judicial notice of that.

09:39:50    21       MS. LIGHTFOOT:  But I think we'd like to know,

09:39:52    22   whether, frankly, it was done by people in Springfield or

09:39:54    23   whether it was done by folks outside of Springfield, i.e., the

09:39:58    24   DCCC.

09:39:58    25       JUDGE LEFKOW:  What does it matter?

09:40:00  1        MS. LIGHTFOOT:  I think it matters, your Honor,
09:40:02  2  because it goes to several points that we're trying to
09:40:04  3  demonstrate in our claims:  One, whether or not there was some
09:40:08  4  kind of partisan animus improperly so that was injected into
09:40:14  5  this process.
09:40:14  6        JUDGE TINDER:  I am going to assume there is partisan
09:40:18  7  animus.
09:40:18  8        MS. LIGHTFOOT:  But improper.  I don't know how we
09:40:20  9  get at that other data knowing who the drawers of the map
09:40:24  10  were.
09:40:24  11        JUDGE LEFKOW:  What could possibly be improper about
09:40:28  12  that?  Most of the state houses are controlled by people --
09:40:32  13  the same party you represent.  So that's the way politics
09:40:38  14  goes.
09:40:38  15        JUDGE TINDER:  And then the measure, the test, is the
09:40:42  16  product, was it a fair product.
09:40:44  17        MS. LIGHTFOOT:  For sure.
09:40:44  18        JUDGE TINDER:  Regardless of who writes it.
09:40:46  19        MS. LIGHTFOOT:  I think we'd like to have some
09:40:48  20  definitive -- a document that shows whether, in fact, any
09:40:50  21  expert actually was involved in opining about the map as
09:40:56  22  passed.  We still don't know that definitively.  All we know
09:41:00  23  is that --
09:41:00  24        JUDGE TINDER:  Well, you do make a good point that to
09:41:04  25  the extent they resist your opponents and third parties resist

| | |
|---|---|
| 09:41:08 | 1 |
| 09:41:14 | 2 |
| 09:41:14 | 3 |
| 09:41:16 | 4 |
| 09:41:18 | 5 |
| 09:41:18 | 6 |
| 09:41:20 | 7 |
| 09:41:24 | 8 |
| 09:41:28 | 9 |
| 09:41:32 | 10 |
| 09:41:34 | 11 |
| 09:41:36 | 12 |
| 09:41:40 | 13 |
| 09:41:44 | 14 |
| 09:41:46 | 15 |
| 09:41:50 | 16 |
| 09:41:56 | 17 |
| 09:42:00 | 18 |
| 09:42:04 | 19 |
| 09:42:10 | 20 |
| 09:42:12 | 21 |
| 09:42:14 | 22 |
| 09:42:16 | 23 |
| 09:42:18 | 24 |
| 09:42:20 | 25 |

disclosing certain things, they can't then bring that witness in to testify.

MS. LIGHTFOOT:  I think that's right.

JUDGE TINDER:  Kind of surprising you with it.  I understand that.

MS. LIGHTFOOT:  And then beyond those two categories, your Honor, what we'd like is essentially what was the data that was used, was there any specific racial bloc voting analysis that was done ahead of time to justify the way in which the end product.  That information I think we are entitled to, and we still don't have that.

Now, one response might be, well, for example -- and this is an issue that we want to talk to the court about -- we are going to get expert reports from the other side relatively soon.  We have no idea if it's one expert report or multiple, but let's assume that it's expert reports that analyze the map as passed.  Certainly, I think that will be helpful, but I think we are also entitled to know whether or not any of those experts or some other experts were engaged to analyze anything about that map before it was passed, and we still don't know that.

JUDGE TINDER:  Well, now, you're confusing me again.

MS. LIGHTFOOT:  Sorry.

JUDGE TINDER:  The test here is not were there other maps that might be better.  It's whether this map

| | | |
|---|---|---|
| 09:42:22 | 1 | discriminates. |
| 09:42:24 | 2 | MS. LIGHTFOOT: And I apologize if I'm confusing you, |
| 09:42:28 | 3 | your Honor, and I agree with you, that is the test, it's |
| 09:42:32 | 4 | whether it's this particular map. |
| 09:42:34 | 5 | What we are interested in knowing, however, is |
| 09:42:34 | 6 | whether or not there was expert involvement in helping craft |
| 09:42:36 | 7 | that map on the front end before it was passed or whether or |
| 09:42:40 | 8 | not the expert analysis was done in an ad hoc basis after the |
| 09:42:44 | 9 | fact. |
| 09:42:44 | 10 | Now, we will learn some of that when we sit down with |
| 09:42:46 | 11 | the expert reports that are produced, we will learn some of |
| 09:42:48 | 12 | that when we have the opportunity, presumably, to depose those |
| 09:42:52 | 13 | experts, but there's still going to be a piece of information |
| 09:42:54 | 14 | that's missing. |
| 09:42:56 | 15 | The defendant in our case is the State Board of |
| 09:42:58 | 16 | Elections. We know now, based upon the discovery that they |
| 09:43:00 | 17 | provided to us, that they effectively didn't get involved in |
| 09:43:04 | 18 | any of this process until after the map was passed. |
| 09:43:06 | 19 | What we're interested in is what the data inputs were |
| 09:43:10 | 20 | that went into the drafting of this map. And if the experts |
| 09:43:14 | 21 | were only retained post the passage of the map, we are not |
| 09:43:18 | 22 | going to know that information because they are not going to |
| 09:43:20 | 23 | know it, frankly. |
| 09:43:22 | 24 | JUDGE LEFKOW: I still don't really see why that |
| 09:43:24 | 25 | matters; that is, if they had the good luck of producing a |

09:43:28  1   valid map without engaging an expert, then that's good for

09:43:36  2   them, right?

09:43:36  3       MS. LIGHTFOOT:  Well, I think it speaks to whether or

09:43:40  4   not, in fact, this map was valid.  It would be -- it would

09:43:44  5   certainly be good luck, maybe even more than that, if they

09:43:48  6   produced this map without having a single expert weigh in on

09:43:52  7   the map before it was passed, and that would be an interesting

09:43:56  8   data point, frankly.

09:43:58  9       But I think what we are looking for is the basic

09:44:02  10  inputs into that map.  That information is not readily

09:44:06  11  available in another source.  We do think if you look at very

09:44:10  12  established case law that talks -- speaks to the issue of

09:44:14  13  balancing the qualified privilege in an evidentiary context,

09:44:20  14  that the balancing weighs in favor of disclosure of the very

09:44:24  15  information that we are seeking, and we'd ask the court to so

09:44:28  16  rule.

09:44:30  17      On a related point, if the court were to determine --

09:44:32  18  and we put this in as an alternative with respect to our

09:44:34  19  argument -- if the court were to determine either that there

09:44:38  20  is absolute immunity -- and I really don't believe that that's

09:44:42  21  a test, and, frankly, as a citizen of the state, I would

09:44:44  22  encourage the court not to adopt that because I think it would

09:44:48  23  make it virtually impossible for any plaintiff seeking to

09:44:52  24  vindicate an important federal right like the Voting Rights

09:44:56  25  Act to be able to come into court and prosecute their case.  I

| | |
|---|---|
| 09:45:04 | 1 |
| 09:45:06 | 2 |
| 09:45:14 | 3 |
| 09:45:18 | 4 |
| 09:45:22 | 5 |
| 09:45:26 | 6 |
| 09:45:30 | 7 |
| 09:45:32 | 8 |
| 09:45:36 | 9 |
| 09:45:40 | 10 |
| 09:45:44 | 11 |
| 09:45:46 | 12 |
| 09:45:50 | 13 |
| 09:45:52 | 14 |
| 09:45:54 | 15 |
| 09:45:56 | 16 |
| 09:45:58 | 17 |
| 09:46:00 | 18 |
| 09:46:02 | 19 |
| 09:46:02 | 20 |
| 09:46:04 | 21 |
| 09:46:06 | 22 |
| 09:46:18 | 23 |
| 09:46:20 | 24 |
| 09:46:24 | 25 |

think the better test is qualified privilege. If the court were to determine that the information is shielded from some -- from view for some reason, what we would ask is that part of that order, the court indicate that the State Board of Elections, or no other party, frankly, can then come back and use that information as a shield -- or, sorry, as a sword in this case. I don't think they can have it both ways. If they are saying, We can legislate in a black box, you are not entitled to any information, fair enough, and if that's what the court determines, we will respect that determination. But I don't think on the back end, it's appropriate for them to say, Wait, wait, wait, but, but, but let us bring in this staffer, this piece of evidence, this expert.

Thank you, your Honor.

MR. PRENDERGAST: May I respond to that one point? I just think it's a little early for motions in limine.

JUDGE LEFKOW: Pardon me?

MR. PRENDERGAST: I think it's a little early for motions in limine.

JUDGE LEFKOW: All right. I think we have heard enough. Thank you all for your help today.

MS. LIGHTFOOT: Thank you, your Honor.

MR. BERGETZ: Your Honor, Carl Bergetz for the defendant. We do have one -- the parties to the case have come to an agreement on a few things. There was one thing

09:46:24  1   that was pending before the court, a motion for a protective

09:46:28  2   order, and then there were some dates that we needed to move

09:46:30  3   out.  And the clerk expressed that we should orally state them

09:46:32  4   to the court for purposes of entry of a minute order.

09:46:36  5          We have an agreement to extend fact depositions to

09:46:38  6   October 19th, currently set for October 5th, but we had an

09:46:44  7   agreement to extend it to the 19th.

09:46:44  8          MS. LIGHTFOOT:  Correct, your Honor.

09:46:46  9          MR. BERGETZ:  We have an agreement that the

09:46:48  10  defendants will have until October 4th to disclose experts.

09:46:52  11  Currently, the date is ended today, but we have an agreement

09:46:54  12  that that will be the 4th.

09:46:56  13         MS. LIGHTFOOT:  That's correct, your Honor.

09:46:58  14         MR. BERGETZ:  They will have 14 days thereafter to

09:47:00  15  produce any rebuttal expert reports.

09:47:02  16         And then we also have while fact depositions would

09:47:06  17  conclude on the 19th of October, we have an agreement that

09:47:10  18  expert depositions might spill over into the 24th -- the week

09:47:18  19  of the 23rd, I believe.

09:47:20  20         None of this would affect the end dates that your

09:47:22  21  Honors have set for purposes of the hearing or for pretrial

09:47:26  22  disclosures.

09:47:26  23         MS. LIGHTFOOT:  That's correct.

09:47:28  24         One other housekeeping matter.  You will recall we

09:47:30  25  filed a motion for protective order with respect to Rule

| | | |
|---|---|---|
| 09:47:36 | 1 | 30(b)(6) following the last appearance in court. |
| 09:47:38 | 2 | We spoke together, and I think we have resolved all |
| 09:47:40 | 3 | of the issues, and we would be withdrawing -- moving to |
| 09:47:42 | 4 | withdraw our motion for protective order without prejudice. |
| 09:47:46 | 5 | JUDGE LEFKOW: All right. Very good. |
| 09:47:50 | 6 | MR. BERGETZ: Thank you, your Honor. |
| 09:47:50 | 7 | MS. LIGHTFOOT: Thank you, your Honor. |

8  (Which were all the proceedings had in the above-entitled

9  cause on the day and date aforesaid.)

10  I certify that the foregoing is a correct transcript from

11  the record of proceedings in the above-entitled matter.

12  Carolyn R. Cox                    Date

Official Court Reporter

13  Northern District of Illinois

14  /s/Carolyn R. Cox, CSR, RPR, CRR, FCRR

15

16

17

18

19

20

21

22

23

24

25