# EXHIBIT A

AO 88A  (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action

# UNITED STATES DISTRICT COURT
for the

District of Columbia

| | | |
|---|---|---|
| Committee For A Fair And Balanced Map, et al. | ) | |
| *Plaintiff* | ) | |
| v. | ) | Civil Action No.   1:11-cv-05065 |
| Illinois State Board of Elections, et al. | ) | |
| | ) | (If the action is pending in another district, state where: |
| *Defendant* | ) | Northern District of Illinois          ) |

## SUBPOENA TO TESTIFY AT A DEPOSITION IN A CIVIL ACTION

To:  Jerry Costello, c/o David Gillies, 2408 Rayburn, House Office Building, Washington, DC 20515

&#9745; *Testimony:*  **YOU ARE COMMANDED** to appear at the time, date, and place set forth below to testify at a deposition to be taken in this civil action.  If you are an organization that is *not* a party in this case, you must designate one or more officers, directors, or managing agents, or designate other persons who consent to testify on your behalf about the following matters, or those set forth in an attachment:

| Place: Mayer Brown LLP, 1999 K Street, N.W. Washington, DC  20006-1101 | Date and Time: 09/28/2011 9:30 am |
|---|---|

The deposition will be recorded by this method:   Court Reporter and Videographer.

&#9745; *Production:*  You, or your representatives, must also bring with you to the deposition the following documents, electronically stored information, or objects, and permit their inspection, copying, testing, or sampling of the material:

Refer to attached Rider to Subpoena

The provisions of Fed. R. Civ. P. 45(c), relating to your protection as a person subject to a subpoena, and Rule 45 (d) and (e), relating to your duty to respond to this subpoena and the potential consequences of not doing so, are attached.

Date:  09/22/2011

*CLERK OF COURT*

OR

_____           _____
*Signature of Clerk or Deputy Clerk*                   *Attorney's signature*

The name, address, e-mail, and telephone number of the attorney representing *(name of party)*   Committee For A Fair and Balanced Map, et al.                                                     , who issues or requests this subpoena, are:
Lori E. Lightfoot                                  llightfoot@mayerbrown.com
71 S. Wacker Drive, Suite 4471          312-701-8680
Chicago, IL  60606

AO 88A (Rev. 06/09) Subpoena to Testify at a Deposition in a Civil Action (Page 2)

Civil Action No.   1:11-cv-05065

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

This subpoena for *(name of individual and title, if any)*     Jerry Costello

was received by me on *(date)*                          .

☐ I served the subpoena by delivering a copy to the named individual as follows:

on *(date)*                    ; or

☐ I returned the subpoena unexecuted because:

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also tendered to the witness fees for one day's attendance, and the mileage allowed by law, in the amount of

$

My fees are $                     for travel and $                     for services, for a total of $     0.00     .

I declare under penalty of perjury that this information is true.

Date:

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc:

## Federal Rule of Civil Procedure 45 (c), (d), and (e) (Effective 12/1/07)

**(c) Protecting a Person Subject to a Subpoena.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The issuing court must enforce this duty and impose an appropriate sanction — which may include lost earnings and reasonable attorney's fees — on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*

**(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.

**(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing or sampling any or all of the materials or to inspecting the premises — or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:

**(i)** At any time, on notice to the commanded person, the serving party may move the issuing court for an order compelling production or inspection.

**(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*

**(A)** *When Required.* On timely motion, the issuing court must quash or modify a subpoena that:

**(i)** fails to allow a reasonable time to comply;

**(ii)** requires a person who is neither a party nor a party's officer to travel more than 100 miles from where that person resides, is employed, or regularly transacts business in person — except that, subject to Rule 45(c)(3)(B)(iii), the person may be commanded to attend a trial by traveling from any such place within the state where the trial is held;

**(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or

**(iv)** subjects a person to undue burden.

**(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the issuing court may, on motion, quash or modify the subpoena if it requires:

**(i)** disclosing a trade secret or other confidential research, development, or commercial information;

**(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party; or

**(iii)** a person who is neither a party nor a party's officer to incur substantial expense to travel more than 100 miles to attend trial.

**(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(c)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:

**(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and

**(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(d) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:

**(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.

**(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.

**(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.

**(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*

**(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:

**(i)** expressly make the claim; and

**(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.

**(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information to the court under seal for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(e) Contempt.** The issuing court may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena. A nonparty's failure to obey must be excused if the subpoena purports to require the nonparty to attend or produce at a place outside the limits of Rule 45(c)(3)(A)(ii).

## RIDER TO SUBPOENA

Plaintiffs, by and through their counsel, hereby request that Congressman Jerry Costello ("Congressman Costello") produce the following documents for inspection and copying at the recipient's address on the date set forth in the subpoena. Congressman Costello shall adhere to the Definitions and Instructions below.

## DEFINITIONS

As used herein, the terms and phrases identified below shall have the following meanings:

The term "Action" when used herein means Case No. 1:11-CV-05065 filed in the United States District Court for the Northern District of Illinois Eastern Division.

The term "Complaint" when used herein means the Complaint filed on July 27, 2011 in the above referenced Action.

The terms "Plaintiff" or "Plaintiffs" refer to all of the following:

    (a)    The Committee for a Fair and Balanced Map (the "Committee"), including its members: Tom Long, Tom Ewing, Larry Nelson, J. Dennis Hastert, James D. Pearson, Lynn Martin, Michael Keiser, and Alexander D. Stuart;

    (b)    The Partisan Gerrymander Plaintiffs named in the Complaint;

    (c)    The Racial Gerrymander Plaintiffs named in the Complaint; and

    (d)    The Racial Dilution Plaintiffs named in the Complaint.

The term "Defendant" refers to all of the following: The Illinois State Board of Elections, including its members: William McGuffage, Jesse R. Smart, Harold D. Byers, Betty J. Coffrin, Ernest L. Gowen, Judith C. Rice, Bryan A. Schneider, Charles W. Scholz, or any employee,

officer, director, agent, attorney or other representative thereof, and any person acting or purporting to act on its behalf.

The terms "You" and "Your" when used herein mean the recipient of these Requests for Production, Your present and former attorneys, agents, investigators, representatives, or anyone else acting in cooperation or in concert with You.

The term "Person" when used herein means any individual, firm, corporation, joint venture, partnership, limited liability company, trust, association, entity or group of persons, unless the request is clearly referring only to an individual, human person.

The term "Illinois General Assembly" when used herein means the state legislature of the state of Illinois.

The terms "Illinois House of Representatives" and "House" when used herein mean the lower house of the Illinois General Assembly and its 118 representatives.

The term "Illinois Senate" when used herein means the upper house of the Illinois General Assembly and its 59 members.

The terms "Congressional District" and "District" when used herein refer to an electoral District in the state of Illinois that elects a single member of the U.S. House of Representatives.

The term "Redistricting" when used herein refers to the process of redefining the geographic boundaries of legislative or Congressional Districts.

The term "Illinois House Redistricting Committee" when used herein means the committee comprised of Democrat and Republican Illinois House members charged with conducting Redistricting hearings throughout the state of Illinois prior to the drawing of the state and congressional legislative maps.  Members include: Barbara Flynn Currie, Mike Fortner,

Edward Acevedo, Marlow Colvin, Jim Durkin, Lou Lang, Frank Mautino, Chapin Rose, Timothy Schmitz, Jill Tracy, and Karen Yarbrough.

The term "Illinois Senate Redistricting Committee" when used herein means the committee comprised of Democrat and Republican Illinois Senate members charged with conducting Redistricting hearings throughout the state of Illinois prior to the drawing of the state and congressional legislative maps. Members include: Kwame Raoul, Michael Noland, Jacqueline Y. Collins, William R. Haine, Don Harmon, Mattie Hunter, Emil Jones, III, Kimberly Lightford, Edward D. Maloney, Iris Y. Martinez, Dale A. Righter, Shane Cultra, Kirk W. Dillard, Dan Duffy, David Luechtefeld, and Matt Murphy.

The term "Communication" when used herein means any and all of the following: written, electronic or otherwise, oral communications, conversations by telephone, meetings, and any contact, written, formal or informal, at any time or place, and under any circumstances whatsoever in which information of any nature was transmitted or exchanged in any form.

The term "Document" when used herein means any and all written, typed, printed, recorded, computerized, electronic, or graphic statements, Communications, or other matter, however, produced or reproduced, whether in final or draft form, and whether or not now in existence, in Your possession, custody, or control, including without limitation, all writings; studies; analyses; tabulations; evaluations; reports; reviews; agreements; contracts; letters or other correspondence; emails from all email accounts in Your possession, custody, or control, including, but not limited to, Your personal, professional, and official email accounts; messages; facsimile messages; text messages; memoranda; records; notes; reports; summaries; PDFs; spreadsheets; sound recordings or transcripts of personal or professional telephone conversations or messages; meetings; conferences or interviews; telephone toll records; diaries; desk calendars;

appointment books; drawings; graphs; charts; maps; diagrams; blueprints; tables; indices; pictures; photographs; films; tapes; statistical or analytical records; minutes or records of committee or other meetings or conferences; transcripts of testimony; reports or summaries of investigations; opinions or reports or summaries of investigations; opinions or reports of consultants; press releases; newspaper and magazine clippings; projections; and any other Document, writing, or other data compilation of whatever description, including, but not limited to, electronically stored data although not yet printed out or the memory units containing such data from which information can be obtained or translated into reasonable usable form; any other data types, including without limitation, all District mapping software data files and shapefiles, including data files in draft form.

The term "Proposed Congressional Plan" when used herein refers to the new map for the state of Illinois' Congressional Districts adopted by the Illinois General Assembly and signed into law by Governor Pat Quinn on Friday, June 24, 2011 as Illinois P.A. 97-14; including, but not limited to, Senate Bill 1178 and amendments thereto.

The terms "Compact" and "Compactness" when used herein mean the degree to which the territory assigned to a District is close together. There are several mathematical methods to measure the elements of Compactness, including, but not limited to, measuring the Circularity Ratio and the Schwartzberg Test:

(a) The term "Circularity Ratio" when used herein refers to the ratio of the area of the proposed Districts to the area of a circle having the same perimeter; this measure of shape is used in Redistricting to maximize the Compactness of electoral Districts and avoid gerrymandering.

4

(b)     The term "Schwartzberg Test" when used herein refers to the perimeter-based measure that compares proposed Districts to a circle, measuring distance from the center of gravity to points in the District boundary. This test is used in Redistricting to maximize the Compactness of electoral Districts and avoid gerrymandering.

The term "Core Report" when used herein refers to the constituency report produced by Maptitude, AutoBound, or similar software that indicates the number of persons or voters residing in a District in a Redistricting plan, who also reside in that same numbered or a differently numbered District in another Redistricting plan.

The terms "Voting Age Population" and "VAP" when used herein mean all citizens above the voting age of eighteen years.

The term "2010 Census" when used herein refers to the twenty-third decennial national census of the United States.

The term "2010 Elections" when used herein means all 2010 Illinois state and Congressional Elections.

To "Identify" a Person or witness means to state his or her name, present employer, last known address, telephone number (business and home), and employer and position in which he or she was employed at the time in question.

To "Identify a Document" means the following: (a) the name and present address of the Person who prepared it; (b) the name and address of the Person to whom it was addressed or distributed; (c) a detailed description of the general nature of the Document's contents; (d) the date it was prepared, and the date it was distributed; (e) the name and address of the Person having custody of the original and any copies; (f) whether the original will voluntarily be made

available for the Plaintiff to inspect and copy, and if not, the specified reason for this refusal and a detail explanation of why this reason is persuasive; and (g) whether the original Document has been destroyed, and if so, why it was destroyed, the Person who directed it to be destroyed, who destroyed the Document, and when it was done.

To "Identify" a Communication or discussion shall mean to state the following: (a) the name and present address of each of the Persons who were involved in any way with the Communication or discussion; (b) a detailed description of the subjects that were involved in the Communication or discussion; (c) whether any memoranda, notes or other compilations, by whatever means, relating to the Communication or discussion were ever created; (d) the general substance of what was said by each Person involved in the Communication or discussion; and (e) the date on which such Communication or discussion occurred.

## INSTRUCTIONS

1.      Each production request shall be construed to include all Documents within Mr. Mapes' possession, custody or control, or the possession, custody or control of its present and former attorneys, agents, investigators, representatives, or anyone acting in cooperation or in concert with It in this case, as of the date of its response to these production requests, as well as any Document that subsequently is obtained or discovered and that demonstrates that any production originally provided in response to these production requests was incorrect or incomplete in any way when made or subsequently became incorrect or incomplete; such supplemental Documents are to be promptly supplied.

2.      If the response to any production request consists, in whole or in part, of an objection to, or including burdensomeness, then provide those Documents which can be produced without undue burden.  For such Documents that are too burdensome to produce,

6

describe the process or method required to obtain said Documents, the quantity and location of the Documents involved, and the number of employee hours and costs of the search.

3.    If the response to the production requests is any other objection, provide all information not covered by the objection and state the basis of the objection.

4.    If any Document responsive to these production requests has been destroyed, for each such Document state when it was destroyed, identify the Person who destroyed the Document and the Person who directed that it be destroyed.  Also, detail the reasons for the destruction, describe the nature of the Document, identify the Persons who created, sent, received or reviewed the Document, and state in as much detail as possible the contents of the Document.

5.    If You withhold any information requested by the production requests contained herein, furnish a list with Your responses to these discovery requests identifying all such withheld information together with the following:

(a)    a brief description of the nature of the information withheld;

(b)    the reason(s) for the withholding;

(c)    an identification of all Documents relating or referring to the information;

(d)    the name of each Person most knowledgeable as to the information, and an identification by employment and title of each such Person;

(e)    a statement of facts constituting the basis for the withholding; and

(f)    the discovery requests to which the information relates.  (If any such withholding relates only to a portion of a particular discovery request specify the portion to which the withholding relates.)

6. The use of the singular form of any word shall be deemed to include the plural form and *vice versa*, and the use of one gender shall include all others, as appropriate in context.

7. The connectives "and," "or" and "and/or" shall be construed distinctively or conjunctively as necessary to bring within the scope of the request any information which might otherwise be construed to be outside its scope.

8. These Requests for Production are continuing in nature. In Your response to these Requests for Production, You are required to furnish all Documents available to You, including, but not limited to, Documents in the possession of any personnel, employees, attorneys, agents, investigators, representatives or anyone acting in cooperation or in concert with You.

9. As provided by the Federal Rules of Civil Procedure, You are under a duty to seasonably amend a prior response if You obtain information upon the basis of which You know that the response was incorrect when made or You know that the response, though correct, when made, is no longer true and the circumstances are such that a failure to amend the response is in substance a knowing concealment. The Committee reserves the right to request additional Documents.

10. Unless otherwise indicated all Document requests should pertain to the time frame of January 1, 2010 to the present.

## REQUESTS FOR PRODUCTION

Request No. 1

All Documents related to the state of Illinois Congressional Redistricting process which led to the planning, development, negotiation, drawing, revision or re-drawing of the Proposed Congressional Plan.

8

<u>Request No. 2</u>

All Documents, including, but not limited to, reports, analyses, election results or other election data, and Communications pertaining or relating to the planning, development, negotiation, drawing, revision or re-drawing of the Proposed Congressional Plan.

<u>Request No. 3</u>

All Documents regarding any Communications, discussions, meetings, and/or conversations, pertaining or relating to the planning, development, negotiation, drawing, revision or re-drawing of the Proposed Congressional Plan with any of the following Persons:

(a)     Defendants;

(b)     Democratic Congressional Campaign Committee ("DCCC");

(c)     NCEC Services Inc.

(d)     National Committee for an Effective Congress

(e)     Any present and former staff, personnel, employees, attorneys, agents, investigators, representatives, experts, consultants, or anyone else acting on the DCCC's behalf;

(f)     Illinois House Redistricting Committee;

(g)     Illinois Senate Redistricting Committee;

(h)     Any member of the Illinois General Assembly;

(i)     Any present and former staff, personnel, employees, attorneys, agents, investigators, representatives, experts, consultants, or anyone else acting on the Illinois General Assembly's behalf;

(j)     Any current or former member of the United States Congress;

(k)     Any present and former staff, personnel, employees, attorneys, agents, investigators, representatives, experts, consultants, or anyone else acting on the United States Congress' behalf; and

(l)     Any interest groups which testified at Redistricting hearings.

9

<u>Request No. 4</u>

Any draft drawings of any Districts of the Proposed Congressional Plan, whether created by You or by any other Person.

<u>Request No. 5</u>

All Documents which reflect the identity of any and all persons who assisted in the drawing of Districts 3, 4, and 5 as they appear in the Proposed Congressional Plan.

<u>Request No. 6</u>

All Documents which reflect when the planning and drawing of Districts 3, 4, and 5 of the Proposed Congressional Plan were finalized.

<u>Request No. 7</u>

With respect to District 3 of the Proposed Congressional Plan, all Documents which reflect the identity of the Person(s) who made or participated in the decision to have the Latino VAP in District 3 as 24.64%.

<u>Request No. 8</u>

With respect to District 4 of the Proposed Congressional Plan, all Documents which reflect the identity of the Person(s) who made or participated in the decision to have the Latino VAP in District 3 as 65.92%.

<u>Request No. 9</u>

With respect to District 5 of the Proposed Congressional Plan, all Documents which reflect the identity of the Person(s) who made or participated in the decision to have the Latino VAP in District 5 as 16.05%.

# EXHIBIT B



ATTORNEYS AT LAW

222 N. LaSalle, Suite 300
Chicago, IL 60601

T 312-704-3000
F 312-704-3001
www.hinshawlaw.com

October 11, 2011

**Via Email Transmission and Facsimile**

Lori E. Lightfoot
Mayer Brown LLP
71 South Wacker Drive, Suite 4471
Chicago, Illinois  606060

      Re:    *Subpoena Issued in 11 C 05065 to Congressman Jerry Costello*

Dear Ms. Lightfoot:

Pursuant to our discussion yesterday and Rule 45(c)(2)(B), the following serves as objections to the subpoena request directed at Congressman Costello ("Respondent"):

***Objections Applicable to Requests 1-9***

Each Request for Production relates to "the Proposed Congressional Plan."  Therefore, as to each request, Respondent objects to documents and/or material exchanged among, or reflecting communications among, Democratic Congressional Campaign Committee (DCCC) members (including Members of Congress and their aides), agents, consultants and/or attorneys relating to Illinois congressional redistricting.  In support of these objections, Respondent specifically adopts those objections and arguments made by the DCCC in both its correspondence to you of August 26, 2011 and in its response to plaintiff's motion to compel the DCCC.

Respondent also objects to any documents or material reflecting information exchanged among, or reflecting communications among, Congressman Costello and his aides regarding Illinois congressional redistricting.  In support of said objection, Respondent again adopts those objections raised by the DCCC and states that such information is protected by the legislative immunity and deliberative process privileges.

Subject to and without waiver, we discussed that I have documents that fall into the above categories, but at this time you do not require a privilege log.  We understand that you may choose to insist upon a log at a later date.

Please feel free to call me with any questions.

October 11, 2011
Page 2


Regards,

HINSHAW & CULBERTSON LLP

/s/ *Robert T. Shannon*

Robert T. Shannon
Direct 312-704-3901
rshannon@hinshawlaw.com

# EXHIBIT C

**Helfrich, Gretchen**

| | |
|---|---|
| **From:** | Douglas, Dana S. |
| **Sent:** | Monday, October 24, 2011 7:07 PM |
| **To:** | Helfrich, Gretchen |
| **Subject:** | FW: Activity in Case 1:11-mc-00514-DAR COMMITTEE FOR A FAIR AND BALANCED MAP et al v. DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE Order on Motion for Leave to File |

**From:** DCD_ECFNotice@dcd.uscourts.gov [mailto:DCD_ECFNotice@dcd.uscourts.gov]
**Sent:** Friday, October 21, 2011 5:31 PM
**To:** DCD_ECFNotice@dcd.uscourts.gov
**Subject:** Activity in Case 1:11-mc-00514-DAR COMMITTEE FOR A FAIR AND BALANCED MAP et al v. DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE Order on Motion for Leave to File

**This is an automatic e-mail message generated by the CM/ECF system. Please DO NOT RESPOND to this e-mail because the mail box is unattended.**
**\*\*\*NOTE TO PUBLIC ACCESS USERS\*\*\* Judicial Conference of the United States policy permits attorneys of record and parties in a case (including pro se litigants) to receive one free electronic copy of all documents filed electronically, if receipt is required by law or directed by the filer. PACER access fees apply to all other users. To avoid later charges, download a copy of each document during this first viewing. However, if the referenced document is a transcript, the free copy and 30 page limit do not apply.**

### U.S. District Court

### District of Columbia

### Notice of Electronic Filing

The following transaction was entered on 10/21/2011 at 6:30 PM and filed on 10/21/2011

| | |
|---|---|
| **Case Name:** | COMMITTEE FOR A FAIR AND BALANCED MAP et al v. DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE |
| **Case Number:** | 1:11-mc-00514-DAR |
| **Filer:** | |
| **Document Number:** | No document attached |

**Docket Text:**
**MINUTE ORDER by Magistrate Judge Deborah A. Robinson on 10/21/2011: For the reasons set forth on the record, Non-Party Democratic Congressional Campaign Committee's Motion for Leave to File Privilege Log Under Seal (Document No.[11]) is DENIED WITHOUT PREJUDICE. It is FURTHER ORDERED that Respondent, in accordance with its agreement to do so and without waiving any applicable privileges, shall produce the documents described by its counsel on the record by Tuesday, October 25, 2011. It is FURTHER ORDERED that the parties shall continue to meet and confer regarding the scope of the subpoena (already narrowed by Petitioners in the manner described by their counsel on the record at the hearing), and jointly**

**file a status report regarding their efforts by no later than November 2, 2011. It is FURTHER ORDERED that a status conference is scheduled for 9:30 a.m. on Friday, November 4, 2011. (lcdar3)**

**1:11-mc-00514-DAR Notice has been electronically mailed to:**

Barry J. Reingold breingold@perkinscoie.com

Anthony Michael Alexis, Sr aalexis@mayerbrown.com

Brian G. Svoboda bsvoboda@perkinscoie.com

Dana S. Douglas dsdouglas@mayerbrown.com

**1:11-mc-00514-DAR Notice will be delivered by other means to::**

# EXHIBIT D

1019COSTELLO.txt

1

```
 1              ROUGH DRAFT-UNCERTIFIED COPY
 2           THE FOLLOWING FILE IS NOT AN OFFICIAL
 3           TRANSCRIPT.  IT IS INTENDED ONLY TO AID
 4          IN CASE PREPARATION.  THE FINAL TRANSCRIPT
 5        WILL BE DIFFERENT, BOTH IN FORM AND SUBSTANCE,
 6             FROM THIS ROUGH DRAFT TRANSLATION.
 7          YOU MAY SEE ERRORS AND OMISSIONS DURING
 8            THE REALTIME TRANSLATION  THIS IS NOT
 9           AN UNUSUAL PROCESS AND THESE ERRORS AND
10           OMISSIONS WILL BE CORRECTED ON THE FINAL
11        TRANSCRIPT.  PLEASE DO NOT TRY TO BRING THESE
12        DISCREPANCIES TO THE ATTENTION OF THE REPORTER
13             DURING THE COURSE OF THE DEPOSITION.
14
15
16              UNOFFICIAL DRAFT TRANSCRIPT
17            THIS IS AN UNOFFICIAL DRAFT TRANSCRIPT!
18
19
20        This transcript has not been checked, proofread or
21        corrected.  It is a draft transcript, NOT a
22        certified transcript.  As such, it may contain
23        computer-generated mistranslations of stenotype
24        code, resulting in inaccurate or nonsensical word
25        combinations, or untranslated stenotype symbols
```

.

2

Page 1

1019COSTELLO.txt

```
 1           ROUGH DRAFT-UNCERTIFIED COPY
 2    which cannot be deciphered by non-stenotypists.
 3    Corrections will be made in the preparation of the
 4    certified transcript, resulting in differences in
 5    page and line numbers, punctuation, and formatting.
 6         THIS DRAFT TRANSCRIPT IS SUPPLIED TO YOU ON
 7    THE CONDITION THAT UPON RECEIPT OF THE CERTIFIED
 8    TRANSCRIPT, THIS DRAFT AND ANY COPIES THEREOF (IN
 9    CONDENSED FORMAT OR OTHERWISE) WILL BE DESTROYED.
10    THE CERTIFIED TRANSCRIPT IS THE ONLY OFFICIAL
11    TRANSCRIPT WHICH MAY BE RELIED UPON FOR PURPOSES OF
12    VERBATIM CITATION OF TESTIMONY.
13
14
15
16
17
18
19
20
21
22
23
24
25
```

.

3

```
 1           ROUGH DRAFT-UNCERTIFIED COPY
 2           THE VIDEOGRAPHER:  Good morning.  We are going
```

1019COSTELLO.txt

3  on the video record at 11:43 a.m.

4          This is Tape 1 to the videotaped

5  deposition of Congressman Jerry Costello in the

6  matter of the Committee for a Fair and Balanced

7  Map, et al. versus Illinois State Board of

8  Elections, et al. It's being heard before the U.S.

9  District Court for the Northern District of

10  Illinois, Eastern Division, case number

11  1:11-CV-05065.

12          This deposition is being held at 71

13  South Wacker Drive, Chicago, Illinois, on October

14  19, 2011.

15          My name is Joseph Elsey and I'm the

16  videographer. The court is Susan Today.

17          Counsel, will you please introduce

18  yourselves and affiliations and the witness will be

19  sworn.

20      MR. BRUCE: Devon Bruce. D-e-v-o-n Bruce, on

21  behalf of the defendants and State of Illinois.

22      MR. ROSENBLATT: Jon Rosenblatt on behalf of

23  defendants.

24      MR. SHANNON: Robert Shannon representing

25  Congressman Jerry Costello.

.

                                                    4




1          ROUGH DRAFT-UNCERTIFIED COPY

2      MS. LIGHTFOOT: Lori Lightfoot representing

3  the plaintiffs in this action.

4                  (WHEREUPON, the witness was duly

5                    sworn.)

                Page 3

1019COSTELLO.txt

6      Q.      Good morning, Congressman.

7      A.      Good morning.

8      Q.      As I had mentioned before we went on the

9   record, we will try to get you in and out of here

10   as quickly as possible.  Your counsel and I have

11   had several conversations leading up to today's

12   deposition.  I think he wants to put a point on the

13   record and then I will respond and then we can

14   actually get to the substance of the deposition

15   itself.

16              So go ahead, Mr. Shannon.

17      MR. SHANNON:  Certainly.  Thank you.

18              As a follow-up to our communications and

19   in connection with the subpoena and the

20   accompanying rider issued to Congressman Costello,

21   we have objected to any materials and

22   communications that would reflect conversations

23   with -- between the Congressman and other fellow

24   members of Federal Congress, any DCCC

25   representatives or agents, including attorneys or

                                                  5

1              ROUGH DRAFT-UNCERTIFIED COPY

2   consultants, which would include the NCEC in

3   connection with the Illinois congressional

4   redistricting for the reasons reflected in the -- I

5   guess the most efficient way to handle it is for

6   the reasons reflected in the DCCC response to

7   plaintiff's motion to compel filed I believe in an

8   ancillary proceeding which I understand to still be

1019COSTELLO.txt

9      pending.

10            We also, as reflected in prior

11     communication, will be objecting and instructing

12     the Congressman not to offer any testimony relative

13     to any material or communications that he may have

14     had with his own congressional aides, again for the

15     reasons reflected in the DCCC response to the

16     pending motion to compel and the ancillary

17     proceeding as well as deliberative process and

18     legislative immunity and legislative privileges.

19          MS. LIGHTFOOT:  All right.  Just one point of

20     clarification, counsel.

21          MR. SHANNON:  Certainly.

22          MS. LIGHTFOOT:  I wanted to make sure that you

23     didn't intend to go as broadly as you did.

24            You said that one of the objections that

25     you have is to any communications that the

.                                                           6

1            ROUGH DRAFT-UNCERTIFIED COPY

2      Congressman might have with any other member of

3      Congress.

4            Did you mean to say it that broadly?

5          MR. SHANNON:  I meant only Democratic members

6      of Congress.

7          MS. LIGHTFOOT:  Fair enough.  You are aware

8      obviously that we have indicated to you that we,

9      one, don't believe that there is any privilege that

10     the Congressman may assert on the basis of the

11     topics that are going to be covered here today.  We

Page 5

1019COSTELLO.txt

12    are not going to be asking him specific questions

13    that impinge about his duties and responsibilities

14    as a federal member of Congress as opposed to his

15    involvement in the Illinois redistricting.

16              So on that basis we don't think he has

17    got any privilege.  We don't believe and as we have

18    reflected in our court papers with the DCCC that

19    any privilege attaches to them and, frankly, that

20    we are struggling to see the nexus between whatever

21    First Amendment issue, which is what they have

22    asserted, might be relevant to them, how that would

23    apply to the congressman.

24              And then finally, as you know, we

25    believe that to the extent that there was any

                                                    7

1              ROUGH DRAFT-UNCERTIFIED COPY

2    privilege between the DCCC and the Congressman, he

3    has waived that by virtue of the fact that he has

4    disclosed certain communications DCCC to third

5    parties that are clearly outside the scope of the

6    ambit of the DCCC.

7              What we have agreed is that I believe --

8    and correct me if I'm wrong -- I'm going to ask

9    certain questions.  To the extent that you are

10    going to object or instruct him not to answer,

11    we'll proceed by that and then we'll let the court

12    determine at some later time.

13              It's certainly not my intent to have to

14    bring the Congressman back but obviously I've got

                      Page 6

1019COSTELLO.txt

18    we agree to disagreed --

19         MS. LIGHTFOOT:   That's right.

20         MR. SHANNON:   -- that you are reserving your

21    right to this material, we are reserving our right

22    to object, you are reserving the right to,

23    depending on how things play out, re-request the

24    Congressman's deposition and we are reserving our

25    right to consider that and reserving our right to

.
                                                          9


1              ROUGH DRAFT-UNCERTIFIED COPY

2    object.

3              And as it relates to the documents, yes,

4    we do have the documents.  The only caveat I would

5    say is that while you indicated that they are

6    responsive, I think what I would state for the

7    record is that subject perhaps to any relevancy

8    arguments that I don't want to waive, we do have

9    documents that are potentially responsive that we

10   have asserted the privilege objections on.

11        MS. LIGHTFOOT:   Fair enough.

12   BY MS. LIGHTFOOT:

13        Q.    Congressman, with the indulgence of your

14   counsel, I'm going to try to quickly move through

15   your background so that we can get on to more

16   substantive matters.

17             I took the liberty of pulling off your

18   bio from the National Journal's Almanac of American

19   Politics.  And let me just see if they've got it

20   right.

1019COSTELLO.txt

21         It looks like you began your political

22    career in -- let's see.  Looks like 1980.  Is that

23    correct?  As the chairman of the St. Clair County

24    Board of Supervisors.

25         A.     That's correct.  In December 1980.

                                                  10

1          ROUGH DRAFT-UNCERTIFIED COPY

2      Q.     And you held that position from 1980

3    through 1988; is that correct?

4      A.     Correct.

5      Q.     And then was that the point that you

6    then became a member of Congress?

7      A.     It was.

8      Q.     And you represent roughly the kind of

9    Belleville, deep south area of the State of

10    Illinois; is that correct?

11      A.     Southwestern and southern Illinois.

12      Q.     Okay.  Is that essentially the area that

13    you have represented for -- since the time you have

14    been in Congress?

15      A.     Essentially, yes.

16      Q.     Again, tell me -- remind me what year

17    you actually started in Congress.

18      A.     August the 11th of 1988.

19      Q.     Were you appointed to fill the unexpired

20    term of Congressman Price?

21      A.     I was not.  We had a special election.

22    I was elected.

23      Q.     Okay.  Fair enough.  Let me then turn to

1019COSTELLO.txt

9      A.     That's correct.

10     Q.     You have a second conversation with him

11  that you described that's roughly 30 days later,

12  correct?

13     A.     A maximum of 30 days.

14     Q.     Okay.

15     A.     It may have been within a matter of a

16  week, but it was no longer than 30 days.

17     Q.     This contact that you had with members

18  of the Democratic delegation, did that occur in

19  between those two Shimkus conversations or did it

20  occur afterwards or some mix?

21     A.     I don't remember.  I really don't.

22     Q.     Okay.  Fair enough.  I'm going to take

23  these one by one.  And I assume that your counsel

24  will object, but I'm going to ask you anyway.

25         What was your conversation with --

                                              27

1      ROUGH DRAFT-UNCERTIFIED COPY

2  again, I think you described it, but these were

3  conversations that took place roughly on the House

4  floor as you were seeing members, is that correct,

5  or did they take place other places?

6     MR. BRUCE:  Object to the form.

7     MR. SHANNON:  You can describe the location.

8     MS. LIGHTFOOT:  I mean, I can go one by one.

9  BY THE WITNESS:

10     A.     Sure.  They took place on the House

11  floor and also in a meeting with all -- I don't

                    Page 24

1019COSTELLO.txt

12    know if all eight democrats were there but the

13    majority of them were there in the meeting.

14    BY MS. LIGHTFOOT:

15        Q.    And we'll get to the meeting in a

16    moment.

17        A.    Sure.

18        Q.    Let's stick right now to the

19    conversations that you had on the House floor and

20    if you -- I'm going to ask you about each of the

21    members that you identified.  If the conversation

22    did not take place on the House floor, I want you

23    to just tell me that.

24            Congressman Lipinski, was that a

25    conversation on the House floor?

                                                    28

 1            ROUGH DRAFT-UNCERTIFIED COPY

 2        MR. BRUCE:  Lori, I'll just get a standing

 3    objection if you agree to it as to all of these

 4    conversations with Democratic congressmen on

 5    relevancy.

 6        MS. LIGHTFOOT:  Sure.  I agree to you

 7    interposing the standing objection, yes.

 8        MR. SHANNON:  I think the question was did it

 9    occur on the House floor with Congressman Lipinski.

10        MS. LIGHTFOOT:  That's right.

11    BY THE WITNESS:

12        A.    There were multiple conversations and

13    all of them occurred on the House floor and there

14    was a meeting as well.

1019COSTELLO.txt
15    BY MS. LIGHTFOOT:

16         Q.    I'll ask about you about the meeting

17    separately.  But with respect to Congressman

18    Lipinski, what did you say and what did he say to

19    you?

20         MR. SHANNON:  I will advise you not to testify

21    or offer testimony reflecting conversations with a

22    fellow member of Congress.  And if you agree, you

23    can simply reflect "on advice of counsel I refuse

24    to answer."

25         MS. LIGHTFOOT:  And again, I assume that your

.                                                          29

1         ROUGH DRAFT-UNCERTIFIED COPY

2    instruction pertains to a Democratic member of

3    Congress only.

4         MR. SHANNON:  That's correct.  Thank you.

5    BY MS. LIGHTFOOT:

6         Q.    Are you going to abide by your counsel's

7    instruction?

8         A.    I am.

9         Q.    Congressman Schakowsky, what did you say

10   to her and what did she say to you?

11        MR. SHANNON:  Same instruction.

12   BY THE WITNESS:

13        A.    I agree.  Or I --

14        MR. SHANNON:  You will abide by my

15   instruction.

16        THE WITNESS:  Okay.

17   BY MS. LIGHTFOOT:

1019COSTELLO.txt

18    Q.    Okay.  Congressman Jackson, what did he

19  say to you and what did you say to him?

20        MR. SHANNON:  Same instruction.

21  BY THE WITNESS:

22    A.    I will abide by my counsel's advice.

23  BY MS. LIGHTFOOT:

24    Q.    Congressman Rush?

25        MR. SHANNON:  Same instruction.

                                                        30




1        ROUGH DRAFT-UNCERTIFIED COPY

2  BY MS. LIGHTFOOT:

3    Q.    Just so the record is clear, for all

4  these folks, I'm going to ask you what did you say

5  to him or her and what they say to you.

6            So Congressman Rush, what did you say to

7  him and what did he say to you?

8        MR. SHANNON:  Same instruction.

9  BY THE WITNESS:

10    A.    And I will abide by my counsel's advice.

11  BY MS. LIGHTFOOT:

12    Q.    Congressman Gutierrez, what did you say

13  to him and what did he say to?

14        MR. SHANNON:  Same instruction.

15  BY THE WITNESS:

16    A.    I will abide by my counsel's advice.

17  BY MS. LIGHTFOOT:

18    Q.    And Congressman Davis, what did you say

19  to him and what did he say to you?

20        MR. SHANNON:  Same instruction.

1019COSTELLO.txt

21    BY THE WITNESS:

22        A.    I will abide by my counsel's advice.

23    BY MS. LIGHTFOOT:

24        Q.    Did there come a point in time where you

25    reported back to Congressman Shimkus what you had

                                                          31

 1              ROUGH DRAFT-UNCERTIFIED COPY

 2    learned from your Democratic colleagues as to

 3    whether or not there was any interest in a

 4    bipartisan solution to the congressional

 5    redistricting issue?

 6        MR. SHANNON:   Objection to form.

 7            You can answer subject to my prior

 8    instructions.

 9    BY THE WITNESS:

10        A.    I did.

11    BY MS. LIGHTFOOT:

12        Q.    And was that before or after the meeting

13    that you indicated took place among the -- some of

14    members of Democratic delegation?

15        A.    I don't recall if it was before or

16    after.

17        Q.    And where did that subsequent

18    consideration with Congressman Shimkus take place?

19        A.    I think it took place on the floor of

20    the House.

21        Q.    Was anybody else a part of that

22    conversation aside from you and Congressman

23    Shimkus?

                        Page 28

1019COSTELLO.txt

24      A.      Not that I recall.

25      Q.      What did you say to him and what did he

                                                            32

1       ROUGH DRAFT-UNCERTIFIED COPY

2   say to you?

3       A.      I told him that there was an interest on

4   the part of the Democratic members in attempting to

5   reach a bipartisan agreement.

6       Q.      And what, if anything, did he say to

7   you?

8       A.      He indicated to me again that he hoped

9   that we could try and reach an agreement.

10      Q.      Did the two of you in that conversation

11  discuss anything in terms of next steps to move the

12  conversation along from conversation to something

13  that might bear fruit?

14      MR. SHANNON:   Objection to the form.

15          You can answer.

16      MR. BRUCE:   Join.

17  BY THE WITNESS:

18      A.      We did.

19  BY MS. LIGHTFOOT:

20      Q.      Okay.  And what did you discuss?

21      A.      We discussed his -- what his members,

22  the Republican members of the delegation, what they

23  thought would be a fair map and what they wanted to

24  do next, the steps that they wanted to take.

25      Q.      And what, if anything, specifically did

                                                            33

1019COSTELLO.txt

43

```
 1              ROUGH DRAFT-UNCERTIFIED COPY
 2    on a map.
 3         Q.    Did you communicate that interest to the
 4    people that were gathered there?
 5         A.    I did.
 6         Q.    By the way, do you know why it was that
 7    Congressman Bill Lipinski was present for that
 8    meeting?
 9         MR. BRUCE:   Objection; foundation, relevancy.
10         MR. SHANNON:   Are you done?
11         MR. BRUCE:   I'm done.
12         MR. SHANNON:   Foundation, speculation.
13              If you know, you can answer.
14    BY THE WITNESS:
15         A.    I requested that he be -- that he attend
16    the meeting.
17    BY MS. LIGHTFOOT:
18         Q.    And why did you request that
19    Congressman Lipinski -- former Congressman Lipinski
20    be present?
21         A.    Because ten years ago when we went
22    through this --
23         MR. SHANNON:   I'm going to caution you to the
24    extent this affects your answer to not testify as
25    to any conversations that you might have had with
```

44

1019COSTELLO.txt

1                    ROUGH DRAFT-UNCERTIFIED COPY
2    Congress Lipinski substantively.
3         MS. LIGHTFOOT:  Former Congressman Bill
4    Lipinski?
5         MR. SHANNON:  Yes.
6         MS. LIGHTFOOT:  You are asserting a privilege
7    as to a conversation that he had with former
8    Congressman Bill Lipinski.
9         MR. SHANNON:  Right.  Well, there's two
10   things.  The answer is yes under the same arguments
11   reflected in the DCCC filing.
12              But I believe if you look back at the
13   record he was about to discuss communications that
14   may have occurred ten years ago.
15        MS. LIGHTFOOT:  Fair enough.
16        MR. SHANNON:  Okay.
17   BY MS. LIGHTFOOT:
18        Q.   Congressman, are you aware of whether or
19   not Congressman Bill Lipinski, former Congressman
20   Bill Lipinski, is a current member of the DCCC?
21        MR. BRUCE:  Objection; form.
22        MR. SHANNON:  Objection; foundation,
23   speculation.
24              If you know.
25

                                                   45


1                    ROUGH DRAFT-UNCERTIFIED COPY
2    BY THE WITNESS:
                         Page 40

1019COSTELLO.txt

3       A.    I don't know.  I assume he is but I

4   don't know.

5   BY MS. LIGHTFOOT:

6       Q.    And what's the basis of your assumption

7   that former Congressman Bill Lipinski is a current

8   member of the DCCC?

9       MR. SHANNON:  Foundation, form.

10         You can answer.

11   BY THE WITNESS:

12       A.    Many former members continue to belong

13   to the DCCC.

14   BY MS. LIGHTFOOT:

15       Q.    As you sit here today, do you have any

16   knowledge one way or the other as to whether or not

17   foreigner Congressman Bill Lipinski is a member

18   of -- current member of the DCCC?

19       A.    I do not.

20       Q.    Do you know why it was that congressman

21   Dan Lipinski was present for this meeting in

22   Chicago?

23       MR. BRUCE:  Objection; foundation.

24       MR. SHANNON:  Foundation and speculation.

25         You can answer.

                                              46

1       ROUGH DRAFT-UNCERTIFIED COPY

2   BY THE WITNESS:

3       A.    I do not.

4   BY MS. LIGHTFOOT:

5       Q.    Let me take you back then to what was

1019COSTELLO.txt

9       Q.      What, if anything, did -- did anyone

10  respond to your comments?

11      MR. BRUCE:   Objection.   Again, out-of-court

12  statement, hearsay, relevancy.

13          Go ahead.

14  BY THE WITNESS:

15      A.      President Cullerton did.

16  BY MS. LIGHTFOOT:

17      Q.      What, if anything, did President

18  Cullerton say?

19      MR. BRUCE:   Standing objection.

20  BY THE WITNESS:

21      A.      He said that any recommendations, input

22  that we wanted to have, that he and others would be

23  willing to listen but that committees had already

24  been established and that they had a responsibility

25  and had already been working on a congressional

                                                        48

1           ROUGH DRAFT-UNCERTIFIED COPY

2   map.

3           But he was willing to listen to us and

4   basically said, you know, you can continue to

5   present whatever you want to present to us but we

6   have committees that are already working on the

7   congressional map.

8   BY MS. LIGHTFOOT:

9       Q.      And what, if anything, did you say in

10  response to those comments from President

11  Cullerton?

                    Page 43

1019COSTELLO.txt

12      A.    Well, I said that I felt that it was in

13  everyone's interest to try and reach a bipartisan

14  agreement.

15      Q.    Did anyone else respond to your initial

16  comments aside from President Cullerton?

17      A.    I don't know about the initial comments

18  but former Congressman Bill Lipinski expressed the

19  same interest and felt that we should try and avoid

20  litigation and ending up in the court system.

21      Q.    Did Speaker Madigan talk at all during

22  that meeting?

23      A.    He talked about the weather and politics

24  and what was going in the General Assembly but did

25  not offer an opinion.  I can't recall anything that

49

1      ROUGH DRAFT-UNCERTIFIED COPY

2  he may have mentioned about the congressional map

3  or the process.

4      Q.    He was sphinx-like?  That was a joke.

5  MR. SHANNON:  Objection to the form.

6  MR. BRUCE:  Lori, could we take a quick break?

7  MS. LIGHTFOOT:  Yes.  Absolutely.

8  THE VIDEOGRAPHER:  Going off the video record

9  at 12:27 p.m.  This is the end of tape No. 1.

10      (WHEREUPON, a recess was had

11       from 12:27 p.m. to 12:34 p.m.)

12      (WHEREUPON, Mr. Devon Bruce exited

13       the deposition proceedings.)

14  THE VIDEOGRAPHER:  Back on the video record at

Page 44

# EXHIBIT E

# THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

COMMITTEE FOR A FAIR AND
BALANCED MAP, JUDY BIGGERT,
ROBERT J. DOLD, RANDY HULTGREN,
ADAM KINZINGER, DONALD MANZULLO,
PETER J. ROSKAM, BOBBY SCHILLING,
AARON SCHOCK, JOHN M. SHIMKUS, JOE
WALSH, RALPH RANGEL, LOU
SANDOVAL, LUIS SANABRIA, MICHELLE
CABALLERO, EDMUND BREZINSKI, and
LAURA WAXWEILER,

        Plaintiffs,

v.

ILLINOIS STATE BOARD OF ELECTIONS,
WILLIAM M. MCGUFFAGE, JESSE R.
SMART, BRYAN A. SCHNEIDER, BETTY J.
COFFRIN, HAROLD D. BYERS, JUDITH C.
RICE, CHARLES W. SCHOLZ, and ERNEST
L. GOWEN,

        Defendants.

)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)
)

Case No. 1:11-mc-00514-DAR

Civil Action No. 1:11-cv-05065
(Pending in the U.S. District
Court for the Northern District of
Illinois)

## PLAINTIFFS' REPLY IN SUPPORT OF THEIR MOTION TO COMPEL DEMOCRATIC CONGRESSIONAL CAMPAIGN COMMITTEE TO COMPLY WITH SUBPOENA SEEKING THIRD PARTY DISCOVERY

Anthony Alexis (Bar No. DC 384545)
MAYER BROWN LLP
1999 K Street, N.W.
Washington DC 20006-1101
(202) 263-3000
(202) 263-3300 – fax

Dana S. Douglas (admitted *pro hac vice*)
Thomas V. Panoff (admitted *pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax

September 29, 2011

**INTRODUCTION**

Plaintiffs have alleged in the underlying case that the Springfield, Illinois Democratic legislature, as directed by the Democratic Congressional Campaign Committee ("DCCC"), violated the United States Constitution and the Voting Rights Act when it drew Illinois' congressional districts following the 2010 census. As a part of discovery, Plaintiffs subpoenaed the DCCC and requested a limited set of documents related to the DCCC's involvement in the Illinois redistricting process. Ever since it was served with Plaintiffs' subpoena ("Subpoena"), however, the DCCC has utterly rejected its obligations pursuant to the Federal Rules of Civil Procedure. Both its blanket objections and bad faith approach to the meet and confer process demonstrate the DCCC's total disregard for the duly issued Subpoena. Likewise, the DCCC's September 22, 2011 Opposition to Plaintiffs' Motion to Compel ("Opposition") relies upon blatant mischaracterizations of Plaintiffs' undeniably narrow document requests, the DCCC's own organization and membership, and inapposite case law in an effort to thwart standard discovery of relevant documents that are central to Plaintiffs' claims now pending in the Northern District of Illinois.

The DCCC's assertion that it has no obligation to comply with the Subpoena in light of the pending motion to dismiss is meritless given that, by the directive of the presiding judge in the underlying matter, the parties to the underlying action are proceeding with their fact and expert discovery. In fact, Judge Lefkow's August 11, 2011 order ("Order") setting a briefing schedule and granting expedited discovery specifically accounted for the fact that the Defendants might file a motion to dismiss (Order ¶ 1). Nevertheless, the Order requires that discovery continue, setting expert discovery deadlines of September 14 and September 28 (*id.* ¶ 2.3), and mandating that "[d]iscovery shall be completed by October 19, 2011." *Id.* ¶ 2.8. The DCCC's

suggestion that this Court simply ignore the Order issued by a fellow United States District Court is untenable.

Despite the DCCC's hyperbole, nothing about Plaintiffs' Subpoena can be construed as "a declaration of war." Opp. at 3. Rather, Plaintiffs' Subpoena is a targeted inquiry focused solely upon the role that the DCCC played in the creation and development of the 2011 Illinois congressional redistricting plan ("Plan") enacted as Illinois P.A. 97-14. On its face, the Subpoena does not, as the DCCC falsely claims, seek the "DCCC's most sensitive information" such as "its analysis of the 2012 Congressional elections in Illinois and redistricting's impact on those elections; documents relating to its efforts to recruit Domocratic (sic) candidates to challenge Plaintiffs; and the tools and methods its uses to target the electorate and analyze voter behavior. . . ." (Opp. at 1). Plaintiffs' counsel repeatedly has stated quite clearly that the Plaintiffs have no interest in such information. Rather, the documents Plaintiffs request are very specific categories of information concerning the role that the DCCC and its agents played in drafting portions of the constitutionally infirm 2011 Illinois congressional redistricting Plan that is the subject of the underlying action. The DCCC does not and cannot assert that it did not have a key role in this process. Indeed, on September 29, 2011, United States Congressman Peter Roskam testified that Illinois Senate President John J. Cullerton, a Democrat, informed him that the DCCC drew the map. It is precisely because the DCCC inserted itself into this state legislative process that historically has been the sole province of state legislators that the DCCC cannot now hide behind purported First Amendment interests, privilege, or confidentiality claims to shield that information from discovery. First Amendment concerns simply are not at issue here.

## ARGUMENT

**I.**     **There Is Nothing "Premature" About Plaintiffs' Discovery Requests Or Motion To Compel Compliance Therewith.**

As explained in Plaintiffs' September 8, 2011 Motion To Compel Democratic Congressional Campaign Committee To Comply With Subpoena Seeking Third Party Discovery ("Motion to Compel"), "Rule 45 subpoenas are 'discovery' under Rules 16 and 26 of the Federal Rules of Civil Procedure, and are subject to the same deadlines as other forms of discovery." *Dag Enters., Inc. v. Exxon Mobil Corp.*, 226 F.R.D. 95, 104 (D.D.C. 2005). Moreover, "[a] scheduling order is not a frivolous piece of paper, idly entered, which can be cavalierly disregarded by counsel without peril. Indeed, disregard of the order would undermine the court's ability to control its docket, disrupt the agreed-upon course of litigation, and reward the indolent and the cavalier." *Id.* (internal citations and brackets omitted).

According to the Order entered by Judge Lefkow in the underlying action as well as her standing order (Mot. Ex. K), discovery proceeds unabated even during the pendency of the briefing of the motion to dismiss. Specifically, the Order sets expert discovery deadlines of September 14 and September 28 (Order ¶ 2.3), and mandates that "[d]iscovery shall be completed by October 19, 2011." *Id.* ¶ 2.8. As set forth in the Motion to Compel, expedited discovery is necessary because of the looming deadlines related to the 2012 election season, for which the Plan was created. Mot. ¶ 5. Thus, the DCCC has absolutely no right to defy that Order and ignore the Subpoena, a court order, simply because the motion to dismiss is pending.

The DCCC cannot unilaterally decide what schedule suits it, particularly in the face of a valid Subpoena and an established expedited briefing and discovery schedule agreed upon by the parties and ordered by a United States District Judge. In addition, it is not up to the DCCC to decide whether discovery should be stayed pending a decision on the motion to dismiss the

3

underlying action.  That determination is solely for the court to make, and the DCCC has made no motion requesting such relief.  *See Beecham v. Socialist People's Libyan Arab Jamahiriya*, 245 F.R.D. 1, 3 (D.D.C.2007) (internal citations omitted) (denying stay of jurisdictional discovery).  Nor does the filing of a dispositive motion presumptively entitle the DCCC to a stay of discovery even if it had asked for it.  *OMG Fidelity, Inc. v. Sirius Techs., Inc.*, 239 F.R.D. 300, 304 (N.D.N.Y. 2006) (mere filing of a motion to dismiss does not guarantee entitlement to a stay).  The DCCC therefore cannot refuse to comply with the Subpoena in light of the pending motion to dismiss the underlying action.

The weakness of its argument is demonstrated clearly by the cases cited in support of it by the DCCC.  In an attempt to justify its position, the DCCC cites several cases in which discovery was stayed while dispositive motions were pending.  None of the cases relied upon by the DCCC are persuasive or applicable, however, because none involve instances in which *a court has ordered expedited discovery*.  *See, e.g., Chavous v. District of Columbia Financial Responsibility & Mgmt. Assistance Authority*, 201 F.R.D. 1, 2 (D.D.C. 2001).  In fact, in granting the moving party's motion to stay discovery, the court in *Cleveland Construction, Inc. v. Schenkel & Schultz Architects, P.A.*, No. 08-CV-407-RJC-DCK, 2009 WL 903564 (W.D.N.C. Mar. 31, 2009), observed that the "discovery deadline is still seven months away".  *Id.* at *2. This tactic from the DCCC can only be interpreted as attempt to delay because, as the undersigned counsel has explained to counsel for the DCCC and as is obvious from the face of the scheduling order, the district court ordered discovery to continue uninterrupted even during the pendency of the motion to dismiss briefing.  In the face of the Northern District of Illinois court's current scheduling order which anticipates on-going discovery during the briefing of a motion to dismiss, there is simply no basis for the DCCC to seek this Court's assistance in

ignoring this valid court order. In addition, as the DCCC well knows, Plaintiffs do not have the luxury of continued delay, as their discovery deadline is *less than one month* away.

Plaintiffs respectfully submit that this Court should refuse the DCCC's request to interfere with the Order's expedited discovery schedule because it is well-settled that "[c]omity interests are advanced when courts of coordinate ranks are respectful of each other's orders, as well as careful to avoid hindering each other's proceedings." *NAACP, Jefferson County Branch v. Brock*, 619 F. Supp. 846, 853 (D.D.C. 1985) (citing *Schauss v. Metals Depository Corp.*, 757 F.2d 649, 654 (5th Cir. 1985)) and declining to issue a show cause order which would have delayed proceedings in another district court.). *See also Doe v. Doe Agency*, 608 F. Supp. 2d 68 (D.D.C. 2009) (declining on ground of comity to modify protective order issued in another jurisdiction). The need to adhere to the expedited discovery schedule is particularly strong in this case in order to facilitate a prompt resolution to the underlying action in advance of upcoming deadlines relating to the 2012 primary election process.

## II. Plaintiffs Have Requested—And The DCCC Possesses—Documents Highly Relevant To Plaintiffs' Claims.

"The party resisting discovery based on relevance bears the burden of demonstrating that the information sought is not legally relevant." *Peskoff v. Faber*, 2006 WL 1933483, *2 (D.D.C. July 11, 2006). The DCCC cannot meet that burden here. "[R]elevancy at the discovery stage is broadly defined," *Albany Molecular Research, Inc. v. Schloemer*, 274 F.R.D. 22, 27 (D.D.C. 2011) (denying motion to quash), and Plaintiffs amply have demonstrated that the material sought is discoverable.

Because the DCCC and/or its agents were instrumental in the creation of the Plan, the DCCC's documents regarding the process of making that map evidence what the mapmakers were trying to accomplish, i.e. *their intent*. Despite the DCCC's protests to the contrary, the

5

DCCC is not a mere disinterested "third party" (*e.g.* Opp. at 9) where the Plan is concerned. On information and belief and as two United States Congressmen have testified[1], the DCCC and/or its agents directed the Illinois redistricting and map drawing process. Tellingly, the DCCC has never denied its role in drafting portions of the Plan and its response in opposition contains no statement or evidence to refute its central role in the drafting of the Plan.[2] The DCCC cannot now argue in good faith that its involvement in drafting portions of the Plan that is now the subject of litigation is somehow irrelevant to showing what Illinois lawmakers were trying to accomplish.

The DCCC blithely suggests that evidence of intent will come from Illinois legislators themselves. Opp. at 9. But "[d]etermining whether invidious discriminatory purpose was a motivating factor [in the passage of legislation] demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available." *Village of Arlington Heights v. Metropolitan Housing Development Corp.*, 429 U.S. 252, 266 (U.S. 1977). Whether Illinois legislators may have other discoverable evidence of intent is beside the point.[3] The DCCC plainly has documents that form part of this "sensitive inquiry" because of their role in the

---

[1] Reps. John Shimkus and Peter Roskam were deposed in the underlying action on September 29, 2011. The transcripts of their depositions are not yet available but will be provided if helpful for the Court.

[2] Although the facts are still evolving, there is a possibility, though not at issue here, that the DCCC, which is not a registered lobbyist in Illinois, may have violated the Illinois Lobbyist Registration Act, 25 ILCS 170, in influencing and directing the Illinois legislative process by which the Plan was passed.

[3] In what cannot be a coincidence, those same Springfield Democrats from whom Plaintiffs also seek discovery have objected on the specious grounds of absolute immunity and pointed to the DCCC as the better source of information. *See* Mem. Supp. Mot. to Quash at 11-12; Opp. to Mot. to Compel at 14 (attached hereto as Exhibits A (attachments omitted) and B, respectively). The image of the DCCC and its partners, the Springfield Democratic lawmakers, pointing to each other as the sources of information about the map would be comical if the issues at stake— specifically whether the Plan which was the product of that alliance violates the Voting Rights Act by, among other things, intentionally discriminating against Latino voters in Illinois—were not so serious.

creation of the Plan. Indeed, the DCCC has admitted as much. Opp. at 5. Plaintiffs must be allowed to discover these materials.

Further, the DCCC's argument that evidence of discriminatory effect will come from experts is a canard. Rule 26(b)(1) permits discovery "regarding any nonprivileged matter that is relevant to any party's claim or defense." FED. R. CIV. P. 26(b)(1). *See also Heat & Control, Inc. v. Hester Indus., Inc.*, 785 F.2d 1017, 1023 (Fed. Cir. 1986) (noting that Rule 45 must be read in light of Rule 26(b)). For that matter, regardless of the DCCC's efforts to evaluate Plaintiffs' claims and strategies in the underlying action, the Federal Rules of Civil Procedure impose no requirement that the material sought be relevant to *every* element of a claim. Furthermore, while discriminatory effect is a factor in Plaintiffs' partisan gerrymander claim under *Davis v. Bandemer*, 479 U.S. 109 (1986), it is *discriminatory intent* that is an integral element of each of Plaintiffs' claims. *See Garza v. County of Los Angeles*, 918 F.2d 763, 766 (9th Cir. 1990) (the Voting Rights Act can be violated by either intentional discrimination or discriminatory effect); *Miller v. Johnson*, 515 U.S. 900, 916 (1995) (plaintiff's burden in a racial gerrymander claim under the Equal Protection Clause is to show that "that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district"); *Davis*, 478 U.S. at 127 (plurality) (to succeed on an equal protection claim, a plaintiff must plead and ultimately prove intentional discrimination against an identifiable group and an actual discriminatory effect on that group). The documents sought by Plaintiffs' Subpoena are highly relevant to Plaintiffs' claims related to discriminatory intent in the creation of the Plan, and that is sufficient to make the information on the DCCC's role in drafting the Plan discoverable.

Nor can the DCCC continue to object to the Subpoena on the ground that it imposes an undue burden. *See* Opp. at 7-8. Aside from having waived that objection by not giving a detailed statement of the time and expense involved, *see Flatow v. The Islamic Republic of Iran*, 196 F.R.D. 203, 207 (D.D.C. 2000), now the DCCC admits that is already has collected nearly 800 pages of responsive documents. Opp. at 5. In that circumstance, there is "no reason to believe that producing them would engender an undue burden or expense." *Marriott Intern. Resorts, L.P. v. United States*, 61 Fed. Cl. 411, 420 (2004) (requiring government to produce documents it already collected and identified).

## III. The First Amendment Does Not Preclude Production Of Documents Pursuant To The Subpoena.

First Amendment interests are not implicated by Plaintiffs' Subpoena. The Subpoena requests a limited range of documents related to the DCCC's involvement in the process (which is now long over) that resulted in the Illinois congressional district map that was signed into law in late June. It does not seek information about private citizens who affiliate with the DCCC, membership lists, or donor lists—the types of materials that typically raise First Amendment concerns. Nor does it seek to pry into the DCCC's campaign strategies for the upcoming elections. The Illinois redistricting process is long over, and it is untenable to maintain that documents related to that process have anything to do with the strategy for the upcoming 2012 elections. Moreover, the DCCC's members, all members of Congress, are well-known public officeholders,[4] distinguishing the DCCC from other groups who have availed themselves of the First Amendment's protection of *private* associational activity.

---

[4] As discussed further below, the DCCC calls itself "the official campaign arm of the Democrats in the House [of Representatives]." http://www.dccc.org/pages/about.

The Subpoena requests documents that evidence the DCCC's involvement in the Illinois state legislative process related to redistricting. This legislative process is one that by its very nature should be public. It also is a process into which the DCCC affirmatively chose to insert its public organization and well known members. Having done this, the DCCC cannot hide behind the First Amendment, and the law (including the cases relied on by the DCCC) does not allow them to do so. The DCCC's claim of First Amendment protections must fail.

A.     **The Subpoena Does Not Seek Documents That Implicate First Amendment Concerns.**

In order to make its fundamentally flawed First Amendment argument, the DCCC mischaracterizes the Subpoena. Despite the DCCC's assertion, Plaintiffs do not seek documents relating to the DCCC's "most sensitive information" (Opp. at 1) or the "DCCC's analysis of the 2012 Congressional elections in Illinois, redistricting's impact on those elections, and DCCC's efforts to recruit candidates to run against Plaintiffs" (Opp. at 7). Indeed, nowhere does the subpoena request any of the types of materials the DCCC highlights as sensitive—the subpoena does not request documents regarding election analysis, campaign strategy, internal DCCC strategy, membership lists, or any information about private individuals. On the contrary, Plaintiffs have made a confined request for documents related *only* to the DCCC's involvement in the fundamentally public process of redistricting in Illinois. The request is limited in both subject matter and time. Moreover, counsel for the Plaintiffs reiterated the limited nature of the information sought to counsel for the DCCC before filing this motion specifically to respond to any concerns that the DCCC might legitimately have had about the Subpoena's scope. It is telling that even with this information, the DCCC still maintains that the Subpoena is an attempt to unearth "sensitive information" when clearly it is not.

The information Plaintiffs request is quite simply not the kind of information that the First Amendment privilege aims to protect, and the DCCC's protests to the contrary are off the mark. The DCCC primarily relies on *Wyoming v. U.S. Dep't of Agriculture*, 208 F.R.D. 449 (D.D.C. 2002) in support of its claim that the First Amendment privilege extends to a wide variety of information. But the request for information that the Court rejected in *Wyoming* was breathtaking in scope. Plaintiffs there sought discovery from three environmental groups that had lobbied the Department of Agriculture on forest management regulations. *Id*. at 452. The "broad range of documents" that Plaintiffs sought included not only material related to the groups' contacts with the Department, but also *all* of their internal communications about the regulations as well as *all* communication about the regulations among the three subpoena respondents or with *ten* other environmental organizations not served. *Id*. Plaintiffs' narrowly tailored Subpoena is nothing like the request in *Wyoming*: it is narrow in both subject matter and time. Moreover, the Subpoena requests documents related to communications with Illinois state legislators and other elected officials; the DCCC should have no expectation of privacy related to communications with public figures, particularly where, as here, those communications relate to the formulation and passage of a public law.[5] *Wyoming* simply does not speak to this case. *See also Int'l Action Center v. U.S.*, 207 F.R.D. 1, 2 (D.D.C. 2002) ("The breadth of information sought by the government is, to say the least, extraordinary.").

---

[5] Throughout the entire redistricting process, Democratic lawmakers stated again and again that their goal was to "make this the most open redistricting process in Illinois history." *See* April 1, 2011 statement of Illinois Senate President John J. Cullerton, available at http://senatedem.illinois.gov/index.php/issues/veterans/benefit-information-for-veterans/1688-- redistricting-hearings-begin-public-input-encouraged. Further, when Governor Quinn signed the bill enacting the Plan, he commended the "openness and transparency in the remap process." *See* June 3, 2011 Statement of Governor Pat Quinn, attached hereto as Exhibit C.

The DCCC also cites *Perry v. Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010), but *Perry* is no more helpful. That case involved the "internal campaign communications relating to campaign strategy and advertising" of a private political organization that had sponsored California's controversial anti-same-sex marriage initiative. *Id*. at 1152. Plaintiffs here repeatedly have emphasized that they do not seek any information about the DCCC's internal campaign communications or strategy, which purportedly "lie at the core of DCCC's associational mission to recruit and support Democratic candidates for the U.S. House of Representatives." Opp. at 12. On the contrary, Plaintiffs only seek information about the DCCC's influence on the state legislature and other public officials in Illinois in drawing the disputed Plan.

The DCCC hangs its hat on the assertion that the First Amendment privilege extends beyond membership lists. Opp. at 10. But there is no denying that exposure of a group's members and supporters, and the effect of that exposure on the members' associational rights, is the fundamental harm the privilege aims to protect. *See NAACP v. Alabama*, 357 U.S. 449, 462 (1958) (Supreme Court recognizes the "vital relationship between freedom to associate and privacy in one's associations."). As demonstrated by several cases cited by the DCCC, the concern with exposing membership or supporters remains the animating force behind recognition of the privilege. *See, e.g., Int'l Action Center.*, 207 F.R.D. at 2 (information about participants or potential participants at protest is "exactly the kind of information the First Amendment is designed to protect"); *Britt v. Superior Court*, 20 Cal. 3d 844, 852 (Cal. 1978) ("In compelling the wholesale disclosure of private association affiliations and activities, the challenged discovery order works an unconstitutional infringement of First Amendment rights."); *Wilkinson v. F.B.I*, 111 F.R.D. 432, 436 (C.D. Cal. 1986) ("A review of the cases applying the privilege

reveals that in each case the discovery that was subject to enhanced First Amendment scrutiny was a specific request for a group's membership list or list of financial contributors.").

The DCCC's argument fails, however, because Plaintiffs simply have not asked for and are not interested in this kind of information. The Subpoena does not seek donor lists, membership lists, or any information about the DCCC's so-called "adherents." *See* Mook Decl. at 2. Plaintiffs seek nothing more than information about the DCCC's role in the entirely external activity of drawing a congressional redistricting Plan in concert with the Illinois legislature—a process that is fundamentally public and which the DCCC *chose* to insert itself into. Having gotten itself involved in this public process, the DCCC cannot now hide behind the First Amendment. Moreover, the DCCC's involvement was with third party *public* figures; it simply is not credible to now maintain that the DCCC thought that those communications were protected by the First Amendment.

**B.    Plaintiffs' Subpoena Will Not Cause A "Chilling Effect."**

The DCCC cannot establish a First Amendment harm for another reason: its assertion of a chilling effect (Opp. at 12, Mook Decl. at 3) simply is not credible. *See New York State Nat'l Assoc. for Women v. Terry*, 886 F.2d 1339, 1355 (2d cir. 1989) (compelling discovery where defendant could not explain how requests would actually interfere with First Amendment activities). The DCCC cannot plausibly contend that "enforcement of the discovery requests will result in (1) harassment, membership withdrawal, or discouragement of new members, or other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Perry*, 591 F.3d at 1160 (internal quotations omitted). As established repeatedly, the information sought has nothing to do with the DCCC's members or core membership and in no way impinges on the DCCC members' freedom of association.

12

Moreover, as explained above (at 11-12), a First Amendment privilege exists to protect "the vital relationship between freedom to associate and *privacy* in one's associations." *Int'l Union v. Nat'l Right to Work Legal Defense and Educ. Found'n, Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978) (citing *NAACP v. Alabama*, 357 U.S. 449, 462 (1958)) (emphasis added). The reasoning behind the privilege is that "public identification of individuals who never intended their participation in First Amendment activity to thrust them into the harsh glare of the limelight is calculated to chill future political dissent and discourage participation in other protest activity." *Int'l Action Center*, 207 F.R.D. at 3-4. It is exposure of association that is behind the so-called chilling effect of compliance with discovery. *See, e.g., Uphaus v. Wyman*, 360 U.S. 72, 78 (1959) (interest at stake was associational privacy); *Superior Court of San Diego County v. San Diego Unified Port Dist.*, 574 Pac. 2d 766, 768 (Cal. 1978) ("intrusion into associational privacy" is what the First Amendment privilege prevents); *Fed. Election Comm'n v. Machinists Non-Partisan Political League*, 655 F.2d 380, (D.D.C. 1981) ("[F]irst [A]mendment interest in privacy of political association" threatened by subpoena).

In a different context, a claim about the expectation of privacy of an interest group's members might have some relevancy; here, with the DCCC, that argument is entirely specious. The DCCC's membership consists of *public* officials, namely Democrat congresspersons, whose political associations are well known. The DCCC describes itself as "the *official* campaign arm of the Democrats in the House [of Representatives]." http://www.dccc.org/pages/about (emphasis added). In its own words, the DCCC is "[o]rganized and operated by Democratic members of the House of Representatives." *See* FEC Advisory Op. 1985-14 attached hereto as Exhibit D. Like all public office holders, Democratic members of the House of Representatives have willingly stepped into "harsh glare of the limelight" and opened their political associations

13

to public scrutiny. Because of this clear willingness to engage in political activity in the most public way possible, the contention that such public figures will be discouraged or "chilled"— that they might actually become reluctant to be Democratic Congresspersons—is laughable. The DCCC cannot claim privilege based merely on a First Amendment *interest* in associating. As the DCCC itself concedes (Opp. at 11), it must demonstrate *harm* to that interest, and this it cannot do.

The DCCC's reliance on *Wyoming* is misplaced in this regard as well. The groups asserting a First Amendment interest in that case were environmental organizations consisting of *private* citizens, not public officials. *Wyoming*, 208 F.R.D. at 451. Unlike the members of the DCCC, members of those groups had not willingly exposed their political activities to public view. The DCCC is not the Heritage Forest Campaign, *id.*, nor is it ProtectMarriage.com—Yes on 8, *Perry*, 591 F.3d at 1147, and it is certainly not the NAACP's Alabama affiliate in 1958, *NAACP*, 357 U.S. at 451. The District of Columbia Circuit recognized decades ago that "the argument in favor of upholding the claim of privilege will ordinarily grow stronger as the danger to rights of expression and association increases." *Black Panther Party v. Smith*, 661 F.2d 1243, 1267 (1981). Here, the DCCC's cry of "chill"—made in a declaration from a highly public figure in the world of Democrat politics[6]—shows the argument at its weakest. The DCCC does

---

[6]     DCCC employee Robert E. Mook, Executive Director, although not a Congressman, is a highly public figure who, according to the Washington Post, took over as "the head of the House Democrats' campaign arm for the 2012 election." *See* http://www.washingtonpost.com/wp-dyn/content/article/2010/12/05/AR2010120504745.html. The DCCC's own December 6, 2010 press release details Mr. Mook's high profile political activities, including that "Mook served as the DCCC's Political Director since the beginning of 2009. In that capacity he oversaw candidate recruitment, campaign planning and strategy. Before joining the committee, he managed Senator Jeanne Shaheen's (NH) successful 2008 campaign for the United States Senate. Mook also previously worked for then-Senator Hillary Clinton's presidential campaign where he was successful winning races as State Director in Nevada, Ohio, and Indiana. During the 2004 cycle, Mook successfully oversaw the Wisconsin GOTV program for then Presidential

not need, and cannot claim, the protection of the First Amendment—certainly not in this instance where the actual requests in the Subpoena do not seek any information about the DCCC's membership or donor lists.

### C. Even If First Amendment Rights Are Implicated, Production Of The DCCC'S Responsive Documents Is Warranted.

Even if the DCCC had a colorable claim that its First Amendment interests are threatened—which it does not—Plaintiffs nonetheless should be permitted discovery because the documents at issue in this case directly go to the "heart of the lawsuit." *Wyoming*, 208 F.R.D. at 455. Plaintiffs' Complaint alleges that the Plan intentionally dilutes the votes of Latinos, enacts an unconstitutional racial gerrymander, and engages in blatant partisan gerrymandering. On information and belief, the DCCC, with and through its Illinois congressional members and its agents, influenced the creation of the map that was eventually adopted by the Illinois General Assembly. The intent of the DCCC thus became the intent of the Illinois legislature. The goals, considerations, and motivations that influenced the DCCC in creating the map therefore are critical to establishing that that the Plan was intended to disenfranchise Latino and Republican voters in Illinois. *See, e.g., Village of Arlington Heights v. Metro. Hous. Dev. Corp.*, 429 U.S. 252, 268 (1977) (recognizing that legislators "might be called to the stand at trial to testify concerning the purpose of the official action"); *Rodriguez v. Pataki*, 280 F. Supp. 2d 89, 102 (S.D.N.Y. 2003) ("While evidence of discriminatory animus may not be an essential element of all of the plaintiffs' claims, it certainly is something that can be considered in deciding whether the . . . redistricting plans pass judicial muster."). *United States v. Irvin*, 127 F.R.D. 169, 171-

---

nominee Senator John Kerry." *See* http://dccc.org/blog/entry/dccc_chairman_steve_israel names_robby_mook_dccc_executive_director/.

15

173 (C.D. Cal. 1989) ("evidence concerning the intent with which the [redistricting body] adopted the plan and rejected certain alternatives," is highly-relevant).

The centrality of the evidence requested here makes this case very different from *Wyoming*. There, the court found that the documents were irrelevant to the State of Wyoming's claims under the Federal Advisory Committee Act ("FACA"). *Wyoming*, 208 F.R.D. at 453. Under that statute, what mattered for the state's claim was the degree of control the government exercised over the interest groups, and the interest groups' activities had no impact on whether the defendant violated FACA. *Id*. at 454. Here, the situation is reversed: it is the DCCC's control over the Illinois mapping process that is central to the litigation. Thus, Plaintiffs must be allowed to gather evidence relating to that influence.

Moreover, and again in contrast to *Wyoming*, these documents cannot be obtained from another source, with or without reasonable efforts. Plaintiffs have sued the Illinois State Board of Elections and its members (collectively "SBE") to enjoin their use of the Proposed Congressional Plan in the upcoming 2012 congressional elections. But, unlike the DCCC, the SBE has admitted that it, not surprisingly, had no role in the development of the Plan and therefore possesses no documents evidencing any intent to dilute the voting strength of Illinois Latinos and/or Republicans. Thus, unlike *Wyoming*, where party discovery clearly was a superior alternative to the contested subpoena, *see id*. at 455, no party in this case can provide the evidence that is in the DCCC's possession.

The DCCC's reliance on *American Fed. of Labor and Congress of Indus. Orgs. v. Fed. Election Comm'n*, 333 F.3d 168 (D.C. Cir. 2003) also is misplaced. *American Federation* involved an FEC regulation requiring disclosure to the *public* of FEC investigatory files. *Id*. at 170. The DCCC is well aware that nothing like that kind of disclosure is contemplated by

Plaintiffs' Subpoena. The DCCC is required only to turn over its responsive documents to Plaintiffs, who repeatedly have expressed their willingness to abide by an agreed-upon protective order. *See* Mot. ¶ 32. *See also Nat'l Org. for Marriage v. McKee*, 723 F. Supp. 2d 236, 240-41 (D. Me. 2010) (alleged chilling effect negated by protective order).

## IV. **Plaintiffs Clearly Have Established A Substantial Need For The Requested Documents.**

The DCCC asserts no sound basis for claiming that its records constitute material akin to trade secrets. "Courts typically consider two factors in analyzing Rule 45 cases, beginning with whether the release of the information would unfairly harm the disclosing party's ability to compete in the marketplace." *Albany Molecular Research*, 274 F.R.D. at 25. Notwithstanding the DCCC's mischaracterization of Plaintiffs' requests, Plaintiffs do *not* seek material regarding the DCCC's strategies with respect to competing in the 2012 congressional elections—in Illinois or anywhere else. Plaintiffs' Subpoena only seeks a narrow set of documents directly related to the DCCC's role in the creation of the Plan at issue in the underlying action. The DCCC has not established, as it must, how production of those documents will work a competitive harm on the DCCC. Therefore these materials should not be considered confidential information under Rule 45.

Because harm to a competitive position is the central concern, the second factor a court considers is whether the information is being disclosed to a competitor. *Falicia v. Advanced Tenant Services, Inc.*, 235 F.R.D. 5, 7 (D.D.C. 2006). Competitive interests are not implicated by the information requested by the Subpoena, and the authority relied upon by the DCCC is inapplicable. *See Echostar Commc'ns Corp. v. News Corp. Ltd.*, 180 F.R.D. 391, 395 (D. Colo. 1998) ("No one disputes that Echostar is a competitor of the non-parties."); *see also Educ. Logistics, Inc. v. Laidlaw Transit, Inc.*, 2011 WL 1348401, at *2 (N.D. Tex. Apr. 8, 2011)

17

(requesting party was a "direct competitor" of the subpoena target). The DCCC's competitor is the National Republican Congressional Committee ("NRCC"), a non-party to this or the underlying action. *See* Opp. at 12, 17. The fact that Plaintiff Congressman John Shimkus also is an officer of the NRCC is irrelevant; the NRCC is not a party to this or the underlying action, and therefore no information will be disclosed to it. Moreover, to alleviate the DCCC's apparent concerns in this regard (*see* Opp. at 1, 2, 5, 17; Mook Decl. ¶ 4), Plaintiffs have made clear their willingness to enter into a reasonable protective order to safeguard the DCCC's documents. Mot. ¶ 32; *see also Albany Molecular Research*, 274 F.R.D. at 26 ("The existence of a protective order weighs against quashing the subpoena on commercial information grounds because the protective order is designed to protect and prevent public disclosure of confidential and sensitive business information, like that potentially at issue here.").

Even if the DCCC had a cognizable trade secret or confidentiality interest, Plaintiffs plainly have a "substantial need for the . . . material that cannot be otherwise met without undue hardship." FED. R. CIV. P. 45(c)(3)(C)(i). To show substantial need, the requesting party must demonstrate that "obtaining the information is both relevant and necessary" to the underlying litigation. *Falicia*, 235 F.R.D. at 7. *See also Compaq Computer Corp. v. Packard Bell Electronics, Inc.*, 163 F.R.D. 329, 338 (N.D. Cal. 1995) ("[D]iscovery is virtually always ordered once the movant has established that the secret information is [both] relevant and necessary."). Plaintiffs amply have demonstrated that the requested documents are highly relevant to their case. Fundamentally, now two members of Congress have testified under oath that two different Democratic lawmakers, one a Congressman and the other the President of the Illinois State Senate, informed them that the DCCC and/or one of its agents drew the map comprising the Plan Plaintiffs challenge in the underlying action. Nowhere in its Opposition does the DCCC deny

this. Thus, the DCCC's documents relating to the drafting process are not merely relevant but *essential* to showing the intent of DCCC and of Illinois legislators with whom they cooperated as to the constitutionally infirm Plan. Plaintiffs' Subpoena requests therefore are "probing the precise topic" of how the Plan was created and why. *Athridge v. Aetna Cas. and Sur. Co.*, 184 F.R.D. 200, 210 (D.D.C. 1998). Documents responsive to the Subpoena clearly exist as the DCCC admits (Opp. at 18), Plaintiffs have established a legitimate use for such documents in that they are central to proving the intent behind the Plan, and the narrowness of the Subpoena's requests demonstrate that this is not a fishing expedition. *See Cusumano v. Microsoft Corp.*, 162 F.3d 708, 716 (1st Cir. 1998).

Furthermore, there are no other easier or less intrusive ways for Plaintiffs to obtain essential and admissible direct evidence of intent other than from the very party who created the Plan. *See Kulzer v. Esschem, Inc.*, 390 F. App'x 88, 93 (3d Cir. 2010) (substantial need for confidential information demonstrated where respondent was only available source of information). Other parties' testimony about what the DCCC and its agents did or did not do concerning the Plan is of course hearsay and likely not admissible. Consequently, the best, most relevant, and admissible source of evidence about what the DCCC intended concerning the drafting of the Plan comes from the DCCC itself.[7] Thus, compelling the DCCC's production of documents responsive to the Subpoena is necessary to provide evidence for Plaintiffs to prove that the individuals and entities who drew the Plan intended to disenfranchise Latino and

---

[7] The DCCC has argued that the better alternative source for the information is the Illinois legislature. However, as the DCCC well knows, individual legislators and their staff have asserted blanket, absolute legislative immunity from discovery and asserted that the documents can be obtained from the DCCC. Moreover, even if the Plaintiffs are able to obtain some information from the Illinois legislature, any such evidence or testimony about the DCCC's actions will likely face a hearsay challenge. As such, the DCCC is, of course, the best source of admissible evidence about its own actions in drafting the Plan.

Republican voters in Illinois. And, it makes the most sense to obtain documents related to these communications directly from the source. For these reasons, Plaintiffs plainly have a substantial need for the documents requested by the Subpoena.

## V. The DCCC Is Not Excused From Compliance With The Federal Rules Of Civil Procedure.

### A. The DCCC's Attempt To Seal Its Privilege Log Is Improper.

The DCCC's Opposition asserts that the entirety of the nearly 800 pages of responsive material is subject to privilege and has been identified in a privilege log. Opp. at 18. If the DCCC truly considers these documents privileged, Rule 45 mandates that the DCCC must describe the nature of the documents not produced or disclosed and do so in a manner that, without revealing information itself privileged or protected, will enable other parties to assess the claim. FED. R. CIV. P. 45(d)(2)(A); *see also In re Apollo Group, Inc. Sec. Litig.*, 2007 WL 778653, at *8 (D.D.C. March 12, 2007) ("To the extent the DOE maintains that it is not required to produce the documents sought in the Amended Subpoena on the grounds of various privileges, the DOE must comply with its obligations under Federal Rule of Civil Procedure 45(d)(2) and produce a privilege log that allows Apollo and the Court to assess the validity of the claimed privileges."). Rather than provide Plaintiffs with a copy of the log as is its duty, the DCCC filed a motion for leave to file its privilege log under seal. *See* Opp. at 18. The DCCC has cited no case law in support of its extraordinary request. In response, Plaintiffs have filed an Opposition to the DCCC's Motion For Leave To File Privilege Log Under Seal, which is incorporated by reference as though fully set forth herein.

### B. The DCCC Still Refuses To Articulate Specific Objections.

As set forth in Plaintiff's Motion to Compel, Rule 34 "plainly states that objections to requests for production must be made on an individual basis." *Lurensky v. Wellinghoff*, 258

20

F.R.D. 27, 30 (D.D.C. 2009). And "[u]nder Rule 34, failure to make particularized objections to document requests constitutes a waiver of those objections." *Sabol v. Brooks*, 469 F. Supp. 2d 324, 328 (D. Md. 2006) (ordering non-party to produce documents requested by a Rule 45 subpoena); *see also* FED. R. CIV. P. 34 (b)(2)(B) ("For *each item or category*, the response must . . . state an objection to the request, including the reasons.") (emphasis added). Rather than attempt to remedy its failure to comply with the specificity requirements of Rule 34, the DCCC broadly asserts that "there was nothing to be gained by repeating DCCC's objections . . . for each request." Opp. at 20. Plaintiffs respectfully submit that, despite the DCCC's assertion otherwise, the Federal Rules of Civil Procedure are not "senseless process" (*id.* at 20), and the DCCC should be bound by their requirements.

## CONCLUSION

WHEREFORE, for the foregoing reasons, the Court should grant Plaintiffs' Motion to Compel and order the Democratic Congressional Campaign Committee to comply with Plaintiffs' subpoena within ten (10) days and award Plaintiffs their attorneys' fees and other costs associated with Plaintiffs' Motion To Compel Democratic Congressional Campaign Committee To Comply With Subpoena Seeking Third Party Discovery.

Dated:  Sept. 29, 2011

Respectfully submitted,

COMMITTEE FOR A FAIR AND
BALANCED MAP, *ET AL*.

By:    /s/Dana S. Douglas

Anthony Alexis (Bar No. DC 384545)
MAYER BROWN LLP
1999 K Street, N.W.
Washington DC 20006-1101
(202) 263-3000
(202) 263-3300 – fax
aalexis@mayerbrown.com

Dana S. Douglas (admitted *pro hac vice*)
Thomas V. Panoff (admitted *pro hac vice*)
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax
dsdouglas@mayerbrown.com
tpanoff@mayerbrown.com

*Attorneys for Plaintiffs*

## CERTIFICATE OF SERVICE

I hereby certify that on September 29, 2011, a copy of the forgoing Plaintiffs' Reply In

Support Of Their Motion To Compel Democratic Congressional Campaign Committee To

Comply With Subpoena Seeking Third Party Discovery was provided by email to:

| | |
|---|---|
| Devon C. Bruce | Brent D. Stratton |
| Larry R. Rogers | Carl T. Bergetz |
| Powers, Rogers & Smith | Jonathan A. Rosenblatt |
| 70 West Madison Street | OFFICE OF THE ILLINOIS ATTORNEY |
| Suite 5500 | GENERAL |
| Chicago, IL 60602 | 100 West Randolph Street |
| dbruce@prslaw.com | Chicago, IL 60601 |
| lrogers@prslaw.com | bstratton@atb.state.il.us |
| | cbergetz@atb.state.il.us |
| | jrosenblatt@atb.state.il.us |

*Counsel for Defendants Illinois State Board of Elections and its Members*

And filed the forgoing on the CM/ECF system which will send a notice of electronic filing to the

following:

Barry J. Reingold
PERKINS COIE, LLP
700 13th Street, NW
Suite 600
Washington, DC 20005-3960
(202) 654-6226
Fax: (202) 654-6211
breingold@perkinscoie.com

*Counsel for Democratic Congressional Campaign Committee*

Dated: September 29, 2011                    By:      /s/ Dana S. Douglas
                                                     Dana S. Douglas (admitted *pro hac vice*)
                                                     MAYER BROWN LLP
                                                     71 South Wacker Drive
                                                     Chicago, Illinois 60606
                                                     (312) 782-0600
                                                     (312) 701-7711 – fax
                                                     dsdouglas@mayerbrown.com

# EXHIBIT A

# IN THE UNITED STATES DISTRICT COURT FOR THE
## NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, et al. | ) ) | Case No. 1:11-cv-05065 |
| | ) | |
| *Plaintiffs,* | ) ) | Circuit Judge John D. Tinder District Judge Joan H. Lefkow |
| vs. | ) | District Judge Robert L. Miller, Jr. |
| | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, et al. | ) ) | |
| | ) | |
| *Defendants.* | ) ) | |
| | ) | |

## MEMORANDUM OF LAW IN SUPPORT OF NON-PARTIES' MOTION TO QUASH SUBPOENAS AND FOR PROTECTIVE ORDER

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881

Eric M. Madiar
Special Asst. Attorney
General
605 State House
Springfield, IL 62706
(217) 782-2156

David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392

## **Introduction**

In this action, Plaintiffs seek to invalidate, in whole or in part, Public Act 97-14, the 2011 congressional redistricting plan (the "Illinois Map" or the "Map"). Plaintiffs have served thirty subpoenas on various members and staff of the Illinois Senate and House of Representatives (collectively the "Illinois General Assembly") for the production of documents concerning the preparation, drafting, and passage of that law. In addition to the thirty subpoenas served to date for the production of documents, Plaintiffs recently indicated that they also intend on serving subpoenas for depositions for at least a sub-set of the individuals who received subpoenas for documents. Plaintiffs' subpoenas should be quashed because the Members and their staff are protected by legislative immunity. This long-recognized doctrine applies not only to immunity from liability but also as a privilege against disclosure of documents and as a testimonial privilege at deposition and trial. It is an absolute privilege from any inquiry into the legislative operations of the Illinois General Assembly. It protects both elected members and staff. And as numerous decisions across the country have held, it clearly applies in the context of redistricting, a fundamental legislative function of the State. Thus, Plaintiffs' subpoenas for documents and depositions should be quashed and a protective order should be entered to bar depositions and other discovery protected by legislative immunity.

At the outset, we note a jurisdictional issue of which this Court should be aware. Twenty-five of the subpoenas served by Plaintiffs were issued out of the United States District Court for the Central District of Illinois ("Central District"), due to the fact that most of the witnesses subpoenaed for documents (whom Plaintiffs' Counsel has indicated they will also seek to depose) reside in Springfield, Illinois. Five of the Plaintiffs' subpoenas were issued out of the United States District Court for the Northern District of Illinois ("Northern District"). This Motion is directed towards the five subpoenas issued by the Plaintiffs from the Northern District.

To expedite a resolution to this matter, counsel for those who received subpoenas issued from the Central District of Illinois the have informed Plaintiffs' counsel that the subpoenas *duces tecum* issued from the Northern District of Illinois and served respectively on the Office of the Senate President and Office of the Speaker of the House of Representatives in Chicago capture all of the documents falling within the scope of the Central District subpoenas. As explained to Plaintiffs' counsel, all of these documents are subject to the control of these Offices, including, if any, responsive email communications or other documents possessed by employees on personal email accounts (e.g., yahoo etc.) or computers. This is also true of any responsive documents of the Senate and House Redistricting Committees as the committee staff members are employees of either Office.

### Background

On May 31, 2011, the Illinois General Assembly passed Public Act 97-14, the Illinois Map at issue. Plaintiffs filed this Complaint nine weeks later, on July 27, 2011. On August 22, Plaintiffs served subpoenas *duces tecum* on the (i) Illinois House of Representatives (through Tim Mapes, House Clerk); (ii) Office of the Speaker of the Illinois House of Representatives (through Tim Mapes, Chief of Staff); (iii) Illinois House Redistricting Committee (through Barbara Flynn Currie, Chairperson); (iv) Office of the Senate President (through Andrew Manar, Chief of Staff); and (v) Senate Redistricting Committee (through Kwame Raoul, Chairperson). (Copies of these subpoenas are attached hereto as Exhibit A-1-A-5.)

These subpoenas, which had a one-week return date, cover tens of thousands of documents, virtually every single document that could remotely relate to the redistricting process dating back to January 1, 2010 and going forward into the future. The subpoenas' scope includes: (1) all Member and staff communications regarding the Map with anyone within or outside the legislature; (2) all analyses and reports regarding the Map or specific districts,

2

including any expert or consultant reports or opinions; (3) all draft maps, no matter who drafted them or however preliminary; (4) all data files and software used in formulating the Map; and (5) all documents identifying the Members and any other persons involved with fashioning or providing input on the Map. (*See* Exhibit A.)

The General Assembly's counsel spoke with Plaintiffs' counsel on August 24. The attorneys agreed on a revised return date of September 2 for the subpoenas.

In its September 2 joint response, the General Assembly asserted all of the objections asserted herein. (*See* Exhibit B). The attorneys for each side conferred on September 6, 13, and 14, and were unable to reach a compromise.

## **Argument**

**I.** **Legislative Immunity Bars The Instant Subpoenas And Prohibits Any Discovery Directed At The General Assembly For Its Actions Concerning Redistricting.**

Legislative immunity absolutely protects the legislative acts of state legislators and legislative aides not only from civil liability, but also from the burdens of document production, depositions, and trial testimony in civil proceedings. This broad privilege stems from the doctrine's fundamental purpose of prohibiting any interference with the integrity of the legislative process. Redistricting is a quintessential legislative function; indeed, the Map resulted from the legislative process culminating in the passage of Public Act 97-14. Because redistricting is part and parcel of the legislative process, legislative immunity precludes Plaintiffs' effort to obtain discovery concerning the legislative activities that resulted in the Map, either through documentary or oral discovery.

3

**A.** **Legislative Immunity Applies To All Aspects Of The Legislative Process.**

"Absolute legislative immunity attaches to all actions taken 'in the sphere of legitimate legislative activity.'" *Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011) (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998) and *Tenney v. Brandhove*, 341 U.S. 367, 376 (1951)). It protects from inquiry any actions that are an "integral part of the deliberative and communicative processes by which Members participate … with respect to the consideration and passage or rejection of proposed legislation . . . ." *Gravel v. United States*, 408 U.S. at 625.

Legislative immunity applies to core legislative acts such as drafting, introducing, debating and voting on legislation. *Biblia Abierta v. Banks*, 129 F.3d 899, 903 (7th Cir. 1997); *Baraka v. McGreevey*, 481 F.3d 187, 196 (3rd Cir. 2007). It covers conduct and communications in preparation for core legislative acts, such as conducting committee hearings, meetings and other official legislative events. *Gravel*, 408 U.S. at 625.

It protects memoranda and other documents used or drafted by legislators or legislative aides for legislative use. *Gravel*, 408 U.S. at 625; *Doe v. McMillan*, 412 U.S. 306, 312-13 (1973) (committee report prepared by staff for legislative use protected); *Brown & Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 417 (D.C. Cir. 1995) ("Once the documents were received by Congress for legislative use … an absolute constitutional bar of privilege drops like a steel curtain to prevent [a litigant] from seeking discovery"); *Lindley v. Life Insurance Co.*, No. 08-CV-379-CVE-PJC, 2009 WL 2245565 at *10 (N.D. Okla. 2009); *Municipal Revenue Services, Inc. v. Xspand, Inc.*, No.4:CV-05-0671, 2007 WL 1314875 at **2-4 (M.D. Pa. 2007); *United Transp. Union v. Springfield Terminal Ry. Co.*, 132 F.R.D. 4, 5-6 (D. Me. 1990) (blocking subpoena to depose senator and obtain production of internal memoranda and drafts of documents prepared for legislative use). The privilege even covers information gathered from

4

constituents and confidential sources. *McSurely v. McClellan*, 553 F.2d 1277, 1286-87 (D.C. Cir. 1976) (*en banc*); *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 530-31 (9th Cir. 1983); *Government of Virgin Islands v. Lee*, 775 F.2d 514, 520-21 (3rd Cir. 1985).

### B. The Passing Of Redistricting Legislation Is Covered By Legislative Immunity.

The various steps necessary to research, investigate, prepare, draft, introduce, analyze, negotiate, and pass a congressional redistricting plan qualify as legitimate legislative activities. *Ryan v. State. Bd. of Elec.*, 661 F.2d 1130, 1132 (7th Cir. 1981) (explaining that it is the constitutional duty and primary responsibility of the General Assembly to draw Illinois' congressional districts after each decennial census and apportionment).

Indeed, the legislative immunity doctrine has been successfully invoked in a great many redistricting cases, including claims of intentional discrimination and violations of the Voting Rights Act. *See, e.g., Gonzalez v. City of Aurora*, No. 02 C 08346, Minute Order (N.D. Ill. 2003) (attached as Exhibit C) (barring deposition of non-party local legislators regarding their subjective motives or reasoning in enacting Aurora's redistricting plan); *Cano v. Davis*, 193 F.Supp.2d 1177, 1180-81 (C.D. Cal. 2002) (three-judge panel) (holding that legislative immunity, when invoked by state legislator, "protects both against disclosure and against use" of legislative acts in redistricting); *Martinez v. Bush*, No. 1:02-cv-20244 AJ, Mem. Op. at 3-6 (S.D. Fla. July 12, 2002) (three-judge panel) (Exhibit D) (barring depositions of state legislators and staff on their motivations and reasons for enacting redistricting plan); *Chen v. City of Houston*, No. H-97-1180, Mem. Op. at 3-4 (S.D. Tex. Oct. 31, 1997) (attached as Exhibit E) (barring deposition of city councilmember on actions involving redistricting); *Simpson v. City of Hampton*, 166 F.R.D. 16, 18-19 (E.D. Va. 1996) (legislative immunity encompasses testimonial

5

privilege that blocked production of legislator's files and notes in redistricting case); *Hispanic Coalition on Reapportionment v. Legislative Reapportionment Commission*, 536 F. Supp. 578, 582-583 n.2 (E.D. Pa. 1982) (barring deposition of chairman of the redistricting commission).

### C.     The Instant Subpoenas Are Aimed At Protected Legislative Actions.

Nor can there be any serious question that the information Plaintiffs seek via their subpoenas "are integral to the deliberative and communication processes" that legislators and staff alike use to fulfill the General Assembly's constitutional obligation to redraw congressional lines.  The subpoenas at issue, all of which request identical information, contain 21 different categories of documents, including "*All* documents related to the state of Illinois legislative and/or congressional Redistricting process which led to the planning, development, negotiation, drawing, revision or re-drawing of the Proposed Congressional Plan."  (*See, e.g.,* Exh. A-1, p. 8 (emphasis added).)  They seek all "reports [and] analyses" concerning congressional redistricting, as well as documents of any kind concerning "communications, discussions, meetings, and/or conversations" on that topic, without limitation.  *Id.*

There can be no question that Plaintiffs are seeking an open window into the deliberative process of the Illinois General Assembly in drawing its 2011 congressional boundaries.  They seek any document, preliminary or otherwise, and any communication, in any form, at whatever stage in the process from the first inkling in the first legislator's mind until final discussions leading up to the passage of Public Act 97-14.  The subpoenas seek information that falls squarely within the sphere of legitimate legislative activity and is covered by legislative immunity.

**D.    Legislative Immunity Is An Absolute Privilege.**

Legislative immunity, as a federal common-law privilege, exists for the same reason as the U.S. Constitution's Speech or Debate clause—to protect the integrity of the legislative process by insuring the independence of individual legislators without the fear of outside interference. *U.S. v. Brewster*, 408 U.S. 501, 507 (1972); *Supreme Court of Virginia v. Consumers Union of the United States*, 446 U.S. 719, 731 (1980). The Supreme Court and Seventh Circuit "equate" legislative immunity with the protections members of Congress enjoy in federal civil actions under the U.S. Constitution. *Bagley*, 646 F.3d at 397 (quoting *Consumers Union*, 446 U.S. at 731-32); *accord Bryant v. Jones*, 575 F.3d 1281, 1304 (11th Cir. 2009); *Larsen v. Senate of the Commonwealth of Pennsylvania*, 152 F.3d 240, 249 (3rd Cir. 1998); *National Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 631 (1st Cir. 1995).

The rationale behind this principle of non-interference is that "[a]ny restriction on a legislator's freedom undermines the public good by interfering with the rights of the people to representation in the democratic process." *Banks*, 129 F.3d at 903 (quoting *Tenney*, 341 U.S. at 377). The doctrine of absolute legislative immunity "embodies the long-held belief that this country is better served by limiting recovery to injured parties rather than threatening the legislative process by placing legislators in fear of lawsuits from exercising their legislative duties." *Rateree v. Rocket*, 852 F.2d 946, 951 (7th Cir. 1988).

And this non-interference principle applies with equal force whether the legislative actor is a defendant or a third party. "A litigant does not have to name [legislators] or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive." *MINPECO, S.A. v. Conticommodity Services*, 844 F.2d 856, 859 (D.C.

7

Cir. 1988). *Accord Equal Employment Opportunity Comm'n v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011).

This principle of non-interference is absolute. As the Seventh Circuit recently reiterated, once it is determined that legislative immunity applies, it is an "absolute bar to interference" from the judiciary. *Bagley*, 646 F.3d at 396 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502-03 (1975)). *Accord Brown & Williamson*, 62 F.3d at 418-19 (regarding subpoena for documents to Congress, "'Once the legislative-act test is met, the privilege is absolute'") (quoting *Miller*, 709 F.2d at 529). Thus, the privilege, once applicable, carries with it no balancing of interests. *Eastland*, 421 U.S. at 509 (refusing to balance alleged First Amendment harms against need to protect legislative process from judicial interference because balancing test "ignores the absolute nature of the speech or debate protection and cases which have broadly construed that protection."); *Harwood*, 69 F.3d at 634 ("'balancing [of harms] plays no part'" in legislative immunity analysis) (quoting *Eastland*, 421 U.S. at 510 n.16).

### E. Absolute Legislative Immunity Applies To Both Legislators And Their Aides.

Courts long ago extended legislative immunity to the activities of legislative aides and consultants. *Gravel*, 408 U.S. at 615, 618; *Harwood*, 69 F.3d at 630-32 & n.10; *Ellis v. Coffee County Bd. of Registrars*, 981 F.2d 1185, 1192-93 (11th Cir. 1993) (collecting cases).

Indeed, in the recent *Bagley* decision, after the Seventh Circuit found that the governor's issuance of a line-item veto enjoyed legislative immunity from liability, it upheld not only the quashing of the governor's deposition but also the lower court's order prohibiting the questioning of the governor's aide, Julie Curry, about that topic (though she could be questioned on non-legislative matters). *Bagley*, 646 F.3d at 396-97. This conclusion naturally flows from what the Supreme Court instructed long ago. First, "it is literally impossible, in view of the

8

complexities of the modern legislative process . . . for [legislators] to perform tasks without the help of aides and assistants." *Gravel*, 408 U.S. at 616. Second, if equivalent protection were not accorded to legislative aides regarding legislative activities, then "the central role of the Speech or Debate Clause—to prevent intimidation by the Executive and accountability before a possibly hostile judiciary—will inevitably be diminished and frustrated." *Id.* at 617.

### F. The Non-Interference Principle Of Absolute Legislative Immunity Applies Equally To Document Production And Oral Testimony.

Absolute legislative immunity protects legislators and their aides "not only from the consequences of litigation's results but also from the burden of defending themselves" in a civil action. *Bagley*, 646 F.3d at 396 (quoting *Dombrowski v. Eastland*, 387 U.S. 82, 85 (1967)). No less than being hauled into court as a party, being compelled to comb through tens of thousands of documents, to submit to depositions, and perhaps to testify at trial in civil actions "force legislators to divert their time, energy, and attention from their legislative tasks . . . ." *Id.* (quoting *Eastland*, 421 U.S. at 502-03).

It is for this reason that the Seventh Circuit in *Bagley* "[saw] no reason why the immunity protecting the Governor from liability for his veto (and Curry to the extent of her involvement in the veto) would not also protect them 'from the burden of defending themselves.'" *Id.* (quoting *Dombrowski*, 387 U.S. at 85) (parenthetical in original).

Likewise, the D.C. Circuit Court of Appeals firmly rejected plaintiff's claim that the scope of the Speech or Debate Clause's testimonial/nondisclosure privilege would be any narrower than the scope of immunity from suit:

> Looking only to the text of the Constitution, we would be inclined to conclude that, if anything, [plaintiff] has it backwards. The Clause says nothing specifically about lawsuits; what it does say is that members of Congress "shall not be *questioned* in any other place" about legislative actions. U.S. Const. art. I, § 6, cl. 1 (emphasis

added). Based on the text of the Constitution, it would seem that the immunity from suit derives from the testimonial privilege, not the other way around.

*Brown & Williamson*, 62 F.3d at 418 (emphasis in original). *See Bagley,* 646 F.3d at 397 (noting that the Supreme Court "generally equates the legislative immunity to which state legislators are entitled … to that accorded Congressmen under the Constitution."). Nor is there a meaningful distinction between an oral deposition and document production. *See Brown & Williamson*, 62 F.3d at 420 ("[d]ocumentary evidence can certainly be as revealing as oral communications").

Indeed, "one of the functions of absolute [legislative] immunity is protecting the claimant from discovery." *Schultz v. Stranczek*, 1991 WL 328518 at *1 (7th Cir. 1991). Thus, to fulfill the non-interference principle, federal courts have properly concluded that legislative immunity provides both testimonial immunity and a non-disclosure privilege pursuant to which legislators and their aides cannot be required to either produce documents or answer questions, whether in a deposition or on the witness stand, regarding legitimate legislative activities. *Gravel*, 408 U.S. at 616; *Equal Employment Opportunity Comm'n*, 631 F.3d at 181; *MINPECO*, 844 F.2d at 859; *Buonauro v. City of Berwyn*, No. 08-c-6687, 2011 WL 116870 at *10 (N.D. Ill. 2011) (legislative immunity precluded questions of non-party city council members concerning deliberations, thought processes, and motivations behind council's denial of business license); *Chen v. City of Houston*, 9 F.Supp.2d 745, 762 (S.D. Tex. 1998); *Municipal Revenue Services, Inc. v. Xspand, Inc.*, 2007 WL 1314875 at *3 (M.D. Pa. 2007) (agreeing with counsel that legislative immunity bars plaintiff from deposing or obtaining documents from a non-party state legislator about "[a]ll facts surrounding the introduction of [the legislation], discussions conducted by Representative Cappelli concerning [it], written documents concerning [it], debate concerning [it], etc.").

### G. Legislative Immunity Applies Regardless Of The Causes Of Action Asserted By Plaintiffs Or The Elements They Must Prove.

It is irrelevant that Plaintiffs here must prove that the General Assembly acted with discriminatory intent in drafting the congressional districts; legislative immunity attaches even "if the claim requires 'proof of a legislative act or the motives or purposes underlying such an act.'" *Empress Casino Joliet Corp. v. Blagojevich*, 638 F.3d 519, 529 (7th Cir. 2011) (quoting *Thillens, Inc. v. Comty. Currency Exch. of Illinois*, 729 F.2d 1128, 1131 (7th Cir. 1984) and *Gravel*, 408 U.S. at 621). Indeed, the doctrine "would have 'little value'" if it could be disregarded so easily by an allegation that the legislature acted unconstitutionally or illegally. *Id.* (quoting *Tenney*, 341 U.S. at 377). In the redistricting context, in particular, courts have rejected the notion that plaintiff's need to prove discriminatory intent should vitiate the privilege. *See Simpson*, 166 F.R.D. at 18-19; *Cano*, 193 F. Supp. 2d at 1180; *Chen*, Mem. Op. at 2 (Exhibit E).

This is particularly true because Plaintiffs have other avenues for seeking evidence regarding their claim that this map was the product of intentional discrimination, including public statements by legislators, records of public proceedings, publicly-available documents, testimony of third parties who are not Members or staff of the General Assembly, expert testimony, and in this case, incumbent members of Congress who may have played a role in drawing the congressional map (whose immunity, if any, is not presently before the Court). *See Chen*, Mem. Op. at 4 (Exhibit E). The Plaintiffs' subpoena to the Democratic Congressional Campaign Committee ("DCCC") highlights that Plaintiffs have additional means to obtain the documents that it seeks to obtain from the moving non-parties. (*See* Exhibit F, Plaintiffs' subpoena to the DCCC). The Plaintiffs are currently seeking to compel the DCCC, which the

11

Plaintiffs describe in their motion to compel as having drafted the map that the General

Assembly subsequently passed, to produce documents concerning the preparation and passage of

the congressional map. (*See* Exhibit F, Motion to Compel DCC). And while the DCCC has

raised certain objections to the Plaintiffs' subpoena, the DCCC has not asserted legislative

immunity as a basis for objecting to the Plaintiffs' subpoena.

Because there can be no dispute that the General Assembly's actions in drafting,

discussing, analyzing, and passing Public Act 97-14 fall comfortably within the sphere of

legitimate legislative actions, they are protected by legislative immunity. This privilege is

unqualified and absolute. It applies with equal force to legislators and their aides and

consultants. And it applies to the compelled production of documents, oral depositions, and trial

testimony. For these reasons, the subpoenas at issue here should be quashed. In addition, this

Court should enter a protective order (1) quashing all subpoenas for documents or discovery

directed at the House, Senate, and its committees and staff and (2) limiting any subpoenas

directed to Members of the General Assembly to those Members who affirmatively waive

legislative immunity.

## II. Independent of Legislative Immunity, the Documents at Issue are Privileged from Disclosure under the Deliberative Process Privilege, the Attorney-Client Privilege and the Attorney Work-Product Doctrine

Although the legislative immunity privilege is absolute, if the court were to find the

privilege inapplicable, the documents requested would still be privileged under the deliberative

process privilege, the attorney-client privilege and the attorney work-product doctrine.

### A. The Deliberative-Process Privilege Applies to the Documents at Issue.

The deliberative process privilege protects communications that are part of the decision-

making process of a governmental agency. *United States v. Farley*, 11 F.3d 1385, 1389 (7th Cir.

1993).  The privilege protects advisory opinions, recommendations and deliberations comprising part of a process by which governmental decisions and policies are formulated.  *NLRB v. Sears, Roebuck & Co.*, 421 U.S. 132, 150 (1975).  The deliberative process privilege encompasses all deliberative communications regardless of what form they take.  *Government Suppliers Consolidating Services, Inc. v. Bayh*, 133 F.R.D. 531, 535 (S.D. Ind. 1990).  This means the privilege will apply to both testimony and to documents.  *Id.*

The documents that Plaintiffs seek clearly contain deliberative communications between legislative members and legislative aides that were part and parcel to the legislative process to enact the 2011 Congressional Redistricting Map.  (*See, e.g.*, Exhibit A-1 at 8-9.)  Specifically, Plaintiffs seek documents regarding communications, discussions, meetings, and conversations relating to the redistricting process.  *Id.*  Documents of this type undoubtedly fall under the deliberative process privilege.  *See Farley*, 11 F.3d at 1389 (staff memoranda containing recommendations and interpretations fall under deliberative process privilege); *United States Securities and Exchange Commission*; 2010 WL 4977220 at *3 (N.D. Ill. 2010) (recommendations, proposals, suggestions, draft documents, and other materials that reflect the personal opinions of the writer fall under the privilege).  Accordingly, if the Court determines that legislative immunity is inapplicable, then counsel requests adequate time to prepare and submit a privilege log detailing the documents subject to the deliberative process privilege.  Fed. R. Civ. P. 26(b)(5) & 45(c)(3).

### B.	The Attorney-Client And Work Product Privileges Bar The Disclosure Of Certain Documents.

In civil cases, the Illinois General Assembly (including its members and staff) enjoy the same attorney-client privilege as non-governmental entities.  *United States v. Jicarilla Apache*

*Nation*, ___ U.S. ___, ___, 131 S. Ct. 2313, 2320-21 (2011). This privilege promotes open

discussions between attorneys and their government client by protecting communications made

in confidence by a client and its employees to an attorney for the purpose of legal advice.

*Sandra T.E. v. South Berwyn School District 100*, 600 F.3d 612, 618 (7th Cir. 2010) (documents

generated by school district's law firm during an investigation were protected by attorney-client

privilege). The privilege applies not only when litigation is ongoing or imminent, but also when

the communication is outside the litigation context where an attorney advises a government

client or employee on legal requirements or addresses legal concerns. *Id.* at 621.

Similarly, the attorney work-product doctrine protects documents prepared by an attorney

in anticipation of litigation for the purpose of analyzing and preparing a client's case. *Id.* at 618;

*U.S. v. Nobles*, 422 U.S. 225, 238-39 (1975). The Seventh Circuit has ruled that the doctrine is

intended to "protect an attorney's thought processes and mental impressions against disclosure."

*Sandra T.E.*, 600 F.3d at 622; *see Hickman v. Taylor*, 329 U.S. 495 (1947). The Seventh Circuit

has held that "documents prepared because of 'some articulable claim, likely to lead to

litigation'" receive work-product protection. *Sandra T.E.*, 600 F.3d at 622; *see Binks Mfg. Co. v*

*Nat'l Presto Indus. Inc*, 709 F.2d 1109, 1120 (7th Cir. 1983).

Both the Illinois Senate President and House Speaker employ attorneys as legislative

aides to advise them, members of their caucuses, and other legislative employees on the

requirements of state and federal law, including the legislature's redistricting obligations. As

part of their duties, the attorneys have provided (and continue to provide) legal advice to

legislators and legislative aides alike via written and oral communications on specific

redistricting topics, whether proactively or in response to specific client requests. In turn, these

attorneys routinely rely upon the assistance of other legislative aides to obtain or compile certain information or other materials in order for the attorneys to render legal advice.

Plaintiffs' subpoenas seek a broad range of documents that include within their scope privileged attorney-client communications between attorneys employed by the Senate President and House Speaker and legislators and/or legislative aides involved in congressional redistricting process. Similarly, many of the documents requested by the Plaintiffs fall under the attorney work-product doctrine because the documents were prepared in anticipation of and as an outgrowth of the claims litigated against redistricting plans for the past four decades. Accordingly, if the Court determines that legislative immunity is inapplicable, then counsel requests adequate time to prepare and submit a privilege log detailing the documents subject to the attorney client privilege and attorney-work product doctrine. Fed. R. Civ. P. 26(b)(5) & 45(c)(3).

### Conclusion

For the reasons stated above, the Court should enter an order quashing Plaintiffs' subpoenas and future subpoenas in a manner consistent with this Court's ruling on the privileges asserted.

Respectfully submitted,
By: /s/ Richard J. Prendergast, Esq.
One of the Attorneys for Non-party Movants

Non-Parties Senate President John J.
Cullerton, House Speaker Michael J.
Madigan, Senator Kwame Raoul,
Representative Barbara Flynn Currie, and
the subpoenaed General Assembly staff
members.

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881

Eric M. Madiar
Special Asst. Attorney
General
605 State House
Springfield, IL 62706
(217) 782-2156

David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392

# EXHIBIT B

# IN THE UNITED STATES DISTRICT COURT FOR THE
# NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, et al. | ) ) ) | Case No. 1:11-cv-05065 |
| *Plaintiffs,* vs. | ) ) ) ) ) | Circuit Judge John D. Tinder District Judge Joan H. Lefkow District Judge Robert L. Miller, Jr. |
| ILLINOIS STATE BOARD OF ELECTIONS, et al. | ) ) ) | |
| *Defendants.* | ) ) ) ) | |
| _____ | ) | |

## THIRD-PARTY RESPONDENTS'
## OPPOSITION TO PLAINTIFFS' MOTION TO COMPEL

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881

Eric M. Madiar
Special Asst. Attorney General
605 State House
Springfield, IL 62706
(217) 782-2156

David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392

## Introduction

In their Motion to Compel Enforcement of Third-Party Subpoenas, Plaintiffs do not—and cannot—deny the applicability of legislative immunity to the subpoenas at issue. That is, they do not deny that the information they seek about the passage of Public Act 97-14 falls clearly within "'the sphere of legitimate legislative activity.'" *Bagley v. Blagojevich*, 646 F.3d 378, 391 (7th Cir. 2011) (quoting *Bogan v. Scott-Harris*, 523 U.S. 44, 54 (1998)). They do not deny that the testimonial and documentary privilege applies to legislative staff and consultants as much as it does to legislators themselves. *See Gravel v. United States*, 408 U.S. 606, 615, 618 (1972); *Bagley*, 646 F.3d at 396-97. Nor do they deny that the privilege applies to document production as well as oral testimony at deposition or trial. *See Bagley*, 646 F.3d at 396-97; *Brown &Williamson Tobacco Corp. v. Williams*, 62 F.3d 408, 418, 420 (D.C. Cir. 1995).[1]

Instead, Plaintiffs principally argue that the privilege, while clearly applicable, is *qualified* rather than absolute. For this proposition, they rely on three sources: (i) case law emanating from a U.S. Supreme Court decision holding that legislative immunity is qualified only in the context of a *criminal investigation*, which is plainly distinguishable from the instant civil action; (ii) *dicta* from another Supreme Court decision that did not involve consideration of legislative privilege; and (iii) case law interpreting a different privilege—the deliberative-process privilege. Plaintiffs cannot cite a *single* case from the Supreme Court or Seventh Circuit for the proposition that the legislative privilege is merely "qualified" in a federal civil lawsuit.[2]

---

[1] Because Respondents herein are also Movants on the contemporaneously filed Motion to Quash and for Protective Order, for ease of discussion we will refer to the parties as the "Plaintiffs" and as the "General Assembly."

[2] At footnote 1 of their Motion to Compel, Plaintiffs state that "counsel for Respondents have agreed to consent to the jurisdiction of this Court for purposes of determining the enforceability of the Subpoenas against all Respondents, whether they reside in this District or in the Central District of Illinois[.]" Contrary to that statement, counsel for the Respondents made no such representations. Rather, counsel for Respondents explained that the entities subpoenaed in the Northern District (*i.e.*, the Office of the Speaker of the House and the Office of the Senate

## Argument

### I.    The Legislative Privilege Is Absolute In A Federal Civil Action.

Once it is determined that legislative immunity applies—as Plaintiffs concede here—it is an "absolute bar to interference" from the judiciary. *Bagley*, 646 F.3d at 396 (quoting *Eastland v. U.S. Servicemen's Fund*, 421 U.S. 491, 502-03 (1975)). *Accord Brown & Williamson*, 62 F.3d at 418-19; *Miller v. Transamerican Press, Inc.*, 709 F.2d 524, 529 (9th Cir. 1983). It involves no balancing of harms or consideration of the interests at stake in the civil lawsuit. *Eastland*, 421 U.S. at 509; *National Ass'n of Social Workers v. Harwood*, 69 F.3d 622, 634 (1st Cir. 1995).

### A.    The Supreme Court and Seventh Circuit Decisions Relied Upon By The General Assembly Are Not "Outlier" Cases But Binding Precedent.

Plaintiffs casually dismiss the 2011 Seventh Circuit decision in *Bagley* and relevant Supreme Court precedent as "outlier cases." (Pl. Mot. at ¶ 6, n. 6). They relegate to a footnote (Pl. Mot. at ¶ 9, n. 7) their discussion of *Bagley*, where the court, on legislative immunity grounds, blocked the depositions of the Illinois Governor and his aide regarding his legislative act of issuing a line-item veto. 646 F.3d at 396-97. They do not cite *Gravel v. United States*, where the Supreme Court found it "incontrovertible" and had "no doubt" that both a legislator and his aide had a privilege against testifying as to actions taken within the legislative sphere. 408 U.S. at 615, 616. Nor do they cite *Dombrowski v. Eastland*, 387 U.S. 82 (1967) or *Eastland v. U. S. Servicemen's Fund*, 421 U.S. 491 (1975), relied upon by the court in *Bagley*, both of which noted that legislators "'should be protected not only from the consequences of litigation's results but also from the burden of defending themselves.'" *Dombrowski*, 387 U.S. at 85, *quoted*

---

President) possess the documents addressed by the Plaintiffs' subpoenas and if the Court granted Plaintiffs' motion, counsel for Respondents would collect responsive emails possessed by employees on personal email accounts, including for Respondents residing in the Central District.

*in Eastland*, 421 U.S. at 503. Far from "outlier cases," these Supreme Court decisions compel a finding of absolute legislative privilege in this matter.

Beyond the Supreme Court precedent, the decision in *Bagley* is consistent with case law in the Seventh Circuit dating back to a 1976 *en banc* decision of that court. *U.S. v. Craig*, 537 F.2d 957, 958 (7th Cir. 1976) (*en banc*). In upholding the panel's decision for the reasons stated in Judge Tone's concurring opinion, the Seventh Circuit's *en banc* opinion held that "the protection afforded state legislators under the federal law for acts done in their legislative roles is based on the common-law doctrine of official immunity, *the privilege is commensurate with the immunity*, and since the immunity does not extend to criminal liability neither should the privilege." *Id.* at 958 (emphasis added). Thus, since 1976, the Seventh Circuit has held that to the extent legislative immunity provides immunity from liability, there exists a *commensurate* evidentiary privilege. *Accord Schultz v. Stranczek*, 1991 WL 328518 at *1 (7th Cir. 1991) ("one of the functions of absolute [legislative] immunity is protecting the claimant from discovery"). As long as, and insofar as immunity from liability attaches, so does the nondisclosure privilege. At no point has the Seventh Circuit or Supreme Court found this framework erroneous or characterized the evidentiary privilege as qualified in a federal civil action.

*Bagley* is entirely consistent with these principles. After finding that the issuance of a veto was immune from civil liability because it took place "'in the sphere of legitimate legislative activity,'" the court "[saw] no reason" why immunity should not also serve as an evidentiary privilege barring depositions of the Governor and his aide. 646 F.3d at 397.

The same result obtains here. Clearly, state legislators would enjoy absolute immunity from *liability* if they were sued over their legislative acts in the course of passing P.A. 97-14. *Tenney v. Brandhove*, 341 U.S. 367, 377 (1951); *Thillens, Inc. v. Cmty. Currency Exch. Ass'n of*

*Illinois, Inc.,* 729 F.2d 1128, 1131 (7th Cir. 1984); *see Scott v. Taylor*, 405 F.3d 1251, 1255-56 (11th Cir. 2005) (legislators absolutely immune from suit in their official capacity for prospective relief in redistricting case). Thus, consistent with *Craig* and *Bagley*, it follows that the commensurate absolute privilege of nondisclosure likewise applies to bar discovery into the General Assembly's drafting, negotiating, and passage of that redistricting law. *Accord Miller*, 709 F.2d at 529-30; *Brown & Williamson*, 62 F.3d at 418-21; *Equal Employment Opportunity Comm'n v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011).[3]

**B.     Plaintiffs' Reliance (i) On Cases Interpreting Legislative Immunity In Criminal Actions, (ii) On the *Arlington Heights* Decision, And (iii) On Case Law Interpreting The Deliberate-Process Privilege Are Misplaced.**

**1.     The Decisions of *Gillock* and *In re Grand Jury* Are Inapposite Because They Concerned Legislative Immunity In Criminal Matters.**

Lacking any Supreme Court or Seventh Circuit case law to support their contention that legislative immunity in a civil lawsuit is qualified, not absolute, Plaintiffs rely heavily on *U.S. v. Gillock*, 445 U.S. 360 (1980), *In re Grand Jury*, 821 F.2d 946 (3rd Cir. 1987), and the small group of cases that relied on them. These cases are obviously distinguishable.[4]

In the case of *In re Grand Jury*, the Third Circuit rejected Pennsylvania lawmakers' claim of absolute legislative privilege from complying with a federal grand jury subpoena—a

---

[3] As further evidence that the General Assembly's position is not the minority view, as Plaintiffs claim, state courts in at least 16 states as well as the U.S. District Court for the District of Columbia have interpreted their respective "speech or debate" clauses as affording an absolute evidentiary privilege against compelled testimony or disclosure of legislative acts. And at least eight states have held the privilege to be absolute in the third-party context. (A list of these decisions is attached hereto as Exhibit A).

[4] Case law cited by Plaintiffs relying on *In re Grand Jury* or *Gillock* include *United States v. Irvin*, 127 F.R.D. 169, 172 (C.D. Cal. 1989) (relying on *In re Grand Jury*, but finding that *Gillock* "plainly does not control the present civil discovery question"); *Fla. Ass'n of Rehab Facs. v. Fla. Dep't of Health & Rehab. Servs.*, 164 F.R.D. 257, 262-67 (N.D. Fla. 1995) (relying on *Gillock, In re Grand Jury*, and *Irvin*); *Manzi v. DiCarlo*, 982 F.Supp. 125 (E.D.N.Y. 1997); *Newport Pacific Inc. v. County of San Diego*, 200 F.R.D. 628, 636-41 (S.D. Cal. 2001) (relying on *Irvin* as well as *In re Grand Jury*); *Rodriguez v. Pataki*, 280 F.Supp.2d 89 (S.D.N.Y. 2003) (relying on *Irvin, Florida Ass'n of Rehabilitation Facilities*, and *In re Grand Jury*); *Kay v. City of Rancho Palos Verdes*, 2003 WL 25294710 *11-22 (C.D. Cal. 2003) (relying on *Irvin, Florida Ass'n of Rehabilitation, In re Grand Jury, Gillock*, and *Newport Pacific*).

decidedly unsurprising result given that the Supreme Court had already found, seven years

earlier in *Gillock*, that federal common-law legislative immunity did not supply legislators with

an evidentiary privilege in federal *criminal* cases. 821 F.2d at 956-958; *Gillock*, 445 U.S. at 373.

It is from this seed that Plaintiffs' case law emerged. The fatal flaw with these cases,

however, is that their vitality depends entirely on the Third Circuit's decision and, in turn, on

*Gillock*. In *Gillock*, the Supreme Court reasoned that no absolute privilege existed primarily

because the enforcement of federal *criminal* statutes presented an important federal interest to

which the principle of protecting state legislators from interference must yield. 445 U.S. at 372-

73. Notably, the Court reiterated that its legislative immunity decisions firmly protect the

independence of state legislators as a common-law privilege in federal *civil* actions. *Id.* at 373.

Following *Gillock*, the Seventh Circuit left no doubt that legislative immunity continued

to apply to *civil* actions. In *Thillens*, 729 F.2d 1128, the court specifically recognized the *Gillock*

holding (which, as the court implicitly recognized, mirrored the Seventh Circuit's *en banc Craig*

decision) and held that state legislators still enjoyed absolute immunity in *civil* actions for their

legislative acts. *Id.* at 1131. Since *Thillens*, the Seventh Circuit has repeatedly limited the

*Gillock* holding to the criminal arena. *See In re Witness*, 288 F.3d 289, 295 (7th Cir. 2002); *U.S.

v. Wilson*, 960 F.2d 48, 50 (7th Cir. 1992); *U.S. v. Davies*, 768 F.2d 893, 898 (7th Cir. 1985).

### 2. The *Arlington Heights* Decision Does Not Alter The Absolute Nature Of Legislative Privilege; If Anything, It Recognizes It.

Plaintiffs' reliance on the decision in *Village of Arlington Heights v. Metropolitan

Housing Corp.*, 429 U.S. 252 (1977), and cases relying on this decision, is misplaced. (Pl. Mot.

at ¶¶ 9-11, 18). Most importantly, *Arlington Heights* did not involve a claim of legislative

immunity or any other privilege. Rather, in *Arlington Heights*, a case involving a challenge to a

village zoning board decision, the Court merely held that plaintiffs must prove, as an element of

their claim, that discriminatory intent or purpose was a motivating factor in the decision.  *Id.* at 265.  The court proceeded in *dicta* to list examples of evidence that might reveal such an intent or purpose, including the following example relied upon by Plaintiffs (Pl. Mot. at ¶ 9, n.6): "[i]n some extraordinary instances the members [of the decision-making body] might be called to stand at trial and testify concerning the purpose of the official action, although even then such testimony frequently will be barred by privilege."  *Id.* at 268.

This reference to "extraordinary instances" in this context is unremarkable.  The Court was quick to add that even in such extraordinary instances, "such testimony frequently will be barred by privilege."  *Id.*  For this proposition, the court cited *Tenney*, the leading Supreme Court decision recognizing absolute immunity for state legislators, *United States v. Nixon*, 418 U.S. 683, 705 (1975), a case recognizing a *qualified* executive privilege for the President, and *Citizens to Preserve Overton Park v. Volpe*, 401 U.S. 402, 420 (1971), a case recognizing a *qualified* testimonial privilege for administrative decisionmakers.  *Id.* at 268 and n.18.  The Court in *Arlington Heights* was not referring only to legislative bodies; it was also discussing executive bodies, such as the one involved in the very controversy before it, a zoning board.  Thus, when the Court wrote that such testimony would "frequently" be barred by privilege, the most logical reading of that statement would be that such testimony would *always* be barred under absolute legislative immunity and would usually, but not necessarily always, be barred under the qualified immunity executive officers enjoy.

Thus, the Court's reference to "extraordinary instances" does not assist Plaintiffs.  If anything, the Court's mention of the attendant privileges that would frequently apply shows that the Court contemplated absolute immunity for legislators.  *See Buonauro v. City of Berwyn*, 08 C 6687, 2011 WL 116870 at *6 (N.D. Ill. Jan. 10, 2011) (noting that *Arlington Heights* did not give

6

plaintiffs the right to inquire into legislators' motives but, in fact, "'has done very nearly the opposite'") (quoting *Dyas v. City of Fairhope,* No. 08-0232-WS, 2009 WL 3151879, at *9 (S.D. Ala. Sept. 24, 2009)).  One court in the redistricting context made this same observation.  *See Cano v. Davis*, 193 F.Supp.2d 1177, 1180 (C.D. Cal. 2002).

At a minimum, it would require a gymnastic leap to believe that legislative immunity, which has been held by the Supreme Court and Seventh Circuit to be absolute in the civil arena—both before and after *Arlington Heights*—was somehow converted into a "qualified" privilege by virtue of *dicta* from a decision that did not even concern that immunity.[5]

### 3. Case Law Interpreting The Deliberative-Process Privilege Does Not Assist Plaintiffs' Objection To Legislative Immunity.

Plaintiffs also rely on cases discussing the deliberative-process privilege to support their argument that the legislative privilege is qualified.  (Pl. Mot. at ¶¶ 13-15 (citing *United States v. Irvin,* 127 F.R.D. 169, 174 (C.D. Cal. 1989); *United States v. Bd. of Educ. of City of Chicago,* 610 F. Supp. 695, 700 (N.D. Ill. 1985)); *Newport Pacific Inc. v. County of San Diego*, 200 F.R.D. 628, 640 (S.D. Cal. 2001)).)  This tactic is ironic given that elsewhere, Plaintiffs argue that the deliberative-process privilege does not even *apply* to legislators.  (Pl. Mot. at ¶ 22.)  Regardless, Plaintiffs' reasoning here is circular.  The deliberative-process privilege, by design, involves a balancing test weighing several factors, so it is only natural that cases discussing that

---

[5] Plaintiffs also seek refuge from language in *Arlington Heights* noting that plaintiffs "were allowed . . . to question [village] Board members fully about materials and information made available to them at the time of decision." *Id.* at 270 n. 20. (*See* Pl. Mot. at ¶ 18.)  But the Court nowhere concluded that plaintiffs were "allowed" to do so because the defendants lacked an evidentiary privilege, as opposed to providing a voluntary disclosure. *Id.* at 270.  Nor can it support Plaintiffs' position that they are somehow entitled to "materials and information available to Respondents at the time a decision was made." (Pl. Mot. at ¶ 18.)  Those "materials and information" would constitute virtually every single document called for in the subpoenas.  That exception would swallow the rule and render an absolute privilege anything but.  And it would do so based on a court case that did not even involve legislative immunity as a litigated issue.

privilege would discuss issues such as the importance of the issues presented in the litigation. It would be a curious result, indeed, if legislative immunity were found to be qualified simply because a separate and distinct privilege is qualified.

In particular, Plaintiffs misread *Irvin*, citing it as a legislative privilege case (Pl. Mot. at ¶ 13) when it plainly concerned the extension of the deliberative-process privilege enjoyed by executive officials to state legislators. *See* 127 F.R.D. at 174.

The purpose of the deliberative-process privilege is to promote frank discussions of government decisions. *Dep't of Interior v. Klamath Water Users Protective Ass'n*, 532 U.S. 1, 8-9 (2001). While the legislative privilege shares this purpose, it is also intended to prevent interference in the legislative process and protect legislators and their aides from having to defend themselves. *Gillock*, 445 U.S. at 1191; *Dembroski*, 387 U.S. at 84-85. The non-interference rationale is why, unlike the deliberative-process privilege, the legislative privilege is "an absolute bar to interference." *Bagley*, 646 F.3d at 396 (quoting *Eastland*, 421 U.S. at 502-03); *see Buonaro*, 2011 WL 2110133 at **2-3 (considering deliberative-process privilege and legislative privilege separately and finding that legislative privilege, but not deliberative-process privilege, precluded production of City Council documents).

### C. The Importance Of The Section 1983 Claims And The Voting Rights Act Do Not Overcome Absolute Legislative Immunity.

Plaintiffs argue that absolute legislative immunity should fall due to the important federal interests in their Section 1983 and Voting Rights Act claims. (Pl. Mot. at ¶ 13.) However, "common-law principles of legislative and judicial immunity were incorporated in our judicial system and [ ] they should not be abrogated absent clear legislative intent to do so." *Pulliam v. Allen*, 466 U.S. 522, 529 (1984). This is especially true with legislative immunity, which "enjoys a unique historical position." *Lake Country Estates, Inc. v. Tahoe Reg'l Planning*

8

*Agency*, 440 U.S. 391, 403 n.24 (1979). Legislative immunity "has its roots in the parliamentary struggles of 16th- and 17th-century England; such immunity was consistently recognized in the common law and was taken as a matter of course by our Nation's founders." *Id.* at 403.

Plaintiffs' argument concerning their Section 1983 claims fail under *Tenney*, where the Supreme Court held that Congress did not abrogate legislative immunity in Section 1983 actions. 341 U.S. at 376 (Congress did not intend "to overturn the tradition of legislative freedom achieved in England by Civil War and carefully preserved in the formation of State and National governments here"). Plaintiffs' remaining claim is the Voting Rights Act; they have cited no "clear legislative intent" in that Act to abrogate this immunity. *Pulliam*, 466 U.S. at 529.

Indeed, if anything, it seems abundantly clear that Congress knew full well that absolute legislative privilege would apply to claims under the Voting Rights Act. *See* S. Rep. No. 417 (1983), *reprinted in* 1982 U.S.C.C.A.N. 177, 214-15. As reflected in the U.S. Senate's report detailing the 1982 amendments to the Voting Rights Act, one of the reasons "intent" was eliminated as the exclusive test to establish a Section 2 violation was the drafters' recognition that legislative privilege might block evidence of "the motives involved in the legislative process." *Id.* Plaintiffs have not demonstrated any hint, much less "clear legislative intent," that Congress intended to abrogate absolute legislative immunity for Voting Rights Act claims.

### D.    Plaintiffs' "Waiver" Argument Misstates The Law.

In a final attempt to avoid the force of absolute legislative privilege, Plaintiffs state that the General Assembly's communications with non-legislative actors constitute a partial waiver of the privilege. Their position runs against the overwhelming weight of authority. Courts have long recognized that information gathering and legislative fact-finding fall within the legislative sphere and are entitled to legislative immunity. *See Almonte v. City of Long Beach*, 478 F.3d

100, 107 (2nd Cir. 2007) (legislative immunity covers all aspects of the legislative process,
including meetings with persons outside the legislature to discuss issues that bear on potential
legislation); *Miller*, 709 F.2d at 530 ("Obtaining information pertinent to potential legislation is
one of the 'things generally done in a session of the House' … concerning matters within the
'legitimate legislative sphere.'"); *Williams v. Johnson*, 597 F.Supp.2d 107, 114 (D.D.C. 2009)
("[W]hether conducted formally or informally, the acquiring of information is an activity that is
a necessary concomitant of legislative conduct and thus should be within the ambit of the
privilege so that legislators are able to discharge their duties properly.").

Such information gathering invariably includes communications regarding legislation
with parties outside of the legislature. Documents exchanged in these communications are
protected from discovery. *Brown v. Williamson*, 62 F.3d at 417 ("Once the documents were
received by Congress for legislative use—at least so long as congressmen were not involved in
the alleged theft—an absolute constitutional bar of privilege drops like a steel curtain to prevent
[a litigant] from seeking discovery."); *Benford v. American Broadcasting Companies, Inc.*, 102
F.R.D. 208, 210 (D. Md. 1984) (holding that information received in execution of legislative
functions, including information gathering, is privileged from discovery).

Under Plaintiffs' view, the only way legislators could preserve their absolute privilege
would be to lock the doors to the capitol building, turn off their phones and email, and work in
complete isolation from the outside world. To say the least, such a narrow view of this historical
privilege would be inconsistent with representative government.[6]

---

[6] Furthermore, waiver of the legislative privilege "can be found only after explicit and unequivocal renunciations of
the protection." *2BD Associates Ltd. Partnership v. County Com'rs for Queen Anne's County*, 896 F.Supp. 528, 535
(D. Md. 1995) (quoting *United States v. Helstoski*, 442 U.S. 477, 491 (1979)); *see also Brown & Williamson*, 62
F.3d at 408, n. 11; *A Helping Hand, LLC v. Baltimore County, Md.*, 295 F.Supp.2d 585, 591 (D. Md. 2003).
Plaintiffs nowhere suggest that General Assembly Members or staff have made such a renunciation.

The few cases cited by Plaintiffs not only are unpersuasive; it is highly questionable that they are even good law. Plaintiffs cite *Almonte v. City of Long Beach*, 2005 WL 1971014 at * 3 (E.D.N.Y. Aug. 16, 2005), for the proposition that "consultations with [a] political operative were not part of the legislative process and thus not privileged." (Pl. Mot. at ¶ 19.) But on appeal, the Second Circuit ruled directly to the contrary:

> We hold that legislative immunity is not limited to the casting of a vote on a resolution or bill; it covers all aspects of the legislative process, including the discussions held and alliances struck regarding a legislative matter in anticipation of a formal vote. *** Meeting with persons outside the legislature—such as executive officers, partisans, political interest groups, or constituents—to discuss issues that bear on potential legislation … assist legislators in the discharge of their legislative duty. These activities are also a routine and legitimate part of the modern-day legislative process.

*Almonte*, 478 F.3d at 107. While the magistrate's interlocutory *Almonte* decision cited by Plaintiffs was not directly reversed by the Second Circuit, it is fair to say that the Second Circuit clearly disagreed with the lower court's view of legislative immunity. In fact, given that every case cited by Plaintiffs for their waiver argument come from a New York district court, it is dubious that any of them are viable in light of the Second Circuit *Almonte* decision.[7]

This is not to say that Plaintiffs cannot seek discovery from third parties with whom legislators or their staff conferred. They simply cannot depose or compel documents from the legislative actors directly. *See Cano*, 193 F.Supp.2d at 1179 (denying protective order regarding deposition of non-legislator about discussions with legislators and their staffs) (citing *Gravel*, 408 U.S. at 629, n. 18). In fact, this raises a point made by the General Assembly previously (G.A. Mem. at pp. 11-12), that Plaintiffs have other avenues to pursue much of the information they seek because they can subpoena these third parties.

---

[7] Plaintiffs' citation to *Rodriguez v. Pataki*, 280 F.Supp.2d 89, 101 (S.D.N.Y. 2003), relies strictly on dicta which is not supported by explanation or case law. The court in *ACORN v. County of Nasssau*, 2007 WL 2815810 at ** 5-6 (E.D.N.Y. 2007), relied on that same dicta from *Rodriguez*.

11

Be that as it may, it would eviscerate the historical, absolute immunity enjoyed by legislators if the routine task of communicating with third parties were construed as a waiver of that privilege by those legislative actors. That should not be the law and it is not the law.

### E.    The Fact That General Assembly Members And Staff Are Not Named Defendants Is Irrelevant.

Plaintiffs make a passing reference, without elaboration, to the fact that the discovery at issue here is "third party" discovery, in which only a "qualified" privilege exists. (Pl. Mot. at ¶ 9). To the extent that they suggest that this long-held, fundamental, and absolute privilege somehow morphs into a "qualified" privilege simply because Members of the General Assembly are not named defendants, their argument fails. Several Circuit Courts have firmly rejected the drawing of "so artificial a line." *See MINPECO, S.A. v. Conticommodity Services, Inc.*, 844 F.2d 856, 859 (D.C. Cir. 1988) (subpoena to non-party subcommittee and staff protected by absolute legislative privilege). "'A litigant does not have to name members or their staffs as parties to a suit in order to distract them from their legislative work. Discovery procedures can prove just as intrusive.'" *E.E.O.C. v. Washington Suburban Sanitary Comm'n*, 631 F.3d 174, 181 (4th Cir. 2011) (non-party legislator absolutely privileged from complying with subpoena) (quoting *MINPECO*, 844 F.2d at 859). Even where the legislative investigation has already ended, and even where the legislators and staff are no longer part of the legislature, the courts have steadfastly refused to permit a breach in the absolute nature of the privilege. *Miller*, 709 F.2d at 528 (subpoena to non-party former congressman protected by absolute legislative privilege, even though he could not possibly be distracted from his legislative duties: "Any questioning about legislative acts, even [of a former legislator], would 'interfere' by having a chilling effect on Congressional freedom of speech.").

12

As the D.C. Circuit noted, if absolute legislative privilege were qualified, then "each time a subpoena is served on a committee, an initial judicial inquiry would be required to calibrate the degree to which its enforcement would burden the committee's work. Such a consequence would be absurd." *MINPECO*, 844 F.2d at 859-60. What is equally "absurd" is any suggestion by Plaintiffs that there is a meaningful difference to the Members and staff of the General Assembly between a request for documents served by third-party subpoena, as opposed to a production request on a named party; or how a deposition compelled by subpoena is any less intrusive on an individual than one compelled by notice to a party. If the privilege can be converted from absolute to qualified by the choice of who is sued, then a privilege deeply rooted in the country's history can be thwarted by strategic gamesmanship.

## II.  Independent of the Absolute Legislative Privilege, the Deliberate Process Privilege Operates to Bar the Subpoenas.

Even under the qualified deliberate process privilege, the balance of interests, for and against disclosure, would favor assertion of the privilege. The chilling effect that disclosure would have on the legislative process clearly outweighs the factors favoring disclosure. *ACORN*, 2007 WL 2815810 at *2. As Plaintiffs recognize, among the factors that the deliberative process privilege requires to be considered in arriving at such a determination are: (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable. *Id.*; *Rodriguez*, 280 F.Supp.2d at 100-101.

The most significant factors to be considered are the availability of other evidence and the seriousness of the litigation. *ACORN*, 2007 WL 2815810 at *3. Here, it is quite evident that Plaintiffs have been and/or will be able to obtain much of the evidence they seek through

13

alternative means. The General Assembly has already provided substantial, publicly-disclosed evidence that is pertinent to the litigation, including approximately 2500 pages of transcripts from the Illinois Senate and House redistricting committee hearings, audio recordings of both the House and Senate floor debate regarding SB 1178, the text of SB 1178 and all associated roll call votes, all hearing witness statements and witness slips received by the Senate and House redistricting committees, and all shape files used to create the Congressional maps (disclosed to Plaintiffs in response to their FOIA request). Beyond the publicly-disclosed materials already provided to Plaintiffs by the General Assembly, Plaintiffs have subpoenaed the DCCC (the entity which Plaintiffs have described in other filings as having drafted the map passed by the General Assembly)[8] and have begun to subpoena individual members of Congress.

And while the claims brought under Section 1983 and the Voting Rights Act are certainly serious, it was noted previously that Congress was aware of the legislative privilege but did not intend to remove its force in claims brought under either the Voting Rights Act or Section 1983. Despite the importance of those claims, Congress intended to foreclose inquiry into legislators' motives. *See ACORN*, 2007 WL 2815810 at * 3 ("neither plaintiffs' submissions nor the court's own research has identified a single case in which the seriousness of the litigation overrode the assertion of legislative privilege as to testimony regarding a legislator's motivations").[9]

---

[8] *See* Plaintiffs' Motion to Compel DCCC at ¶¶ 14-15.

[9] Contrary to Plaintiffs' claim (Pl. Mot. at ¶ 23), the General Assembly properly asserted the deliberative process privilege, even though their objection was not on a document-by-document basis. In *Tuite v. Henry*, the court reasoned that under Rule 45(d)(2), a district court must ensure that an objecting party has a reasonable time to fully evaluate subpoenaed documents and a requesting party has reasonable time to contest that claim. 98 F.3d. 1411, 1416-17 (D.C. Cir. 1996). The Northern District of Illinois adopted this reasonableness standard in *Minnesota Sch. Boards Ass'n Ins. Trust v. Employers Ins. Co. of Wausau*, 183 F.R.D. 627, 630 (N.D. Ill. 1999).

### III.    The General Assembly Properly Asserted And Preserved The Attorney-Client And Work Product Privileges.

Plaintiffs argue in cursory fashion that the General Assembly failed to assert the attorney-client and work-product privileges because it has not purportedly "gone to the trouble to analyze particular documents." That is not true. General Assembly staff has diverted time and resources from their legislative obligations to preliminarily review the documents potentially responsive to Plaintiffs' subpoena, at least to recognize they number the tens of thousands. The subpoenas seek a broad range of documents that include within their scope privileged attorney-client communications between attorneys employed by the Senate President and House Speaker and legislators and/or legislative aides involved in the congressional redistricting process.[10]

As with the deliberative-process privilege, the General Assembly properly and timely asserted these privileges, and, if the legislative privilege is denied, would seek sufficient time to provide the Court with a privilege log detailing the privileged documents pursuant to Rule 45(d)(2). *Tuite*, 98 F.3d. at 1416-17; *Minnesota Sch. Boards*, 183 F.R.D. at 630; *Metzger v. American Fidelity Assurance Co.*, No. CIV-05-1387-M, 2007 WL 895141 2-4 (W.D. Okla. 2007) (rejecting claim that legislators waived legislative privilege by failing to submit a privilege log because "even if no privilege log has been provided, the nature of the documents sought is clear from the text of Plaintiff's request").

WHEREFORE, Third-Party Respondents respectfully request that Plaintiffs' Motion to Compel be denied for the reasons stated herein.

---

[10] Indeed, Plaintiffs were brazen enough to specifically target their subpoenas at two attorneys employed by the Senate President. Similarly, many of the documents requested fall under the attorney-work product doctrine because the documents were prepared in anticipation of, and as an outgrowth of, claims litigated against Illinois redistricting plans for the past four decades.

15

Respectfully submitted,

By: /s/ Richard J. Prendergast, Esq.
One of the Attorneys for Third Party
Respondents

Senate President John J. Cullerton, House
Speaker Michael J. Madigan, Senator
Kwame Raoul, Representative Barbara
Flynn Currie, and the subpoenaed General
Assembly staff members.

Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881

Eric M. Madiar
Special Asst. Attorney General
605 State House
Springfield, IL 62706
(217) 782-2156

David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392

16

# EXHIBIT A

I.   **State Court and United States District Court for the District of Columbia decisions interpreting their respective "speech or debate" clauses as affording an absolute evidentiary privilege against compelled testimony or disclosure of legislative acts.**

- *Arizona Independent Redistricting Commission v. Fields*, 75 P.3d 1088, 1095 (Ariz. App. Div. 1, 2003)

- *State v. Neufeld*, 926 P.2d 1325, 1332 (Kan. 1996)

- *Copsey v. Baer*, 593 So.2d 685, 686-687 (La. App. 1st Cir. 1991)

- *Hughes v. Speaker of the New Hampshire House of Representatives*, 876 A.2d 736, 750 (N.H. 2005)

- *Novak v. City of High Point*, 582 S.E.2d 726 at *6 (N.C. App. 2003)

- *Brock v. Thompson*, 948 P.2d 279, 287 (Okla. 1997)

- *Holmes v. Farmer*, 475 A.2d 976, 984 (R.I. 1984)

- *Humane Society of NY v. City of New York*, 729 N.Y.S.2d 360, 363 (Sup. Ct. N.Y. 2001)

- *Campaign for Fiscal Equality v. State*, 687 N.Y.S.2d 227, 230-232 (N.Y. Sup. 1999)

- *In re Perry*, 60 S.W.3d 857, 859-860 (Tex. 2001)

- *Kerttula v. Abood*, 686 P.2d 1197, 1204-1205 (Alaska 1984)

- *Montgomery County v. Schooley*, 627 A.2d 69, 75 (Md. App. 1993)

- *Blume v. County of Ramsey*, No. C9-88-2861, 1988 WL 114606 at *2 (Minn. Tax. Ct.)

- *State v. Township of Lyndhurst*, 650 A.2d 840, 844 (N.J. Super. Ch. 1994)

- *Melvin v. Does*, No. GD99-10264, 2000 WL 33252882 at *574 (Pa. Comm. Pl.)

- *Covel v. Town of Vienna*, No. CH-2003-184618, 2009 WL 7326376 at *6-7 (Va. Cir. Ct.)

- *Greenburg v. Collier*, 482 F.Supp. 200, 202-203 (E.D. Va. 1979)

- *State v. Beno*, 341 N.W.2d 668, 678 (Wis. 1984)

- *Williams v. Johnson*, 597 F.Supp.2d 107 (D.D.C. 2009)

- *Chang v. United States*, 512 F.Supp.2d 62 (D.D.C. 2007)

- *City of King City v. Community Bank of Central California*, 131 Cal.App.4[th] 913, 931, n. 12 (Cal. App. 4th Dist. 2005)

**II.**     **State Court and United States District Court for the District of Columbia decisions that have held the legislative privilege to be absolute in the third party context.**

- *Humane Society of NY v. City of New York*, 729 N.Y.S.2d 360, 363 (Sup. Ct. N.Y. 2001)

- *Campaign for Fiscal Equality v. State*, 687 N.Y.S.2d 227, 230-232 (N.Y. Sup. 1999)

- *In re Perry*, 60 S.W.3d 857, 859-860 (Tex. 2001)

- *Kerttula v. Abood*, 686 P.2d 1197, 1204-1205 (Alaska 1984)

- *Montgomery County v. Schooley*, 627 A.2d 69, 75 (Md. App. 1993)

- *Blume v. County of Ramsey*, No. C9-88-2861, 1988 WL 114606 at *2 (Minn. Tax. Ct.)

- *State v. Township of Lyndhurst*, 650 A.2d 840, 844 (N.J. Super. Ch. 1994)

- *Melvin v. Does*, No. GD99-10264, 2000 WL 33252882 at *574 (Pa. Comm. Pl.)

- *Covel v. Town of Vienna*, No. CH-2003-184618, 2009 WL 7326376 at *6-7 (Va. Cir. Ct.)

- *State v. Beno*, 341 N.W.2d 668, 678 (Wis. 1984)

- *Chang v. United States*, 512 F.Supp.2d 62 (D.D.C. 2007)

- *City of King City v. Community Bank of Central California*, 131 Cal.App.4[th] 913, 931, n. 12 (Cal. App. 4th Dist. 2005)

IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, et al. | ) ) ) | Case No. 1:11-cv-05065 |
| | ) | Circuit Judge John D. Tinder |
| *Plaintiffs,* | ) | District Judge Joan H. Lefkow |
| vs. | ) ) | District Judge Robert L. Miller, Jr. |
| | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, et al. | ) ) ) | |
| | ) | |
| *Defendants.* | ) ) | |
| | ) ) | |

## NOTICE OF FILING

**TO:**   SERVICE LIST

PLEASE TAKE NOTICE that on **Tuesday, September 27, 2011**, I caused to be filed with the Clerk of the Northern District of Illinois, Eastern Division, **Third-Party Respondents' Opposition to Plaintiffs' Motion to Compel**, a copy of which is attached and served upon you.


By: */s/ Richard J. Prendergast*
One of the Attorneys for Non-party Movants


Richard J. Prendergast
Michael T. Layden
Special Asst. Attorneys General
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, Illinois 60602
(312) 641-0881


David W. Ellis
Special Asst. Attorney General
402 State House
Springfield, IL 62706
(217) 782-3392


Eric M. Madiar
Special Asst. Attorney General
605 State House
Springfield, IL 62706
(217) 782-2156

## **CERTIFICATE OF SERVICE**

Richard J. Prendergast, an attorney, certifies that he caused a copy of the **Notice** and **Third-Party Respondents' Opposition to Plaintiffs' Motion to Compel** to be served upon the following Service List via electronic means, this 27th day of September, 2011.

/s/  Richard J. Prendergast

<u>**SERVICE LIST**</u>

*Committee for a Fair and Balanced Map v. Illinois State Board of Elections, 11-cv-5065*

| | | |
|---|---|---|
| **Joshua D Yount**<br>**Thomas Vangel Panoff**<br>**Lori E. Lightfoot**<br>**John Albert Janicik**<br>**Tyrone C. Fahner**<br>**Dana S Douglas**<br>Mayer Brown LLP<br>71 South Wacker Drive<br>Chicago, IL 60606<br>(312) 782-0600<br><u>courtnotification@mayerbrown.com</u> | representing | **Committee For A Fair And**<br>**Balanced Map**<br>**Aaron Schock**<br>**Adam Kinzinger**<br>**Bobby Schilling**<br>**Donald Manzullo**<br>**Joe Walsh**<br>**John M Shimkus**<br>**Judy Biggert**<br>**Laura Waxweiler**<br>**Lou Sandoval**<br>**Luis Sanabria**<br>**Michelle Caballero**<br>**Peter J Roskam**<br>**Ralph Rangel**<br>**Randy Hultgren**<br>**Robert J Dold**<br>*(Plaintiffs)* |

| | | |
|---|---|---|
| **Brent Douglas Stratton**<br>Office of the Attorney General<br>100 West Randolph Street<br>Chicago, IL 60601<br>(312) 814-4499<br><u>bstratton@atg.state.il.us</u><br><br>**Jennifer Marie Zlotow**<br>(312) 814-5354<br><u>jzlotow@atg.state.il.us</u><br><br>**Jonathan A. Rosenblatt**<br>(312) 814-4720<br><u>jrosenblatt@atg.state.il.us</u><br><br>**Paul Joseph Gaynor**<br>(312) 814-1134<br><u>pgaynor@atg.state.il.us</u><br><br>**Barbara Carroll Delano**<br>(312) 814-1137<br><u>bcarroll@atg.state.il.us</u> | representing | **Illinois State Board of Elections**<br>**Betty J. Coffrin**<br>**Bryan A. Schneider**<br>**Charles W. Scholz**<br>**Ernest L Gowen**<br>**Harold D. Byers**<br>**Jesse R. Smart**<br>**Judith C Rice**<br>**William M McGuffage**<br>*(Defendants)* |

<u>SERVICE LIST</u>

*Committee for a Fair and Balanced Map v. Illinois State Board of Elections, 11-cv-5065*

**Carl Thomas Bergetz**
(312) 814-5194
cbergetz@atg.state.il.us

**Larry R. Rogers**
**Devon C. Bruce**
Powers, Rogers & Smith
70 West Madison St., Suite 5500
Chicago, IL 60602
(312) 236-9381
lrogers@prslaw.com
dbruce@prslaw.com

**David W. Ellis**
Special Assistant Attorney General
402 Capitol Building
Springfield, IL 62706
(217) 782-3392
dellis@hds.ilga.gov

representing

**Illinois House Redistricting**
**Committee**
**Anne Schaeffer**
**Barbara Flynn Currie**
**Bria Scudder**
**Daniel Frey**
**Jonathan Maxson**
**Katy Langenfeld**
**Michael J. Madigan**
**Timothy Mapes**
**Travis Shea**
**Illinois House of Representatives**
**Office of the Speaker of the Illinois**
**House of Representatives**
*(Movants)*

**Richard J. Prendergast**
**Michael T. Layden**
Richard J. Prendergast, Ltd.
111 W. Washington St., Suite 1100
Chicago, IL 60602
(312) 641-0881
rprendergast@rjpltd.com
mlayden@rjpltd.com

representing

**Barbara Flynn Currie**
**Michael J. Madigan**
**Senate President John J. Cullerton**
**Senator Kwame Raoul**
*(Movants)*

## SERVICE LIST

*Committee for a Fair and Balanced Map v. Illinois State Board of Elections, 11-cv-5065*

| | | |
|---|---|---|
| **Eric Michael Madiar**<br>Chief Legal Counsel<br>Office of the Senate President<br>State House<br>Room 605<br>Springfield, IL 62706<br>(217)535-1060<br>emadiar@senatedem.ilga.gov | representing | **Secretary of Senate Jillayne Rock<br>Senate President John J. Cullerton<br>Senator Kwame Raoul<br>Office of the IL Senate President<br>Andrew Manar<br>Lee LoBue<br>Noe Chaimongkol<br>Giovanni Randazzo<br>Amy Bowne<br>Illinois Senate<br>Illinois Senate Redistricting<br>Committee<br>Magen Ryan<br>Ronald Holmes<br>AJ Sheehan<br>Deb McCarver<br>Ian Watts<br>Jade Huebner<br>Jeremy Flynn<br>Jill Dykhoff<br>Lee Whack<br>Monica Brar<br>Ted Pruitt<br>*(Movants)*** |

# EXHIBIT C

| | |
|---|---|
| **From:** | Mason, Andrew |
| **Subject:** | Governor Quinn Takes Bill Action**Friday, June 3, 2011** |
| **Date:** | Friday, June 03, 2011 3:58:47 PM |
| **Attachments:** | @ |



### OFFICE OF GOVERNOR PAT QUINN

# NEWS

**FOR IMMEDIATE RELEASE:**       **CONTACT:**       Annie Thompson
 (o. 217-782-7355; c. 217-720-1853)
Friday, June 3, 2011       Grant Klinzman    (o. 312-814-
3158; c. 217-299-2448)

# Governor Quinn Takes Bill Action
## **Friday, June 3, 2011**

CHICAGO – June 3, 2011. Governor Pat Quinn today took action on the following bill:

**Bill No.: SB 1177**
Creates the General Assembly Redistricting Act of 2011.
An Act Concerning: Redistricting
Action: Signed
Effective Date: Immediately

"Ensuring that everyone's voice is heard in government is crucial to our democracy. For the first time, the people of Illinois have been able to participate in public hearings and have their voices heard in drawing their legislative districts. I would like to commend lawmakers for significantly increasing openness and transparency in the remap process," said Governor Quinn. "I commend Sen. Kwame Raoul and Rep. Barbara Flynn Currie for their leadership in drafting a map that better represents the interest of our diverse communities."

### ###

<<       Bill Action Notice – 06.03.11 – RELEASE.pdf     (49.9KB)
         image001.png    (31.5KB)

(81.3KB)

# EXHIBIT D



FEDERAL ELECTION COMMISSION
Washington, DC  20463

May 30, 1985

CERTIFIED MAIL,
RETURN RECEIPT REQUESTED

ADVISORY OPINION 1985-14

Robert F. Bauer, Esq.
Perkins, Coie, Stone, Olsen & Williams
1110 Vermont Avenue, N.W.
Washington, D.C. 20005

Dear Mr. Bauer:

This responds to your letters of March 18 and April 9, 1985, requesting an advisory opinion on behalf of the Democratic Congressional Campaign Committee ("DCCC"), concerning application of the Federal Election Campaign Act of 1971, as amended ("the Act"), and Commission regulations to the allocation and reporting of expenditures for certain political advertisements.

DCCC is registered with the Commission as a party-related, multicandidate political committee. You state that DCCC is "[o]rganized and operated by Democratic members of the House of Representatives" and "functions broadly as a national party organization in support of Democratic candidates to the House, as well as other public offices around the country." You state that DCCC plans to initiate a program involving criticism of the records of individual Republican members of the House of Representatives and of the activities of Republican Members of Congress as a class. Some of these Republican members may not be announced candidates for the 1986 elections, while some will have qualified as candidates pursuant to the Act. See 2 U.S.C. 431(2).

You state that DCCC plans to focus its program in 20-100 selected congressional districts but may expand it to include all districts represented by Republicans. You add that DCCC's program will have "the clear purpose of influencing voter perceptions of these candidates with a view toward weakening their positions as candidates for re-election in 1986." You state that some of the proposed communications will refer to the next or the last election, while other communications will criticize a congressman's record without any reference to any election or without any express advocacy language. These communications will include television and radio

broadcasts, newspaper and other print advertising, and direct mail brochures. You propose to produce and disseminate these communications currently and in September 1985.[1]

In this context, you have provided the scripts for radio and television broadcasts and the text for a direct mail brochure:

"PLIERS AND TOILET SEATS" (Radio/TV)
Democratic Congressional Campaign Committee

Background: Loud laughter and applause

Voice No. 1: What's going on? What's so funny?

Voice No. 2: (laughing intermittently): Oh, that's the President getting a good laugh from the crowd in Washington, the Republicans in Congress. He says we should take care of the farm crisis by keeping the grain (begins to burst into uncontrolled laughter)-- and exporting the farmers!!!

Voice No. 1: (with anger): That's not funny at all; this farm crisis is real and endangering the very existence of family farms. People are really suffering.

Voice No. 1: Who cares? The Republicans sure don't. So just join the crowd and have a good laugh.

Announcer: But it is not a laughing matter. The President and his Republican supporters in Congress are enjoying this joke at the expense of the American farmer--but the last laugh is on you and on your children. And while the Republicans are breaking every election-year promise they ever made to the American farmer, they just look on and smile when multi-billion dollar defense contractors charge you--the taxpayer--$_____ for a pair of pliers and $_____ for a toilet seat. That's the real joke.

(Pause)

Announcer: Let your Republican Congressman know that you don't think this is funny.
(Or, in some ads: Let the Republicans in Congress know what you think about their sense of humor.)
[In some scripts, the text closes with "Vote Democratic"]

"Crumbling Foundation" (Radio/TV)
Democratic Congressional Campaign Committee

Sound: A crumbling, cracking sound of something "giving away."

Announcer (with sound in background): You read the newspaper nowadays and what do you find: stories about collapsing banks, people in a panic over the loss of their savings, federal and state government coming up with rescue plans and bailouts.

(Sound in background get louder)

Announcer: It all sounds too familiar, like 1932, but it's not then. It's now. And it's real.

(Sound in background increases in volume)

Announcer: The President and his Republican allies in Congress are all smiles, they tell us not to worry. But under their leadership, the budget deficit grows to monstrous proportions, Wall Street is nervous, the dollar begins to show signs of weakness.

(Sound comes to fore, very loud and then replaced by a moment of silence)

Announcer: We've seen all this before: let's make sure it doesn't happen again. Let your Republican Congressman (or in some ads, the Republicans in Congress) know that their irresponsible management of the nation's economy must end--before it's too late.

[In some scripts, the text closes with "Vote Democratic"]

SAMPLE MAILER
17 x 22/One Fold

Front Face
8 1/2 x 11

                                                    Bulk mail
                              Wave of the future?

                  [dye-cut; beautiful sunset; couple walking
                  in ocean surf/beach]

Inside                              Fold
17 x 22

                  The wave of the future could be an oil spill if
                  Cong. X has his way! [Picture of giant oil-
                  derrick in ocean ruins the lovely picture]

                  Text

                  List of X's contributions from oil industry
                  [Same couple on beach]

Back Cover
8 1/2 x 11

                  Don't be fooled by Republican rhetoric. Save our coastal
                  environment.

                  Let Congressman X know how you feel.

                  [In some scripts, the text closes with "Vote Democratic".]

You seek to determine whether DCCC's expenditures for these planned communications must be considered attributable contributions or expenditures under 11 CFR 106.1 and Advisory Opinion 1984-15. You have presented several specific questions:

1. Would broadcast advertisements and other general public communications (e.g. direct mail, leaflets, etc.) that specifically identify Republican congressmen and criticize their records, require allocation under 11 CFR 106.1(a) and AO 1984-15? Does the answer depend on whether the communications contain reference to "elections" or any "express advocacy" language?

2. Would broadcast advertisements and other general public communications that criticize the activities and record of Republican congressmen as a class require allocation under 11 CFR 106.1(a) and AO 1984-15 to the individual Democratic candidates, when ultimately nominated by the Democratic Party?

3. Does the answer to question 2 differ if DCCC directs these "generic" critiques to selected congressional districts?

DCCC's payments for these communications are reportable expenditures for the purpose of influencing Federal elections, and the sources of the funds used by DCCC to make these expenditures are subject to the limitations and prohibitions of the Act. See 2 U.S.C. 434, 441a, 441b, 441c, 441e, and 441f. Your questions relate to whether these expenditures are attributable to a specific candidate or candidates and, thus, subject to the Act's limitations on those contributions or expenditures made by DCCC.

You state that there may be no Democratic candidate, either announced or qualified under the Act, in the congressional districts selected to receive DCCC's proposed communications. Thus, the Commission assumes that DCCC's expenditures for these communications will not be made in cooperation or consultation with any candidate.[2] Instead, the Commission views your request as limited to the situation where expenditures for these communications are made without any consultation or cooperation, or any request or suggestion of, candidates seeking election to the House of Representatives in the selected districts.

In this context, the Act's limitations at 2 U.S.C. 441a(d) become relevant since the Commission has stated that expenditures pursuant to 2 U.S.C. 441a(d) may be made without consultation or coordination with any candidate and may be made before the party's general election candidates are nominated. See Advisory Opinion 1984-15.[3] This section permits "the national committee of a political party" to make additional expenditures, subject to certain specific dollar limitations, "in connection with the general election campaign of a candidate for" the House of Representatives "who is affiliated with such party." 2 U.S.C. 441a(d)(3).[4] A national committee of a political party, as defined at 2 U.S.C. 431(14), may designate the party's congressional campaign committee as its agent for purposes of making these expenditures, if such designation occurs before the designee committee makes the expenditures. See 11 CFR 110.7(a)(4); <u>FEC v. Democratic Senatorial Campaign Committee</u>, 454 U.S. 27, 28-29 (1981); First General Counsel's Report, MUR 1460.[5]

In Advisory Opinion 1984-15, the Commission considered the application of the limitations of 2 U.S.C. 441a(d) to expenditures for political advertising similar to DCCC's proposed communications. There, the Commission concluded that the limitations of 441a(d) would apply where the communication both (1) depicted a clearly identified candidate and (2) conveyed an electioneering message. See also Advisory Opinion 1978-46. Under the Act and regulations, a candidate is clearly identified if his or her name or likeness appears or if his or her identity is apparent by unambiguous reference. 2 U.S.C. 431(18); 11 CFR 106.1(d). Electioneering messages include statements "designed to urge the public to elect a certain candidate or party." United States v. United Auto Workers, 352 U.S. 567, 587 (1957); see Advisory Opinion 1984-62.

Both the "Pliers and Toilet Seats" and the "Crumbling Foundation" scripts offer two alternative taglines: one referring to "your Republican Congressman" and one referring to "the Republicans in Congress." You further state that some scripts will also close with a "Vote Democratic" statement. The Commission concludes that DCCC's expenditures for its proposed radio and television advertisements (with scripts as set forth in this opinion) that use the tagline, "the Republicans in Congress," either with or without the "Vote Democratic" statement (or other electioneering message), will not be subject to the Act's limitations. In addition, the Commission concludes that DCCC's expenditures for its proposed advertisements that use the tagline, "your Republican Congressman," without the "Vote Democratic" statement, will also not be subject to the Act's limitations. Instead DCCC may report these expenditures as operating expenditures. See 11 CFR 104.3(b). These conclusions also apply where the advertisements are directed to only selected congressional districts.

With respect to DCCC expenditures for the proposed radio and television advertisements that use the tagline, "your Republican Congressman," together with the "Vote Democratic" statement, the Commission considered alternative responses but on a tie vote was unable to agree whether such expenditures would or would not be subject to the Act's limitations and attributable pursuant to 11 CFR 106.1. See 11 CFR 112.4(a).

With regard to DCCC's proposed sample mailer, the Commission assumes that its references to "Cong. X" indicate that a specific congressman will be identified by name. The Commission also assumes that the mailer's dissemination may include part or all of the district represented by the identified congressman. The Commission concludes that DCCC's expenditures for producing and disseminating the mailer either with or without the "Vote Democratic" statement will be subject to the Act's limitations and attributable pursuant to 11 CFR 106.1.

You have indicated that DCCC's proposed program is for the purpose of influencing the 1986 election process and that these activities will be scheduled for approximately the next month and for September 1985. The Commission emphasizes that this opinion is limited to the timetable you have specified and does not address the implementation of the same or a similar program at some later date.

The Commission notes the foregoing discussion responds to the three questions you presented in your letter dated March 18, 1985.

This response constitutes an advisory opinion concerning application of the Act, or regulations prescribed by the Commission, to the specific transaction or activities set forth in your request. See 2 U.S.C. 437f.

Sincerely yours,

(signed)

John Warren McGarry
Chairman for the Federal Election Commission


Enclosures (AOs 1984-62, 1984-15, 1980-119, and 1978-46)


1. Your request indicates a schedule of April and September 1985, but you also note that this proposed schedule as to April will be adjusted depending on the timing of the Commission's response to your request.

2. See 2 U.S.C. 441a(a)(7)(B)(i); 11 CFR 104.3(b) and 104.13(a).

3. This interpretation is consistent with the reporting requirements. Expenditures made under 441a(d) and 11 CFR 110.7 are reported as expenditures by the committee making them. 11 CFR 104.3(b)(3)(viii). The candidate on whose behalf such expenditures are made, however, does not report these expenditures as contributions. 11 CFR 104.3(a)(3)(iii).

4. Party political committees are incapable of making independent expenditures. 11 CFR 110.7(a)(5) and (b)(4); Advisory Opinions 1984-15 and 1980-119; General Counsel's Report, MUR 273.

5. For purposes of this advisory opinion, the Commission assumes that DCCC is or will be the designated agent of the national committee of the Democratic Party for the purpose of making expenditures pursuant to 2 U.S.C. 441a(d)(3). This expenditure limitation is in addition to the limitation on contributions by DCCC pursuant to 2 U.S.C. 441a(a)(2)(A). See 11 CFR 110.7(b)(3); H.R. Rep. No. 1057, 94th Cong., 2d Sess. 59 (1976), reprinted in Legislative History of the Federal Election Campaign Act Amendments of 1976, 1053 (GPO 1977).

# EXHIBIT F

# UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS
## EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BRENZINSKI, and LAURA WAXWEILER | ) ) ) ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No. 11 C 5065 |
| ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLTZ, and ERNEST L. GOWEN, | ) ) ) ) ) ) ) ) | Judge John Daniel Tinder Judge Robert L. Miller Judge Joan Humphrey Lefkow |
| Defendants. | ) | |

## OPINION AND ORDER

This matter is before the court on plaintiffs' motion to compel enforcement of third party subpoenas [Dkt. No. 52] and certain non-parties' motion to quash subpoenas and for a protective order [Dkt. No. 58]. The motions raise legislative privilege issues rarely addressed by the courts because they pertain to the redistricting activity that follows each decennial census. For this reason, this opinion is more lengthy than the typical ruling on discovery issues.

## BACKGROUND

The United States Constitution requires Illinois lawmakers to redraw the state's congressional district boundaries after each decennial census.  U.S. CONST. ART. I, § 2; *id.* amend. XIV, §§ 1 & 2; *id.* AMEND. XV; *Ryan* v. *State Bd. of Elections of State of Ill.*, 661 F.2d 1130, 1132 (7th Cir. 1981).  Pursuant to this authority, the Illinois General Assembly drafted, debated, and passed the Illinois Congressional Redistricting Act of 2011 (the "Redistricting Act") (P.A. 97-14).  The Redistricting Act eliminates one congressional seat, as required by the 2010 United States Census results, and establishes boundaries for the state's eighteen remaining congressional districts.

Beginning on March 28, 2011, and continuing through May 2, 2011, members of the Illinois House of Representatives and the Illinois Senate held a series of public hearings at locations around the state where members of the public were allowed to comment on the redistricting process.  *See* 10 Ill. Comp. Stat. 125/10-5.  On May 27, 2011, the Democratic leadership of the Illinois House and Senate Redistricting Committees released the congressional redistricting plan ("2011 Map") on its website.  Three days later, the Illinois House of Representatives passed the Redistricting Act, and the next day the Illinois Senate followed suit.  On June 24, 2011, the Governor signed the Redistricting Act into law, and the present litigation ensued.

The plaintiffs comprise three groups: The Committee for a Fair and Balanced Map, a not-for-profit organization created by Illinois citizens concerned about the congressional redistricting process in Illinois; nine Republican Congressmen and one Republican Congresswoman; and six registered voters, four of whom are identified as Latino and two as Republican (collectively

2

"plaintiffs"). The defendants include the Illinois State Board of Elections, the agency charged with implementing the 2011 Map, and its individual members (collectively "defendants").

Plaintiffs allege that the 2011 Map discriminates against Latino and Republican voters, and they seek to invalidate the redistricting plan in whole or in part. Specifically, plaintiffs allege that the 2011 Map violates the Voting Rights Act of 1965, 42 U.S.C. § 1973 ("VRA") (Count I), the Fourteenth Amendment (Count II) and the Fifteenth Amendment (Count III) by diluting the voting strength of Latino voters. Plaintiffs also claim that the 2011 Map constitutes an impermissible racial gerrymander in violation of the Fourteenth Amendment (Count IV) and a partisan gerrymander in violation the First Amendment (Count V) and Fourteenth Amendment (Count VI).

The parties have engaged in expedited discovery. Pursuant to Federal Rule of Civil Procedure 45, plaintiffs served thirty subpoenas *duces tecum*[1] on a number of non-party entities and individuals, including the (i) Illinois House of Representatives (through Tim Mapes, Chief of Staff); (ii) Office of the Speaker of the Illinois House of Representatives (through Tim Mapes, Chief of Staff); (iii) Illinois House Redistricting Committee (through Barbara Flynn Currie, Chairperson); (iv) Illinois Senate (through Jillayne Rock, Secretary of the Senate); (v) Office of the Senate President (through Andrew Manar, Chief of Staff); (vi) Illinois Senate Redistricting Committee (through Kwame Raoul, Chairperson); and (vii) various legislative staffers with knowledge of the reapportionment scheme (collectively "Non-Parties"). The subpoenas contain

---

[1] The United States District Court for the Central District of Illinois issued twenty-five of the thirty subpoenas served by plaintiffs because most of subpoenaed witnesses reside in Springfield, Illinois. The remaining five subpoenas were issued by the United States District Court for the Northern District of Illinois. According to Non-Parties, the Northern District of Illinois subpoenas capture all of the documents within the scope of the Central District of Illinois subpoenas, including those possessed by the Illinois House and Senate Redistricting Committees and individual staff members.

twenty-one requests for production encompassing documents and communications related to the 2011 Map. Non-Parties refused to comply with plaintiffs' requests, claiming that legislative immunity, the deliberative process privilege, the attorney-client privilege and/or the work-product doctrine protect the documents from disclosure.

On September 15, 2011, plaintiffs filed a motion to compel enforcement of the third party subpoenas. The next day, the President of the Illinois Senate, the Speaker of the Illinois House of Representatives, and the chairpersons of the Illinois House and Senate Redistricting Committees moved to quash. Each party was allowed to file a response and this three-judge court heard arguments on September 29, 2011.

## ANALYSIS

### I. Relevance of Requested Discovery

Plaintiffs have served Non-Parties with twenty-one document requests.

### A. Requested Documents

Plaintiffs seek a plethora of documents concerning the planning, development, negotiation, and drawing of the 2011 Map.[2] These documents can be broadly categorized as

---

[2] Plaintiffs' document requests include:

1. All documents related to the state of Illinois legislative and/or congressional redistricting process which led to the planning, development, negotiation, drawing, revision or re-drawing of the 2011 Map.
2. All documents, including, but not limited to, reports, analyses, election results or other election data, and communications pertaining or relating to the planning, development, negotiation, drawing, revision or re-drawing of the 2011 Map.
3. All documents regarding any communications, discussions, meetings and/or conversations, pertaining or relating to the planning, development, negotiation, drawing, revision or re-drawing of the 2011 Map with any of the following: Defendants; Democratic Congressional Campaign Committee or anyone else acting on its behalf; Illinois House and Senate Redistricting Committees; any member of the Illinois General Assembly or anyone acting on their behalf; any current or former member of Congress

(continued...)

4

$^2$(...continued)

and anyone acting on their behalf; any interest groups that testified at the redistricting hearings.

4. All documents, communications or other matter, including all data files or other data type related to election and/or voter data; election redistricting software; and all 2010 Census data used for the purpose of planning and drawing the 2011 Map or any other potential congressional plan that was not adopted.

5. All documents, communications or other matter, that constitute, refer or relate to data files and drafts of data files used to formulate the composition of Districts 3, 4, 5 of the 2011 Map.

6. Any draft drawings of any Districts of the 2011 Map.

7. All documents which reflect the identity of any and all persons who assisted in the drawing of Districts 3, 4, and 5 of the 2011 Map.

8. All documents which reflect when the planning and drawing of Districts 3, 4, and 5 of the 2011 Map were finalized.

9. All documents which reflect the identity of person(s) who made or participated in the decision to have the Latino Voting Age Population ("VAP") in District 3 as 24.64%.

10. All documents which reflect the identity of person(s) who made or participated in the decision to have the Latino VAP in District 4 as 65.92%.

11. All documents which reflect the identity of person(s) who made or participated in the decision to have the Latino VAP in District 5 as 16.05%.

12. All documents which reflect the identity of any expert or consultant who reviewed, commented on, advised or otherwise rendered any advice or opinion concerning the 2011 Map.

13. All documents which reflect the identity of any expert or consultant who conducted any racial bloc voting or racial polarization analysis concerning the 2011 Map.

14. Documents which reflect any racial bloc voting or racial polarization analysis conducted by any expert or consultant.

15. All documents or communications pertaining or relating to any analysis, review, study or consideration undertaken by any expert, consultant, scholar or other person regarding whether the 2011 Map complies with the VRA, the U.S. Constitution, or the Illinois Constitution.

16. All documents which consist of reports or opinions of any expert or consultant used to support the composition of the entire 2011 Map.

17. All documents which reflect any and all analysis concerning the viability of drawing two Latino congressional Districts, whether the Districts be considered majority or influence districts.

18. Any engagement letters provided to experts or consultants engaged for the purposes of planning, preparing, drawing, and analyzing or providing supporting evidence for the 2011 Map.

19. All records of payment to any experts or consultants.

20. All documents identifying any person(s) involved in the decision to post the proposed congressional plan on the Illinois Senate website during the early morning hours of May 27, 2011.

21. All documents identifying any person(s) who actually posted the congressional plan on

(continued...)

5

(1) information concerning the motives, objectives, plans, reports, and/or procedures used by lawmakers to draw the 2011 Map;[3] (2) information concerning the identities of persons who participated in decisions regarding the 2011 Map;[4] (3) the identities of experts and/or consultants retained to assist in drafting the 2011 Map and contractual agreements related thereto;[5] and (4) objective facts upon which lawmakers relied in drawing the 2011 Map.[6]

## B.    Relevancy of Requested Documents

Under Rule 26 of the Federal Rules of Civil Procedure, parties may obtain discovery of any nonprivileged matter that is relevant to any party's claim or defense.  Plaintiffs make six claims related to the 2011 Map.  *See* Compl. ¶¶ 108–38.  Proof of discriminatory intent is required for plaintiffs to prevail on their Fourteenth and Fifteenth Amendment racial discrimination claims.[7]  It has also been found sufficient, though not necessary, to sustain a VRA claim.  *See United States* v. *Irvin*, 127 F.R.D. 169, 171 (C.D. Cal. 1989) (after the 1982 amendments to the VRA, "plaintiffs may carry their burden by fulfilling *either* the more restrictive intent test or the results test") (internal quotation marks and citations omitted); *accord Garza* v. *County of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990).

---

[2](...continued)
    the Illinois Senate website during the early morning hours of May 27, 2011.

[3]*See* Req. Nos. 1–6, 8, 14–17. [Doc. No. 52-1.]

[4]*See* Req. Nos. 7, 9–11, 20–21. [Doc. No. 52-1.]

[5]*See* Req. Nos. 12–13, 18–19. [Doc. No. 52-1.]

[6] *See* Req. Nos. 2 & 4. [Doc. No. 52-1.]

[7] The test for plaintiffs' partisan gerrymandering claims is unsettled.  *See Vieth* v. *Jubelirer*, 541 U.S. 267, 124 S. Ct. 1769, 158 L. Ed. 2d 546 (2004).

To demonstrate intentional discrimination, however, plaintiffs need not offer direct evidence of discriminatory intent. Direct evidence includes statements made by the decision making body or members thereto. *See, e.g., ACORN* v. *County of Nassau*, No. 05-2301, 2007 WL 2815810, at *3 (E.D.N.Y. Sept. 25, 2007) (*ACORN I*) ("testimony regarding a legislator's stated motivation might be the most direct form of evidence" of discriminatory intent.) Instead, plaintiffs may rely on circumstantial evidence to show that lawmakers purposefully discriminated against Latino and/or Republican voters in enacting the 2011 Map. *See Ketchum* v. *Byrne*, 740 F.2d 1398, 1406 (7th Cir. 1984) ("In *Rogers*, the [Supreme] Court affirmed the district court's finding of intentional discrimination based on indirect and circumstantial evidence and endorsed its reliance on a 'totality of the circumstances' approach.") (citing *Rogers* v. *Lodge*, 458 U.S. 613, 622–27, 102 S. Ct. 3272, 73 L. Ed. 2d 1012 (1982)).

For example, to evaluate claims of racial vote dilution under the Fourteenth Amendment, courts rely on the totality of the circumstances test. *See Rogers*, 458 U.S. at 618. Under this test, courts may infer discriminatory intent from a variety of circumstantial factors. These factors include, but are not limited to, bloc voting along racial lines; low minority voter registration; exclusion from the political process; unresponsiveness of elected officials to needs of minorities; and depressed socio-economic status attributable to inferior education and employment and housing discrimination. *Ketchum*, 740 F.2d at 1406 (citing *Rogers*, 458 U.S. at 622–27). Other factors include the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; minority retrogression (i.e. a decrease in the voting strength of a cohesive voting bloc over time); and manipulation of district boundaries to adjust the relative size of minority groups, including

7

the "packing" of minority voters. *See Village of Arlington Heights* v. *Metro. Housing Dev. Corp.*, 429 U.S. 252, 267–68, 97 S. Ct. 555, 50 L. Ed. 2d 450 (1977); *Rybicki* v. *State Bd. of Elections*, 574 F. Supp. 1082, 1108–12 (N.D. Ill. 1982). Thus, under the totality of the circumstances test, the court may infer an "invidious discriminatory purpose . . . from the totality of the relevant facts," including the discriminatory effect of the redistricting scheme. *Rogers*, 458 U.S. at 618 (citation omitted).

Plaintiffs allege many of these circumstantial factors in their Complaint. *See* Compl. ¶¶ 38–45 (events leading up to enactment); ¶ 60 (history of discrimination); ¶¶ 52–54 (manipulating district boundaries); ¶ 57 (racial polarization of elections). Yet many of plaintiffs' document requests solicit direct, not circumstantial, evidence of legislative intent, by demanding documents that contain communications between lawmakers and their staff. *See, e.g.,* Req. Nos. 1–5 & 8. These documents are likely to contain the motives, impressions and/or opinions of those responsible for drafting the 2011 Map. Other requests seek the identities of those who made or participated in key decisions, suggesting an attempt by plaintiffs to gain insight to the thought processes of these individuals, if not now, then perhaps later through depositions. *See, e.g.,* Req. Nos. 7, 9–13.

To be sure, statements made by members of the decision-making body are relevant to show discriminatory intent. *See Village of Arlington Heights*, 429 U.S. at 268. But this is but one factor among many that plaintiffs may use to prove their claims. As acknowledged by the Supreme Court,

> Inquiries into congressional motives or purposes are a hazardous matter. When the issue is simply the interpretation of legislation, the Court will look to statements by legislators for guidance as to the purpose of the legislature, because the benefit to sound decision-making in this circumstance is thought sufficient to risk the

8

possibility of misreading Congress' purpose. It is entirely a different matter when we are asked to void a statute that is, under well-settled criteria, constitutional on its face, on the basis of what fewer than a handful of Congressmen said about it. What motivates one legislator to make a speech about a statute is not necessarily what motivates scores of others to enact it, and the stakes are sufficiently high for us to eschew guesswork.

*Hunter* v. *Underwood*, 471 U.S. 222, 228, 105 S. Ct. 1916, 85 L. Ed. 2d 222 (1985) (quoting

*United States* v. *O'Brien*, 391 U.S. 367, 383–84, 88 S. Ct. 1673, 1682–1683, 20 L. Ed. 2d 672

(1968)); *see also Palmer* v. *Thompson*, 403 U.S. 217, 224, 91 S. Ct. 1940, 29 L. Ed. 2d 438

(1971) ("no case in this Court has held that a legislative act may violate equal protection solely

because of the motivations of the men who voted for it"); *Hispanic Coalition on*

*Reapportionment* v. *Legislative Reapportionment Comm.*, 536 F. Supp 578, 586 (D. Pa. 1982)

(holding that discriminatory statements made by the chairman of a city redistricting committee

were insufficient to prove discriminatory intent absent a showing that the state legislative body

adopted the chairman's views). Thus, the individual motivations and objectives of those who

drafted the 2011 Map, although relevant, are not critical to the outcome of this case.

The remainder of plaintiffs' document requests pertain to facts, plans, reports or

procedures created, formulated or used by lawmakers to draft the 2011 Map. Objective facts,

such as United States Census reports and election returns, are highly relevant to plaintiffs' claims

and necessary to prove many of the totality of the circumstances factors, including racial bloc

voting, retrogression and manipulation of district boundaries. The actual facts upon which

lawmakers relied, however, are less relevant because they say little as to whether the overall

effect of the 2011 Map is discriminatory. Lawmakers may have considered a lot of facts and

drawn a discriminatory map, or considered no facts and drawn a perfectly constitutional map.

The proof, so they say, is in the pudding; and the pudding is the 2011 Map.

9

Finally, to the extent that the plans, reports and procedures used by lawmakers to draw the 2011 Map shed light on the sequence of events leading up to its enactment, this information may be relevant to plaintiffs' claims.  The most important events, however, are those undertaken by the legislative body, such as public hearings, committee meetings and floor debates.  The deliberations of individual lawmakers, even those who helped draw the 2011 Map, are less probative of the totality of the circumstances test.  Nevertheless, because most of plaintiffs' requests seek material relevant within Rule 26, the court will consider whether any of these documents are privileged from disclosure.

## II.     Identification of Nonprivileged Matter

The issue before this court is the extent to which legislative immunity shields non-party state lawmakers from providing evidence in a civil lawsuit related to their legislative activities.  Plaintiffs argue that the privilege is qualified and narrow.  Non-Parties argue that it is absolute.

### A.     Absolute Legislative Immunity

The Speech or Debate Clause of the United States Constitution grants federal lawmakers absolute legislative immunity from civil suit for their legitimate legislative activities. The Clause states that "for any Speech or Debate in either House," Senators and Representatives "shall not be questioned in any other Place."  U.S. CONST. ART. I, § 6, cl. 1.  When applied, this provision shields federal lawmakers "engaged in the sphere of legitimate legislative activity" from being sued for prospective relief or damages.  *Supreme Ct. of Va.* v. *Consumers Union of U.S.*, 446 U.S. 719, 732, 100 S. Ct. 1967, 64 L. Ed. 2d 641 (1980) (quoting *Tenney* v. *Branhove*, 341 U.S. 367, 376, 71 S. Ct. 783, 95 L. Ed. 1019 (1951)).  It also mandates an evidentiary privilege that  prevents the legislative acts of a member of Congress from being used against him

10

or her in court. *See United States* v. *Helstoski*, 442 U.S. 477, 488–89, 99 S. Ct. 2432, 61 L. Ed. 2d 12 (1979). Finally, it provides a testimonial privilege that protects a member or the member's aides from judicial questioning regarding the member's legislative acts. *Gravel* v. *United States*, 408 U.S. 606, 616, 92 S. Ct. 2614, 33 L. Ed. 2d 583 (1972). "In sum, the Speech or Debate Clause prohibits inquiry . . . into those things generally said or done in the House or the Senate in the performance of official duties and into the motivation for those acts." *United States* v. *Brewster*, 408 U.S. 501, 512, 92 S. Ct. 2531, 33 L. Ed. 2d 507 (1972).

The Speech or Debate Clause, by its terms, does not apply at all to state and local legislators. *See, e.g., Fla. Ass'n of Rehab. Fac., Inc.* v. *State of Fla. Dep't of Health & Rehab. Servs.,* 164 F.R.D. 257, 266 (N.D. Fla. 1995). Instead, the federal common law applies.[8] Applying the federal common law, the Supreme Court in *Tenney* held that members of a state legislative committee were immune from civil liability for allegedly violating an individual's civil rights by calling him before the committee to testify in an effort to interfere with his First Amendment rights. 341 U.S. at 376–77. Since *Tenney*, it is clear that under the federal common law "state and local officials are absolutely immune from federal suit for personal damages for their legitimate legislative activities." *Empress Casino Joliet Corp.* v. *Blagojevich*, 638 F.3d 519, 527 (7th Cir. 2011) (citations omitted), *partially vacated and decided on unrelated grounds by Empress Casino Joliet Corp.* v. *Balmoral Racing Club, Inc*., 651 F3d 799 (7th Cir. 2011); *see also Tenney*, 341 U.S. at 376–77. This immunity also extends to "legislative staff members, officers, or other employees of a legislative body, although it is considered less absolute as

---

[8] This case presents federal questions and therefore the federal common law applies. Fed. R. Evid. 501; *see generally* 3 WEINSTEIN'S EVIDENCE § 501.02[2][b][i] (1997) (in federal question cases, federal privilege law, rather than the privilege law of the forum state, generally applies).

applied to these individuals." *Marylanders for Fair Representation, Inc.* v. *Schaefer*, 144 F.R.D. 292, 298 (D. Md. 1992) (internal quotation marks and citations omitted).

The scope of the federal common law is not entirely settled, however. The Supreme Court has held that in a federal criminal prosecution, a state legislator did not have an absolute evidentiary privilege based in legislative immunity from introduction of evidence of his legislative acts. *United States* v. *Gillock*, 445 U.S. 360, 373, 100 S. Ct. 1185, 63 L. Ed. 2d 454 (1980). *Gillock* carved out an exception from *Tenney*, reasoning that "the cases in this court which have recognized an immunity from civil suit for state officials have presumed the existence of federal criminal liability as a restraining factor on the conduct of state officials." 445 U.S. at 372. *See Fla. Ass'n of Rehab. Fac., Inc*, 164 F.R.D. at 267 ("legislators and some of their staff members may be immune to civil process in a suit directly against them . . . [but this immunity] is not an evidentiary privilege").

Since *Gillock*, a number of courts have "rejected the notion that the common law immunity of state legislators gives rise to a general evidentiary privilege." *Manzi* v. *DiCarlo*, 982 F. Supp. 125, 129 (E.D.N.Y. 1997) (citations omitted); *see Cano* v. *Davis*, 193 F. Supp. 2d 1177, 1180 (C.D. Cal. 2002) ("state legislators do not enjoy the type of absolute protection afforded members of the Congress under the Speech or Debate Clause"); *In re Grand Jury*, 821 F.2d 946, 957 (3d Cir. 1987) ("Neither the threat of harassment, the dangers of distraction, nor the potential disruption of confidential communications justifies a qualified privilege for the full range of legislative activities normally protected by the Speech or Debate Clause.").

The issue before this court is whether common law legislative immunity absolutely shields non-party state lawmakers from providing evidence in a civil lawsuit related to their

legislative activities.  Given the federal interests at stake in redistricting cases, this court

concludes that common law legislative immunity does not entirely shield Non-Parties here.  In

*Gillock*, the Supreme Court noted that "where important federal interests are at stake, such as in

the enforcement of federal criminal statutes, comity yields."  445 U.S. at 373.  The federal

government's interest in enforcing voting rights statutes is, without question, important.  *See,*

*e.g.*, *Irvin*, 127 F.R.D. at 174 ("The federal interest in the present case is compelling.  The

Voting Rights Act forbids local practices that abridge the fundamental right to vote. This Act

requires vigorous and searching federal enforcement."); *Bartlett* v. *Strickland*, 556 U.S. 1, ----,

129 S. Ct. 1231, 1240, 173 L. Ed. 2d 173 (2009) ("Passage of the Voting Rights Act of 1965 was

an important step in the struggle to end discriminatory treatment of minorities who seek to

exercise one of the most fundamental rights of our citizens:  the right to vote.").  Voting rights

cases, although brought by private parties, seek to vindicate public rights.  In this respect, they

are akin to criminal prosecutions.  Thus, much as in *Gillock*, "recognition of an evidentiary

privilege for state legislators for their legislative acts would impair the legitimate interest of the

Federal government."  *Gillock*, 445 U.S. at 373.

Moreover, the Supreme Court has stated that evidentiary privileges must be "strictly

construed" and accepted "only to the very limited extent that permitting a refusal to testify or

excluding relevant evidence has a public good transcending the normally predominant principle

of utilizing all rational means for ascertaining truth."  *Trammel* v. *United States*, 445 U.S. 40, 50,

100 S. Ct. 906, 63 L. Ed. 2d 186 (1980) (citation omitted).  This court therefore does not find in

the common law an absolute immunity for non-party state lawmakers that protects them from

13

producing documents in federal redistricting cases.  Instead, Non-Parties' privilege claims are best analyzed under the doctrine of legislative privilege.

### B.     Legislative Privilege

Other courts in different contexts have applied a qualified legislative privilege to protect state lawmakers from producing documents related to their legislative activities.  This privilege is similar to the deliberative process privilege, which is also qualified, but the deliberative process privilege applies to the executive branch, not the legislature.  The legislative privilege does not shield lawmakers from being sued, but rather protects them from producing documents in certain cases.  *See Lindley* v. *Life Ins. Co. of Am.*, No. 08-CV-379, 2009 WL 2245565, at *9 (N.D. Okla. Jul. 24, 2009) ("Generally, legislators' immunity from suit is referred to as 'legislative immunity,' and the evidentiary privilege accorded legislators is referred to as the 'legislative privilege.'").  Under the federal common law, legislative privilege is qualified, not absolute, and may be overcome by a showing of need.  *In re Grand Jury*, 821 F.2d at 958; *Joseph's House & Shelter, Inc.* v. *City of Troy, N.Y.*, 641 F. Supp. 2d 154, 158 n.3 (N.D.N.Y. 2009).

In determining whether and to what extent a state lawmaker may invoke legislative privilege, the court will consider the following factors: (i) the relevance of the evidence sought to be protected; (ii) the availability of other evidence; (iii) the seriousness of the litigation and the issues involved; (iv) the role of the government in the litigation; and (v) the possibility of future timidity by government employees who will be forced to recognize that their secrets are violable.  *Rodriguez* v. *Pataki*, 280 F. Supp. 2d 89, 101 (S.D.N.Y. 2003) (citing *In re Franklin Nat'l Bank Secs. Litig.*, 478 F. Supp. 577, 583 (E.D.N.Y. 1979)); *see also ACORN* v. *County of*

14

*Nassau*, No.05-2301, 2009 WL 2923435, at *2 (E.D.N.Y. Sept. 10, 2009) (*ACORN II*); *Joseph's*

*House & Shelter, Inc*, 641 F. Supp. 2d at 158 n.3.  In considering these factors, the court's goal is

to determine whether the need for disclosure and accurate fact finding outweighs the

legislature's "need to act free of worry about inquiry into [its] deliberations."  *ACORN II*, 2009

WL 2923435, at *2 n.2.[9]

## C.   Balancing of Interests

### 1.   The Seriousness of the Litigation and the Issues Involved, and the Role of the Government in the Litigation

In balancing the relevant interests, the first two factors weigh in favor of disclosure.

There can be little doubt that plaintiffs' allegations are serious.  Plaintiffs raise profound

---

[9] These factors are also used by some courts to evaluate the availability and scope of the deliberative process privilege.  *See, e.g., Doe* v. *Nebraska*, Nos. 8:09CV456, 4:09CV3266, 4:10CV3005, ----F. Supp. 2d----, 2011 WL 1480483, at *7 (D. Neb. Apr. 19, 2011).  The deliberative process privilege prohibits discovery of communications that are used by governmental bodies in formulating policy. *United States* v. *Farley*, 11 F.3d 1385, 1389 (7th Cir. 1993).  The key difference between the deliberative process privilege and the legislative privilege is that the former protects executive and administrative deliberations, and the latter safeguards legislative independence.  *See Kay* v. *City of Rancho Palos Verdes*, No. CV 02-3922, 2003 WL 25294710, at *15 (C.D. Cal. Oct. 10, 2003).

Some courts considering the scope of the deliberative process privilege have applied the same legislative privilege factors discussed herein.  *See, e.g, Doe*, 2011 WL 1480483, at *7; *Kay*, 2003 WL 25294710, at *18.  In this respect, "the balancing tests that courts have suggested for challenges to both the legislative privilege and the deliberative process privilege are quite similar and functionally interchangeable."  *Kay*, 2003 WL 25294710, at *17 (collecting cases).

Several cases in the Northern District of Illinois, however, have required a particularized showing to invoke the deliberative process privilege.  *See, e.g., Buonauro* v. *City of Berwyn*, No. 08-C-6687, 2011 WL 2110133, at *2 (N.D. Ill. May 25, 2011) ("In order to invoke the privilege, a party must show three elements: (1) the department head with control over the information has made a formal claim of privilege; (2) the responsible official must demonstrate, usually by affidavit, the reasons for preserving the confidentiality of the documents; and, (3) the official must specifically identify and describe the documents in question.") (citing *Ferrell* v. *U.S. Dep't Hous. & Urban Dev*., 177 F.R.D. 425, 428 (N.D. Ill.1998)); *see also Parvati Corp.* v. *City of Oak Forest,* No. 08-C-702, 2010 WL 2836739, at *5 (N.D. Ill. July 19, 2010).

Because Non-Parties are members of the legislative branch, not the executive branch, and because they have not made the particularized showing required to invoke the deliberative process privilege, the deliberative process privilege does not apply.  This court will consider cases in other courts analyzing the deliberative process privilege only to the extent that they bear on the scope of the legislative privilege.

15

questions about the legitimacy of the redistricting process and the viability of the 2011 Map. Moreover, the legislators' role in the allegedly unlawful conduct is direct. The General Assembly, through its members, aides and consultants, was primarily responsible for drafting, revising and approving the 2011 Map. These actions are under scrutiny. This is not, then, "the usual 'deliberative process' case in which a private party challenges governmental action . . . and the government tries to prevent its decision-making process from being swept up unnecessarily into [the] public [domain]." *United States* v. *Bd. of Ed. of City of Chicago*, 610 F. Supp 695, 700 (N.D. Ill. 1985). Rather, "the decisionmaking process . . . [itself] *is* the case," at least to the extent that plaintiffs allege that the General Assembly intentionally discriminated against Latino and/or Republican voters. *Id.* (emphasis in original). The seriousness of the litigation and the role of Non-Parties militate in favor of disclosure.

### 2. The Relevance of the Evidence Sought to be Protected and the Availability of Other Evidence

As discussed in Part I.B. the evidence plaintiffs seek is relevant, although it is not central to the outcome of this case. Moreover, the availability of other evidence favors non-disclosure. Plaintiffs already have considerable information at their fingertips. This includes public hearing minutes, special interest group position papers, statements made by lawmakers during debate, committee reports, press releases, newspaper articles, census reports, registered voter data and election returns. These documents and data are a matter of public record. As such, these factors weigh against disclosure.

### 3. The Possibility of Future Timidity by Government Employees

Finally, the need to encourage frank and honest discussion among lawmakers favors non-disclosure. Plaintiffs claim that disclosure of the subpoenaed documents will not unduly chill

16

legislators in their future communications because Non-Parties are not defendants in the present litigation and there is little danger that any discovered material would be used against them in a later criminal prosecution. Plaintiffs also claim that because this case involves redistricting—a task not oft performed by legislators—permitting discovery will not work to chill the day-to-day functioning of the legislature.

The Redistricting Act, however, evolved from the same legislative process as any other law. Legislators negotiated the law in private and debated it in public. Infrequency is therefore irrelevant. In addition, the need for confidentiality between lawmakers and their staff is of utmost importance. Legislators face competing demands from constituents, lobbyists, party leaders, special interest groups and others. They must be able to confer with one another without fear of public disclosure.

In this respect, the legislature is not unlike other branches of government. As noted by the Third Circuit, a "legislator's need for confidentiality is similar to the need for confidentiality in communications between judges, between executive officials, and between a President and his aides." *In re Grand Jury*, 821 F.2d at 957 (citations omitted); *see also Certain Complaints Under Investigation by an Investigating Comm. of the Judicial Council of the Eleventh Circuit*, 783 F.2d 1488, 1520 (11th Cir. 1986) (judicial privilege applies where matters under inquiry implicate communications among a judge and his staff concerning official judicial business such as "the framing and researching of opinions, orders and rulings"); *N.L.R.B.* v. *Sears, Roebuck & Co.*, 421 U.S. 132, 150, 95 S. Ct. 1504, 44 L. Ed. 2d 29 (1975) (executive privilege for agency officials applies to documents "reflecting advisory opinions, recommendations and deliberations

comprising part of a process by which governmental decisions and policies are formulated") (citation omitted).

Failure to protect confidential communications between lawmakers and their staff will not only chill legislative debate, it will also discourage "earnest discussion within governmental walls." *Doe*, 2011 WL 1480483, at *6 (citations omitted). In the redistricting context, full public disclosure would hinder the ability of party leaders to synthesize competing interests of constituents, special interest groups and lawmakers, and draw a map that has enough support to become law. This type of legislative horse trading is an important and undeniable part of the legislative process.

Courts have recognized that disclosure of confidential documents concerning intimate legislative activities should be avoided. *See Rodriguez*, 280 F. Supp. 2d at 102; *Kay*, 2003 WL 25294710, at *14. Courts applying this approach have held that a qualified privilege protects documents "created prior to the passage and implementation [of a bill] that involve opinions, recommendations or advice about legislative decisions between legislators or between legislators and their aides." *Doe*, 2011 WL 1480483, at *8; *see generally City of Las Vegas* v. *Foley*, 747 F.2d 1294, 1297 (9th Cir. 1984) ("The Court prevents inquiry into the motives of legislators because it recognizes that such inquiries are a hazardous task.") (citations omitted).

By limiting privileged documents to those that contain "opinions, recommendations or advice," courts have allowed discovery of "documents containing factually based information used in the decision-making process or disseminated to legislators or committees, such as committee reports and minutes of meetings." *Id.* at *6 (citations omitted). Courts have also required disclosure of "the materials and information available [to lawmakers] at the time a

18

decision was made." *ACORN I*, 2007 WL 2815810, at *4 (citing *Village of Arlington Heights*, 429 U.S. at n.20).

This approach strikes the proper balance between the need for public accountability and the desire to avoid future timidity of lawmakers. Although always accountable to the public, lawmakers must be able to confer in private. This court therefore concludes that the legislative privilege shields from disclosure pre-decisional, non-factual communications that contain opinions, recommendations or advice about public policies or possible legislation. It does not protect facts or information available to lawmakers at the time of their decision.

In terms of the categories identified above, (1) information concerning the motives, objectives, plans, reports and/or procedures used by lawmakers to draw the 2011 Map; and (2) information concerning the identities of persons who participated in decisions regarding the 2011 Map, the need for the information is outweighed by the purposes of the qualified privilege. The contrary is true of (3) the identities of experts and/or consultants retained to assist in drafting the 2011 Map and contractual agreements related thereto; and (4) objective facts upon which lawmakers relied in drawing the 2011 Map. Indeed, much of this information is discoverable under Rule 26(a)(2)(B)(ii) should defendants' experts chose to rely on it.


### D.    Waiver

As with any privilege, the legislative privilege can be waived when the parties holding the privilege share their communications with an outsider. *See ACORN I*, 2007 WL 2815810, at *4 ("the legislative privilege may be waived as to communications made in the presence of third parties") (citation omitted). "Where a legislative aide or staff member performs functions that

19

would be deemed legislative if performed by the legislator himself, the staff member is entitled to the same privilege that would be available to the legislator." *Id.* (citation omitted). Thus, communications between Non-Parties and their staff retain their privileged status. *See id.* at *5.

Communications between Non-Parties and outsiders to the legislative process, however, do not. This includes lobbyists, members of Congress and the Democratic Congressional Campaign Committee ("DCCC"). Although these groups may have a heightened interest in the outcome of the redistricting process, they could not vote for or against the Redistricting Act, nor did they work for someone who could. As such, the legislative privilege does not apply. *See Rodriguez*, 280 F. Supp. 2d at 101 ("a conversation between legislators and knowledgeable outsiders, such as lobbyists, to mark up legislation [is] a session for which no one could seriously claim privilege").

The same rule applies to experts and/or consultants retained or utilized by Non-Parties to assist in the redistricting process. "While legislators are certainly free to seek information from outside sources, they may not assume that every such contact is forever shielded from view. . . . [A] contrary ruling would allow a legislator to cloak any communication with legislative privilege by simply retaining an outsider in some capacity." *ACORN I*, 2007 WL 2815810, at *6. Thus, to the extent that Non-Parties relied on reports or recommendations generated by outside consultants to draft the 2011 Map, they waived their legislative privilege as to these documents.

Finally, Non-Parties cannot invoke the privilege as to themselves yet allow others to use the same information against plaintiffs at trial. *See, e.g., Brown* v. *City of Detroit*, 259 F. Supp. 2d 611, 623–24 (E.D. Mich. 2003); *Pacific Gas & Elec. Co.* v. *Lynch*, No. C-01-3023, 2002 WL

20

32812098, at *3 (N.D. Cal. Aug. 19, 2002).  As such, any communications disclosed by Non-Parties to defendants or their trial experts, upon which defendants or their experts intend to rely, must be disclosed to plaintiffs.  *See* Fed. R. Civ. P. 26(a)(2)(B)(ii).[10]

## ORDER

Plaintiffs' motion to compel enforcement of third party subpoena [Dkt. No. 52] and certain non-parties' motion to quash subpoenas and for a protective order [Dkt. No. 58] are granted in part and denied in part, respectively. Non-parties are directed to comply with this order by October 19, 2011, specifically as follows:

To the extent that plaintiffs seek documents containing the (1) motives, objectives, plans, reports and/or procedures created, formulated or used by lawmakers to draw the 2011 Map prior to the passage of the Redistricting Act;[11] or (2) identities of persons who participated in decisions regarding the 2011 Map,[12] their requests are denied and the subpoenas are quashed.  Plaintiffs are also prohibited from subpoenaing the aforementioned documents from individual members of the General Assembly unless the member affirmatively waives his or her legislative privilege in writing.

---

[10] Non-Parties indicated that to the extent the legislative privilege did not shield them from discovery, they would likely assert attorney-client privilege or work product immunity.  This decision addresses only the legislative privilege raised in the motions.  If Non-Parties have a serious basis for asserting any other privilege, this decision does not foreclose them.

[11] *See* Req. Nos. 1– 6, 8, 14–17. [Doc. No. 52-1.]

[12] *See* Req. Nos. 7, 9–11, 20–21. [Doc. No. 52-1.]

The motion to compel is granted and the motion to quash is denied as to documents containing objective facts upon which lawmakers relied in drawing the 2011 Map;[13] documents available to members of the General Assembly at the time the Redistricting Act was passed; the identities of experts and/or consultants retained by Non-Parties to assist in drafting the 2011 Map and contractual agreements related thereto;[14] and any documents that do not contain information concerning categories (1) or (2) above or to which Non-Parties have waived their legislative privilege.  This order is applicable only to those parties served with subpoenas issued by the Northern District of Illinois.

All documents withheld as privileged under this order shall be identified in a privilege log that contains (1) the name and capacity of each individual from whom or to whom a document was communicated; (2) the date of the document and attachments; (3) the type of document; (4) Bates number identification; and (5) a description of the subject matter in sufficient detail to allow the receiving parties to determine whether the privilege claim should be challenged.  *See Petrovic* v. *City of Chicago*, No. 06-C-611, 2007 WL 2410336, at *2 (N.D. Ill. Aug. 21, 2007).

Enter: October 12, 2011

___/s/ John Daniel Tinder_____
JUDGE JOHN DANIEL TINDER
United States Court of Appeals

---

[13] *See* Req. Nos. 2 & 4. [Doc. No. 52-1.]

[14] *See* Req. Nos. 12–13, 18–19.  [Doc. No. 52-1.]

22

for the Seventh Circuit

_____

JUDGE ROBERT L. MILLER
United States District Court
for the Northern District of Indiana

_____

JUDGE JOAN HUMPHREY LEFKOW
United States District Court
for the Northern District of Illinois

# EXHIBIT G

092911shimkusrough.TXT

```
 1          THE VIDEOGRAPHER:   Recording.

 2          For the record, my name is Jim Ross of

 3    Video Instanter.  I'm am the recording device

 4    operator for this deposition.  My business address

 5    is 161 North Clark Street, Suite 4975, Chicago,

 6    Illinois, 60601.

 7          This deposition is being videotaped

 8    pursuant to Illinois Supreme Court Rule 206 and all

 9    other applicable state and local rules.

10          We are at 70 West Madison Street, Chicago,

11    Illinois, Suite 550 (sic) to take the videotaped

12    deposition of John Shimkus in the matter of the

13    Committee for a Fair And Balanced Map, et al.,

14    versus the Illinois State Board of Elections,

15    et al., case number 11 5065 in the United States

16    District Court for the Northern District of

17    Illinois, Eastern Division.

18          Today's date is September 29th, 2011, and

19    the time is 10:35 a.m.  This deposition is being

20    videotaped on behalf of Plaintiff and is being

21    taken at the instance of Plaintiff.

22          Would the attorneys present please

23    introduce themselves for the record?

24          MR. BRUCE:  Devon Bruce on behalf of -- as
```
                                                        1

          **********   ROUGH ASCII    **********

.

```
 1    Special Assistant Attorney General on behalf of the

 2    Defendants.
```
                       Page 1

092911shimkusrough.TXT

3        THE VIDEOGRAPHER: Oh, sorry.

4        MS. DOUGLAS: Dana Douglas on behalf of

5  the Plaintiffs.

6        MS. LIGHTFOOT: Lori Lightfoot on behalf

7  of the Plaintiff and representing Congressman

8  Shimkus here today.

9        Just one point of clarification. This

10  deposition is not being taken pursuant to any state

11  court rules. This is a federal case and is being

12  taken pursuant to relevant Federal Rules of Civil

13  Procedure.

14        MR. BRUCE: I agree. And I think the

15  videographer simply -- the videographer simply

16  misspoke.

17        Okay. Can you swear the witness in,

18  please?

19        (The witness was duly sworn.)

20        MR. BRUCE: Let the record reflect that

21  this is the deposition of Congressman John Shimkus

22  taken pursuant to notice and agreed to by the

23  parties.

24        CONGRESSMAN JOHN SHIMKUS,

                                    2

      ********* ROUGH ASCII *********

.

1  called as a witness herein, having been first duly

2  sworn, was examined upon oral interrogatories, and

3  testified as follows:

4        DIRECT EXAMINATION

5  BY MR. BRUCE:

6    Q. Congressman, could you please state your

092911shimkusrough.TXT

14    that you referred to where Congressman Costello

15    told you what you've told us here today, did that

16    take place in a single conversation or more than

17    one conversation?

18        A.    More than one.

19        Q.    Okay.  Do you remember how many?

20        A.    Two or three.  Again, our conversations

21    are -- are frequent, numerous, every week on the

22    floor, at different locations.  We -- and -- and we

23    speak on numerous confidential issues weekly.

24        Q.    Have you told me everything that you can

                                                    52

        **********   ROUGH ASCII    **********

.

 1    remember about what Congressman Costello told you

 2    about the drawing of the map?

 3        A.    No.

 4        Q.    Okay.  What, if any, other conversations

 5    did you have with Congressman Costello about the

 6    drawing of the map?

 7        A.    The --

 8            MS. LIGHTFOOT:  Object to the form.  It's

 9    a slightly different question.

10    BY THE WITNESS:

11        A.    The -- Congressman Costello sought the

12    assistance of the DCCC to initially draw maps.

13    The -- Congressman Costello told me that more

14    specific information was not going to be provided

15    him by the DCCC because they didn't like the

16    direction that he was going in trying to have a

17    less partisan map.

                    Page 46

092911shimkusrough.TXT

18          Congressman Costello told me that that is

19     when Senator Durbin, Congressman Schakowsky, and

20     John Cullerton took over the process with the help

21     of the DCCC to draw the map that we have in front

22     of us.

23     BY MR. BRUCE:

24          Q.    Now have I exhausted your recollection of
                                                        53
          **********     ROUGH ASCII     **********

.


1      any conversation that you had with Congressman

2      Costello about the drawing of the map?

3          A.    This map in front of us, yes.

4          Q.    Okay.   Did you have any conversation with

5      Congressman Costello about the drawing of any other

6      map other than the map that's been labeled as tab 3

7      which was tasked by the Illinois legislature?

8          A.    Congressman Costello was working with the

9      DCCC and shared -- as I said in the previous

10     answer, parts of what has become this map with --

11     with gaps in it, that he shared with me.

12         Q.    Do you have a copy of those with you here

13     today?

14         A.    I personally don't have a copy.

15         Q.    Okay.   Did -- did Congressman Costello

16     give you any map that was different than the map

17     which is set forth as Exhibit Number 3?

18               MS. LIGHTFOOT:   Object to the form.

19     BY THE WITNESS:

20         A.    Congressman Costello gave me a map which

21     has some similarities, but there was opening.   I
                            Page 47