**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BREZINSKI, and LAURA WAXWEILER, | ) ) ) ) ) ) ) Case No. 1:11-CV-5065 ) ) Hon. John Daniel Tinder ) Hon. Robert L. Miller, Jr. ) Hon. Joan Humphrey Lefkow ) |
| Plaintiffs, v. | ) (3-judge court convened pursuant ) to 28 U.S.C. § 2284) ) |
| ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLZ, and ERNEST L. GOWEN, | ) ) ) ) ) ) ) ) |
| Defendants. | ) ) |

## AMENDED COMPLAINT

## I.     INTRODUCTION

1.     Without any of the promised public hearings, the State of Illinois has adopted a new map for the state's federal congressional districts (the "Proposed Congressional Plan") that blatantly discriminates against Latino and Republican voters.[1]   As a result of the Proposed

---

[1]     Images of the Proposed Congressional Plan—taken from the Illinois General Assembly's website at http://www.ilga.gov/CongressionalDistrictMaps/Statewide%20View.pdf and at http://www.ilga.gov/CongressionalDistrictMaps/Cook%20and%20Collar%20County%20View .pdf—are attached to this Amended Complaint as Exhibits A and B.   Images of the current congressional map—taken from the U.S. Geological Survey's National Atlas of the United States, available at http://nationalatlas.gov/printable/images/pdf/congdist/pagecgd112_il.pdf— are attached to this Amended Complaint as Exhibits C and D.   A table reflecting demographic

Congressional Plan, Latino voters are packed into a single congressional district racially gerrymandered to capture an unnecessarily excessive supermajority of Latino voters, so that the votes of Latinos inside and outside that district are unlawfully diluted. Similarly, the Proposed Congressional Plan—which the New York Times has called "[p]erhaps the most aggressive example of partisan maneuvering" to arise out of the 2010 national census[2]—effectively reverses the results of the 2010 congressional elections by redrawing districts so that the citizens of Illinois that gave Republicans an 11 to 8 advantage in Illinois's congressional delegation only one year ago would see the state's congressional delegation transformed to one with 12 Democrats and only 6 Republicans (with Illinois having lost one seat in national reapportionment). The law does not permit such obviously discriminatory gerrymandering.

2.      By packing excessive numbers of Latino voters into the proposed 4th congressional district, the Proposed Congressional Plan violates the Equal Protection Clause of the Fourteenth Amendment, the Fifteenth Amendment, and Section 2 of the Voting Rights Act of 1965, 42 U.S.C. § 1973. It sacrifices the interests of Latino voters in favor of preserving *and strengthening* white majorities in the proposed congressional districts that surround proposed District 4—proposed District 3 and proposed District 5. Packing Latino voters into proposed District 4 unnecessarily "wastes" the supermajority of Latino votes in that district, while also diluting the influence of Latino voters in proposed Districts 3 and 5. The Proposed Congressional Plan converts the District 4 that was created in 1991 in order to *provide* representation to Latinos into one that now *denies* effective representation to Latinos. That

---

information about the racial and ethnic composition of the proposed and current congressional districts is attached as Exhibit E.

[2]      Jennifer Steinhauer, *For Republicans, Redistricting Offers Few Gains*, New York Times, A12 (June 12, 2011).

intentional discrimination against Latino voters is precisely the kind of conduct outlawed by Section 2 of the Voting Rights Act, the Equal Protection Clause, and the Fifteenth Amendment.

3. District 4 of the Proposed Congressional Plan also independently violates the Equal Protection Clause of the Fourteenth Amendment because it is an intentional and unjustified racial gerrymander. The tortured "earmuff" shape of District 4, coupled with its extremely large Latino population and the judicially established facts about the creation of the district after the 1990 census, leave no doubt that race was the predominant factor in drawing the district and that the district therefore is a racial gerrymander. And even if there were a compelling state interest in creating such a district, proposed District 4 is not narrowly tailored to accomplish that interest. Given the current Latino voting age population in Cook County and nearby, the "earmuff" district no longer complies with the Fourteenth Amendment because there are other viable and constitutionally permissible alternatives to proposed District 4. The district, therefore, is unconstitutional.

4. The Proposed Congressional Plan also is a partisan gerrymander that violates the First Amendment and the Equal Protection Clause of the Fourteenth Amendment. The map as a whole and several individual districts in particular represent a flexing of Democratic political muscle in Springfield aimed at creating a Democratic majority in the Illinois congressional delegation, regardless of the actual preferences of the electorate demonstrated only one year ago. It dismantles traditional areas of Republican influence such as DuPage County, diluting that influence across multiple districts, many carefully connected to traditional areas of Democratic strength. At the same time, the map packs Republican incumbents into the same districts or squeezes Republican incumbents into Democratic-leaning districts with Democratic incumbents.

5.     The dismantling of Republican Congresswoman Judy Biggert's current congressional District 13 in Southern DuPage, Northern Will, and Southwestern Cook Counties is particularly striking.  Under the Proposed Congressional Plan, Republican-leaning portions of current District 13 are packed into proposed Districts 6 and 14.  The removal of those voters from current District 13 allows for the creation of proposed District 11, which is a blatantly gerrymandered, irregularly shaped district drawn with no apparent reason other than to encompass sufficient Democratic voters from Democratic strongholds such as Aurora and Joliet to create a new district with a manufactured Democratic majority.  Adding insult to injury, proposed District 5 sweeps in a curving hook from the Lake Michigan shoreline on the north side of Chicago around the Latino enclaves on Chicago's west side that are packed into proposed District 4 until it just catches Congresswoman Biggert's suburban Hinsdale home at its very tip.

6.     In short, as another New York Times article noted, "[n]o matter their repeated attempts to justify the jigsaw puzzle based on census changes, Democrats took a razor to their colleagues' domain.  They activated every switch at their disposal: clout, secrecy and spools of electronic data that guided block-by-block precision."[3]  That back-room precision was used both to disenfranchise Latino voters and to guide an outrageous partisan gerrymander.

7.     Plaintiffs therefore file this action seeking declaratory and injunctive relief to prevent the use of the Proposed Congressional Plan in any future elections.

## II.     JURISDICTION AND VENUE

8.     This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1331, 1343, and 1357.  Plaintiffs bring claims arising under the United States Constitution, 42 U.S.C. § 1983, and 42 U.S.C. § 1973 for violations of their civil rights and elective franchise.

---

[3]     Kristen McQueary, *Incumbents Carve Out a New Congressional Map*, New York Times, A17B (June 3, 2011).

9.      Venue is proper pursuant to 28 U.S.C. § 1391(b) because all defendants reside in Illinois and because some of the defendants reside in the Northern District of Illinois.  By Illinois law, Defendant Illinois State Board of Elections is required to maintain an office in the City of Chicago.  10 ILCS § 5/1A-11.  Pursuant to that requirement, the Illinois State Board of Elections maintains an office at 100 W. Randolph Street, Suite 14-100, Chicago, Illinois.  Illinois law also requires four board members of the State Board of Elections to be residents of Cook County.  10 ILCS § 5/1A-2.  Defendant board members Ernest Gowen, William McGuffage, Judith Rice, and Bryan Schneider reside in Cook County.

### III.     PARTIES

#### A.     Plaintiffs

10.     Plaintiff COMMITTEE FOR A FAIR AND BALANCED MAP is an independent not-for-profit organization created by Illinois citizens concerned about the Congressional redistricting process in Illinois.  The committee is comprised of the following members, who reside in the following congressional districts as noted: TOM LONG (current District 19, proposed District 13), TOM EWING (current District 15, proposed District 16), LARRY NELSON (current District 14, proposed District 14), J. DENNIS HASTERT (current District 14, proposed District 14), JAMES D. PEARSON (current District 14, proposed District 14), LYNN MARTIN, MICHAEL KEISER (current District 5, proposed District 5), and ALEXANDER D. STUART (current District 10, proposed District 10).

11.     Plaintiff RALPH RANGEL is Latino, a citizen, and a registered voter whose residence is located in proposed District 3 under the Proposed Congressional Map.

12.     Plaintiff LOU SANDOVAL is Latino, a citizen, and a registered voter whose residence is located in proposed District 3 under the Proposed Congressional Map.

13.    Plaintiff LUIS SANABRIA is Latino, a citizen, and a registered voter whose residence is located in proposed District 4 under the Proposed Congressional Map.

14.    Plaintiff MICHELLE CABALLERO is Latina, a citizen, and a registered voter whose residence is located in proposed District 5 under the Proposed Congressional Map.

15.    Plaintiff EDMUND BREZINSKI is a Republican, a citizen, and a registered voter who resides in current Congressional District 13 and would reside in proposed District 11 under the Proposed Congressional Map.

16.    Plaintiff LAURA WAXWEILER is a Republican, a citizen, and a registered voter who resides in current Congressional District 13 and would reside in proposed District 3 under the Proposed Congressional Map.

17.    Plaintiff PETER J. ROSKAM is the United States Congressman for current District 6.  He is a member of the Republican Party and would reside in proposed District 6 under the Proposed Congressional Plan.

18.    Plaintiff JOE WALSH is the United States Congressman for current District 8. He is a member of the Republican Party and would reside in proposed District 14 under the Proposed Congressional Plan.

19.    Plaintiff ROBERT J. DOLD is the United States Congressman for current District 10.  He is a member of the Republican Party and would reside in proposed District 9 under the Proposed Congressional Plan.

20.    Plaintiff ADAM KINZINGER is the United States Congressman for current District 11.  He is a member of the Republican Party and would reside in proposed District 2 under the Proposed Congressional Plan.

21. Plaintiff JUDY BIGGERT is the United States Congresswoman for current District 13. She is a member of the Republican Party and would reside in proposed District 5 under the Proposed Congressional Plan.

22. Plaintiff RANDY HULTGREN is the United States Congressman for current District 14. He is a member of the Republican Party and would reside in proposed District 14 under the Proposed Congressional Plan.

23. Plaintiff DONALD MANZULLO is the United States Congressman for current District 16. He is a member of the Republican Party and would reside in proposed District 16 under the Proposed Congressional Plan.

24. Plaintiff BOBBY SCHILLING is the United States Congressman for current District 17. He is a member of the Republican Party and would reside in proposed District 17 under the Proposed Congressional Plan.

25. Plaintiff AARON SCHOCK is the United States Congressman for current District 18. He is a member of the Republican Party and would reside in proposed District 18 under the Proposed Congressional Plan.

26. Plaintiff JOHN M. SHIMKUS is the United States Congressman for current District 19. He is a member of the Republican Party and would reside in proposed District 15 under the Proposed Congressional Plan.

### B. Defendants

27. Defendant ILLINOIS STATE BOARD OF ELECTIONS is the state agency required to "[s]upervise the administration of the registration and election laws throughout the State." 10 ILCS § 5/1A-8(12); Ill Const. 1970, art. III § 5. Among other duties, the Board must furnish "a manual of uniform instructions … which shall be used by election authorities"

throughout the state, 10 ILCS § 5/1A-8(3), prescribe "uniform forms, notices, and other supplies" to be used "in the conduct of elections and registrations," 10 ILCS § 5/1A-8(4), and "[r]eview and inspect procedures and records relating to conduct of elections and registration … and to report violations of election laws" to appropriate authorities. 10 ILCS § 5/1A-8(7). The Board has eight members, who are named as defendants below (collectively the "Individual Board Member Defendants").

28.     Defendant WILLIAM McGUFFAGE is the Chairman of the Illinois State Board of Elections. He is sued in his official capacity.

29.     Defendant JESSE R. SMART is the Vice Chairman of the Illinois State Board of Elections. He is sued in his official capacity.

30.     Defendant HAROLD D. BYERS is a member of the Illinois State Board of Elections. He is sued in his official capacity.

31.     Defendant BETTY J. COFFRIN is a member of the Illinois State Board of Elections. She is sued in her official capacity.

32.     Defendant ERNEST L. GOWEN is a member of the Illinois State Board of Elections. He is sued in his official capacity.

33.     Defendant JUDITH C. RICE is a member of the Illinois State Board of Elections. She is sued in her official capacity.

34.     Defendant BRYAN A. SCHNEIDER is a member of the Illinois State Board of Elections. He is sued in his official capacity.

35.     Defendant CHARLES W. SCHOLZ is a member of the Illinois State Board of Elections. He is sued in his official capacity.

## IV.    BACKGROUND

36.    As a result of the decennial national census (hereinafter "the 2010 Census") and congressional reapportionment, the State of Illinois lost one of its existing nineteen congressional districts.  Beginning in the next Congress, Illinois will have eighteen members of the United States House of Representatives.

37.    The Illinois General Assembly and the Governor of Illinois are charged with the duty to enact a plan for dividing the state into congressional districts.  In the 2010 elections, despite gains by Republicans in both chambers of the Illinois General Assembly, Democrats retained majority control of both the Illinois House of Representatives and the Illinois Senate. Additionally, the Democratic gubernatorial candidate won a very close election.  As a result, the Democratic Party enjoys unified partisan control of state government.

### A.    The Back-Room Process That Resulted In The Proposed Congressional Plan

38.    The Proposed Congressional Plan was drawn through backroom channels by Illinois's Democratic state legislative leaders, Illinois's Democratic members of the U.S. Congress, and the Democratic Congressional Campaign Committee ("DCCC") and its agents. With respect to areas represented by Republicans, their (privately) stated intent was to get "more Democratic pick-ups" and to "maximize Democratic performance." In other parts of the State, however, the mapmakers monitored and massaged the Latino voting age population in crucial districts they wanted to keep safe for white incumbents in the face of surging Latino populations.

39.    While the backroom mapmaking proceeded out of public view, members of the Illinois House of Representatives and the Illinois Senate held a series of hearings at locations around the state between March 28, 2011 and May 2, 2011 pursuant to 10 ILCS 125/10-5.  The hearings were conducted by the Illinois Senate Redistricting Committee and the Illinois House

Redistricting Committee. The chairpersons of those committees—State Senator Kwame Raoul, a Democrat, and House Majority Leader Barbara Flynn Currie, also a Democrat—controlled the conduct of the hearings.[4] Members of the public were permitted to comment, in theory, on the redistricting process and their respective communities of interest. However, pursuant to a rule established by the Democratic chairpersons of the committees, members of the public were not permitted to ask questions of the members of the Redistricting Committees. As stated by Senator Raoul at the first hearing after the state legislative map was released, "We're taking input today. We're not fielding questions."[5] In addition, during the purported public hearings, the Democratic-controlled committee never presented any draft or proposed congressional maps or redistricting plan for the public to consider.

40. With respect to the congressional reapportionment plan, numerous commenters urged that "it's crucial that input be heard after draft maps are released and when we can give specific feedback about how the lines will affect our communities."[6] Moreover, numerous citizen commenters, as well as Republican legislators, implored the Democratic leadership of the committees to release proposed maps at least one or two weeks before any vote would be taken,

---

[4]    See http://www.ilsenateredistricting.com.

[5]    Senator Kwame Raoul, Illinois State Senate Hearing (May 21, 2011), at 69.

[6]    http://www.ilga.gov/senate/Committees/Redistricting/Final%20Approved%20Transcript%20for%20Senate%20Redistricting%20Hearing%203.28.11.pdf, at 37. See also *id.* at 43 ("So that points to the need for meaningful considering of our input, not just now but also after draft maps are made available."). See also http://www.ilhousedems.com/redistricting/hearings/Champaign-April-16/Champaign041611.pdf, at 9 ("But if we don't come back here with a map prior to it being voted on so that you all citizens have a comment period on it, then this really would be for naught."); *id.* at 86 ("The public should be allowed to see and comment on any new map that is drawn by the General Assembly at least two weeks before they are voted on by the House and the Senate in this session of the General Assembly."); *id.* at 96 ("But at least two weeks before the vote, the map should be disclosed to the public.").

to allow for public comment.[7] Chairman Raoul pledged to do precisely that, stating "[i]t's my intention to, you know, as soon as there's a rendering of a map, to post that up so people can see that and so we can have hearings afterwards and so people can be informed."[8] Unfortunately, as set forth below, the Senator reneged on that pledge.

41. On May 18, 2011, the Democratic leadership of the Redistricting Committees released a proposed state legislative map on the Illinois Senate Redistricting Committee website. The congressional map was not released at that time. Redistricting Committees in the Illinois Senate and the Illinois House of Representatives held three hearings—on May 21, 22, and 24, 2011—on the proposed state map. During those meetings, several public commenters pleaded for the immediate release of the congressional map, to no avail.[9]

---

[7] http://www.ilga.gov/senate/Committees/Redistricting/Final%20Approved%20Transcript%20for%20Senate%20Redistricting%20Hearing%203.28.11.pdf, at 63 ("We'd like to call on the Senate Redistricting Committee and also the General Assembly to do three -- three of the following things: One is to present potential redistricting maps to the public at least one week before a vote so that communities can have interests and have their input."); *id.* at 79 ("And so, lastly, as was mentioned with our coalition, what we're calling on the General Assembly to do is present the potential redistricting maps at least a week before the vote so that we can provide input."); *id.* at 81 ("present potential redistricting maps to the public at least one week before a vote so that the communities can provide input"); *id.* at 89 ("While we appreciate the scheduling of these hearings to receive input, we think, as Senator Righter has pointed out, it is also critical to have hearings after the relevant legislative committees have developed their proposed maps and at least two weeks before any vote is taken.").

[8] *Id.* at 165.

[9] Rev. Alexander Sharp, CHANGE Illinois!, Illinois State Senate Hearing (May 21, 2011), at 73 ("We asked that the maps drafted by the legislative leaders and presented to lawmakers be posted on a Web site accessible to the general public. You did that on Thursday for the Senate maps and Friday afternoon for the House maps. There still is the question, where is the Congressional map?"); Whitney Woodward, Illinois Campaign for Political Reform, *id.* at 77 ("In addition, ICPR knows that General Assembly has yet to release the draft of Congressional districts for the public to review and offer changes. This, too, is unacceptable. Ten years ago, the General Assembly gave great deference to the Congressional Delegation in the drawing of its own districts. It is regrettable that history seems to be repeating itself as published reports have indicated that Illinois demographic [SIC, Democratic] congressmen are intimately involved with the map drawing process this time around and that the public has not been invited to sit in the audience, let alone the table."); Joceyln Woodards, Illinois Campaign for Accountable

42.     At approximately 4:00 a.m., in the early morning hours of Friday, May 27, 2011, only hours before the start of Memorial Day Weekend, the Democratic leadership of the Redistricting Committees released a proposed congressional district map, SB 1178, for the first time, posting the map on its website.  No public hearings were held.

43.     On Sunday, May 29, 2011, during Memorial Day Weekend, the Redistricting Committee of the Illinois House of Representatives passed SB 1178 on a straight party-line vote (6-4).  The next day the committee passed an amendment making a modest change to district lines in Southern Illinois.

44.     On Memorial Day, Monday, May 30, 2011, the full Illinois House of Representatives took up and passed the bill as amended on a straight party line vote (63-54, with one Republican voting present).  The House debate lasted approximately 40 minutes before a vote on the bill was called on an issue that will determine the rights of Illinois voters for the next decade.  In committee and on the House floor, Republican members of the House questioned why the Democratic leadership failed to have public hearings on the Congressional map, failed to explain why there was only one majority-Latino district, why the proposed districts appeared less compact than the current districts, and why the proposed districts divided recognized communities of interest.

45.     On Monday, May 30, 2011, just hours after the bill passed the House, the Redistricting Committee of the Illinois Senate passed the amended bill on a straight party-line vote (10-7).

---

Redistricting, Joint Illinois Senate and House Hearing (May 24, 2011), at 121, *available at* http://ilhousedems.com/redistricting/hearings/Springfield-May-24/95791redistrictinghrg 05242011FullSize.pdf ("Finally, while these proposals are for the State House and State Senate boundaries, the public still has not seen what this body is proposing with regard to the congressional map. We believe that the public deserves a chance to weigh in on that map also.").

46.     The full Senate passed the bill the next day, again on a straight party line vote (34-25).  At no time before the General Assembly passed SB 1178 into law did the Democrats controlling either chamber allow for any public comment on the actual Proposed Congressional Plan.

47.     On Friday, June 24, 2011, Illinois Governor Pat Quinn signed SB 1178 into law. The bill took effect immediately upon becoming law.

**B.     The Proposed Congressional Plan Disenfranchises Latino Voters by Packing Them into a Single Congressional District**

48.     According to the 2010 Census, Latinos are now the largest minority group in the State of Illinois.

49.     According to the 2010 Census, the total population for Illinois is 12,830,632.

50.     Of that total, the Latino population is 2,027,578, or 15.8%.

51.     The total population for the next largest minority group, African-Americans, is 1,866,414, or 14.5%.

52.     Latinos comprise a growing proportion of the population of Illinois and Cook County.  Statewide, Latinos have increased from 12.3% of all residents in 1990 to 15.8% in 2010.  In the same time period, the Latino population of Cook County has almost doubled, increasing from 13.6% in 1990 to 24.0% in 2010.

53.     Despite Illinois's large and growing Latino population, the Proposed Congressional Plan contains only one majority Latino district, District 4, out of the eighteen districts created.  Latinos make up 65.92% of the proposed District 4 voting age population and 71.07% of the total population, far more than is necessary to allow the election of a candidate who is the choice of Latino voters.  No other proposed district has a Latino voting age population

13

that exceeds 25% of the district's voting age population. But seven other districts have a Latino voting age population that exceeds 10%.

54.     The district with the next largest Latino population in the Proposed Congressional Plan is proposed District 3, which borders proposed District 4 on the south. Its voting age population is 24.64% Latino. That figure represents a reduction in the percentage of Latino voting age population in current District 3, which is currently 29.31% Latino. Congressman Dan Lipinski, who is white, represents current District 3 and resides in proposed District 3. Proposed District 3 was drawn to protect the ability of the white majority in the proposed district to defeat the candidate of choice for Latino voters.

55.     The district that borders proposed District 4 on the north and west is proposed District 5. Its voting age population is 16.05% Latino. That figure represents a reduction in the percentage of Latino voting age population in current District 5, which is currently 24.56% Latino. Congressman Mike Quigley, who is white, represents current District 5 and resides in proposed District 5. Proposed District 5 was drawn to protect the ability of the white majority in the proposed district to defeat the candidate of choice for Latino voters.

56.     The Latino population of the State of Illinois and Cook County is disproportionately under the age of 18. As juvenile Latinos attain voting age over the next ten years, Latinos will constitute a growing percentage of the voting age population.

57.     Latino voters traditionally and consistently vote cohesively in the State of Illinois, particularly in Cook County.

58.     Traditionally, elections in Illinois have been racially and ethnically polarized. The two other large racial and ethnic populations in Illinois, white non-Latinos and African-

Americans, have often voted sufficiently as blocs that, in the absence of special circumstances or a large Latino voter population, the preferred candidates of Latino voters have been defeated.

59. The Proposed Congressional Plan intentionally discriminates against and dilutes the votes of Latino voters in proposed Districts 3, 4, and 5—including Plaintiffs Lou Sandoval, Ralph Rangel, Luis Sanabria, and Michelle Caballero (collectively, the "Racial Dilution Plaintiffs")—by unnecessarily packing Latino voters into proposed District 4 and thereby reducing the Latino voter population in proposed Districts 3 and 5.

## C. The Proposed Congressional Plan Impermissibly Uses Racial Gerrymandering To Create A Majority Latino District

60. Proposed District 4 is gerrymandered in an "earmuff" shape with the two "muffs" capturing predominately Latino neighborhoods to the north and south of proposed District 7, a majority African-American district. The predominately Latino neighborhoods are connected only by the earmuff's "headband," a narrow strip running along U.S. Interstate 294.

61. A Latino majority district with a very similar shape was created in the same location after the 1990 census in judicial proceedings over redistricting. At that time, the number of Latinos living in Cook County was roughly half of its current number, and it was believed that the "earmuff" district was the only way to create a Latino majority congressional district in Illinois. The Latino voting age population in the post-1990 District 4 was 59.18%.

62. Judicial proceedings concerning the post-1990 District 4 established that race— that is, Latino ethnicity—was the predominant consideration in the creation of that district.

63. Latino ethnicity was the predominant consideration in the creation of proposed District 4. No other factor explains the "earmuff" shape of the proposed district or the extremely high concentration of Latino voters in the proposed district.

15

64.     Proposed District 4 is far less compact than other districts in the Proposed Congressional Plan.

65.     Proposed District 4's 0.05 Circularity Ratio—*i.e.*, the ratio of the area of the proposed districts to the area of a circle having the same perimeter—is the lowest of any district in the Proposed Congressional Plan.  It is also lower than the Plan's average of 0.16.  Smaller numbers indicate less compactness.

66.     Proposed District 4's 0.24 ratio between the circumference of an equal area circle divided by the perimeter of the district is the lowest of any district in the Proposed Congressional Plan.  It is also lower than the Plan's average of 0.41.  Smaller numbers indicate less compactness.

67.     Proposed District 4's 0.42 Schwartzberg Test ratio—*i.e.*, district area divided by the area of the district's convex hull—is the lowest of any district in the Proposed Congressional Plan.  It is also lower than the Plan's average of 0.61.  Smaller numbers indicate less compactness.

68.     Proposed District 4 is not narrowly tailored to serve the State of Illinois's interest in complying with Section 2 of Voting Rights Act.  A more compact and less bizarrely shaped, majority-Latino district that respects traditional redistricting principles can be created.

69.     The Proposed Congressional Plan impermissibly classifies the citizens of proposed District 4—including Plaintiff Luis Sanabria (the "Racial Gerrymander Plaintiff")—by their race.

**D.     The Proposed Congressional Plan Is Gerrymandered to Disproportionately Favor Democratic Candidates**

70.     Working together, the Democratic leadership of the Illinois General Assembly, the DCCC, its agents, and certain Democratic members of Congress developed the Proposed

Congressional Plan by engaging in impermissible partisan gerrymandering that dilutes the ability of Republican voters in Illinois to elect candidates of their choice.

71. Illinois is relatively evenly divided between Republican and Democratic voters. From 1999 to 2005 and again from 2011 to the present, Illinois has been represented in the United States Senate by one Republican and one Democratic senator. Republicans held the office of Governor of Illinois from 1977 to 2003, and Democrats have held it from 2003 to the present. In the 2010 Illinois United States Senate race, Republican Candidate Mark Kirk received 48.01% of the vote, while Democratic Candidate Alexi Giannoulias received 46.42%. Similarly, in the 2010 Illinois gubernatorial election, Democratic Candidate Pat Quinn received 46.79% of the vote, while Republican Bill Brady received 45.94%.

72. The Illinois congressional delegation has been similarly divided between Republicans and Democrats. Following the 2002 elections, there were 10 Republican and 9 Democratic Congressmen from Illinois. In 2004, 9 Republican and 10 Democratic Congressmen were elected. In 2006, 8 Republican and 11 Democratic Congressmen were elected. In 2008, 7 Republican and 12 Democratic Congressmen were elected.

73. In 2010, voters rejected four Democratic incumbents in favor of Republican challengers and elected a Republican candidate to the seat vacated as a result of Republican Congressman Mark Kirk's decision to run for United States Senate, resulting in a delegation of 11 Republican and 8 Democratic Congressmen.

74. Despite the 2010 Congressional election results and the relatively even division of voters between parties in Illinois, the Proposed Congressional Plan creates a situation in which the Illinois Congressional delegation is likely to go from its current composition of 11 Republicans and 8 Democrats to only 6 Republicans and 12 Democrats.

75.     According to the Partisan Voting Index developed by Charlie Cook ("PVI"), the most widely used and accepted measure of partisan leanings for congressional districts, the Proposed Congressional Plan increases the number of districts that favor Democrats by nearly 20 percentage points.[10] Nine of the 19 Illinois congressional districts (47.4%) have Democratic-leaning PVI scores under the current congressional plan, which was adopted through a bipartisan process in 2001. By contrast, under the Proposed Congressional Plan, 12 of the 18 Illinois congressional districts (66.7%) have Democratic-leaning PVI scores.

76.     The Proposed Congressional Plan accomplishes that result by packing traditional Republican voters statewide into a relatively small number of proposed districts and then dividing the remaining Republican voters into districts that include reliable majorities of Democratic voters.

77.     While the entire Proposed Congressional Plan reflects a statewide partisan gerrymander, proposed District 11 is an especially blatant example of partisan gerrymandering. That district was created by dismantling current District 13, represented by seven-term, Republican Congresswoman Judy Biggert, the only woman in the current Republican congressional delegation. Current District 13 is located in southern DuPage, northern Will, and southwestern Cook Counties and encompasses a number of western and southwestern suburbs of

---

[10] The PVI is a measurement of how strongly a congressional district leans toward one political party compared to the nation as a whole. The index for each congressional district is derived by averaging its results from the prior two presidential elections and comparing them to national results. The index indicates which party's candidate was more successful in that district, as well as the number of percentage points by which its results exceeded the national average. The index is formatted as a letter followed by a plus sign and then a number. For instance, in a district whose PVI score is D+2, a generic Democratic candidate would be expected to receive 2 percentage points more votes than the national average. An "Even" score is assigned when the district performed within half a point of the national average.

Chicago such as Bolingbrook, Naperville, Orland Park, Downers Grove, Westmont, and Woodridge.

78.     In the 2010 Illinois gubernatorial election, the Republican candidate received 53.66% of the vote in current District 13, while the Democratic candidate received 38.49%.

79.     The Proposed Congressional Plan intentionally slices current District 13 into six proposed Districts (proposed Districts 1, 3, 5, 6, 11, and 14) in order to dilute the influence of Republican voters.

80.     The Proposed Congressional Plan first packs Republican enclaves in Naperville and Downers Grove into proposed Districts 6 and 14, resulting in new districts whose electorate is overwhelmingly Republican.

81.     In the 2010 Illinois gubernatorial election, the electorate of proposed District 6 voted 57.79% for the Republican candidate and 34.59% for the Democratic candidate.

82.     In the 2010 Illinois gubernatorial election, the electorate of proposed District 14 voted 57.19% for the Republican candidate and 32.91% for Democratic candidate.

83.     By packing Republican voters into proposed Districts 6 and 14, the drafters of the Proposed Congressional Plan were able to create a new, snake-shaped proposed District 11 centered around Aurora, Bolingbrook, and Joliet that combines just enough Democratic enclaves in those communities to give the proposed district a likely majority of Democratic voters, diluting the votes of Republican voters captured in the connecting segments.

84.     In the 2010 Illinois gubernatorial election, the electorate of proposed District 11 voted 46.02% for the Republican candidate and 44.86% for the Democratic candidate. However, in the 2008 Presidential election, the electorate of proposed District 11 voted 61.10% for the Democratic candidate and 37.01% for the Republican candidate. Similarly, in the 2006 Illinois

gubernatorial election, the electorate of proposed District 11 voted 46.82% for the Democratic candidate and 40.16% for the Republican candidate. Finally, in the 2004 Presidential election the electorate of proposed District 11 voted 49.94% for the Democratic candidate and 48.42% for the Republican candidate. On average, Democratic candidates in these elections received 6.66% more votes in proposed District 11 than in current District 13, while the Republican candidates in these elections received 7.29% fewer votes, for a total average vote swing of 13.96% in favor of the Democratic candidates.

85. Finally, proposed District 5 starts at the shores of Lake Michigan on the north side of Chicago, stretches west to O'Hare Airport, and then swings south around proposed District 4 to just capture Congresswoman Biggert's suburban Hinsdale home. Proposed District 5 has a Democratic majority as well as a Democratic incumbent, Mike Quigley.

86. In the 2010 Illinois gubernatorial election, the electorate of proposed District 5 voted 36.17% for the Republican candidate and 54.18% for the Democratic candidate.

87. Further evidencing its partisan animus, the Proposed Congressional Plan draws some Republican incumbents into the same districts, forcing them to run against each other or move, while it also places Republican incumbents in Democratic-leaning districts with Democratic incumbents.

88. The Proposed Congressional Plan places incumbent Republican Congressmen Joe Walsh and Randy Hultgren in proposed District 14, forcing them to run against each other in the Republican primary or move.

89. The Proposed Congressional Plan does not place a single Democratic incumbent in the same Congressional district as another Democratic incumbent.

90.     The Proposed Congressional Plan places incumbent Republican Congressman Adam Kinzinger and incumbent Democratic Congressman Jesse Jackson, Jr. in proposed District 2.  Proposed District 2 is significantly weighted in favor of a Democratic candidate.  Proposed District 2 contains 78% of Congressman Jackson's current district.  Also, in the 2010 Illinois gubernatorial election, proposed District 2 voted 70.76% in favor of the Democratic candidate and only 20.50% in favor of the Republican candidate.  In the 2008 and 2004 Presidential elections, it voted 80.64% and 73.56% in favor of the Democratic candidate and only 17.57% and 24.17% in favor of the Republican candidate.

91.     As already noted, the Proposed Congressional Plan places incumbent Republican Congresswoman Judy Biggert and incumbent Democratic Congressman Mike Quigley in proposed District 5.  Proposed District 5 is significantly weighted in favor of a Democratic candidate.  Proposed District 5 contains 72% of Congressman Quigley's current district.  Also, in the 2010 Illinois gubernatorial election, it voted 54.18% in favor of the Democratic candidate and only 36.17% in favor of the Republican candidate.  In the 2008 and 2004 Presidential elections, it voted 68.62% and 62.59% in favor of the Democratic Candidate and only 28.89% and 35.22% in favor of the Republican candidate.

92.     The Proposed Congressional Plan places incumbent Republican Congressman Bob Dold and incumbent Democratic Congresswoman Jan Schakowsky in proposed District 9.  Proposed District 9 is significantly weighted in favor of a Democratic candidate.  Proposed District 9 contains 77% of Congresswoman Schakowsky's current district.  Also, in the 2010 Illinois gubernatorial election, it voted 55.30% in favor of the Democratic candidate and only 36.68% in favor of the Republican candidate.  In the 2008 and 2004 Presidential elections, it

voted 67.74% and 62.63% in favor of the Democratic Candidate and only 30.17% and 35.03% in favor of the Republican candidate.

93.     The Proposed Congressional Plan also favors Democratic incumbents in terms of overlap of population between current and proposed congressional districts.    The Proposed Congressional Plan places Republican incumbents in districts whose population overlaps with an average of 34.20% of their current districts.

94.     By contrast, the Proposed Congressional Plan places Democratic incumbents in districts whose population overlaps with an average of 77.52% of their current districts.

95.     The population overlaps for Democratic incumbents range from a high of 100.0% (proposed District 12) to a low of 76.3% (proposed District 3), with an average of 87.8% across all Democratic incumbents.    The highest Republican incumbent's population overlap is only 67.9% (proposed District 18), while the lowest is a mere 1.3% (proposed District 5), with an average of 34.4% across all Republican incumbents.

96.     The Proposed Congressional Plan also unnecessarily splits a significant number of prominent and populous communities, including Bloomington, Champaign, DeKalb, Peoria, Rockford, and Urbana, into multiple congressional districts, reducing the ability of these communities to select representatives of their choice.    It also divides significant Chicago suburbs (with populations greater than 25,000 people), including Algonquin, Carol Stream, Carpentersville, Cicero, Crystal Lake, Glen Ellyn, Glendale Heights, Glenview, Gurnee, Hanover Park, Lake in the Hills, Melrose Park, Mundelein, Oswego, Streamwood, Waukegan, Wheaton, and Woodridge, as well as Chicago's Chinatown neighborhood.

97.     The Proposed Congressional Plan is less compact than the present congressional map.

98.     The present congressional map has a Circularity Ratio of 0.19.   The Proposed Congressional Plan has a Circularity Ratio of 0.16.

99.     The present congressional map has a ratio of the circumference of an equal area circle divided by the perimeter of the proposed districts of 0.45.   The Proposed Congressional Plan has a ratio of 0.41.

100.    The present congressional map has a Schwartzberg Test ratio of 0.64.   The Proposed Congressional Plan has a ratio of 0.61.

101.    By diluting the votes of Republican voters—including plaintiffs Committee for a Fair and Balanced Map, Peter J. Roskam, Joe Walsh, Robert J. Dold, Adam Kinzinger, Judy Biggert, Randy Hultgren, Donald Manzullo, Bobby Schilling, Aaron Schock, John M. Shimkus, Laura Waxweiler, and Edmund Brezinski (collectively, the "Partisan Gerrymander Plaintiffs")—the partisan gerrymander embodied in the Proposed Congressional Plan intentionally discriminates against Republican voters and penalizes Republican voters based on their voting history and other expressions of political views.

E.      **The State Board of Elections Is Responsible For Administering Elections in Illinois**

102.    The Illinois State Board of Elections has "general supervision over the administration of the registration and election laws throughout the State," Ill. Const. 1970, art. III § 5; 10 ILCS § 5/1A-1, and must "[s]upervise the administration of the registration and election laws throughout the State." 10 ILCS § 5/1A-8(12).

103.    In accordance with that mandate, the State Board of Elections is required to, among other things, "[d]isseminate information to and consult with election authorities concerning the conduct of elections and registration" 10 ILCS § 5/1A-8(2), furnish "a manual of uniform instructions … which shall be used by election authorities" throughout the state, 10

ILCS § 5/1A-8(3), prescribe "uniform forms, notices, and other supplies" to be used "in the conduct of elections and registrations," 10 ILCS § 5/1A-8(4), "[r]eview and inspect procedures and records relating to conduct of elections and registration ... and to report violations of election laws" to appropriate authorities. 10 ILCS § 5/1A-8(7).

104.   The first day to circulate petitions for party nominations for United States Congress for the 2012 Illinois primary election is ninety days before the last day to file petitions, *i.e.*, September 6, 2011. 10 ILCS § 5/7-10.

105.   The first day to file petitions for party nominations for United States Congress for the 2012 Illinois primary election is November 28, 2011. 10 ILCS § 5/7-12, as recently amended by Public Act 96-1008.

106.   The last day to file petitions for party nominations for United States Congress for the 2012 Illinois primary election is December 5, 2011. *Id.*

107.   The 2012 Illinois primary election for United States Congress is March 20, 2012. 10 ILCS § 5/2A-1.1(a), as recently amended by Public Act 96-866.

## V.   CAUSES OF ACTION

### COUNT I
### (Violation of 42 U.S.C. § 1973 against All Defendants brought by the Racial Dilution Plaintiffs)

108.   Plaintiffs reallege the facts set forth in paragraphs 1 through 107, above.

109.   Count I is brought by the Racial Dilution Plaintiffs against Defendant Illinois State Board of Elections as well as the Individual Board Member Defendants in their official capacities.

110.   The Proposed Congressional Plan intentionally discriminates against Latino voters on the basis of their race. The Plan intentionally dilutes the votes of Latino voters by packing an excessive super-majority of Latino voters into proposed District 4 and by

simultaneously reducing the growing percentage of Latino voters in proposed Districts 3 and 5. Many Latino voters in proposed District 4 will see their votes wasted because the Plan intentionally makes those votes unnecessary to elect a candidate of their choice. At the same time, Latino voters in proposed Districts 3 and 5 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates of their choice.

111. As a result, the Proposed Congressional Plan denies or abridges the right of the Racial Dilution Plaintiffs to vote, on account of their race or color, and affords the Racial Dilution Plaintiffs less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice.

112. Accordingly, the Proposed Congressional Plan violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973.

**COUNT II**
**(Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983, against the Individual Board Member Defendants brought by the Racial Dilution Plaintiffs)**

113. Plaintiffs reallege the facts set forth in paragraphs 1 through 107, above.

114. Count II is brought by the Racial Dilution Plaintiffs against the Individual Board Member Defendants in their official capacities.

115. The Proposed Congressional Plan intentionally discriminates against Latino voters on the basis of their race. The Plan intentionally dilutes the votes of Latino voters by packing an excessive super-majority of Latino voters into proposed District 4 and by simultaneously reducing the growing percentage of Latino voters in proposed Districts 3 and 5. Many Latino voters in proposed District 4 will see their votes wasted because the Plan intentionally makes those votes unnecessary to elect a candidate of their choice. At the same

time, Latino voters in proposed Districts 3 and 5 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates of their choice.

116. As a result, the Proposed Congressional Plan intentionally treats the Racial Dilution Plaintiffs differently and worse than it treats similarly situated voters who are not Latino. And the Plan does so because the Racial Dilution Plaintiffs are Latino.

117. Accordingly, the Proposed Congressional Plan violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

## COUNT III
### (Violation of the Fifteenth Amendment, actionable under 42 U.S.C. § 1983, against the Individual Board Member Defendants brought by the Racial Dilution Plaintiffs)

118. Plaintiffs reallege the facts set forth in paragraphs 1 through 107, above.

119. Count III is brought by the Racial Dilution Plaintiffs against the Individual Board Member Defendants in their official capacities.

120. The Proposed Congressional Plan intentionally discriminates against Latino voters on the basis of their race. The Plan intentionally dilutes the votes of Latino voters by packing an excessive super-majority of Latino voters into proposed District 4 and by simultaneously reducing the growing percentage of Latino voters in proposed Districts 3 and 5. Many Latino voters in proposed District 4 will see their votes wasted because the Plan intentionally makes those votes unnecessary to elect a candidate of their choice. At the same time, Latino voters in proposed Districts 3 and 5 will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates of their choice.

121.    As a result, the Proposed Congressional Plan denies or abridges the right of the Racial Dilution Plaintiffs to vote, on account of their race or color.

122.    Accordingly, the Proposed Congressional Plan violates the Fifteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

### COUNT IV
**(Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983, against the Individual Board Member Defendants brought by the Racial Gerrymander Plaintiff)**

123.    Plaintiffs reallege the facts set forth in paragraphs 1 through 107, above.

124.    Count IV is brought by the Racial Gerrymander Plaintiff against the Individual Board Member Defendants in their official capacities.

125.    The Proposed Congressional Plan intentionally made race—namely, Latino ethnicity—the predominant factor in the creation of proposed District 4. That proposed District disregards traditional districting principles such as compactness, contiguity, and respect for political subdivisions. Instead, it manufactures a Latino voting age supermajority of 65.92% by packing Latino residents into an earmuff-shaped district so bizarre on its face that race is the only explanation for the shape and demographic composition of the District.

126.    Proposed District 4 is not narrowly tailored to serve an interest in complying with the Voting Rights Act because it includes far more Latino voters than would be necessary to comply with that law and a Latino majority district can be drawn without racial gerrymandering.

127.    As a result, proposed District 4 impermissibly classifies the Racial Gerrymander Plaintiff by his race.

128.    Accordingly, District 4 of the Proposed Congressional Plan violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

**COUNT V**
**(Violation of the First Amendment, actionable under 42 U.S.C. § 1983, against the Individual Board Member Defendants brought by the Partisan Gerrymander Plaintiffs)**

129.    Plaintiffs reallege the facts set forth in paragraphs 1 through 107, above.

130.    Count V is brought by the Partisan Gerrymander Plaintiffs against the Individual Board Member Defendants in their official capacities.

131.    The Proposed Congressional Plan—on a statewide basis and in proposed Districts 11, 13, and 17—intentionally and unreasonably dilutes the votes of Republican voters in a manner that gives Republican voters a far smaller chance of electing candidates of their choice than would result from traditional, non-partisan redistricting.

132.    The Proposed Congressional Plan satisfies Plaintiffs' proposed standard for judging partisan gerrymander claims. That standard has an intent requirement and an effect requirement.

133.    The intent requirement demands direct or circumstantial proof that the State's mapmakers created one or more congressional districts with the predominant intent to secure partisan advantage. That requirement is met by (a) the evidence that the State of Illinois's mapmakers (including Democratic leaders of the General Assembly and the DCCC) had the admitted goal of maximizing what they called "Democratic pickups" in areas represented by Republicans, (b) the way proposed Districts 11, 13, and 17 are bizarrely shaped to capture heavily Democratic areas in Joliet, Aurora, Rockford, Peoria, Springfield, Bloomington/Normal, and Champaign/Urbana, and (c) the complete dismantling of current District 13.

134.    The effect requirement demands a showing of three things: (1) that the Proposed Congressional Plan increases the number of districts that favor Democrats by at least 10% according to an accepted measure of partisan voting; (2) that the Proposed Congressional Plan

28

keeps at least 10% more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents; and (3) that at least one of the districts created with the intent to advantage Democrats is among the districts that contributes to the proof of elements 1 and 2. The Proposed Congressional Plan increases the number of districts that favor Democrats by over 19% according to the PVI, and it keeps 53.4% more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents. Proposed Districts 11, 13, and 17 all have Democratic-leaning PVI scores and incumbent-constituent overlap figures that are far below the overlap figures for any proposed districts with Democratic incumbents.

135. As a result, the Proposed Congressional Plan burdens and penalizes the Partisan Gerrymander Plaintiffs' exercise of their freedom of association, their right to express political views, and their right to petition the government for redress of grievances. In particular, the Proposed Congressional Plan deters potential Republican congressional candidates from exercising their right to run for office by making a Republican candidacy futile, and it deters potential Republican voters from casting ballots that are likely to be meaningless. In addition, those Democratic members of Congress from Illinois whose election is effectively assured by the Proposed Congressional Plan's partisan gerrymandering will necessarily pay little if any heed to their Republican constituents, effectively depriving them of representation based on their political affiliation.

136. Accordingly, the Proposed Congressional Plan violates the First Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

**COUNT VI**
**(Violation of the Equal Protection Clause, actionable under 42 U.S.C. § 1983, against the Individual Board Member Defendants brought by the Partisan Gerrymander Plaintiffs)**

137. Plaintiffs reallege the facts set forth in paragraphs 1 through 107, above.

138. Count VI is brought by the Partisan Gerrymander Plaintiffs against the Individual Board Member Defendants in their official capacities.

139. The Proposed Congressional Plan—on a statewide basis and in proposed Districts 11, 13, and 17—intentionally and unreasonably dilutes the votes of Republican voters in a manner that gives Republican voters a far smaller chance of electing candidates of their choice than would result from traditional, non-partisan redistricting.

140. The Proposed Congressional Plan satisfies Plaintiffs' proposed standard for judging partisan gerrymander claims. That standard has an intent requirement and an effect requirement.

141. The intent requirement demands direct or circumstantial proof that the State's mapmakers created one or more congressional districts with the predominant intent to secure partisan advantage. That requirement is met by (a) the evidence that the State of Illinois's mapmakers (including Democratic leaders of the General Assembly and the DCCC) had the admitted goal of maximizing what they called "Democratic pickups" in areas represented by Republicans, (b) the way proposed Districts 11, 13, and 17 are bizarrely shaped to capture heavily Democratic areas in Joliet, Aurora, Rockford, Peoria, Springfield, Bloomington/Normal, and Champaign/Urbana, and (c) the complete dismantling of current District 13.

142. The effect requirement demands a showing of three things: (1) that the Proposed Congressional Plan increases the number of districts that favor Democrats by at least 10% according to an accepted measure of partisan voting; (2) that the Proposed Congressional Plan

30

keeps at least 10% more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents; and (3) that at least one of the districts created with the intent to advantage Democrats is among the districts that contributes to the proof of elements 1 and 2. The Proposed Congressional Plan increases the number of districts that favor Democrats by over 19% according to the PVI, and it keeps 53.4% more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents. Proposed Districts 11, 13, and 17 all have Democratic-leaning PVI scores and incumbent-constituent overlap figures that are far below the overlap figures for any proposed districts with Democratic incumbents.

143. As a result, the Proposed Congressional Plan intentionally treats the Partisan Gerrymander Plaintiffs differently and worse than it treats similarly situated voters who are Democrats. And the Plan does so because the Partisan Gerrymander Plaintiffs are Republicans. Accordingly, the Proposed Congressional Plan violates the Equal Protection Clause of the Fourteenth Amendment to the United States Constitution, made actionable in this suit by 42 U.S.C. § 1983.

*     *     *

144. As a proximate result of the actions described above, Plaintiffs have suffered violations of their statutory and constitutional rights, have been and continue to be injured, and have incurred expenses, attorneys' fees, and court costs.

### REQUEST FOR THREE JUDGE COURT

145. Plaintiffs request a three-judge trial court pursuant to 28 U.S.C. § 2284.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully pray that this Court:

1.      Assume jurisdiction over this action and designate a three-judge panel pursuant to 28 U.S.C. § 2284.

2.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the Proposed Congressional Plan dilutes the voting strength of Latino voters in violation of 42 U.S.C. § 1973, the Equal Protection Clause of the Fourteenth Amendment, and the Fifteenth Amendment.

3.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the Proposed Congressional Plan engages in racial gerrymandering in violation of the Equal Protection Clause of the Fourteenth Amendment.

4.      Issue a declaratory judgment, pursuant to 28 U.S.C. §§ 2201 and 2202 and Fed. R. Civ. P. 57, declaring that the Proposed Congressional Plan is an unconstitutional political gerrymander in violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

5.      Issue a permanent injunction enjoining the appropriate Defendants, their agents, employees, and those persons acting in concert with them, from enforcing or giving any effect to the proposed district boundaries as drawn in the Proposed Congressional Plan, including enjoining the appropriate Defendants from conducting any elections for the United States House of Representatives based on the Proposed Congressional Plan.

6.      Order that the defendants conduct elections for the United States House of Representatives based on a redistricting plan chosen by the Court that complies with the Voting Rights Act and the Constitution.

7.      Make all further orders as are just, necessary, and proper to ensure complete fulfillment of this Court's declaratory and injunctive orders in this case.

8.      Issue an order requiring Defendants to pay Plaintiffs' costs, expenses, and reasonable attorneys' fees incurred in the prosecution of this action, as authorized by the Civil Rights Attorneys' Fees Awards Act of 1976, 42 U.S.C. § 1988 and as authorized by 42 U.S.C. § 1973l(e).

9.      Grant such other and further relief as it deems is proper and just.

Dated: November 4, 2011               Respectfully submitted,

                                  /s/ Lori E. Lightfoot

                                  Tyrone C. Fahner
                                  John A. Janicik
                                  Lori E. Lightfoot
                                  Joshua D. Yount
                                  Dana S. Douglas
                                  Thomas V. Panoff
                                  Mayer Brown LLP
                                  71 South Wacker Drive
                                  Chicago, Illinois  60606
                                  (312) 782-0600

                                  Attorneys for Plaintiffs

# Exhibit A:
# Proposed Illinois Congressional Map



## Senate Bill 1178- House Amendment 2
## Congressional Districts

Source: Illinois General Assembly, http://www.ilga.gov/CongressionalDistrictMaps/
Statewide%20View.pdf

# Exhibit B:
# Proposed Illinois Congressional Map, Cook and Collar Counties



## Senate Bill 1178 - House Amendment 2
## Congressional Districts

Source: http://www.ilga.gov/CongressionalDistrictMaps/Cook%20and%20Collar%20County%20View.pdf

# Exhibit C:
# Current Illinois Congressional Map



Source: http://nationalatlas.gov/printable/images/pdf/congdist/pagecgd112_il.pdf

# Exhibit D:
# Current Illinois Congressional Map, Cook and Collar Counties



Source: http://nationalatlas.gov/printable/images/pdf/congdist/pagecgd112_il.pdf

# Exhibit E:
# Proposed and Current Illinois
# Congressional District Demographics

| Congressional District | Districts with 2010 Census Pop | | | | | SB 1178 with 2010 Census Pop | | | |
|---|---|---|---|---|---|---|---|---|---|
| | Pop | Pop Change | AA VA% | Asian VA % | Latino VA % | Population | AA VA% | Asian VA% | Latino VA % |
| 1 | 587,596 | -66,051 | 61.22% | 2.16% | 7.40% | 712,813 | 52.40% | 2.12% | 7.35% |
| 2 | 602,758 | -50,889 | 67.70% | 0.69% | 11.45% | 712,813 | 53.77% | 0.79% | 11.09% |
| 3 | 663,381 | 9,734 | 6.81% | 4.00% | 29.31% | 712,813 | 4.54% | 3.96% | 24.64% |
| 4 | 601,156 | -52,491 | 4.37% | 2.99% | 68.13% | 712,813 | 4.05% | 3.31% | 65.92% |
| 5 | 648,610 | -5,037 | 2.88% | 7.31% | 24.56% | 712,813 | 2.69% | 7.12% | 16.05% |
| 6 | 657,131 | 3,484 | 3.38% | 10.38% | 15.31% | 712,813 | 2.38% | 7.96% | 7.44% |
| 7 | 638,105 | -15,542 | 47.17% | 7.63% | 8.04% | 712,812 | 50.28% | 6.91% | 11.44% |
| 8 | 738,840 | 85,193 | 3.85% | 8.39% | 14.05% | 712,812 | 4.20% | 12.26% | 22.14% |
| 9 | 628,859 | -24,788 | 9.84% | 14.86% | 10.94% | 712,813 | 8.72% | 12.64% | 9.60% |
| 10 | 650,425 | -3,222 | 4.75% | 8.76% | 13.27% | 712,813 | 6.43% | 9.60% | 18.09% |
| 11 | 759,445 | 105,798 | 7.94% | 1.29% | 9.24% | 712,813 | 10.73% | 7.02% | 21.81% |
| 12 | 666,459 | 12,812 | 16.28% | 1.24% | 2.47% | 712,813 | 15.72% | 1.20% | 2.44% |
| 13 | 773,095 | 119,448 | 6.58% | 9.51% | 9.02% | 712,813 | 9.44% | 3.74% | 2.56% |
| 14 | 840,956 | 187,309 | 5.09% | 3.45% | 20.81% | 712,813 | 2.51% | 4.00% | 9.35% |
| 15 | 681,580 | 27,933 | 6.22% | 4.28% | 3.06% | 712,813 | 3.97% | 0.62% | 1.87% |
| 16 | 718,791 | 65,144 | 5.63% | 2.09% | 8.19% | 712,813 | 3.25% | 1.51% | 6.55% |
| 17 | 634,792 | -18,855 | 7.69% | 0.94% | 4.30% | 712,813 | 10.00% | 1.11% | 6.40% |
| 18 | 665,723 | 12,076 | 6.89% | 1.56% | 2.29% | 712,813 | 3.55% | 2.12% | 1.92% |
| 19 | 672,930 | 19,283 | 3.92% | 0.77% | 1.57% | N/A | N/A | N/A | N/A |

Source: http://www.ilsenateredistricting.com/phocadownload/releases/SB1178-CongressionalComparison.pdf