**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BREZINSKI, and LAURA WAXWEILER, | ) ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:11-cv-05065 Hon. John D. Tinder Hon. Joan H. Lefkow Hon. Robert L. Miller, Jr. (3-judge court convened pursuant to 28 U.S.C. § 2284) |
| Plaintiffs, | ) ) | |
| v. | ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLZ, and ERNEST L. GOWEN, | ) ) ) ) ) ) ) ) | |
| Defendants. | ) ) ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF
THEIR MOTION FOR A PERMANENT INJUNCTION**

Tyrone C. Fahner
John A. Janicik
Lori E. Lightfoot
Joshua D. Yount
Dana S. Douglas
Thomas V. Panoff
Mitchell D. Holzrichter
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for Plaintiffs*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ................................................................................................ 1

BACKGROUND ................................................................................................. 2

ARGUMENT ...................................................................................................... 5

I.    The Court Should Permanently Enjoin Defendants From Implementing And Enforcing The Adopted Plan. ......................................................................... 6

    A.    District 4 Of The Adopted Plan Is An Unconstitutional Racial Gerrymander ............................................................................... 6

        1.    Race Was The Predominant Factor Motivating Adopted District 4's Shape ............................................................... 7

        2.    Defendants Cannot Show, Under Strict Scrutiny, That The Adopted Plan Is Narrowly Tailored To Achieve A Compelling State Interest ......................................................... 14

    B.    The Adopted Plan Intentionally Discriminates Against Latino Voters In Districts 3, 4, And 5 .......................................................... 16

    C.    The Adopted Plan Intentionally Creates Unconstitutional Partisan Gerrymanders ............................................................................ 28

        1.    The State's Predominant Intent In Drawing Several Districts In The Adopted Plan Was To Advance Democratic Partisan Interests ............................................................... 30

        2.    The Adopted Plan Has The Effect of Creating Partisan Gerrymanders In Several Districts ...................................... 35

II.    The Court Should Implement Plaintiffs' Proposed Plan................................. 38

CONCLUSION ................................................................................................. 44

i

# TABLE OF AUTHORITIES

**Page(s)**

CASES

*Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998) ................................................19, 21, 25

*Barnett v. Daley*, 32 F.3d 1196 (7th Cir. 1994) ...........................................................................17

*Black v. McGuffage*, 209 F. Supp. 2d 889 (N.D. Ill. 2002) ........................................................25

*Brown v. Thomson*, 462 U.S. 835 (1983).....................................................................................36

*Bush v. Vera*, 517 U.S. 952 (1996) ...........................................................................6, 7, 9, 13, 15

*Campuzano v. Ill. State Bd. of Elections*, 200 F. Supp. 2d 905 (N.D. Ill. 2002) ..........................19

*In re Cong. Dist. Reapportionment Cases*, No. 81 C 3915, slip op.
    (N.D. Ill. Nov. 23, 1981), *aff'd sub nom. Ryan v. Otto*, 454 U.S. 1130 (1982) ........................5

*Daggett v. Kimmelman*, 580 F. Supp. 1259 (D.N.J. 1984), *aff'd sub. nom.*
    *Karcher v. Daggett*, 467 U.S. 1222 (1984)..............................................................................13

*Davis v. Bandemer*, 478 U.S. 109 (1986) .................................................................. 28-31, 35, 36

*Garza v. Cnty. of Los Angeles*, 918 F.2d 763 (9th Cir. 1990)................................................16, 17

*Gonzalez v. City of Aurora, Ill.*, 535 F.3d 594 (7th Cir. 2008)....................................................21

*Hastert v. State Bd. of Elections*, 777 F. Supp. 634
    (N.D. Ill. 1991)................................................................5, 7, 8, 16, 25, 27, 39, 43

*Karcher v. Daggett*, 462 U.S. 725 (1983).............................................................................8, 13

*Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir. 1984).........................................................17, 18, 24

*King v. State Bd. of Elections,* 979 F. Supp. 582 (N.D. Ill. 1996)
    ("*King I*"), *vacated and remanded*, 519 U.S. 978 (1996) .................. 6, 8, 9, 11-13, 15, 25, 40

*King v. State Bd. of Elections*, 979 F. Supp. 619 (N.D. Ill. 1997)
    ("*King II*"), *aff'd*, 522 U.S. 1087 (1998)...............................................................6, 7, 9, 15, 40

*Larios v. Cox*, 300 F. Supp. 2d 1320 (N.D. Ga. 2004),
    *aff'd*, 542 U.S. 947 (2004) ....................................................................................................14

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ("*LULAC*") ....................................18, 21, 28, 29, 31, 36, 42

*Miller v. Johnson*, 515 U.S. 900 (1995).........................................................6-8, 10-13, 31, 40, 42

## TABLE OF AUTHORITIES
### (continued)

Page(s)

*Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743 (2010)....................................................5

*Prejean v. Foster*, 227 F.3d 504 (5th Cir. 2000).......................................................................7, 15

*Reynolds v. Sims*, 377 U.S. 533 (1964)..................................................................................5, 38

*Rogers v. Lodge*, 458 U.S. 613 (1982)................................................................................16, 17

*Rybicki v. State Bd. of Elections*, 574 F. Supp. 1082 (N.D. Ill. 1982)...........................................24

*Shaw v. Hunt*, 517 U.S. 899 (1996) ("*Shaw II*")....................................................................9, 41

*Shaw v. Reno*, 509 U.S. 630 (1993) ("*Shaw I*")....................................................................8, 40

*Thornburg v. Gingles*, 478 U.S. 30 (1986) ..............................................................................41

*United States v. Brown*, 561 F.3d 420 (5th Cir. 2009)...........................................................17, 21

*United States v. Town of Cicero*, No. 00-C-1530, 2000 WL 34342276
  (N.D. Ill. Mar. 15, 2000)......................................................................................................26

*Vieth v. Jubelirer*, 541 U.S. 267 (2004) ........................................................................ 28-31, 36

*Vigo Cnty. Republican Cent. Comm. v. Vigo Cnty. Comm'rs*, 834 F. Supp. 1080
  (S.D. Ind. 1993) ...............................................................................................................43

*Vill. of Arlington Heights v. Metro. Hous. Dev. Auth. Corp.*, 429 U.S. 252 (1977)....................17

STATUTES

10 ILCS 5/1A-8....................................................................................................................4

10 ILCS 5/7-12 ...................................................................................................................43

20 ILCS 3983/5...................................................................................................................26

## INTRODUCTION

As the Court has recognized, this case "raise[s] profound questions about the legitimacy of the redistricting process and the viability of [Illinois's] 2011 [congressional redistricting] Map." Doc. 77 at 15-16.[1] Plaintiffs have alleged that the 2011 Map (the "Adopted Plan") violates the U.S. Constitution and the Voting Rights Act in three ways: it unconstitutionally creates a racially gerrymandered district; it intentionally dilutes the votes of Latinos; and it unconstitutionally discriminates against Republican voters. The record at the close of expedited discovery now confirms that each of Plaintiffs' claims has merit.

While it may be true that Latino Democrats in the Illinois state legislature voted in favor of the Adopted Plan and Latino community groups have remained on the sidelines in this case, the Adopted Plan unlawfully discriminates against Latinos. The record overwhelmingly establishes that the Adopted Plan violates the Equal Protection Clause because race was the predominant factor motivating the shape of Adopted District 4 and the gerrymandered district is not narrowly tailored to comply with any compelling interest. The record also makes clear that the Adopted Plan intentionally and unlawfully dilutes the votes of Latinos by packing Latinos into District 4, while it reduces the Latino population in neighboring Districts 3 and 5 to arrest the growing Latino community's influence over contests in those districts.

And while political considerations often properly inform the redistricting process, the Adopted Plan takes partisan gerrymandering to an unconstitutional extreme. The Democratic-

---

[1] As used throughout this Memorandum, "Doc. _" refers by number to entries in this case's docket. "Ex. A_" refers by number to the exhibits to Exhibit A, which is the affidavit of Michael David Frisch. "Ex. B at ¶_" refers to paragraph numbers in Exhibit B, which is the affidavit of Edward D. Marshall, and "Ex. B_" refers by number to the exhibits to that affidavit. Exhibits A and B are contain in the separate Appendix to this Memorandum. "Add. _" refers by page to the Addendum attached to this Memorandum, which, for the convenience of the Court, contains several referenced maps.

controlled Illinois government worked hand-in-hand with the Democratic Congressional Campaign Committee to draw a map that discriminates against and penalizes Republican voters based on their political affiliations and expression of political views. Under any reliable standard for measuring the constitutionality of political gerrymanders, including the one that Plaintiffs have proposed in their Amended Complaint, the Adopted Plan violates the Constitution.

Plaintiffs' motion for a permanent injunction should be granted. This Court should invalidate the Adopted Plan and require Defendants to implement and enforce Plaintiffs' proposed redistricting plan.

## BACKGROUND

Top Democrats in the Illinois state legislature have publicly declared that the Adopted Plan resulted from "the most transparent, the most accountable, the most open redistricting process in the history of the state of Illinois." Ex. A66. But nothing could be further from the truth. The Adopted Plan was drawn through backroom channels by Illinois's Democratic state legislative leaders, Illinois's Democratic members of the U.S. Congress, and the Democratic Congressional Campaign Committee ("DCCC"). *See* Exs. A19-A33, A35 (e-mails and proposed maps exchanged among map drafters). With respect to areas represented by Republicans, their (privately) stated intent was to "advance our goal—more Democratic pick-ups" (Ex. A19) and to "maximize Democratic performance" (Ex. A30). In other parts of the State, however, the mapmakers monitored and massaged the Latino voting age population ("VAP") in crucial districts they wanted to keep safe for white incumbents in the face of surging Latino populations. *See, e.g.*, Ex. A25 (e-mail communicating Latino VAP to Rep. Lipinski's staff); Ex. A1 at 15 (Latino share of VAP in Cook County jumped from 11.5% in 1990 to 20.8% in 2010).

2

As the Democrats were drawing the Adopted Plan behind closed doors, the Democratic-controlled redistricting committees in the State Senate and State House of Representatives misled the public in a cruel charade. The committees held a series of hearings at locations around the State, ostensibly to receive public input. Indeed, the Chairman of the State Senate Redistricting Committee represented that it was his "intention . . . as soon as there's a rendering of a map, to post that up so people can see that and so we can have hearings afterwards and so people can be informed." Ex. A40 at 165. But instead of the promised openness, the committee leadership tightly controlled the conduct of the hearings, never supplying any drafts of a congressional map despite pleas from the public to do so and even forbidding the public from questioning committee members. *See* Ex. A41 at 69, 73, 77.

The State redistricting committees finally released the proposed map at 4:00 a.m. on the Friday of Memorial Day weekend, May 27, 2011. *See* Ex. A47. Rather than "have hearings afterwards" as promised, the State redistricting committees passed the map with extraordinary swiftness on straight party-line votes. The Adopted Plan cleared both houses of the Illinois legislature by the following Tuesday, May 31, 2011, just as the Memorial Day weekend came to a close. *See* Exs. A44, A46-A47.

The Adopted Plan skillfully accomplishes the drafters' goals. Chicago-area Latinos are largely packed into a single congressional district—Adopted District 4—that is racially gerrymandered to capture an excessive supermajority of Latinos. *See* Ex. A2 at 9-11 (expert report noting excessive 65.9% Latino VAP); Add. 25-26 (map of district). Meanwhile, the mapmakers substantially reduced the Latino VAP in neighboring Districts 3 and 5 from where it currently stands. Ex. A1 at 8, 10 (Latino VAP reduced 4.7 points to 24.6% in District 3 and reduced 8.5 points to 16.1% in District 5).

3

The Adopted Plan also reverses the results of the 2010 congressional elections by turning Illinois from a state in which 11 Republicans and 8 Democrats were elected to Congress a year ago into a state in which 6 Republicans and 12 Democrats would be elected to Congress in the next election (Illinois having lost one seat in national reapportionment). *See* Ex. A48; Ex. B at ¶ 25. It does so by dismantling traditional areas of Republican influence, carefully connecting disparate enclaves of Democratic strength, and separating Republican incumbents from their constituents. *See* Add. 37-38, 41-48, 51-56; Ex. B at ¶ 36.

Plaintiffs filed a Complaint against the State election authorities who, under Illinois law, are charged with enforcing the Adopted Plan. *See* 10 ILCS 5/1A-8. The Amended Complaint alleges that the Adopted Plan is a product of intentional vote dilution of Latino voters in Districts 3, 4, and 5, in violation of Section 2 of the Voting Rights Act (Count I), the Fourteenth Amendment (Count II), and the Fifteenth Amendment (Count III); that District 4 is an obvious racial gerrymander that is not narrowly tailored to accomplish a compelling state interest, in violation of the Fourteenth Amendment (Count IV); and that the redistricting plan is a blatant partisan gerrymander against Republican voters, in violation of the First Amendment (Count V) and the Fourteenth Amendment (Count VI).[2]

During expedited discovery, the non-parties who developed the Adopted Plan largely stonewalled Plaintiffs' attempts to discover relevant evidence. The DCCC refused to provide evidence of its central role in the mapmaking process, and the D.C. federal district court has yet to decide Plaintiffs' motion to compel the DCCC's production. The Illinois state legislature and

---

[2] On November 1, 2011, this Court dismissed Plaintiffs' partisan gerrymander claims and allowed Plaintiffs the opportunity to re-plead those claims. Doc. 98 at 22. Plaintiffs filed their Amended Complaint on November 4, 2011.

their agents also withheld a great deal of relevant evidence on privilege grounds. *See* Doc. 77 at 21.

Notwithstanding the discovery barriers that Plaintiffs have faced, the record evidence proves that the Adopted Plan violates the Constitution and the Voting Rights Act. This Court's intervention is absolutely necessary "to vindicate" the "important" "public rights" at stake in this case. Doc. 77 at 13. For the reasons set forth below, this Court should grant Plaintiffs' motion for a permanent injunction.

## ARGUMENT

To obtain a permanent injunction, a plaintiff must demonstrate (1) that it will suffer irreparable injury; (2) that its remedies at law are inadequate; (3) that a remedy in equity is warranted in light of the balance of hardships between the plaintiff and defendant; and (4) that the public interest would not be disserved by an injunction. *Monsanto Co. v. Geertson Seed Farms*, 130 S. Ct. 2743, 2756 (2010). In voting rights cases, injunctive relief turns largely on the merits of the plaintiff's claims, as the right to vote is "fundamental" and "preservative of other basic civil and political rights." *Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964). Accordingly, "once a State's legislative apportionment scheme has been found to be unconstitutional, it would be the unusual case in which a court would be justified in not taking appropriate action to insure that no further elections are conducted under the invalid plan." *Id.* at 585. Indeed, this Court has a history of enjoining Illinois's unconstitutional congressional redistricting plans. *E.g.*, *Hastert v. State Bd. of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991); *In re Cong. Dist. Reapportionment Cases*, No. 81 C 3915, slip op. (N.D. Ill. Nov. 23, 1981), *aff'd sub nom. Ryan v. Otto*, 454 U.S. 1130 (1982). This case calls on this Court to exercise its equitable powers once more.

I.     **The Court Should Permanently Enjoin Defendants From Implementing And Enforcing The Adopted Plan.**

This Court should permanently enjoin the Adopted Plan because it unlawfully impairs the fundamental right to vote in three ways. First, Adopted District 4 is an unconstitutional racial gerrymander that is not narrowly tailored to achieve a compelling state interest. Second, Adopted Districts 3, 4, and 5 are the product of an intentional effort to dilute the votes of Latinos in the area by packing Latinos into District 4 and removing them from neighboring Districts 3 and 5. Third, the Adopted Plan is a gross partisan gerrymander by the Democratic-controlled Illinois government that tramples Republican voters' constitutional rights. For all of these reasons, a permanent injunction should issue.

A.     **District 4 Of The Adopted Plan Is An Unconstitutional Racial Gerrymander.**

The Adopted Plan must be enjoined because its District 4 is a racial gerrymander that violates the Equal Protection Clause. To prove such a claim, "[t]he plaintiff's burden is to show, either through circumstantial evidence of a district's shape and demographics or more direct evidence going to legislative purpose, that race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson*, 515 U.S. 900, 916 (1995). This standard can be satisfied even if "[t]raditional districting criteria were not *entirely* neglected." *Bush v. Vera*, 517 U.S. 952, 963 (1996) (plurality opinion). The question simply is whether "traditional districting criteria [were] *subordinated to race*." *Id*. at 962. "Alternatively stated, the question is whether racial considerations substantially explain the configuration of the district's borders; if the answer is yes, racial considerations will have predominated." *King v. State Bd. of Elections*, 979 F. Supp. 582, 608 (N.D. Ill. 1996) ("*King I*"), *vacated and remanded*, 519 U.S. 978 (1996), *reaff'd*, 979 F. Supp. 619, 620 (N.D. Ill. 1997) ("*King II*"), *aff'd*, 522 U.S. 1087 (1998).

6

Once the plaintiff establishes that race predominated, it is the *defendant's* burden to justify the map under "strict scrutiny, [the] most rigorous and exacting standard of constitutional review." *Miller*, 515 U.S. at 920. "To satisfy strict scrutiny, the State must demonstrate that its districting legislation is narrowly tailored to achieve a compelling interest." *Id.* Compliance with the Voting Rights Act ("VRA") is the only compelling interest that courts have recognized in cases involving racial gerrymanders. *King II*, 979 F. Supp. at 622. And a defendant invoking VRA Section 2 as the justification for a racial gerrymander must clear two hurdles. First, the defendant must show "a 'strong basis in evidence' for concluding that creation of a majority-minority district is reasonably necessary to comply with § 2." *Bush*, 517 U.S. at 977 (plurality opinion). Second, the defendant must establish that the challenged district "'substantially addresses the § 2 violation.'" *Id.* Stated differently, "[n]arrow tailoring demands an explanation that the district chosen entails the least race-conscious measure needed to remedy a violation." *Prejean v. Foster*, 227 F.3d 504, 518 (5th Cir. 2000).

Under these standards, Adopted District 4 is unconstitutional. Race predominantly motivated the district's shape, and Defendants cannot prove that the district is narrowly tailored to comply with Section 2 of the VRA.

**1.     Race Was The Predominant Factor Motivating Adopted District 4's Shape.**

Race was the predominant factor motivating the shape of Adopted District 4. This conclusion is inescapable given the district's history, demographics, and bizarre shape.

**History**. After the 1990 Census, the Illinois legislature failed to adopt a redistricting plan, prompting several lawsuits that were consolidated before this Court. *See Hastert*, 777 F. Supp. 634. Republican challengers sought the creation of a Latino-majority district (*see* Ex. A69 at 6), as did the Latino plaintiffs (*Hastert*, 777 F. Supp. at 638). The Democratic challengers did not

initially seek such a district (*see* Ex. A70), but they were later forced to agree with the other

parties that Section 2 required a Latino-majority district to prevent vote dilution. *Hastert*, 777 F.

Supp. at 648. The parties settled on a district with a 59.2% Latino voting age population that,

according to the court, had an "extraordinary appearance" that "looks not unlike a Rorschach

blot turned on its side." *Id.* at 648 nn.22 & 24. As the court explained:

> We would be remiss if we failed to observe that the proposed Hispanic district
> agreed to by all parties in the present action makes the "bizarre" configuration of
> the *Karcher* [*v. Daggett*, 462 U.S. 725 (1983),] congressional districts acceptable
> by comparison. The Chicago Hispanic community resides principally in two
> dense enclaves, one on Chicago's near northwest side and one on the near
> southwest side. . . . Both the *Hastert* and *Rosebrook* plans connect the northwest
> and southwest side Hispanic enclaves by running a narrow corridor around the
> western end of the 7th Congressional District, creating a C-shaped configuration.

*Id.* at 648 n.24. In light of "[t]he extraordinary configuration of the proposed Hispanic district"

(*id.* at 648), the *Hastert* court independently assessed whether Section 2 required a majority-

Latino district to prevent racial vote dilution. Concluding that such a district was necessary, the

*Hastert* court approved the "creation of an Hispanic majority district." *Id.* at 650-51.

Two years later, the Supreme Court recognized a Fourteenth Amendment claim based on

the "deliberate segregation of voters into separate districts on the basis of race." *Shaw v. Reno*,

509 U.S. 630, 641 (1993) ("*Shaw I*"); *see Miller*, 515 U.S. 900. A voter from the *Hastert*-

adopted majority-Latino district soon challenged that district under *Shaw*. *See King I*, 979 F.

Supp. 582.

Extensively examining the *Hastert*-adopted district, the *King I* court agreed with the

plaintiff that "the only reasonable conclusion that can be drawn from the shape and

demographics of the district is that racial considerations *predominated* over all other factors in

the configuration of the Fourth Congressional District." *Id.* at 607 (emphasis added). "[T]he only

factor that consistently explains the precise configuration of the district's boundaries is race." *Id.*

As *King I* noted, "the lines of the Fourth Congressional District follow the concentrations of the Hispanic population with 'exquisite' detail." *Id.* at 609. The district "'includes virtually all areas of high percent Hispanic concentration on the northern . . . part of the City of Chicago as well as virtually all of the areas of high Hispanic concentration on the southern part of the City of Chicago.'" *Id.* The court also found that the district was "not visually compact" and that the district's slim western connector made the district contiguous in a "'hypertechnical'" and "cynical" sense only. *Id.* at 608 n.48, 609 n.49.

The *King I* court nevertheless upheld the *Hastert*-adopted district as narrowly tailored to achieve a compelling state interest. It concluded that VRA Section 2 required a majority-Latino district to prevent vote dilution, and the *Hastert*-adopted district was reasonably necessary to satisfy that requirement. *Id.* at 610-17. At the time, neither enclave of Latinos in the district was alone adequate to constitute an effective majority-Latino district. *See id.* at 617 ("the district's extraordinary configuration was required").

The Supreme Court vacated and remanded *King I* for "further consideration in light of *Shaw v. Hunt*, 517 U.S. 899 (1996) [("*Shaw II*")] and *Bush v. Vera*, 517 U.S. 952 (1996)." 519 U.S. 978. But the district court on remand found "both cases supportive of its analysis and accordingly affirm[ed] its previous decision." *King II*, 979 F. Supp. at 620. The Supreme Court summarily affirmed, over the objections of Justices Scalia, Kennedy, and Thomas. 522 U.S. 1087.

The redistricting that followed the 2000 Census maintained District 4 as a racial gerrymander. The Senate sponsor of the redistricting plan explained that the legislation "complies with the requirements of the Voting Rights Act" and "the Hispanic majority district has been preserved and reconfigured to meet the new population requirements." Ex. A36 at 10.

He continued: "[t]he existing minority/majority districts are already irregularly shaped today, and these districts have been reconfigured to maintain as much of the present districts as possible, while bringing the districts' population to the ideal. Doing so requires irregularly shaped districts." *Id.* at 11. The House sponsor likewise stated that the redistricting plan was "intended to comply with Section II of the Voting Rights Act of 1965 . . . with respect to fairness to the voting rights of racial and language minorities. In accordance therewith, . . . the one existing Hispanic District ha[s] been preserved and reconfigured to achieve population equality." Ex. A37 at 131.

The most recent redistricting following the 2010 Census preserved the racial gerrymander yet again. When questioned about Adopted District 4, the House sponsor defended the gerrymander by observing that "an earlier [district] that did not look dissimilar had been upheld by the federal courts," (Ex. A43 at 15), clearly referencing *King I* and *II*. The sponsor in the Illinois Senate likewise explained that District 4 was "preserved to be substantially similar to the 4th Congressional District as the 4th Congressional District was presented ten years ago." Ex. A45 at 12. He added that the Adopted Plan was "intended to comply with the Federal Voting Rights Act" and that "[i]n accordance therewith, the legislation retains effective African American and Hispanic majority/minority districts while also achieving population equality, the preservation of the core of existing district boundaries, and incumbent constituent relationships, and the maintenance of the parties in composition of these districts." *Id.* at 10.

From this history, the conclusion is unavoidable that race was the "predominant factor motivating the legislature's decision to place a significant number of voters within or without" Adopted District 4. *Miller*, 515 U.S. at 916.

**Demographics**. Demographic evidence confirms that race predominated in the shaping of Adopted District 4. The district "encompasses the most heavily Latino portions of both [Chicago's] northside and the southside [Latino] enclaves." Ex. A1 at 7 (Morrison Rep.); *see* Add. 25-26 (map of district). In fact, the Latino share of voting age population ("VAP") in Adopted District 4 has increased since *Hastert* to 65.92%. Ex. A5 at 4 (Morrison Rep.). And that increase is not accidental. In the 65.8% of the *Hastert*-adopted district that remains in District 4, the Latino VAP is 73.5%, while the portion of the *Hastert* district removed from District 4 has a Latino VAP of only 37.9%. *Id.* at 3.

Territorial swaps in the latest redistricting further evidence the predominance of race in shaping Adopted District 4. Because Illinois lost a congressional seat as a result of the 2010 Census, the State had to increase District 4's population by 111,657. *See* Ex. A5 at 4 (Morrison Rep.). To do so, the State could have simply added territory to District 4. It instead decided to "*trade* lower Latino VAP territory for higher Latino VAP territory." *Id.* The area removed from District 4 has a Latino VAP of 40.6%. *Id.* at 3. The area added has a Latino VAP of 47.2%. *Id.* "Had these territorial trades been more ethnically neutral rather than so ethnically unbalanced," Latino VAP in Adopted District 4 would be lower. *Id.*

**Shape**. Adopted District 4's bizarre shape further indicates that race was the predominant factor behind the creation of the district. *See Miller*, 515 U.S. at 916 (referencing "circumstantial evidence of a district's shape"); *King I*, 979 F. Supp. at 606 (considering "uncouth configuration" of District 4). Adopted District 4 "retains the 'earmuff' feature of this district that has been in place" since the *Hastert*-adopted district (Ex. A2 at 9 (Engstrom Rep.); *see* Add. 15-16 (map of district)), which *King I* and *King II* both held was a racial gerrymander.

11

This bizarre shape cannot be explained by the "traditional race-neutral districting principles" of contiguity and compactness. *Miller*, 515 U.S. at 916. Just like the district adopted in *Hastert*, Adopted District 4 is contiguous in a "hypertechnical[] and . . . cynical[]" sense only. *See King I*, 979 F. Supp. at 608 n.49. The "headband" connecting the district's two "muffs" is incredibly narrow. At one point, District 4's western edge runs along I-294's southbound lanes while its eastern edge travels along I-294's northbound lanes, leaving the median as the only part that falls within the district. *See* Add. 17-20. Slightly to the south of that point, the headband becomes nothing more than unpopulated grass fields and a cemetery. *See id.*

Nor is Adopted District 4 compact. The district flunks the "eyeball test" for compactness. Ex. A2 at 10 (Engstrom Rep.); *see King I*, 979 F. Supp. at 608 n.48 (finding predecessor district "not visually compact"). In addition, the district has a "very low .05" score under the Polsby-Popper measure of compactness, which examines "how much districts wander geographically" (Ex. A2 at 10-11 (Engstrom Rep.)) and is the "most appropriate compactness measure" for that district (Ex. A12 at 218 (Engstrom Dep.)). In fact, District 4 has the lowest Polsby-Popper measure of any district in the Adopted Plan. Ex. B at ¶ 21; Ex. A2 at 11 (Engstrom Rep.). As Plaintiffs' expert Dr. Richard Engstrom concludes, "[t]he most apparent reason for the bizarre shape of CD 4 in the [Adopted] Plan is a desire to create a district with an extremely high concentration of Latino voters." Ex. A2 at 11.

**Defendants' Responses**. Defendants' expert, Dr. Allan Lichtman, has proffered a series of rationalizations for the shape of Adopted District 4, but none of his arguments rebuts the obvious fact that race was the predominant motivating factor in shaping the district. First, Dr. Lichtman claims that Illinois did not "maximize" District 4's Latino population and could have squeezed an additional 2.5% of Latino VAP into the district. Ex. A3 at 13, 16. But even if Dr.

Lichtman's "maximized" district were possible,[3] whether a district maximizes Latino VAP is not the right question. A racial gerrymander exists if race was "the predominant factor motivating the legislature's [redistricting] decision" (*Miller*, 515 U.S. at 916), not the sole factor. Thus, in *Bush v. Vera* the Supreme Court found a district unconstitutional even though the State redistricted with "mixed motive[s]." 517 U.S. at 959. Here too, even if Adopted District 4 could have been *more* racially gerrymandered, it is racially gerrymandered nonetheless; race "substantially explain[s] the configuration of [its] borders." *King I*, 979 F. Supp. at 608.

Second, Dr. Lichtman contends that Adopted District 4 "preserves the core" of prior versions of District 4. Ex. A3 at 32. But given District 4's history, that argument simply acknowledges that the district remains constitutionally suspect. "[P]reserving the cores of prior districts" can be "legitimate" if that core is "nondiscriminatory." *Karcher v. Daggett*, 462 U.S. 725, 740 (1983). But District 4's core is *discriminatory*. *See King I*, 979 F. Supp. at 607. That gerrymandered core cannot be grandfathered in simply because it has existed for 20 years. *See Daggett v. Kimmelman*, 580 F. Supp. 1259, 1262 (D.N.J. 1984) ("While Exhibit IF–2(c) preserves the cores of the districts established in the Feldman Plan, those districts are unconstitutional."), *aff'd sub. nom. Karcher v. Daggett*, 467 U.S. 1222 (1984). Moreover, the Adopted Plan did not simply preserve District 4's core; it *increased* the racial gerrymander by moving residents out of District 4 in order to "*trade* lower Latino VAP territory for higher Latino VAP territory." Ex. A5 at 4 (Morrison Rep.).

Third, Dr. Lichtman argues that Latino ethnicity is strongly correlated with partisan affiliation. Ex. A3 at 32. But that fact is irrelevant here because District 4 and its neighboring

---

[3] Plaintiffs' expert demographer, Dr. Peter Morrison, has concluded that Dr. Lichtman's hypothesized district "rest[s] on a series of undocumented assumptions" and does not "maintain[] the necessary equal total population in CD4 and all of the surrounding districts." Ex. A5 at 6.

areas are "overwhelmingly Democratic." Ex. A6 at 10 (Engstrom Rep.). To keep District 4 Democratic, it matters very little where the lines are drawn. Yet those lines are drawn to segregate the area's Latinos, who vote mostly for Democrats, from non-Latinos, who also vote mostly for Democrats.

Finally, Dr. Lichtman suggests in passing that the shape of District 4 protects its incumbent Luis Gutierrez. Ex. A3 at 32. But selectively protecting certain incumbents "does not qualify as a legitimate state policy." *Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004), *aff'd*, 542 U.S. 947 (2004). Plus, Defendants have presented no evidence that Rep. Gutierrez would lose in a non-racially gerrymandered district—including either district proposed by Plaintiffs (Fair District 3 or 4), which each contain large portions of Adopted District 4 and have relatively high Latino VAPs (46.5% and 59.4%, respectively)—especially when he has always won by enormous margins on the occasions that anyone has bothered to challenge him. *See* Ex. A1 at 16 (Morrison Rep.); Ex. B at ¶ 37. Indeed, Defendants cannot plausibly claim that Rep. Gutierrez requires a district with a Latino VAP of 65.92% when it is Defendants' position that racial bloc voting does not exist in the first place. *See* Ex. A4 at 3 (Lichtman Rep.).

### 2. Defendants Cannot Show, Under Strict Scrutiny, That The Adopted Plan Is Narrowly Tailored To Achieve A Compelling State Interest.

Because race predominated in shaping Adopted District 4, *Defendants* must prove that the district is narrowly tailored to achieve a compelling state interest. Defendants cannot do so. Defendants have not presented a strong evidentiary basis that VRA Section 2 requires a majority-Latino district, and, even if they had, Adopted District 4 is not the least race-conscious measure needed to comply with Section 2.

**No Strong Basis In Evidence.** The reports of *their own expert* preclude Defendants from establishing the required "'strong basis in evidence' for concluding that creation of a majority-

minority district is reasonably necessary to comply with § 2." *Bush*, 517 U.S. at 977. On behalf of Defendants, Dr. Lichtman asserts that racial bloc voting does not exist: "In Cook County there is an overwhelming pattern of voting that is not polarized between Latinos and non-Latinos and an overwhelming pattern of victory, not defeat, for Latino candidates of choice." Ex. A4 at 3. In the absence of racially polarized voting, Section 2 does not require *any* majority-Latino district. *See Bush*, 517 U.S. at 978. As a result, based on Defendants' position regarding racial bloc voting, compliance with Section 2 cannot justify making race the predominant factor in the creation of Adopted District 4.[4]

**Not Least Race-Conscious Measure.** To the extent that Defendants can prove that Section 2 requires a majority-Latino district, Defendants cannot establish that Adopted District 4 is the "least race-conscious measure needed" to comply with Section 2. *Prejean*, 227 F.3d at 518. Though *King I* and *King II* concluded that the *Hastert*-adopted predecessor district was reasonably necessary in the 1990s, conditions have changed substantially. These last twenty years have seen "substantial Latino population growth." Ex. A1 at 2 (Morrison Rep.). The Latino share of Cook County's population has surged from 13.6% in 1990 to 24.0% in 2010. *Id.* These changed conditions require a reassessment of *King I*'s and *King II*'s conclusions.

As Plaintiffs' expert Dr. Engstrom—who testified in favor of creating the majority-Latino district adopted in *Hastert*—has explained, "a district with such a bizarre shape is no longer necessary to provide Latino voters with an opportunity to elect representatives of their choice similar to that provided by the initial earmuff-shaped district." Ex. A6 at 9. Indeed, the State

---

[4]  As Plaintiffs explain below (at pp. 21-22), Dr. Lichtman's conclusion on racial bloc voting is incorrect. Still, because Defendants bear the burden of proving racial bloc voting on Plaintiffs' racial gerrymander claim, Dr. Lichtman's testimony compels a finding of unconstitutionality.

easily could have drawn a district that complies with Section 2 without racial gerrymandering. *See* Ex. A2 at 11-12 (Engstrom Rep.).

Plaintiffs have proposed just such a district—Fair District 4. That district has a 59.4% Latino VAP (Ex. A1 at 13 (Morrison Rep.)), which exceeds the 59.2% Latino VAP that *Hastert*, *King I*, and *King II* all found to be sufficient under Section 2. And, crucially, Fair District 4 is not racially gerrymandered. Joining the southern part of the "earmuff" with truly contiguous areas in the near southwest Chicago area, Fair District 4 is "considerably more compact" than Adopted District 4. Ex. A6 at 21 (Engstrom Rep.); Add. 15-16 (Adopted District 4); Add. 65-66 (Fair District 4). This is visually apparent and confirmed by Fair District 4's Polsby-Popper measure of .34, a six-fold improvement over the figure for Adopted District 4. *See* Ex. B at ¶ 21.

In short, race predominated in the shaping of Adopted District 4, and Defendants cannot prove that the district is narrowly tailored to achieve a compelling state interest. The Adopted Plan thus violates the Constitution and must be enjoined.

**B.    The Adopted Plan Intentionally Discriminates Against Latino Voters In Districts 3, 4, And 5.**

The Adopted Plan must be enjoined for a second reason: it is the product of intentional discrimination against Latino voters. The State purposely diluted the voting power of Latinos by packing Latinos into Adopted District 4 while removing them from neighboring Adopted Districts 3 and 5. Such intentional discrimination violates Section 2 of the Voting Rights Act, the Fourteenth Amendment, and the Fifteenth Amendment. *See* Doc. 98 at 3, 13; *see also Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771 (9th Cir. 1990) (Section 2); *Rogers v. Lodge*, 458 U.S. 613, 617 (1982) (Fourteenth Amendment); *Hastert*, 777 F. Supp. at 645 (Fifteenth Amendment).

A State "engage[s] in deliberate racial discrimination" when it "deliberately adopt[s] devices for limiting [minority] representation," regardless of "the dominant desire actuating the

16

redistricting plan." *Barnett v. Daley*, 32 F.3d 1196, 1199 (7th Cir. 1994). Thus, "[i]t is not . . . necessary for a plaintiff to demonstrate that discriminatory purpose is the only underlying motivation for the challenged redistricting plan." *Ketchum v. Byrne*, 740 F.2d 1398, 1406 (7th Cir. 1984). "[A]s long as [discriminatory purpose] is one of the motives," the State has acted unlawfully. *Id.*; *accord United States v. Brown*, 561 F.3d 420, 433 (5th Cir. 2009). Further, where intentional discrimination exists, a plaintiff's "showing of injury . . . need not be as rigorous" as in other vote dilution cases. *Garza*, 918 F.2d at 771; *see also* Doc. 98 at 8 ("the first *Gingles* factor is appropriately relaxed when intentional discrimination is shown").

"Determining whether invidious discriminatory purpose was a motivating factor demands a sensitive inquiry into such circumstantial and direct evidence of intent as may be available" (*Vill. of Arlington Heights v. Metro. Hous. Dev. Auth. Corp.*, 429 U.S. 252, 266 (1977)), though "discriminatory intent need not be proved by direct evidence" (*Rogers*, 458 U.S. at 618). Courts consider a number of circumstantial factors in assessing whether intentional discrimination exists. As this Court recognized in its discovery order, the "factors include, but are not limited to, bloc voting along racial lines; low minority voter registration; exclusion from the political process; unresponsiveness of elected officials to needs of minorities; and depressed socio-economic status attributable to inferior education and employment and housing discrimination." Doc. 77 at 7. "Other factors include the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; minority retrogression . . . ; and manipulation of district boundaries to adjust the relative size of minority groups, including the 'packing' of minority voters." *Id.* at 7-8. Yet "[a]nother relevant consideration is whether the number of districts in which the minority group

forms an effective majority is roughly proportional to its share of the population in the relevant area." *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 426 (2006) ("*LULAC*").

When examining the totality of the relevant evidence, it is clear that the State purposely diluted Latino votes in Adopted Districts 3, 4, and 5 to cabin Latinos' growing political influence.

**Manipulated District Boundaries**. The district boundaries established by Adopted Districts 3, 4, and 5 provide compelling evidence of intentional vote dilution. *See Ketchum*, 740 F.2d at 1407 ("discrimination may be identified in the manipulation of . . . boundaries to adjust the relative size of racial groups"). In two ways, the Adopted Plan purposely alters district boundaries so as to prevent Latinos from electing their candidate of choice in any district other than District 4.

First, the Adopted Plan packs a supermajority of Latinos into District 4 so that the votes of Latinos inside the district are "wasted" and cannot be combined with the votes of Latinos outside the district. *See id.* at 1408 n.7 ("packing" involves the "excessive concentration of [minority] population" and "may be viewed as 'wasting' minority voting power and unnecessarily minimizing minority effectiveness in other districts"). The Latino share of VAP in Adopted District 4 stands at 65.9% as a result of ethnically unbalanced territorial trades in the 2011 redistricting process that added territory with a 47.2% Latino VAP, while removing territory with a 40.6% Latino VAP. Ex. A1 at 8 (Morrison Rep.). That Latino VAP is "higher than necessary to provide Latinos with a viable opportunity to elect representatives of their choice." Ex. A2 at 9 (Dr. Engstrom: "In other words, the district is packed in a way that 'wastes' Latino votes."). Indeed, after *Hastert* gave the predecessor district a Latino VAP of 59.2%, "both of the candidates that contested the Democratic primary in [District 4] were Latinos," and the

winner (Luis Gutierrez) handily won the general election, and every primary and general election since, by large margins. *Id.*; *see also* Ex. B at ¶ 37.[5]

Second, the Adopted Plan simultaneously "cracks" Latinos in bordering Districts 3 and 5 by reducing their share of VAP. Adopted District 3 lies directly south of Adopted District 4's southern muff. For the past two decades, District 3 has been represented by white congressmen Bill Lipinski (1993-2005) and his son Dan Lipinski (2005-present). The explosive growth of Chicago's southwest Latino community threatens their hold on power, and that threat increases by the day. *See* Ex. A1 at 6 (Morrison Rep.).[6] To counteract this threat, District 3 in the Adopted Plan expands significantly to the south and west, picking up considerable territory with low Latino population. *See* Add. 11-12. The area added to District 3 has a Latino VAP of 16.4%, while the area removed from District 3 has a Latino VAP of 34.4%. Ex. A1 at 8 (Morrison Rep.). These ethnically unbalanced territorial trades reduce District 3's Latino VAP from 29.3% to

---

[5] In its November 1, 2011 opinion, this Court suggested that "'Latinos must be 65 to 70 percent of the total population in order to be confident of electing a Latino.'" Doc. 98 at 8 (quoting *Barnett v. City of Chicago*, 141 F.3d 699, 703 (7th Cir. 1998)). But that is simply a "rule of thumb" (*Barnett*, 141 F.3d at 702) to be used "[i]n the absence of more reliable data" and "'should be reconsidered regularly to reflect new information and new statistical data.'" *Campuzano v. Ill. State Bd. of Elections*, 200 F. Supp. 2d 905, 910-11 (N.D. Ill. 2002). Here, just as in *Campuzano*, expert evidence of voting strength should supplant those rules of thumb. *See id.* at 911-12 (crediting testimony of Dr. Lichtman "that current voting rights scholarship generally opposes uniform application of the rule of thumb to majority-minority districts because factors such as age, registration rates, and turnout behavior of voters can vary significantly from district to district"). In any event, Latinos represent 71.1% of Adopted District 4's total population, exceeding the rule of thumb. Ex. A1 at 16 (Morrison Rep.). Latinos would constitute 65.0% of Fair District 4's total population, falling within the Court's rule of thumb. *Id.*

[6] Plaintiffs' expert demographer, Dr. Peter Morrison, has determined that Latino VAP in Chicago's southwest Latino community will increase by 1.1 percentage points every year. Ex. A1 at 6 (Morrison Rep.). Latino VAP in Chicago's northwest Latino community will increase by one percentage point every 3.2 years. *Id.*

24.6%. *Id.* Such a low share of VAP does not offer Latinos any chance to influence, much less control, the choice of their representative. *See* Ex. A6 at 21-23 (Engstrom Rep.).[7]

District 5 tells a similar story. For the last 15 years, District 5 has been represented by white Democrats (currently, Mike Quigley). The 2002-2010 version of District 5 lies directly north of District 4's northern "muff" and has been affected by the Latino community's strong growth. *See* Ex. A1 at 4-5 (Morrison Rep.). Under the Adopted Plan, District 5 retreats from this highly Latino-populated area and grabs largely white-populated territory to the west, east, and north. *See* Add. 31-32. The territory removed from District 5 has a Latino VAP of 54.5%. Ex. A1 at 10 (Morrison Rep.). The area added to District 5 has a Latino VAP of 12.8%. *Id.* As a result, Latino VAP plummets from 24.6% to 16.1%. *Id.* Again, such a low share of VAP offers Latinos no role in selecting their representative. *See* Ex. A6 at 21-23 (Engstrom Rep.).

The allocation of Latino voters among the Adopted Districts in and around Chicago is not mere coincidence. Latinos increasingly threaten the white congressmen of Districts 3 and 5— especially in the crucial Democratic primary—and the Adopted Plan intentionally stems that tide by packing District 4 and cracking Districts 3 and 5.

**Proportionality.** Illinois's Latino population doubled over the last twenty years, rising from 7.9% in 1990 to 15.8% in 2010, with voting age population likewise jumping from 6.8% in 1990 to 13.4% in 2010. Ex. A1 at 2, 15 (Morrison Rep.). Latinos thus would control 2.4 districts if Illinois's 18 congressional seats were distributed proportionally based on VAP. Yet, Latinos form an effective majority in only one district in the Adopted Plan—District 4. *See* Ex. A6 at 21-22 (Engstrom Rep.).

---

[7] Indeed, Defendants' expert Dr. Lichtman testified before the General Assembly's redistricting committees that in identifying state legislative districts that offered a minority group a reasonable opportunity for electoral success, he did "not go into the 20 percent range" in terms of the minority group's share of VAP, but instead stopped at 35%. Ex. A42 at 77-78.

While this Court concluded in its November 1, 2011 opinion that citizen voting age population ("CVAP") is "the more appropriate inquiry for the proportionality factor" (Doc. 98 at 9), Plaintiffs respectfully disagree. This Court relied on *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998), and *LULAC*, which both used citizenship figures reported in the 2000 Census. Yet, as this Court acknowledged, "the 2010 census doesn't include citizenship." Doc. 98 at 9. The Court suggested that "citizen voting-age population can be shown through expert testimony" (*id.* at 9-10), but that approach conflicts with Seventh Circuit holding that "estimates about population . . . don't matter, because apportionment is based on Census returns." *Gonzalez v. City of Aurora, Ill.*, 535 F.3d 594, 597 (7th Cir. 2008). Plus, estimates of CVAP based on the American Communities Survey ("ACS") suffer from "important limitations that render them inaccurate and unreliable." Ex. A5 at 8 (Morrison Rep.).

Even if CVAP were the proper benchmark, Latinos are still underrepresented by 57% on that measure. Defendants' expert Dr. Lichtman admits that Latinos would control 1.57 districts if Illinois's congressional seats were distributed proportionally based on the ACS estimate of CVAP. Ex. A7 at 20. But again, under the Adopted Plan they control only one district. Moreover, as the Court may "consider both census voting-age population data and evidence deducing citizen voting-age population" (Doc. 98 at 10), the fact that Latinos are underrepresented by 140% when using VAP should further tip the scales toward a finding of disproportionality.

**Polarized Voting**. Racially polarized voting in the Latino areas of Adopted Districts 3, 4, and 5 further evidences discriminatory intent. *See Brown*, 561 F.3d at 433 n.10 (listing "the extent to which voting in the elections of the state or political subdivision is racially polarized" as relevant). It also establishes the necessary injury. *See* Doc. 98 at 8 (Plaintiffs must prove "that

the minority group is politically cohesive and that the majority votes as a bloc"). After studying relevant elections in the specific areas in which vote dilution is alleged—Adopted District 4 and Fair Districts 3 and 4—Plaintiffs' expert Dr. Engstrom concluded that "voting in the area at issue is racially polarized." Ex. A2 at 14. Dr. Engstrom examined relevant Democratic primaries, as well as other relevant elections, and found that "[t]he preference of Latino voters residing in this area for Latino candidates . . . is unmistakable, and it is not a preference shared by the other voters in the area." *Id.* at 8. Because voting is racially polarized, "[t]he relative presence of Latinos in congressional districts in this area therefore will be a major factor in whether Latino voters are able to elect the representatives of their choice from this area to the U.S. House of Representatives." *Id.* As a result, the packing of Latinos in Adopted District 4 and the cracking of Latinos in Adopted Districts 3 and 5 diminishes Latinos' opportunity to elect representatives of their choice. Accordingly, as Dr. Engstrom concludes, the Adopted Plan "dilutes the voting strength of Latinos in the area." *Id.* at 14.[8]

**Redistricting Process**. On March 3, 2011, soon after the 2010 Census figures were released, District 3's congressman Dan Lipinski drew his own proposed district and emailed it to the Illinois Speaker of the House's chief of staff. Ex. A20. That proposed District 3 retreated

---

[8] Defendants' expert Dr. Lichtman argues that racial bloc voting does not exist. But Dr. Lichtman's analysis is deeply flawed. Among other things, Dr. Lichtman relies on a methodology called "ecological regression," which "is 'often wildly inaccurate,'" "produces 'impossible results . . . with regularity,'" and fails to provide "confidence intervals to reflect the uncertainty of [its] estimates." Ex. A6 at 5, 8 (Engstrom Rep.). Dr. Engstrom, by contrast, relies on a "celebrated" methodology called "ecological inference," which was developed in response to the inadequacies of the ecological regression model. *See id.* In addition, Dr. Lichtman's analysis improperly focuses beyond the area of concern by examining "all of Cook County," even though Plaintiffs' intentional vote dilution allegations pertain only to Districts 3, 4, and 5 of the Adopted Plan. *Id.* at 12. As Defendants themselves have argued in this case, "vote dilution is a district-specific, not statewide"—or even county-wide—"inquiry." Doc. 40 at 6. Dr. Lichtman's flawed methodology and overbroad analysis do not remotely undermine Dr. Engstrom's conclusions. *See also* Doc. 98 at 8 (requiring district-specific analysis).

from current District 3's northern border with District 4 and expanded significantly to the south and west. *See* Ex. A21. The following month, on April 11, 2011, Rep. Lipinski sent another email to the Speaker's chief of staff, asking to meet with him and attaching a "work-in-progress map" that likewise expanded District 3 significantly south and west of District 3's current boundaries. Ex. A24.

On April 15, 2011, Rep. Lipinski's deputy chief of staff emailed the Speaker's chief of staff with a "revis[ed]" "map for Congressman Lipinski's 3rd District." Ex. A25. The aide explained that Rep. Lipinski "asked that I send you a copy" and commented that the revised District 3 "is about 57% DPI, 22% hispanic, about 4% black." *Id.*[9] And on April 17, an employee working for the DCCC emailed the chief of staff of Democratic Rep. Jerry Costello—who also was involved with the mapmaking process—with "the proposed Lipinski changes," which included "[t]he most relevant stats for the 3rdCD." Ex. A26. Those "most relevant stats" (*id.*) again show the district's "18+ Hisp" figure. Ex. A27. As is clear, Rep. Lipinski's office and the other map drafters closely monitored District 3's Latino VAP. And for good reason: the higher the Latino VAP in District 3, the more likely it would be that Rep. Lipinski would face a strong Latino challenger, particularly as the Latino population continued to grow in future years.

Rep. Lipinski had tremendous reason to fear such a challenge. Rep. Lipinski has an especially "poor voting record on immigration issues," despite the fact that "[o]ne-fifth of [his] district's residents are immigrants." Ex. A68. For example, he voted for a border fence and voted to punish Chicago for refusing to inquire about immigration status when offering police protection and other vital services. *Id.* His abysmal voting record lost him the endorsement of Illinois's lone Latino congressman. *Id.* The fact that "elected officials" like Rep. Lipinski are

---

[9] "DPI" likely means Democratic Performance Index, an estimate of which party will prevail in a general election.

"unresponsive[] . . . to needs of minorities" is yet another factor favoring an intentional discrimination finding. Doc. 77 at 7.

While Rep. Lipinski's office privately drew the boundaries of District 3, the leadership of Illinois's state legislature kept the backroom map-drawing process well-hidden.  As we have already detailed, the Democratic leaders of the legislature's redistricting committees refused to answer questions about the mapmaking process and reneged on promises to hold hearings after releasing their proposed map.  *See supra* p. 3.  Instead, over Memorial Day weekend, the map was released and pushed through the General Assembly in quick succession.  *Id.*  Those deceptive procedural maneuvers further support a finding of discriminatory intent. *See* Doc. 77 at 7 (listing "the specific sequence of events leading up to the challenged decision" and "departures from the normal procedural sequence" as indicia of discriminatory intent).

**History Of Discrimination**. The Adopted Plan is the latest chapter in a sad history of governmental discrimination against Chicago's Latinos. *See* Doc. 77 at 7 (listing "the historical background of the decision" as a relevant factor). In *Rybicki v. State Board of Elections*, 574 F. Supp. 1082, 1122-23 (N.D. Ill. 1982), Latinos challenged the Illinois state legislative redistricting plan and presented evidence at trial of purposeful vote dilution, including evidence that the current Speaker of the Illinois House of Representatives (Mike Madigan) was behind that effort. *See id.* at 1123 (alleging that "Representative Madigan" and others "intentionally fractured both Hispanic communities by dividing each community among four separate legislative districts"). "[A]t the urging of the court," the parties reached a settlement agreement in which there no longer was "purposeful dilution of the Hispanic vote." *Id.* at 1123-24. Furthermore, in *Ketchum*, 740 F.2d 1398, the Seventh Circuit upheld a decision striking down the 1982 Chicago aldermanic redistricting plan because it diluted the votes of Latinos.

The following decade, the *Hastert* court concluded "that ethnic bloc voting patterns have thwarted the political interests of the Hispanic community." 777 F. Supp. at 650. The "history of discrimination, both past and recent, against the Chicago Hispanic community and its attendant impact on effective political participation and representation" convinced the court to adopt the majority-Latino District 4. *Id.* Then, in *King I*, the court upheld the constitutionality of that district after noting the existence of "a definite pattern and practice of electoral discrimination against the Hispanic community." 979 F. Supp. at 615.

In *Barnett*, 141 F.3d at 702, the Seventh Circuit observed that "[v]oting for aldermen in Chicago is polarized" and "Latinos are almost never elected in wards that do not contain a Latino majority of citizens of voting age." In the redistricting committee hearings that followed the 2000 Census, Defendants' own expert Dr. Lichtman testified that "the State of Illinois in my view is on special notice to make sure that any redistricting plan does not impede minority voter opportunities."  Ex. A38 at 65. Dr. Lichtman subsequently testified in 2002 litigation challenging the redistricting of Illinois's legislature that the three threshold requirements for a VRA Section 2 claim—including racially polarized voting—were satisfied by Cook County Hispanics. Ex. A13 at 99.

Finally, courts have also recognized that Cook County Latinos have been subjected to discriminatory voting practices that prevent them from enjoying an equal opportunity to elect candidates of their choice. In *Black v. McGuffage*, 209 F. Supp. 2d 889, 897 (N.D. Ill. 2002), for instance, the court refused to dismiss a suit by Latino voters challenging the impact of punch card error in the 2000 election, ruling that "voters residing in predominantly Latino and African American precincts where punch card machines are utilized[] bear a greater risk that their votes will not be counted than do other voters" and therefore "Plaintiffs' participation in the political

25

process could be significantly diminished." Similarly, in *United States v. Town of Cicero*, No. 00-C-1530, 2000 WL 34342276, at *1 (N.D. Ill. Mar. 15, 2000), the Department of Justice obtained a temporary restraining order after the court found it likely that Cicero's candidate residency requirement was "adopted, at least in part, with the racially discriminatory purpose of targeting potential Hispanic candidates for disqualification and thereby seeking to prevent Hispanic voters from having the opportunity to vote for and/or elect candidates of their choice, in violation of Section 2 of the Voting Rights Act."

To be sure, recent years have seen a few electoral successes for Latino candidates in the Chicago area. But those victories are too limited in number and scope to be considered anything but isolated exceptions where Latino candidates were able to prevail in spite of the long and continuing history of electoral discrimination against Latinos in the Chicago area. *See* Ex. A6 at 8-14 (Engstrom Rep.).

**Socioeconomic Disparities**. Latinos in Illinois also continue to suffer the effects of discrimination in a wide variety of areas, including employment, education, and housing. *See* Doc. 77 at 7 (listing "depressed socio-economic status attributable to inferior education and employment and housing discrimination" as relevant). As summarized in the 2007 Illinois Latino Family Commission Act, "[d]espite unprecedented population growth, Latinos lag behind in major indicators of well-being relative to education, health, employment, and child welfare, as well as representation throughout the State [of Illinois]." 20 ILCS 3983/5. "Latino families remain outside of the margins of opportunities in the State" and face "tremendous challenges." *Id.*

In the area of employment, recent census data reveals that Latinos in Cook County have a per capita annual income of only $15,184, which is just over half of the Cook County average.

26

*See* Exs. A57, A58; *see also* Ex. A53 at 8 ("Latinos had lower family incomes than any other major racial or ethnic group in the Chicago region in both 2000 and 2006."). Latinos suffer from higher unemployment rates as well: 12.7% of Latinos in Illinois were unemployed in 2010, compared with only 9.1% of whites. *See* Ex. A60.

Latinos in the Chicago area also face severe disadvantages in education, with a 2005 study reporting that several Chicago-area school districts serving predominantly Latino students were underperforming by a considerable margin and spending less per pupil when compared to predominantly white districts. Ex. A61 at 24-25, 31. These and other disadvantages contribute to Latino students' lower rates of high school and college completion. *See* Exs. A55, A56 (42% percent of Cook County Latinos lack high school diplomas, compared to 17% of all Cook County residents); Ex. A53 ("[o]nly 11 percent of Latinos in the [Chicago] region in 2006 had college degrees, compared to 18 percent for African-Americans, 41 percent for White residents, and 61 percent for Asians").

Latinos fare no better when it comes to housing. Not only do they have difficulty accessing affordable housing (*see* Ex. A52), but they encounter discrimination when trying to purchase homes in Chicago (*see* Ex. A65 at A6-3). Accordingly, "metro Chicago continues to be marked by a large degree of residential segregation along racial/ethnic lines." Ex. A64 at 5.

These disadvantages impede the ability of Latinos to participate effectively in the political process. As the *Hastert* court observed, "discrimination against Chicago Hispanics in housing, education and services" is a "cause of the historically low Hispanic voter registration and turnout." 777 F. Supp. at 650. As of 2010, only 51.9% of Latino citizens of voting age were registered to vote in Illinois, compared to 66.8% of whites and 66.7% of African Americans. Ex. A59. And in the November 2010 elections, only 32.2% of Illinois's Latino voting-age citizens

27

voted, compared to 45.0% of whites and 54.8% of African Americans. *Id.* As this data shows, "Latino political power" in Illinois continues to be "overshadowed by other segments of the electorate." Ex. A62 at 3.

In short, the State purposely diluted the votes of Latinos in Districts 3, 4, and 5 of the Adopted Plan in response to the Latino community's strong and certain growth. The changes in Districts 3, 4, and 5's demographics provide unmistakable evidence that the Adopted Plan will diminish Latinos' electoral opportunities over the next ten years, and the totality of relevant factors confirm the presence of intentional vote dilution. The Adopted Plan violates the Voting Rights Act and the U.S. Constitution and must be enjoined.

## C. The Adopted Plan Intentionally Creates Unconstitutional Partisan Gerrymanders.

The Adopted Plan suffers from another fatal defect. It uses blatant partisan gerrymandering to benefit Democrats at the expense of Republicans. The Adopted Plan thus violates the First and Fourteenth Amendments by intentionally penalizing and discriminating against Republican voters based on their political affiliations and their expression of political views. The Adopted Plan should therefore be enjoined on partisan gerrymandering grounds.

Although some Justices have voiced justiciability objections, the Supreme Court has consistently maintained that partisan gerrymandering claims are indeed justiciable and that some partisan gerrymandering violates the Constitution. *See LULAC*, 548 U.S. at 413-20 (Kennedy, J.); *id.* at 447-73 (Stevens, J., concurring in part and dissenting in part); *id.* at 483-84 (Souter, J., concurring in part and dissenting in part); *id.* at 491-92 (Breyer, J., concurring in part and dissenting in part); *Vieth v. Jubelirer*, 541 U.S. 267, 306-17 (2004) (Kennedy, J., concurring); *id.* at 317-39 (Stevens, J., dissenting); *id.* at 343-55 (Souter, J., dissenting); *id.* at 355-56, 366-67 (Breyer, J., dissenting); *Davis v. Bandemer*, 478 U.S. 109, 118-34 (1986) (plurality opinion); *id.*

at 161-174 (Powell, J., concurring in part and dissenting in part). As Justice Kennedy explained

in providing the fifth vote for that view in *Vieth*, 541 U.S. at 312:

> If a State passed an enactment that declared 'All future apportionment shall be drawn so as most to burden Party X's rights to fair and effective representation, though still in accord with one-person, one-vote principles,' we would surely conclude the Constitution had been violated. If that is so, we should admit the possibility remains that a legislature might attempt to reach the same result without that express directive. This possibility suggests that in another case a standard might emerge that suitably demonstrates how an apportionment's *de facto* incorporation of partisan classifications burdens rights of fair and effective representation (and so establishes the classification is unrelated to the aims of apportionment and thus is used in an impermissible fashion).

The Court has articulated two legal bases for partisan gerrymander claims. Traditionally,

the Court has understood partisan gerrymandering to violate the Equal Protection Clause of the

Fourteenth Amendment when a State uses political party classifications to create districts that

impermissibly dilute the votes of those who support one of the political parties. *See Davis*, 478

U.S. at 118-19, 127-33 (plurality opinion) ("unconstitutional discrimination occurs" when the

electoral system "will consistently degrade a voter's or a group of voters' influence on the

political process"); *id.* at 171 (Powell, J., concurring in part and dissenting in part) (violation

present where "district lines were drawn for the purpose and with the effect of substantially

debasing the strength of votes cast by Democrats as a group"). More recently, Justice Kennedy

has suggested that "[w]here it is alleged that a gerrymander had the purpose and effect of

imposing burdens on a disfavored party and its voters, the First Amendment may offer a sounder

and more prudential basis for intervention than does the Equal Protection Clause." *Vieth*, 541

U.S. at 315. Plaintiffs have alleged claims under both theories.

The Supreme Court has yet to agree on the specifics of a standard for judging partisan

gerrymander claims, whether under the Equal Protection Clause or the First Amendment. *See*

*LULAC*, 548 U.S. at 413-14 (disagreement over substantive standard "persists"). But the Court

has long recognized that such a claim has two basic elements: (1) an intent to discriminate against or otherwise burden a political group; and (2) an effect that harms the ability of a political group to elect candidates. *See Vieth*, 541 U.S. at 315 (Kennedy, J., concurring) (unconstitutionality turns on whether "gerrymander had the purpose and effect of imposing burdens on a disfavored party and its voters"); *Davis*, 478 U.S. at 127 (plurality opinion) ("in order to succeed" on partisan gerrymander claim, plaintiffs must "prove both intentional discrimination against an identifiable political group and an actual discriminatory effect on that group"); *id.* at 161 (Powell, J., concurring in part and dissenting in part) (same).

Plaintiffs remain convinced that courts bear the burden of fleshing out the precise proof required to prevail on a partisan gerrymander claim and that articulating a precise standard is unnecessary because the abundant evidence here would meet any reasonable standard this Court might adopt. *See* Doc. 83 at 7-9. But Plaintiffs recognize that this Court has taken the view that Plaintiffs must come forward with a proposed standard. Doc. 98 at 17-19. Accordingly, Plaintiffs offer their own workable and reliable standard for judging partisan gerrymander claims. Consistent with Supreme Court precedent in this area, Plaintiffs' proposed standard has an intent requirement and an effect requirement. We address the intent requirement first.

### 1. The State's Predominant Intent In Drawing Several Districts In The Adopted Plan Was To Advance Democratic Partisan Interests.

To establish the intent element of the proposed standard for judging partisan gerrymanders, Plaintiffs would have to prove that the State's mapmakers created one or more congressional districts with the predominant intent to secure partisan advantage. Plaintiffs could do so with any direct or circumstantial evidence of such an intent, including evidence that the mapmakers disregarded traditional and neutral districting principles. This intent standard has the advantage of paralleling the intent standard that applies to racial gerrymandering claims. *See*

30

*Miller*, 515 U.S. at 916. And it directly targets the "excessive" or "substantial" or "penalizing" uses of partisanship that have concerned the Supreme Court Justices who see a role for courts in stopping partisan gerrymandering. *See LULAC*, 548 U.S. at 463 (Stevens, J., concurring in part and dissenting in part); *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring); *Davis*, 478 U.S. at 133 (plurality opinion); *id.* at 171 (Powell, J., concurring in part and dissenting in part).

There is abundant direct and circumstantial evidence that the State's mapmakers drew several districts in the Adopted Plan with the predominant intent of securing a partisan advantage for the Democrats. To begin with, Democrats completely excluded Republicans from the districting process, and indeed did all they could to keep the process from public view. The Democrats controlled both chambers of the General Assembly and the Governor's mansion. *See* Exs. A49-A51. They used the DCCC to create the map, trading drafts with the DCCC from the moment census data became available. *See* Exs. A19, A22, A23, A28-A33, A35; *see also* Ex. A17 at 29 (Rep. Schock told by state legislature staff that congressional map drawing was left up to "[Senate] President Cullerton and Steve Israel with the DCCC"). They rejected the efforts of (Democratic) Congressman Jerry Costello to negotiate a bipartisan map. See Ex. A10 at 45, 85, 89, 92, 104-05 (Costello Dep.).[10] In hearings before the redistricting committees of the Illinois

---

[10] Rep. Costello testified: "It was clear to me from both meetings [with the Democratic leaders of General Assembly] that the Legislature was going forward doing their work to produce a map and in the end that that's exactly what they were going to do, that our – I had tried on both occasions to say we think we can come up with a ten, eight map, but that I felt that based upon the conversations that the Legislature is moving forward and I didn't think we would see a ten, eight map." Ex. A10 at 104. Congressman John Shimkus confirmed that the DCCC would not provide shape files to aid his and Rep. Costello's effort to negotiate a bipartisan map, at which point Costello "realized that other influences, Senator Durbin, Congresswoman Schakowsky, President Cullerton, were taking over the map process." Ex. A18 at 69. Congressman Peter Roskam likewise testified that "based on the conversations that [he] had with [Illinois Senate President John] Cullerton, it was clear that there was an agenda to move a map forward that was going to create a great advantage to the Democrats and they weren't interested in substantive input into it." Ex. A16 at 37-38. Finally, Congressman Jesse Jackson has said that while "seven

House and Senate, the Democratic chairpersons of those committees refused to field questions or provide a draft map (to the public or their Republican colleagues), despite promises to do so. *See* Ex. A40 at 165; Ex. A41 at 69, 73, 77. And after publicly disclosing the proposed map for the first time at 4:00 a.m. on the Friday of Memorial Day weekend, the Democrats in the General Assembly passed the map on a strict party-line basis with votes on Memorial Day in the House and the next day in the Senate. *See* Exs. A44, A46, A47, A67.

Meanwhile, behind the scenes, the Democratic leadership of the General Assembly and its mapmaking partner, the DCCC, did not mince words in describing their shared goals for remapping the districts held by Republicans. In February 2011, a DCCC representative (Ian Russell) thanked the chief of staff for the Senate President John Cullerton (Andy Manar) for his guidance on how to "advance our goal—more Democratic pick-ups." Ex. A19. Two weeks later, Russell suggested several potential districts aimed at getting "Democratic performance" above 50%, including one linking Rockford and Rock Island and another connecting Champaign/Urbana, Decatur, Springfield, and Bloomington/Normal. Ex. A22. That same week, Manar asked Russell for maps reflecting "potential pick-ups," and Russell responded that the DCCC was "open to discussing how to maximize pick-up opportunities." Ex. A23. Thereafter, through April and May, the DCCC fed Senate President Cullerton's staff with ideas about how to make various districts "more Democratic" (Ex. A28) and achieve the "goal" to "maximize Democratic performance" (Ex. A30).

A May 24, 2011 DCCC memo addressed directly to Senate President Cullerton is particularly revealing. The memo first acknowledges that a map presented by the State

---

of the Democrat representatives had voted for" the map "that Costello had showed" them, Jan Schakowsky "voted against it and she had won because she was greedy." Ex. A9 at 19-20 (Biggert Dep.).

legislature's Democratic leadership at a May 21, 2011 meeting "redraws downstate Illinois with the goal of providing a Democratic-leaning district stretching from Rock Island to Rockford and another one pulling together the cities in downstate Illinois." Ex. A31 at SEND2650. The memo then proceeds to offer suggestions for "increas[ing] our odds of making at least one and probably two downstate seats part of a durable majority in the delegation," including by "pairing the Quad Cities with Peoria." *Id.* at SEND2651. Finally, boasting that "[a] critical part of the remapping process is altering the districts of incumbent Republicans to complicate their paths back to Washington," the memo proposes "split[ting] Peoria in half, with the Democratic neighborhoods going into a Democratic-leaning district that runs north to the Quad Cities" and Peoria-based (Republican) Congressman Aaron Schock going into a "heavily Republican" (*i.e.*, packed) district. *Id.*

The Adopted Plan confirms that the Democratic leadership of the General Assembly was taking the DCCC's guidance to heart. Extending long tendrils eastward, Adopted District 17 links the Quad Cities with the Democratic-leaning parts of Peoria and the Democratic-leaning parts of Rockford, leaving not just Congressmen Schock but also (Republican) Congressman Don Manzullo (from the Rockford area) in other districts. *See* Add. 51-52 (map of district); Ex. B at ¶ 35 (incumbent residences); Ex. A17 at 41-43 (Rep. Schock describing how the Adopted Plan divides Peoria by cutting the "large minority population center . . . out of my district"); Ex. A15 at 18-21, 50 (Rep. Manzullo describing how the Adopted Plan divides Rockford by "mak[ing] the minorities on the West Side of Rockford nothing but an appendage to a new district that's formed to the west" even though Rockford has "never been divided since 1850").[11]

---

[11]  Indeed, Senate President Cullerton admitted to Congressman Schock, "we've decided that we are not going to beat you. So we are not going to waste our Democrat voters on you, and

District 13 likewise pulls together Democratic-leaning parts of Springfield, Bloomington/ Normal, and Champaign/Urbana with Decatur by sending arms off toward the east, north, and northwest. *See* Add. 41-42 (map of district). And District 11 zigzags across Chicago's southwestern suburbs to link Democratic-leaning populations in Aurora and Joliet. *See* Add. 37-38 (map of district). Needless to say, none of these districts is particularly compact, with Polsby-Popper compactness scores ranging from 0.12 for District 11 to 0.19 for Districts 13 and 17. Ex. B at ¶ 21.

Nor does the Adopted Plan reflect adherence to any other neutral redistricting principles. The plan divides over 50 towns with at least 25,000 residents between more than one district. *See* Ex. B19. With respect to districts currently represented by Republicans, moreover, the plan exhibits no intent to protect incumbents. To the contrary, the Adopted Plan places three Republican incumbents (Biggert, Kinzinger, and Dold) into heavily Democratic districts with a Democratic incumbent and places another two Republican incumbents (Walsh and Hultgren) in the same district, while separating each Republican incumbent from his or her constituents to a greater degree than it separates any Democratic incumbent from his or her constituents. *See* Ex. B at ¶ 36.

The treatment of current District 13 is particularly indicative of the Adopted Plan's partisan animus. The plan dismantles that compact district—long represented by (Republican) Congresswoman Judy Biggert—placing pieces of the district into six different districts (Districts 1, 3, 5, 6, 11, and 14). *See* Add. 57-58 (map); Ex. A9 at 50-51 (Biggert Dep.). And it places Rep. Biggert's Hinsdale home at the extreme tip of an extended southern appendage of a heavily Democratic district (with a Democratic incumbent) that stretches from Lake Michigan to O'Hare

---

congratulations, we are giving you the most Republican district in the state." Ex. A17 at 30 (Schock Dep.).

on Chicago's north side and contains a mere 1.3% of Rep. Biggert's constituents. *See* Add. 57-58 (map); Ex. B at ¶¶ 25, 35. Indeed, Defendants' own expert has admitted that Rep. Biggert was placed in Adopted District 5 for "political reasons." Ex. A14 at 74-75 (Lichtman Dep.).

Together, all of the direct and circumstantial evidence leaves no doubt that the predominant intent behind the shape of several districts in the Adopted Plan (including Districts 11, 13, and 17) was to secure a partisan advantage for the Democrats. *See Davis*, 478 U.S. at 129 ("As long as redistricting is done by a legislature, it should not be very difficult to prove that the likely political consequences of the reapportionment were intended.").

### 2. The Adopted Plan Has The Effect of Creating Partisan Gerrymanders In Several Districts.

Under Plaintiffs' suggested standard for judging partisan gerrymander claims, proving the required discriminatory effect would require a showing of three things: (1) that the Adopted Plan increases the number of districts that favor Democrats by at least 10% according to an accepted measure of partisan voting; (2) that the Adopted Plan keeps at least 10% more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents; and (3) that at least one of the districts created with the intent to advantage Democrats is among the districts that contributes to the proof of elements 1 and 2.

That standard is eminently workable, as it relies on simple and objective metrics. With its use of a partisanship index to judge increases in districts that promise 50%+ Democratic performance and its focus on changes that destabilize Republican incumbent-constituent relationships, the standard also mirrors precisely the kind of analysis that those in the business of partisan redistricting (like the DCCC) use in evaluating maps. *See, e.g.*, Ex. A31 (discussing ways to get "Democratic performance" above 50% and ways of "Destabilizing Republican

Incumbents"); Ex. A34 (discussing indices of DCCC and State Democrats); Ex. A28 (discussing

DCCC formula for measuring partisan leanings). And like Plaintiffs' suggested intent standard,

the effect standard properly targets the "excessive," "substantial," and "penalizing" uses of

partisanship that the Supreme Court deems unconstitutional, while linking the prohibited conduct

to particular districts. *See LULAC*, 548 U.S. at 463 (Stevens, J., concurring in part and dissenting

in part); *Vieth*, 541 U.S. at 314 (Kennedy, J., concurring); *Davis*, 478 U.S. at 133 (plurality

opinion); *id.* at 171 (Powell, J., concurring in part and dissenting in part).[12]

The evidence easily satisfies the proposed effect standard. The Adopted Plan increases

the number of districts that favor Democrats by well over 10%, according to the Partisan Voting

Index developed by Charlie Cook ("PVI"), the most widely used and accepted measure of

partisan leanings for congressional districts.[13] As the accompanying affidavit of Edward D.

Marshall details, 9 of the 19 Illinois congressional districts (47.4%) have Democratic-leaning

PVI scores under the current plan, which was adopted through a bipartisan process in 2001. *See*

Ex. B at ¶ 25; Ex. A39 (Conference Report adopted by vote of 46-10 in Senate and by vote of

89-27 in House); Ex. A37 at 15 ("the incumbents . . . negotiated, both bipartisan, Republican and

Democrat, to come up with this map"). By contrast, under the Adopted Plan, 12 of the 18 Illinois

congressional districts (66.7%) have Democratic-leaning PVI scores. Ex. B at ¶ 25. That 19.3

---

[12] Plus, the 10% deviation figures used in the proposed standard mirror the 10% population deviation figure that establishes a prima facie violation of the one-person-one-vote rule in the redistricting of state legislatures. *See Brown v. Thomson*, 462 U.S. 835, 842-843 (1983).

[13] The PVI is a measurement of how strongly a congressional district leans toward one political party compared to the nation as a whole. The index for each congressional district is derived by averaging its results from the prior two presidential elections and comparing them to national results. The index indicates which party's candidate was more successful in that district, as well as the number of percentage points by which its results exceeded the national average. The index is formatted as a letter followed by a plus sign and then a number. For instance, in a district whose PVI score is D+2, a generic Democratic candidate would be expected to receive 2 percentage points more votes than the national average. An "Even" score is assigned when the district performed within half a point of the national average. *See* Ex. B at ¶ 24; Ex. A63.

percentage point increase in Democratic-leaning districts far exceeds the 10% increase required by the suggested standard.

The Adopted Plan also keeps far more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents. As the Marshall Affidavit shows, between 100.0% and 76.4% of Democratic-represented constituents remain in the same district as their representative, with an average of 87.8% across all Democratic incumbents. Ex. B at ¶¶ 35, 36. Republican-represented constituents fare much worse, with between 67.9% and 1.3% remaining in the same district as their representative—34.4% on average. *See id.* The 53.4 percentage point spread in average constituent-representative carryover more than quintuples the 10% difference required by the proposed effect standard.

Finally, the districts that the Democratic leadership of the General Assembly most clearly intended to partisan gerrymander—Districts 11, 13, and 17—all exhibit the effects of that effort. Each district has a Democratic-leaning PVI score—D+5 for Adopted District 11, D+1 for Adopted District 13, and D+7 for Adopted District 17. *See* Ex. B at ¶ 25. Adopted Districts 13 and 17 contain Republican incumbents separated from large numbers of their constituents (70.5% of Rep. Johnson's constituents would reside outside of District 13, and 48.1% of Rep. Schilling's constituents would reside outside of District 17). *See* Ex. B at ¶ 36. And Adopted District 11, which is carved largely out of Congresswoman Biggert's current district, severs all representative relationships for every single person in the district.  *See* Add. 37-38, 57-58 (maps); Ex. B at ¶ 36.

In sum, the evidence of a partisan gerrymander is overwhelming. The Adopted Plan should be invalidated as a violation of the First Amendment and the Equal Protection Clause of the Fourteenth Amendment.

## II.     The Court Should Implement Plaintiffs' Proposed Plan.

Plaintiffs' proposed redistricting map (the "Fair Plan") redresses the numerous statutory and constitutional violations in the Adopted Plan. *See* Add. 59-60 (statewide Fair Plan); Add. 61-62 (Chicago-area Fair Plan). Specifically, the Fair Plan eliminates the Adopted Plan's intentional dilution of Latino voters, respects traditional race-neutral redistricting criteria while complying with Section 2 of the Voting Rights Act, and rectifies the Democratic-controlled General Assembly's backroom partisan gerrymander.[14]

The Fair Plan remedies the intentional vote dilution and racial gerrymandering of the Adopted Plan by splitting the two unnaturally linked "muffs" of Adopted District 4 and making one "muff" part of a compact district on the north side (Fair District 3) and one "muff" part of a compact district on the south side (Fair District 4). Add. 61-62 (Chicago-area Fair Plan); Add. 63-64 (Fair District 3); Add. 65-66 (Fair District 4). Doing so first and foremost unpacks Adopted District 4, ending the illegal "packing" of that district. *See supra* pp. 18-19. Fair District 4 (in the south) and Fair District 3 (in the north) are the natural result of that unpacking.

Fair District 4, in turn, ends the dilution of Latino votes in the near southwestern part of Chicagoland by combining the unpacked southern portion of Adopted District 4 with adjacent portions of Adopted District 3 where Latino votes otherwise would be diluted. *See supra* pp. 19-20. Fair District 4 will have a Latino VAP of 59.4%, which is plainly sufficient to "provide[] Latinos with a viable opportunity to elect a representative of their choice, without continuing the packing of Latinos in it, and without continuing the bizarre earmuff shape." Ex. A2 at 11 (Engstrom Rep.). Fair District 4's 59.4% Latino VAP is "virtually the same as that figure for the original version of the earmuff, adopted in 1991, which was 59.2%." *Id*.; *see* Ex. A1 at 13

---

[14] The Fair Plan also meets the Constitution's "one-person, one-vote" requirement, as the population is equally distributed among the 18 districts in the Fair Plan. *See Reynolds v. Sims*, 377 U.S. 533 (1964); Ex. B at ¶ 20.

(reporting Latino VAP). In 1991, the *Hastert* court concluded that a district with 59.2% Latino VAP was sufficient to provide Latinos the "opportunity to exercise political control over the Hispanic majority district." 777 F. Supp. at 648 n.2, 651. And that prediction was borne out when Luis Gutierrez was elected to office the following year with nearly 60% of the Democratic primary vote and 78% of the general election vote and was re-elected time and again by wide margins. *See* Ex. B at ¶ 37. Tellingly, Defendants have not argued that Fair District 4—at 59.4% Latino VAP—is not an effective district.

Likewise, Fair District 3 ends the dilution of Latino votes in the near northwestern part of Chicagoland by combining the unpacked northern portion of Adopted District 4 with adjacent portions of Adopted District 5 where Latino votes would otherwise be diluted. *See supra* p. 20. In Fair District 3, Latinos will constitute 46.5% of the VAP, which will give Latinos a plurality in the district. Ex. A2 at 13 (Engstrom Rep.); Ex. A6 at 18, 22 (Engstrom Rep.). Latinos thus will have a strong opportunity to "influence the outcomes of elections in [Fair District] 3." Ex. A2 at 13 (Engstrom Rep.). The portion of Illinois that Fair District 3 encompasses is highly Democratic, and therefore the election of consequence in determining who is sent to Congress to represent Fair District 3 is the Democratic primary. *Id.* at 14. With 46.5% of the VAP in Fair District 3, Latinos (who disproportionally vote Democratic) will have a good chance to control the outcome of the Democratic primary, and therefore will have the opportunity to send their chosen representative to Congress. *Id*. at 13-14.

Splitting Adopted District 4 also necessarily breaks down that district's unconstitutional racial gerrymander. *See supra* pp. 6-16. And neither of the Fair Plan's replacement districts revives such a gerrymander. In judging racial gerrymander claims, the Supreme Court has focused on the shape of districts—especially their compactness and contiguity—because

"reapportionment is one area in which appearances do matter." *Shaw I*, 509 U.S. at 647; *see Miller*, 515 U.S. at 916 (listing "compactness" and "contiguity" as "traditional race-neutral districting principles"). Unlike the "bizarre shape" and "hypertechnical" contiguity of Adopted District 4 (*King II*, 979 F. Supp. at 625; *King I*, 979 F. Supp. at 609 n.49), Fair Districts 3 and 4 are both regularly shaped, highly compact, and fully contiguous. The numbers back up that observation. Using the Polsby-Popper measure of perimeter length, Fair District 3 scores .22 and Fair District 4 scores .34, far better than Adopted District 4's .05 score. *See* Ex. B at ¶ 21. There is simply no reason to believe that either Fair District 3 or Fair District 4 was predominantly motivated by racial classifications, as opposed to simply being the natural result of the necessary dismantling of Adopted District 4.[15]

Indeed, Plaintiffs could not have configured Fair Districts 3 and 4 much differently without doing violence to the cores of surrounding districts. Drawing a district including the

---

[15] Defendants' expert Dr. Lichtman argues that race was the predominant factor in the configuration of Fair District 3 because a large number of Latinos were "extracted from existing CD4" and from Districts 5, 6, 7, and 9 (Ex. A3 at 13-19) and moved to Fair District 3. As explained above, the shift of Latino population from the existing District 4 results simply from undoing the improper "packing" of Latinos into that district. Dr. Morrison explained in his rebuttal report that "[t]he reductions in CD6, CD7, and CD9 are de minimis (less than 2%)." Ex. A5 at 7. And the shift of population from existing District 5 to Fair District 3 was necessary to bring Fair District 3 up to the required population and to reconstitute the compact and contiguous Latino community of interest whose voting power the Adopted Plan discriminatorily dilutes. As for Dr. Lichtman's supposition that racial gerrymandering must explain the instances in which Fair District 3's splits precincts (Ex. A7 at 19), an analysis of the very data that Dr. Lichtman provided in his supplemental report belies that conclusion. First, of the 77 "precinct splits" that Lichtman identifies, 24 instances are not true "splits" at all, since the line-drawing merely chops off a portion of a precinct in which no population resides. *See, e.g.*, Ex. A8 at Line 23. The remaining 53 splits resulted in the addition of only 7,356 Latinos residing in the district, which amounts to only 1% of the district's total population. Plus, in 16 of the 53 splits (30%), the area excluded from Fair District 3 had a higher Latino concentration than the area included, refuting any suggestion that race accounted for those splits. *Id.* And nearly half of the 53 splits (24) involved the border between Fair District 3 and District 7, which is one of the African American majority-minority districts, and thus indicate only an intent to maintain an adequately high African American concentration in District 7.

northern part of Adopted District 4 in a materially different, but still compact and contiguous, way would have unduly impinged on the African-American majority district to the south (current District 7) or the core of the current District 5 to the east (represented by Democrat Mike Quigley). *See* Add. 3-4 (current districts); Add. 61-62 (Fair Districts). And going north would have unnecessarily forced Rep. Quigley and fellow Democratic incumbent Jan Schakowsky into the same district. *Id.* Repositioning the district encompassing the southern half of Adopted District 4, while maintaining compactness and contiguity, similarly would have disrupted African-American majority District 7 to the north and east. *Id.* Holding District 7 as a constant, the only direction in which a district encompassing the southern half of the earmuff could spread was south and west, where Fair District 4 does in fact spread.

Moreover, even if Fair District 4 could be deemed to be a racial gerrymander, it still would not violate the Constitution. Even more so than the bizarrely shaped predecessor District 4 that *King II*, 979 F. Supp. at 620, upheld following 1991 redistricting, Fair District 4 is narrowly tailored to achieve the compelling state interest of complying with Section 2 of the Voting Rights Act. Plaintiffs, unlike Defendants, have shown that there is a "strong basis in evidence" establishing that each of the three *Gingles* preconditions are met with respect to Plaintiff's Fair District 4. *See Shaw II*, 517 U.S. at 908-09 n.4. The area's Latino population is "sufficiently large and geographically compact to constitute a majority in" Fair District 4 (*Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986)), given that the district would contain 59.4% Latino VAP. The Latino vote is politically cohesive. Ex. A2 at 8 (Engstrom Rep.); Ex. A6 at 3 (Engstrom Rep.). And absent the districts, the white majority vote would be sufficiently cohesive to usually defeat the preferred candidate of Latinos. *Id*. Fair District 4 is narrowly tailored because it achieves the required Latino-majority district without unnecessarily "packing" Latino voters and

without subordinating the traditional districting principles of compactness and contiguity. *See supra* pp. 14-16.

Finally, the Fair Plan fully remedies the Adopted Plan's partisan gerrymander by replacing the Adopted Districts with ones that bear none of the hallmarks of partisan gerrymandering. Defendants have adduced no evidence that suggests that the Fair Plan was drawn with the predominant intent of securing a partisan advantage for Republicans. *See supra* pp. 30-31. To the contrary, the evidence shows that the Fair Plan respects traditional redistricting principles far better than the Adopted Plan.

The Fair Plan certainly better "respect[s] county and municipal boundaries" (*LULAC*, 548 U.S. at 451) and shows more "respect for political subdivisions or communities defined by actual shared interests" (*Miller*, 515 U.S. at 916). As discussed above, the Adopted Plan fractures historically Republican communities, particularly in the Chicago suburbs. *See* Ex. A9 at 50-51 (Biggert Dep.). For example, DuPage County is divided into six districts. *See* Ex. B18 (table of county splits); Add. 57-58 (map). In total, the Adopted Plan splits 18 counties, while the Fair Plan only splits 13.[16] Ex. B18. The Adopted Plan splits 54 municipalities with populations of 25,000 or more, while the Fair Plan only splits 30 such municipalities. *See* Ex. B19.[17]

Furthermore, the Fair Plan does not wrongfully discriminate against Democrats under the effect standard that Plaintiffs have proposed. *See supra* p. 35. First, under the Fair Plan, 8 of the 18 Illinois congressional districts (44.4%) would have Democratic-leaning PVI scores, as

---

[16] And when the Adopted Plan and Fair Plan both split a county, the split is much less pronounced in the Fair Plan. *See* Ex. B18 (detailing how Adopted Plan divides counties into more districts).

[17] For instance, the Fair Plan maintains Rockford in one district, as has been the case since 1850, rather than dividing the "white community in Rockford from the Latinos, the African-Americans, the Thais, the Vietnamese, the Cambodians and the Burmese" as the Adopted Plan does. Ex. A15 at 18, 21 (Manzullo Dep.); *see also* Ex. B19; Add. 55-56 (map).

compared to 9 of 19 (47.4%) among the existing districts adopted in 2001. *See* Ex. B at ¶ 25. That 3 percentage point decrease is insufficient to establish any improperly partisan effect. Second, under the Fair Plan, an average of 61.0% of Democrat-represented constituents would remain in districts in which their current representatives would reside, while 52.7% of Republican-represented constituents would remain in districts in which their current representatives would reside. *See* Ex. B at ¶ 36. That 2.4 percentage point spread (in favor of Democrats no less) falls short of the requisite 10 point shift.

For all of the above reasons, the Court should implement Plaintiffs' Fair Plan. When the Illinois General Assembly "fail[s] to perform [its] duty" of acceptably reconfiguring Illinois's congressional districts, the task "falls to this court by default." *Hastert*, 777 F. Supp. at 640-41. This Court has ample familiarity with selecting and ordering the implementation of reapportionment maps in Illinois. *See, e.g.*, *id.* at 641 & n.6; *Vigo Cnty. Republican Cent. Comm. v. Vigo Cnty. Comm'rs*, 834 F. Supp. 1080, 1086 (S.D. Ind. 1993) (Tinder, J.) (striking down redistricting plan and ordering implementation of plaintiffs' proposed plan that was "more contiguous, more compact, and more respectful of natural boundaries"). The extremely short time period before the primary election, which is scheduled for March 20, 2012, and the time required for candidates and voters to prepare for that election require that the Court adopt a plan without delay. *See* 10 ILCS 5/7-12. The last day to file petitions for party nominations for United States Congress for the 2012 Illinois primary election is December 5, 2011. *Id.* Fortunately, once the Court adopts the Fair Plan, Defendant Illinois State Board of Elections will quickly and easily be able to implement it. The 30(b)(6) witness for the State Board of Elections, Eric J. Donnewald, testified that if the Court were to order the SBE to implement the Fair Plan, the

implementation process "would be similar to the development of the current congressional lines" and could be completed in a short time period. Ex. A11 at 129-35 (Donnewald Dep.).

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court grant their motion for a permanent injunction.

Dated: November 4, 2011                    Respectfully submitted,

                                           /s/ Lori E. Lightfoot

                                           Tyrone C. Fahner
                                           John A. Janicik
                                           Lori E. Lightfoot
                                           Joshua D. Yount
                                           Dana S. Douglas
                                           Thomas V. Panoff
                                           Mitchell D. Holzrichter
                                           MAYER BROWN LLP
                                           71 South Wacker Drive
                                           Chicago, Illinois 60606
                                           (312) 782-0600
                                           (312) 701-7711 – fax

                                           *Attorneys for Plaintiff*