**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BREZINSKI, and LAURA WAXWEILER, | ) ) ) ) ) ) ) Case No. 1:11-cv-05065 ) ) Hon. John D. Tinder ) Hon. Joan H. Lefkow ) Hon. Robert L. Miller, Jr. ) (3 judge court convened |
| Plaintiffs, | ) pursuit to 28 U.S.C. § 2284) |
| v. | ) ) |
| ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLZ, and ERNEST L. GOWEN, | ) ) ) ) ) ) ) ) |
| Defendants. | ) |

**APPENDIX TO PLAINTIFFS' MEMORANDUM
IN SUPPORT OF THEIR MOTION FOR A PERMANENT INJUNCTION**

**VOLUME 1 of 3**

**(Exhibits A-A13)**

## TABLE OF CONTENTS

| Ex. | Document |
|---|---|
| **VOLUME 1** | |
| A | **Affidavit of Michael David Frisch** |
| A1 | Peter Morrison Affirmative Expert Report (9/14/11) |
| A2 | Richard Engstrom Affirmative Expert Report (9/15/11) |
| A3 | Allan Lichtman Affirmative Expert Report (10/4/11) |
| A4 | Allan Lichtman Report Responding to the Report of Richard Engstrom (10/4/11) |
| A5 | Peter Morrison Rebuttal Report (10/18/11) |
| A6 | Richard Engstrom Rebuttal Report (10/19/11) |
| A7 | Allan Lichtman Response to Rebuttal Reports of Richard Engstrom and Peter Morrison (10/27/11) |
| A8 | Spreadsheet entitled "Fair Map CD3 Split Precinct" submitted as underlying data supporting Allan Lichtman's Response to Rebuttal Reports of Richard Engstrom and Peter Morrison (10/27/11) |
| A9 | Excerpts from Judith Biggert Deposition (10/10/11) |
| A10 | Excerpts from Jerry Costello Deposition (10/19/11) |
| A11 | Excerpts from Eric Donnewald Deposition (10/13/11) |
| A12 | Excerpts from Richard Engstrom Deposition (10/25/11) |
| A13 | Excerpts from Allan Lichtman Deposition (1/5/02), *Campuzano v. Ill. State Bd. of Elections*, 200 F. Supp. 2d 905 (N.D. Ill. 2002) |
| **VOLUME 2** | |
| A14 | Excerpts from Allan Lichtman Deposition (11/2/11) |
| A15 | Excerpts from Donald Manzullo Deposition (10/7/11) |
| A16 | Excerpts from Peter Roskam Deposition (9/29/11) |

| Ex. | Document |
|-----|----------|
| A17 | Excerpts from Aaron Schock Deposition (10/6/11) |
| A18 | Excerpts from John Shimkus Deposition  (9/29/11) |
| A19 | Email to Andrew Manar from Ian Russell regarding Cullerton meeting follow-up (2/24/11) (SEND2676) |
| A20 | Email to Tim Mapes from Daniel Lipinsk regarding IL-3 Map (3/3/11) (GA006424) |
| A21 | Proposed IL-3 Map in Blue attached to email to Tim Mapes from Daniel Lipinski regarding IL-3 Map (3/3/11) (GA006425) |
| A22 | Email to Andrew Manar from Ian Russell regarding census data and election returns (3/7/11) (SEND2685-SEND2686) |
| A23 | Email to Andrew Manar from Ian Russell regarding pick-up opportunities (3/18/11) (SEND2689) |
| A24 | Email to Tim Mapes from Daniel Lipinski regarding work-in-progress map (4/11/11) (GA006422) |
| A25 | Email to Tim Mapes from Eric Lausten regarding draft of the new third district map (4/15/11) (GA003461) |
| A26 | Email to Anne Schaeffer from Mary Shalapin regarding proposed Lipinski map changes (4/18/11) (GA004284-GA004287) |
| A27 | Data attached to email to Anne Schaeffer from Mary Shalapin regarding proposed Lipinski map changes (4/18/11) (GA004288) |
| A28 | Email to Lee LoBue from Ian Russell regarding spreadsheet showing Obama performance and Kerry performance (4/28/11) (SEND2625-SEND2627) |
| A29 | Email to Ian Russell from Lee LoBue regarding latest Congressional map proposal (5/16/11) (SEND2641) |
| A30 | Email to Andrew Manar from Ian Russell regarding Latest Congressional Map Proposal (5/16/11) (SEND2643-SEND2645) |
| A31 | Email to Andrew Manar from Ian Russell regarding a memorandum for the Senate President pertaining to redistricting (5/24/11) (SEND2649-SEND2653) |
| A32 | Email to Andrew Manar from Ian Russell regarding shape file with minor changes to the Congressional map (5/26/11) (SEND2632-SEND2634) |

| Ex. | Document |
|-----|----------|
| A33 | Email to Andrew Manar from Ian Russell regarding District 3 (5/27/11) (SEND2635-SEND2637) |
| A34 | Email to Alan Pirtle from Andrew Manar regarding a new district (5/27/11) (SEND2671) |
| A35 | Email to Ian Russell from Lee LoBue regarding requested file (5/31/11) (SEND2639-SEND2640) |
| A36 | Excerpts from 92nd General Assembly Senate Transcript (5/25/01) |
| A37 | Excerpts from 92nd General Assembly House Transcript (5/30/01) |
| A38 | Excerpts from Illinois Legislative Redistricting Commission in re: The Matter of the 2000 Census Transcript (9/18/01) |
| A39 | Status of HB2917 Creating the Illinois Congressional Redistricting Act of 2001, Illinois General Assembly website, available at: http://www.ilga.gov/legislation/legisnet92/status/920HB2917.html |
| A40 | Excerpts from State Senate Redistricting Committee Public Hearing Transcript (3/28/11) |
| A41 | Excerpts from State Senate Redistricting Committee Public Hearing Transcript (5/21/11) |
| A42 | Excerpts from State Senate Redistricting Committee Public Hearing Transcript (5/24/11) |
| A43 | Excerpts from 97th General Assembly House Transcript (5/30/11) (transcribed 9/30/11) |
| A44 | 97th General Assembly House Roll Call for SB1178 (5/30/11), available at: http://www.ilga.gov/legislation/votehistory/97/house/09700SB1178_05302011_026000T.pdf |
| A45 | Excerpts from 97th General Assembly, Senate Transcript (5/31/11) (transcribed 9/30/11) |
| A46 | 97th General Assembly Senate Roll Call for SB1178 (5/31/11), available at: http://www.ilga.gov/legislation/votehistory/97/senate/09700SB1178_05312011_005000C.pdf |
| A47 | Status of SB1178, Illinois General Assembly website,  available at: :http://www.ilga.gov/legislation/billstatus.asp?DocNum=1178&GAID=11& |

| Ex. | Document |
|-----|----------|
| | GA=97&DocTypeID=SB&LegID=56012&SessionID=84 |
| A48 | Directory of Representatives for Illinois, House of Representatives website, available at: http://www.house.gov/representatives/#state_il |
| A49 | Table of Illinois House Members for the 97th General Assembly, Illinois General Assembly website, available at: http://www.ilga.gov/senate/ |
| A50 | Table of Illinois Senate Members for the 97th General Assembly, Illinois General Assembly website, available at: http://www.ilga.gov/house/ |
| A51 | About the Governor, Illinois Governor's website, available at: http://www2.illinois.gov/gov/Pages/AbouttheGovernor.aspx |
| A52 | John J. Betancur & Maribel Ríos Louie, Latinos United, "The Latino Consent Decree 10 Years Later: Increasing Latin Access to Chicago Housing Authority Programs" (2006) (PLF009169-PLF009183) |
| A53 | Chicago Metropolitan Agency for Planning, "Latinos in our Region: CMAP Regional Snapshot" (2011) (PLF008243-PLF008258) |
| A54 | The Cook Political Report, "Partisan Voting Index: Districts of the 111th Congress, Arranged by State/District," available at: http://cookpolitical.com/sites/default/files/pvistate.pdf |
| A55 | Dept. of Commerce, Bureau of the Census, "Educational Attainment for the Population 25 Years and Over for Cook County" (Table B15002) (2010) (PLF008746-PLF008747) |
| A56 | Dept. of Commerce, Bureau of the Census, "Educational Attainment for the Population 25 Years and Over (Hispanic or Latino) for Cook County" (Table C150021) (2010) (PLF008748) |
| A57 | Dept. of Commerce, Bureau of the Census, "Per Capita Income in the Past 12 Months for Cook County" (Table B19301) (2009) (PLF008758) |
| A58 | Dept. of Commerce, Bureau of the Census, "Per Capita Income in the Past 12 Months (Hispanic or Latino) for Cook County" (Table B19301I) (2009) (PLF008759) |
| A59 | Dept. of Commerce, Bureau of the Census, "Voting and Registration in the Election of 2010—Reported Voting and Registration by Sex, Race, and Hispanic Origin, Broken Down by State" (Table 4b) (2010) (PLF009148-PLF009160) |
| A60 | Dept. of Labor, Bureau of Labor Statistics, "Employment Status of the Civilian Noninstitutional Population by Sex, Race, Hispanic or Latino Ethnicity, Marital Status, and Detailed Age 2010 Annual Averages—Illinois" (2010) (PLF009243- |

| Ex. | Document |
|---|---|
| | PLF009244) |
| **VOLUME 3** | |
| A61 | Institute for Latino Studies at the University of Notre Dame, "Measuring the Minority Education Gap in Metropolitan Chicago" (2005) (PLF009089-PLF009091, PLF009112-PLF009121) |
| A62 | Latino Policy Forum, Statistics on Latinos, "2011 Data Series: Illinois Latinos at the Voting Booth" (2011) (PLF009139-PLF009143) |
| A63 | NationalJournal.com, "Almanac of American Politics: Cook Partisan Voting Index," available at: http://www.nationaljournal.com/almanac/2008/guide.php |
| A64 | Rob Paral & Timothy Ready, Institute for Latino Studies at the University of Notre Dame, "The Economic Progress of US- and Foreign-Born Mexicans in Metro Chicago: Indications from the United States Census" (2005) (PLF008652-PLF008672) |
| A65 | Margery A. Turner, Stephen L. Ross, George C. Galster & John Yinger, Urban Institute Report to the U.S. Department of Housing and Urban Development, "Discrimination in Metropolitan Housing Markets: National Results from Phase I HDS 2000" (2002) (PLF008814-PLF008816, PLF009017-PLF009021) |
| A66 | Chicago Tribune, "House Democrats Send New Legislative Map to Senate" (5/27/11) (PLF005206-PLF005207) |
| A67 | Rick Miller, Capitol Fax.com, "Updated x13-Kirk: Map designed to force Pelosi back into power, Dems unveil new congressional maps and revised state maps" (5/27/11) |
| A68 | Illinois Coalition for Immigrant and Refugee Rights, "Congressman Luis Gutierrez Withdrew His Endorsement of Congressman Lipinski" (1/31/08) |
| A69 | Complaint for Declaratory Judgment, Injunctive and Other Relief, *Hastert, et al. v. State Board of Elections, et al.*, No. 91-C-4028 (N.D. Ill. June 27, 1991) |
| A70 | Complaint for Injunctive, Declaratory and Other Relief, *Rosebrook, et al. v. State Board of Elections, et al.*, No. 91-C-4656 (N.D. Ill. July 24, 1991) |
| **B** | **Affidavit of Edward D. Marshall** |
| B1 | Current Plan Statewide Map |
| B2 | Current Plan Chicago-Area Map |

| Ex. | Document |
|-----|----------|
| B3 | Adopted Plan Statewide Map |
| B4 | Adopted Plan Chicago-Area Map |
| B5 | Map of Adopted District 3 |
| B6 | Map of Adopted District 4 |
| B7 | Map of Adopted District 5 |
| B8 | Map of Adopted District 11 |
| B9 | Map of Adopted District 13 |
| B10 | Map of Adopted District 17 |
| B11 | Maps of Adopted District 4's Connector, Showing Population |
| B12 | Maps of Adopted District 4's Connector, Satellite Images |
| B13 | Map of Current District 13 overlaid over Adopted Plan lines |
| B14 | Fair Plan Statewide Map |
| B15 | Fair Plan Chicago-area Map |
| B16 | Map of Fair District 3 |
| B17 | Map of Fair District 4 |
| B18 | County Splits Analysis |
| B19 | Municipality Splits Analysis |
| B20 | Map of Adopted District 11 with PVI overlay |
| B21 | Map of Adopted District 13 with PVI overlay |
| B22 | Map of Adopted District 17 with PVI overlay |
| B23 | Map of Bloomington, IL with PVI overlay |
| B24 | Map of Champaign, IL with PVI overlay |
| B25 | Map of Springfield, IL with PVI overlay |

| Ex. | Document |
|-----|----------|
| B26 | Map of Peoria, IL with PVI overlay |
| B27 | Map of Rockford, IL with PVI overlay |
| B28 | Map of Adopted District 3 with Latino VAP thematic |
| B29 | Map of District 3 with lines of Current and Adopted Plans with Latino thematic |
| B30 | Map of Adopted District 4 with Latino VAP thematic |
| B31 | Map of District 4 with lines of Current and Adopted Plans with Latino thematic |
| B32 | Map of Adopted District 5 with Latino VAP thematic |
| B33 | Map of District 5 with lines of Current and Adopted Plans with Latino thematic |
| B34 | Census Block Description of Fair Plan |

**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, et al. | ) |
| | ) |
| | ) Case No. 1:11-cv-05065 |
| Plaintiffs, | ) |
| v. | ) Judge Joan Humphrey Lefkow |
| | ) Judge John Daniel Tinder |
| ILLINOIS STATE BOARD OF ELECTIONS, | ) Judge Robert L. Miller, Jr. |
| et al., | ) |
| | ) |
| Defendants. | ) |

**AFFIDAVIT OF MICHAEL DAVID FRISCH**

I, Michael D. Frisch, upon knowledge, information and belief, state as follows:

1.      I am an attorney with the law firm of Mayer Brown LLP, 71 South Wacker Drive, Chicago, Illinois 60606.  I am one of the attorneys representing the Plaintiffs in the above-captioned matter.

2.      I submit this affidavit based upon my knowledge of certain documents and other information that has been produced in discovery in this case..

3.      Attached hereto as Exhibit A1 is a true and correct copy of Peter Morrison's Affirmative Expert Report dated September 14, 2011.

4.      Attached hereto as Exhibit A2 is a true and correct copy of Richard Engstrom's Affirmative Expert Report dated September 15, 2011.

5.      Attached hereto as Exhibit A3 is a true and correct copy of Allan Lichtman's Affirmative Expert Report dated October 4, 2011.

6.      Attached hereto as Exhibit A4 is a true and correct copy of Allan Lichtman's Report Responding to the Report of Richard Engstrom dated October 4, 2011.

7.      Attached hereto as Exhibit A5 is a true and correct copy of Peter Morrison's Rebuttal Report dated October 18, 2011.

8.      Attached hereto as Exhibit A6 is a true and correct copy of Richard Engstrom's Rebuttal Report dated October 19, 2011.

9.      Attached hereto as Exhibit A7 is a true and correct copy of Allan Lichtman's Response to the Rebuttal Reports of Richard Engstrom and Peter Morrison, dated October 27, 2011.

10.      Attached hereto as Exhibit A8 is a true and correct copy of a spreadsheet entitled "Fair Map CD3 Split Precinct," submitted as underlying data supporting Allan Lichtman's Response to the Rebuttal Reports of Richard Engstrom and Peter Morrison, dated October 27, 2011.

11.      Attached hereto as Exhibit A9 is a true and correct copy of excerpts of the transcript of the deposition of Judith Biggert, taken on October 10, 2011.

12.      Attached hereto as Exhibit A10 is a true and correct copy of excerpts of the transcript of the deposition of Jerry Costello, taken on October 19, 2011.

13.      Attached hereto as Exhibit A11 is a true and correct copy of excerpts of the transcript of the deposition of Eric Donnewald, taken on October 13, 2011.

14.      Attached hereto as Exhibit A12 is a true and correct copy of excerpts of the transcript of the deposition of Richard Engstrom, taken on October 25, 2011.

15.      Attached hereto as Exhibit A13 is a true and correct copy of excerpts of the transcript of the deposition of Allan Lichtman in *Campuzano v. Ill. State Bd. of Elections*, 200 F. Supp. 2d 905 (N.D. Ill. 2002).

2

16.     Attached hereto as Exhibit A14 is a true and correct copy of excerpts of the transcript of the deposition of Allan Lichtman, taken on November 2, 2011.

17.     Attached hereto as Exhibit A15 is a true and correct copy of excerpts of the transcript of the deposition of Donald Manzullo, taken on October 7, 2011.

18.     Attached hereto as Exhibit A16 is a true and correct copy of excerpts of the transcript of the deposition of Peter Roskam, taken on September 29, 2011.

19.     Attached hereto as Exhibit A17 is a true and correct copy of excerpts of the transcript of the deposition of Aaron Schock, taken on October 6, 2011.

20.     Attached hereto as Exhibit A18 is a true and correct copy of excerpts of the transcript of the deposition of John Shimkus, taken on September 29, 2011.

21.     Attached hereto as Exhibit A19 is a true and correct copy of an email to Andrew Manar from Ian Russell regarding Cullerton meeting follow-up dated February 24, 2011, which was produced in discovery.

22.     Attached hereto as Exhibit A20 is a true and correct copy of an email to Tim Mapes from Daniel Lipinski regarding the IL-3 Map dated March 3, 2011, which was produced in discovery.

23.     Attached hereto as Exhibit A21 is a true and correct copy of a document titled "Proposed IL-3 Map in Blue," attached to the March 3, 2011 email to Tim Mapes from Daniel Lipinsk regarding the IL-3 Map, which was produced in discovery.

24.     Attached hereto as Exhibit A22 is a true and correct copy of an email to Andrew Manar from Ian Russell regarding census data and election returns dated March 7, 2011, which was produced in discovery.

25.     Attached hereto as Exhibit A23 is a true and correct copy of an email to Andrew Manar from Ian Russell regarding pick-up opportunities dated March 18, 2011, which was produced in discovery.

26.     Attached hereto as Exhibit A24 is a true and correct copy of an email to Tim Mapes from Daniel Lipinski regarding a work-in-progress map dated April 11, 2011, which was produced in discovery.

27.     Attached hereto as Exhibit A25 is a true and correct copy of an email to Tim Mapes from Eric Lausten regarding a draft of the new third district map dated April 15, 2011, which was produced in discovery.

28.     Attached hereto as Exhibit A26 is a true and correct copy of an email to Anne Schaeffer from Mary Shalapin regarding proposed Lipinski map changes dated April 18, 2011, which was produced in discovery.

29.     Attached hereto as Exhibit A27 is a true and correct copy of data attached to the April 18, 2011 email to Anne Schaeffer from Mary Shalapin regarding proposed Lipinski map changes, which was produced in discovery.

30.     Attached hereto as Exhibit A28 is a true and correct copy of an email to Lee LoBue from Ian Russell regarding a spreadsheet showing Obama performance and Kerry performance, dated April 28, 2011, which was produced in discovery.

31.     Attached hereto as Exhibit A29 is a true and correct copy of an email to Ian Russell from Lee LoBue regarding the latest Congressional map proposal, dated May 16, 2011, which was produced in discovery.

4

32.     Attached hereto as Exhibit A30 is a true and correct copy of an email to Andrew Manar from Ian Russell regarding the latest Congressional map proposal, dated May 16, 2011, which was produced in discovery.

33.     Attached hereto as Exhibit A31 is a true and correct copy of an email to Andrew Manar from Ian Russell regarding a memorandum for the Senate President pertaining to redistricting dated May 24, 2011, which was produced in discovery.

34.     Attached hereto as Exhibit A32 is a true and correct copy of an email to Andrew Manar from Ian Russell regarding a shape file with minor changes to the Congressional map dated May 26, 2011, which was produced in discovery.

35.     Attached hereto as Exhibit A33 is a true and correct copy of an email to Andrew Manar from Ian Russell regarding District 3, dated May 27, 2011, which was produced in discovery.

36.     Attached hereto as Exhibit A34 is a true and correct copy of an email to Alan Pirtle from Andrew Manar regarding a new district, dated May 27, 2011, which was produced in discovery.

37.     Attached hereto as Exhibit A35 is a true and correct copy of an email to Ian Russell from Lee LoBue regarding a requested file, dated May 31, 2011, which was produced in discovery.

38.     Attached hereto as Exhibit A36 is a true and correct copy of excerpts of a transcript of proceedings of the 92nd General Assembly of Illinois (Senate) held on May 25, 2001.

39.    Attached hereto as Exhibit A37 is a true and correct copy of excerpts of a transcript of proceedings of the 92nd General Assembly of Illinois (House) held on May 30, 2001.

40.    Attached hereto as Exhibit A38 is a true and correct copy of excerpts from a public hearing of the Illinois Legislative Redistricting Commission Transcript regarding the Matter of the 2000 Census, held on September 18, 2001.

41.    Attached hereto as Exhibit A39 is a true and correct copy of the Status of HB2917 Creating the Illinois Congressional Redistricting Act of 2001, which I obtained from the Illinois General Assembly website: http://www.ilga.gov/legislation/legisnet92/status/920HB2917.html.

42.    Attached hereto as Exhibit A40 is a true and correct copy of excerpts from a transcript of a public hearing of the State Senate Redistricting Committee, held on March 28, 2011.

43.    Attached hereto as Exhibit A41 is a true and correct copy of excerpts from a transcript of a public hearing of the State Senate Redistricting Committee, held on May 21, 2011.

44.    Attached hereto as Exhibit A42 is a true and correct copy of excerpts from a transcript of a public hearing of the State Senate Redistricting Committee, held on May 24, 2011.

45.    Attached hereto as Exhibit A43 is a true and correct copy of excerpts from a transcript of the Floor Debates of the 97th General Assembly House on May 30, 2011.  These were received in audio format, and were transcribed on September 30, 2011 by Certified Court Reporter Anica Roti at Sarnoff Reporting.

46.    Attached hereto as Exhibit A44 is a true and correct copy of the 97th General Assembly House Roll Call for SB1178 on May 30, 2011, which I obtained from the Illinois

General Assembly website, http://www.ilga.gov/legislation/votehistory/97/house/09700SB1178_05302011_026000T.pdf.

47.     Attached hereto as Exhibit A45 is a true and correct copy of excerpts of a Floor Debate from the 97th General Assembly Senate on May 31, 2011.  These were received in audio format, and were transcribed on September 30, 2011 by Certified Court Reporter Margaret Beddard at Sarnoff Reporting.

48.     Attached hereto as Exhibit A46 is a true and correct copy of the 97th General Assembly Senate Roll Call for SB1178 on May 31, 2011, which I obtained from the Illinois General Assembly website, http://www.ilga.gov/legislation/votehistory/97/senate/09700SB1178_05312011_005000C.pdf.

49.     Attached hereto as Exhibit A47 is a true and correct copy of the Status of SB1178, which I obtained from the Illinois General Assembly website, http://www.ilga.gov/legislation/billstatus.asp?DocNum=1178&GAID=11&GA=97&DocTypeID=SB&LegID=56012&SessionID=84.

50.     Attached hereto as Exhibit A48 is a true and correct copy of a Directory of Representatives for Illinois, which I obtained from the House of Representatives website, http://www.house.gov/representatives/#state_il.

51.     Attached hereto as Exhibit A49 is a true and correct copy of a Table of Illinois House Members for the 97th General Assembly, which I obtained from the Illinois General Assembly website, http://www.ilga.gov/senate/.

52.     Attached hereto as Exhibit A50 is a true and correct copy of a Table of Illinois Senate Members for the 97th General Assembly, which I obtained from the Illinois General Assembly website,  http://www.ilga.gov/house/.

53. Attached hereto as Exhibit A51 is a true and correct copy of a webpage titled "About the Governor," which I obtained from the Illinois Governor's website, http://www2.illinois.gov/gov/Pages/AbouttheGovernor.aspx.

54. Attached hereto as Exhibit A52 is a true and correct copy of a publication by John J. Betancur and Maribel Rios Louie of Latinos United entitled "The Latino Consent Decree 10 Years Later: Increasing Latin Access to Chicago Housing Authority Programs" (2006).

55. Attached hereto as Exhibit A53 is a true and correct copy of a publication by the Chicago Metropolitan Agency for Planning entitled "Latinos in our Region: CMAP Regional Snapshot" (2011).

56. Attached hereto as Exhibit A54 is a true and correct copy of a publication by the Cook Political Report entitled "Partisan Voting Index: Districts of the 111th Congress, Arranged by State/District," available at: http://cookpolitical.com/sites/default/files/pvistate.pdf.

57. Attached hereto as Exhibit A55 is a true and correct copy of a table from the Department of Commerce, Bureau of the Census, entitled "Educational Attainment for the Population 25 Years or Over for Cook County" (Table B15002) (2010).

58. Attached hereto as Exhibit A56 is a true and correct copy of a table from the Department of Commerce, Bureau of the Census entitled "Educational Attainment for the Population 25 Years or Over (Hispanic or Latino) for Cook County" (Table C150021) (2010).

59. Attached hereto as Exhibit A57 is a true and correct copy of a table from the Department of Commerce, Bureau of the Census entitled "Per Capita income in the Past 12 Months for Cook County" (Table B19301) (2009).

60. Attached hereto as Exhibit A58 is a true and correct copy of a table from the Department of Commerce, Bureau of the Census entitled "Per Capita income in the Past 12 Months (Hispanic or Latino) for Cook County" (Table B19301I) (2009).

61. Attached hereto as Exhibit A59 is a true and correct copy of a table from the Department of Commerce, Bureau of the Census entitled "Voting and Registration in the Election of 2010—Reported Voting and Registration by Sex, Race, and Hispanic Origin, Broken Down by State" (Table 4b) (2010).

62. Attached hereto as Exhibit A60 is a true and correct copy of a table from the Department of Labor, Bureau of Labor Statistics table entitled "Employment Status of the Civilian Noninstitutional Population by Sex, Race, Hispanic or Latino Ethnicity, Marital Status, and Detailed Age 2010 Annual Averages—Illinois" (2010).

63. Attached hereto as Exhibit A61 is a true and correct copy of a publication by the Institute for Latino Studies at the University of Notre Dame entitled "Measuring the Minority Education Gap in Metropolitan Chicago" (2005).

64. Attached hereto as Exhibit A62 is a true and correct copy of a publication by the Latino Policy Forum entitled "2011 Data Series: Illinois Latinos at the Voting Booth" (2011).

65. Attached hereto as Exhibit A63 is a true and correct copy of a webpage from the website of the National Journal entitled "Almanac of American Politics: Cook Partisan Voting Index," available at: http://www.nationaljournal.com/almanac/2008/guide.php.

66. Attached hereto as Exhibit A64 is a true and correct copy of a publication by Rob Paral and Timothy Ready of the Institute for Latino Studies at the University of Notre Dame entitled "The Economic Progress of US- and Foreign-Born Mexicans in Metro Chicago: Indications from the United States Census" (2005).

9

67.     Attached hereto as Exhibit A65 is a true and correct copy of a publication by Margery Austin Turner, Stephen L. Ross, George C. Galster, and John Yinger of the Urban Institute entitled "Discrimination in Metropolitan Housing Markets: National Results from Phase I HDS 2000" (2002).

68.     Attached hereto as Exhibit A66 is a true and correct copy of a news article published by the Chicago Tribune on May 27, 2011 entitled "House Democrats Send New Legislative Map to Senate."

69.     Attached hereto as Exhibit A67 is a true and correct copy of a news article authored by Rick Miller of CapitolFax.com on May 27, 2011 entitled "Updated x13 Kirk: Map designed to force Pelosi back into power, Dems unveil new congressional maps and revised state maps."

70.     Attached hereto as Exhibit A68 is a true and correct copy of a press release published by the Illinois Coalition for Immigrant and Refugee Rights on January 31, 2008 entitled "Congressman Luis Gutierrez Withdrew His Endorsement of Congressman Lipinski."

71.     Attached hereto as Exhibit A69 is a true and correct copy of the Complaint for Declaratory Judgment, Injunctive and Other Relief filed in *Hastert, et al. v. State Board of Elections, et al.*, No. 91-C-4028, in the Northern District of Illinois on June 27, 1991.

72.     Attached hereto as Exhibit A70 is a true and correct copy of the Complaint for Injunctive, Declaratory and Other Relief filed in *Rosebrook, et al. v. State Board of Elections, et al.*, No. 91-C-4656, in the Northern District of Illinois on July 24, 1991.

I hereby declare under the penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Dated: November 4, 2011

Michael D. Frisch

SUBSCRIBED AND SWORN

to before me this 4th day of _November_, 2011.

_Deborah Schumal-Barry_

Notary Public

OFFICIAL SEAL
DEBORAH SCHUMAL-BARRY
Notary Public - State of Illinois
My Commission Expires Jul 25, 2013

11

# EXHIBIT A1

# Peter Morrison Affirmative Expert Report (9/14/11)

# EXPERT REPORT OF PETER A. MORRISON, PH.D.

In the case of

COMMITTEE FOR A FAIR AND BALANCED MAP, et al.
v.
ILLINOIS STATE BOARD OF ELECTIONS, et al.

No. 11-C-5065 (N.D. Ill.)

September 14, 2011

Ex. A1

# I. <u>INTRODUCTION</u>

This report responds to the request by counsel for plaintiffs, Mayer Brown LLP, that I undertake a demographic analysis of the residents of several proposed congressional election districts in Illinois. Those districts are Congressional districts CD3, CD4, and CD5 of a Congressional redistricting plan adopted by the Illinois state legislature in May 2011 and signed into law in June 2011 (hereinafter "the Adopted Plan"). The primary focus of this analysis is the concentration of Latinos among potential voters in each of those Adopted Districts and in two alternative Fair Plan districts (Fair CD3 and Fair CD4). My report addresses the following questions:

1. How has Latinos' presence among residents and potential voters changed since 1990 in Cook County, in each of the three Adopted Districts, and in each of the two Fair Plan districts above?
2. What demographic factors underlie those changes?
3. Do the boundaries of particular Adopted Districts bolster or diminish Latino populations within those Districts?

To address these questions, I performed several analyses using data from the 1990, 2000, and 2010 decennial censuses.

<u>DEMOGRAPHIC CONTEXT</u>

Since 1990, the State of Illinois and Cook County in particular have registered substantial Latino population growth. Statewide, the Latino share of population has risen from 7.9% in 1990 to 15.8% by 2010; in Cook County, the corresponding increase was from 13.6% to 24.0% percent (see Fig. 1 and Appendix Table A).

Those increases are the product of Latino migratory influx to Illinois and Cook County over the two decades and the fact that the Latino population of both Illinois and Cook County regularly contains proportionally more prospective eligible voters among its youth than current eligible voters among its adults. As of 2010, at every geographic level I examined, from the community level up to the statewide level, I found Latinos to be overly concentrated in the under-18 age range and non-Latinos to be overly concentrated among persons age 65 and older. In Cook County, for example, Latinos were 24% of the total 2010 population but 34% of the under-18 population. Moreover, non-Latinos are over-concentrated in the older (65+) age range. This means that the population dying off (i.e., potential voters subtracted from the 65+ population) is disproportionately non-Latino. Accordingly, forthcoming mortality loss will inevitably elevate the Latino share among the remaining adult population. That disproportionate Latino concentration among youth foreshadows further increases in Latinos' share among future voters, for purely demographic reasons. In short, Latinos' prominence within the electorate (other things being equal) is bound to increase in future years.





Figure 1.  Changing Makeup of Voting-age Population
of Illinois and Cook County: 1990-2010

ETHNIC COALESCENCE AND SPATIAL DIFFUSION WITHIN COOK COUNTY

Over the decades, Latino residents have coalesced into numerous communities within Cook County. Those scattered Latino enclaves, in turn, have become magnets for other Latinos who have settled in the enclaves or in neighboring communities, which in turn enlarge the spatial area of the enclaves.[1] Increasingly, Latinos have become the majority among the residents of many communities adjacent to the original Latino enclaves.

As seen above, Illinois and Cook County in particular have witnessed a remarkable increase in Latinos since 1990.[2] From my review and analysis of census data, Latinos' growth over the past two decades has been concentrated in particular communities, as scattered small Latino enclaves drew newcomers to the region. As these enclaves have diffused outward, they have extended into neighboring communities, thereby encompassing more territory and forming well-defined concentrations of Latinos within Cook County (as illustrated in Table 1 for one such set of neighboring communities). This process of spatial diffusion feeds further growth of the Latino population. Models of such diffusion provide a scientific basis for anticipating the future course of that growth.[3]

Figure 2 illustrates the spatial diffusion of the Latino population in the past decade within Cook County. The residential spread of Latinos has given rise to two distinct enclaves of Latinos, one on the northside and the other on the southside. Each enclave has registered only modest overall population growth generally but a sharp increase in the number of Latino residents since 2000.

---

[1] An enclave is a portion of territory within or surrounded by a larger territory whose inhabitants are culturally or ethnically distinct from the inhabitants in the surrounding areas. For further elaboration, see F. D. Bean and M. Tienda, *The Hispanic Population of the United States* (New York: The Russell Sage Foundation, 1987).

[2] See "New U.S. census numbers herald a greater Latino presence in the Chicago area" in *Chicago Tribune*, August 8, 2011.

[3] See S. K. Smith et al., *State and Local Population Projections: Methodology and Analysis* (New York: KluwerAcademic/Plenum, 2001), chapter 15.





Figure 2.  Emergence of Two Latino Enclaves Within Cook County, 2000-2010

As seen in Figure 2, the residential spread of Latinos has increased their presence substantially in each enclave. A noteworthy feature of these patterns is the consistency in the upward Latino trend in population across communities that otherwise registered only modest growth of total population (as illustrated in the 11 representative communities in Table 1). Clearly, such communities have evolved collectively into a pair of Latino enclaves that, as diffusion occurs, are coalescing into an extended spatial distribution of Latinos. As Latinos move in and replace non-Latinos moving out or dying off, this growth will continue.

Table 1. Illustration of Adjacent Communities Evolving into Hispanic Enclave

| Community | Total Population | | | Hispanic Population | | | Hispanic share (%) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1990 | 2000 | 2010 | 1990 | 2000 | 2010 | 1990 | 2000 | 2010 |
| Addison village | 32,058 | 35,914 | 36,942 | 4,287 | 10,198 | 14,813 | 13% | 28% | 40% |
| Bensenville village | 17,767 | 20,703 | 18,352 | 3,333 | 7,690 | 8,781 | 19% | 37% | 48% |
| Des Plaines city | 53,223 | 58,720 | 58,364 | 3,520 | 8,229 | 10,053 | 7% | 14% | 17% |
| Elmwood Park village | 23,206 | 25,405 | 24,883 | 1,001 | 2,798 | 5,729 | 4% | 11% | 23% |
| Melrose Park village | 20,859 | 23,171 | 25,411 | 6,303 | 12,485 | 17,675 | 30% | 54% | 70% |
| Northlake city | 12,505 | 11,878 | 12,323 | 2,028 | 4,133 | 6,520 | 16% | 35% | 53% |
| River Grove village | 9,961 | 10,668 | 10,227 | 411 | 1,043 | 1,901 | 4% | 10% | 19% |
| Rosemont village | 3,995 | 4,224 | 4,202 | 785 | 1,493 | 1,734 | 20% | 35% | 41% |
| Schiller Park village | 11,189 | 11,850 | 11,793 | 1,382 | 2,598 | 2,843 | 12% | 22% | 24% |
| Stone Park village | 4,383 | 5,127 | 4,946 | 2,544 | 4,057 | 4,359 | 58% | 79% | 88% |
| Wood Dale city | 12,425 | 13,535 | 13,770 | 870 | 1,768 | 2,796 | 7% | 13% | 20% |
| Total, 11 communities | 201,571 | 221,195 | 221,213 | 26,464 | 56,492 | 77,204 | 13% | 26% | 35% |

Sources: US Census Bureau, 1990 Census, STF1 Tables QT-P1A, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P12H.

FUTURE OUTLOOK

The self-perpetuating character of local spatial diffusion, along with the demographic inevitabilities tied to age structure, provide a firm scientific basis for anticipating the future growth of Latinos' strength in numbers within Cook County and the two Latino enclaves described above. Any congressional district that encompasses either Latino enclave has a predictable future: Its overly-Latino youth population will mature into the voting ages, thereby adding Latinos who are newly eligible to vote; and its overly non-Latino elderly population will gradually die off, thereby subtracting non-Latinos eligible to vote.

To quantify this future growth, I have calibrated a spatial diffusion model, which captures the effects of these spatial and demographic effects. My analysis shows that the Latino percentage of the voting-age population will increase approximately one percentage point every 3.2 years in the Northside enclave and approximately 1.1 percentage point every single year in the Southside enclave. These values imply that when voters go to the polls in November 2018, Latinos will constitute approximately 51.8% of VAP in the Northside enclave and approximately 68.9% of VAP in the Southside enclave.

### III. CONGRESSIONAL DISTRICTS ENCOMPASSING LATINO ENCLAVES

Three of the Congressional districts adopted by the State of Illinois for 2012 elections encompass portions of this growing and spatially diffusing Latino population. One district (Adopted Congressional District 4) encompasses the most heavily Latino portions of both the northside and the southside enclaves, leaving Adopted Congressional Districts 3 and 5 with much smaller Latino populations. In the following sections, I trace the evolution and discuss the current characteristics of these three districts (Adopted Districts CD3, CD4, and CD5). These districts are shown in Figure 3 below. The data for this analysis (shown in Appendix Table B) refer to fixed territories that correspond to each district as of 2010. Each fixed territory has been approximated as closely as possible using the census tract geography from earlier decennial censuses. Each fixed territory provides comparable data on population *composition* at several time points for each district. For constant geography as of 1990 (also shown), absolute totals for 2010 do not exactly match published totals.

### Figure 3. Boundaries of Adopted Congressional Districts 3, 4, and 5

ADOPTED CONGRESSIONAL DISTRICT 4

Adopted CD4 closely coincides with and retains the same basic "earmuff" shape as the Fourth
Congressional District that was drawn as a majority Latino district after the 1990 census (1992
CD4) and carried forward after the 2000 census (2002 CD4). The Latino share of voting-age
population ("VAP") in CD4 has increased from 59.2% in the post-1990 CD4 to 65.9% in
Adopted CD4.

When the State of Illinois redrew Adopted CD4 after the 2010 census, it added some territory to
Adopted CD4 and it removed some territory that had been part of 2002 CD4. For each
individual block of new territory that was added to Adopted CD4 or territory formerly in 2002
CD4 that was removed, I compared the Latino share of the voting-age population (H%VAP)
with the corresponding Latino share of Adopted CD4's voting-age population, using 2010 census
data. The territory added to Adopted CD4 had a 47.2% Latino share of VAP. The territory
formerly in 2002 CD4 that was removed had a 40.6% Latino share of VAP.

Thus, in redrawing the Adopted CD4 to contain the necessary number of residents, the State of
Illinois traded lower Latino VAP territory for higher Latino VAP territory.

ADOPTED CONGRESSIONAL DISTRICT 3

The 2002 CD3 has a voting-age population (VAP) that is 29.3% Latino, based on 2010 census
figures. In the Adopted CD3, Latinos comprise 24.6% of the VAP. To understand why the
Latino share of VAP for Adopted CD3 fell despite growing concentrations of Latinos in the
southern half of Cook County, I identified the various blocks of new territory that were added to
Adopted CD3 and territory formerly in 2002 CD3 that was removed. For each individual block
of territory added, I compared the Latino share of the voting-age population (H%VAP) with the
corresponding Latino share of Adopted CD3's voting-age population, using 2010 census data.
The territory added to Adopted CD3 had a 16.4% Latino share of VAP. The territory formerly in
2002 CD3 that was removed had a 34.4% Latino share of VAP.

Thus, switching territory in and out to rebalance total population had the net effect of *reducing*
Latinos' share of VAP in the redrawn Adopted CD3.

Figure 5A shows the territory added to Adopted CD3 (on the southwest and on the northeast).
Figure 5B shows the territory formerly in 2002 CD3 that was removed (mostly along the
northern and eastern borders). Territorial blocks shown in **red** are those that have a Latino VAP
percentage that is less than the 29.3% Latino VAP in the 2002 CD3 as of 2010. Territorial
blocks shown in **green** are those that have a Latino VAP percentage that is greater than the
29.3% Latino VAP in the 2002 CD3 as of 2010. The overall reduction of Latinos' share of VAP
in Adopted CD3 was caused by (1) the addition of red-colored territory, i.e., territory that is less
than 29.3% Latino; and (2) the removal of green-colored territory, i.e., territory that is more than
29.3% Latino.

## Figure 5. Changes to Congressional District 3

### A. Territory Added



### B. Territory Removed



ADOPTED CONGRESSIONAL DISTRICT 5

The 2002 CD5 has a voting-age population (VAP) that is 24.6% Latino, based on 2010 census data.  In the Adopted CD5, Latinos comprise 16.1% of the VAP.   To understand why the Latino share of VAP for Adopted CD5 fell despite growing concentrations of Latinos in the northern half of Cook County, I performed the same analysis of blocks of territory that were added to Adopted CD5 and removed from 2002 CD5 that I performed with respect to Adopted CD3. The territory added to Adopted CD5 had a 12.8% Latino share of VAP.  The territory formerly in 2002 CD5 that was removed had a 54.5% Latino share of VAP.

Thus, switching territory in and out to rebalance total population had the net effect of *reducing* Latinos' share of VAP in the redrawn Adopted CD5.

Figure 6A shows the territory added to Adopted CD5 (to the north, west, and southeast).  Figure 6B shows the territory formerly in 2002 CD5 that was removed from Adopted CD5 (mostly along the district's northern and eastern borders).   Territorial blocks shown in **red** are those that have a Latino VAP percentage that is less than the 24.6% Latino VAP in the 2002 CD3 as of 2010..  Territorial blocks shown in **green** are those that have a Latino VAP percentage that is greater than the 29.3% Latino VAP in the 2002 CD3 as of 2010.  The overall reduction of Latinos' share of VAP was caused by the addition of red-colored territory, i.e., territory that is less than 24.6% Latino, along with the removal of green-colored territory, i.e., territory that is more than 24.6% Latino.

## Figure 6. Changes to Congressional District 5

### A. Territory Added





### B. Territory Removed





<u>CONCLUSION</u>

My analysis of three of the Congressional districts adopted by the State of Illinois for 2012 elections reveals that in each instance, the reconfiguration of territory had the effect of increasing the Latino share of VAP in Adopted CD4 while at the same time decreasing the Latino share of VAP in Adopted CD3 and Adopted CD5.

**IV.  <u>FAIR CONGRESSIONAL DISTRICTS PROPOSED BY PLAINTIFFS</u>**

I have also examined the demographic characteristics of the congressional districts that Plaintiffs in this litigation have proposed as an alternative to the congressional districts adopted by the State of Illinois for 2012.[4]  I focus on the Plaintiffs' proposed third and fourth congressional districts (Fair CD3 and Fair CD4) because they have significant Latino populations and substantially overlap the three adopted congressional districts that I have already discussed (Adopted CD3, CD4, CD5).

**Figure 4.  Comparison of Adopted Congressional Plan and Fair Map**



Case: 1:11-cv-05065 Document #: 24  Filed: 08/04/11 Page 26 of 28 PageID #:112

---

[4] Plaintiffs' proposed districts are contained as exhibits to Plaintiffs' Motion for a Preliminary Injunction and Expedited Discovery, Docket No. 24.

FAIR DISTRICT 4

Fair CD4 encompasses a broad portion of the Latino enclave in the southern half of Cook County.  As seen in Figure 7 and Appendix Table B, the demographic composition of this fixed territory has changed markedly since 1990.  The data indicate that Latinos replaced non-Latinos over those two decades, leaving somewhat fewer residents overall but many more Latinos.  From 2000 to 2010, Latino residents increased 18% and the number of voting-age Latinos increased nearly 22%.  As of 2010, Latinos in Fair CD4 comprise 59.4% of the voting-age population— virtually identical to their share of the voting-age population of post-1990 CD4 (59.2%).  And the Latino share of the voting-age population in Fair CD4  is destined to increase as the under-18 population in this area (which is now 78% Latino) attains voting age in the years ahead.

FAIR DISTRICT 3

Fair CD3 encompasses a broad portion of the Latino enclave in the northern half of Cook County.  As seen in Figure 7 and Appendix Table B, the demographic composition of this fixed territory has changed markedly since 1990.  The data indicate that Latinos replaced non-Latinos over those two decades, again leaving fewer residents overall but many more Latinos.  Latino residents increased 8% and the number of voting-age Latinos increased 12%.  As of 2010, Latinos in Fair CD3 comprise 46.5% of the voting-age population.  This latter percentage will increase as the under-18 population (which is now 67% Latino) attains voting age in the years ahead.





**Figure 7.  Hispanics' Changing Share of Population: 1990-2010**

(Source: Appendix Table B.)


**V.  <u>CONCLUSION</u>**

As demonstrated in this report, my analysis of three of the Congressional districts adopted by the State of Illinois for 2012 elections reveals that in each instance, the reconfiguration of territory increased the Latino share of VAP in Adopted CD4 while at the same time decreasing the Latino share of VAP in Adopted CD3 and Adopted CD5.  As of 2010, Latinos comprise 59.4% of the voting-age population of Fair CD4 and 46.5% of Fair CD3, and both percentages are destined to increase in the years ahead.

## APPENDIX TABLES

Appendix Table A
Changing Makeup of Voting-age Population of Illinois and Cook County: 1990-2010

| | 1990 | 2000 | 2010 |
|---|---|---|---|
| | Illinois | | |
| Population 18 and older | 8,484,236 | 9,173,842 | 9,701,453 |
| *% Hispanic* | *6.8%* | *10.7%* | *13.4%* |
| *% Black/Black alone* | *13.4%* | *13.8%* | *13.6%* |
| *% Black alone/in combination* | *n.a.* | *14.1%* | *13.9%* |
| *% White Non-Hispanic* | *83.1%* | *70.9%* | *67.1%* |
| | Cook County | | |
| Population 18 and older | 3,825,022 | 3,978,922 | 3,962,395 |
| *% Hispanic* | *11.5%* | *17.3%* | *20.8%* |
| *% Black/Black alone* | *23.4%* | *24.0%* | *23.3%* |
| *% Black alone/in combination* | *n.a.* | *24.4%* | *23.7%* |
| *% White Non-Hispanic* | *65.1%* | *52.2%* | *48.1%* |

Sources: US Census Bureau, 1990 Census, STF1 Tables QT-P1A, QT-P1D, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P11, P12H. Note: 1990 White Non-Hispanic defined as Non-Black Non-Hispanic.

Appendix Table B
Hispanics' Changing Share of Population in Adopted CD4 and Proposed CD3 and CD4

(constant geography as of 2010)

| District / year | Total Population | | | Hispanic Population | | | Hispanic Share of Population | | |
|---|---|---|---|---|---|---|---|---|---|
| | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 |
| **ADOPTED CD4** | | | | | | | | | |
| 2000 | 761,154 | 526,546 | 234,608 | 506,761 | 320,141 | 186,620 | 66.6% | 60.8% | 79.5% |
| 2010 | 712,813 | 507,602 | 205,211 | 506,584 | 334,614 | 171,970 | 71.1% | 65.9% | 83.8% |
| **FAIR CD3** | | | | | | | | | |
| 2000 | 756,132 | 546,509 | 209,623 | 343,280 | 220,506 | 122,774 | 45.4% | 40.3% | 58.6% |
| 2010 | 712,813 | 531,234 | 181,579 | 369,219 | 247,071 | 122,148 | 51.8% | 46.5% | 67.3% |
| **FAIR CD 4** | | | | | | | | | |
| 2000 | 727,772 | 506,674 | 221,098 | 393,898 | 245,455 | 148,443 | 54.1% | 48.4% | 67.1% |
| 2010 | 712,813 | 502,170 | 210,643 | 463,349 | 298,530 | 164,819 | 65.0% | 59.4% | 78.2% |

Sources: US Census Bureau, 1990 Census, STF1 Tables QT-P1A, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P12H.

(constant geography as of 1990)

| District / year | Total Population | | | Hispanic Population | | | Hispanic Share of Population | | |
|---|---|---|---|---|---|---|---|---|---|
| | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 |
| **ADOPTED CD4** | | | | | | | | | |
| 1990 | 692,989 | 494,848 | 198,141 | 330,178 | 202,923 | 127,255 | 47.6% | 41.0% | 64.2% |
| 2000 | 388,156 | 266,370 | 121,786 | 276,372 | 175,161 | 101,211 | 71.2% | 65.8% | 83.1% |
| 2010 | 719,400 | 512,765 | 206,635 | 508,892 | 335,980 | 172,912 | 70.7% | 65.5% | 83.7% |
| **FAIR CD3** | | | | | | | | | |
| 1990 | 702,577 | 520,280 | 182,297 | 212,983 | 134,106 | 78,877 | 30.3% | 25.8% | 43.3% |
| 2000 | 499,418 | 358,275 | 141,143 | 264,631 | 169,722 | 94,909 | 53.0% | 47.4% | 67.2% |
| 2010 | 725,526 | 541,958 | 183,568 | 368,172 | 246,476 | 121,696 | 50.7% | 45.5% | 66.3% |
| **FAIR CD 4** | | | | | | | | | |
| 1990 | 644,278 | 466,178 | 178,100 | 223,701 | 135,730 | 87,971 | 34.7% | 29.1% | 49.4% |
| 2000 | 502,791 | 349,096 | 153,695 | 297,157 | 185,337 | 111,820 | 59.1% | 53.1% | 72.8% |
| 2010 | 701,988 | 493,874 | 208,114 | 456,780 | 294,073 | 162,707 | 65.1% | 59.5% | 78.2% |

Sources: US Census Bureau, 1990 Census, STF1 Tables QT-P1A, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P12H.

Signed: _____

# SUPPLEMENTAL MATERIAL TO ACCOMPANY

# EXPERT REPORT OF PETER A. MORRISON, PH.D.

In the case of

COMMITTEE FOR A FAIR AND BALANCED MAP, et al.
v.
ILLINOIS STATE BOARD OF ELECTIONS, et al.

No. 11-C-5065 (N.D. Ill.)

1. Facts or data considered.

2. List of other cases in which I testified as an expert at trial or by deposition in the past four years.

3. Compensation to be paid for the study and testimony in this case.

4. CV for Peter A. Morrison, Ph.D.

## I. FACTS OR DATA CONSIDERED IN THIS CASE

1. Data from the U.S. Censuses of Population, 1990, 2000, and 2010: 1990 Census, STF1 Tables QT-P1A, QT-P1D, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P11, P12H.

2. Maps of existing and proposed Congressional districts.

3. The following scholarly publications:

   F. D. Bean and M. Tienda, *The Hispanic Population of the United States* (New York: The Russell Sage Foundation, 1987).

   Stanley K. Smith et al., *State and Local Population Projections: Methodology and Analysis* (New York: KluwerAcademic/Plenum, 2001), chapter 15.

   Richard L. Morrill, "Waves of Spatial Diffusion," *Journal of Regional Science*, 3 (1968): 1-17

   R. L. Morrill, G. L. Gaile, and G. I. Thrall, *Spatial Diffusion* (Sage Publications, 1988).

## II. CASES I HAVE TESTIFIED IN SINCE SEPTEMBER 2007

Since September 2007, I have given no trial testimony. I have given deposition testimony (only) in the following cases:

1. UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA COLUMBIA DIVISION, CHADRIC WILEY and LISA LANGLEY WILEY v. ADVANCE AMERICA, CASH ADVANCE CENTERS OF SOUTH CAROLINA, INC. and CHECK INTO CASH OF SOUTH CAROLINA, INC.

2. SUPERIOR COURT FOR STATE OF ALASKA, ALASKA RETIREMENT MANAGEMENT BOARD V. MERCER, CASE # 1 JU-07-974 C I.

3. CIRCUIT COURT, TWENTIETH JUDICIAL CIRCUIT OF ILLINOIS, KITSON V. BANK OF EDWARDSVILLE. CLASS ACTION 3 02-L-807.

## III. COMPENSATION FOR STUDY AND TESTIMONY IN THIS CASE

I bill my time in this case at an hourly rate of $215. I bill my time for testimony as an expert at trial or by deposition in this case at an hourly rate of $400.

## IV.  <u>QUALIFICATIONS AND PUBLICATIONS</u>

See accompanying c.v. which follows.

# PETER A. MORRISON

## EDUCATION

B.A., Sociology, 1962, Dartmouth College
Ph.D., Sociology, 1967, Brown University

## PROFESSIONAL EXPERIENCE

1969-2009 — Senior Staff Demographer and Resident Consultant, The RAND Corporation, Santa Monica, California
1979-1990 — Founding Director, Population Research Center, RAND
1967-1969 — Assistant Professor, Department of Sociology, and Research Associate, Population Studies Center, University of Pennsylvania, Philadelphia

## AREAS OF EXPERTISE

Dr. Morrison's principal expertise centers on applications of demographic analysis in tracking socioeconomic trends and envisioning their consequences for public policy and business. Domestic applications include demographic analysis for electoral redistricting; store site selection; human resource analysis; evaluating employment discrimination claims; evaluating effectiveness of school desegregation remedies; forecasting school enrollments; gauging minority representation within jury pools; and various applications of census and administrative data in monitoring local demographic contexts. International applications include business concerns with corporate strategic planning and globally emerging middle-class consumer markets; identifying and quantifying demographic precursors of expanding consumer markets; comparing and evaluating individual markets; and analyzing forthcoming demographic trends to spot potential business opportunities.

Dr. Morrison performs studies for the private sector and conducts executive briefings on these topics through his consulting firm, founded in 1984. Clients have included American Express, American Stores, Corning, Inc., Ford Motor Co., Marriott International, NBC, New Directions for News, Times Mirror, University of California, and CIBC Securities (Canada).

Dr. Morrison has taught at The RAND Graduate School and lectures periodically before Congressional, academic, and business audiences. He has given testimony before subcommittees of the U.S. Senate and House of Representatives and addressed meetings of the National Science Board, The Conference Board, National League of Cities, National Conference of State Legislatures, University of California Management Institute, American Bar Association, American Society of Newspaper Editors, newsroom seminars for the Casey Journalism Center, County Counsels Association of California, American College of Surgeons, National Association of Homebuilders, Missouri Legislative Forum, World Future Society, and Volunteers of America.

He has served as advisor to the Committee for Economic Development, the Congressional Research Service, and committees of the National Academy of Sciences, U.S. Census Bureau, Department of Agriculture, National Institutes of Health, California Energy Commission, California Governor's Council on Growth Management, Center for California Studies, and United Way.

## PROFESSIONAL ORGANIZATIONS/HONORS

Invited participant, U.S. Census Bureau Working Group on 2010 Race and Ethnicity

Member, L.A. Unified School District Enrollment Analysis Technical Advisory Committee

Visiting Lecturer, Helsinki School of Economics and Business Administration, summer 2001

U.S. Census Bureau Advisory Committee on Population Statistics, 1989-1995 (Chair, 1990).

Population Association of America: Board of Directors, 1978-1980; Public Affairs Committee, 1979-1986; Chair, Nominations Committee, 1981-1982; annual Program Organizing Committee, 1995, 1998; Local Arrangements Committee, 2000; Committee on Applied Demography, 1995-1999, Chair, 1998; Development Committee, 2006-.

Southern Demographic Association: Board of Directors, 1999-present; Vice President, 2001; President, 2003.

Center for Spatially Integrated Social Science, UC Santa Barbara: Advisory Board, 2000-

Research Advisory Board, Committee for Economic Development, 1988-1991.

Regents' Lecturer, UCLA, Spring 1987.

Social Science Research Council's Committee on the Survey of Income and Program Participation, 1985-1988.

National Advisory Child Health and Human Development Council, National Institute of Health, 1984-1987.

Population Research Committee, National Institute of Child Health and Human Development, 1977-1979.

Committee on Behavioral and Social Aspects of Energy Consumption and Production, National Academy of Sciences, 1980-1982.

Committee on Urbanization and Population Redistribution, International Union for Scientific Study of Population, Chairman, 1976-1979.

Advisory Subcommittee for Applied Social and Behavioral Sciences, National Science Foundation, 1978-1981.

Future of Rural America Advisory Committee, FHA, 1978-1981.

Editorial Advisory Committee, *Urban Studies,* 1985-1995.

Editorial Advisory Board, *J. Australian Population Assoc., 1995-1998.*

**RECENT MEDIA APPEARANCES:**

*Interviews*: CNBC; New York Times; Los Angeles Times; USA Today; Time Magazine; Seattle Times; AMA/Marketing News

*Commentary*: International Herald Tribune; Pittsburgh Post-Gazette; Los Angeles Times; Atlanta Constitution; Houston Chronicle

**SELECTED RECENT PUBLICATIONS/PAPERS**

"Chinese Workers Could Replace Mexican Immigrants," op-ed in *Houston Chronicle*, Aug. 12, 2011 (coauthored with Dudley Poston, Jr.).

"Integrating Census Data to Support a Motion for Change of Venue," *Population Research & Policy Review* (coauthored with Dean Judson), 2011.

"An Evaluation of Additive and Hierarchical Classifications of Race/Ethnicity as Measured on Census 2000," coauthor (under review).

"Using the Census Bureau's Surname List to Improve Estimates of Race/Ethnicity and Associated Disparities," *Health Services and Outcomes Research Methodology* 9(2), pp.69-83 (coauthor).

"Teaching Business Demography Using Case Studies," presented at the International Union for the Scientific Study of Population Seminar on Applications of Demography in Business, Sydney Australia, October 2007 (coauthor).  Appears in *Population Research & Policy Review.*

"Targeting Spatial Clusters of Elderly Consumers in the USA," presented at the International Union for the Scientific Study of Population Seminar on Applications of Demography in Business, Sydney Australia, October 2007 (coauthored with Thomas Bryan).  Appears in *Population Research & Policy Review.*

"Assessing the Need for a New Medical School: A Case Study in Applied Demography," *Population Research & Policy Review* (coauthor).

 "A New Method for Estimating Race/Ethnicity and Associated Disparities Where Administrative Records Lack Self-Reported Race/Ethnicity," coauthor, *Health Services Research Journal* 43(5), Oct. 2008.

"Forecasting the Supply of and Demand for Physicians in the Inland Southern California Area" (coauthor), RAND Technical Report TR524, 2007.

"Evaluating a Claim of Discriminatory Annexation Using Demographic Analysis: An Instructional Case," at 2005 annual Southern Demographic Association meetings.

"Evaluating Evidence of Discrimination in Multi-Ethnic Housing Markets," *Population Research & Policy Review,* 2008 (coauthored with William A. V. Clark).

"Methods for Gauging the Target Populations that Community Colleges Serve," *Population Research & Policy Review* 26(1), 2007 (coauthored with L. Santibañez, G. Gonzalez, S. J. Carroll).

"Lingering Effects of Discrimination: Tracing Persistence Over Time in Local Populations," *Population Research & Policy Review*, 2006.

"China: Bachelor Bomb," op-ed in *International Herald Tribune*, Sept. 14, 2005 (coauthored with Dudley Poston).

"Small-Area and Business Demography," chapter in D. Poston and M. Micklin, *Handbook of Population*, 2005 (coauthored with Stan Smith).

"Future Demographic Challenges to California School Districts," presented at 2005 annual Population Association of America meetings, session on School Demography.

"Demographic Overview of California's K-12 Public School Student Population," chap. 2 in S. J. Carroll et al., *California's K-12 Public Schools: How Are They Doing?* RAND MG-186, 2005.

"Counting on Demography: Fostering Applications of the Social Sciences," invited plenary address at the 2005 Southwestern Social Science Association meetings, New Orleans

"How Migration Flows Shape the Elderly Population of Metropolitan Pittsburgh," at 2004 annual Southern Demographic Association meetings, Hilton Head, SC (coauthored with Chris Briem)

"The Bright Lights in Pittsburgh's Future," op ed appearing in Pittsburgh Post-Gazette, Sept. 19, 2004 (coauthored with Barry Balmat)

"New Approaches to Spotting Enclaves of the Elderly Who Have Aged in Place," presented at 2004 Population Association of America meetings (coauthored with Tom Bryan).

"Developing an Arab-American Surname List: Potential Demographic and Health Research Applications," at 2003 Southern Demographic Association meetings (coau. with B. Kestenbaum, D. Lauderdale, A. Abrahamse, S. El-Badry).

"A Demographic Overview of Metropolitan Pittsburgh," RAND Issue Paper IP-256 (2003).

"Confronting a Race-Based School Admissions Policy," *Chance* 16(1), 2003.

"An Overview of Business Demography in the U.S.A.," invited paper for the Australian Population Association's 11th Biennial Conference, Sydney, October 2002.

"Internal Migration and Short-Distance Mobility," Chapter 19 in D. Swanson, et al., *The Methods and Materials of Demography*, rev. ed., 2003 (coau. with T.M. Bryan and D.A. Swanson).

"Business Demography," in P. Demeny and J. McNicholl, eds., *Encyclopedia of Population*, 2003 (coauthored with Stan Smith).

"A National Legacy of Migration," in Carla Blank, *Rediscovering America* (2003).

Review of J. S. Siegel, *Applied Demography: Applications to Business, Government, Law, and Public Policy* in *Population and Development Review* 28(1), 2002.

"A Demographic Perspective on Our Nation's Future," RAND Documented Briefing, 2001.

"Using First Names to Estimate Racial Proportions in Populations," presented at the 2001 Population Association of America meetings.

"At-Large Elections Under Legal Challenge: Where Demographic Analysis Fits In," presented at the 2000 Population Association of America meetings.

"Meeting Local Information Needs: A Case Study in Team Applied Demography," *Applied Demography Newsletter*, Population Association of America, Spring 2002 (coauthored).

"Gauging Future Prospects for a Neighborhood Vehicle: Where Demographic Analysis Fits In," at 1999 Southern Demographic Association meetings, San Antonio.

"Forecasting Enrollments for Immigrant Entry-Port School Districts," *Demography*, Nov. 2000.

"Charting Alternatives to a Segregated School Admissions Policy: Where Demographic Analysis Fits In," at 1998 Population Association of America meetings, Chicago (abridged version appears in *Chance*).

"Unveiling the Demographic 'Action' in Class Actions," *Population Research and Policy Review*, 1999.

"Family Policies and Demographic Realities," chapter in J.W. Hughes and J.J. Seneca, eds., *America's Demographic Tapestry: Baseline for the New Millennium*, Rutgers Univ. Press, 1999.

"Applying Demographic Analysis in Affirmative Action Disputes: An Instructional Case," *Population Research and Policy Review*, 1998.

"Demographic Influences on Latinos' Political Empowerment: Comparative Local Illustrations," *Population Research and Policy Review*, 1998.

"Demographic Change and School District Response: Assessing Alleged Discriminatory Effects of Boundary Changes," under review (with W.A.V. Clark).

"Forecasting Enrollments During Court-Ordered Desegregation," *Population Research and Policy Review*, 1996.

"Applying Demographic Analysis to Store Site Selection," *Population Research and Policy Review,* 1996 (with A. F. Abrahamse).

"Tracking Growth of Emerging Consumer Markets Worldwide: Where Demographic Analysis Fits In," presented at Sixth International Conference on Applied and Business Demography, Bowling Green, OH (coauthored).

"Tying Knots in the American Tapestry," Op-ed article, *Los Angeles Times,* Sept. 18, 1995.

"Broadening Client Perspectives on Business Concerns," *Applied Demography*, Summer 1995.

"Demographic Foundations of Political Empowerment in Multi-Minority Cities," *Demography*, May, 1995 (with W.A.V. Clark).

"Demographic Perspectives on the Voting Rights Act," RAND P-7905, 1995 (briefing cohosted by U. S. House Subcommittee on Census and The Population Resource Center, Oct.19,1994).

*Demographics: A Casebook for Business and Government*, Westview Press, 1994 (coeditor).

"Empowered or Disadvantaged?   Applications of Demographic Analysis to Political Redistricting," chapter in *Demographics* (cited above).

"A Riot of Color: The Demographic Setting of Civil Disturbance in Los Angeles," RAND P-7819 (with Ira S. Lowry).  Condensed version appears in Mark Baldassare (ed.), *The Los Angeles Riots:  Lessons for the Urban Future*, Westview, 1994.

"Surname Analysis for Estimating Local Concentration of Hispanics and Asians," *Population Research and Policy Review*, 1994 (with A. F. Abrahamse).

"The Demographic Context of Army Family Support Policy," chapter in M.J. Eitelberg and S.L. Mehay (eds.), *Marching Toward the 21st Century* (Greenwood Press, 1994).

"Strategic Sleuths," *Forecast Magazine*, Nov/Dec 1993.

"Congress and the Year 2000:  Peering into the Demographic Future," *Business Horizons*, Nov/Dec 1993 (condensation of RAND N-3279 cited below).

"A California That Can Work:  People, Productivity, and Energy," RAND P-7828 (invited testimony before the California Energy Commission, June 1993).

"Goodbye Past, Hello Future:  California's Demographic Shift,"  Op-ed article, *Los Angeles Times*, September 13, 1993.

"More than Meets the Eye," *Chance*, May 1993.

"Employment Discrimination:  How Demographic Analysis Fits In," presented at Fourth International Conf. on Applied Demography, Bowling Green, Ohio, September 1992.

"Is 'Aging in Place' a Blueprint for the Future?"  Association of American Geographers Meeting, San Diego, RAND, P-7794, 1992.

"Gauging Hispanic Voting Strength:  Pitfalls and Paradoxes," *Population Research and Policy Review*, 1992 (with W.A.V. Clark).

"Local Redistricting: The Demographic Context of Local Boundary Drawing," *National Civic Review*, Winter/Spring 1992 (with W.A.V. Clark).

"Mirroring the Mosaic:  Redistricting in a Context of Cultural Pluralism," RAND, P-7789, 1992.

"Testimony before House Subcommittee on Census and Population," RAND, P-7784, 1992.

"Healthier Childhoods and Family Responsibility:  Two Issue Papers," RAND, P-7788, 1992.

"How Demographic Analysis Supports Redistricting," for Mandatory Continuing Legal Education course sponsored by County Counsels Association of California, January 1992.

"California's Future:  More to Come," Op-ed article, *The Los Angeles Times*, Dec. 3, 1991.

*Soldiers' Families:  Tracking Their Well-Being During Peacetime and War*, RAND, N-3405-A, 1992 (coauthor).

"California's Demographic Outlook:  Implications for Growth Management," RAND, P-7738, 1991.

"The Changing Demographic Context of Postsecondary Education," RAND, P-7737, 1991.

"The Demographer's Role in the Local Boundary-Drawing Process," RAND, P-7711, 1991 (coauthor).

"Looking In From Outside:  Enhancing Demographic Perspectives on Business Concerns," given at 1991 Population Association of America meetings.

"Demographic Paradoxes in the Los Angeles Voting Rights Case," *Evaluation Review*, 1991 (with W.A.V. Clark).

"Future Images—Childhood, The Workplace, Our Communities," RAND  P-7656, 1990.

"The Changing Demographic Context of Municipal Governance," RAND P-7654, 1990.

"Pitfalls in Estimating Eligible Voters Among Hispanics," coauthored, given at 1990 Population Association of America meetings.

"Demographic Factors Reshaping Ties to Family and Place," *Research on Aging*, Dec. 1990.

"Applied Demography:  Its Growing Scope and Future Direction," *The Futurist*, March/April 1990.

"A Demographic Perspective on Future Issues," *Congressional Research Service CRS Review*, Jan/Feb 1990.

"Leaving School Early:  'Stopping Out' and Dropping Out Among American Youth," given at the 1989 American Sociological Association meetings (with Jane Mauldon).

*A Taste of the Country:  A Collection of Calvin Beale's Writings*, editor and author of introduction (Penn State Univ. Press), 1990.

*Families in the Army:  Looking Ahead*, RAND, R-3691-A, 1989 (coauthor).

"Quantifying Legal Standards in Section 2 Voting Rights Cases," paper given at Population Association of America.

*Congress and the Year 2000:  A Demographic Perspective on Future Issues*, RAND, N-3279, March 1991.

"What Tomorrow's Demographers Will Be Called Upon to Do," RAND  P-7469, 1988.

*Beyond Stereotypes: Who Becomes a Single Teenage Mother?*, RAND R-3489, 1988 (coau.).

"Government Must Help Families With Long-term Care for Elderly," op-ed article, *The Atlanta Constitution*, April 19, 1988.

"Teens Willing  to Consider Single Parenthood:  Who is at Greatest Risk?" *Family Planning Perspectives*, Jan/Feb, 1988 (coauthor).

*The Current Demographic Context of Federal Social Programs*, RAND, N-2785, 1988.

"Demographic Factors Reshaping the U.S. Market for New Housing," RAND, P-7467, 1988.

"Applied Demography:  Its Current Scope and Future Direction in the United States," RAND Paper, 1988.

*Public Libraries Face California's Ethnic and Racial Diversity*, RAND, R-3656, 1988 (coauthor, Chapter 4).

"Changing Demographics:  What to Watch For," *Business Economics*, 1987.

"Continuity and Change Across the Population Sciences," RAND,  P-7281, 1986.

"Pro-Family Laws May Miss the Mark," op-ed article in *The Wall Street Journal*, Dec. 5, 1986.

*Changing Family Structure:  Who Cares for America's Dependents?* RAND, N-2518, 1986.

"Accounting for the Educational Shortfalls of Mothers," *Journal of Marriage and the Family*, 1986 (coauthored).

"The Prism of Migration," *Social Science Quarterly*, 1986 (with Julie DaVanzo).

*How Demographic Shifts Will Affect the IRS and Its Mission*, RAND, P-7170, 1985.

"Characteristics of Migrants from Metropolitan to Nonmetropolitan Areas in the U.S.A.," *Espace Populations Societes*, 1985 (with Kevin McCarthy).

*Demographics and Business Decisionmaking: Prospects and Possibilities for the 1980s*, RAND, P-7017, 1984. Appears in *Marketing Review*, Fall 1985.

"Tracking People," *Group Practice Journal*, July/August 1984.

*Demographic Forces Reshaping Small Communities in the 1980s*, RAND, N-1887, 1982 (coauthor). Appears in *Southwestern Review of Management and Economics*, 1984.

*Population Movements: Their Forms and Functions in Urbanization and Development*, published by Ordina for International Union for the Scientific Study of Population, 1983 (editor and author of Chap. 1).

*Current Demographic Trends and Federal Policy: An Overview*, RAND, N-2030, 1983.

"Is Population Deconcentration Lengthening Commuting Distances?" *Population Research and Policy Review*, 1983 (with Kevin McCarthy).

*Migration Sequences: Who Moves Back and Who Moves On?*, RAND, R-2548-NICHD, 1982 (with Julie DaVanzo).

*Demographic Challenges in America's Future*, RAND, R-2911, 1982 (with William P. Butz).

"Different Approaches to Monitoring Local Demographic Change," chapter in E. S. Lee and H. F. Goldsmith, eds., *Population Estimates: Methods for Small Area Analysis*, Sage, 1982.

"The Energy Situation and the World of Californians," in *Regional Perspectives on Energy Issues*, (The Conference Board, July 1982).

*Demographic Certainties and Uncertainties in the Future of Social Security*, RAND, N-1742-NICHD, 1981 (invited Senate testimony). Appears in *Challenge: The Magazine of Economic Affairs*, Jan.-Feb., 1982.

"There Are Just Too Many Uncertainties," op-ed article, *The Sacramento Bee*, 9/20/81.

*Teenage Parenthood: A Review of Risks and Consequences*, RAND N-1714, 1981 (coau.).

*Teenage Parents: Their Ambitions and Attainments*, RAND, R-2771, 1981 (coau.).

"Return and Other Sequences of Migration in the U.S.," *Demography*, 1981 (coau.).

"How Demographers Can Help Legislators," *Policy Analysis*, 1980.

*Accommodating the Demography of the 1980s*, Midcontinent Perspective Series, Midwest Research Institute, December 1980.

*City Data: A Catalog of Data Sources for Small Cities*, RAND, R-2612, 1980 (coauthored).

"Demographic Trends Impinging on Energy Use," chapter in Charles T. Unseld et al., *Sociopolitical Effects of Energy Use and Policy*, National Academy of Sciences, Washington, D.C., 1979.

*The Future Demographic Context of the Health Care Delivery System*, RAND, N-1347, 1979.

"The Transition to Zero Population Growth in the Midwest," chapter in C. C. Roseman (ed.), *Population Redistribution in the Midwest*.

"Current Demographic Change in Regions of the United States," chapter in V. L. Arnold (ed.), *Alternatives to Confrontation: A National Policy Toward Regional Change*; condensed version appears in *American Demographics*, May 1979.

*Overview of Demographic Trends Shaping the Nation's Future*, RAND, P-6128, 1978 (testimony before Joint Economic Committee of Congress).

*The Current Demographic Context of National Growth and Development*, RAND, P-5514, 1975 (Congressional testimony); published in condensed form in L. S. Bourne and J. W. Simmons (eds.), *Systems of Cities*, Oxford Univ. Press, 1978, Chap. 6.6.

"Emerging Public Concerns Over U.S. Population Movements in an Era of Slowing Growth," in T. Espenshade and W. Serow (eds.), *The Economic Consequences of Slowing Population Growth*, 1978.

"The Image of 'Elsewhere' in the American Tradition of Migration" (coauthored), in W. H. McNeill and R. S. Adams (eds.), *Human Migration: Patterns, Policies, Implications*, Indiana University Press, Bloomington, Indiana, 1978.

"New York State's Transition to Stability: The Demographic Outlook," in Ben Chinitz (ed.), *The Declining of New York in the 1970s: A Demographic and Economic Analysis*, Praeger, 1978.

*Toward A Policy Planner's View of the Urban Settlement System*, RAND, P-5357, 1975; condensed version appears in L. S. Bourne and J. W. Simmons (eds.), *Systems of Cities*, Oxford University Press, 1978, Chap. 7.3.

"The Changing Demographic and Economic Structure of Nonmetropolitan Areas in the U.S.," *International Regional Science Review*, 2(2), 1977 (with Kevin McCarthy).

"Forecasting Population of Small Areas: An Overview," in *Population Forecasting for Small Areas*, Oak Ridge Associated Universities, Oak Ridge, Tennessee, 1977.

"Demographic Trends That Will Shape Future Housing Demand," *Policy Sciences*, 1977.

"The Functions and Dynamics of the Migration Process" (Chap. 4); and "Urban Growth and Decline in the U.S.: A Study of Migration's Effects in Two Cities" (Chap. 14), in A. Brown and E. Neuberger (eds.), *Internal Migration: A Comparative Perspective*, Academic Press, 1977.

*San Jose and St. Louis in the 1960s: A Case Study of Changing Urban Populations*, RAND, R-1313-NSF, 1973; adaptation appears in S. Goldstein and D. Sly (eds.), *Patterns of Urbanization: Comparative Country Studies*, International Union for Scientific Study of Population, Liege, Belgium, 1977.

*Rural Renaissance in America? The Revival of Population Growth in Remote Areas*, Population Reference Bureau, Inc., 1976.

*National Longitudinal Study of High School Seniors: An Agenda for Policy Research*, RAND, R-1964-HEW, 1976 (coauthored).

*The Demographic Context of Educational Policy Planning*, Occasional Paper of the Aspen Institute for Humanistic Studies, 1976.

"A Method for Monitoring Small-Area Population Changes in Cities," *Review of Public Data Use*, April 1975 (coauthored).

*Recent Research Insights into Local Migration Flows*, RAND, P-5379, 1975 (coauthored).

*Population Movements and the Shape of Urban Growth: Implications for Public Policy*, RAND, R-1072-CPG, 1972 (Commission on Population Growth and the American Future, *Research Reports*, Vol. V, 1973); adaptation appears in J. Friedmann and W. Alonso, *Regional Policy: Readings in Theory and Applications*, MIT Press, 1975.

"Urban Growth and Decline: San Jose and St. Louis in the 1960s," *Science*, 1974.

*Review of Federal Programs to Alleviate Rural Deprivation*, RAND, R-1651, 1974 (coauth.).

"A Demographic Assessment of New Cities and Growth Centers as Population Redistribution Strategies," *Public Policy*, 1973.

*Dimensions of the Population Problem in the United States* RAND, R-864-CPG, 1972 (Comm. on Population Growth and the Amer. Future, *Research Reports*, Vol. V, 1973).

*How Population Movements Shape National Growth*, RAND, P-5007, 1973 (Congressional Seminar on National Growth Policy).

*Migration from Distressed Areas: Its Meaning for Regional Policy*, RAND, R-1103, 1973.

"Theoretical Issues in the Design of Population Mobility Models," *Environment and Planning*, 1973.

*The Impact and Significance of the Rural-Urban Migration in the United States*, RAND, P-4752, 1972 (testimony before U.S. Senate Subcommittee on Migratory Labor and Public Welfare).

"Chronic Movers and the Future Redistribution of Population," *Demography*, 1971.

*Demographic Information for Cities: A Manual for Estimating and Projecting Local Population Characteristics*, RAND R-618, 1971.

"The Role of Migration in California's Growth," in K. Davis and F. Styles (eds.), *California's Twenty Million: Research Contributions to Public Policy*, Institute of International Studies, University of California, Berkeley, 1971.

"Duration of Residence and Prospective Migration," *Demography*, 1967.

(Updated: August 2011)

# EXHIBIT A2

# Richard Engstrom Affirmative Expert Report (9/15/11)

Expert Report for Committee for a Fair and Balanced Map, *et al,*
v. Illinois State Board of Elections

by

Richard L. Engstrom

Visiting Research Fellow

Center for the Study of Race, Ethnicity, and Gender in the Social Sciences
Duke University

## BACKGROUND

My name is Richard L. Engstrom and I am a resident of Durham, North Carolina. I am a former Research Professor of Political Science and Endowed Professor of Africana Studies at the University of New Orleans. I was employed as a consultant at the Center for Civil Rights at the School of Law, University of North Carolina, Chapel Hill, from 2006 through 2007. I am presently a Visiting Research Fellow at the Center for the Study of Race, Ethnicity, and Gender in the Social Sciences at Duke University. I have served two terms as the Chairperson of the Representation and Electoral Systems Section of the American Political Science Association, from 1993-1995 and 1995-1997, and served as a member of the Executive Council for that section from 1993 to 2007.

I have done extensive research into the relationship between election systems and the ability of minority voters to participate fully in the political process and to elect representatives of their choice. The results of my research on this topic have been published in the *American Political Science Review, Journal of Politics, Western Political Quarterly, Legislative Studies Quarterly, Social Science Quarterly, Journal of Law and Politics, Electoral Studies, Representation, Saint Louis University Public Law Review,* and other journals and books. Three

Ex. A2

articles authored or co-authored by me were cited with approval in <u>Thornburg v. Gingles</u>, 478 U.S. 30, at 46 n.11, 49 n.15, 53 n.20, 55, and 71 (1986), the Supreme Court decision interpreting amended section 2 of the Voting Rights Act. I am the co-author, with Mark A. Rush, of *Fair and Effective Representation? Debating Electoral Reform and Minority Rights* (Lanham, MD: Rowman and Littlefield Publishers, Inc. 2001). A copy of my curriculum vitae is attached as Appendix B to this report.

I have also testified as an expert witness in numerous cases in federal and state courts across the United States. Since 2005 I have testified at trial and/or been deposed in the following cases: Pender County v. Bartlett (General Court of Justice, Superior Court Division, County of Wake, NC 2005), Arise for Social Justice v. City of Springfield and Springfield Election Commission (D.C. Mass. 2006, 2007), Gonzalez v. State of Arizona (D.C. Ariz. 2008), United States of American and Cesar Ruiz v. Village of Port Chester (S.D. NY 2008), United States of America v. Euclid City School District Board of Education and Cuyahoga County Board of Elections (N.D. Ohio 2009), Benavidez v. City of Irving, Texas (N.D. Tex. 2009), Benavides v Irving Independent School District, Texas (N.D. TX 2009), and Texas Latino Redistricting Task Force v. Perry (W.D. TX 2011).

## QUESTIONS ANALYZED

The attorneys for the plaintiffs in this case have asked me to address several matters. The first is to analyze the extent to which the candidate preferences of Latino voters differed from those of other voters in the area from which Congressional District (hereinafter CD) 4 in the new congressional districting plan adopted by the state of Illinois (hereinafter Adopted Plan), or CD 3 or CD 4 in the illustrative remedial plan presented by the plaintiffs in this litigation (hereinafter Plaintiffs' Plan), were created. CD 4 in each plan is a majority-Latino district in voting age

population (VAP), and CD 3 in the Plaintiffs' Plan is the only district in which Latinos constitute a plurality of the VAP, but not majority, in either plan. CD 3 and CD 4 in the Plaintiffs' Plan and CD 4 in the Adopted Plan encompass areas within which Latinos tend to be concentrated. This therefore is the area of concern for the racially polarized voting analysis. The extent to which voting might be racially polarized in other areas of the state has no impact on the drawing of districts within this area.

The elections analyzed for this purpose were the most recent elections in which voters within this area have been presented with a choice between or among Latino and non-Latino candidates for offices within Cook County in which voters in a large portion of the area at issue participated. All of the elections are ones in which voters have a single vote to cast and only one candidate will be nominated or elected, as is the case in congressional elections. The elections analyzed are the 2006, 2008, and 2010 Democratic primaries for State's Attorney, County Assessor, District 16 for the County Board, and four judgeships in Subcircuits of the Cook County Circuit Court.[1] In addition, the 2011 election for Mayor of Chicago is analyzed as well.

I also have been asked to provide a comparative assessment of the opportunities Latinos have to elect representatives of their choice in the majority-Latino districts in each plan, and to compare the relative electoral opportunities provided by the second most Latino districts in VAP

---

[1] If data are available, I plan to supplement this report with analyses of the votes cast in the area for the 2010 general election for County Assessor and the 2008 general election for State's Attorney, both of which were more competitive general elections than usual in Cook County, with the winning candidates receiving 48.0 percent and 60.8 percent of the votes cast in them. In addition, if data are available, I plan to supplement this report with analyses of Democratic primary elections for two county-wide contests for Circuit Court judgeships, one in 2010 and one in 2008. All of these elections also present voters with a choice between or among Latino and non-Latino candidates.

Not included in the analyses are two elections in which Latino candidates were not competitive. These were the 2006 Democratic primary for a Subcircuit 7 seat on the Circuit Court, in which a Latino candidate received 5.2 percent of the vote in a four-person contest, and the 2010 Democratic primary for CD 3, in which a Latino candidate received 22.1 percent of the vote in a two-person contest.

in each plan. These analyses entail examinations of not only the demographics of the districts, but also the results of past elections in the various versions of CD 4 that have been in place, and the results of votes cast in other elections within the geographical area of CD 4 in the Adopted Plan and the Plaintiffs' Plan and the geographical area of CD 3 in the Plaintiffs' Plan.[2]

I am being compensated at a rate of $300 an hour for my work in this case.

## RACIALLY POLARIZED VOTING

Data and Methods

The data used in the analyses of the candidate preferences of Latino and other voters include the numbers of votes cast in the precincts for the various candidates in these elections. These data were obtained from the Defendant, State Board of Elections, Cook County Clerk and Chicago Board of Elections. These election returns are matched, by precinct, to additional data reflecting the relative presence of Latinos and others in the voting age population of the respective precincts, based on the 2010 Census of Population.[3]

The estimates of the extent to which the candidate preferences of the Latino voters differed from those of the non-Latino voters in these elections have been derived through a methodology developed for this purpose by Professor Gary King subsequent to Thornburg v. Gingles [478 U.S. 30 (1986)]. This procedure is known as *Ecological Inference* and is superior

---

[2]  Appendix A to this report contains the facts and data relied upon to reach my opinions and conclusions in this case.

[3]  In analyses of this type it is not uncommon to find that there are problems with the matching of precinct demographics and precinct election returns. This has occurred in this analysis as well. Some precincts are listed as having more votes cast in them than voting age population residing in them. Most such precincts are reported to have no people of voting age within them, or very few. These precincts have been excluded from the analyses. Despite their exclusion, the percentages of the votes cast in an election that are included in the following analyses range from 88.0 percent to 97.3 percent.

to the methodologies relied upon in the Gingles case, which were homogeneous precinct analysis (HP) and ecological regression analyses (ER).[4]

In the county-wide elections, in which all of the voters in Cook County residing in the area of interest can participate, there is sufficient presence of African Americans in the precincts to provide reasonably precise estimates of their candidate preferences, and therefore they are included as a voting group in the multivariate EI analyses of these elections. These analyses provide estimates for the candidate preferences of Latinos, African Americans, and the remaining voters. This is also the case for the Chicago mayoral election. The presence of African Americans is not sufficient, however, to provide reasonably precise estimates of their candidate preferences in the precincts in the area of interest in District 16 for the County Board or within the Circuit Court subcircuits. The analyses of these elections therefore will be bivariate applications of EI in which estimates of candidate preferences will be reported for Latino and non-Latino voters, with the later group including African Americans.

Results

The results of the analyses are reported in Tables 1 and 2 at the end of this report. Identified in the first column of these tables are the year and type of election being analyzed, and

---

[4] HP analyses simply report the percentage of the votes received by a candidate or set of candidates within the precincts in which a particular group constitutes over 90 percent of the voting age population. Voters in such precincts might not vote in a similar way to that of voters residing in mixed precincts however. ER derives estimates, based on all of the precincts, through a linear model premised on the notion that the percentages of a group's voters who vote for a particular candidate or candidates are the same in every precinct. EI also relies on every precinct but does not rely on the linear assumption. It employs a maximum likelihood model for deriving estimates rather than a linear model. The EI procedure further incorporates the method of bounds in the analysis, which precludes group estimates from exceeding real world limits, such as estimates of a group's support for a candidate or group of candidates being above 100.0 percent or below 0.0 percent, as happens with ER. EI, which can also be used for other purposes, is now used widely in racially polarized voting analyses. EI is the subject of Professor King's book, A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data (Princeton University Press, 1997). On the superiority of EI over ER for assessing differences in the candidate preferences between or among groups of voters, see pp. 15-16 of this book.

the surnames of the Latino candidates. The other columns contain the results of the analyses for the respective group of voters. The first number in each cell in these columns identifies, in percentage terms, the point estimate for a group's support for the Latino candidates or candidate. The point estimate is considered the best estimate based on the EI analysis. Reported immediately below each point estimate is the range of the 95 percent confidence interval around that estimate. The confidence interval identifies the range of estimates within which we can be 95 percent confident, statistically, that the true value of the percentage vote for a candidate or set of candidates by a group falls. The point estimate is the value most likely to be the true value, and estimates within the range of the confidence interval are less likely to be the true value the further they are from the point estimate. I will therefore focus on the point estimates in my discussion of the results.

Table 1 contains the results of the multivariate analyses for the county-wide elections and the Chicago mayoral election. The preference of Latino voters in the area of interest for Latino candidates is stark in this table. In all three elections Latinos are estimated to have cast over 80 percent of their votes for a Latino candidate. In the two elections with two Latino candidates Latino voters are estimated to have cast close to 65 percent of their votes for Mr. Berrios in the Assessor primary, and a plurality of their votes, 46.0 percent, for Mr. Chico in the Chicago mayoral contest.

African American voters did not share this preference in any of these elections. In the Assessor primary the only candidate competing with the two Latino candidates was an African American. She was their choice in that election, receiving an estimated 62 percent of their votes. African Americans also did not support Ms. Alvarez in the State's Attorney contest. There was no African American candidate in that primary; Ms. Alvarez's opponents were two white

candidates. The estimate of her African American support in that election is 16.7 percentage points. African Americans also did not support the Latino candidates for Mayor of Chicago, casting an estimated 8.6 percent of their votes for them. This election was also contested by three African American candidates and one white candidate. Their candidate of choice of the African Americans voting in this election was the white candidate, who received an estimated 63.7 percent of their votes (CI = 58.9 to 68.4).

The remaining voters, identified as "others" in the table, cast an estimated 81 percent of their votes for the Latino candidates in the primary election for Assessor, in which there was not a white candidate. As noted above, only one of the six candidates in the mayoral election was white, while three of the remaining five were African American. The other voters cast just under a majority of their votes, an estimated 49.6 percent, for the two Latino candidates combined in this election. Their candidate of choice however was the one white candidate, who received an estimated 49.4 percent of their vote (CI = 47.0 to 51.8 percent).[5] In the State's Attorney primary, in which Ms. Alvarez faced two white candidates, her support from the other voters is estimated to be 23.7 percent.

Table 2 contains the results of the bivariate analyses for the County Board District 16 primary and those for the Circuit Court subcircuit judgeships. In all five of these primaries Latino voters have cast an estimated majority of their votes for Latino candidates; in the four most recent primaries, those in 2008 and 2010, their support for these candidates ranged from an estimated 68.4 percent to 84.1 percent. This preference was not shared by the non-Latino voters

---

[5] The white candidate, who was also the candidate of choice of African American voters, therefore received the most votes of any candidate in this election, 42.9 percent, from the voters residing in the area of interest. The two Latino candidates combined received 52.9 percent.

in any of these primaries. In the four most recent, the highest estimate of the non-Latino support for any of the Latino candidates is 16.4 percent.

Conclusion

Based on the results of the eight elections analyzed I conclude that there is racially polarized voting in the Democratic primaries in the area from which CD 4 in the Adopted Plan and CDs 3 and 4 in the Plaintiffs' Plan have been created. The preference of Latino voters residing in this area for Latino candidates in these primaries is unmistakable, and it is not a preference shared by the other voters in the area. These primaries decide who receives the Democratic nominations within the area, a very valuable designation in this largely Democratic area.[6] The relative presence of Latinos in congressional districts in this area therefore will be a major factor in whether Latino voters are able to elect the representatives of their choice from this area to the U.S. House of Representatives.

In addition, the 2011 Chicago mayoral election further shows that the non-Latino voters in the area would have prevented the Latino candidate of choice from winning that election if only the votes cast by voters in the area were counted. The two Latino candidates received strong support from Latino voters, with Mr. Chico their clear preference between them. African Americans provided only minimal support for the Latino candidates however, instead providing solid support for the white candidate in the race, who was also the choice of the other voters, who provided close to a majority of their votes for him.

---

[6] In the 2010 statewide general election for Governor, for example, the Democratic candidate received 75.0 percent of the votes cast for the two major parties within the version of CD 4 in the Adopted Plan, and the Democratic candidate for U.S. Senator received 74.1 percent of the two-party vote. In the version of CD 4 in the Plaintiffs' Plan those candidates received 70.5 percent and 68.4 percent of the two-party vote cast in their elections, respectively. In the version of CD 3 in the Plaintiffs' Plan, those respective figures were 68.6 percent and 67.6 percent.

8

ANALYSIS OF THE DIFFERENT VERSIONS OF CDs 3 AND 4

CD 4 in Adopted Plan

The version of CD 4 in the Adopted Plan retains the "earmuff" feature of this district that has been in place since it was included in the 1991 redistricting plan adopted by the State.[7] The district had a Latino VAP of 59.2 percent at that time. The "earmuff" remained a feature of the district in the plan adopted in 2001 as well, and at the time of the 2010 census the Latino VAP percentage of CD 4 stood at 68.1. It had become a packed district. During this time a Latino Democrat had been elected in the district in all 10 elections. It was the same person every time, Luis Gutierrez, who has not faced any opposition in the Democratic primary in the last four elections, and won the last general election with 77.4 percent of the votes, his worst performance since 1994. The district has clearly been an effective "Latino district" the entire time.

The version of CD 4 in the Adopted Plan reduces the Latino VAP percentage in it by just 2.2 percentage points, to 65.9. This was accomplished by increasing the district by a net of 85,403 in VAP, with 53.1 percent of that increased VAP being Latino. It no doubt remains an effective Latino district, but does so by maintaining a percentage of Latino voters within it that is higher than necessary to provide Latinos with a viable opportunity to elect representatives of their choice. In other words, the district is packed in a way that "wastes" Latino votes.

The district, as noted above, was 59.2 percent Latino in VAP at the time it was adopted. In the first election in it, not surprisingly, given that high percentage of Latinos and the explicit reason for its creation being to facilitate the election of a Latino, both of the candidates that contested the Democratic primary in it were Latinos. (Only once has a candidate without a

---

[7] See Richard L. Engstrom, "The Political Thicket, Electoral Reform, and Minority Voting Rights," in Mark E. Rush and Richard L. Engstrom, *Fair and Effective Representation? Debating Electoral Reform and Minority Rights*, Rowman and Littlefield Publishers, Inc , (Lanham, MD, 2001), at 6.

Spanish surname sought the Democratic nomination in CD 4, in 1996.) Mr. Gutierrez won the nomination, and then won the subsequent general election with 77.6 percent of the votes.

The version of CD4 in the Adopted Plan is wholly contained within Cook County, and therefore the county-wide elections analyzed above, the Democratic primaries for Assessor in 2010 and State's Attorney in 2008, can be used to assess the opportunity it provides Latino voters to elect a representative of their choice. When the votes cast in the Assessor Primary within the area of the district are examined, in which Mr. Berrios and Mr. Figueroa faced an African American candidate, they received a combined 83.2 percent of the votes, with Mr. Berrios himself receiving 49.8 percent of them. In the State's Attorney primary, Ms. Alvarez won more votes than any of the three white candidates and two African American candidates she competed against. She received 45.9 percent of the votes while her closest competitor received 26.8 percent.[8]

CD 4 in the Adopted Plan remains an effective Latino District, but does so by continuing the packing of Latino voters within it. It also retains, as noted above, the bizarre earmuff shape. It is the least compact district in the Adopted Plan. While the district fails the "eyeball test" for compactness, its relative lack of compactness, when compared to all of the other districts in the Adopted Plan, is confirmed by quantitative compactness measures. There are many different measures of compactness, but they are generally of two distinct types, dispersion measures and perimeter measures. Dispersion measures assess how closely districts resemble a shape that is considered compact, such as a circle, whereas perimeter scores assess how much districts wander geographically.

---

[8] If the data are available for the four county-wide elections identified in footnote 1 above, I plan to supplement this report with an examination of the votes cast within the districts in those elections as well.

I have chosen one of each type of measure through which to compare the compactness of districts in the respective plans. The dispersion measure, known as the Reock measure, compares the area of the district with the area of the minimum circumscribing circle around the district. Scores range from just above zero to one with higher scores indicating more compact districts. The perimeter measure, known as the Polsby-Popper measure, compares the area of the district to the area of a circle with the same perimeter length. Again, scores range from just above zero to one, with higher scores indicating more compact districts.[9] The Reock measure ranks CD 4 as the least compact district not only in the Adopted Plan, but in either of the plans. Its score on the Reock measure is very low, .15. The Polsby-Popper measure also scores CD 4 in the Adopted Plan as the least compact district in either plan, a very low .05. These same measures score CD 4 in the Plaintiffs' Plan considerably higher, with .26 on the Reock measure and .32 on the Polsby-Popper measure.[10]

The most apparent reason for the bizarre shape of CD 4 in the Adopted Plan is a desire to create a district with an extremely high concentration of Latino voters.

CD 4 in Plaintiffs' Plan

The version of CD 4 in the Plaintiffs' Plan also provides Latinos with a viable opportunity to elect a representative of their choice, without continuing the packing of Latinos in it, and without continuing the bizarre earmuff shape. The Latino VAP within CD 4 of the Plaintiffs' Plan is close to 60 percent, 59.5. This is virtually the same as that figure for the original version of the earmuff, adopted in 1991, which was 59.2 percent.

---

[9] These are the measures focused on in Richard H. Pildes and Richard G. Niemi, "Expressive harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances after Shaw v. Reno, 92 Mich. L. Rev. 483 (1993).

[10] The scores were derived through autoBound redistricting software.

The version of CD 4 in the Plaintiffs' Plan is also wholly contained in Cook County, and the votes cast in the 2010 Democratic primary for Assessor and the 2008 Democratic primary for State's Attorney in the area of the district can again be examined to assess the opportunity it provides Latinos to elect representatives of their choice. In the Assessor race, Mr. Berrios and Mr. Figueroa combined receive 80.0 percent of the votes, just 2.3 percentage points less than they received in CD 4 in the Adopted Plan. Mr. Berrios himself did even better in this version of CD 4 that he did in CD 4 in the Adopted Plan, receiving a majority of the votes cast, 52.7 percent, compared to 49.8 percent in CD 4 in the Adopted Plan. Ms. Alvarez received 42.0 percent of the votes in her nomination contest for State's Attorney in the version of CD 4 in the Plaintiffs' Plan, with a margin of 13.7 percentage points over her closest competitor.[11]

CD 4 in the Plaintiffs' Plan reveals that the earmuff shape of CD 4 in the Adopted Plan is not necessary to provide Latinos with a viable opportunity to elect. CD 4 in the Plaintiffs' Plan provides that opportunity, and it does so without packing Latino voters. In addition, the compactness scores for CD 4 in the Plaintiffs' Plan, as noted above, show that it is more compact than the CD 4 in the Adopted Plan.

CD 3 in Both Plans

There is a large difference in the Latino presence in the second most Latino district in VAP within the Adopted Plan and within the Plaintiffs' Plan. The number of this district is 3 in both plans. The version in the Adopted Plan is south of CD 4, while in the Plaintiffs' Plan it is north of CD 4.

---

[11] If the data are available for the four county-wide elections identified in footnote 1 above, I plan to supplement this report with an examination of the votes cast within the district in those elections as well.

The big difference in these plans is the percentage of the VAP within them that is Latino. Despite being the second largest such district in the Adopted Plan, the Latino VAP percentage for CD 3 in that plan is only 24.6 percent, a reduction from the 29.3 percent in CD 3 in 2010 in the previous plan. This was accomplished by a net increase of 40,027 in VAP in CD 3 in the Adopted Plan, which is entirely accounted for by the increase in non-Latinos in it. Non-Latino whites constitute well over a majority of the VAP within this version in, 66.3 percent. A similar change occurred in CD 5 in the Adopted Plan, another adjacent district to CD 4. The Latino percentage of VAP in this district was reduced from 24.6 percent in the previous plan, to 16.0 percent in the version in the Adopted Plan. This was accomplished by a net increase of 62,531 in VAP, all of which, again, is accounted for by non-Latinos.

In contrast, the Latino VAP in the version of CD 3 in the Plaintiffs' Plan is 46.5 percent, and Latinos constitute a plurality of the VAP, with non-Latino whites being 40.8 percent. Latinos would have a chance to influence the outcomes of elections in CD 3 in the Plaintiffs' Plan, even if Mr. Gutierrez (a resident of the district) does not seek reelection in it. Although not wholly contained in Cook County, 91.3 percent of the VAP in the district resides in that county. Voting in the county-wide contests analyzed above for the versions of CD 4 can again be examined to assess how well the Latino candidates did in those elections in the area of CD 3 in the Plaintiffs' Plan, with an understanding that 8.7 percent of the people of voting age in the district could not participate in them because they resided in DuPage County.

In the 2010 Democratic primary for Assessor, Mr. Berrios and Mr. Figuerroa together received 79.2 percent of the votes cast in the Cook County portion of CD 3 in the Plaintiffs' Plan, with Mr. Berrios receiving close to a majority of the votes there, 48.6 percent. In the 2008 Democratic primary for State's Attorney, Ms. Alvarez received a plurality of the votes in this

six-candidate contest in the area, 36.2 percent. The second place candidate received 33.2 percent.[12] Latino candidates other than Mr. Gutierrez appear to be competitive in this district.

Conclusion

While CD 3 in the Plaintiffs' Plan cannot be said to be a Latino majority district at this time, based on my analysis it already offers Latino voters a chance to elect candidates of their choice within it. This will be facilitated by the need to obtain only a plurality of the votes in it to win the Democratic Party nomination. That nomination would provide them with a significant advantage in a general election in this Democratic area. In the latest statewide general election, held on November 2, 2011, which was a good year for Republican candidates in Illinois, the Democratic candidates for Governor and United States Senator in the area of CD 3 in the Plaintiffs' Plan received 68.6 percent and 67.6 percent of the two-party vote, respectively. This opportunity will be enhanced if the Latino VAP percentage in the district were to grow. CD 3 in the Adopted Plan, in contrast, is a majority-white district that is not likely to provide this opportunity.

CONCLUSION

Based on my analysis of group preferences in the elections above, I conclude that voting in the area at issue is racially polarized. I also conclude, based on that finding and my analysis of the relative electoral opportunities provided to Latino voters in the two redistricting plans, the Adopted Plan and the Plaintiffs' Plan, that the first dilutes the voting strength of Latinos in the area. CD 4 in the Adopted Plan is packed with more Latino VAP than necessary to provide Latinos with a viable opportunity to elect the representative of their choice within it. This packing will not only result in wasting the votes of Latinos in that district, but contributes to the

---

[12] If the data are available for the four county-wide elections identified in footnote. 1 above, I plan to supplement this report with an examination of the votes cast within the district in those elections as well.

further "bleaching" of adjacent CDs 3 and 5 in that plan. The version of CD 4 in the Plaintiffs' Plan will not only provide Latinos with a viable opportunity to elect the representative of their choice, but also allow for another district in which Latinos will constitute a plurality of the VAP. Latinos certainly have a chance to have an impact on election outcomes in that district. The votes cast in the area of CD 3 in Democratic Party primaries for other offices demonstrate that they will have an opportunity to select the person who wins the Democratic nomination in that district, who would then be advantaged by that nomination in the heavily Democratic district. Based on my examination of the two plans, I conclude that the Plaintiffs' Plan demonstrates that the Adopted Plan unnecessarily dilutes the votes of Latinos in the area.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct to the best of my knowledge.

Executed on September 15, 2011 in Durham, NC.

Richard L. Engstrom

Table 1

Multivariate Analyses of County-Wide Elections
and Chicago Mayoral Election

Group Support for Latino Candidates
Point Estimates and Confidence Intervals#

| Election | % of Latino Voters | % of African American Voters | % of Other Voters |
|---|---|---|---|
| *2010 Dem Primary* | | | |
| Assessor | | | |
| Berrios + Figuerroa | 93.5 <br> 91.1 – 95.8 | 38.0 <br> 30.9 – 45.3 | 81.6 <br> 79.8 – 83.3 |
| Berrios | 64.7 <br> 57.1 -- 73.2 | 27.2 <br> 21.3 – 33.6 | 50.4 <br> 47.1 – 53.8 |
| *2008 Dem Primary* | | | |
| State's Attorney | | | |
| Alvarez | 82.3 <br> 77.7 – 87.3 | 16.7 <br> 14.1 – 19.5 | 23.7 <br> 22.2 – 25.2 |
| *2011 Chicago Municipal* | | | |
| Mayor | | | |
| Chico + DelValle | 83.7 <br> 77.8 – 90.2 | 8.6 <br> 6.1 – 11.1 | 49.6 <br> 47.1 – 52.0 |
| Chico | 46.0 <br> 40.9– 51.4 | 5.6 <br> 3.8 – 7.4 | 39.5 <br> 36.9 – 42.1 |

# Confidence intervals contain a range of estimates from which we can be 95 percent confident, given the data, that the true value of the percentage being estimated will fall.

16

Table 2

Bivariate Analyses of District and Subcircuit Elections

Group Support for Latino Candidates
Point Estimates and Confidence Intervals#

| Election | % of Latino Voters | % of Other Voters |
|---|---|---|
| *2010 Dem Primary* | | |
| Co Board, D. 16 | | |
| Garcia | 84.1 73.0 -- 97.0 | 10.4 8.2 – 13.0 |
| Circuit Ct Sub. 11 | | |
| Martinez | 73.9 65.3 – 83.8 | 11.3 9.7 – 13.1 |
| *2008 Dem Primary* | | |
| Circuit Ct Sub. 4 | | |
| Aguilar | 79.5 72.1 – 87.6 | 11.5 10.0 – 13.0 |
| Circuit Ct Sub. 6 | | |
| Araujo | 68.4 57.0 – 83.1 | 16.4 12.0 – 21.4 |
| *2006 Dem Primary* | | |
| Circuit Ct Sub. 6 | | |
| Ocasio | 56.4 48.9 – 64.4 | 41.6 34.9 – 48.5 |

# Confidence intervals contain a range of estimates from which we can be 95 percent confident, given the data, that the true value of the percentage being estimated will fall.

17

APPENDIX A

FACTS OR DATA RELIED UPON IN REACHING MY CONCLUSIONS AND OPINIONS
IN THIS REPORT IN THIS CASE

1.  Data from the U.S. Censuses of Population, 1990, 2000, and 2010:  1990 Census, STF1 Tables QT-P1A, QT-P1D, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P11, P12H.

2.  Primary and general election data from the Illinois State Board of Elections for the election of U.S. Representatives from Illinois, 1992 through 2010.

3.  Primary and general election data from the Cook County Clerk and Chicago Board of Elections for the election of Cook County Assessor, Cook County State's Attorney, Cook County Circuit Court, and Chicago Mayor, 2006 through 2011.

4.  Maps of Illinois Congressional districts in effect for the elections in 1992 through 2010.

5.  Maps of Illinois Congressional districts proposed by Illinois Public Act 97-14.

6.  Maps of Illinois Congressional districts proposed by the Plaintiffs.

7.  AutoBound compactness reports, showing the compactness of the current and proposed Congressional district plans.

8.  The following scholarly publications:

    Richard L. Engstrom, "The Political Thicket, Electoral Reform, and Minority Voting Rights," in Mark E. Rush and Richard L. Engstrom, *Fair and Effective Representation? Debating Electoral Reform and Minority Rights*, Rowman and Littlefield Publishers, Inc , (Lanham, MD, 2001), at 6.

    Richard H. Pildes and Richard G. Niemi, "Expressive harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances after Shaw v. Reno, 92 Mich. L. Rev. 483 (1993).

APPENDIX B

**VITA**
**RICHARD L. ENGSTROM**

June, 2011

OFFICE
Center for the Study of Race, Ethnicity,
    and Gender in the Social Sciences
Social Science Research Institute
Duke Box 90420
Duke University
Erwin Mill
Durham, NC 27705
Phone:(504-756-1478) Fax:(919)-681-4183
E-Mail Address = richard.engstrom@uno.edu
                  richard.engstrom@duke.edu

HOME
6205 Farrington Rd.
Apt. G-1

Chapel Hill, NC 27517
Phone = (504)-756-1478

PERSONAL AND EMPLOYMENT INFORMATION

Born May 23, 1946. Married to former Carol L. Verheek. Four children: Richard Neal, born 3/10/70; Mark Andrew, born 1/14/73; Brad Alan, born 3/31/77; and Amy Min, born 8/18/84.

Assistant Professor of Political Science, University of New Orleans, 1971-74; Associate Professor, 1974-1979; Professor, 1979-present; Research Professor, 1987-2006, Endowed Professor of Africana Studies, 2003-2005.

Chairperson, Department of Political Science, University of New Orleans, 1976-1979. Coordinator of Graduate Studies, 1990-1992, 1993-2006.

Consultant, Center for Civil Rights, School of Law, University of North Carolina, Chapel Hill, 2006-2007.

Visiting Research Professor of Political Science and Visiting Research Fellow, Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University, Spring and Summer, 2008. Visiting Professor of Political Science and Visiting Research Fellow, Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University 2008 - present.

19

Fulbright-Hays Professor, National Taiwan University and National Chengchi University, and Visiting Research Fellow, Institute of American Culture, Academic Sinica, Taipei, Taiwan, R.O.C., 1981-82.

Fulbright-Hays Professor, University College, Galway, Ireland, 1985-86.

Senior Research Fellow, Institute of Irish Studies, the Queen's University of Belfast, 1990.

David Bruce Fellow, Bruce Centre for American Studies, University of Keele, England, 1993.

Visiting Fellow, School of Politics, Australian Defence Force Academy, Canberra, Australia, 1998.

Program Visitor, Political Science Program, Research School of Social Sciences, Australian National University, Canberra, Australia, June-July, 2005.

Recipient, UNO Alumni Association's Career Distinction Award for Excellence in Research, December 1985.

Recipient, George W. Lucas Community Service Award, New Orleans NAACP, 1993.

## FORMAL EDUCATION

Ph.D., University of Kentucky, 1971

M.A., University of Kentucky, 1969

A.B., Hope College (Holland, Michigan), 1968.
    (recipient of Class of '65 Political Science Award, 1968.

## PRIMARY TEACHING FIELDS

Election Systems, Urban and Minority Politics, Legislative Process, American Politics.

## PROFESSIONAL ACTIVITIES

Member, Election Review Committee, American Political Science Association, 2003-2004.

Chair, Section on Representation and Electoral Systems, American Political Science Association, 1993-95, 95-97. Section Board, 1993-present.

Book review editor, American Review of Politics, 1995-present.


Lecture tour, under sponsorship of United States Information Agency, of Tanzania, Ethiopia, Kenya, Malawi, and Liberia, January, 1994. Topics include, among others, comparative election systems, legislatures within democratic regimes, and race and gender in contemporary politics.

Associate Member, Centre for the Study of Irish Elections, University College Galway.

Member, Board of Editors, Public Administration Quarterly 1977- present.

Member, Editorial Board, Journal of Politics, 1988-1993.

Member, Board of Editors, State and Local Government Review, 1988- 1990.

Member, Committee on the Status of Blacks, Southern Political Science Association, 1991-1996.

Treasurer, Southwestern Political Science Association, 1981 (position resigned during term due to Fulbright Lectureship).

Chair, Harold D. Lasswell Award Committee, American Political Science Association, 1995-1996 (best dissertation in public policy).

Chair, Ted Robinson Award Committee, Southwestern Political Science Association, 1995-1996 (best research project in minority politics by a graduate student).

Member, Nominating Committees, Southern Political Science Association, 1980; Louisiana Political Science Association, 1981, Study Group on Comparative Representation and Electoral Systems, International Political Science Association, 1988, Section on Representation and Electoral Systems, American Political Science Association, 1999.

Member, Chastain Award Committee, Southern Political Science Association, 1978. V.O. Key Award Committee, Southern Political Science Association, 1990. Ted Robinson Memorial Award Committee, Southwestern Political Science Association, 1995, 1996 (chair). Hallett Award Committee, Section on Representation and Electoral Systems, American Political Science Association, 1999, 2000.

Member, Program Committee (Urban Politics Section), 1976 Annual Meeting of the Southern Political Science Association. Program Committee (Urban Politics Section), 1992 Annual Meeting of the Midwest Political Science Association. Program Committee (Representation and Electoral Systems Section), 1994 Annual Meeting of the American Political Science Association. Program Committee (Representation and Electoral Systems Section), 2002 Annual Meeting of the American Political Science Association.

Member, Membership Committee, Southwestern Social Science Association, 1973-74.

Presented papers at meetings of the American Political Science Association, International Political Science Association, Midwest Political Science Association, Southern Political Science Association, Southwestern Political Science Association, Louisiana Political Science Association, Citadel Symposium on Southern Politics, International Society of Political Psychology, Harvard University Computer Graphics Week, Australian-New Zealand Academy for the Advancement of Science. Formal papers also presented at programs at Tulane University, Sagamon State University,

University of Keele (England), Rice University, and Chief Justice Earl Warren Institute on Law and Social Policy, University of California School of Law.

Chaired panels at meetings of the American Political Science Association, Southern Political Science Association, Midwest Political Science Association, Southwestern Political Science Association, and International Political Science Association.

Served as discussant for panels at meetings of the American Political Science Association, Midwest Political Science Association, Southern Political Science Association; Southwestern Social Science Association; Louisiana Political Science Association; Institute of American Culture, Academic Sinica (Taiwan), and International Political Science Association.

Reviewed manuscripts for the American Political Science Review, American Journal of Political Science, Journal of Politics, Political Research Quarterly, Polity, Social Science Quarterly, Legislative Studies Quarterly, American Politics Quarterly, Urban Affairs Review, Electoral Studies, Election Law Journal, Political Analysis, National Political Science Review, Women and Politics, Southeastern Political Review, State and Local Government Review, Public Administration Review, Public Administration Quarterly, American Review of Politics, Presidential Studies Quarterly, Law and Policy, Journal of Policy History, Public Administration and Management, Howard University Press and Stanford University Press, and Northern Illinois University Press.

Recipient of grant from Pacific Cultural Foundation, Taipei, Taiwan to support project entitled "The Legislative Yuan: A Study of Legislative Adaptation" (1982).

Recipient of grant from private sources, New Orleans, to support a study of mayoral tenure in large American cities (1983).

Recipient of grant from Southern Regional Council, Atlanta, Georgia, to conduct exit poll of cumulative voting election in Chilton County, Alabama (1992).

Recipient of grants from Louisiana Education Quality Support Fund, Fellowship Funding for Superior Graduate Students, 1992 (1993-1997) $48,000; 1996 (1997-2001) $64,000; 1997 (1998-2002) $48,000; 1998 (1999-2003) $56,000.

Reviewed grant proposals for National Science Foundation programs in Political Science and Law and Social Sciences, and National Science Foundation graduate fellowship applications for the National Research Council.
Served as mentor in Southern Regional Council's Voting Rights Fellowship Program to Jason F. Kirksey, 1992-1993, and Dr. Olethia Davis, 1993-1994.

United Nations Consultant on Election Systems and Constituency Delimitation, National Election Commission of Liberia, UN Mission in Liberia, 2004.

COMMUNITY AND UNIVERSITY SERVICE

Consultant, Charter Task Force Committee, New Orleans, 2000. Preparation of <u>Term Limits: A Report to the Charter Task Force Committee</u>, February, 2000.

Interviewed on term limits issue on "Crescent City Close Up," public affairs program on three radio stations, WNOE, KKND, and KUMX, March 19, 2000.

Participant, Roundtable on At-Large Elections for the Internet Corporation for Assigned Names and Numbers (ICANN), sponsored by Common Cause, the Center for Democracy and Technology, and the Markle Foundation, at the Kennedy School of Government, Harvard University, February 9, 2000.

Member, Board of Directors, Concern International Charities, 1998-2003.

Chairperson, Taskforce on Civil Service, Mayor-Elect Ernest Morial's Transition Office (New Orleans), 1977-78.

Member, Chachere Subcommittee of UNO Diversity Cabinet, 2003-2004.

Member, Graduate Council, UNO, 1975-76, 1994-95, 2006.

Member, Research Council, UNO, 1995-97, 2005.

Member, International Student Recruitment Committee, UNO, 1993-96.

Chairperson, Search Committee for Vice Chancellor for Research and Graduate Studies and Dean of the Graduate School, UNO, 1987-88.

Chairperson, Search Committee for Graduate Dean, UNO, 1978-79.

Member, University Budget Committee, UNO, 1983-84.

Member, Liberal Arts Advisory Committee, UNO, 1975-76, 1982-84.

Member, Academic Planning Committee, UNO, 1982-1988.

Member, Faculty Council Committee on Faculty Honors, UNO, 1985-1990.

Member, Committee on Research, UNO Self-Study, 1972-73; 1982-83.

Member, Dean's Advisory Committee on Academic Planning, College of Liberal Arts, UNO, 1983-84.
Member, University Senate, UNO, 1975-77; 1980-81; 83-85; 87-91.

Member, Steering Committee, Legal Division, New Orleans Chapter, American Foundation for Negro Affairs, 1977-79.

Service as expert witness in numerous vote dilution cases in federal courts. Employed by the United States Department of Justice, Lawyers' Committee for Civil Rights Under Law, NAACP Legal Defense and Educational Fund, Center for Constitutional Rights, Mexican-American Legal Defense and Educational Fund; Native American Rights Fund, and other organizations. Served as court-appointed expert for the remedial portion of Williams v. City of Dallas, United States District Court for the Northern District of Texas, Dallas Division, 1991. Service as Special Master for the remedial portion of Harper v. City of Chicago Heights, United States District Court for the Northern District of Illinois, Eastern Division, 2002-2004.

INVITED LECTURES / PRESENTATIONS (Since 1986)

1986: McGee College, University of Ulster - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

The Queen's University of Belfast - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

University of Keele - "The Contemporary Voting Rights Issue in American Politics"

University College Dublin - "The Contemporary Voting Rights Issue in American Politics" (4/30/86).

University College Galway - "The Reagan Elections: Realignment or Dealignment?"

1987: Southern University -"The Equal Protection Clause and Electoral Reapportionment" (4/8/87).

APSA Summer Institute for Black Students, Louisiana State University - "The Political Scientist as Expert Witness" (7/26/87).

NAACP Legal Defense Fund, Conference on Voting Rights, San Antonio, Texas - "Cumulative and Limited Voting as Remedies for Minority Vote Dilution."

1988: College of William and Mary - "The Contemporary Voting Rights Issue" and "The Role of Social Scientists in Voting Rights Litigation"

University of Queensland - "One Vote, One Value: The U.S. Experience After 25 Years" (5/24/88).

Griffith University (Brisbane) - "One Vote, One Value: The U.S. Experience After 25 Years" (5/25/88).

1989: Tulane University - "Frontiers of Voting Rights: Vote Dilution in Judicial Elections" (3/9/89).
Lamar University - "Voting Rights: A Retrospective" (10/30/89).

Oklahoma State University - "Frontiers of Voting Rights" (November/10/89).

24

Prairie View A and M University - "Reapportionment and Black Political Power" (11/16/89).

1990: The Queen's University of Belfast-Institute of Irish Studies, "The Irish Election System: Manipulation and Reform" (3/13/90); Department of Politics, "The Reagan Presidency: An Assessment" (3/8/90).

Brookings Institution - "Social Scientists and the Voting Rights Act" (10/19/90).

Lyndon Baines Johnson Library (Austin, Texas) - "The Evolution of the Voting Rights Act of 1965" (10/29/90).

1991: University of Texas at Dallas - "Redistricting the Dallas City Council" (3/8/91).
United States Department of Justice, Voting Section - "Alternative Election Systems" (3/15/91).
Stetson University School of Law - "Alternative Election Systems as Remedies for Minority Vote Dilution" (4/27/91).

Norfolk State University - "Election Analyses in Voting Rights Litigation" (6/15/91).

1992: University of Colorado, Summer Workshop in Urban Politics - "Race and Voting in Judicial Elections: New Orleans as a Case Study Setting" (7/9/91).

Harold Washington College, Chicago - "Political Science Research and Testimony in the Miami-Dade County Core" (9/5/92 - not presented to illness).

Southern Regional Council, Atlanta, Georgia - "Exit Polls and Voting Rights Litigation" (10/2/92).
1994: Lecture tour of Tanzania, Ethiopia, Malawi, and Liberia for United States Information Agency, January, 1994.

National Conference of State Legislators, Annual Meeting, New Orleans - "Redistricting and the Courts" (7/26/94)

1995: Department of International Politics, Peking University, "Constitutional Law, Comparative Electoral Systems, and the Politics of Race and Gender" (10/17/95).

1997: John D. Lees Memorial Lecture, Keynote Address, 1997 Annual Meeting of the American Politics Group, (United Kingdom) Political Science Association, Keele, England, "Affirmative Action: The Election and the Election System" (1/3/97).

Alumni College, College of Liberal Arts, University of New Orleans, "Racial Gerrymandering in the 1990s: The Issues and the Alternatives" (2/1/97).

Commission on Governmental Reorganization, City of New Orleans, "Principles for Governmental Organization" (9/23/97).

Civil Rights Training Institute (Airlie Conference), NAACP Legal Defense and Educational Fund, "Alternative Election Systems in the Post-Shaw Era" (11/8/97).

25

1998

School of Politics, Australian Defence Force Academy, Canberra, "Racial Gerrymandering in the United States" (4/1/98) and "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (5/29/98).

School of Political Science, University of New South Wales, Sydney, "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (4/8/98).

Illinois Secretary of State's Commission on Redistricting, Chicago, IL, "Computer Generated Districting Plans: Necessary Conditions and Tie Breaking Criteria" (12/16/98).

2001

Carinthian Institute of Minority Affairs, Villach, Austria, "Spiders, Earmuffs, and the Mark of Zorro: Creating Electoral Opportunities for Minorities in America's Single Member District System" (5/5/01).

Bureau of Governmental Research, New Orleans, LA, "The Mayor: How Many Terms?" (10/10/01).

2002

Pomona College, Claremont, CA, "Spiders, Earmuffs, and the Mark of Zorro: There Must be a Better Way" (3/13/02).

Utah State University, "The Redistricting Thicket: Are There Alternatives?" Bennion Teachers' Workshop (8/9/02).

Utah State University, "Missing the Target: Priorities among Districting Constraints," Redistricting in the New Millennium: A Lecture Series, (11/26/02).

2003

Florida State University, "Missing the Target: Priorities among Districting Constraints," (1/21/03).

2004

Cleveland City Club/Cleveland State University, "Metro Reform and Minority Voting Rights," (2/25/04).

Liberian National Election Commission Consultative Assembly, Monrovia, Liberia, "Constituency Boundary Redemarcation: Concepts and Timeframes," (6/7/04).

2005

Subcommittee on the Constitution, Committee on the Judiciary, United States House of Representatives, written and oral testimony, hearing on Extension of the Preclearance Provision of the Voting Rights Act, (10/25/05).

William C. Velasquez Institute, San Antonio, TX, "Influence Districts," (11/19/05)

2006

University of West Georgia, "The Gerrymandering Problem: Lessons from Australia?" (4/3/06).

Duke University, "Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" (4/7/06).

International Political Science Association, Fukuoka, Japan. Roundtable on Electronic Voting. "E Voting in the U.S.," (7/13/06).

Brennan Center for Justice, New York University School of Law, "The Gerrymandering Problem: Lessons from Australia?," (8/7/06).

Short Course on The National Popular Vote Plan to Revamp the Electoral College, American Political Science Association Annual Meeting, Philadelphia, "Potential Impact of the National Popular Vote Plan on Presidential Elections and Other Electoral Reforms," (8/30/06).

American Bar Association, Administrative Law Section, "Redistricting Reform: Lessons from Australia," Washington, D.C. (10/26/06).

2008

Morehouse College, "The Gerrymandering Problem in the United States: Judicial Protection or Redistricting Commissions or Alternative Election Systems," Voting Analysis in Mathematics and Politics: Interdisciplinary Research and Education Seminar (VAMPIRES) (4/18/08).

2009

Duke University, "Response to Thomas Brunell, 'Why Competitive Elections are Bad for America'," Duke University Political Science Students' Association (2/10/09).

Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity, University of California at Berkeley School of Law, presenter, panel on "The Redistricting Experience: Tales from the Field," conference on Redistricting Reform and Voting Rights: Identifying Common Ground and Challenges, UC Washington Center, (11/11/09).

2010

Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University Presentation on "Race and Redistricting" at the conference "Counting Race: Racial Classifications and the 2010 Census," Duke University (3/19/10).

St. Louis University Law School, Presentation on "Cumulative and Limited Voting as Remedies for Dilutive Election Systems," at the symposium on "Voting 45 Years after the Voting Rights Act," (3/26/10).

Demos, Presentation on "Issues in the Post-2010 Round of Redistricting" and Discussion Leader for Session on Redistricting, "An In-Depth Discussion with Demos," Washington, DC (9/4/10).

NAACP Legal Defense and Educational Fund, Presentation on "Prongs II and III: Necessary Preconditions under *Thornburg* v. *Gingles*," at the Voting Rights and Redistricting Training Institute, Airlie Conference, Warrenton, VA (10/9/10).

Center for Democratic Performance, Binghamton University, "Influence Districts and the Courts: A Concept in Need of Clarity," (10/28/10).

Mexican American Legal Defense and Educational Fund, Short presentation on "Racially Polarized Voting Analyses," National Redistricting Convening, San Antonio, TX (12/9-19/10).


Numerous other presentations before groups such as the Louisiana Municipal Association; New Orleans League of Women Voters; Public Policy Forums at Southern University in Baton Rouge; Louisiana Municipal Clerks Institute; (La.) Black Legislative Caucus Institute; Robert A. Taft Institute of Government Seminars, Southern University; Special Committee on Elective Law and Voter Participation, American Bar Association; Subcommittee on Civil and Constitutional Law, United States House of Representatives Committee on the Judiciary; Institute of American Culture, Academic Sinica (Taiwan), Foundation for Scholarly Exchange (Taiwan), and Tulane University, Department of Political Science and College of Law.


## REFERENCES

Dr. Charles Barrilleaux, Department of Political Science, Florida State University, Tallahassee, FL 32306  904-644-7643

Christine L. Day, Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148, 500-6266

Dr. Jason F. Kirksey, Department of Political Science, Oklahoma State University, Stillwater, OK 74074  405-744-5575

Dr. Charles D. Hadley, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148  504-280-6456

28

Dr. Susan Howell, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148  504-280-6467

Dr. Michael D. McDonald, Department of Political Science, State University of New York at Binghamton, Binghamton, NY 13901  607-777-4563

CURRENT RESEARCH

"Districting by Independent Commissions: Lessons from Australia?"

Analysis of Instance Runoff Voting Elections in North Carolina, 2007 and 2009 (with Michael Cobb).

A Review of the Evidentiary Record for the Renewal and Amendment of the Special Provisions of the Voting Rights Act, 2006.

LATEST CONFERENCE PAPERS

"Influence District and the Courts: A Concept in Need of Clarity."  Initially presented at the Conference on "Lessons from the Past, Prospects for the Future: Honoring the Fortieth Anniversary of the Voting Rights Act of 1965," Center for the Study of American Politics, Yale University, April 21-23, 2005.  Expanded version forthcoming in volume edited by Daniel McCool, The Most Fundamental Right: The 2006 Reauthorization of the Voting Rights Act.

"Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" John Hope Franklin Center, Duke University, April 7, 2006.

"Majority Vote Rule and Runoff Elections," presented at a conference on "Plurality and Multi-Round Elections," University of Montreal, June, 2006 (co-authored with Richard N. Engstrom), Montreal, June 17-18, 2006.   Expanded version selected for inclusion in mini-symposium in Electoral Studies, edited by Bernard Grofman, 27 (September 2008)  407-416.

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," presented at the symposium on *Voting 45 Years* after the *Voting Rights Act,* St. Louis University School of Law, March 26, 2010; forthcoming in the Fall 2010 edition of the St. Louis University Public Law Review.

"Political Scientists as Expert Witness," Annual Meeting of the State Politics and Policy Association,  Springfield, IL, June, 2010), with Michael P. McDonald.  (Presented by Michael P. McDonald.)

# **PUBLICATIONS**

BOOKS

<u>Fair and Effective Representation? Debating Electoral Reform and Minority Rights</u> (Lanham, MD: Rowman and Littlefield, 2001) (with Mark A. Rush).

MONOGRAPHS

<u>Home Rule for Louisiana Parishes</u> (Baton Rouge: Police Jury Association of Louisiana and Governmental Services Institute, Louisiana State University, 1974).

<u>Municipal Home Rule in Louisiana</u> (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1974).

<u>Municipal Government Within the 1974 Louisiana Constitution</u>: <u>A Reference Guide for Municipal Officials</u> (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1975).

<u>Louisiana Mayor's Handbook</u> (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1977), (with Edward Clynch and Konrad Kressley).

<u>Mayoral Tenure in Large American Cities</u> (New Orleans: School of Urban and Regional Studies, University of New Orleans, 1983).

ARTICLES, RESEARCH NOTES, AND BOOK CHAPTERS

"Statutory Restraints on Administrative Lobbying -- 'Legal Fiction'", <u>Journal of Public Law</u>, Vol. 19, No. 1 (1970), 90-103 (with Thomas G. Walker). Reprinted in Dennis Ippolito and Thomas Walker (eds.), <u>Reform and Responsiveness</u>: <u>Readings in American Politics</u> (New York: St. Martin's Press, Inc., 1972), pp. 428-438.

"Race and Compliance: Differential Political Socialization," <u>Polity</u>, 3 (Fall 1970), 100-111. Reprinted in Charles S. Bullock, III, and Harrell Rogers, Jr. (eds.), <u>Black Political Attitudes</u>: <u>Implications for Political Support</u> (Chicago: Markham Publishing Co., 1972), pp. 33-44.

"Political Ambitions and the Prosecutorial Office," <u>Journal of Politics</u>, 33 (February 1971), 190-194.

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments," <u>Midwest Journal of Political Science</u> 15 (August 1971), 475-494 (with W.E. Lyons).

"Expectations and Images: A Note on Diffuse Support for Legal Institutions," <u>Law and Society Review</u>, 6 (May 1972), 631-636 (with Michael W. Giles).

"Black Control or Consolidation: The Fringe Response," <u>Social Science Quarterly</u>, 53 (June 1972), 161-167 (with W.E. Lyons).

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments: A Comparison of Survey Findings," American Journal of Political Science, 17 (February 1973), 182-188 (with W. W. E. Lyons).

"Racial Gerrymandering and Southern State Legislative Redistricting: Attorney General Determinations Under the Voting Rights Act," Journal of Public Law, Vol. 22, No. 1 (1973), 37-66 (with Stanley A. Halpin, Jr.).

"Socio-Political Cross Pressures and Attitudes Toward Political Integration of Urban Governments," Journal of Politics, 35 (August 1973), 682-711 (with W.E. Lyons).

"Candidate Attraction to the Politicized Councilmanic Office: A Note on New Orleans," Social Science Quarterly, 55 (March 1975), 975-982 (with James N. Pezant).

"Home Rule in Louisiana -- Could This Be The Promised Land?," Louisiana History, 17 (Fall 1976), 431-455.

"Judicial Activism and the Problem of Gerrymandering," in Randall B. Ripley and Grace A. Franklin (eds.), National Government and Public Policy in the United States (Itasca, IL: Peacock Publishers, Inc., 1977), pp. 239-244.

"The Supreme Court and Equi-Populous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation," Arizona State Law Journal, Vol. 1976, No. 2 (1977), 277-319. Cited in Karcher v. Daggett, 462 U.S. 725 (1983) (by J. Stevens, concurring, at 750 n. 8, 752 n. 10, 753 n. 11, and 758 n. 16, and J. White, dissenting, at 776 n. 12).

"State Centralization Versus Home Rule: A Note on Ambition Theory's Powers Proposition," Western Political Quarterly 30 (June 1977), 288-294 (with Patrick F. O'Connor).

"Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering," Legislative Studies Quarterly, 2 (November 1977) 465-479 (with John K. Wildgen). Cited extensively in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan).

"Racial Vote Dilution: Supreme Court Interpretations of Section 5 of the Voting Rights Act," Southern University Law Review, 4 (Spring 1978), 139-164.

"The Political Behavior of Lawyers in the Louisiana House of Representatives," Louisiana Law Review 39 (Fall 1978), 43-79 (with Patrick F. O'Connor, Justin J. Green, and Chong Lim Kim).

"Restructuring the Regime: Support for Change Within the Louisiana Constitutional Convention," Polity 11 (Spring 1979), 440-451 with Patrick F. O'Connor).

"The Hale Boggs Gerrymander: Congressional Redistricting, 1969," Louisiana History, 21 (Winter 1980), 59-66.

"Lawyer-Legislators and Support for State Legislative Reform," Journal of Politics, 42 (February 1980), 267-276 (with Patrick F. O'Connor).

"Racial Discrimination in the Electoral Process: The Voting Rights Act and the Vote Dilution Issue," in Robert P. Steed, Lawrence W. Moreland, and Tod A. Baker, (eds.), Party Politics in the South (New York: Praeger Publishing, 1980), pp. 197-213.

"Spatial Distribution of Partisan Support and the Seats/Votes Relationship," Legislative Studies Quarterly, 5 (August 1980), 423- 435 (with John K. Wildgen).

"Computer Graphics and Political Cartography: ASPEX of Gerrymandering," in Computer Mapping Applications in Urban, State, and Federal Government, Plus Computer Graphics in Education, Vol. 16, Harvard Library of Computer Graphics, 1981 Mapping Collection (Cambridge, Mass.: Laboratory for Computer Graphics and Spatial Analysis, Harvard University, 1981), pp. 51-57 (with John K. Wildgen).

"The Election of Blacks to City Councils: Clarifying the Impact of Electoral Arrangements on the Seats/Population Relationship," American Political Science Review, 75 (June 1981), 344-354 (with Michael D. McDonald).

"Post-Census Representational Districting: The Supreme Court, 'One Person, One Vote,' and the Gerrymandering Issue," Southern University Law Review, 7 (Spring 1981), 173-226.

"Municipal Government," in James Bolner (ed.), Louisiana Politics: Festival in a Labyrinth (Baton Rouge: Louisiana State University Press, 1982), pp. 181-219.

"The 1980 Election and the Realignment Thesis: A Note of Caution," American Studies (Mei-kuo-Yen-chiu), 12 (June 1982), 107-132.

"Racial Vote Dilution and the 'New' Equal Protection Clause: City of Mobile v. Bolden," American Studies (Mei-kuo-Yen-chiu) 12 (September 1982), 25-72.

"The Underrepresentation of Blacks on City Councils: Comparing the Structural and Socioeconomic Explanations for South/Non-South Differences," Journal of Politics, 44 (November 1982), 1088-1099 (with Michael D. McDonald).

"The Impact of the 1980 Supplementary Election on Nationalist China's Legislative Yuan," Asian Survey, 24 (April 1984), 447-458 (with Chu Chi-hung).

"The Marginality Hypothesis and the State Legislative Salary Issue," Southeastern Political Review, 13 (Spring 1985), 169-182 (with Patrick F. O'Connor).

"Racial Vote Dilution: The Concept and the Court," in Lorn Foster (ed.), The Voting Rights Act: Consequences and Implications (New York: Praeger Publishers, 1985), pp. 13-43.

"Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting," The Urban Lawyer, 17 (Summer 1985), 369-377 (with Michael D. McDonald). Cited in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan).

"The Reincarnation of the Intent Standard: Federal Judges and At- Large Election Cases," Howard Law Journal 28 (No 2, 1985), 495-513. Cited in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan). Abbreviated version appeared in Focus (June, 1985). (Focus is a monthly publication of the Joint Center for Political Studies in Washington, D.C.).

"The Effect of At-Large Versus District Elections on Racial Representation in U.S. Municipalities," in Bernard Grofman and Arend Lijphart (eds.), Electoral Laws and Their Political Consequences (New York: Agathon Press, Inc., 1986), pp. 203-225 (with Michael D. McDonald).

"Repairing the Crack in New Orleans' Black Vote: VRA's Results Test Nullifies 'Gerryduck'," Publius 16 (Fall 1986), 109-121. Reprinted in Charles Vincent (ed.), The African American Experience in Louisiana: From Jim Crow to Civil Rights (Lafayette, LA: Center for Louisiana Studies).

"Quantitative Evidence in Vote Dilution Litigation, Part II: Minority Coalitions and Multivariate Analysis," Urban Lawyer 19 (Winter 1987), 65-75 (with Michael D. McDonald).

"District Magnitudes and the Election of Women to the Irish Dail," Electoral Studies, 6 (August 1987), 123-132.

"The Election of Blacks to Southern City Councils: The Dominant Impact of Electoral Arrangements," in Robert P. Steed, Laurence W. Moreland, and Tod A. Baker (eds.) Blacks in Southern Politics (New York: Praeger Publishers, 1987), pp. 245-258 (with Michael D. McDonald).

"Race, Referendums, and Rolloff," Journal of Politics 49 (November 1987), 1081-1092 (with Jim M. Vanderleeuw).

"Definitions, Measurements, and Statistics: Weeding Wildgen's Thicket," Urban Lawyer 20 (Winter 1988), 175-191 (with Michael D. McDonald).

"The Desirability Hypotheses and the Election of Women to City Councils: A Research Note," State and Local Government Review 20 (Winter 1988), 38-40 (with Michael D. McDonald and Bih-Er Chou).

"Black Politics and the Voting Rights Act(s): 1965-1982," in James Lea (ed.), Contemporary Southern Politics: Continuity and Change (Baton Rouge: Louisiana State University Press, 1988), pp. 83-106.

"Race and Representational Districting: Protections Against Delineational and Institutional Gerrymandering," Comparative State Politics Newsletter 9 (October 1988), 15-24.

"Cumulative Voting as a Remedy for Minority Vote Dilution: The Case of Alamogordo, New Mexico," Journal of Law and Politics 5 (Spring 1989), 469-497 (with Delbert A. Taebel and Richard L. Cole). Reprinted in Roger L. Kemp, (ed.), Local Government Election Practices: A Handbook for Public Officials and Citizens (Jefferson, N.C.: McFarland & Co., 1999), 372-391.

"When Blacks Run for Judge: Racial Divisions in the Candidate Preferences of Louisiana Voters," Judicature 73 (August-September 1989), 87-89.

"Detecting Gerrymandering," in Bernard Grofman (ed.), Political Gerrymandering and the Courts (New York: Agathon Press, Inc., 1990), pp. 178-202 (with Michael D. McDonald).

"Cumulative Voting in a Municipal Election: A Note on Voter Reactions and Electoral Consequences," Western Political Quarterly, 43 (March 1990), 191-199 (with Richard L. Cole and Delbert A. Taebel).

"Alternative Electoral Systems as Remedies for Minority Vote Dilution," Hamline Journal of Public Law and Policy 11 (Spring 1990), 19-29 (with Delbert A. Taebel and Richard L. Cole). Cited in Holder v. Hall, _____ U.S. _____ (1994), (by J. Thomas, concurring).

"Cincinnati's 1988 Proportional Representation Initiative," Electoral Studies 9 (September 1990), 217-225.

"Getting the Numbers Right: A Response to Wildgen," Urban Lawyer 22 (Summer 1990), 495-502.

"Native Americans and Cumulative Voting: The Sisseton-Wahpeton Sioux," Social Science Quarterly 72 (June 1991), 388-393 (with Charles J. Barrilleaux).

"Proportional Representation Considered in Cincinnati," Representation 30 (Spring 1991), 3-5.

"Voting for Judges: Race and Roll-Off in Judicial Elections," in William Crotty (ed.), Political Participation and Democratic Politics (New York: Greenwood Press, 1991), pp. 171-191 (with Victoria M. Caridas).

"Minority Representation and Councilmanic Election Systems: A Black and Hispanic Comparison," in Anthony Messina, Laurie Rhodebeck, Frederick Wright, and Luis R. Fraga, (eds.), Ethnic and Racial Minorities in Advanced Industrial Democracies, (New York: Greenwood Press, 1992), pp. 127-142 (with Michael D. McDonald).

"Alternative Judicial Election Systems: Solving the Minority Vote Dilution Problem," in Wilma Rule and Joseph F. Zimmerman (eds.), United States Electoral Systems: Their Impact on Women and Minorities (New York: Greenwood Press, 1992), pp. 129-139.

"Modified Multi-Seat Election Systems as Remedies for Minority Vote Dilution," Stetson Law Review 21 (Summer 1992), 743-770.

"Councilmanic Redistricting Conflicts: The Dallas Experience," Urban News 6 (Fall 1992), 1, 4-8.

"The Single Transferable Vote: An Alternative Remedy for Minority Vote Dilution," University of San Francisco Law Review 27 (Summer, 1993), 781-813. Excerpt reprinted in Voting and Democracy Report, 1993 (Washington, D.C.: Center for Voting and Democracy, 1993).

"'Enhancing' Factors in At-Large Plurality and Majority Systems: A Reconsideration," Electoral Studies 12 (December 1993), 385-401 (with Michael D. McDonald).

"Louisiana," in Chandler Davidson and Bernard Grofman (eds.), The Quiet Revolution: Minority Voting Rights and Representation in the South (Princeton: Princeton University Press, 1994), pp. 103-135, 413-417 (with Stanley A. Halpin, Jean A. Hill, and Victoria M. Caridas-Butterworth).

"The Voting Rights Act: Disfranchisement, Dilution, and Alternative Election Systems," PS: Political Science and Politics 27 (December 1994), 685-688.

"The 1994 New Orleans Mayoral Election: Racial Divisions Continue," Urban News 9 (Spring 1995), 6-9 (with Willie D. Kirkland).

"Shaw v. Reno and New Election Systems: The Cumulative Voting Alternative," Voting Rights Review (Spring 1995), 10, 12 (with Jason F. Kirksey and Edward Still) [excerpt reprinted in Voting and Democracy Report, 1995 (Washington, D.C.: Center for Voting and Democracy, 1995), 67-68].

"Voting Rights Districts: Debunking the Myths," Campaigns and Elections (April 1995), 24, 46.

"Shaw, Miller, and the Districting Thicket," National Civic Review, 84 (Fall-Winter 1995), 323-336. Reprinted as "The Supreme Court on Redistricting" in Roger L. Kemp, (ed.), Local Government Election Practices: A Handbook for Public Officials and Citizens (Jefferson, N.C.: McFarland & Co., Inc., 1999), 80-92.

"Local Redistricting Under the Voting Rights Act," Communities and the Voting Rights Act: A Guide to Compliance in These Changing Times (Denver: National Civic League, Inc., 1996), 69-82.

"One Person, Seven Votes: The Cumulative Voting Experience in Chilton County, Alabama," in Anthony Peacock, (ed.), Affirmative Action and Representation: Shaw v. Reno and the Future of Voting Rights (Durham, N.C.: Carolina Academic Press, 1997), pp. 285-313 (with Jason Kirksey and Edward Still).

"Limited and Cumulative Voting in Alabama: An Assessment After Two Rounds of Elections," National Political Science Review, Vol. 6 Race and Representation (New Brunswick: Transaction Publishers, 1997), 180-191 (with Jason F. Kirksey and Ed Still).

"Cumulative Voting and Latino Representation: Exit Surveys in Fifteen Texas Communities," Social Science Quarterly 78 (December 1997), 973-991 (with Robert R. Brischetto).

"Is Cumulative Voting Too Complex? Evidence from Exit Polls," Stetson Law Review 27 (Winter 1998), 813-833 (with Robert R. Brischetto).

"Affirmative Action and the Politics of Race," in Gillian Peele, Christopher J. Bailey, Bruce Cain, and B. Guy Peters, (eds.), <u>Developments in American Politics 3</u> (London: MacMillan Press Ltd. and New York: Chatham House Publishers, 1998), pp. 292-306.

"Race and Representational Districting in Louisiana," in Bernard Grofman, (ed.), <u>Race and Redistricting in the 1990s</u> (New York: Agathon Press, 1998), pp. 229-268 (with Jason F. Kirksey).

"Minority Electoral Opportunities and Alternative Election Systems in the United States," in Mark Rush, (ed.), <u>Voting Rights and Redistricting in the United States</u> (New York: Greenwood Publishing, 1998), pp. 227-243.

"Electoral Arrangements and Minority Political Incorporation," in Richard Kaiser and Katherine Underwood, (eds.), <u>Minority Politics at the Millennium</u> (New York: Garland Publishing, Inc., 2000), pp. 19-50.

"Louisiana," in Dale Krane, Platon R. Rigos, and Melvin Hill, (eds.), <u>Home Rule in America: A Fifty-State Handbook</u> (Washington, D.C.: Congressional Quarterly Press, 2001), 173-182 (with Robert K. Whelan).

"The Post-2000 Round of Redistricting: An Entangled Thicket within the Federal System," <u>Publius</u>, 32 (Fall 2002): 51-70.

"The United States: the Future – Reconsidering Single-Member Districts and the Electoral College," in Josep M. Colomer, (ed)., <u>Handbook of Electoral System Choice</u> (London: Palgrave Macmillan Ltd, 2004), 164-176.

"Expert Witness Testimony," <u>Encyclopedia of Social Measurement</u>, Vol. 1 (London: Elsevier Inc., 2005), 919-925.

"Revising Constituency Boundaries in the United States and Australia: It Couldn't be More Different," <u>Democratic Audit of Australia</u> (August 2005), 1-10 (http://democratic.audit.anu.edu.au)

"Missing the Target: The Supreme Court, 'One Person, One Vote,' and Partisan Gerrymandering," in Peter Galderisi, (ed.), <u>Redistricting in the New Millennium</u>, (Lanham, MD: Lexington Books, 2005), 313-340.

"Reapportionment," in Joseph R. Marbach, Ellis Katz, and Troy E. Smith (eds.), <u>Federalism in America: An Encyclopedia</u> (Westport, CT: Greenwood Press, 2006), Vol. 2, 528-532.

"Race and Southern Politics: The Special Case of Congressional Districting," in Robert P. Steed and Laurence W. Moreland, (eds.), <u>Writing Southern Politics: Contemporary Interpretations and Future Directions</u>, (Lexington, KY: University Press of Kentucky, 2006), 91-118.

"Electoral College," in William A. Darity, Jr. (ed.), <u>International Encyclopedia od the Social Sciences</u> (Vol. 2, 2d ed; Detroit: Macmillan Reference USA, 2008), 559-560.

"Majority Vote Rules and Runoff Primaries in the United States," <u>Electoral Studies</u>, 27 (September 2008): 407-416 (with Richard N. Engstrom).

"*NAMUDNO*: A Curveball on Voting Rights," <u>Justice System Journal</u>, 30 (No. 3 2009): 351-360.

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," <u>St. Louis University Public Law Review</u> 30 (No. 1, 2010): forthcoming.

"The Political Scientist as Expert Witness," <u>PS</u> 44 (April 2011): 285-289 (with Michael P. McDonald).

"Influence Districts: A Note of Caution and a Better Measure," Chief Justice Earl Warren Institute on Law and Social Policy, University of California Law School, <u>Policy Brief</u>, 2011.

"Influence District: The Concept and the Court," in Daniel McCool (ed.), <u>The Most Fundamental Right: The 2006 Reauthorization of the Voting Rights Act.</u> (Bloomington, IN: Indiana University Press), forthcoming.

TITLED BOOK REVIEWS

"Partisan Gerrymandering and State Legislative Districts," review of Jonathan Winburn, THE REALITIES OF REDISTRICTING: FOLLOWING THE RULES AND LIMITING GERRYMANDERING IN STATE LEGISLATIVE REDISTRICTICTING, in <u>Election Law Journal</u>, 8 (No. 3, 2009), 227-232.

"Thernstrom v. Voting Rights Act: Round Two," review of Abigail Thernstrom, VOTING RIGHTS – AND WRONGS: THE ELUSIVE QUEST FOR RACIALLY FAIR ELECTIONS, <u>Election Law Journal</u>, 9 (No.3, 2010), 203-210

"Race and Southern Politics," review of Charles S. Bullock and Ronald Keith Gaddie, THE TRIUMPH OF VOTING RIGHTS IN THE SOUTH, in <u>Election Law Journal</u>, 10 (No. 1, 2011), 53-61.

OTHER BOOK REVIEWS

Review of John Wilson Lewis (ed.), THE CITY IN COMMUNIST CHINA, in <u>Journal of Politics</u>, 34 (February 1972), 310-311.

Review of Arthur I. Blaustein and Geoffrey Faux, THE STAR-SPANGLED HUSTLE: WHITE POWER AND BLACK CAPITALISM in <u>Wall Street Review of Books</u>, 1 (June 1973), 215-229.

Review of Carroll Smith Rosenberg, RELIGION AND THE RISE OF THE AMERICAN CITY: THE NEW YORK CITY MISSION MOVEMENT, 1812-1870, in Christian Scholar's Review, Vol. 4, No. 1 (1974), 73-75.

Review of Robert Higgs, COMPETITION AND COERCION, BLACKS IN THE AMERICAN ECONOMY, 1865-1914, in Wall Street Review of Books, 6 (Spring 1978), 117-119.

Review of Herbert E. Alexander, MONEY IN POLITICS, and Herbert E. Alexander, FINANCING POLITICS: MONEY, ELECTIONS, AND POLITICAL REFORM, in Wall Street Review of Books, 6 (Summer 1978), 209-211.

Review of James M. Buchanan and Richard E. Wagner, DEMOCRACY IN DEFICIT: THE POLITICAL LEGACY OF LORD KEYNES, in Wall Street Review of Books, 6 (Fall 1978), 319-320.

Review of American Enterprise Institute for Public Policy Research, ZERO-BASE BUDGETING AND SUNSET LEGISLATION, in Wall Street Review of Books, 7 (Winter 1979), 53-55.

Review of David Rogers, CAN BUSINESS MANAGEMENT SAVE THE CITIES? THE CASE OF NEW YORK, in Wall Street Review of Books, 7 (Spring 1979), 75-77.

Review of Kevin R. Cox and R. J. Johnston (eds.), CONFLICT, POLITICS AND THE URBAN SCENE, in American Political Science Review, 78 (June 1984), 531-532.

Review of Manuel Carballo and Mary Jo Bane (eds.), THE STATE AND THE POOR IN THE 1980s, in American Political Science Review, 79 (June 1985), 523-524.

Review of Terry Sanford, A DANGER TO DEMOCRACY: THE PRESIDENTIAL NOMINATING PROCESS, in Presidential Studies Quarterly, 16 (Winter 1986), 153-155.

Review of Charles W. Whalen, Jr., THE HOUSE AND FOREIGN POLICY: THE IRONY OF CONGRESSIONAL REFORM, in Presidential Studies Quarterly, 16 (Spring 1986), 369-371.

Review of Arend Lijphart and Bernard Grofman (eds.), CHOOSING AN ELECTORAL SYSTEM: ISSUES AND ALTERNATIVES, in Irish Political Studies, 1 (1986), 125-127.

Review of David McKay, AMERICAN POLITICS AND SOCIETY, in Presidential Studies Quarterly, 17 (Fall 1987), 784-785.

Review of Sheila D. Collins, THE RAINBOW CHALLENGE: THE JACKSON CAMPAIGN AND THE FUTURE OF AMERICAN POLITICS, in Presidential Studies Quarterly, 19 (Fall 1988), 874-875.

Review of Abigail M. Thernstrom, WHOSE VOTES COUNT? AFFIRMATIVE ACTION AND MINORITY VOTING RIGHTS, in Policy Studies Review 8 (Autumn 1988), 191-194.

Review of Herbert H. Haines, BLACK RADICALS AND THE CIVIL RIGHTS MAINSTREAM, 1954-1970, in Journal of Southern History, 56 (February 1990): 155-157.

Review of Harlan Hahn and Sheldon Kamienieki, PREFERENDUM VOTING: SOCIAL STATUS AND POLICY PREFERENCES, in Presidential Studies Quarterly 20 (Fall 1990): 828-830.

Review of Michael Gallagher and Michael Marsh (eds.), CANDIDATE SELECTION IN COMPARATIVE PERSPECTIVE: THE SECRET GARDEN OF POLITICS, in Presidential Studies Quarterly 21 (Winter 1991): 167- 168.

Review of Thomas Cronin, DIRECT DEMOCRACY: THE POLITICS OF INITIATIVE, REFERENDUM, AND RECALL, in Presidential Studies Quarterly, 22 (Fall 1992): 786-788.

Review of F. Leslie Seidle, (ed.), COMPARATIVE ISSUES IN PARTY AND ELECTION FINANCE, in British Journal of Canadian Studies, (1993).

Review of John Dittmer, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI, in Annals of the American Academy of Political and Social Science, 540 (July 1995): 170-171.

Review of Michael J. Glennon, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION, in National Political Science Review, 6 (1997): 323-325.

Review of Frederick M. Wirt, "WE AIN'T WHAT WE WAS": CIVIL RIGHTS IN THE NEW SOUTH, in American Political Science Review, 92 (June 1998): 474-475.

Review of David T. Canon, RACE, REDISTRICTING, AND REPRESENTATION: THE UNINTENDED CONSEQUENCES OF BLACK MAJORITY DISTRICTS, in The Law and Politics Book Review, 9 (October 1999): 467-471.

Review of Christopher M. Burke, THE APPEARANCE OF EQUALITY: RACIAL GERRYMANDERING, REDISTRICTING, AND THE SUPREME COURT, in The Law and Politics Book Review, 9 (November 1999): 506-508.

Review of J. Morgan Kousser, COLORBLIND INJUSTICE: MINORITY VOTING RIGHTS AND THE UNDOING OF THE SECOND RECONSTRUCTION, in Journal of Politics, 62 (August 2000): 934-937.

Review of Kathleen L. Barber, A RIGHT TO REPRESENTATION: PROPORTIONAL ELECTION SYSTEMS FOR THE TWENTIETH-FIRST CENTURY, in Representation, 38 (Summer/Autumn 2001), 171-173.

Review of Shaun Bowler and Bernard Grofman, (eds.), ELECTIONS IN AUSTRALIA, IRELAND, AND MALTA UNDER THE SINGLE TRANSFERABLE VOTE: REFLECTIONS

ON AN EMBEDDED INSTITUTION, in American Political Science Review, 95 (December 2001), 1012 - 1013.

Review of Dianne T. Thompson, CONGRESSIONAL REDISTRICTING IN NORTH CAROLINA: RECONSIDERING TRADITIONAL CRITERIA, in The Law and Politics Book Review, 13 (December 2003).

Review of Douglas J. Amy, REAL CHOICES / NEW VOICES: HOW PROPORTIONAL REPRESENTATION ELECTIONS COULD REVITALIZE AMERICAN DEMOCRACY, in Representation, 40 (No. 2, 2004), 158-160.

Review of David M. Ferrell and Ian McAllister, THE AUSTRALIAN ELECTION SYSTEM: ORIGINS, VARIATIONS AND CONSEQUENCES, in Representation, 42 (November 2006), 368-370.

Review of Thomas E. Mann and Bruce E. Cain, (eds.), PARTY LINES: COMPETITION, PARTISANSHIP, AND CONGRESSIONAL REDISTRICTING, in Party Politics, 14 (May 2008), 373-376.

Review of Lisa Handley and Bernard Grofman, (eds.), REDISTRICTING IN COMPARATIVE PERSPECTIVE, in American Review of Politics, 30 (Winter 2010), 363-368.

Review of James Thomas Tucker, THE BATTLE OVER BILINGUAL BALLOTS: LANGUAGE MINORITIES AND POLITICAL ACCESS UNDER THE VOTING RIGHTS ACT, in International Journal of Law in Context, forthcoming.

# EXHIBIT A3

# Allan Lichtman Affirmative Expert Report (10/4/11)

EXPERT REPORT OF ALLAN J. LICHTMAN RE: PLAINTIFFS' ALLEGATIONS OF
INTENTIONAL VOTE DILUTION & RACIAL PREDOMINANCE IN REDISTRICTING

OCTOBER 4, 2011

Ex. A3

**Statement of Inquiry and Organization**

This report analyzes facts, data, and expert opinion pertinent to Plaintiffs' claims of vote dilution and racial gerrymandering in the case of *Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al*, Case No. 11-C-5065. The report is divided into two parts. The first section of this report relates to Plaintiffs' claims of intentional discrimination and vote dilution, looking at *Gingles* prongs 1 and 3 as well as the "totality of the circumstances" test. The second section relates to Plaintiffs' claims that racial considerations predominated in the crafting of Congressional District 4 (CD 4) of the redistricting plan in Public Act 97-0014 (the "Adopted Plan" or "State-passed plan").

My expected fee in this matter is $400 per hour. I have enclosed an updated CV and a table of cases in which I have provided written or oral testimony.

**Summary of Opinions**

My analysis has resulted in the following opinions:

- **Plaintiffs have not established that an additional majority Latino district could be created in Illinois and consequently have not met *Gingles* prong 1.**

- **As set out in my Response to the Report of Richard Engstrom, there is no polarization in the candidate preferences of Latinos and non-Latinos and, further, Latino candidates of choice almost invariably prevailed in endogenous elections and elections pairing Latino and non-Latino candidates; therefore, Plaintiffs cannot meet *Gingles* prong 3.**

- **Analysis of factors considered by courts under the totality of the circumstances test does not show dilution or intent to dilute.**

- **Analysis of the population shifts in and out of CD 4 from the prior Congressional**

2

> **Map to the present Map and compactness measures of CD4 do not indicate that race was the predominant factor in the crafting of CD 4.**

- **Unlike the state passed plan, plaintiffs' alternative plan is predominantly driven by race in its effort to concentrate Latinos into its new Congressional District 3.**

**Qualifications**

I am a Professor of History at American University in Washington, D.C., where I have been employed for 38 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, analysis of redistricting plans, and historical and quantitative methodology. I am the author of numerous scholarly works on quantitative and non-quantitative methods in social science. This scholarship includes articles in such academic journals as <u>Political Methodology</u>, <u>Journal of Interdisciplinary History</u>, <u>International Journal of Forecasting</u>, and <u>Social Science History</u>. It also includes my co-authored book, *Historians and the Living Past*. I have coauthored <u>Ecological Inference</u> with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as <u>Journal of Law and Politics</u>, <u>La Raza Law Journal</u>, <u>Evaluation Review</u>, <u>Journal of Legal Studies</u>, and <u>National Law Journal</u>. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies, published in such academic journals as <u>The Proceedings of the National Academy of Sciences</u>, <u>The American Historical Review</u>, <u>Forecast</u>, and <u>The Journal of Social History</u>. Quantitative and historical

3

analyses also ground my books, Prejudice and the Old Politics: The Presidential Election of 1928, The Thirteen Keys to the Presidency (co-authored with Ken DeCell), The Keys to the White House, and White Protestant Nation: The Rise of the American Conservative Movement. My most recent book, White Protestant Nation, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than seventy-five voting and civil rights cases. These include several cases in the state of Illinois. Among other cases, I testified for the prevailing parties in *King v. Board of Elections*, regarding the Latino congressional district in Illinois and also in *Campuzano v. Illinois Board of Election* the statewide challenge to the post-2000 redistricting plan for state legislative positions. In *King*, I testified on behalf of plaintiffs and in *Campuzano* on behalf of defendants. I was also an expert witness in the landmark case of *Garza v. City of Los Angeles*, 756 F. Supp. 1298 (1990), on Latino vote dilution. In many cases, I have analyzed the demography of congressional redistricting plans. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness in defending enacted plans from voting rights challenges. A copy of my resume and a table of cases are attached as Appendix I of this report.

**Data and Methods**

This report relies on standard data and methods used in social science. The methods and data used for voting analysis are described in my Reply Report to the Report of Dr. Richard L. Engstrom. Methods and data used for the analysis of districts and population flows are described in my Reply Report to the Report of Dr. Peter A. Morrison. This report also relies on standard methods of historical and political analysis that I have applied in my scholarship as a political

4

historian and in my writing on quantitative and non-quantitative methods in historical and social science study. That scholarship is described above.

## SECTION I:  CLAIMS OF VOTE DILUTION IN COUNTS I, II, AND III

### A.       Plaintiffs' General Allegations of Intent

Proof of an intentional discrimination claim requires an exacting and stringent expert analysis of circumstantial evidence.  Such requirements are explained in a 142 page scholarly article by California Institute of Technology Professor J. Morgan Kousser, the intent expert in *Garza v. Los Angeles County* that plaintiffs cite as the case in which a court found intentional discrimination against Latinos in the crafting of a legislative redistricting plan.[1] There is, however, no analysis of intentional discrimination in either of the expert reports submitted by plaintiffs or any other material submitted by plaintiffs.  Rather, plaintiffs' expert reports and the material developed in this case offer no facts, data, or opinions, unlike in the *Garza* case, which allow an inference of racial discrimination to be drawn.  Unlike in *Garza*, in this case:

- The Illinois State legislature charged with redistricting had a substantial number of Latinos.

- Substantial facts and data explained below show that the Illinois State legislature has acted affirmatively to expand minority opportunities to participate in the political process. Democrats nearly universally backed such initiatives, whereas Republicans mostly opposed them. No special rules that militate against the interests of minorities exist for the redistricting process in Illinois.

---

[1] J. Morgan Kousser, "How to Determine Intent: Lessons From L. A.," *Journal of Law & Politics,* VII (1991).

- Nothing in the reports of plaintiffs' experts or any other material submitted by plaintiffs indicates any manipulation of the redistricting process in Illinois to the exclusion of Latinos.

- As indicated in the discussion of the "totality of circumstances" below and in my Reply Report to the Engstrom Report, elections in the Cook County region of Illinois were not marked by polarized voting, and numerous Latino candidates (and white candidates of choice of Latinos) have gained election to the Illinois General Assembly, U.S. Congress, countywide offices in Cook County, and citywide offices in Chicago. Further, the Adopted Plan achieves rough proportionality in Congressional districts relative to the Latino share of citizen voting age population in the state.

- As demonstrated in my Reply Report to the Report of Dr. Engstrom, there are no demonstrable discriminatory effects of the 2011 Congressional redistricting plan in Illinois given the lack of polarized voting, the success of Latino candidates of choice, and the larger number of districts in the state plan, as compared to plaintiffs' plan, with a Latino voting age population that exceeds Cook County overall.

Although effects and intent are not coterminous, the lack of discriminatory effect in a redistricting plan is a strong indicium of a lack of discriminatory intent. Further, Plaintiffs' claim that the Adopted Plan intentionally discriminated against Latinos in the drawing of districts also lacks credibility in light of the fact that all Latinos in the General Assembly voted for the plan.

Plaintiffs have instead alleged intentional dilution based in large part on contentions of "packing" CD4 in the Adopted Plan. As I set forth in my Response to the Report of Dr. Richard L. Engstrom which I incorporate herein, there is no evidence of packing in CD 4 of the Adopted

6

Plan. Furthermore, as I explain below my analysis of CD 4 of the Adopted Plan shows that

drafters did not maximize the Latino concentration in that district.

      As an additional matter, Plaintiffs have alleged in paragraphs 53 and 54 of their

Complaint that CD 3 and CD 5 in the Adopted Plan were drawn to protect the ability of the white

majority to defeat candidates of choice for Latino voters. Plaintiffs have not presented any direct

or indirect evidence that decision-makers feared that the white majority's preferred candidates

would be defeated by the candidates of choice for Latino voters. These allegations are based on

a demonstrably false presumption that Latino voters and white voters differ in their preferred

candidates in these districts. As indicated in the electoral analysis presented in my Response to

the Report of Engstrom, Rep. Lipinski and Rep. Quigley were in fact the candidates of choice for

Latinos in CD 3 and CD 5, respectively. Lipinski in CD 3 and Quigley in CD 5 have been the

candidates of choice of Latino and non-Latino voters in elections against Latino competitors.

This was the case for Representative Lipinski in two Democratic primary elections in CD 3 held

in 2008 and 2010, when Lipinski defeated Latino opponents. He was the candidate of choice of

Latinos as well as of African Americans and whites. He then won both follow up general

elections, likewise with unified support from all three voter groups (see Response to the Report

of Engstrom). In the special 2009 general election for the Congressional seat in CD 5 vacated by

former Representative Emanuel, Quigley, with unified support from Latinos and non-Latinos,

defeated a Latino opponent. (There was insufficient African American population and

concentration in CD 5 to estimate separately African American voting.)

      In addition to these readily disprovable allegations about CD 3 and CD 5 contained in

paragraphs 53 and 54 of their Complaint, Plaintiffs fail to consider the districts drawn by the

state in Cook County and bordering regions in the Adopted Plan. Plaintiffs fail to note that while

reducing the Latino percentages in CD 3 and CD 5, the state substantially increased the Latino percentages of two other districts in Cook County and border counties: CD 8 and CD 11. The state increased the Latino voting age population in CD 8 from 14.1 percent to 22.1 percent and the Latino voting age population in CD 11 from 9.2 percent to 21.8 percent. The Adopted Plan thus creates four districts of above 21 percent Latino voting age population, in which Latinos have an opportunity to influence the political process: CD 3, CD 4, CD 8, and CD 11. This compares to three such districts in the previous map drawn in 2001 (CD 3 CD 4 and CD 5) and merely two in plaintiffs' plan (CD 3 and CD 4). Maps 1 and 2 in my Response to the Report of Engstrom portray the four 21%+ Latino voting age districts in the state passed plan and the two such districts in the plaintiffs' alternative plan. By concentrating Latinos in two districts and spreading them out in others, Plaintiffs' plan is far less favorable to Latinos, because it restricts their opportunity to influence the election of candidates of their choice in general elections for Congressional representatives. As demonstrated in my Response to the Engstrom Report, Latinos vote overwhelmingly Democratic in general elections, much more so than whites and others.

**B.    The Three-Part *Gingles* Test**

The U.S. Supreme Court opinion in *Thornburg v. Gingles*, 478 U.S. 30 (1986), guides the expert analysis of voting issues with a three-part test that is a necessary condition for proving a vote dilution claim. The Court set forth the three-part test as follows:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district ... Second, the minority must be able to show that it is politically cohesive ... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it-in the absence of special circumstances … usually to defeat the minority's preferred candidate.

8

478 U.S. at 50-51.

**Gingles "Prong One."** As construed by the United States Supreme Court in *Bartlett v. Strickland*, 129 S. Ct. 1231 (2009), the satisfaction of "prong one" of the *Gingles* test requires a showing that the minority group at issue could constitute at least 50 percent of the voting age population in an additional district. Plaintiffs' alternative plan fails to meet this threshhold in that it creates an additional district (CD 3) that is only 46.5 percent Latino in its voting age population.

**Gingles "Prong Three."** To meet "prong three" of the *Gingles* test, an analysis must show first that voting is polarized along racial lines in that Latinos and non-Latinos usually prefer different candidates. It also requires a showing that non-Latino bloc voting against Latinos is sufficiently strong to usually defeat the candidates of choice of Latinos in a pattern of elections over time. My Response to the Report of Engstrom shows that neither requirement is met in this case. The evidence and analysis presented in that report demonstrates that Dr. Engstrom cannot provide a reliable and complete assessment of racially polarized voting and the effects of white bloc voting given his limited and unrepresentative sample of elections and other problems with his analysis. Further, the study of a large corpus of relevant Democratic primary and general elections – including Congressional elections, state legislative elections, countywide, and citywide elections – shows that in the great majority of contests there was no polarization in the candidate preferences of Latinos and non-Latinos. In addition, Latino candidates of choice almost invariably prevailed in these elections; more than half of those victories occurred in districts or jurisdictions that were overwhelmingly non-Latino in their voting age population (Congressional District 3, Congressional District 5, Representative District 44, Cook County, and the City of Chicago).

C.      The "Totality of Circumstances"

In determining whether there has been voter dilution under effects and intent based theories, courts look at the "totality of circumstances." Analysis of factors considered by courts under this test does not show dilution or intent to dilute.

**Factor: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.** The Illinois State legislature has acted affirmatively to expand minority opportunities to participate in the political process. Recent initiatives include the enactment by the Illinois General Assembly of House Bill 1968 in 2005, which became Public Act 94-0645. To facilitate access to the ballot, this law authorized early voting in Illinois without the necessity of applying for an absentee ballot. The law also provided for a grace period that allowed citizens to register after the regularly established deadline. Such measures are particularly important for improving access to the ballot for minority groups, like Latinos, who have faced barriers to voting in the past. The federal Help America Vote Act Report on Illinois noted, "Illinois law now includes an early voting option, alongside the absentee ballot during the early voting period, to encourage more people to vote and remove time-related barriers that have impeded many voters in the past." Among members of the Illinois House of Representatives and Senate casting votes on this House Bill 1968, the vote almost exactly followed party lines, with almost every Democrat backing the bill and Republicans uniformly opposing the bill.[2]

---

[2] HAVA, "Illinois HAVA Implementation," 2006, p. 5, Illinois/HAVA%20REPORT%202006%20IL.htm. National Council of State Legislature, "Voter Identification Requirements," 8 September 2011, http://www.ncsl.org/default.aspx?tabid=16602.

Another recent initiative to enhance minority voting rights was the Illinois Voting Rights Act, enacted by the legislature and signed into law in 2011. The bill will require that in drawing Congressional and state legislative districts, the General Assembly shall draw minority crossover districts, coalition districts, and influence districts all designed to enhance minority opportunities to elect candidates of their choice to legislative positions. The bill passed with bipartisan support in the Illinois State Senate, but followed party lines in the House, with Democrats supporting it and Republicans opposing it.

While courts previously found a history of electoral discrimination against the Latino community in the City of Chicago and Illinois, those findings are twenty or more years old and consequently cannot establish electoral discrimination over the most recent two decades or in the present. To the contrary, as indicated above, Democrats in the Illinois General Assembly and the governorship have taken important steps to advance the ability of Latinos and other minorities to elect candidates of the their choice and participate fully in the political process.

**Factor: The extent to which voting in the elections of the state or political subdivision is racially polarized.** As demonstrated by the analysis presented in my Response to the Report of Engstrom, voting in Cook County has not been racially polarized since at least 2002, even when analysis focuses on contests pitting Latinos against non-Latinos. Rather, Latinos and non-Latinos in Congressional elections and other elections relevant to Congressional races have in the great majority of contests chosen the same candidates of their choice, who have been both Latino and non-Latino. In addition, Latino candidates of choice have almost invariably prevailed in both Democratic primaries and general elections.

**Factor: The extent to which members of the minority group have been elected to public office in the jurisdiction.** Considerable numbers of Latinos have been elected to public

11

office in Illinois, especially in the Cook County region. In this region, a Latino (Gutierrez) has been elected as a member of Congress and in recent elections Latinos have been elected to countywide positions in Cook County and citywide positions in Chicago, even though Cook County is 79 percent non-Latino in its voting age population and Chicago is 75 percent non-Latino in its voting age population. Since the last redistricting, Latinos have been elected Cook County State's Attorney, Cook County Assessor, and City of Chicago Clerk. Latinos have been elected as well to State House and State Senate positions in Cook County, the closest analogue to Congressional offices. Overall, according to a survey by the National Association of Latino Elected Officials (NALEO) there were 113 Latino elected officials in Illinois in 2010, placing the state seventh in the nation (tied with New Jersey). This number represents a 176 percent increase in Latino office-holding since 1996, when Latinos held only 41 elected offices in Illinois. The NALEO report lists the nine states with the largest number of Latino elected officials in 2010. Of these states, Illinois' rate of increase in Latino elected officials since 1996 was second only to New Jersey.[3]

    **Factor: Rough Proportionality**. While not one of the initial "totality of circumstances" factors, in *Johnson v. de Grandy*, 512 U.S. 997 (1994), the U. S. Supreme Court introduced the issue of "rough proportionality" in a jurisdiction's creation of effective minority districts. This issue was construed by the Seventh Circuit in *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998). The Court noted, "An important consideration in deciding whether a districting plan discriminates is whether the plan creates majority districts for each group in proportion to each group's electoral potential." *Id.* at 703. The Court further held, "We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the

---

[3] NALEO, *A Profile Of Latino Elected Officials In The United States And Their Progress Since 1996* (2010), p. 4.

policy of the statute." *Id.* at 704. With the creation of effective minority opportunity district CD 4, the state has achieved rough proportionality according to this standard. According to the latest U.S. Census data from the American Community Survey sample, the Latino citizen voting age population of the state of Illinois is 8.2 percent. Multiplied by 18 congressional districts, this percentage equals 1.48 congressional districts, which is roughly proportional to the one clearly effective Latino opportunity district (CD 4) created by the state.

**SECTION II:  THE CLAIM OF RACIAL GERRYMANDER IN COUNT IV**

My analysis of the available facts and data as well as Plaintiffs' experts' opinions does not indicate that race could have been the predominant factor in the drawing of CD 4. Rather, the contrary inference should be drawn from the pertinent facts and data.

First, as indicated by Table 1 and Map 1, the drafters of the Adopted Plan did not move population in and out of previous Congressional District 4 in order to maximize or nearly maximize the Latino share of the voting age population in the new version of this district, as would be expected if the district was drawn predominantly according to race. According to the data reported in Table 1, 15,619 persons of voting age with a Latino percentage 86.8 percent were extracted from existing CD 4 and added to new CD 3 under the state passed plan. An additional 15,542 persons of voting age with a Latino percentage of 60.5% were extracted from existing CD 4 and added to new CD 7 under the state passed plan. As shown in Map 1, which

13

**Table 1**
**Voting Age Population of High Latino VAP Areas From Existing CD 4 to Other New Districts and Inflow of Low Latino VAP Areas to CD 4 From Other Existing Districts: State Passed Congressional Plan**

| OUTFLOW OF HIGH LATINO VOTING AGE POPULATION FROM EXISTING CD 4 | | | |
|---|---|---|---|
| **NEW DISTRICT** | **TOTAL VAP** | **HISPANIC VAP** | **HISPANIC VAP %** |
| **TO NEW CD3** | 15,619 | 13,560 | **86.82%** |
| **TO NEW CD7** | 15,542 | 9,399 | **60.47%** |
| INFLOW OF LOW LATINO VOTING AGE POPULATION FROM OTHER EXISTING DISTRICTS TO STATE PASSED CD 4 | | | |
| **FROM EXISTING CD3** | 53,737 | 19,602 | 36.48% |
| **FROM EXISTING CD7** | 7,414 | 1,694 | 22.85% |

14

**Map 1**
**Outflow of Census Blocks From Previous CD 4 to Other New State Passed Districts: Red =**
**Blocks 60%+ Latino In VAP, Green = Blocks 60% or Less Latino VAP**



displays population outflows from previous CD 4 in new state adopted districts, these areas with high concentrations of Latinos were on the border of new CD 4 and could have easily been retained within CD 4, if the state's plan was predominantly driven by racial considerations. With a 2010 Census population of 601,156, previous CD 4 was 111,657 persons short of the target population for new Congressional districts of 712,813 and did not need to shed these heavily Latino areas. As shown in Map 2, which displays population inflows from other previous districts into new CD 4, there were areas with lower concentrations of Latinos that the state need not have transferred into CD 4 if it had chosen to retain in this district areas with high concentrations of Latinos.[4]

These patterns of shifting population out of and into previous CD 4 contradict the notion that race predominated in the drawing of CD 4 under the Adopted Plan. As the calculations in Table 2 below indicate, by doing nothing more than retaining in previous CD 4 the heavily Hispanic areas moved to other districts and not bringing in an equivalent voting age population from other districts with low Hispanic concentration, the state could have increased the Latino voting age population in CD 4 by 2.5 percentage points. This would have raised the Latino voting age percentage in revised CD 4 in the state's plan to 68.4 percent, making the Latino voting age share of the new district higher, not lower, than the 68.1 percent in previous CD 4. Instead, the Adopted Plan actually lowered the Latino voting age population in CD 4 by 2.2 percentage points from the previous map.

---

[4] Although there were blocks with a 65%+ Latino VAP transferred into new CD 4, many were contained within areas of lower Latino concentration in contrast to the outflow pattern from previous CD 4, where the heavy Latino areas were largely self-contained and not included within areas of lower Latino concentration.

**Map 2**
**Inflow of Census Blocks From Other Previous Districts Into New State Passed CD 4: Red = Blocks 60%+ Latino In VAP, Green = Blocks 60% or Less Latino VAP**



**Table 2**
**The Increase in Latino Voting Age Population for a Revised CD4 in the State Passed Plan**
**Achieved by Retaining High Latino Concentration Areas Moved Out of Previous CD4 and**
**Eliminating Lower Latino Concentration Areas Moved Into New CD4.**

| | Total | Latino |
|---|---|---|
| High Latino Concentration VAP not moved from existing CD4 to new CD3 and CD 7 | 31,161 | 22,959 |
| Lower Latino VAP not moved into new CD4 from other districts. | | |
| Previous CD7 | 7,414 | 1,694* |
| Previous CD3 | 23,747 | 8,663** |
| Total | 31,161 | 10,357 |
| Net increase in VAP in New CD4 | 0 | 12,602 (22,959-10,357) |
| VAP in new CD 4 prior to revisions | 507,602 | 334,614 |
| VAP in new CD4 After Revisions | 507,602 | 349,216 |

**Latino Voting Age Percentage in Revised CD4 = 68.4% (349,216/507,602)**

**Increased Latino Percentage in Revised CD4 = 2.5% (68.4-65.9)**

* The exact amount of VAP and Latino VAP moved into new CD4 from previous CD7
** The amount of VAP moved into new CD4 from previous CD3 to equal 31,161. The Latino component was obtained by multiplying 23,747 by .3648 the average Latino share of this VAP.

Chart 1 portrays the differences in the Latino voting age population of CD 4 under the existing plan, the Adopted Plan, and as revised above. This increase in Latino voting age population also would have been the product only of shifts in large areas of population. The state could have increased the Latino concentration in CD 4 even more by splitting additional precincts and picking and choosing among individual blocks moved into and out of existing CD 4. There are only 40 split precincts in all of new CD 4 under the state's plan, which is just 8 percent of the 510 precincts in this district that touch upon its border with other districts. Unlike the Adopted Plan, plaintiffs' alternative plan is predominantly driven by race in its effort to concentrate Latinos into its new CD 3. This is a newly created district that bears no relationship to CD 3 under the previous plan. It is created by capturing the northern component of previous CD 4 and adding population from previous CD 5, CD 6, CD 7, and CD 9. By splitting existing CD 4 into north/south components, plaintiffs' CD 3 keeps the southern concentration of Latinos in existing CD 4. However, as Map 3 illustrates, plaintiffs also exclude a northern area of low Latino concentration that could have been included within their new CD 3.  On Map 3, areas in red are greater than 50 percent Latino, whereas areas in green are 50 percent or less Latino.  The concentration of Latinos in plaintiffs' new CD 3 is further demonstrated by comparing the percentage of the Latino voting age population contributed to new CD 3 from previous CD 5, CD 6, CD 7, and CD 9, with the Latino voting age percentage of the population retained in the new versions of these four districts.  Table 3 provides this comparison. As reported in Table 3, the Latino percentage of the voting age population contributed to plaintiffs' new CD 3 from these previous four districts is 37.2 percent. As also reported in Table 3, the Latino percentage of the voting age population retained in plaintiffs' new versions of CD 5, CD 6, CD 7, and CD 9 is 10.6 percent. Thus plaintiffs largely drained the

**Chart 1**
**Comparison of Latino Voting Age Percentage, Existing CD 4, Adopted CD 4, & Revised CD 4**



**Map 3**
**Outflow of Census Blocks From Existing CD 4 to Plaintiffs' CD 3: Red = Blocks 50%+
Latino In VAP, Green = Blocks 50% or Less Latino VAP**



**Table 3**
**Voting Age Population Inflow From Previous CD 5, CD 6, CD 7 and CD 9 to New CD 3 In Plaintiffs Alternative Plan and Voting Age Population In CD 5, CD 6, CD 7, and CD 9 Not Moved to News CD 3**

| INFLOW OF VOTING AGE POPULATION TO NEW CD3: PLAINTIFFS' PLAN | | | |
|---|---|---|---|
| DISTRICTS | TOTAL VAP | LATINO VAP | LATINO VAP PERCENTAGE |
| FROM EXISTING CD5 | 242,633 | 95,169 | 39.22% |
| FROM EXISTING CD6 | 58,599 | 19,846 | 33.87% |
| FROM EXISTING CD7 | 37,249 | 12,062 | 32.38% |
| FROM EXISTING CD9 | 9,601 | 2,413 | 25.13% |
| TOTAL | **348,082** | **129,490** | **37.2%** |
| VOTING AGE POPULATIONS IN NEW CD5, CD6, CD7, AND CD9: PLAINTIFFS' PLAN | | | |
| DISTRICTS | TOTAL VAP | LATINO VAP | LATINO VAP PERCENTAGE |
| NEW CD5 | 598,584 | 73,950 | 12.35% |
| NEW CD6 | 538,274 | 74,922 | 13.91% |
| NEW CD7 | 552,362 | 33,765 | 6.11% |
| NEW CD9 | 553,642 | 56,072 | 10.13% |
| TOTAL | **2,242,862** | **238,709** | **10.64%** |

22

Latino voting age population from four previous districts to maximize the Latino population in new CD 3. As illustrated in Chart 2, the differential between the Latino voting age percentage of the population added to new CD 3 from the four previous districts and the Latino voting age population retained in the new versions of these districts under plaintiffs' plan is nearly 27 percentage points. As illustrated in Chart 3, this differential in Latino voting age population is more than four times greater that the differential of 6.6 percentage points indicated in Dr. Morrison's report for the flow of population into and out of CD 4 under the state's plan.

Map 4 traces the population flows into CD 3 described above. On Map 4, areas in red are greater than 50 percent Latino, whereas areas in green are 50 percent or less Latino. Map 4 shows that plaintiffs have concentrated virtually every area of red territory within their CD 3 rather than surrounding districts.

Table 4 further demonstrates the draining in Plaintiffs' Plan of Latinos from CD 5, 6, 7, and 9 of the existing plan. Table 4 compares the current 2010 Latino voting age population of these existing districts with the Latino voting age population in Plaintiffs' new versions of each district. As indicated in Table 4, in every one of these four Congressional Districts, Plaintiffs' Plan has reduced the Latino voting age percentage of the existing Congressional District. In CD 5, plaintiffs' plan cuts the Latino voting age percentage in half, reducing this percentage from 24.56 percent to 12.35 percent, a reduction of 12.21 percentage points. Another important indicium of districts drawn predominantly according to race is the splitting of voter precincts. By splitting precincts, within the limits of geographic location, plan drawers can allocate the more concentrated and less concentrated Latino blocks within precincts to different districts. In creating new CD 3, plaintiffs split 77 voter precincts, compared to the 40 precincts that the state split in creating congressional district 4, as indicated in Table 5.

**Chart 2**
**Comparison Between Latino Inflow and Outflow of Voting Age Population**
**in CD 3 under the Plaintiffs' Plan**



**Chart 3**
**Differential Between Latino Inflow and Outflow of Voting Age Population,**
**CD 4 in the State Plan Compared to CD 3 in Plaintiffs' Plan, Differential in Percent**



**Map 4**
**Inflow of Census Blocks to Plaintiffs' CD 3 From Surrounding Districts: Red = Blocks 50%+ Latino In VAP, Green = Blocks 50% or Less Latino VAP**

### CD 3 Fair Map Inflow



**Table 4**
**The Latino Voting Age Population of 2002 Congressional Districts 5, 6, 7, and 9 Compared to the Latino Voting Age Population of Congressional Districts 5, 6, 7, and 9 in Plaintiffs' Plan**

| CONGRESSIONAL DISTRICT | LATINO VAP IN 2002 VERSION | LATINO VAP IN PLAINTIFFS' PLAN | DIFFERENCE |
|---|---|---|---|
| | | | |
| CD 5 | 24.56% | 12.35% | -12.21% |
| | | | |
| CD 6 | 15.31% | 13.92% | -1.39% |
| | | | |
| CD 7 | 8.04% | 6.11% | -1.93 |
| | | | |
| CD 9 | 10.94% | 10.13% | -0.81% |

CD 3 in the plaintiffs' plan split nearly twice as many precincts as CD 4 in the state passed plan, even though it includes many fewer precincts that touch the district border and could be divided between districts. As indicated in Table 5, CD 3 in the plaintiffs' plan includes 354 border precincts, whereas CD 4 in the state passed plan includes 510 border precincts, nearly half again as many. As additionally indicated in Table 5 and Chart 4, CD 3 in the plaintiffs' plan splits 22 percent of its border precincts, whereas CD 4 in the state passed plan splits only 8 percent of its border precincts. Thus, in drawing CD 3, plaintiffs split nearly three times the percentage of border precincts than the state did in drawing CD 4. If the drafters of the state's plan had split precincts in CD 4 in proportion to the percentage of precincts split in CD 3 under plaintiffs' plan, that would have resulted in the splitting of 72 additional precincts.[5]

---

[5] 510*.22 = 112 splits – 40 actual splits = 72 additional splits.

**Table 5**
**Split Precincts and Border Precincts: CD 3 In Plaintiffs' Congressional Plan and CD 4 in the State Passed Congressional Plan**

| DISTRICT | NUMBER OF SPLIT PRECINCTS | NUMBER OF PRECINCTS ON DISTRICT BORDER | PERCENTAGE OF BORDER PRECINCTS SPLIT |
|---|---|---|---|
| | | | |
| CD 3 PLANTIFFS' PLAN | 77 | 354 | **22%** |
| | | | |
| CD 4 STATE PASSED PLAN | 40 | 510 | **8%** |
| | | | |
| SOURCE: ILLINOIS HOUSE REDISTRICTING OFFICE | | | |

29

**Chart 4**
**Percentage of Border Precincts Split, CD 4 in the State Plan Compared to CD 3 in Plaintiffs' Plan**



With respect to expert presentation and analysis of indirect evidence of allegations of racial predominance in the drawing of the state passed CD 4, the Report of Engstrom opines that CD 4 has relatively low compactness scores. After presenting his measurements of compactness of CD 4 in the Adopted Plan, Dr. Engstrom fails to compare these statistics to any benchmark measures. Instead, without examining alternative explanations, he concludes that, "The most apparent reason for the bizarre shape of CD 4 in the Adopted Plan is a desire to create a district with extremely high concentration of Latinos." (p. 11).

In and of itself, Dr. Engstrom's analysis of compactness is incomplete and inaccurate. He does not compare either of his compactness scores to scores for the 1991 or the 2002 versions of CD 4. According to information conveyed by Professor Gerald R. Webster, Chair of the Department of Geography at the University of Wyoming, the CD 4 in the Adopted Plan is more compact than either of the earlier versions of the district, based on both dispersion and perimeter scores. Moreover, according to Professor Webster, Dr. Engstrom's calculation of the Reock geographic dispersion measure is off by 100 percent; the proper measure is .30, not .15. (The *lower* the Reock score, the *less* compact the district.) Professor Webster's results are based on calculations conducted by the University of Alabama Cartographic Research Laboratory, a standard resource for such work. The Laboratory conducted their calculations twice to confirm their results. I personally confirmed these results with the Laboratory as well. The Laboratory calculated a Reock score of .30, compared to Dr. Engstrom's score of .15. This difference is of substantive significance given that analysts have recognized scores of .15 or below as the cutoff point for indicating low compactness.[6] The compactness measurement in the Adopted Plan's CD

---

[6] Richard H. Pildes and Richard G. Niemi, "Expressive Harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances After *Shaw v. Reno*," *Michigan Law Review*, 92 (1993).

4 and the increase in compactness since 1991 is not indicative of race being a predominant factor in the drawing of CD in the Adopted Plan.

Moreover, in its construction of new CD 4, the Adopted Plan preserves the core of the district of Democratic Representative Gutierrez, a nearly 20-year incumbent, and, in turn, his relationship with his constituents. Preserving this core, protecting incumbents, and maintaining relationships between representatives and constituents are valid, non-racial reasons for the drawing of a district. The correlation between partisan affiliation and Latino ethnicity is strong in CD 4 of the Adopted Plan. As demonstrated by the electoral analysis in my Reply Report to the Report of Richard Engstrom, Latinos and African Americans vote overwhelmingly Democratic in general elections, far more so than whites and others. As indicated in Table 6, 82 percent of the population in existing CD 4 is preserved in the state passed plan. The existing plan also preserves the core of CD 3 and Democratic incumbent Representative Lipinski's relationship with his constituents. Lipinski has been the candidate of choice of Latino voters in both primary and general elections. As indicated in Table 6, 76 percent of the population in existing CD 3 is preserved in the state passed plan.

**Table 6**
**Incumbent Placement and the Retention of Previous Constituents: State Passed Plan**
**Compared to Plaintiffs' Alternative Plan**

| EXISTING DISTRICT | INCUMBENT | POPULATION OF EXISTING DISTRICT | INCUMBENT NEW DISTRICT | POPULATION RETAINED IN NEW DISTRICT | % RETAINED |
|---|---|---|---|---|---|
| STATE PASSED PLAN | | | | | |
| CD 4 | GUTIERREZ (HD) | 601,156 | CD 4 | 494,541 | 82% |
| | | | | | |
| CD 3 | LIPINSKI (WD) | 663,381 | CD 3 | 506,998 | 76% |
| CD 5 | QUIGLEY (WD) | 648,610 | CD 5 | 511,438 | 79% |
| | | | | | |
| CD 13 | BIGGERT (WR) | 773,095 | CD 5 | 10,196 | 1% |
| | | | | | |
| PLAINTIFFS' ALTERNATIVE PLAN | | | | | |
| CD 4 | GUTIERREZ (HD) | 601,156 | CD 3 | 289,198 | 48% |
| | | | | | |
| CD 3 | LIPINSKI (WD) | 663,381 | CD 13 | 23,520 | 4% |
| | | | | | |
| CD 5 | QUIGLEY (WD) | 648,610 | CD 5 | 324,994 | 50% |
| | | | | | |
| CD 13 | BIGGERT (WR) | 773,095 | CD 13 | 519,406 | 67% |

Plaintiffs' alternative plan fails to achieve any of these objectives. Plaintiffs' plan actually moves Gutierrez from existing CD 4 to new CD 3, which preserves only 48 percent of his previous constituents and reduces the Latino voting age population of his district by more than 21 percentage points (from 68.1% to 46.5%). Dr. Engstrom's report indicates that CD 3 under the plaintiffs' plan is not an effective Latino opportunity district but an "influence district" and that Gutierrez might not even choose to run there. He states, "Latinos would have a chance to influence the outcomes of elections in CD 3 in the Plaintiffs' Plan, even if Mr. Gutierrez (a resident of the district) does not seek reelection in it." (p. 13)

In addition, Plaintiffs' plan dismantles existing CD 3 and moves Democratic incumbent Lipinski to a new CD 13, where he is paired with Republican incumbent Biggert. CD 13 under the plaintiffs' plan includes only 4 percent of the population of Lipinski's previous District 3, while it retains 67 percent of the population from previous District 13, which Biggert currently represents. As compared to CD 3 under the Adopted Plan, CD 13 under the plaintiffs' plan cuts nearly in half the voting age population of heavily Democratic Latinos and African Americans in Lipiniski's existing district, reducing his minority component from 29 percent to 15 percent. It also includes Republican-leaning voters. Thus, under plaintiffs' plan, Lipinski is paired in a favorably Republican district with very few of his previous constituents and with a Republican incumbent who retains two-thirds of her previous constituents.

As such, Plaintiffs' plan pursues Republican partisan objectives rather than the partisan objectives of the Democratic majority in the Illinois General Assembly. Understandably, Republicans would prefer a Congressional redistricting plan that facilitated the election of Republicans rather than Democrats, which is precisely what their proposed plan would

accomplish even at the expense of Latino influence in two congressional districts. According to

the Complaint, "The Proposed Congressional Plan [the Adopted Plan] also engages in

impermissible partisan gerrymandering that dilutes the ability of Republican voters in Illinois to

elect candidates of their choice." (Complaint, paragraph 69, p. 16.) The Complaint proffers

partisan, non-racial objectives for changes in Congressional districts 3 and 11 outlined above:

"While the entire Proposed Congressional Plan reflects a statewide partisan gerrymander,

proposed Districts 3 and 11 are especially blatant examples of partisan gerrymandering."

(Complaint, paragraph 75, p. 18.) In sharp contrast to their allegations of intentional

discrimination against Latinos, the complaint provides extensive, detailed, and specific

information showing how the Adopted Plan allegedly advances Democratic partisan objectives

in these and other districts in Cook County and the border region. (See Complaint, paragraphs

76-95, pp. 18-22.)

In *Easley v. Cromartie* the U. S. Supreme Court ruled on the issue of legitimate political

objectives in instances, such as the present case, where there is a high correlation between racial

identification and political affiliation and the state is pursuing "legitimate political objectives."

The Court ruled as follows:

> We can put the matter more generally as follows: In a case such as this one where
> majority-minority districts (or the approximate equivalent) are at issue and where
> racial identification correlates highly with political affiliation, the party attacking
> the legislatively drawn boundaries must show at the least that the legislature could
> have achieved its legitimate political objectives in alternative ways that are
> comparably consistent with traditional districting principles. That party must also
> show that those districting alternatives would have brought about significantly
> greater racial balance. Appellees failed to make any such showing here. We
> conclude that the District Court's contrary findings are clearly erroneous. Because
> of this disposition, we need not address appellants' alternative grounds for
> reversal.

*Easley v. Cromartie*, 532 U.S. 234, 258 (2001).

This doctrine is clearly relevant to the present matter. As indicated above, race and party are highly correlated in Illinois and the state has achieved political objectives that are consistent with such traditionally redistricting principles as maintaining the core of existing districts and protecting incumbents. Plaintiffs' plan achieves opposite political objectives of the Adopted Plan and brings about significantly less racial balance. Plaintiffs' Plan reduces the Latino presence in four districts and dismantles Latino influence districts. In addition to the Latino voting age majority district in each plan, the Adopted Plan includes three Latino influence districts in the Cook County and border region, whereas Plaintiffs' Plan includes just one. Unlike the Adopted Plan, Plaintiffs' Plan is also predominantly driven by race in its concentration of Latinos in CD 3 at the expense of other districts.

**CONCLUSIONS**

Evaluating evidence pertinent to vote dilution and racial gerrymandering, this report finds neither in the Adopted Plan. To the contrary, the evidence contradicts any finding of racial discrimination. Specifically, this report concludes that Plaintiffs have not met either *Gingles* prong 1 or prong 3 and that an analysis of factors considered by courts under the totality of the circumstances test does not show dilution or an intent to dilute. Analysis shows no evidence of intentional discrimination in the Illinois Congressional redistricting. Analysis of the population shifts in and out of CD 4 show that the state did not maximize or nearly maximize the Latino concentration in CD 4. Plaintiffs' experts' reports and the facts and data developed in the case do not indicate race was the predominant factor in the redrawing of CD 4 of the Adopted Plan; and rather, the plaintiffs' alternative plan is predominantly driven by race in its effort to concentrate Latinos into its new Congressional District 3. The Adopted Plan also achieves legitimate political objectives and traditional non-racial redistricting objectives that are contradicted in Plaintiffs'

36

Plan. The Adopted Plan also achieves greater racial balance than Plaintiffs' Plan.[7]

---

[7] My report is based upon facts, data, and analyses currently available. If additional facts, data, or analyses are elicited in the discovery of this case, I reserve the right to supplement my report to reflect such additional information if necessary.