```
            IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
                     EASTERN DIVISION
- - - - - - - - - - - - - - - - - - -X
COMMITTEE FOR A FAIR AND BALANCED   :
MAP, JUDY BIGGERT, ROBERT J. DOLD,  :
RANDY HULTGREN, ADAM KINZINGER,     :
DONALD MANZULLO, PETER J. ROSKAM,   :
BOBBY SCHILLING, AARON SCHOCK,      :
JOHN M. SHIMKUS, JOE WALSH, RALPH   :
RANGEL, LOU SANDOVAL, LUIS          :Case No. 1:11-cv-05065
SANABRIA, MICHELLE CABALLERO,       :
EDMUND BREZINSKI, and               :
LAURA WAXWEILER,                    :
              Plaintiffs,           :
        v.                          :
ILLINOIS STATE BOARD OF ELECTIONS,  :
WILLIAM M. MCGUFFAGE,               :
JESSE R. SMART, BRYAN A. SCHNEIDER,:
BETTY J. COFFRIN, HAROLD D. BYERS,  :
JUDITH C. RICE, CHARLES W. SCHOLZ,  :
and ERNEST L. GOWEN,                :
              Defendants.           :
- - - - - - - - - - - - - - - - - - -X
```

                              Washington, D.C.
                              Thursday, October 6, 2011


          Videoconference Deposition of AARON
SCHOCK, a witness herein, called for examination by
counsel for Defendants, in the above-entitled matter,
pursuant to  notice, the witness being duly sworn by

SUSAN L. CIMINELLI, a Notary Public in and for the
District of Columbia, taken at the offices of Mayer
Brown, LLP, 1999 K Street, N.W., Washington, D.C., at
3:36 p.m., and the proceedings being taken down by
Stenotype by SUSAN L. CIMINELLI, CRR, RPR.



EXHIBIT
C

**Page 2**

1  APPEARANCES:
2
3      On behalf of the Plaintiffs:
4          THOMAS V. PANOFF, ESQ.
5          GRETCHEN HELFRICH, ESQ. (Via video)
6          Mayer Brown, LLP
7          71 South Wacker Drive
8          Chicago, IL 60606-4637
9          (312) 701-8821
10         tpanoff@mayerbrown.com
11         ghelfrich@mayerbrown,com
12
13     On behalf of the Defendants: (Via video)
14         DEVON C. BRUCE, ESQ.
15         Power, Rogers & Smith
16         70 West Madison, Suite 5500
17         Chicago, IL 60602
18         (312) 827-6109
19         dbruce@prslaw.com
20
21
22

**Page 3**

1              C O N T E N T S
2  AARON SCHOCK              EXAMINATION
3      By Mr. Bruce           4
4
5              E X H I B I T S
6  SCHOCK EXHIBIT NO.           PAGE NO.
7  Exhibit 1 - Deposition Exhibits      4
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22

**Page 4**

1              P R O C E E D I N G S
2  Whereupon,
3              AARON SCHOCK,
4  was called as a witness by counsel for Defendants,
5  and having been duly sworn by the Notary Public, was
6  examined and testified as follows:
7              (Schock Exhibit No. 1 was marked for
8              identification.)
9      EXAMINATION BY COUNSEL FOR DEFENDANTS
10         BY MR. BRUCE:
11     Q.  Let the record reflect that this is the
12  deposition of Congressman Aaron Schock taken pursuant
13  to the Federal Rules of Civil Procedure noticed by
14  the defendants in this case and continued by the
15  parties. Sir, could you please state your first and
16  last name, and spell your last name for the record,
17  please?
18         MR. PANOFF:  Devon, before we do that, why
19  don't we introduce counsel for the record.  Tom
20  Panoff for Mayer Brown on behalf of plaintiff and the
21  witness, and also with us, Gretchen Helfrich, who is
22  with us in our Chicago office.  Go ahead,

**Page 5**

1  Congressman.
2      THE WITNESS:  Aaron Schock, S-C-H-O-C-K.
3         BY MR. BRUCE:
4      Q.  Congressman, my name is Devon Bruce and I
5  have been appointed as a special assistant to the
6  Illinois Attorney General to defend the defendants in
7  this case that you have brought.  And you have been
8  disclosed as a witness in this case which is why I'm
9  taking your deposition here today.
10         If at any time, you don't understand a
11  question that I ask, just tell me, and I'll be happy
12  to rephrase it.  It's important that you answer out
13  loud and audibly for the court reporter, even though
14  I can see a nod of the head or shrug of the
15  shoulders.  If at any time, you don't understand a
16  question I ask, just tell me and I'll be happy to
17  rephrase it.
18         Congressman, I don't have any doubts that
19  the vast majority of my questions you're going to
20  anticipate before I finish asking them, but we have
21  to wait until I finish asking my question before you
22  begin your answer.  Otherwise we are going to be

Schock, Aaron

October 6, 2011

Page 6

1 talking over one other. Okay?
2    A.  Fair enough.
3    Q.  Congressman, let me just get some general
4 background information, if I could, please. Tell me,
5 have you ever given a deposition before?
6    A.  Not that I'm aware of. No.
7    Q.  It would be --
8    A.  Yeah. I don't -- not like this. If I've
9 ever been deposed, I don't know it. No. I've not.
10    Q.  And what about trial testimony. Have you
11 ever given any trial testimony of any type?
12    A.  The only -- the only courtroom that I can
13 recall being in was in a small claims court a long
14 time ago when I was 18. So I don't remember anything
15 other than -- I've done my best to stay out of court.
16    Q.  Well, in this case, you chose to walk into
17 court, so that's -- that's why we are here today. So
18 Congressman, I'm not asking your specific home
19 address, but you're currently residing where, in
20 Peoria?
21    A.  Peoria, Illinois.
22    Q.  Okay. And your address where you

Page 7

1 currently reside, do you plan on staying at that
2 address for the next two years?
3    A.  Yes. I have no plans.
4    Q.  Or do you plan --
5    A.  I have no plans to move.
6    Q.  Okay. And is that home that you're living
7 in today, is that home currently located in the new
8 18th Congressional District that was passed in
9 Springfield?
10    A.  Yes.
11    Q.  Okay. And you currently live in the old
12 18th Congressional District, is that correct?
13    A.  Correct. Yes.
14    Q.  Okay. Let me just quickly go through some
15 background. Your first elected office was what, sir?
16    A.  To the Peoria School Board.
17    Q.  Okay.
18    A.  The Peoria Board of Education.
19    Q.  You did that from what period of time to
20 what period of time?
21    A.  I was a candidate in 2000. I was elected
22 in 2001. But you probably should have all this if

Page 8

1 you Googled me.
2    Q.  Actually, well --
3    A.  I can do this. 2001, I served on the
4 school board for four years. So that would have put
5 it at 2005. In 2004, I was elected to the state
6 legislature and I served coterminously as the school
7 board president and as an Illinois state legislator
8 from January of 2005 until I stepped down as the
9 school board president in July of 2005.
10    I continued serving as the State
11 Representative for that term, was re-elected and
12 served, you know, again elected as a State Rep. in
13 2004, sworn in as a State Rep. in 2005, served four
14 years until my election to Congress in 2008 when I
15 was sworn in in 2009. I had to step down, resign as
16 a State Representative two weeks early to begin my
17 U.S. Congress term in January of 2009.
18    Q.  And have you made any public announcement
19 as to what your intent is in the future with respect
20 to running for public office as of today's date?
21    A.  Yes. I'm running for Congress in the 18th
22 Congressional District. The 18th Congressional

Page 9

1 District is the district I represent today. It is
2 the district that -- I mean, no matter what happens,
3 I will be a candidate in the 18th Congressional
4 District because under the map that was presented as
5 a more fair and balanced map, it's considered the
6 18th Congressional District. Under the map that the
7 Democrat legislature passed, it's considered the 18th
8 Congressional District where I live. So in either
9 case, I would circulate petitions and run in the 18th
10 Congressional District.
11    Q.  Now, the map that was passed into law by
12 the Illinois legislature and signed by the Governor
13 with respect to that map, does that 18th
14 Congressional District place you with any other
15 current sitting United States Congressmen or
16 Congresswomen?
17    A.  No.
18    Q.  Has any current United States Congressman
19 publicly announced that they would vote -- or strike
20 that. Has any current United States Congressman
21 indicated that they would be running against you in
22 the 18th Congressional District?

Schock, Aaron                                      October 6, 2011

Page 10

1    A.   No.
2         MR. PANOFF:  Objection.  Foundation.
3         BY MR. BRUCE:
4    Q.   Yes.  I think I said if there was a public
5    announcement.  You're not aware, Congressman of any
6    public announcement by any sitting United States
7    Congressman that has indicated that they will be
8    running against you, is that true?
9    A.   No.  I'm not aware of anyone who is a
10   United States Congressman announcing that they are
11   going to run against me in the 18th Congressional
12   District.
13   Q.   Congressman, did you have any involvement
14   at all in drawing the congressional district map that
15   was passed into law in Springfield?
16        MR. PANOFF:  Object to the form.  Go ahead
17   and answer.
18        THE WITNESS:  No.
19        BY MR. BRUCE:
20   Q.   At any time during the redistricting
21   process, did you speak to any Illinois state
22   legislator regarding the congressional map that was

Page 11

1    passed into law?
2    A.   Well, any Illinois legislator?  Obviously
3    after the election in November of last year when it
4    became apparent who was going to control the House,
5    the Senate and the Governorship, there was a lot of
6    speculation among members of Congress, as well as
7    State Reps. and State Senators as to what a
8    Democratic House, Senate and Governor would do in
9    terms of drawing a map.
10        So I know that I had multiple
11   conversations with people who are in the state
12   legislature about the map process.  But if you're
13   speaking, did I -- was I privy to any insider
14   discussion or people who were actually drawing the
15   map, the answer would be no.
16        But as a member of Congress, I interact
17   with the roughly seven or eight State Representatives
18   roughly four State Senators who make up my
19   congressional district on at least a monthly basis,
20   meetings in my office when we are talking about
21   projects and issues relative to my district.  And so
22   I would have conversations with them obviously about

Page 12

1    my -- about the map.  About my district, what perhaps
2    could happen.
3         But again, no specific -- nothing
4    specific, I would say, with anyone of authority that
5    would be drawing the lines.
6    Q.   Did you know -- well, strike that.  Do you
7    know whether there were any Republican State
8    Representatives that were on the House, Illinois
9    House Redistricting Committee?
10   A.   I don't know that.  I actually don't know.
11   I mean, I think they had a -- I don't know.
12   Q.   Okay.  Do you know whether there were any
13   Republican Senate members of the Illinois State
14   Senate Redistricting Committee, do you know one way
15   or the other?
16   A.   If I were pressed to answer, I would say
17   that I think they had Republicans and Democrats on a
18   committee.  My view of that was that that committee
19   really didn't do much other than have hearings
20   because at the end of the day, they were having
21   hearings all through May.  I think they maybe had one
22   in Peoria.  I remember reading one in my local

Page 13

1    newspaper, they had one near me.
2         And -- but in the same time, I continued
3    to hear from my colleagues in the legislature that
4    the map was being drawn, and shortly thereafter at
5    the end of May, the map came out and there were
6    promised hearings where public comment would be able
7    to be made once the map was released and that never
8    came to fruition.
9         So I don't remember who was on the
10   committee or I want to say Kwame Raoul was the
11   chairman of the Senate committee maybe or something.
12   I know him because I served with him.  He took
13   President Obama's seat in the statehouse, or in the
14   State Senate, but I can't give you any names of
15   anybody on those committees.  I never attended any of
16   their hearings and that's all I know.
17   Q.   Based on that answer, I've got a follow-up
18   up on a couple of points.  First of all, I think we
19   digressed.  I was just asking you whether or not you
20   were aware of any Republicans on the State Senate
21   Redistricting Committee.  And from what I understand,
22   you're saying, you don't know of any?

Schock, Aaron                                                    October 6, 2011

Page 14

1      **A.   No.**
2      Q.   Is that correct?
3      **A.   No.**
4      Q.   Okay.  Did you ever -- strike that.  Did
5  you have any conversations that you can recall having
6  with any members of the Illinois legislators who were
7  on the state redistricting committees, whether it be
8  the House or the Senate?
9      **A.   Well, since I can't tell you who was on**
10 **the committee, I can't tell you whether I had any**
11 **conversations with them.  But if I talked to any**
12 **State Representative or State Senator about this**
13 **whole process, I never knew they were on the state**
14 **committee.**
15     Q.   I understand.  And I think you answered
16 the question.  You were aware that there were State
17 Redistricting Committee meetings being held within
18 your congressional district while the process was
19 ensuing, is that true?
20         MR. PANOFF:  Objection.  Mischaracterizes
21 testimony.
22         MR. BRUCE:  Wait a minute.  I'm sorry.

Page 15

1  Your lawyer objected, so I have to rephrase the
2  question.
3         BY MR. BRUCE:
4      Q.   I thought I heard you say that you read in
5  the newspaper that there was a Redistricting
6  Committee meeting in Peoria.  Is that true?
7         MR. PANOFF:  I believe he testified he
8  thought that there might have been, but feel free to
9  ask your question.
10         BY MR. BRUCE:
11     Q.   The record speaks for itself.  You can
12 answer, Congressman.
13         MR. PANOFF:  Let's read back the question,
14 please.
15         THE REPORTER:  "Question:  I thought I
16 heard you say that you read in the newspaper that
17 there was a Redistricting Committee meeting in
18 Peoria.  Is that true?"
19         THE WITNESS:  I was not aware of the
20 meetings until they took place.  I mean, I did not
21 get an invitation.  I did not read a formal notice.
22 I get clips out here as a member of Congress from all

Page 16

1  my newspapers, and I do remember reading one of the
2  stories in the paper about a redistricting hearing
3  taking place somewhere in my district.  And I think
4  it was in Peoria.  If it wasn't in Peoria, it would
5  have been in East Peoria, Pekin, somewhere that the
6  Peoria Journal Star would have covered it, but that's
7  what I recall.
8         BY MR. BRUCE:
9      Q.   Were you aware one way or the other
10 whether there were any websites for the House --
11 Illinois House Redistricting Committee?
12     **A.   No.**
13     Q.   Were you aware one way or the other
14 whether there was any websites for the Illinois State
15 Senate Redistricting Committee?
16     **A.   No.**
17     Q.   Suffice it to say, Congressman, you did
18 not personally attend any Illinois Redistricting
19 Committee meetings, is that true?
20     **A.   Correct.**
21     Q.   And did you ever at any time send any
22 representative or counsel to any Illinois

Page 17

1  Redistricting Committee meetings?
2      **A.   No.**
3      Q.   When did you first hire counsel with
4  respect to any issue concerning the redistricting of
5  the Congressional map?
6      **A.   It would have been late last year, early**
7  **this year.  I'm not -- do not recall the specific**
8  **date.**
9      Q.   Can you tell me the month?
10     **A.   Late, I mean December, January.**
11     Q.   Either December 2010 or January 2011 is
12 your best recollection as to when you first hired
13 counsel with respect to redistricting?  Is that true?
14     **A.   Correct.  Yes.**
15     Q.   And what was the -- what was the name of
16 the lawyer that you hired or lawyers?
17     **A.   Mayer Brown.**
18     Q.   And can you tell me the name of the lawyer
19 that you dealt with in December of 2010 and January
20 2011?
21         MR. PANOFF:  He is only asking for the
22 name, to the extent you remember.

Schock, Aaron                                    October 6, 2011

Page 18

1    THE WITNESS: Well, I don't -- I mean, I
2  don't even know. I mean, I don't -- I don't know who
3  we -- I mean, Tom. I don't know if -- you know,
4  we've had what, a couple of attorneys that have
5  worked with us. So I mean, it wasn't like there was
6  a formal --
7    MR. PANOFF: I'll caution you not to
8  divulge any of the content of any of the discussions.
9  He is just asking you if you remember any of the
10  names of the attorneys you met with. If you don't,
11  you don't. If you do, tell him.
12    THE WITNESS: Well, Ty Fahner is one that
13  I probably talked to the most at the beginning
14  because -- so I would say Ty Fahner.
15    BY MR. BRUCE:
16    Q.  Okay. And did any lawyer on your behalf
17  at any time submit any proposals, drafts, suggestions
18  or input to the Illinois redistricting committees
19  that were drawing the map?
20    MR. PANOFF: That can be answered yes or
21  no, to the best of your knowledge.
22    THE WITNESS: To the best of my knowledge,

Page 19

1  no.
2    BY MR. BRUCE:
3    Q.  And there was nothing precluding your
4  lawyers from providing suggestions or draft maps or
5  any input, to your knowledge, is that true?
6    MR. PANOFF: Object to the form. Again,
7  to the extent you know.
8    THE WITNESS: I would have no knowledge
9  because as I mentioned earlier in my testimony, I'm
10  not familiar with this process that you speak of that
11  took place until I read about a meeting that took
12  place in my district after the fact. So I'm not
13  familiar with --
14    BY MR. BRUCE:
15    Q.  I'm sorry. I didn't mean to interrupt
16  you, Congressman. Go ahead.
17    A.  No. That's it.
18    Q.  Okay. Well, are you suggesting that you
19  did not know that the Illinois legislature was going
20  through a process to redraw, among other things, the
21  Congressional map before it was actually drawn?
22    MR. PANOFF: Objection. Mischaracterizes

Page 20

1  prior testimony.
2    THE WITNESS: I'm not aware of any
3  opportunity for my legal representation to submit an
4  alternative map prior to the legislature acting.
5    BY MR. BRUCE:
6    Q.  Okay. That wasn't my question, though.
7  Did you -- did you understand that the Illinois
8  legislature was in the process of redrawing
9  congressional district lines?
10    A.  Yes.
11    Q.  And you knew that before the map was
12  passed into law, true?
13    A.  Correct.
14    Q.  Did you ever yourself make any effort to
15  appear before any of the committees that were drawing
16  the map?
17    MR. PANOFF: Are you asking whether he did
18  personally or through his attorneys?
19    MR. BRUCE: I think my question is very
20  clear. Ma'am, can I have it back, please?
21    THE REPORTER: "Question: Did you ever
22  yourself make any effort to appear before any of the

Page 21

1  committees that were drawing the map?"
2    MR. PANOFF: Object to the form. And to
3  the extent it's calling for anything regarding the
4  conduct of attorneys, I'll instruct you not to answer
5  as to the conduct of attorneys and communications
6  with the attorneys.
7    THE WITNESS: No. I did not.
8    BY MR. BRUCE:
9    Q.  All right. Well, your lawyer has now
10  brought up an excellent point. So now that he has,
11  I'm glad that he has, and we'll get into it. Did
12  Mayer Brown & Platt ever appear at any time at any of
13  the redistricting committee meetings on your behalf?
14    MR. PANOFF: Object to the form.
15  Foundation. Calls for speculation. To the extent
16  you know, feel free to answer.
17    THE WITNESS: Not that I'm aware.
18    BY MR. BRUCE:
19    Q.  All right. Did Mayer Brown & Platt ever
20  forward any maps to the Illinois Redistricting
21  Committee on your behalf, to your knowledge?
22    MR. PANOFF: Object to the form.

Schock, Aaron                                    October 6, 2011

Page 22

1   Foundation.  Calls for speculation.
2        THE WITNESS:  Not that I'm aware of.
3        BY MR. BRUCE:
4        Q.   Yeah.  I don't want you to speculate on
5   any of this.  I would believe that as a sitting U.S.
6   Congressman, if some law firm on your behalf sent a
7   map to Springfield, that you would be aware of it.
8   That's why I'm asking you.  That wasn't done?
9        MR. PANOFF:  That was a nice speech, but
10  let's stick to asking questions.  If you have a
11  question, ask your question.
12       MR. BRUCE:  Tom, you keep interrupting me.
13  Because of your objections, I'm having to ask
14  follow-up questions and frankly, I don't think that
15  your objections are meritorious, but we'll keep going
16  and try to get through this.
17       MR. PANOFF:  They have been perfectly
18  appropriate objections to inappropriate questions.
19  If you have appropriate questions, feel free to ask
20  them.
21       BY MR. BRUCE:
22       Q.   All right.  Congressman, are you aware of

Page 23

1   anyone on your behalf that appeared and offered any
2   input on any Illinois Redistricting Committee?
3        MR. PANOFF:  Object to the form.
4        THE WITNESS:  I am not aware of anyone
5   doing that.
6        BY MR. BRUCE:
7        Q.   Are you aware of any rule, regulation or
8   guideline of the Illinois Redistricting Committees
9   that would have barred your representatives from
10  providing input to the redistricting process?
11       MR. PANOFF:  Object to the form.
12       THE WITNESS:  As -- I'm not aware of it.
13  I'm not, as I mentioned, I am not aware of this whole
14  -- I'm not aware of any of the rules or guidelines or
15  process to this, so you know -- the answer is no.
16       BY MR. BRUCE:
17       Q.   Did you ever yourself make any inquiry to
18  determine whether or not you could provide input to
19  the Illinois Redistricting Committee as to how the
20  Congressional lines were going to be drawn?
21       MR. PANOFF:  Object to the form.
22       MR. BRUCE:  I'm sorry, Tom, what's wrong

Page 24

1   with the form?
2        MR. PANOFF:  It's vague.
3        MR. BRUCE:  Can I have the question back,
4   madam court reporter?
5        THE REPORTER:  "Question:  Did you ever
6   yourself make any inquiry to determine whether or not
7   you could provide input to the Illinois Redistricting
8   Committee as to how the Congressional lines were
9   going to be drawn?"
10       BY MR. BRUCE:
11       Q.   Congressman, do you understand that
12  question?
13       A.   Well, I do, but if I can say, how do I
14  inquire into a process that I'm not aware of?
15       Q.   Could you have called Springfield and
16  asked or looked on the Internet as to what the
17  process was?
18       MR. PANOFF:  Object to the form.
19       THE WITNESS:  Well, sure, I could have,
20  but I've already stated clearly earlier that I wasn't
21  aware of this process.  So if you ask me a hundred
22  questions about specifics of the process, I'm going

Page 25

1   to have to tell you I'm not aware of anything or
2   having done anything, because I'm not familiar with
3   the process.
4        So I guess -- I mean, I'm trying to be
5   helpful here, but no, I'm not aware of anyone doing
6   anything on my behalf in that process.  I didn't do
7   anything in that process, because I was not aware of
8   that process.  Period.
9        BY MR. BRUCE:
10       Q.   Congressman, were you aware that the
11  Illinois legislature was going through a process to
12  redraw the congressional district lines before the
13  map was passed into law?
14       A.   No.  I mean, I knew that the legislature
15  had to draw maps.  Okay.  But as to what their
16  process internally was going to be to do that, I was
17  not privy to it.
18       Q.   Fair enough.  And you didn't make any
19  inquiry to determine how they were going to do it?
20  Is that fair?
21       A.   That's -- yes.
22       Q.   Okay.  Now, I think I understood your

Schock, Aaron                                     October 6, 2011

Page 26

1  previous testimony with respect to conversations with
2  legislators, and I'm going to try and ask some broad
3  questions so that we can move on to the next topic.
4  If I heard you correctly, you did have conversations
5  during the time period the map process was being
6  developed with Illinois legislators, but nothing
7  specific that you can recall as you sit here today.
8  Is that true?
9      A.  Correct.
10         MR. PANOFF:  Object to the form.
11     BY MR. BRUCE:
12     Q.  Well, because your lawyer objected, I have
13  to ask a follow-up question.  Can you recall any
14  specific conversations that you've had with any
15  Illinois legislator during the time period that the
16  Illinois legislature was in the process of redrawing
17  the congressional district lines about the
18  redistricting process?
19     A.  No.
20     Q.  Am I correct, Congressman, that you have
21  no firsthand knowledge as to the reasons why the
22  congressional district map that was passed into law

Page 27

1  was drawn?
2         MR. PANOFF:  Object to the form.
3         THE WITNESS:  Who would -- let me ask you
4  this.  Who would be firsthand knowledge?  I mean, me
5  and the person with the pen?  Me -- I mean, what's --
6  help me understand what firsthand knowledge is.
7      BY MR. BRUCE:
8      Q.  Sure.  I can help you out.  Do you know
9  who drew the map?
10         MR. PANOFF:  You're referring to the map
11  enacted into law?
12         MR. BRUCE:  Yes, Tom -- I'll agree with
13  that.
14         THE WITNESS:  I don't know who
15  specifically drew the map.  No.
16     BY MR. BRUCE:
17     Q.  Okay.  Do you know anyone that was
18  involved in the map making process?
19     A.  Absolutely.  We -- I guess my assumption
20  is the legislative -- I mean -- the only conversation
21  I had relative to the map process was with Michael
22  Madigan's chief of staff, Tim Mapes.  And I was in

Page 28

1  Springfield because it's in my congressional district
2  and I was at the Capitol, and it was at a time period
3  when the -- it was in May of 2011.  And the
4  legislature had -- apparently the Speaker's office,
5  Mike Madigan's office had, I guess, settled their map
6  and they were calling in individual State
7  Representatives to show them their portion of the
8  newly drawn State House map.
9         And I was on the floor of the State House
10  talking to my former colleagues and every once in a
11  while one would get a phone call on their cell phone
12  asking them to come up to the Speaker's office.  And
13  they were getting to see their new map.
14         And the joke was the only people getting
15  called were the ones with really good State House
16  districts.  And so when they would get called by the
17  Speaker's office, they would kind of get excited to
18  go into the Speaker's office to see their new map.
19         And my understanding was Tim Mapes, the
20  Speaker's chief of staff was the one showing them the
21  map.  So I decided to go to the Speaker's office to
22  see perhaps if he had my map.  I know Tim Mapes very

Page 29

1  well.  Have a good relationship with him.  And did it
2  more as a joke, knowing that even if he had it, he
3  probably wouldn't show it to me, but I went to the
4  Speaker's office, told the receptionist that I was
5  there to see Mr. Mapes, that he had called me and
6  asked me to come in to see the map.
7         And they looked a little puzzled and said,
8  well, let me check.  And then they invited me back
9  and, you know, he said, oh, what honor do I have to
10  have you come in, what do you need.  And I said,
11  well, I understand you're passing out maps, I'd like
12  to get mine.
13         And he just kind of laughed and said, you
14  know that I'm not drawing your map.  And I said,
15  well, come on, you know who's got the map.  And -- or
16  you've got to have a copy of the map.  And he said,
17  no, he said we are leaving that up to President
18  Cullerton and Steve Israel with the DCCC.
19         And so I -- we chatted a little bit more
20  and then I left.  But you know, I did not have a
21  conversations with any other legislator that I would
22  consider that close to the time at which the map came

Schock, Aaron                                       October 6, 2011

Page 30

1  out before it did.
2        And then the only other legislator I spoke
3  with was after the map came out, or actually I think
4  the day that it was coming out, the Senate President,
5  John Cullerton, called me and basically just gave me
6  a heads up that he said, you know, something to the
7  effect of, look, Aaron, you know, we've decided that
8  we are not going to beat you.
9        So we are not going to waste our Democrat
10  voters on you, and congratulations, we are giving you
11  the most Republican district in the state. And I
12  said, well, I suppose I should say thank you and he
13  said, well, I was hoping you'd say something kind
14  about it, the map.
15        And I said, well, having not seen the map,
16  I'm assuming that if you -- if you've made my
17  district really good, you've probably, you know,
18  really done a doozy on my colleagues. And you know,
19  I'll want to see what this map looks like. But you
20  know -- so those are the two conversations I've had,
21  I think of any significance with anyone other than
22  casual conversations with individual legislators.

Page 31

1     Q.   Have you told me everything that you said
2  to Mr. Mapes and that Mr. Mapes said to you in that
3  conversation regarding the map?
4     A.   That I -- yes. That I recall.
5     Q.   I'm sorry. And would there be anything
6  that would refresh your recollection of that
7  conversation?
8     A.   No. That's everything that I recall.
9     Q.   And with respect to President Cullerton
10  and the conversation you testified to, have you now
11  told us everything that you remember about that
12  conversation that he said to you and that you said to
13  him?
14        MR. PANOFF:  Object to the form.
15        THE WITNESS:  That's all that I recall.
16  Yes.
17        BY MR. BRUCE:
18     Q.   Is there anything that would refresh your
19  recollection about that conversation?
20     A.   The only thing I guess I would add is I
21  was -- I do believe I asked specifically about Peoria
22  because a lot of my -- you know, again, not having

Page 32

1  any inside information, but only hearing what the
2  reporters were writing about what people were
3  speculating would happen in the map, the
4  redistricting process, the speculation was that
5  Peoria was going to be divided for the first time in
6  30 years.
7        And being from Peoria, that's where I've
8  grown up, that's where I live, I think I may have
9  said something like, you know, well, what happened to
10  Peoria. And -- but he -- and he basically said
11  something about, well, you live -- don't worry, you
12  live in the district. And I said, I know, but what
13  happens to the -- you know, my old State Rep.
14  district was the whole downtown of Peoria. And so I
15  said something about what happened to my old State
16  Rep. district or something like that. But that's the
17  only other thing I can recall other than what I've
18  already said with that conversation.
19     Q.   Okay. And was there anything -- did you
20  write down any notes with respect to that
21  conversation?
22     A.   No. I was in a car on my cell phone.

Page 33

1     Q.   And did you call him or did he call you?
2     A.   He called me. He called me on an
3  unidentified number and I tend not to answer those so
4  I waited until he left a message and I got the
5  voicemail and I called him back.
6     Q.   And you called him back where?
7     A.   I believe it was his cell phone number.
8     Q.   And you did that the day the map was
9  coming out?
10        MR. PANOFF:  Objection. Mischaracterizes
11  testimony.
12        BY MR. BRUCE:
13     Q.   I'm sorry. When did -- go ahead.
14     A.   I do not know the exact date, but he was
15  calling me with information obviously that I did not
16  have and it was right before it came out. So if it
17  wasn't the day that it came out, it might have been
18  the night before the day that it came out, but I
19  would say it was definitely within a 48-hour period
20  of that map coming out.
21     Q.   Have you now told me all of the
22  conversations that you can recall as you sit here

Schock, Aaron

October 6, 2011

Page 34

1    today with respect to anyone that may have had any
2    involvement with actually drawing the map?
3        MR. PANOFF: Object to the form.
4        THE WITNESS: Yes.
5        BY MR. BRUCE:
6        Q.   All right.  Did anyone at any time ever
7    tell you that the congressional district map lines
8    were drawn to intentionally discriminate against
9    Latinos?
10       MR. PANOFF: Object to the form and also,
11   Congressman, to the extent it calls for any
12   attorney-client communications, I'll instruct you not
13   to answer.  If you have any independent basis, feel
14   free to answer that question.
15       THE WITNESS: No.
16       BY MR. BRUCE:
17       Q.   Now, I think we digressed.  I was asking
18   you if you had any firsthand knowledge as to why
19   various lines, congressional lines were drawn with
20   respect to the districts.  Do you have any such
21   knowledge other than what may have been told to you
22   by Mr. Mapes or President Cullerton?

Page 35

1        A.   No.
2        Q.   Have you made any comments to the press
3    that you believe the congressional district map was
4    drawn purely for partisan reasons?
5        MR. PANOFF: Object to the form.
6        THE WITNESS: Not that I can recall.
7    Well, I don't know.  I don't know.  Not recently.
8    But you may --
9        BY MR. BRUCE:
10       Q.   Congressman, I'll ask you an easier
11   question.  Let me ask you this.  As you sit here
12   today, is it your opinion that the congressional
13   district map lines that were drawn and passed into
14   law in Springfield were drawn for purely partisan
15   reasons?
16       MR. PANOFF: Object to the form.
17       THE WITNESS: I have no idea.
18       BY MR. BRUCE:
19       Q.   Okay.
20       A.   I have no idea why they were drawn the way
21   they were.
22       Q.   Well, have you ever told anyone or made

Page 36

1    any statement to the press that it was a completely
2    partisan drawn map?
3        A.   I may have -- what I believe I have said
4    is that it was a completely partisan process, meaning
5    that when you're a legislator, you talk about
6    partisanship meaning one party.  So if the Democrats
7    control the entire process or if the Republicans
8    control the entire process, it's a partisan process.
9        So you know, this obviously was a very
10   partisan process.  It was a partisanly drawn map
11   because I'm not aware of any Republican legislator or
12   Congressman in Illinois having input into the
13   process.
14       Q.   I'm sorry.  I missed that last part.  You
15   were not aware of any what?
16       A.   I'm not aware of any Republicans having
17   input into the process.  In other words, I would
18   define it as a partisan process, because -- a
19   partisanly drawn map, because there is only one party
20   that's been involved and engaged in the process.
21       Q.   And you're saying that despite knowing or
22   not being able to identify any of the Republicans, if

Page 37

1    any, that were on the Senate or House Redistricting
2    Committee, is that true?
3        MR. PANOFF: Object to the form.
4        THE WITNESS: Well, again, I would say
5    that I would question whether or not any bipartisan
6    committee had anything to do with the final map.
7        BY MR. BRUCE:
8        Q.   Well, do you know?
9        A.   As I said --
10       MR. PANOFF: Object to the form.
11       THE WITNESS: I'm not aware of any
12   Republican, State Representative, State Senator or
13   Congressman who had anything to do with this map in
14   its final form.
15       BY MR. BRUCE:
16       Q.   Have you spoken to any Democratic United
17   States Congressman from Illinois or Congresswoman
18   either before or after the map was passed regarding
19   the map process?
20       A.   I would characterize most of my
21   conversations as -- as informal small talk.  I mean,
22   when I'm here during the week in Washington, D.C., I

Schock, Aaron

October 6, 2011

Page 38

1  see my colleagues from Illinois every day, so you
2  know, I have spoken with Jesse Jackson, Jr. since the
3  map came out because obviously he has made comments
4  publicly about the map.
5        And so, you know, I asked him what his
6  take was. I have a good relationship with my
7  colleagues here on both sides and so -- but you know,
8  nothing in great depth, I would say. More casual. I
9  mean, I didn't have a meeting with anybody in their
10  office and we sat down and went over the map. It was
11  more on the floor passing by.
12     Q. Right. Well, as you sit here today, can
13  you tell me the specifics of any conversation that
14  you had with Congressman Jackson about the map.
15     A. I know that his concern -- I do not
16  remember the exact language, but I know his concern
17  was specific to the dilution of his minority vote.
18  He felt that the legislature's map that they passed
19  unfairly diluted his once -- what he called a, you
20  know, stronghold of African-American votes. So he
21  was upset with the dilution of what his view was a
22  dilution of minority vote in his district.

Page 39

1     Q. And who was present in that -- present in
2  that conversation?
3     A. 434 other members of Congress.
4     Q. So it was on the House floor?
5     A. Yes. We -- yes. I mean, it was either
6  coming in off the floor or coming off the floor. But
7  you don't get a lot of chance to talk for very long
8  so it would have been during one of our series of
9  votes.
10     Q. Was there anything else that he said to
11  you or you said to him about the congressional map
12  other than what you've already told us here today?
13     MR. PANOFF: Object to the form.
14     THE WITNESS: Not that I'm aware of.
15     BY MR. BRUCE:
16     Q. Have you ever spoken to any staff member
17  of the National Republican Party or the National
18  Republican Campaign Committee about the map?
19     MR. PANOFF: Object to the form.
20     THE WITNESS: I have not had any formal
21  meetings that I can recall. I have had informal
22  conversations again in passing when people have said,

Page 40

1  you know, what are you hearing about the map. What
2  do you think of the map. Those kinds of things in
3  passing, but that's the extent of my conversations.
4     BY MR. BRUCE:
5     Q. With respect to your former district, as I
6  understand it, that included only parts of Adams
7  County -- and by former district, I mean the district
8  that you're representing today.
9     A. Correct.
10     Q. All right. And is the newly passed map
11  that was passed in Springfield, does that encompass
12  all of Adams County?
13     A. Yes, it does.
14     Q. And prior to the map being passed, was it
15  your desire that the entire Adams County be included
16  in the 18th Congressional District?
17     MR. PANOFF: Object to the form.
18     THE WITNESS: Well, for what it's worth,
19  my belief is that to the degree a congressional
20  district can include the entire community or an
21  entire county, it's to the betterment of the
22  constituents. So I would say it would be my -- Adams

Page 41

1  County was not any more specifically a priority for
2  me than any other county that I had a portion of, but
3  would I like to have had all of Adams County in my
4  map? Absolutely.
5     BY MR. BRUCE:
6     Q. And that's what happened, right?
7     A. Correct. But I have 20 counties -- I have
8  20 counties, and a number of them are portions of
9  counties. What I think is relevant is the largest
10  population center in my current district is the
11  greater Peoria area which accounts for half of my
12  congressional district's population under the current
13  map. And under the new map, that major population
14  center is now split up.
15     Q. And in fact, southern Peoria, as I
16  understand it, that was in your 18th Congressional
17  District and is no longer, is that correct?
18     A. If you -- yes. Correct. But not just
19  southern Peoria. I would argue parts of central
20  Peoria and even north Peoria depending on, you know,
21  what you consider the streets to be, but -- but yes.
22  Your definite urban core has been cut out along with

Schock, Aaron

October 6, 2011

Page 42

1 quite a bit going north.
2     Q.   In the southern --
3         MR. PANOFF: Devon, when you're at a good
4 breaking point, can we take a five-minute break? But
5 whenever you want to finish your line of questioning.
6         MR. BRUCE: Let me finish a couple of
7 these, and I'd be happy to, if that's okay.
8         BY MR. BRUCE:
9     Q.   Congressman, with respect to the southern
10 portion of Peoria that was no longer in the 18th
11 Congressional District, do you agree that that was a
12 majority of Democratic voters versus Republican
13 voters?
14         MR. PANOFF: Object to the form. Calls
15 for speculation.
16         BY MR. BRUCE:
17     Q.   Well, I don't want you to speculate.
18     A.   I would say this. It's a portion of the
19 city that I was elected to as a State Representative
20 as a Republican, so to speculate as to how they vote,
21 really I would argue, depends on who's running. But
22 it is an overwhelmingly majority -- it is an

Page 43

1 overwhelmingly minority demographic in that portion
2 of the city.
3     Q.   And that -- and that apportionment that
4 you're referring to is no longer in your 18th
5 Congressional District?
6     A.   That large minority population center has
7 been cut out of my district.
8     Q.   And last question on this line, then we
9 can take a break. Putnam County, was Putnam County
10 in the district that you currently represent today?
11     A.   Yes.
12     Q.   And is that in the new congressional
13 district that was drawn and passed into law in
14 Springfield?
15     A.   No.
16     Q.   And is that predominantly a Democratic
17 county?
18         MR. PANOFF: Object to the form. Calls
19 for speculation.
20         THE WITNESS: Well, I did not have -- when
21 you asked me about that county, was that a largely
22 Democratic county, I again do not know how that

Page 44

1 county votes, depending on the candidate. But I
2 didn't have the entire county. I don't remember the
3 exact squiggly lines, but I had a portion of Putnam
4 County. So I don't know how the whole county votes
5 traditionally on races. I can't really -- I mean, I
6 have no idea really.
7         MR. BRUCE: Why don't we take a break.
8         MR. PANOFF: Just five minutes or so. Is
9 that fine with you, Devon?
10         MR. BRUCE: Sure.
11         MR. PANOFF: Let's go off the record.
12         (Recess.)
13         BY MR. BRUCE:
14     Q.   Sir, did you agree with President
15 Cullerton after you saw the map that you had the most
16 Republican congressional district in the newly passed
17 map?
18         MR. PANOFF: Object to the form.
19         THE WITNESS: Based on what I know, yes.
20         BY MR. BRUCE:
21     Q.   All right. Is the 18th Congressional
22 District, in your opinion, as an experienced public

Page 45

1 official, is that district, the newly drawn 18th
2 Congressional District advantageous for a Republican
3 candidate such as yourself versus a Democratic
4 candidate?
5         MR. PANOFF: Object to the form. And,
6 Congressman, to the extent you have any independent
7 basis to answer that, feel free to do so. To the
8 extent it involves any attorney-client communication,
9 I would instruct you not to answer.
10         THE WITNESS: You asked me whether it
11 would be more advantageous for a Republican versus a
12 Democrat?
13         BY MR. BRUCE:
14     Q.   Yes, sir.
15     A.   Yes. I mean, my district, my current
16 district is not the most Republican district in the
17 state, so assuming that, yes, I would say it is more
18 advantageous for a Republican -- yes, short answer,
19 yes.
20     Q.   Okay. Thank you. Congressman, when we
21 took a break, and feel free -- in front of you should
22 be some maps, and this is not a memory test,

Schock, Aaron                                          October 6, 2011

---

Page 46

1  Congressman. To answer any of my questions today, if
2  you need to look at these maps, I believe what you
3  have in front of you are some maps which include the
4  map that was recently passed in Springfield into law.
5  There also should be a map that is your current 18th
6  Congressional District that you represent currently,
7  right?
8      A.  Yes.
9      Q.  Do you see that?
10     A.  Yes.
11     Q.   And then there is actually a bigger one.
12         MR. PANOFF:  Is that the next page?
13         BY MR. BRUCE:  Yes.  He has it in front of
14  you.  And then lastly there is a map that has been
15  proffered by you and your fellow Congressmen.  Do you
16  see that?
17         MR. PANOFF:  No.  There is an intermediate
18  map.  We have four maps before the one that we've
19  introduced.  Do you only have three, Devon?
20         MR. BRUCE:  I don't know.
21         MR. PANOFF:  Why don't we go through them
22  so that we are on the same page.  The first map you

Page 47

1  have --
2         THE WITNESS:  I have a side by side.  Is
3  that what you wanted me to look at?
4         MR. BRUCE:  Not yet.  I'm going to ask you
5  some questions first about the map that you're
6  currently representing, the district.
7         BY MR. BRUCE:
8      Q.  Do you have that in front of you?
9      A.  Yes.
10     Q.   As I look at this map, Congressman, in
11  terms of the district that you currently represent,
12  your district only has part of Pike, Adams, Brown
13  Knox, Woodford, Macon and Sangamon Counties, is that
14  correct?
15         MR. PANOFF:  Object to the form.
16         THE WITNESS:  Correct.
17         MR. PANOFF:  Do you know where he is?
18         THE WITNESS:  Yes.  You're talking about
19  the current map?
20         BY MR. BRUCE:
21     Q.  I am.
22     A.  Yes.

Page 48

1      Q.   Okay.  With respect to the map that's
2  being proffered by you and your fellow Republican
3  Congressman in this lawsuit, have you ever seen that
4  map before today?
5         MR. PANOFF:  You can answer that yes or
6  no.
7         THE WITNESS:  Yes.
8         BY MR. BRUCE:
9      Q.   Okay.  Do you know who drew the map that's
10  being offered by you and your fellow Republican
11  Congressman?
12         MR. PANOFF:  Congressman, to the extent
13  that calls for attorney-client communications, I'm
14  going to instruct you not to answer.  If you have an
15  independent basis, please feel free to answer it, but
16  if everything that you know came from attorney-client
17  communications, I'll instruct you not to answer.
18         THE WITNESS:  Yes.  All I know is what I
19  got from my attorneys, so I have no -- outside of my
20  attorney's communication, I have no other source of
21  information.
22         BY MR. BRUCE:

Page 49

1      Q.   And would your answer be the same with
2  respect to the demographic make-up of the map that is
3  being proffered by you and your fellow Republican
4  Congressmen in this case?
5         MR. PANOFF:  If I may, he is asking if all
6  the demographic information regarding that map came
7  from communications from counsel.
8         THE WITNESS:  Yes.
9         BY MR. BRUCE:
10     Q.   Did you ever at any time see any draft map
11  of the map that's being proffered in this lawsuit?
12         MR. PANOFF:  I'm going to instruct you not
13  to answer to the extent it involves attorney-client
14  communications.
15         THE WITNESS:  The only -- the only
16  information I would have would come from my
17  attorneys.  I don't have any outside information.
18         BY MR. BRUCE:
19     Q.   And under the map that's being proffered
20  in this lawsuit, which congressional district in that
21  map would you run in?
22         MR. PANOFF:  Objection.  Calls for

---

Schock, Aaron                                    October 6, 2011

---

Page 50

1  speculation.
2       BY MR. BRUCE:
3       Q.  If you know.
4       A.  Yes.  As I stated earlier, I live in the
5  current 18th District under the Democrats-passed map.
6  I live in the 18th District, and under the Committee
7  for a Fair and Balanced Map's map, I live in the 18th
8  District.  So my intention is to run in the 18th
9  Congressional District.
10      Q.  Can you tell me, is there any member of
11 the Democratic Party that's a plaintiff in this cause
12 of action that you're bringing?
13      A.  Not that I'm aware of.
14      Q.  All right.  And this Committee for a Fair
15 and Balanced Map, where are they located physically?
16 What's their address?
17      MR. PANOFF:  Object to the form.  Calls
18 for speculation.
19      THE WITNESS:  I don't know of any address.
20      BY MR. BRUCE:
21      Q.  Can you tell me the head of the Committee
22 for a Fair and Balanced Map?

---

Page 51

1       MR. PANOFF:  Objection.  Foundation.
2  Calls for speculation.
3       THE WITNESS:  I believe it's -- I believe
4  the chairperson is Lynn Martin.  But then there is a
5  whole bunch of people, I think, that make it up.
6       BY MR. BRUCE:
7       Q.  And tell me who you understand makes it
8  up?
9       A.  Well, I'm most familiar with the former
10 members of Congress, so I would say Lynn Martin, I
11 believe Denny Hastert and I believe Tom Ewing.  But
12 that's all I can --
13      Q.  I'm sorry.  I didn't mean to interrupt
14 you, Congressman.
15      A.  That's all I can recall right now.
16      Q.  I take it at some point in time, you've
17 seen a list of the members of the committee, is that
18 correct?
19      MR. PANOFF:  Object to the form.
20      THE WITNESS:  Yes.  I've seen a list I'm
21 sure at some point, but I do not recall anyone else
22 on the list.  I think it was a rather -- I mean,

---

Page 52

1  there was significantly more than the four or five
2  names that I can come up with.
3       BY MR. BRUCE:
4       Q.  Were there any members of the Committee
5  for a Fair and Balanced Map that you know to be a
6  member of the Democratic Party?
7       MR. PANOFF:  Object to the form.  Calls
8  for speculation.
9       THE WITNESS:  I did not recognize most of
10 those names.
11      BY MR. BRUCE:
12      Q.  How many meetings of the Committee for a
13 Fair and Balanced Map have you been to?
14      MR. PANOFF:  Object to the form.
15      THE WITNESS:  I'm not aware of any
16 official meetings that I've been to.
17      BY MR. BRUCE:
18      Q.  How many fundraisers have you been to?
19      MR. PANOFF:  You mean for the committee?
20      BY MR. BRUCE:
21      Q.  Sure.
22      A.  I believe I've been to one.

---

Page 53

1       Q.  And where was that?
2       A.  It was in a -- I believe a suburb of
3  Chicago.
4       Q.  And where was it physically located, in a
5  restaurant?
6       A.  I believe it was at the home -- it was at
7  a private home.
8       Q.  And whose home was that?
9       A.  I do not remember his name.
10      Q.  Well, did you get an invitation to go
11 there?
12      A.  Yes.  But I don't remember.  I actually
13 believe I was on the invitation.  I don't know.  I
14 don't remember.
15      Q.  And can you tell me who did you recognize
16 at the fundraiser that was a Democrat?
17      MR. PANOFF:  Object to the form.  Calls
18 for speculation.
19      THE WITNESS:  I -- you're assuming I
20 recognized anyone.  I do not know people's parties.
21 I mean, first of all, what does a Democrat look like?
22      BY MR. BRUCE:

---

Schock, Aaron                                October 6, 2011

**Page 54**

1    Q.   Did you recognize --
2    A.   I mean, you're talking about somebody that
3    never under any circumstances under any -- under any
4    reason would ever vote for a Republican or what?
5    Q.   Yes.  Well, you bring up a good point.
6    Did you see a lot of current and former elected
7    officials there at the fundraiser?
8        MR. PANOFF:  Object to the form.
9        THE WITNESS:  I saw many of my colleagues
10   in the House that I serve with, but they were by far
11   outnumbered by the people who were there in
12   attendance paying, I'm assuming.  In other words, it
13   wasn't -- it wasn't a party for elected officials.
14       BY MR. BRUCE:
15   Q.   All right.  How many of your fellow
16   colleagues from the House were there at the party?
17       MR. PANOFF:  Object to form and
18   foundation.
19       THE WITNESS:  I would say again not
20   knowing exactly, I would say, first of all, I didn't
21   see everybody that was at the party, so I would say
22   there were probably four, five maybe.

**Page 55**

1        BY MR. BRUCE:
2    Q.   And which of those members were Democrats?
3        MR. PANOFF:  Object to the form.
4    Foundation.
5        THE WITNESS:  I do not recall seeing one
6    of my Democratic House colleagues at the event.
7        BY MR. BRUCE:
8    Q.   Do you know if they were invited?
9        MR. PANOFF:  Object to form.  Foundation.
10       THE WITNESS:  I do not know that.
11       BY MR. BRUCE:
12   Q.   And when was this party in the suburbs?
13   A.   I would say in the month of August, of
14   2011.
15   Q.   I'd like you to tell me the names of the
16   employees of the Committee for a Fair and Balanced
17   Map that you're aware of.
18       MR. PANOFF:  Object to the form.
19   Foundation.
20       THE WITNESS:  I'm not aware -- I have not
21   had interaction with the employees that I'm aware of.
22       BY MR. BRUCE:

**Page 56**

1    Q.   Now, are you a member of the Committee for
2    a Fair and Balanced Map yourself?
3    A.   Yes.
4    Q.   Or do you know?  Okay.  Can you tell me,
5    other than Lynn Martin, who are the officers of the
6    committee?
7        MR. PANOFF:  Object to the form.
8    Foundation.  Calls for speculation.
9        THE WITNESS:  I'm not aware.
10       BY MR. BRUCE:
11   Q.   Can you tell me who the vice chairperson
12   is or the treasurer or the secretary of this
13   committee that you are a member of?
14       MR. PANOFF:  Object to form.  Form.
15   Foundation.  Calls for speculation.  Asked and
16   answered.
17       BY MR. BRUCE:
18   Q.   Go ahead.
19   A.   Well, those are the officers, correct?
20   Q.   Typically in an organization, right, you
21   have a chairperson or president, you have vice
22   president, chairperson, treasurer, secretary.  I'm

**Page 57**

1    just asking, other than Lynn Martin, who else do you
2    know fills those roles?
3        MR. PANOFF:  Same objections.
4        THE WITNESS:  No one.  I don't know.
5        BY MR. BRUCE:
6    Q.   Was it your feeling that the -- based upon
7    your experience in elected office and not based on
8    anything that you have learned from your lawyers, is
9    it your opinion that the congressional district lines
10   that were drawn and passed into law in the new map
11   were drawn for partisan reasons?
12       MR. PANOFF:  Object to the form and
13   foundation, and I'd reiterate in his question, he is
14   not asking for any communications with counsel.
15       THE WITNESS:  I have no idea why the lines
16   were drawn the way they were.
17       BY MR. BRUCE:
18   Q.   Other than what your lawyers have told you
19   and other than what you and I have discussed here
20   today in your deposition, do you have any other
21   knowledge about how the congressional district map
22   that was passed into law in Springfield was made?

Schock, Aaron

October 6, 2011

```
                                    Page 58
 1      A.  No.
 2      Q.  Congressman, thank you for your time
 3  today.  I appreciate it.  And look forward to seeing
 4  you again sometime.
 5      MR. PANOFF:  We'll reserve on signature.
 6      MR. BRUCE:  Thank you.
 7      (Whereupon, at 4:42 p.m., the taking of
 8  the deposition ceased.)
 9
10      _____
11          Signature of the Witness
12
13  SUBSCRIBED AND SWORN to before me this _____ day
14  of _____, 2011.
15
16      _____
17          NOTARY PUBLIC
18  My Commission expires: _____
19
20
21
22
```

```
 1              IN THE UNITED STATES DISTRICT COURT
            FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                      EASTERN DIVISION

 3

 4    COMMITTEE FOR A FAIR AND      )
      BALANCED MAP, JUDY            )
 5    BIGGERT, ROBERT J. DOLD,      )
      RANDY HULTGREN, ADAM          )
 6    KINZINGER, DONALD             )
      MANZULLO, PETER J. ROSKAM,    )
 7    BOBBY SCHILLING, AARON        )
      SCHOCK, JOHN M. SHIMKUS,      )
 8    JOE WALSH, RALPH RANGEL,      )
      LOU SANDOVAL, LUIS SANABRIA,  )
 9    MICHELLE CABALLERO,           )
      EDMUND BREZINSKI, and         )
10    LAURA WAXWEILER,              )
                                    )  No.  1:11-cv-5065
11              Plaintiffs,         )
                                    )
12         vs.                      )
                                    )
13    ILLINOIS STATE BOARD OF       )
      ELECTIONS, WILLIAM A.         )
14    MCGUFFAGE, JESSE R.           )
      SMART, BRYAN A. SCHNEIDER,    )
15    BETTY J. COFFRIN,             )
      HAROLD D. BYERS,              )
16    JUDITH C. RICE,               )
      CHARLES W. SCHOLZ, and        )
17    ERNEST L. GOWEN,              )
                                    )
18              Defendants.         )

19         The videotaped deposition of

20    CONGRESSMAN PETER ROSKAM, called by the Defendants,

21    for examination, taken pursuant to notice, taken

22    before CARYL L. HARDY, a Notary Public within and

23    for the County of Cook, State of Illinois, and a

24    Certified Shorthand Reporter of said state, ta
```

RECEIVED
OCT 07 2011
POWER, ROGERS & SMITH, P.C.

EXHIBIT
PENGAD 800-631-6989

Page 2

1    at 70 West Madison Street, 55th Floor, Chicago,
2    Illinois, at the hour of 2:47 p.m., on the 29th day
3    of September, A.D., 2011.
4
5    A P P E A R A N C E S:
6
7        MAYER BROWN, LLP,
         71 South Wacker Drive
8        Chicago, Illinois  60606
         (312) 782-0600
9    BY:  MS. LORI E. LIGHTFOOT and
         MR. THOMAS V. PANOFF,
10
         Appeared on behalf of the Plaintiffs;
11
12       POWER, ROGERS, & SMITH, P.C.,
         70 West Madison Street
13       55th Floor
         Chicago, Illinois  60602
14       (312) 236-9381
         BY:  MR. DEVON C. BRUCE,
15
         Appeared on behalf of the Defendants.
16
17   ALSO PRESENT:
18       Mr. Jim Ross - Videographer
19
20
21
22
23
24

Page 3

1             I N D E X
2    EXAMINATION OF CONGRESSMAN PETER ROSKAM      PAGE
3    By Mr. Bruce.................................. 5
4
5
6    EXHIBITS MARKED
7    Roskam Deposition Exhibit No. 1...............27
         Roskam Deposition Exhibit No. 2...............27
8        Roskam Deposition Exhibit No. 3...............43
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

Page 4

1        THE VIDEOGRAPHER:  Recording.
2        For the record, my name is Jim Ross of
3    Video Instanter.  I am the videorecording device
4    operator for this deposition.  My business address
5    is 161 North Clark Street, Suite 4975, Chicago,
6    Illinois, 60601.
7        This deposition is being videorecorded
8    pursuant to Federal Rule 30 and all other
9    applicable rules.
10       We are at 70 West Madison Street,
11   Suite 5500, Chicago, Illinois, 60601, to take the
12   videotaped deposition of Peter Roskam in the matter
13   of the Committee for a Fair and Balanced Map,
14   et al., versus the Illinois State Board of
15   Elections, et al., case number 11-5065 in the
16   United States District Court for the Northern
17   District of Illinois, Eastern Division.  Today's
18   date is September 29th, 2011.  The time is
19   2:47 p.m.
20       This deposition is being videotaped on
21   behalf of the Defendant.  It is being taken at the
22   instance of the Defendant.
23       Will the attorneys present please
24   introduce themselves for the record?

Page 5

1        MR. BRUCE:  Devon Bruce as Special
2    Assistant Attorney General on behalf of the
3    Defendants.
4        MR. PANOFF:  Tom Panoff on behalf of the
5    Plaintiffs and the witness.
6        MS. LIGHTFOOT:  Lori Lightfoot on behalf
7    of the Plaintiffs and Congressman Roskam.
8        THE VIDEOGRAPHER:  Will the court reporter
9    please swear in the witness?
10       (The witness was duly sworn.)
11       MR. BRUCE:  Let the record reflect that
12   this is the deposition of Congressman Peter Roskam
13   taken pursuant to the Federal Rules of Civil
14   Procedure and continued by the parties pursuant to
15   notice.
16       CONGRESSMAN PETER ROSKAM,
17   called as a witness herein, having been first duly
18   sworn, was examined upon oral interrogatories, and
19   testified as follows:
20            DIRECT EXAMINATION
21   BY MR. BRUCE:
22   Q.   Congressman, could you please state your
23   first and last name and spell your last name for
24   the record, please?

Page 6

1    A.  Peter Roskam, R-o-s-k-a-m.

2    Q.  It's my understanding, Congressman, that
3  you've been through the deposition process on a
4  number of occasions in the past; is that true?

5    A.  That's true.

6    Q.  All right.  I'm just going to ask you a
7  series of questions today.  You are one of the
8  individuals that has brought, as I understand it, a
9  lawsuit against the Illinois Board of Elections,
10  and as a result, I asked that -- and you've been
11  identified as a witness that may testify at trial
12  which is why I asked to take your deposition here
13  today.

14      If at any time you don't understand a
15  question that I ask, just tell me, and I'll be
16  happy to rephrase it.

17      We can take a break at any time as long as
18  there's not a question pending.

19      Despite the fact that the deposition is
20  being videotaped, it's important that you answer
21  out loud and audibly for the court reporter.

22      And I don't have any doubt, Congressman,
23  that you are going to anticipate the vast majority
24  of my questions before I finish asking them, but

Page 7

1  it's important that you let me finish asking my
2  question before you begin your answer.  Otherwise,
3  we'll be talking over one other.  Okay?

4    A.  Okay.

5    Q.  And lastly, if at any time you don't
6  understand a question, just tell me, and I'll be
7  happy to rephrase it.

8    A.  Understand.

9    Q.  Let me just get some general background
10  information.

11      What city do you live in, Congressman?

12    A.  Wheaton, Illinois.

13    Q.  Okay.  And do you have any plans on moving
14  from Wheaton anytime in the next year?

15    A.  No.

16    Q.  And why don't you tell me a little bit
17  about your background?

18      Where did you go to undergraduate?

19    A.  Undergraduate degree from the University
20  of Illinois at Champaign, a law degree from IIT
21  Chicago Kent College of Law; spent time on Capitol
22  Hill as a staffer and served in the Illinois House,
23  Illinois Senate, and now a U.S. representative.

24    Q.  And did you practice any election law when

Page 8

1  you were a practicing attorney?

2    A.  No.

3    Q.  Were you involved in any redistricting
4  litigation during the time that you were a
5  practicing attorney?

6    A.  No.

7    Q.  Have you been named in any other
8  redistricting litigation other than the instant
9  case that we're here for today?

10    A.  No.

11    Q.  With respect to your Congressional
12  experience, I just want to briefly talk about your
13  role in government, and I want to go back to when
14  you were first elected to office.

15      When was that that you were first elected?

16    A.  To any office?

17    Q.  Yes, sir.

18    A.  I was elected to the Illinois House in
19  1992.

20    Q.  And then you served in the House for how
21  many terms?

22    A.  I served three terms.

23    Q.  Okay.  And so that brings us up to what,
24  1998?

Page 9

1    A.  1999.  Then I ran unsuccessfully for the
2  U.S. House of Representatives.  I was out of public
3  service for a year.  I was appointed to the state
4  Senate in 2000.

5    Q.  And with respect to the unsuccessful
6  election, what district did you run in at that
7  time?

8    A.  The 13th.

9    Q.  And who was it that beat you -- was it a
10  primary?

11    A.  It was a primary.  I was beat by a fellow
12  Plaintiff, Judy Biggert.

13    Q.  You and she are friends now.

14      In any event, you were appointed to the
15  state Senate -- I'm sorry -- Congressman, at what
16  time?

17    A.  January 2000.

18    Q.  And then what happened after that?

19    A.  I ran for the United States House of
20  Representatives in the sixth district.

21    Q.  In what year?

22    A.  2006.

23    Q.  And you won?

24    A.  That's right.

Page 10

1   Q.   And who was your general opponent that
2   year, do you remember?
3      A.   Tammy Duckworth.
4      Q.   And have you served in the Congress since
5   that time in 2006?
6      A.   Yes.
7      Q.   And you're currently in leadership?
8      A.   Yes.
9      Q.   In what position?
10     A.   Chief deputy whip.
11     Q.   Have you always been a Congressman sixth
12  district?
13     A.   Yes.
14     Q.   Now, sir, did you play any role at all in
15  the redistricting process for the map that was
16  passed in Illinois in 2011?
17     MS. LIGHTFOOT:  Object to the form.
18  BY THE WITNESS:
19     A.   Could you give me -- what are you asking
20  me?  I mean, it's a very broad question.
21  BY MR. BRUCE:
22     Q.   It is a broad question and I -- I'm trying
23  to -- I don't want to take up your time,
24  Congressman.

Page 11

1      A.   I've got time.
2      Q.   Okay.  Did you yourself play any firsthand
3   role in drawing any of the lines on the
4   Congressional map that was ultimately adopted in
5   2011?
6      A.   By firsthand role, do you mean offering
7   amendments as a member of the Illinois General
8   Assembly or the Illinois Senate?  No.  I wasn't a
9   member of the legislature.
10     Q.   And that's what I understood.  The map
11  that you're taking issue with was passed by the
12  Illinois legislature and signed by the Illinois
13  governor; is that correct?
14     A.   That's correct.
15     Q.   Okay.  What I'm getting at -- and I'm not
16  trying to be, you know, ev- -- I'm just trying to
17  directly address the issue.  Did you have any role
18  at all in creating the map that was ultimately
19  adopted?
20     A.   No.
21     Q.   Okay.  Did you speak to anyone that had a
22  direct role in adopting the map that you're taking
23  issue with?
24     MS. LIGHTFOOT:  Object to the form.

Page 12

1   BY THE WITNESS:
2      A.   Yes.
3   BY MR. BRUCE:
4      Q.   Okay.  Who did you speak to?
5      A.   Senate President John Cullerton.
6      Q.   Okay.  Anyone else?
7      A.   Not that I recall.
8      Q.   And was that -- when was the
9   conversation -- did you have one conversation with
10  President Cullerton or more than one?
11     A.   More than one.
12     Q.   How many?
13     A.   Two to my recollection.
14     Q.   And were those in person or over the
15  phone?
16     A.   Over the phone.
17     Q.   Both of them?
18     A.   Both of them.
19     Q.   And when was the first conversation?
20     A.   I don't recall.
21     Q.   Do you have any notes of that conversation?
22     A.   No.
23     Q.   Did you have any -- at any time have you
24  either generated or received any correspondence,

Page 13

1   emails, notes, or any other tangible item with
2   respect to the redistricting of the map that you're
3   now taking issue with --
4      A.   No.
5      Q.   -- other than possibly from counsel?  Go
6   ahead.
7      MS. LIGHTFOOT:  Can I just have that
8   question read back?
9      (Record read.)
10  BY MR. BRUCE:
11     Q.   You understood my question other than with
12  possibly your counsel?
13     A.   I understood it.  The answer is no.
14     Q.   Okay.  Back to the conversation that you
15  had with President Cullerton, the first
16  conversation, do you remember what month and year
17  that occurred in?
18     A.   I recall that it was shortly before the
19  map was passed by the General Assembly.
20     Q.   Hours, days, weeks?
21     A.   In the days/weeks.
22     Q.   And you knew President Cullerton from your
23  time in the Senate?
24     A.   Yes.

Page 14

1    Q.   Who initiated the phone call?
2    A.   Senator Cullerton.
3    Q.   And what did he say to you and what did
4  you say to him in that conversation?
5    A.   My recollection is that he proposed a
6  version of the map that would have been favorable
7  to me personally; that he was interested in my
8  support for that and also for me encouraging other
9  Republicans to vote in favor of that map.
10        I recall that he said he had been in
11  contact with the Democratic Congressional Campaign
12  Committee, and I recall that he said that, in his
13  opinion, Judy Biggert, Congresswoman Biggert, was
14  gone under any version of the map.
15    Q.   Do you remember anything else that he said
16  to you in that conversation?
17    A.   He said that he had been in touch with
18  Congressman Randy Hultgren.  And that's my
19  recollection.
20    Q.   What did you say to President Cullerton in
21  that first conversation?
22    A.   I asked him about the map.
23    Q.   Did he ever provide you, either over fax
24  or in the mail or in an email, any -- any map or

Page 15

1  draft map for you to look at?
2    A.   No.
3    Q.   You asked him about the map.  And what did
4  he say, do you remember?
5    A.   He offered to have someone come and look
6  at the map in Springfield.
7    Q.   And what did you say to that?
8    A.   I said I'd think about it and would circle
9  back and possibly send someone to Springfield to
10  look at the map.
11    Q.   Did you do that ultimately?
12    A.   I did.
13    Q.   Okay.  Who did you send?
14    A.   I sent my chief of staff, Steven Moore.
15    Q.   M-o-o-r-e?
16    A.   That's right.
17    Q.   Is there anything else that you remember
18  about that conversation with President Cullerton
19  that you have not told us here today?
20    A.   Not that I recall.
21    Q.   Do you know, for example, what was it
22  about the map that Congressman -- that President
23  Cullerton was talking to you about that was
24  favorable to you personally?

Page 16

1    A.   A map that, in his opinion -- a district
2  that, in his opinion, I could win.  He expressed a
3  certain amount of flexibility in how the -- how the
4  districts were being fashioned and that if I was
5  able to get Republican support for the map, then he
6  would be able to put me in a map -- put me in a
7  district that was favorable to me.
8    Q.   Well, that was nice of him.
9        Is there anything else about that
10  conversation that you have -- that you recall that
11  you've not told me about here today?
12    A.   Not that I recall.
13    Q.   Is there anything that would refresh your
14  recollection?
15    A.   No.
16    Q.   You had a subsequent conversation with
17  President Cullerton?
18    A.   I did.
19    Q.   What month and year was that?  It was
20  2011.
21    A.   It was 2011.
22    Q.   Yeah.  What month was that?
23    A.   It was subsequent, so within the same time
24  frame generally.

Page 17

1    Q.   So would this have all been occurring in
2  March or April or May?  I mean, can you narrow it
3  down for a month?
4    A.   I -- it was imminent to the House and the
5  Senate acting.  I don't have a recollection as we
6  sit here today about what -- what month or what
7  week that was, but it was -- it was imminent to
8  that.
9    Q.   Within days?
10    A.   Within days.
11    Q.   Okay.  And by the way, was anyone in your
12  office when you spoke to Congress- -- President
13  Cullerton?
14    A.   Not on the first conversation that --
15    Q.   Okay.
16    A.   -- we just talked about.
17    Q.   Okay.  And do you know if you were on the
18  speakerphone or if there was anyone else that was a
19  witness to the conversation at his end of the
20  telephone?
21    A.   I don't know.
22    Q.   All right.  Tell me about the second
23  conversation.  Did he call you, or did you call
24  him?

1    A.   Representative Randy Hultgren and I called
2  President Cullerton.
3    Q.   From Washington?
4    A.   From Washington.
5    Q.   And was there any -- were you on a
6  speakerphone?
7    A.   I don't recall.
8    Q.   Okay. And what did you say to President
9  Cullerton in that telephone conversation?
10    A.   We essentially declined his offer.
11    Q.   You and Congressman Hultgren?
12    A.   That's right.
13    Q.   Why?
14    A.   It didn't seem like a good idea.
15    Q.   What didn't?
16    A.   The offer to find Republican votes on
17  President Cullerton's proposed map.
18    Q.   And you understood he was willing to work
19  with you and Congressman Hultgren in terms of
20  moving the district lines based upon the original
21  conversation?
22    A.   Yes.
23    Q.   Other than declining his offer, can you
24  tell me anything else that you said to him or that

1  Congressman Hultgren said to President Cullerton in
2  that second conversation that you had?
3    A.   There was a reluctance that we expressed
4  about not being able to see the map in its
5  totality.  In other words, we were shown
6  information only about the proposed districts that
7  we would run in, but there was no sense of seeing
8  the larger picture.
9    Q.   Anything else that you said to President
10  Cullerton or that he said to you that you can
11  recall in that conversation?
12    A.   Not that I recall.
13    Q.   Would there be anything that would refresh
14  your recollection?
15    A.   No.
16    Q.   And at this point, had you seen any map or
17  draft map?
18    A.   Any map from the -- from Senator Cullerton?
19    Q.   Yes, sir.
20    A.   No.
21    Q.   Well, had you seen any map from anyone at
22  this point?
23    A.   No.
24    Q.   Now, other than President Cullerton, did

1  you ever speak to anyone that you understand that
2  had any involvement at all -- strike that.
3    Did you ever speak to any other state
4  legislator about the redistricting process other
5  than two those conversations that you had with
6  President Cullerton?
7    A.   No.
8    Q.   Did you ever speak to any state
9  legislative staff at any time regarding this
10  legislative process?
11    A.   No.
12    Q.   And by that, I mean the redistricting
13  process.
14    A.   I understood.
15    Q.   Okay.  You told me about your chief of
16  staff going down to Springfield?
17    A.   That's right.
18    Q.   Did he do that once or more than once?
19    A.   Once.
20    Q.   And did he obtain any documents for you to
21  review?
22    A.   No.
23    Q.   And I take it you talked to Mr. Moore
24  either while he was down there or after he came

1  back?
2    A.   Correct.
3    Q.   And what did he -- did he call you while
4  he was there or after he came back?
5    A.   My memory is that he called me while he
6  was there.
7    Q.   All right.  What did he say to you and
8  what did you say to him in that conversation?
9    A.   I don't recall the details.  I recall the
10  essence which was he was invited in by Senator
11  Cullerton to what was described as a map room.  He
12  was able to see only the proposed sixth district
13  map and was not able to see the totality of the
14  map.  He was not allowed to take notes.  And
15  that -- that's the -- that's the essence of the
16  conversation.
17    Q.   Do you remember anything else that
18  Mr. Moore said to you or you said to him about his
19  involvement in seeing the proposed sixth district
20  map?
21    A.   No.
22    Q.   Do you remember any comments he made about
23  where the boundaries were or anything of that
24  nature?

Page 22

1  A.  No.
2  Q.  To your knowledge, did Mr. Moore speak to
3  anyone in Springfield at any time himself about the
4  redistricting and how the lines were drawn?
5  MS. LIGHTFOOT:  Beyond what he's just
6  testified to?
7  MR. BRUCE:  Well, I don't think he
8  testified that he talked to anybody.
9  BY MR. BRUCE:
10  Q.  Did Mr. Moore, to your knowledge, talk to
11  anybody when he was in President Cullerton's --
12  A.  I don't know.
13  Q.  Okay.  I --
14  A.  I interrupted.  Go ahead and ask the
15  question.
16  Q.  Yeah.  I understood you to say that
17  Mr. Moore was shown the proposed sixth district map
18  in the map room; is that correct?
19  A.  That's my understanding.
20  Q.  That's what he told you?
21  A.  That's correct.
22  Q.  Was it your understanding that Mr. Moore
23  spent any time talking to President Cullerton about
24  the substance of the map issue at all?

Page 23

1  A.  I understand that they had a conversation.
2  I don't know the duration of it.
3  Q.  Okay.  And you don't know what they talked
4  about?
5  A.  They talked about the -- what I
6  essentially relayed to you a couple minutes ago.
7  Q.  He's able to see the proposed map and he
8  can't take any notes?
9  A.  That's right.
10  Q.  Anything else that you recall that
11  Mr. Moore told you?
12  A.  Not that I can recall.
13  Q.  Sir, do you know who -- which individuals
14  ultimately drew the map that was adopted in
15  Springfield and passed into law?
16  A.  I don't know.
17  Q.  Do you know the intent of any of the
18  individuals in terms of why they put various
19  Congressional lines and boundaries in the map that
20  was ultimately adopted?
21  MS. LIGHTFOOT:  Object.
22  BY THE WITNESS:
23  A.  Are you asking am I in the minds of those
24  people?

Page 24

1  BY MR. BRUCE:
2  Q.  No.  Do you have any firsthand knowledge
3  as to the intent of any of the individuals that
4  actually created the map that was passed in
5  Springfield?
6  A.  No.
7  Q.  Has anybody ever told you at any time that
8  the Congressional lines were drawn to intentionally
9  discriminate against any minority?
10  MS. LIGHTFOOT:  You can answer that
11  question yes or no.
12  BY THE WITNESS:
13  A.  No.
14  BY MR. BRUCE:
15  Q.  Has anyone ever told you at any time that
16  the Congressional map that was ultimately adopted
17  and passed in Illinois was intentionally drawn to
18  discriminate against Latinos?
19  MS. LIGHTFOOT:  You can answer that
20  question yes or no.
21  BY THE WITNESS:
22  A.  No.
23  BY MR. BRUCE:
24  Q.  If you -- Congressman, I want to turn to a

Page 25

1  different kind of -- line of questions.  Well,
2  before we do, have I exhausted your recollection of
3  conversations with anyone that was involved in
4  drawing the map that was ultimately passed into
5  law, or are there other conversations that you had
6  that we have not talked about here today?
7  MS. LIGHTFOOT:  One moment.  Can you have
8  that read back to me, please?
9  (Record read.)
10  MS. LIGHTFOOT:  Counsel, is your question
11  with the caveat outside of any privileged
12  communications, or are you -- are you including
13  that as well?
14  MR. BRUCE:  I -- in fairness to me, I
15  think I'm asking about any conversations.
16  MS. LIGHTFOOT:  All right.  I'm going to
17  instruct you, Congressman Roskam, that you can
18  answer the question yes or no as to if you had any
19  other conversations and we'll take it step-by-step
20  because I think the question intentionally imposes
21  upon privileged communications.
22  THE WITNESS:  Could you ask me the
23  question again?
24  MR. BRUCE:  I think it was a good one,

Page 26

1    Congressman, so I'll have her read it back.
2         THE WITNESS:  Okay.
3         MR. BRUCE:  Sometimes if they're not good,
4    I rephrase.  I think it's a decent one.  She'll
5    read it back, and you'll tell me whether it's
6    decent or not.
7         (Record read.)
8    BY THE WITNESS:
9         A.  I'm confused by your question.  Are you
10   asking me about people in Springfield that have --
11   that drew the map --
12   BY MR. BRUCE:
13        Q.  Yes.
14        A.  -- or the entire universe of people?
15        Q.  The people in Springfield.
16        A.  We've exhausted my memory.
17        Q.  Okay.  I just want to be clear.  What I'm
18   asking you is, have you now told me today all of
19   the conversations that you can recall with anyone
20   that was in any way potentially involved in drawing
21   the map that you're taking issue with here today?
22        A.  Yes.  We've exhausted my memory.
23        Q.  And is there any document, email, or
24   correspondence that would refresh your recollection

Page 27

1    about any other conversations that you may have had
2    with anyone that was in any way involved in the
3    map-making process?
4         A.  No.
5         Q.  There's nothing that would refresh your
6    recollection; is that correct?
7         A.  That's correct.
8         (Roskam Deposition Exhibit Nos. 1 and
9         2 marked for identification, 9-29-11.)
10   BY MR. BRUCE:
11        Q.  Okay.  I'd like to talk to you now
12   about -- briefly about some of these -- the
13   districts.
14        As I understand it, if you turn to that
15   little booklet that I gave you, Exhibit Number 2,
16   that's the district -- the Sixth Congressional
17   District that you currently represent; is that
18   correct?
19        A.  That's correct.
20        Q.  Okay.  And then what should be tabbed as
21   Exhibit -- well, attached to Exhibit Number 2,
22   there's a third page.  And is that the district
23   that was passed into law representing the new Sixth
24   Congressional District?

Page 28

1         A.  I'm not sure I'm following you.
2         MS. LIGHTFOOT:  So if I may, counsel --
3         MR. BRUCE:  Yeah, absolutely.
4         MS. LIGHTFOOT:  -- direct him?
5         THE WITNESS:  This?
6    BY MR. BRUCE:
7         Q.  Yes.
8         A.  Right.  This is my understanding of the
9    map that passed in Springfield.
10        Q.  Okay.
11        A.  The sixth district.
12        Q.  Okay.  And do you live in the newly-passed
13   Sixth Congressional District?
14        A.  Yes.
15        Q.  And are there any other sitting
16   Congressmen that are currently in the new Sixth
17   Congressional District?
18        A.  No.
19        Q.  Are there any Democratic Congressmen that
20   are in the new Sixth Congressional District?
21        A.  No.
22        Q.  Do you intend on running for Congress
23   during the next term?
24        A.  Yes.

Page 29

1         Q.  And will you be running in the Sixth
2    Congressional District if this map is upheld?
3         MS. LIGHTFOOT:  Object to the form,
4    relevance.
5    BY MR. BRUCE:
6         Q.  Do you understand my question?
7         A.  Yes.  I understand your question.  Yes, I
8    would intend to run.
9         Q.  Okay.  What I'm establishing is if the --
10   if your lawsuit is unsuccessful and the map that
11   has been passed into law is upheld, you'll be --
12   your intention is to run for this Congressional
13   seat that's the new Sixth Congressional District?
14        MS. LIGHTFOOT:  Object to the form,
15   relevance.
16   BY THE WITNESS:
17        A.  Yes.
18   BY MR. BRUCE:
19        Q.  And is it your understanding that you
20   would not be running against any incumbent
21   Congressman?
22        MS. LIGHTFOOT:  Object to the form, calls
23   for speculation.
24

Page 30

1  BY THE WITNESS:
2     A.  Correct.
3  BY MR. BRUCE:
4     Q.  All right.  Have you read any -- I mean,
5  this is something that's probably of interest to
6  you.  Have you read any newspaper articles or seen
7  any media that would suggest that any sitting
8  incumbent Congressman intends on running against
9  you?
10    MS. LIGHTFOOT:  Object to the form,
11 relevance.
12 BY THE WITNESS:
13    A.  There was some early speculation, and I
14 think at this point it's been reconciled and that's
15 not likely to happen, so no.
16 BY MR. BRUCE:
17    Q.  And who was it that was early thought that
18 might run against you?
19    MS. LIGHTFOOT:  Objection; relevance.
20 BY THE WITNESS:
21    A.  Joe Walsh.
22 BY MR. BRUCE:
23    Q.  Okay.  And have you spoken to
24 Congressman Walsh about that yourself?

Page 31

1     MS. LIGHTFOOT:  Objection; relevance.
2  BY THE WITNESS:
3     A.  No, no.
4  BY MR. BRUCE:
5     Q.  Okay.  But he said in the press he's not
6  running against you?
7     A.  That's correct.
8     Q.  Okay.  He said in the press that he's
9  going to run against who, if anyone?
10    MS. LIGHTFOOT:  Objection; relevance.
11 BY THE WITNESS:
12    A.  Congressman Hultgren.
13 BY MR. BRUCE:
14    Q.  Okay.  Is -- the Sixth Congressional
15 District map that has been drawn in Springfield, do
16 you know the breakdown of Republicans versus
17 Democrats in that map?
18    A.  No.
19    Q.  Has anybody done an analysis on your
20 behalf regarding that fact?
21    A.  I'm sure I've had people that have looked
22 at it and studied it.
23    Q.  Is -- here, let me just ask you a basic
24 question.  Is it your understanding that the

Page 32

1  Congressional district six map which was passed in
2  Springfield is predominantly Republican?
3     MS. LIGHTFOOT:  Objection.
4  BY THE WITNESS:
5     A.  Yes.
6  BY MR. BRUCE:
7     Q.  And do you have, from any source, the
8  knowledge of the proportion of Republicans versus
9  Democrats in the newly-drawn sixth district?
10    MS. LIGHTFOOT:  Congressman, let me just
11 caution you, if the answer to that question would
12 be -- tend to reveal communications or information
13 that you learned in the context of your privileged
14 communication with counsel, I instruct you not to
15 answer it.  If you otherwise have an independent
16 basis on which you can answer that question, feel
17 free to do so.
18 BY THE WITNESS:
19    A.  I have no other independent basis.
20 BY MR. BRUCE:
21    Q.  Other than what you've been told by your
22 lawyers?
23    A.  That's right.
24    MS. LIGHTFOOT:  Object to the form of the

Page 33

1  question.
2  BY MR. BRUCE:
3     Q.  And do you use a pollster?
4     A.  I do.
5     Q.  And do you always use the same pollster or
6  different pollsters?
7     A.  Always the same.
8     Q.  Who do you use?
9     A.  Glen Bolger.
10    Q.  In Washington?
11    MS. LIGHTFOOT:  Object to the relevance of
12 the question.
13 BY THE WITNESS:
14    A.  Yes.
15 BY MR. BRUCE:
16    Q.  Okay.  When is the last time that polling
17 agency has done any polling on your behalf?
18    MS. LIGHTFOOT:  Objection; relevance.
19 BY THE WITNESS:
20    A.  I don't recall.
21 BY MR. BRUCE:
22    Q.  From what you've told me, you didn't have
23 any involvement in the drawing of the map that
24 you're taking issue with; is that true?

Page 34

1     A.   That's true.
2     Q.   Have you spoken to any Democratic
3  Congressmen at all about either the -- the process
4  which led to the map being adopted that you're
5  taking issue with either before or after the map
6  was adopted?
7     A.   Yes.
8     Q.   Who did you speak to?
9     A.   Congressman Lipinski.
10    Q.   And which Congress- -- Congressman
11 Lipinski are you referring to, the father or the
12 son?
13    A.   The son, Congressman Dan Lipinski.
14    Q.   Certainly.
15       Did you have one conversation with him or
16 more than one?
17    A.   One conversation that I recall.
18    Q.   And was that before or after the map was
19 adopted?
20    A.   Before.
21    Q.   And who initiated that conversation?
22    A.   I did.
23    Q.   And why did you do that?
24    A.   In a playful conversation.  I -- I just

Page 35

1  initiated a chat with him.
2     Q.   And was that in Congress itself?
3     A.   It was on the floor of the House of
4  Representatives.
5     Q.   Certainly.
6        And when was that?
7     A.   I don't recall.
8     Q.   And playfully, what did you say to him and
9  what did he say to you about the redistricting?
10    A.   Playfully what I said was it's all about
11 him; that he was the only member of Congress that,
12 with any certainty, was going to be coming back to
13 Washington; that every other member of Congress was
14 largely interchangeable in terms of the leadership
15 in Springfield and that he was the beneficiary of a
16 close relationship with the Speaker of the House,
17 Mike Madigan, and I congratulated him on his
18 certainty in coming back.
19    Q.   And what was his response to that?
20    A.   A playful shrug.
21    Q.   He didn't -- he did not respond vocally?
22    A.   Not that I recall.
23    Q.   All right.  And have you had any other
24 conversations either with Congressman Lipinski or

Page 36

1  anyone else in the Democratic Illinois delegation
2  about the redistricting process?
3     A.   No.
4     Q.   Have you ever spoken to any United States
5  senators at any time about the redistricting
6  process?
7     A.   No.
8     Q.   Have you ever spoken to Speaker Madigan,
9  Congresswoman Schakowsky, or Senator Durbin at any
10 time regarding the redistricting process or the map
11 that was ultimately adopted?
12       MS. LIGHTFOOT:  Object to the form.
13 BY THE WITNESS:
14    A.   No.
15 BY MR. BRUCE:
16    Q.   There were a number of redistricting
17 committee hearings here in Illinois hosted by both
18 the House and the Senate.  Let me first ask you,
19 are you aware of that fact?
20    A.   I'm aware that there was a schedule, yes.
21    Q.   Okay.  Did you attend any of those
22 redistricting committee hearings yourself?
23    A.   No.
24    Q.   Did you ever at any time send anyone to

Page 37

1  attend those committee hearings on your behalf?
2     A.   No.
3     Q.   Did you ever at any time attempt to
4  provide the redistricting committees with any
5  alternative maps or information that they could
6  rely upon to formulate a map?
7     A.   No.
8     Q.   Do you agree with me nothing would have
9  precluded you from doing so?
10       MS. LIGHTFOOT:  Object to the form,
11 assumes facts not in evidence.
12 BY THE WITNESS:
13    A.   I just got confused by your question.  The
14 question is, do I agree with you that nothing would
15 have precluded me from doing that?
16 BY MR. BRUCE:
17    Q.   That's the question.
18    A.   Nothing would have precluded me, but it
19 wouldn't have been very fruitful, in my view.
20       So in answer to your question, nothing
21 would have precluded me.
22    Q.   All right.  And whether or not it would
23 have been fruitful you don't know because you
24 didn't do it; is that a fair statement?

Page 38

1    MS. LIGHTFOOT:  Object to the form,
2  mischaracterizes the witness' prior testimony.
3  BY THE WITNESS:
4    A.  I think I do know.  I think based on the
5  conversations that I had with Senator Cullerton, it
6  was clear that there was an agenda to move a map
7  forward that was going to create a great advantage
8  to the Democrats and they weren't interested in
9  substantive input into it.  That's why I didn't
10  agree to reach out to Republicans to have them vote
11  in favor of it.
12    So could I have offered input?  I could
13  have.  I think the political reality was that
14  decisions had largely been made at that point and
15  it wasn't fruitful.
16  BY MR. BRUCE:
17    Q.  Do you hold an opinion, Congressman, that
18  this map that was ultimately adopted was
19  intentionally drawn to politically favor the
20  Democratic Congressional delegation?
21    A.  I do.
22    Q.  And what's the basis of that opinion?
23    A.  I think Senator Cullerton's comment to me
24  that Judy Biggert is gone under the map, the

Page 39

1  decision to put Congresswoman Biggert's home into
2  Mike Quigley's Congressional district linking
3  Hinsdale to the lakefront, the decision to put Bob
4  Dold's home into Congresswoman Jan Schakowsky's
5  district, the decision to pair up Don Manzullo and
6  Adam Kinzinger, the decision to put Adam
7  Kinzinger's home in Jesse Jackson's district, and
8  the fact that no Democrats who are currently
9  serving are in any serious jeopardy of re-election
10  led me to my conclusion.
11    Q.  And it's your opinion that's why the map
12  was drawn the way it was?
13    A.  Yes.
14    Q.  I'd like to switch gears, Congressman, and
15  I'd like to ask you some questions about this
16  committee that's one of the named Plaintiffs.
17    Do you know anything about this committee?
18    A.  I know the committee exists.  I know it's
19  incorporated.  I know a few members of the
20  committee.
21    Q.  Are you a member of the committee?
22    A.  No.
23    Q.  Have you ever gone to any committee
24  meetings?

Page 40

1    A.  Yes.
2    Q.  How many?
3    A.  One.
4    Q.  And when and where was that?
5    A.  It was a fundraiser for the committee
6  earlier this year.
7    Q.  Where was it?
8    A.  It was at a home on the North Side of
9  Chicago.
10    Q.  Whose home was it in?
11    A.  It was at the home of Don Wilson.
12    Q.  And do you recall who was in attendance?
13    A.  I recall Mr. Wilson and his wife.  I
14  recall Lynn Martin.  I recall Lisa Wagner.  And
15  that's -- that's all I recall.
16    Q.  And about how many people were there?
17    A.  I would estimate 30.
18    Q.  Did you recognize any Democrats that
19  you -- individuals that you knew to be Democrats at
20  the committee?
21    A.  No.
22    Q.  A poorly phrased question.  I apologize.
23  At the function that you were referring to, did you
24  see anyone that you recognized to be a Democrat?

Page 41

1    A.  No.  I recall Judy Biggert was there.
2    Q.  And how did the committee form, if you
3  know?
4    A.  I don't know.
5    Q.  All of the Congressmen and women who are
6  Plaintiffs to this lawsuit are Republican; is that
7  true?
8    A.  That's correct.
9    Q.  Are you a lifelong Republican?
10    A.  For as long as I've been politically
11  active, yes.
12    Q.  Can you tell me the names of any
13  individuals that are Plaintiffs that are not
14  Republicans?
15    A.  I don't know.
16    Q.  Have you read the complaint?
17    A.  Yes.
18    Q.  Was there any aspect of the complaint that
19  you disagreed with?
20    A.  No.
21    Q.  There's some individuals -- and I'll be
22  happy to show you.  There's some -- there's some
23  non-Congressional named Plaintiffs.  I was just
24  going to ask you if you knew any of those

Page 42

1  individuals.  And I'm sorry, Congressman.  For some
2  reason, that wasn't included in your packet and I
3  apologize.
4        MS. LIGHTFOOT:  Counsel, I can share
5  from --
6        MR. BRUCE:  Absolutely.
7        MS. LIGHTFOOT:  -- the previous
8  deposition --
9        MR. BRUCE:  Sure.
10       MS. LIGHTFOOT:  -- a copy.
11       MR. BRUCE:  And, Congressman, I'm sorry.
12  BY MR. BRUCE:
13     Q.  So looking at tab Exhibit 2 to Congressman
14  Shimkus' deposition, I believe that's the complaint
15  that's been filed in this cause of action.  Do you
16  recognize that?
17     A.  I do.
18     Q.  Okay.  And the question is, do you know
19  any of these named Plaintiffs that are
20  non-Congressional?
21     A.  No.
22     Q.  And do you know how they were chosen to
23  become involved in this case?
24     A.  No.

Page 43

1        (Roskam Deposition Exhibit No. 3
2         marked for identification, 9-29-11.)
3  BY MR. BRUCE:
4     Q.  If you turn to Exhibit Number 3 to your
5  deposition --
6        MS. LIGHTFOOT:  Over here.
7        THE WITNESS:  Oh, okay.
8  BY MR. BRUCE:
9     Q.  -- there are -- there are a couple maps.
10  Can you see those?  They're black and white.
11     A.  Yes.
12     Q.  All right.  If you look at the first page,
13  there's a map of the entire state of Illinois, and
14  on the left, there's a map, I believe.  Is that the
15  map that was your understanding was ultimately
16  adopted?
17     A.  Yes, in Springfield.
18     Q.  Yeah.  And what's the map on the right?
19     A.  The map on the right is the product of the
20  fair and balanced committee.
21     Q.  And -- well, is that the map that's --
22  that's being proffered by the Republican
23  Congressional delegation, to your knowledge?
24     A.  Yes.

Page 44

1     Q.  And is the map on the right, in your
2  opinion, more likely to elect Republican members to
3  Congress than the map on the left?
4     A.  Yes.
5     Q.  And what is the basis of that opinion?
6        MS. LIGHTFOOT:  Congressman, I'll just
7  caution you, if you have an independent basis
8  beyond any communications that you received in the
9  context of attorney-client communications, then
10  feel free to share that with Mr. Bruce.
11  BY THE WITNESS:
12     A.  I don't have an independent basis.
13  BY MR. BRUCE:
14     Q.  So from your years of serving in the
15  Illinois legislature and now in Congress, you
16  cannot look at those two maps and tell me why
17  they're more advantageous to Republicans, the one
18  on the right, other than receiving information from
19  your counsel; is that correct?
20     A.  That's correct.
21     Q.  Okay.  Do you know -- strike that.
22        Have you ever seen at any time any of the
23  demographics that correspond with the map on the
24  right that's being proffered by the Republican

Page 45

1  Congressional delegation?
2        MS. LIGHTFOOT:  You can answer that
3  question yes or no.
4  BY THE WITNESS:
5     A.  What do you mean by demographics?
6  BY MR. BRUCE:
7     Q.  Have you ever seen any cultural, racial
8  makeup of any of the districts that are --
9  correspond with the -- with the map on the right of
10  Exhibit 3?
11     A.  I've not seen anything independent of
12  things that have been provided by counsel.
13     Q.  Do you have any independent knowledge of
14  the composition -- the Latino composition of these
15  Congressional districts that are being proffered on
16  the map on the right other than what your lawyers
17  have shown you?
18     A.  No.
19        MS. LIGHTFOOT:  Object to the form.
20  BY MR. BRUCE:
21     Q.  Do you know whether the map on the right
22  of Exhibit Number 3 provides for two majority VAP
23  Latino districts?
24        MS. LIGHTFOOT:  Object to the form.

Page 46

```
 1  BY MR. BRUCE:
 2    Q.  Do you know one way or the other?
 3    A.  I don't know this beyond what I've been
 4  told by counsel.
 5    Q.  Have you ever made any independent inquiry
 6  of that?
 7    A.  No.
 8    Q.  Am I correct, Congressman, that -- well,
 9  tell me, is there a -- strike that.
10      In your current or future Sixth
11  Congressional District, either one, the one you're
12  representing now or in the future, what's the
13  population of Latino voters over the age of 18?
14      MS. LIGHTFOOT:  Object to the form,
15  foundation.
16      MR. BRUCE:  If you know.
17  BY THE WITNESS:
18    A.  I don't know a number off the top of my
19  head.
20  BY MR. BRUCE:
21    Q.  Okay.  Is it a rather small or de minimus
22  number?
23      MS. LIGHTFOOT:  Object to the form and
24  calls for speculation based upon his previous
```

Page 47

```
 1  answer.
 2  BY MR. BRUCE:
 3    Q.  I don't want you to speculate.  I'm
 4  assuming that you know your own Congressional
 5  district.  Why don't we just confine my question to
 6  the district that you're sitting in now, okay?
 7    A.  Okay.
 8    Q.  In that district, is the Latino population
 9  small or de minimus or do you know?
10    A.  I wouldn't describe it as de minimus.  I
11  mean, how would you characterize de minimus?
12    Q.  I don't know.  I'm trying to get that -- I
13  was searching for a percentage from you, if you
14  knew.
15    A.  My understanding is that it's less than
16  10 percent.
17    Q.  Okay.  And do you have any idea as you sit
18  here today what the newly-passed Sixth
19  Congressional District Latino population over the
20  age of 18 is?
21    A.  No, not with any information beyond what
22  counsel has given me.
23    Q.  All right.
24      MR. BRUCE:  And are you going to allow him
```

Page 48

```
 1  to answer the question of what you told him or not?
 2      MS. LIGHTFOOT:  Of course not.
 3      MR. BRUCE:  Okay.
 4  BY MR. BRUCE:
 5    Q.  Congressman, I'm starting to wrap up.
 6      Have you ever seen or been provided any
 7  draft maps that -- from any source of the map that
 8  was ultimately adopted in Springfield?
 9    A.  No.
10      MR. BRUCE:  That's all the questions I
11  have.  Thank you for coming down today,
12  Congressman.
13      THE WITNESS:  Thank you.
14      MS. LIGHTFOOT:  Reserve signature.
15      THE VIDEOGRAPHER:  This is the end of tape
16  number 1.  This is the end of the deposition.  The
17  time is 3:27 p.m.  The length of this tape is
18  41 minutes, three seconds.
19      We're off the record.
20      (AND FURTHER DEPONENT SAITH NOT.)
21
22
23
24
```

Page 49

```
 1      IN THE UNITED STATES DISTRICT COURT
      FOR THE NORTHERN DISTRICT OF ILLINOIS
 2             EASTERN DIVISION

 3  COMMITTEE FOR A FAIR AND      )
 4  BALANCED MAP, et al.,         )
                                  )
 5        Plaintiffs,             )
                                  )
 6    vs.                         )  No. 1:11-cv-5065
                                  )
 7  ILLINOIS STATE BOARD OF       )
    ELECTIONS, et al.,            )
 8                                )
        Defendants.               )
 9
        I hereby certify that I have read the
10  foregoing transcript of my deposition given on
    September 29, 2011, at the time and place
11  aforesaid, consisting of Pages 1 through 48
    inclusive and I do again subscribe and make oath
12  that the same is a true, correct and complete
    transcript of my deposition so given as aforesaid.
13
14      Please check one:
15      _____ I have submitted errata sheet(s)
        _____ No corrections were noted
16
17      _____
18         CONGRESSMAN PETER ROSKAM
19
20  SUBSCRIBED AND SWORN TO
    before me this____ day
21  of _____, A.D., 2011.
22      _____
        Notary Public
23
24
```



Page 50

1　STATE OF ILLINOIS )
　　　　　　　　　　　) SS.
2　COUNTY OF COOK　　)

3

4　　　　I, CARYL L. HARDY, Certified Shorthand
5　Reporter No. 084-3896, Notary Public in and for the
6　County of Cook, State of Illinois, do hereby
7　certify that previous to the commencement of the
8　examination, said witness was duly sworn by me to
9　testify the truth; that the said deposition was
10　taken at the time and place aforesaid; that the
11　testimony given by said witness was reduced to
12　writing by means of shorthand and thereafter
13　transcribed into typewritten form; and that the
14　foregoing is a true, correct, and complete
15　transcript of my shorthand notes so taken as
16　aforesaid.
17　　　　I further certify that there were present
18　at the taking of the said deposition the persons
19　and parties as indicated on the appearance page
20　made a part of this deposition.
21　　　　I further certify that I am not counsel
22　for nor in any way related to any of the parties to
23　this suit, nor am I in any way interested in the
24　outcome thereof.

Page 51

1　　　　I further certify that this certificate
2　applies to the original signed and certified
3　transcripts only. I assume no responsibility for
4　the accuracy of any reproduced copies not made
5　under my control or direction.
6　　　　IN TESTIMONY WHEREOF I have hereunto set
7　my hand and affixed my notarial seal this 7th day
8　of October, A.D., 2011.
9
10
11　　　　Caryl L. Hardy, CSR
12
13　My Commission Expires
14　January 31, 2012
15
16
17
18
19
20
21
22
23
24

Page 52

1　October 7, 2011
2
　　Ms. Lori E. Lightfoot
3　Mayer Brown, LLP
　　71 South Wacker Drive
4　Chicago, Illinois 60606
5　Re: Committee for a Fair and Balanced Map, et al.,
　　　　vs. IL State Board of Elections, et al.
6　　　Case No. 1:11-cv-5065
7　Dear Ms. Lightfoot:
8　Enclosed please find a copy of the deposition
　　transcript of Congressman Peter Roskam taken in the
9　above-captioned case on the 29th day of September,
　　2011, along with the original copy of the signature
10　page and errata sheets for the witness to sign.
11　Please have the witness review his transcript, making
　　whatever corrections he may have on the errata
12　sheets I have provided, not on the deposition
　　transcript.
13
　　After he has reviewed his deposition, please have
14　him sign each correction sheet, if any, at the
　　bottom of the page and sign the signature pages.
15　Then, within 30 days of today, return the original
　　copy of the signature page and errata sheets, if
16　any, to my office, keeping a copy for yourself. If
　　they are not returned by said date, upon request an
17　affidavit will be provided pursuant to the procedure
　　outlined in Rule 30(e) of the Rules of Civil
18　Procedure and the deposition will be completed and
　　will be "used as fully as though signed."
19
　　Thank you for your cooperation in this matter. If
20　you have any questions, please do not hesitate to
　　call me.
21
　　Sincerely,
22
　　Caryl L. Hardy
23
　　Enclosures
24