# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 11-C-5065 |
| v. | ) ) | |
| | ) | Hon. John D. Tinder |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) ) | Hon. Joan H. Lefkow |
| | ) | Hon. Robert L. Miller, Jr. |
| | ) | (3-judge court convened pursuant to |
| Defendants. | ) | 28 U.S.C. § 2284) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
## FOR A PERMANENT INJUNCTION

## Table of Authorities

**Page(s)**

## Cases

*Barnett v. City of Chicago,*
141 F.3d 699 (7th Cir. 1998) ................................................................ 12, 13

*Barnett v. Daley,*
141 F.3d 699 (7th Cir.1998) ...................................................................... 14

*Black v. McGuffage,*
209 F. Supp.2d 889 (N.D. Ill. 2002) ........................................................... 14

*Bush v. Vera,*
517 U.S. 952 (1996) ............................................................................ 18, 24

*Chrysler Corp. v. Brown,*
441 U.S. 281 (1979) .................................................................................. 20

*City of Mobile v. Bolden,*
446 U.S. 55 (1980) ..................................................................................... 3

*Davis v. Bandemer,*
478 U.S. 109 (1986) .................................................................................. 29

*DeWitt v. Wilson,*
856 F. Supp. 1409 (E.D. Cal. 1994) .......................................................... 22

*Easley v. Cromartie,*
532 U.S. 234 (2000) .................................................................................. 17

*Garza v. Los Angeles County,*
918 F.2d 763 (1990) .................................................................................... 9

*Growe v. Emison,*
507 U.S. 25 (1993) ...................................................................................... 2

*Harper v. City of Chicago Heights,* 223 F.3d 593 (7th Cir. 2000) ................................................. 41

*Hastert v. State Bd. of Elections,*
777 F. Supp. 634 (N.D. Ill. 1991) ...................................................... 14, 19, 22

*Johnson v. De Grandy,*
512 U.S. 997 (1994) ............................................................................... 4, 12

*Ketchum v. Byrne*,
    740 F.2d 1398 (7th Cir.1984) .......................................................................... 14

*King v. State Bd. of Elections*,
    979 F. Supp. 582 (N.D. Ill. 1996) ..................................... 14, 18, 19, 20, 22, 23

*League of United Latin Am. Citizens v. Perry*,
    548 U.S. 399 (2006) ......................................................................................... 4

*Lott v. Pfizer, Inc.*,
    492 F.3d 789 (7th Cir. 2007) ......................................................................... 20

*LULAC*,
    548 U.S. 399 (2006) ............................................................... 3, 4, 12, 13, 16

*Miller v. Johnson*,
    515 U.S. 900 (1995) .................................................... 1, 13, 17, 25, 29

*Reynolds v. Sims*,
    377 U.S. 533 (1964) ......................................................................................... 2

*Rodriguez v. Pataki*,
    308 F. Supp. 2d 346 (S.D.N.Y. 2004) .......................................................... 26

*Rogers v. Lodge*,
    458 U.S. 613 (1982) .................................................................................... 3, 16

*Rybicki v. State Bd. of Elections*,
    574 F. Supp. 1082 (N.D. Ill. 1982) ...................................................... 10, 11, 14

*Shaw v. Reno*,
    509 U.S. 630 (1993) ...................................................................................... 17

*Thornburg v. Gingles*,
    478 U.S. 30 (1986) ..................................................................................... 3, 5, 6

*Whitcomb v. Chavis*,
    403 U.S. 124, 149 (1971) ................................................................................. 3

*Wise v. Lipscomb*, 437 U.S. 535, 540 (1978) ............................................................ 41

*United States v. Town of Cicero*,
    2000 WL 34342276, at *1 (N.D. Ill. Mar. 15, 2000) ..................................... 14

*Vieth v. Jubelirer*,
    541 U.S. 267 (2004) ...................................................... 28, 29, 30, 36, 38

*Voinovich v. Quilter,*
507 U.S. 146 (1993) ............................................................................................2, 22, 41

**<u>Other Authorities</u>**

Il. Const. Art. IV, §3(a) ...........................................................................................25

## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 11-C-5065 |
| v. | ) ) | |
| | ) | Hon. John D. Tinder |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) ) | Hon. Joan H. Lefkow |
| | ) | Hon. Robert L. Miller, Jr. |
| | ) | (3-judge court convened pursuant to |
| Defendants. | ) | 28 U.S.C. § 2284) |

## DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
## FOR A PERMANENT INJUNCTION

### INTRODUCTION

The Supreme Court has repeatedly emphasized the caution that must be taken in redistricting cases because of "the complex interplay of forces that enter a legislature's redistricting calculus." *Miller v. Johnson,* 515 U.S. 900, 915-16 (1995). It has further admonished that "[t]his evidentiary difficulty, together with the sensitive nature of redistricting and the presumption of good faith that must be accorded legislative enactments, requires courts to exercise extraordinary caution in adjudicating claims that a State has drawn district lines on the basis of race." *Id.* at 916.

This case raises serious allegations of racial discrimination in redistricting against the Illinois state legislature with an abundance of heated rhetoric and only the scantest of circumstantial information. All of the Latino members of the General Assembly overwhelmingly voted in favor of Public Act 97-0014 – the challenged 2011 Congressional Map – and no Latino advocacy or citizen group has joined the lawsuit or expressed any opposition to the map, yet Plaintiffs claim that the legislature intentionally diluted the votes of Latino voters in

three Congressional Districts and intentionally drew a Congressional district with Latino ethnicity as the predominant consideration in violation of the Voting Rights Act, the Fourteenth Amendment and the Fifteenth Amendment. Plaintiffs further claim that the legislature intentionally discriminated against Republican voters, notwithstanding serious questions about justiciability and a workable and reliable standard for partisan gerrymander claims, as well as a complete absence of authority supporting the invalidation of a legislative redistricting plan on such grounds.

At the close of discovery, Plaintiffs' claims are still unsupported and lack credible evidence. Indeed, in their Memorandum in Support of their Motion for a Permanent Injunction, Plaintiffs have already retreated from their intentional vote dilution claims in Counts I to III, and instead have placed a greater emphasis on the racial gerrymandering claim in Count IV. Yet the record contains no evidence to substantiate any of these claims. When these unsubstantiated racial allegations are stripped away, Plaintiffs are left with partisan allegations in Counts V and VI. However, Plaintiffs have provided neither a workable standard for these political claims nor any supporting evidence.

Plaintiffs should not be permitted to substitute their objectives for the legislature's on this meager record. As the Supreme Court stated in *Voinovich v. Quilter,* 507 U.S. 146, 156 (1993), "[t]ime and again we have emphasized that reapportionment is primarily the duty and responsibility of the State through its legislature or other body, rather than of a federal court." *Id.* (citing several earlier Supreme Court cases including *Growe v. Emison*, 507 U.S. 25, 34 (1993), and *Reynolds v. Sims*, 377 U.S. 533, 586 (1964)) (internal quotations omitted)).

Plaintiffs' motion for a permanent injunction should be denied. This Court should uphold Public Act 97-0014, the Congressional Map.

I.    **The Court Should Uphold the 2011 Congressional Map**

A.    **Districts 3, 4, and 5 Comply with the Voting Rights Act and the Fourteenth and Fifteenth Amendments**

In their Memorandum in Support of Their Motion for a Permanent Injunction ("Memorandum"), Plaintiffs have tellingly retreated from their claims that the Congressional Map intentionally dilutes the votes of the Latino population in Congressional Districts 3, 4 and 5, now elevating their Count IV racial gerrymandering argument ahead of their Counts I, II and III intentional vote dilution argument. Just as significantly, and despite this Court's November 1, 2011 Opinion and Order, Plaintiffs do not even attempt to argue the required *Gingles* pre-conditions for their Voting Rights Act (VRA) claim in Count I. Indeed, Plaintiffs have clearly failed to prove that the Congressional Map violates Section 2 of the VRA, the Fourteenth Amendment, or the Fifteenth Amendment.

In charging intentional vote dilution, Plaintiffs have an "inordinately difficult" burden of proof. *Thornburg v. Gingles,* 478 U.S. 30, 44 (1986). For all of their claims, Plaintiffs must ultimately prove that the totality of the circumstances supports a finding that Congressional Districts 3, 4 and 5 were "conceived . . . as a purposeful device to further racial discrimination." *City of Mobile, Alabama v. Bolden,* 446 U.S. 55, 60-61, 66 (1980) (quoting *Whitcomb v. Chavis,* 403 U.S. 124, 149 (1971)). Plaintiffs also must prove that Latino voters have less opportunity than other residents in these districts to participate in the political processes and to elect legislators of their choice. (Dkt. 98 at 6); *Rogers v. Lodge,* 458 U.S. 613, 624 (1982) (Fourteenth Amendment).

Additionally, to prove the Count I VRA claim, Plaintiffs must first satisfy strict preconditions initially set out in *Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986). (Dkt. 98 at 4); *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 425-26 (2006) ("*LULAC*").

Plaintiffs must prove that the minority group is politically cohesive and that the majority votes as a bloc, allowing majority voters to usually defeat the minority's preferred candidates. *Id.* Plaintiffs have not made this showing (and attempt to dodge this failure by skipping directly to factors relevant to the totality of the circumstances analysis). Generally, Plaintiffs must also establish the first *Gingles* precondition—"the possibility of creating more than the existing number of reasonably compact districts with a sufficiently large minority population to elect candidates of its choice." *Johnson v. De Grandy*, 512 U.S. 997, 1008 (1994); *LULAC*, 548 U.S. at 429-30. As set out in Defendants' Memorandum in Support of Their Motion to Dismiss, Plaintiffs also have not satisfied this showing and have not even attempted to do so. (Dkt. 40 at 3-5.) Consequently, their VRA claim fails even before the totality of the circumstances is considered. Plaintiffs' proof also fails to support a finding of intentional vote dilution, however, under a totality of the circumstances. Consequently, Plaintiffs have failed to prove intentional vote dilution under the 14th and 15th Amendments as well as the VRA.

### 1. Plaintiffs Have Not Satisfied the *Gingles* Pre-Conditions for a VRA Claim

In its November 1, 2011 Opinion and Order, this Court held that Plaintiffs must establish preconditions set out in *Gingles* to prove a VRA claim. However, Plaintiffs do not even attempt to argue that they have established the *Gingles* preconditions for a VRA claim, and for good reason. Plaintiffs' expert analysis of whether voting is racially polarized is severely flawed, and Plaintiffs offer no evidence that the non-Latino majority votes sufficiently as a bloc to enable it usually to defeat Latino voters' preferred candidate. A complete analysis of a large, representative sample of elections demonstrates that voting in Congressional Districts 3, 4 and 5 is no longer racially polarized and that the Latino population in those districts is usually able to elect their candidates of choice.

4

The sole evidence Plaintiffs proffer on the question of whether voting is racially polarized is their expert Dr. Richard L. Engstrom's analysis. Dr. Engstrom's analysis is severely flawed for four primary reasons. First, Dr. Engstrom's area of analysis is arbitrary and lacking in probative value. In evaluating whether voting is racially polarized, Dr. Engstrom analyzes elections in a self-selected "area of geographic concern" consisting of Congressional District 4 and *Plaintiffs'* Congressional Districts 3 and 4. (A170, D-31 at 3.) This area of geographic concern is both substantially under- and over- inclusive of the area within Congressional Districts 3, 4 and 5, the specific districts at issue in this litigation. (*See* A97, D-27 at 9.) It excludes large portions of Congressional Districts 3 and 5, while including pieces of no less than four additional districts. (A274, D-119). As such, Dr. Engstrom's analysis lacks probative value for examining racial polarization in Congressional Districts 3 and 5. Indeed, Dr. Engstrom has stated that he did not perform a district-specific analysis of racially polarized voting in Congressional Districts 3 and 4. (Engstrom Dep. at 5-6, 17, 20.) As the inquiry into the existence of vote dilution is necessarily district specific, Plaintiffs' evidence cannot and does not establish racially polarized voting on this basis alone. (*See* Dkt. 98 at 8)(this Court's Nov. 1, 2011 Opinion and Order); *Thornburg v. Gingles*, 478 U.S. 30, 59, n. 28 (1986).

Second, compounding his failure to conduct a district-specific analysis, Dr. Engstrom's sample of elections is limited and unrepresentative. Dr. Engstrom analyzes only ten of the twenty-five most relevant recent elections in which voters in Cook County were presented with a choice between or among Latino and non-Latino candidates for office. (A159, D-29 at 13, Table 2; *see also* A299-A303, D-130; A277, D-123, Updated Table 2.) Two of the elections he excluded are Congressional elections in Congressional Districts 3 and 5, "the most relevant and probative" elections to the analysis of racially polarized voting in these districts. (A104, D-27 at

16.) Dr. Engstrom also neglected to include state legislative elections in Cook County, the elections substantively the closest to Congressional contests, and some countywide general elections, which involved a large number of voters. (A296-A298, D-130; D-122; A98-A99, D-27 at 10-11.) While excluding these highly relevant elections, Dr. Engstrom includes six judicial elections in his analysis (accounting for nearly half of his total sample of fourteen elections), which he himself has opined are fundamentally different from high stimulus Congressional elections. (*See* A103, D-27 at 15.) In a chapter in the book *Political Participation and American Democracy*, Dr. Engstrom writes:

> Elections to judicial offices are generally low stimulus affairs. Candidates are restricted by ethical canons from certain types of campaign activities, including taking positions on controversial legal and/or political issues. The media's attention to these more subdued campaigns is usually low, and voters tend to have minimal information about the candidates. Not surprisingly, many voters rolloff when they reach the portion of the ballot containing judicial contests.

(A258-A259, D-46 at 173 (internal citations omitted).) Further, in five of the elections Dr. Engstrom includes, the Latino candidates received very few votes by Latinos or voters of other races, a clearly inadequate sample for analysis. (A100-A101, D-27 at 12-13.) Dr. Engstrom's limited and unrepresentative sample of elections biases his analysis of racially polarized voting. (*See* A99, D-27 at 11.)

Dr. Engstrom's analysis is also flawed because he fails to analyze non-Latino voters as a bloc for the countywide and citywide elections that he analyzes. (A97, D-27 at 9.) Dr. Engstrom instead breaks out African-American votes. *Id.* The relevant question in a VRA claim is whether Latinos are able to elect their candidates of choice, irrespective of whether other populations sometimes vote differently from the non-Latino population as a whole. (Dkt. 98 at 4, 8); *Thornburg v. Gingles*, 478 U.S. 30, 50-51 (1986). Further, African Americans only

account for a small portion of the population in Congressional Districts 3, 4 and 5—less than 5% of each district. (A97-A98, D-27 at 9-10.)

Finally, Dr. Engstrom relied on erroneous data for his analysis. Reviewing Dr. Engstrom's spreadsheets when they were finally produced the night before Dr. Lichtman's deposition on October 19th, Dr. Lichtman observed that Dr. Engstrom's data included all of a precinct's votes in the split precinct vote counts where the portion of a precinct in the relevant Congressional District had only a portion of the population or no population. (A278-A284, D-124; A296-A298, D-130; Lichtman Dep at 8-12.) Dr. Engstrom's data also includes incorrect Latino VAP numbers for many precincts, often as much as 100 voters different from State data. *Id.* Dr. Engstrom was questioned about the former problem at his October 25, 2011 deposition, but had no knowledge of how split precincts had been handled in his data. (Engstrom Dep. at 174-180 and Ex. 13 thereto.) Now on the eve of trial and with insufficient time for Dr. Lichtman to fully examine Dr. Engstrom's new data, Dr. Engstrom has filed a supplemental report changing virtually every number in his tables, thereby effectively admitting that all of his original results were erroneous. For example, Dr. Engstrom's estimate of the Latino vote for Anita Alvarez in the 2008 Democratic Primary for State's Attorney decreased by 9 percentage points, from 82.3% to 73.3%. (*Compare* A183, D-31 at 16, Table 1, with Engstrom Supplemental, Adjusted Table 1; *see also* A288-A289, D-126; A296-A298, D-130; Lichtman Dep. at 268-275.) Significantly, to the extent Dr. Lichtman has been able to review Dr. Engstrom's new, eleventh-hour report and data, Dr. Lichtman has again found incorrect Latino VAP numbers, as well as unidentified and unverifiable precincts. (A296-A298, D-130; A285-A287, D-125.)

Dr. Engstrom's arbitrary, non-district-specific area of analysis, limited and unrepresentative sample of elections, failure to analyze the non-Latino population as a bloc, and errors in his underlying data completely undermine the reliability of Dr. Engstrom's analysis of racially polarized voting. Plaintiffs have not offered any other evidence of racially polarized voting and have not proved its existence.

Not only have Plaintiffs failed to prove that voting is racially polarized, or that Latino voters' preferred candidates are, as a result, usually defeated, but a complete analysis of a large, representative sample of elections demonstrates the contrary—that voting is no longer racially polarized and that the Latino population in those districts is usually able to elect their candidates of choice. Analyzing the sample of the twenty-five most relevant elections examined by both Dr. Lichtman and Dr. Engstrom (*i.e.*, all elections but Dr. Engstrom's judicial sub-circuit elections), Dr. Lichtman found that the large majority of elections were not polarized (72%). (A158-A162, D-29 at 12-16; *see also* A296-A298, D-130; A277, D-123, Updated Table 2.) Further, to the extent polarized voting occurred, it rarely defeated the Latino candidates of choice, even in overwhelmingly non-Latino jurisdictions and districts: Latino candidates prevailed in 88% of the relevant elections, and 94% of elections in jurisdictions that were 70 percent or more non-Latino. *Id.* Significantly, neither of the two most probative elections, the Congressional elections, was polarized, and the Latino candidates of choice prevailed. (A105, D-27 at 21.)

Having failed to prove that voting is racially polarized and offering no evidence that the non-Latino majority votes sufficiently as a bloc to enable it usually to defeat Latino voters' preferred candidate, Plaintiffs have failed to establish the *Gingles* preconditions to a VRA claim, and thereby failed to prove Count I of their Amended Complaint.

### 2. Plaintiffs' Evidence Does Not Establish Intentional Vote Dilution under a Totality of the Circumstances Analysis

Plaintiffs fare no better in proving their intentional vote dilution claims under the Fourteenth and Fifteenth Amendments, nor could they prove their VRA claim even if they had satisfied the *Gingles* preconditions. As discussed *supra*, courts consider the totality of the circumstances in analyzing intentional vote dilution. Significantly, Plaintiffs have neither alleged nor offered any direct evidence of invidious purpose, leaving them to prove their intentional dilution claims entirely through circumstantial evidence. Their circumstantial evidence, however, is woefully inadequate to prove that the Congressional Map intentionally dilutes Latino votes in Congressional Districts 3, 4 and 5.

As a preliminary matter, Plaintiffs offer no expert analysis of the totality of the circumstances or most of the individual factors Plaintiffs cite. Proof of an intentional discrimination claim requires an exacting and stringent expert analysis of circumstantial evidence. (A55, D-26 at 5); *cf. Garza v. County of Los Angeles*, 918 F.2d 763 (1990). As Dr. Lichtman explains, the requisite expert analysis was set out in a 142 page scholarly article by California Institute of Technology Professor J. Morgan Kousser, the intent expert in *Garza*. (A55, D-26 at 5.)

The evidence that Plaintiffs do offer on individual factors relevant to the totality of the circumstances analysis, however, is deficient for reasons beyond only a lack of expert analysis. Plaintiffs argue six factors relevant to the totality of the circumstances analysis: changed district boundaries; rough proportionality; polarized voting; the redistricting process; a history of discrimination; and socioeconomic disparities. Plaintiffs' failure to prove polarized voting has been detailed *supra*, pp. 3-6. They similarly fail to prove the other factors, and factors for which

Defendants provide evidence clearly show the totality of the circumstances weighs heavily against Plaintiffs.

### a. Changed District Boundaries

Plaintiffs' argument that the changes in the boundaries of Congressional Districts 3, 4 and 5 evidence intentional vote dilution suffers from the same flaw this Court cited in its November 1, 2011 Opinion and Order on Defendants' Motion to Dismiss—Plaintiffs fail to demonstrate that the changes in the Latino VAP in Congressional Districts 3, 4 and 5 have any significance for Latino voters' opportunity to elect candidates of their choice. (Dkt. 98 at 8.) While the Latino VAP in Congressional Districts 3 and 5 decreased with the Congressional Map, the Latino VAP in Congressional Districts 3 and 5 was only 29.3% and 24.6% to begin with—nowhere near a majority or even a plurality—and the Latino VAP in both districts only decreased by 4.7 and 8.5 percentage points, respectively. (Dkt. 103 at Exh. E.) Plaintiffs compare the 1991 Congressional Map with the present one to argue that Congressional District 4 was packed, yet Plaintiffs omit the critical fact that the Latino VAP in Congressional District 4 has actually *decreased* since 2001, from 68.1% to 65.9%, when it could have readily increased much further. (A134, D-28 at 6; A63-A69, D-26 at 13-19.) Plaintiffs fail to establish that these small percentage point differences have diminished Latino voters' opportunity to elect their candidates of choice. Further, these *de minimis* changes in the Latino VAP in these districts stand in stark contrast to the changes in cases where courts have found manipulated district boundaries, such as *Rybicki v. State Bd. of Elections,* 574 F. Supp. 1082 (N.D. Ill. 1982). In these cases, the changes in the district boundaries reduced the minority populations so drastically as to result in retrogression. For example, in *Rybicki,* a senate district that would have had a 58%

African-American population under prior district boundaries had only a 38% African-American population under new district boundaries. *Rybicki*, 574 F. Supp. at 1108-09.

Plaintiffs attempt to bolster their changed boundaries argument glibly alleging that these changes were motivated by a "threat" to the Congressional District 3 and 5 representatives posed by the Chicago Latino community's growth, but Plaintiffs do not offer a single piece of evidence that Representative Lipinski or Representative Quigley feared growth in their districts' Latino population. Moreover, other evidence suggests the contrary—both representatives have been the Latino candidates of choice in past elections. Running against Latino candidates, Representative Lipinski received 57% of the Latino vote in the 2010 primary for Congressional District 3, while Representative Quigley received 60% of the Latino vote in the 2008 general election for Congressional District 5. (A106, D-27 at 22, Table 5.)

With Plaintiffs having shown neither that the changes in the boundaries of Congressional Districts 3, 4 and 5 affect Latino voters' opportunity to elect candidates of their choice or that the representatives in Congressional Districts 3 and 5 feared the growth of the Latino population in their districts, this factor does not provide any support for a finding of intentional vote dilution.

### b. "Rough Proportionality"

Similarly, Plaintiffs' argument about proportionality fails for a reason this Court identified in its November 1, 2011 Opinion and Order on Defendants' Motion to Dismiss— Plaintiffs fail to show a lack of proportionality based on citizen voting-age population (CVAP).[1] (Dkt. 98 at 9.) Plaintiffs attempt to portray a large gulf in proportionality based on CVAP by describing the minor difference from perfect proportionality in percentages, but ultimately, even under perfect proportionality, only 1.57 districts would have a Latino majority—not even a full district more than the one Latino majority district under the Congressional Map, Congressional District 4 (65.9%). (A166, D-29 at 20.) Significantly, perfect proportionality is not required; rather, the relevant consideration is "whether the number of districts in which the minority group forms an effective majority is *roughly* proportional to its share of the population in the relevant area." *LULAC*, 548 U.S. 399, 426 (2006) (citing *Johnson v. De Grandy*, 512 U.S. 997, 1000 (1994)). Rough proportionality means exactly that: "There is, of course, no 'magic parameter' . . . .and 'rough proportionality' must allow for some deviations." *Id.* at 438. Moreover, "[t]he degree of probative value assigned to proportionality may vary with other facts . . . ." *Id.* (declining to decide whether a two-district deficit weighed in favor of a VRA violation given

---

[1] In its November 1, 2011 Opinion and Order, this Court concluded that CVAP is the appropriate benchmark for rough proportionality under *Barnett v. City of Chicago*, 141 F.3d 699, 705 (7th Cir. 1998), and *LULAC*, 548 U.S. 399, 426 (2006). (Dkt. 98 at 9.) Dr. Lichtman offers additional support for this benchmark. (D-29 at 20.)

other evidence). The Congressional Map achieves rough proportionality because it has one majority Latino district – Congressional District 4, and Plaintiffs fail to offer other evidence of intentional vote dilution.

Even if the Court found that rough proportionality required an additional Latino district, however, both the Congressional Map and Plaintiffs' map have one Latino majority district, not two. (Dkt. 105 at 38-39.) ("Fair District 4 will have a Latino VAP of 59.4"; "In Fair District 3, Latinos will constitute 46.5% of the VAP, which will give Latinos a plurality in the district.") Plaintiffs' expert has made the admission. (Engstrom Dep at 53.) Thus, Plaintiffs' plan fares no better under rough proportionality than the Congressional Map. "[T]he plaintiff must show that there *is* a feasible alternative to the defendant's map, an alternative that does a better job of balancing the relevant factors . . . ," and they have not done so. (Dkt. 98 at 8-9); *Barnett v. City of Chicago*, 141 F.3d 699, 702 (1998). As such, proportionality weighs *against* a finding of intentional vote dilution.

### c. The Redistricting Process

Plaintiffs purport to offer evidence of "irregular" procedure in the redistricting process, but in fact, none of the evidence had anything to do with diluting Latino votes. While Latino VAP was reported in correspondence between Representative Lipinski, his staff, and the DCCC, it was never specifically referenced as motivating the changes to the district under discussion, and it was always reported without any elaboration in tandem with statistics indicating average Democratic performance and the African-American VAP. (*See* Pls.' Exh. A25-A27.) This mere reporting of Latino VAP is not proof of intentional vote dilution. "Although a State will almost always be aware of racial demographics when it redistricts, it does not follow from this awareness that the State redistricted on the basis of race." *LULAC*, 548 U.S. 399, 513 (2006)

(Scalia, J., dissenting) (citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). At the same time, the e-mails contain direct statements of a different motivation for the changes to Congressional District 3: political concerns. The DCCC wanted to avoid a primary contest between Representative Lipinski and another Democrat. (Pls.' Exh. A30.) On May 16, 2011, Ian Russell, DCCC, e-mailed proposed district maps to Andrew Manar, aide to Senate President John Cullerton, and noted with respect to Congressional District 13 that, "This is similar to the district drawn in our earlier map to avoid the primary in 3. Our goal here was to maximize Democratic performance so we would all have an idea of the best-case scenario in this area." *Id.* Similarly, none of Plaintiffs' evidence regarding the redistricting hearings and passage of the Congressional Map shows that the procedural events had anything to do with Latino voters. Plaintiffs have not proved irregular procedure with respect to Latino voters, and consequently, this factor does not provide any support for a finding of intentional vote dilution.

#### d. History of Intentional Discrimination

Plaintiffs' decades old evidence of a history of intentional voting-related discrimination lacks probative value. *Rybicki* and *Ketchum v. Byrne*, 740 F.2d 1398 (7th Cir.1984) both involved redistricting thirty years ago, while *Hastert v. State Bd. of Elections*, 777 F. Supp. 634 (N.D. Ill. 1991), *King v. State Bd. of Elections,* 979 F. Supp. 582 (N.D. Ill. 1996) (*King I*), and *Barnett v. Daley*, 141 F.3d 699 (7th Cir.1998) concerned redistricting twenty years past. *Barnett*, moreover, was an effects case and did not make any intentional discrimination findings. 141 F.3d at 702. Finally, *Black v. McGuffage*, 209 F. Supp.2d 889 (N.D. Ill. 2002) and *United States v. Town of Cicero*, 2000 WL 34342276, at *1 (N.D. Ill. Mar. 15, 2000) both concerned redistricting in 2000, and further, neither concerned acts of the state legislature.

Not only is Plaintiffs' evidence of historical intentional discrimination lacking in probative value, but more recent evidence in fact demonstrates affirmative action by the state legislature to improve Latinos' access to the political process and an absence of intentional voting-related discrimination. The Illinois Legislature has recently enacted the Illinois Voting Rights Act of 2011 to enhance minority voting rights, as well as another bill authorizing early voting and a grace period for registration. The latter bill has been recognized for encouraging more people to vote and removing barriers previously impeding voters. (P.A. 96-1541 (2011); 94-0645 (2005); A240-A256, D-36.) In addition, Latinos have been elected to office in substantial and increasing numbers in Illinois. In Cook County, Latinos have been elected to Congress, Cook County countywide positions, and Chicago citywide positions, even though both Cook County and the City of Chicago are 75% or more non-Latino VAP. (A62, D-26 at 12.) There were over 113 Latino elected officials in Illinois overall in 2010, a 176% increase from 1996. (A62, D-26 at 12; D-38.) Finally, the Latino members of the General Assembly overwhelmingly voted in favor of the challenged Congressional Map and no Latino advocacy or citizen group has joined the lawsuit or expressed any opposition to the Map.

As Plaintiffs' evidence of a history of intentional discrimination lacks probative value and more recent evidence points to efforts to improve Latinos' access to the political process and Latino support of the Map, this factor, like proportionality, weighs against a finding of intentional vote dilution, rather than in favor of it.

### e. Socioeconomic Disparities

The final factor Plaintiffs point to as relevant to the totality of the circumstances analysis is socioeconomic disparities. Significantly, Plaintiffs' socioeconomic disparities evidence is the subject of Defendants' Motion in *Limine* #3, as Plaintiffs did not produce it until long after the

deadline for expert disclosures and initial reports, and neither of Plaintiffs' experts ever referenced the studies. (Dkt. 117) Even if that evidence were considered, Plaintiffs must show more than the presence of socioeconomic disparities alone; they must demonstrate that these disparities hinder Latinos' opportunity to participate effectively in the political process. *LULAC*, 548 U.S. 399, 426 (discussing "the extent to which minority group members bear the effects of past discrimination in areas such as education, employment, and health, *which hinder their ability to participate effectively in the political process*" as a factor relevant to the totality of the circumstances analysis) (emphasis added); *Rogers v. Lodge*, 458 U.S. 613, 620, n. 8 (affirming the District Court, which applied the *Zimmer* evidentiary factors, including "the existence of past discrimination which precludes effective participation in the elector process"). Such a showing requires expert analysis. Plaintiffs have provided no such expert analysis, or even a study linking socioeconomic disparities to the differential registration and voting rates that Plaintiffs report. Thus, this factor also provides no support for a finding of intentional vote dilution.

*       *       *

Plaintiffs have failed to prove the *Gingles* preconditions to a VRA claim or a single factor supporting a finding of intentional vote dilution under a totality of the circumstances analysis, while other evidence weighs against a finding of intentional vote dilution. To the contrary, the evidence available indicates that the redistricting changes had nothing to do with race, and if anything, involved political objectives. As such, Plaintiffs have failed to prove their intentional dilution claims in Counts I, II and III.

### B. Congressional District 4 is Not a Racial Gerrymander

Recognizing the weaknesses in their intentional dilution claims, Plaintiffs give greater emphasis in their Memorandum to their claim in Count IV of the Amended Complaint that

16

Congressional District 4 is a racial gerrymander. As with their intentional dilution claims, however, Plaintiffs' lack of evidence is fatal to their racial gerrymandering theory.

"Until a claimant makes a showing sufficient to support [an allegation of race-based decision-making] the good faith of a state legislature must be presumed." *Miller,* 515 U.S. at 915. "[C]ourts, in assessing the sufficiency of a challenge to a districting plan, must be sensitive to the complex interplay of forces that enter a legislature's redistricting calculus . . . Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process." *Id.* at 916.

To prove a Fourteenth Amendment racial gerrymandering claim, Plaintiffs must establish that "race was the predominant factor motivating the legislature's decision to place a significant number of voters within or without a particular district." *Miller v. Johnson,* 515 U.S. 900, 916 (1995). Plaintiffs must show "at a minimum" that the legislature subordinated traditional race-neutral districting principles, including but not limited to compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, to racial considerations. *Easley v. Cromartie,* 532 U.S. 234, 241 (2000) (*Cromartie II*); (*see* Dkt. 98 at 15.) Plaintiffs must also prove that a facially neutral law is "unexplainable on grounds other than race." *Cromartie II,* 532 U.S. at 241-42. Significantly, race may be considered in redistricting as long as it is not the predominant factor because, as the Supreme Court observed in *Shaw v. Reno,* 509 U.S. 630, 646 (1993), "redistricting differs from other kinds of state decisionmaking in that the legislature always is aware of race when it draws district lines, just as it is aware of age, economic status, religious and political persuasion, and a variety of other demographic factors." Further, "[t]he Constitution does not mandate regularity of district shape, and the neglect of traditional districting criteria is merely necessary, not sufficient," to prove a racial

gerrymander claim. *Bush v. Vera*, 517 U.S. 952, 962 (1996) (internal citations omitted). Where political and racial objectives are indistinguishable, plaintiffs must additionally show that (1) "at the least, the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles;" and (2) "that those districting alternatives would have brought about significantly greater racial balance. *Cromartie II*, 532 U.S. at 258.

Plaintiffs have not proven either that race was the predominant factor motivating the legislature's crafting of Congressional District 4 or that traditional race-neutral districting principles were subordinated to race. Moreover, the shape of District 4 is at the least equally explainable by political motives, but Plaintiffs fail to show that the Illinois General Assembly could have achieved its legitimate political objectives in an alternative way that was comparably consistent with traditional districting principles and provided significantly greater racial balance.

### 1. Plaintiffs Have Not Offered Sufficient Proof that Race was the Predominant Factor in Drawing the Congressional District 4

Plaintiffs also have not offered any direct evidence that race was the predominant factor in crafting Congressional District 4, and thus their claim again relies entirely on circumstantial evidence. The only circumstantial evidence that Plaintiffs offer is the district's history and its shape and demographics. "Establishing that racial considerations predominated over all of the other complex factors involved in redistricting through indirect, inferential evidence is an extremely difficult burden under any set of circumstances." *King,* 979 F. Supp. 582, 605 (1996). Moreover, the history of Congressional District 4 is at best only remotely probative of the motivation in the design of the district, and evidence on the shape and demographics counter, rather than support, that race was the predominant motivation.

18

### a. History

Plaintiffs point to prior litigation over Congressional District 4 as their strongest evidence that race was the predominant factor in its drawing. Both *Hastert* and *King*, however, have limited, if any, probative value as those cases both concerned the drawing of Congressional District 4 two decades ago. Indeed, Congressional District 4 has changed substantially as to several factors the *King* court relied upon in concluding that race predominated in its drawing. First, the *King* court found that the district had a bizarre shape because it resembled a "wobbly eighth note." *Id.* at 606. This description would not be fair one of the district at present: the district's borders have smoothed out and the territory in the district has become more evenly distributed, such that the district now resembles a horseshoe more than the above description. (*Compare* A272, D-116 with A271, D-114.) Second, the *King* court found that the lines of prior Congressional District 4 "follow[ed] the concentrations of the Hispanic population with exquisite detail" given that the map tracked the Hispanic population on a block-by-block basis, maximizing the concentration of Hispanics within the district. *King,* 979 F. Supp. at 608 (internal quotations omitted). Plaintiffs have not alleged or shown the same for Congressional District 4, likely because the present district's boundaries do not trace the Hispanic population block-by-block. (A65, D-26 at 15, Map 1.) In addition, Dr. Lichtman analyzed inflows to and outflows from the prior Congressional District 4 to the present map and concluded that "the drafters of the Adopted Plan did not move population in and out of previous Congressional District 4 in order to maximize or nearly maximize the Latino share of the voting age population in the new version of the district, as would be expected if the district was drawn predominantly according to race." (A63, D-26 at 13.) The *King* court also cited the *Hastert* court's finding that

"rays" shot out from the north and south enclaves to capture additional Hispanic population, but those rays are no longer present. (*Compare* A272, D-116 with A271, D-114.) Again, the borders of the district are now largely smooth. Finally, the *King* court considered that only 4.7% of the population of the district resided in the portion of the district west of Central Avenue—the "Western connector"—and considered the district's contiguity as a consequence to be "hypertechnical and cynical, and preserved through the use of non-populated parks and barren industrial areas." Since *King*, however, the Western connector has widened significantly, incorporating substantial additional population. (*Compare* A275, D-120 with A276, D-121.) The population of Congressional District 4 west of Central Avenue is now 25.8%, over five times the population of the Western connector in 1991.[2] (A292-A295, D-129.) These substantial differences in several of the factors the *King* court relied upon in concluding that race predominated in its drawing further lessen the probative value of the *King* court's finding.

Plaintiffs also point to statements by sponsors of the 2001 and 2011 redistricting bills. Yet "[t]he remarks of a single legislator, even the sponsor, are not controlling in analyzing legislative history." *Chrysler Corp. v. Brown*, 441 U.S. 281, 311 (1979); *Lott v. Pfizer, Inc.*, 492 F.3d 789, 794 (7th Cir. 2007) ("Additionally, individual legislators' statements are of minimal

_____

[2] Plaintiffs misleadingly and improperly characterize the Western connector as a limited section along I-294 in their exhibits supporting their Motion for a Permanent Injunction. The *King* court defined it as the area of Congressional District 4 west of Central Avenue. *King*, 979 F.Supp. at 609, fn. 49.

value     when     it     comes     to     interpreting     statutes.")     (citing

*Chrysler Corp. v. Brown,* 441 U.S. 281, 311 (1979)).     Even considering legislators' statements

about the Congressional Map, they demonstrate that many factors were considered and that race

was not predominant among those factors.     Questioned about drawing an additional Latino

district during the second reading of the bill creating the Congressional Map in the House of

Representatives, State Representative Barbara Flynn Currie repeatedly stated that many factors

were at play in the drawing the Congressional Map and that race was only one such factor:

> We've taken lots of different factors into account. As you know, race should not be the only factor that you take into account. We took into account communities of interest. We certainly looked for opportunities to make sure that members of minority groups have the opportunity for full participation in the electoral process. But we also look, as you know, at many other factors; political subdivisions, natural boundaries like rivers and mountains. (Pls.' Exh. A43, 15:17-16:4.)
> *     *     *

> All I can say, again, is that many factors go into map making. And certainly, opportunities for members of minority groups to enjoy full participation in the electoral process is one. But there are also issues of compactness, contiguity, communities of interest, issues of natural boundaries, political boundaries, cities, counties and so forth. All of these play a role. Partisan considerations, incumbency, all of those are legitimate values in map making. (Pls.' Exh. A43, 17:20-18:7.)

> Again, many factors go into a redistricting plan. You can't consider one district in a vacuum. Because anything you do in one part of the map is going to have an impact on another part of the map. Population shifts explain some of the changes in this map from the map that we have today. But if you look at the maps compared to the maps that are currently in use, I think you will see that the core of the districts are actually very much respected in the proposal that is contained in Senate Bill 1178. (Pls.' Exh. A43, 19:13-24.)

Similarly, speaking on Senate Bill 1178 in the Senate, State Senator Kwame Raoul stated:

> The redistricting plan . . . balances the State's obligations under Federal law as well as observed traditional districting principles in light of significant population shifts. In doing so, existing district boundaries, relative compactness, communities of interest, and other traditional districting principles have been

observed to the extent determined to be appropriate in light of the other factors I've previously mentioned. (Pls.' Exh. A45, 10:10-22.)

Significantly, consideration of compliance with the Voting Rights Act is not tantamount to a finding that race was the predominant consideration behind a map. Concern for federal law "does not raise an inference of intentional discrimination; it demonstrates obedience to the Supremacy Clause of the United States Constitution." *Voinovich v. Quilter*, 507 U.S. 146, 159 (1993); *see also King*, 979 F. Supp. at 600 ("[W]e conclude that in the context or [sic] redistricting, where race is considered only in applying traditional redistricting principles along with the requirements of the Voting Rights Act, that strict scrutiny is not required") (quoting *DeWitt v. Wilson*, 856 F. Supp. 1409, 1415 (E.D. Cal. 1994)).

Contrary to Plaintiffs' assertions, the history of Congressional District 4 does not establish that race was the predominant factor behind its current shape, and if anything, leads to the opposite conclusion.

### b. Demographics

Plaintiffs' demographic evidence also fails to establish that race was the predominant consideration in the crafting of Congressional District 4. Plaintiffs rely upon their expert Dr. Morrison to argue that the district contains the most heavily Latino portions of both Chicago's northside and southside "enclaves," but Dr. Morrison asserts this conclusion without any data, analysis or maps. (*See* A214, D-33 at 7.) In addition, to the extent Latino VAP increased within the boundaries of the prior Congressional District 4, the 2011 Congressional District 4's inclusion of the most heavily Latino portions of the enclaves would be equally consistent with preservation of the core of Congressional District 4, a traditional districting principle, and a factor repeatedly cited by state legislators discussing the Congressional Map, as set forth *supra*.

Plaintiffs then argue that the Latino VAP has increased in Congressional District 4 since *Hastert*, but this is misleading as there was an interim redistricting since which time Latino VAP has fallen, from 68.1% to 65.9% from 2001 to 2011. (A134, D-28 at 6.)

The final demographic evidence that Plaintiffs offer is the territorial trades in the latest round of redistricting. Plaintiffs argue that the territory removed from Congressional District 4 had a Latino VAP of 40.6%, while the area added has a Latino VAP of 47.2%, but as Dr. Lichtman points out, this only amounts to a mere 2 percentage point difference in the Latino VAP within new Congressional District 4. (A135, D-28 at 7.) In addition, if there were a focus on racial balance in the territorial trades, this would require favoring race over other districting principles, exactly what Plaintiffs are contesting here.

While Plaintiffs' demographic evidence fails to establish that race was the predominant factor, other demographic evidence directly contradicts such a conclusion. As set forth *supra*, the drafters of the Congressional Map could have easily, but did not, increase the Latino VAP in Congressional District 4. (A63-A69, D-26 at 13-19.)

### c. Shape

Plaintiffs finally argue that the shape of Congressional District 4 indicates that race was the predominant factor in the crafting of the district, but their characterization of the district does not align with the evidence. Plaintiffs argue that Congressional District 4 retains the original 1991 "earmuff" shape that *King I* and *King II* both held was a racial gerrymander, but as discussed above, the district's shape, including its Western Connector, has changed significantly since *King* to become more regular and compact. As evident from Defendants' Exhibits D-120 and D-121 (A275 and A276 respectively), the district's present compactness is evident to the naked eye, and it passes, not fails, any "eyeball test" of compactness.

Moreover, Congressional District 4 scores at or above the accepted levels of the two most common compactness tests, the geographic dispersion or Reock Measure, and the perimeter or Polsby-Popper Measure. According to Defendants' expert Dr. Gerald R. Webster, the "geographic dispersion and perimeter measures focus on different aspects of geographic compactness and are most appropriately considered in tandem (Webster 2004: 44-5)." (A299, D-30 at 1.) Richard Pildes and Richard Niemi wrote about these two measures in a 1993 *Michigan Law Review* article, and these measures are the most commonly employed for evaluating district compactness. *Id.* Significantly, the Pildes and Niemi article was also cited in the Supreme Court's 1996 decision in *Bush v. Vera*, 517 U.S. 952, 960 (1996). On the Reock or geographic dispersion measure, Pildes and Niemi suggest that low compactness is equal to or less than 0.15. (A300-301, D-30 at 2-3). Congressional District 4's Reock compactness measure of .30 is fully twice the cutoff level of .15. *Id.* In addition, CD 4's Polsby-Popper compactness measure is at Pildes and Niemi cutoff level of 0.05. *Id.*

In addition to the Richard and Niemi cutoff levels, the compactness of Congressional District 4 is also demonstrated by comparing its compactness measures to the prior iterations of Congressional District 4 and by comparing Congressional District 4's compactness measure with other districts in the Congressional Map. (A300-A301, D-30 at 2-3; Webster Dep. 4 at 66-69.) As both Plaintiffs and Defendants experts agree, the .30 Reock measure of district 4 is 50% greater than its original score of .20 in 1991, and also greater than the score of .21 in 2001. *Id.* In the 1991 plan Congressional District 4 had a perimeter compactness score of 0.02, below the suggested Niemi and Pildes suggested level. *Id.* In the 2001 plan, Congressional District 4's perimeter compactness score doubled to 0.04, and rose again to 0.05 in the 2011 plan, which is 150% greater than Congressional District 4's 1991 Polsby-Popper measure. *Id.* This is evident

24

from the fact that Congressional District 4 Reock measure of .30 is within 0.02 of the mean for the state (0.32), with nine other districts in the Congressional Map having a Reock measure within .02 of the District 4's Reock measure. (Webster Dep. at 66-69.) In sum, Congressional District 4 has grown significantly more compact since 1991, and as Dr. Webster opined, is now reasonably compact. (Webster Dep. at 78-79).

### d. Traditional Districting Principles

Plaintiffs have also failed to make the minimum requisite showing that traditional districting principles were subordinated to race. Compactness is one of these principles, and as explained *supra*, Congressional District 4 has grown reasonably compact. (Il. Const. Art. IV, §3(a); *Miller*, 515 at 915). Other traditional districting principles include preservation of the core of a district and protection of incumbents.

Preservation of the core of a district supports relationships among residents and with their representative. The Congressional Map House sponsor cited this principle as a factor in the crafting of the Map in the hearings on the bill, and indeed, a full 82% of the population of prior Congressional District 4 was retained in the adopted district. (*See e.g.* Pls.' Exh. A43, 19:13-24; A83, D-26 at 33, Table 6.) Plaintiffs attempt to dismiss this evidence by arguing that maintenance of the core is not legitimate if it is discriminatory, but prior Congressional District 4 was found to remedy discrimination, not implement it.

Similarly, incumbency protection is a legitimate traditional districting principle for the benefit of incumbents' constituents. The Congressional Map House sponsor also cited this principle as a specific factor in crafting the Map, and as Plaintiffs point out, all of the Democratic

representatives have favorable overlaps of population between their prior and current districts. (Dkt. 103 at ¶¶ 93-94, "The Proposed Congressional Plan also favors Democratic incumbents in terms of overlap of population between current and proposed congressional districts.... The Proposed Congressional Plan places Democratic incumbents in districts whose population overlaps with an average 77.52% of their current districts.") Plaintiffs argue that incumbency protection is not justifiable in Congressional District 4 because Defendants have proffered no evidence that Representative Gutierrez would need protection, but Plaintiffs' own expert suggested Representative Gutierrez's vulnerability under Plaintiffs' alternative map: Dr. Engstrom observed that Representative Gutierrez would reside in Plaintiffs' Congressional District 3, which would merely be an influence, rather than effective district. (A180, D-31 at 13.)

These traditional districting principles explain the shape of Congressional District 4 as well or better than race. Indeed, other courts have upheld longstanding Congressional districts with near 20-year incumbents in the face of charges of intentional vote dilution, finding that race was not predominant in light of evidence of these traditional redistricting principles. *See e.g.*, *Rodriguez v. Pataki*, 308 F. Supp. 2d 346 (S.D.N.Y. 2004).

### a. Congressional District 4 Can Be Explained on Grounds Other than Race

Significantly, the evidence also supports a further explanation for the shape of Congressional District 4 other than race. Examining a map overlaying Congressional Districts 3, 4 and 5 over the 2001 Congressional Map (A273, D-118), and considering Plaintiffs original partisan gerrymandering allegations, the most evident explanation for the changed shape of Congressional District 4 is politics, not race. In their Complaint, Plaintiffs alleged that Congressional Districts 3 and 5 were crafted for a political purpose – to dismantle former

Congressional District 13 – pointing to their extensions into that district. (Dkt. 1 at ¶¶ 5, 75, 77, 83, 85, 131, 136.) Incorporation of these large southwest expansions of territory in each district would likely require loss of territory elsewhere to maintain one-person, one-vote, and as a neighboring district, Congressional District 4 would be a logical place to reassign excess territory. The changes to the boundaries of Congressional District 4 are thus at least equally explainable by politics. In an attempt to avoid their force, Plaintiffs have since deleted all of the allegations with respect to Congressional District 3 in their Amended Complaint. (*Compare* Dkt. 1 at ¶¶ 5, 75, 77, 83-84, 131, 136 *with* Dkt. 103 at ¶¶ 5, 77, 84-85, 131, 139.)

Strikingly, in a "Fact Sheet" on the Congressional Map on their Web site, Plaintiff Committee for a Fair and Balanced Map Plaintiff Committee for a Fair and Balanced Map has actually asserted that politics, *and not race*, explain the shape of Congressional District 4. The Committee writes: "This map includes three "ear-muff" districts (8, 11 and 4) drawn *not to advance a minority interest* but to protect Democratic office-holders." (A42, D-21 at 4.)(emphasis added).

Given that political and racial motives for the shape of Congressional District 4 are indistinguishable, Plaintiffs have the burden of showing that another district could be drawn that would achieve the original drafters' desired political objectives and have a better racial balance. *See Cromartie II*, 532 U.S. at 258. Plaintiffs have not met this burden. Plaintiffs' proposed Congressional Map would in fact worsen the racial balance, reducing the number of districts with over 21% Latino VAP in the Cook County area from four to two. (A121, A126-A127, D-27 at 37, 42-43, Maps 1 & 2.) Moreover, rather than achieving the desired political objectives, Plaintiffs' map would achieve *Plaintiffs'* desired political objectives. Representative Gutierrez would be in an influence rather than effective district. (A180, D-31 at 13; A86, D-26 at 36.)

Representative Lipinski would be paired with Representative Biggert in a district with only 4 percent of the population of his previous district and 67 percent of the population of her previous district. (A86, D-26 at 36.) Finally, Representatives Gutierrez, Lipinski and Quigley would all lose significant percentages of their constituents: Lipinksi would lose 72%, Gutierrez 34%, and Quigley 29%. (A83, D-26 at 33, Table 6.)

Plaintiffs have not proven that race was the predominant motivation in the shaping of Congressional District 4, and to the contrary, other explanations for the district—politics and traditional districting principles—explain its shape equally or better. As such, Plaintiffs have failed to prove that Congressional District 4 is a racial gerrymander in violation of the 14th Amendment Equal Protection Clause.

### C. Plaintiffs Fail to Establish that the 2011 Congressional Map Intentionally Creates Unconstitutional Partisan Gerrymanders

Plaintiffs' original Complaint contained two counts alleging an unconstitutional partisan gerrymander in violation of the First and Fourteenth Amendments (Counts V and VI). This Court's November 1, 2011 Opinion and Order dismissed both partisan gerrymandering counts. (Dkt. 98 at 21-22.) The Court dismissed Count V because Plaintiffs were unable to show that the 2011 Congressional Map infringed Republican voters' rights to free expression, association, or petition. *Id.* at 21. Likewise, the Court dismissed Count VI because Plaintiffs did not plead a workable standard for gauging partisan gerrymandering claims upon which relief could be granted. *Id.* at 19. Recognizing that the Supreme Court has rejected every proposed standard, this Court noted that "[w]e surmise that amendment might be futile in light of today's understanding of the law under Equal Protection Clause." *Id.* at 19.

In spite of this, the Court granted Plaintiffs an opportunity "to amend its Complaint in an effort to articulate a workable and reliable standard for adjudicating their partisan

gerrymandering claim and sufficient factual allegations to demonstrate plausibility." *Id.* at 20. However, Plaintiffs have still not provided a workable and reliable standard by which to measure that the 2011 Congressional Map's infringement upon Republican voters' First or Fourteenth Amendment rights. Instead, Plaintiffs offer a standard for measuring partisan gerrymandering claims that the U.S. Supreme Court has already expressly rejected. *See Vieth v. Jubelirer*, 541 U.S. 267, 284 (2004). Regardless, even if Plaintiffs' standard were appropriate, Plaintiffs fail to provide evidence to establish the factors set forth in their own standard and so cannot prove a violation of Republican voters' First or Fourteenth Amendment rights.

1. **Plaintiffs Fail to Propose a Workable and Reliable Standard for Adjudicating their Partisan Gerrymandering Claims.**

Plaintiffs articulate a standard that is neither workable nor reliable and that has already been rejected by the Supreme Court. (Dkt. 98 at 21-22)(citing *Vieth*, 541 U.S. at 286). Perhaps this is due to Plaintiffs' belief that "courts bear the burden of fleshing out the precise proof required to prevail in a partisan gerrymander claim and that articulating a precise standard is unnecessary…," but Plaintiffs have clearly failed to meet this Court's directive in their Amended Complaint. (Dkt. 105 at 30.)

Plaintiffs' standard purports to have "an intent requirement and an effect requirement." (Dkt. 105 at 30.) However, this dual intent-and-effect standard is essentially the same as the one proposed in *Davis v. Bandemer*, 478 U.S. 109, 133 (1986), and *Vieth*, 541 U.S. 267. In *Vieth*, the U.S. Supreme Court flatly rejected a proposed "predominant intent" standard that was essentially the same as the one proposed here. *Vieth*, 541 U.S. at 284 (proposed "intent standard" would require plaintiff to "'show that the mapmakers acted with a *predominant intent* to achieve partisan advantage,' which can be shown 'by direct evidence or by circumstantial evidence that other neutral and legitimate redistricting criteria were subordinated to the goal of

29

achieving partisan advantage.'"). As discussed in greater detail in Defendants' Motion to Dismiss Counts V and VI of Plaintiffs' Amended Complaint, this Court need not further examine Plaintiffs' proposed standard because it has already been the subject of litigation and has been rejected by other courts. (Dkt. 122 at 3-9.)

Furthermore, the U.S. Supreme Court has also already rejected Plaintiffs' proposed standard that parallels the intent standard that applies to racial gerrymandering claims. (Dkt. 105 at 27)(citing *Miller v. Johnson*, 515 U.S. 900, 916 (1995)). As further discussed in Defendants' Motion to Dismiss Counts V and VI of Plaintiffs' Amended Complaint, the Supreme Court rejected paralleling the two standards because, unlike a person's race, a person's partisan preference can never be considered consistent or immutable. (Dkt. 122 at 3-9.) In addition, the Supreme Court reasoned that since partisan districting is lawful and common, a partisan gerrymandering standard similar to that of racial gerrymandering would only result in constant election-impeding litigation. *Vieth*, 541 U.S. at 286. In short, Plaintiffs' proposed standard is essentially the same standard that was considered and rejected by the Supreme Court, and therefore, Plaintiffs' proposed standard should be rejected by this Court.

### 2. Plaintiffs Cannot Establish that the State Drafted the 2011 Congressional Map to Advance Partisan Interests Even under Plaintiffs' Proposed Standard.

Plaintiffs' proposed standard is legally indefensible in light of earlier U.S. Supreme Court precedent. However, even if this Court were to explore Plaintiffs' proposed standard, Plaintiffs have not provided any evidence that Defendants' 2011 Congressional Map constitutes unconstitutional partisan gerrymandering under their two-pronged, intent-and-effect test.

### a. Plaintiffs Cannot Prove that Defendants Had the Predominant Intent to Partisan Gerrymander the 2011 Congressional Map.

Plaintiffs argue, "To establish the intent element of the proposed standard for judging

partisan gerrymanders, Plaintiffs would have to prove that the State's mapmakers created one or more [C]ongressional districts with the predominant intent to secure partisan advantage. Plaintiffs could do so with any direct or circumstantial evidence of such intent, including evidence that the mapmakers disregarded traditional and neutral redistricting principles." (Dkt. 105 at 30.)

Under their very own standard, Plaintiffs do not—and cannot—provide any of that direct or circumstantial evidence to demonstrate that Illinois mapmakers drew the 2011 Congressional map with the predominant intent of securing a partisan advantage for the Democratic party. Plaintiffs argue that (1) Democrats excluded Republicans and the public from the redistricting process; (2) the Democratic leadership of the General Assembly took "the [Democratic Congressional Campaign Committee, or] DCCC's guidance to heart" when drafting the map and that the DCCC's goal was to maximize Democratic opportunities; (3) the 2011 Congressional Map does not reflect adherence to any other neutral redistricting principles; and (4) the "treatment of current District 13" establishes that the predominant intent behind the shape of several districts in the 2011 Congressional Map "was to secure a partisan advantage for the Democrats." (Dkt. 105 at 30-35.) However, none of these arguments carry weight as evidence of partisan gerrymandering when viewed within their proper context.

Plaintiffs' first argument, that Democrats excluded Republicans and the public from the redistricting process, is wholly inaccurate, not supported by any evidence that Plaintiffs cite, and does not establish partisan intent. Both the Illinois House of Representatives and Senate created redistricting committees that were made up of Democratic and Republican members. For the first time in several redistricting cycles, both committees conducted numerous statewide meetings and public hearings. These statewide hearings afforded members of the public,

including Republican Congressmen themselves, as well as Republican committee members an opportunity to testify as to their preferences, suggestions, and comments and, generally, be a part of the redistricting process. However, Plaintiffs cannot demonstrate that any member of the Republican Congressional delegation attended, testified, or provided written testimony to either redistricting committee. (Rep. Shimkus Dep. at 113-118, 122, 124-135; Rep. Schock Dep. at 12-13, 16-17, 18-23; Rep. Hultgren Dep. at 17-18; Rep. Manzullo Dep., at 10-11; Rep. Biggert Dep. at 46, 57; Rep. Dold Dep. at 28-31, 42; Rep. Roskam Dep. at 36-39; Rep. Schilling Dep. 48-55.) For example, Rep. Judy Biggert admitted that she made no effort to be involved in the redistricting process despite now claiming that her current Congressional District 13 is the primary victim of partisan gerrymandering. (Rep. Biggert Dep. at 6, 57.) Furthermore, Republican Congressmen admitted that, from the beginning of the redistricting process, they were in discussions with members of the General Assembly and their staff, including Illinois Senate President John Cullerton, regarding the outlines of the 2011 Congressional map. (Rep. Schock Dep. at 27-33; Rep. Hultgren Dep. at 27-29, 32-33; and Rep. Roskam Dep. at 12-20.) Congressman Peter Roskam even sent his Chief of Staff to the state capitol to view draft redistricting maps and provide commentary. (Rep. Roskam Dep. at 15, 20-23.) By their own admission, the Republican Congressmen were provided significant opportunities to participate in the redistricting process, but they refused to avail themselves of such offers. Yet, Plaintiffs' failure to take advantage of these numerous opportunities to be included in the redistricting process does not consequently establish that the predominant intent of the drafters of the map was to secure a partisan advantage for the Democrats.

Plaintiffs' second argument, that the Democratic leadership of the General Assembly took "the DCCC's guidance to heart" when drafting the map, so as to accomplish the DCCC's

goal and maximize Democratic opportunities, is also inaccurate, not supported by the evidence Plaintiffs cite, and, furthermore, does not establish partisan intent. Plaintiffs point to e-mails between the DCCC and, primarily, Senator Cullerton's staff to establish the partisan intent of the map drafters. However, these e-mails only establish that the DCCC provided draft map proposals to Senator Cullerton's staff. Nowhere do Plaintiffs put forth any evidence that the various DCCC draft maps were actually considered by members of the General Assembly, let alone formed the basis for the redistricting map that, in the end, passed the General Assembly.

Furthermore, the e-mails reveal nothing as to the intent of the actual drafters of the 2011 Congressional Map. All that these e-mails evidence is that third parties, like the DCCC, had an opportunity to provide input on the redistricting process, just as the Republican Congressmen had. For example, in one e-mail, Ian Russell, a DCCC employee, wrote Andrew Manor, then Senator Cullerton's Chief of Staff, asking, "What advice do you have on how to get the committee to consider map ideas we've discussed (only, of course, if the Senate President likes them)?" (A266-A267, D-105.) The fact that the DCCC may have had the goal of maximizing Democratic "potential pick-ups" under this map does not establish that the drafters of the map shared that same intent or that this supposedly shared objective was the map drafters' predominant influence as they drew the map. (Dkt. 105 at 32)(quoting Plaintiffs' Ex. A23).

Instead, the only evidence pertinent to understanding the state legislators' intent as they drafted the 2011 Congressional map are their own statements made during the redistricting process. Despite Plaintiffs' assertions to the contrary, the General Assembly took many factors, including standard redistricting principles, into account when drawing the 2011 Congressional map. In fact, both Sen. Kwame Raoul and Rep. Barbara Flynn Currie stated on the floor of their respective chambers that the 2011 Congressional map was designed following traditional

redistricting principles, such as achieving population equality, preserving the core of existing district boundaries, maximizing relative compactness, maintaining communities of interest, and protecting incumbent constituent relationships. (Pls.' Exh. A43; Pls.' Exh. A45.)

Consequently, Plaintiffs' argument that the 2011 Congressional Map fails to consider the redistricting principle of compactness when drawing district boundaries is entirely erroneous. Rather, the mean district compactness score has increased for the state as a whole as demonstrated by data produced Defendants' expert Gerrald Webster. (A265, D-53; Webster Dep. at 68.) Moreover, the Polsby-Popper and Reock scores, which are the two standard measures of compactness, for the 2011 Congressional map have a mean of 0.17 and 0.32, respectively. *Id.* These two scores are higher than the compactness scores that authorities suggest might draw scrutiny. (A300, D-30 at 2.) Plaintiffs simply stating that the 2011 districts are not "particularly compact" does not prove the accuracy of the statement or provide evidence in support of Plaintiffs' contention that Defendants have failed to adhere to traditional redistricting principles.

Likewise, Plaintiffs' argument that the dividing of 50 towns with at least 25,000 residents into more than one district does not establish that the 2011 Congressional Map failed to follow traditional redistricting principles. One of the traditional redistricting principles is preserving the core of existing district boundaries. Hence, a town may need to be divided among multiple districts in order to maintain traditional district boundaries. Plaintiffs do not offer any evidence of how many towns were split under the 2001 Congressional Map and how that figure compares to the 2011 Congressional Map. Plaintiffs' vague claim that the 2011 Congressional Map was drawn without deference to traditional redistricting principles is inaccurate, not supported by the evidence Plaintiffs cite, and incapable of establishing partisan intent.

Finally, Plaintiffs argue that "[t]he treatment of District 13 is particularly indicative of the Adopted Plan's partisan animus. The plan dismantles that compact district – long represented by (Republican) Congresswoman Judy Biggert – placing pieces of the district into six different districts (Districts 1, 3, 5, 6, 11, and 14)." (Dkt. 105 at 34.) While the 2011 Congressional Map does indicate that these other districts were redrawn and that the prior Congressional District 13 was drawn out, due to these changes, the 2010 U.S. Census mandated that Illinois lose one district due to statewide population losses. Plaintiffs do not offer any suggestion as to which other district, other than Congressional District 13, should have been removed. Even though it was well known by Republican Congressmen that Congressional District 13 was the district that was going to be divided and redrawn into other districts, no Republican official, including incumbent Rep. Biggert, offered input into the redistricting process in order to protect her seat or district boundaries. (Rep. Roskam Dep. at 15, 20-23; Rep. Biggert Dep. at 6, 57.) All that Plaintiffs' argument suggests is that, since the General Assembly decided to redraw Congressional District 13, which was helmed by a Republican, it must mean that the General Assembly acted with a predominantly partisan animus. Such conclusions do not follow the evidence, however.

Indeed, Plaintiffs are unable to meet their proposed intent standard because their purported evidence does not demonstrate (1) an exclusion of Republicans or members of the general public from the redistricting process; (2) the DCCC's influence over the Illinois redistricting process; (3) a failure to follow traditional redistricting principles; or (4) partisan animus with regard to the redistribution of Congressional District 13. Plaintiffs' have failed to establish that the predominant intent of the map drafters was to secure a partisan advantage.

### b. Plaintiffs Cannot Prove that the 2011 Congressional Map Had the Effect of Creating Partisan Gerrymandered Districts.

Plaintiffs' "effects" element, the second prong of their proposed standard, fares no better than their proposed intent element. Plaintiffs argue that a redistricting plan has an unconstitutional effect where it is the case:

> (1) that the Proposed Congressional Plan increases the number of districts that favor Democrats by at least 10% according to an accepted measure of partisan voting; (2) that the Proposed Congressional Plan keeps at least 10% more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents; and (3) that at least one of the districts created with the intent to advantage Democrats is among the districts that contributes to the proof of elements 1 and 2.

( Dkt. 105 at 35; Dkt. 103 at ¶ 142.)

Neither case law nor any authority supports this standard, and there certainly is no evidence that this is a "reliable" or "workable" standard. Plaintiffs simply generate this purported standard and proceed with legal arguments on it. Plaintiffs are incorrect in stating that this standard "relies on simple and objective metrics." (Dkt. 105 at 35.) Rather, as discussed in further length in Defendants' Motion to Dismiss Counts V and VI of Plaintiffs' Amended Complaint and Motion in *Limine* #1, these factors for measuring the effect of purported unconstitutional partisan gerrymandering are unreliable and unworkable.

Of primary importance, and further discussed in Defendants' Motion in *Limine* #1, Plaintiffs argue that partisanship must be determined by an "accepted" measure. (Dkt. 113; Dkt. 105 at 35.) In particular, Plaintiffs make reference to a partisan voting index ("PVI") by Charlie Cook. (Dkt. 103 at 18.) However, Plaintiffs are unclear in their proffered standard. Plaintiffs do not offer explanation as to why the Cook index is preferred or accurate for measuring whether a district "favors Democrats." Moreover, Plaintiffs do not explain that the Cook index only

evaluates *presidential* elections, omitting Congressional midterm elections and any statewide electoral contests, and provides *national* averages. As such, the Cook index could be irrelevant to evaluating the partisan effect of Congressional districts in Illinois. Furthermore, the U.S. Supreme Court has already pointed out the difficulty with using indices to determine partisanship because a voter's political affiliation may change from election to election and can never be permanently discernible. *Vieth*, 541 U.S. at 287. Thus, putting aside the problems with the applicability and reliability of the Cook index, the Supreme Court's opinion indicates that *any* index that attempts to determine partisanship is an improper indicator of voter choice.

Moreover, as discussed in further detail in Defendants' Motion to Dismiss Counts V and VI of Plaintiffs' Amended Complaint, Plaintiffs do not explain what it means to "favor Democrats." The phrase "favor Democrats" can have any number of interpretations, and Plaintiffs leave this unenviable task to the Court. Similarly, it is unclear whether the 10% "increase" requirement applies to total districts or the districts previously found to favor Democrats. Further, Plaintiffs are unclear when they argue that partisanship can be determined when a redistricting plan "keeps" 10% more Democrats in the "same district as their representative" than "it does constituents of Republican incumbents." (Dkt. 103 at 30-31.) Plaintiffs do not clarify whether this percentage would be determined, for example, statewide or at the district level, or by using total population, voting age population, or citizen voting age population.

Also, Plaintiffs have not offered any evidence that supports or meets their standard for measuring the effect of excessive partisan gerrymandering. Illinois has been inconsistent when it comes to party preference for various political races, which only evidences that Plaintiffs' proposed standard is unworkable and unreliable. In fact, Plaintiffs' allegations in their Amended

Complaint support Defendants' contention—and the Supreme Court's determination—that partisanship is constantly fluctuating. (Dkt. 103 at 17.) For example, since 1985, Illinois has altered between two Democratic Senators and one Democratic and one Republican Senator. (Dkt. 124 at 20-21.) Likewise, it has switched from Republican governors to Democratic governors. *Id.* These exemplar inconsistencies illustrate that the Cook index, or any index, for that matter, can hardly be considered probative, predictive, and reliable for purposes of determining levels of partisanship in a Congressional redistricting plan or in individual Congressional district.

Furthermore, Plaintiffs have not provided any evidence that PVIs, specifically the Cook index, are accurate and reliable. As this court already noted, "partisan affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line." (Dkt. 98 at 20)(quoting *Vieth* 541 U.S. at 287). Plaintiffs have not proffered any expert to evaluate their application or the accuracy of the Cook index. Plaintiffs appear to rely on fact witness Edward D. Marshall, and his Affidavit attached to their Motion for a Permanent Injunction, to establish that the 2011 Congressional map has the discriminatory effect of creating partisan gerrymanders in several districts. (Dkt. 105 at 35-37.) However, Marshall, who has not been disclosed or qualified as an expert and only identified as a fact witness, is incapable of explaining the necessity of a PVI score or whether the Cook PVI methodology and formula are accurate and reliable. PVI data and its evaluation and application must be analyzed by a qualified expert who can opine on such matters after careful study.

In addition, the PVI evidence on which Plaintiffs rely to make their partisan gerrymandering arguments in their Motion for a Permanent Injunction was produced for the first time on November 4, 2011. Failing to produce this evidence timely violates this Court's

discovery order, which set September 17, 2011 as the date for Plaintiffs to have responded to

Defendants' written discovery requests and October 19, 2011 as the last date for fact depositions.

In fact, Defendants propounded written discovery to Plaintiffs on September 7, 2011, for which

the Court's Scheduling Order provided 10 days for Plaintiffs to respond, and Defendants asked

numerous interrogatories and document requests on Plaintiffs' partisan gerrymander claims. At

that time, Plaintiffs' responses to Defendants' discovery requests included no PVI data. Indeed,

in their written responses to Defendants' interrogatories and document requests, Plaintiffs stated

that information relating to the partisan gerrymandering claims were "more appropriate" for

expert discovery. (A35-A36, D-6 at 35-36.) Yet, no such disclosures or documents were

produced until November 4, 2011. There is no indication that the documents Plaintiffs provided

on November 4, 2011 relating to PVI and partisan gerrymandering were unavailable for

production during the discovery period in this case. Because Plaintiffs did not timely produce

their PVI documents, as discussed herein and detailed in Defendants' Motions in *Limine* #1 and

#2, Defendants' expert, Professor Allan Lichtman, or any other expert Defendants may have

disclosed, have not had the opportunity to rebut or respond to the PVI documents.[3] Regardless,

without the use of an expert, Plaintiffs fail to establish that the Cook PVI is accurate and reliable

---

[3] Defendants would respectfully request this Court that, if it permits the PVI material into evidence, Defendants be given a brief opportunity to respond and rebut such expert analysis.

and that the 2011 Congressional Map has the effect of creating partisan germanders in several districts.

Plaintiffs have provided no proof that the drafters of the 2011 Congressional Map intentionally drafted it so as to exclude Republicans.  Instead, the evidence demonstrates that Republicans were invited to provide input just as much as any other interested party.  Likewise, Plaintiffs have provided no proof that the 2011 Congressional Map has the effect of gerrymandering districts based on partisanship.  Not only do Plaintiffs offer a standard that has been earlier rejected by the Supreme Court, but they offer one that is demonstrably unworkable and unreliable.  Moreover, Plaintiffs fail to counteract evidence of partisan swings in previous Illinois elections or to introduce expert testimony as to why PVIs, such as the Cook index, are applicable and accurate.  Plaintiffs cannot establish that the 2011 Congressional Map was a partisan gerrymander in violation of the Constitution, and their Motion for a Permanent Injunction must be denied on this ground.

## II.    The Court Should Not Implement Plaintiffs' Proposed Plan

Plaintiffs have failed to prove any of their claims, and the available evidence, in fact, contradicts several of Plaintiffs' claims.  As such, Plaintiffs' Motion for Permanent Injunction should be denied and their Amended Complaint should be dismissed.  However, should this Court conclude otherwise, the Court should not implement Plaintiffs' proposed plan.  Plaintiffs' Congressional District 3 is a racial gerrymander.  (A69, D-26 at 19.)  The district would be brand new, constructed from pieces of Congressional Districts 4, 5, 6, 7 and 9.  (A274, D-119.)  To create Congressional District 3, Plaintiffs largely drained the Latino voting age population from four previous Congressional Districts, 5, 6, 7 and 9.  (A69-76, D-26 at 19-26.)  The difference between the LVAP creating Plaintiffs' Congressional District 3 and the population retained in the new versions of Districts 5, 6, 7 and 9 is nearly 27 percentage points, more than four times

greater than the differential of 6.6 percentage point difference between the inflows to and outflows from Congressional District 4. *Id.* A map of the inflows to Plaintiffs' Congressional District 3 further underscores this point; it shows that Plaintiffs have concentrated virtually every area of high Latino VAP within their proposed district. (A76, D-26 at 26, Map 4.)

That Plaintiffs' Congressional District 3 could be considered regularly shaped and compact does not disprove the gerrymander, according to Plaintiffs' own expert Dr. Engstrom. (A268, D-113 at 22)("[G]errymandering is not limited to funny-shaped districts.") Nor does the fact that the inflows were "necessary" and in some cases small mean that race was not the predominant consideration. In their Memorandum, Plaintiffs describe in detail how the district will remedy the alleged voted dilution and racial gerrymander, but provide no other explanation for the shape, location, or composition of their proposed districts. (Dkt. 105 at 38-39.) Further, Plaintiffs' Congressional District 3 splits nearly three times as many precincts as Congressional District 4: 22 percent versus 8 percent of border precincts. (A78, D-26 at 28, Table 5, Chart 4.) Even accepting Plaintiffs' claim that 53 of the split precincts actually involved a split population, a full 70% of the splits included a higher Latino concentration area in Plaintiffs CD3 according to their own allegations.

In addition, as described *supra*, Plaintiffs' plan substitutes Plaintiffs' partisan objectives for the legislature's objectives. As redistricting is the duty and responsibility of the state through its legislature, the responsibility of crafting new districts, or an entirely new map, should be returned to the legislature. *See Voinovich v. Quilter*, 507 U.S. 146, 156 (1993). As the Supreme Court held in *Wise v. Lipscomb*, 437 U.S. 535, 540 (1978):

> When a federal court declares an existing apportionment scheme unconstitutional, it is therefore, appropriate, whenever practicable, to afford a reasonable opportunity for the legislature to meet constitutional requirements by adopting a substitute measure rather than for the federal court to devise and order into effect

its own plan. The new legislative plan, if forthcoming, will then be the governing law unless it, too, is challenged and found to violate the Constitution.

*See also Harper v. City of Chicago Heights*, 223 F.3d 593, 599-600 (7th Cir. 2000) ("When a Section 2 violation has been found, the district court 'must wherever practicable, afford the jurisdiction an opportunity to remedy the violation first, . . . with deference afforded the jurisdiction's plan if it provides a full, legally acceptable ...'") (quoting *Dickinson v. Indiana State Election Bd.*, 933 F.2d 497, 501 n.5 (7th Cri. 1991)).

## CONCLUSION

For the foregoing reasons, Defendants respectfully request that the Court deny Plaintiffs' Motion for a Permanent Injunction and dismiss Plaintiffs' Amended Complaint with prejudice. Should the Court find in the alternative, Defendants request that the Court allow the legislature another opportunity to craft a new map consistent with the Court's order.

Date: November 14, 2011

Respectfully submitted,

LISA MADIGAN,
Attorney General for the State of Illinois

_____/s/ Brent D. Stratton_____
Attorney for Defendants

Brent D. Stratton
Carl Bergetz
Jennifer Zlotow
Office of the Illinois Attorney General
100 West Randolph, 12th Floor
Chicago, Illinois 60601
(312) 814-3000