**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | |
| | ) | Case No. 11-C-5065 |
| v. | ) ) | |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) ) ) ) ) | Hon. John D. Tinder Hon. Joan H. Lefkow Hon. Robert L. Miller, Jr. (3-judge court convened pursuant to 28 U.S. C. § 2284) |
| Defendants. | ) | |

**APPENDIX 2**
**TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION**
**FOR A PERMANENT INJUNCTION**

**A-51 thru A-100**

EXPERT REPORT OF ALLAN J. LICHTMAN RE: PLAINTIFFS' ALLEGATIONS OF
INTENTIONAL VOTE DILUTION & RACIAL PREDOMINANCE IN REDISTRICTING

OCTOBER 4, 2011

I

D-26

**Statement of Inquiry and Organization**

This report analyzes facts, data, and expert opinion pertinent to Plaintiffs' claims of vote dilution and racial gerrymandering in the case of *Committee for a Fair and Balanced Map, et al. v. Illinois State Board of Elections, et al*, Case No. 11-C-5065. The report is divided into two parts. The first section of this report relates to Plaintiffs' claims of intentional discrimination and vote dilution, looking at *Gingles* prongs 1 and 3 as well as the "totality of the circumstances" test. The second section relates to Plaintiffs' claims that racial considerations predominated in the crafting of Congressional District 4 (CD 4) of the redistricting plan in Public Act 97-0014 (the "Adopted Plan" or "State-passed plan").

My expected fee in this matter is $400 per hour. I have enclosed an updated CV and a table of cases in which I have provided written or oral testimony.

**Summary of Opinions**

My analysis has resulted in the following opinions:

- **Plaintiffs have not established that an additional majority Latino district could be created in Illinois and consequently have not met *Gingles* prong 1.**

- **As set out in my Response to the Report of Richard Engstrom, there is no polarization in the candidate preferences of Latinos and non-Latinos and, further, Latino candidates of choice almost invariably prevailed in endogenous elections and elections pairing Latino and non-Latino candidates; therefore, Plaintiffs cannot meet *Gingles* prong 3.**

- **Analysis of factors considered by courts under the totality of the circumstances test does not show dilution or intent to dilute.**

- **Analysis of the population shifts in and out of CD 4 from the prior Congressional**

2

D-26

Map to the present Map and compactness measures of CD4 do not indicate that race was the predominant factor in the crafting of CD 4.

- Unlike the state passed plan, plaintiffs' alternative plan is predominantly driven by race in its effort to concentrate Latinos into its new Congressional District 3.

Qualifications

I am a Professor of History at American University in Washington, D.C., where I have been employed for 38 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, analysis of redistricting plans, and historical and quantitative methodology. I am the author of numerous scholarly works on quantitative and non-quantitative methods in social science. This scholarship includes articles in such academic journals as Political Methodology, Journal of Interdisciplinary History, International Journal of Forecasting, and Social Science History. It also includes my co-authored book, *Historians and the Living Past.* I have coauthored Ecological Inference with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as Journal of Law and Politics, La Raza Law Journal, Evaluation Review, Journal of Legal Studies, and National Law Journal. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies, published in such academic journals as The Proceedings of the National Academy of Sciences, The American Historical Review, Forecast, and The Journal of Social History. Quantitative and historical

3

D-26

analyses also ground my books, Prejudice and the Old Politics: The Presidential Election of 1928, The Thirteen Keys to the Presidency (co-authored with Ken DeCell), The Keys to the White House, and White Protestant Nation: The Rise of the American Conservative Movement. My most recent book, White Protestant Nation, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America.

I have worked as a consultant or expert witness for both plaintiffs and defendants in more than seventy-five voting and civil rights cases. These include several cases in the state of Illinois. Among other cases, I testified for the prevailing parties in *King v. Board of Elections*, regarding the Latino congressional district in Illinois and also in *Campuzano v. Illinois Board of Election* the statewide challenge to the post-2000 redistricting plan for state legislative positions. In *King*, I testified on behalf of plaintiffs and in *Campuzano* on behalf of defendants. I was also an expert witness in the landmark case of *Garza v. City of Los Angeles*, 756 F. Supp. 1298 (1990), on Latino vote dilution. In many cases, I have analyzed the demography of congressional redistricting plans. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness in defending enacted plans from voting rights challenges. A copy of my resume and a table of cases are attached as Appendix I of this report.

Data and Methods

This report relies on standard data and methods used in social science. The methods and data used for voting analysis are described in my Reply Report to the Report of Dr. Richard L. Engstrom. Methods and data used for the analysis of districts and population flows are described in my Reply Report to the Report of Dr. Peter A. Morrison. This report also relies on standard methods of historical and political analysis that I have applied in my scholarship as a political

4

historian and in my writing on quantitative and non-quantitative methods in historical and social science study. That scholarship is described above.

## SECTION I: CLAIMS OF VOTE DILUTION IN COUNTS I, II, AND III

### A.     Plaintiffs' General Allegations of Intent

Proof of an intentional discrimination claim requires an exacting and stringent expert analysis of circumstantial evidence. Such requirements are explained in a 142 page scholarly article by California Institute of Technology Professor J. Morgan Kousser, the intent expert in *Garza v. Los Angeles County* that plaintiffs cite as the case in which a court found intentional discrimination against Latinos in the crafting of a legislative redistricting plan.[1] There is, however, no analysis of intentional discrimination in either of the expert reports submitted by plaintiffs or any other material submitted by plaintiffs. Rather, plaintiffs' expert reports and the material developed in this case offer no facts, data, or opinions, unlike in the *Garza* case, which allow an inference of racial discrimination to be drawn. Unlike in *Garza*, in this case:

- The Illinois State legislature charged with redistricting had a substantial number of Latinos.

- Substantial facts and data explained below show that the Illinois State legislature has acted affirmatively to expand minority opportunities to participate in the political process. Democrats nearly universally backed such initiatives, whereas Republicans mostly opposed them. No special rules that militate against the interests of minorities exist for the redistricting process in Illinois.

---

[1] J. Morgan Kousser, "How to Determine Intent: Lessons From L. A.," *Journal of Law & Politics*, VII (1991).

D-26

- Nothing in the reports of plaintiffs' experts or any other material submitted by plaintiffs indicates any manipulation of the redistricting process in Illinois to the exclusion of Latinos.

- As indicated in the discussion of the "totality of circumstances" below and in my Reply Report to the Engstrom Report, elections in the Cook County region of Illinois were not marked by polarized voting, and numerous Latino candidates (and white candidates of choice of Latinos) have gained election to the Illinois General Assembly, U.S. Congress, countywide offices in Cook County, and citywide offices in Chicago. Further, the Adopted Plan achieves rough proportionality in Congressional districts relative to the Latino share of citizen voting age population in the state.

- As demonstrated in my Reply Report to the Report of Dr. Engstrom, there are no demonstrable discriminatory effects of the 2011 Congressional redistricting plan in Illinois given the lack of polarized voting, the success of Latino candidates of choice, and the larger number of districts in the state plan, as compared to plaintiffs' plan, with a Latino voting-age population that exceeds Cook County overall.

Although effects and intent are not coterminous, the lack of discriminatory effect in a redistricting plan is a strong indicium of a lack of discriminatory intent. Further, Plaintiffs' claim that the Adopted Plan intentionally discriminated against Latinos in the drawing of districts also lacks credibility in light of the fact that all Latinos in the General Assembly voted for the plan.

Plaintiffs have instead alleged intentional dilution based in large part on contentions of "packing" CD4 in the Adopted Plan. As I set forth in my Response to the Report of Dr. Richard L. Engstrom which I incorporate herein, there is no evidence of packing in CD 4 of the Adopted

D-26

Plan. Furthermore, as I explain below my analysis of CD 4 of the Adopted Plan shows that drafters did not maximize the Latino concentration in that district.

As an additional matter, Plaintiffs have alleged in paragraphs 53 and 54 of their Complaint that CD 3 and CD 5 in the Adopted Plan were drawn to protect the ability of the white majority to defeat candidates of choice for Latino voters. Plaintiffs have not presented any direct or indirect evidence that decision-makers feared that the white majority's preferred candidates would be defeated by the candidates of choice for Latino voters. These allegations are based on a demonstrably false presumption that Latino voters and white voters differ in their preferred candidates in these districts. As indicated in the electoral analysis presented in my Response to the Report of Engstrom, Rep. Lipinski and Rep. Quigley were in fact the candidates of choice for Latinos in CD 3 and CD 5, respectively. Lipinski in CD 3 and Quigley in CD 5 have been the candidates of choice of Latino and non-Latino voters in elections against Latino competitors. This was the case for Representative Lipinski in two Democratic primary elections in CD 3 held in 2008 and 2010, when Lipinski defeated Latino opponents. He was the candidate of choice of Latinos as well as of African Americans and whites. He then won both follow up general elections, likewise with unified support from all three voter groups (see Response to the Report of Engstrom). In the special 2009 general election for the Congressional seat in CD 5 vacated by former Representative Emanuel, Quigley, with unified support from Latinos and non-Latinos, defeated a Latino opponent. (There was insufficient African American population and concentration in CD 5 to estimate separately African American voting.)

In addition to these readily disprovable allegations about CD 3 and CD 5 contained in paragraphs 53 and 54 of their Complaint, Plaintiffs fail to consider the districts drawn by the state in Cook County and bordering regions in the Adopted Plan. Plaintiffs fail to note that while

reducing the Latino percentages in CD 3 and CD 5, the state substantially increased the Latino percentages of two other districts in Cook County and border counties: CD 8 and CD 11. The state increased the Latino voting age population in CD 8 from 14.1 percent to 22.1 percent and the Latino voting age population in CD 11 from 9.2 percent to 21.8 percent. The Adopted Plan thus creates four districts of above 21 percent Latino voting age population, in which Latinos have an opportunity to influence the political process: CD 3, CD 4, CD 8, and CD 11. This compares to three such districts in the previous map drawn in 2001 (CD 3 CD 4 and CD 5) and merely two in plaintiffs' plan (CD 3 and CD 4). Maps 1 and 2 in my Response to the Report of Engstrom portray the four 21%+ Latino voting age districts in the state passed plan and the two such districts in the plaintiffs' alternative plan. By concentrating Latinos in two districts and spreading them out in others, Plaintiffs' plan is far less favorable to Latinos, because it restricts their opportunity to influence the election of candidates of their choice in general elections for Congressional representatives. As demonstrated in my Response to the Engstrom Report, Latinos vote overwhelmingly Democratic in general elections, much more so than whites and others.

**B.    The Three-Part *Gingles* Test**

The U.S. Supreme Court opinion in *Thornburg v. Gingles,* 478 U.S. 30 (1986), guides the expert analysis of voting issues with a three-part test that is a necessary condition for proving a vote dilution claim. The Court set forth the three-part test as follows:

> First, the minority group must be able to demonstrate that it is sufficiently large and geographically compact to constitute a majority in a single-member district ... Second, the minority must be able to show that it is politically cohesive ... Third, the minority must be able to demonstrate that the white majority votes sufficiently as a bloc to enable it-in the absence of special circumstances ... usually to defeat the minority's preferred candidate.

D-26

478 U.S. at 50-51.

Gingles "Prong One." As construed by the United States Supreme Court in *Bartlett v. Strickland*, 129 S. Ct. 1231 (2009), the satisfaction of "prong one" of the *Gingles* test requires a showing that the minority group at issue could constitute at least 50 percent of the voting age population in an additional district. Plaintiffs' alternative plan fails to meet this threshhold in that it creates an additional district (CD 3) that is only 46.5 percent Latino in its voting age population.

Gingles "Prong Three." To meet "prong three" of the *Gingles* test, an analysis must show first that voting is polarized along racial lines in that Latinos and non-Latinos usually prefer different candidates. It also requires a showing that non-Latino bloc voting against Latinos is sufficiently strong to usually defeat the candidates of choice of Latinos in a pattern of elections over time. My Response to the Report of Engstrom shows that neither requirement is met in this case. The evidence and analysis presented in that report demonstrates that Dr. Engstrom cannot provide a reliable and complete assessment of racially polarized voting and the effects of white bloc voting given his limited and unrepresentative sample of elections and other problems with his analysis. Further, the study of a large corpus of relevant Democratic primary and general elections – including Congressional elections, state legislative elections, countywide, and citywide elections – shows that in the great majority of contests there was no polarization in the candidate preferences of Latinos and non-Latinos. In addition, Latino candidates of choice almost invariably prevailed in these elections; more than half of those victories occurred in districts or jurisdictions that were overwhelmingly non-Latino in their voting age population (Congressional District 3, Congressional District 5, Representative District 44, Cook County, and the City of Chicago).

D-26

C.    The "Totality of Circumstances"

In determining whether there has been voter dilution under effects and intent based theories, courts look at the "totality of circumstances." Analysis of factors considered by courts under this test does not show dilution or intent to dilute.

**Factor: The extent of any history of official discrimination in the state or political subdivision that touched the right of members of the minority group to register, vote, or otherwise to participate in the democratic process.** The Illinois State legislature has acted affirmatively to expand minority opportunities to participate in the political process. Recent initiatives include the enactment by the Illinois General Assembly of House Bill 1968 in 2005, which became Public Act 94-0645. To facilitate access to the ballot, this law authorized early voting in Illinois without the necessity of applying for an absentee ballot. The law also provided for a grace period that allowed citizens to register after the regularly established deadline. Such measures are particularly important for improving access to the ballot for minority groups, like Latinos, who have faced barriers to voting in the past. The federal Help America Vote Act Report on Illinois noted, "Illinois law now includes an early voting option, alongside the absentee ballot during the early voting period, to encourage more people to vote and remove time-related barriers that have impeded many voters in the past." Among members of the Illinois House of Representatives and Senate casting votes on this House Bill 1968, the vote almost exactly followed party lines, with almost every Democrat backing the bill and Republicans uniformly opposing the bill.[2]

---

[2] HAVA, "Illinois HAVA Implementation," 2006, p. 5, Illinois/HAVA%20REPORT%202006%201L.htm. National Council of State Legislature, "Voter Identification Requirements." 8 September 2011. http://www.ncsl.org/default.aspx?tabid=16602.

10

D-26

Another recent initiative to enhance minority voting rights was the Illinois Voting Rights Act, enacted by the legislature and signed into law in 2011. The bill will require that in drawing Congressional and state legislative districts, the General Assembly shall draw minority crossover districts, coalition districts, and influence districts all designed to enhance minority opportunities to elect candidates of their choice to legislative positions. The bill passed with bipartisan support in the Illinois State Senate, but followed party lines in the House, with Democrats supporting it and Republicans opposing it.

While courts previously found a history of electoral discrimination against the Latino community in the City of Chicago and Illinois, those findings are twenty or more years old and consequently cannot establish electoral discrimination over the most recent two decades or in the present. To the contrary, as indicated above, Democrats in the Illinois General Assembly and the governorship have taken important steps to advance the ability of Latinos and other minorities to elect candidates of the their choice and participate fully in the political process.

**Factor: The extent to which voting in the elections of the state or political subdivision is racially polarized.** As demonstrated by the analysis presented in my Response to the Report of Engstrom, voting in Cook County has not been racially polarized since at least 2002, even when analysis focuses on contests pitting Latinos against non-Latinos. Rather, Latinos and non-Latinos in Congressional elections and other elections relevant to Congressional races have in the great majority of contests chosen the same candidates of their choice, who have been both Latino and non-Latino. In addition, Latino candidates of choice have almost invariably prevailed in both Democratic primaries and general elections.

**Factor: The extent to which members of the minority group have been elected to public office in the jurisdiction.** Considerable numbers of Latinos have been elected to public

11

office in Illinois, especially in the Cook County region. In this region, a Latino (Gutierrez) has been elected as a member of Congress and in recent elections Latinos have been elected to countywide positions in Cook County and citywide positions in Chicago, even though Cook County is 79 percent non-Latino in its voting age population and Chicago is 75 percent non-Latino in its voting age population. Since the last redistricting, Latinos have been elected Cook County State's Attorney, Cook County Assessor, and City of Chicago Clerk. Latinos have been elected as well to State House and State Senate positions in Cook County, the closest analogue to Congressional offices. Overall, according to a survey by the National Association of Latino Elected Officials (NALEO) there were 113 Latino elected officials in Illinois in 2010, placing the state seventh in the nation (tied with New Jersey). This number represents a 176 percent increase in Latino office-holding since 1996, when Latinos held only 41 elected offices in Illinois. The NALEO report lists the nine states with the largest number of Latino elected officials in 2010. Of these states, Illinois' rate of increase in Latino elected officials since 1996 was second only to New Jersey.[3]

Factor: Rough Proportionality. While not one of the initial "totality of circumstances" factors, in *Johnson v. de Grandy*, 512 U.S. 997 (1994), the U. S. Supreme Court introduced the issue of "rough proportionality" in a jurisdiction's creation of effective minority districts. This issue was construed by the Seventh Circuit in *Barnett v. City of Chicago*, 141 F.3d 699 (7th Cir. 1998). The Court noted, "An important consideration in deciding whether a districting plan discriminates is whether the plan creates majority districts for each group in proportion to each group's electoral potential." *Id.* at 703. The Court further held, "We think that citizen voting-age population is the basis for determining equality of voting power that best comports with the

---

[3] NALEO. *A Profile Of Latino Elected Officials In The United States And Their Progress Since 1996* (2010), p. 4.

D-26

policy of the statute." *Id.* at 704. With the creation of effective minority opportunity district CD 4, the state has achieved rough proportionality according to this standard. According to the latest U.S. Census data from the American Community Survey sample, the Latino citizen voting age population of the state of Illinois is 8.2 percent. Multiplied by 18 congressional districts, this percentage equals 1.48 congressional districts, which is roughly proportional to the one clearly effective Latino opportunity district (CD 4) created by the state.

## SECTION II: THE CLAIM OF RACIAL GERRYMANDER IN COUNT IV

My analysis of the available facts and data as well as Plaintiffs' experts' opinions does not indicate that race could have been the predominant factor in the drawing of CD 4. Rather, the contrary inference should be drawn from the pertinent facts and data.

First, as indicated by Table 1 and Map 1, the drafters of the Adopted Plan did not move population in and out of previous Congressional District 4 in order to maximize or nearly maximize the Latino share of the voting age population in the new version of this district, as would be expected if the district was drawn predominantly according to race. According to the data reported in Table 1, 15,619 persons of voting age with a Latino percentage 86.8 percent were extracted from existing CD 4 and added to new CD 3 under the state passed plan. An additional 15,542 persons of voting age with a Latino percentage of 60.5% were extracted from existing CD 4 and added to new CD 7 under the state passed plan. As shown in Map 1, which

13

D-26

Table 1
Voting Age Population of High Latino VAP Areas From Existing CD 4 to Other New
Districts and Inflow of Low Latino VAP Areas to CD 4 From Other Existing Districts:
State Passed Congressional Plan

| OUTFLOW OF HIGH LATINO VOTING AGE POPULATION FROM EXISTING CD 4 | | | |
|---|---|---|---|
| NEW DISTRICT | TOTAL VAP | HISPANIC VAP | HISPANIC VAP % |
| TO NEW CD3 | 15,619 | 13,560 | 86.82% |
| TO NEW CD7 | 15,542 | 9,399 | 60.47% |
| INFLOW OF LOW LATINO VOTING AGE POPULATION FROM OTHER EXISTING DISTRICTS TO STATE PASSED CD 4 | | | |
| FROM EXISTING CD3 | 53,737 | 19,602 | 36.48% |
| FROM EXISTING CD7 | 7,414 | 1,694 | 22.85% |

D-26

Map 1
Outflow of Census Blocks From Previous CD 4 to Other New State Passed Districts: Red =
Blocks 60%+ Latino In VAP, Green = Blocks 60% or Less Latino VAP



15

A65

D-26

displays population outflows from previous CD 4 in new state adopted districts, these areas with high concentrations of Latinos were on the border of new CD 4 and could have easily been retained within CD 4, if the state's plan was predominantly driven by racial considerations. With a 2010 Census population of 601,156, previous CD 4 was 111,657 persons short of the target population for new Congressional districts of 712,813 and did not need to shed these heavily Latino areas. As shown in Map 2, which displays population inflows from other previous districts into new CD 4, there were areas with lower concentrations of Latinos that the state need not have transferred into CD 4 if it had chosen to retain in this district areas with high concentrations of Latinos.[4]

These patterns of shifting population out of and into previous CD 4 contradict the notion that race predominated in the drawing of CD 4 under the Adopted Plan. As the calculations in Table 2 below indicate, by doing nothing more than retaining in previous CD 4 the heavily Hispanic areas moved to other districts and not bringing in an equivalent voting age population from other districts with low Hispanic concentration, the state could have increased the Latino voting age population in CD 4 by 2.5 percentage points. This would have raised the Latino voting age percentage in revised CD 4 in the state's plan to 68.4 percent, making the Latino voting age share of the new district higher, not lower, than the 68.1 percent in previous CD 4. Instead, the Adopted Plan actually lowered the Latino voting age population in CD 4 by 2.2 percentage points from the previous map.

---

[4] Although there were blocks with a 65%+ Latino VAP transferred into new CD 4, many were contained within areas of lower Latino concentration in contrast to the outflow pattern from previous CD 4, where the heavy Latino areas were largely self-contained and not included within areas of lower Latino concentration.

D-26

Map 2
Inflow of Census Blocks From Other Previous Districts Into New State Passed CD 4: Red =
Blocks 60%+ Latino In VAP, Green = Blocks 60% or Less Latino VAP



17

A67

D-26

Table 2
**The Increase in Latino Voting Age Population for a Revised CD4 in the State Passed Plan Achieved by Retaining High Latino Concentration Areas Moved Out of Previous CD4 and Eliminating Lower Latino Concentration Areas Moved Into New CD4.**

| | Total | Latino |
|---|---|---|
| High Latino Concentration VAP not moved from existing CD4 to new CD3 and CD 7 | 31,161 | 22,959 |
| Lower Latino VAP not moved into new CD4 from other districts. | | |
| Previous CD7 | 7,414 | 1,694* |
| Previous CD3 | 23,747 | 8,663** |
| Total | 31,161 | 10,357 |
| Net increase in VAP in New CD4 | 0 | 12,602 (22,959-10,357) |
| VAP in new CD 4 prior to revisions | 507,602 | 334,614 |
| VAP in new CD4 After Revisions | 507,602 | 349,216 |

**Latino Voting Age Percentage in Revised CD4 = 68.4% (349,216/507,602)**

**Increased Latino Percentage in Revised CD4 = 2.5% (68.4-65.9)**

* The exact amount of VAP and Latino VAP moved into new CD4 from previous CD7
** The amount of VAP moved into new CD4 from previous CD3 to equal 31,161. The Latino component was obtained by multiplying 23,747 by .3648 the average Latino share of this VAP.

18

D-26

A68

Chart 1 portrays the differences in the Latino voting age population of CD 4 under the existing plan, the Adopted Plan, and as revised above. This increase in Latino voting age population also would have been the product only of shifts in large areas of population. The state could have increased the Latino concentration in CD 4 even more by splitting additional precincts and picking and choosing among individual blocks moved into and out of existing CD 4. There are only 40 split precincts in all of new CD 4 under the state's plan, which is just 8 percent of the 510 precincts in this district that touch upon its border with other districts. Unlike the Adopted Plan, plaintiffs' alternative plan is predominantly driven by race in its effort to concentrate Latinos into its new CD 3. This is a newly created district that bears no relationship to CD 3 under the previous plan. It is created by capturing the northern component of previous CD 4 and adding population from previous CD 5, CD 6, CD 7, and CD 9. By splitting existing CD 4 into north/south components, plaintiffs' CD 3 keeps the southern concentration of Latinos in existing CD 4. However, as Map 3 illustrates, plaintiffs also exclude a northern area of low Latino concentration that could have been included within their new CD 3. On Map 3, areas in red are greater than 50 percent Latino, whereas areas in green are 50 percent or less Latino. The concentration of Latinos in plaintiffs' new CD 3 is further demonstrated by comparing the percentage of the Latino voting age population contributed to new CD 3 from previous CD 5, CD 6, CD 7, and CD 9, with the Latino voting age percentage of the population retained in the new versions of these four districts. Table 3 provides this comparison. As reported in Table 3, the Latino percentage of the voting age population contributed to plaintiffs' new CD 3 from these previous four districts is 37.2 percent. As also reported in Table 3, the Latino percentage of the voting age population retained in plaintiffs' new versions of CD 5, CD 6, CD 7, and CD 9 is 10.6 percent. Thus plaintiffs largely drained the

D-26

Chart 1
Comparison of Latino Voting Age Percentage, Existing CD 4, Adopted CD 4, & Revised
CD 4



20

D-26

A70

Map 3
Outflow of Census Blocks From Existing CD 4 to Plaintiffs' CD 3: Red = Blocks 50%+
Latino In VAP, Green = Blocks 50% or Less Latino VAP



**CD 3 Fair Map**

Outflow

Legend
☐ CD 3 in the Fair Map Proposal
· CD 4 in the 111th Congressional
⌐ ¯ ¯ Area of CD 4 in the 111th that remained as CD 3 in the Fair Map
Hispanic Voting Age Percent by Block
■ 0% - 50%
■ 50.01% - 100%

21

D-26

Table 3
Voting Age Population Inflow From Previous CD 5, CD 6, CD 7 and CD 9 to New CD 3 In
Plaintiffs Alternative Plan and Voting Age Population In CD 5, CD 6, CD 7, and CD 9 Not
Moved to News CD 3

| INFLOW OF VOTING AGE POPULATION TO NEW CD3: PLAINTIFFS' PLAN | | | |
|---|---|---|---|
| DISTRICTS | TOTAL VAP | LATINO VAP | LATINO VAP PERCENTAGE |
| FROM EXISTING CD5 | 242,633 | 95,169 | 39.22% |
| FROM EXISTING CD6 | 58,599 | 19,846 | 33.87% |
| FROM EXISTING CD7 | 37,249 | 12,062 | 32.38% |
| FROM EXISTING CD9 | 9,601 | 2,413 | 25.13% |
| TOTAL | 348,082 | 129,490 | 37.2% |
| VOTING AGE POPULATIONS IN NEW CD5, CD6, CD7, AND CD9: PLAINTIFFS' PLAN | | | |
| DISTRICTS | TOTAL VAP | LATINO VAP | LATINO VAP PERCENTAGE |
| NEW CD5 | 598,584 | 73,950 | 12.35% |
| NEW CD6 | 538,274 | 74,922 | 13.91% |
| NEW CD7 | 552,362 | 33,765 | 6.11% |
| NEW CD9 | 553,642 | 56,072 | 10.13% |
| TOTAL | 2,242,862 | 238,709 | 10.64% |

22

D-26

Latino voting age population from four previous districts to maximize the Latino population in new CD 3. As illustrated in Chart 2, the differential between the Latino voting age percentage of the population added to new CD 3 from the four previous districts and the Latino voting age population retained in the new versions of these districts under plaintiffs' plan is nearly 27 percentage points. As illustrated in Chart 3, this differential in Latino voting age population is more than four times greater that the differential of 6.6 percentage points indicated in Dr. Morrison's report for the flow of population into and out of CD 4 under the state's plan.

Map 4 traces the population flows into CD 3 described above. On Map 4, areas in red are greater than 50 percent Latino, whereas areas in green are 50 percent or less Latino. Map 4 shows that plaintiffs have concentrated virtually every area of red territory within their CD 3 rather than surrounding districts.

Table 4 further demonstrates the draining in Plaintiffs' Plan of Latinos from CD 5, 6, 7, and 9 of the existing plan. Table 4 compares the current 2010 Latino voting age population of these existing districts with the Latino voting age population in Plaintiffs' new versions of each district. As indicated in Table 4, in every one of these four Congressional Districts, Plaintiffs' Plan has reduced the Latino voting age percentage of the existing Congressional District. In CD 5, plaintiffs' plan cuts the Latino voting age percentage in half, reducing this percentage from 24.56 percent to 12.35 percent, a reduction of 12.21 percentage points. Another important indicium of districts drawn predominantly according to race is the splitting of voter precincts. By splitting precincts, within the limits of geographic location, plan drawers can allocate the more concentrated and less concentrated Latino blocks within precincts to different districts. In creating new CD 3, plaintiffs split 77 voter precincts, compared to the 40 precincts that the state split in creating congressional district 4, as indicated in Table 5.

23

D-26

**Chart 2**
**Comparison Between Latino Inflow and Outflow of Voting Age Population**
**in CD 3 under the Plaintiffs' Plan**



24

A74

D-26

**Chart 3**
**Differential Between Latino Inflow and Outflow of Voting Age Population,**
**CD 4 in the State Plan Compared to CD 3 in Plaintiffs' Plan, Differential in Percent**



D-26

Map 4
Inflow of Census Blocks to Plaintiffs' CD 3 From Surrounding Districts: Red = Blocks
50%+ Latino In VAP, Green = Blocks 50% or Less Latino VAP

## CD 3 Fair Map Inflow



Table 4
The Latino Voting Age Population of 2002 Congressional Districts 5, 6, 7, and 9 Compared
to the Latino Voting Age Population of Congressional Districts 5, 6, 7, and 9 in Plaintiffs'
Plan

| CONGRESSIONAL DISTRICT | LATINO VAP IN 2002 VERSION | LATINO VAP IN PLAINTIFFS' PLAN | DIFFERENCE |
|---|---|---|---|
| CD 5 | 24.56% | 12.35% | -12.21% |
| CD 6 | 15.31% | 13.92% | -1.39% |
| CD 7 | 8.04% | 6.11% | -1.93 |
| CD 9 | 10.94% | 10.13% | -0.81% |

27

D-26

CD 3 in the plaintiffs' plan split nearly twice as many precincts as CD 4 in the state passed plan, even though it includes many fewer precincts that touch the district border and could be divided between districts. As indicated in Table 5, CD 3 in the plaintiffs' plan includes 354 border precincts, whereas CD 4 in the state passed plan includes 510 border precincts, nearly half again as many. As additionally indicated in Table 5 and Chart 4, CD 3 in the plaintiffs' plan splits 22 percent of its border precincts, whereas CD 4 in the state passed plan splits only 8 percent of its border precincts. Thus, in drawing CD 3, plaintiffs split nearly three times the percentage of border precincts than the state did in drawing CD 4. If the drafters of the state's plan had split precincts in CD 4 in proportion to the percentage of precincts split in CD 3 under plaintiffs' plan, that would have resulted in the splitting of 72 additional precincts.[5]

---

[5] 510*.22 = 112 splits − 40 actual splits = 72 additional splits.

Table 5
Split Precincts and Border Precincts: CD 3 In Plaintiffs' Congressional Plan and CD 4 in
the State Passed Congressional Plan

| DISTRICT | NUMBER OF SPLIT PRECINCTS | NUMBER OF PRECINCTS ON DISTRICT BORDER | PERCENTAGE OF BORDER PRECINCTS SPLIT |
|---|---|---|---|
| | | | |
| CD 3 PLANTIFFS' PLAN | 77 | 354 | 22% |
| | | | |
| CD 4 STATE PASSED PLAN | 40 | 510 | 8% |
| | | | |
| SOURCE: ILLINOIS HOUSE REDISTRICTING OFFICE | | | |

29

D-26

**Chart 4**
**Percentage of Border Precincts Split, CD 4 in the State Plan Compared to CD 3 in**
**Plaintiffs' Plan**



D-26

With respect to expert presentation and analysis of indirect evidence of allegations of racial predominance in the drawing of the state passed CD 4, the Report of Engstrom opines that CD 4 has relatively low compactness scores. After presenting his measurements of compactness of CD 4 in the Adopted Plan, Dr. Engstrom fails to compare these statistics to any benchmark measures. Instead, without examining alternative explanations, he concludes that, "The most apparent reason for the bizarre shape of CD 4 in the Adopted Plan is a desire to create a district with extremely high concentration of Latinos." (p. 11).

In and of itself, Dr. Engstrom's analysis of compactness is incomplete and inaccurate. He does not compare either of his compactness scores to scores for the 1991 or the 2002 versions of CD 4. According to information conveyed by Professor Gerald R. Webster, Chair of the Department of Geography at the University of Wyoming, the CD 4 in the Adopted Plan is more compact than either of the earlier versions of the district, based on both dispersion and perimeter scores. Moreover, according to Professor Webster, Dr. Engstrom's calculation of the Reock geographic dispersion measure is off by 100 percent; the proper measure is .30, not .15. (The *lower* the Reock score, the *less* compact the district.) Professor Webster's results are based on calculations conducted by the University of Alabama Cartographic Research Laboratory, a standard resource for such work. The Laboratory conducted their calculations twice to confirm their results. I personally confirmed these results with the Laboratory as well. The Laboratory calculated a Reock score of .30, compared to Dr. Engstrom's score of .15. This difference is of substantive significance given that analysts have recognized scores of .15 or below as the cutoff point for indicating low compactness.[6] The compactness measurement in the Adopted Plan's CD

---

[6] Richard H. Pildes and Richard G. Niemi, "Expressive Harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances After *Shaw v. Reno*," *Michigan Law Review*, 92 (1993).

4 and the increase in compactness since 1991 is not indicative of race being a predominant factor in the drawing of CD in the Adopted Plan.

Moreover, in its construction of new CD 4, the Adopted Plan preserves the core of the district of Democratic Representative Gutierrez, a nearly 20-year incumbent, and, in turn, his relationship with his constituents. Preserving this core, protecting incumbents, and maintaining relationships between representatives and constituents are valid, non-racial reasons for the drawing of a district. The correlation between partisan affiliation and Latino ethnicity is strong in CD 4 of the Adopted Plan. As demonstrated by the electoral analysis in my Reply Report to the Report of Richard Engstrom, Latinos and African Americans vote overwhelmingly Democratic in general elections, far more so than whites and others. As indicated in Table 6, 82 percent of the population in existing CD 4 is preserved in the state passed plan. The existing plan also preserves the core of CD 3 and Democratic incumbent Representative Lipinski's relationship with his constituents. Lipinski has been the candidate of choice of Latino voters in both primary and general elections. As indicated in Table 6, 76 percent of the population in existing CD 3 is preserved in the state passed plan.

D-26

Table 6
Incumbent Placement and the Retention of Previous Constituents: State Passed Plan
Compared to Plaintiffs' Alternative Plan

| EXISTING DISTRICT | INCUMBENT | POPULATION OF EXISTING DISTRICT | INCUMBENT NEW DISTRICT | POPULATION RETAINED IN NEW DISTRICT | % RETAINED |
|---|---|---|---|---|---|
| STATE PASSED PLAN | | | | | |
| CD 4 | GUTIERREZ (HD) | 601,156 | CD 4 | 494,541 | 82% |
| CD 3 | LIPINSKI (WD) | 663,381 | CD 3 | 506,998 | 76% |
| CD 5 | QUIGLEY (WD) | 648,610 | CD 5 | 511,438 | 79% |
| CD 13 | BIGGERT (WR) | 773,095 | CD 5 | 10,196 | 1% |
| PLAINTIFFS' ALTERNATIVE PLAN | | | | | |
| CD 4 | GUTIERREZ (HD) | 601,156 | CD 3 | 289,198 | 48% |
| CD 3 | LIPINSKI (WD) | 663,381 | CD 13 | 23,520 | 4% |
| CD 5 | QUIGLEY (WD) | 648,610 | CD 5 | 324,994 | 50% |
| CD 13 | BIGGERT (WR) | 773,095 | CD 13 | 519,406 | 67% |

33

D-26

Plaintiffs' alternative plan fails to achieve any of these objectives. Plaintiffs' plan actually moves Gutierrez from existing CD 4 to new CD 3, which preserves only 48 percent of his previous constituents and reduces the Latino voting age population of his district by more than 21 percentage points (from 68.1% to 46.5%). Dr. Engstrom's report indicates that CD 3 under the plaintiffs' plan is not an effective Latino opportunity district but an "influence district" and that Gutierrez might not even choose to run there. He states, "Latinos would have a chance to influence the outcomes of elections in CD 3 in the Plaintiffs' Plan, even if Mr. Gutierrez (a resident of the district) does not seek reelection in it." (p. 13)

In addition, Plaintiffs' plan dismantles existing CD 3 and moves Democratic incumbent Lipinski to a new CD 13, where he is paired with Republican incumbent Biggert. CD 13 under the plaintiffs' plan includes only 4 percent of the population of Lipinski's previous District 3, while it retains 67 percent of the population from previous District 13, which Biggert currently represents. As compared to CD 3 under the Adopted Plan, CD 13 under the plaintiffs' plan cuts nearly in half the voting age population of heavily Democratic Latinos and African Americans in Lipiniski's existing district, reducing his minority component from 29 percent to 15 percent. It also includes Republican-leaning voters. Thus, under plaintiffs' plan, Lipinski is paired in a favorably Republican district with very few of his previous constituents and with a Republican incumbent who retains two-thirds of her previous constituents.

As such, Plaintiffs' plan pursues Republican partisan objectives rather than the partisan objectives of the Democratic majority in the Illinois General Assembly. Understandably, Republicans would prefer a Congressional redistricting plan that facilitated the election of Republicans rather than Democrats, which is precisely what their proposed plan would

34

A84

D-26

accomplish even at the expense of Latino influence in two congressional districts. According to the Complaint, "The Proposed Congressional Plan [the Adopted Plan] also engages in impermissible partisan gerrymandering that dilutes the ability of Republican voters in Illinois to elect candidates of their choice." (Complaint, paragraph 69, p. 16.) The Complaint proffers partisan, non-racial objectives for changes in Congressional districts 3 and 11 outlined above: "While the entire Proposed Congressional Plan reflects a statewide partisan gerrymander, proposed Districts 3 and 11 are especially blatant examples of partisan gerrymandering." (Complaint, paragraph 75, p. 18.) In sharp contrast to their allegations of intentional discrimination against Latinos, the complaint provides extensive, detailed, and specific information showing how the Adopted Plan allegedly advances Democratic partisan objectives in these and other districts in Cook County and the border region. (See Complaint, paragraphs 76-95, pp. 18-22.)

In *Easley v. Cromartie* the U. S. Supreme Court ruled on the issue of legitimate political objectives in instances, such as the present case, where there is a high correlation between racial identification and political affiliation and the state is pursuing "legitimate political objectives." The Court ruled as follows:

> We can put the matter more generally as follows: In a case such as this one where majority-minority districts (or the approximate equivalent) are at issue and where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional districting principles. That party must also show that those districting alternatives would have brought about significantly greater racial balance. Appellees failed to make any such showing here. We conclude that the District Court's contrary findings are clearly erroneous. Because of this disposition, we need not address appellants' alternative grounds for reversal.

*Easley v. Cromartie*, 532 U.S. 234, 258 (2001).

35

This doctrine is clearly relevant to the present matter. As indicated above, race and party are highly correlated in Illinois and the state has achieved political objectives that are consistent with such traditionally redistricting principles as maintaining the core of existing districts and protecting incumbents. Plaintiffs' plan achieves opposite political objectives of the Adopted Plan and brings about significantly less racial balance. Plaintiffs' Plan reduces the Latino presence in four districts and dismantles Latino influence districts. In addition to the Latino voting age majority district in each plan, the Adopted Plan includes three Latino influence districts in the Cook County and border region, whereas Plaintiffs' Plan includes just one. Unlike the Adopted Plan, Plaintiffs' Plan is also predominantly driven by race in its concentration of Latinos in CD 3 at the expense of other districts.

## CONCLUSIONS

Evaluating evidence pertinent to vote dilution and racial gerrymandering, this report finds neither in the Adopted Plan. To the contrary, the evidence contradicts any finding of racial discrimination. Specifically, this report concludes that Plaintiffs have not met either *Gingles* prong 1 or prong 3 and that an analysis of factors considered by courts under the totality of the circumstances test does not show dilution or an intent to dilute. Analysis shows no evidence of intentional discrimination in the Illinois Congressional redistricting. Analysis of the population shifts in and out of CD 4 show that the state did not maximize or nearly maximize the Latino concentration in CD 4. Plaintiffs' experts' reports and the facts and data developed in the case do not indicate race was the predominant factor in the redrawing of CD 4 of the Adopted Plan; and rather, the plaintiffs' alternative plan is predominantly driven by race in its effort to concentrate Latinos into its new Congressional District 3. The Adopted Plan also achieves legitimate political objectives and traditional non-racial redistricting objectives that are contradicted in Plaintiffs'

D-26

Plan. The Adopted Plan also achieves greater racial balance than Plaintiffs' Plan.[7]

---

[7] My report is based upon facts, data, and analyses currently available. If additional facts, data, or analyses are elicited in the discovery of this case, I reserve the right to supplement my report to reflect such additional information if necessary.

D-26

Executed on October 4, 2011:

Allan J. Lichtman

D-26

EXPERT REPORT OF ALLAN J. LICHTMAN: RESPONSE TO THE REPORT OF
DR. RICHARD L. ENGSTROM

OCTOBER 4, 2011

1

*Lichtman* EXHIBIT 4

FOR I.D. 10 20 11 / alf

**Statement of Inquiry and Organization**

1.     This report responds to the Expert Report of Richard L. Engstrom (plaintiffs'

expert, dated September 14, 2011) relating to the case *Committee for a Fair and Balanced Map,*

*et al. v. Illinois State Board of Elections, et al.*, 11-C-5065.  The report is divided into four parts.

The first section of this report explores internal problems with the Engstrom Report. The second

section considers whether Latino and non-Latino voting is polarized along racial lines and if so

whether non-Latino bloc voting usually is sufficient to defeat the Latino candidates of choice.

The third section analyzes Engstrom's assessment of the electoral opportunities in CD 3 and CD

4 of the redistricting plan in Public Act 97-0014 (the "Adopted Plan" or "state-passed plan") and

plaintiffs' plan, as well as his conclusions regarding the concentration of Latinos into CD 4 under

the Adopted Plan.  The fourth section is my assessment of Engstrom's compactness analysis.

2.     My expected fee in this matter is $400 per hour. I have enclosed an updated CV

and a table of cases in which I have provided written or oral testimony.

**Summary of Opinions**

3.     My analysis has resulted in the following opinions:

- **The Engstrom Report, which examines only 8 elections, fails to provide a sufficiently large and probative set of elections to ascertain whether or not there is a usual pattern of racially polarized voting between Latinos and non-Latinos.**

- **This limited sample of elections also fails to provide a sufficient basis for assessing whether non-Latino bloc voting, if it exists, is usually sufficient to defeat Latino candidates of choice.**

- **The Engstrom Report includes numerous errors in the identification of**

2

candidates and in the polarization estimates produced by his methodology.

- The Engstrom Report cannot be relied upon for a complete and accurate analysis of racially polarized voting or vote dilution.

- Analysis of a large and relevant set of 23 Latino versus non-Latino elections demonstrates a lack of polarized voting in the great majority of these contests.

- Analysis further demonstrates that Latino candidates have nearly always prevailed in these 23 elections.

- Thus, in Cook County, the focus of this litigation, there is no pattern of polarized voting that is usually sufficient to defeat the Latino candidate of choice.

- In Cook County there is an overwhelming pattern of voting that is not polarized between Latinos and non-Latinos and an overwhelming pattern of victory, not defeat, for Latino candidates of choice.

- The Engstrom Report fails to provide the district specific analysis needed to establish a claim of vote dilution or show that it is feasible to create an additional Latino majority district for the election of members of Congress from Illinois.

- The Engstrom Report fails to sustain allegations that the state excessively concentrated or "packed" Latinos in Congressional district 4 and drained Latinos from other districts to the detriment of Latino voters.

- Engstrom errs in his calculation of one compactness measurement for CD 4 in the Adopted Plan. Further, the relevant compactness measurements are at

3

or above the suggested cutoff levels for low compactness, and CD 4's level of compactness has increased in each of three successive redistricting plans (1991-2011).

## Qualifications

4.      I am a Professor of History at American University in Washington, D.C., where I have been employed for 38 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, analysis of redistricting plans, and historical and quantitative methodology. I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as Political Methodology, Journal of Interdisciplinary History, International Journal of Forecasting, and Social Science History. In addition, I have coauthored Ecological Inference with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as Journal of Law and Politics, La Raza Law Journal, Evaluation Review, Journal of Legal Studies, and National Law Journal. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies, published in such academic journals as The Proceedings of the National Academy of Sciences, The American Historical Review, Forecast, and The Journal of Social History. Quantitative and historical analyses also ground my books, Prejudice and the Old Politics: The Presidential Election of 1928, The Thirteen Keys to the Presidency (co-authored

4

with Ken DeCell), The Keys to the White House, and White Protestant Nation: The Rise of the American Conservative Movement. My most recent book, White Protestant Nation, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America.

5.     I have worked as a consultant or expert witness for both plaintiffs and defendants in more than seventy-five voting and civil rights cases. These include several cases in the state of Illinois. Among other cases, I testified for the prevailing parties in *King v. Board of Elections*, regarding the Latino Congressional district in Illinois and also in *Campuzano v. Illinois Board of Election* the statewide challenge to the post-2000 redistricting plan for state legislative positions. In *King*, I testified on behalf of plaintiffs and in *Campuzano* on behalf of defendants. I was also an expert witness in the landmark case of *Garza v. City of Los Angeles*, 756 F. Supp. 1298 (1990), on Latino vote dilution. In many cases, I have analyzed the demography of Congressional redistricting plans. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness in defending enacted plans from voting rights challenges. A copy of my resume and a table of cases are attached as Appendix I of this report.

**Data and Methods**

6.     The voting analysis in this report relies on standard data utilized in social science: precinct by precinct election returns for each candidate in elections, with candidates identified by race and precinct by precinct breakdowns of voting age Latinos, African-Americans, and Whites, which includes a small number of Asians and members of other races. The election and demographic data and the racial identification of candidates were obtained from the staff of the Redistricting Office of the Illinois Speaker of the House of Representatives. This information

5

A93                                                            D-27

was obtained electronically. I also obtained election results from the websites of the Illinois State
Board of Elections, the Cook County Board of Elections, and the City of Chicago Board of
Elections. To estimate the voting of Latinos, African-Americans, and whites (a group that also
includes some Asians and members of other races) the analysis utilizes the standard
methodology of ecological regression that I have employed in some 75 previous voting rights
cases and applied to the analysis of many thousands of elections and the study of numerous
redistricting plans. The ecological regression procedure estimates the voting behavior of
demographic groups such as non-Latinos and Latinos by comparing the racial composition of
voting precincts to the division of the vote among competing candidates in each precinct. It
produces an equation that estimates both the turnout and voting for each candidate by each voter
group. The procedure was accepted by the Supreme Court in *Thornburg v. Gingles,* 478 U.S. 30
(1986), and applied by the Court to single-member districts plans in *Quilter v. Voinovich,* 113 S.
Ct 1149 (1993). My analysis based on these methods was cited authoritatively several times by
the United States Supreme Court in the Congressional redistricting case, *League of United Latin
Am. Citizens (LULAC) v. Perry,* 548 U.S. 399 (2006).[1]

   7.     The results of ecological regression analysis were also checked and verified in
several ways. First, the analysis was checked and verified to make sure that the estimates of
voting behavior by demographic groups accurately represented the actual votes for candidates in
the election. Second, the analysis was checked as verified by the method of extreme case or

---

1 For a scholarly analysis of ecological regression and why it works well in the context of analyzing the voting of
racial groups, especially Latinos and non-Latinos, see, Allan J. Lichtman, "Passing the Test: Ecological Regression
in the *Garza* Case and Beyond," *Evaluation Review* 15 (1991). This article also shows why Dr. Engstrom is
incorrect in his critique that ecological regression depends on linearity of voting by demographic groups in all
precincts. Following my standard practice, I utilized the two equations and weighted ecological regression procedure
that adjusts for turnout and for differences in the voting-age populations of precincts. Bernard Grofman, the expert
witness in the *Gingles* case, and myself were co-originators of this statistical methodology which I have since
refined, to introduce a method of bounds see, Bernard Grofman, Lisa Handley, Richard G. Niemi, *Minority
Representation and the Quest for Voting Equality* (New York: Cambridge University Press, 1992), pp. 102, 146.

homogeneous precinct analysis, also accepted by the Supreme Court in *Gingles*, and by the

graphic analysis of data. The method of homogeneous precinct analysis examines the actual

votes cast for candidates in precincts that are heavily of one race. This methodology involves no

inferential procedures. It simply tallies the votes actually cast for Latino and non-Latino

candidates in the precincts chosen for this analysis. Although it will not exactly reproduce

estimates derived from all precincts, if there are large numbers of extreme-case precincts, the

actual votes for candidates should approximate those estimates.[2] Additional verification includes

the examination graphic displays of the relationship between voting-age percentages of

demographic groups in precincts with the division of the vote in the precincts. These various

forms of verification are designed to reveal any anomalies and to make sure that the ecological

regression results with reasonable accuracy estimate the actual votes cast in the election for each

candidate. All of the additional procedures verified the ecological regression estimates derived

for this report.[3]

---

2 For Latinos, citizenship and turnout issues often mean that the actual voters in the extreme-case precincts will have a lower percentage than the voting age population and results should be interpreted accordingly.

3 Dr. Engstrom utilizes another method known as ecological inference, developed by political scientist Gary King in 1997. This method has not had nearly the rigorous testing of ecological regression. In *Black Political Task Force v. Galvin*, 300 F. Supp. 2d 291 (2004), Dr. Engstrom presented the Court with both ecological regression and ecological inference estimates, but the Court set aside ecological inference results in favor of the more tested methods of ecological regression and homogeneous precinct analysis. The investigators in a recent survey of voting rights cases found that they could not "discover any instance of a court finding racial bloc voting when the plaintiff did not present evidence from ecological regression or extreme case analysis. Note that courts have, for the most part, considered a third ecological inference technique, called 'King's EI,' only when it conforms with the results of regression and/or extreme case." (D. James Greinier, "Re-Solidifying Racial Bloc Voting: Empirics and Legal Doctrine in the Melting Pot," *Indiana Law Journal* 86 (2011), p. 454. Ecological regression and ecological inference generally produce very similar results. However, as will be demonstrated above, as applied by Dr. Engstrom in his report, ecological inference has produced results that do not conform with the actual results of elections. Dr. Engstrom also employs no means for checking or verifying his ecological inference results.

7

## SECTION I: THE PROBLEMS WITH ENGSTROM'S RACIAL POLARIZATION AND DILUTION ANALYSIS

8.     Dr. Engstrom sets forth two goals in his report. The first goal is to determine whether voting is polarized along racial lines in a limited area of Cook County that Engstrom identifies as CD 4 of the Adopted Plan and CD 3 and CD 4 of Plaintiffs' Plan. (Engstrom, p.3.) This inquiry requires the examination of relevant elections over time to determine whether Latinos and non-Latinos usually differ in their candidate preferences. Dr. Engstrom's second goal is to determine whether polarized voting, if it exists, results in the dilution of Latino opportunities to elect candidates of their choice in the identified area. This second inquiry into any discriminatory effects of racially polarized voting also requires the scrutiny of a pattern of results over time to assess whether non-Latino bloc voting usually defeats candidates of choice of Latinos in districts under the challenged plan. Dr. Engstrom's limited and unrepresentative sample of elections, however, is not sufficient to reliably assess polarized voting or dilution in the identified area or in Cook County.

9.     In addition, Dr. Engstrom does not conduct the additional study as to whether voter polarization, if it exists, impedes the opportunity for Latino voters in the identified area or in Cook County to elect candidates of their choice and participate fully in the political process in Congressional districts under the state's plan. Further, he does not consider the full range of the "totality of the circumstances" relating to voting and political participation for Latinos in the state of Illinois.

10.     There are also problems with the way in which Dr. Engstrom defines the parameters of his racially polarized voting analysis. First, his designation of the so-called "area of concern for the racially polarized voting analysis" is too narrow. He designates this area as

8

A96

.D-27

follows: "CD 3 and CD 4 in the Plaintiffs' Plan and CD 4 in the Adopted Plan encompass areas within which Latinos tend to be concentrated. This therefore is the area of concern for the racially polarized voting analysis. The extent to which voting might be racially polarized in other areas of the state has no impact on the drawing of districts within this area." (Engstrom, p. 3). Yet plaintiffs' plan does not simply create new versions of CD 3 and CD 4 as drawn in the Adopted Plan. Plaintiffs' plan entirely dismantles the state's CD 3 and fundamentally redraws all Congressional districts within the Cook County region. In so doing it eliminates two Cook County based districts (CD 3 and CD 8) with Latino voting age populations greater than the 21 percent in Cook County overall and replaces them with only one such district (CD 3). Thus voting across Cook County is relevant to assessing racial polarization and the ability of Latinos to elect candidates of their choice to Congress. Moreover, in excluding CD 3 and CD 8 in the Adopted Plan from his "area of concern," Dr. Engstrom's study on its own terms can reach no conclusions about racially polarized voting and vote dilution in the most relevant districts of the Adopted Plan.

11.     Second, for his countywide and citywide elections, Dr. Engstrom separately estimates and reports voting for both African Americans and "others" (mostly whites, but also including some Asians and persons of other races). It is highly problematic that when African Americans and "others" differ in their choices of candidates, Dr. Engstrom does not analyze or report whether non-Latino voters as a bloc have different candidate preferences than Latinos. If non-Latinos and Latinos have the same candidate preferences, then there is no politically significant racially polarized voting and, by definition, bloc voting by non-Latinos does not defeat Latino candidates of choice. This holds true regardless of whether the African American subset of non-Latinos might split off to vote for a different candidate. Moreover, African Americans are an insignificant presence in Cook County Congressional districts under the state's

9

plan with Latino voting age percentages greater than the 21 percent for Cook County overall. CD 4 (65.9% Latino VAP) has an African American voting age population of 4.1 percent, CD 3 (24.6% Latino VAP) has an African American voting age population of 4.5 percent, and CD 8 (22.1% Latino VAP) has an African American voting age population of 4.2 percent. So the fact that in a countywide election, Dr. Engstrom's finding that African American voters may have backed an African American candidate is of little import in assessing either polarized voting or vote dilution in the Adopted Plan's Congressional districts located in Cook County.

12.    Third, the report does not follow the parameters set by Engstrom who states that he analyzed "the most recent elections in which voters within this area have been presented with a choice between or among Latino and non-Latino candidates for offices within Cook County in which voters in a large portion of the area at issue participated." (Engstrom p. 3.) Engstrom's analysis is flawed because he failed to analyze 20 elections that fit within these parameters, which elections are set forth below in Table 1. Each of these 20 elections involved a Latino and non-Latino candidate who ran for offices within Cook County in which voters in a large portion of Engstrom's identified area participated. The Engstrom report omits these 20 elections and analyzes only 8 elections. The 8 elections are listed below in Table 2.

Table 1
20 Latino v. Non-Latino Democratic Primaries, Partisan General Elections, and City of
Chicago Elections Falling Within Engstrom's Parameters But Not Analyzed in the
Engstrom Report: Congressional, State Legislative, Countywide and Citywide Elections

| |
|---|
| **2008 PRIM CD 3** |
| **2010 PRIM CD 3** |
| **2009 SPECIAL GENERAL CD 5** |
| **2002 PRIM SEN 20** |
| **2006 PRIM REP 3** |
| **2008 PRIM REP 3** |
| **2010 PRIM REP 2** |
| **2010 PRIM REP 23** |
| **2006 GEN REP 24** |
| **2006 GEN REP 44** |
| **2008 GEN REP 39** |
| **2008 GEN REP 44** |
| **2010 GEN REP 39** |
| **2010 GEN REP 44** |
| **2006 GEN COOK SHERIFF** |
| **2008 GEN COOK STATE'S ATTORNEY** |
| **2010 GEN COOK ASSESSOR** |
| **2010 GEN COOK CLERK** |
| **2007 CHICAGO CLERK** |
| **2011 CHICAGO CLERK** |

11

A99

D-27

**Table 2**
**Elections Analyzed in the Report of Richard L. Engstrom**

| COUNTYWIDE & CITYWIDE ELECTIONS |
|:---:|
| COOK CO. STATE'S ATTORNEY<br>2008 DEM PRIMARY |
| COOK CO. ASSESSOR<br>2010 DEM PRIMARY |
| CITY OF CHICAGO MAYOR 2011 NONPARTISAN ELECTION |
| **COUNTY DISTRICT AND SUBDISTRICT ELECTIONS** |
| COOK CO. BOARD D. 16<br>2010 DEM PRIMARY |
| CIRCUIT CT. SUB. 11<br>2010 DEM PRIMARY |
| CIRCUIT CT. SUB. 4<br>2008 DEM PRIMARY |
| CIRCUIT CT. SUB. 6<br>2008 DEM PRIMARY |
| CIRCUIT CT. SUB. 6<br>2006 DEM PRIMARY |

13.     In addition to omitting 20 elections falling within his own parameters, 5 of the 8

elections, 63% of his sample, are not probative of racially polarized voting in Cook County.  In

Engstrom's Table 2 on p. 17, Engstrom estimates the percentage of Latino voters in each of those

5 elections and determines based on his methodology that the Latino voters preferred the Latino

candidates.  His report nowhere acknowledges that the Latino candidates studied in these

elections garnered very few votes by Latinos and voters of other races.  The results reported in

Table 3 below show that the votes received by the Latino candidates in these 5 elections ranged