**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

COMMITTEE FOR A FAIR AND BALANCED  )
MAP, *et al.*,                     )
                                   )
        Plaintiffs,                )
                                   )        Case No. 11-C-5065
        v.                         )
                                   )        Hon. John D. Tinder
ILLINOIS STATE BOARD OF ELECTIONS, )        Hon. Joan H. Lefkow
*et al.*,                          )        Hon. Robert L. Miller, Jr.
                                   )        (3-judge court convened pursuant to
                                   )        28 U.S. C. § 2284)
        Defendants.                )

**APPENDIX 2**
**TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION**
**FOR A PERMANENT INJUNCTION**

**A-101 thru A-150**

from a low of 4,262 for Garcia in the County Commission District 16 Primary in 2006 to a high of 11,606 for the Circuit Court in Subdistrict 6.

### Table 3
### Total Votes Received by Latino Candidates Analyzed the Report of Richard L. Engstrom for Five Sub-County Elections District of Subdistrict Elections

| ELECTION & YEAR | CANDIDATE | TOTAL VOTES |
|---|---|---|
| COOK CO. BOARD D. 16 2010 DEM PRIMARY | GARCIA | 4,262 |
| CIRCUIT CT. SUB. 11 2010 DEM PRIMARY | MARTINEZ | 4,416 |
| CIRCUIT CT. SUB. 4 2008 DEM PRIMARY | AGUILAR | 7,139 |
| CIRCUIT CT. SUB. 6 2008 DEM PRIMARY | ARAUJO | 11,606 |
| CIRCUIT CT. SUB. 6 2006 DEM PRIMARY | OCASIO | 9,555 |
| ALL ELECTIONS | | 36,978 |

14.     Taken together, the Latino candidates in 5 of the 8 elections that Dr. Engstrom analyzed received a total of 36,978 votes, across three Democratic primaries, in which some two million Cook County citizens participated. Overall, Dr. Engstrom's limited and unrepresentative sample does not provide an adequate basis for assessing whether voting is usually polarized along racial lines in elections relevant to the election of Congressional representatives in the Cook County region of the state. The issue of racially polarized voting will be examined in greater depth in Section II of this report.

15.     Only 3 of the 8 elections analyzed by Engstrom are adequate for purposes of assessing racial polarization within Cook County. This sample, however, is far too small to

13

explore the existence of racially polarized voting and vote dilution. For example, Dr. Engstrom did not analyze any elections for representative in Congress, the subject of this litigation and the most probative elections for assessing both polarized voting and vote dilution. Glaring is Dr. Engstrom's failure to analyze the 2008 and 2010 primary elections for the representative of Congressional District 3 and the 2009 special general election for the representative in Congressional District 5. These three elections fit his criteria for including Latino and non-Latino candidates. All three elections are for Congressional representatives in Cook County districts that Plaintiffs allege were diluted of Latino voters in the Adopted Map in order to protect the white majority. In the two primaries in CD 3 and the general election in CD 5, the preferred candidate of Latino voters was elected and was the same candidate preferred by non-Latino voters. In the subsequent general elections that followed the 2008 and 2010 primaries in CD 3, the preferred candidate of Latinos was elected to office, with majority support from both Latino and non-Latino voters.

16.     Dr. Engstrom inexplicably states that he declined to analyze the 2010 primary in CD 3 as a "non-competitive" contest because the losing Latino candidate garnered 22 percent of the vote in a two-person election. However, while failing to analyze this highly relevant endogenous election, Dr. Engstrom does analyze remotely relevant elections that are no more competitive, including the 2010 Democratic primary for County Board District 16, where the losing and last-place Latino candidate also garnered 22 percent of the vote, and was 33 percentage points behind the winning candidate according to returns from the Cook County Board of Elections. Dr. Engstrom provides no standards based on his past practice or other criteria for separating out so-called "non-competitive" elections. In addition, he provides no rationale for his failure to analysis the 2008 primary in CD 3 and the 2009 special general

14

A102                                                                    D-27

election in CD 5. Engstrom also did not examine any elections for the Illinois state legislature, the closest substantive analogue in Illinois to elections to Congress. He did not examine any partisan general elections, which include many more voters than Democratic primary elections and are the contests that actually send Congressional representatives to Springfield and Washington. In footnote 1 of his Report, Dr. Engstrom indicates that he plans to analyze some general elections, but no such elections are included in this report. (Engstrom p.3).

17.     Four of Dr. Engstrom's elections are subdistrict judicial primaries that are only remotely related to the election of Congressional representatives. Another election is for a district position on a board with only county-level responsibilities. Yet another election is a nonpartisan city of Chicago election conducted on a different basis and in a different election year than either partisan primaries or partisan general elections for Congress. That leaves only two partisan Democratic primaries that cover Cook County overall rather than a county commission district or a judicial subdistrict.

18.     Dr. Engstrom's sample of elections is also inadequate to assess whether polarized voting, if it exists, results in a usual pattern of vote dilution in Congressional districts under the Adopted Plan. In his conclusion Dr. Engstrom states that the Adopted Plan "dilutes the voting strength of Latinos in the areas." (Engstrom, p. 14.) Yet in the body of his report, Dr. Engstrom does not provide the district-specific analysis of the Adopted Plan needed to sustain this assertion about vote dilution because relevant districts are excluded from his "area of concern," (see paragraph 10 above), because his sample of elections includes no Congressional contests, and because it includes only two countywide elections that cover Congressional districts in the state's plan, as indicated in Table 2 above. Even if Dr. Engstrom were to extrapolate from their results to relevant adopted districts, two elections are not nearly sufficient to assess whether alleged

15

A103

D-27

polarized voting results in a usual pattern over time of denying Latinos the opportunity to elect candidates of their choice in Congressional districts.

19.    Moreover, in both of the countywide elections studied by Dr. Engstrom, the Latino candidate of choice prevailed in Cook County, which has only a 21 percent Latino voting age population according to the 2010 Census. The issue of vote dilution will be examined in greater depth in Section III of this report.[4]

20.    Dr. Engstrom's analysis of an unrepresentative sample of 8 elections does not reflect a lack of other Latino v. non-Latino elections to examine within Cook County. As identified in Table 1 above, there are some 20 additional recent Latino v. non-Latino elections within Cook County that are not analyzed in Dr. Engstrom's report and that are more relevant to assessing polarized voting in a Congressional redistricting case than five of the eight elections included in the report (i.e., the four subdistrict judicial elections and the County Commission district election). These additional elections include two Democratic primaries for Congress and one special general election for Congress. These "endogenous" elections for the office under challenge in the litigation are generally considered the most relevant and probative elections by social scientists and courts. The additional elections also include 5 Democratic primaries and 6 general elections for the Illinois State Senate and State House of Representatives. These elections are contests for legislative positions with much greater responsibilities (statewide) than county board elections. Also, the additional elections include 4 countywide partisan general elections for Cook County positions and 2 citywide nonpartisan elections in Chicago, all of which include large numbers of voters. These additional elections are listed in Table 1. Examination of these

---

4 In the 2008 primary for the County's State's Attorney, Alvarez, the Latino candidate of choice, prevailed. In the 2010 Democratic primary for Assessor, Berrios, the Latino candidate of choice, prevailed. Both candidates then won the general election in Cook County.

**Analysis of a Large Representative Sample of Relevant Elections**

27.     An analysis of voting by Latinos and non-Latinos in 23 elections is included in Table 5 to Table 10. These include 20 elections not analyzed in the Engstrom report, and listed in Table 1 above, plus the three countywide and citywide elections analyzed by Dr. Engstrom, for a total of 23 elections. For countywide and citywide elections, the analysis uses multivariate equations to separately estimate the voting behavior of Latinos, African Americans, and whites. The white category is the same as Dr. Engstrom's "others" and includes some Asians and members of other races. However, as explained above, the focus is on the voting of non-Latinos as a bloc, not on subdivisions of the non-Latino elections. This is an issue only in a few elections. For district-level state legislative elections, where it is not feasible to analyze African American voting, the analysis considers only Latinos and non-Latinos. All 23 elections analyzed in Tables 5 to 10 are for Congressional, state legislative, countywide, or citywide positions. The elections cover the time period since the last redistricting in 2001, although nearly all the elections are from 2006 to 2011.[7]

28.     The results for the most probative elections, the 3 Congressional primaries and general elections reported in Table 5 below, reveal no polarized voting between Latinos and non-Latinos. In these elections, the prevailing candidates Lipinski in the two primaries and Quigley in the general election won unified support from both Latinos and non-Latinos in their contests against Latino candidates. Primary victor Lipinski, who won unified support from Latinos, African Americans, and whites, went on to win the general elections overwhelmingly, again with

7 As explained above in paragraph 10, all elections within Cook County may be relevant given that plaintiffs' alternative plan fundamentally redraws the Cook County based Congressional districts. Plaintiffs' plan, for example, increases the Latino concentration in CD 3 under the state-passed plan, but reduces the Latino concentration in CD 4 and CD 8. As noted above, the state-passed plan includes three districts with a Latino voting age population greater than the countywide percentage of 21 percent (CD 3, CD 4, and CD 8). Plaintiffs' alternative plan includes two such districts (CD 3 and CD 4).

21

support from all three voter groups according to ecological regression results. Although these general elections did not include Latino candidates, they are still important for assessing opportunities for Latino preferred candidates in CD 3.[8]

**Table 5**
**White, Black, &Latino Voting In Latino vs. Non-Latino Democratic Primary and General Elections, Congressional Districts, Cook County**

| ELECTION & CANDIDATE | % White Voters for Candidate | % Latino Voters for Candidate | % Black Voters for Candidate |
|---|---|---|---|
| **2008 PRIM CD 3** | | | |
| Lipinski (W) | 52% | 64% | 48% |
| Pena (H) | 25% | 27% | 25% |
| Bennett (W) | 10% | 0% | 20% |
| Capparelli (W) | 13% | 9% | 8% |
| **2010 PRIM CD 3** | | | |
| **Lipinski (W)** | 81% | 57% | 76% |
| Mujica (H) | 19% | 43% | 24% |
| **2008 SPECIAL GENERAL CD 5\*** | | | |
| **Quigley (WD)** | 71% | 60% | NA |
| Pulido (HR) | 22% | 35% | NA |
| Reichel (WG) | 7% | 4% | NA |
| **\*WINNER LISTED FIRST, IN BOLD. THE AFRICAN AMERICAN POPULATION AND CONCENTRATION IN CD 5 IS NOT SUFFICIENT FOR RELIABLE ESTIMATION** | | | |

29. In state legislative primaries, results reported in Table 6 show that in 4 of 5 contested primaries, Latinos and non-Latinos had the same choice of candidates and those candidates, of course, prevailed in the election. Thus, voting was polarized along racial lines in only one of 8 Congressional elections and state legislative primary elections studied. The only exception was

---

8 Ecological regression analysis shows that in the 2008 general, Lipinski won the votes of 93 percent of Latinos, 87 percent of blacks and 69 percent of whites. In the 2010 general he won the votes of 97 percent of Latinos, 82 percent of blacks and 66 percent of whites. *The population and concentration of African Americans in CD 5 is not sufficient* to reliably separate out this small group of voters.

22

in the 2010 state representative primary in District 23. The results reported in Tables 5 and 6 also

demonstrate that in 7 of 8 of these elections, the candidate of choice of Latino voters prevailed.

**Table 6**
**Non-Latino & Latino Voting In Latino Versus Non-Latino Democratic Primary Elections,**
**State Legislative Districts, Cook County**

| ELECTION & CANDIDATE | % Non-Latino Voters for Candidate | % Latino Voters for Candidate |
|---|---|---|
| **2002 PRIM SEN 20** | | |
| **Martinez (H)** | 70% | 53% |
| Wojcik (W) | 30% | 47% |
| **2006 PRIM REP 3** | | |
| **Delgado (H)** | 63% | 82% |
| Strand (W) | 37% | 18% |
| **2008 PRIM REP 3** | | |
| **Arroyo (H)** | 65% | 89% |
| Strand (W) | 35% | 11% |
| **2010 PRIM REP 2** | | |
| **Acevedo (H)** | 57% | 57% |
| Martinez (H) | 3% | 40% |
| Trutin (W) | 21% | 3% |
| Schultz (W) | 20% | 0% |
| **2010 PRIM REP 23** | | |
| **Burke (W)** | 84% | 36% |
| Lozano (H) | 11% | 60% |
| Diaz (H) | 3% | 2% |
| Meza-Zavala (H) | 2% | 2% |
| **WINNER LISTED FIRST, IN BOLD** | | |

27.     The results for state legislative general elections between Latinos and non-Latinos

reported in Table 7 below likewise demonstrate a lack of racially polarized voting. In 5 of 6

elections, Latinos and non-Latinos had the same choice of candidates. In the one remaining

election, the 2010 state representative primary in District 39, the overwhelming Latino candidate

23

of choice garnered an estimated 47 percent of the non-Latino vote in a two-candidate contest.

Such minimal polarization is not politically significant in that it would not impede the

opportunity for Latino voters to elect their candidates of choice, given the Latino cohesion of 99

percent in favor of their candidate of choice. In all 6 of the state legislative general elections

included in Table 7, the Latino candidate of choice was elected to office.[9]

**Table 7**
**Non-Latino & Latino Voting In Latino Versus non-Latino General Elections, State**
**Legislative Districts, Cook County**

| ELECTION & CANDIDATE | % Non-Latino Voters for Candidate | % Latino Voters for Candidate |
|---|---|---|
| **2006 GEN REP 24** | | |
| **Hernandez (HD)** | 64% | 86% |
| Ledvina (WR) | 36% | 14% |
| **2006 GEN REP 44** | | |
| **Crespo (HD)** | 51% | 94% |
| Parke (WR) | 49% | 6% |
| **2008GEN REP 39** | | |
| **Berrios (HD)** | 65% | 100% |
| Karpen (WR) | 35% | 0% |
| **2008 GEN REP 44** | | |
| **Crespo (HD)** | 65% | 100% |
| Borthman (WR) | 35% | 0% |
| **2010 GEN REP 39** | | |
| **Berrios (HD)** | 47% | 99% |
| Karpen (WR) | 53% | 1% |
| **2010 GEN REP 44** | | |
| **Crespo (HD)** | 51% | 75% |
| Roth (WR) | 49% | 25% |
| **WINNER LISTED FIRST, IN BOLD** | | |

28.    The results for two countywide Democratic primary elections in Cook County

---

9 An estimate of 100% does not necessarily mean that every voter voted for the candidate, but rather that at extreme levels of voter cohesion, which especially occurs in general elections, the estimate is sometimes at the maximum.

reported below in Table 8 disclose some polarization in these elections, although in neither case was such polarization sufficient to defeat the Latino candidate of choice in a county that is only 21 percent Latino in its voting age population. The 2008 primary contest for State's Attorney is polarized in that Latinos, whites, and African-Americans differed in their choices of candidates. However, as indicated in the analysis above, Alvarez assembled a sufficient inter-racial coalition to prevail countywide. In the 2010 primary contest for Assessor, Latinos and whites had the same choices of candidates, preferring the Latino candidate Berrios, whereas African Americans preferred the African American candidate Shaw. When non-Latinos are combined as a group, Shaw is narrowly the candidate of choice of non-Latinos with an estimated 40 percent, on the basis of her strength with African American voters. However, Berrios and Figueroa combined won 60 percent of the Latino vote and Berrios, the Latino candidate of choice, prevailed in the primary election. Thus, in two Democratic primary elections, one was polarized along racial lines, another had a mixed picture on polarization, but the Latino candidate of choice prevailed in both elections.

25

Table 8
White, Black, & Latino Voting In Latino Versus non-Latino Democratic Primary Elections,
Non-Legislative Elections, Illinois, 2002-2010

| ELECTION & CANDIDATE | % White Voters for Candidate | % Latino Voters for Candidate | % Black Voters for Candidate |
|---|---|---|---|
| **2008 COOK CO. STATE'S ATTNY** | | | |
| **Alvarez (H)** | 25% | 76% | 15% |
| Allen (W) | 37% | 23% | 11% |
| Suffredin (W) | 28% | 0% | 19% |
| Milan (W) | 9% | 1% | 3% |
| Brookins (B) | 0% | 0% | 47% |
| Brewer (B) | 2% | 1% | 6% |
| **2010 COOK CO ASSESSOR** | | | |
| **Berrios (H)** | 44% | 71% | 27% |
| Figueroa (H) | 38% | 29% | 10% |
| Shaw (B) | 18% | 0% | 63% |
| WINNER LISTED FIRST IN BOLD. SHAW WAS NARROWLY THE CANDIDATE OF CHOICE OF NON-LATINO VOTERS IN THE 3 CANDIDATE ASSESSOR RACE WITH 40 PERCENT. THE TWO LATINO CANDIDATES WON 60 PERCENT OF THE NON-LATINO VOTE | | | |

29.    The results for 4 countywide general elections in Cook County reported in Table 9 disclose that 3 of 4 elections, Latino, white, and African-American voters had the same candidates of choice, all of whom obviously were elected to public office. In the fourth election for County Assessor, the Latino candidate Berrios was the candidate of choice of Latinos and African Americans and of non-Latinos overall. Like all other candidates of choice of Latinos in these general elections, Berrios prevailed countywide.

26

A110

D-27

Table 9
**White, Black, &Latino Voting In Latino vs. non-Latino General Elections, Countywide Elections, Cook County**

| ELECTION & CANDIDATE | % White Voters for Candidate | % Latino Voters for Candidate | % Black Voters for Candidate |
|---|---|---|---|
| **2006 COOK CO. SHERIFF** | | | |
| **Dart (WD)** | 64% | 89% | 95% |
| Garza (HR) | 36% | 11% | 5% |
| **2008 COOK CO. COUNTY ATTNY.** | | | |
| **Alvarez (HD)** | 54% | 96% | 95% |
| Peraica (WR) | 40% | 0% | 2% |
| O'Brien (WG) | 6% | 4% | 3% |
| **2010 COOK CO. ASSESSOR** | | | |
| **Berrios (HD)** | 25% | 93% | 88% |
| Eckersoll (WR) | 28% | 0% | 0% |
| Claypool (WI) | 44% | 0% | 10% |
| Grota (WG) | 3% | 7% | 2% |
| **2010 COOK CO. CLERK** | | | |
| **Orr (WD)** | 66% | 100% | 99% |
| Garcia (HR) | 34% | 0% | 1% |
| **WINNER LISTED FIRST IN BOLD. BERRIOS WAS THE CANDIDATE OF CHOICE OF NON-LATINO VOTERS IN THE 4 CANDIDATE ASSESSOR RACE WITH 46 PERCENT.** | | | |

30.     The results for 3 citywide nonpartisan elections in the city of Chicago reported below in Table 10 disclose racially polarized voting in only one election. In the 2007 election, Latino and white voters preferred the Latino candidate Del Valle, whereas African American voters preferred the African American candidate Jones. However, when non-Latinos are combined as a group they preferred Del Valle. As a result of this combined Latino and non-Latino support, this Latino candidate of choice prevailed citywide in Chicago, which is only 25 percent Latino in voting age population according to the 2010 Census. Similarly, in the 2011 election for City Clerk, Latino and white voters preferred the Latino candidate Mendoza,

27

A111

whereas African American voters preferred the African American candidate Horton. However, when non-Latinos are combined as a group they preferred Mendoza. Like Del Valle, Mendoza also prevailed in the election as a result of this combined Latino and non-Latino support. Unlike the two Clerk elections, Latino and non-Latino voters were polarized in the 2011 election for Mayor, with Latino voters favoring Latino candidate Chico and white voters and African-American voters favoring white candidate Emanuel, who prevailed in the election. Thus, in 2 of 3 elections (2007 and 2011 for Clerk) there was no polarization between Latinos and non-Latinos as a group, although there were differences of preference within the non-Latino electorate. The Latino candidate of choice prevailed in both elections. There was racial polarization between Latinos and non-Latinos in the remaining election (2011 for Mayor) and the Latino candidate of choice did not prevail.

**Table 10**
**White, Black, &Latino Voting In Latino Versus Non-Latino City of Chicago Elections**

| ELECTION & CANDIDATE | % White Voters for Candidate | % Latino Voters for Candidate | % Black Voters for Candidate |
|---|---|---|---|
| **2007CITY CLERK** | | | |
| **Del Valle (H)** | 67% | 94% | 37% |
| Cerda (H) | 13% | 6% | 4% |
| Jones (B) | 21% | 0% | 59% |
| | | | |
| **2011CITY CLERK** | | | |
| **Mendoza (H)** | 72% | 99% | 33% |
| Horton (B) | 28% | 1% | 67% |
| | | | |
| **2011 CITY MAYOR** | | | |
| **Emanuel (W)** | 61% | 11% | 61% |
| Chico (H) | 29% | 57% | 7% |
| Del Valle (H) | 9% | 32% | 3% |
| Mosley-Braun (B) | 1% | 0% | 24% |
| 2 Minor Cands (B) | 1% | 0% | 6% |
| WINNER LISTED FIRST IN BOLD. DEL VALLE WON 54 PERCENT OF THE NON-LATINO VOTE IN THE 2007 CLERK ELECTION. MENDOZA WON 54 PERCENT OF THE NON-LATINO VOTE IN THE 2011 CLERK ELECTION. | | | |

28

A112

31.     Table 11 and Charts 1 and 2 (see end of section) summarize the racial polarization analysis for the 23 Latino vs. non-Latino elections reported above. Table 11 reports for each election whether voting was polarized between Latinos and non-Latinos – that is, did Latinos and non-Latinos have different candidates of choice. It also indicates the name and race of the winning candidate, and whether that candidate was the candidate of choice of Latino voters in the election. The results reported in Table 11 disclose that Latinos and non-Latinos had different candidates of choice in only 5 of 23 Congressional, state legislative, countywide, and citywide elections since the last redistricting (22 percent). In two of these five elections voting was barely polarized. In the 2010 Democratic primary in Representative District 39, 47 percent of non-Latino voters backed the Latino candidate of choice and in the 2008 countywide primary for Assessor the African American candidate was barely the first choice of non-Latino voters as a result of a split among two Latino candidates, who together won an estimated 60 percent of the non-Latino vote.

32.     In addition, in 3 of the 5 polarized elections reported in Table 11, the Latino candidate of choice prevailed. These were the 2010 Democratic primary in Representative District 39, which is majority Latino in its voting age population, the 2008 Democratic primary for State's Attorney in Cook County, and the 2010 primary for Assessor in Cook County, which is 21 percent Latino in its voting age population. The two polarized elections in which the Latino candidates of choice lost were the 2010 Democratic primary in Representative District 23, which is nearly 80 percent Latino in its voting age population and the 2011 nonpartisan election for Mayor of Chicago, which is 25 percent Latino in its voting age population. Thus, there is no relationship between wins and losses in the few elections with polarized voting and the Latino

29

A113

composition of the electoral district or jurisdiction. Overall, Latino candidates of choice prevailed in 21 of 23 elections studied, for a win rate of 91 percent. A majority of these victories for Latino candidates of choice occurred in districts or jurisdictions with less than a 30 percent Latino voting-age population. These include 2 victories for Latino candidates of choice in Congressional District 3 (29% Latino), 1 in Congressional District 5 (25% Latino), 3 victories in State Representative District 44 (22% Latino), 6 victories countywide in Cook County (21% Latino), and 2 victories citywide in Chicago (25% Latino). If the two general elections involving the Latino candidate of choice in the 2008 and 2010 Democratic primaries in CD 3 are included, then Latino candidates of choice prevailed in 23 of 25 elections and in 5 of 5 endogenous Congressional elections.

30

A114

Table 11
Summary of Racial Polarization Analysis: 23 Latino v. Non-Latino
Congressional, State Legislative, Countywide and City of Chicago Elections

| ELECTION | POLARIZED LATINOS & NON-LATINOS? | WINNING CANDIDATE | CANDIDATE OF CHOICE OF LATINOS? |
|---|---|---|---|
| 2008 PRIM CD 3 | NO | Lipinski | YES |
| 2010 PRIM CD 3 | NO | Lipinski | YES |
| 2009 SPECIAL GEN CD 5 | NO | Quigley | YES |
| 2002 PRIM SEN 20 | NO | Martinez | YES |
| 2006 PRIM REP 3 | NO | Delgado | YES |
| 2008 PRIM REP 3 | NO | Arroyo | YES |
| 2010 PRIM REP 2 | NO | Acevedo | YES |
| 2010 PRIM REP 23 | YES | Burke | NO |
| 2006 GEN REP 24 | NO | Hernandez | YES |
| 2006 GEN REP 44 | NO | Crespo | YES |
| 2008 GEN REP 39 | NO | Berrios | YES |
| 2008 GEN REP 44 | NO | Crespo | YES |
| 2010 GEN REP 39 | YES | Berrios | YES |
| 2010 GEN REP 44 | NO | Crespo | YES |
| 2008 PRIM COOK STATT | YES | Alvarez | YES |
| 2008 PRIM COOK ASSR | YES | Berrios | YES |
| 2006 GEN COOK SHER | NO | Dart | YES |
| 2008 GEN COOK STATT | NO | Alvarez | YES |
| 2010 GEN COOK ASSR | NO | Berrios | YES |
| 2010 GEN COOK CLERK | NO | Orr | YES |
| 2007 CHICAGO CLERK | NO | Del Valle | YES |
| 2011 CHICAGO CLERK | NO | Mendoza | YES |
| 2011 CHICAGO MAYOR | YES | Emanuel | NO |

31

**Chart 1**
**Polarized versus Non-Polarized, Latino vs. Non-Latino Elections: 23**
**Congressional, State Legislative, Countywide and City of Chicago Elections**



**Chart 2**
**Victories vs. Defeats for Latino Candidates of Choice, Latino vs. Non-Latino**
**Elections: 23 Congressional, State Legislative, Countywide and City of**
**Chicago Elections**



A116                                                                                    D-27

**SECTION III: DR. ENGSTROM'S FAILURE TO PROVE VOTE DILUTION THROUGH A COMPARISON OF ELECTORAL OPPORTUNITIES PROVIDED TO LATINO VOTERS UNDER THE ADOPTED PLAN AND PLAINTIFFS' PLAN**

33.    In the conclusion of his report, Dr. Engstrom states, "Based on my examination of the two plans, I conclude Plaintiffs' Plan demonstrates that the Adopted Plan unnecessarily dilutes the votes of Latinos in the area." (Engstrom p. 14).

34.    Dr. Engstrom bases his conclusion of dilution first on his finding of racial polarization in the identified area. As established above, the polarization opinion is incorrect, and Dr. Engstrom failed to show one of the elements of a vote dilution claim, which is that non-Latino bloc voting usually defeats candidates of choice of Latino voters in districts under the state-passed plan. Second, Engstrom does not show another element of a vote dilution claim, which is that the Plaintiffs' plan creates an additional Congressional district in which Latinos comprise a majority of the voting age population. In fact, Engstrom concedes that no additional Latino majority district is created in Plaintiffs' plan on page 14 of his report when he states "... CD 3 in the Plaintiffs' Plan cannot be said to be a Latino majority district at this time."

35.    In addition to Engstrom's polarization finding, Dr. Engstrom claims that he bases his opinion of dilution on his analysis of the "relative electoral opportunities" in the Adopted Plan's CD 3 versus the plaintiffs' plan's CD 3 and in the Adopted Plan's CD 4 versus the plaintiffs' plan's CD 4. (Engstrom at 3-4, 14). Dr. Engstrom, however, fails to conduct a comparative analysis of the relative electoral opportunities in the Adopted Plan's CD 3 and the plaintiffs' plan CD 3. Engstrom merely notes the different locations of CD 3 under each plan, the VAP percentages in both plans' CD 3 and that the increase of 40,027 in VAP in CD 3 in the Adopted Plan was accounted for by non-Latinos. Without any analysis, Engstrom concludes that with a Latino VAP of 46.5% in plaintiffs' plan that "Latinos would have a chance to influence

33

A117

D-27

the outcomes of elections in CD 3." (Engstrom p.13). Engstrom does not opine, however, that Latinos would not have a chance to influence the outcomes of elections in CD 3 in the Adopted Plan.

36. Moreover, the plaintiffs' plan, despite its effort to concentrate Latinos maximally in CD 3, fails to create an additional minority opportunity district according to Dr. Engstrom's own conclusion. Rather he uses language usually applied to a so-called minority "influence district," not an effective minority opportunity district. In the final paragraph of his report, Dr. Engstrom concludes that in plaintiffs' CD 3 Latinos "certainly have a chance to have an impact on election outcomes." However, Latinos also have a chance to have an impact on election outcomes in three adopted Cook County districts with a Latino population of more than 21 percent as well as one bordering district, compared to only two such districts in plaintiffs' alternative plan.

37. As indicated in Table 13 at the end of my report, the Adopted Plan includes three Cook-County based Congressional districts with a Latino voting age population greater than 21 percent. This is a reasonable benchmark percentage because Latino candidates of choice prevailed in all Latino vs. non-Latino elections held countywide in Cook County (see Table 11), which is 21 percent Latino in its voting age population. These three 21 percent plus Latino voting age districts in the Adopted Plan are: CD 3 (24.6%), CD 4 (65.9%), and CD 8 (22.1%). Plaintiffs' alternative plan reduces the number of such districts to two: CD 3 (46.5%) and CD 4 (59.5%). Moreover, the state plan has a fourth district on the border of Cook County, CD 11, with a Latino voting age population of 21.8 percent. There is no comprabable border-area Latino voting age population district in the plaintiffs' plan, which fundamentally redraws all districts on the border of Cook County. Not only does Dr. Engstrom provide no district specific analysis of

34

A118

Latino opportunities to elect candidates of their choice in these any of these districts, but he cannot do so because he analyzes no Congressional contests and because his sample of elections includes only two countywide contests. Maps 1 and 2 at the end of my report show the location of these 21%+ Latino voting age population districts in both the Adopted Plan and plaintiffs' plan. Districts that are above 21 percent Latino VAP are coded red, and districts that are below 21 percent Latino VAP are coded green.

38. Engstrom's comparison of both plans' CD 4 is equally problematic. The Engstrom Report fails to demonstrate that Latinos are "packed" into CD 4 of the state's plan. Dr. Engstrom's report alleges that "CD 4 in the Adopted Plan is packed with more Latino VAP than necessary to provide Latinos with a viable opportunity to elect the representative of their choice within it."(Engstrom p. 14). Dr. Engstrom does not provide a standard to distinguish a "packed" district from an effective minority opportunity district. He also fails to indicate that plaintiffs' plan did not simply "unpack" CD 4 and add its allegedly excess Latino population to a bordering district. Rather, plaintiffs' plan reduces the Latino voting age population in the Adopted Plan by only 6.4 percentage points (from 65.9 percent to 59.5 percent). Moreover, in comparing CD 4 in the Adopted Plan to the allegedly unpacked CD 4 in Plaintiffs' Plan, Dr. Engstrom used only two elections, the Democratic primaries for Assessor in 2010 and for State's Attorney in 2008. Based upon Dr. Engstrom's choice of elections and his analytic results, this analysis actually shows that CD 4 in Plaintiffs' Plan "wastes" as many votes for Latino candidates as CD 4 in the Adopted Plan. As indicated in Table 12, the vote for the Latino candidate of choice, Berrios, in the 2010 Assessor primary is actually 2.9 percentage points *higher* in CD 4 under Plaintiffs' Plan than in CD 4 under the Adopted Plan. Table 5 also indicates that vote for the Latino candidate of choice, Alvarez, in the 2008 State's Attorney

35

primary is a similar 3.9 percentage point lower in CD 4 under Plaintiffs' Plan than in CD 4 under

the Adopted Plan. This close similarity of the two Congressional districts, based on Dr.

Engstrom's methodology and results, refutes the notion that CD 4 in the Adopted Plan is a

"packed" district that "wastes" votes as compared to CD 4 in the Plaintiffs' Plan.

**Table 12**
**Dr. Engstrom's Results for his Analysis of the Support for Latino Candidates in Adopted**
**CD 4 and CD 4 Under Plaintiffs' Plan (Engstrom Report, pp. 10, 12)**

| ELECTION | LATINO CANDIDATE OF CHOICE OF LATINO VOTERS | % FOR LATINO CANDIDATE OF CHOICE IN CD 4 ADOPTED PLAN | % FOR LATINO CANDIDATE(S) CD 4 PLAINTIFFS' PLAN | DIFFERENCE |
|---|---|---|---|---|
| | | | | |
| **2010 DEM PRIM COOK CO ASSESSOR** | **BERRIOS** | 49.8% | 52.7% | +2.9% |
| | | | | |
| **2010 DEM PRIM COOK CO ASSESSOR** | **ALVAREZ** | 45.9% | 42.0% | -3.9% |
| | | | | |

36

A120

39.    In addition, the so-called unpacking is not nearly sufficient to concentrate Latinos substantially in another Congressional district.  The 6.4 percentage of Latinos that are taken out of CD 4 in plaintiffs' plan were not sufficient to create another Latino majority district.   Rather, as demonstrated in my Affirmative Report, plaintiffs' efforts to concentrate Latinos in an entirely new CD 3 led to a race-driven redrawing of state passed districts across Cook County and border counties. This redrawing drains Latinos from surrounding districts and reduces the number of districts in Cook County and bordering areas with a Latino population of 21 percent or more, from four to two. Although Dr. Engstrom points out that the Adopted Plan reduced the Latino concentration in CD 3 and CD 5, he fails to note that the plan increased the Latino voting age population in CD 8 by 8 percentage points, from 14 percent to 22 percent, creating an additional district with a Latino voting age population greater than that in Cook County overall.  In the bordering region, the state passed plan increased CD 11 by some 12.6 percentage points, from 9.2 percent to 21.8 percent.

40.    Further undermining any claim of packing, Dr. Engstrom's report states that Congressional District 4 in the Adopted Plan was increased "by a net of 85,403 in VAP, with 53.1 percent of that increased VAP being Latino." (Engstrom p. 9).  Dr. Engstrom does not provide any methodological justification for this approach or provide data or calculations to support his finding. His approach is also at odds with that of the other plaintiffs' expert Dr. Peter Morrison. In his report, Dr. Morrison compares the Latino percentage of the voting age population added to CD 4 in the Adopted Plan with the Latino percentage of the voting age population subtracted from the district. This methodology accounts for all the voting age population inflows and outflows. Dr. Morrison found a minimal difference between these flows of voting age population: "The territory added to Adopted CD 4 had a 47.2% Latino share of

37

VAP. The territory formerly in 2002 CD 4 that was removed had a 40.6% Latino share of VAP."

(Morrison, p. 8). Finally, even if true, the fact that the alleged inflow net of 85,402voting age

population was slightly above 50 percent Latino does not prove an effort to maximize or "pack"

Latino concentration in a district with more than 500,000 persons of voting age. In addition, as

my Affirmative Report on racial predominance indicates, in crafting new CD 4, the state reduced

the Latino voting age population in existing CD 4 from 68.1 percent to 65.9 percent, even though

it could easily have raised the Latino voting age population in new CD 4 above its previous level

if its objective was to maximize the concentration of Latinos in that district. An inference could

be credibly drawn from this fact that there was an effort to avoiding "packing."

SECTION IV: COMPACTNESS ANALYSIS

41.    Dr. Engstrom presents measures of compactness showing that CD 4 in the state

passed plan has low levels of compactness. He does not compare these statistics to any

benchmark measures. Instead, without examining alternative explanations, he concludes that,

"The most apparent reason for the bizarre shape of CD 4 in the Adopted Plan is a desire to create

a district with an extremely high concentration of Latinos" (p. 11). This leaping to a conclusion

based on compactness alone is contradicted by Dr. Engstrom's own scholarship, which stresses

that an analysis must consider alternative explanations for any alleged departures from "so-called

traditional principles" and consider whether such alternative explanations "cannot be dismissed."

In a 2002 article Dr. Engstrom stated, "If the so-called traditional principles are found to be

subordinated to racial considerations, strict scrutiny must follow. But if they are found to be

subordinated to partisan considerations, or presumably other 'non-racial' political considerations,

or even if these alternative explanations for the district lines cannot be dismissed, no further

scrutiny of the district is needed." My third report explores partisan, political, and other non-

38

A122                                              D-27

racial explanations for the crafting the state passed Congressional plan.[10]

42.     Dr. Engstrom's analysis of compactness is also incomplete and inaccurate. He does not compare either of his compactness scores to scores for the 1991or the 2001 versions of CD 4. According to information conveyed by Professor Gerald R. Webster, Chair of the Department of Geography at the University of Wyoming, the CD 4 in the Adopted Plan is more compact than either of the earlier versions of the district, based on both dispersion and perimeter scores. Moreover, according to Professor Webster, Dr. Engstrom's calculation of the Reock geographic dispersion measure is off by 100 percent; the proper measure is .30, not .15. (The *lower* the Reock score, the *less* compact the district.) Professor Webster's results are based on calculations conducted by the University of Alabama Cartographic Research Laboratory, a standard resource for such work. The Laboratory conducted their calculations twice to confirm their results. I personally confirmed these results with the Laboratory as well. The Laboratory calculated a Reock score of .30, compared to Dr. Engstrom's score of .15. This difference is of substantive significance given that analysts have recognized scores of .15 or below as the cutoff point for indicating low compactness.[11]

## CONCLUSIONS

43.     The evidence and analysis presented in this report demonstrates that Dr. Engstrom's report cannot be relied upon for a complete and accurate study of polarized voting and vote dilution – the primary objectives of his report. Further, the study of a large corpus of relevant Democratic primary and general elections, including Congressional elections, state

---

10 Richard L. Engstrom, "The Post-2000 round of Redistricting: An Entangled Thicket within the Federal System," *Publius* 32 (2002), p. 64.

11 Richard H. Pildes and Richard G. Niemi, "Expressive Harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances After *Shaw v. Reno*," *Michigan Law Review*, 92 (1993).

legislative elections, countywide, and citywide elections, shows that in the great majority of

contests there was no polarization in the candidate preferences of Latinos and non-Latinos. In

addition, Latino candidates of choice almost invariably prevailed in these elections; more than

half of those victories occurred in districts or jurisdictions that were overwhelmingly non-Latino

in their voting age population (Congressional District 3, Cook County, and the City of Chicago).

Thus evidence and analysis conclusively reject the propositions that voting is polarized along

racial lines in Cook County, that non-Latinos usually vote as a bloc against the preferred

candidates of choice of Latinos, and that such non-Latino bloc voting usually defeats the Latino

candidate of choice. Analysis presented in this report also shows that plaintiffs' alternative plan

does not meet the requirement of "prong one" of the *Gingles* test – to create at least one

additional district with a Latino voting age majority. Finally, analysis shows that Dr. Engstrom's

report does not establish that the state sought to maximize or "pack" the concentration of Latinos

in CD 4 or that race was the predominant factor in drawing this district. These last two issues

will be examined in depth in my reply report to the report of Dr. Peter A. Morrison and in my

third report that deals with the totality of circumstances regarding minority voter opportunities,

allegations of intentional discrimination, and allegations that race was the predominant factor in

the crafting of CD 4 under the state's plan.12

---

12 My report is based upon facts, data, and analyses currently available. If additional facts, data, or analyses are
elicited in the discovery of this case, I reserve the right to supplement my report to reflect such additional
information if necessary.

ADDENDUM: TABLE AND MAPS SHOWING 21%+ LATINO VAP DISTRICTS IN
THE ADOPTED PLAN AND IN PLAINTIFFS' PLAN

Table 13
Congressional Districts With a Latino Voting Age Population of 21% or More, State
Passed Plan Compared to Plaintiffs' Plan

| CONGRESSIONAL DISTRICTS IN STATE PLAN | LATINO VAP | CONGRESSIONAL DISTRICTS IN PLAINTIFFS' PLAN | LATINO VAP |
|---|---|---|---|
| DISTRICTS WHOLLY OR PARTLY IN COOK COUNTY | | | |
| CD4 | 65.9% | CD 4 | 59.5% |
| CD 3 | 24.6% | CD 3 | 45.6% |
| CD 8 | 22.1% | | |
| DISTRICTS BORDERING COOK COUNTY | | | |
| CD 11 | 21.8% | | |

41

A125

D-27

**Map 1**
**Congressional Districts 21%+ Latino VAP, Adopted Plan**

## Districts 21% Hispanic VAP and Over
### PA 97-0014



42

A126

**Map2**
**Plaintiffs' Plan: Cook County and Border Districts with 21%+ Latino VAP**

## Districts 21% Hispanic VAP and Over

Republican 'Fair Map' Proposal



43

D-27

Executed on October 4, 2011:

Allan J. Lichtman

EXPERT REPORT OF ALLAN J. LICHTMAN: RESPONSE TO THE REPORT OF DR.
PETER A. MORRISON, PH.D.

OCTOBER 4, 2011

1

D-28

Statement of Inquiry

1.     I have been asked to respond to the Expert Report of Peter A. Morrison

(plaintiffs' expert, dated September 14, 2011).

2.     My expected fee in this matter is $400 per hour. I have enclosed an updated CV

and a table of cases in which I have provided written or oral testimony.

Summary of Opinions

3.     My analysis of the Morrison report has led to the following opinions.

- Morrison's opinion that the Latino voting age population increased in CD 4 of the Adopted Plan is incorrect.

- Morrison does not provide a complete analysis of the population moved into and out of CD 4 in the Adopted Plan.

- Morrison's examination of the concentrations of Latino voters only in CD 3, CD 4 and CD 5 of the Adopted Plan and in CD 3 and CD 4 of plaintiffs' plan is incomplete and does not include the proper geographic area for analysis.

- CD 5 in plaintiffs' plan decreases the percentage of Latino voters more than CD 5 in the Adopted Plan, and this fact was omitted from Morrison's report.

- Morrison's report fails to analyze and consider CD 8 and CD 11 in the Adopted Plan, which increased the Latino concentrations to above 21% of the Latino voting age population.

- Given that Morrison analyzes the concentration of Latinos in CD 3, CD 4 and CD 5 of the Adopted Plan by examining the added and removed territories from those districts, it is inconsistent and indefensible from a methodological perspective not to have examined the added and removed

2

A130

D-28

territories in **CD 3, CD 4 and CD 5** in plaintiffs' plan.

- **CD 3** in plaintiffs' plan increased the Latino voting age population by largely draining the Latino voting age population from the 2002 **CD 5, 6, 7, and 9,** which had the effect of lowering the percentage of the Latino voting age population in **CD 5, 6, 7 and 9** in plaintiffs' plan.

- Based on his prior scholarship, Morrison's report improperly considers and opines on postcensal estimates of future Latino growth.

- The Morrison report is a result-driven analysis, which lacks a scientific foundation. It provides quantitative conclusions without any underlying numerical analysis, fails to apply methodology to the data studied, and contradicts Dr. Morrison's own scholarly standards.

**Qualifications**

8.      I am a Professor of History at American University in Washington, D.C., where I have been employed for 38 years. Formerly, I served as Chair of the History Department and Associate Dean of the College of Arts and Sciences at American University. I received my BA in History from Brandeis University in 1967 and my Ph.D. in History from Harvard University in 1973, with a specialty in the mathematical analysis of historical data. My areas of expertise include political history, electoral analysis, analysis of redistricting plans, and historical and quantitative methodology. I am the author of numerous scholarly works on quantitative methodology in social science. This scholarship includes articles in such academic journals as Political Methodology, Journal of Interdisciplinary History, International Journal of Forecasting, and Social Science History. In addition, I have coauthored Ecological Inference with Dr. Laura Langbein, a standard text on the analysis of social science data, including political information. I

3

A131

have published articles on the application of social science analysis to civil rights issues. This work includes articles in such journals as Journal of Law and Politics, La Raza Law Journal, Evaluation Review, Journal of Legal Studies, and National Law Journal. My scholarship also includes the use of quantitative and qualitative techniques to conduct contemporary and historical studies, published in such academic journals as The Proceedings of the National Academy of Sciences, The American Historical Review, Forecast, and The Journal of Social History. Quantitative and historical analyses also ground my books: Prejudice and the Old Politics: The Presidential Election of 1928, The Thirteen Keys to the Presidency (co-authored with Ken DeCell), The Keys to the White House, and White Protestant Nation: The Rise of the American Conservative Movement. My most recent book, White Protestant Nation, was one of five finalists for the National Book Critics Circle Award for the best general nonfiction book published in America.

9.      I have worked as a consultant or expert witness for both plaintiffs and defendants in more than seventy-five voting and civil rights cases. These include several cases in the state of Illinois. Among other cases, I testified for the prevailing parties in *King v. Board of Elections*, the challenge to the post-1990 congressional redistricting plan that led to the creation of the first Latino-majority district and in *Campuzano v. Illinois Board of Election* the statewide challenge to the post-2000 redistricting plan for state legislative positions. In *King*, I testified on behalf of plaintiffs and in *Campuzano* on behalf of defendants. In the 2003 congressional redistricting case that became the U. S. Supreme Court case, *League of United Latin Am. Citizens (LULAC) v. Perry*, 548 U.S. 399 (2006), the majority opinion written by Justice Kennedy authoritatively cited my statistical work several times. I was also an expert witness in the case of *Garza v. City of Los Angeles*, 756 F.Supp. 1298 (1990), where the Court found intentional discrimination

4

D-28

against Latinos. In many cases, I have analyzed the demography of congressional redistricting plans. My work includes more than a dozen cases for the United States Department of Justice and cases for many civil rights organizations. I have also worked as a consultant or expert witness in defending enacted plans from voting rights challenges. A copy of my resume and a table of cases are attached as Appendix 1 of this report.

**Data and Methods**

10.    The analysis in this report relies on standard data utilized in social science. This data includes reports showing the total population, Latino population, voting age population and Latino voting age population for existing districts, districts in the state passed plan, and districts in plaintiffs' alternative plan. It includes core retention reports showing the inflow and outflow of these demographic groups from existing districts to new districts in the state passed plan and plaintiffs' plan. It includes reports on split precincts in districts of the state passed plan and the plaintiffs' plan. It includes maps showing the flow of voting age population and Latino voting age population into an out of congressional districts. All data and maps were obtained from the staff of the Redistricting Office of the Illinois Speaker of the House of Representatives. This information was obtained electronically.

**I.    PROBLEMS IN MORRISON'S ANALYSIS OF CD 4 IN THE ADOPTED PLAN.**

11.    The Morrison report violates an essential requirement of scientific study: that an investigator not alter his methodology either to avoid certain results or to generate others. The Morrison report alters its methodological approach to analyzing changes in district populations and also alters the standards set by Dr. Morrison in his published scholarship.

12.    Dr. Morrison applies different methodologies to studying population changes in CD 3 and CD 5 as compared to CD 4 in the state adopted Congressional plan. This is not a minor

adjustment, but a shift in procedure that shapes his analyses and conclusions. In analyzing CD 3 and CD 5, Dr. Morrison properly uses the benchmark 2002 plan for comparing changes in the districts' percentage of Hispanic voting age population. For example, with respect to CD 3 he states, "The 2002 CD 3 has a voting-age population (VAP) that is 29.3% Latino, based on 2010 census figures. In the Adopted CD 3, Latinos comprise 24.6% of the VAP." (p. 8). However, with respect to CD 4, Dr. Morrison ignores the 2002 benchmark district, and instead compares the Latino voting age population in CD 4 under the state adopted plan to the Latino voting age population in CD 4 in the post-1990 plan, stating, "The Latino share of voting-age population ("VAP") in CD 4 has increased from 59.2% in the post-1990 CD4 to 65.9% in Adopted CD4." (p. 8). If Dr. Morrison had consistently followed his methodology and compared the Latino concentration in adopted CD 4 to the benchmark CD 4 in the 2002 plan he would have reached the contrary finding that the state reduced the Latino share of the voting age population in this district from 68.1% to 65.9%. Thus, the rise in the Latino concentration in adopted CD 4 occurred prior to the drawing of the 2011 congressional redistricting plan.

13.     Dr. Morrison also shifts his analysis of CD 4 as compared to CD 3 and CD 5 in yet another way. For CD 3 and CD 5 he provides a border analysis, complete with maps showing the Latino concentrations of territory shifted in and out of these districts from other districts in the benchmark 2002 plan. However, Dr. Morrison provides no border analysis and no maps for CD 4 under the state's plan, even though the alleged concentration of Latinos CD 4 is the focus of plaintiffs' complaint. Thus, his analysis of CD 4 in the Adopted Plan is incomplete according to Dr. Morrison's own methodology.

14.     Further, with respect to CD 4, Morrison concludes only that, "The territory added to Adopted CD4 had a 47.2% Latino share of VAP. The territory formerly in 2002 CD4 that was

6

removed had a 40.6% Latino share of VAP." (p. 8). He does not, however, present the data or calculations that produced his findings about the inflow and outflow of Latino voting age population in state passed CD 4. Given that only about 30.6 percent of new CD4 comes from outside the 2002 version, this small differential of 6.6 percent amounts to only a two percentage point difference in the Hispanic VAP percentage within new CD4 (6.6%*.306=2.0%).[1]

15.     After analyzing the changes in CD 3, CD 4 and CD 5 in the Adopted Plan, Dr. Morrison reaches an erroneous conclusion. He no longer assesses the changes in District 4 by comparing the Adopted Plan to the post-1990 plan. Rather, he incorrectly concludes without any qualification that the Latino voting age population in CD 4 in the Adopted Plan increased.

## II.     DR. MORRISON'S EXAMINATION OF THE CONCENTRATIONS OF LATINO VOTERS ONLY IN CD 3, CD 4 AND CD 5 OF THE ADOPTED PLAN AND IN CD 3 AND CD 4 OF PLAINTIFFS' PLAN IS INCOMPLETE AND DOES NOT INCLUDE THE PROPER GEOGRAPHIC AREA FOR ANALYSIS.

16.     In analyzing the concentrations of Latino voters in the Adopted Plan and in plaintiffs' plan, Dr. Morrison improperly limits the districts in each plan that he considers. The proper geographic area for analysis of concentrations of Latinos voters is broader and includes districts in Cook County and bordering Cook County, given that the Latino populations in a number of the excluded districts is larger than 21% and given that plaintiffs' plan fundamentally redraws Congressional Districts in this region of the state, which impacts concentrations of Latino populations beyond just CD 3, CD 4 and CD 5.

17.     Dr. Morrison focuses on reductions of Latino voting age population in CD 3 and CD 5. However, he fails to indicate that the Adopted Plan also increased the Latino

---

1 Dr. Morrison's results cannot be replicated because he provides no data and calculations. My own calculations indicate that that the Latino voting percentage in the outflow from existing CD 4 is 41.2 percent, not 40.6 percent, slightly narrowing the gap reported by Dr. Morrison. According to data provided by the Illinois Redistricting Office, 83,442 persons of voting age moved out of existing CD 4, including 34,377 Latinos, for a percentage of 41.2% Latino.

concentration in CD 8 in the Cook County by 8 percentage points, from 14.1 percent to 22.1 percent, and the Latino concentration in CD 11 in the bordering region by 12.6 percentage points, from 9.2 percent to 21.8 percent. As a result, the state passed plan retains in the Cook County and bordering region four congressional districts with Latino voting age population in excess of Cook County overall (21 percent) -- a reasonable benchmark given the success of Latino candidates of choice in the county -- whereas plaintiffs' plan retains two such districts. Table 1 displays these districts for both plans. Maps 1 and 2 show the location of these districts, with districts that are above 21 percent Latino VAP coded red and districts that are below 21 percent Latino VAP coded green. Significantly, Morrison also fails to report that the Latino concentration in the 2002 CD 11 is reduced from 9.24 percent to 4.78 percent in CD 11 of plaintiffs' plan.

18.     Not only does Dr. Morrison fail to consider the Latino concentration in districts other than CD 3, CD 4 and CD 5, but he improperly excludes any consideration or even reference to CD 5 in plaintiffs' plan. Although one of his only conclusions is that CD 5 in the Adopted Plan decreases the Latino share of VAP, he fails to consider or even mention what happens to the Latino VAP in CD 5 of plaintiffs' plan. CD 5 in plaintiffs' plan decreases the percentage of Latino voters more than CD 5 in the Adopted Plan (by 12.2 percentage points, from 24.6% to 12.4%), and this fact was omitted from Morrison's report.

8

Table 1
Districts with a Latino Voting Age Population Greater than 21 Percent, State Passed
Congressional Plan Compared to Plaintiffs' Plan, Cook County and Border Region

| DISTRICTS IN STATE PLAN 21%+ LATINO VAP | |
|---|---|
| DISTRICT | LATINO VAP PERCENT |
| CD 4 | 65.9% |
| CD 3 | 24.9% |
| CD 8 | 22.1% |
| CD 11 | 21.8%* |
| DISTRICTS IN PLAINTIFFS' PLAN 21%+ LATINO VAP | |
| DISTRICT | LATINO VAP PERCENT |
| CD 4 | 59.2% |
| CD 3 | 46.5% |
| * DISTRICT IN BORDER REGION | |

9

D-28

Map 1
State Passed Plan: Cook County and Border Districts with 21%+ Latino VAP

## Districts 21% Hispanic VAP and Over
PA 97-0014



10

D-28

Map 2
Plaintiffs' Plan: Cook County and Border Districts with 21%+ Latino VAP

## Districts 21% Hispanic VAP and Over

Republican 'Fair Map' Proposal



11

A139

D-28

### III.   DR. MORRISON'S FAILURE TO CONDUCT ANY ANALYSIS REGARDING CD 3, CD 4 AND CD 5 IN PLAINTIFFS' PLAN AND THESE DISTRICTS' EFFECT ON LATINO CONCENTRATIONS IN BORDERING DISTRICTS.

19.    Dr. Morrison's comparison of Latino concentrations under both plans lacks a consistent approach in that it attempts to analyze the Latino concentration in CD 3, CD 4 and CD 5 of the Adopted Plan by examining Latino VAP percentages in added and removed territories, but does not provide any such analysis for CD 3 and CD 4 in plaintiffs' plan. Morrison simply reports the Latino VAP percentages in CD 3 and CD 4 of plaintiffs' plan: 46.5% and 59.4% respectively. Unlike his analysis of the Adopted Plan, Morrison does not explain the inflows and outflows of plaintiffs' plan and provides no maps for analysis. Given that Morrison analyzes the concentration of Latinos in CD 3, CD 4, and CD 5 of the Adopted Plan by examining the added and removed territories from those districts, it is inconsistent and indefensible from a methodological perspective not to have examined the added and removed territories in CD 3, CD 4 and CD 5 in plaintiffs' plan.

20.    CD 3 in plaintiffs' plan is created by capturing the northern component of previous CD 4 and adding population from previous CD 5, CD 6, CD 7, and CD 9. By splitting existing CD 4 into north/south components, plaintiffs' CD 3 keeps the southern concentration of Latinos in CD 4 in plaintiffs' plan. CD 3 in plaintiffs' plan increased the Latino voting age population by largely draining the Latino voting age population from the previous CD 5, 6, 7, and 9, which had the effect of lowering the percentage of the Latino voting age population in CD 5, 6, 7 and 9 in plaintiffs' plan. The Latino VAP is reduced from 24.6 percent in 2002 CD 5 to 12.4 percent in CD 5 of plaintiffs' plan. The Latino VAP is reduced from 15.3 percent in 2002 CD 6 to 13.9 percent in CD 6 of plaintiffs' plan. The Latino VAP is reduced from 8.0 percent in 2002 CD 7 to 6.1 percent in CD 7 of plaintiffs' plan. The Latino VAP is reduced from 10.94

12

A140

D-28

percent in 2002 CD 9 to 10.1 percent in CD 9 of plaintiffs' plan. Table 2 summarizes these

reductions in Latino voting-age population in these four districts under Plaintiffs' Plan.

Table 2
The Latino Voting Age Population of 2002 Congressional Districts 5, 6, 7, and 9 Compared
to the Latino Voting Age Population of Congressional Districts 5, 6, 7, and 9 in Plaintiffs'
Plan

| CONGRESSIONAL DISTRICT | LATINO VAP IN 2002 VERSION | LATINO VAP IN PLAINTIFFS' PLAN | DIFFERENCE |
|---|---|---|---|
| CD 5 | 24.56% | 12.35% | -12.21% |
| CD 6 | 15.31% | 13.92% | -1.39% |
| CD 7 | 8.04% | 6.11% | -1.93 |
| CD 9 | 10.94% | 10.13% | -0.81% |

21.    Map 3 below traces the population flows into CD 3 of plaintiffs' plan as described

above. On Map 3, areas in red are greater than 50 percent Latino, whereas areas in green are 50

percent or less Latino. Map 3 shows that plaintiffs have concentrated virtually every area of red

territory within their CD 3 rather than surrounding districts. In analyzing CD 3 under plaintiffs'

plan Dr. Morrison provides no such map display as he does for CD 3 under the state passed plan.

13

A141

D-28

Map 3
Inflow of Census Blocks to Plaintiffs' CD 3 From Surrounding Districts: Red = Blocks
50%+ Latino In VAP, Green = Blocks 50% or Less Latino VAP

## CD 3 Fair Map Inflow



|4

## IV.    THE MORRISON REPORT CONTRADICTS DR. MORRISON'S OWN STANDARDS.

22.    Dr. Morrison's analysis in his report is also inconsistent with the standards he established in his prior scholarship. Both Dr. Morrison and I were expert witnesses in the *Garza* case in Los Angeles County. I testified on behalf of the *Garza* plaintiffs and Dr. Morrison on behalf of the County. In his testimony and a follow-up scholarly article in *Evaluation Review*, Dr. Morrison maintained that the proper basis for analyzing Latino concentration in a legislative district is not population or voting age population, but citizen voting age population. He even took the position that citizen voting age population, not total population, should be the basis for creating legislative districts under the one person, one vote doctrine. In his *Evaluation Review* article Dr. Morrison states: "The distribution of total population may not accurately mirror the distribution of citizens. Using total population as the apportionment base may seriously over-or undervalue the individual vote cast by a citizen residing in one or another district." [2] Yet, in his report, Dr. Morrison provides no analysis of citizen voting age population in any Congressional district, in either the state passed plan or plaintiffs' alternative plan.

23.    In his *Garza* testimony and a second follow-up article in *Evaluation Review* Dr. Morrison also strongly warns against the use of postcensal population estimates in evaluating legislative districts. This second article, co-authored with William A. V. Clark, his co-expert in the *Garza* case is entitled, "Should the Court Rely on Postcensal Estimates for Redistricting?" and the authors give their answer as a decisive no. The authors state, "Even using the best population estimates can seriously mislead courts and play havoc with the constitutional mandate

---

2 William A. V. Clark and Peter A. Morrison, "Demographic Paradoxes in the Los Angeles Voting Rights Case," *Evaluation Review* 15 (1991), p. 722.

D-28

that one person is entitled to one vote."[3] Yet in his current report, Dr. Morrison violates his own stricture in several ways. He projects the postcensal Latino growth in population in communities within Cook County as well as Latino population percentages through 2018. He also relies on postcensal estimates to project the future voting age percentage of Latinos within plaintiffs' CD 3, which is 46.5 percent Latino voting age according to the 2010 Census. He does not, however, report the timeline for when he projects the Latino share of the voting age population to rise to 50 percent. Moreover, in estimating changes in the Latino percentage of voting age population in alternative CD 3, Dr. Morrison relies only on the current percentage of Latinos in the under 18 population, without considering the many other factors that could affect district's future demography, such as the out-migration and in-migration of population groups, and the death rates of various groups, etc. He also provides no estimates of the present or future citizen voting age population in this or any other district.

## CONCLUSIONS

24.     The Morrison report is a result-driven analysis, which lacks a scientific foundation. It provides quantitative conclusions without any underlying numerical analysis, fails to apply methodology to the data studied, and contradicts Dr. Morrison's own scholarly standards.   Dr. Morrison provides an incomplete analysis of CD 4 in the Adopted Plan that contradicts his approach to analyzing other districts. He does not provide a complete assessment of the inflows and outflows of population for this district and presents the incorrect conclusions that the state increased the Latino voting age population in CD 4 of the Adopted Plan. The Morrison report's examination of the concentrations of Latino voters only in CD 3, CD 4 and CD 5 of the Adopted Plan and in CD 3 and CD 4 of plaintiffs' plan is an incomplete comparison and

---

3 William A. V. Clark and Peter A. Morrison, "Should the Court Rely on Postcensal Estimates for Redistricting?" *Evaluation Review* 15 (1991), 727.

analysis of the two plans that improperly limits the proper geographic area for analysis. Dr. Morrison omits from his report the fact that CD 5 in Plaintiffs' plan decreases the percentage of Latino voters more than CD 5 in the Adopted Plan. Morrison's report also fails to analyze and consider CD 8 and CD 11 in the Adopted Plan, which increased the Latino concentrations to above 21% of the Latino voting age population. Given that Morrison analyzes the concentration of Latinos in CD 3, CD 4 and CD 5 of the Adopted Plan by examining the added and removed territories from those districts, it is inconsistent and indefensible from a methodological perspective not to have examined the added and removed territories in CD 3, CD 4 and CD 5 in plaintiffs' plan. CD 3 in plaintiffs' plan increases the Latino voting age population by largely draining the Latino voting age population from the previous CD 5, 6, 7, and 9, which had the effect of lowering the percentage of the Latino voting age population in CD 5, 6, 7 and 9 in plaintiffs' plan. Finally, Morrison's report contradicts his own scholarship in not analyzing citizen voting age population and basing opinions on postcensal estimates of future Latino population growth.[4]

---

4 My report is based upon facts, data, and analyses currently available. If additional facts, data, or analyses are elicited in the discovery of this case, I reserve the right to supplement my report to reflect such additional information if necessary.

17

D-28

Executed on October 4, 2011:

Allan J. Lichtman

D-28

RESPONSE OF ALLAN J. LICHTMAN TO REBUTTAL REPORTS OF
RICHARD J. ENGSTROM AND PETER A. MORRISON

OCTOBER 27, 2011

1

Statement of Inquiry and Organization

This report responds to new disclosures of the data relied upon by plaintiffs' experts Richard L. Engstrom regarding his electoral analysis. These disclosures were received on October 19, 2011, the day that Dr. Engstrom submitted his Response Report. This report also responds to substantial new electoral analyses presented in Dr. Engstrom's Response Report as well as other new material. It also reports on recently available citizenship data from the U. S. Census Bureau that was released in late September 2011 and Peter A. Morrison's opinions on citizenship data.

Summary of Opinions

My analysis has resulted in the following opinions.

- Dr. Engstrom's electoral analysis provides no insight into whether the State of Illinois' Adopted Plan for Congressional districts diminished the opportunities of Latino voters to elect candidates of their choice to Congressional offices.

- Dr. Engstrom's methodology explicitly excludes such insight.

- Dr. Engstrom's updated sample of elections remains limited and unrepresentative of Congressional elections.

- Analysis continues to show a lack of polarized voting and of non-Latino bloc voting sufficient to defeat Latino candidates of choice.

- Dr. Engstrom's updated electoral analysis does not sustain allegations of "packing" in Adopted CD 4 as compared to plaintiffs' CD 4.

- Dr. Engstrom's new analysis fails to refute the finding that as compared to Adopted CD 4, the construction of plaintiffs' CD 3 was predominantly driven

2

D-29

A148

by race.

- New data from the U. S. Census Bureau sustains rough proportionality in Illinois for Latino voter opportunities in Congressional districts.

**Dr. Engstrom's Electoral Analysis is Limited and Biased in its Scope**

Dr. Engstrom's initial report indicates that his "area of concern" includes CD 4 in the Adopted Plan and CD 3 and CD 4 in Plaintiffs' Plan. The report does not state explicitly whether his electoral analyses include full results for jurisdictions and districts containing or overlapping his area of concern or whether he is selecting only a subset incorporated within the "area of concern." His statistical tables (Tables 1 and 2, pp. 16-17), upon which experts typically rely, suggest the former interpretation. Table 1 is labeled, "Multivariate Analyses of County-Wide Elections and Chicago Mayoral Election" and Table 2 "Bivariate Analyses of District and Subcircuit Elections." There is no indication that the analysis is restricted to only a portion of the county, city, or district under study. Moreover, the fact that plaintiff's plan fundamentally redraws all districts in the Cook County and that plaintiffs' complaint alleges vote dilution in Adopted CD 3 and CD 5 also suggests an analysis that broadly covers Cook County.

The resolution seems to have been found in disclosures of the actual election data upon which Dr. Engstrom relied. These disclosures received a few days after submission of his initial report, included all precincts for all elections, whether conducted county-wide, city-wide or within a district. Thus, it appeared that the analysis was not restricted to certain selected precincts, since no such precincts were eliminated or depicted in the disclosure.

The new disclosures received on October 19, 2011 were strikingly different. These disclosures for the first time showed that for each election Dr. Engstrom had eliminated precincts that did not fall within his "area of concern." Thus the actual basis for Dr. Engstrom's electoral

3

D-29

analysis was properly indicated only with the second set of disclosures.

These new disclosures account for the large discrepancy noted in my response report between actual votes cast in the 2011 Chicago mayoral election and Dr. Engstrom's ecological inference estimates. These new results also indicate how unrepresentative the selected "area of concern" is of any actual jurisdiction. The disclosures, however, do not account for the discrepancy between Dr. Engstrom's estimates and actual returns in the 2006 judicial primary in sub-circuit 6. Dr. Engstrom's estimates for Latino candidate Ocasio remain too high for actual results even within his selected precincts and his confidence intervals still give impossible results. (see Lichtman Response Report, pp. 18-20 and Engstrom Response Report pp. 6-8).

**Dr. Engstrom's Methodology Cannot Assess Whether the Adopted Congressional Plan Dilutes Latino Voting Strength.**

Dr. Engstrom's methodology turns upside down the appropriate procedure for assessing whether the Adopted Congressional Plan impedes opportunities for Latino voters to elect candidates of their choice to Congress. Dr. Engstrom limits his electoral analysis within the Adopted Plan only to CD 4. However, he contends that CD 4 not only provides Latinos effective opportunities to elect candidates of choice, but is "packed" with an excess of Latino voter strength. It allegedly "wastes" Latino votes. However, if politically significant, those "wasted" votes in Adopted CD 4 must have prevented Latino voters in other Adopted districts from opportunities to elect candidates of their choice. Otherwise, the alleged concentration of Latinos in Adopted CD 4 does not produce the vote dilution alleged in Counts 1-3 of Plaintiff's Complaint.

Proof of such vote dilution requires a two-stage analysis. First, analysis must demonstrate that in challenged districts of any redistricting plan there is a usual pattern of

4

D-29