**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, )<br><br>Plaintiffs, )<br><br>v. )<br><br>ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, )<br><br>Defendants. ) | Case No. 11-C-5065<br><br>Hon. John D. Tinder<br>Hon. Joan H. Lefkow<br>Hon. Robert L. Miller, Jr.<br>(3-judge court convened pursuant to 28 U.S. C. § 2284) |

**APPENDIX 4
TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR A PERMANENT INJUNCTION**

**A-151 thru A-200**

polarized voting, such that in this instance Latinos and non-Latinos have different candidates of choice. Absent such differences, the allocation of Latinos across districts will not affect their opportunities to elect preferred candidates for members of Congress. Second, such polarized voting if it exists must be politically significant, that is, non-Latino bloc voting against the candidate choices of Latino voters must be sufficient strong to usually defeat the Latino candidates of choice within challenged districts. These two requirements comprise what is known as Prong 3 of the three-prong *Gingles* test (See Lichtman report on Allegations Of Intentional Vote Dilution & Racial Predominance In Redistricting, pp.8-9).

Dr. Engstrom's methodology precludes any analysis of whether polarized voting exists and of whether it is politically significant within the Adopted Plan because it excludes all Adopted Districts with the exception of the allegedly packed CD 4.

Moreover, Dr. Engstrom's methodology cannot specifically analyze polarized voting even within Adopted CD 4 or within Plaintiffs' CD 3 or CD 4 because his electoral studies mingle the precincts of all these districts. Dr. Engstrom states that, "The racial discrimination claims in this case, however, focus primarily on the treatment of Latinos in the geographic area encompassed by two versions of CD 4, along with the only other plurality-Latino district in either plan, CD 3 in Plaintiffs' Plan." (Engstrom Response Report, p. 12). In fact, the object in a challenge to an adopted redistricting plan is not to decide how to treat Latinos in a self-defined "area of concern." Rather the analysis considers whether or not electoral study sustains the claims that the adopted plan dilutes the voting strength of Latinos within the districts of that plan. Such claims cannot be tested by restricting analysis to an artificially created "area of concern" that explicitly excludes all relevant districts of the Adopted Plan.

Plaintiffs' Complaint clearly indicates that their allegations of vote dilution are not

5

limited to Dr. Engstrom's "area of concern," but encompass districts outside that area. Count 1 of

Plaintiffs' Complaint on vote dilution (page 24) states:

> The Plan intentionally dilutes the votes of Latino voters by packing an excessive super-majority of Latino voters into proposed District 4 and by simultaneously reducing the growing percentage of Latino voters in proposed Districts 3 and 5. Many Latino voters in proposed District 4 will see their votes wasted because the Plan intentionally makes those votes unnecessary to elect a candidate of their choice. At the same time, Latino voters in *proposed Districts 3 and 5* will be prevented by their intentionally diminished numbers from having any significant influence in choosing primary and general election candidates of their choice. (emphasis added)

Plaintiffs' Complaint repeats this identical paragraph in Counts 2 and 3.

Dr. Engstrom's analysis of elections only within his area of concerns provides no insight

into whether Latino voters in Adopted Districts 3 and 5 are prevented "from having any

significant influence in choosing primary and general election candidates of their choice." It

provides no insight into whether such effects occur in any other districts of the Adopted Plan. It

also provides no insight into whether plaintiffs' alternative plan, by concentrating Latino voters

into its CD 3, which is not a majority Latino voting age population district, prevents Latino

voters in other districts such as CDs 3, 8, and 11 from having "significant influence" in electing

candidates of their choice to Congress (see Lichtman Report on Intentional Discrimination, p. 8).

Even if it were relevant to assess racial polarization with the "area of concern," Dr.

Engstrom cannot and does not proceed to the second step of assessing whether non-Latino bloc

voting usually defeats Latino candidates of choice. His composite "area of concern" does not

correspond to any district or jurisdiction within Illinois.

6

D-29

Electoral Analysis Shows That Voting is not Racially Polarized in Most Latino versus
non-Latino Elections and That Latino Candidates of Choice Overwhelmingly Prevail

The analysis of a large corpus of Latino versus non-Latino elections that was conducted
since the last redistricting for Cook County shows that neither part of the two-part test for vote
dilution can be met. In the great majority of contests there is no polarized voting between Latinos
and non-Latinos. To the extent polarized voting exists it rarely defeats Latino candidates of
choice even in overwhelmingly non-Latino jurisdictions and districts. Thus, there is no
evidentiary basis for alleging that the Adopted Plan diminishes the Latino vote to elect
candidates of their choice.

Dr. Engstrom in his response report updates his initial analysis of 8 elections with 6
additional contests. These include 4 that I analyzed in my response report to his initial report and
two additional judicial elections. This updated sample of elections remains too limited and
unrepresentative to provide a reliable assessment of polarized voting, even if analysis were not
restricted to Dr. Engstrom's area of concern. Dr. Engstrom's sample of Latino versus non-
Latino elections includes no Congressional elections. His sample includes no state legislative
elections. Overall, his sample includes only one election for a legislative position, for a district-
level county board seat, an extraordinary omission in the context of a challenge to an adopted
legislative plan for elections to Congress. My initial sample of Latino versus non-Latino
elections included 3 endogenous Congressional elections and 11 state legislative elections.[1]

Dr. Engstrom's sample is heavily weighted toward judicial elections, which comprise 6
of 14 selected elections (43 percent), four of them in judicial sub-circuits. As Dr. Engstrom
himself noted in a scholarly article on judicial elections, these elections are fundamentally

---

[1] There were actually 3 Congressional elections initially, but to avoid dispute, I have since eliminated the 2008
primary in CD 3. One candidate had a Spanish surname, but there is dispute over whether he actually is Latino.

7

different from high stimulus legislative elections for the U. S. Congress. "Elections to judicial offices are generally low stimulus affairs," Dr. Engstrom writes. Candidates in such elections, he adds, "are restricted by ethical canons from certain types of campaign activities, including taking positions on controversial legal and/or political issues." In addition, "The media's attention to these more subdued campaigns is usually low, and voters tend to have minimal information about the candidates." In judicial elections, moreover, Dr. Engstrom states, "Not surprisingly, many voters rolloff when they reach the portion of the ballot containing judicial contests."[2]

As indicated in his initial and response report, Dr. Engstrom excludes from his analysis numerous Latino versus non-Latino elections conducted since the last redistricting. He excludes two Latino versus non-Latino endogenous elections on the grounds that they are non-competitive. As reported in Table 1, these include the 2010 Democratic primary in CD 3 in which the losing candidate Mujica received 22.1 percent of the vote and the 2009 special general election in CD 5 in which the losing candidate Pulido received 24.2 percent of the vote.

In my initial report I challenged these exclusions for lacking an objective threshold or justification through Dr. Engstrom's past practice. He did not address either problem in his Response Report. In fact, his exclusion of these endogenous elections contradicts both his past practice and the choices he made in this analysis. In 2005, Dr. Engstrom testified before a subcommittee of the U.S. Congress on extending Section 5 of the Voting Rights Act. To demonstrate the continued existence of polarized voting, he presented his report of a polarization analysis from a Section 5 case on state House districts in Louisiana involving African

---

2 Richard L. Engstrom and Victoria M. Caridas, "Voting for Judges: Race and Roll-Off in Judicial Elections," in William Crotty, ed., *Political Participation and American Democracy* (Greenwood, 1991), pp. 172-173.

Table 1
15 Latino vs. Non-Latino Elections Included in Electoral Analyses of Allan J.
Lichtman and Excluded From the Analyses of Richard L. Engstrom

| ELECTION |
|---|
| 2010 DEM PRIM CONGRESSIONAL DISTRICT 3 |
| 2009 GENERAL CONGRESSIONAL DISTRICT 5 |
| 2002 DEM PRIM SEN 20 |
| 2006 DEM PRIM STATE REP 3 |
| 2008 DEM PRIM STATE REP 3 |
| 2010 DEM PRIM STATE REP 2 |
| 2010 DEM PRIM STATE REP 23 |
| 2006 GENERAL STATE REP 24 |
| 2006 GENERAL STATE REP 44 |
| 2006 GENERAL STATE REP 39 |
| 2008 GENERAL STATE REP 44 |
| 2010 GENERAL STATE REP 39 |
| 2010 GENERAL STATE REP 44 |
| 2006 GENERAL COOK COUNTY SHERIFF |
| 2010 GENERAL COOK COUNTY CLERK |

Americans.[3] This report represented his "best practice." In the report, Dr. Engstrom stated that

he did not exclude any endogenous elections from his analysis, but excluded some exogenous

---

[3] Whether the protected minority is African American or Latino does not alter the principles for conducting a
polarization analysis discussed here.

9

elections as non-competitive because they included "minor candidates." The largest vote for an excluded candidate or group of candidates was 13.2%, which is 9 percentage points lower than the vote for Mujica and 11 percentage points lower than for Pulido. Dr. Engstrom, for example, included in his Louisiana analysis an exogenous judicial election (2001 primary, Civil District Court Division E) in which the minority candidate (Ware) in a two-person election garnered 18.8 percent of the vote, according to the Louisiana State Board of Elections. This percentage was 3.4 percentage points lower than the vote for excluded candidate Mujica and 5.4 percentage points lower than the vote for excluded candidate Pulido. In this case, Dr. Engstrom included the 2010 primary for Cook County Board in which the Latino candidate won 22% of the vote, the 2010 primary in Circuit Court sub-circuit 11 in which the Latino candidate won 13.9 percent of the vote, and the 2008 primary in Circuit Court sub-circuit 4 in which the Latino candidate won 11.5 percent of the vote. Although these were multiple candidate elections, Dr. Engstrom's methodology treats all non-Latino candidates as a single combined group. He does not report results for any individual non-Latino candidate or even indicate the number of such candidates or their racial identity in any of his tables.[4]

Dr. Engstrom also excluded as non-competitive two Latino versus non-Latino countywide general elections (see Table 1), the 2006 election for Sheriff where the losing Latino candidate garnered 25 percent of the vote, and the 2010 election for Clerk where the losing Latino candidate garnered 22 percent of the vote. These encompass a very large number of voters and the percentages for the losing candidates were well above his best practice threshold of about 13 percent and the percentages for other included elections in his Louisiana analysis.

By excluding these four so-called non-competitive elections, Dr. Engstrom not only

---

[4] Engstrom, *Testimony Before the Subcommittee on the Constitution of the Committee on the Judiciary, U. S. House of Representatives*, October 25, 2005, pp. 49-79.

10

limits the size and representativeness of his sample, but also biases his analysis. These are the elections in which Latinos and non-Latinos have formed a strong coalition in support of a common candidate of choice. Their exclusion makes it much more likely that any analysis will find racial polarization.

As additionally indicated in Table 1, Dr. Engstrom also excludes 5 Latino versus non-Latino primaries and 6 such general elections for state legislative positions, the elections that are substantively the closest to Congressional contests. Dr. Engstrom excludes the 2002 Democratic Primary in Senate District 20 because it is not "recent," even though the election was conducted since the completion of the last redistricting cycle. He excludes state House of Representatives elections in House District 44, because it is outside of his "area of concern," even though this district is within Cook County in Congressional District 8. This district, as noted in my initial report, has a Latino population greater than Cook County overall and is eliminated in Plaintiffs' plan. He excludes 4 primary elections and 3 general elections in other State House districts that are within his "area of concern" because such districts comprise only a small portion of a Congressional district and allegedly do not include enough votes to be useful for analysis. However, he did not check to see how the votes for Latino candidates in these highly relevant elections compared to the votes for Latino candidates in his much less relevant county board and judicial sub-circuit elections. He also did not check whether Latino candidates in the state legislative elections were more competitive than Latino candidates in his county board and sub-circuit elections.[5]

Table 2 below summarizes the result of any inquiry into racially polarized voting and politically significant racially polarized voting for all 29 Latino versus non-Latino elections,

11

included in either Dr. Engstrom's two reports or my response report to Dr. Engstrom's initial report. This corpus of elections included more than twice as many contests as the 14 elections analyzed in Dr. Engstrom's updated sample of elections. It includes endogenous as well as a many different types of exogenous elections and is not unduly weighted toward judicial elections, which comprise only 6 of 29 contests.

The results reported in Table 2 and depicted in Chart 1 show that voting was racially polarized between Latinos and non-Latinos in only 11 of 29 Latino vs. non-Latino elections. Thus voting was *not polarized* in 62 percent of these elections. In some elections such as the 2010 general election in Representative District 39 and the 2010 primary for Cook County Assessor voting was polarized by just a few percentage points. As also indicated in Table 2 and Chart 1 Latino candidates prevailed in 24 of 29 elections, which is a win rate of 83 percent.

Although sub-circuit judicial elections are only remotely relevant to this inquiry into districts for electing members of Congress, for argument sake they were included in the election analysis depicted below. As depicted in Chart 2, the study of a more probative sample of 25 elections, not including the sub-circuit judicial elections, demonstrates that voting was polarized between Latinos and non-Latinos in only 7 elections of 25 elections. This indicates that voting was not polarized in 72 percent of the more probative sample of elections. As also depicted in Chart 2, Latino candidates prevailed in 22 of 25 of the more probative elections, which is a win rate of 88 percent.

Table 3 and Chart 3 isolate only those elections conducted in jurisdictions and districts that were 70 percent or more non-Latino in their voting age population. The results of this analysis show that only one of sixteen candidates of choice of Latino voters were defeated in Latino v. non-Latino elections held in districts or jurisdictions that were at least 70 percent non-

12

Latino in their voting age population. Thus Latino candidates of choice prevailed in 94 percent of these elections.

## Table 2
### Summary of Racial Polarization Analysis: 29 Latino v. Non-Latino Congressional, State Legislative, Countywide and City of Chicago Elections

| ELECTION | POLARIZED LATINOS & NON-LATINOS? | WINNING CANDIDATE | CANDIDATE OF CHOICE OF LATINOS? |
|---|---|---|---|
| 2010 PRIM CD 3 | NO | Lipinski | YES |
| 2009 SPECIAL GEN CD 5 | NO | Quigley | YES |
| 2002 PRIM SEN 20 | NO | Martinez | YES |
| 2006 PRIM REP 3 | NO | Delgado | YES |
| 2008 PRIM REP 3 | NO | Arroyo | YES |
| 2010 PRIM REP 2 | NO | Acevedo | YES |
| 2010 PRIM REP 23 | YES | Burke | NO |
| 2006 GEN REP 24 | NO | Hernandez | YES |
| 2006 GEN REP 44 | NO | Crespo | YES |
| 2008 GEN REP 39 | NO | Berrios | YES |
| 2008 GEN REP 44 | NO | Crespo | YES |
| 2010 GEN REP 39 | YES | Berrios | YES |
| 2010 GEN REP 44 | NO | Crespo | YES |
| 2010 PRIM CO BOARD D 16 | YES | Garcia | NO |
| 2008 PRIM COOK ST ATT | YES | Alvarez | YES |
| 2008 PRIM COOK ASSR | YES | Berrios | YES |
| 2006 GEN COOK SHER | NO | Dart | YES |
| 2008 GEN COOK ST ATT | NO | Alvarez | YES |
| 2010 GEN COOK ASSR | NO | Berrios | YES |
| 2010 GEN COOK CLERK | NO | Orr | YES |
| 2007 CHICAGO CLERK | NO | Del Valle | YES |
| 2011 CHICAGO CLERK | NO | Mendoza | YES |
| 2011 CHICAGO MAYOR | YES | Emanuel | NO |
| 2010 PRIM CIR CT SUB 11 | YES | Martinez | NO |
| 2010 PRIM CIR CT RAMOS | YES | Ramos | YES |
| 2008 PRIM CIR CT SUB 4 | YES | Aguilar | NO |
| 2008 PRIM CIR CT SUB 6 | YES | Araujo | YES |
| 2008 PRIM CIR CT REYES | NO | Reyes | YES |
| 2006 PRIM CIR CT SUB 6 | YES | Ocasio | YES |

13

D-29

Chart 1
Polarized versus Non-Polarized, Latino vs. Non-Latino Elections, Victories vs.
Defeats for Latino Candidates of Choice: 29 Elections



14

A160

D-29

## Chart 2
### Polarized versus Non-Polarized, Latino vs. Non-Latino Elections, Victories vs. Defeats for Latino Candidates of Choice: 25 Most Probative Elections



15

A161

Table 3
Summary of Victories vs. Defeats for Latino Candidates of Choice: 16 Latino
v. Non-Latino Elections Held in 70%+ Non-Latino Districts or Jurisdictions

| ELECTION | WINNING CANDIDATE | CANDIDATE OF CHOICE OF LATINOS? |
|---|---|---|
| 2010 PRIM CD 3 | Lipinski | YES |
| 2009 SPECIAL GEN CD 5 | Quigley | YES |
| 2006 GEN REP 44 | Crespo | YES |
| 2008 GEN REP 44 | Crespo | YES |
| 2010 GEN REP 44 | Crespo | YES |
| 2008 PRIM COOK STATT | Alvarez | YES |
| 2008 PRIM COOK ASSR | Berrios | YES |
| 2006 GEN COOK SHER | Dart | YES |
| 2008 GEN COOK STATT | Alvarez | YES |
| 2010 GEN COOK ASSR | Berrios | YES |
| 2010 GEN COOK CLERK | Orr | YES |
| 2007 CHICAGO CLERK | Del Valle | YES |
| 2011 CHICAGO CLERK | Mendoza | YES |
| 2011 CHICAGO MAYOR | Emanuel | NO |
| 2010 PRIM CIR CT RAMOS | Ramos | YES |
| 2008 PRIM CIR CT REYES | Reyes | YES |

Chart 3
Victories vs. Defeats for Latino Candidates of Choice, Latino vs. Non-Latino
Elections Held in 70%+ Non-Latino Districts



Latino v. non-Latino Elections

■ Defeats

■ Victories

A162

D-29

It is also important to indicate that Dr. Engstrom uses his updated analysis to defend opportunities for Latino voters in plaintiffs' CD 3 by noting that the following Latino candidates of choice received at least a plurality of the vote within the precincts of CD 3: Berrios in the 2010 Assessor primary, Alvarez in the 2080 State's Attorney primary, Ramos in the 2010 Circuit Court primary, Reyes in the 2008 Circuit Court primary, Berrios in the 2010 Assessor general, and Alvarez in the 2008 State's Attorney general. However, he provides no comparative analysis. As demonstrated in Table 3, every one of these candidates also won at least a plurality of the vote in Cook County overall, which is only 21 percent Latino in its voting age population.

Dr. Engstrom also uses his updated electoral analysis to reanalyze votes for Latino candidates in alleged "packed" CD 4 in the Adopted Plan and allegedly "unpacked" CD 4 in the plaintiffs' plan. This updated analysis is reported in Table 4. This table has two entries for the 2010 primary for Cook County Assessor. This election included two Latino candidates and Dr. Engstrom reported the results both for the candidate of choice of Latino voters and for the two candidates combined.

For candidates of choice, Table 4 indicates that the mean percentage difference between the two versions of CD 4 is only 3.3 percent. In the 2010 Assessor primary the Latino candidate of choice actually garnered a greater share of votes in the alleged unpacked plaintiffs' CD 4 than in the allegedly packed Adopted CD 4. The two greatest differences between results in Adopted CD 4 and Plaintiffs' CD 4 are for judicial elections. The 2010 primary for Circuit Court (Ramos), for example, shows that Ramos received a lower vote by 9.9 percentage points in plaintiffs' CD 4 – by far the largest difference in the analysis. However, this would hardly be indicative of "wasted" votes; Ramos garnered 39.6 percent of the vote in plaintiffs' CD 4,

17

Table 4
Dr. Engstrom's Results for his Analysis of the Support for Latino Candidates in Adopted
CD 4 and CD 4 Under Plaintiffs' Plan

| ELECTION | LATINO CANDIDATE(S) OF CHOICE OF LATINO VOTERS | % FOR LATINO CANDIDATE(S) OF CHOICE IN CD 4 ADOPTED PLAN | % FOR LATINO CANDIDATE(S) CD 4 PLAINTIFFS' PLAN | DIFFERENCE |
|---|---|---|---|---|
| 2010 DEM PRIM COOK CO ASSESSOR | BERRIOS | 49.8% | 52.7% | +2.9% |
| 2010 DEM PRIM COOK CO ASSESSOR | BERRIOS & FIGUEROA COMBINED | 83.2% | 80.0% | -3.2% |
| 2008 DEM PRIM COOK CO STATE'S ATT | ALVAREZ | 45.9% | 42.0% | -3.9% |
| 2010 DEM PRIM CIR COURT | RAMOS | 49.5% | 39.6% | -9.9% |
| 2008 DEM PRIM CIR COURT | REYES | 68.6% | 63.3% | -5.3% |
| 2010 GEN COOK CO ASSESSOR | BERRIOS | 52.9% | 52.1% | -0.8% |
| 2008 GEN COOK CO STATE'S ATT | ALVAREZ | 74.4% | 71.5% | -2.9% |
| All Elections Cands of Choice | | 56.85% | 53.53% | -3.3% |
| All Elections Latino Cands Combined | | 62.4% | 58.1% | -4.3% |

Source: Expert Report of Richard L. Engstrom, Sept. 15, 2011, p. 12, Expert Response
Report of Richard L. Engstrom, Oct. 15, 2011, pp. 16-17

18

D-29

whereas the non-Latino candidates as a bloc won 60.4 percent. In three of six elections the Latino candidate of choice received a plurality but not a majority of the vote in Adopted CD 4.[6]

**Dr. Engstrom's New Claims Regarding Intentional Discrimination Cannot be Sustained**

Dr. Engstrom also presents new claims regarding the racial concentration of Latino voters in plaintiffs' CD 3 as compared to Adopted CD 4. In my initial report, I indicated that the movement of population in and out of plaintiffs' CD 3 and Adopted CD 4 shows that the former unlike the latter is predominantly driven by race. In response Engstrom claims that CD 3 does not subordinate traditional redistricting principles, because it is compact. Yet a racially gerrymandered district may be perfectly compact. Compactness is only an indirect indicator. Moreover, other than compactness, plaintiffs' CD 3 as compared to Adopted CD 4 subordinates several redistricting principles. Plaintiffs' CD 3 splits the counties of Cook and DuPage, whereas Adopted CD 4 splits no counties. Plaintiffs' CD 3 splits nearly twice as many precincts and nearly three times as many border precincts than Adopted CD 4, creating more voter confusion. Plaintiffs' CD 3 preserves much less of the core of an existing district than does Plaintiffs' Adopted CD 4. Unlike Adopted CD 4, Plaintiffs' CD 3 does not protect the only Latino member of the Illinois Congressional delegation. Generally in the area of plaintiffs' CD 3 and Adopted CD 4 the Adopted Plan preserves the core of the districts better and protects more incumbents. (see Lichtman Report on Intentional Discrimination, pages 32-34, and Lichtman Response Report to Engstrom Report, Maps 1 and 2). The splitting of precincts in plaintiffs' CD 3 also divides along racial lines. The portion of the split precincts retained within CD 3 is 31 percent

---

6 The combination of the two Latino candidates in the 2010 Assessor primary increases the mean difference between the districts only by a single percentage point. Given that Dr. Engstrom did not explain his methodology for dealing with split precincts, I could not verify the percentages in Table 4, but are simply taking percentages from Dr. Engstrom's response report.

Latino VAP, whereas the portion of the split precincts allocated to other districts is 19 percent Latino VAP, for a racial gap of 12 percentage points in split precincts alone.

New Census Data Sustains Rough Proportionality for Congressional Districts in Illinois

The United States Bureau of the Census released in late September its 2010 data on citizenship status, based on its American Community Survey. This data is not incorporated in any reports of plaintiffs' experts and I did not have the data at the time of my initial report. Based on this data the percentage of Latinos in the citizen voting age population in Illinois is 8.7 percent. Multiplied by 18 Congressional districts this percentage equals 1.57 Congressional districts, which is less than one tenth of a difference from the 1.48 reported in my initial report, which was based on data from the American Community Survey from 2005 to 2009. The State clearly remains well within the range of rough proportionality for the drawing of effective Latino opportunity districts. Like other Census citizenship data, this latest data is based upon a sample that is highly accurate at the level of the state as a whole. The error margins are within a few tenths of one percent.

This 2010 state-level citizenship data is not subject to any of the alleged criticism of the 5-year American Community Survey from 2005 to 2009. While the ACS citizenship data is based on samples, and not enumeration, so was the Census citizenship data. The ACS data is for the latest Census year. It is for the state overall so it does not require the measurement of citizenship at lower levels of Census geography. It does not require the mapping of 2000 Census geography on 2010 Census geography (which could be achieved if it were necessary). It is also unaffected by age distributions since it is for a single year. The 2010 data on Latino citizenship is also consistent with the 2005-2009 data in terms of the results derived (see Rebuttal Report of Peter A. Morrison, pp. 7-9).

20

_Allan J. Licht_

Allan J. Lichtman

_October 27, 2011_

Date

Expert Report for Committee for a Fair and Balanced Map, *et al.*
v. Illinois State Board of Elections

by

Richard L. Engstrom

Visiting Research Fellow

Center for the Study of Race, Ethnicity. and Gender in the Social Sciences
Duke University

## BACKGROUND

My name is Richard L. Engstrom and I am a resident of Durham, North Carolina. I am a

former Research Professor of Political Science and Endowed Professor of Africana Studies at the

University of New Orleans. I was employed as a consultant at the Center for Civil Rights at the

School of Law, University of North Carolina, Chapel Hill, from 2006 through 2007. I am

presently a Visiting Research Fellow at the Center for the Study of Race, Ethnicity, and Gender

in the Social Sciences at Duke University. I have served two terms as the Chairperson of the

Representation and Electoral Systems Section of the American Political Science Association,

from 1993-1995 and 1995-1997, and served as a member of the Executive Council for that

section from 1993 to 2007.

I have done extensive research into the relationship between election systems and the

ability of minority voters to participate fully in the political process and to elect representatives

of their choice. The results of my research on this topic have been published in the *American

Political Science Review, Journal of Politics. Western Political Quarterly, Legislative Studies

Quarterly, Social Science Quarterly, Journal of Law and Politics. Electoral Studies,

Representation, Saint Louis University Public Law Review*, and other journals and books. Three



EXHIBIT NO. _1_

10/25/11 BK

articles authored or co-authored by me were cited with approval in Thornburg v. Gingles, 478

U.S. 30, at 46 n.11, 49 n.15, 53 n.20, 55, and 71 (1986), the Supreme Court decision interpreting

amended section 2 of the Voting Rights Act. I am the co-author, with Mark A. Rush, of *Fair*

*and Effective Representation? Debating Electoral Reform and Minority Rights* (Lanham, MD:

Rowman and Littlefield Publishers, Inc. 2001). A copy of my curriculum vitae is attached as

Appendix B to this report.

I have also testified as an expert witness in numerous cases in federal and state courts

across the United States. Since 2005 I have testified at trial and/or been deposed in the following

cases: Pender County v. Bartlett (General Court of Justice, Superior Court Division, County of

Wake, NC 2005), Arise for Social Justice v. City of Springfield and Springfield Election

Commission (D.C. Mass. 2006, 2007), Gonzalez v. State of Arizona (D.C. Ariz. 2008), United

States of American and Cesar Ruiz v. Village of Port Chester (S.D. NY 2008), United States of

America v. Euclid City School District Board of Education and Cuyahoga County Board of

Elections (N.D. Ohio 2009), Benavidez v. City of Irving, Texas (N.D. Tex. 2009), Benavides v

Irving Independent School District, Texas (N.D. TX 2009), and Texas Latino Redistricting Task

Force v. Perry (W.D. TX 2011).

## QUESTIONS ANALYZED

The attorneys for the plaintiffs in this case have asked me to address several matters. The

first is to analyze the extent to which the candidate preferences of Latino voters differed from

those of other voters in the area from which Congressional District (hereinafter CD) 4 in the new

congressional districting plan adopted by the state of Illinois (hereinafter Adopted Plan), or CD 3

or CD 4 in the illustrative remedial plan presented by the plaintiffs in this litigation (hereinafter

*Plaintiffs' Plan*), were created. CD 4 in each plan is a majority-Latino district in voting age

2

population (VAP), and CD 3 in the Plaintiffs' Plan is the only district in which Latinos constitute a plurality of the VAP, but not majority, in either plan. CD 3 and CD 4 in the Plaintiffs' Plan and CD 4 in the Adopted Plan encompass areas within which Latinos tend to be concentrated. This therefore is the area of concern for the racially polarized voting analysis. The extent to which voting might be racially polarized in other areas of the state has no impact on the drawing of districts within this area.

The elections analyzed for this purpose were the most recent elections in which voters within this area have been presented with a choice between or among Latino and non-Latino candidates for offices within Cook County in which voters in a large portion of the area at issue participated. All of the elections are ones in which voters have a single vote to cast and only one candidate will be nominated or elected, as is the case in congressional elections. The elections analyzed are the 2006, 2008, and 2010 Democratic primaries for State's Attorney, County Assessor, District 16 for the County Board, and four judgeships in Subcircuits of the Cook County Circuit Court.[1] In addition, the 2011 election for Mayor of Chicago is analyzed as well.

I also have been asked to provide a comparative assessment of the opportunities Latinos have to elect representatives of their choice in the majority-Latino districts in each plan, and to compare the relative electoral opportunities provided by the second most Latino districts in VAP

---

[1] If data are available, I plan to supplement this report with analyses of the votes cast in the area for the 2010 general election for County Assessor and the 2008 general election for State's Attorney, both of which were more competitive general elections than usual in Cook County, with the winning candidates receiving 48.0 percent and 60.8 percent of the votes cast in them. In addition, if data are available, I plan to supplement this report with analyses of Democratic primary elections for two county-wide contests for Circuit Court judgeships, one in 2010 and one in 2008. All of these elections also present voters with a choice between or among Latino and non-Latino candidates.

Not included in the analyses are two elections in which Latino candidates were not competitive. These were the 2006 Democratic primary for a Subcircuit 7 seat on the Circuit Court, in which a Latino candidate received 5.2 percent of the vote in a four-person contest, and the 2010 Democratic primary for CD 3, in which a Latino candidate received 22.1 percent of the vote in a two-person contest.

3

in each plan. These analyses entail examinations of not only the demographics of the districts, but also the results of past elections in the various versions of CD 4 that have been in place, and the results of votes cast in other elections within the geographical area of CD 4 in the Adopted Plan and the Plaintiffs' Plan and the geographical area of CD 3 in the Plaintiffs' Plan.[2]

I am being compensated at a rate of $300 an hour for my work in this case.

## RACIALLY POLARIZED VOTING

Data and Methods

The data used in the analyses of the candidate preferences of Latino and other voters include the numbers of votes cast in the precincts for the various candidates in these elections. These data were obtained from the Defendant, State Board of Elections, Cook County Clerk and Chicago Board of Elections. These election returns are matched, by precinct, to additional data reflecting the relative presence of Latinos and others in the voting age population of the respective precincts, based on the 2010 Census of Population.[3]

The estimates of the extent to which the candidate preferences of the Latino voters differed from those of the non-Latino voters in these elections have been derived through a methodology developed for this purpose by Professor Gary King subsequent to Thornburg v. Gingles [478 U.S. 30 (1986)]. This procedure is known as *Ecological Inference* and is superior

---

[2]  Appendix A to this report contains the facts and data relied upon to reach my opinions and conclusions in this case.

[3]  In analyses of this type it is not uncommon to find that there are problems with the matching of precinct demographics and precinct election returns. This has occurred in this analysis as well. Some precincts are listed as having more votes cast in them than voting age population residing in them. Most such precincts are reported to have no people of voting age within them, or very few. These precincts have been excluded from the analyses. Despite their exclusion, the percentages of the votes cast in an election that are included in the following analyses range from 88.0 percent to 97.3 percent.

4

A171

D-31

to the methodologies relied upon in the Gingles case, which were homogeneous precinct analysis (HP) and ecological regression analyses (ER).[4]

In the county-wide elections, in which all of the voters in Cook County residing in the area of interest can participate, there is sufficient presence of African Americans in the precincts to provide reasonably precise estimates of their candidate preferences, and therefore they are included as a voting group in the multivariate EI analyses of these elections. These analyses provide estimates for the candidate preferences of Latinos, African Americans, and the remaining voters. This is also the case for the Chicago mayoral election. The presence of African Americans is not sufficient, however, to provide reasonably precise estimates of their candidate preferences in the precincts in the area of interest in District 16 for the County Board or within the Circuit Court subcircuits. The analyses of these elections therefore will be bivariate applications of EI in which estimates of candidate preferences will be reported for Latino and non-Latino voters, with the later group including African Americans.

Results

The results of the analyses are reported in Tables 1 and 2 at the end of this report. Identified in the first column of these tables are the year and type of election being analyzed, and

---

[4] HP analyses simply report the percentage of the votes received by a candidate or set of candidates within the precincts in which a particular group constitutes over 90 percent of the voting age population. Voters in such precincts might not vote in a similar way to that of voters residing in mixed precincts however. ER derives estimates, based on all of the precincts, through a linear model premised on the notion that the percentages of a group's voters who vote for a particular candidate or candidates are the same in every precinct. EI also relies on every precinct but does not rely on the linear assumption. It employs a maximum likelihood model for deriving estimates rather than a linear model. The EI procedure further incorporates the method of bounds in the analysis, which precludes group estimates from exceeding real world limits, such as estimates of a group's support for a candidate or group of candidates being above 100.0 percent or below 0.0 percent, as happens with ER. EI, which can also be used for other purposes, is now used widely in racially polarized voting analyses. EI is the subject of Professor King's book, A Solution to the Ecological Inference Problem: Reconstructing Individual Behavior from Aggregate Data (Princeton University Press, 1997). On the superiority of EI over ER for assessing differences in the candidate preferences between or among groups of voters, see pp. 15-16 of this book.

5

the surnames of the Latino candidates. The other columns contain the results of the analyses for the respective group of voters. The first number in each cell in these columns identifies, in percentage terms, the point estimate for a group's support for the Latino candidates or candidate. The point estimate is considered the best estimate based on the EI analysis. Reported immediately below each point estimate is the range of the 95 percent confidence interval around that estimate. The confidence interval identifies the range of estimates within which we can be 95 percent confident, statistically, that the true value of the percentage vote for a candidate or set of candidates by a group falls. The point estimate is the value most likely to be the true value, and estimates within the range of the confidence interval are less likely to be the true value the further they are from the point estimate. I will therefore focus on the point estimates in my discussion of the results.

Table 1 contains the results of the multivariate analyses for the county-wide elections and the Chicago mayoral election. The preference of Latino voters in the area of interest for Latino candidates is stark in this table. In all three elections Latinos are estimated to have cast over 80 percent of their votes for a Latino candidate. In the two elections with two Latino candidates Latino voters are estimated to have cast close to 65 percent of their votes for Mr. Berrios in the Assessor primary, and a plurality of their votes, 46.0 percent, for Mr. Chico in the Chicago mayoral contest.

African American voters did not share this preference in any of these elections. In the Assessor primary the only candidate competing with the two Latino candidates was an African American. She was their choice in that election, receiving an estimated 62 percent of their votes. African Americans also did not support Ms. Alvarez in the State's Attorney contest. There was no African American candidate in that primary; Ms. Alvarez's opponents were two white

6

candidates. The estimate of her African American support in that election is 16.7 percentage points. African Americans also did not support the Latino candidates for Mayor of Chicago, casting an estimated 8.6 percent of their votes for them. This election was also contested by three African American candidates and one white candidate. Their candidate of choice of the African Americans voting in this election was the white candidate, who received an estimated 63.7 percent of their votes (CI = 58.9 to 68.4).

The remaining voters, identified as "others" in the table, cast an estimated 81 percent of their votes for the Latino candidates in the primary election for Assessor, in which there was not a white candidate. As noted above, only one of the six candidates in the mayoral election was white, while three of the remaining five were African American. The other voters cast just under a majority of their votes, an estimated 49.6 percent, for the two Latino candidates combined in this election. Their candidate of choice however was the one white candidate, who received an estimated 49.4 percent of their vote (CI = 47.0 to 51.8 percent).[5] In the State's Attorney primary, in which Ms. Alvarez faced two white candidates, her support from the other voters is estimated to be 23.7 percent.

Table 2 contains the results of the bivariate analyses for the County Board District 16 primary and those for the Circuit Court subcircuit judgeships. In all five of these primaries Latino voters have cast an estimated majority of their votes for Latino candidates; in the four most recent primaries, those in 2008 and 2010, their support for these candidates ranged from an estimated 68.4 percent to 84.1 percent. This preference was not shared by the non-Latino voters

---

[5] The white candidate, who was also the candidate of choice of African American voters, therefore received the most votes of any candidate in this election, 42.9 percent, from the voters residing in the area of interest. The two Latino candidates combined received 52.9 percent.

7

in any of these primaries. In the four most recent, the highest estimate of the non-Latino support for any of the Latino candidates is 16.4 percent.

Conclusion

Based on the results of the eight elections analyzed I conclude that there is racially polarized voting in the Democratic primaries in the area from which CD 4 in the Adopted Plan and CDs 3 and 4 in the Plaintiffs' Plan have been created. The preference of Latino voters residing in this area for Latino candidates in these primaries is unmistakable, and it is not a preference shared by the other voters in the area. These primaries decide who receives the Democratic nominations within the area, a very valuable designation in this largely Democratic area.[6] The relative presence of Latinos in congressional districts in this area therefore will be a major factor in whether Latino voters are able to elect the representatives of their choice from this area to the U.S. House of Representatives.

In addition, the 2011 Chicago mayoral election further shows that the non-Latino voters in the area would have prevented the Latino candidate of choice from winning that election if only the votes cast by voters in the area were counted. The two Latino candidates received strong support from Latino voters, with Mr. Chico their clear preference between them. African Americans provided only minimal support for the Latino candidates however, instead providing solid support for the white candidate in the race, who was also the choice of the other voters, who provided close to a majority of their votes for him.

---

[6] In the 2010 statewide general election for Governor, for example, the Democratic candidate received 75.0 percent of the votes cast for the two major parties within the version of CD 4 in the Adopted Plan, and the Democratic candidate for U.S. Senator received 74.1 percent of the two-party vote. In the version of CD 4 in the Plaintiffs' Plan those candidates received 70.5 percent and 68.4 percent of the two-party vote cast in their elections, respectively. In the version of CD 3 in the Plaintiffs' Plan, those respective figures were 68.6 percent and 67.6 percent.

8

A175                                                          D-31

ANALYSIS OF THE DIFFERENT VERSIONS OF CDs 3 AND 4

CD 4 in Adopted Plan

The version of CD 4 in the Adopted Plan retains the "earmuff" feature of this district that has been in place since it was included in the 1991 redistricting plan adopted by the State.[7] The district had a Latino VAP of 59.2 percent at that time. The "earmuff" remained a feature of the district in the plan adopted in 2001 as well, and at the time of the 2010 census the Latino VAP percentage of CD 4 stood at 68.1. It had become a packed district. During this time a Latino Democrat had been elected in the district in all 10 elections. It was the same person every time, Luis Gutierrez, who has not faced any opposition in the Democratic primary in the last four elections, and won the last general election with 77.4 percent of the votes, his worst performance since 1994. The district has clearly been an effective "Latino district" the entire time.

The version of CD 4 in the Adopted Plan reduces the Latino VAP percentage in it by just 2.2 percentage points, to 65.9. This was accomplished by increasing the district by a net of 85,403 in VAP, with 53.1 percent of that increased VAP being Latino. It no doubt remains an effective Latino district, but does so by maintaining a percentage of Latino voters within it that is higher than necessary to provide Latinos with a viable opportunity to elect representatives of their choice. In other words, the district is packed in a way that "wastes" Latino votes.

The district, as noted above, was 59.2 percent Latino in VAP at the time it was adopted. In the first election in it, not surprisingly, given that high percentage of Latinos and the explicit reason for its creation being to facilitate the election of a Latino, both of the candidates that contested the Democratic primary in it were Latinos. (Only once has a candidate without a

---

[7] See Richard L. Engstrom, "The Political Thicket, Electoral Reform, and Minority Voting Rights," in Mark E. Rush and Richard L. Engstrom, *Fair and Effective Representation? Debating Electoral Reform and Minority Rights*, Rowman and Littlefield Publishers, Inc., (Lanham, MD, 2001), at 6.

9

A176

Spanish surname sought the Democratic nomination in CD 4, in 1996.) Mr. Gutierrez won the nomination, and then won the subsequent general election with 77.6 percent of the votes.

The version of CD4 in the Adopted Plan is wholly contained within Cook County, and therefore the county-wide elections analyzed above, the Democratic primaries for Assessor in 2010 and State's Attorney in 2008, can be used to assess the opportunity it provides Latino voters to elect a representative of their choice. When the votes cast in the Assessor Primary within the area of the district are examined, in which Mr. Berrios and Mr. Figueroa faced an African American candidate, they received a combined 83.2 percent of the votes, with Mr. Berrios himself receiving 49.8 percent of them. In the State's Attorney primary, Ms. Alvarez won more votes than any of the three white candidates and two African American candidates she competed against. She received 45.9 percent of the votes while her closest competitor received 26.8 percent.[8]

CD 4 in the Adopted Plan remains an effective Latino District, but does so by continuing the packing of Latino voters within it. It also retains, as noted above, the bizarre earmuff shape. It is the least compact district in the Adopted Plan. While the district fails the "eyeball test" for compactness, its relative lack of compactness, when compared to all of the other districts in the Adopted Plan, is confirmed by quantitative compactness measures. There are many different measures of compactness, but they are generally of two distinct types, dispersion measures and perimeter measures. Dispersion measures assess how closely districts resemble a shape that is considered compact, such as a circle, whereas perimeter scores assess how much districts wander geographically.

---

[8] If the data are available for the four county-wide elections identified in footnote 1 above, I plan to supplement this report with an examination of the votes cast within the districts in those elections as well.

10

I have chosen one of each type of measure through which to compare the compactness of districts in the respective plans. The dispersion measure, known as the Reock measure, compares the area of the district with the area of the minimum circumscribing circle around the district. Scores range from just above zero to one with higher scores indicating more compact districts. The perimeter measure, known as the Polsby-Popper measure, compares the area of the district to the area of a circle with the same perimeter length. Again, scores range from just above zero to one, with higher scores indicating more compact districts.[9] The Reock measure ranks CD 4 as the least compact district not only in the Adopted Plan, but in either of the plans. Its score on the Reock measure is very low, .15. The Polsby-Popper measure also scores CD 4 in the Adopted Plan as the least compact district in either plan, a very low .05. These same measures score CD 4 in the Plaintiffs' Plan considerably higher, with .26 on the Reock measure and .32 on the Polsby-Popper measure.[10]

The most apparent reason for the bizarre shape of CD 4 in the Adopted Plan is a desire to create a district with an extremely high concentration of Latino voters.

CD 4 in Plaintiffs' Plan

The version of CD 4 in the Plaintiffs' Plan also provides Latinos with a viable opportunity to elect a representative of their choice, without continuing the packing of Latinos in it, and without continuing the bizarre earmuff shape. The Latino VAP within CD 4 of the Plaintiffs' Plan is close to 60 percent, 59.5. This is virtually the same as that figure for the original version of the earmuff, adopted in 1991, which was 59.2 percent.

---

[9] These are the measures focused on in Richard H. Pildes and Richard G. Niemi, "Expressive harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances after Shaw v. Reno, 92 Mich. L. Rev. 483 (1993).

[10] The scores were derived through autoBound redistricting software.

11

The version of CD 4 in the Plaintiffs' Plan is also wholly contained in Cook County, and the votes cast in the 2010 Democratic primary for Assessor and the 2008 Democratic primary for State's Attorney in the area of the district can again be examined to assess the opportunity it provides Latinos to elect representatives of their choice. In the Assessor race, Mr. Berrios and Mr. Figueroa combined receive 80.0 percent of the votes, just 2.3 percentage points less than they received in CD 4 in the Adopted Plan. Mr. Berrios himself did even better in this version of CD 4 that he did in CD 4 in the Adopted Plan, receiving a majority of the votes cast, 52.7 percent, compared to 49.8 percent in CD 4 in the Adopted Plan. Ms. Alvarez received 42.0 percent of the votes in her nomination contest for State's Attorney in the version of CD 4 in the Plaintiffs' Plan, with a margin of 13.7 percentage points over her closest competitor.[11]

CD 4 in the Plaintiffs' Plan reveals that the earmuff shape of CD 4 in the Adopted Plan is not necessary to provide Latinos with a viable opportunity to elect. CD 4 in the Plaintiffs' Plan provides that opportunity, and it does so without packing Latino voters. In addition, the compactness scores for CD 4 in the Plaintiffs' Plan, as noted above, show that it is more compact than the CD 4 in the Adopted Plan.

CD 3 in Both Plans

There is a large difference in the Latino presence in the second most Latino district in VAP within the Adopted Plan and within the Plaintiffs' Plan. The number of this district is 3 in both plans. The version in the Adopted Plan is south of CD 4, while in the Plaintiffs' Plan it is north of CD 4.

---

[11] If the data are available for the four county-wide elections identified in footnote 1 above, I plan to supplement this report with an examination of the votes cast within the district in those elections as well.

The big difference in these plans is the percentage of the VAP within them that is Latino. Despite being the second largest such district in the Adopted Plan, the Latino VAP percentage for CD 3 in that plan is only 24.6 percent, a reduction from the 29.3 percent in CD 3 in 2010 in the previous plan. This was accomplished by a net increase of 40,027 in VAP in CD 3 in the Adopted Plan, which is entirely accounted for by the increase in non-Latinos in it. Non-Latino whites constitute well over a majority of the VAP within this version in, 66.3 percent. A similar change occurred in CD 5 in the Adopted Plan, another adjacent district to CD 4. The Latino percentage of VAP in this district was reduced from 24.6 percent in the previous plan, to 16.0 percent in the version in the Adopted Plan. This was accomplished by a net increase of 62,531 in VAP, all of which, again, is accounted for by non-Latinos.

In contrast, the Latino VAP in the version of CD 3 in the Plaintiffs' Plan is 46.5 percent, and Latinos constitute a plurality of the VAP, with non-Latino whites being 40.8 percent. Latinos would have a chance to influence the outcomes of elections in CD 3 in the Plaintiffs' Plan, even if Mr. Gutierrez (a resident of the district) does not seek reelection in it. Although not wholly contained in Cook County, 91.3 percent of the VAP in the district resides in that county. Voting in the county-wide contests analyzed above for the versions of CD 4 can again be examined to assess how well the Latino candidates did in those elections in the area of CD 3 in the Plaintiffs' Plan, with an understanding that 8.7 percent of the people of voting age in the district could not participate in them because they resided in DuPage County.

In the 2010 Democratic primary for Assessor, Mr. Berrios and Mr. Figueroa together received 79.2 percent of the votes cast in the Cook County portion of CD 3 in the Plaintiffs' Plan, with Mr. Berrios receiving close to a majority of the votes there, 48.6 percent. In the 2008 Democratic primary for State's Attorney, Ms. Alvarez received a plurality of the votes in this

13

six-candidate contest in the area, 36.2 percent. The second place candidate received 33.2 percent.[12] Latino candidates other than Mr. Gutierrez appear to be competitive in this district.

Conclusion

While CD 3 in the Plaintiffs' Plan cannot be said to be a Latino majority district at this time, based on my analysis it already offers Latino voters a chance to elect candidates of their choice within it. This will be facilitated by the need to obtain only a plurality of the votes in it to win the Democratic Party nomination. That nomination would provide them with a significant advantage in a general election in this Democratic area. In the latest statewide general election, held on November 2, 2011, which was a good year for Republican candidates in Illinois, the Democratic candidates for Governor and United States Senator in the area of CD 3 in the Plaintiffs' Plan received 68.6 percent and 67.6 percent of the two-party vote, respectively. This opportunity will be enhanced if the Latino VAP percentage in the district were to grow. CD 3 in the Adopted Plan, in contrast, is a majority-white district that is not likely to provide this opportunity.

## CONCLUSION

Based on my analysis of group preferences in the elections above, I conclude that voting in the area at issue is racially polarized. I also conclude, based on that finding and my analysis of the relative electoral opportunities provided to Latino voters in the two redistricting plans, the Adopted Plan and the Plaintiffs' Plan, that the first dilutes the voting strength of Latinos in the area. CD 4 in the Adopted Plan is packed with more Latino VAP than necessary to provide Latinos with a viable opportunity to elect the representative of their choice within it. This packing will not only result in wasting the votes of Latinos in that district, but contributes to the

---

[12] If the data are available for the four county-wide elections identified in footnote 1 above, I plan to supplement this report with an examination of the votes cast within the district in those elections as well.

further "bleaching" of adjacent CDs 3 and 5 in that plan. The version of CD 4 in the Plaintiffs'
Plan will not only provide Latinos with a viable opportunity to elect the representative of their
choice, but also allow for another district in which Latinos will constitute a plurality of the VAP.
Latinos certainly have a chance to have an impact on election outcomes in that district. The
votes cast in the area of CD 3 in Democratic Party primaries for other offices demonstrate that
they will have an opportunity to select the person who wins the Democratic nomination in that
district, who would then be advantaged by that nomination in the heavily Democratic district.
Based on my examination of the two plans, I conclude that the Plaintiffs' Plan demonstrates that
the Adopted Plan unnecessarily dilutes the votes of Latinos in the area.

I declare under penalty of perjury under the laws of the United States that the foregoing is true
and correct to the best of my knowledge.

Executed on September 15, 2011 in Durham, NC.

Richard L. Engstrom

Table 1

Multivariate Analyses of County-Wide Elections
and Chicago Mayoral Election

Group Support for Latino Candidates
Point Estimates and Confidence Intervals#

| Election | % of Latino Voters | % of African American Voters | % of Other Voters |
|---|---|---|---|
| *2010 Dem Primary* | | | |
| Assessor | | | |
| Berrios + Figuerroa | 93.5 91.1 – 95.8 | 38.0 30.9 – 45.3 | 81.6 79.8 – 83.3 |
| Berrios | 64.7 57.1 -- 73.2 | 27.2 21.3 – 33.6 | 50.4 47.1 – 53.8 |
| *2008 Dem Primary* | | | |
| State's Attorney | | | |
| Alvarez | 82.3 77.7 – 87.3 | 16.7 14.1 – 19.5 | 23.7 22.2 – 25.2 |
| *2011 Chicago Municipal* | | | |
| Mayor | | | |
| Chico + DelValle | 83.7 77.8 – 90.2 | 8.6 6.1 – 11.1 | 49.6 47.1 – 52.0 |
| Chico | 46.0 40.9 – 51.4 | 5.6 3.8 -- 7.4 | 39.5 36.9 – 42.1 |

# Confidence intervals contain a range of estimates from which we can be 95 percent confident, given the data, that the true value of the percentage being estimated will fall.

16

A183

D-31

Table 2

Bivariate Analyses of District and Subcircuit Elections

Group Support for Latino Candidates
Point Estimates and Confidence Intervals#

| Election | % of Latino Voters | % of Other Voters |
|---|---|---|
| *2010 Dem Primary* | | |
| Cb Board, D. 16 | | |
| Garcia | 84.1 73.0 -- 97.0 | 10.4 8.2 -- 13.0 |
| Circuit Ct Sub. 11 | | |
| Martinez | 73.9 65.3 – 83.8 | 11.3 9.7 – 13.1 |
| *2008 Dem Primary* | | |
| Circuit Ct Sub. 4 | | |
| Aguilar | 79.5 72.1 – 87.6 | 11.5 10.0 – 13.0 |
| Circuit Ct Sub. 6 | | |
| Araujo | 68.4 57.0 – 83.1 | 16.4 12.0 – 21.4 |
| *2006 Dem Primary* | | |
| Circuit Ct Sub. 6 | | |
| Ocasio | 56.4 48.9 – 64.4 | 41.6 34.9 – 48.5 |

# Confidence intervals contain a range of estimates from which we can be 95 percent confident, given the data, that the true value of the percentage being estimated will fall.

17

APPENDIX A

FACTS OR DATA RELIED UPON IN REACHING MY CONCLUSIONS AND OPINIONS
IN THIS REPORT IN THIS CASE

1.  Data from the U.S. Censuses of Population, 1990, 2000, and 2010:  1990 Census, STF1
    Tables QT-P1A, QT-P1D, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1
    Tables QT-P1, P11, P12H.

2.  Primary and general election data from the Illinois State Board of Elections for the
    election of U.S. Representatives from Illinois, 1992 through 2010.

3.  Primary and general election data from the Cook County Clerk and Chicago Board of
    Elections for the election of Cook County Assessor, Cook County State's Attorney, Cook
    County Circuit Court, and Chicago Mayor, 2006 through 2011.

4.  Maps of Illinois Congressional districts in effect for the elections in 1992 through 2010.

5.  Maps of Illinois Congressional districts proposed by Illinois Public Act 97-14.

6.  Maps of Illinois Congressional districts proposed by the Plaintiffs.

7.  AutoBound compactness reports, showing the compactness of the current and proposed
    Congressional district plans.

8.  The following scholarly publications:

        Richard L. Engstrom, "The Political Thicket, Electoral Reform, and Minority
        Voting Rights," in Mark E. Rush and Richard L. Engstrom, *Fair and Effective
        Representation? Debating Electoral Reform and Minority Rights*, Rowman and
        Littlefield Publishers, Inc., (Lanham, MD, 2001), at 6.

        Richard H. Pildes and Richard G. Niemi, "Expressive harms, 'Bizarre Districts,'
        and Voting Rights: Evaluating Election-District Appearances after Shaw v. Reno,
        92 Mich. L. Rev. 483 (1993).

18

APPENDIX B

VITA
**RICHARD L. ENGSTROM**

June, 2011

OFFICE
Center for the Study of Race, Ethnicity,
    and Gender in the Social Sciences
Social Science Research Institute
Duke Box 90420
Duke University
Erwin Mill
Durham, NC 27705
Phone:(504-756-1478) Fax:(919)-681-4183
E-Mail Address = richard.engstrom@uno.edu
                 richard.engstrom@duke.edu

HOME
6205 Farrington Rd.
Apt. G-1

Chapel Hill, NC 27517
Phone = (504)-756-1478

PERSONAL AND EMPLOYMENT INFORMATION

Born May 23, 1946. Married to former Carol L. Verheek. Four children: Richard Neal, born 3/10/70; Mark Andrew, born 1/14/73; Brad Alan, born 3/31/77; and Amy Min, born 8/18/84.

Assistant Professor of Political Science, University of New Orleans, 1971-74; Associate Professor, 1974-1979; Professor, 1979-present; Research Professor, 1987-2006, Endowed Professor of Africana Studies, 2003-2005.

Chairperson, Department of Political Science, University of New Orleans, 1976-1979. Coordinator of Graduate Studies, 1990-1992, 1993-2006.

Consultant, Center for Civil Rights, School of Law, University of North Carolina, Chapel Hill, 2006-2007.

Visiting Research Professor of Political Science and Visiting Research Fellow, Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University, Spring and Summer, 2008. Visiting Professor of Political Science and Visiting Research Fellow, Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University 2008 - present.

19

Fulbright-Hays Professor, National Taiwan University and National Chengchi University, and Visiting Research Fellow, Institute of American Culture, Academic Sinica, Taipei, Taiwan, R.O.C., 1981-82.

Fulbright-Hays Professor, University College, Galway, Ireland, 1985-86.

Senior Research Fellow, Institute of Irish Studies, the Queen's University of Belfast, 1990.

David Bruce Fellow, Bruce Centre for American Studies, University of Keele, England, 1993.

Visiting Fellow, School of Politics, Australian Defence Force Academy, Canberra, Australia, 1998.

Program Visitor, Political Science Program, Research School of Social Sciences, Australian National University, Canberra, Australia, June-July, 2005.

Recipient, UNO Alumni Association's Career Distinction Award for Excellence in Research, December 1985.

Recipient, George W. Lucas Community Service Award, New Orleans NAACP, 1993.

FORMAL EDUCATION

Ph.D., University of Kentucky, 1971

M.A., University of Kentucky, 1969

A.B., Hope College (Holland, Michigan), 1968.
    (recipient of Class of '65 Political Science Award, 1968.

PRIMARY TEACHING FIELDS

Election Systems, Urban and Minority Politics, Legislative Process, American Politics.

PROFESSIONAL ACTIVITIES

Member, Election Review Committee, American Political Science Association, 2003-2004.

Chair, Section on Representation and Electoral Systems, American Political Science Association, 1993-95, 95-97. Section Board, 1993-present.

Book review editor, American Review of Politics, 1995-present.

Lecture tour, under sponsorship of United States Information Agency, of Tanzania, Ethiopia, Kenya, Malawi, and Liberia, January, 1994. Topics include, among others, comparative election systems, legislatures within democratic regimes, and race and gender in contemporary politics.

20

A187

D-31

Associate Member, Centre for the Study of Irish Elections, University College Galway.

Member, Board of Editors, Public Administration Quarterly 1977- present.

Member, Editorial Board, Journal of Politics, 1988-1993.

Member, Board of Editors, State and Local Government Review, 1988- 1990.

Member, Committee on the Status of Blacks, Southern Political Science Association, 1991-1996.

Treasurer, Southwestern Political Science Association, 1981 (position resigned during term due to Fulbright Lectureship).

Chair, Harold D. Lasswell Award Committee, American Political Science Association, 1995-1996 (best dissertation in public policy).

Chair, Ted Robinson Award Committee, Southwestern Political Science Association, 1995-1996 (best research project in minority politics by a graduate student).

Member, Nominating Committees, Southern Political Science Association, 1980; Louisiana Political Science Association, 1981, Study Group on Comparative Representation and Electoral Systems, International Political Science Association, 1988, Section on Representation and Electoral Systems, American Political Science Association, 1999.

Member, Chastain Award Committee, Southern Political Science Association, 1978. V.O. Key Award Committee, Southern Political Science Association, 1990. Ted Robinson Memorial Award Committee, Southwestern Political Science Association, 1995, 1996 (chair). Hallett Award Committee, Section on Representation and Electoral Systems, American Political Science Association, 1999, 2000.

Member, Program Committee (Urban Politics Section), 1976 Annual Meeting of the Southern Political Science Association. Program Committee (Urban Politics Section), 1992 Annual Meeting of the Midwest Political Science Association. Program Committee (Representation and Electoral Systems Section), 1994 Annual Meeting of the American Political Science Association. Program Committee (Representation and Electoral Systems Section), 2002 Annual Meeting of the American Political Science Association.

Member, Membership Committee, Southwestern Social Science Association, 1973-74.

Presented papers at meetings of the American Political Science Association, International Political Science Association, Midwest Political Science Association, Southern Political Science Association, Southwestern Political Science Association, Louisiana Political Science Association, Citadel Symposium on Southern Politics, International Society of Political Psychology, Harvard University Computer Graphics Week, Australian-New Zealand Academy for the Advancement of Science. Formal papers also presented at programs at Tulane University, Sagamon State University,

21

University of Keele (England), Rice University, and Chief Justice Earl Warren Institute on Law and Social Policy, University of California School of Law.

Chaired panels at meetings of the American Political Science Association, Southern Political Science Association, Midwest Political Science Association, Southwestern Political Science Association, and International Political Science Association.

Served as discussant for panels at meetings of the American Political Science Association, Midwest Political Science Association, Southern Political Science Association; Southwestern Social Science Association; Louisiana Political Science Association; Institute of American Culture, Academic Sinica (Taiwan), and International Political Science Association.

Reviewed manuscripts for the American Political Science Review, American Journal of Political Science, Journal of Politics, Political Research Quarterly, Polity, Social Science Quarterly, Legislative Studies Quarterly, American Politics Quarterly, Urban Affairs Review, Electoral Studies, Election Law Journal, Political Analysis, National Political Science Review, Women and Politics, Southeastern Political Review, State and Local Government Review, Public Administration Review, Public Administration Quarterly, American Review of Politics, Presidential Studies Quarterly, Law and Policy, Journal of Policy History, Public Administration and Management, Howard University Press and Stanford University Press, and Northern Illinois University Press.

Recipient of grant from Pacific Cultural Foundation, Taipei, Taiwan to support project entitled "The Legislative Yuan: A Study of Legislative Adaptation" (1982).

Recipient of grant from private sources, New Orleans, to support a study of mayoral tenure in large American cities (1983).

Recipient of grant from Southern Regional Council, Atlanta, Georgia, to conduct exit poll of cumulative voting election in Chilton County, Alabama (1992).

Recipient of grants from Louisiana Education Quality Support Fund, Fellowship Funding for Superior Graduate Students, 1992 (1993-1997) $48,000; 1996 (1997-2001) $64,000; 1997 (1998-2002) $48,000; 1998 (1999-2003) $56,000.

Reviewed grant proposals for National Science Foundation programs in Political Science and Law and Social Sciences, and National Science Foundation graduate fellowship applications for the National Research Council.
Served as mentor in Southern Regional Council's Voting Rights Fellowship Program to Jason F. Kirksey, 1992-1993, and Dr. Olethia Davis, 1993-1994.

United Nations Consultant on Election Systems and Constituency Delimitation, National Election Commission of Liberia, UN Mission in Liberia, 2004.

COMMUNITY AND UNIVERSITY SERVICE

Consultant, Charter Task Force Committee, New Orleans, 2000. Preparation of <u>Term Limits: A Report to the Charter Task Force Committee</u>, February, 2000.

Interviewed on term limits issue on "Crescent City Close Up," public affairs program on three radio stations, WNOE, KKND, and KUMX, March 19, 2000.

Participant, Roundtable on At-Large Elections for the Internet Corporation for Assigned Names and Numbers (ICANN), sponsored by Common Cause, the Center for Democracy and Technology, and the Markle Foundation, at the Kennedy School of Government, Harvard University, February 9, 2000.

Member, Board of Directors, Concern International Charities, 1998-2003.

Chairperson, Taskforce on Civil Service, Mayor-Elect Ernest Morial's Transition Office (New Orleans), 1977-78.

Member, Chachere Subcommittee of UNO Diversity Cabinet, 2003-2004.

Member, Graduate Council, UNO, 1975-76, 1994-95, 2006.

Member, Research Council, UNO, 1995-97, 2005.

Member, International Student Recruitment Committee, UNO, 1993-96.

Chairperson, Search Committee for Vice Chancellor for Research and Graduate Studies and Dean of the Graduate School, UNO, 1987-88.

Chairperson, Search Committee for Graduate Dean, UNO, 1978-79.

Member, University Budget Committee, UNO, 1983-84.

Member, Liberal Arts Advisory Committee, UNO, 1975-76, 1982-84.

Member, Academic Planning Committee, UNO, 1982-1988.

Member, Faculty Council Committee on Faculty Honors, UNO, 1985-1990.

Member, Committee on Research, UNO Self-Study, 1972-73; 1982-83.

Member, Dean's Advisory Committee on Academic Planning, College of Liberal Arts, UNO, 1983-84.
Member, University Senate, UNO, 1975-77; 1980-81; 83-85; 87-91.

Member, Steering Committee, Legal Division, New Orleans Chapter, American Foundation for Negro Affairs, 1977-79.

23

Service as expert witness in numerous vote dilution cases in federal courts. Employed by the United States Department of Justice, Lawyers' Committee for Civil Rights Under Law, NAACP Legal Defense and Educational Fund, Center for Constitutional Rights, Mexican-American Legal Defense and Educational Fund, Native American Rights Fund, and other organizations. Served as court-appointed expert for the remedial portion of Williams v. City of Dallas, United States District Court for the Northern District of Texas, Dallas Division, 1991. Service as Special Master for the remedial portion of Harper v. City of Chicago Heights, United States District Court for the Northern District of Illinois, Eastern Division, 2002-2004.

INVITED LECTURES / PRESENTATIONS (Since 1986)

1986: McGee College, University of Ulster - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

The Queen's University of Belfast - "The Reagan Elections: Realignment or Dealignment?" and "The Contemporary Voting Rights Issue in American Politics"

University of Keele - "The Contemporary Voting Rights Issue in American Politics"

University College Dublin - "The Contemporary Voting Rights Issue in American Politics" (4/30/86).

University College Galway - "The Reagan Elections: Realignment or Dealignment?"

1987: Southern University - "The Equal Protection Clause and Electoral Reapportionment" (4/8/87).

APSA Summer Institute for Black Students, Louisiana State University - "The Political Scientist as Expert Witness" (7/26/87).

NAACP Legal Defense Fund, Conference on Voting Rights, San Antonio, Texas - "Cumulative and Limited Voting as Remedies for Minority Vote Dilution."

1988: College of William and Mary - "The Contemporary Voting Rights Issue" and "The Role of Social Scientists in Voting Rights Litigation"

University of Queensland - "One Vote, One Value: The U.S. Experience After 25 Years" (5/24/88).

Griffith University (Brisbane) - "One Vote, One Value: The U.S. Experience After 25 Years" (5/25/88).

1989: Tulane University - "Frontiers of Voting Rights: Vote Dilution in Judicial Elections" (3/9/89).
Lamar University - "Voting Rights: A Retrospective" (10/30/89).

Oklahoma State University - "Frontiers of Voting Rights" (November/10/89).

24

A191

D-31

Prairie View A and M University - "Reapportionment and Black Political Power" (11/16/89).

1990: The Queen's University of Belfast-Institute of Irish Studies, "The Irish Election System: Manipulation and Reform" (3/13/90); Department of Politics, "The Reagan Presidency: An Assessment" (3/8/90).

Brookings Institution - "Social Scientists and the Voting Rights Act" (10/19/90).

Lyndon Baines Johnson Library (Austin, Texas) - "The Evolution of the Voting Rights Act of 1965" (10/29/90).

1991: University of Texas at Dallas - "Redistricting the Dallas City Council" (3/8/91). United States Department of Justice, Voting Section - "Alternative Election Systems" (3/15/91). Stetson University School of Law - "Alternative Election Systems as Remedies for Minority Vote Dilution" (4/27/91).

Norfolk State University - "Election Analyses in Voting Rights Litigation" (6/15/91).

1992: University of Colorado, Summer Workshop in Urban Politics - "Race and Voting in Judicial Elections: New Orleans as a Case Study Setting" (7/9/91).

Harold Washington College, Chicago - "Political Science Research and Testimony in the Miami-Dade County Core" (9/5/92 - not presented to illness).

Southern Regional Council, Atlanta, Georgia - "Exit Polls and Voting Rights Litigation" (10/2/92). 1994: Lecture tour of Tanzania, Ethiopia, Malawi, and Liberia for United States Information Agency, January, 1994.

National Conference of State Legislators, Annual Meeting, New Orleans - "Redistricting and the Courts" (7/26/94)

1995: Department of International Politics, Peking University, "Constitutional Law, Comparative Electoral Systems, and the Politics of Race and Gender" (10/17/95).

1997: John D. Lees Memorial Lecture, Keynote Address, 1997 Annual Meeting of the American Politics Group, (United Kingdom) Political Science Association, Keele, England, "Affirmative Action: The Election and the Election System" (1/3/97).

Alumni College, College of Liberal Arts, University of New Orleans, "Racial Gerrymandering in the 1990s: The Issues and the Alternatives" (2/1/97).

Commission on Governmental Reorganization, City of New Orleans, "Principles for Governmental Organization" (9/23/97).

Civil Rights Training Institute (Airlie Conference), NAACP Legal Defense and Educational Fund, "Alternative Election Systems in the Post-Shaw Era" (11/8/97).

25

A192

D-31

## 1998

School of Politics, Australian Defence Force Academy, Canberra, "Racial Gerrymandering in the United States" (4/1/98) and "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (5/29/98).

School of Political Science, University of New South Wales, Sydney, "Election Systems and Minority Representation in the United States: Racial Gerrymandering and Its Aftermath" (4/8/98).

Illinois Secretary of State's Commission on Redistricting, Chicago, IL, "Computer Generated Districting Plans: Necessary Conditions and Tie Breaking Criteria" (12/16/98).

## 2001

Carinthian Institute of Minority Affairs, Villach, Austria, "Spiders, Earmuffs, and the Mark of Zorro: Creating Electoral Opportunities for Minorities in America's Single Member District System" (5/5/01).

Bureau of Governmental Research, New Orleans, LA, "The Mayor: How Many Terms?" (10/10/01).

## 2002

Pomona College, Claremont, CA, "Spiders, Earmuffs, and the Mark of Zorro: There Must be a Better Way" (3/13/02).

Utah State University, "The Redistricting Thicket: Are There Alternatives?" Bennion Teachers' Workshop (8/9/02).

Utah State University, "Missing the Target: Priorities among Districting Constraints," Redistricting in the New Millennium: A Lecture Series, (11/26/02).

## 2003

Florida State University, "Missing the Target: Priorities among Districting Constraints," (1/21/03).

## 2004

Cleveland City Club/Cleveland State University, "Metro Reform and Minority Voting Rights," (2/25/04).

Liberian National Election Commission Consultative Assembly, Monrovia, Liberia, "Constituency Boundary Redemarcation: Concepts and Timeframes," (6/7/04).

## 2005

26

Subcommittee on the Constitution, Committee on the Judiciary, United States House of Representatives, written and oral testimony, hearing on Extension of the Preclearance Provision of the Voting Rights Act, (10/25/05).

William C. Velasquez Institute, San Antonio, TX, "Influence Districts," (11/19/05)

2006

University of West Georgia, "The Gerrymandering Problem: Lessons from Australia?" (4/3/06).

Duke University, "Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" (4/7/06).

International Political Science Association, Fukuoka, Japan. Roundtable on Electronic Voting. "E Voting in the U.S.," (7/13/06).

Brennan Center for Justice, New York University School of Law, "The Gerrymandering Problem: Lessons from Australia?," (8/7/06).

Short Course on The National Popular Vote Plan to Revamp the Electoral College, American Political Science Association Annual Meeting, Philadelphia, "Potential Impact of the National Popular Vote Plan on Presidential Elections and Other Electoral Reforms," (8/30/06).

American Bar Association, Administrative Law Section, "Redistricting Reform: Lessons from Australia," Washington, D.C. (10/26/06).

2008

Morehouse College, "The Gerrymandering Problem in the United States: Judicial Protection or Redistricting Commissions or Alternative Election Systems," Voting Analysis in Mathematics and Politics: Interdisciplinary Research and Education Seminar (VAMPIRES) (4/18/08).

2009

Duke University, "Response to Thomas Brunell, 'Why Competitive Elections are Bad for America'," Duke University Political Science Students' Association (2/10/09).

Chief Justice Earl Warren Institute on Race, Ethnicity, and Diversity, University of California at Berkeley School of Law, presenter, panel on "The Redistricting Experience: Tales from the Field," conference on Redistricting Reform and Voting Rights: Identifying Common Ground and Challenges, UC Washington Center, (11/11/09).

2010

27

Center for the Study of Race, Ethnicity, and Gender in the Social Sciences, Duke University Presentation on "Race and Redistricting" at the conference "Counting Race: Racial Classifications and the 2010 Census," Duke University (3/19/10).

St. Louis University Law School, Presentation on "Cumulative and Limited Voting as Remedies for Dilutive Election Systems," at the symposium on "Voting 45 Years after the Voting Rights Act," (3/26/10).

Demos, Presentation on "Issues in the Post-2010 Round of Redistricting" and Discussion Leader for Session on Redistricting, "An In-Depth Discussion with Demos," Washington, DC (9/4/10).

NAACP Legal Defense and Educational Fund, Presentation on "Prongs II and III: Necessary Preconditions under *Thornburg* v. *Gingles*," at the Voting Rights and Redistricting Training Institute, Airlie Conference, Warrenton, VA (10/9/10).

Center for Democratic Performance, Binghamton University, "Influence Districts and the Courts: A Concept in Need of Clarity," (10/28/10).

Mexican American Legal Defense and Educational Fund, Short presentation on "Racially Polarized Voting Analyses," National Redistricting Convening, San Antonio, TX (12/9-19/10).


Numerous other presentations before groups such as the Louisiana Municipal Association; New Orleans League of Women Voters; Public Policy Forums at Southern University in Baton Rouge; Louisiana Municipal Clerks Institute; (La.) Black Legislative Caucus Institute; Robert A. Taft Institute of Government Seminars, Southern University; Special Committee on Elective Law and Voter Participation, American Bar Association; Subcommittee on Civil and Constitutional Law, United States House of Representatives Committee on the Judiciary; Institute of American Culture, Academic Sinica (Taiwan), Foundation for Scholarly Exchange (Taiwan), and Tulane University, Department of Political Science and College of Law.


## REFERENCES

Dr. Charles Barrilleaux, Department of Political Science, Florida State University, Tallahassee, FL 32306 904-644-7643

Christine L. Day, Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148; 500-6266

Dr. Jason F. Kirksey, Department of Political Science, Oklahoma State University, Stillwater, OK 74074 405-744-5575

Dr. Charles D. Hadley, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148 504-280-6456

28

Dr. Susan Howell, former Chair, Department of Political Science, University of New Orleans, New Orleans, LA 70148  504-280-6467

Dr. Michael D. McDonald, Department of Political Science, State University of New York at Binghamton, Binghamton, NY 13901  607-777-4563

CURRENT RESEARCH

"Districting by Independent Commissions: Lessons from Australia?"

Analysis of Instance Runoff Voting Elections in North Carolina, 2007 and 2009 (with Michael Cobb).

A Review of the Evidentiary Record for the Renewal and Amendment of the Special Provisions of the Voting Rights Act, 2006.

LATEST CONFERENCE PAPERS

"Influence District and the Courts: A Concept in Need of Clarity."  Initially presented at the Conference on "Lessons from the Past, Prospects for the Future: Honoring the Fortieth Anniversary of the Voting Rights Act of 1965," Center for the Study of American Politics, Yale University, April 21-23, 2005.  Expanded version forthcoming in volume edited by Daniel McCool, The Most Fundamental Right: The 2006 Reauthorization of the Voting Rights Act.

"Racially Polarized Voting: Pervasive and Persistent in the American South," Conference on "W(h)ithering the Voting Rights Act?" John Hope Franklin Center, Duke University, April 7, 2006.

"Majority Vote Rule and Runoff Elections," presented at a conference on "Plurality and Multi-Round Elections," University of Montreal, June, 2006 (co-authored with Richard N. Engstrom), Montreal, June 17-18, 2006.  Expanded version selected for inclusion in mini-symposium in Electoral Studies, edited by Bernard Grofman, 27 (September 2008) 407-416.  .

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," presented at the symposium on Voting 45 Years after the Voting Rights Act, St. Louis University School of Law, March 26, 2010; forthcoming in the Fall 2010 edition of the St. Louis University Public Law Review.

"Political Scientists as Expert Witness," Annual Meeting of the State Politics and Policy Association, Springfield, IL, June, 2010), with Michael P. McDonald.  (Presented by Michael P. McDonald.)

## PUBLICATIONS

29

BOOKS

Fair and Effective Representation? Debating Electoral Reform and Minority Rights (Lanham, MD: Rowman and Littlefield, 2001) (with Mark A. Rush).

MONOGRAPHS

Home Rule for Louisiana Parishes (Baton Rouge: Police Jury Association of Louisiana and Governmental Services Institute, Louisiana State University, 1974).

Municipal Home Rule in Louisiana (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1974).

Municipal Government Within the 1974 Louisiana Constitution: A Reference Guide for Municipal Officials (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1975).

Louisiana Mayor's Handbook (Baton Rouge: Louisiana Municipal Association and Governmental Services Institute, Louisiana State University, 1977) (with Edward Clynch and Konrad Kressley).

Mayoral Tenure in Large American Cities (New Orleans: School of Urban and Regional Studies, University of New Orleans, 1983).

ARTICLES, RESEARCH NOTES, AND BOOK CHAPTERS

"Statutory Restraints on Administrative Lobbying -- 'Legal Fiction'", Journal of Public Law, Vol. 19, No. 1 (1970), 90-103 (with Thomas G. Walker). Reprinted in Dennis Ippolito and Thomas Walker (eds.), Reform and Responsiveness: Readings in American Politics (New York: St. Martin's Press, Inc., 1972), pp. 428-438.

"Race and Compliance: Differential Political Socialization," Polity, 3 (Fall 1970), 100-111. Reprinted in Charles S. Bullock, III, and Harrell Rogers, Jr. (eds.), Black Political Attitudes: Implications for Political Support (Chicago: Markham Publishing Co., 1972), pp. 33-44.

"Political Ambitions and the Prosecutorial Office," Journal of Politics, 33 (February 1971), 190-194.

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments," Midwest Journal of Political Science 15 (August 1971), 475-494 (with W.E. Lyons).

"Expectations and Images: A Note on Diffuse Support for Legal Institutions," Law and Society Review, 6 (May 1972), 631-636 (with Michael W. Giles).

"Black Control or Consolidation: The Fringe Response," Social Science Quarterly, 53 (June 1972), 161-167 (with W.E. Lyons).

30

"Life-Style and Fringe Attitudes Toward the Political Integration of Urban Governments: A Comparison of Survey Findings," American Journal of Political Science, 17 (February 1973), 182-188 (with W. W. E. Lyons).

"Racial Gerrymandering and Southern State Legislative Redistricting: Attorney General Determinations Under the Voting Rights Act," Journal of Public Law, Vol. 22, No. 1 (1973), 37-66 (with Stanley A. Halpin, Jr.).

"Socio-Political Cross Pressures and Attitudes Toward Political Integration of Urban Governments," Journal of Politics, 35 (August 1973), 682-711 (with W.E. Lyons).

"Candidate Attraction to the Politicized Councilmanic Office: A Note on New Orleans," Social Science Quarterly, 55 (March 1975), 975-982 (with James N. Pezani).

"Home Rule in Louisiana -- Could This Be The Promised Land?," Louisiana History, 17 (Fall 1976), 431-455.

"Judicial Activism and the Problem of Gerrymandering," in Randall B. Ripley and Grace A. Franklin (eds.), National Government and Public Policy in the United States (Itasca, IL: Peacock Publishers, Inc., 1977), pp. 239-244.

"The Supreme Court and Equi-Populous Gerrymandering: A Remaining Obstacle in the Quest for Fair and Effective Representation," Arizona State Law Journal, Vol. 1976, No. 2 (1977), 277-319. Cited in Karcher v. Daggett, 462 U.S. 725 (1983) (by J. Stevens, concurring, at 750 n. 8, 752 n. 10, 753 n. 11, and 758 n. 16, and J. White, dissenting, at 776 n. 12).

"State Centralization Versus Home Rule: A Note on Ambition Theory's Powers Proposition," Western Political Quarterly 30 (June 1977), 288-294 (with Patrick F. O'Connor).

"Pruning Thorns from the Thicket: An Empirical Test of the Existence of Racial Gerrymandering," Legislative Studies Quarterly, 2 (November 1977) 465-479 (with John K. Wildgen). Cited extensively in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan).

"Racial Vote Dilution: Supreme Court Interpretations of Section 5 of the Voting Rights Act," Southern University Law Review, 4 (Spring 1978), 139-164.

"The Political Behavior of Lawyers in the Louisiana House of Representatives," Louisiana Law Review 39 (Fall 1978), 43-79 (with Patrick F. O'Connor, Justin J. Green, and Chong Lim Kim).

"Restructuring the Regime: Support for Change Within the Louisiana Constitutional Convention," Polity 11 (Spring 1979), 440-451 with Patrick F. O'Connor).

"The Hale Boggs Gerrymander: Congressional Redistricting, 1969," Louisiana History, 21 (Winter 1980), 59-66.

A198

D-31

"Lawyer-Legislators and Support for State Legislative Reform," Journal of Politics, 42 (February 1980), 267-276 (with Patrick F. O'Connor).

"Racial Discrimination in the Electoral Process: The Voting Rights Act and the Vote Dilution Issue," in Robert P. Steed, Lawrence W. Moreland, and Tod A. Baker, (eds.), Party Politics in the South (New York: Praeger Publishing, 1980), pp. 197-213.

"Spatial Distribution of Partisan Support and the Seats/Votes Relationship," Legislative Studies Quarterly, 5 (August 1980), 423-435 (with John K. Wildgen).

"Computer Graphics and Political Cartography: ASPEX of Gerrymandering," in Computer Mapping Applications in Urban, State, and Federal Government, Plus Computer Graphics in Education, Vol. 16, Harvard Library of Computer Graphics, 1981 Mapping Collection (Cambridge, Mass.: Laboratory for Computer Graphics and Spatial Analysis, Harvard University, 1981), pp. 51-57 (with John K. Wildgen).

"The Election of Blacks to City Councils: Clarifying the Impact of Electoral Arrangements on the Seats/Population Relationship," American Political Science Review, 75 (June 1981), 344-354 (with Michael D. McDonald).

"Post-Census Representational Districting: The Supreme Court, 'One Person, One Vote,' and the Gerrymandering Issue," Southern University Law Review, 7 (Spring 1981), 173-226.

"Municipal Government," in James Bolner (ed.), Louisiana Politics: Festival in a Labyrinth (Baton Rouge: Louisiana State University Press, 1982), pp. 181-219.

"The 1980 Election and the Realignment Thesis: A Note of Caution," American Studies (Mei-kuo-Yen-chiu), 12 (June 1982), 107-132.

"Racial Vote Dilution and the 'New' Equal Protection Clause: City of Mobile v. Bolden," American Studies (Mei-kuo-Yen-chiu) 12 (September 1982), 25-72.

"The Underrepresentation of Blacks on City Councils: Comparing the Structural and Socioeconomic Explanations for South/Non-South Differences," Journal of Politics, 44 (November 1982), 1088-1099 (with Michael D. McDonald).

"The Impact of the 1980 Supplementary Election on Nationalist China's Legislative Yuan," Asian Survey, 24 (April 1984), 447-458 (with Chu Chi-hung).

"The Marginality Hypothesis and the State Legislative Salary Issue," Southeastern Political Review, 13 (Spring 1985), 169-182 (with Patrick F. O'Connor).

"Racial Vote Dilution: The Concept and the Court," in Lorn Foster (ed.), The Voting Rights Act: Consequences and Implications (New York: Praeger Publishers, 1985), pp. 13-43.

32

"Quantitative Evidence in Vote Dilution Litigation: Political Participation and Polarized Voting," The Urban Lawyer, 17 (Summer 1985), 369-377 (with Michael D. McDonald). Cited in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan).

"The Reincarnation of the Intent Standard: Federal Judges and At- Large Election Cases," Howard Law Journal 28 (No 2, 1985), 495-513. Cited in Thornburg v. Gingles, _____ U.S. _____ (1986) (by J. Brennan). Abbreviated version appeared in Focus (June, 1985). (Focus is a monthly publication of the Joint Center for Political Studies in Washington, D.C.).

"The Effect of At-Large Versus District Elections on Racial Representation in U.S. Municipalities," in Bernard Grofman and Arend Lijphart (eds.), Electoral Laws and Their Political Consequences (New York: Agathon Press, Inc., 1986), pp. 203-225 (with Michael D. McDonald).

"Repairing the Crack in New Orleans' Black Vote: VRA's Results Test Nullifies 'Gerryduck'," Publius 16 (Fall 1986), 109-121. Reprinted in Charles Vincent (ed.), The African American Experience in Louisiana: From Jim Crow to Civil Rights (Lafayette, LA: Center for Louisiana Studies).

"Quantitative Evidence in Vote Dilution Litigation, Part II: Minority Coalitions and Multivariate Analysis," Urban Lawyer 19 (Winter 1987), 65-75 (with Michael D. McDonald).

"District Magnitudes and the Election of Women to the Irish Dail," Electoral Studies, 6 (August 1987), 123-132.

"The Election of Blacks to Southern City Councils: The Dominant Impact of Electoral Arrangements," in Robert P. Steed, Laurence W. Moreland, and Tod A. Baker (eds.) Blacks in Southern Politics (New York: Praeger Publishers, 1987), pp. 245-258 (with Michael D. McDonald).

"Race, Referendums, and Rolloff," Journal of Politics 49 (November 1987), 1081-1092 (with Jim M. Vanderleeuw).

"Definitions, Measurements, and Statistics: Weeding Wildgen's Thicket," Urban Lawyer 20 (Winter 1988), 175-191 (with Michael D. McDonald).

"The Desirability Hypotheses and the Election of Women to City Councils: A Research Note," State and Local Government Review 20 (Winter 1988), 38-40 (with Michael D. McDonald and Bih-Er Chou).

"Black Politics and the Voting Rights Act(s): 1965-1982," in James Lea (ed.), Contemporary Southern Politics: Continuity and Change (Baton Rouge: Louisiana State University Press, 1988), pp. 83-106.

"Race and Representational Districting: Protections Against Delineational and Institutional Gerrymandering," Comparative State Politics Newsletter 9 (October 1988), 15-24.

33