**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

COMMITTEE FOR A FAIR AND BALANCED )
MAP, *et al.*, )
                         )
         Plaintiffs, )
                         )     Case No. 11-C-5065
      v. )
                         )     Hon. John D. Tinder
ILLINOIS STATE BOARD OF ELECTIONS, )     Hon. Joan H. Lefkow
*et al.*, )     Hon. Robert L. Miller, Jr.
                         )     (3-judge court convened pursuant to
                         )     28 U.S.C. § 2284)
         Defendants. )

**APPENDIX 5
TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR A PERMANENT INJUNCTION**

**A-201 thru A-250**

"Cumulative Voting as a Remedy for Minority Vote Dilution: The Case of Alamogordo, New Mexico," Journal of Law and Politics 5 (Spring 1989), 469-497 (with Delbert A. Taebel and Richard L. Cole). Reprinted in Roger L. Kemp, (ed.), Local Government Election Practices: A Handbook for Public Officials and Citizens (Jefferson, N.C.: McFarland & Co., 1999), 372-391.

"When Blacks Run for Judge: Racial Divisions in the Candidate Preferences of Louisiana Voters," Judicature 73 (August-September 1989), 87-89.

"Detecting Gerrymandering," in Bernard Grofman (ed.), Political Gerrymandering and the Courts (New York: Agathon Press, Inc., 1990), pp. 178-202 (with Michael D. McDonald).

"Cumulative Voting in a Municipal Election: A Note on Voter Reactions and Electoral Consequences," Western Political Quarterly, 43 (March 1990), 191-199 (with Richard L. Cole and Delbert A. Taebel).

"Alternative Electoral Systems as Remedies for Minority Vote Dilution," Hamline Journal of Public Law and Policy 11 (Spring 1990), 19-29 (with Delbert A. Taebel and Richard L. Cole). Cited in Holder v. Hall, _____ U.S. _____ (1994), (by J. Thomas, concurring).

"Cincinnati's 1988 Proportional Representation Initiative," Electoral Studies 9 (September 1990), 217-225.

"Getting the Numbers Right: A Response to Wildgen," Urban Lawyer 22 (Summer 1990), 495-502.

"Native Americans and Cumulative Voting: The Sisseton-Wahpeton Sioux," Social Science Quarterly 72 (June 1991), 388-393 (with Charles J. Barrilleaux).

"Proportional Representation Considered in Cincinnati," Representation 30 (Spring 1991), 3-5.

"Voting for Judges: Race and Roll-Off in Judicial Elections," in William Crotty (ed.), Political Participation and Democratic Politics (New York: Greenwood Press, 1991), pp. 171-191 (with Victoria M. Caridas).

"Minority Representation and Councilmanic Election Systems: A Black and Hispanic Comparison," in Anthony Messina, Laurie Rhodebeck, Frederick Wright, and Luis R. Fraga, (eds.), Ethnic and Racial Minorities in Advanced Industrial Democracies, (New York: Greenwood Press, 1992), pp. 127-142 (with Michael D. McDonald).

"Alternative Judicial Election Systems: Solving the Minority Vote Dilution Problem," in Wilma Rule and Joseph F. Zimmerman (eds.), United States Electoral Systems: Their Impact on Women and Minorities (New York: Greenwood Press, 1992), pp. 129-139.

"Modified Multi-Seat Election Systems as Remedies for Minority Vote Dilution," Stetson Law Review 21 (Summer 1992), 743-770.

"Councilmanic Redistricting Conflicts: The Dallas Experience," Urban News 6 (Fall 1992), 1, 4-8.

34

"The Single Transferable Vote: An Alternative Remedy for Minority Vote Dilution," University of San Francisco Law Review 27 (Summer, 1993), 781-813. Excerpt reprinted in Voting and Democracy Report, 1993 (Washington, D.C.: Center for Voting and Democracy, 1993).

"'Enhancing' Factors in At-Large Plurality and Majority Systems: A Reconsideration," Electoral Studies 12 (December 1993), 385-401 (with Michael D. McDonald).

"Louisiana," in Chandler Davidson and Bernard Grofman (eds.), The Quiet Revolution: Minority Voting Rights and Representation in the South (Princeton: Princeton University Press, 1994), pp. 103-135, 413-417 (with Stanley A. Halpin, Jean A. Hill, and Victoria M. Caridas-Butterworth).

"The Voting Rights Act: Disfranchisement, Dilution, and Alternative Election Systems," PS: Political Science and Politics 27 (December 1994), 685-688.

"The 1994 New Orleans Mayoral Election: Racial Divisions Continue," Urban News 9 (Spring 1995), 6-9 (with Willie D. Kirkland).

"Shaw v. Reno and New Election Systems: The Cumulative Voting Alternative," Voting Rights Review (Spring 1995), 10, 12 (with Jason F. Kirksey and Edward Still) [excerpt reprinted in Voting and Democracy Report, 1995 (Washington, D.C.: Center for Voting and Democracy, 1995), 67-68].

"Voting Rights Districts: Debunking the Myths," Campaigns and Elections (April 1995), 24, 46.

"Shaw, Miller, and the Districting Thicket," National Civic Review, 84 (Fall-Winter 1995), 323-336. Reprinted as "The Supreme Court on Redistricting" in Roger L. Kemp, (ed.), Local Government Election Practices: A Handbook for Public Officials and Citizens (Jefferson, N.C.: McFarland & Co., Inc., 1999), 80-92.

"Local Redistricting Under the Voting Rights Act," Communities and the Voting Rights Act: A Guide to Compliance in These Changing Times (Denver: National Civic League, Inc., 1996), 69-82.

"One Person, Seven Votes: The Cumulative Voting Experience in Chilton County, Alabama," in Anthony Peacock, (ed.), Affirmative Action and Representation: Shaw v. Reno and the Future of Voting Rights (Durham, N.C.: Carolina Academic Press, 1997), pp. 285-313 (with Jason Kirksey and Edward Still).

"Limited and Cumulative Voting in Alabama: An Assessment After Two Rounds of Elections," National Political Science Review, Vol. 6 Race and Representation (New Brunswick: Transaction Publishers, 1997), 180-191 (with Jason F. Kirksey and Ed Still).

"Cumulative Voting and Latino Representation: Exit Surveys in Fifteen Texas Communities," Social Science Quarterly 78 (December 1997), 973-991 (with Robert R. Brischetto).

"Is Cumulative Voting Too Complex? Evidence from Exit Polls," Stetson Law Review 27 (Winter 1998), 813-833 (with Robert R. Brischetto).

35

"Affirmative Action and the Politics of Race," in Gillian Peele, Christopher J. Bailey, Bruce Cain, and B. Guy Peters, (eds.), Developments in American Politics 3 (London: MacMillan Press Ltd. and New York: Chatham House Publishers, 1998), pp. 292-306.

"Race and Representational Districting in Louisiana," in Bernard Grofman, (ed.), Race and Redistricting in the 1990s (New York: Agathon Press, 1998), pp. 229-268 (with Jason F. Kirksey).

"Minority Electoral Opportunities and Alternative Election Systems in the United States," in Mark Rush, (ed.), Voting Rights and Redistricting in the United States (New York: Greenwood Publishing, 1998), pp. 227-243.

"Electoral Arrangements and Minority Political Incorporation," in Richard Kaiser and Katherine Underwood, (eds.), Minority Politics at the Millennium (New York: Garland Publishing, Inc., 2000), pp. 19-50.

"Louisiana," in Dale Krane, Platon R. Rigos, and Melvin Hill, (eds.), Home Rule in America: A Fifty-State Handbook (Washington, D.C.: Congressional Quarterly Press, 2001), 173-182 (with Robert K. Whelan).

"The Post-2000 Round of Redistricting: An Entangled Thicket within the Federal System," Publius, 32 (Fall 2002): 51-70.

"The United States: the Future – Reconsidering Single-Member Districts and the Electoral College," in Josep M. Colomer, (ed.), Handbook of Electoral System Choice (London: Palgrave Macmillan Ltd, 2004), 164-176.

"Expert Witness Testimony," Encyclopedia of Social Measurement, Vol. 1 (London: Elsevier Inc., 2005), 919-925.

"Revising Constituency Boundaries in the United States and Australia: It Couldn't be More Different," Democratic Audit of Australia (August 2005), 1-10 (http://democratic. audit.anu.edu.au)

"Missing the Target: The Supreme Court, 'One Person, One Vote,' and Partisan Gerrymandering," in Peter Galderisi, (ed.), Redistricting in the New Millennium, (Lanham, MD: Lexington Books, 2005), 313-340.

"Reapportionment," in Joseph R. Marbach, Ellis Katz, and Troy E. Smith (eds.), Federalism in America: An Encyclopedia (Westport, CT: Greenwood Press, 2006), Vol. 2, 528-532.

"Race and Southern Politics: The Special Case of Congressional Districting," in Robert P. Steed and Laurence W. Moreland, (eds.), Writing Southern Politics: Contemporary Interpretations and Future Directions, (Lexington, KY: University Press of Kentucky, 2006), 91-118.

"Electoral College," in William A. Darity, Jr. (ed.), International Encyclopedia od the Social Sciences (Vol. 2, 2d ed; Detroit: Macmillan Reference USA, 2008), 559-560.

"Majority Vote Rules and Runoff Primaries in the United States," Electoral Studies, 27 (September 2008): 407-416 (with Richard N. Engstrom).

"*NAMUDNO*: A Curveball on Voting Rights," Justice System Journal, 30 (No. 3 2009): 351-360.

"Cumulative and Limited Voting: Remedies for Dilutive Election Systems and More," St. Louis University Public Law Review 30 (No. 1, 2010): forthcoming.

"The Political Scientist as Expert Witness," PS 44 (April 2011): 285-289 (with Michael P. McDonald).

"Influence Districts: A Note of Caution and a Better Measure," Chief Justice Earl Warren Institute on Law and Social Policy, University of California Law School, Policy Brief, 2011.

"Influence District: The Concept and the Court," in Daniel McCool (ed.), The Most Fundamental Right: The 2006 Reauthorization of the Voting Rights Act, (Bloomington, IN: Indiana University Press), forthcoming.

TITLED BOOK REVIEWS

"Partisan Gerrymandering and State Legislative Districts," review of Jonathan Winburn, THE REALITIES OF REDISTRICTING: FOLLOWING THE RULES AND LIMITING GERRYMANDERING IN STATE LEGISLATIVE REDISTRICTICTING, in Election Law Journal, 8 (No. 3, 2009), 227-232.

"Thernstrom v. Voting Rights Act: Round Two," review of Abigail Thernstrom, VOTING RIGHTS – AND WRONGS: THE ELUSIVE QUEST FOR RACIALLY FAIR ELECTIONS, Election Law Journal, 9 (No.3, 2010), 203-210

"Race and Southern Politics," review of Charles S. Bullock and Ronald Keith Gaddie, THE TRIUMPH OF VOTING RIGHTS IN THE SOUTH, in Election Law Journal, 10 (No. 1, 2011), 53-61.

OTHER BOOK REVIEWS

Review of John Wilson Lewis (ed.), THE CITY IN COMMUNIST CHINA, in Journal of Politics, 34 (February 1972), 310-311.

Review of Arthur I. Blaustein and Geoffrey Faux, THE STAR-SPANGLED HUSTLE: WHITE POWER AND BLACK CAPITALISM in Wall Street Review of Books, 1 (June 1973), 215-229.

37

Review of Carroll Smith Rosenberg, RELIGION AND THE RISE OF THE AMERICAN CITY: THE NEW YORK CITY MISSION MOVEMENT, 1812-1870, in Christian Scholar's Review, Vol. 4, No. 1 (1974), 73-75.

Review of Robert Higgs, COMPETITION AND COERCION, BLACKS IN THE AMERICAN ECONOMY, 1865-1914, in Wall Street Review of Books, 6 (Spring 1978), 117-119.

Review of Herbert E. Alexander, MONEY IN POLITICS, and Herbert E. Alexander, FINANCING POLITICS: MONEY, ELECTIONS, AND POLITICAL REFORM, in Wall Street Review of Books, 6 (Summer 1978), 209-211.

Review of James M. Buchanan and Richard E. Wagner, DEMOCRACY IN DEFICIT: THE POLITICAL LEGACY OF LORD KEYNES, in Wall Street Review of Books, 6 (Fall 1978), 319-320.

Review of American Enterprise Institute for Public Policy Research, ZERO-BASE BUDGETING AND SUNSET LEGISLATION, in Wall Street Review of Books, 7 (Winter 1979), 53-55.

Review of David Rogers, CAN BUSINESS MANAGEMENT SAVE THE CITIES? THE CASE OF NEW YORK, in Wall Street Review of Books, 7 (Spring 1979), 75-77.

Review of Kevin R. Cox and R. J. Johnston (eds.), CONFLICT, POLITICS AND THE URBAN SCENE, in American Political Science Review, 78 (June 1984), 531-532.

Review of Manuel Carballo and Mary Jo Bane (eds.), THE STATE AND THE POOR IN THE 1980s, in American Political Science Review, 79 (June 1985), 523-524.

Review of Terry Sanford, A DANGER TO DEMOCRACY: THE PRESIDENTIAL NOMINATING PROCESS, in Presidential Studies Quarterly, 16 (Winter 1986), 153-155.

Review of Charles W. Whalen, Jr., THE HOUSE AND FOREIGN POLICY: THE IRONY OF CONGRESSIONAL REFORM, in Presidential Studies Quarterly, 16 (Spring 1986), 369-371.

Review of Arend Lijphart and Bernard Grofman (eds.), CHOOSING AN ELECTORAL SYSTEM: ISSUES AND ALTERNATIVES, in Irish Political Studies, 1 (1986), 125-127.

Review of David McKay, AMERICAN POLITICS AND SOCIETY, in Presidential Studies Quarterly, 17 (Fall 1987), 784-785.

Review of Sheila D. Collins, THE RAINBOW CHALLENGE: THE JACKSON CAMPAIGN AND THE FUTURE OF AMERICAN POLITICS, in Presidential Studies Quarterly, 19 (Fall 1988), 874-875.

Review of Abigail M. Thernstrom, WHOSE VOTES COUNT? AFFIRMATIVE ACTION AND MINORITY VOTING RIGHTS, in Policy Studies Review 8 (Autumn 1988), 191-194.

Review of Herbert H. Haines, BLACK RADICALS AND THE CIVIL RIGHTS MAINSTREAM, 1954-1970, in Journal of Southern History, 56 (February 1990): 155-157.

Review of Harlan Hahn and Sheldon Kamienieki, PREFERENDUM VOTING: SOCIAL STATUS AND POLICY PREFERENCES, in Presidential Studies Quarterly 20 (Fall 1990): 828-830.

Review of Michael Gallagher and Michael Marsh (eds.), CANDIDATE SELECTION IN COMPARATIVE PERSPECTIVE: THE SECRET GARDEN OF POLITICS, in Presidential Studies Quarterly 21 (Winter 1991): 167-168.

Review of Thomas Cronin, DIRECT DEMOCRACY: THE POLITICS OF INITIATIVE, REFERENDUM, AND RECALL, in Presidential Studies Quarterly, 22 (Fall 1992): 786-788.

Review of F. Leslie Seidle, (ed.), COMPARATIVE ISSUES IN PARTY AND ELECTION FINANCE, in British Journal of Canadian Studies, (1993).

Review of John Dittmer, LOCAL PEOPLE: THE STRUGGLE FOR CIVIL RIGHTS IN MISSISSIPPI, in Annals of the American Academy of Political and Social Science, 540 (July 1995): 170-171.

Review of Michael J. Glennon, WHEN NO MAJORITY RULES: THE ELECTORAL COLLEGE AND PRESIDENTIAL SUCCESSION, in National Political Science Review, 6 (1997): 323-325.

Review of Frederick M. Wirt, "WE AIN'T WHAT WE WAS": CIVIL RIGHTS IN THE NEW SOUTH, in American Political Science Review, 92 (June 1998): 474-475.

Review of David T. Canon, RACE, REDISTRICTING, AND REPRESENTATION: THE UNINTENDED CONSEQUENCES OF BLACK MAJORITY DISTRICTS, in The Law and Politics Book Review, 9 (October 1999): 467-471.

Review of Christopher M. Burke, THE APPEARANCE OF EQUALITY: RACIAL GERRYMANDERING, REDISTRICTING, AND THE SUPREME COURT, in The Law and Politics Book Review, 9 (November 1999): 506-508.

Review of J. Morgan Kousser, COLORBLIND INJUSTICE: MINORITY VOTING RIGHTS AND THE UNDOING OF THE SECOND RECONSTRUCTION, in Journal of Politics, 62 (August 2000): 934-937.

Review of Kathleen L. Barber, A RIGHT TO REPRESENTATION: PROPORTIONAL ELECTION SYSTEMS FOR THE TWENTIETH-FIRST CENTURY, in Representation, 38 (Summer/Autumn 2001), 171-173.

Review of Shaun Bowler and Bernard Grofman, (eds.), ELECTIONS IN AUSTRALIA, IRELAND, AND MALTA UNDER THE SINGLE TRANSFERABLE VOTE: REFLECTIONS

ON AN EMBEDDED INSTITUTION, in American Political Science Review, 95 (December 2001), 1012 - 1013.

Review of Dianne T. Thompson, CONGRESSIONAL REDISTRICTING IN NORTH CAROLINA: RECONSIDERING TRADITIONAL CRITERIA, in The Law and Politics Book Review, 13 (December 2003).

Review of Douglas J. Amy, REAL CHOICES / NEW VOICES: HOW PROPORTIONAL REPRESENTATION ELECTIONS COULD REVITALIZE AMERICAN DEMOCRACY, in Representation, 40 (No. 2, 2004), 158-160.

Review of David M. Ferrell and Ian McAllister, THE AUSTRALIAN ELECTION SYSTEM: ORIGINS, VARIATIONS AND CONSEQUENCES, in Representation, 42 (November 2006), 368-370.

Review of Thomas E. Mann and Bruce E. Cain, (eds.), PARTY LINES: COMPETITION, PARTISANSHIP, AND CONGRESSIONAL REDISTRICTING, in Party Politics, 14 (May 2008), 373-376.

Review of Lisa Handley and Bernard Grofman, (eds.), REDISTRICTING IN COMPARATIVE PERSPECTIVE, in American Review of Politics, 30 (Winter 2010), 363-368.

Review of James Thomas Tucker, THE BATTLE OVER BILINGUAL BALLOTS: LANGUAGE MINORITIES AND POLITICAL ACCESS UNDER THE VOTING RIGHTS ACT, in International Journal of Law in Context, forthcoming.

40

A207

D-31

## EXPERT REPORT OF PETER A. MORRISON, PH.D.

In the case of

COMMITTEE FOR A FAIR AND BALANCED MAP, et al.
v.
ILLINOIS STATE BOARD OF ELECTIONS, et al.

No. 11-C-5065 (N.D. Ill.)

September 14, 2011



EXHIBIT
morrison
4
D-33

# I. INTRODUCTION

This report responds to the request by counsel for plaintiffs, Mayer Brown LLP, that I undertake a demographic analysis of the residents of several proposed congressional election districts in Illinois. Those districts are Congressional districts CD3, CD4, and CD5 of a Congressional redistricting plan adopted by the Illinois state legislature in May 2011 and signed into law in June 2011 (hereinafter "the Adopted Plan"). The primary focus of this analysis is the concentration of Latinos among potential voters in each of those Adopted Districts and in two alternative Fair Plan districts (Fair CD3 and Fair CD4). My report addresses the following questions:

1. How has Latinos' presence among residents and potential voters changed since 1990 in Cook County, in each of the three Adopted Districts, and in each of the two Fair Plan districts above?
2. What demographic factors underlie those changes?
3. Do the boundaries of particular Adopted Districts bolster or diminish Latino populations within those Districts?

To address these questions, I performed several analyses using data from the 1990, 2000, and 2010 decennial censuses.

## DEMOGRAPHIC CONTEXT

Since 1990, the State of Illinois and Cook County in particular have registered substantial Latino population growth. Statewide, the Latino share of population has risen from 7.9% in 1990 to 15.8% by 2010; in Cook County, the corresponding increase was from 13.6% to 24.0% percent (see Fig. 1 and Appendix Table A).

Those increases are the product of Latino migratory influx to Illinois and Cook County over the two decades and the fact that the Latino population of both Illinois and Cook County regularly contains proportionately more prospective eligible voters among its youth than current eligible voters among its adults. As of 2010, at every geographic level I examined, from the community level up to the statewide level, I found Latinos to be overly concentrated in the under-18 age range and non-Latinos to be overly concentrated among persons age 65 and older. In Cook County, for example, Latinos were 24% of the total 2010 population but 34% of the under-18 population. Moreover, non-Latinos are over-concentrated in the older (65+) age range. This means that the population dying off (i.e., potential voters subtracted from the 65+ population) is disproportionately non-Latino. Accordingly, forthcoming mortality loss will inevitably elevate the Latino share among the remaining adult population. That disproportionate Latino concentration among youth foreshadows further increases in Latinos' share among future voters, for purely demographic reasons. In short, Latinos' prominence within the electorate (other things being equal) is bound to increase in future years.

D-33

3





Figure 1. Changing Makeup of Voting-age Population
of Illinois and Cook County: 1990-2010

D-33

## ETHNIC COALESCENCE AND SPATIAL DIFFUSION WITHIN COOK COUNTY

Over the decades, Latino residents have coalesced into numerous communities within Cook County. Those scattered Latino enclaves, in turn, have become magnets for other Latinos who have settled in the enclaves or in neighboring communities, which in turn enlarge the spatial area of the enclaves.[1] Increasingly, Latinos have become the majority among the residents of many communities adjacent to the original Latino enclaves.

As seen above, Illinois and Cook County in particular have witnessed a remarkable increase in Latinos since 1990.[2] From my review and analysis of census data, Latinos' growth over the past two decades has been concentrated in particular communities, as scattered small Latino enclaves drew newcomers to the region. As these enclaves have diffused outward, they have extended into neighboring communities, thereby encompassing more territory and forming well-defined concentrations of Latinos within Cook County (as illustrated in Table 1 for one such set of neighboring communities). This process of spatial diffusion feeds further growth of the Latino population. Models of such diffusion provide a scientific basis for anticipating the future course of that growth.[3]

Figure 2 illustrates the spatial diffusion of the Latino population in the past decade within Cook County. The residential spread of Latinos has given rise to two distinct enclaves of Latinos, one on the northside and the other on the southside. Each enclave has registered only modest overall population growth generally but a sharp increase in the number of Latino residents since 2000.

---

[1] An enclave is a portion of territory within or surrounded by a larger territory whose inhabitants are culturally or ethnically distinct from the inhabitants in the surrounding areas. For further elaboration, see F. D. Bean and M. Tienda, *The Hispanic Population of the United States* (New York: The Russell Sage Foundation, 1987).

[2] See "New U.S. census numbers herald a greater Latino presence in the Chicago area" in *Chicago Tribune*, August 8, 2011.

[3] See S. K. Smith et al., *State and Local Population Projections: Methodology and Analysis* (New York: Kluwer Academic/Plenum, 2001), chapter 15.

5





Figure 2. Emergence of Two Latino Enclaves Within Cook County, 2000-2010

D-33

6

As seen in Figure 2, the residential spread of Latinos has increased their presence substantially in each enclave. A noteworthy feature of these patterns is the consistency in the upward Latino trend in population across communities that otherwise registered only modest growth of total population (as illustrated in the 11 representative communities in Table 1). Clearly, such communities have evolved collectively into a pair of Latino enclaves that, as diffusion occurs, are coalescing into an extended spatial distribution of Latinos. As Latinos move in and replace non-Latinos moving out or dying off, this growth will continue.

Table 1. Illustration of Adjacent Communities Evolving into Hispanic Enclave

| Community | Total Population | | | Hispanic Population | | | Hispanic share (%) | | |
|---|---|---|---|---|---|---|---|---|---|
| | 1990 | 2000 | 2010 | 1990 | 2000 | 2010 | 1990 | 2000 | 2010 |
| Addison village | 32,058 | 35,914 | 36,942 | 4,287 | 10,198 | 14,813 | 13% | 28% | 40% |
| Bensenville village | 17,767 | 20,703 | 18,352 | 3,333 | 7,690 | 8,781 | 19% | 37% | 48% |
| Des Plaines city | 53,223 | 58,720 | 58,364 | 3,520 | 8,229 | 10,053 | 7% | 14% | 17% |
| Elmwood Park village | 23,206 | 25,405 | 24,883 | 1,001 | 2,798 | 5,729 | 4% | 11% | 23% |
| Melrose Park village | 20,859 | 23,171 | 25,411 | 6,303 | 12,485 | 17,675 | 30% | 54% | 70% |
| Northlake city | 12,505 | 11,878 | 12,323 | 2,028 | 4,133 | 6,520 | 16% | 35% | 53% |
| River Grove village | 9,961 | 10,668 | 10,227 | 411 | 1,043 | 1,901 | 4% | 10% | 19% |
| Rosemont village | 3,995 | 4,224 | 4,202 | 785 | 1,493 | 1,734 | 20% | 35% | 41% |
| Schiller Park village | 11,189 | 11,850 | 11,793 | 1,382 | 2,598 | 2,843 | 12% | 22% | 24% |
| Stone Park village | 4,383 | 5,127 | 4,946 | 2,544 | 4,057 | 4,359 | 58% | 79% | 88% |
| Wood Dale city | 12,425 | 13,535 | 13,770 | 870 | 1,768 | 2,796 | 7% | 13% | 20% |
| Total, 11 communities | 201,571 | 221,195 | 221,213 | 26,464 | 56,492 | 77,204 | 13% | 26% | 35% |

Sources: US Census Bureau. 1990 Census, STF1 Tables QT-P1A, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P12H.

## FUTURE OUTLOOK

The self-perpetuating character of local spatial diffusion, along with the demographic inevitabilities tied to age structure, provide a firm scientific basis for anticipating the future growth of Latinos' strength in numbers within Cook County and the two Latino enclaves described above. Any congressional district that encompasses either Latino enclave has a predictable future: Its overly-Latino youth population will mature into the voting ages, thereby adding Latinos who are newly eligible to vote; and its overly non-Latino elderly population will gradually die off, thereby subtracting non-Latinos eligible to vote.

To quantify this future growth, I have calibrated a spatial diffusion model, which captures the effects of these spatial and demographic effects. My analysis shows that the Latino percentage of the voting-age population will increase approximately one percentage point every 3.2 years in the Northside enclave and approximtely 1.1 percentage point every single year in the Southside enclave. These values imply that when voters go to the polls in November 2018, Latinos will constitute approximately 51.8% of VAP in the Northside enclave and approximately 68.9% of VAP in the Southside enclave.

D-33

### III. CONGRESSIONAL DISTRICTS ENCOMPASSING LATINO ENCLAVES

Three of the Congressional districts adopted by the State of Illinois for 2012 elections encompass portions of this growing and spatially diffusing Latino population. One district (Adopted Congressional District 4) encompasses the most heavily Latino portions of both the northside and the southside enclaves, leaving Adopted Congressional Districts 3 and 5 with much smaller Latino populations. In the following sections, I trace the evolution and discuss the current characteristics of these three districts (Adopted Districts CD3, CD4, and CD5). These districts are shown in Figure 3 below. The data for this analysis (shown in Appendix Table B) refer to fixed territories that correspond to each district as of 2010. Each fixed territory has been approximated as closely as possible using the census tract geography from earlier decennial censuses. Each fixed territory provides comparable data on population *composition* at several time points for each district. For constant geography as of 1990 (also shown), absolute totals for 2010 do not exactly match published totals.

### Figure 3. Boundaries of Adopted Congressional Districts 3, 4, and 5



8

## ADOPTED CONGRESSIONAL DISTRICT 4

Adopted CD4 closely coincides with and retains the same basic "earmuff" shape as the Fourth Congressional District that was drawn as a majority Latino district after the 1990 census (1992 CD4) and carried forward after the 2000 census (2002 CD4). The Latino share of voting-age population ("VAP") in CD4 has increased from 59.2% in the post-1990 CD4 to 65.9% in Adopted CD4.

When the State of Illinois redrew Adopted CD4 after the 2010 census, it added some territory to Adopted CD4 and it removed some territory that had been part of 2002 CD4. For each individual block of new territory that was added to Adopted CD4 or territory formerly in 2002 CD4 that was removed, I compared the Latino share of the voting-age population (H%VAP) with the corresponding Latino share of Adopted CD4's voting-age population, using 2010 census data. The territory added to Adopted CD4 had a 47.2% Latino share of VAP. The territory formerly in 2002 CD4 that was removed had a 40.6% Latino share of VAP.

Thus, in redrawing the Adopted CD4 to contain the necessary number of residents, the State of Illinois traded lower Latino VAP territory for higher Latino VAP territory.

## ADOPTED CONGRESSIONAL DISTRICT 3

The 2002 CD3 has a voting-age population (VAP) that is 29.3% Latino, based on 2010 census figures. In the Adopted CD3, Latinos comprise 24.6% of the VAP. To understand why the Latino share of VAP for Adopted CD3 fell despite growing concentrations of Latinos in the southern half of Cook County, I identified the various blocks of new territory that were added to Adopted CD3 and territory formerly in 2002 CD3 that was removed. For each individual block of territory added, I compared the Latino share of the voting-age population (H%VAP) with the corresponding Latino share of Adopted CD3's voting-age population, using 2010 census data. The territory added to Adopted CD3 had a 16.4% Latino share of VAP. The territory formerly in 2002 CD3 that was removed had a 34.4% Latino share of VAP.

Thus, switching territory in and out to rebalance total population had the net effect of *reducing* Latinos' share of VAP in the redrawn Adopted CD3.

Figure 5A shows the territory added to Adopted CD3 (on the southwest and on the northeast). Figure 5B shows the territory formerly in 2002 CD3 that was removed (mostly along the northern and eastern borders). Territorial blocks shown in red are those that have a Latino VAP percentage that is less than the 29.3% Latino VAP in the 2002 CD3 as of 2010. Territorial blocks shown in green are those that have a Latino VAP percentage that is greater than the 29.3% Latino VAP in the 2002 CD3 as of 2010. The overall reduction of Latinos' share of VAP in Adopted CD3 was caused by (1) the addition of red-colored territory, i.e., territory that is less than 29.3% Latino; and (2) the removal of green-colored territory, i.e., territory that is more than 29.3% Latino.

D-33

9

## Figure 5. Changes to Congressional District 3

### A. Territory Added



### B. Territory Removed



D-33

ADOPTED CONGRESSIONAL DISTRICT 5

The 2002 CD5 has a voting-age population (VAP) that is 24.6% Latino, based on 2010 census data. In the Adopted CD5, Latinos comprise 16.1% of the VAP. To understand why the Latino share of VAP for Adopted CD5 fell despite growing concentrations of Latinos in the northern half of Cook County, I performed the same analysis of blocks of territory that were added to Adopted CD5 and removed from 2002 CD5 that I performed with respect to Adopted CD3. The territory added to Adopted CD5 had a 12.8% Latino share of VAP. The territory formerly in 2002 CD5 that was removed had a 54.5% Latino share of VAP.

Thus, switching territory in and out to rebalance total population had the net effect of *reducing* Latinos' share of VAP in the redrawn Adopted CD5.

Figure 6A shows the territory added to Adopted CD5 (to the north, west, and southeast). Figure 6B shows the territory formerly in 2002 CD5 that was removed from Adopted CD5 (mostly along the district's northern and eastern borders). Territorial blocks shown in red are those that have a Latino VAP percentage that is less than the 24.6% Latino VAP in the 2002 CD5 as of 2010.. Territorial blocks shown in green are those that have a Latino VAP percentage that is greater than the 29.8% Latino VAP in the 2002 CD5 as of 2010. The overall reduction of Latinos' share of VAP was caused by the addition of red-colored territory, i.e., territory that is less than 24.6% Latino, along with the removal of green-colored territory, i.e., territory that is more than 24.6% Latino.

24.6

11

## Figure 6. Changes to Congressional District 5

### A. Territory Added



### B. Territory Removed



D-33

12

<u>CONCLUSION</u>

My analysis of three of the Congressional districts adopted by the State of Illinois for 2012 elections reveals that in each instance, the reconfiguration of territory had the effect of increasing the Latino share of VAP in Adopted CD4 while at the same time decreasing the Latino share of VAP in Adopted CD3 and Adopted CD5.

## IV. <u>FAIR CONGRESSIONAL DISTRICTS PROPOSED BY PLAINTIFFS</u>

I have also examined the demographic characteristics of the congressional districts that Plaintiffs in this litigation have proposed as an alternative to the congressional districts adopted by the State of Illinois for 2012.[4] I focus on the Plaintiffs' proposed third and fourth congressional districts (Fair CD3 and Fair CD4) because they have significant Latino populations and substantially overlap the three adopted congressional districts that I have already discussed (Adopted CD3, CD4, CD5).

**Figure 4. Comparison of Adopted Congressional Plan and Fair Map**



Case: 1:11-cv-05065 Document #: 24 Filed: 08/04/11 Page 26 of 28 PageID #: 112

---

[4] Plaintiffs' proposed districts are contained as exhibits to Plaintiffs' Motion for a Preliminary Injunction and Expedited Discovery, Docket No. 24.

D-33

## FAIR DISTRICT 4

Fair CD4 encompasses a broad portion of the Latino enclave in the southern half of Cook County. As seen in Figure 7 and Appendix Table B, the demographic composition of this fixed territory has changed markedly since 1990. The data indicate that Latinos replaced non-Latinos over those two decades, leaving somewhat fewer residents overall but many more Latinos. From 2000 to 2010, Latino residents increased 18% and the number of voting-age Latinos increased nearly 22%. As of 2010, Latinos in Fair CD4 comprise 59.4% of the voting-age population — virtually identical to their share of the voting-age population of post-1990 CD4 (59.2%). And the Latino share of the voting-age population in Fair CD4 is destined to increase as the under-18 population in this area (which is now 78% Latino) attains voting age in the years ahead.

## FAIR DISTRICT 3

Fair CD3 encompasses a broad portion of the Latino enclave in the northern half of Cook County. As seen in Figure 7 and Appendix Table B, the demographic composition of this fixed territory has changed markedly since 1990. The data indicate that Latinos replaced non-Latinos over those two decades, again leaving fewer residents overall but many more Latinos. Latino residents increased 8% and the number of voting-age Latinos increased 12%. As of 2010, Latinos in Fair CD3 comprise 46.5% of the voting-age population. This latter percentage will increase as the under-18 population (which is now 67% Latino) attains voting age in the years ahead.

14



**Figure 7. Hispanics' Changing Share of Population: 1990-2010**

(Source: Appendix Table B.)

## V. CONCLUSION

As demonstrated in this report, my analysis of three of the Congressional districts adopted by the State of Illinois for 2012 elections reveals that in each instance, the reconfiguration of territory increased the Latino share of VAP in Adopted CD4 while at the same time decreasing the Latino share of VAP in Adopted CD3 and Adopted CD5. As of 2010, Latinos comprise 59.4% of the voting-age population of Fair CD4 and 46.5% of Fair CD3, and both percentages are destined to increase in the years ahead.

D-33

15

## APPENDIX TABLES

Appendix Table A
Changing Makeup of Voting-age Population of Illinois and Cook County: 1990-2010

|  | 1990 | 2000 | 2010 |
|---|---|---|---|
|  | Illinois | | |
| Population 18 and older | 8,484,236 | 9,173,842 | 9,701,453 |
| % Hispanic | 6.8% | 10.7% | 13.4% |
| % Black/Black alone | 13.4% | 13.8% | 13.6% |
| % Black alone/in combination | n.a. | 14.1% | 13.9% |
| % White Non-Hispanic | 83.1% | 70.9% | 67.1% |
|  | Cook County | | |
| Population 18 and older | 3,825,022 | 3,978,922 | 3,962,395 |
| % Hispanic | 11.5% | 17.3% | 20.8% |
| % Black/Black alone | 23.4% | 24.0% | 23.3% |
| % Black alone/in combination | n.a. | 24.4% | 23.7% |
| % White Non-Hispanic | 65.1% | 52.2% | 48.1% |

Sources: US Census Bureau, 1990 Census, STF1 Tables QT-P1A, QT-P1D, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P11, P12H. Note: 1990 White Non-Hispanic defined as Non-Black Non-Hispanic.

D-33

A222

Appendix Table B

Hispanics' Changing Share of Population in Adopted CD4 and Proposed CD3 and CD4

(constant geography as of 2010)

| District / year | Total Population | | | Hispanic Population | | | Hispanic Share of Population | | |
|---|---|---|---|---|---|---|---|---|---|
| | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 |
| **ADOPTED CD4** | | | | | | | | | |
| 2000 | 761,154 | 526,546 | 234,608 | 506,761 | 320,141 | 186,620 | 66.6% | 60.8% | 79.5% |
| 2010 | 712,813 | 507,602 | 205,211 | 506,584 | 334,614 | 171,970 | 71.1% | 65.9% | 83.8% |
| **FAIR CD3** | | | | | | | | | |
| 2000 | 756,132 | 546,509 | 209,623 | 343,280 | 220,506 | 122,774 | 45.4% | 40.3% | 58.6% |
| 2010 | 712,813 | 531,234 | 181,579 | 369,219 | 247,071 | 122,148 | 51.8% | 46.5% | 67.3% |
| **FAIR CD 4** | | | | | | | | | |
| 2000 | 727,772 | 506,674 | 221,098 | 393,898 | 245,455 | 148,443 | 54.1% | 48.4% | 67.1% |
| 2010 | 712,813 | 502,170 | 210,643 | 463,349 | 298,530 | 164,819 | 65.0% | 59.4% | 78.2% |

Sources: US Census Bureau, 1990 Census, STF1 Tables QT-P1A, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P12H.

(constant geography as of 1990)

| District / year | Total Population | | | Hispanic Population | | | Hispanic Share of Population | | |
|---|---|---|---|---|---|---|---|---|---|
| | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 | All ages | 18 & older | Under 18 |
| **ADOPTED CD4** | | | | | | | | | |
| 1990 | 692,989 | 494,848 | 198,141 | 330,178 | 202,923 | 127,255 | 47.6% | 41.0% | 64.2% |
| 2000 | 388,156 | 266,370 | 121,786 | 276,372 | 175,161 | 101,211 | 71.2% | 65.8% | 83.1% |
| 2010 | 719,400 | 512,765 | 206,635 | 508,892 | 335,980 | 172,912 | 70.7% | 65.5% | 83.7% |
| **FAIR CD3** | | | | | | | | | |
| 1990 | 702,577 | 520,280 | 182,297 | 212,983 | 134,106 | 78,877 | 30.3% | 25.8% | 43.3% |
| 2000 | 499,418 | 358,275 | 141,143 | 264,631 | 169,722 | 94,909 | 53.0% | 47.4% | 67.2% |
| 2010 | 725,526 | 541,958 | 183,568 | 368,172 | 246,476 | 121,696 | 50.7% | 45.5% | 66.3% |
| **FAIR CD 4** | | | | | | | | | |
| 1990 | 644,278 | 466,178 | 178,100 | 223,701 | 135,730 | 87,971 | 34.7% | 29.1% | 49.4% |
| 2000 | 502,791 | 349,096 | 153,695 | 297,157 | 185,337 | 111,620 | 59.1% | 53.1% | 72.8% |
| 2010 | 701,988 | 493,874 | 208,114 | 456,780 | 294,073 | 162,707 | 65.1% | 59.5% | 78.2% |

Sources: US Census Bureau, 1990 Census, STF1 Tables QT-P1A, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P12H.

17

Signed: _____

D-33

# SUPPLEMENTAL MATERIAL TO ACCOMPANY

# EXPERT REPORT OF PETER A. MORRISON, PH.D.

In the case of

COMMITTEE FOR A FAIR AND BALANCED MAP, et al.
v.
ILLINOIS STATE BOARD OF ELECTIONS, et al.

No. 11-C-5065 (N.D. Ill.)

1. Facts or data considered.

2. List of other cases in which I testified as an expert at trial or by deposition in the past four years.

3. Compensation to be paid for the study and testimony in this case.

4. CV for Peter A. Morrison, Ph.D.

D-33

2

## I. FACTS OR DATA CONSIDERED IN THIS CASE

1. Data from the U.S. Censuses of Population, 1990, 2000, and 2010: 1990 Census, STF1 Tables QT-P1A, QT-P1D, QT-P1E; 2000 Census, SF2 Table QT-P1; 2010 Census, SF1 Tables QT-P1, P11, P12H.

2. Maps of existing and proposed Congressional districts.

3. The following scholarly publications:

   F. D. Bean and M. Tienda, *The Hispanic Population of the United States* (New York: The Russell Sage Foundation, 1987).

   Stanley K. Smith et al., *State and Local Population Projections: Methodology and Analysis* (New York: KluwerAcademic/Plenum, 2001), chapter 15.

   Richard L. Morrill, "Waves of Spatial Diffusion," *Journal of Regional Science*, 3 (1968): 1-17

   R. L. Morrill, G. L. Gaile, and G. I. Thrall, *Spatial Diffusion* (Sage Publications, 1988).

## II. CASES I HAVE TESTIFIED IN SINCE SEPTEMBER 2007

Since September 2007, I have given no trial testimony. I have given deposition testimony (only) in the following cases:

1. UNITED STATES DISTRICT COURT FOR THE DISTRICT OF SOUTH CAROLINA COLUMBIA DIVISION, CHADRIC WILEY and LISA LANGLEY WILEY v. ADVANCE AMERICA, CASH ADVANCE CENTERS OF SOUTH CAROLINA, INC. and CHECK INTO CASH OF SOUTH CAROLINA, INC.

2. SUPERIOR COURT FOR STATE OF ALASKA, ALASKA RETIREMENT MANAGEMENT BOARD V. MERCER, CASE # 1 JU-07-974 C I.

3. CIRCUIT COURT, TWENTIETH JUDICIAL CIRCUIT OF ILLINOIS, KITSON V. BANK OF EDWARDSVILLE. CLASS ACTION 3 02-L-807.

## III. COMPENSATION FOR STUDY AND TESTIMONY IN THIS CASE

I bill my time in this case at an hourly rate of $215. I bill my time for testimony as an expert at trial or by deposition in this case at an hourly rate of $400.

D-33

3

## IV. QUALIFICATIONS AND PUBLICATIONS

See accompanying c.v. which follows.

4

## PETER A. MORRISON

**EDUCATION**

B.A., Sociology, 1962, Dartmouth College
Ph.D., Sociology, 1967, Brown University

**PROFESSIONAL EXPERIENCE**

1969-2009 — Senior Staff Demographer and Resident Consultant, The RAND Corporation, Santa Monica, California
1979-1990 — Founding Director, Population Research Center, RAND
1967-1969 — Assistant Professor, Department of Sociology, and Research Associate, Population Studies Center, University of Pennsylvania, Philadelphia

**AREAS OF EXPERTISE**

Dr. Morrison's principal expertise centers on applications of demographic analysis in tracking socioeconomic trends and envisioning their consequences for public policy and business. Domestic applications include demographic analysis for electoral redistricting; store site selection; human resource analysis; evaluating employment discrimination claims; evaluating effectiveness of school desegregation remedies; forecasting school enrollments; gauging minority representation within jury pools; and various applications of census and administrative data in monitoring local demographic contexts. International applications include business concerns with corporate strategic planning and globally emerging middle-class consumer markets; identifying and quantifying demographic precursors of expanding consumer markets; comparing and evaluating individual markets; and analyzing forthcoming demographic trends to spot potential business opportunities.

Dr. Morrison performs studies for the private sector and conducts executive briefings on these topics through his consulting firm, founded in 1984. Clients have included American Express, American Stores, Corning, Inc., Ford Motor Co., Marriott International, NBC, New Directions for News, Times Mirror, University of California, and CIBC Securities (Canada).

Dr. Morrison has taught at The RAND Graduate School and lectures periodically before Congressional, academic, and business audiences. He has given testimony before subcommittees of the U.S. Senate and House of Representatives and addressed meetings of the National Science Board, The Conference Board, National League of Cities, National Conference of State Legislatures, University of California Management Institute, American Bar Association, American Society of Newspaper Editors, newsroom seminars for the Casey Journalism Center, County Counsels Association of California, American College of Surgeons, National Association of Homebuilders, Missouri Legislative Forum, World Future Society, and Volunteers of America.

D-33

5

He has served as advisor to the Committee for Economic Development, the Congressional Research Service, and committees of the National Academy of Sciences, U.S. Census Bureau, Department of Agriculture, National Institutes of Health, California Energy Commission, California Governor's Council on Growth Management, Center for California Studies, and United Way.

## PROFESSIONAL ORGANIZATIONS/HONORS

Invited participant, U.S. Census Bureau Working Group on 2010 Race and Ethnicity

Member, L.A. Unified School District Enrollment Analysis Technical Advisory Committee

Visiting Lecturer, Helsinki School of Economics and Business Administration, summer 2001

U.S. Census Bureau Advisory Committee on Population Statistics, 1989-1995 (Chair, 1990),

Population Association of America: Board of Directors, 1978-1980; Public Affairs Committee, 1979-1986; Chair, Nominations Committee, 1981-1982; annual Program Organizing Committee, 1995, 1998; Local Arrangements Committee, 2000; Committee on Applied Demography, 1995-1999, Chair, 1998; Development Committee, 2006-.

Southern Demographic Association: Board of Directors, 1999-present; Vice President, 2001; President, 2003.

Center for Spatially Integrated Social Science, UC Santa Barbara: Advisory Board, 2000-

Research Advisory Board, Committee for Economic Development, 1988-1991.

Regents' Lecturer, UCLA, Spring 1987.

Social Science Research Council's Committee on the Survey of Income and Program Participation, 1985-1988.

National Advisory Child Health and Human Development Council, National Institute of Health, 1984-1987.

Population Research Committee, National Institute of Child Health and Human Development, 1977-1979.

Committee on Behavioral and Social Aspects of Energy Consumption and Production, National Academy of Sciences, 1980-1982.

Committee on Urbanization and Population Redistribution, International Union for Scientific Study of Population, Chairman, 1976-1979.

Advisory Subcommittee for Applied Social and Behavioral Sciences, National Science Foundation, 1978-1981.

Future of Rural America Advisory Committee, FHA, 1978-1981.

D-33

Editorial Advisory Committee, *Urban Studies,* 1985-1995.

Editorial Advisory Board, *J. Australian Population Assoc., 1995-1998.*

## RECENT MEDIA APPEARANCES:

*Interviews:* CNBC; New York Times; Los Angeles Times; USA Today; Time Magazine; Seattle Times; AMA/Marketing News

*Commentary:* International Herald Tribune; Pittsburgh Post-Gazette; Los Angeles Times; Atlanta Constitution; Houston Chronicle

## SELECTED RECENT PUBLICATIONS/PAPERS

"Chinese Workers Could Replace Mexican Immigrants," op-ed in *Houston Chronicle,* Aug. 12, 2011 (coauthored with Dudley Poston, Jr.).

"Integrating Census Data to Support a Motion for Change of Venue," *Population Research & Policy Review* (coauthored with Dean Judson), 2011.

"An Evaluation of Additive and Hierarchical Classifications of Race/Ethnicity as Measured on Census 2000," coauthor (under review).

"Using the Census Bureau's Surname List to Improve Estimates of Race/Ethnicity and Associated Disparities," *Health Services and Outcomes Research Methodology* 9(2), pp.69-83 (coauthor).

"Teaching Business Demography Using Case Studies," presented at the International Union for the Scientific Study of Population Seminar on Applications of Demography in Business, Sydney Australia, October 2007 (coauthor). Appears in *Population Research & Policy Review.*

"Targeting Spatial Clusters of Elderly Consumers in the USA," presented at the International Union for the Scientific Study of Population Seminar on Applications of Demography in Business, Sydney Australia, October 2007 (coauthored with Thomas Bryan). Appears in *Population Research & Policy Review.*

"Assessing the Need for a New Medical School: A Case Study in Applied Demography," *Population Research & Policy Review* (coauthor).

"A New Method for Estimating Race/Ethnicity and Associated Disparities Where Administrative Records Lack Self-Reported Race/Ethnicity," coauthor, *Health Services Research Journal* 43(5), Oct. 2008.

"Forecasting the Supply of and Demand for Physicians in the Inland Southern California Area" (coauthor), RAND Technical Report TR524, 2007.

"Evaluating a Claim of Discriminatory Annexation Using Demographic Analysis: An Instructional Case," at 2005 annual Southern Demographic Association meetings.

"Evaluating Evidence of Discrimination in Multi-Ethnic Housing Markets," *Population Research & Policy Review,* 2008 (coauthored with William A. V. Clark).

"Methods for Gauging the Target Populations that Community Colleges Serve," *Population Research & Policy Review* 26(1), 2007 (coauthored with L. Santibañez, G. Gonzalez, S. J. Carroll).

"Lingering Effects of Discrimination: Tracing Persistence Over Time in Local Populations," *Population Research & Policy Review,* 2006.

"China: Bachelor Bomb," op-ed in *International Herald Tribune,* Sept. 14, 2005 (coauthored with Dudley Poston).

"Small-Area and Business Demography," chapter in D. Poston and M. Micklin, *Handbook of Population,* 2005 (coauthored with Stan Smith).

"Future Demographic Challenges to California School Districts," presented at 2005 annual Population Association of America meetings, session on School Demography.

"Demographic Overview of California's K-12 Public School Student Population," chap. 2 in S. J. Carroll et al., *California's K-12 Public Schools: How Are They Doing?* RAND MG-186, 2005.

"Counting on Demography: Fostering Applications of the Social Sciences," invited plenary address at the 2005 Southwestern Social Science Association meetings, New Orleans

"How Migration Flows Shape the Elderly Population of Metropolitan Pittsburgh," at 2004 annual Southern Demographic Association meetings, Hilton Head, SC (coauthored with Chris Briem)

"The Bright Lights in Pittsburgh's Future," op ed appearing in Pittsburgh Post-Gazette, Sept. 19, 2004 (coauthored with Barry Balmat)

"New Approaches to Spotting Enclaves of the Elderly Who Have Aged in Place," presented at 2004 Population Association of America meetings (coauthored with Tom Bryan).

"Developing an Arab-American Surname List: Potential Demographic and Health Research Applications," at 2003 Southern Demographic Association meetings (coau. with B. Kestenbaum, D. Lauderdale, A. Abrahamse, S. El-Badry).

"A Demographic Overview of Metropolitan Pittsburgh," RAND Issue Paper IP-256 (2003).

"Confronting a Race-Based School Admissions Policy," *Chance* 16(1), 2003.

"An Overview of Business Demography in the U.S.A.," invited paper for the Australian Population Association's 11th Biennial Conference, Sydney, October 2002.

8

"Internal Migration and Short-Distance Mobility," Chapter 19 in D. Swanson, et al., *The Methods and Materials of Demography*, rev. ed., 2003 (coau. with T.M. Bryan and D.A. Swanson).

"Business Demography," in P. Demeny and J. McNicholl, eds., *Encyclopedia of Population*, 2003 (coauthored with Stan Smith).

"A National Legacy of Migration," in Carla Blank, *Rediscovering America* (2003).

Review of J. S. Siegel, *Applied Demography: Applications to Business, Government, Law, and Public Policy* in *Population and Development Review* 28(1), 2002.

"A Demographic Perspective on Our Nation's Future," RAND Documented Briefing, 2001.

"Using First Names to Estimate Racial Proportions in Populations," presented at the 2001 Population Association of America meetings.

"At-Large Elections Under Legal Challenge: Where Demographic Analysis Fits In," presented at the 2000 Population Association of America meetings.

"Meeting Local Information Needs: A Case Study in Team Applied Demography," *Applied Demography Newsletter*, Population Association of America, Spring 2002 (coauthored).

"Gauging Future Prospects for a Neighborhood Vehicle: Where Demographic Analysis Fits In," at 1999 Southern Demographic Association meetings, San Antonio.

"Forecasting Enrollments for Immigrant Entry-Port School Districts," *Demography*, Nov. 2000.

"Charting Alternatives to a Segregated School Admissions Policy: Where Demographic Analysis Fits In," at 1998 Population Association of America meetings, Chicago (abridged version appears in *Chance*).

"Unveiling the Demographic 'Action' in Class Actions," *Population Research and Policy Review*, 1999.

"Family Policies and Demographic Realities," chapter in J.W. Hughes and J.J. Seneca, eds., *America's Demographic Tapestry: Baseline for the New Millennium*, Rutgers Univ. Press, 1999.

"Applying Demographic Analysis in Affirmative Action Disputes: An Instructional Case," *Population Research and Policy Review*, 1998.

"Demographic Influences on Latinos' Political Empowerment: Comparative Local Illustrations," *Population Research and Policy Review*, 1998.

"Demographic Change and School District Response: Assessing Alleged Discriminatory Effects of Boundary Changes," under review (with W.A.V. Clark).

"Forecasting Enrollments During Court-Ordered Desegregation," *Population Research and Policy Review*, 1996.

D-33

"Applying Demographic Analysis to Store Site Selection," *Population Research and Policy Review,* 1996 (with A. F. Abrahamse).

"Tracking Growth of Emerging Consumer Markets Worldwide: Where Demographic Analysis Fits In," presented at Sixth International Conference on Applied and Business Demography, Bowling Green, OH (coauthored).

"Tying Knots in the American Tapestry," Op-ed article, *Los Angeles Times,* Sept. 18, 1995.

"Broadening Client Perspectives on Business Concerns," *Applied Demography,* Summer 1995.

"Demographic Foundations of Political Empowerment in Multi-Minority Cities," *Demography,* May, 1995 (with W.A.V. Clark).

"Demographic Perspectives on the Voting Rights Act," RAND P-7905, 1995 (briefing cohosted by U. S. House Subcommittee on Census and The Population Resource Center, Oct.19,1994).

*Demographics: A Casebook for Business and Government,* Westview Press, 1994 (coeditor).

"Empowered or Disadvantaged? Applications of Demographic Analysis to Political Redistricting," chapter in *Demographics* (cited above).

"A Riot of Color: The Demographic Setting of Civil Disturbance in Los Angeles," RAND P-7819 (with Ira S. Lowry). Condensed version appears in Mark Baldassare (ed.), *The Los Angeles Riots: Lessons for the Urban Future,* Westview, 1994.

"Surname Analysis for Estimating Local Concentration of Hispanics and Asians," *Population Research and Policy Review,* 1994 (with A. F. Abrahamse).

"The Demographic Context of Army Family Support Policy," chapter in M.J. Eitelberg and S.L. Mehay (eds.), *Marching Toward the 21st Century* (Greenwood Press, 1994).

"Strategic Sleuths," *Forecast Magazine,* Nov/Dec 1993.

"Congress and the Year 2000: Peering into the Demographic Future," *Business Horizons,* Nov/Dec 1993 (condensation of RAND N-3279 cited below).

"A California That Can Work: People, Productivity, and Energy," RAND P-7828 (invited testimony before the California Energy Commission, June 1993).

"Goodbye Past, Hello Future: California's Demographic Shift," Op-ed article, *Los Angeles Times,* September 13, 1993.

"More than Meets the Eye," *Chance,* May 1993.

"Employment Discrimination: How Demographic Analysis Fits In," presented at Fourth International Conf. on Applied Demography, Bowling Green, Ohio, September 1992.

D-33

10

"Is 'Aging in Place' a Blueprint for the Future?" Association of American Geographers Meeting, San Diego, RAND, P-7794, 1992.

"Gauging Hispanic Voting Strength: Pitfalls and Paradoxes," *Population Research and Policy Review*, 1992 (with W.A.V. Clark).

"Local Redistricting: The Demographic Context of Local Boundary Drawing," *National Civic Review*, Winter/Spring 1992 (with W.A.V. Clark).

"Mirroring the Mosaic: Redistricting in a Context of Cultural Pluralism," RAND, P-7789, 1992.

"Testimony before House Subcommittee on Census and Population," RAND, P-7784, 1992.

"Healthier Childhoods and Family Responsibility: Two Issue Papers," RAND, P-7788, 1992.

"How Demographic Analysis Supports Redistricting," for Mandatory Continuing Legal Education course sponsored by County Counsels Association of California, January 1992.

"California's Future: More to Come," Op-ed article, *The Los Angeles Times*, Dec. 3, 1991.

*Soldiers' Families: Tracking Their Well-Being During Peacetime and War*, RAND, N-3405-A, 1992 (coauthor).

"California's Demographic Outlook: Implications for Growth Management," RAND, P-7738, 1991.

"The Changing Demographic Context of Postsecondary Education," RAND, P-7737, 1991.

"The Demographer's Role in the Local Boundary-Drawing Process," RAND, P-7711, 1991 (coauthor).

"Looking In From Outside: Enhancing Demographic Perspectives on Business Concerns," given at 1991 Population Association of America meetings.

"Demographic Paradoxes in the Los Angeles Voting Rights Case," *Evaluation Review*, 1991 (with W.A.V. Clark).

"Future Images—Childhood, The Workplace, Our Communities," RAND P-7656, 1990.

"The Changing Demographic Context of Municipal Governance," RAND P-7654, 1990.

"Pitfalls in Estimating Eligible Voters Among Hispanics," coauthored, given at 1990 Population Association of America meetings.

"Demographic Factors Reshaping Ties to Family and Place," *Research on Aging*, Dec. 1990.

"Applied Demography: Its Growing Scope and Future Direction," *The Futurist,* March/April 1990.

11

"A Demographic Perspective on Future Issues," *Congressional Research Service CRS Review*, Jan/Feb 1990.

"Leaving School Early: 'Stopping Out' and Dropping Out Among American Youth," given at the 1989 American Sociological Association meetings (with Jane Mauldon).

*A Taste of the Country: A Collection of Calvin Beale's Writings*, editor and author of introduction (Penn State Univ. Press), 1990.

*Families in the Army: Looking Ahead*, RAND, R-3691-A, 1989 (coauthor).

"Quantifying Legal Standards in Section 2 Voting Rights Cases," paper given at Population Association of America.

*Congress and the Year 2000: A Demographic Perspective on Future Issues*, RAND, N-3279, March 1991.

"What Tomorrow's Demographers Will Be Called Upon to Do," RAND P-7469, 1988.

*Beyond Stereotypes: Who Becomes a Single Teenage Mother?*, RAND R-3489, 1988 (coau.).

"Government Must Help Families With Long-term Care for Elderly," op-ed article, *The Atlanta Constitution*, April 19, 1988.

"Teens Willing to Consider Single Parenthood: Who is at Greatest Risk?" *Family Planning Perspectives*, Jan/Feb, 1988 (coauthor).

*The Current Demographic Context of Federal Social Programs*, RAND, N-2785, 1988.

"Demographic Factors Reshaping the U.S. Market for New Housing," RAND, P-7467, 1988.

"Applied Demography: Its Current Scope and Future Direction in the United States," RAND Paper, 1988.

*Public Libraries Face California's Ethnic and Racial Diversity*, RAND, R-3656, 1988 (coauthor, Chapter 4).

"Changing Demographics: What to Watch For," *Business Economics*, 1987.

"Continuity and Change Across the Population Sciences," RAND, P-7281, 1986.

"Pro-Family Laws May Miss the Mark," op-ed article in *The Wall Street Journal*, Dec. 5, 1986.

*Changing Family Structure: Who Cares for America's Dependents?* RAND, N-2518, 1986.

"Accounting for the Educational Shortfalls of Mothers," *Journal of Marriage and the Family*, 1986 (coauthored).

"The Prism of Migration," *Social Science Quarterly*, 1986 (with Julie DaVanzo).

*How Demographic Shifts Will Affect the IRS and Its Mission*, RAND, P-7170, 1985.

"Characteristics of Migrants from Metropolitan to Nonmetropolitan Areas in the U.S.A.," *Espace Populations Societes*, 1985 (with Kevin McCarthy).

*Demographics and Business Decisionmaking: Prospects and Possibilities for the 1980s*, RAND, P-7017, 1984. Appears in *Marketing Review*, Fall 1985.

"Tracking People," *Group Practice Journal*, July/August 1984.

*Demographic Forces Reshaping Small Communities in the 1980s*, RAND, N-1887, 1982 (coauthor). Appears in *Southwestern Review of Management and Economics*, 1984.

*Population Movements: Their Forms and Functions in Urbanization and Development*, published by Ordina for International Union for the Scientific Study of Population, 1983 (editor and author of Chap. 1).

*Current Demographic Trends and Federal Policy: An Overview*, RAND, N-2030, 1983.

"Is Population Deconcentration Lengthening Commuting Distances?" *Population Research and Policy Review*, 1983 (with Kevin McCarthy).

*Migration Sequences: Who Moves Back and Who Moves On?*, RAND, R-2548-NICHD, 1982 (with Julie DaVanzo).

*Demographic Challenges in America's Future*, RAND, R-2911, 1982 (with William P. Butz).

"Different Approaches to Monitoring Local Demographic Change," chapter in E. S. Lee and H. F. Goldsmith, eds., *Population Estimates: Methods for Small Area Analysis*, Sage, 1982.

"The Energy Situation and the World of Californians," in *Regional Perspectives on Energy Issues*, (The Conference Board, July 1982).

*Demographic Certainties and Uncertainties in the Future of Social Security*, RAND, N-1742-NICHD, 1981 (invited Senate testimony). Appears in *Challenge: The Magazine of Economic Affairs*, Jan.-Feb., 1982.

"There Are Just Too Many Uncertainties," op-ed article, *The Sacramento Bee*, 9/20/81.

*Teenage Parenthood: A Review of Risks and Consequences*, RAND N-1714, 1981 (coau.).

*Teenage Parents: Their Ambitions and Attainments*, RAND, R-2771, 1981 (coau.).

"Return and Other Sequences of Migration in the U.S.," *Demography*, 1981 (coau.).

13

"How Demographers Can Help Legislators," *Policy Analysis*, 1980.

*Accommodating the Demography of the 1980s*, Midcontinent Perspective Series, Midwest Research Institute, December 1980.

*City Data: A Catalog of Data Sources for Small Cities*, RAND, R-2612, 1980 (coauthored).

"Demographic Trends Impinging on Energy Use," chapter in Charles T. Unseld et al., *Sociopolitical Effects of Energy Use and Policy*, National Academy of Sciences, Washington, D.C., 1979.

*The Future Demographic Context of the Health Care Delivery System*, RAND, N-1347, 1979.

"The Transition to Zero Population Growth in the Midwest," chapter in C. C. Roseman (ed.), *Population Redistribution in the Midwest*.

"Current Demographic Change in Regions of the United States," chapter in V. L. Arnold (ed.), *Alternatives to Confrontation: A National Policy Toward Regional Change*; condensed version appears in *American Demographics*, May 1979.

*Overview of Demographic Trends Shaping the Nation's Future*, RAND, P-6128, 1978 (testimony before Joint Economic Committee of Congress).

*The Current Demographic Context of National Growth and Development*, RAND, P-5514, 1975 (Congressional testimony); published in condensed form in L. S. Bourne and J. W. Simmons (eds.), *Systems of Cities*, Oxford Univ. Press, 1978, Chap. 6.6.

"Emerging Public Concerns Over U.S. Population Movements in an Era of Slowing Growth," in T. Espenshade and W. Serow (eds.), *The Economic Consequences of Slowing Population Growth*, 1978.

"The Image of 'Elsewhere' in the American Tradition of Migration" (coauthored), in W. H. McNeill and R. S. Adams (eds.), *Human Migration: Patterns, Policies, Implications*, Indiana University Press, Bloomington, Indiana, 1978.

"New York State's Transition to Stability: The Demographic Outlook," in Ben Chinitz (ed.), *The Declining of New York in the 1970s: A Demographic and Economic Analysis*, Praeger, 1978.

*Toward A Policy Planner's View of the Urban Settlement System*, RAND, P-5357, 1975; condensed version appears in L. S. Bourne and J. W. Simmons (eds.), *Systems of Cities*, Oxford University Press, 1978, Chap. 7.3.

"The Changing Demographic and Economic Structure of Nonmetropolitan Areas in the U.S.," *International Regional Science Review*, 2(2), 1977 (with Kevin McCarthy).

"Forecasting Population of Small Areas: An Overview," in *Population Forecasting for Small Areas*, Oak Ridge Associated Universities, Oak Ridge, Tennessee, 1977.

D-33

14

"Demographic Trends That Will Shape Future Housing Demand," *Policy Sciences*, 1977.

"The Functions and Dynamics of the Migration Process" (Chap. 4); and "Urban Growth and Decline in the U.S.: A Study of Migration's Effects in Two Cities" (Chap. 14), in A. Brown and E. Neuberger (eds.), *Internal Migration: A Comparative Perspective*, Academic Press, 1977.

*San Jose and St. Louis in the 1960s: A Case Study of Changing Urban Populations*, RAND, R-1313-NSF, 1973; adaptation appears in S. Goldstein and D. Sly (eds.), *Patterns of Urbanization: Comparative Country Studies*, International Union for Scientific Study of Population, Liege, Belgium, 1977.

*Rural Renaissance in America? The Revival of Population Growth in Remote Areas*, Population Reference Bureau, Inc., 1976.

*National Longitudinal Study of High School Seniors: An Agenda for Policy Research*, RAND, R-1964-HEW, 1976 (coauthored).

*The Demographic Context of Educational Policy Planning*, Occasional Paper of the Aspen Institute for Humanistic Studies, 1976.

"A Method for Monitoring Small-Area Population Changes in Cities," *Review of Public Data Use*, April 1975 (coauthored).

*Recent Research Insights into Local Migration Flows*, RAND, P-5379, 1975 (coauthored).

*Population Movements and the Shape of Urban Growth: Implications for Public Policy*, RAND, R-1072-CPG, 1972 (Commission on Population Growth and the American Future, *Research Reports*, Vol. V, 1973); adaptation appears in J. Friedmann and W. Alonso, *Regional Policy: Readings in Theory and Applications*, MIT Press, 1975.

"Urban Growth and Decline: San Jose and St. Louis in the 1960s," *Science*, 1974.

*Review of Federal Programs to Alleviate Rural Deprivation*, RAND, R-1651, 1974 (coauth.).

"A Demographic Assessment of New Cities and Growth Centers as Population Redistribution Strategies," *Public Policy*, 1973.

*Dimensions of the Population Problem in the United States* RAND, R-864-CPG, 1972 (Comm. on Population Growth and the Amer. Future, *Research Reports*, Vol. V, 1973).

*How Population Movements Shape National Growth*, RAND, P-5007, 1973 (Congressional Seminar on National Growth Policy).

*Migration from Distressed Areas: Its Meaning for Regional Policy*, RAND, R-1103, 1973.

"Theoretical Issues in the Design of Population Mobility Models," *Environment and Planning*, 1973.

D-33

*The Impact and Significance of the Rural-Urban Migration in the United States,* RAND, P-4752, 1972 (testimony before U.S. Senate Subcommittee on Migratory Labor and Public Welfare).

"Chronic Movers and the Future Redistribution of Population," *Demography,* 1971.

*Demographic Information for Cities: A Manual for Estimating and Projecting Local Population Characteristics,* RAND R-618, 1971.

"The Role of Migration in California's Growth," in K. Davis and F. Styles (eds.), *California's Twenty Million: Research Contributions to Public Policy,* Institute of International Studies, University of California, Berkeley, 1971.

"Duration of Residence and Prospective Migration," *Demography,* 1967.

(Updated: August 2011)

D-33

About | FAQ | Contact | Get RSS Feeds
Home ›

# Illinois' HAVA Implementation:

## *A Survey of Local Election Authorities*



# Executive Summary

Illinois has made substantial changes to its election laws in these three areas:

* *New Balloting Equipment*, including machinery that is readily accessible to voters with disabilities

* *Statewide Voter Registration Database* to help voters transfer registrations across local boundaries and to help local authorities identify fraudulent registrations.

* *Early and Absentee Voting Laws* to facilitate voting before Election Day by voters who may not be able to get to the polls during voting hours.

These changes came to different local jurisdictions at different times and have been implemented faster in some areas than in others. But by the 2006 elections all are to be fully implemented.

ICPR reviewed self assessments of the larger local authorities and conducted a survey to measure implementation at smaller authorities. Based on these reviews, it appears that the changes broadened the ability of registered voters to exercise their rights to vote and to be assured that their votes would count. Nonetheless, implementation is not yet complete and the Legislature, the State Board of Elections, and local election authorities will have to take additional actions to ensure that the promise of these reforms is fulfilled.

D-36

Some further changes are required to ensure that these changes are fully implemented to benefit Illinois voters:

* *Finish the statewide database.* Illinois' statewide database is not fully compliant with HAVA. The state will need to devote additional resources in time and money to make the database serve all of the functions it is intended to serve.

* *Increase the number of early voting locations, particularly in areas of high population density.* Early voting proved a popular alternative, especially among grace period registrants. Local authorities, possibly with additional financing from the state, should increase the accessibility of this option by deploying more satellite registration sites, and by holding their regular offices open into the evening and on weekends.

* *Enhance judicial recruitment and training.* Judges remain the front line guardians of the integrity of elections. Election authorities will have to provide judges with more training on the new equipment and procedures

D-36

# Illinois' HAVA Implementation:

## *A Survey of Local Election Authorities*

Introduction ...............................................3

Changes in Statute......................................4

    *New Balloting Equipment*

    *Statewide Voter Registration Database*

    *Early and Absentee Voting*

Changes in Practice....................................6

    *Before Election Day*

    *On Election Day*

    *After Election Day*

Changes in the Future.................................10

    *Statewide Database*

    *Early Voting*

    *Judicial Recruitment and Training*

    *Balloting Equipment*

Methodology.............................................13

D-36

# Introduction

In the six years since the long count in Florida delayed the end of the 2000 U.S. Presidential election, states around the nation have changed their election laws in some of the most sweeping modernization efforts in the nation's history. This is especially true in Illinois. Some of these changes were homegrown reforms initiated at different times by some of the 110 local election authorities, some required of all parts of the state by the Illinois General Assembly.

In 2002, the federal government, with the passage of the Help America Vote Act, or HAVA, offered hundreds of millions The HAVA formulas, and Illinois statutory changes, allowed Illinois to obtain $144 million from the federal government to pay for some of these election changes. HAVA resulted in some of the most sweeping changes, in impact and scope, but many of the changed mandated by HAVA had previously been adopted at the local level in some parts of Illinois and some even were begun by the state prior to HAVA.

Election reform, in short, has come to Illinois in fits and starts. HAVA imposed deadlines and provided funds for some changes, but different parts of Illinois experienced these reforms at different times. Some changes, as with balloting equipment, were relatively easy to implement in time for the 2006 Primary Elections in some jurisdictions because they had been adopted years before HAVA required them. In other parts of Illinois, the HAVA requirement of new balloting equipment resulted in a dramatic and sudden shift in procedures, which caused some upheaval as local election authorities raced to adopt the change.

This report will look at Illinois' compliance with HAVA and how Illinois' local election authorities fared under the first post-HAVA election, the 2006 Primary Election. It is based on an examination of Illinois' statues, self-critiques by the larger local election authorities and a survey of smaller local election authorities.

# I. Changes in Statute

Recent changes to Illinois' election laws enacted three changes so central to the conduct of elections that they affect practices before Election Day, during actual balloting, and afterwards, while counting and verifying the results. This section will examine these changes in statute. Later, we will look at changes in procedures, and then we will consider additional needs to fully integrate these changes into Illinois' election practices.

While new laws created statewide standards that took effect with the 2006 March Primary, many local authorities had previously adopted some of the new procedures, while others had to make additional changes to satisfy the new demands.

* *New Balloting Equipment*, including enhanced access for differently-abled voters, a Voter Verified Paper Audit Trail (VPAT) and improved voting system standards

Under HAVA, the federal government offered funds to states willing to buy new balloting equipment. Accepting federal money bound the state to select machinery that was accessible to people with hearing or vision impairments. Punch cards, with their infamous hanging chads, were to be replaced. New equipment also had to allow the voter to verify that their votes were accurately represented before submitting the ballot, and notify voters if they voted for too many or too few candidates in some races, also called over-voting and under-voting, respectively.

Illinois agreed to update all of its voting equipment to ensure that a person's vote is correctly cast and counted. This change was made to avoid problems like hanging chads and ballot inconsistencies that caused people to accidentally cast a vote for the wrong candidate. When replacing equipment, federal funds could be used only to purchase equipment that the State Board of Elections had certified as HAVA compliant; that is, that new equipment, whether optical scan machines or Direct Recording Electronic Voting systems (DREs), comply with HAVA's requirements. The State Board also required that new equipment produce a paper audit trail; a step not required by HAVA but strongly recommended by outside observers and now required in half of the states.

Illinois received $144 million in federal funds, including $123 million for punch card buyouts, buying new equipment and making polling places accessible. As of September, 2006, Illinois had spent about $86 million of those funds.

* *Statewide Voter Registration Database*

HAVA requires that the state maintain a single, uniform, and official centralized database of all voters registered in the state. Every registered voter must be assigned a unique identifier within the system, both to aid in registering new voters and to help voters who either move their registrations or who attempt to vote in the wrong polling place.

Illinois had begun creation of a statewide voter roll before the passage of HAVA, but the project has been fraught with delays. The database requires cooperation between the State Board of

D-36

Elections and the 110 local election authorities, along with the Secretary of State's office to ensure that the information in the database is current and verified. HAVA, passed by the federal government after Illinois had begun its statewide database project, added new requirements and resulted in some midstream course corrections. Technical issues, such as coordinating communication among some two dozen computer platforms, have largely been addressed; as have policy goals, such as ultimate control over the registration itself.

\* *Early and Absentee Voting Laws/ Voter Education*

The purpose of the HAVA's voter education provisions, as well as Illinois' early and absentee voting change, are to encourage and allow more people to participate in elections. The voter education provision involved teaching voters about the requirements for voting, new voting equipment, and their rights as voters. Illinois law now includes an early voting option, alongside the absentee ballot during the early voting period, to encourage more people to vote and remove time-related barriers that have impeded many voters in the past.

Early voting for the March 2006 primary election began on Monday, February 27 and extended Thursday, March 16. Early voting typically takes place at the central office of the local election authority, though some authorities created satellite locations outside of their central offices. Local authorities received no additional funding to support satellite locations, and satellite locations were not located systematically or consistently throughout the state. Some voters undoubtedly had better access to early voting than others.

# II. Changes in Practice

The last section looked at statutory changes in Illinois law. This section will focus on how those changes were implemented in practice. Each of the new requirements, including new balloting machinery, the statewide voter database, and new procedures for early voting, required changes in procedures by local election authorities and judges of elections.

## A.   Before Election Day

One of the key changes allows voters to cast ballots before Election Day, outside of the traditional absentee balloting procedures. Where absentee rules required the voter to affirm that they would be out of the jurisdiction on Election Day, early voting let voters who could not swear to their travel plans vote at their convenience.

Early voting was a relatively popular option among registered voters. In Chicago and smaller surveyed jurisdictions alike, early ballots accounted for about 3.5% of all ballots cast in the March Primary. Chicago, which held early voting at 21 sites scattered around the City, reported steady week-over-week growth for most days of the week; half of all early voters cast ballots in the final four days of the 18-day period.

Less widely utilized was the change to allow voters to register during the first half of the traditional blackout period before an election. Such registrations must take place in person, generally at the central office of the local election authority although some of the larger authorities created satellite office for these "grace period" registrations.

Across Illinois, very few voters took advantage of grace period registration. Smaller jurisdictions in our survey reported just over 900 new voters in this two-week period, or less than one-tenth of one percent all registrants in those jurisdictions. The larger jurisdictions had a comparable percentage: suburban Cook County reported 151 grace period registrants; also less than one-tenth of one percent of all registered voters.

Grace period registrants, however, were particularly likely to take advantage of the early voting option. Over all, more than nine in 10 grace period registrants voted at the time of their registration, effectively creating an election-day registration option. Indeed, in most jurisdictions, 100% of grace period registrants voted at the time of their registration, and one jurisdiction told us they required grace period registrants to vote early. These accounted for a tiny percentage of the overall vote, but indicate keen interest among some voters in having the option of voting at the time they register.

Some predicted that early voting would obviate the need for absentee ballots, as it gave voters another means by which they could cast ballots before Election Day. Surveyed jurisdictions, though, saw little change in the number of absentee ballots returned. Nearly three-fourths of surveyed jurisdictions reported that the number of absentee ballot applications ran about normal for a gubernatorial primary, though, among the rest, jurisdictions were two-and-a-half times as likely to report a drop in applications as an increase.

When it came time to return absentee ballots, nearly 9 in 10 surveyed jurisdictions reported the numbers were about normal, including some jurisdictions that had reported a decline in applications. Only one jurisdiction reported an increase in returned absentees, while five reported a drop. While more saw a drop in returns than an increase, the bigger finding is that the vast majority saw no change.

Recruiting and training election judges has been a perennial issue for local election authorities. Roughly four out of five judges in surveyed jurisdictions had served in previous elections. Suburban Cook County announced a need for 2,000 new election judges, out of 12,000 openings; a percentage slightly below that of the smaller jurisdictions. About three in four jurisdictions said they had to recruit about the normal number of new judges, though tellingly, no jurisdictions said they had to recruit fewer judges, while about a quarter said they had to recruit more than usual.

Illinois law allows certain high school students to serve as election judges even if they are too young to vote. Students serving as judges must be 17-years-old, have permission from their high school principle, and meet a minimum grade point average. Local election authorities retain the final decision to recruit from high schools or not. Most in our survey did not utilize student judges. But among those who did, and who provided numbers, high school students made up just under 10% of election judges.

Surveyed jurisdictions were asked if they did anything different with judge training this year. About half reported that they held additional trainings. About a third said they held longer trainings this year. Just over a quarter reported that they brought in new trainers; some of these volunteered that they had purchased new equipment, and the vendor sent someone to direct the training of judges to set up and manage that new equipment. About a fifth of surveyed jurisdictions said they held trainings at new locations.

## B.  On Election Day

Election Day remains the time when most citizens vote; that's the time when media attention on the workings of elections is the most focused, and that's the time when, despite absentees and early voting, most elections are decided.

New standards in Illinois make several changes to the conduct of Election Day. The biggest is the requirement that local election authorities stop tabulating voters' choices on punch card balloting machines. Punch card machines had been in use for many decades across Illinois, and the transition to other equipment was a centerpiece of HAVA.

New equipment had to meet several requirements. It had to accurately record voter choices, produce a "paper trail", and be easy for voters with disabilities. By the time of the March Primary, jurisdictions across Illinois had adopted one of two kinds of equipment, and sometimes both. Optical scan equipment proved popular, as did touch-screen computer-assisted machines. Several vendors, including Fidlar, Election Systems and Software, Hart, Sequoia, and Populex, all sold Board-certified equipment (often manufactured by others, including Diebold), and federal funds were available through HAVA to assist with the transition.

New equipment affected not only the voters who had to adjust how they used the equipment but also the election judges who had to oversee the balloting and the back office procedures of the local authorities. Different jurisdictions adopted new equipment at different times, and some were more familiar with the punch card replacements than others, but all jurisdictions had to be rid of punch cards by 2006. The transition was particular taxing in some areas. One survey respondent voiced fears that the 75-pound unit was too much for judges to handle without risking injury; another noted that some election judges "don't really know how to work with the new high technology."

Another change to Election Day procedures related to provisional ballots. Voters who believed they were entitled to vote but who were denied a ballot by the judges at a polling place had the right in 2006 to cast a provisional ballot. These procedures had changed from previous years to clarify who could cast a provisional ballot, how local jurisdictions were to handle the ballot, and how the provisional ballot was to be verified and counted, or rejected.

By and large, the day of the March Primary ran smoothly. While several surveyed jurisdictions noted that bad weather complicated Election Day, none reported significant equipment problems that delayed balloting. Not one reported polling places that were late to open, nor any forced to stay open after the statutory closing time.

About a quarter of surveyed jurisdictions reported that at least one polling place had problems with the DRE equipment. One jurisdiction reported that the printer on one of their DRE machines caught fire; other jurisdictions reported less serious problems. Another reported that, in one polling place, judges were unable to coax a touch screen device to work, forcing all voters to use the optical scan equipment. Chicago and suburban Cook reported a host of problems though in general most of the machines seem to have functioned properly, and where there were problems, voters were most often able to use other equipment. About one in seven of the surveyed jurisdictions said they had at least one polling place that reported a problem with non-DRE equipment; though these do not appear to have disrupted balloting.

Some jurisdictions said they used DRE machines exclusively, but among those with both DRE and non-DRE machines, about one-fifth of ballots cast were voted on DRE machines.

It is worth noting, too, that HAVA requires that each polling place have at least one DRE machine available. Nearly three-fourth of the surveyed jurisdictions reported at least two precincts that share a polling place, and those polling places could also share one DRE machine across two or more precincts. Only one jurisdiction, though, reported any difficulty deriving precinct-specific results from a shared DRE machine. The difficulty was ascribed to human error.

## C.    After Election Day

After the election, local authorities faced the task of counting the ballots. Local authorities reported some difficulties with the counting, but nothing insurmountable. Most jurisdictions began releasing results to the media at about the usual time; a tenth had counts earlier than usual, while about a sixth began releasing numbers later than normal. Just over half of all surveyed

jurisdictions reported having final results at the normal time, though three in 10 took longer than normal, and one in seven finished counting sooner than normal. Indeed, a week before the March Primary, Chicago Board of Elections Chairman Langdon Neal predicted it would take "considerably longer" to finish their counting.

Provisional ballots accounted for a very small number of all ballots cast. These ballots had to be reviewed after Election Day before they could be counted; if approved, they were added to the official counts for the proper precinct. Most surveyed jurisdictions were unable to provide exact numbers of provisional ballots issued, but among those that did provide an exact number, provisional ballots accounted for six one-hundredths of one percent of all ballots cast. Most provisional ballots were eventually accepted, though the acceptance rate varied significantly from one jurisdiction to another and the numbers themselves are too small to support generalizations. Our survey is unable to identify why some jurisdictions had more than others, or why some accepted more than others; it appears, though, that local authorities may employ different standards when deciding when to issue a provisional ballot, and when to accept one.

D-36

# III. Changes in the Future

In recent years, Illinois has instituted several profound changes to its election conduct. New statutes, rules and practices will take time to integrate into the seamless system it is intended to be. To fully realize the potential of these changes, the Legislature, the State Board of Elections, and local authorities will have to work together, each adapting to facilitate more voter participation and confidence. For instance, grace period registration did not draw many new voters in the March primary; but that may change in the future; as one local authority told us, "If grace period [registration] becomes more popular, adjustments ... will be needed."

At the same time, reform must be measured and cautious. Like the proverbial snake that ate an elephant, Illinois election authorities will need time to adjust to these changes. As one local authority told ICPR, "Everyone should look at all the extra work they are putting on the Election Officials in your attempt to improve elections. It is easy to dream up ideas but there is always someone down the line that has to do all the work to administer these ideas". Indeed, over one-third of the surveyed local authorities, in response to an open-ended question, urged restraint when considering additional changes.

Nonetheless, some changes, in statute, rule, or practice, are needed to bring these reforms to fruition. We identify these areas as in need of particular attention:

*Finish the statewide database.*

Although Illinois received for a federal waiver to extend the deadline to finish the database by January 2006, the state has failed to complete this task. The State Board of Elections originally let the contract for the database long before HAVA was enacted in an emergency, no-bid contract. The contract was awarded to Catalyst Consulting and is intended to be completed at the latest by the 2006 general election in November. It is unclear if and what penalties the federal government might assess to the state for this failure to meet the January, 2006, deadline.

The unfinished state database means that local authorities may have a harder time verifying voter registrations. Whether faced with new registrants transferring from another jurisdictions or a voter appearing in person at the wrong polling place on Election Day, the statewide database was a lost opportunity in the March Primary. Completion will better enable election authorities to meet the needs of a growing and mobile electorate.

*Increase the number of early voting locations, particularly in areas of high population density.*

Despite its novelty, early voting accounted for over 3% of ballots cast in the March primary. Data from Chicago shows that the number of early votes cast grew [TK]. When voters know about this option and have access to it, they respond by casting ballots. Local authorities, particularly those in urban areas with high population densities, should create and publicize satellite voting locations. Such voting options may be especially helpful to voters if they offer weekend and evening hours.

D-36