**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) ) ) | |
| Plaintiffs, | ) ) | Case No. 11-C-5065 |
| v. | ) ) | Hon. John D. Tinder |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) ) ) | Hon. Joan H. Lefkow Hon. Robert L. Miller, Jr. (3-judge court convened pursuant to |
| Defendants. | ) ) ) | 28 U.S.C. § 2284) |

**APPENDIX 6
TO DEFENDANTS' RESPONSE TO PLAINTIFFS' MOTION
FOR A PERMANENT INJUNCTION**

**A-251 thru A-310**

*\* Enhance judicial recruitment and training.*

Asked what they would do differently in future elections, most jurisdictions said they would improve judge training. And about a third of surveyed jurisdictions said they would improve judge recruiting. These answers were not exclusive; the question was open ended and we noted whatever they reported, but concerns about helping judges apparently rank high with local authorities.

Suburban Cook County reported problems with election judges who were not familiar with the new procedures, and vowed to "provide our election judges with more support in the polling place so Election Day runs smoothly in the future." Additional judge training was first on a list of 10 improvements that Cook County Clerk David Orr pledged to accomplish in time for the fall General Election. Too, DuPage County Election Commission Assistant Executive Director Doreen Nelson asserted that "some of our pollworkers threatened to quit when we told them they needed to implement the new electronic voting technology." The election itself ran smoothly in DuPage according to their own analysis, but bringing judges and other staff up to speed on the new equipment and procedures will take more than one election.

Local authorities may need additional resources to facilitate the recruitment and training of new election judges. Whether from the federal HAVA funds available at the discretion of the State Board of Elections or from additional allocations of general revenue fund monies, local authorities need and deserve resources to support recruitment and training.

The Chicago Board of Elections announced plans to appoint an "administrative judge" for every polling precinct to ensure proper procedures are followed. It seems unlikely that every local election authority has the resources to make such an appointment, but the Chicago experiment should be watched in the November General to see if it is worth duplicating elsewhere.

*\* Ensure that balloting equipment is in full compliance with new laws*

There were practical problems with implementing the new balloting equipment rules for the March, 2006 Primary. At the February 21, 2006 State Board of Elections meeting, Fidlar Election Company, which provided new equipment to about a third of Illinois' jurisdictions, explained that it would not be able to provide modifications on many of its Accuvote systems because Diebold, its supplier, was unable to provide certain software and hardware updates. The State Board had previously certified this equipment contingent on these modifications, and had to back track when they concluded that existing machines were acceptable for the Primary without the updates. While all machinery is expected to be fully compliant in time for the November General Election, not all updates had been completed as of the date of our survey. Too, as noted earlier, at least one polling place reported that its DRE equipment failed, forcing all voters to use optical scan equipment. State and local election authorities should work together to ensure that functioning and HAVA compliant equipment is available as required in every polling place.

Too, the machinery itself, even when certified in compliance, in some cases did not work. As noted above, machines around the state failed to turn on, failed to accurately count votes and, in at least one case, caught fire when judges tried to print results. Four of the 10 improvements

Cook County Clerk David Orr pledged to make concern equipment.

IV. Methodology of the Survey

ICPR developed a 67-question survey instrument to gauge implementation of recent election law changes by local election authorities with an eye to finding out what happened outside of the larger jurisdictions. During two weeks in April and two weeks in July, we phoned nearly 100 local authorities to obtain their answers. We obtained finished surveys from 57 jurisdictions. Of these, most answered the questions over the phone, but some did so by fax. Many jurisdictions were unable to provide exact answers to all questions; where we lacked enough meaningful data to draw conclusions, we ignored that question.

*Related Links:*

- *2006*
- *Analysis*
- *archives*
- *reports*









**ICPR Spotcheck for September 15, 2011**
*Read more here...*
*September 15, 2011*

**View ICPR's Photo Gallery!**

D-36

🔲 SHARE 🔳🔳🔳

*Login/Create Account*

*Search this site:*

Search | 1orm-c0ec50e56( | search_block_for |

*Subscribe to ICPR's Newsletter, Spotcheck*

| Sign Up Now | 1102390778273 | oi |

GOJEVIC
TR

## Illinois Campaign for Political Reform



*ILCampaign In helping a judicial candidate raise $, @chicagosmayor flexing his political muscle. @greghinz story w/ICPR analysis: http://t.co/oFAaH9UO* 4 days ago
reply · retweet · favorite



*ILCampaign RT @headlineclub: Spillane: The issue of pointing people to data online will probably come up in an upcoming legislative session.* 3 days ago · reply · retweet · favorite



*ILCampaign Kankakee ed board calls #FOIA changes "misguided," citing @ILCampaign opposition, + calls on gvmt to increase openness: http://t.co/L2D5lMsf* yesterday · reply · retweet · favorite

twitter Join the conversation

D-36

Search the Sunshine Database



by Candidate    by Contributor



*Premium for policies (Editorial)*
*Read more here...*
September 16, 2011

*Gambling bill would weaken state's regulatory muscle, critics fear*
*Read more here...*
September 16, 2011

*Republicans rewriting state election laws in ways that could hurt Democrats*
*Read more here...*
September 15, 2011

Illinois Campaign for Political Reform
325 W. Huron, Suite 706, Chicago, IL 60654
(312) 335-1767
(312) 335-1067 (fax)
© Copyright 2011. All material. Privacy policy.



- SEARCH SUNSHINE DATABASE
- SEARCH STATEMENTS OF ECONOMIC INTEREST

- ISSUES
- ISSUE BRIEFINGS
- PRESS RELEASES
- SPOTCHECK (ICPR News)
- RACE IS ON (ICPR's Blog)
- ANNOUNCEMENTS
- PATRON PROFILE WIKI
- --Top Contributors
- --Career Patrons
- RELATED NEWS
- --Illinois
- --Scandal

D-36

- --National
- --Chicago
- --Judicial
- --ICPR on TV

- EVENTS
- CONTACT YOUR LEGISLATORS
- GET INVOLVED

D-36

# 7 Voting for Judges: Race and Roll-Off in Judicial Elections

Richard L. Engstrom and Victoria M. Caridas

The typical American ballot presents the voter with multiple decisions. A variety of separate elections are usually contested at any one time. Voters may be asked to choose, on a single ballot, between or among candidates for offices as diverse as president of the United States and county coroner, or governor of a state and traffic court judge. Participation in these various elections is not compulsory, however. Just as eligible voters may stay home on election day, so also may those who sign in to vote decline or neglect to cast votes in some of the elections on the ballot. This type of nonparticipation is not random, of course, but tends to vary with the perceived importance of an office. Most voters are drawn to the polls initially by the high stimulus elections to the more salient offices (contests usually located at or near the top of the ballot). After voting in these contests, however, some "rolloff" (i.e., do not vote) in the elections to offices perceived to be less salient (contests usually located farther down the ballot). Indeed, the "stereotypical voter" has been described as one who shows up at the polls intending to vote in one or two salient and well publicized races or in a controversial referendum. Entering the polling place, the voter is confronted with a bewildering array of contests and choices. After voting on a few salient races, interest is quickly lost as the voter no longer recognizes names of candidates, becomes fatigued, gets careless, and, eventually, goes beyond the point of indifference and stops voting entirely. (Darcy and Schneider 1989, 348)

Students of political participation, like voters, have been most interested in high stimulus elections. Roll-off, as a consequence, has not been

-171-

Questia, a part of Gale, Cengage Learning. *www.questia.com*

**Publication Information:** Book Title: Political Participation and American Democracy. Contributors: William Crotty - editor. Publisher: Greenwood Press. Place of Publication: New York. Publication Year: 1991. Page Number: 171.



EXHIBIT NO. 11
10/25/11 PA-

studied extensively. This relative inattention to roll-off does not mean that it is a politically unimportant phenomenon, however. To the contrary, due to roll-off, the actual electorate in low stimulus elections can be different in politically significant ways from that in the high stimulus elections. Just as roll-off does not occur randomly across the ballot, neither does its incidence among the voters occur randomly. Certain types of voters therefore can be expected to rolloff more frequently than other types.

One extremely important correlate of roll-off has been the race of the voters. Not only have blacks been found less likely than whites to be among those who sign in on election day, they also have been found more likely to be among the voters who rolloff rather than vote an entire ballot (see Darcy and Schneider 1989; Vanderleeuw and Engstrom 1987; Sheffield and Hadley 1984, 458; Magleby 1984, 103-114; Collins 1980 333; Clubb and Traugott 1972, 145-146; Walker 1966, 460). The extent to which either form of nonparticipation is attributable to blacks being disproportionately poor and less educated, or to other variables related to race, remains a matter of dispute (see, e.g., Darcy and Schneider 1989, 360-362; Vanderleeuw and Engstrom 1987, 1087-1090; Sheffield and Hadley 1984, 458; Abramson and Claggett 1984, 1986, 1989), but the demographic consequences of the nonparticipation are not disputed. The actual electorate, when compared with the potential electorate, is usually disproportionately white, and becomes increasingly so as it moves down (or across) the ballot from high stimulus to low stimulus contests. This is especially significant given that the candidate preferences of American voters often differ by the voter's race (see, e.g., Bullock 1984, 1985; Collins 1980; Engstrom 1985, 1989; Sheffield and Hadley 1984).

While the elections most affected by roll-off tend to be those for the less salient offices on a ballot, many of those offices are far from unimportant. Salience is a relative matter, of course, and some very important decisions are made by people who occupy these offices. Among these low salience positions, for example, are numerous state and local judgeships. Despite rhetoric about "mechanical jurisprudence" and judges being neutral decisionmakers, judges are widely acknowledged to have considerable discretion when interpreting and applying the law. Different judges, in short, may make different findings and reach different conclusions (see, e.g., Uhlman 1977; Welch, Combs, and Gruhl 1988; Crockett 1976).

## JUDICIAL ELECTIONS

Trial and/or appellate court judges are popularly elected in many states ( Dubois 1980a; Fund for Modern Courts 1985; Marquardt 1988). Elections

-172-

Questia, a part of Gale, Cengage Learning. www.questia.com

Publication Information: Book Title: Political Participation and American Democracy. Contributors: William Crotty - editor. Publisher: Greenwood Press. Place of Publication: New York. Publication Year: 1991. Page Number: 172.

to judicial offices are generally low stimulus affairs. Candidates are restricted by ethical canons from certain types of campaign activities, including taking positions on controversial legal and/or political issues (see Alfini and Brooks 1988-89). The media's attention to these more subdued campaigns is usually low, and voters tend to have minimal information about the candidates ( Johnson, Shaefer, and McKnight 1978; McKnight, Shaefer, and Johnson 1978; Klots 1973; Landinsky and Silver 1967, 161; Jacob 1966; 818). Not surprisingly, many voters rolloff when they reach the portion of the ballot containing judicial contests. This is especially the case when judicial elections are nonpartisan, or when the ballot format does not facilitate straight-party voting ( Dubois 1980a, 1980b, 4748, 54-57; Berg and Flynn 1980, 168-169; Barber 1971, 772-776, 782-784; Darcy and Schneider 1989, 358; Baum 1987, 72 n. 1; Lovrich and Sheldon 1985, 289).

Roll-off in judicial elections may be extremely important politically. Black voters reportedly have a preference for black judges, a preference not generally shared by white voters. Federal courts in Mississippi, Louisiana, and Texas, for example, have found judicial elections involving a choice between or among black and white candidates to be infected with "racially polarized voting." [1] These voting patterns presumably reflect, at least in part, expectations that white and black judges will exercise discretion differently, expectations for which there is some empirical evidence (see Welch, Combs, and Gruhl 1988). When voting is racially divided, the relative levels of participation between blacks and whites in judicial elections may be a critical variable (along with the type of election system employed, see McDuff 1989) affecting black electoral prospects. Indeed, one black jurist has admonished black voters for ignoring judicial elections, stating:

One judge and one decision can do more to protect your rights than any elected mayor. But we blacks seem to concentrate on electing mayors; we pride ourselves in saying that we have a black mayor who is taking over some bankrupt metropolitan city. When we go to the polls to vote, we don't even look at the judicial ballot. That, I submit, is where the power is. ( Crockett 1976, 192)

Empirical research on the extent to which there are racial differences in participation in judicial elections has been very limited, however, and the findings have not been consistent. Support for the assertion that blacks rolloff from judicial elections at rates greater than whites is provided in one study of an election involving a choice between black and white candidates for criminal court judge in New Orleans, Louisiana, in 1982. Based on reported participation by the respondents in a postelection survey, Sheffield and Hadley ( 1984) conclude that while black

-173-

Questia, a part of Gale, Cengage Learning. *www.questia.com*

**Publication Information:** Book Title: Political Participation and American Democracy. Contributors: William Crotty - editor. Publisher: Greenwood Press. Place of Publication: New York. Publication Year: 1991. Page Number: 173.

D-46

The elections in which the two group preferences have contrasted most sharply have been, as noted above, those involving a biracial choice in judicial candidates. It is when black voters prefer a black candidate that the divisions tend to be greatest. It has been in these biracial elections therefore that blacks have tended to rolloff the least, and the racial composition of the actual judicial electorate has been the least distorted. This is illustrated in figure 7.3, in which the racial differences in roll-off (black roll-off percentage minus white roll-off percentage) have been plotted and regressed against the racial divisions over the judicial candidates. Those elections in which the candidate preferred by black voters was black are identified in the plot by a B; those in which the blackpreferred candidate was white are identified by a W. The race of the candidate preferred by black voters is obviously an important variable. It was the candidacies of blacks over which the voters were most divided, and it was these candidacies that stimulated black voters to vote in, rather than rolloff from, the simultaneous judicial contests. The more racially salient the election, therefore, the less is the participation gap between blacks and whites (see also Vanderleeuw and Engstrom 1987).

## CONCLUSION

No other democracy employs elections to fill the number and variety of offices as does the United States ( Lijphart 1985, 19). Students of American electoral politics, however, have focused on participation in the elections to the few major offices such as president, governor, and mayor, while little attention has been devoted to elections to the large number of less salient offices, such as county supervisor or municipal judge. The preoccupation with the "high stimulus" elections is understandable, but unfortunately it does neglect an important type of nonparticipation, roll-off. Due to roll-off, the actual electorate may vary from office to office on any particular day, and this variation may be politically important.

One significant dimension on which the electorate may vary is its racial composition. Blacks and whites often have contrasting candidate preferences, so participation differences between these groups are important. Numerous studies have documented the general tendency for blacks to participate in major office elections at a rate below that for whites. Differences in roll-off between the groups can accentuate this participation gap as voters move down or across the ballot to the contests for other offices.

Among the less salient offices filled by election are numerous state and local judgeships. Judicial elections tend to be low stimulus affairs that attract relatively few voters to the polls. When these elections are not held concurrently with those for major offices, participation in them

-185-

Questia, a part of Gale, Cengage Learning. www.questia.com.

Publication Information: Book Title: Political Participation and American Democracy. Contributors: William Crotty - editor. Publisher: Greenwood Press. Place of Publication: New York. Publication Year: 1991. Page Number: 185.

A260

D-46





E86

A261

D-46

is usually severely depressed. But even when held simultaneously with a major office contest, participation in judicial elections still tends to be considerably below that in the major office election. Many voters simply rolloff rather than vote for judges.

Roll-off in New Orleans' judicial elections has affected the racial composition of the local judicial electorate. Black voters were found, in over 80 percent of simultaneous judicial elections, to rolloff at greater rates than white voters. The relative rates of roll-off varied, however, depending on the candidate choices presented to the voters. The more racially divided the response to the candidates, the less the difference in participation tended to be. This was primarily attribute to the impact that black candidacies had on the voters, however. It was the black candidates for judicial office over which the voters were most divided, and it was support of these candidates that black voters tended to "rollon" ( Loewen and Grofman 1989, 591) rather than off. Blacks candidacies undoubtedly provided blacks with an incentive to participate, once at the polls, in these judicial elections. But these black candidacies it must be remembered usually only reduced the racial differences in participation, rather than reversed them. Racial differences in roll-off, even when blacks were candidates, generally resulted in a judicial electorate that was, in comparison to the major office electorate, disproportionately white.

NOTES

1.  See *Martin v. Allain*, 658 F.Supp. 1183 (S.D. Miss. 1987); *Clark v. Edwards*, 725 F.Supp. 285 (M.D. La. 1988); *Chisom v. Roemer*, Civ. No. 86-4057 (E.D. La. 1989); *Rangel v. Mattox*, Civ. No. B-88-053 (S.D. Tx. 1989); and *LULAC v. Mattox*, Civ. No. MO-88-CA-154 (W.D. Tx. 1989).

2.  These elections were held on a total of 27 separate days from 15 April 1978 through 8 November 1988. The positions at issue in the 52 judicial elections were on the Civil District Court (13), Criminal District Court (11), Juvenile Court (7), Traffic Court (3), Municipal Court (5), First City Court (5), Circuit Court of Appeals (6), and state Supreme Court (2). Voters throughout the City of New Orleans voted in all of these elections except those for First City Court, in which the residents of one ward (comprising the west bank of the Mississippi River) do not participate. The 15 simultaneous major office elections were for President of the United States (3), United States Senator (4), Governor of Louisiana (3), Mayor of New Orleans (4), and District Attorney for the Parish of Orleans (1).

3.  For the elections held in 1988, voter sign-in data were available, and these were used in place of the registration data for the purpose of estimating the support for particular candidates among those voting. Registered voters were classified as either white or black until 1986, at which time the category "others" was added. Our comparisons for elections beginning with that of 27 September 1986 therefore are technically between blacks and nonblacks, rather than blacks and whites. The "others" category, however, never exceeded 1.0 percent of

187

Plan Name:      Illinois 2000 Congressional Districts
Plan Type:
Date:           9/28/2011
Time:           11:19:03 AM

Administrator:

# Measures of Compactness
9/28/2011

| DISTRICT | Reock | Polsby-Popper |
|---|---|---|
| 1 | 0.22 | 0.12 |
| 2 | 0.33 | 0.28 |
| 3 | 0.49 | 0.20 |
| 4 | 0.21 | 0.04 |
| 5 | 0.29 | 0.13 |
| 6 | 0.58 | 0.31 |
| 7 | 0.22 | 0.10 |
| 8 | 0.42 | 0.19 |
| 9 | 0.31 | 0.21 |
| 10 | 0.38 | 0.19 |
| 11 | 0.32 | 0.17 |
| 12 | 0.27 | 0.23 |
| 13 | 0.51 | 0.38 |
| 14 | 0.23 | 0.21 |
| 15 | 0.23 | 0.05 |
| 16 | 0.32 | 0.35 |
| 17 | 0.24 | 0.06 |
| 18 | 0.42 | 0.25 |
| 19 | 0.37 | 0.14 |
| Sum | N/A | N/A |
| Min | 0.21 | 0.04 |
| Max | 0.58 | 0.45 |
| Mean | 0.33 | 0.20 |
| Std. Dev. | 0.10 | 0.10 |

D-52

Plan Name:     Illinois 2010 Congressional Districts
Plan Type:
Date:          9/28/2011
Time:          11:26:46 AM

Administrator:

# Measures of Compactness
9/28/2011

| DISTRICT | Reock | Polsby-Popper |
|----------|-------|---------------|
| 1 | 0.19 | 0.12 |
| 2 | 0.43 | 0.36 |
| 3 | 0.28 | 0.17 |
| 4 | 0.30 | 0.05 |
| 5 | 0.31 | 0.09 |
| 6 | 0.30 | 0.11 |
| 7 | 0.25 | 0.08 |
| 8 | 0.40 | 0.12 |
| 9 | 0.24 | 0.13 |
| 10 | 0.35 | 0.18 |
| 11 | 0.36 | 0.12 |
| 12 | 0.31 | 0.24 |
| 13 | 0.29 | 0.19 |
| 14 | 0.32 | 0.17 |
| 15 | 0.32 | 0.21 |
| 16 | 0.35 | 0.23 |
| 17 | 0.31 | 0.19 |
| 18 | 0.49 | 0.23 |
| Sum | N/A | N/A |
| Min | 0.19 | 0.12 |
| Max | 0.49 | 0.36 |
| Mean | 0.32 | 0.17 |
| Std. Dev. | 0.06 | 0.07 |

D-53

Print               **SEND2690**             Page 1 of 2

| | |
|---|---|
| Subject: | RE: maps |
| From: | Ian Russell (Russell@DCCC.ORG) |
| To: | awmanar@yahoo.com; |
| Date: | Monday, March 21, 2011 9:51 AM |

That would be great. What advice do you have on how to get the committee to consider map ideas we've discussed (only, of course, if the Senate President likes them)?

---

**From:** Andrew Manar [mailto:awmanar@yahoo.com]
**Sent:** Sunday, March 20, 2011 4:42 AM
**To:** Ian Russell
**Subject:** Re: maps

The senate is starting public hearings. I will forward you a list of dates/times/locations. AM

---

**From:** Ian Russell <Russell@DCCC.ORG>;
**To:** Andrew Manar <awmanar@yahoo.com>;
**Subject:** RE: maps
**Sent:** Fri, Mar 18, 2011 9:28:08 PM

We've given a lot of thought to how pick-ups could be maximized and have looked at lines internally for pick-up opportunities (a lot of it based around the concepts I emailed you about earlier). We're deferring to the delegation on their districts and are always wary of getting out of line with them so haven't gotten very far, but we'd be open to discussing how to maximize pick-up opportunities we think are possible around the state.

Let me know what would be helpful from us. Thanks.

---

**From:** Andrew Manar [mailto:awmanar@yahoo.com]
**Sent:** Friday, March 18, 2011 3:17 PM
**To:** Ian Russell

D-105

# SEND2691

Subject: maps

Ian, have you put together maps that you can share with the Senate President to reflect the potential pick-ups in IL? AM

D-105

1994, 468; *Johnson v. Miller* 1994, 1368).[13] Some courts have even begun to treat contiguity as a continuous concept, as if some districts can be viewed as "more" or "less" contiguous than others (*Shaw v. Hunt* 1994, 452; see also *Vera v. Richards* 1994, 1338, 1342).

This approach to contiguity has been an unfortunate development. It commingles the notion of contiguity with that of compactness, treating the two as if they are synonymous. A district that is never less than eighty miles wide may well be "more compact" than one that is eighty feet wide at points, but it should not be considered "more contiguous" for that reason as well. These are distinct criteria that concern different aspects of the geographical form that districts can assume. A district should not be found to violate the contiguity criterion simply because its shape violates the compactness criterion.[14]

### Compactness

In contrast to contiguity, the compactness criterion has always been a matter of considerable ambiguity (Webster 2000, 144). It concerns the shape of districts, not whether they contain geographically discrete parts. Compactness is a continuous concept. Districts can be considered more or less compact, and therefore this criterion, unlike contiguity, has been the object of a great variety of quantitative measurements (see, e.g., Niemi et al. 1990). There is "no generally-accepted definition" of what exactly compactness entails, however, and therefore no generally accepted measure of it (*Shaw v. Hunt* 1994, 452; see also *Johnson v. Miller* 1994, 1388).

Compactness is legally required less often than contiguity (Lyons and Jewell 1986, 76), and there is far less consensus about its importance in the design of districts. The linkage between the shapes districts assume and the quality of representation district residents receive has long been questioned. As candidly expressed by one set of commentators:

> It is, in truth, hard to develop a powerful case for the intrinsic value of having compact districts: If the representative lived at the center of a compact district, he or she wouldn't have to travel any more than absolutely necessary to campaign door-to-door or meet with constituents, but other than that, uncompactness does not seem to affect representation in any way. (Backstrom, Robins, and Eller 1990, 152)

A compactness requirement is widely touted, however, as an impediment to gerrymandering. It will rarely preclude gerrymandering, at least the dilutive kind, because that type of gerrymandering is not limited to funny-shaped districts. Indeed, a compactness rule in some circumstances could even serve as an excuse for this type of gerrymander (see Butler and Cain 1992, 149–50). But it is at least a constraint on the way in which district lines can be drawn

D-113

and therefore an impediment to the manipulation of those lines for political advantage. And of course odd-shaped districts do stimulate suspicions of deliberate manipulation.

Since *Shaw* elevated the concern for compactness, lower courts have been confronted with a wide array of quantitative indicators that supposedly reveal the relative compactness of districts (see *Johnson v. Miller* 1994, 1388–90; *Vera v. Richards* 1994, 1329–30; *Diaz v. Silver* 1997, 114–15; *Cromartie v. Hunt* 1998, 5–9; *Cromartie v. Hunt* 2000, sl. op. at 13–14, 16, 21–22). These measures emphasize different aspects of shapes, however, and therefore can and do result in conflicting conclusions. Even bizarrely shaped districts can satisfy some of the tests (see Young 1988; Seher, Mills, and Hotaling 1997, 95). The measures also vary greatly in complexity. The simplest is based on the length of district boundaries. The shorter the boundary, the more compact a district is considered to be. Other measures examine the extent to which district shapes deviate from some standard, such as a circle or a square, or the extent to which a district fills the area of a polygon encasing it.

The unambiguous connection between district shapes and representation is the reason, no doubt, that attempts have been made to separate the concept of compactness from any notion of geographical shape whatsoever. New quantitative measures of compactness have been proposed that depart from the notion of geographical appearances, focusing instead on the physical distances between the homes of the people residing within a district (see Niemi et al. 1990, 1162, 1165–66). A federal court in California recently departed even further from the traditional concern for shape and adopted the notion of "functional compactness," holding that "Compactness does not refer to geometric shapes but to the ability of citizens to relate to each other and their representatives and to the ability of representatives to relate effectively to their constituency" (*DeWitt v. Wilson* 1994, 1414; see also *Johnson v. Mortham* 1996, 1512–13, Hatchett, J., dissenting; *Cromartie v. Hunt* 1998, 15, Ervin, J., dissenting). "Functional compactness" has evolved into a concept, much like communities of interest (discussed below), in which virtually anything can be treated as an indicator. One commentator has considered topography, transportation linkages, communication systems, economic bases, and local government boundaries as indicia of whether districts are functionally compact or noncompact (McKaskle 1995, 61–63). Rather than treat these other factors as valid reasons to deviate from a geographical-compactness constraint, which they may be, given the tenuous linkage between compactness and representation, the concept itself is being redefined even more unambiguously, permitting these other factors, in effect, to be part of the definition itself. A panel of the Fifth Circuit Court of Appeals has appropriately noted that "functional compactness" is "an inherently nebulous term" that is "open to abuse" (*Chen v. City of Houston* 2000, 507 n. 2).

The variation in approaches does not end here, either. Just as the federal

court in Louisiana commingled compactness with contiguity in *Hays*, the fed-
eral court in Georgia handling the *Miller* case commingled communities of
interest with compactness. After reviewing several approaches to measuring
geographical compactness, that court chose to rely on a population-based
approach that would "require an assessment of population densities, shared
history, and common interests; essentially whether the populations roped into
a particular district are close enough geographically, economically, and cul-
turally to justify them being held in a single district" (*Johnson v. Miller* 1994,
1389; see also *Vera v. Richards* 1994, 1341; *Johnson v. Mortham* 1996,
1512–13, Hatchett, J., dissenting). A federal court in Illinois, in turn, has com-
mingled respect for political subdivisions with compactness, concluding that a
finding that the state's Fourth Congressional District "did not excessively split
political subdivisions" supported the view that the district was "reasonably
compact" (*King v. State Board of Elections* 1997, 626 n. 5). The Supreme
Court has affirmed the California, Georgia, and Illinois decisions without com-
menting on what compactness actually entails (see *DeWitt v. Wilson* 1995;
*Miller v. Johnson* 1995; *King v. Illinois Board of Elections* 1998).

With this type of confusion over the concept of compactness, requiring that
districts not be subordinated to a compactness standard will not simplify the
districting task. Districting decisions are likely to be more, not less, difficult in
this context. Without some clarity concerning this constraint, those designing
and/or adopting districts cannot be expected to know the limitations under
which they must work. They can also be expected to choose an approach to
this concept that provides the least constraint to implementing other goals
through the design of districts.

## Political Subdivisions

The third traditional criterion identified by the Court in *Shaw* is respect for
political subdivisions. Local units of government, especially counties, have
often served as building blocks for state legislative and congressional districts.
Prior to the Supreme Court's adoption of the one person, one vote principle,
counties were even the units to which legislative seats were apportioned in
many states (see Jewell 1955). Not dividing counties among districts unless
necessary to equalize populations has been a common districting constraint
(Grofman 1985, 177–83). Following established political boundaries such as
these is said to keep districts more cognizable to voters.

Political subdivisions are recognized by law, and there should be no prob-
lem in identifying them and in determining whether or not they have been
divided by representational district lines. This is a simple matter of counting.
There may be arguments, however, over which political subdivisions to
include in the count. Counties, as noted, had been the major focus prior to
*Shaw* and *Miller*, but the treatment of other subdivisions could be examined as

# Congressional District 4 (1991-2001)



**Legend**

| | |
|---|---|
| ▭ | CD4 (1991-2001) |
| ⬚ | Counties |
| ⬚ | Townships |

D-114

Congressional District 4 (2011-)



D-116



Congressional Districts 3, 4, 5 & 13
2001 and 2011 Comparison

Legend
- 2011 Congressional Districts
- CD5 (2001-2011)
- CD3 (2001-2011)
- CD4 (2001-2011)
- CD13 (2001-2011)
- Counties
- Townships

# PA 97-0014 Districts with Republican Plan Overlay



## Congressional District 4 (2011 - )



**Legend**

CD4 (2011 - )

Counties

Townships

Norwood Park

Addison

Leyden

River Forest

Oak Park

Chicago

Central Ave.

A275

Cook

DuP
York

Proviso

Cicero

Berwyn

Riverside

Stickney

Downers Grove

Lyons

D-120

## Congressional District 4 (1991-2001)



**Legend**

- Counties
- Townships
- CD4 (1991-2001)

D-121

Updated Table 2 to Lichtman's October 27, 2011 Response Report to Engstrom: Summary of Racial Polarization Analysis: 29 Latino v. Non-Latino Congressional, State Legislative, Countywide and City of Chicago Elections

| | ELECTION | POLARIZED LATINOS & NON-LATINOS? | WINNING CANDIDATE | CANDIDATE OF CHOICE OF LATINOS?* |
|---|---|---|---|---|
| Congressional Elections | 2010 PRIM CD 3 | NO | Lipinski | YES |
| | 2009 SPECIAL GEN CD 5 | NO | Quigley | YES |
| State Legislative Primary Elections in Cook County | 2002 PRIM SEN 20 | NO | Martinez | YES |
| | 2006 PRIM REP 3 | NO | Delgado | YES |
| | 2008 PRIM REP 3 | NO | Arroyo | YES |
| | 2010 PRIM REP 2 | NO | Acevedo | YES |
| | 2010 PRIM REP 23 | YES | Burke | NO |
| State Legislative General Elections in Cook County | 2006 GEN REP 24 | NO | Hernandez | YES |
| | 2006 GEN REP 44 | NO | Crespo | YES |
| | 2008 GEN REP 39 | NO | Berrios | YES |
| | 2008 GEN REP 44 | NO | Crespo | YES |
| | 2010 GEN REP 39 | YES | Berrios | YES |
| | 2010 GEN REP 44 | NO | Crespo | YES |
| Cook County Primary Elections | 2008 PRIM COOK STATT | YES | Alvarez | YES |
| | 2008 PRIM COOK ASSR | YES | Berrios | YES |
| | 2010 PRIM CIR CT RAMOS | YES** | Ramos | YES |
| | 2008 PRIM CIR CT REYES | NO** | Reyes | YES |
| Cook County General Elections | 2006 GEN COOK SHER | NO | Dart | YES |
| | 2010 GEN COOK CLERK | NO | Orr | YES |
| | 2008 GEN COOK STATT | NO | Alvarez | YES |
| | 2010 GEN COOK ASSR | NO | Berrios | YES |
| City of Chicago Elections | 2007 CHICAGO CLERK | NO | Del Valle | YES |
| | 2011 CHICAGO CLERK | NO | Mendoza | YES |
| | 2011 CHICAGO MAYOR | YES | Emanuel | NO |
| County District and Judicial Sub-Circuit Primary Elections | 2010 PRIM CO BOARD D 16 | YES | Tobolski | NO |
| | 2010 PRIM CIR CT SUB 11 | YES | Collins | NO |
| | 2008 PRIM CIR CT SUB 4 | YES | Rogers | NO |
| | 2008 PRIM CIR CT SUB 6 | YES | Araujo | YES |
| | 2006 PRIM CIR CT SUB 6 | YES | Ocasio | YES |
| | | | | |
| | Elections Analyzed Only by Dr. Lichtman | | | |
| | Elections Analyzed by Dr. Lichtman & Dr. Engstrom | | | |
| | Elections Analyzed by Dr. Engstrom | | | |

\* This column is Dr. Lichtman's analysis for all elections reported, as Dr. Engstrom does not analyze whether the Latino candidate of choice prevails.

\*\* Dr. Lichtman also analyzes these elections in his 10/27/2011 Response of Allan J. Lichtman to Rebuttal Reports of Richard J. Engstrom and Peter A. Morrison, for the limited purpose of verifying the Latino candidate of choice, determining whether non-Latinos as a block voted against that candidate, and assessing whether the Latino candidate of choice won or lost.

D-123

DR ENGSTROM DATA DISCLOSURE OCTOBER 19, 2011: PRECINCTS WITH LESS VOTING AGE
POPULATION THAN VOTES CAST: 2008 DEM PRIMARY COOK CO STATE'S ATTORNEY

|  | NewEngstromJoin.pname (PRECINCT NAME) | NewEngstromJoin. VAPERSONS (VAP) | 2008Alvarez_DemCast (VOTES CAST 2008 COOK PRIM ST ATTY) |
|---|---|---|---|
| 1 | COOK_BERWYNW1P2 | 0 | 195 |
| 2 | COOK_BERWYNW1P4 | 68 | 183 |
| 3 | COOK_BERWYNW2P2 | 42 | 119 |
| 4 | COOK_CHICAGOWD11PR12 | 178 | 201 |
| 5 | COOK_CHICAGOWD11PR26 | 0 | 302 |
| 6 | COOK_CHICAGOWD11PR28 | 5 | 137 |
| 7 | COOK_CHICAGOWD11PR31 | 1 | 129 |
| 8 | COOK_CHICAGOWD15PR22 | 241 | 262 |
| 9 | COOK_CHICAGOWD15PR38 | 13 | 180 |
| 10 | COOK_CHICAGOWD16PR12 | 104 | 143 |
| 11 | COOK_CHICAGOWD16PR18 | 42 | 206 |
| 12 | COOK_CHICAGOWD16PR30 | 41 | 187 |
| 13 | COOK_CHICAGOWD18PR13 | 59 | 330 |
| 14 | COOK_CHICAGOWD18PR21 | 0 | 398 |
| 15 | COOK_CHICAGOWD18PR23 | 0 | 258 |
| 16 | COOK_CHICAGOWD18PR27 | 0 | 271 |
| 17 | COOK_CHICAGOWD18PR59 | 0 | 213 |
| 18 | COOK_CHICAGOWD1PR31 | 0 | 192 |
| 19 | COOK_CHICAGOWD1PR39 | 5 | 202 |
| 20 | COOK_CHICAGOWD1PR41 | 0 | 186 |
| 21 | COOK_CHICAGOWD1PR42 | 13 | 162 |
| 22 | COOK_CHICAGOWD1PR6 | 7 | 218 |
| 23 | COOK_CHICAGOWD20PR21 | 0 | 110 |
| 24 | COOK_CHICAGOWD23PR14 | 0 | 113 |
| 25 | COOK_CHICAGOWD23PR14 | 1 | 113 |
| 26 | COOK_CHICAGOWD24PR44 | 276 | 291 |
| 27 | COOK_CHICAGOWD26PR21 | 0 | 145 |
| 28 | COOK_CHICAGOWD28PR28 | 48 | 124 |
| 29 | COOK_CHICAGOWD28PR30 | 0 | 109 |
| 30 | COOK_CHICAGOWD2PR36 | 0 | 329 |
| 31 | COOK_CHICAGOWD30PR15 | 9 | 183 |
| 32 | COOK_CHICAGOWD36PR16 | 91 | 335 |
| 33 | COOK_CHICAGOWD36PR50 | 73 | 178 |
| 34 | COOK_CHICAGOWD36PR54 | 85 | 313 |
| 35 | COOK_CHICAGOWD37PR14 | 38 | 297 |
| 36 | COOK_CHICAGOWD37PR16 | 0 | 250 |

D-124

| 37 | COOK_CHICAGOWD37PR42 | 0 | 147 |
|---|---|---|---|
| 38 | COOK_CHICAGOWD38PR45 | 53 | 209 |
| 39 | COOK_CHICAGOWD38PR5 | 0 | 360 |
| 40 | COOK_CHICAGOWD39PR10 | 23 | 182 |
| 41 | COOK_CHICAGOWD39PR5 | 0 | 165 |
| 42 | COOK_CHICAGOWD3PR10 | 18 | 104 |
| 43 | COOK_CHICAGOWD41PR29 | 0 | 129 |
| 44 | COOK_CHICAGOWD45PR18 | 0 | 234 |
| 45 | COOK_CHICAGOWD45PR37 | 0 | 250 |
| 46 | COOK_CHICAGOWD45PR47 | 129 | 240 |
| 47 | COOK_ELKGROVE17 | 84 | 162 |
| 48 | COOK_ELKGROVE18 | 0 | 152 |
| 49 | COOK_ELKGROVE37 | 0 | 120 |
| 50 | COOK_ELKGROVE54 | 0 | 124 |
| 51 | COOK_LEYDEN13 | 0 | 106 |
| 52 | COOK_LEYDEN33 | 0 | 95 |
| 53 | COOK_LEYDEN48 | 0 | 116 |
| 54 | COOK_LEYDEN64 | 0 | 128 |
| 55 | COOK_LYONS1 | 2 | 30 |
| 56 | COOK_LYONS105 | 0 | 122 |
| 57 | COOK_LYONS107 | 0 | 103 |
| 58 | COOK_LYONS108 | 0 | 166 |
| 59 | COOK_LYONS17 | 123 | 245 |
| 60 | COOK_LYONS31 | 129 | 189 |
| 61 | COOK_LYONS49 | 0 | 165 |
| 62 | COOK_LYONS53 | 35 | 209 |
| 63 | COOK_LYONS70 | 69 | 227 |
| 64 | COOK_LYONS75 | 56 | 181 |
| 65 | COOK_MAINE7 | 0 | 156 |
| 66 | COOK_MAINE8 | 0 | 169 |
| 67 | COOK_MAINE95 | 0 | 88 |
| 68 | COOK_NORWOODPARK4 | 48 | 239 |
| 69 | COOK_OAKPARK25 | 5 | 155 |
| 70 | COOK_OAKPARK33 | 11 | 374 |
| 71 | COOK_OAKPARK54 | 5 | 221 |
| 72 | COOK_PROVISO112 | 0 | 244 |
| 73 | COOK_PROVISO113 | 0 | 350 |
| 74 | COOK_PROVISO113 | 3 | 350 |
| 75 | COOK_PROVISO124 | 0 | 212 |
| 76 | COOK_PROVISO126 | 0 | 205 |
| 77 | COOK_PROVISO19 | 0 | 211 |
| 78 | COOK_PROVISO21 | 13 | 178 |
| 79 | COOK_PROVISO22 | 100 | 181 |
| 80 | COOK_PROVISO3 | 0 | 145 |
| 81 | COOK_PROVISO30 | 14 | 160 |

D-124

| 82 | COOK_PROVISO49 | 14 | 185 |
| 83 | COOK_PROVISO52 | 4 | 179 |
| 84 | COOK_PROVISO57 | 83 | 155 |
| 85 | COOK_PROVISO64 | 0 | 217 |
| 86 | COOK_PROVISO7 | 0 | 33 |
| 87 | COOK_PROVISO77 | 165 | 219 |
| 88 | COOK_PROVISO82 | 0 | 322 |
| 89 | COOK_PROVISO92 | 0 | 124 |
| 90 | COOK_RIVERFOREST15 | 0 | 108 |
| 91 | COOK_RIVERFOREST2 | 0 | 154 |
| 92 | COOK_RIVERSIDE6 | 0 | 180 |
| 93 | COOK_WORTH44 | 82 | 215 |

D-124

DR ENGSTROM DATA DISCLOSURE OCTOBER 19, 2011: ENGSTROM VAP LISTING WITH 100 VAP
LESS THAN STATE VAP DATA: 2008 DEM PRIMARY COOK CO STATE'S ATTORNEY

| | NewEngstromJoin.pname (PRECINCT NAME) | NewEngstromJoin.VAPERSONS (ENSTROM LISTED VAP) | Total VA Persons (STATE DATA VAP) | _2008Alvarez.Dem Cast (VOTES CAST 2008 COOK PRIM ST ATTY) |
|---|---|---|---|---|
| 1 | COOK_BERWYNW1P1 | 879 | 1041 | 238 |
| 2 | COOK_BERWYNW2P4 | 493 | 749 | 128 |
| 3 | COOK_CHICAGOWD11PR15 | 394 | 554 | 172 |
| 4 | COOK_CHICAGOWD11PR23 | 383 | 706 | 155 |
| 5 | COOK_CHICAGOWD11PR32 | 274 | 510 | 153 |
| 6 | COOK_CHICAGOWD11PR35 | 729 | 887 | 246 |
| 7 | COOK_CHICAGOWD11PR37 | 568 | 730 | 229 |
| 8 | COOK_CHICAGOWD11PR39 | 455 | 885 | 274 |
| 9 | COOK_CHICAGOWD11PR50 | 133 | 886 | 105 |
| 10 | COOK_CHICAGOWD12PR19 | 1337 | 1581 | 190 |
| 11 | COOK_CHICAGOWD13PR21 | 664 | 834 | 266 |
| 12 | COOK_CHICAGOWD13PR42 | 376 | 617 | 211 |
| 13 | COOK_CHICAGOWD15PR24 | 417 | 780 | 184 |
| 14 | COOK_CHICAGOWD16PR10 | 821 | 922 | 296 |
| 15 | COOK_CHICAGOWD16PR29 | 168 | 470 | 161 |
| 16 | COOK_CHICAGOWD16PR44 | 846 | 943 | 183 |
| 17 | COOK_CHICAGOWD18PR17 | 727 | 952 | 236 |
| 18 | COOK_CHICAGOWD18PR31 | 640 | 805 | 269 |
| 19 | COOK_CHICAGOWD18PR42 | 546 | 658 | 193 |
| 20 | COOK_CHICAGOWD18PR44 | 380 | 515 | 170 |
| 21 | COOK_CHICAGOWD1PR22 | 749 | 923 | 196 |
| 22 | COOK_CHICAGOWD1PR24 | 995 | 1170 | 300 |
| 23 | COOK_CHICAGOWD1PR32 | 532 | 1008 | 191 |
| 24 | COOK_CHICAGOWD1PR39 | 991 | 1184 | 202 |
| 25 | COOK_CHICAGOWD20PR15 | 2354 | 2538 | 191 |
| 26 | COOK_CHICAGOWD23PR21 | 450 | 567 | 242 |
| 27 | COOK_CHICAGOWD23PR40 | 627 | 778 | 226 |
| 28 | COOK_CHICAGOWD23PR52 | 603 | 711 | 278 |
| 29 | COOK_CHICAGOWD23PR54 | 808 | 965 | 279 |
| 30 | COOK_CHICAGOWD23PR7 | 117 | 850 | 107 |
| 31 | COOK_CHICAGOWD25PR17 | 1819 | 1979 | 356 |
| 32 | COOK_CHICAGOWD26PR19 | 630 | 1011 | 221 |
| 33 | COOK_CHICAGOWD26PR56 | 550 | 976 | 106 |
| 34 | COOK_CHICAGOWD28PR29 | 1286 | 1413 | 183 |
| 35 | COOK_CHICAGOWD28PR52 | 302 | 783 | 158 |

D-124

| | | | | |
|---|---|---|---|---|
| 36 | COOK_CHICAGOWD29PR22 | 510 | 827 | 182 |
| 37 | COOK_CHICAGOWD29PR34 | 419 | 689 | 168 |
| 38 | COOK_CHICAGOWD31PR10 | 568 | 888 | 61 |
| 39 | COOK_CHICAGOWD31PR42 | 768 | 873 | 184 |
| 40 | COOK_CHICAGOWD31PR5 | 729 | 893 | 155 |
| 41 | COOK_CHICAGOWD31PR50 | 723 | 848 | 146 |
| 42 | COOK_CHICAGOWD33PR1 | 1846 | 2145 | 284 |
| 43 | COOK_CHICAGOWD33PR10 | 1042 | 1153 | 311 |
| 44 | COOK_CHICAGOWD33PR11 | 1369 | 1477 | 288 |
| 45 | COOK_CHICAGOWD33PR2 | 1242 | 1372 | 307 |
| 46 | COOK_CHICAGOWD33PR26 | 2197 | 2356 | 282 |
| 47 | COOK_CHICAGOWD35PR18 | 1381 | 1525 | 250 |
| 48 | COOK_CHICAGOWD35PR32 | 610 | 711 | 136 |
| 49 | COOK_CHICAGOWD36PR16 | 588 | 765 | 335 |
| 50 | COOK_CHICAGOWD36PR2 | 806 | 916 | 161 |
| 51 | COOK_CHICAGOWD36PR21 | 1111 | 1323 | 334 |
| 52 | COOK_CHICAGOWD36PR22 | 786 | 1102 | 260 |
| 53 | COOK_CHICAGOWD36PR4 | 869 | 976 | 170 |
| 54 | COOK_CHICAGOWD36PR55 | 403 | 642 | 320 |
| 55 | COOK_CHICAGOWD37PR22 | 314 | 542 | 161 |
| 56 | COOK_CHICAGOWD37PR26 | 839 | 1021 | 297 |
| 57 | COOK_CHICAGOWD37PR34 | 600 | 875 | 252 |
| 58 | COOK_CHICAGOWD37PR43 | 246 | 729 | 231 |
| 59 | COOK_CHICAGOWD38PR14 | 293 | 777 | 169 |
| 60 | COOK_CHICAGOWD38PR38 | 1093 | 1203 | 227 |
| 61 | COOK_CHICAGOWD38PR51 | 495 | 708 | 144 |
| 62 | COOK_CHICAGOWD38PR9 | 715 | 878 | 188 |
| 63 | COOK_CHICAGOWD39PR14 | 1392 | 2160 | 194 |
| 64 | COOK_CHICAGOWD39PR22 | 763 | 1764 | 216 |
| 65 | COOK_CHICAGOWD39PR24 | 1703 | 1994 | 217 |
| 66 | COOK_CHICAGOWD39PR29 | 569 | 940 | 215 |
| 67 | COOK_CHICAGOWD39PR7 | 272 | 596 | 154 |
| 68 | COOK_CHICAGOWD39PR8 | 825 | 1221 | 234 |
| 69 | COOK_CHICAGOWD45PR25 | 352 | 1071 | 247 |
| 70 | COOK_CHICAGOWD45PR40 | 472 | 974 | 278 |
| 71 | COOK_CICERO26 | 1247 | 1424 | 133 |
| 72 | COOK_CICERO30 | 346 | 739 | 111 |
| 73 | COOK_CICERO6 | 297 | 718 | 94 |
| 74 | COOK_ELKGROVE32 | 963 | 2110 | 130 |
| 75 | COOK_ELKGROVE36 | 837 | 2909 | 210 |
| 76 | COOK_ELKGROVE38 | 1825 | 2344 | 150 |
| 77 | COOK_ELKGROVE39 | 378 | 627 | 94 |
| 78 | COOK_LEYDEN12 | 318 | 531 | 53 |
| 79 | COOK_LEYDEN16 | 636 | 811 | 93 |
| 80 | COOK_LEYDEN17 | 1095 | 1231 | 179 |

D-124

| 81 | COOK_LEYDEN22 | 140 | 667 | 120 |
| 82 | COOK_LEYDEN29 | 1023 | 1157 | 137 |
| 83 | COOK_LEYDEN35 | 155 | 683 | 104 |
| 84 | COOK_LEYDEN4 | 1563 | 1733 | 124 |
| 85 | COOK_LEYDEN44 | 1055 | 1360 | 129 |
| 86 | COOK_LEYDEN45 | 464 | 867 | 115 |
| 87 | COOK_LEYDEN47 | 635 | 759 | 94 |
| 88 | COOK_LEYDEN64 | 265 | 617 | 128 |
| 89 | COOK_LEYDEN66 | 594 | 1100 | 122 |
| 90 | COOK_LEYDEN68 | 514 | 749 | 122 |
| 91 | COOK_LEYDEN77 | 624 | 734 | 146 |
| 92 | COOK_LEYDEN80 | 646 | 918 | 118 |
| 93 | COOK_LYONS102 | 333 | 857 | 145 |
| 94 | COOK_LYONS104 | 517 | 828 | 171 |
| 95 | COOK_LYONS107 | 392 | 675 | 103 |
| 96 | COOK_LYONS2 | 229 | 616 | 117 |
| 97 | COOK_LYONS28 | 132 | 476 | 98 |
| 98 | COOK_LYONS3 | 354 | 738 | 134 |
| 99 | COOK_LYONS51 | 438 | 1380 | 236 |
| 100 | COOK_LYONS56 | 1013 | 1447 | 151 |
| 101 | COOK_LYONS58 | 1675 | 1817 | 221 |
| 102 | COOK_LYONS73 | 333 | 463 | 114 |
| 103 | COOK_LYONS76 | 315 | 436 | 94 |
| 104 | COOK_LYONS8 | 942 | 1101 | 170 |
| 105 | COOK_LYONS82 | 362 | 954 | 117 |
| 106 | COOK_LYONS90 | 410 | 571 | 125 |
| 107 | COOK_LYONS92 | 377 | 603 | 164 |
| 108 | COOK_LYONS99 | 1708 | 1879 | 152 |
| 109 | COOK_MAINE128 | 233 | 1463 | 162 |
| 110 | COOK_MAINE17 | 383 | 1239 | 175 |
| 111 | COOK_MAINE41 | 676 | 1078 | 194 |
| 112 | COOK_PROVISO117 | 430 | 566 | 130 |
| 113 | COOK_PROVISO118 | 983 | 1144 | 221 |
| 114 | COOK_PROVISO51 | 329 | 591 | 167 |
| 115 | COOK_PROVISO54 | 372 | 760 | 191 |
| 116 | COOK_PROVISO71 | 974 | 1231 | 288 |
| 117 | COOK_PROVISO75 | 837 | 1073 | 231 |
| 118 | COOK_PROVISO97 | 411 | 515 | 144 |
| 119 | COOK_RIVERSIDE17 | 654 | 803 | 128 |
| 120 | COOK_STICKNEY12 | 817 | 1070 | 137 |
| 121 | COOK_STICKNEY13 | 1182 | 1406 | 261 |
| 122 | COOK_STICKNEY21 | 809 | 990 | 153 |
| 123 | COOK_WORTH109 | 192 | 433 | 178 |
| 124 | COOK_WORTH40 | 233 | 861 | 107 |
| 125 | COOK_WORTH94 | 513 | 816 | 183 |

D-124

D-124

Engstrom New Data Disclosure, Nov. 10, 2011: Difference Between Engstrom Listed VAP and
State Provided VAP, Difference Greater Than 100, 2008 Dem Prim Cook Co State's Attorney

| | IL08PREC (Precinct Name) | SUM(electionblocks.VAPERSONS) (VAP Engstrom Data) | Total VA Persons (VAP State Data) | DIFFVAP (Difference Between Engstrom and State Data) |
|---|---|---|---|---|
| 1 | COOK_CHICAGOWD11PR37 | 568 | 730 | 162.00 |
| 2 | COOK_CHICAGOWD12PR19 | 1337 | 1581 | 244.00 |
| 3 | COOK_CHICAGOWD13PR21 | 664 | 834 | 170.00 |
| 4 | COOK_CHICAGOWD13PR42 | 376 | 617 | 241.00 |
| 5 | COOK_CHICAGOWD18PR17 | 727 | 952 | 225.00 |
| 6 | COOK_CHICAGOWD1PR22 | 749 | 923 | 174.00 |
| 7 | COOK_CHICAGOWD1PR39 | 986 | 1126 | 140.00 |
| 8 | COOK_CHICAGOWD18PR13 | 59 | 203 | 144.00 |
| 9 | COOK_CHICAGOWD23PR21 | 450 | 567 | 117.00 |
| 10 | COOK_CHICAGOWD23PR40 | 627 | 778 | 151.00 |
| 11 | COOK_CHICAGOWD23PR52 | 603 | 711 | 108.00 |
| 12 | COOK_CHICAGOWD23PR54 | 808 | 965 | 157.00 |
| 13 | COOK_CHICAGOWD23PR7 | 117 | 850 | 733.00 |
| 14 | COOK_CHICAGOWD24PR44 | 276 | 417 | 141.00 |
| 15 | COOK_CHICAGOWD26PR19 | 630 | 1011 | 381.00 |
| 16 | COOK_CHICAGOWD26PR56 | 550 | 976 | 426.00 |
| 17 | COOK_CHICAGOWD28PR29 | 1266 | 1413 | 147.00 |
| 18 | COOK_CHICAGOWD31PR10 | 568 | 688 | 120.00 |
| 19 | COOK_CHICAGOWD31PR42 | 768 | 873 | 105.00 |
| 20 | COOK_CHICAGOWD31PR5 | 729 | 893 | 164.00 |
| 21 | COOK_CHICAGOWD31PR50 | 723 | 848 | 125.00 |
| 22 | COOK_CHICAGOWD33PR1 | 1846 | 2145 | 299.00 |
| 23 | COOK_CHICAGOWD33PR11 | 1369 | 1477 | 108.00 |
| 24 | COOK_CHICAGOWD33PR2 | 1242 | 1372 | 130.00 |
| 25 | COOK_CHICAGOWD35PR18 | 1301 | 1525 | 224.00 |
| 26 | COOK_CHICAGOWD35PR32 | 610 | 711 | 101.00 |
| 27 | COOK_CHICAGOWD36PR21 | 1111 | 1323 | 212.00 |
| 28 | COOK_CHICAGOWD36PR4 | 869 | 976 | 107.00 |
| 29 | COOK_CHICAGOWD37PR26 | 839 | 1021 | 182.00 |
| 30 | COOK_CHICAGOWD38PR9 | 715 | 878 | 163.00 |
| 31 | COOK_CHICAGOWD39PR24 | 1703 | 1994 | 291.00 |

D-125

| 32 | COOK_CICERO26 | 1247 | 1424 | 177.00 |
| 33 | COOK_ELKGROVE38 | 1825 | 2344 | 519.00 |
| 34 | COOK_LEYDEN12 | 318 | 531 | 213.00 |
| 35 | COOK_LEYDEN16 | 636 | 811 | 175.00 |
| 36 | COOK_LEYDEN17 | 1095 | 1231 | 136.00 |
| 37 | COOK_LEYDEN29 | 1023 | 1157 | 134.00 |
| 38 | COOK_LEYDEN4 | 1563 | 1733 | 170.00 |
| 39 | COOK_LEYDEN44 | 1055 | 1360 | 305.00 |
| 40 | COOK_LEYDEN45 | 464 | 867 | 403.00 |
| 41 | COOK_LEYDEN47 | 635 | 759 | 124.00 |
| 42 | COOK_LEYDEN77 | 624 | 734 | 110.00 |
| 43 | COOK_LEYDEN80 | 646 | 918 | 272.00 |
| 44 | COOK_LYONS31 | 129 | 272 | 143.00 |
| 45 | COOK_LYONS56 | 1013 | 1447 | 434.00 |
| 46 | COOK_LYONS58 | 1675 | 1817 | 142.00 |
| 47 | COOK_LYONS70 | 69 | 1052 | 983.00 |
| 48 | COOK_LYONS73 | 333 | 463 | 130.00 |
| 49 | COOK_LYONS75 | 56 | 578 | 522.00 |
| 50 | COOK_LYONS76 | 315 | 436 | 121.00 |
| 51 | COOK_LYONS90 | 410 | 571 | 161.00 |
| 52 | COOK_LYONS92 | 377 | 603 | 226.00 |
| 53 | COOK_LYONS99 | 1708 | 1879 | 171.00 |
| 54 | COOK_LYONS107 | 392 | 671 | 279.00 |
| 55 | COOK_PROVISO71 | 974 | 1231 | 257.00 |
| 56 | COOK_PROVISO97 | 411 | 515 | 104.00 |
| 57 | COOK_STICKNEY12 | 817 | 1002 | 185.00 |
| 58 | COOK_STICKNEY21 | 809 | 990 | 181.00 |
| 59 | COOK_WORTH109 | 192 | 433 | 241.00 |

D-125

Engstrom New Data Disclosure, Nov. 10, 2011: Unidentified and
Unverifiable Precincts, 2008 Dem Prim Cook Co State's Attorney

| | CONG_DEM (District in Adopted Plan) | CONG_F2 (District in Plaintiffs' Plan) | IL08PREC (Precinct Name) | SUM(electionbl ocks.VAPERSO NS) (VAP in Engstrom Data) |
|---|---|---|---|---|
| 1 | 4 | 5 | COOK_ | 0 |
| 2 | 1 | 4 | COOK_ | 245 |
| 3 | 9 | 3 | COOK_ | 169 |
| 4 | 7 | 3 | COOK_ | 305 |
| 5 | 7 | 4 | COOK_ | 882 |
| 6 | 8 | 3 | COOK_ | 905 |
| 7 | 4 | 4 | COOK_ | 1025 |
| 8 | 4 | 7 | COOK_ | 559 |
| 9 | 4 | 3 | COOK_ | 2366 |
| 10 | 5 | 3 | COOK_ | 3403 |
| 11 | 3 | 4 | COOK_ | 5446 |

D-125

Updated Table 4 to Lichtman's October 27, 2011 Response Report To Engstrom

Dr. Engstrom's Original and Corrected Results for his Analysis of the Support for Latino
Candidates in Adopted CD 4 and CD 4 Under Plaintiffs' Plan
(The red font is Engstrom's data from his 9-15-11 Report, pp. 10, 12 and his 10-15-11 Rebuttal
report, pp. 16-17. The blue font is Engstrom's corrected data from his 11-10-11
Supplemental Expert Report)

| ELECTION | LATINO CANDIDATE OF CHOICE OF LATINO VOTERS | % FOR LATINO CANDIDATE OF CHOICE IN CD 4 ADOPTED PLAN | % FOR LATINO CANDIDATE(S) CD 4 PLAINTIFFS' PLAN | DIFFERENCE |
|---|---|---|---|---|
| 2010 DEM PRIM COOK CO ASSESSOR | BERRIOS | 49.8% | 52.7% | +2.9% |
| | | 50.7% | 53.4% | +2.7% |
| 2010 DEM PRIM COOK CO ASSESSOR | BERRIOS & FIGUEROA COMBINED | 83.2% | 80.0% | -3.2% |
| | | 85.1% | 80.9% | -4.2% |
| 2008 DEM PRIM COOK CO STATE'S ATTY | ALVAREZ | 45.9% | 42.0% | -3.9% |
| | | 48.2% | 42.8% | -5.4% |
| 2010 DEM PRIM CIRCUIT COURT | RAMOS | 49.5% | 39.6% | -9.9% |
| | | 59.0% | 45.8% | -13.2% |
| 2008 DEM PRIM CIRCUIT COURT | REYES | 68.6% | 63.3% | -5.3% |
| | | 69.5% | 64.0% | -5.5% |
| 2010 GEN COOK CO ASSESSOR | BERRIOS | 52.9% | 52.1% | -0.8% |
| | | 54.6% | 53.3% | -1.3% |

1

D-126

| ELECTION | LATINO CANDIDATE OF CHOICE OF LATINO VOTERS | % FOR LATINO CANDIDATE OF CHOICE IN CD 4 ADOPTED PLAN | % FOR LATINO CANDIDATE(S) CD 4 PLAINTIFFS' PLAN | DIFFERENCE |
|---|---|---|---|---|
| 2008 GEN COOK CO STATE'S ATTY | ALVAREZ | 74.4% | 71.5% | -2.9% |
| | | 75.4% | 72.8% | -2.6% |
| ALL ELECTIONS | | 56.85% | 53.53% | -3.3% |
| | | 59.56% | 55.35% | -4.2% |
| ALL ELECTIONS LATINO CANDS COMBINED | | 62.4% | 58.1% | -4.3% |
| | | 65.3% | 59.9% | -5.4% |
| Source: Expert Report of Richard L. Engstrom, Sept. 15, 2011, pp. 10-12, Expert Response Report of Richard L. Engstrom, Oct. 15, 2011, p. 16, 17, Supplemental Expert Report of Richard L. Engstrom, November 10, 2011, Attachment A | | | | |

2

D-126



D-127

**Legend**

Adopted CD4

Area Examined in Exhibit B12

A-290

Adopted CD4

D–128

Adopted CD 4 Precincts West of Central Avenue

| Precinct | Total Pop |
|---|---|
| Berwyn 1-1 | 1,092 |
| Berwyn 1-4 | 82 |
| Berwyn 2-2 | 55 |
| Berwyn 2-4 | 664 |
| Berwyn Wd-1 Pct-5 | 1,019 |
| BERWYN WD2- PCT 1 | 1,206 |
| Berwyn Wd-2 Pct-6 | 880 |
| Berwyn Wd-2 Pct-7 | 924 |
| Berwyn Wd-3 Pct-1 | 1,520 |
| Berwyn Wd-3 Pct-2 | 686 |
| Berwyn Wd-3 Pct-3 | 1,219 |
| Berwyn Wd-3 Pct-4 | 993 |
| Berwyn Wd-3 Pct-5 | 721 |
| Berwyn Wd-3 Pct-6 | 825 |
| Berwyn Wd-3 Pct-7 | 813 |
| BERWYN WD4- PCT 1 | 1,303 |
| Berwyn Wd-4 Pct-2 | 2,127 |
| Berwyn Wd-4 Pct-3 | 1,120 |
| Berwyn Wd-4 Pct-4 | 1,257 |
| Berwyn Wd-4 Pct-5 | 1,360 |
| Berwyn Wd-5 Pct-1 | 1,976 |
| Berwyn Wd-5 Pct-2 | 1,909 |
| Berwyn Wd-5 Pct-3 | 1,851 |
| Berwyn Wd-5 Pct-4 | 1,195 |
| Berwyn Wd-6 Pct-1 | 1,195 |
| Berwyn Wd-6 Pct-4 | 1,578 |
| Berwyn Wd-6 Pct-5 | 1,486 |
| BERWYN WD8- PCT 2 | 2,048 |
| Berwyn Wd-8 Pct-4 | 1,217 |
| Cicero 12 | 931 |
| Cicero 14 | 2,075 |
| Cicero 15 | 1,788 |
| Cicero 16 | 2,180 |
| Cicero 17* | 1,359 |
| Cicero 18 | 1,548 |
| Cicero 19 | 2,267 |
| Cicero 21 | 1,476 |
| Cicero 22 | 676 |
| Cicero 23 | 1,504 |
| Cicero 24* | 994 |
| Cicero 25* | 1,475 |
| Cicero 27 | 1,621 |
| Cicero 28 | 1,208 |
| Cicero 31 | 1,928 |
| Cicero 33 | 1,144 |
| Cicero 34 | 2,043 |

A292

D-129

Adopted CD 4 Precincts West of Central Avenue

| Precinct | Total Pop |
|---|---|
| Cicero 35 | 1,780 |
| Cicero 36 | 1,891 |
| Cicero 37 | 1,343 |
| Cicero 38 | 963 |
| Cicero 41* | 254 |
| Cicero 47* | 709 |
| Leyden 58 | 724 |
| Leyden 63 | 552 |
| Leyden 67 | 900 |
| Oak Park 25 | 5 |
| Oak Park 33 | 14 |
| Oak Park 54 | 6 |
| Prosiso 130 | 880 |
| Proviso 10 | 3,702 |
| Proviso 102 | 652 |
| Proviso 109 | 710 |
| Proviso 11 | 2,507 |
| PROVISO 111 | 1,448 |
| Proviso 114 | 687 |
| Proviso 117 | 547 |
| Proviso 118 | 1,280 |
| Proviso 12 | 1,256 |
| Proviso 120 | 669 |
| PROVISO 121 | 1,433 |
| Proviso 122 | 1,482 |
| Proviso 129 | 812 |
| Proviso 13 | 1,152 |
| Proviso 136 | 0 |
| Proviso 14 | 2,759 |
| Proviso 140 | 1,788 |
| Proviso 141 | 751 |
| Proviso 143 | 1,232 |
| Proviso 145 | 1,563 |
| Proviso 146 | 863 |
| Proviso 15 | 2,684 |
| Proviso 16 | 0 |
| Proviso 22 | 984 |
| Proviso 25 | 723 |
| Proviso 27 | 1,505 |
| Proviso 29 | 911 |
| Proviso 30 | 18 |
| Proviso 31 | 777 |
| Proviso 32 | 519 |
| Proviso 54 | 485 |
| Proviso 6 | 956 |
| Proviso 63 | 512 |

Adopted CD 4 Precincts West of Central Avenue

| Precinct | Total Pop |
|---|---|
| PROVISO 7 | 159 |
| Proviso 71 | 1,657 |
| Proviso 75 | 1,435 |
| Proviso 78 | 1,738 |
| Proviso 8 | 1,235 |
| Proviso 84 | 847 |
| Proviso 85 | 838 |
| Proviso 87 | 1,025 |
| Proviso 88 | 1,702 |
| Proviso 89 | 937 |
| Proviso 9 | 1,355 |
| Proviso 90 | 846 |
| Proviso 97 | 665 |
| Proviso 98 | 1,173 |
| River Forest 1 | 677 |
| River Forest 10 | 677 |
| River Forest 15 | 752 |
| Riverside 1 | 667 |
| Riverside 10 | 1,447 |
| Riverside 11 | 809 |
| Riverside 12 | 1,050 |
| Riverside 13 | 658 |
| Riverside 14 | 727 |
| Riverside 15 | 944 |
| Riverside 16 | 757 |
| Riverside 17 | 821 |
| Riverside 2 | 279 |
| Riverside 3 | 828 |
| Riverside 4 | 750 |
| Riverside 5 | 1,321 |
| RIVERSIDE 6 | 1,328 |
| Riverside 7 | 1,045 |
| Riverside 8 | 1,119 |
| Riverside 9 | 856 |
| Wd 29 Pct 2 | 1,824 |
| Wd 29 Pct 24 | 1,993 |
| Wd 29 Pct 30 | 1,158 |
| Wd 29 Pct 32 | 1,883 |
| Wd 29 Pct 39 | 1,749 |
| Wd 29 Pct 6 | 1,671 |
| Wd 29 Pct 9 | 1,364 |
| Wd 30 Pct 10 | 1,753 |
| Wd 30 Pct 11 | 808 |
| Wd 30 Pct 12 | 1,444 |
| Wd 30 Pct 17 | 1,228 |
| Wd 30 Pct 2 | 881 |

Adopted CD 4 Precincts West of Central Avenue

| Precinct | Total Pop |
|---|---|
| Wd 30 Pct 28 | 1,277 |
| Wd 30 Pct 34 | 982 |
| Wd 30 Pct 37* | 142 |
| Wd 30 Pct 6 | 973 |
| Wd 31 Pct 15 | 906 |
| Wd 36 Pct 1 | 1,334 |
| Wd 36 Pct 14 | 1,613 |
| Wd 36 Pct 15 | 1,417 |
| Wd 36 Pct 16 | 128 |
| Wd 36 Pct 19 | 1,708 |
| Wd 36 Pct 2 | 1,163 |
| Wd 36 Pct 22 | 989 |
| Wd 36 Pct 23 | 352 |
| Wd 36 Pct 3 | 1,245 |
| Wd 36 Pct 4 | 1,374 |
| Wd 36 Pct 45 | 817 |
| Wd 36 Pct 51 | 1,681 |
| Wd 36 Pct 52 | 1,902 |
| Wd 36 Pct 54 | 102 |
| Wd 36 Pct 55 | 859 |
| Wd 37 Pct 11 | 1,390 |
| Wd 37 Pct 39 | 2,868 |

Total Population

| | |
|---|---|
| West of Central Ave: | 184,028 |
| Entire District | 712,813 |

* Indicates a precinct that is entirely within CD4, but portions of which extend east of Central Ave.
Population totals for starred precincts indicates only population west of Central Ave.

SUPPLEMENTAL REPORT OF ALLAN J. LICHTMAN REGARDING DR. ENGSTROM'S
DATABASE IN HIS SEPTEMBER 15 AND OCTOBER 15, 2011 REPORTS COMPARED TO
HIS DATABASE IN HIS NOVEMBER 10, 2011 REPORT.

November 14, 2011

In this Supplemental Report dated November 10, 2011, Dr. Engstrom states that I offered a new oral opinion at my November 2, 2011 deposition about how "split precincts" affected the voting analysis that Dr. Engstrom provided in his first two reports. I opined on errors in Dr. Engstrom's database that affected his accounting of "split precincts" at the first opportunity. Dr. Engstrom's first disclosure on September 19, 2011 did not include the databases on which he relied. This first disclosure included election returns in pdf form that were not limited to his area of interest or adjusted in any way for split precincts. I only received Dr. Engstrom's actual databases on October 19, 2011, a month after submission of Dr. Engstrom's first report dated September 19, 2011.

Dr. Engstrom only changed his databases in his November 10, 2011 Supplemental Expert Report after I criticized his use of split precincts during my deposition on November 2, 2011. Dr. Engstrom created new databases for every election he analyzed and changed virtually every number contained in his first two reports.

D-126 is an updated version of Table 4, which is contained in my October 27, 2011 Response Report to Engstrom's Rebuttal report. I updated Table 4 to include Engstrom's corrected results from his November 10, 2011 Supplemental Expert Report, which results are indicated in blue font. Updated Table 4 now is a compilation and summary of Engstrom's reconstituted election analyses for Adopted CD 4 and Plaintiffs' CD 4 from his three reports. As I received Dr. Engstrom's revised data and report a few days ago, I cannot attest to the accuracy of Dr. Engstrom's new databases and results.

D-123 is an updated version of Table 2, which is contained in my October 27, 2011 Response Report to Engstrom's Rebuttal report. I updated Table 2 to include shading indicating elections that I analyzed, elections that Engstrom analyzed, and elections that we both analyzed. None of the analytic results reported in the Updated Table 2 have changed, but I did correct the names of some of the candidates listed in the original Table 2. In the updated table I also provided an explanation of my analysis of the two countywide judicial elections.

D-122 is a table I prepared based upon my initial report and Dr. Engstrom's first and second reports comparing the legislative election analyzed in Dr. Engstrom's and my report.

D-124 contains a table I prepared that shows precincts in Dr. Engstrom's second data disclosure of October 19, 2011 in which the VAP was less than the votes cast. This analysis was solely internal to Dr. Engstrom's databases. The second table contained in D-124 also based on Engstrom's second data disclosure of October 19, 2011. This table contains precincts in which the VAP in Dr. Engstrom's databases is different than the VAP for the precincts provided by Ann Schaffer of staff of the Redistricting Office of the Illinois Speaker of the House of Representatives for the state. The difference for a precinct has to be least 100 VAP. During my deposition on November 2, 2011, I disclosed that Ann Schaffer had provided me with data.

D-125 contains a table that I prepared based upon Dr. Engstrom's third data disclosure on November 10, 2011. It contains precincts in which the VAP in Engstrom's corrected database is

different from the VAP for the precincts provided to me by Ann Schaffer for the state, with a difference greater than 100. The second table contained in D-125 I also prepared based upon Dr. Engstrom's third data disclosure of November 10, 2011. It contains precincts identified in Engstrom's corrected database and whose identity I could not verify.


__s/Allan Lichtman_____          _____11/14/11_____ _____
Allan Lichtman                         Date

**Report on the Geographic Compactness of Illinois Congressional District 4**

My name is Gerald R. Webster, and I currently reside in Laramie, Wyoming. I am a Professor of Geography in the Department of Geography at the University of Wyoming, where I also serve as departmental chair. I am beginning my fifth year in my present position. Prior to assuming my duties at Wyoming in the fall of 2007, I was a faculty member in the Department of Geography at the University of Alabama for 18 years, and served as departmental chair from 2000 to 2007. I am a member of the Association of American Geographers (AAG), Southeastern Division of the AAG, Great Plains-Rocky Mountain Division of the AAG and National Council for Geographic Education. I presently serve on the editorial board of *Political Geography*.

My formal education includes an undergraduate degree in political science from the University of Colorado at Denver (1975), a Masters of Science degree in geography from Western Washington University (1981) and a Ph.D. in geography from the University of Kentucky (1984). My primary research and teaching interests are in political geography, including a focus on redistricting. I have authored or co-authored over 70 book chapters and articles in refereed journals. I have also served as a consultant and expert witness in a number of redistricting cases in the states of Alabama, Mississippi, North Carolina, Virginia, Florida, Louisiana and Illinois. In 2001, I provided testimony via affidavit to the Illinois Supreme Court pertaining to the geographic compactness of the state's 118 House and 59 Senate districts.

The purpose of the present report is to evaluate the geographic compactness of Illinois Congressional District 4 in the 2011 Adopted Plan. Before proceeding it is important to explain my procedures for evaluating the geographic compactness of representational districts. There are several different methods that have been proposed to evaluate geographic compactness over the past few decades. The two measures employed here are the geographic dispersion or Reock Measure, and the perimeter or Polsby-Popper Measure. The geographic dispersion and perimeter measures focus on different aspects of geographic compactness and are most appropriately considered in tandem (Webster 2004: 44-5). These two measures were highlighted in a 1993 *Michigan Law Review* article by Richard Pildes and Richard Niemi, and have become the most commonly employed measures for evaluating district compactness. Adding to the relevance of both measures was the citation of the Pildes and Niemi article in the Supreme Court's 1996 decision in *Bush v. Vera*.

The geographic dispersion compactness measure focuses on the level of spatial concentration of a district's geographic area. To calculate this indicator the smallest possible circle is circumscribed around a district. The reported coefficient is the proportion of the area in the circle that is also included in the district. The coefficient ranges from 1.0 (most compact) to 0.0 (least compact). Notably, a perfect square has a geographic dispersion coefficient of 0.64, and a typical rectangle has a score of approximately 0.40.

The perimeter compactness measure focuses on the length of a district's perimeter relative to the quantity of area included in the district. The reported coefficient is the proportion of the area in the district relative to a circle with the same perimeter. The coefficient also theoretically ranges from 1.0 (most compact) to 0.0 (least compact). A perfect square has a perimeter compactness coefficient of 0.78, and a typical rectangle has a coefficient of approximately 0.60.

The above noted Pildes and Niemi (1993: 565) article provides guidance for evaluating the two compactness measures. Paying substantial attention to the Court's language in *Shaw v. Reno* (1993), they propose cutoff levels for low compactness. With respect the geographic dispersion compactness measure they suggest low is equal to or less than 0.15. On the perimeter measure they suggest that low is equal to or less than 0.05. With regard to this guidance they state that "In choosing the cutoff points used . . . [here] . . . we do not imply that all districts below these points or only those districts are vulnerable after *Shaw*" (Pildes and Niemi 1993: 564).

New redistricting plans are typically compared to the plans they replace. Here I compare CD 4 in the Adopted Plan with the same district in the 2001 benchmark plan and 1991 plan. The district compactness calculations included in this evaluation were performed by the Cartographic Research Laboratory at the University of Alabama, Tuscaloosa, Alabama, using the Maptitude redistricting software. The calculations are based upon district shape files provided by the state of Illinois.

As noted earlier, Pildes and Niemi (1993: 565) provide guidance for cutoff points indicating low geographic compactness on both measures. On the Reock or geographic dispersion measure they suggest that low compactness is equal to or less than 0.15. In the 1991 plan CD 4 had a geographic dispersion compactness coefficient of 0.20, which rose to 0.21 in the 2001 benchmark plan. In the 2011 Adopted Plan, the coefficient rose further to 0.30, fully twice the suggested cut off level for low compactness. Notably this coefficient is also well above that calculated by Professor Engstrom in his Expert Report (p. 11). Due to this contrast in calculations, the University of Alabama Cartographic Research Laboratory undertook their analysis a second time and confirmed their initial results.

Pildes and Niemi (1993: 565) suggest that low compactness on the perimeter or Polsby-Popper compactness measure is equal to or less than 0.05. In the 1991 plan CD 4 had a perimeter compactness score of 0.02, below the suggested benchmark. In the 2001 plan CD 4's perimeter compactness score doubled to 0.04, and rose again to 0.05 in the 2011 plan. Thus, CD 4's score in the Approved Plan is more compact than it was in either of the past two decadal congressional districting plans.

**Conclusions**

This report has three principal findings.

1. Professor Engstrom's calculation of the geographic dispersion or Reock Compactness measure for CD 4 in the 2011 Adopted Plan is incorrect. In the Adopted Plan the coefficient for CD 4's level of geographic dispersion compactness is 0.30.
2. The compactness scores for CD 4 on the geographic dispersion and perimeter compactness measures are at or above the Pildes and Niemi (1993: 565) suggested cut off levels for low compactness.
3. CD 4's level of geographic compactness increased in the Adopted Plan on both measures when comparing the district to its predecessors in the 1991 plan and 2001 benchmark plan.

**References**

Pildes, R.H. and Niemi, R.G. 1993. "Expressive Harms, 'Bizarre Districts,' and Voting Rights: Evaluating Election-District Appearances After *Shaw v. Reno*," *Michigan Law Review*, 92: 483-587.

Webster, G.R. 2004. "Evaluating the Geographic Compactness of Representational Districts," in *WorldMinds: Geographical Perspectives on 100 Problems*, eds. D.G. Janelle, B. Warf, and K. Hansen, pp. 43-48. Boston: Kluwer Academic.

**Facts or Data Relied Upon in Reaching My Conclusions**

1) Congressional district shape files for the 1990s, 2000s and the 2011 Adopted Plan provided by the staff of the Redistricting Office of the Speaker of the Illinois House of Representatives. These were used by the University of Alabama Cartographic Research Laboratory to calculate the compactness coefficients for CD 4.

2) Maps of congressional districts in Illinois in the 1990s, 2000s and in the 2011 Adopted Plan produced by the University of Alabama Cartographic Research Laboratory.

3) The two references listed above in the "References" section.

D-30

**Additional Information**

1) My Curriculum Vita accompanies this report and lists all publications and court cases I have worked on in the past.

2) My compensation is $150 per hour.

D-30

Executed on October 4, 2011:

D-30



# A PROFILE OF LATINO ELECTED OFFICIALS IN THE UNITED STATES AND THEIR PROGRESS SINCE 1996

The growth in the number of Latino elected officials in the United States is one sign of the political progress of the Latino population. This progress is due partly to the increasing ability of the Latino community to translate its population growth into increased political participation. Initiatives to mobilize Latino voters and promote their engagement in the political process have contributed greatly to the growth of the Latino electorate. However, the ability of Latino elected officials to gain and retain public office also reflects their success in the effective representation of all voters - both Latino and non-Latino.

## LATINO ELECTED OFFICIALS IN 2010

At the beginning of January 2010, there were 5,739 Latinos serving in elected office nationwide.[1] As the following table indicates, while there are Latino elected officials serving at virtually all levels of government, nearly two-thirds (66%) are either municipal or school board officials.

### Latino Elected Officials by Level of Office: 2010

| Level of Office | Number |
| --- | --- |
| Federal | 24 |
| Statewide Officials (including Governor) | 7 |
| State Legislators | 245 |
| County Officials | 563 |
| Municipal Officials | 1,707 |
| Judicial/Law Enforcement Officials | 874 |
| School Board/Education Officials | 2,071 |
| Special District Officials | 248 |
| Total | 5,739 |

---

[1] Generally, the data on Latino elected officials in this *Profile* reflect those who were in office as of June 2010 (for U.S. Senators and Representatives and State Senators and Representatives) or as of January 2010 (for all other elected officials).

## STATE DISTRIBUTION

Latino elected officials serve in 43 of the nation's 50 states. Nearly half (43% serve in Texas). Most Latino elected officials (95%) serve in states or regions that are traditional centers of Latino population including California and the Southwest, Florida, New Jersey, New York and Illinois.

### Latino Elected Officials by State: 2010

| State | Number |
|-------|--------|
| Texas | 2,459 |
| California | 1,311 |
| New Mexico | 714 |
| Arizona | 362 |
| Florida | 158 |
| Colorado | 167 |
| Illinois | 113 |
| New Jersey | 113 |
| New York | 73 |
| Other states | 269 |
| Total | 5,739 |

## GENDER

Nearly three-quarters of Latino elected officials are male (68%), and 32% are female.

### Latino Elected Officials by Gender: 2010

| Gender | Number |
|--------|--------|
| Male | 3,881 |
| Female | 1,858 |
| Total | 5,739 |

The level of representation of Latinas at higher offices in the United States is greater than the level for all female officeholders. For example, 16.8% of all U.S. Representatives are female; however, 26.1% of the Latinos in the House are women. According to the Center for American Women and Politics at Rutgers University, women hold 22.0% of the nation's state senate seats and 25.4% of the state lower house seats. In comparison, Latinas comprise 34.9% of the Latino state senators, and 27.9% of the Latino state lower house members.

*See "Methodology" at the end of this profile.*

2

## PARTY AFFILIATION

Over three-quarters (76%) of Latino elected officials are not publicly affiliated with either major political party or serve in offices that are elected on a non-partisan basis. Only 24% of Latino elected officials serve in partisan offices or are publicly affiliated with either major political party; of these, 91.5% are Democrat and 8.5% are Republican.

**Latino Elected Officials by Party Affiliation: 2010**

| Party Affiliation | Number |
|---|---|
| Non-partisan/Unaffiliated | 4,371 |
| Democrat | 1,248 |
| Republican | 116 |
| Independent | 4 |
| Total | 5,739 |

## A COMPARISON OF LATINO ELECTED OFFICIALS: 1996 AND 2010

The number of Latino elected officials has grown significantly over the past ten years. In 1996, there were 3,743 Latinos serving in elected office. By 2010, that number had grown by 1,996 to 5,739 – a 53% increase.

**Latino Elected Officials by Level of Office: 1996 and 2010**

| Level of Office | 1996 | 2010 | Change |
|---|---|---|---|
| Federal | 17 | 24 | 41.2% |
| Statewide Officials (including Governor) | 6 | 7 | 16.7% |
| State Legislators | 156 | 245 | 57.1% |
| County Officials | 358 | 563 | 57.3% |
| Municipal Officials | 1,295 | 1,707 | 31.8% |
| Judicial/Law Enforcement Officials | 546 | 874 | 60.1% |
| Education/School Board Officials | 1,240 | 2,071 | 67.0% |
| Special District Officials | 125 | 248 | 98.4% |

The growth of Latinos serving in offices that are elected statewide is of interest. In 1996, there were no Latinos serving in the United States Senate. Five of the six Latino state officials were serving in New Mexico, including three Corporation Commissioners, the Secretary of State and the State Auditor. The other state official was the Texas Attorney General. In 2010, there is now one Latino U.S. Senator, representing New Jersey. In New Mexico, the Latino state officials include the Governor, the Secretary of State and State Auditor. Other Latinos now serving in state office include the Superintendent of Public Education in Idaho, the Attorney General in

Nevada, and the Superintendent of Public Instruction in Oregon. In Texas, one of the statewide Railroad Commissioners is Latino.

The growth of Latinos serving in statewide offices demonstrates the increasing ability of Latinos to win elections in statewide campaigns where they must attract votes from a significant number of non-Latino voters. This is particularly true for the officials serving in states such as Idaho, New Jersey, and Oregon where less than 25% of the state's population is Latino.

## STATE GROWTH

In both 1996 and 2010, Latino elected officials tended to be concentrated in the Southwest – in both years, the top four states with the largest number of Latino elected officials were Texas, California, New Mexico, and Arizona. However, there was rapid growth in states outside the Southwest, including Illinois, New Jersey, and states which have emerging Latino populations. In 1996, Latino elected officials served in 34 states; by 2010, that number had increased to 43.

**Latino Elected Officials by State: 1996 and 2010**

| State | 1996 | 2010 | Change |
|-------|------|------|--------|
| Texas | 1,687 | 2,459 | 45.8% |
| California | 693 | 1,311 | 89.2% |
| New Mexico | 623 | 714 | 14.6% |
| Arizona | 298 | 362 | 21.5% |
| Florida | 72 | 158 | 119.4% |
| Colorado | 161 | 167 | 3.7% |
| Illinois | 41 | 113 | 175.6% |
| New Jersey | 33 | 113 | 242.4% |
| New York | 40 | 73 | 82.5% |
| Other states | 95 | 269 | 183.2% |

The increasing number of Latino elected officials in states outside the traditional areas of Latino population concentration is due both to the growth of the Latino population in those states, and the development of mobilization efforts and political infrastructures that helped Latinos gain office. In 1996, there were no Latino elected officials in Alaska, Georgia, Kentucky, New Hampshire, Missouri, North Dakota, Oklahoma, Tennessee or Virginia; by 2010, Georgia had six, Missouri and New Hampshire each had four, Oklahoma, Tennessee and Virginia each had three, Alaska had two, and Kentucky and North Dakota each had one. Other states with significant gains in Latino elected officials between 1996 and 2010 include Connecticut (from 13 to 29), Maryland (from 2 to 10), Massachusetts (from 8 to 25); Michigan (from 4 to 11); Nevada (from 5 to 13); Oregon (from 1 to 11); Rhode Island (from 1 to 8); and Wisconsin (from 2 to 7).

## GENDER

Between 1996 and 2010, the number of Latina elected officials grew faster than the number of male Latino officials – the number of Latinas increased by 105%, compared to 37% for male Latinos. As a result, the Latina share of all Latino elected officials grew from 24% in 1996 to 32% in 2010.

### Latino Elected Officials by Gender: 1996 and 2010

|        | 1996   |         | 2010   |         |
|--------|--------|---------|--------|---------|
|        | Number | Percent | Number | Percent |
| Male   | 2,836  | 75.8%   | 3,881  | 67.6%   |
| Female | 907    | 24.2%   | 1,858  | 32.4 %  |

## CONCLUSION

The comparison of Latino elected officials in 1996 and 2010 reveals some trends that are likely to continue in the future – the overall growth in the number of Latino elected officials nationwide, the increase of Latino elected officials in "emerging population" states, and the continued progress of Latinas in elected office. The comparison also suggests some future challenges for the Latino community and some milestones that have yet to be attained. There is currently only one Latino in the U.S. Senate, and only one Latino Governor (New Mexico's Bill Richardson).

However, future Latino political progress will not just occur automatically as the Latino population continues to grow. The Latino community must continue the successful empowerment strategies of the past three decades. We must promote U.S. citizenship for the nearly four million Latino legal permanent residents who are currently eligible to naturalize. We must mobilize Latino citizens to cast their ballots through effective voter registration and engagement efforts. We must ensure that the Latino community has a meaningful voice in the 2011 redistrictings, so that Congressional, state and local jurisdiction maps provide Latinos with a fair opportunity to choose their elected representatives. We must develop the political infrastructure to support future Latino leaders throughout the country. The success of these efforts is critical for our nation as a whole. Latino political progress does not just mean that more Latinos have the opportunity to share their talents and skills by serving in elected office – it also means that our nation's democracy remains truly representative and vital.

*See "Methodology" at the end of this profile.*

5

# METHODOLOGY

<u>Compilation and verification of data about Latino elected officials:</u> Since 1984, the NALEO Educational Fund has conducted an annual verification to ascertain the number of Latino elected officials nationwide. As part of this enumeration process, we re-verify Latino elected officials identified during the last annual verification. The NALEO Educational Fund also identifies officeholders through the state and local government directories, World Wide Websites on the Internet, newspapers' listings of national and local election results, and membership lists of national and state organizations. Additionally, we learn of Latino elected officials through our own constituency services and civic engagement programs. We also arrange for the review of our lists of Latino elected officials in certain jurisdictions, by Board members, local civic leaders, representatives of community-based organizations, and other stakeholders.

While the NALEO Educational Fund believes its compilation of information about Latino elected officials is the most comprehensive conducted in the United States, our data are subject to certain limitations. First, to some extent we rely on Spanish surnames to help identify potential Latino elected officials, and we may not initially identify an individual without a Spanish surname as potentially being Latino. However, once we identify individuals as potentially being Latino, we conduct a verification to definitively ascertain that they are Latino, regardless of their surname.

Additionally, because of the large number of local jurisdictions, and the frequency with which they hold elections, it is not possible for the NALEO Educational Fund to review the election results of every local jurisdiction in the nation. As noted above, much of verification process involves re-verifying information about Latinos currently serving in office, and compiling information about any changes in the jurisdictions in which they serve. Thus, our verification process is more effective at identifying Latino elected officials in local jurisdictions where Latinos are currently serving in office than in identifying newly-elected officials in local jurisdictions where no Latinos currently serve. We have partly addressed this limitation by compiling information from the lists maintained by the Latino or Hispanic caucuses of local election official professional associations, such as the Hispanic Elected Local Officials of the National League of Cities, or the Hispanic Caucus of the National School Board Association.

<u>Comparability of data between 1996 and 2010:</u> There are certain changes in electoral procedures, the classification of elected officials, and our verification process which affect the comparability of data on Latino elected officials between 1996 and 2009. First, we continue to make improvements in our verification process which enable us to enhance our identification of Latino elected officials. In particular, the review of our lists of Latino elected officials by stakeholders in certain jurisdictions has greatly improved our identification of Latino officeholders in those areas. The greater availability of jurisdiction websites with information about elected officials has also assisted us in better identification of Latino officeholders. Thus, the increase in the number of Latino elected officials in some jurisdictions between 1996 and 2010 may not only reflect the political progress of Latinos in those areas, but also our enhanced verification capabilities.

In 1996, the Corporation Commissioners of New Mexico were elected on a statewide basis at large and are included in our 1996 data as "statewide officials." In 2006, the responsibilities held by Corporation Commissioners are now held by New Mexico's Public Regulation Commissioners, and the Public Regulation Commissioners are elected in individual districts. Thus as of 2006, Public Regulation Commissioners are classified as "special district officials."

In 1996, the NALEO Educational Fund classified Texas county judges as "judicial/law enforcement officials." Starting in 2000, the NALEO Educational Fund began to classify those judges as "county officials" based on the nature of their county administrative and executive responsibilities.

In 2004, New York City replaced its community school boards with 32 community education councils, each governing a community school district. Members of the public elected representatives to the community school boards, and in 1996, those representatives were included as Latino elected officials. Members of the new community education councils are selected by either officers of the community school district's parent and parent-teacher associations; the borough president; or the community superintendent. Thus, we no longer classify community education councilmembers as elected officials. In 1996, we included 37 Latino New York City community school board members. As a result of the replacement of the school boards with educational councils, the comparison of Latino elected officials between 1996 and 2010 in New York may somewhat understate the full extent of the increase in Latino elected officials between those years.

Additionally, for the purposes of this profile, the NALEO Educational Fund has not included the number of Latino Chicago local school councilmembers (LSC's) in its data on Latino elected officials. The number of LSC's fluctuates widely from year to year, and the inclusion in the statistics in this fact sheet could distort the comparability of data between different states and between different time periods.

**COMPARISON OF LATINO V. NON-LATINO LEGISLATIVE ELECTIONS
ANALYZED BY DR. ENGSTROMAND DR. LICHTMAN**

| LEGISLATIVE ELECTIONS INCLUDED IN DR. ENGSTROM'S ELECTORAL STUDIES | LEGISLATIVE ELECTIONS INCLUDED IN DR. LICHTMAN'S STUDIES, EXCLUDED BY DR. ENGSTROM |
|---|---|
| | |
| **2010 DEM PRIM COOK COUNTY BOARD DISTRICT 16** | **2010 DEM PRIM CONGRESSIONAL DISTRICT 3** |
| | **2009 GENERAL CONGRESSIONAL DISTRICT 5** |
| | **2002 DEM PRIM STATE SEN 20** |
| | **2006 DEM PRIMSTATE REP 3** |
| | **2008 DEM PRIMSTATE REP 3** |
| | **2010 DEM PRIMSTATE REP 2** |
| | **2010 DEM PRIMSTATE REP 23** |
| | **2006 GENERALSTATE REP 24** |
| | **2006 GENERAL STATE REP 44** |
| | **2008 GENERALSTATE REP39** |
| | **2008 GENERALSTATE REP44** |
| | **2010 GENERALSTATE REP 39** |
| | **2010 GENERALSTATE REP 44** |