Page 134

1  BY THE WITNESS:
2     A.  This -- I'm -- this map was filed as part
3  of our injunction, and when it was filed was the
4  first time I saw the map.
5  BY MR. BRUCE:
6     Q.  And my question is, you don't know where
7  it came from, true?
8        MS. LIGHTFOOT:  Objection;
9  mischaracterizes his testimony.  And if the answer
10  to that question involves a privileged
11  communication with counsel, I would instruct you
12  not to answer.  Otherwise, feel free.
13  BY THE WITNESS:
14     A.  And I believe it's political -- I mean,
15  privileged communication with my counsel.  I will
16  not.
17  BY MR. BRUCE:
18     Q.  Okay.  So other than what your lawyers
19  have told you, sir, do you know who drew the map
20  that's marked as Exhibit 5 and entitled the Fair
21  Congressional Map?
22     A.  No.
23     Q.  Do you know -- other than what your
24  lawyers have told you, do you know the intent of

Page 135

1  any of the individuals that drew the lines on that
2  map?
3        MS. LIGHTFOOT:  Object to the form,
4  assumes facts not in evidence.
5  BY THE WITNESS:
6     A.  No.
7  BY MR. BRUCE:
8     Q.  Have you reviewed the demographic
9  information concerning the -- what has been titled
10  the Fair Congressional Map?
11        MS. LIGHTFOOT:  You can answer that
12  question yes or no, if you understand the question.
13  BY THE WITNESS:
14     A.  And if I can just for clar- -- I'm not
15  sure of timeline.  Before or after?  I mean,
16  after --
17  BY MR. BRUCE:
18     Q.  I'll help you out.  At any time, sir, have
19  you seen any demographic information that would
20  correspond with the map which has been titled,
21  quote:  The Fair Congressional Map which is
22  attached to Exhibit 5 of your deposition?
23        MS. LIGHTFOOT:  And you can answer that
24  yes or no.

Page 136

1  BY THE WITNESS:
2     A.  Yes.
3  BY MR. BRUCE:
4     Q.  And where did you first see that
5  information?
6        MS. LIGHTFOOT:  You can answer that
7  question.
8  BY THE WITNESS:
9     A.  In consultations with the attorneys.
10  BY MR. BRUCE:
11     Q.  And is the sole basis of -- your
12  demographic knowledge of the Congressional map
13  which was provided to you by your attorneys, is the
14  sole basis of that from your attorneys, or do you
15  have an independent basis of that demographic data?
16        MS. LIGHTFOOT:  Object to the form of the
17  question, mischaracterizes the prior testimony in
18  the record, but you can answer it.
19  BY THE WITNESS:
20     A.  Sole information is from attorneys.
21  BY MR. BRUCE:
22     Q.  And just for the record -- and I don't
23  want to belabor the point.  It's my understanding,
24  sir, that you gave an interview after this lawsuit

Page 137

1  was filed to a member of the press and it was
2  videotaped; is that true?
3     A.  That's true.
4        MR. BRUCE:  All right.  And am I correct,
5  counsel, that you're going to object and preclude
6  me from showing the Congressman the video and ask
7  him questions regarding that?
8        MS. LIGHTFOOT:  You are not correct.
9        MR. BRUCE:  Okay.  Are you going to allow
10  me to ask questions about that and show it to him?
11        MS. LIGHTFOOT:  I have an objection to the
12  method of disclosure of this videotape as -- as we
13  indicated.  You sent me an email at 6:30 last night
14  after the State Board of Elections, who you
15  represent, had produced responsive documents to a
16  series of discovery requests that we had tendered
17  upon the state.
18        The first that I heard that there was
19  going to be any supplementation of the documents
20  that were produced is when you sent me an email
21  last night with a video link.  I object to the form
22  in which that production was made, but we'll take
23  whatever questions you have on a
24  question-by-question basis.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

- - - - - - - - - - - - - - - - - -X
COMMITTEE FOR A FAIR AND BALANCED     :
MAP, JUDY BIGGERT, ROBERT J. DOLD,    :
RANDY HULTGREN, ADAM KINZINGER,       :
DONALD MANZULLO, PETER J. ROSKAM,     :
BOBBY SCHILLING, AARON SCHOCK,        :
JOHN M. SHIMKUS, JOE WALSH, RALPH     :
RANGEL, LOU SANDOVAL, LUIS            :Case No. 1:11-cv-05065
SANABRIA, MICHELLE CABALLERO,         :
EDMUND BREZINSKI, and                 :
LAURA WAXWEILER,                      :
              Plaintiffs,             :
     v.                               :
ILLINOIS STATE BOARD OF ELECTIONS,    :
WILLIAM M. MCGUFFAGE,                 :
JESSE R. SMART, BRYAN A. SCHNEIDER,   :
BETTY J. COFFRIN, HAROLD D. BYERS,    :
JUDITH C. RICE, CHARLES W. SCHOLZ,    :
and ERNEST L. GOWEN,                  :
              Defendants.             :
- - - - - - - - - - - - - - - - - -X

                        Washington, D.C.
                        Thursday, October 6, 2011


         Videoconference Deposition of AARON
SCHOCK, a witness herein, called for examination by
counsel for Defendants, in the above-entitled matter,
pursuant to  notice, the witness being duly sworn by

SUSAN L. CIMINELLI, a Notary Public in and for the
District of Columbia, taken at the offices of Mayer
Brown, LLP, 1999 K Street, N.W., Washington, D.C., at
3:36 p.m., and the proceedings being taken down by
Stenotype by SUSAN L. CIMINELLI, CRR, RPR.

Schock, Aaron                                    October 6, 2011

Page 10

1    A.   No.
2         MR. PANOFF:  Objection. Foundation.
3    BY MR. BRUCE:
4    Q.   Yes.  I think I said if there was a public
5    announcement.  You're not aware, Congressman of any
6    public announcement by any sitting United States
7    Congressman that has indicated that they will be
8    running against you, is that true?
9    A.   No.  I'm not aware of anyone who is a
10   United States Congressman announcing that they are
11   going to run against me in the 18th Congressional
12   District.
13   Q.   Congressman, did you have any involvement
14   at all in drawing the congressional district map that
15   was passed into law in Springfield?
16        MR. PANOFF:  Object to the form.  Go ahead
17   and answer.
18        THE WITNESS:  No.
19   BY MR. BRUCE:
20   Q.   At any time during the redistricting
21   process, did you speak to any Illinois state
22   legislator regarding the congressional map that was

Page 11

1    passed into law?
2    A.   Well, any Illinois legislator?  Obviously
3    after the election in November of last year when it
4    became apparent who was going to control the House,
5    the Senate and the Governorship, there was a lot of
6    speculation among members of Congress, as well as
7    State Reps. and State Senators as to what a
8    Democratic House, Senate and Governor would do in
9    terms of drawing a map.
10        So I know that I had multiple
11   conversations with people who are in the state
12   legislature about the map process.  But if you're
13   speaking, did I -- was I privy to any insider
14   discussion or people who were actually drawing the
15   map, the answer would be no.
16        But as a member of Congress, I interact
17   with the roughly seven or eight State Representatives
18   roughly four State Senators who make up my
19   congressional district on at least a monthly basis,
20   meetings in my office when we are talking about
21   projects and issues relative to my district.  And so
22   I would have conversations with them obviously about

Page 12

1    my -- about the map.  About my district, what perhaps
2    could happen.
3         But again, no specific -- nothing
4    specific, I would say, with anyone of authority that
5    would be drawing the lines.
6    Q.   Did you know -- well, strike that.  Do you
7    know whether there were any Republican State
8    Representatives that were on the House, Illinois
9    House Redistricting Committee?
10   A.   I don't know that.  I actually don't know.
11   I mean, I think they had a -- I don't know.
12   Q.   Okay.  Do you know whether there were any
13   Republican Senate members of the Illinois State
14   Senate Redistricting Committee, do you know one way
15   or the other?
16   A.   If I were pressed to answer, I would say
17   that I think they had Republicans and Democrats on a
18   committee.  My view of that was that that committee
19   really didn't do much other than have hearings
20   because at the end of the day, they were having
21   hearings all through May.  I think they maybe had one
22   in Peoria.  I remember reading one in my local

Page 13

1    newspaper, they had one near me.
2         And -- but in the same time, I continued
3    to hear from my colleagues in the legislature that
4    the map was being drawn, and shortly thereafter at
5    the end of May, the map came out and there were
6    promised hearings where public comment would be able
7    to be made once the map was released and that never
8    came to fruition.
9         So I don't remember who was on the
10   committee or I want to say Kwame Raoul was the
11   chairman of the Senate committee maybe or something.
12   I know him because I served with him.  He took
13   President Obama's seat in the statehouse, or in the
14   State Senate, but I can't give you any names of
15   anybody on those committees.  I never attended any of
16   their hearings and that's all I know.
17   Q.   Based on that answer, I've got a follow-up
18   up on a couple of points.  First of all, I think we
19   digressed.  I was just asking you whether or not you
20   were aware of any Republicans on the State Senate
21   Redistricting Committee.  And from what I understand,
22   you're saying, you don't know of any?

Schock, Aaron                                October 6, 2011

Page 14

1    A.   No.
2    Q.   Is that correct?
3    A.   No.
4    Q.   Okay. Did you ever -- strike that. Did
5    you have any conversations that you can recall having
6    with any members of the Illinois legislators who were
7    on the state redistricting committees, whether it be
8    the House or the Senate?
9    A.   Well, since I can't tell you who was on
10   the committee, I can't tell you whether I had any
11   conversations with them. But if I talked to any
12   State Representative or State Senator about this
13   whole process, I never knew they were on the state
14   committee.
15   Q.   I understand. And I think you answered
16   the question. You were aware that there were State
17   Redistricting Committee meetings being held within
18   your congressional district while the process was
19   ensuing, is that true?
20        MR. PANOFF: Objection. Mischaracterizes
21   testimony.
22        MR. BRUCE: Wait a minute. I'm sorry.

Page 15

1    Your lawyer objected, so I have to rephrase the
2    question.
3         BY MR. BRUCE:
4    Q.   I thought I heard you say that you read in
5    the newspaper that there was a Redistricting
6    Committee meeting in Peoria. Is that true?
7         MR. PANOFF: I believe he testified he
8    thought that there might have been, but feel free to
9    ask your question.
10        BY MR. BRUCE:
11   Q.   The record speaks for itself. You can
12   answer, Congressman.
13        MR. PANOFF: Let's read back the question,
14   please.
15        THE REPORTER: "Question: I thought I
16   heard you say that you read in the newspaper that
17   there was a Redistricting Committee meeting in
18   Peoria. Is that true?"
19        THE WITNESS: I was not aware of the
20   meetings until they took place. I mean, I did not
21   get an invitation. I did not read a formal notice.
22   I get clips out here as a member of Congress from all

Page 16

1    my newspapers, and I do remember reading one of the
2    stories in the paper about a redistricting hearing
3    taking place somewhere in my district. And I think
4    it was in Peoria. If it wasn't in Peoria, it would
5    have been in East Peoria, Pekin, somewhere that the
6    Peoria Journal Star would have covered it, but that's
7    what I recall.
8         BY MR. BRUCE:
9    Q.   Were you aware one way or the other
10   whether there were any websites for the House --
11   Illinois House Redistricting Committee?
12   A.   No.
13   Q.   Were you aware one way or the other
14   whether there was any websites for the Illinois State
15   Senate Redistricting Committee?
16   A.   No.
17   Q.   Suffice it to say, Congressman, you did
18   not personally attend any Illinois Redistricting
19   Committee meetings, is that true?
20   A.   Correct.
21   Q.   And did you ever at any time send any
22   representative or counsel to any Illinois

Page 17

1    Redistricting Committee meetings?
2    A.   No.
3    Q.   When did you first hire counsel with
4    respect to any issue concerning the redistricting of
5    the Congressional map?
6    A.   It would have been late last year, early
7    this year. I'm not -- do not recall the specific
8    date.
9    Q.   Can you tell me the month?
10   A.   Late, I mean December, January.
11   Q.   Either December 2010 or January 2011 is
12   your best recollection as to when you first hired
13   counsel with respect to redistricting? Is that true?
14   A.   Correct. Yes.
15   Q.   And what was the -- what was the name of
16   the lawyer that you hired or lawyers?
17   A.   Mayer Brown.
18   Q.   And can you tell me the name of the lawyer
19   that you dealt with in December of 2010 and January
20   2011?
21        MR. PANOFF: He is only asking for the
22   name, to the extent you remember.

Schock, Aaron                                    October 6, 2011

Page 18

1    THE WITNESS: Well, I don't -- I mean, I
2  don't even know. I mean, I don't -- I don't know who
3  we -- I mean, Tom. I don't know if -- you know,
4  we've had what, a couple of attorneys that have
5  worked with us. So I mean, it wasn't like there was
6  a formal --
7    MR. PANOFF: I'll caution you not to
8  divulge any of the content of any of the discussions.
9  He is just asking you if you remember any of the
10  names of the attorneys you met with. If you don't,
11  you don't. If you do, tell him.
12    THE WITNESS: Well, Ty Fahner is one that
13  I probably talked to the most at the beginning
14  because -- so I would say Ty Fahner.
15    BY MR. BRUCE:
16    Q.  Okay. And did any lawyer on your behalf
17  at any time submit any proposals, drafts, suggestions
18  or input to the Illinois redistricting committees
19  that were drawing the map?
20    MR. PANOFF: That can be answered yes or
21  no, to the best of your knowledge.
22    THE WITNESS: To the best of my knowledge,

Page 19

1  no.
2    BY MR. BRUCE:
3    Q.  And there was nothing precluding your
4  lawyers from providing suggestions or draft maps or
5  any input, to your knowledge, is that true?
6    MR. PANOFF: Object to the form. Again,
7  to the extent you know.
8    THE WITNESS: I would have no knowledge
9  because as I mentioned earlier in my testimony, I'm
10  not familiar with this process that you speak of that
11  took place until I read about a meeting that took
12  place in my district after the fact. So I'm not
13  familiar with --
14    BY MR. BRUCE:
15    Q.  I'm sorry. I didn't mean to interrupt
16  you, Congressman. Go ahead.
17    A.  No. That's it.
18    Q.  Okay. Well, are you suggesting that you
19  did not know that the Illinois legislature was going
20  through a process to redraw, among other things, the
21  Congressional map before it was actually drawn?
22    MR. PANOFF: Objection. Mischaracterizes

Page 20

1  prior testimony.
2    THE WITNESS: I'm not aware of any
3  opportunity for my legal representation to submit an
4  alternative map prior to the legislature acting.
5    BY MR. BRUCE:
6    Q.  Okay. That wasn't my question, though.
7  Did you -- did you understand that the Illinois
8  legislature was in the process of redrawing
9  congressional district lines?
10    A.  Yes.
11    Q.  And you knew that before the map was
12  passed into law, true?
13    A.  Correct.
14    Q.  Did you ever yourself make any effort to
15  appear before any of the committees that were drawing
16  the map?
17    MR. PANOFF: Are you asking whether he did
18  personally or through his attorneys?
19    MR. BRUCE: I think my question is very
20  clear. Ma'am, can I have it back, please?
21    THE REPORTER: "Question: Did you ever
22  yourself make any effort to appear before any of the

Page 21

1  committees that were drawing the map?"
2    MR. PANOFF: Object to the form. And to
3  the extent it's calling for anything regarding the
4  conduct of attorneys, I'll instruct you not to answer
5  as to the conduct of attorneys and communications
6  with the attorneys.
7    THE WITNESS: No. I did not.
8    BY MR. BRUCE:
9    Q.  All right. Well, your lawyer has now
10  brought up an excellent point. So now that he has,
11  I'm glad that he has, and we'll get into it. Did
12  Mayer Brown & Platt ever appear at any time at any of
13  the redistricting committee meetings on your behalf?
14    MR. PANOFF: Object to the form.
15  Foundation. Calls for speculation. To the extent
16  you know, feel free to answer.
17    THE WITNESS: Not that I'm aware.
18    BY MR. BRUCE:
19    Q.  All right. Did Mayer Brown & Platt ever
20  forward any maps to the Illinois Redistricting
21  Committee on your behalf, to your knowledge?
22    MR. PANOFF: Object to the form.

Henderson Legal Services

Schock, Aaron                                          October 6, 2011

7 (Pages 22 to 25)

| Page 22 | Page 24 |
|---|---|

Page 22

1   Foundation. Calls for speculation.
2           THE WITNESS: Not that I'm aware of.
3           BY MR. BRUCE:
4       Q.   Yeah. I don't want you to speculate on
5   any of this. I would believe that as a sitting U.S.
6   Congressman, if some law firm on your behalf sent a
7   map to Springfield, that you would be aware of it.
8   That's why I'm asking you. That wasn't done?
9           MR. PANOFF: That was a nice speech, but
10  let's stick to asking questions. If you have a
11  question, ask your question.
12          MR. BRUCE: Tom, you keep interrupting me.
13  Because of your objections, I'm having to ask
14  follow-up questions and frankly, I don't think that
15  your objections are meritorious, but we'll keep going
16  and try to get through this.
17          MR. PANOFF: They have been perfectly
18  appropriate objections to inappropriate questions.
19  If you have appropriate questions, feel free to ask
20  them.
21          BY MR. BRUCE:
22      Q.   All right. Congressman, are you aware of

Page 23

1   anyone on your behalf that appeared and offered any
2   input on any Illinois Redistricting Committee?
3           MR. PANOFF: Object to the form.
4           THE WITNESS: I am not aware of anyone
5   doing that.
6           BY MR. BRUCE:
7       Q.   Are you aware of any rule, regulation or
8   guideline of the Illinois Redistricting Committees
9   that would have barred your representatives from
10  providing input to the redistricting process?
11          MR. PANOFF: Object to the form.
12          THE WITNESS: As -- I'm not aware of it.
13  I'm not, as I mentioned, I am not aware of this whole
14  -- I'm not aware of any of the rules or guidelines or
15  process to this, so you know -- the answer is no.
16          BY MR. BRUCE:
17      Q.   Did you ever yourself make any inquiry to
18  determine whether or not you could provide input to
19  the Illinois Redistricting Committee as to how the
20  Congressional lines were going to be drawn?
21          MR. PANOFF: Object to the form.
22          MR. BRUCE: I'm sorry, Tom, what's wrong

Page 24

1   with the form?
2           MR. PANOFF: It's vague.
3           MR. BRUCE: Can I have the question back,
4   madam court reporter?
5           THE REPORTER: "Question: Did you ever
6   yourself make any inquiry to determine whether or not
7   you could provide input to the Illinois Redistricting
8   Committee as to how the Congressional lines were
9   going to be drawn?"
10          BY MR. BRUCE:
11      Q.   Congressman, do you understand that
12  question?
13      A.   Well, I do, but if I can say, how do I
14  inquire into a process that I'm not aware of?
15      Q.   Could you have called Springfield and
16  asked or looked on the Internet as to what the
17  process was?
18          MR. PANOFF: Object to the form.
19          THE WITNESS: Well, sure, I could have,
20  but I've already stated clearly earlier that I wasn't
21  aware of this process. So if you ask me a hundred
22  questions about specifics of the process, I'm going

Page 25

1   to have to tell you I'm not aware of anything or
2   having done anything, because I'm not familiar with
3   the process.
4           So I guess -- I mean, I'm trying to be
5   helpful here, but no, I'm not aware of anyone doing
6   anything on my behalf in that process. I didn't do
7   anything in that process, because I was not aware of
8   that process. Period.
9           BY MR. BRUCE:
10      Q.   Congressman, were you aware that the
11  Illinois legislature was going through a process to
12  redraw the congressional district lines before the
13  map was passed into law?
14      A.   No. I mean, I knew that the legislature
15  had to draw maps. Okay. But as to what their
16  process internally was going to be to do that, I was
17  not privy to it.
18      Q.   Fair enough. And you didn't make any
19  inquiry to determine how they were going to do it?
20  Is that fair?
21      A.   That's -- yes.
22      Q.   Okay. Now, I think I understood your

Schock, Aaron                                    October 6, 2011

Page 26

1  previous testimony with respect to conversations with
2  legislators, and I'm going to try and ask some broad
3  questions so that we can move on to the next topic.
4  If I heard you correctly, you did have conversations
5  during the time period the map process was being
6  developed with Illinois legislators, but nothing
7  specific that you can recall as you sit here today.
8  Is that true?
9      A.  Correct.
10         MR. PANOFF:  Object to the form.
11         BY MR. BRUCE:
12     Q.  Well, because your lawyer objected, I have
13  to ask a follow-up question.  Can you recall any
14  specific conversations that you've had with any
15  Illinois legislator during the time period that the
16  Illinois legislature was in the process of redrawing
17  the congressional district lines about the
18  redistricting process?
19     A.  No.
20     Q.  Am I correct, Congressman, that you have
21  no firsthand knowledge as to the reasons why the
22  congressional district map that was passed into law

Page 27

1  was drawn?
2         MR. PANOFF:  Object to the form.
3         THE WITNESS:  Who would -- let me ask you
4  this.  Who would be firsthand knowledge?  I mean, me
5  and the person with the pen?  Me -- I mean, what's --
6  help me understand what firsthand knowledge is.
7         BY MR. BRUCE:
8     Q.  Sure.  I can help you out.  Do you know
9  who drew the map?
10        MR. PANOFF:  You're referring to the map
11  enacted into law?
12        MR. BRUCE:  Yes, Tom -- I'll agree with
13  that.
14        THE WITNESS:  I don't know who
15  specifically drew the map.  No.
16        BY MR. BRUCE:
17     Q.  Okay.  Do you know anyone that was
18  involved in the map making process?
19     A.  Absolutely.  We -- I guess my assumption
20  is the legislative -- I mean -- the only conversation
21  I had relative to the map process was with Michael
22  Madigan's chief of staff, Tim Mapes.  And I was in

Page 28

1  Springfield because it's in my congressional district
2  and I was at the Capitol, and it was at a time period
3  when the -- it was in May of 2011.  And the
4  legislature had -- apparently the Speaker's office,
5  Mike Madigan's office had, I guess, settled their map
6  and they were calling in individual State
7  Representatives to show them their portion of the
8  newly drawn State House map.
9         And I was on the floor of the State House
10  talking to my former colleagues and every once in a
11  while one would get a phone call on their cell phone
12  asking them to come up to the Speaker's office.  And
13  they were getting to see their new map.
14        And the joke was the only people getting
15  called were the ones with really good State House
16  districts.  And so when they would get called by the
17  Speaker's office, they would kind of get excited to
18  go into the Speaker's office to see their new map.
19        And my understanding was Tim Mapes, the
20  Speaker's chief of staff was the one showing them the
21  map.  So I decided to go to the Speaker's office to
22  see perhaps if he had my map.  I know Tim Mapes very

Page 29

1  well.  Have a good relationship with him.  And did it
2  more as a joke, knowing that even if he had it, he
3  probably wouldn't show it to me, but I went to the
4  Speaker's office, told the receptionist that I was
5  there to see Mr. Mapes, that he had called me and
6  asked me to come in to see the map.
7         And they looked a little puzzled and said,
8  well, let me check.  And then they invited me back
9  and, you know, he said, oh, what honor do I have to
10  have you come in, what do you need.  And I said,
11  well, I understand you're passing out maps, I'd like
12  to get mine.
13        And he just kind of laughed and said, you
14  know that I'm not drawing your map.  And I said, -- or
15  well, come on, you know who's got the map.  And he said,
16  you've got to have a copy of the map.  And he said,
17  no, he said we are leaving that up to President
18  Cullerton and Steve Israel with the DCCC.
19        And so I -- we chatted a little bit more
20  and then I left.  But you know, I did not have a
21  conversations with any other legislator that I would
22  consider that close to the time at which the map came

Schock, Aaron

October 6, 2011

9 (Pages 30 to 33)

Page 30

1  out before it did.
2       And then the only other legislator I spoke
3  with was after the map came out, or actually I think
4  the day that it was coming out, the Senate President,
5  John Cullerton, called me and basically just gave me
6  a heads up that he said, you know, something to the
7  effect of, look, Aaron, you know, we've decided that
8  we are not going to beat you.
9       So we are not going to waste our Democrat
10 voters on you, and congratulations, we are giving you
11 the most Republican district in the state. And I
12 said, well, I suppose I should say thank you and he
13 said, well, I was hoping you'd say something kind
14 about it, the map.
15      And I said, well, having not seen the map,
16 I'm assuming that if you -- if you've made my
17 district really good, you've probably, you know,
18 really done a doozy on my colleagues. And you know,
19 I'll want to see what this map looks like. But you
20 know -- so those are the two conversations I've had,
21 I think of any significance with anyone other than
22 casual conversations with individual legislators.

Page 31

1       Q.   Have you told me everything that you said
2  to Mr. Mapes and that Mr. Mapes said to you in that
3  conversation regarding the map?
4       A.   That I -- yes. That I recall.
5       Q.   I'm sorry. And would there be anything
6  that would refresh your recollection of that
7  conversation?
8       A.   No. That's everything that I recall.
9       Q.   And with respect to President Cullerton
10 and the conversation you testified to, have you now
11 told us everything that you remember about that
12 conversation that he said to you and that you said to
13 him?
14      MR. PANOFF: Object to the form.
15      THE WITNESS: That's all that I recall.
16 Yes.
17      BY MR. BRUCE:
18      Q.   Is there anything that would refresh your
19 recollection about that conversation?
20      A.   The only thing I guess I would add is I
21 was -- I do believe I asked specifically about Peoria
22 because a lot of my -- you know, again, not having

Page 32

1  any inside information, but only hearing what the
2  reporters were writing about what people were
3  speculating would happen in the map, the
4  redistricting process, the speculation was that
5  Peoria was going to be divided for the first time in
6  30 years.
7       And being from Peoria, that's where I've
8  grown up, that's where I live, I think I may have
9  said something like, you know, well, what happened to
10 Peoria. And -- but he -- and he basically said
11 something about, well, you live -- don't worry, you
12 live in the district. And I said, I know, but what
13 happens to the -- you know, my old State Rep.
14 district was the whole downtown of Peoria. And so I
15 said something about what happened to my old State
16 Rep. district or something like that. But that's the
17 only other thing I can recall other than what I've
18 already said with that conversation.
19      Q.   Okay. And was there anything -- did you
20 write down any notes with respect to that
21 conversation?
22      A.   No. I was in a car on my cell phone.

Page 33

1       Q.   And did you call him or did he call you?
2       A.   He called me. He called me on an
3  unidentified number and I tend not to answer those so
4  I waited until he left a message and I got the
5  voicemail and I called him back.
6       Q.   And you called him back where?
7       A.   I believe it was his cell phone number.
8       Q.   And you did that the day the map was
9  coming out?
10      MR. PANOFF: Objection. Mischaracterizes
11 testimony.
12      BY MR. BRUCE:
13      Q.   I'm sorry. When did -- go ahead.
14      A.   I do not know the exact date, but he was
15 calling me with information obviously that I did not
16 have and it was right before it came out. So if it
17 wasn't the day that it came out, it might have been
18 the night before the day that it came out, but I
19 would say it was definitely within a 48-hour period
20 of that map coming out.
21      Q.   Have you now told me all of the
22 conversations that you can recall as you sit here

**1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION
COMMITTEE FOR A FAIR AND           )
BALANCED MAP; JUDY BIGGERT;        )
ROBERT J. DOLD; RANDY HULTGREN;    )
ADAM KINZINGER; DONALD MANZULLO;   )
PETER J. ROSKAM; BOBBY SCHILLING;  )
AARON SCHOCK; JOHN M. SHIMKUS;     )
JOE WALSH; RALPH RANGEL; LOU       )
SANDOVAL; LUIS SANABRIA; MICHELLE  )
CABALLERO; EDMUND BREZINSKI; and   )
LAURA WAXWEILER,                   )
                                   )
        Plaintiffs,                )
                                   )
    vs.                            )   No. 11-C-5065
                                   )
ILLINOIS STATE BOARD OF ELECTIONS; )
WILLIAM M. McGUFFAGE; JESSE R.     )
SMART; BRYAN A. SCHNEIDER; BETTY   )
J. COFFRIN; HAROLD D. BYERS;       )
JUDITH C. RICE; CHARLES W.         )
SCHOLTZ; and ERNEST L. GOWEN,      )
                                   )
        Defendants.                )

The deposition of CONGRESSMAN RANDY HULTGREN,
called by the Defendant for examination pursuant to
notice and pursuant to the Rules of Civil Procedure
for the United States District Courts pertaining to
the taking of depositions, taken before Tracy L.
Overocker, a notary public within and for the County
of Will and State of Illinois, at 70 West Madison
Street, Chicago, Illinois on the 7th day of October
2011.

**2**

1   APPEARANCES:
2     MAYER BROWN, LLP, by
       MS. LORI E. LIGHTFOOT
3     71 South Wacker Drive
       Chicago, Illinois 60606
4     (312) 701-8680
         Appearing on behalf of the plaintiffs;
5
       POWER, ROGERS & SMITH, PC, by
6      MR. DEVON C. BRUCE,
       Special Assistant Illinois Attorney General
7      70 West Madison Street, 55th Floor
       Chicago, Illinois 60602
8      (312) 236-9381
         Appearing on behalf of the defendants.
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1              I N D E X
2   WITNESS:                        PAGE
3   CONGRESSMAN RANDY HULTGREN
4   Examination by:
5      Mr. Bruce. . . . . . . . . .4
6
7
8
9            E X H I B I T S
10
11  NAME              FOR IDENTIFICATION
12  Nos. 1 through 4
13
14
15
16
17
18
19
20
21
22
23
24

**4**

1           (Whereupon, Deposition
2   Exhibit Nos. 1 through 4 were
3   marked for identification by
4   Mr. Bruce.)
5           (Witness sworn.)
6     MR. BRUCE: Let the record reflect that this is
7   the deposition of Congressman Randy Hultgren taken
8   pursuant to the Federal Rules of Civil Procedure and
9   continued by the parties.
10          CONGRESSMAN RANDY HULTGREN,
11  called as a witness herein, having been first duly
12  sworn, was examined and testified as follows:
13          EXAMINATION
14          BY
15          MR. BRUCE:
16    Q   Sir, could you please state your first and
17  last name, spell your last name for the record,
18  please.
19    A   Randy H. Hultgren, H-u-l-t-g-r-e-n.
20    Q   Congressman, have you ever given a
21  deposition before?
22    A   I haven't.
23    Q   My name is Devon Bruce and I've been
24  appointed as a Special Assistant Illinois Attorney

17

1     THE WITNESS: Yes, that's correct.
2     MS. LIGHTFOOT: Relevance.
3   BY MR. BRUCE:
4     Q   Sir, during the redistricting -- strike
5   that.
6         Had you, in your experience in
7   Springfield, ever gone through a redistricting
8   process in the past?
9     A   Can you be more clear?
10    Q   Sure. Absolutely.
11        You had some history in the Illinois
12  Legislature that we spoke about. Do you remember
13  that?
14    A   Yes.
15    Q   Okay. During the time period that you were
16  in the Illinois Legislature, did you go through a
17  redistricting process to which you were involved?
18    A   Can you explain "involved."
19    Q   Well, that's my question of you. How, if
20  at all, you were involved in the redistricting
21  process that occurred in 2000.
22    A   To answer your question, yes.
23    Q   And so how were you involved?
24    A   They redrew my district in 2002 when I was

18

1   in the House of Representatives.
2     Q   And did you have any role or play any role
3   in that at all?
4     A   No.
5     Q   Let me ask you about this most recent
6   redistricting process.
7         During the time period process of --
8   redrawing the Congressional District map occurred in
9   Springfield, did you have any conversations with any
10  State Legislators about the redistricting process?
11        MS. LIGHTFOOT: Objection. Form. Vague. You
12  really do need a time frame, Devon.
13        MR. BRUCE: I don't think I do, Lori.
14        MS. LIGHTFOOT: Well, I made my objection.
15        MR. BRUCE: Sure.
16  BY MR. BRUCE:
17    Q   You can answer the question, Congressman.
18    A   Yes.
19    Q   Who did you speak to?
20    A   When?
21    Q   At any time.
22        MS. LIGHTFOOT: I object to the form.
23  BY MR. BRUCE:
24    Q   You can answer.

19

1     A   I suppose many people over the last year.
2     Q   Okay. Can you tell me the names of any of
3   the State Legislators that you recall the
4   conversation that you had with concerning the
5   redistricting process?
6     A   In any discussion or specifics of how this
7   map was going to be drawn?
8     Q   Any discussion.
9         MS. LIGHTFOOT: Objection. Relevance. Vague.
10        THE WITNESS: I think it would be many of my
11  colleagues in Springfield.
12  BY MR. BRUCE:
13    Q   Okay. Congressman, I'm -- I have a right
14  to know what you're going to testify to at trial --
15    A   Yes.
16    Q   -- and what I'm just simply trying to do in
17  the most plain and simple fashion is trying to
18  understand if you can recall, as you sit here today,
19  any specific conversation that you had with any State
20  Legislature about this redistricting process by which
21  you filed a complaint at law. That's where I'm
22  going, that's what I'm trying to find out. So
23  however you want to tell me that, that's fine, and if
24  you don't recall the specifics of any conversation

20

1   that you had with any State Legislature about the
2   redistricting process, you can tell me that, too.
3         So the question is, Congressman, as
4   you sit here today, do you have a recollection of any
5   specific conversation that you had with any Illinois
6   State Legislator about the redistricting process?
7         MS. LIGHTFOOT: I object to the form.
8         THE WITNESS: Yes.
9   BY MR. BRUCE:
10    Q   So why don't we just go chronologically.
11        When is the first conversation you
12  remember having?
13    A   I don't remember when it would have been,
14  but I had conversations with Representative Mike
15  Fortner, who is my State Representative. I've had
16  conversations with Senator Tom Johnson, who is my
17  senator. I had conversation with Tom Cross, the
18  Republican Leader in the House, and had conversation,
19  very generally, with Christine Radogno. I had
20  conversation with Mike Madigan and I had conversation
21  with Senator John Cullerton. Those are the ones that
22  I would remember.
23    Q   Okay. Other than the six Legislators that
24  you just identified, do you have a recollection of

25

1   Q   Okay. And how long did that meeting with
2   Representative Cross take place?
3   A   I don't recall.
4   Q   During your meeting with Representative
5   Cross, did the topic of redistricting come up?
6   A   Yes.
7   Q   And can you just tell me everything that
8   you can recall that he said to you and that you said
9   to him in that conversation about the redistricting?
10  A   I don't recall many details. It was very
11  early in the process, but there was frustration
12  already of a feeling on his part that -- the lack of
13  input that he was having and -- being able to have in
14  that process, but it was very early on in the
15  process.
16  Q   You know the next question I'm going to ask
17  you, Congressman. Is that the extent of your
18  recollection --
19  A   That's the extent of my recollection, yes.
20  Q   Okay. And were there any documents? Did
21  you take any notes or was there any letter or e-mail
22  that will help refresh your recollection?
23  A   No, nothing that I know of or could recall.
24  Q   And if I remember correctly, you only had

26

1   one conversation with Representative Cross about the
2   redistricting process?
3   A   As I sit here today, that's all I recall,
4   yes.
5   Q   Certainly. Senator Radogno, did you have
6   one conversation with her or more than one?
7   A   I had one conversation with her.
8   Q   And when was -- and I meant to ask -- it
9   was a poorly phrased question, I think you understood
10  I was asking about a conversation with her concerning
11  the redistricting process.
12      Did you understand that?
13  A   That is what I intended by my answer.
14  Q   Okay. When did you have that one
15  conversation with Senator Radogno about the
16  redistricting process?
17  A   It was the same day that I met with Leader
18  Cross, so it would have been -- I don't recall the
19  exact date, but it would have been sometime, I think,
20  in March.
21  Q   And what did she say to you and you say to
22  her?
23  A   I don't recall the exact details, but there
24  would have been some discussion of a frustration and

27

1   uncertainty over how the redistricting process was
2   going to go.
3   Q   Do you -- as you sit here today, do you
4   remember the exact words that she used?
5   A   I don't. I don't recall now.
6   Q   Have you told me the extent of your
7   recollection of that conversation?
8   A   Yes, I have.
9   Q   Speaker Madigan, you spoke to Speaker
10  Madigan concerning the redistricting process?
11  A   It came up in our discussion as very
12  similar to the other meetings I had.
13  Q   Okay. Did you have one conversation with
14  Speaker Madigan or more than one concerning the
15  redistricting process?
16  A   I had one conversation with
17  Speaker Madigan.
18  Q   Was that in person or over the phone?
19  A   It was in person.
20  Q   And was that when you were in Springfield
21  in March of 2011?
22  A   Yes, it was the same day.
23  Q   You were making the rounds?
24  A   I was greeting people that I had worked

28

1   with previously.
2   Q   Certainly.
3       And who was present in your meeting
4   with Speaker Madigan?
5   A   I don't recall.
6   Q   And where did the meeting take place?
7   A   To the best of my recollection today, it
8   was in his office, I think.
9   Q   And you don't remember whether any of his
10  staff members were there or any other individuals
11  were there; is that true?
12  A   That's true.
13  Q   All right. And how long did that meeting
14  take place?
15  A   I don't recall exactly, a few minutes, I
16  think.
17  Q   And what was the purpose of you seeing
18  Speaker Madigan?
19  A   To say "hello." It was the first time I
20  had seen him or talked with him since I had been
21  elected to Congress.
22  Q   And with respect to the issue of
23  redistricting, did that topic come up?
24  A   The topic of redistricting did come up

29

1  briefly.
2      Q   And what did you say to him and what did he
3  say to you about redistricting?
4      A   I don't recall the details.  It was very
5  early in the process and he -- to the best of my
6  recollection, said that, that very little work had
7  been done on it at that point and was -- there was
8  not clarity of how the process was going to go.
9      Q   And was that the extent of your
10  recollection about that conversation with
11  Speaker Madigan?
12      A   Yes, it is.
13      Q   Is there anything of a written nature that
14  would refresh your recollection about that
15  conversation?
16      A   Not that I know of.
17      Q   And can you tell me, Congressman, which --
18  can you tell me with any greater specificity in March
19  when you went down to Springfield?
20      A   I can't.  I don't remember exactly when it
21  was.
22      Q   There's a national holiday on March 17th.
23  Was it before or after that holiday?
24      A   I honestly can't recall.  There would be --

30

1  I don't recall.
2      Q   All right.  Lastly, you told me that you
3  believed you had a conversation with President --
4  Senate President John Cullerton about the
5  redistricting process?
6      A   Yes, I did.
7      Q   And did that occur in the same time period
8  when were you down in Springfield?
9      A   It did, yes.
10      Q   And did you only have one conversation with
11  President Cullerton about the redistricting process?
12      A   No, I had a couple of conversations with
13  Senator Cullerton -- President Cullerton.
14      Q   Okay.  Let's just go chronologically.
15          Was the first conversation you had
16  with him in March when you were down in Springfield?
17      A   Yes, it was.
18      Q   And what was the -- strike that.
19          Was that an in-person meeting?
20      A   That was an in-person meeting.
21      Q   And do you remember who was present at that
22  meeting with President Cullerton?
23      A   I don't recall.
24      Q   And how long was the meeting?

31

1      A   I don't recall.
2      Q   And did the topic of redistricting come up?
3      A   Yes.
4      Q   And what did he say to you and you say to
5  him about redistricting?
6      A   It was -- to the best of my recollection
7  today, it was very general, where there was
8  uncertainty of how the process would be going.
9      Q   Do you remember the details of what he said
10  to you?
11      A   I do not, no.
12      Q   Is there anything else you remember about
13  that conversation other than what you've told me here
14  today?
15      A   That is all I remember.
16      Q   You said you had a subsequent conversation
17  with President Cullerton about redistricting?
18      A   Yes, I did.
19      Q   And when was that?
20      A   That would have been in late May.
21      Q   And was that in person or over the phone?
22      A   That was over the phone.
23      Q   And where were you?
24      A   I was in Washington, D.C.

32

1      Q   In your office?
2      A   No, in the Capitol.
3      Q   And did -- were you on your cell phone?
4      A   I was on a -- to the best of my
5  recollection, it was a line -- phone line in the
6  Capitol.
7      Q   And did he call you or did you call him?
8      A   To the best of my recollection, he called
9  me or he called us.
10      Q   "Us" meaning who?
11      A   Congressman Roskam and myself were in that
12  meeting.
13      Q   And was he on a speakerphone?
14      A   Yes, he was -- in -- we were listening to
15  him and -- on a speakerphone.
16      Q   And what did he say to you and what did you
17  two say to him in that conversation?
18      A   I don't recall everything he said; but
19  to the best of my recollection, as I sit here today,
20  that there were -- they were working on the maps,
21  that there was a map that the DCCC was pushing him to
22  pass that would put Congressman Roskam and myself in
23  the same district.  There was another map that
24  wouldn't, but would put me in the district with Joe

33

1 Walsh and he said if we would work to get some
2 Republican votes on that map, he would work to pass
3 the map that doesn't have us together.
4 Q Referring to who?
5 A Congressman Roskam and myself.
6 Q Is that the extent of what you can remember
7 he said to you about the redistricting in that
8 conversation?
9 A Yes.
10 Q And what did you say to him?
11 A We said -- we refused the offer.
12 Q Well, what did you say and what did
13 Congressman Roskam say?
14 A I don't recall exactly what was said, but
15 it was basically, We can't -- we won't do that, we
16 can't do that.
17 Q Is that the extent of what you recall about
18 that conversation you had with President Cullerton in
19 late May?
20 A Yes.
21 Q And would there be any document or tangible
22 item that would refresh your recollection about that
23 conversation?
24 A No document that I know of, no.

34

1 Q Is that the last time you spoke to
2 President Cullerton about the redistricting?
3 A Yes.
4 Q I think as we -- strike that.
5 As you sit here today, have you now
6 told me all of your recollections about all of your
7 conversations with State Legislators that you can
8 remember about the redistricting?
9 A Yes.
10 Q Did you ever at any time speak to your
11 United States Congressional Democratic colleagues
12 about the districting process?
13 MS. LIGHTFOOT: I object to the form.
14 THE WITNESS: I don't recall, no.
15 BY MR. BRUCE:
16 Q Did you understand what I mean?
17 A Yes.
18 Q Okay. Did you ever speak to any member of
19 the DCCC staff about the Congressional map?
20 A No.
21 Q Did you ever speak to any Legislators, to
22 your knowledge, that were on either the Senate or
23 House Redistricting Committees?
24 MS. LIGHTFOOT: Other than what he's testified

35

1 to?
2 MR. BRUCE: Yes.
3 THE WITNESS: No.
4 BY MR. BRUCE:
5 Q Do you know if any of the Legislators that
6 you told me that you spoke to were on the
7 Redistricting Committees?
8 A Yes.
9 Q What do you know about that?
10 A Well, I know that Representative Fortner is
11 on the House Committee and I know that Speaker
12 Madigan and President Cullerton, although -- I don't
13 know if they're de facto members of every committee.
14 I think maybe they are, but I don't know that for
15 sure.
16 Q Fair enough.
17 Sir, as you sit here today, do you
18 have firsthand knowledge as to who the individuals
19 were that actually drew the map that was passed into
20 law in Springfield?
21 A No, I don't.
22 Q Based on that answer, is it fair to say,
23 Congressman, you don't know what factors were intent
24 those drafters of the map had when they drew the

36

1 Congressional District lines?
2 MS. LIGHTFOOT: I object to the form.
3 Foundation. And to the extent that that calls for a
4 legal conclusion.
5 BY MR. BRUCE:
6 Q You can answer.
7 A I don't.
8 Q Am I correct, Congressman, that no one has
9 ever told you that the Congressional map that was
10 passed into law in Springfield was done to
11 intentionally discriminate against Latinos?
12 MS. LIGHTFOOT: Congressman, you can answer
13 that question yes or no. It clearly impinges upon --
14 potentially impinges on attorney-client privilege,
15 but you can answer the question.
16 THE WITNESS: The only information I would have
17 on that would be with conversations I had with my
18 attorneys.
19 BY MR. BRUCE:
20 Q Okay. So other than any conversations that
21 you've had with your lawyers, am I correct you do not
22 have any information that the map was drawn and
23 passed in Springfield with the intent to
24 intentionally discriminate against Latinos?

**1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COMMITTEE FOR A FAIR AND          )
BALANCED MAP, JUDY BIGGERT,       )
ROBERT J. DOLD, RANDY HULTGREN,   )
ADAM KINZINGER, DONALD            )
MANZULLO, PETER ROSKAM BOBBY      )
SCHILLING, AARON SCHOCK, JOHN     )
M. SHIMKUS, JOE WALSH, RALPH      )
RANGEL, LOU SANDOVAL, LUIS        )
SANABRIA, MICHELLE CABALLERO,     )
EDMUND BREZINSKI, and LAURA       )
WAXWEILER,                        )
                                  )
            Plaintiffs,           )
                                  )
    vs.                           ) No.
                                  ) 1:11-CV-050065
ILLINOIS STATE BOARD OF           )
ELECTIONS, WILLIAM M.             )
MCGUFFAGE, JESSE F. SMART,        )
BRYAN A. SCHNEIDER, BETTY J.      )
COFFRIN, HAROLD D. BYERS,         )
JUDITH C. RICE, CHARLES W.        )
SCHOLZ, and ERNEST L. GOWEN,      )
                                  )
            Defendants.           )

        The deposition of CONGRESSMAN DONALD
MANZULLO, called by the defendant for examination
pursuant to notice and pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Amy M. Spee, a notary public within and for the
County of Cook and State of Illinois, at 70 West
Madison Street, 55th Floor, Chicago, Illinois, on the
7th day of October 2011.

**2**

1   APPEARANCES:
2       MAYER BROWN, LLP, by
        MS. LORI E. LIGHTFOOT
3       71 South Wacker Drive
        Chicago, Illinois 60606-4673
4       (312) 701-8680
        lightfoot@mayerbrown.com
5       for the plaintiffs;
6       POWER, ROGERS & SMITH, P.C., by
        MR. DEVON C. BRUCE
7       70 West Madison Street
        55th Floor
8       Chicago, Illinois 60602
        (312) 236-9381
9       dbruce@prslaw.com
        for the defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

**3**

1           I N D E X
2   Witness:                    Page
3   CONGRESSMAN DONALD MANZULLO
4       Examination by:
5       Mr. Bruce                4
6
7
8
9           E X H I B I T S
10  Number                      Page
11  Group 1                     4
12
13
14
15
16
17
18
19
20
21
22
23
24

**4**

1       (Whereupon, Manzullo Deposition
2       Group Exhibit No. 1 was marked
3       for identification, as of this
4       date.)
5       (Witness sworn.)
6       MR. BRUCE:  Let the record reflect that this is
7   the deposition of Congressman Donald Manzullo taken
8   pursuant to the Federal Rules of Civil Procedure and
9   continued by the parties.
10          CONGRESSMAN DONALD MANZULLO,
11  called as a witness herein, having been first duly
12  sworn, was examined and testified as follows:
13          EXAMINATION
14          BY
15          MR. BRUCE:
16      Q   Congressman, could you please state your
17  first and last name and spell your last name for the
18  record.
19      A   It's Donald; last name is spelled
20  M-a-n-z-u-l-l-o.
21      Q   Congressman Manzullo, I know you've got a
22  legal background.
23          Had you taken a number of depositions
24  over the years when you were in private practice?

9

1  is running in the 16th Congressional District that
2  was passed in Springfield in the event that there is
3  no change in the map that was passed into law?
4      MS. LIGHTFOOT: Objection. Form. Relevance.
5      THE WITNESS: I don't know what he's going to
6  say.
7  BY MR. BRUCE:
8      Q   Okay. Have you spoken to him about it?
9      A   No.
10     MS. LIGHTFOOT: Objection. Relevance.
11 BY MR. BRUCE:
12     Q   In your legal practice, did you have any
13 dealings in the redistricting process when you were a
14 practicing attorney?
15     A   No.
16     Q   And forgive me, Congressman, I forget your
17 elected official background.
18         Were you in the state legislature at
19 some point in time?
20     A   The first office I ever held is that of a
21 U.S. congressman.
22     Q   And what documents did you review to
23 prepare for your deposition?
24     A   What documents?

10

1      Q   Yes, sir.
2      MS. LIGHTFOOT: Objection. Foundation.
3  Relevance.
4      THE WITNESS: Well, the complaint.
5  BY MR. BRUCE:
6      Q   Okay.
7      A   The motion for preliminary injunction and
8  the maps, of course.
9      Q   Anything else?
10     A   I don't -- no, no other documents. I don't
11 know of any other documents.
12     Q   Congressman, with respect to the map
13 redistricting process that ensued in Springfield,
14 during that process, did you speak to any Illinois
15 state legislators about the redistricting process?
16     MS. LIGHTFOOT: Objection. Form. Time frame.
17     THE WITNESS: No.
18 BY MR. BRUCE:
19     Q   You never spoke to any state legislators
20 about the map process; is that correct?
21     A   That's correct.
22     Q   Did you ever at any time speak to
23 Illinois -- any Illinois state legislative staff
24 members about the redistricting process?

11

1      A   No.
2      Q   Did you ever speak to any Democratic United
3  States congressman about the redistricting here in
4  Illinois?
5      MS. LIGHTFOOT: Objection. Form.
6      THE WITNESS: Well, we were all talking on the
7  floor.
8  BY MR. BRUCE:
9      Q   Okay. What I'm asking you for is any
10 specific recollection of a specific conversation that
11 you had with any Democratic United States congressman
12 or congresswoman.
13     A   I mean, everybody's upset with this map and
14 we all talk to each other about how bad it is.
15     Q   Did you talk to any Democratic United
16 States congressmen or congresswomen that said how bad
17 it was?
18     A   I probably did, but I can't give you time
19 and place.
20     Q   Could you tell me the name of any of the
21 Democratic U.S. congressmen or congresswomen that you
22 spoke to that said it was a bad map?
23     A   Yeah, I probably spoke to all of them. I
24 mean, we -- this is a close Illinois delegation.

12

1  We're always talking about maps.
2      Q   Okay. I'm asking you more kind of a
3  specific question.
4          I'm simply trying to ascertain, can
5  you tell me the names of any Democratic United States
6  congressmen or congresswomen who have told you that
7  the map was bad or made any comment about the map?
8      MS. LIGHTFOOT: Objection. Form.
9  BY MR. BRUCE:
10     Q   Any Democrats.
11     MS. LIGHTFOOT: Objection. Form.
12     THE WITNESS: You mean, have talked to me
13 personally about it?
14 BY MR. BRUCE:
15     Q   Yes, sir.
16     A   I -- I mean, I can't remember specifically.
17 It's just --
18     Q   That's fine.
19     MS. LIGHTFOOT: I think what he's asking you is
20 not at this point do you remember any specific
21 conversations. I think what he's just simply asking
22 you is, do you remember actually having such a
23 conversation with any Democrat in Congress about the
24 Illinois redistricting process.

Page 1

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COMMITTEE FOR A FAIR AND )
BALANCED MAP, JUDY )
BIGGERT, ROBERT J. DOLD, )
RANDY HULTGREN, ADAM )
KINZINGER, DONALD )
MANZULLO, PETER J. ROSKAM, )
BOBBY SCHILLING, AARON )
SCHOCK, JOHN M. SHIMKUS, )
JOE WALSH, RALPH RANGEL, )
LOU SANDOVAL, LUIS SANABRIA,)
MICHELLE CABALLERO, )
EDMUND BREZINSKI, and )
LAURA WAXWEILER, )
     Plaintiffs, ) No. 1:11-cv-5065
      )
   vs. )
      )
ILLINOIS STATE BOARD OF )
ELECTIONS, WILLIAM A. )
MCGUFFAGE, JESSE R. )
SMART, BRYAN A. SCHNEIDER, )
BETTY J. COFFRIN, )
HAROLD D. BYERS, )
JUDITH C. RICE, )
CHARLES W. SCHOLZ, and )
ERNEST L. GOWEN, )
      )
     Defendants. )

     The deposition of REPRESENTATIVE JUDITH
BIGGERT, called by the Defendants, for examination,
taken pursuant to notice, taken before CARYL L.
HARDY, a Notary Public within and for the County of
Cook, State of Illinois, and a Certified Shorthand
Reporter of said state, taken at 70 West

---

Page 2

1 Madison Street, 55th Floor, Chicago, Illinois, at
2 the hour of 2:00 o'clock p.m., on the 10th day of
3 October, A.D., 2011.
4
5 A P P E A R A N C E S :
6
7    MAYER BROWN, LLP,
    71 South Wacker Drive
8    Chicago, Illinois 60606
    (312) 782-0600
9    BY: MS. LORI E. LIGHTFOOT,
10    Appeared on behalf of the Plaintiffs;
11
    POWER, ROGERS, & SMITH, P.C.,
12    70 West Madison Street
    55th Floor
13    Chicago, Illinois 60602
    (312) 236-9381
14    BY: MR. DEVON C. BRUCE,
15    Appeared on behalf of the Defendants.
16
17
18
19
20
21
22
23
24

---

Page 3

1           I N D E X
2 EXAMINATION OF REPRESENTATIVE JUDITH BIGGERT  PAGE
3 By Mr. Bruce.................................. 4
4
5
6

       NO EXHIBITS WERE MARKED

7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

Page 4

1      (The witness was duly sworn.)
2      MR. BRUCE: Let the record reflect that
3 this is the deposition of Representative Judith
4 Biggert taken pursuant to the Federal Rules of
5 Civil Procedure, local rules, and continued by the
6 parties.
7      REPRESENTATIVE JUDITH BIGGERT,
8 called as a witness herein, having been first duly
9 sworn, was examined upon oral interrogatories, and
10 testified as follows:
11      DIRECT EXAMINATION
12 BY MR. BRUCE:
13    Q. Representative, could you please state
14 your first and last name and spell your last name
15 for the record, please?
16    A. I go by Judy, J-u-d-y.
17    Q. Okay.
18    A. Biggert, B, as in boy, i-g-g-e-r-t.
19    Q. Ma'am, have you ever given a deposition
20 before?
21    A. No.
22    Q. I'm just going to be asking you a series
23 of questions about the lawsuit that you filed. If
24 at any time you don't understand a question that I

Page 5

1    ask, just tell me, and I'll be happy to rephrase
2    it.
3         It's important that you answer out loud
4    and audibly for the court reporter because she's
5    taking down verbatim everything that we say here in
6    the room.
7         And I don't have any doubts that you're
8    going to anticipate the vast majority of my
9    questions before I finish asking them, but it's
10   important that you let me finish asking my question
11   before you begin your answer. Otherwise, we'll be
12   talking over one another.
13        And, Representative, we can take a break
14   at any time, as long as there's not a question
15   pending, if you need to use the restroom or make a
16   phone call or anything of that nature. I don't
17   expect that you'll be here that long.
18        Let me ask some general background
19   information.
20        Prior to 2011, in either your role as an
21   attorney or as a state legislator, did you
22   personally have any involvement in any
23   redistricting of any map prior to 2011?
24   A. No.

Page 6

1    Q. During the redistricting process that
2    occurred in Illinois in 2011, did you speak to any
3    Illinois state legislators about the redistricting
4    process?
5    A. Before 2011?
6    Q. No, no. I'm talking about 2011 now, the
7    most recent redistricting process that occurred in
8    Springfield. I'm just trying to understand, did
9    you speak to any Illinois state legislators about
10   the redistricting process?
11   A. No.
12   Q. A similar question: Did you have an
13   opportunity to speak to any Illinois state
14   legislative staff members about the redistricting
15   process that occurred here in 20011?
16   A. No.
17   Q. At any time did you speak to any members
18   of the United States Congress that were a member of
19   the Democratic party about the Illinois
20   redistricting process?
21   A. Do you want to define what the Illinois
22   process is?
23   Q. The redistricting process. I'm sorry.
24        MS. LIGHTFOOT: Object to the form.

Page 7

1         THE WITNESS: Would you restate the
2    question?
3         MR. BRUCE: Sure.
4    BY MR. BRUCE:
5    Q. I'm just -- Representative, I'm just
6    trying to find out, did you speak to any of your
7    Democratic colleagues in the United States Congress
8    either before or after the map that was passed here
9    in Illinois came into law about the redistricting
10   process?
11   A. Yes.
12   Q. And who did you speak to?
13   A. Jerry Costello.
14   Q. You spoke to Representative Costello.
15   Anyone else?
16   A. Jesse Jackson, Junior.
17   Q. Anyone else?
18   A. Mike Quigley.
19   Q. Anyone else?
20   A. I believe that's all.
21   Q. And with respect to -- I'm just going to
22   go briefly through these conversations that you
23   had.
24        With respect to Representative Costello,

Page 8

1    was that one conversation with him or more than
2    one?
3    A. I think it was one. Two. It was two.
4    Q. Two?
5    A. Uh-huh, yes.
6    Q. And were those in person or over the
7    telephone?
8    A. They were in person. It was...
9    Q. And do you remember when the first
10   conversation with Representative Costello occurred?
11   A. The first one was in Statuary Hall. It
12   was just after the map had come out, the Democrat
13   map.
14   Q. And are you referring to the map that was
15   passed by both chambers of the legislature in
16   Springfield and signed into law?
17   A. Yes.
18   Q. Okay. And so you spoke to Representative
19   Costello in Statuary Hall in the Capitol?
20   A. Yes.
21   Q. And what did he say to you and what did
22   you say to him in that conversation?
23   A. Well, I was talking to somebody else and
24   he came up and started talking -- it was more of a

Page 45

1  like you don't -- you don't know who drew the map
2  ultimately?
3      A.  No, I don't.
4      Q.  And I take it then you didn't speak to
5  them, to your knowledge, about drawing the map?
6      A.  No, I did not.
7      Q.  Okay.  And all I'm asking is you don't
8  know what factors they relied upon to draw the map
9  that became law; is that true?
10         MS. LIGHTFOOT:  Object to the form.
11  BY THE WITNESS:
12      A.  Who is "they?"
13  BY MR. BRUCE:
14      Q.  Well, do you know who drew the map?
15      A.  No.
16      Q.  Okay.  Ma'am, has anyone ever told you
17  that the map was drawn to intentionally
18  discriminate against Latinos?
19         MS. LIGHTFOOT:  Congresswoman, I'm going
20  to give you the admonishment that he's not asking
21  you for privileged communications that you may have
22  had with counsel, so if you can answer the question
23  outside of that, a privileged communication, feel
24  free to do so.

Page 46

1  BY THE WITNESS:
2      A.  No.
3  BY MR. BRUCE:
4      Q.  Ma'am, did you ever at any time attend any
5  Illinois redistricting hearings concerning the
6  drawing of the Congressional map?
7      A.  No.
8      Q.  Did you ever send anyone to any of those
9  hearings on your behalf?
10      A.  No.
11      Q.  Did you ever at any time submit a letter
12  or a draft map or any input as to how you believed
13  the map should have been drawn before the map was
14  passed into law?
15      A.  No.
16      Q.  Absent anything that your lawyers have
17  told you, do you have independent knowledge of the
18  demographic makeup of the map that was passed into
19  law in Springfield?
20         MS. LIGHTFOOT:  Object to the form.
21  BY THE WITNESS:
22      A.  No.
23  BY MR. BRUCE:
24      Q.  There's a Committee for a Fair and

Page 47

1  Balanced Map?
2      A.  Yes.
3      Q.  And are you a member of that committee?
4      A.  No.
5      Q.  And do you know who is a member of that
6  committee?
7      A.  I know several of the members.
8      Q.  And who are they?
9      A.  Lynn Martin.
10      Q.  She's a former Republican United States
11  senator, correct?
12      A.  No.  She's a former Congressman and
13  secretary of labor.
14      Q.  All right.  Why did I think she ran for
15  Senate?
16      A.  She did run.
17      Q.  She ran for Senate unsuccessfully.  I'm
18  sorry.
19      A.  Right.
20      Q.  Yeah.  Okay.
21         We got sidetracked.  Who else are the
22  members of the committee?
23      A.  Denny Hastert.
24      Q.  Former Speaker of the House, Republican?

Page 48

1      A.  Yes.
2      Q.  And who else?
3      A.  Tom Ewing.
4      Q.  Former Republican United States Congressman?
5      A.  Yes.
6      Q.  And who else?
7      A.  Sandy Stuart, Alexander Stuart.
8      Q.  And who is Alexander Stuart?
9      A.  He's the ambassador's son.
10      Q.  Ambassador to where?
11      A.  He was an ambassador.  He's gone.  I don't
12  remember.
13      Q.  And what's his party affiliation?
14      A.  Republican.
15      Q.  All right.  And who else do you know
16  that's on the committee?
17      A.  There's others that I don't know.
18      Q.  Have you ever attended any meetings of the
19  committee?
20         MS. LIGHTFOOT:  Object to the form, asked
21  and answered.
22         MR. BRUCE:  I didn't ask that.
23         MS. LIGHTFOOT:  I thought you did.  Sorry.
24  I apologize if you did not.  You can answer.

Page 57

```
1   BY MR. BRUCE:
2       Q.  And do you know roughly approximately by
3   what percentages?
4       A.  Probably the 70s.  The number of
5   constituents that I would have in that district is
6   minuscule, maybe 1.5 percent.
7       Q.  And I think I understand from what you've
8   already told me, you did not have any firsthand
9   involvement in drawing the map that became the law
10  in Springfield; is that true?
11      A.  The Democrat map?
12      Q.  The map that was passed into law.
13      A.  Yes.  No, absolutely not.
14      Q.  Did you know that there were Republicans
15  that were members of both the House and the Senate
16  Illinois redistricting committees?
17      A.  Yes, I did.
18      Q.  And did you ever at any time make any
19  effort to speak to them while the Illinois
20  legislature was going through the redistricting
21  process?
22      A.  No.
23      Q.  Absent anything that your lawyers have
24  told you, do you know how the lines on the map that
```

Page 58

```
1   is being offered by the Republican Congressional
2   delegation in this case were drawn?
3       A.  No.
4       Q.  If the lawsuit is successful and the Court
5   were to adopt the map that's being offered by the
6   Republican Congressional delegation, which of the
7   Congressional districts on that map would you run
8   in?
9           MS. LIGHTFOOT:  Object to the form, calls
10  for speculation, assumes facts not in evidence.
11  BY THE WITNESS:
12      A.  I would -- I would be in the
13  13th Congressional District which is back to the
14  district that I am in somewhat.
15          MR. BRUCE:  That's all the questions I
16  have.  Thank you, Representative.
17          MS. LIGHTFOOT:  Reserve signature, please.
18          (AND FURTHER DEPONENT SAITH NOT.)
19
20
21
22
23
24
```

Page 59

```
1         IN THE UNITED STATES DISTRICT COURT
          FOR THE NORTHERN DISTRICT OF ILLINOIS
2                  EASTERN DIVISION
3   COMMITTEE FOR A FAIR AND    )
4   BALANCED MAP, et al.,       )
                                )
5         Plaintiffs,           )
                                )
6   vs.                         ) No. 1:11-cv-5065
7   ILLINOIS STATE BOARD OF     )
    ELECTIONS, et al.,          )
8         Defendants.           )
9         I hereby certify that I have read the
10  foregoing transcript of my deposition given on
    October 10, 2011, at the time and place aforesaid,
11  consisting of Pages 1 through 58 inclusive and I do
12  again subscribe and make oath that the same is a
    true, correct and complete transcript of my
    deposition so given as aforesaid.
13
14        Please check one:
15        _____ I have submitted errata sheet(s)
16        _____ No corrections were noted
17
          _____
          REPRESENTATIVE JUDITH BIGGERT
18
19
20  SUBSCRIBED AND SWORN TO
    before me this____ day
21  of _____, A.D., 2011.
22  _____
          Notary Public
23
24
```

Page 60

```
1   STATE OF ILLINOIS )
                      ) SS.
2   COUNTY OF COOK    )
3
4       I, CARYL L. HARDY, Certified Shorthand
5   Reporter No. 084-3896, Notary Public in and for the
6   County of Cook, State of Illinois, do hereby
7   certify that previous to the commencement of the
8   examination, said witness was duly sworn by me to
9   testify the truth; that the said deposition was
10  taken at the time and place aforesaid; that the
11  testimony given by said witness was reduced to
12  writing by means of shorthand and thereafter
13  transcribed into typewritten form; and that the
14  foregoing is a true, correct, and complete
15  transcript of my shorthand notes so taken as
16  aforesaid.
17      I further certify that there were present
18  at the taking of the said deposition the persons
19  and parties as indicated on the appearance page
20  made a part of this deposition.
21      I further certify that I am not counsel
22  for nor in any way related to any of the parties to
23  this suit, nor am I in any way interested in the
24  outcome thereof.
```

**1**

IN THE UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

COMMITTEE FOR A FAIR AND )
BALANCED MAP; JUDY BIGGERT; )
ROBERT J. DOLD; RANDY HULTGREN; )
ADAM KINZINGER; DONALD MANZULLO; )
PETER J. ROSKAM; BOBBY SCHILLING; )
AARON SCHOCK; JOHN M. SHIMKUS; )
JOE WALSH; RALPH RANGEL; LOU )
SANDOVAL; LUIS SANABRIA; MICHELLE )
CABALLERO; EDMUND BREZINSKI; and )
LAURA WAXWEILER, )
                    )
      Plaintiffs, )
                    )
  vs. )  No. 11-C-5065
                    )
ILLINOIS STATE BOARD OF ELECTIONS; )
WILLIAM M. McGUFFAGE; JESSE R. )
SMART; BRYAN A. SCHNEIDER; BETTY )
J. COFFRIN; HAROLD D. BYERS; )
JUDITH C. RICE; CHARLES W. )
SCHOLTZ; and ERNEST L. GOWEN, )
                    )
      Defendants. )

      The deposition of CONGRESSMAN ROBERT J. DOLD,
J.D., called by the Defendant for examination
pursuant to notice and pursuant to the Rules of Civil
Procedure for the United States District Courts
pertaining to the taking of depositions, taken before
Carla L. Camiliere, CSR, a notary public within and
for the County of Cook and State of Illinois, at
70 West Madison Street, Chicago, Illinois on the 30th
day of September 2011.

---

**2**

1
2   APPEARANCES:
3     MAYER BROWN, LLP, by
      MS. DANA DOUGLAS
4     71 South Wacker Drive
      Chicago, Illinois 60606
5     (312) 782-0600
        Appearing on behalf of the plaintiffs;
6
    POWER, ROGERS & SMITH, PC, by
7     MR. DEVON C. BRUCE,
      Special Assistant Illinois Attorney General
8     70 West Madison Street, Suite 5500
      Chicago, Illinois 60602
9     (312) 236-9381
        Appearing on behalf of the defendants.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**3**

1            I N D E X
    Witness:                 Page
2   ROBERT J. DOLD, J.D.................4
3     Examination by:
4       MR. BRUCE...............4
5
6
7
8            E X H I B I T S
9   Number                Page
10   No. 2................................4
11
12
13
14
15
16
17
18
19
20
21
22
23
24

---

**4**

1     MR. BRUCE: Let the record reflect this is the
2 deposition of Congressman Robert Dold, taken pursuant
3 to the federal rules of Civil Procedure, Notice of
4 Deposition and continued by the parties.
5     (Witness sworn.)
6     ROBERT DOLD, J.D.
7 called as a witness herein, having been first duly
8 sworn, was examined and testified as follows:
9       EXAMINATION
10       BY
11       MR. BRUCE:
12   Q   Sir, could you please state your first and
13 last name, and spell your last name for the record,
14 please.
15   A   Robert Dold; D, as in David, o-l-d, as in
16 David.
17   Q   Congressman, my name is Devon Bruce. I
18 have been appointed as a Special Assistant Illinois
19 Attorney General to defend the Illinois Board of
20 Elections in a lawsuit in which you are a named
21 plaintiff.
22     That's why I asked to take your
23 deposition here today. You have been identified as a
24 witness at trial and that's why I asked to take your

## 25

1    Q    Is there any written documentation as to
2  when you engaged counsel regarding any redistricting
3  issue?
4    MS. DOUGLAS:  Object to the form, foundation.
5    THE WITNESS:  I have not seen the document, so
6  I can't give you the specific date or year.  I know
7  that we had retained counsel early on in this
8  process.
9  BY MR. BRUCE:
10    Q    When you say "we," who are you referring
11  to?
12    A    My co-plaintiffs in the case.
13    Q    Are you referring to the other members of
14  the Republican Congressional Illinois Delegation?
15    A    Correct.
16    Q    And there is a reference to a committee,
17  are you familiar with what I'm referring to, there is
18  a committee?
19    MS. DOUGLAS:  Question; form, vague and
20  ambiguous.
21  BY MR. BRUCE:
22    Q    In the caption of the complaint that's
23  filed there is a reference to the committee.  That's
24  what I'm asking you about it.

## 26

1    A    You're saying the Committee For a Fair and
2  Balance Map.  Is that the committee you're talking
3  about?  There is a lot of committees in Washington,
4  that's why I'm get a better clarification.
5    Q    That self-described committee is the
6  committee I'm referring to.
7    A    Yes, I am familiar with the Committee For a
8  Fair and Balance Map.
9    Q    And who thought up that name?
10    MS. DOUGLAS:  Object to the form, foundation.
11  BY MR. BRUCE:
12    Q    Do you know?
13    A    No.
14    Q    Are you a member of that committee or not?
15    A    No.
16    MS. DOUGLAS:  Objection; foundation.  Answer to
17  the extent you know.
18    THE WITNESS:  I think Deny Hastert is a member
19  of that committee, Lynne Martin is a member of that
20  committee.  Sandy Stewart is a member of that
21  committee.  Michael Keiser is a member of that
22  committee.  And there are several others, but I do
23  not know anyone else off the top of my head.
24  BY MR. BRUCE:

## 27

1    Q    Have you ever been to any committee
2  meetings of The Fair and Balancing Act Committee?
3    A    No.
4    Q    Who is paying for your counsel in this
5  case?
6    MS. DOUGLAS:  Objection; that goes to the
7  funding issue, I believe, that we had discussed with
8  the court.
9        I mean, do you know who's paying for
10  it?
11    THE WITNESS:  Who's paying for the overall?
12    MS. DOUGLAS:  I'm just going to object to that
13  question and instruct the witness not to answer.
14  BY MR. BRUCE:
15    Q    Yesterday, Congressman, I deposed two of
16  your colleagues, Congressman Shimkus and Congressman
17  Roskam and Congressman Shimkus -- and I don't believe
18  I'm mischaracterizing his testimony -- said that in
19  his opinion that the map that was passed in
20  Springfield was drawn purely for political reasons to
21  gain Democratic seats to send to Washington.
22        Do you agree with that opinion?
23    MS. DOUGLAS:  Objection to the extent you just
24  mischaracterized John Shimkus' testimony.

## 28

1        You can answer to the extent you --
2    THE WITNESS:  I certainly think that it was
3  politically motivated and gerrymandered in a way that
4  I believe is as to try to gain Democratic seats, and
5  I have heard press testimony from the DCCC, more
6  specifically Mr. Israel talking about this is going
7  to be Ground Zero in terms of trying to gain seats to
8  go back and takeover the United States House of
9  Representatives.
10    Q    Is that your opinion as to what occurred?
11    A    That is my opinion.
12    Q    Now, in terms of the redistricting process
13  that occurred in Springfield, do you have any
14  knowledge as to how that occurred?
15    A    No.
16    Q    Do you understand that there was both a
17  state house redistricting committee and a state
18  Senate Redistricting Committee?
19    .A    I was aware of that.
20    Q    Okay.  And were you aware, Congressman,
21  that those two committees had a number of committee
22  meetings around the State of Illinois?
23    A    I don't know that that was the case.
24    Q    Okay.  Has anyone ever told you that either

29

1 of those committees had meetings around the State of
2 Illinois?
3     MS. DOUGLAS: Objection; asked and answered.
4     THE WITNESS: No, I don't know that.
5 BY MR. BRUCE:
6     Q   Suffice it to say, you did not appear at
7 any of the state legislative redistricting committees
8 to provide input on how you believe the map should
9 have been drawn; is that true?
10    A   I did not attend any meeting nor was aware
11 of any.
12    Q   My statement is true?
13    A   Can you restate it again for me -- or read
14 it back.
15    MR. BRUCE: Carla, please.
16         (Whereupon, the record was read
17          as requested.)
18    THE WITNESS: I said I did not attend, nor was
19 I aware of any of the meetings that were going on.
20 BY MR. BRUCE:
21    Q   Did you provide any input at all to the
22 state redistricting committees?
23    A   I did not provide any input.
24    Q   Prior to the newly passed congressional map

30

1 being adopted into law, had you already retained
2 counsel?
3     A   Yes.
4     Q   And did either you or your counsel ever
5 make any attempt to provide an alternative map to the
6 Illinois redistricting process?
7     MS. DOUGLAS: Objection; that calls for
8 attorney/client communications. I will instruct you
9 not to answer.
10 BY MR. BRUCE:
11    Q   Sir, to your knowledge, did anyone on your
12 behalf ever submit an alternative map to the Illinois
13 House Redistricting Committee or the Illinois Senate
14 Redistricting Committee?
15    A   No, not to my knowledge.
16    Q   Can you think of any reason that would have
17 precluded you from doing so?
18    MS. DOUGLAS: Objection; calls for speculation.
19    THE WITNESS: I would simply say we didn't have
20 a whole lot of time to take a look at any map before
21 it was basically put down and then passed, so there
22 wasn't a whole lot of time.
23
24 BY MR. BRUCE:

31

1     Q   Now, did you understand that each of those
2 committees had web sites where they were receiving
3 citizen input as to how the maps should be drawn and
4 what factors to consider?
5     MS. DOUGLAS: Object to the form of the
6 question.
7     THE WITNESS: I was not aware of any specific
8 web sites that they were taking down comments.
9 BY MR. BRUCE:
10    Q   Now, did you read the complaint that was
11 filed on your behalf in this cause of action?
12    A   Yes.
13    Q   Did you agree with the statements that were
14 made in that complaint?
15    A   Yes.
16    Q   Was there anything in that complaint that
17 you disagreed with after you read it?
18    A   No.
19    Q   Did you understand that your lawyers filed
20 a map that they suggested should be utilized as a
21 part of the pleadings on your behalf?
22    A   Yes.
23    Q   Did you look at that map?
24    A   Yes.

32

1     Q   Who drew that map?
2     MS. DOUGLAS: Objection; foundation.
3     THE WITNESS: You're asking for a name?
4 BY MR. BRUCE:
5     Q   Or names, plural.
6     MS. DOUGLAS: Objection; foundation.
7         If you don't know, you don't know.
8     THE WITNESS: I don't know. I have no
9 foundation. I have no knowledge in terms of who
10 actually drew the map.
11 BY MR. BRUCE:
12    Q   Did you provide any input as to how the map
13 that your lawyers have put forth was drawn?
14    MS. DOUGLAS: Objection; to the extent that
15 that answer would involve an attorney/client
16 communication. I would instruct you not to answer.
17    THE WITNESS: It was all attorney/client stuff.
18 BY MR. BRUCE:
19    Q   Other than anything that you may have
20 learned from your lawyers, do you have any knowledge
21 whatsoever about the demographic composition of the
22 map that has been proffered by the plaintiffs in this
23 cause of action?
24    A   The answer is yes. I think that we've seen

Page 1

```
 1            IN THE UNITED STATES DISTRICT COURT
           FOR THE NORTHERN DISTRICT OF ILLINOIS
 2                    EASTERN DIVISION

 3

 4    COMMITTEE FOR A FAIR AND    )
      BALANCED MAP, JUDY          )
 5    BIGGERT, ROBERT J. DOLD,    )
      RANDY HULTGREN, ADAM        )
 6    KINZINGER, DONALD           )
      MANZULLO, PETER J. ROSKAM,  )
 7    BOBBY SCHILLING, AARON      )
      SCHOCK, JOHN M. SHIMKUS,    )
 8    JOE WALSH, RALPH RANGEL,    )
      LOU SANDOVAL, LUIS SANABRIA,)
 9    MICHELLE CABALLERO,         )
      EDMUND BREZINSKI, and       )
10    LAURA WAXWEILER,            )
                                  )  No.  1:11-cv-5065
11               Plaintiffs,      )
                                  )
12               vs.              )
                                  )
13    ILLINOIS STATE BOARD OF     )
      ELECTIONS, WILLIAM A.       )
14    MCGUFFAGE, JESSE R.         )
      SMART, BRYAN A. SCHNEIDER,  )
15    BETTY J. COFFRIN,           )
      HAROLD D. BYERS,            )
16    JUDITH C. RICE,             )
      CHARLES W. SCHOLZ, and      )
17    ERNEST L. GOWEN,            )
                                  )
18               Defendants.      )

19            The videotaped deposition of

20    CONGRESSMAN PETER ROSKAM, called by the Defendants,

21    for examination, taken pursuant to notice, taken

22    before CARYL L. HARDY, a Notary Public within and

23    for the County of Cook, State of Illinois, and a

24    Certified Shorthand Reporter of said state, taken
```

RECEIVED
OCT 0 7 2011
POWER ROGERS & SMITH, P.C.

Page 10

1    Q.   And who was your general opponent that
2    year, do you remember?
3    A.   Tammy Duckworth.
4    Q.   And have you served in the Congress since
5    that time in 2006?
6    A.   Yes.
7    Q.   And you're currently in leadership?
8    A.   Yes.
9    Q.   In what position?
10   A.   Chief deputy whip.
11   Q.   Have you always been a Congressman sixth
12   district?
13   A.   Yes.
14   Q.   Now, sir, did you play any role at all in
15   the redistricting process for the map that was
16   passed in Illinois in 2011?
17       MS. LIGHTFOOT:  Object to the form.
18   BY THE WITNESS:
19   A.   Could you give me -- what are you asking
20   me?  I mean, it's a very broad question.
21   BY MR. BRUCE:
22   Q.   It is a broad question and I -- I'm trying
23   to -- I don't want to take up your time,
24   Congressman.

Page 11

1    A.   I've got time.
2    Q.   Okay.  Did you yourself play any firsthand
3    role in drawing any of the lines on the
4    Congressional map that was ultimately adopted in
5    2011?
6    A.   By firsthand role, do you mean offering
7    amendments as a member of the Illinois General
8    Assembly or the Illinois Senate?  No.  I wasn't a
9    member of the legislature.
10   Q.   And that's what I understood.  The map
11   that you're taking issue with was passed by the
12   Illinois legislature and signed by the Illinois
13   governor; is that correct?
14   A.   That's correct.
15   Q.   Okay.  What I'm getting at -- and I'm not
16   trying to be, you know, ev- -- I'm just trying to
17   directly address the issue.  Did you have any role
18   at all in creating the map that was ultimately
19   adopted?
20   A.   No.
21   Q.   Okay.  Did you speak to anyone that had a
22   direct role in adopting the map that you're taking
23   issue with?
24       MS. LIGHTFOOT:  Object to the form.

Page 12

1    BY THE WITNESS:
2    A.   Yes.
3    BY MR. BRUCE:
4    Q.   Okay.  Who did you speak to?
5    A.   Senate President John Cullerton.
6    Q.   Okay.  Anyone else?
7    A.   Not that I recall.
8    Q.   And was that -- when was the
9    conversation -- did you have one conversation with
10   President Cullerton or more than one?
11   A.   More than one.
12   Q.   How many?
13   A.   Two to my recollection.
14   Q.   And were those in person or over the
15   phone?
16   A.   Over the phone.
17   Q.   Both of them?
18   A.   Both of them.
19   Q.   And when was the first conversation?
20   A.   I don't recall.
21   Q.   Do you have any notes of that conversation?
22   A.   No.
23   Q.   Did you have any -- at any time have you
24   either generated or received any correspondence,

Page 13

1    emails, notes, or any other tangible item with
2    respect to the redistricting of the map that you're
3    now taking issue with --
4    A.   No.
5    Q.   -- other than possibly from counsel?  Go
6    ahead.
7        MS. LIGHTFOOT:  Can I just have that
8    question read back?
9            (Record read.)
10   BY MR. BRUCE:
11   Q.   You understood my question other than with
12   possibly your counsel?
13   A.   I understood it.  The answer is no.
14   Q.   Okay.  Back to the conversation that you
15   had with President Cullerton, the first
16   conversation, do you remember what month and year
17   that occurred in?
18   A.   I recall that it was shortly before the
19   map was passed by the General Assembly.
20   Q.   Hours, days, weeks?
21   A.   In the days/weeks.
22   Q.   And you knew President Cullerton from your
23   time in the Senate?
24   A.   Yes.

Page 14

1    Q.   Who initiated the phone call?
2    A.   Senator Cullerton.
3    Q.   And what did he say to you and what did
4    you say to him in that conversation?
5    A.   My recollection is that he proposed a
6    version of the map that would have been favorable
7    to me personally; that he was interested in my
8    support for that and also for me encouraging other
9    Republicans to vote in favor of that map.
10       I recall that he said he had been in
11   contact with the Democratic Congressional Campaign
12   Committee, and I recall that he said that, in his
13   opinion, Judy Biggert, Congresswoman Biggert, was
14   gone under any version of the map.
15   Q.   Do you remember anything else that he said
16   to you in that conversation?
17   A.   He said that he had been in touch with
18   Congressman Randy Hultgren.  And that's my
19   recollection.
20   Q.   What did you say to President Cullerton in
21   that first conversation?
22   A.   I asked him about the map.
23   Q.   Did he ever provide you, either over fax
24   or in the mail or in an email, any -- any map or

Page 15

1    draft map for you to look at?
2    A.   No.
3    Q.   You asked him about the map.  And what did
4    he say, do you remember?
5    A.   He offered to have someone come and look
6    at the map in Springfield.
7    Q.   And what did you say to that?
8    A.   I said I'd think about it and would circle
9    back and possibly send someone to Springfield to
10   look at the map.
11   Q.   Did you do that ultimately?
12   A.   I did.
13   Q.   Okay.  Who did you send?
14   A.   I sent my chief of staff, Steven Moore.
15   Q.   M-o-o-r-e?
16   A.   That's right.
17   Q.   Is there anything else that you remember
18   about that conversation with President Cullerton
19   that you have not told us here today?
20   A.   Not that I recall.
21   Q.   Do you know, for example, what was it
22   about the map that Congressman -- that President
23   Cullerton was talking to you about that was
24   favorable to you personally?

Page 16

1    A.   A map that, in his opinion -- a district
2    that, in his opinion, I could win.  He expressed a
3    certain amount of flexibility in how the -- how the
4    districts were being fashioned and that if I was
5    able to get Republican support for the map, then he
6    would be able to put me in a map -- put me in a
7    district that was favorable to me.
8    Q.   Well, that was nice of him.
9        Is there anything else about that
10   conversation that you have -- that you recall that
11   you've not told me about here today?
12   A.   Not that I recall.
13   Q.   Is there anything that would refresh your
14   recollection?
15   A.   No.
16   Q.   You had a subsequent conversation with
17   President Cullerton?
18   A.   I did.
19   Q.   What month and year was that?  It was
20   2011.
21   A.   It was 2011.
22   Q.   Yeah.  What month was that?
23   A.   It was subsequent, so within the same time
24   frame generally.

Page 17

1    Q.   So would this have all been occurring in
2    March or April or May?  I mean, can you narrow it
3    down for a month?
4    A.   I -- it was imminent to the House and the
5    Senate acting.  I don't have a recollection as we
6    sit here today about what -- what month or what
7    week that was, but it was -- it was imminent to
8    that.
9    Q.   Within days?
10   A.   Within days.
11   Q.   Okay.  And by the way, was anyone in your
12   office when you spoke to Congress- -- President
13   Cullerton?
14   A.   Not on the first conversation that --
15   Q.   Okay.
16   A.   -- we just talked about.
17   Q.   Okay.  And do you know if you were on the
18   speakerphone or if there was anyone else that was a
19   witness to the conversation at his end of the
20   telephone?
21   A.   I don't know.
22   Q.   All right.  Tell me about the second
23   conversation.  Did he call you, or did you call
24   him?

Page 18

1    A.   Representative Randy Hultgren and I called
2    President Cullerton.
3       Q.   From Washington?
4       A.   From Washington.
5       Q.   And was there any -- were you on a
6    speakerphone?
7       A.   I don't recall.
8       Q.   Okay. And what did you say to President
9    Cullerton in that telephone conversation?
10      A.   We essentially declined his offer.
11      Q.   You and Congressman Hultgren?
12      A.   That's right.
13      Q.   Why?
14      A.   It didn't seem like a good idea.
15      Q.   What didn't?
16      A.   The offer to find Republican votes on
17   President Cullerton's proposed map.
18      Q.   And you understood he was willing to work
19   with you and Congressman Hultgren in terms of
20   moving the district lines based upon the original
21   conversation?
22      A.   Yes.
23      Q.   Other than declining his offer, can you
24   tell me anything else that you said to him or that

Page 19

1    Congressman Hultgren said to President Cullerton in
2    that second conversation that you had?
3       A.   There was a reluctance that we expressed
4    about not being able to see the map in its
5    totality. In other words, we were shown
6    information only about the proposed districts that
7    we would run in, but there was no sense of seeing
8    the larger picture.
9       Q.   Anything else that you said to President
10   Cullerton or that he said to you that you can
11   recall in that conversation?
12      A.   Not that I recall.
13      Q.   Would there be anything that would refresh
14   your recollection?
15      A.   No.
16      Q.   And at this point, had you seen any map or
17   draft map?
18      A.   Any map from the -- from Senator Cullerton?
19      Q.   Yes, sir.
20      A.   No.
21      Q.   Well, had you seen any map from anyone at
22   this point?
23      A.   No.
24      Q.   Now, other than President Cullerton, did

Page 20

1    you ever speak to anyone that you understand that
2    had any involvement at all -- strike that.
3       Did you ever speak to any other state
4    legislator about the redistricting process other
5    than two those conversations that you had with
6    President Cullerton?
7       A.   No.
8       Q.   Did you ever speak to any state
9    legislative staff at any time regarding this
10   legislative process?
11      A.   No.
12      Q.   And by that, I mean the redistricting
13   process.
14      A.   I understood.
15      Q.   Okay. You told me about your chief of
16   staff going down to Springfield?
17      A.   That's right.
18      Q.   Did he do that once or more than once?
19      A.   Once.
20      Q.   And did he obtain any documents for you to
21   review?
22      A.   No.
23      Q.   And I take it you talked to Mr. Moore
24   either while he was down there or after he came

Page 21

1    back?
2       A.   Correct.
3       Q.   And what did he -- did he call you while
4    he was there or after he came back?
5       A.   My memory is that he called me while he
6    was there.
7       Q.   All right. What did he say to you and
8    what did you say to him in that conversation?
9       A.   I don't recall the details. I recall the
10   essence which was he was invited in by Senator
11   Cullerton to what was described as a map room. He
12   was able to see only the proposed sixth district
13   map and was not able to see the totality of the
14   map. He was not allowed to take notes. And
15   that -- that's the -- that's the essence of the
16   conversation.
17      Q.   Do you remember anything else that
18   Mr. Moore said to you or you said to him about his
19   involvement in seeing the proposed sixth district
20   map?
21      A.   No.
22      Q.   Do you remember any comments he made about
23   where the boundaries were or anything of that
24   nature?

Page 22

1    A.  No.
2    Q.  To your knowledge, did Mr. Moore speak to
3  anyone in Springfield at any time himself about the
4  redistricting and how the lines were drawn?
5      MS. LIGHTFOOT:  Beyond what he's just
6  testified to?
7      MR. BRUCE:  Well, I don't think he
8  testified that he talked to anybody.
9  BY MR. BRUCE:
10    Q.  Did Mr. Moore, to your knowledge, talk to
11  anybody when he was in President Cullerton's --
12    A.  I don't know.
13    Q.  Okay.  I --
14    A.  I interrupted.  Go ahead and ask the
15  question.
16    Q.  Yeah.  I understood you to say that
17  Mr. Moore was shown the proposed sixth district map
18  in the map room; is that correct?
19    A.  That's my understanding.
20    Q.  That's what he told you?
21    A.  That's correct.
22    Q.  Was it your understanding that Mr. Moore
23  spent any time talking to President Cullerton about
24  the substance of the map issue at all?

Page 23

1    A.  I understand that they had a conversation.
2  I don't know the duration of it.
3    Q.  Okay.  And you don't know what they talked
4  about?
5    A.  They talked about the -- what I
6  essentially relayed to you a couple minutes ago.
7    Q.  He's able to see the proposed map and he
8  can't take any notes?
9    A.  That's right.
10    Q.  Anything else that you recall that
11  Mr. Moore told you?
12    A.  Not that I can recall.
13    Q.  Sir, do you know who -- which individuals
14  ultimately drew the map that was adopted in
15  Springfield and passed into law?
16    A.  I don't know.
17    Q.  Do you know the intent of any of the
18  individuals in terms of why they put various
19  Congressional lines and boundaries in the map that
20  was ultimately adopted?
21      MS. LIGHTFOOT:  Object.
22  BY THE WITNESS:
23    A.  Are you asking am I in the minds of those
24  people?

Page 24

1  BY MR. BRUCE:
2    Q.  No.  Do you have any firsthand knowledge
3  as to the intent of any of the individuals that
4  actually created the map that was passed in
5  Springfield?
6    A.  No.
7    Q.  Has anybody ever told you at any time that
8  the Congressional lines were drawn to intentionally
9  discriminate against any minority?
10      MS. LIGHTFOOT:  You can answer that
11  question yes or no.
12  BY THE WITNESS:
13    A.  No.
14  BY MR. BRUCE:
15    Q.  Has anyone ever told you at any time that
16  the Congressional map that was ultimately adopted
17  and passed in Illinois was intentionally drawn to
18  discriminate against Latinos?
19      MS. LIGHTFOOT:  You can answer that
20  question yes or no.
21  BY THE WITNESS:
22    A.  No.
23  BY MR. BRUCE:
24    Q.  If you -- Congressman, I want to turn to a

Page 25

1  different kind of -- line of questions.  Well,
2  before we do, have I exhausted your recollection of
3  conversations with anyone that was involved in
4  drawing the map that was ultimately passed into
5  law, or are there other conversations that you had
6  that we have not talked about here today?
7      MS. LIGHTFOOT:  One moment.  Can you have
8  that read back to me, please?
9      (Record read.)
10      MS. LIGHTFOOT:  Counsel, is your question
11  with the caveat outside of any privileged
12  communications, or are you -- are you including
13  that as well?
14      MR. BRUCE:  I -- in fairness to me, I
15  think I'm asking about any conversations.
16      MS. LIGHTFOOT:  All right.  I'm going to
17  instruct you, Congressman Roskam, that you can
18  answer the question yes or no as to if you had any
19  other conversations and we'll take it step-by-step
20  because I think the question intentionally imposes
21  upon privileged communications.
22      THE WITNESS:  Could you ask me the
23  question again?
24      MR. BRUCE:  I think it was a good one,

Page 34

1    A.  That's true.
2    Q.  Have you spoken to any Democratic
3  Congressmen at all about either the -- the process
4  which led to the map being adopted that you're
5  taking issue with either before or after the map
6  was adopted?
7    A.  Yes.
8    Q.  Who did you speak to?
9    A.  Congressman Lipinski.
10    Q.  And which Congress- -- Congressman
11  Lipinski are you referring to, the father or the
12  son?
13    A.  The son, Congressman Dan Lipinski.
14    Q.  Certainly.
15      Did you have one conversation with him or
16  more than one?
17    A.  One conversation that I recall.
18    Q.  And was that before or after the map was
19  adopted?
20    A.  Before.
21    Q.  And who initiated that conversation?
22    A.  I did.
23    Q.  And why did you do that?
24    A.  In a playful conversation.  I -- I just

Page 35

1  initiated a chat with him.
2    Q.  And was that in Congress itself?
3    A.  It was on the floor of the House of
4  Representatives.
5    Q.  Certainly.
6      And when was that?
7    A.  I don't recall.
8    Q.  And playfully, what did you say to him and
9  what did he say to you about the redistricting?
10    A.  Playfully what I said was it's all about
11  him; that he was the only member of Congress that,
12  with any certainty, was going to be coming back to
13  Washington; that every other member of Congress was
14  largely interchangeable in terms of the leadership
15  in Springfield and that he was the beneficiary of a
16  close relationship with the Speaker of the House,
17  Mike Madigan, and I congratulated him on his
18  certainty in coming back.
19    Q.  And what was his response to that?
20    A.  A playful shrug.
21    Q.  He didn't -- he did not respond vocally?
22    A.  Not that I recall.
23    Q.  All right.  And have you had any other
24  conversations either with Congressman Lipinski or

Page 36

1  anyone else in the Democratic Illinois delegation
2  about the redistricting process?
3    A.  No.
4    Q.  Have you ever spoken to any United States
5  senators at any time about the redistricting
6  process?
7    A.  No.
8    Q.  Have you ever spoken to Speaker Madigan,
9  Congresswoman Schakowsky, or Senator Durbin at any
10  time regarding the redistricting process or the map
11  that was ultimately adopted?
12    MS. LIGHTFOOT:  Object to the form.
13  BY THE WITNESS:
14    A.  No.
15  BY MR. BRUCE:
16    Q.  There were a number of redistricting
17  committee hearings here in Illinois hosted by both
18  the House and the Senate.  Let me first ask you,
19  are you aware of that fact?
20    A.  I'm aware that there was a schedule, yes.
21    Q.  Okay.  Did you attend any of those
22  redistricting committee hearings yourself?
23    A.  No.
24    Q.  Did you ever at any time send anyone to

Page 37

1  attend those committee hearings on your behalf?
2    A.  No.
3    Q.  Did you ever at any time attempt to
4  provide the redistricting committees with any
5  alternative maps or information that they could
6  rely upon to formulate a map?
7    A.  No.
8    Q.  Do you agree with me nothing would have
9  precluded you from doing so?
10    MS. LIGHTFOOT:  Object to the form,
11  assumes facts not in evidence.
12  BY THE WITNESS:
13    A.  I just got confused by your question.  The
14  question is, do I agree with you that nothing would
15  have precluded me from doing that?
16  BY MR. BRUCE:
17    Q.  That's the question.
18    A.  Nothing would have precluded me, but it
19  wouldn't have been very fruitful, in my view.
20      So in answer to your question, nothing
21  would have precluded me.
22    Q.  All right.  And whether or not it would
23  have been fruitful you don't know because you
24  didn't do it; is that a fair statement?

Page 38

1     MS. LIGHTFOOT: Object to the form,
2  mischaracterizes the witness' prior testimony.
3  BY THE WITNESS:
4     A.  I think I do know.  I think based on the
5  conversations that I had with Senator Cullerton, it
6  was clear that there was an agenda to move a map
7  forward that was going to create a great advantage
8  to the Democrats and they weren't interested in
9  substantive input into it.  That's why I didn't
10  agree to reach out to Republicans to have them vote
11  in favor of it.
12     So could I have offered input?  I could
13  have.  I think the political reality was that
14  decisions had largely been made at that point and
15  it wasn't fruitful.
16  BY MR. BRUCE:
17     Q.  Do you hold an opinion, Congressman, that
18  this map that was ultimately adopted was
19  intentionally drawn to politically favor the
20  Democratic Congressional delegation?
21     A.  I do.
22     Q.  And what's the basis of that opinion?
23     A.  I think Senator Cullerton's comment to me
24  that Judy Biggert is gone under the map, the

Page 39

1  decision to put Congresswoman Biggert's home into
2  Mike Quigley's Congressional district linking
3  Hinsdale to the lakefront, the decision to put Bob
4  Dold's home into Congresswoman Jan Schakowsky's
5  district, the decision to pair up Don Manzullo and
6  Adam Kinzinger, the decision to put Adam
7  Kinzinger's home in Jesse Jackson's district, and
8  the fact that no Democrats who are currently
9  serving are in any serious jeopardy of re-election
10  led me to my conclusion.
11     Q.  And it's your opinion that's why the map
12  was drawn the way it was?
13     A.  Yes.
14     Q.  I'd like to switch gears, Congressman, and
15  I'd like to ask you some questions about this
16  committee that's one of the named Plaintiffs.
17     Do you know anything about this committee?
18     A.  I know the committee exists.  I know it's
19  incorporated.  I know a few members of the
20  committee.
21     Q.  Are you a member of the committee?
22     A.  No.
23     Q.  Have you ever gone to any committee
24  meetings?

Page 40

1     A.  Yes.
2     Q.  How many?
3     A.  One.
4     Q.  And when and where was that?
5     A.  It was a fundraiser for the committee
6  earlier this year.
7     Q.  Where was it?
8     A.  It was at a home on the North Side of
9  Chicago.
10     Q.  Whose home was it in?
11     A.  It was at the home of Don Wilson.
12     Q.  And do you recall who was in attendance?
13     A.  I recall Mr. Wilson and his wife.  I
14  recall Lynn Martin.  I recall Lisa Wagner.  And
15  that's -- that's all I recall.
16     Q.  And about how many people were there?
17     A.  I would estimate 30.
18     Q.  Did you recognize any Democrats that
19  you -- individuals that you knew to be Democrats at
20  the committee?
21     A.  No.
22     Q.  A poorly phrased question.  I apologize.
23  At the function that you were referring to, did you
24  see anyone that you recognized to be a Democrat?

Page 41

1     A.  No.  I recall Judy Biggert was there.
2     Q.  And how did the committee form, if you
3  know?
4     A.  I don't know.
5     Q.  All of the Congressmen and women who are
6  Plaintiffs to this lawsuit are Republican; is that
7  true?
8     A.  That's correct.
9     Q.  Are you a lifelong Republican?
10     A.  For as long as I've been politically
11  active, yes.
12     Q.  Can you tell me the names of any
13  individuals that are Plaintiffs that are not
14  Republicans?
15     A.  I don't know.
16     Q.  Have you read the complaint?
17     A.  Yes.
18     Q.  Was there any aspect of the complaint that
19  you disagreed with?
20     A.  No.
21     Q.  There's some individuals -- and I'll be
22  happy to show you.  There's some -- there's some
23  non-Congressional named Plaintiffs.  I was just
24  going to ask you if you knew any of those

Schilling, Robert T.                                    October 3, 2011

Page 1

IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF ILLINOIS

------------------------------------:
COMMITTEE FOR A FAIR AND BALANCED      :
MAP, JUDY BIGGERT, ROBERT J. DOLD,     :
RANDY HULTGREN, ADAMKINZINGER,         :
DONALD MANZULLO, PETER J. ROSKAM,      :
BOBBY SCHILLING, AARON SCHOCK,         :
JOHN M. SHIMKUS, JOE WALSH, RALPH      :
RANGEL, LOU SANDOVAL, LUIS             :
SANABRIA, MICHELLE CABALLERO,          :
EDMUND BREZINSKI, and LAURA            :
WAXWEILER,                             :
                                       :
          Plaintiffs,                  :
                                       :
     v.                                : Civil Action No.
                                       : 1:11-cv-05065
ILLINOIS STATE BOARD OF ELECTIONS,     :
WILLIAM M. McGUFFAGE, JESSE R.         :
SMART, BRYAN A SCHNEIDER, BETTY J.     :
COFFRIN, HAROLD D. BYERS, JUDITH       :
C. RICE, CHARLES W. SCHOLZ, and        :
ERNEST L. GOWEN,                       :
                                       :
          Defendants.                  :
------------------------------------


          Deposition of ROBERT T. SCHILLING, a witness

herein, at the law offices of Mayer, Brown, LLP,

1999 K Street, N.W., Washington, D.C., commencing at

2:26 p.m. on Monday, October 3, 2011, and the

proceedings being taken down by stenotype and

transcribed by Catherine B. Crump, a Notary Public in

And for the District of Columbia.

Schilling, Robert T.

October 3, 2011

13 (Pages 46 to 49)

Page 46

1  free to answer.
2  THE WITNESS: All but one, all but Tim
3  Johnson.
4  BY MR. BRUCE:
5  Q.  I think what you mean to say,
6  Congressman, is all of the members of the Republican
7  delegation to the United States House of
8  Representatives save Tim Johnson; is that correct?
9  MR. PANOFF: Objection. Could we read back
10  his answer to the question that he asked?
11  [Whereupon, the requested testimony was read
12  back by the court reporter.]
13  BY MR. BRUCE:
14  Q.  I understood what you meant,
15  Congressman. I just want to make the record. I'm
16  trying to clarify the record for you.
17  Did you mean to say all of the Republican
18  members of the United States Congress from Illinois
19  except for Representative Johnson?
20  A.  That is correct, sir.
21  Q.  None of the Democratic members of
22  Congress are joined in this lawsuit with you; is that

Page 47

1  correct?
2  A.  That's correct.
3  Q.  Have you spoken to Congressman Johnson
4  about this lawsuit?
5  A.  I have not.
6  Q.  Have you spoken to Congressman Johnson
7  about this map that passed in Springfield?
8  A.  I have not.
9  Q.  And do you know why Congressman Johnson
10  has not joined the lawsuit?
11  MR. PANOFF: Objection. Calls for
12  speculation.
13  THE WITNESS: You would have to ask
14  Congressman Johnson that.
15  BY MR. BRUCE:
16  Q.  Now, as I understood your previous
17  testimony, you take issue with the process in which
18  the redistricting and the map that was passed in
19  Springfield was actually created; is that true?
20  A.  That is true.
21  MR. PANOFF: Object to the form.
22  THE WITNESS: That's correct.

Page 48

1  BY MR. BRUCE:
2  Q.  That's what it sounded like when you
3  were telling me that earlier. Am I correct in saying
4  that?
5  MR. PANOFF: Object to the form.
6  THE WITNESS: Yes.
7  BY MR. BRUCE:
8  Q.  Okay. Now, do you understand that there
9  was both a House and Senate Redistricting Committee
10  in Springfield that was formulated?
11  A.  Yes.
12  Q.  And did you understand that there were
13  Republican members both to the Senate Redistricting
14  Committee and to the House Redistricting Committee?
15  A.  The majority, is that what you're
16  saying?
17  Q.  No. Did you understand that there were
18  Republican members to the Senate and House
19  Redistricting Committees?
20  A.  Yes. That's how it works. Yes.
21  Q.  All right. And do you know any of those
22  members of -- the Republican members of those

Page 49

1  committees?
2  A.  I do not.
3  Q.  Kurt Dillard?
4  A.  Oh, I know Kurt. Yeah. Maybe you
5  better read these guys off.
6  Q.  All right. Let me go through. In terms
7  of the State representatives, State House members,
8  there is a Jim Durkin.
9  A.  No.
10  Q.  Chapin Rose?
11  A.  No.
12  Q.  Tim Schmitz?
13  A.  No.
14  Q.  Jil Tracy?
15  A.  I know Jil.
16  Q.  Is she from your area?
17  A.  She's in the Quincy area, the part that
18  they're taking away from me.
19  Q.  Okay. And she is a Republican?
20  A.  Yes, she is.
21  Q.  Did you ever at any time speak to
22  Representative Tracy about your concerns about the

Schilling, Robert T.

October 3, 2011

14 (Pages 50 to 53)

| Page 50 | Page 52 |
|---|---|
| 1  map making process? | 1     Q.   Did you at any time make any effort to |
| 2      MR. PANOFF: Object to the form. | 2  attend any Redistricting Committee meeting? |
| 3      THE WITNESS: No, sir. | 3     A.   No, sir. I'm a member of Congress and |
| 4  BY MR. BRUCE: | 4  my schedule would not allow me to. I believe that |
| 5     Q.   Did you ever speak to Representative | 5  the one that they had in Rock Island County, I was in |
| 6  Tracy about when the Redistricting Committee would | 6  Washington, D.C. If I would have been able to go to |
| 7  meet in your area, geographic area? | 7  the meeting, I would have. |
| 8     A.   No, sir. | 8     Q.   Do you remember the date of the one that |
| 9     Q.   Do you know the Redistricting Committees | 9  was in Rock Island County? |
| 10  met throughout the State of Illinois to gather input | 10     A.   I do not. |
| 11  to formulate the map? | 11     Q.   Do you know if it was a House or Senate |
| 12     A.   I know that they met to hear concerns, | 12  Committee? |
| 13  but not so much to formulate the map. | 13     A.   I don't know. I just know that they had |
| 14     Q.   Okay. What's your understanding as to | 14  a meeting there. |
| 15  why the committee meetings were being held all over | 15     Q.   Did you ever, at any time, make any |
| 16  the State of Illinois? | 16  attempt to send anyone on your behalf to go to any of |
| 17     A.   It was more of a visual thing to make it | 17  these House or Senate Redistricting Committee |
| 18  look like that they were giving people -- allowing | 18  meetings? |
| 19  people's voices to be heard, and I know that some | 19     A.   No, sir. |
| 20  folks had gone to the one in Rock Island County and | 20     Q.   You could have done so; is that correct? |
| 21  that some of the words back from people were that it | 21      MR. PANOFF: Object to the form. |
| 22  was like they weren't even being listened to. | 22      THE WITNESS: Um-hum. |

| Page 51 | Page 53 |
|---|---|
| 1     Q.   Okay. Who told you it was a visual | 1  BY MR. BRUCE: |
| 2  thing? | 2     Q.   Yes? |
| 3     A.   That's what I just said. No one told me | 3     A.   Yes. |
| 4  it was a visual thing. | 4     Q.   Did you ever speak to any lawyers about |
| 5     Q.   Which folks went to Rock Island County? | 5  asking them to provide input on your behalf to any of |
| 6  What were their name? | 6  these committees about how the Congressional 17th |
| 7     A.   I don't recall the names of the people. | 7  District should be drawn? |
| 8  There's a group of people that went from Rock Island | 8      MR. PANOFF: You can answer that yes or no. |
| 9  County and said that it was basically more of a show | 9      THE WITNESS: No, sir. |
| 10  than to do a proper remap, and the reason they went | 10  I want to verify, also, I don't know if I was |
| 11  was because of the 17th District, of how | 11  in D.C. at the time when they were having the hearing |
| 12  gerrymandered it was to try to avoid that from | 12  in Rock Island County or if I was out in the field |
| 13  happening again. | 13  with previous engagements as to why I did not make it |
| 14     Q.   And you can't tell me any of those | 14  to that meeting. |
| 15  people's names that you spoke to about it? | 15  BY MR. BRUCE: |
| 16     A.   I can't, sir. | 16     Q.   Well, who keeps your schedule? |
| 17     Q.   Would that be written down anywhere? | 17     A.   Claire Repass. |
| 18     A.   No. | 18     Q.   And she's in your Illinois office? |
| 19     Q.   Would there be anything that would | 19     A.   D.C. office. |
| 20  refresh your recollection about who these | 20     Q.   So Claire would know where you were at? |
| 21  unidentified folks were? | 21     A.   Yes, sir. |
| 22     A.   No. | 22     Q.   Now, did you at any time send any letter |

Schilling, Robert T.                                    October 3, 2011

15 (Pages 54 to 57)

| Page 54 | Page 56 |
|---|---|
| 1 or any thoughts about how the 17th Congressional | 1 BY MR. BRUCE: |
| 2 District should be drawn to any of the chairpersons | 2 Q. Okay. Well, tell me what you know about |
| 3 or committee members of the Redistricting Committees? | 3 that committee. |
| 4 MR. PANOFF: Object to the form. | 4 MR. PANOFF: Object to the form. To the |
| 5 THE WITNESS: I did not. | 5 extent it calls for any communications with counsel, |
| 6 BY MR. BRUCE: | 6 I'll instruct you not to answer. If you have any |
| 7 Q. All right. Did you have any concerns | 7 independent basis, feel free to do so. |
| 8 during the time period in which the map process was | 8 THE WITNESS: I don't have any independent |
| 9 taking place about how it was occurring? | 9 basis. |
| 10 MR. PANOFF: Object to the form. | 10 BY MR. BRUCE: |
| 11 THE WITNESS: I mean, I'm from Illinois. Of | 11 Q. So the only thing that you know about |
| 12 course, I did. | 12 this Committee for a Fair and Balanced Map is what |
| 13 BY MR. BRUCE: | 13 your attorneys have told you privately; is that true? |
| 14 Q. Okay. What I'm trying to find out, | 14 **A. Yeah, and just by looking at the map** |
| 15 Congressman, is I'm trying to find out did you do | 15 **differences, they're going to allow the people to** |
| 16 anything to offer anyone in the State legislature | 16 **pick the politician versus the politician picking the** |
| 17 your thoughts of the map or, more specifically, how | 17 **people.** |
| 18 the 17th District should be drawn. | 18 Q. So would more Republicans get elected if |
| 19 **A. No. I didn't because it wasn't going to** | 19 the map that you're proffering would be adopted? |
| 20 **matter, sir.** | 20 MR. PANOFF: Objection. Calls for |
| 21 Q. Well, how do you know that? | 21 speculation. |
| 22 **A. Because it's how we do business in** | 22 BY MR. BRUCE: |

| Page 55 | Page 57 |
|---|---|
| 1 **Illinois, sir. We're 48 out of 50 in job creation.** | 1 Q. I don't want you to speculate. Can you |
| 2 **Sorry.** | 2 tell me? |
| 3 Q. Do you think that jobs have to do with | 3 **A. No. I believe that the --** |
| 4 how the congressional map is drawn? | 4 MR. PANOFF: How can he tell you who is going |
| 5 **A. Yeah. I believe when you've got people** | 5 to win an election? You're asking him to speculate. |
| 6 **that are overtaxed and businesses out of the entire** | 6 MR. BRUCE: He's already told me that it's |
| 7 **State, yeah, it has a great deal to do with it, sir.** | 7 less advantageous. |
| 8 Q. Do you know if Congressman Johnson | 8 BY MR. BRUCE: |
| 9 agrees with you on that point? | 9 Q. This map is less advantageous for you. |
| 10 MR. PANOFF: Object to the form. | 10 We've already gone through that. So my question is |
| 11 THE WITNESS: You'd have to call him. | 11 do you think that more Republicans would be elected |
| 12 MR. PANOFF: Speculation. | 12 in the map that's being proffered by the Republicans |
| 13 BY MR. BRUCE: | 13 in this lawsuit? |
| 14 Q. Now, are you a member of this committee | 14 MR. PANOFF: Objection. Calls for |
| 15 that was formed that's the plaintiff in the lawsuit | 15 speculation. Feel free to answer. |
| 16 that we're here for today? | 16 THE WITNESS: I believe that this map |
| 17 MR. PANOFF: Object to the form. Are you | 17 basically takes the will of the people away from the |
| 18 referring to the Committee for a Fair and Balanced | 18 past election, and what it does by the drawings is it |
| 19 Map? | 19 makes it more advantageous for the Democrats to hold |
| 20 MR. BRUCE: I think that's what the committee | 20 a majority in the State. |
| 21 has decided to call itself. | 21 [Exhibit No. 4 was identified |
| 22 THE WITNESS: I'm not on the committee, sir. | 22 for the record.] |