**Page 1**

```
 1          IN THE UNITED STATES DISTRICT COURT
 2             NORTHERN DISTRICT OF ILLINOIS
 3                    EASTERN DIVISION
 4   COMMITTEE FOR A FAIR AND        )
 5   BALANCED MAP, JUDY BIGGERT,     )
 6   ROBERT J. GOLD, RANDY HULTGREN, )
 7   ADAM KINZINGER, DONALD MANZULLO,)
 8   PETER J. ROSKAM, BOBBY          )
 9   SCHILLING, AARON SCHOCK, JOHN M.)
10   SHIMKUS, JOE WALSH, RALPH       )
11   RANGEL, LOU SANDOVAL, LUIS      )
12   SANABRIA, MICHELLE CABALLERO,   )
13   EDMUND BREZINSKI, and LAURA     )
14   WAXWEILER,                      )
15              Plaintiffs,          )
16        vs.                        ) 1:11-cv-05065
17   ILLINOIS STATE BOARD OF         )
18   ELECTIONS, WILLIAM M. McGUFFAGE,) DEPOSITION OF
19   JESSE R. SMART, BRYAN A.        ) JUAN RANGEL
20   SCHNEIDER, BETTY J. COFFRIN,    ) 10/6/11
21   HAROLD D. BYERS, JUDITH C. RICE,)
22   CHARLES W. SCHOLZ, and ERNEST L.)
23   GOWEN,                          )
24              Defendants.          )
```

**Page 2**

```
 1       The videotaped deposition of JUAN RANGEL,
 2   called for examination, taken pursuant to the
 3   Federal Rules of Civil Procedure of the United
 4   States District Courts pertaining to the taking of
 5   depositions, taken before LISA O'BRIEN, CSR
 6   No. 84-3822, a Certified Shorthand Reporter of the
 7   State of Illinois, at Suite 3200, 71 South Wacker
 8   Drive, Chicago, Illinois, on the 6th day of October,
 9   A.D. 2011, at 10:11 a.m.
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
```

**Page 3**

```
 1   PRESENT:
 2       MAYER BROWN, LLP,
 3       (71 South Wacker Drive,
 4       Chicago, Illinois 60606,
 5       312-701-7093), by:
 6       MS. LORI LIGHTFOOT,
 7          appeared on behalf of the Plaintiffs;
 8       TRISTAN & CERVANTES,
 9       (30 West Monroe Street, Suite 630,
10       Chicago, Illinois 60603,
11       312-345-9200), by:
12       MR. HOMERO TRISTAN,
13       MS. KERRY REIDY,
14          appeared on behalf of Juan Rangel;
15       POWER ROGERS & SMITH, P.C.,
16       (Three First National Plaza,
17       70 West Madison Street, 55th Floor,
18       Chicago, Illinois 60602,
19       312-236-9381), by:
20       MR. DEVON C. BRUCE,
21          appeared on behalf of the Defendants.
22   ALSO PRESENT: MR. JOSEPH CERULLO, VIDEOGRAPHER.
23   REPORTED BY: LISA O'BRIEN, C.S.R.
24          CERTIFICATE NO. 84-3822.
```

**Page 4**

```
 1       THE VIDEOGRAPHER:  This is Videotape Number 1
 2   of the videotaped deposition of Juan Rangel in the
 3   matter of The Committee for Balanced Map versus
 4   ISBOE, being heard before the U.S. District Court
 5   for the Northern District of Illinois, Eastern
 6   Division, Case File Number 11 C 5065.
 7       This deposition is being held at Mayer
 8   Brown, 71 South Wacker Drive, Chicago, Illinois, on
 9   October 6, 2011.  The time showing on the video is
10   10:11 a.m.  My name is Joseph Cerullo.  I am the
11   legal video photographer.  The court reporter is
12   Lisa O'Brien.
13          Counsel, would you please identify
14   yourselves for the record?
15       MR. BRUCE:  Devon, D-e-v-o-n, Bruce on behalf
16   of the Defendants.
17       MS. LIGHTFOOT:  Lori Lightfoot on behalf of the
18   Plaintiffs.
19       MR. TRISTAN:  Homero Tristan on behalf of Juan
20   Rangel.
21       MS. REIDY:  Kerry Reidy on behalf of Juan
22   Rangel.
23       THE VIDEOGRAPHER:  Will the court reporter
24   please swear the witness.
```



ESQUIRE
an Alexander Gallo Company



EXHIBIT
K

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                                October 6, 2011

5

1     (WHEREUPON, the witness was duly
2     sworn.)
3          JUAN RANGEL,
4   called as a witness herein, having been first duly
5   sworn, was examined and testified as follows:
6          EXAMINATION
7   BY MS. LIGHTFOOT:
8   Q.   Good morning, Mr. Rangel.
9   A.   Good morning.
10  Q.   We will try to get through this
11  deposition as expeditiously as possible today.  Let
12  me start by, kind of, giving you some rules of the
13  road for deposition, which I think will, hopefully,
14  make the process easier for you and for the lawyers
15  who are gathered here.
16          Let me first ask, have you ever been
17  deposed before?
18  A.   Yes.
19  Q.   Okay.  How many times?
20  A.   One.
21  Q.   Okay.  And how long ago was that, sir?
22  A.   About a month and a half ago, two months
23  ago.
24  Q.   Okay.  Can you give me, again, in very

6

1   high level, the reason why you were deposed about a
2   month and a half ago?
3   A.   It was an employment issue at our
4   schools.
5   Q.   Okay.  You probably then got some feel
6   for the back and forth of the deposition, but let me
7   give you a couple of reminders then.  One of the
8   most important things is, you see that the court
9   reporter is taking down a verbatim transcript of
10  everything that is going to be said here today.
11  There are a couple of rules that follow from the
12  fact that there is a verbatim transcript.  The first
13  is that it's important for you and for me not to
14  talk over each other.  It's a little artificial,
15  because the way that people normally communicate,
16  you get the gist of what somebody is saying, you
17  respond, and there's a back and forth, and that's
18  normal conversation mode.  But in this context with
19  the deposition, it's important that you let me
20  finish answering -- asking the question, and by the
21  same token, you -- I will let you fully answer
22  before you begin -- before I begin asking you any
23  follow-up.  Do you understand that?
24  A.   Yes.

7

1   Q.   The other thing that's important is that
2   you must answer the questions verbally.  And by
3   that -- again, it's a little artificial, because
4   when we talk to people in normal conversation, you
5   use body language, you nod your head, you shrug your
6   shoulders.  You may do other non-verbal responses.
7   But in this context, it's important that you
8   actually respond verbally.  Everyone forgets.  If
9   you forget, I will remind you.  I am sure your very
10  able Counsel will remind you if you forget.  But
11  that's another important rule.
12          There may be from time to time objections
13  that are interposed, either from Mr. Bruce or from
14  your Counsel, to a question that I might ask.  That
15  is kind of standard fare.  Lawyers have a right to
16  object if they think there's some kind of
17  imperfection with the question.  Two things about
18  that.  One, don't be bothered by that, because it
19  will happen.  Two, if someone objects, and unless
20  your lawyer instructs you not to answer a question,
21  then you are still obligated to answer the question.
22          As a matter of course, I have never
23  seen -- a witness, particularly one who hasn't
24  testified a lot, if there are objections, will

8

1   sometimes tend to forget what the question is, and
2   that's why we have a verbatim transcript.  You can
3   either have the question read back to you or I can
4   restate it.  So don't be thrown off by the fact that
5   there may be objections.  But two, if you forget the
6   question, that's also fine, too, because I can
7   either restate it or we can have the court reporter
8   read it back.
9          If there's something about a question
10  that I ask you that you don't understand, then feel
11  free to tell me that you don't understand it.  I may
12  press you a little bit and ask you what part you
13  don't understand or why you don't understand it.
14  But this is not a memory test.  It's not a guessing
15  game.  It's just to get what you know as you sit
16  here today, and what your recollection is.  If I ask
17  a question, though, in such a way that you don't
18  understand it, feel free to say, I don't understand
19  it, and then we will try to work through that
20  together.
21          You, obviously, have Counsel here, and
22  you should feel free to consult with your Counsel at
23  any point.  My only request, though, is that if
24  there's a question pending, that you answer the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                                    October 6, 2011

9

1   question first, and then ask your Counsel whatever
2   you want.  But, obviously, if you can't answer the
3   question without consulting with your Counsel, you
4   should just let me know that, and then -- clearly,
5   that is your right as a witness, to consult with
6   your Counsel.
7           It is certainly my objective to stay away
8   from anything -- and I say this more for your
9   lawyers than for you -- but to stay away from
10  anything that might even remotely impinge upon
11  attorney/client privilege.  I know you are a
12  litigant in the State redistricting case.  I am
13  going to ask you very little about that; and,
14  frankly, not even about the case itself.  I am going
15  to ask you about some of your testimony through the
16  public hearing process.  But otherwise, it's
17  certainly my hope that I am not going to get into
18  anything that even comes close to attorney/client
19  privilege.  But, obviously, if you think it does,
20  you will let me know, and then we can, again, work
21  together on either me reasking it, or you will make
22  your objection.
23          I don't expect our time here today to be
24  particularly long, which is probably a welcome news

10

1   for you, as I said before the deposition started,
2   but I do think it will probably be somewhere between
3   one hour and two hours.  And I will try to keep it
4   more on the one-hour side than on the two-hour side.
5   Obviously, I don't know what questions, if any,
6   Mr. Bruce may have.
7           That's all a prelude to say, if you need
8   to take a break, feel free to take a break.  And
9   again, my only request would be that if there's a
10  question pending, answer the question, and then you
11  can take a break.
12          I have said a lot to you here today, and
13  you have been very patient in listening.  Is there
14  anything that I have said that you don't understand?
15  A.  No.
16  Q.  Do you have any -- otherwise have any
17  questions for me?
18  A.  No questions.
19  Q.  Is there any reason why you can't provide
20  truthful testimony to the questions that are going
21  to be put to you here today?
22  A.  No.
23  Q.  All right.  Then let's begin.
24

11

1           (WHEREUPON, there was a short
2           interruption.)
3   BY MS. LIGHTFOOT:
4   Q.  All right.  You are the chief executive
5   officer of United Neighborhood Organization; is that
6   correct?
7   A.  Yes.
8   Q.  For purposes of today, I am going to use
9   the shorthand UNO, and I assume you will know what I
10  mean.  Is that all right?
11  A.  Yes.
12  Q.  How long have you been the CEO at UNO?
13  A.  Fifteen years.
14  Q.  Okay.  And can you tell us, sir, as the
15  job is now, what your specific responsibilities
16  entail as the CEO of UNO?
17  A.  It's the day-to-day management of the
18  organization, although, a large part of the
19  organization is managing our charter school
20  operation, which is -- now encompasses 11 schools,
21  5,400 students across the city.  And so most of it
22  has to do with that; the overseeing the academic
23  program, the finances, obviously, human resources,
24  the operations of the organization --

12

1   Q.  Okay.
2   A.  -- which include the schools.
3   Q.  And can you tell me, sir -- obviously,
4   the charter school mission is a substantial amount
5   of what UNO does.
6           Aside from that, can you tell me, are
7   there any other programatic areas that UNO is
8   invested in at this point?
9   A.  Well, the overall mission of the
10  organization is the empowerment of Hispanic
11  communities, and that would entail leadership
12  development programs that we operate, and then just
13  a host of other programs that are part of the
14  schools, like after-school programs, and things like
15  that, that support the school; looking at issues
16  relevant to our community, whether it's housing
17  issues, employment issues, immigration issues.
18  Q.  Okay.  And I assume -- and you will
19  correct me if I am wrong -- that UNO is a 501(c)(3)
20  organization?
21  A.  Yes.
22  Q.  And I would imagine you rely in part on
23  fundraising and donations from outside of the
24  organization itself.  Is that correct?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                                        October 6, 2011

13

1    A.   Yes.
2    Q.   Okay.  Does UNO have any lobbying
3  operation?
4    A.   Within the organization?
5    Q.   Well, whether -- let's put it this way:
6  Does UNO either directly or do you hire someone to
7  engage in lobbying on behalf of the various
8  programatic issues with respect to UNO?
9      MR. BRUCE:  Object to the form.  Go ahead.
10 BY THE WITNESS:
11   A.   We have had -- we have had attorneys that
12 have represented us in Government.  We do advocacy
13 work with our parents as well, depending on the
14 issue at hand.
15 BY MS. LIGHTFOOT:
16   Q.   I guess what I was asking is -- and I
17 didn't ask a very good question, as Mr. Bruce, I
18 think, pointed out.
19      Let's say in 2010 and 2011, does UNO have
20 anyone acting on its behalf as a registered lobbyist
21 under the laws of the State of Illinois?
22   A.   I am going to assume that they are -- the
23 people that we have engaged as consultants within
24 the organization are registered lobbyists within the

14

1  State of Illinois.
2    Q.   Okay.  And are those individuals engaged
3  in doing any lobbying in Springfield, which is the
4  capital?
5    A.   Do they do that?  I assume that that's
6  what they do, yes.
7    Q.   Okay.  I take it then, sir, that the
8  folks that are engaged on behalf of UNO doing
9  lobbying in Springfield are not directly reporting
10 in to you; is that right?
11   A.   They do at times.  It depends on what the
12 project may be.
13   Q.   Okay.
14   A.   So sometimes I am engaged directly with
15 them.  Other times it's -- might be other staff.
16   Q.   Okay.
17   A.   Depending on what the issue may be.
18   Q.   Okay.  For example, is there any -- in
19 the same time period, 2010, 2011 -- does UNO -- has
20 UNO advocated on behalf of any particular
21 legislation that's either been introduced or
22 potentially introduced down in Springfield?
23   A.   Yes.
24   Q.   Okay.  And can you give me a sense of

15

1  what those various pieces of legislation might be?
2    A.   I guess more recently was the Senate Bill
3  7, which was the education bill that was passed.
4  There's been looking at funding formulas for
5  schools, for education as well.  I don't know that
6  there was a particular bill for those.
7      I am trying to think between 2010, 2011.
8  So yes, there's been --
9    Q.   Okay.  I am going to ask you both because
10 of the outside noise -- you can probably hear the
11 ambulance that seems to be going by -- but also your
12 voice is a little low -- I am sure it's my bad
13 hearing -- but if you could just keep your voice up
14 a little bit.
15   A.   Absolutely.
16   Q.   So you told us that you were -- you,
17 meaning UNO, was involved in advocating on behalf of
18 Senate Bill 7, which was the education bill.
19   A.   Uh-huh.
20   Q.   And is that -- I will show my ignorance.
21 But is that the bill that got a huge amount of press
22 about changing the school day, strike rules, and
23 other things?  Is that the one you are talking
24 about?

16

1    A.   Correct.
2    Q.   Okay.  Any other, kind of, legislative
3  initiatives regarding Springfield that UNO has been
4  involved in during the, kind of, 2010/2011
5  legislative cycle?
6    A.   Legislative and -- I guess I am just
7  trying to get clarity on legislative, as in
8  specific --
9    Q.   As in Springfield; not, for example, Cook
10 County Board, or not the City of Chicago.  But just
11 things that would be pending in front of either
12 chamber of the General Assembly.
13      MR. BRUCE:  Objection, form.
14 BY THE WITNESS:
15   A.   Certainly during the remap discussions.
16 BY MS. LIGHTFOOT:
17   Q.   Okay.  And we will talk a little bit
18 about those.
19      Anything else besides the education bill
20 and then the remap discussion?
21   A.   No.  I am trying to think.
22      Again, there were -- we were looking at
23 the education funding formula that was separate from
24 SB 7, but it didn't materialize into any specific



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                              October 6, 2011

17

1  legislation.
2      Q.  Okay.  All right.  Let me show you what
3  we can mark as Exhibit 1.
4      MR. BRUCE:  Are you going to mark this as a
5  group exhibit, Lori?
6      MS. LIGHTFOOT:  Correct.
7          (WHEREUPON, a certain document was
8          marked Rangel Deposition Exhibit
9          No. Group 1, for identification, as
10         of 10/6/11.)
11 BY MS. LIGHTFOOT:
12     Q.  Sir, you have just been handed what's
13 been marked as Rangel Exhibit Number 1.
14         And so the record is clear, the first
15 page of this multi-page document has the -- your
16 name written on top -- and I will ask you whether
17 that's your handwriting or not -- and it has
18 "Proposed Districts."
19         And then the next page is RD 1.  The next
20 page is RD 2.  The next page is also RD 2.  The next
21 page is RD 23.  The next page is RD 24, RD 3, RD 4,
22 RD 39, RD 40, RD 60, RD 43, RD 77, RD 83.  And then
23 the last page is "Proposed West Chicago District."
24         And these are a series of maps; is that

18

1  correct, sir?
2      A.  Correct.
3      Q.  Have you seen these maps before?
4      A.  They look very familiar.  Yes.
5      Q.  Okay.  In the top right-hand corner of
6  the first page, there's handwriting there that
7  spells your name, Juan Rangel.
8      A.  Correct.
9      Q.  Is that your handwriting, sir?
10     A.  No.
11     Q.  Are you otherwise familiar with that
12 handwriting?
13     A.  No.
14     Q.  Okay.  Are these, sir, maps that UNO and
15 some other allied groups proposed to either the
16 House or Senate Redistricting Committees as they
17 were considering reapportionment of the General
18 Assembly districts?
19     MR. TRISTAN:  Objection, form.
20     MR. BRUCE:  Objection, foundation.
21 BY THE WITNESS:
22     A.  I believe so.
23 BY MS. LIGHTFOOT:
24     Q.  Okay.  And again, this is not a trick

19

1  question.
2          You testified at various hearings, public
3  hearings that were held, both before and -- well,
4  you testified during the spring at various public
5  hearings that were held by both the Senate and House
6  redistricting committees, correct?
7      A.  Correct.
8      Q.  And then you also similarly testified
9  before both committees after the General Assembly
10 produced a draft -- or a proposed, I should say, map
11 for both House districts and Senate districts; is
12 that correct?
13     A.  Correct.
14     Q.  And as part of your testifying in these
15 various public hearings, UNO and some other groups
16 with whom UNO was aligned proposed certain
17 districts; is that right, sir?
18     A.  Correct.
19     Q.  And what you have in front of you as
20 Group Rangel Exhibit Number 1 were some proposed
21 districts that UNO and others put together as part
22 of that process; is that correct?
23     A.  Correct.
24     Q.  All right.  Let me ask you a couple

20

1  questions then about these maps.
2          Who was involved in the drawing of these
3  maps on behalf of UNO?
4      MR. BRUCE:  I object to the relevancy, to the
5  extent that we are here on the Federal map the
6  Congressional map.  Now we are getting into details
7  of the State Legislative redistricting.  And so I
8  would object as to relevance and scope as to this
9  deposition.
10     MS. LIGHTFOOT:  Okay.
11 BY MS. LIGHTFOOT:
12     Q.  You may answer, sir.
13     A.  We were -- there's several of us, myself
14 included, and then our staff, Alfred Quijano --
15     Q.  I'm sorry, say again.
16     A.  Alfred Quijano.
17     Q.  Quijano?
18     A.  Quijano, Q-u-i-j-a-n-o, and when we were
19 looking at the populations for the State map
20 districts.
21     Q.  Okay.  In drawing these maps, did you --
22 you or either Mr. Quijano or anybody else that was
23 involved, have any assistance from anybody else?
24     MR. BRUCE:  Same objection as to scope of



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                          October 6, 2011

21

1   relevancy, as to asking questions of this witness in
2   this case about State Legislative redistricting maps
3   and districts.
4       MR. TRISTAN:  Same objection.
5       MS. LIGHTFOOT:  And -- go ahead.
6       MR. BRUCE:  I haven't finished.  And to the
7   extent that this is going to continue, I will have a
8   standing objection on that.  And I don't know how
9   long Mr. Rangel's Counsel is going to allow this to
10  go on, but I object because we are here on the
11  Congressional map.
12      MR. TRISTAN:  We have the same objection as
13  well.
14      MS. LIGHTFOOT:  Go ahead.
15      MR. TRISTAN:  And Mr. Rangel will be produced
16  for a deposition in that matter in the next week.
17      MS. LIGHTFOOT:  Fair enough.  I think it's
18  relevant to the Congressional map, but you can
19  certainly have a standing objection, Mr. Bruce.  I
20  was actually going to suggest it.
21          And certainly, Mr. Hamero, if you have a
22  standing -- or I'm sorry, Tristan -- if you have a
23  standing objection, you can make it.  But I will tie
24  it into this particular litigation.

22

1           I have now forgotten the question.  I
2   know you nodded your head.
3       MR. BRUCE:  That was your last question, Lori.
4   You were done.
5       MS. LIGHTFOOT:  Mr. Bruce, if you would give me
6   a moment, please.
7       MR. BRUCE:  That was a stab at levity.
8       MS. LIGHTFOOT:  Why don't we go back and read
9   the question, because I have now forgotten it myself
10  after this long colloquy.
11          (WHEREUPON, the record was read by
12           the reporter.)
13  BY THE WITNESS:
14      A.   When you say "Assistance," assistance in
15  terms of understanding the computer, and how to
16  operate it or --
17  BY MS. LIGHTFOOT:
18      Q.   We can start with that question.
19      A.   There was a staff person that was
20  present.
21      Q.   And who was the staff person?
22      A.   I don't know.  I don't know the name.
23      Q.   Was this staff person at UNO?
24      A.   No.

23

1       Q.   A staff person from what entity or
2   organization?
3       A.   From the State.
4       Q.   From the State?
5       A.   Uh-huh.
6       Q.   Again, you have to answer verbally.
7       A.   Yes.  I'm sorry.
8       Q.   When you say "From the State," what do
9   you mean?
10      A.   I believe there was -- the State made
11  available computers to the public to be able to draw
12  our own maps, as we saw fit, for our community.  And
13  so at that time, the only ones, as far as I
14  understood, that was available was down in
15  Springfield.  So we would travel down there to
16  access those computers.  But there was always a
17  staff person there present as we were working on the
18  computers.
19          So the level of assistance was them
20  explaining how to draw what you -- how to manipulate
21  the computer to be able to do what we needed to do.
22  But at no time did they assist us in the physical
23  drawing of the maps.
24      Q.   All right.  Let me make sure I understand

24

1   the distinction you are drawing.
2           So from time to time, you and others
3   would travel to Springfield and meet with some State
4   employee; is that correct?
5       A.   We would have to go in and, kind of,
6   register --
7       Q.   Okay.
8       A.   -- to use the computers.
9       Q.   Okay.
10      A.   And the -- and so there would be a staff
11  person that would be present.
12      Q.   Okay.  And where would you actually
13  physically go to, to use their computers?
14      A.   I don't remember -- I don't remember the
15  room number.  It was in the Stratton building.
16      Q.   Okay.
17      A.   And -- I just don't remember the number.
18      Q.   How is it that you knew that you could go
19  there, to Springfield, to be able to access a
20  computer to draw a map?
21      A.   I believe it was announced that there
22  would be that access.  And there was also announced
23  that -- of, hopefully, a similar room here in
24  Chicago, but we never used the Chicago one.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                                    October 6, 2011

25

1    Q.   Okay.  Was there a reason why you
2  traveled to Springfield as opposed to using a
3  computer here in Chicago?
4    A.   I don't know that it was available at the
5  time.
6    Q.   Okay.  That would make the trip worth it,
7  I guess, then.
8         And was there -- when you -- how many
9  times did you go -- you personally go to Springfield
10 to use the -- what I will call the map-drawing
11 equipment?
12   A.   I don't recall.  It might have been
13 twice.
14   Q.   Okay.
15   A.   We spent several hours in the room.  But
16 I -- we were down there several times.  But the
17 actual sitting in the room, it might have been two
18 times.  But I can't recall exactly.
19   Q.   In the two times that you remember going
20 down to Springfield, sitting in the -- what I will
21 call the map-drawing room, were -- was there anyone
22 else present, aside from you and -- I am assuming it
23 was Mr. Quijano that were there?
24   A.   One time our attorney was present.

26

1    Q.   Okay.  Aside from the time that your
2  attorney was present, was there anybody not directly
3  affiliated with UNO, i.e., either you, Mr. Quijano,
4  or your attorney, that was actually present in the
5  room?
6    A.   No, just the staff person.
7    Q.   Okay.  And was it the same staff person
8  both times that you were there?
9    A.   No.  I think it was just people that were
10 available at the time or that were there stationed.
11 And so --
12   Q.   All right.  Okay.  And do you remember
13 the name of any of the staff people who were there
14 when you were there?
15   A.   No.
16   Q.   Can you tell me what -- can you tell me
17 whether it was male or female?
18   A.   Female.
19   Q.   Female?
20   A.   Both times it was female.
21   Q.   And can you describe what -- and was it a
22 different female or the same female?
23   A.   A different female.
24   Q.   Okay.  Let's call Female One, maybe, the

27

1  female that was there the first time that you can
2  recall.
3         Can you describe what she physically
4  looked like?
5    A.   I don't recall.
6    Q.   Was she, from your perception, White,
7  Black, Latino, Asian?
8    A.   White.
9    Q.   Okay.  Can you give me a sense of what
10 her age was?
11   A.   No.  I am really bad with age.
12   Q.   We won't call on you to do a lineup then.
13         Hair color?
14   A.   I believe one of them was blond.  I can't
15 recall which one was --
16   Q.   Fair enough.
17   A.   I believe one was blond, and the other
18 one might have been brunette.
19   Q.   Okay.  And both white females; is that
20 correct?
21   A.   Yes.
22   Q.   All right.  That's fine.
23         Take a look at Exhibit 1.  If you look at
24 the second page, for example, you have -- and this

28

1  is a, kind of -- information that's repeated on the
2  various maps themselves, except for the one on the
3  first page, I believe.
4         There's a legend on the left-hand side.
5  Do you see that, sir?
6    A.   Uh-huh.
7    Q.   And then there's a heading that says
8  "Existing."  Do you see that, sir?
9    A.   Uh-huh.
10   Q.   Again, you have to answer verbally.
11   A.   Yes.  I'm sorry.
12   Q.   Then there's a heading that says
13 "Proposed."  Do you see that, sir?
14   A.   Yes.
15   Q.   And then under both the Proposed and the
16 Existing, there's what I will call demographic
17 information.  For example, the headings are Total
18 Pop, Raw DEV -- and I will ask you what that
19 means -- Hispanic Pop, Hispanic Percentage, Total
20 Voting Age, Hispanic Voting Age, and Hispanic Voting
21 Age Percentage.
22         Do you see that, sir?
23   A.   Yes, sir.
24   Q.   What's the source of the information



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                          October 6, 2011

29

1    under the column of Existing on these maps?
2        A.   If I recall, the way the software -- why
3    we had to go to Springfield, because of specific
4    software for mapping purposes. And I found it to be
5    unique in the sense that you have the existing
6    boundaries of a particular district, but it would
7    give you the population that exists within that.
8    And so those figures would represent that. And as
9    we would shift the lines, looking to try to capture
10   the number that is needed, the total numbers would
11   change over time.
12       Q.   Okay. So if I am hearing you
13   correctly -- and let's stick with page 2, which is
14   RD 1. Once you would, kind of, zero in on the
15   geographic area that you were going to focus on for
16   a particular map, the computer program would
17   automatically load it up with this -- what I will
18   call demographic information under Existing, and
19   then under Proposed; is that correct?
20       A.   Correct.
21       Q.   So to the extent that that
22   information exists on other maps within Exhibit 1,
23   it was the same kind of process? You would figure
24   out what the geographic boundaries were of a

30

1    particular map, and then the computer would
2    automatically generate it and spit it out to you; is
3    that correct?
4        A.   Correct.
5        Q.   Okay. Now, in looking at the maps for
6    which there are demographic information -- and I
7    should back up because I don't know this.
8            A number of these maps have the header
9    RD, and then a number that follows. What does the
10   "RD" represent?
11       A.   I am not sure. Maybe it's Representative
12   District.
13       Q.   Okay.
14       A.   I am not sure.
15       Q.   Okay. That's fine. As I said before,
16   it's not a guessing game. I just wanted the record
17   to be complete, and I recalled that I hadn't asked
18   you about that.
19           There are a number of these districts,
20   and I think there are 13 in total. Is that
21   consistent with your recollection?
22       A.   I believe so.
23       Q.   All right. There are some of these
24   districts that have majority Latino population and

31

1    voting age population, correct?
2        A.   Correct.
3        Q.   And then there are some -- actually, one
4    more, 7, which are less than 50 percent Hispanic
5    voting age.
6        MR. TRISTAN:  Objection, vague, and foundation.
7    BY MS. LIGHTFOOT:
8        Q.   Is that correct, sir?
9        MR. BRUCE:  At this point I am going to make
10   another objection with respect to getting into the
11   details now of -- you have gone beyond the process,
12   and now you are asking about the details of State
13   Legislative representative districts. And I wasn't
14   aware, but apparently, according to Mr. Rangel's
15   Counsel, if I understood what the objection was, he
16   is going to be deposed on this in the near future --
17       MR. TRISTAN:  Correct.
18       MR. BRUCE:  -- in a different lawsuit. And I
19   am not involved in that lawsuit, and -- but I do
20   object as to the scope and relevancy of this -- in
21   this case, of asking about now majority, minority,
22   and whatever demographic information you are going
23   to start asking about with respect to State
24   Legislative districts.

32

1            And I am -- I am grasping to understand
2    how that could have any relevance to a case
3    involving a Congressional map. And I think at this
4    point it's becoming abusive and harassing to the
5    witness, because he's going to be deposed on these
6    issues --
7        MS. LIGHTFOOT:  He certainly looks harassed and
8    abused.
9        MR. BRUCE:  I guess that's your stab at levity.
10           But I do feel strongly that we are
11   getting pretty far afield from the issues that are
12   raised in the Plaintiffs' complaint.
13           So maybe, Lori, if you could articulate
14   on the record why you think it's relevant in this
15   case, and -- you know, because I don't want to be
16   here going through all of this when he's going to be
17   deposed in the near future on these matters.
18       MS. LIGHTFOOT:  Well, I will, if you -- if you
19   are finished with your objection, we will be quickly
20   getting to why I think it's relevant in about three
21   questions.
22       MR. TRISTAN:  And my objection continues. And
23   to the extent that we will permit this line of
24   questioning, at some point, though, we are going to



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

33
1   have to get back to the issue that we are here.  So
2   on that note -- if I can finish --
3       MS. LIGHTFOOT:  Sure.  Please.
4       MR. TRISTAN:  -- we will allow those three
5   questions, and hopefully we will get to, you know --
6   I am not waiving any future objections to any of
7   those three questions, but certainly to the extent
8   that soon after that we better -- we should arrive
9   at the reason that we were brought here.
10      MS. LIGHTFOOT:  Well, if we can dispense with
11  the paragraph-long speaking objections, we will
12  probably get there relatively quickly.
13      MR. TRISTAN:  Is that one of your questions,
14  Counsel?
15      MS. LIGHTFOOT:  Sorry, Mr. Tristan?
16      MR. TRISTAN:  Is that one of the three
17  questions?
18      MS. LIGHTFOOT:  Pardon me?
19      MR. TRISTAN:  Continue.
20      MS. LIGHTFOOT:  Is that your attempt at
21  sarcasm, sir?
22      MR. TRISTAN:  Sorry?
23      MS. LIGHTFOOT:  Is that your attempt at
24  sarcasm?

34
1       MR. TRISTAN:  Perhaps.  But you can continue.
2       MS. LIGHTFOOT:  Can we go back to the question
3   that was pending before we went off on this little
4   frolic and detour?  I don't know that I got an
5   answer to my question.
6           (WHEREUPON, the record was read by
7           the reporter.)
8       MR. TRISTAN:  Objection, foundation.
9   BY MS. LIGHTFOOT:
10      Q.   Sir, if you take a look at -- and I will
11  highlight them for you -- Exhibit 1.  Look, for
12  example, page 3, which is RD 2.
13           Do you see that, sir?
14      A.   Uh-huh.  Yes.
15      Q.   And the -- in the column that says
16  Proposed -- do you see that?
17      A.   Yes.
18      Q.   There's a -- the very last column, it
19  says "Hispanic voting age percentage," and it says
20  49.3 percent, correct?
21      A.   Correct.
22      Q.   And if you look at the -- let's see.
23           If you look at, several pages in,
24  RD 40.  Do you have that one in front of you, sir?

35
1       A.   Yes.
2       Q.   Also on the Proposed, it has a Hispanic
3   voting age percentage of 48.17 percent.  Do you see
4   that, sir?
5       A.   Correct.
6       Q.   And if you turn to the next page, RD 60,
7   under Proposed, that has Hispanic voting age
8   percentage of 49.3 percent.  Do you see that, sir?
9       A.   Correct.
10      Q.   And then similarly, RD 43 has Hispanic
11  voting age percentage of 49.05 percent, correct?
12      A.   Correct.
13      Q.   And the next one, RD 77, has Hispanic
14  age -- sorry, Hispanic voting age percentage of
15  48.32 percent, correct?
16      A.   Correct.
17      Q.   And RD 83, which is the next page, has
18  Hispanic voting age percentage of 49.49 percent,
19  correct?
20      A.   Correct.
21      Q.   And then the final page of this exhibit,
22  Proposed West Chicago District, has a proposed
23  Hispanic voting age percentage -- or has a Hispanic
24  voting age percentage of 46.81 percent, correct?

36
1       A.   Correct.
2       Q.   By the way, just on -- so the record is
3   clear, on the last page, this Proposed Chicago
4   District, unlike the other districts that are
5   contained in this exhibit, doesn't appear to have
6   any demographic information on Existing; is that
7   correct?
8       A.   Correct.
9       Q.   Do you know why that is?
10      A.   Because --
11      MR. BRUCE:  Objection.  I'm sorry.  Objection,
12  foundation.  Go ahead.
13  BY MS. LIGHTFOOT:
14      Q.   Do you know why that is, sir?
15      A.   The district doesn't exist.
16      Q.   So this was a brand new district that UNO
17  and the other folks with you were proposing,
18  correct?
19      A.   Correct.
20      Q.   Now, are you familiar with the term
21  "Cross-over district"?
22      MR. BRUCE:  Objection, foundation.
23  BY THE WITNESS:
24      A.   Yes.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                          October 6, 2011

37

1    BY MS. LIGHTFOOT:
2        Q.   And, in fact, you testified about that
3    term in your various testimony before the
4    redistricting committees in the hearings this
5    spring; is that correct?
6        MR. BRUCE:  Objection, relevancy, foundation.
7    BY THE WITNESS:
8        A.   That's correct.
9    BY MS. LIGHTFOOT:
10       Q.   How do you -- when you were testifying
11   about cross-over districts, can you tell us what you
12   meant by "Cross-over districts"?
13       MR. TRISTAN:  Objection.
14       MR. BRUCE:  Foundation, relevancy.
15       MR. TRISTAN:  And again, Counsel, I think with
16   respect to cross-over districts, to the extent that
17   cross-over districts are relevant in Federal
18   litigation, with Congressional maps my objection
19   stands.  And I assume that we are going to get very
20   quickly to the reason that we are here for the
21   Congressional litigation.
22       MS. LIGHTFOOT:  I think we are here.
23   BY MS. LIGHTFOOT:
24       Q.   Can you answer my question, sir?  And if

38

1    you don't have it in mind, we can have it read back.
2        MR. BRUCE:  Same objections.
3            (WHEREUPON, the record was read by
4            the reporter.)
5    BY THE WITNESS:
6        A.   In what context?  What was -- what was
7    the question that was asked?
8    BY MS. LIGHTFOOT:
9        Q.   You testified -- you made comments about
10   majority Latino districts; is that correct, sir?
11       A.   Probably.
12       Q.   Okay.  And you also used the term
13   "Cross-over districts," correct?
14       A.   Uh-huh.  Probably.
15       Q.   When you -- what I am asking is, when you
16   used the term "Cross-over district," what did you
17   mean that -- what did you mean by that?
18       MR. BRUCE:  Objection to the extent it calls
19   for a legal conclusion, foundation, and relevancy in
20   this Federal case.
21   BY THE WITNESS:
22       A.   I don't recall having used the word
23   "Cross-over."  I may have.  And what I probably
24   meant, if I used that word -- that phrase, is

39

1    looking at areas that are -- maybe influence
2    districts, not majority -- vast majority Latino, in
3    our case, what we were looking at.
4            And so it might have meant that looking
5    at areas that had more of a -- not -- not a super
6    majority or majority, but had enough influence
7    within -- within the district.
8    BY MS. LIGHTFOOT:
9        Q.   And when you say "Had enough influence
10   within the district," what do you mean by that, sir?
11       MR. BRUCE:  Same objection.
12       MR. TRISTAN:  Same objection.
13       MR. BRUCE:  I'm sorry, I didn't mean to
14   interrupt.  I am objecting to the extent that it
15   calls for a legal conclusion.  I would further
16   object based on foundation of this witness to
17   testify to that.  And I would object on relevancy
18   with respect to asking questions about State map --
19       MS. LIGHTFOOT:  I am not asking questions about
20   the State map.  I am asking questions about his
21   understanding of these terms which, as you know,
22   Mr. Bruce, are applicable in the context of the
23   Congressional redistricting and reapportioning
24   cases.

40

1        MR. BRUCE:  If he knows.  Go ahead.
2    BY MS. LIGHTFOOT:
3        Q.   Let me reask the question.
4            Since you used the term "Influence within
5    a district," what did you mean by that, sir?
6        MR. BRUCE:  Objection, foundation.
7    BY THE WITNESS:
8        A.   At no time did I use those words in
9    reference to any Congressional --
10   BY MS. LIGHTFOOT:
11       Q.   I am asking you --
12       A.   -- district.
13       Q.   -- what -- just so we are clear -- and
14   I'm sorry to interrupt you.
15           You just used that term about ten seconds
16   ago, excising out the objections.  And what I want
17   to know is what you mean by that.
18       A.   As it pertains to the State maps.
19       Q.   As it pertains in any concept -- in any
20   context that you would use the term "Influence
21   within a district."
22       MR. BRUCE:  Objection, foundation, form,
23   relevancy.
24       MR. TRISTAN:  Objection, vague.



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                          October 6, 2011

41

BY THE WITNESS:

A.   Again, as it pertains to a State map --
because I assume -- I am a little confused as to
what we are discussing here. But when we were
looking at the State maps -- if that's what we are
talking about now -- looking at areas -- I think our
position was always not losing the gains that we
have made over the last ten years.

There is a possibility of adding on
influence areas within a district. So some of the
districts that you pointed out that don't have a
majority Hispanic voting age, clearly, there's a
community of interest there; not enough,
necessarily, to elect a Hispanic, I guess you can
say, but enough to have their interests in some way
looked at.

BY MS. LIGHTFOOT:

Q.   Okay. You -- I have read a lot of your
testimony from the various hearings, and there's one
phrase that you used a lot, and I just want to read
that to you, to help you contextualize it. And this
is drawn from a May 21st hearing of the Senate
Redistricting Committee. It's a public hearing that
was held here in Chicago.

42

MR. TRISTAN:  If you will allow us to also get
to the same page. We have brought those transcripts
as well.

MS. LIGHTFOOT:  In fact, we can just mark it.

MR. TRISTAN:  That might be easier.

MS. LIGHTFOOT:  Mark it as 2.

(WHEREUPON, a certain document was
marked Rangel Deposition Exhibit
No. 2, for identification, as of
10/6/11.)

BY MS. LIGHTFOOT:

Q.   Sir, you now have before you what's been
marked as Rangel Exhibit Number 2. As you see from
the first page, this is a transcript of a public
hearing that was held before the 2011 Illinois State
Senate Redistricting Committee on May 21st here in
Chicago.

And I am going to direct you to what is
numbered page 15. And if you look at the preceding
page on page 14, you are introducing yourself as the
CEO of UNO, Latin Coalition for Fair Redistricting.

I am going to ask you about the next
page, which is lines 6 through 12. And it reads,
quote, "I am here to express the Latino Coalition

43

for Fair Redistricting support of the map proposed
by the Illinois Senate. We stand by our consistent
position that we need to protect the Latino
community's means over the past two decades, and
also expand our representation based upon our
population growth."

Q.   Do you see that, sir?

A.   Uh-huh. Yes.

Q.   You have to answer verbally.

So this was a statement, this, kind of,
opening stanza, if you will, that you made at a
number of public hearings, both before and after
there were any maps that were introduced; is that
correct?

MR. TRISTAN:  Objection, foundation, vague.
Please be specific as to for which maps.

MR. BRUCE:  I join in the objection.

BY MS. LIGHTFOOT:

Q.   Did you make this statement more than
once, sir, in the context -- and again, if you want
to -- we can spend time going through all of the
various parts -- but it looks like you had written
testimony, and you made this statement a number of
times.

44

A.   I --

MR. BRUCE:  I don't even know if that's a
question. I object to the form.

BY MS. LIGHTFOOT:

Q.   Go ahead, sir.

A.   I don't mean any disrespect to court
reporters, but I don't think the word "Means" is
correct. I might have said Latino community's
gains --

Q.   Okay.

A.   -- over the past two decades.

But if this is what it says, I guess this
is what I said at the time.

Q.   And is it correct, sir, that the Latino
Coalition for Fair Redistricting that you were a
part of had two primary objectives in looking at
redistricting in Illinois, whether it was the State
map or the Congressional map?

MR. TRISTAN:  Objection, vague.

MS. LIGHTFOOT:  Sir, I haven't even asked the
question.

MR. TRISTAN:  I am already confused. Sorry.

MS. LIGHTFOOT:  Apparently. Let me ask the
question. Then you can interpose your objection.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

45

1      MR. TRISTAN:  Please start the question over.
2  BY MS. LIGHTFOOT:
3      Q.   Sir, was it the case that the Latino
4  Coalition for Fair Redistricting had two primary
5  objectives with respect to the redistricting process
6  in Illinois, whether it was the State map or the
7  Congressional map?  One was to protect the Latino
8  community's gains over the past two decades?  Was
9  that one of the objectives, sir?
10     MR. TRISTAN:  Objection.
11     MR. BRUCE:  Objection to the form.  It's
12 compound.  You are now asking about both the
13 Congressional and State.  You are muddling the
14 issues.  He never testified to that.  You haven't
15 asked him what his involvement in the Congressional
16 maps was at all.  And so I object.  That
17 mischaracterizes his testimony.  I object to the
18 foundation and relevancy.
19     MR. TRISTAN:  Same objection as to compound.  I
20 lost track after the third question.  So if you can
21 just narrow it down to one per question.
22     MS. LIGHTFOOT:  Re-read my question back,
23 please.  I want an answer to that.
24

46

1          (WHEREUPON, the record was read by
2           the reporter.)
3  BY THE WITNESS:
4      A.   Again, I think we took a very -- very
5  specific position on the State map.  And what you
6  have in front of me here is my testimony for State
7  Senate Redistricting Committee public hearing.  And
8  there were -- there were, actually, several other
9  points.  It was also ensuring that the civil rights
10 of other minority groups were respected.
11 BY MS. LIGHTFOOT:
12     Q.   Okay.
13     A.   I think those were the three points that
14 we would always make as it pertains to the State
15 maps.
16     Q.   Well, UNO has taken a position with
17 respect to the Congressional map; isn't that
18 correct, sir?
19     A.   Yes.
20     Q.   And your position was that, in effect,
21 you were satisfied with only having one majority
22 Latino district as proposed by the Springfield
23 Democrats, correct?
24     A.   Correct.

47

1      Q.   And my question, sir, was, with respect
2  to -- let's talk about the Congressional map
3  specifically.  With respect to the Congressional
4  map -- well, let me back up.
5          With respect to the State map, you have
6  said -- and the Exhibit 2 that we have in front of
7  you -- was that there were three objectives now.
8  And let me make sure that I have got them right.
9  One was to protect the Latino community's gains over
10 the past two decades.  Was that one of the
11 objectives with respect to the State map?
12     A.   Correct.
13     Q.   The other was to expand the Latino
14 community's representation based upon the population
15 growth that occurred over the past decade here in
16 Illinois; is that correct?
17     A.   Correct.
18     Q.   And sounds like there was a third
19 objective, which was to make sure that the rights
20 and objectives of other minority groups in the state
21 were also respected; is that correct?
22     A.   Correct.
23     Q.   With -- keeping those three objectives in
24 mind, sir, were those objectives the same or

48

1  different with respect to the Congressional
2  redistricting process that ensued here in Illinois?
3      A.   Well, it's apples and oranges.  And I
4  think those are two different processes --
5      Q.   Okay.
6      A.   -- in terms of what we are trying to --
7  in terms of the objectives.  And the three that you
8  just mentioned, the three objectives, were very
9  specific to our State remap position.
10     Q.   Did you have any specific objectives with
11 respect to the Congressional redistricting process,
12 sir?
13     A.   We never undertook a process with the
14 Congressional maps as we did with the State.
15     Q.   Okay.
16     A.   We did take a position, but it wasn't
17 through a process like we had done with the State
18 maps, of drawing maps, or anything like that.
19     Q.   So let me explore that a little bit more.
20         When you say that "We never undertook a
21 process," with respect to the Congressional map,
22 what specifically are you referring to, sir?
23     A.   Drawing maps and -- like we did very
24 specific work that was done with the State maps.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                              October 6, 2011

49

1    Q.   Okay.  Let's explore that a little bit.
2         So, for example, sir -- and this is -- I
3    am going to try to do a compare and contrast; what
4    you did with the State map versus what you did or
5    didn't do with respect to the Congressional map.
6         Obviously, as we put in front of you with
7    Exhibit 1, you undertook the process of going down
8    to Springfield, drawing some particular districts,
9    and then proposing those districts as part of the
10   public hearing process, correct?
11   A.   Correct.
12   MR. BRUCE:  Objection to form.
13   BY MS. LIGHTFOOT:
14   Q.   Did you engage in any similar exercise of
15   drawing any draft Congressional districts as part of
16   the redistricting process for the Congressional
17   maps?
18   MR. BRUCE:  I'm sorry.  Same objection.
19   BY THE WITNESS:
20   A.   No.
21   BY MS. LIGHTFOOT:
22   Q.   Okay.  Did you, sir -- and again, looking
23   at the demographic information that is on the
24   Exhibit 1 that we put in front of you.

50

1         I take it that you -- I will ask you.
2    Did you, for purposes of the 13 districts that you
3    drew which are embodied in Exhibit 1, did you review
4    any specific demographic information, other than
5    what was, kind of, automatically put in on the
6    maps -- let me ask a better question.
7         Aside from the demographic information
8    that is reflected on the maps that are embodied in
9    Exhibit 1, did you -- and I mean you, Mr. Rangel --
10   and I will ask you another question -- but did you
11   review any other demographic information about the
12   State of Illinois State districts?
13   MR. BRUCE:  Objection, form, foundation, and
14   relevancy.
15   BY THE WITNESS:
16   A.   You lost me there.
17   BY MS. LIGHTFOOT:
18   Q.   Okay.  Take a look at Exhibit 1.
19   A.   Uh-huh.
20   Q.   And look at the second page.  Do you have
21   that, sir?
22   A.   Yes.
23   Q.   All right.  As we established earlier,
24   there's two columns; Existing and Proposed.  Do you

51

1    see that, sir?
2    A.   Yes.
3    Q.   On the -- and there's certain demographic
4    information; Total Pop, Hispanic Pop, Voting Age,
5    and so forth.  Do you see that, sir?
6    A.   Correct.
7    Q.   Aside from having this information
8    reflected on the maps that were drawn -- and it
9    sounds like it was automatically generated by the
10   computer once you printed the map; is that correct?
11   A.   Correct.
12   Q.   Aside from seeing this information that
13   was automatically generated by the software program
14   that was used to draw these particular maps, did you
15   otherwise review any other demographic information
16   as part of your State map-making exercise?
17   MR. TRISTAN:  Objection as to relevance with
18   respect to the processes that were used for the
19   drawing of the State map.
20   MR. BRUCE:  Same objection.
21   BY THE WITNESS:
22   A.   For the purpose of the -- drawing the
23   State maps --
24   BY MS. LIGHTFOOT:

52

1    Q.   Correct?
2    A.   -- as we found it?  Not specifically, no.
3    Q.   Okay.  So then let's shift gears and talk
4    about the Congressional.
5         I take it then, sir -- but you will tell
6    me -- did you look at any specific demographic
7    information as -- on -- related to any Congressional
8    maps leading up to UNO taking a position vis-a-vis
9    the Congressional map?
10   MR. BRUCE:  Objection to the form.  Go ahead.
11   BY THE WITNESS:
12   A.   To the degree that we did for the State
13   maps, no.
14   BY MS. LIGHTFOOT:
15   Q.   To any degree?
16   A.   Just general population numbers that we
17   know, but not -- not in terms of engaging in a
18   Congressional district map process.
19   Q.   Okay.  And --
20   MR. BRUCE:  Lori, if you can wait until the
21   witness finishes his answer before you begin the
22   next one, I think that's appropriate.
23   MS. LIGHTFOOT:  I didn't know that I was
24   interrupting the witness, sir.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

53

1   BY MS. LIGHTFOOT:
2       Q.   When you say general population numbers,
3   what are you referring to, sir?
4       A.   Well, I think that's common knowledge
5   that there's been a population growth within the
6   Latino community in the state of Illinois.
7       Q.   So you are talking about, kind of,
8   general census information about the growth in the
9   Latino population here in Illinois; is that correct?
10      A.   Correct.
11      Q.   All right.  Aside from that kind of
12  general census information about the growth in
13  Latino population in Illinois, did you look at any
14  other demographic information related to any
15  population changes in Illinois relative to the
16  Congressional redistricting process?
17      A.   No.
18      MR. TRISTAN:  Objection.
19  BY MS. LIGHTFOOT:
20      Q.   And let me broaden the question just --
21  and I think I know what the answer is, but let me
22  just make sure.
23          Aside from what you personally may have
24  done, are you aware of anybody acting on behalf of

54

1   UNO who reviewed any demographic information related
2   to population in Illinois in connection with a
3   Congressional as opposed to a State redistricting
4   process?
5       A.   No.
6       Q.   Okay.
7           (WHEREUPON, discussion was had off
8           the record.)
9   BY MS. LIGHTFOOT:
10      Q.   Let me shift gears and ask you some other
11  questions, sir.
12          Are you familiar with the term "Racial
13  block voting"?
14      MR. BRUCE:  Objection, foundation.
15  BY THE WITNESS:
16      A.   Yes, I guess.  It's almost
17  self-explanatory.
18  BY MS. LIGHTFOOT:
19      Q.   Well, okay.
20          How is it that you are familiar with the
21  term "Racial block voting"?
22      MR. BRUCE:  Same objection.
23  BY THE WITNESS:
24      A.   I don't know that I am familiar with it.

55

1   I think it's, again, just those words put together
2   means something.  I don't know that I can say I
3   learned it here or there.
4           I assume it means that there's votes
5   based on a certain race that vote in a certain way.
6   BY MS. LIGHTFOOT:
7       Q.   Okay.  I won't confirm that that's
8   accurate or not.  But let me ask this question then:
9   Did you -- and I am talking about you personally --
10  engage in any racial block voting analysis with
11  respect to anything related to Congressional
12  redistricting in 2010 or 2011?
13      MR. TRISTAN:  Objection, foundation.
14  BY THE WITNESS:
15      A.   No.
16      MR. BRUCE:  Same objection.
17  BY MS. LIGHTFOOT:
18      Q.   Okay.  Did anyone acting -- did UNO
19  itself or did it cause any racial block voting
20  analysis to be conducted related to the
21  Congressional redistricting process in either 2010
22  or -- hold on, sir -- let me just finish asking the
23  question -- in either 2010 or 2011?
24      MR. BRUCE:  Objection, form.

56

1       MR. TRISTAN:  Objection as to the form.
2   Objection as to asked and answered in that the
3   witness has stated that he was not involved in the
4   process.
5       MS. LIGHTFOOT:  I asked him about him
6   personally, and now I asked about the organization
7   or anybody acting on the organization's behalf.
8   BY MS. LIGHTFOOT:
9       Q.   Do you have that question in mind or
10  should I restate?
11      A.   Restate it.
12      Q.   Just so you are clear, the way I am going
13  to ask these questions is what you personally did --
14      A.   Sure.
15      Q.   -- and then I am going to ask what UNO
16  did or anybody acting on UNO's behalf.  So that's
17  the dichotomy.  So the topic -- each topic that I go
18  into will have two parts to it.
19      A.   Sure.
20      Q.   What you know -- what you may have done
21  personally, and what UNO did.  You understand that
22  distinction?
23      A.   Yes.
24      Q.   Let me go back.



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                          October 6, 2011

57

1    I previously asked you about what you did
2    or didn't do regarding racial block voting analysis.
3         My question then, sir, is, are you aware
4    of whether or not either UNO or anyone or entity
5    acting on behalf of UNO conducted any racial block
6    voting analysis related to the Congressional
7    redistricting process in either 2010 or 2011?
8         A.   No.
9         Q.   Okay.  Same, kind of, two-part question.
10   And the topic is the effectiveness of any Latino
11   district.  So that's the topic.
12        The question is whether or not you
13   personally conducted any kind of analysis which
14   attempted to determine the effectiveness of any
15   Latino majority district related to Congressional
16   redistricting.
17        A.   No.
18        Q.   All right.  Same topic.  The question is,
19   did UNO or anyone acting on behalf of UNO conduct
20   any kind of analysis regarding the effectiveness of
21   any Latino majority district related to
22   Congressional redistricting.
23        A.   No.
24        Q.   Slightly different topic, but similar to

58

1    the last one.
2         Did you conduct any analysis to determine
3    whether or not, with respect to the Congressional
4    redistricting, there could be drawn two Latino
5    majority districts?
6         A.   No.
7         Q.   Did UNO, or anyone acting on behalf of
8    UNO, undertake any analysis to determine whether or
9    not there could be drawn two Latino majority
10   districts in the Congressional context?
11        A.   No.
12        Q.   All right.  Did you conduct any analysis
13   to determine -- well, let me back up and set the
14   foundation.
15        You are familiar with Congressional
16   District 4, correct?
17        A.   Uh-huh.  Yes.
18        Q.   And you understand Congressional District
19   4 to be a Congressional district that, for the last
20   20 years, has been represented by Congressman
21   Gutierrez, correct?
22        A.   Correct.
23        Q.   Are you aware that -- that the
24   Congressional District 4 is sometimes referred to as

59

1    an earmuff?
2         A.   Correct.
3         Q.   Okay.  So I am going to use that term.  I
4    just want to make sure that you understood it.
5         With respect to the earmuff, did you
6    conduct any analysis to determine whether or not the
7    two Latino enclaves that are connected by the
8    connector could be uncoupled to have viable Latino
9    districts?
10        MR. TRISTAN:  Objection, asked and answered.
11        MR. BRUCE:  Objection to the form and
12   foundation.  Go ahead, sir.
13   BY THE WITNESS:
14        A.   Could you repeat the first part of the
15   question?
16   BY MS. LIGHTFOOT:
17        Q.   Sure.  Let me lay a little more
18   foundation so the question is a little more
19   comprehensible.
20        You are familiar with the earmuff,
21   correct?
22        A.   Uh-huh.  Yes.
23        Q.   And you are aware, sir, are you not, that
24   the earmuff, the connector piece, essentially

60

1    connects a Hispanic enclave -- Latino enclave
2    district on the North side of Chicago with a Latino
3    enclave district on the South side of Chicago,
4    correct?
5         A.   Correct.
6         Q.   And you are familiar with the fact that
7    Congressman Davis' district kind of goes through the
8    middle of those two enclaves, like a cigar, so to
9    speak, correct?
10        A.   Correct.
11        Q.   Okay.  What -- my question is whether or
12   not you conducted any analysis to determine whether
13   or not those two enclaves could be uncoupled, and
14   function as viable Latino districts.
15        A.   No.
16        Q.   My second part of that question:  Did UNO
17   or anyone acting on behalf of UNO conduct any
18   analysis to determine whether or not those two
19   Latino enclaves could be uncoupled to create Latino
20   districts?
21        A.   No.
22        Q.   All right.  Now, you have told me, in
23   effect, that neither you personally nor UNO did any
24   of the kind of extensive analysis on the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                      October 6, 2011

61

1    Congressional districts that was performed by UNO
2    and yourself vis-a-vis the State Legislative
3    districts; is that correct?
4        A.  Correct.
5        Q.  Let's say prior to -- prior to the end of
6    June of this year, okay, were you aware of whether
7    or not any elected officials from Springfield
8    conducted any kind of racial block voting analysis
9    related to the Congressional redistricting process?
10       A.  Not specifically, no.
11       Q.  Because you qualified it, I will have to
12   follow up.
13           What do you mean by "Not specifically,"
14   sir?
15       A.  Well, you said if I was aware.
16       Q.  Yes.
17       A.  I wasn't aware.  I assumed that there's
18   analysis that's being done as the State is
19   conducting its business of drawing remaps, but I
20   don't have any specific knowledge to it.
21       Q.  Okay.  All right.  And let me make sure
22   that I am clear.
23           So what you are, in essence, saying is
24   you made an assumption that somebody was probably

62

1    doing it, but you don't have any particular
2    knowledge one way or the other; is that correct?
3        A.  Correct.
4        Q.  All right.  UNO came out and supported
5    the Congressional map that was passed by the General
6    Assembly and signed into law by the Governor; is
7    that correct?
8        A.  I don't know that it was -- the
9    Congressional map --
10       Q.  That's what I am talking about.
11       A.  -- specifically?
12           I think our position was in support of
13   one Congressional district.
14       Q.  Okay.
15       A.  I am not sure about the specific map as
16   it's delineated throughout.  But the concept of one
17   Congressional district is what we stood behind.
18       Q.  And in fair point, I didn't mean to
19   overstate what your endorsement was.
20           So in other words, UNO has taken a
21   position that it supports the CD 4 as it is
22   reflected in the map that was passed by the General
23   Assembly and signed into law by the Governor,
24   correct?

63

1        A.  Again, it's -- I don't know that we took
2    a position specifically to the map that was
3    approved.  I think our position was the concept of
4    one Congressional district.
5        Q.  Are you finished?
6            Okay.  I don't want to be accused of
7    interrupting you.
8            All right.  So let me ask it a different
9    way then, and make sure we are both on the same
10   page.
11           What you are saying is that UNO came out
12   in support of the concept of having one majority
13   Latino district; is that correct?
14       A.  Correct.
15       Q.  But UNO has not taken a position with
16   respect to the specific iteration of CD 4 that is in
17   the -- in the map that was passed by the General
18   Assembly and signed into law by the Governor; is
19   that the distinction you are drawing?
20       A.  Yes, although, I think that we are
21   satisfied with the map that was produced by the
22   State because it followed the concept of one
23   Congressional district.
24       Q.  Okay.

64

1        A.  And all I am saying is in terms of the
2    lines, where the lines are drawn, what streets and
3    all that, it's -- we were happy that the State
4    followed what we believe is the best -- in the best
5    interest of our community at that time.
6        Q.  I'm sorry, go ahead.
7        A.  That's it.
8        Q.  And that is one majority Latino --
9        A.  Congressional district, yes.
10       Q.  Okay.  In other words, you are not --
11   neither you nor UNO are specifically endorsing the
12   various line drawing that constitutes CD 4; is that
13   correct?
14       A.  I don't want to come across like we are
15   opposing it either.
16       Q.  No, I understand.  You qualified it, so I
17   just want to understand what the qualification
18   means.
19       A.  I think our position was that this is our
20   preference of having one Congressional district,
21   along with a coalition of organizations that came
22   together.  Whether it was a specific endorsement of
23   that map, I am not sure it was that either.  But it
24   wasn't like we were opposed to the map so --



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                          October 6, 2011

65

1  Q.   I am just trying to get at -- let me just
2  ask it directly, since we are on the topic.
3      Has UNO taken any specific position
4  regarding the particular way in which CD 4, as
5  reflected in the map that was passed and signed into
6  law, have you taken any specific position as to that
7  particular district, beyond the concept of, We
8  support one majority Latino district?
9  A.   I think our position was that we support
10  the map that was passed by the State because it
11  followed the concept.  So it's kind of like -- I
12  don't mean to be obtuse about it.  It's just that
13  the State passed a map, and even though we weren't
14  looking at the specific lines, it followed the
15  concept of one Congressional district, and we were
16  satisfied with that.
17      So I guess in some way we were endorsing
18  the map, without saying, This is the map that we
19  want.  It's the concept of one Congressional
20  district.
21  Q.   So in other words, in endorsing the
22  concept -- let's stick with that -- of one
23  Congressional district, it sounds like, based on the
24  comments that you just made and our previous

66

1  discussion about what analysis was done -- that UNO
2  or anybody acting on behalf of UNO hadn't sat down
3  and, you know, crunched the numbers, so to speak, of
4  what the specific demographic information was,
5  political data, or where particular lines may have
6  been drawn; is that correct?
7  A.   Correct.
8  Q.   All right.  Okay.  I now understand what
9  you were saying.
10      Tell me, sir, then why -- what was the
11  basis for UNO's endorsement of the concept of one
12  majority Latino Congressional district.
13  A.   Sure.  I think initially, just given the
14  census figures in the state of Illinois, it's
15  obvious the Latino community has grown.
16  Q.   Sure.
17  A.   And I think there's always been a desire
18  to see more representation on the Congressional
19  side.
20      But after having conversations with other
21  organizations in terms of what the position ought to
22  be, and try to present a united front on this topic,
23  kind of, was a give-and-take, in trying to figure
24  out what was best for our community.  And as much as

67

1  it would be great to see two, three, four or more,
2  we settled on, kind of, the reality of voting
3  patterns within our community, and feeling that --
4  unfortunately, that if we followed those trends, we
5  may lose the gains that we have made with having at
6  least one Congressional representative.
7      And so we came to the conclusion that
8  what was best at this time is to enhance that one
9  Congressional district to ensure that we don't lose
10  that.  So that was the basis of our position.
11  Q.   So you said a couple things there that I
12  want to just follow up with you on.
13      You said something about, The reality of
14  voting patterns within our community.  What did you
15  mean by that, sir?
16  A.   Unfortunately, Latinos vote in very small
17  numbers, and for different reasons.  You have --
18  could have a very large Latino population, but it
19  may not be a voting population.  It may not be
20  eligible to vote.
21      And then you do have those that are
22  eligible to vote that may not vote themselves.  And,
23  to me, that's kind of -- that's the certain reality
24  that we need to contend with.  And in our ambition

68

1  to try to get more districts, are we actually
2  diluting our strength that we have?  So that was the
3  logic that we used.
4  Q.   Let me ask you this then:  With respect
5  to that concern about Latinos voting in small
6  numbers, and the potential to lose gains that had
7  come -- I am talking specifically about the
8  Congressional process -- are you aware of whether or
9  not any of the various groups that you were talking
10  about in arriving at this discussion, are you aware
11  that any of them had conducted any kind of specific
12  voting analysis of how Latinos vote anywhere in
13  Northern Illinois over any period of time?
14  A.   I am not aware of a specific but, again,
15  I am going to assume that some of them had.
16  Q.   So beyond your assumption, in any of
17  these conversations that you were having that led to
18  the conclusion that you could endorse the concept of
19  one Latino majority Congressional district, are you
20  aware for a fact as to whether or not any of the
21  various constituency groups that you were talking
22  with had actually done any kind of analysis of
23  Latino voting patterns in Northern Illinois -- and
24  by that I mean city of Chicago, Cook, suburban Cook,



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

69

1  at -- for any time period?
2       MR. BRUCE: Objection, foundation.
3  BY THE WITNESS:
4       A.  There's groups that do this.  There has
5  been analysis that has been done.  Was it done
6  specifically for this discussion?  That I am not
7  aware of.
8  BY MS. LIGHTFOOT:
9       Q.  Okay.  And that was my question, whether
10  or not somebody came and said, Hey, we have done
11  this -- in other words -- I am, obviously, making it
12  up, because I wasn't part of the discussion -- We
13  have done this analysis of how Latinos vote in city,
14  county, suburban Cook, DuPage County, anywhere else
15  in Northern Illinois, and here is what the results
16  were?  Anything along that line that were part of
17  the discussions that you were in?
18       A.  Not specific to the Congressional -- no
19  analysis -- I guess I should say I don't know that
20  there were analyses that were done for the purpose
21  of that discussion.  But some of these organizations
22  have histories of doing analyses and have expertise
23  that we were relying on as well, and our own
24  experiences within our communities.

70

1       Q.  Okay.  But nothing that was specifically
2  done, that you are aware of, of analysis of Latino
3  voting patterns in Northern Illinois and the
4  boundaries that I have defined?
5       A.  Not in attempting to shape a
6  Congressional district.
7       Q.  Okay.  All right.
8           Okay.  Are you aware, sir, of whether or
9  not either any of the -- and I am calling them
10  constituency groups -- any of the groups that you
11  were in discussion with regarding the Congressional
12  redistricting process, did any kind of racial block
13  voting analysis?
14           We have talked about you.  We have talked
15  about UNO.  But I want to expand it now to any of
16  the groups that you were talking about in either --
17  talking with in either 2010 or 2011, did any kind of
18  racial block voting analysis in the context of
19  thinking about Congressional redistricting.
20       MR. BRUCE:  Objection, asked and answered, and
21  foundation.  Go ahead.
22  BY THE WITNESS:
23       A.  I am not aware of it.  It's possible that
24  they had in some of these groups.  That's what they

71

1  do.
2  BY MS. LIGHTFOOT:
3       Q.  Again, this is just what you know, not
4  what may have happened outside of your knowledge.
5           A couple more topics, sir.
6           Are you -- did you, you, Juan Rangel --
7  this is actually going to be a three-part -- same
8  topic, but three parts.
9           Did you, Juan Rangel, conduct any kind of
10  analysis to determine what the percentage of voting
11  age population would be needed to have an effective
12  district for Latinos, and, again, in the context of
13  Congressional redistricting?
14       A.  No.
15       Q.  Did any -- did UNO or anyone on behalf of
16  UNO conduct such an analysis to determine,
17  essentially, what's the threshold level that we
18  could be at, under 50 percent, to have a Latino
19  district that would be effective?
20       MR. BRUCE:  Objection.
21       MR. TRISTAN:  Objection, compound and vague.
22       MR. BRUCE:  I'm sorry, objection, foundation,
23  form.  And I think it's seeking a legal conclusion.
24           But go ahead, if you know the answer --

72

1  if you can answer.
2  BY THE WITNESS:
3       A.  I am a little confused on the question.
4  BY MS. LIGHTFOOT:
5       Q.  Fair enough.  Let me restate it.
6           We talked at the very beginning of our
7  discussion here this morning -- you used the term
8  "Influence within a district."  Do you remember
9  that, sir?
10       A.  Uh-huh.
11       Q.  Okay.
12       A.  Yes.
13       Q.  What I am asking you is whether or not
14  UNO or anyone on behalf of UNO conducted any kind of
15  analysis to determine what the Latino voting age
16  population percentage could be to have influence
17  within any particular Congressional district.
18       A.  No.
19       Q.  All right.  Same question, but I am going
20  to expand it out to the universe of folks that you
21  were talking with throughout this process.
22           In your discussions with these various
23  constituency groups about the Congressional
24  redistricting process, are you aware of whether or



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

73

1  not there was anyone who had conducted an analysis
2  to determine what the percentage of Latino voting
3  age population could be in order for Latinos to have
4  influence within a particular Congressional
5  district?
6      A.    Same as before, I am not aware of
7  specifically but, again, I am assuming that because
8  of the work that these -- some of these other
9  organizations do, that they had done so; not
10 necessarily for -- not necessarily for the
11 Congressional map, perhaps, but I am not sure. But
12 analysis has been done by some of these groups in
13 the past.
14     Q.    But as you sit here today, you are not
15 aware of any specific analysis that was done along
16 these lines, i.e., what's the threshold number that
17 we can -- that we should have ideally for Latino
18 voting age population, for Latinos to have influence
19 within a particular Congressional district?
20     A.    No.
21     Q.    Okay.
22         MS. LIGHTFOOT:  Why don't we take a quick break
23 so the videographer can change the tape.
24         THE VIDEOGRAPHER:  This is the end of Tape

74

1  Number 1.  We are going off the record at 11:26.
2         (WHEREUPON, a recess was had.)
3         THE VIDEOGRAPHER:  This is the beginning of
4  Tape Number 2.  We are back on the record at 11:31.
5  BY MS. LIGHTFOOT:
6      Q.    Mr. Rangel, I asked you a series of
7  questions about what, if any, analysis was done
8  vis-a-vis any congressional districts by either you,
9  UNO, and then I came back and asked you questions
10 about the various constituency groups that you were
11 talking with about the congressional process.
12         Just so I have tied up that topic area,
13 since the map was -- the congressional map was
14 signed into law in or about June of this year,
15 have -- are you aware of -- have you conducted any
16 kind of analysis related to the Congressional map at
17 all?
18     A.    No.
19     Q.    Okay.  Has UNO or anyone acting on UNO's
20 behalf conducted any analysis of the Congressional
21 map since it was signed into law by the Governor in
22 June of this year?
23     A.    No.
24     Q.    All right.  And similarly, are you aware

75

1  of whether or not anyone has done any analysis of
2  the Congressional map, aside from, obviously, the
3  parties to this litigation, but aside from that, are
4  you -- do you have any personal knowledge of whether
5  or not anyone else has done any analysis of any kind
6  related to the Congressional map since it was passed
7  and signed into law in June of this year?
8      A.    No.
9      Q.    All right.  Aside from the various
10 constituency groups that you have talked about that
11 you were in conversation with -- and I mean the
12 broader you -- UNO and you personally were in
13 conversation with -- leading up to the position that
14 UNO ended up taking vis-a-vis the Congressional map,
15 were you in consultation with any elected officials
16 before UNO announced its support of the concept of
17 one Latino majority Congressional district?
18     A.    The only person that we spoke -- elected
19 official that we spoke to regarding the
20 Congressional district was Congressman Gutierrez.
21     Q.    Okay.  Aside from Congressman Gutierrez,
22 for example, did you -- were you in consultation
23 with any elected official -- any State-elected
24 official -- by that I mean either a member of the

76

1  Illinois House of Representatives or the Illinois
2  Senate -- regarding UNO's position about the one
3  majority Latino district?
4      A.    No.
5      Q.    Okay.  Were you in contact with any staff
6  person for any State-elected official?
7         Again, I am defining that as a member of
8  the General Assembly.  Were you in contact with any
9  staff person of a General Assembly member about
10 UNO's position regarding the one majority Latino
11 district?
12     A.    No.
13     Q.    Okay.  Aside from your Counsel, did you
14 talk to anybody else about the fact that you were
15 going to be called for a deposition in this case?
16     A.    Aside from Counsel?
17     Q.    Yes.
18     A.    Like -- like --
19     Q.    Anyone.
20     A.    Just letting staff know that I am not
21 going to be in today.
22     Q.    Okay.  I take it Pat is probably your
23 assistant; is that correct?
24     A.    Pardon me?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

77

1    Q.   Is Pat your assistant or --
2    A.   No.
3    Q.   Okay.  Did you say --
4    A.   Other than the staff.
5    Q.   I'm sorry, staff.  I misheard you.
6         Okay.  Other than staff, other than your
7    Counsel, did you talk to anybody else about the fact
8    that you were going to be deposed here today?
9    A.   No.  I don't recall.
10   Q.   So, for example, did you meet with
11   Mr. Bruce in advance of your deposition here today?
12   A.   Oh, yes.
13   Q.   When did you meet with Mr. Bruce?
14   A.   Yesterday.
15   Q.   And was that face to face or over the
16   phone?
17   A.   Face to face.
18   Q.   And where did that meeting take place,
19   sir?
20   A.   In his office.
21   Q.   Okay.  Was that at your initiation or at
22   Mr. Bruce's initiation, if you know?
23   A.   That was -- I don't know -- I don't
24   recall if it was our attorneys that worked on -- are

78

1    working on this.
2    Q.   And what did Mr. Bruce ask you about?
3    A.   Asked -- it was more of -- kind of what
4    this process is, what -- the deposition and what to
5    expect, kind of thing.
6    Q.   Okay.  And did you talk about anything
7    else with Mr. Bruce?
8    A.   Other than -- I am not sure what your
9    question is.
10   Q.   Well, you just said that one of the
11   things that you talked about with Mr. Bruce was what
12   the deposition process was going to be like.
13        Did you talk about anything else with
14   Mr. Bruce?
15   A.   Outside of the deposition itself, no.
16   Q.   Well, outside of that topic of what -- I
17   take it what you are saying is that one of the
18   things you talked about with Mr. Bruce was what it
19   was going to be like to be deposed.  Is that
20   correct?
21   A.   Correct.
22   Q.   All right.  Did you talk about anything
23   related to the Congressional redistricting process
24   itself with Mr. Bruce when you met with him

79

1    yesterday?
2    A.   Repeat the question again.
3    Q.   We have talked a lot today about the --
4    your knowledge or -- and maybe lack thereof, about
5    the Congressional redistricting process, correct?
6    A.   Correct.  Uh-huh.
7    Q.   Did you talk with Mr. Bruce when you met
8    with him yesterday about anything related to the
9    Congressional redistricting process?
10   A.   We talked about the deposition.  So the
11   deposition is about the Congressional district.  So
12   yes, I guess.
13   Q.   And what specifically did you talk about,
14   sir?
15   A.   Just kind of what to expect in terms of
16   this process, and always told me to be truthful.
17   Q.   Did you talk about any of the questions
18   that we talked about here today?
19   A.   We talked about possible questions that
20   would be asked.
21   Q.   Like what?
22   A.   Some of the questions that you asked
23   today.
24   Q.   For example?

80

1    A.   Did we play any role in the Congressional
2    district remap.
3    Q.   Did you tell him anything different than
4    you told me here today?
5    A.   Pardon me?
6    Q.   Did you tell him anything different than
7    what you told me here today?
8    A.   No.
9    Q.   How long did you meet with Mr. Bruce?
10   A.   Not very long.  Twenty minutes, maybe.
11   Q.   Okay.  Aside from telling staff and
12   talking to your attorneys, and meeting with the
13   lawyer for the State, did you talk about your
14   deposition with anybody else?
15   A.   I don't believe so.
16   Q.   Okay.
17   MS. LIGHTFOOT:  Okay.  I think that's all the
18   questions I have for you.
19   THE WITNESS:  Thank you.
20              EXAMINATION
21   BY MR. BRUCE:
22   Q.   Mr. Rangel, you have no knowledge or
23   information that any Congressional district map was
24   drawn to discriminate against Latinos; is that true?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

81
1    A.   That's correct.
2    Q.   And as I understood your testimony here
3  today, you would, in fact, disagree with that?  You
4  don't think it was drawn, based upon what you know,
5  to discriminate against Latinos; is that correct?
6    A.   Correct.
7    MS. LIGHTFOOT:  Objection, foundation and
8  mischaracterizes his testimony.
9  BY THE WITNESS:
10    A.   Correct.
11  BY MR. BRUCE:
12    Q.   I don't think I am mischaracterizing your
13  testimony.  Do you think the Latinos were
14  discriminated against in the way the map was drawn?
15    A.   No, we support the concept of one
16  Congressional district, as was passed by the General
17  Assembly and signed into law.
18    MR. BRUCE:  That's all the questions I have.
19  Thank you for your time here today.
20    MR. TRISTAN:  I have no questions.
21    THE VIDEOGRAPHER:  This concludes the
22  deposition and ends Tape Number 2.  We are going off
23  the record at 11:40 a.m.
24    FURTHER DEPONENT SAITH NOT.

82
1              CERTIFICATE OF OFFICER
2
3
4       I, LISA O'BRIEN, a Certified Shorthand
5  Reporter of the state of Illinois, do hereby
6  certify:
7       That previous to the commencement of the
8  examination of the witness, the witness was duly
9  sworn to testify the whole truth concerning the
10  matters herein;
11       That the foregoing deposition transcript
12  was reported stenographically by me, was thereafter
13  reduced to typewriting under my personal direction
14  and constitutes a true record of the testimony given
15  and the proceedings had;
16       That the said deposition was taken before
17  me at the time and place specified;
18       That I am not a relative or employee or
19  attorney or counsel, nor a relative or employee of
20  such attorney or counsel for any of the parties
21  hereto, nor interested directly or indirectly in the
22  outcome of this action.
23
24

83
1              IN WITNESS WHEREOF, I do hereunto set my
2  hand at Chicago, Illinois, this 17th day of October,
3  2011.
4
5
6
7  C.S.R. Certificate No. 84-3822.
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

84
1              I N D E X
2  WITNESS                    EXAMINATION
3  JUAN RANGEL
4  By Ms. Lightfoot              5
5  By Mr. Bruce                  80
6
          E X H I B I T S
8  NUMBER                      PAGE
9  Rangel Deposition Exhibits
10   Deposition Exhibit No. Group 1      17
11   Deposition Exhibit No. 2            42
12
13
14
15
16
17
18
19
20
21
22
23
24


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

Juan Rangel                                    October 6, 2011

85
1        DEPOSITION ERRATA SHEET
2        Our Assignment No. 278699
3          IN THE UNITED STATES DISTRICT COURT
4     NORTHERN DISTRICT OF ILLINOIS - EASTERN DIVISION
5     COMMITTEE FOR A FAIR AND        )
6     BALANCED MAP, et al.,           )
7              Plaintiffs,     )
8        vs.            ) No. 1:11-cv-05065
9     ILLINOIS STATE BOARD OF      )
10    ELECTIONS, et al.,           )
11              Defendants.    )
12       DECLARATION UNDER PENALTY OF PERJURY
13        I declare under penalty of perjury that I
14    have read the entire transcript of my Deposition
15    taken in the captioned matter or the same has been
16    read to me, and the same is true and accurate, save
17    and except for changes and/or corrections, if
18    any, as indicated by me on the DEPOSITION
19    ERRATA SHEET hereof, with the understanding that I
20    offer these changes as if still under oath.
21        Signed on the _____ day of
22    _____, 20___.
23    _____
24        JUAN RANGEL

87
1        DEPOSITION ERRATA SHEET
2     Page No.____Line No.____Change to:_____
3     _____
4     Reason for change:_____
5     Page No.____Line No.____Change to:_____
6     _____
7     Reason for change:_____
8     Page No.____Line No.____Change to:_____
9     _____
10    Reason for change:_____
11    Page No.____Line No.____Change to:_____
12    _____
13    Reason for change:_____
14    Page No.____Line No.____Change to:_____
15    _____
16    Reason for change:_____
17    Page No.____Line No.____Change to:_____
18    _____
19    Reason for change:_____
20    Page No.____Line No.____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24        JUAN RANGEL

86
1        DEPOSITION ERRATA SHEET
2     Page No.____Line No.____Change to:_____
3     _____
4     Reason for change: _____
5     Page No.____Line No.____Change to:_____
6     _____
7     Reason for change:_____
8     Page No.____Line No.____Change to:_____
9     _____
10    Reason for change:_____
11    Page No.____Line No.____Change to:_____
12    _____
13    Reason for change:_____
14    Page No.____Line No.____Change to:_____
15    _____
16    Reason for change:_____
17    Page No.____Line No.____Change to:_____
18    _____
19    Reason for change:_____
20    Page No.____Line No.____Change to:_____
21    _____
22    Reason for change:_____
23    SIGNATURE:_____DATE:_____
24        JUAN RANGEL


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com