**Page 1**

```
                IN THE UNITED STATES DISTRICT COURT
               FOR THE NORTHERN DISTRICT OF ILLINOIS
                         EASTERN DIVISION

COMMITTEE FOR A FAIR AND        )
BALANCED MAP, et al.,           )
                Plaintiffs,     )
          vs.                   )   1:11-cv-05065
ILLINOIS STATE BOARD OF         )
ELECTIONS, et al.,              )
                Defendants.     )
```

The videotaped deposition of WILLIAM LIPINSKI, called for examination, taken pursuant to the provisions of the Code of Civil Procedure and the rules of the Supreme Court of the State of Illinois pertaining to the taking of depositions for the purpose of discovery, taken before KAREN PILEGGI, a Notary Public within and for the County of DuPage, State of Illinois, and a Certified Shorthand Reporter of said state, at 71 South Wacker Drive, Chicago, Illinois, November 1, 2011, at the approximate hour of 10:57 a.m.

**Page 2**

1  PRESENT:
2      MAYER BROWN, LLP,
3      (71 South Wacker Drive, Suite 3200,
4      Chicago, Illinois 60606,
5      312-782-0600), by:
6      MS. LORI LIGHTFOOT,
7      llightfoot@mayerbrown.com,
8          appeared on behalf of the Plaintiffs;
9
10     POWER, ROGERS & SMITH, P.C.,
11     (70 West Madison Street, 55th floor,
12     Chicago, Illinois 60602,
13     312-236-9381), by:
14     MR. DEVON C. BRUCE,
15     dcbruce@prslaw.com,
16         appeared on behalf of the Defendants;

**Page 3**

1  PRESENT: (Continued)
2      HINSHAW & CULBERTSON, LLP,
3      (222 North LaSalle Street, Suite 300,
4      Chicago, Illinois 60601,
5      312-704-3000), by:
6      MR. ROBERT T. SHANNON,
7      rshannon@hinshawlaw.com,
8          appeared on behalf of the deponent
9          Congressman Lipinski.
10
11
12     VIDEOGRAPHER: Kevin Dailey, Esquire.
...
23     REPORTED BY: Karen L. Pileggi, CSR, RMR, CRR.
24         CSR License No. 84-3404

**Page 4**

1      THE VIDEOGRAPHER: Good morning. We're going
2  on the video record at 10:57 a.m. My name is
3  Kevin Dailey and I'm the legal videographer in
4  association with Esquire Deposition Solutions. Our
5  address is 311 West Monroe, Chicago, Illinois.
6      The court reporter is Karen Pileggi also
7  of Esquire Deposition Solutions. Here begins the
8  videotaped deposition of William Lipinski taking
9  place at 71 South Wacker Drive, Chicago, Illinois.
10 Today's date is November 1st, 2011. This deposition
11 is being taken in the matter of Committee for a Fair
12 and Balanced Map, et al., versus the Illinois State
13 Board of Elections, et al., being heard before the
14 United States District Court, Northern District of
15 Illinois, Eastern Division.
16     Will counsel please state their names for
17 the record.
18     MR. BRUCE: Devon, D-e-v-o-n, Bruce on behalf
19 of the defendants.
20     MS. LIGHTFOOT: Lori Lightfoot on behalf of the
21 plaintiffs.
22     MR. SHANNON: Robert Shannon representing
23 Congressman Lipinski for the purposes of this
24 deposition.




EXHIBIT H

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 5**

1  THE VIDEOGRAPHER: Will the reporter please
2  swear in the witness.
3          (WHEREUPON, the witness was
4          duly sworn.)
5  THE WITNESS: I do.
6          WILLIAM LIPINSKI,
7  called as the witness herein, having been first duly
8  sworn, was examined and testified as follows:
9          EXAMINATION
10 BY MS. LIGHTFOOT:
11    Q.   Sir, could you state your name and spell
12 your last name for the record.
13    A.   William Lipinski, L-i-p-i-n-s-k-i.
14    Q.   Have you ever had your deposition taken
15 before, Congressman?
16    A.   Yes, I have.
17    Q.   By virtue of the fact you had to think
18 about it, I suspect it was probably a while ago.
19    A.   It was a long time ago, yes.
20    Q.   Let me give you a few basic rules of the
21 road.
22         Because as you see there's a court
23 reporter taking down a verbatim transcript of
24 everything that's going to be discussed here today,

**Page 6**

1  there are a couple of important rules that flow from
2  that. The first is that you and I should endeavor
3  not to talk over each other. We're not going to be
4  here long today. I'm going to see if I can get this
5  done you start in record time.
6          Even so, it's important that you allow me
7  to ask my questions before you start to answer, even
8  if you know the answer.
9          And by the same token I will endeavor to
10 allow you to answer before I ask any follow-up or
11 new question.
12         The other thing that's important because
13 the court reporter is taking down a verbatim
14 transcript is that you must answer audibly.
15         It happens with virtually every witness
16 that there will be times when you nod your head or
17 do some other nonverbal response to a question.
18         If you forget, I'll try to remind you or
19 I'm sure your able counsel will remind you as well.
20         The other thing that's important is there
21 may be from time to time objections that are
22 interposed on the basis of a question I've asked.
23         Objections are kind of standard fare in
24 these things. Unless your lawyer instructs you not

**Page 7**

1  to answer a question, you are still obliged to
2  answer the question, even with an objection.
3          I will tell you that most witnesses, if
4  there's an objection, tend to forget what the
5  question is. Again, that's the benefit of having a
6  court reporter here, because we can just have the
7  question read back or I can restate it.
8          I think that's all we need to discuss for
9  purposes of today. As I said, we won't be here that
10 long. I don't think we'll be here longer than an
11 hour plus, but if at any time you need to take a
12 break, feel free to do so.
13         The only thing that I would ask is you
14 not take a break while there's a question pending;
15 unless, of course, you need to confer with your
16 lawyer and you can feel free to do that.
17         With that I'm going to kind of take you
18 through your background and get on to the issues
19 that brought us here today and then try to get you
20 out of here as quickly as possible.
21         I referred to you as congressman. You
22 are the former congressman of the Third
23 Congressional District of Illinois, correct, sir?
24    A.   That is correct.

**Page 8**

1    Q.   Let me just go back through a little bit
2  of your elected history.
3          As I understand it, you were -- before
4  you were a congressman for the third district, you
5  were actually congressman for the fifth district; is
6  that correct, sir?
7    A.   That is correct.
8    Q.   And then as a result of the decennial
9  census in 1993, Illinois lost population and you
10 were put in the same district as former congressman
11 Marty Russo; is that correct, sir?
12   A.    That is correct.
13   Q.    And then you and Mr. Russo ran against
14 each other in a 1992 democratic primary and you were
15 successful; is that correct?
16   A.    That's correct.
17   Q.    And thereafter you continued to serve as
18 the elected representative of the third
19 congressional district until you announced your
20 retirement -- you announced your retirement in the
21 summer of 2004 and you officially retired, I
22 believe, in January of 2005; is that correct?
23   A.    That is correct.
24   Q.    The person who succeeded you as the



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM LIPINSKI                                                              November 1, 2011

                                                    9
1  representative from the third district is your son,
2  Daniel Lipinski; is that correct, sir?
3     A.  That is correct.
4     Q.  You're familiar with someone by the name
5  of Jerry Costello; is that correct, sir?
6     A.  Yes, that is correct.
7     Q.  Mr. Costello is a member of Congress from
8  Southern Illinois; is that correct?
9     A.  That is correct.
10    Q.  And you and he served together in the
11 House of Representatives as fellow members from the
12 Illinois Congressional Delegation; is that correct?
13    A.  That is correct.
14    Q.  You're also familiar with somebody by the
15 name of Michael Madigan; is that correct?
16    A.  That is correct.
17    Q.  Michael Madigan has been for a number of
18 years the Speaker of the House of Representatives
19 here in Illinois; is that correct?
20    A.  That's correct.
21    Q.  You're also familiar with somebody by the
22 name of John Cullerton; is that correct, sir?
23    A.  Yes, that is correct.
24    Q.  You know John Cullerton, at least in 2001

                                                    10
1  to be the president of the Illinois Senate; is that
2  correct, sir?
3     A.  Well, in 2001 he wasn't the president --
4     Q.  If I said 2001, I misspoke.  2011.
5     A.  Yes, I do know him to be president at
6  that time.
7     Q.  Let me take you back to approximately the
8  early part of this year, January or February.
9         Did you participate in a meeting in
10 approximately February of 2011 in the ward offices
11 of Speaker Madigan along with Congressman Costello,
12 President Cullerton, yourself and Congressman Dan
13 Lipinski?
14    A.  That is correct.
15    Q.  How did you come --
16    A.  I think it was his district office,
17 though.  I don't think it was his ward office.
18    Q.  Okay.
19        How did you come to be a participant in
20 that meeting, sir?
21    A.  Congressman Costello asked me to attend
22 the meeting with him because he was going to try to
23 sell President Cullerton and Speaker Madigan on him
24 working on a bipartisan map.

                                                    11
1     Q.  And by "bipartisan map" you're talking
2  about a congressional map for Illinois; is that
3  correct, sir?
4     A.  Yes.  A map that could be agreed to by
5  the Democrats and the Republicans, or at least a
6  large majority of those people.
7     Q.  Why did you agree to participate in that
8  meeting, sir?
9     A.  First of all, because Jerry Costello was
10 a friend of mine and had been for a long time.
11        Secondly, I had been very much involved
12 in the redistricting ten years prior.
13        Speaker Hastert and I had worked out a
14 map that was a bipartisan agreement and Jerry hoped
15 that I would be able to aid and assist him in doing
16 that.
17    Q.  What was discussed at that -- I'll call
18 it the February 2011 meeting?
19        MR. BRUCE:  Standing objection on hearsay and
20 relevance.
21        MR. SHANNON:  You can answer.
22 BY THE WITNESS:
23    A.  Would you repeat the question?
24

                                                    12
1  BY MS. LIGHTFOOT:
2     Q.  Sure.
3         What was discussed at that meeting?
4     A.  Congressman Costello talked about his
5  desire to try to put together a bipartisan map,
6  getting the Democrats and the Republicans together
7  to agree to a map that would make the vast majority
8  of the members of the Illinois delegation happy.
9     Q.  What, if any, reaction to Congressman
10 Costello's stated objective did you have?
11    A.  I personally?
12    Q.  Yes.
13    A.  I don't understand what you mean by that.
14    Q.  Did you say anything in response to what
15 Congressman Costello said --
16    A.  I simply said that ten years before,
17 Speaker Hastert and I had come up with a bipartisan
18 map and I thought that it would serve everyone well
19 if we could do the same thing this time around.
20        I said very little because I really felt
21 that I was no longer a member of Congress and I felt
22 that -- I was a little bit squeamish about being
23 there and not being a member of Congress any longer.
24    Q.  What, if anything, did President



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**13**

1  Cullerton say in response to the comments from
2  Congressman Costello?
3     A.  He said that he would be more than happy
4  to listen to the suggestions that were made by
5  Congressman Costello and the members of the Illinois
6  delegation, but he felt that there was a process
7  that the legislature would be involved in -- in
8  fact, had already started -- and they would probably
9  wind up coming up with their own map.  But he would
10 be happy to listen to what Congressman Costello had
11 to say and take it under consideration.
12    Q.  What, if anything, did Speaker Madigan
13 say in response to Congressman Costello's comments
14 about a desire to have a bipartisan map?
15    A.  I would have to say that Speaker Madigan
16 in his usual fashion had very, very little to say,
17 and whatever it was he had to say, I, frankly, don't
18 remember, but I don't remember it being of anything
19 of any particular significance.
20    Q.  Finally, what, if anything, did
21 Congressman Dan Lipinski say in response to the
22 comments from --
23    A.  I don't remember Dan saying anything.
24 Dan probably felt a little uneasy because he was

**14**

1  there with his father.  His father felt very uneasy
2  that he was there.
3        The only reason Dan wound up being there
4  is I asked him to come along because I didn't want
5  people to get the idea that I was doing any
6  negotiating for him in any way, shape or form.  He's
7  a big boy.  He's a member of Congress.  It was his
8  area, not really mine.
9        I was there because Costello asked me to
10 and he was a friend of mine.
11    Q.  Prior to that February 2011 meeting had
12 you had any other conversations with anyone else
13 about redistricting in Illinois as it pertained to
14 congressional districts?
15    A.  I probably talked to my son about it.
16    Q.  I'm not going to ask you about that.
17 Aside from your son did you have -- prior to that
18 February meeting did you have any discussions with
19 any other current member of Congress about
20 congressional redistricting for this year?
21    A.  No, not up to that point I had not, no.
22    Q.  My understanding is that that meeting
23 lasted for some time, most of which was -- involved
24 conversations unrelated to congressional

**15**

1  redistricting.  Is that your recollection?
2     A.  Correct.  There was a lot of
3  conversations about the White Sox since there was a
4  lot of White Sox fans in the room and only one Cub
5  fan, my son.
6     Q.  I won't comment about that, being a White
7  Sox fan myself.
8         After this February meeting did you have
9  any further discussions with Congressman Costello
10 about any kind of effort to get a bipartisan plan in
11 place?
12    A.  Congressman Costello told me on a number
13 of occasions that he was working with Congressman
14 Shimkus and Congressman Biggert trying to put
15 together a bipartisan map that the Democrats and the
16 Republicans would agree upon, and I guess he was
17 telling me that information because I had been
18 involved ten years earlier, and I guess he felt if
19 there was anything that I wanted to suggest to him
20 that he might be able to do to help facilitate that.
21        But as I mentioned to you earlier, I
22 really wanted to try to stay out of this as much as
23 possible because of my son being the congressman.
24        When he would ask me questions about

**16**

1  redistricting, Jerry directly, I would say to him,
2  "Jerry, I don't want to talk about that.  I'm not
3  there anymore."  I actually said to him, "It's none
4  of my business."
5     Q.  I take it, sir -- did these subsequent
6  conversations that you had with Congressman Costello
7  come up in the context of discussions about other
8  things or were they specific?
9     A.  They came up -- he may have called me at
10 sometime to ask me something about redistricting and
11 my opinion on redistricting, but the vast majority
12 of the times we talked about it -- he and I talked
13 at least once a week usually on the telephone.  We
14 talked about many different things.
15    Q.  That was my sense.  I wanted to just
16 verify that.
17        Did there come a point in time where you
18 participated in a meeting in Springfield, Illinois
19 regarding congressional redistricting?
20    A.  Yes, there was.
21    Q.  Do you recall when that was, sir?
22    A.  No, I don't really recall when it was.
23 I'm sure I could check my schedule, but I'm sure
24 that you have it there also.


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM LIPINSKI                                November 1, 2011

```
                                    17
 1        Yes, there was a meeting in Springfield,
 2   Illinois in President Cullerton's office.  It was
 3   President Cullerton, Speaker Madigan, Congressman
 4   Costello and myself.
 5        Congressman Costello had told me prior --
 6   Q.   Let me just --
 7   A.   I'm sorry.
 8   Q.   I have to do what's called, "lay a
 9   foundation."  Before we get to what was discussed,
10   let me piece out a few more details.
11        This was in President Cullerton's office.
12   It was yourself, Speaker Madigan and Congressman
13   Costello; is that correct?
14   A.   Correct.
15   Q.   Anybody else that was part of that
16   meeting aside from the people that you just
17   identified?
18   A.   There were staff members from Cullerton's
19   staff that came in and out, but I really don't know
20   what their names were or anything like that.
21   Q.   Was Congressman Quigley a part of that
22   discussion?
23   A.   No, he was not.  I mean, his name may
24   have came up.  He wasn't at the meeting.
```

```
                                    18
 1   Q.   That's what I'm asking.  Was he
 2   physically present for any part of that meeting?
 3   A.   No, absolutely not.
 4   Q.   How did you come to be in this meeting in
 5   Springfield?
 6   A.   Congressman Costello told me that he had
 7   worked out a bipartisan map with Congressman Shimkus
 8   and Congresswoman Biggert that would be ten
 9   Democrats and eight Republicans and he wanted me to
10   accompany him to Springfield to try to sell
11   President Cullerton and Speaker Madigan on this
12   bipartisan map that he had worked out.
13   Q.   I take it you agreed to accompany him to
14   the meeting?
15   A.   Yes, I did.
16   Q.   Did you see any version of the map -- of
17   a map before you went to this meeting in
18   Springfield?
19   A.   No, I did not.
20   Q.   Did you learn any particulars about the
21   purported bipartisan map other than what you've
22   identified, which is ten Democratic districts and
23   eight Republican districts?
24   A.   On the way down to Springfield that day I
```

```
                                    19
 1   really don't remember if I called or if she called
 2   me, Nancy Kimmy -- Nancy Kimmy is a close associate
 3   of Judy Barr Topinka.  She had called me numerous
 4   times during the redistricting process to ask me
 5   what I knew about it and I kept telling her I knew
 6   almost nothing.
 7        She used to call me on a regular basis.
 8   Now I may have called her that morning or she may
 9   have called me.  One way or another I told her that
10   I was on my way down to Springfield.  Costello had
11   asked me to accompany him to try to persuade
12   President Cullerton and Speaker Madigan on accepting
13   this bipartisan map he had worked out.
14        I said to her that I would feel better
15   about it if I knew for sure that the Republicans
16   were on board for this map.  She asked me if I would
17   take a call from Congressman Shimkus and I said yes,
18   I would.
19   Q.   Did you end up having a discussion with
20   Congressman Shimkus on your way down to Springfield?
21   A.   Yes.  Congressman Shimkus called me and I
22   told him I was on my way down to Springfield to try
23   to help Congressman Costello persuade the president
24   and the speaker to accept this map.
```

```
                                    20
 1        I said I was told that it is 10 Democrats
 2   and eight Republicans.  "John, is that correct?"  He
 3   says, "Yes, that is correct."
 4   Q.   Did you and Congressman Shimkus talk
 5   about anything else in that telephone call?
 6   A.   We talked about the redistricting process
 7   and that he was onboard for it.  I probably said to
 8   him too, or he may have said to me, that Judy
 9   Biggert was negotiating also with Costello for the
10   Republicans.
11        I probably asked him about where was Judy
12   on it, Biggert.  He said she supported it also ten
13   to eight, the ten to eight map.
14        She actually called me when I got to
15   Springfield, but unfortunately at the time I was
16   having some health problems and I said, "I can't
17   really talk to you right now, Judy, but I'll try to
18   get back to you later on."  I never did get back to
19   her.
20   Q.   We started this part of the discussion by
21   me asking you whether or not you learned prior to
22   the meeting any other specific details about the
23   composition of the map and I think you testified
24   that your understanding was it was going to be 10
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM LIPINSKI                                                  November 1, 2011

**Page 21**

```
 1   Democrats, eight Republicans. Did you find out any
 2   other details about the supposed map before you got
 3   into the meeting itself?
 4      A.   What kind of details?
 5      Q.   So, for example, did you find out any
 6   information about what geography -- what the
 7   boundaries of Congressional District 3, your son's
 8   district, were going to be?
 9      A.   My son's district?
10      Q.   Yeah.
11      A.   No.
12      Q.   Did you find out the boundaries of any
13   other district within the map prior to that
14   Springfield meeting?
15      A.   I believe in the conversation with
16   Shimkus he mentioned to me that the 10/8 map that
17   the Republicans were agreeing on at that particular
18   time had only one Hispanic district.
19      Q.   Are you certain that Congressman Shimkus
20   told you that he was agreeing to -- that the
21   Republicans were agreeing to the map that
22   Congressman Costello was taking to Springfield?
23           MR. BRUCE: Objection to form.
24           MR. SHANNON: Join.
```

**Page 22**

```
 1           You can answer, Congressman.
 2   BY THE WITNESS:
 3      A.   He told me that he had agreed to a 10
 4   Democrats, eight Republicans with Congressman
 5   Costello.
 6           I can't tell you because I didn't see any
 7   maps that the 10/8 split Shimkus was agreeing to was
 8   the same one that Costello was working on.
 9           I didn't see either one of their maps,
10   but I assume when they both come up with 10/8 that
11   they are probably talking about the same maps.
12   BY MS. LIGHTFOOT:
13      Q.   For example, did Congressman Shimkus tell
14   you either in that phone call when you were on your
15   way down to Springfield or at any other time that
16   the Republicans had not agreed on any specific map?
17      A.   Did John Shimkus tell me that?
18      Q.   Yes.
19      A.   No. Every indication I had was that they
20   had agreed on this ten to eight map.
21      Q.   I believe you said that you never did end
22   up having a conversation with Congresswoman Biggert
23   regarding the map?
24      A.   No, I didn't.
```

**Page 23**

```
 1      Q.   Let's talk about the meeting itself then.
 2   What was discussed in that meeting?
 3      A.   Congressman Costello made a presentation
 4   of having a bipartisan map, ten Democrats, eight
 5   Republicans that he believed the Republicans were
 6   supporting that could probably pass the legislature.
 7           Once again, President Cullerton said he
 8   would be happy to take a look at that map but they
 9   were pretty far along in the process of developing
10   their own map and that he would listen to what Jerry
11   had to say but -- he was being polite and he was
12   telling us that they were drawing the map themselves
13   out of respect to a former member and a member; they
14   were going to listen to the argument that was being
15   presented, but it really wasn't going anyplace.
16           I myself, I mentioned to you I was having
17   some health problems at the time, and at the meeting
18   I, unfortunately, really added nothing to the
19   attempt to persuade the legislature.
20      Q.   What, if anything, did Speaker Madigan
21   say in the meeting?
22           MR. BRUCE: Objection. Irrelevance. Hearsay.
23           MR. SHANNON: You can answer, Congressman.
24
```

**Page 24**

```
 1   BY THE WITNESS:
 2      A.   I think the only concrete thing he said
 3   was that we seem to be pretty far along in
 4   developing a map with our hearings and so forth.
 5           We'll certainly think about what you're
 6   talking about, Congressman. That was about it.
 7           For as long as the two meetings took,
 8   there was very little time, in reality, spent on
 9   this redistricting process.
10   BY MS. LIGHTFOOT:
11      Q.   That was going to be my next question.
12   How long did the discussion regarding congressional
13   redistricting last in that Springfield meeting?
14      A.   It's a very difficult question for me to
15   answer. I'll say between 20 minutes and 30 minutes.
16      Q.   You said I think that Congressman
17   Costello made a presentation of some sort. Was that
18   just an oral presentation or did he actually present
19   any kind of a map?
20      A.   I don't believe Jerry had any kind of map
21   whatsoever.
22      Q.   Do you remember seeing any kind of map in
23   that meeting?
24      A.   There were maps that President Cullerton
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

**Page 25**

1  had but they were simply -- they had no boundaries
2  on them. It was simply we can create a democratic
3  district here and we can create one over here and we
4  can create one over there. That's all there was.
5      There weren't any boundaries to any of
6  these districts at that particular time. There may
7  have been some maps that existed that had the actual
8  districts on it, but they were not presented at that
9  meeting.
10     Q.  After that meeting did you have any other
11 contact with Congressman Shimkus?
12     A.  Yes. On the way back to Chicago,
13 Congressman Shimkus called me and asked me how the
14 meeting went, and I told him that Congressman
15 Costello made a presentation for a bipartisan map,
16 but I didn't think that the legislature was going to
17 accept the map that he and Shimkus and Biggert had
18 worked out or were working out. It didn't look that
19 optimistic to me.
20     Q.  What, if anything, did Congressman
21 Shimkus say in response?
22     A.  He talked about the possibility of doing
23 an 11 Democrats, seven Republicans. I says, "John,
24 if you want to do that, you call Costello and talk

**Page 26**

1  to Costello about it. I'm not going to any more
2  meetings in regards to the situation."
3      Q.  Did you have any subsequent conversation
4  with Congressman Shimkus about congressional
5  redistricting after that phone call on the way back?
6      A.  No. I haven't talked to John since.
7  Congresswoman Biggert never did call me back. Nor
8  did I call her back.
9      Q.  What about Congressman Costello? Did you
10 have any discussions with him after that Springfield
11 meeting regarding congressional redistricting?
12     A.  I think -- we did have a conversation
13 about it. He asked me what I thought and I said, "I
14 don't think you're going to get your bipartisan map,
15 Jerry." I kidded him. I said, "You're just not as
16 good a negotiator as I was ten years ago." Hastert
17 and I bursted out. I says, "Let's talk about
18 something else," and we went on to something else.
19     The whole process was difficult for me
20 because I didn't think from the beginning I should
21 really be involved in it.
22     Q.  Did you have any contact with any other
23 republican member of Congress at any point in this
24 year, in 2011, about congressional redistricting?

**Page 27**

1      A.  No. I think -- Speaker Hastert and I are
2  friends. I think some time after that second
3  meeting he called me to inquire about what I might
4  know and I said to him at the time, I says, "I'm
5  trying to stay out of it. Why don't you call
6  Costello and talk to him about it." And that was
7  about it. Other than that conversation, no.
8      Q.  Other than what you've described as the
9  two meetings regarding -- that involved Senate
10 President Cullerton and Speaker Madigan, did you
11 have any other conversations with any current member
12 of the Illinois General Assembly regarding
13 congressional redistricting in 2011?
14     A.  No.
15     Q.  Did you have any discussions at all in
16 2011 with any staff person acting on behalf of
17 President Cullerton?
18     A.  No.
19     Q.  Did you have any conversations with any
20 staff member in 2011 acting on behalf of Speaker
21 Madigan concerning congressional redistricting?
22     A.  I may have spoken to Tim Mapes about it
23 in a -- there was another conversation that I had
24 with him.

**Page 28**

1      Actually, that may have been after the
2  map was out and everything. It may not have been
3  before.
4      My wife and I went to Springfield to tour
5  the Abraham Lincoln library and then we went to
6  dinner, and Tim Mapes stopped over to see us for a
7  while and we may have discussed it, but I'm pretty
8  sure that was after everything was over with.
9      Q.  Let me ask you a couple additional
10 questions.
11     Why don't I just mark this so we have a
12 frame of reference.
13         (WHEREUPON, a certain document was
14         marked Lipinski Deposition Exhibit
15         No. 1, for identification, as of
16         11-01-2011.)
17 BY MS. LIGHTFOOT:
18     Q.  Sir, you've just been handed what's been
19 marked as Lipinski Exhibit No. 1. I will represent
20 to you that this is a copy of the -- what I'll call
21 the northern Illinois, so Chicago Cook County and
22 suburban Cook County congressional districts as
23 adopted into law this year.
24     With this map as a frame of reference,


ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM LIPINSKI                                          November 1, 2011

                                   29
1  did you have any involvement in the drafting of any
2  of the congressional districts that are reflected in
3  Lipinski Exhibit No. 1?
4      A.  No, I did not.
5      Q.  Do you know, sir, who was involved in
6  drafting any of the congressional districts that are
7  reflected in Lipinski Exhibit No. 1?
8      A.  I assume it was the House and the Senate.
9      Q.  Do you have any specific firsthand
10 knowledge as to who drew any of these particular
11 districts, sir?
12     A.  No.  I would assume --
13     MR. SHANNON:  Congressman, if you have any
14 specific knowledge.
15     THE WITNESS:  No, I don't.  No.
16 BY MS. LIGHTFOOT:
17     Q.  For example -- let me just show you.
18        Mark this.
19        (WHEREUPON, a certain document was
20        marked Lipinski Deposition Exhibit
21        No. 2, for identification, as of
22        11-01-2011.)
23 BY MS. LIGHTFOOT:
24     Q.  You've just been handed what's been

                                   30
1  marked as Lipinski Exhibit No. 2.  This is the
2  outlines of Congressional District 3.
3        Following on the questions that we
4  were -- I was just asking you, do you have any
5  specific knowledge as to why any of these particular
6  boundary lines of Congressional District 3 were
7  drawn for any particular reason?
8      MR. SHANNON:  Objection.  Asked and answered.
9         You can answer.
10     MR. BRUCE:  Join.
11     THE WITNESS:  I can answer?
12     MR. SHANNON:  You can answer, yes.
13     THE WITNESS:  Would you repeat the question?
14 BY MS. LIGHTFOOT:
15     Q.  Sure.
16        With respect to Congressional District 3,
17 and I assume the answer based on your prior
18 testimony, but I want to be absolutely certain, do
19 you have any particular knowledge why a particular
20 line was drawn in any way with respect to the shape
21 of Congressional District 3?
22     MR. BRUCE:  Objection.  Foundation.  Asked and
23 answered.
24     MR. SHANNON:  Join.

                                   31
1         You can answer.
2  BY THE WITNESS:
3      A.  No, I don't.
4  BY MS. LIGHTFOOT:
5      Q.  Are you aware that Congressional
6  District 4 is the district in which Congressman
7  Gutierrez resides?
8      A.  I assume that was Congressman Gutierrez's
9  District 4 when I looked at the map here.
10     Q.  Very similar to probably the shape of the
11 district when you were a member of Congress,
12 correct?
13     A.  Uh-huh.
14     Q.  Do you have any knowledge about how and
15 why the shape and the lines of Congressional
16 District 4 came to be?
17     MR. SHANNON:  Objection.  Asked and answered.
18        You can answer.
19     MR. BRUCE:  Objection.  Foundation.
20 BY THE WITNESS:
21     A.  How it came to be --
22 BY MS. LIGHTFOOT:
23     Q.  In this particular iteration of -- not
24 20 years ago --

                                   32
1      A.  I know nothing about how this came to be
2  at this particular time.
3      Q.  Do you have any specific knowledge,
4  sir -- I may have asked you this before, and if I
5  did, your counsel will object properly.
6         Do you have any knowledge -- I did ask
7  you this, who drew the map.  Never mind.  I'll
8  withdraw the question.
9         Did you have any contact with anyone from
10 the DCCC regarding the drafting of any district in
11 the congressional reapportionment plan for this
12 year?
13     A.  No.
14     Q.  Are you familiar with an entity known as
15 NCEC Services, Inc.?
16     A.  I had no contact with them whatsoever.
17 That entity I don't even know what it is, to be
18 perfectly frank with you.  I've heard Congressman
19 Costello make mention of it.  I heard my son make
20 mention of it, but I really don't know what they
21 are.
22     Q.  Just so the record is clear, you
23 personally have never had any contact with anybody
24 associated with NCEC Services, Inc.?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

```
                                         33
 1    A.  No.
 2         MS. LIGHTFOOT: Let's go off the record for a
 3    moment.
 4         THE VIDEOGRAPHER: Going off the video record
 5    at 11:32 a.m.
 6              (WHEREUPON, a recess was had.)
 7         THE VIDEOGRAPHER: Back on the video record at
 8    11:32 a.m.
 9    BY MS. LIGHTFOOT:
10    Q.  Congressman, just a couple more
11    questions.
12         I take it then, based upon your testimony
13    right before we took the short break, that you don't
14    know anything about the intent of the individual or
15    individuals who drafted any portion of the 2011
16    congressional reapportionment plan for Illinois,
17    correct?
18         MR. SHANNON: Objection. Form.
19         You can answer.
20    BY THE WITNESS:
21    A.  No, I really don't -- give me the
22    question again.
23    BY MS. LIGHTFOOT:
24    Q.  You've testified that you don't know who
```

```
                                         34
 1    drafted the plan?
 2    A.  That's correct.
 3    Q.  You've testified particularly with
 4    respect to Congressional Districts CD 3 and CD 4
 5    that you don't know anything about why lines were
 6    drawn in any particular way?
 7    A.  Correct.
 8    Q.  I take it then, sir, that you have no
 9    knowledge about the intent of the drafters of the
10    map with respect to any of the congressional
11    districts in the reapportionment plan?
12    A.  That's correct.
13         MS. LIGHTFOOT: I have no further questions.
14              EXAMINATION
15    BY MR. BRUCE:
16    Q.  Congressman, I just have a couple
17    follow-up questions.
18         First of all, Congressman Shimkus did
19    tell you that he agreed to a map with one Latino
20    district?
21    A.  That is correct.
22         MS. LIGHTFOOT: Object to the form.
23    BY MR. BRUCE:
24    Q.  You don't have any doubt about that in
```

```
                                         35
 1    your mind?
 2         MS. LIGHTFOOT: Object to the form.
 3         THE REPORTER: I'm sorry?
 4         MS. LIGHTFOOT: Object to the form.
 5         THE REPORTER: And what was your answer?
 6         MS. LIGHTFOOT: "None whatsoever."
 7    BY THE WITNESS:
 8    A.  I have no doubt that what I said was
 9    correct.
10    BY MR. BRUCE:
11    Q.  That's what Congressman Shimkus told you?
12         MS. LIGHTFOOT: Same objection.
13    BY MR. BRUCE:
14    Q.  Now with respect to --
15         THE REPORTER: What was your answer?
16         MR. SHANNON: She may be objecting a little bit
17    more than we have in the past, so if you could give
18    her one second.
19         THE WITNESS: Absolutely. I'm sorry.
20         THE REPORTER: What was your answer?
21         "That's what Congressman Shimkus told
22    you?"
23    BY THE WITNESS:
24    A.  Yes, that is correct, that's what
```

```
                                         36
 1    Congressman Shimkus told me.
 2    BY MR. BRUCE:
 3    Q.  Congressman, was it your understanding,
 4    based upon your discussions with Congressman Shimkus
 5    and others, that he was representing the other
 6    republican members of the congressional delegation
 7    in his efforts to engage in the redistricting
 8    process?
 9         MS. LIGHTFOOT: Object to the form.
10    Foundation.
11    BY THE WITNESS:
12    A.  Yes.
13    BY MR. BRUCE:
14    Q.  Did he also tell you that they had
15    agreed -- "they," meaning the other republican
16    congressional congressman that he was working on
17    behalf of -- that they also agreed to a
18    congressional map with one Latino district?
19         MS. LIGHTFOOT: Object to the form.
20    Foundation.
21    BY THE WITNESS:
22    A.  He told me that they had agreed to the
23    10/8 and that he told me there was only one Hispanic
24    district.
```



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM LIPINSKI					November 1, 2011

37

1 From that I would assume that the other
2 Republicans knew that also, but none of the other
3 Republicans ever told me that directly.
4 BY MR. BRUCE:
5   Q.   I understand. You understood in your
6 discussions with him he was speaking on their
7 behalf?
8   A.   Correct.
9   MS. LIGHTFOOT: Object to the form.
10 Foundation.
11 BY MR. BRUCE:
12   Q.   Congressman, let me switch topics and
13 talk about a different area.
14     As I understand it from your background,
15 you have been an active member of Illinois
16 government for at least four decades?
17   A.   Well, I was an alderman for eight years
18 and I was in the U.S. Congress for 22 years. So
19 that's 30 years. Illinois government, I've never
20 served in Springfield.
21   Q.   You're familiar, as I understand it,
22 based on your testimony today, with legislators in
23 Illinois; is that correct?
24   A.   Yes, I am.

38

1   Q.   You're familiar with legislative
2 leadership and who they are?
3   A.   I certainly am.
4   Q.   I'd like to turn now to the members of
5 the Latino delegation in the Illinois Senate and the
6 Illinois House. I take it you're familiar with
7 them?
8   A.   I'm familiar with most House members.
9   Q.   With respect to the House members in the
10 Illinois House, are you familiar with Representative
11 Acevedo, A-c-e-v-e-d-o?
12   MS. LIGHTFOOT: I'm going to object to this
13 whole line of questions on relevance grounds.
14 BY MR. BRUCE:
15   Q.   You can answer the question.
16   A.   Yes, I am.
17   Q.   Is Representative Acevedo a Latino?
18   A.   Yes, he is.
19   Q.   Are you familiar with Representative
20 Arroyo, A-r-r-o-y-o?
21   A.   Yes, I am.
22   Q.   Is Representative Arroyo a Latino?
23   A.   Yes, he was.
24   Q.   Are you familiar with Representative

39

1 Berrios?
2   A.   I know of Representative Berrios. I
3 don't believe I've ever met her.
4   Q.   Do you understand that she's Joe Berrios'
5 daughter?
6   A.   Yes, I do.
7   Q.   You know Joe?
8   A.   Yes, I do.
9   Q.   You understand that Representative
10 Berrios is a Latino?
11   A.   Yes, I do.
12   Q.   With respect to Representative Chapa
13 LaVia, are you familiar with that representative?
14   MS. LIGHTFOOT: You probably want to spell that
15 for the record.
16   MR. BRUCE: C-h-a-p-a L-a-V-i-a.
17 BY THE WITNESS:
18   A.   She's from Aurora, correct?
19     Yes, I met her a couple of times at the
20 airport, actually.
21 BY MR. BRUCE:
22   Q.   Do you understand that Representative
23 Chapa LaVia is a Latino?
24   A.   Yes, I do.

40

1   Q.   With respect to Representative Crespo,
2 C-r-e-s-p-o, is Representative Crespo a Latino?
3   A.   I've never met that representative. I
4 don't know.
5   Q.   What about Representative Hernandez?
6   A.   Yes.
7   Q.   Is Representative Hernandez a Latino?
8   A.   Yes.
9   Q.   Is Representative Soto -- are you
10 familiar with Representative Soto?
11   A.   I know who she is.
12   Q.   Is she a Latino?
13   A.   Yes, she is.
14   Q.   Similarly, on the Senate side are you
15 familiar with Senator Delgado?
16   A.   I know who Senator Delgado is, yes.
17   Q.   Is Senator Delgado, to your
18 understanding, a Latino?
19   A.   Yes.
20   Q.   With respect to Senator Munoz, is Senator
21 Munoz a Latino, to your knowledge?
22   A.   To my knowledge he is.
23   Q.   With respect to Senator Sandoval, is
24 Senator Sandoval a Latino?



ESQUIRE
an Alexander Gallo Company

Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM LIPINSKI                                  November 1, 2011

Page 41

1  A.  Yes.
2  Q.  Lastly, Senator Martinez, do you know
3  Senator Martinez?
4  A.  No, I do not.
5  Q.  Do you know if Senator Martinez is a
6  Latino or not?
7      MS. LIGHTFOOT:  Object to form and foundation.
8  You're clearly calling for the witness to speculate
9  since he doesn't know.
10     MR. SHANNON:  If you know.
11 BY THE WITNESS:
12 A.  I don't know.
13 BY MR. BRUCE:
14 Q.  Congressman, was it your understanding
15 that the Latino delegation both in the Illinois
16 House and the Illinois Senate supported the map, the
17 congressional map that was ultimately passed into
18 law?
19     MS. LIGHTFOOT:  Object to the form.
20 Foundation.
21     MR. SHANNON:  You can answer.
22 BY THE WITNESS:
23 A.  Yes.
24

Page 42

1  BY MR. BRUCE:
2  Q.  How do you know that, Congressman?
3  A.  I read the results in the newspaper.
4  Q.  You read the roll call results and what
5  was reported in the newspaper; is that correct?
6  A.  That is correct.
7  Q.  You noted that the Latino caucuses in
8  each of the chambers did vote in favor of the
9  congressional map that we're here to talk about here
10 today?
11     MS. LIGHTFOOT:  Object to the form.
12 Foundation.  Leading.
13 BY MR. BRUCE:
14 Q.  Is that correct?
15 A.  Yes, that is correct.
16     MR. BRUCE:  That's all the questions I have.
17 Thank you, Congressman.
18     MS. LIGHTFOOT:  Thank you, Congressman, for
19 your time.
20     MR. SHANNON:  Give me one second.
21     THE VIDEOGRAPHER:  Going off the video record
22 at 11:40 a.m.
23
24

Page 43

1      (WHEREUPON, a recess was had.)
2      THE VIDEOGRAPHER:  Going back on the record at
3  11:42 a.m.
4  BY MR. BRUCE:
5  Q.  Congressman, I have one last line of
6  questions.  With respect to the conversation that
7  you had with Congressman Shimkus, did he tell you
8  which republican congressmen would be left without a
9  Congressional district in the proposals that he was
10 speaking to you about?
11     MS. LIGHTFOOT:  Object to the form.
12 Foundation.
13     MR. SHANNON:  You can answer.
14 BY THE WITNESS:
15 A.  Yes, he did.
16 BY MR. BRUCE:
17 Q.  Which congressmen, republican
18 congressmen, did he indicate would not be left with
19 a seat?
20 A.  Johnson, Walsh and Manzullo.
21     MR. BRUCE:  That's all the questions I have.
22 Thank you.
23     MS. LIGHTFOOT:  Let me just ask a follow up to
24 that.

Page 44

1      FURTHER EXAMINATION
2  BY MS. LIGHTFOOT:
3  Q.  Your testimony is that Congressman
4  Shimkus told you that three republican members would
5  be giving up their seats by virtue of a bipartisan
6  map; is that correct?
7  A.  That is correct.
8  Q.  That was Johnson, Walsh and who else?
9  A.  Johnson, Walsh and Manzullo.
10     I asked him who it would be.  He didn't
11 volunteer that information.  I said, "Who is going
12 to lose out on this, John?"  And he mentioned those
13 three names.
14     MS. LIGHTFOOT:  That's all the questions I
15 have.
16     MR. SHANNON:  Okay.  We'll reserve.
17     THE VIDEOGRAPHER:  That will conclude today's
18 deposition of William Lipinski on November 1, 2011.
19 We're going off the video record at 11:44 a.m.
20     FURTHER DEPONENT SAITH NOT.
21
22
23
24



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

```
                                         45                                              47
 1   STATE OF ILLINOIS    )                    1              EXAMINATION
 2                   ) SS:                     2                         Page Line
 3   COUNTY OF DUPAGE     )                    3   WILLIAM LIPINSKI
 4        I, KAREN PILEGGI, a Notary Public    4   Examination by Ms. Lightfoot    5   9
 5   within and for the County of DuPage, State of  5  Examination by Mr. Bruce    34  14
 6   Illinois, and a Certified Shorthand Reporter of said  6  Further Examination by Ms. Lightfoot  44  1
 7   state, do hereby certify:                 7
 8        That previous to the commencement of 8
 9   the examination of the witness, the witness was duly  9            E X H I B I T S
10   sworn to testify the whole truth concerning the  10  Lipinski Deposition Exhibit      Page Line
11   matters herein;                          11   No. 1................................ 28  15
12        That the foregoing deposition       12   No. 2................................ 29  21
13   transcript was reported stenographically by me, was  13
14   thereafter reduced to typewriting under my personal  14
15   direction, and constitutes a true record of the  15
16   testimony given and the proceedings had;  16
17        That the said deposition was taken  17
18   before me at the time and place specified;  18
19        That I am not a relative or employee  19
20   or attorney or counsel, nor a relative or employee  20
21   of such attorney or counsel for any of the parties  21
22   hereto, nor interested directly or indirectly in the  22
23   outcome of this action.                   23
24        IN WITNESS WHEREOF, I do hereunto    24

                                         46                                              48
 1   set my hand and affix my seal of office at Chicago,  1         DEPOSITION ERRATA SHEET
 2   Illinois, this 8th day of November, A.D. 2011.  2
 3                                             3   Our Assignment No. 286625
 4        Notary Public,                       4   Committee for Balanced Map v ISBOE
 5        DuPage County, Illinois.             5
 6        My commission expires 11/05/11.      6      DECLARATION UNDER PENALTY OF PERJURY
 7                                             7
 8   CSR Certificate No. 84-3404               8      I declare under penalty of perjury that I
 9                                             9   have read the entire transcript of my Deposition
10                                            10   taken in the captioned matter or the same has been
11                                            11   read to me, and the same is true and accurate, save
12                                            12   and except for changes and/or corrections, if any,
13                                            13   as indicated by me on the DEPOSITION ERRATA SHEET
14                                            14   hereof, with the understanding that I offer these
15                                            15   changes as if still under oath.
16                                            16
17                                            17           Signed on the _____ day of
18                                            18           _____, 20___.
19                                            19           _____
20                                            20           WILLIAM LIPINSKI
21                                            21
22                                            22
23                                            23
24                                            24
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com

WILLIAM LIPINSKI            November 1, 2011

```
                                                             49
 1           DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23     SIGNATURE:_____DATE:_____
24           WILLIAM LIPINSKI
```

```
                                                             50
 1           DEPOSITION ERRATA SHEET
 2     Page No._____Line No._____Change to:_____
 3     _____
 4     Reason for change:_____
 5     Page No._____Line No._____Change to:_____
 6     _____
 7     Reason for change:_____
 8     Page No._____Line No._____Change to:_____
 9     _____
10     Reason for change:_____
11     Page No._____Line No._____Change to:_____
12     _____
13     Reason for change:_____
14     Page No._____Line No._____Change to:_____
15     _____
16     Reason for change:_____
17     Page No._____Line No._____Change to:_____
18     _____
19     Reason for change:_____
20     Page No._____Line No._____Change to:_____
21     _____
22     Reason for change:_____
23     SIGNATURE:_____DATE:_____
24           WILLIAM LIPINSKI
```



Toll Free: 800.708.8087
Facsimile: 312.704.4950

Suite 1200
311 West Monroe Street
Chicago, IL 60606
www.esquiresolutions.com