IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, JUDY BIGGERT, ROBERT J. DOLD, RANDY HULTGREN, ADAM KINZINGER, DONALD MANZULLO, PETER J. ROSKAM, BOBBY SCHILLING, AARON SCHOCK, JOHN M. SHIMKUS, JOE WALSH, RALPH RANGEL, LOU SANDOVAL, LUIS SANABRIA, MICHELLE CABALLERO, EDMUND BREZINSKI, and LAURA WAXWEILER, <br><br>      Plaintiffs, <br>v. <br><br>ILLINOIS STATE BOARD OF ELECTIONS, WILLIAM M. MCGUFFAGE, JESSE R. SMART, BRYAN A. SCHNEIDER, BETTY J. COFFRIN, HAROLD D. BYERS, JUDITH C. RICE, CHARLES W. SCHOLZ, and ERNEST L. GOWEN, <br><br>      Defendants. | Case No. 1:11-cv-05065 <br><br>Hon. John D. Tinder <br>Hon. Joan H. Lefkow <br>Hon. Robert L. Miller, Jr. <br>(3-judge court convened pursuant to 28 U.S.C. § 2284) |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO DEFENDANTS' MOTION TO DISMISS COUNTS V AND VI OF PLAINTIFFS' AMENDED COMPLAINT**

Tyrone C. Fahner
John A. Janicik
Lori E. Lightfoot
Joshua D. Yount
Dana S. Douglas
Thomas V. Panoff
Mitchell D. Holzrichter
MAYER BROWN LLP
71 South Wacker Drive
Chicago, Illinois 60606
(312) 782-0600
(312) 701-7711 – fax

*Attorneys for Plaintiffs*

# INTRODUCTION

Defendants are obviously desperate to avoid any judicial review of the overwhelming evidence that the redistricting plan challenged in this suit (the "Adopted Plan") had the invidious, illegitimate, and acknowledged purpose and effect of radically diminishing the voting power of Republicans in large swaths of the State. *See* Doc. 105 at 30-37. Why else would Defendants rest their new motion to dismiss Plaintiffs' partisan gerrymander claims—Counts V and VI of the amended complaint (Doc. 103 at ¶¶ 129-44)—on blatant mischaracterizations of (a) Supreme Court precedent, (b) Plaintiffs' proposed standard for adjudicating such claims, and (c) this Court's ruling on the prior motion to dismiss? Clearing away all of those mischaracterizations leaves no basis for dismissing Plaintiffs' partisan gerrymander claims.

Indeed, Plaintiffs have fully cured the deficiencies that this Court perceived in dismissing Counts V and VI as originally pleaded. *See* Doc. 98 at 16-22. The amended complaint proposes a workable and reliable standard for adjudicating partisan gerrymander claims. Doc. 103 at ¶¶ 132-34, 140-42. And it supplies additional facts that plausibly allege how the Adopted Plan burdens and penalizes the partisan gerrymander plaintiffs' exercise of First Amendment freedoms. *Id.* at ¶ 135. The motion to dismiss thus should be denied, particularly given that discovery is already over, a bench trial is set to commence in two days, and hearing the partisan gerrymander evidence will help the Court evaluate the partisan gerrymander claims and the standard for judging them.

# ARGUMENT

**I.   There Are No Grounds For Dismissing Count VI.**

Defendants make two arguments for dismissing Count VI of the amended complaint, which alleges that the partisan gerrymandering of the Adopted Plan violates the Equal Protection Clause of the Fourteenth Amendment. They contend that the Supreme Court has supposedly

1

rejected the standard that Plaintiffs propose for adjudicating partisan gerrymander claims. And they maintain that the standard is unworkable.

Plaintiffs' proposed standard has an intent requirement and an effect requirement. Doc. 103 at ¶¶ 132, 140. The intent requirement demands direct or circumstantial proof that the State's mapmakers created one or more congressional districts with the predominant intent to secure partisan advantage. *Id.* at ¶¶ 133, 141. The effect requirement demands a showing of three things: (1) that the Adopted Plan increases the number of districts that favor Democrats by at least 10 percentage points according to an accepted measure of partisan voting; (2) that the Adopted Plan keeps at least 10 percentage points more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents; and (3) that at least one of the districts created with the intent to advantage Democrats is among the districts that contributes to the proof of elements 1 and 2. *Id.* at ¶¶ 134, 142. Neither of the arguments that Defendants make against this standard warrants dismissal of Count VI.

### A. The Supreme Court Has Not Rejected Plaintiffs' Proposed Standard.

Defendants badly mischaracterize the relevant Supreme Court precedents in arguing that those precedents foreclose Plaintiffs' proposed standard. Defendants first say (at 3-4) that *Vieth v. Jubelirer*, 541 U.S. 267 (2004), "expressly rejected" any two-pronged intent/effect standard. But none of the opinions in *Vieth* make any such statement. And that is not surprising, given that the two-pronged intent/effect standard is the long- and well-established general standard for adjudicating all Equal Protection challenges to facially neutral laws. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 264-65 (1977). Indeed, Justice Kennedy's controlling concurrence in *Vieth* expressly affirms that "there is no doubt" that the general "Fourteenth Amendment standard governs." 541 U.S. at 313-14. In support of their absurd claim to the contrary, Defendants rely only on the *Vieth* plurality's rejection of the *subsidiary*

2

effect requirement that Justice White proposed in *Bandemer v. Davis*, 478 U.S. 109, 132-33 (1986). That part of *Vieth* neither discards all intent/effect standards nor forecloses the very different intent and effect requirements that Plaintiffs propose here. *See Vieth*, 541 U.S. at 281-84.

Defendants further assert (at 5) that *Vieth* deemed partisan gerrymandering a "lawful and common practice" that may not be impeded. For that notion, however, they rely on an out-of-context passage from the *Vieth* plurality opinion. *See Vieth*, 541 U.S. at 286. Reading that entire opinion reveals that the plurality actually acknowledged that "segregating voters by political affiliation" is "unlawful" if it is "excessive." *Id.* at 293. In any event—as Defendants themselves persuaded this Court to rule (*see* Doc. 98 at 17; Doc. 78 at 10 n.5)—Justice Kennedy's concurring opinion, not the plurality opinion, is the controlling statement of *Vieth*'s holdings. And Justice Kennedy's opinion is crystal clear that some partisan gerrymandering violates the Constitution. *Vieth*, 541 U.S. at 311-12, 316-17 ("we would surely conclude that the Constitution had been violated" if a State declared that apportionments must burden one party's representational rights, so the Court should not foreclose a similar result as to an "apportionment's *de facto* incorporation of partisan classifications").

Defendants also maintain (at 4-5) that *Vieth* rejected the "predominant intent" requirement that Plaintiffs propose. But Defendants again mistakenly invoke the analysis of the *Vieth* plurality opinion. *See Vieth*, 541 U.S. at 284-86.[1] Justice Kennedy's controlling opinion

---

[1] Plus, that analysis is incorrect. In explaining why they believed the "predominant intent" requirement of racial gerrymander claims could not be borrowed for partisan gerrymander claims, the plurality suggested that applying the requirement to racial gerrymanders would be easier because race cannot be used to draw districts while political affiliation can. *Vieth*, 541 U.S. at 285-86. But race can sometimes be used to draw districts—such as when the Voting Rights Act so requires or when race is not the predominant factor and there is no intentional vote dilution. *See Easley v. Cromartie*, 532 U.S. 234, 257-58 (2001); *King v. State Bd. of Elections*,

3

does not criticize the "predominant intent" test. *See id.* at 306-17. Justice Kennedy faulted the standard offered by the *Vieth* plaintiffs only because it provided no way to suitably "measure the burden appellants claim has been imposed"—that is, the effect—"on their representational rights." *Id.* at 313; *see also League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 418 (2006) ("*LULAC*") (Kennedy, J.) (Court rejected test proposed in *Vieth* because it could not "show a burden, as measured by a reliable standard, in the complainants' representational rights"). Nothing in *Vieth* or any other Supreme Court decision precludes use of a "predominant intent" requirement that mirrors the "predominant intent" requirement for racial gerrymander claims. *See Miller v. Johnson*, 515 U.S. 900, 916 (1995) (describing "predominant intent" standard for racial gerrymander claims).[2]

Finally, Defendants contend (at 8) that *Vieth* criticized the use of "statewide partisanship indexes" as part of any partisan gerrymander standard. That contention is just plain wrong. First, Defendants yet again incorrectly rely on the *Vieth* plurality opinion, instead of Justice Kennedy's controlling opinion. *See Vieth*, 541 U.S. at 288-90. Second, the *Vieth* plurality criticized only a particular proposal—by Defendants' expert in this case, Allan Lichtman—to use the separate "normalized" results of 18 different statewide races tallied in some unexplained way and merged into a general "totality of the circumstances" analysis. *See* Appellant's Reply Brief, *Vieth*, 541 U.S. 267 (No. 02-1580), 2003 WL 22811823, at *9-*12. That open-ended analysis—

---

979 F. Supp. 619, 621-27 (N.D. Ill. 1997), *aff'd*, 522 U.S. 1087 (1998). And the plurality themselves recognized that some uses of political affiliation in districting are unconstitutional. *Vieth*, 541 U.S. at 293.

[2] Plaintiffs also try (at 4-5) to make something out of the fact that, in *LULAC*, Justice Kennedy criticized a "sole motivation" requirement for proving a partisan gerrymander. But Plaintiffs do not propose such a requirement. And Justice Kennedy criticized that requirement because it was too demanding as an intent test (given that other considerations always influence district lines) and because it was not coupled with any reliable test of the burden on the plaintiffs (*i.e.*, an effect requirement). *LULAC*, 548 U.S. at 417-19 (Kennedy, J.).

4

which does not use an index—has nothing in common with the easily applied, district-specific, and completely objective effect requirement that Plaintiffs propose.

### B. Plaintiffs' Proposed Standard Is Workable And Reliable.

There is no merit whatsoever to Defendants' claim that Plaintiffs' proposed standard for judging partisan gerrymander claims is "unworkable" and "unmanageable." Defendants first pretend (at 6-8) that they do not understand how the proposed effect requirement works. But the elements of that requirement are detailed and calculated in the amended complaint, as well as the motion for permanent injunction filed at the same time. Doc. 103 at ¶¶ 75, 95, 132-34, 140-42 (amended complaint); Doc. 105 at 35-37 (injunction motion). Defendants cannot really be in the dark about how the effect requirement works. To avoid any further controversy over the matter, however, we are happy to answer Defendants' supposed questions.

The first element of the effect requirement demands that the Adopted Plan increase the number of districts that favor Democrats by at least 10 percentage points according to an accepted measure of partisan voting. Doc. 103 at ¶¶ 134, 142. That means Plaintiffs must first identify a measure of partisan voting that is accepted by those in the business of measuring partisan voting. Plaintiffs have done that by identifying the widely referenced and widely used Partisan Voting Index ("PVI") developed by the Cook Political Report. Doc. 103 at ¶¶ 75, 134, 142; *see also* Doc. 105 at 36.[3] Plaintiffs must then show that the percentage of all of Illinois's

---

[3] As the amended complaint states, "The PVI is a measurement of how strongly a congressional district leans toward one political party compared to the nation as a whole. The index for each congressional district is derived by averaging its results from the prior two presidential elections and comparing them to national results. The index indicates which party's candidate was more successful in that district, as well as the number of percentage points by which its results exceeded the national average. The index is formatted as a letter followed by a plus sign and then a number. For instance, in a district whose PVI score is D+2, a generic Democratic candidate would be expected to receive 2 percentage points more votes than the national average. An 'Even' score is assigned when the district performed within half a point of the national average." Doc. 103 at ¶ 75 n.10.

5

congressional districts that favor Democrats in the Adopted Plan, according to the identified measure of partisan voting, is at least 10 percentage points greater than the percentage of all of Illinois's congressional districts that favor Democrats under the current plan enacted in 2001, according to the exact same measure of partisan voting. Plaintiffs have done that by showing that 12 of Illinois's 18 congressional districts in the Adopted Plan (66.7%) favor Democrats according to the PVI, while 9 of Illinois's 19 congressional districts under the current plan (47.4%) favor Democrats according to the PVI. Doc. 103 at ¶¶ 75, 134, 142; *see also* Doc. 105 at 36-37.[4]

The second element of the effect requirement demands that the Adopted Plan keep at least 10 percentage points more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents. Doc. 103 at ¶¶ 134, 142. That means Plaintiffs must first calculate for each incumbent what percentage of the incumbent's constituents under the current plan (total population, regardless of party) would be in the district in which their representative would reside under the Adopted Plan. Plaintiffs have done that analysis, which reveals overlap figures that range from 100% to 76.4% for the 8 Democratic incumbents and range from 67.9% to 1.3% for the 11 Republican incumbents. Doc. 103 at ¶ 95; *see also* Doc. 105 at 37. Plaintiffs finally must calculate the average of the overlap figures for Democratic incumbents, calculate the average of the overlap figures for the Republican incumbents, and then show that the average overlap figure for Democratic incumbents is ten

---

[4] The example that Defendants offer (at 7) of a situation in which a loss of a congressional seat would supposedly prevent a State from enacting a constitutional redistricting plan is completely wrong. If a State had to redistrict after going from 10 to 9 congressional seats and did so by redrawing a map with 5 districts favoring Democrats (50%) so that 5 districts continued to favor Democrats (55.6%), the percentage of districts favoring Democrats would increase by only 5.6%. In any event, even if a redistricting caused the requisite 10% shift in districts favoring one party, a constitutional violation would be established only if partisan advantage were the predominant motivation and the redistricting satisfied the other elements of the effect requirement.

percentage points greater than the average overlap figure for Republican incumbents. Plaintiffs have met that obligation by calculating an average overlap figure of 87.8% for Democratic incumbents and a 34.4% average overlap figure for Republican incumbents. Doc. 103 at ¶ 95, 134, 142; *see also* Doc. 105 at 37.

Finally, the third element of the effect requirement demands that at least one of the districts created with the intent to advantage Democrats is among the districts that contributes to the proof of elements 1 and 2. Doc. 103 at ¶¶ 134, 142. That requires Plaintiffs to first identify districts in the Adopted Plan that the mapmakers created with the predominant intent to advantage Democrats. The amended complaint—like the permanent injunction motion—identifies three such districts, Adopted Districts 11, 13, and 17. Doc. 103 at ¶ 131, 133, 139, 141; *see also* Doc. 105 at 31-35.[5] Plaintiffs next must show that at least one of those districts contributes to the PVI-measured shift of districts toward Democrats under the Adopted Plan (element 1) and to the constituent-incumbent overlap disparity among Democratic incumbents and Republican incumbents (element 2). Satisfying that obligation, the amended complaint explains that Adopted Districts 11, 13, and 17 all have Democratic-leaning PVI scores and all have constituent-incumbent overlap figures far below any Adopted Districts with Democratic incumbents. Doc. 103 at ¶¶ 134, 142; *see also* Doc. 105 at 37.

---

[5] In passing, Defendants insinuate (at 3) that the amended complaint improperly adds districts to the ones identified as partisan gerrymanders. But the original complaint did not purport to limit the districts challenged as partisan gerrymanders, but instead challenged the entire map and gave a few examples based on what was known at the time. *See* Doc. 1 at ¶¶ 74-75. After receiving discovery provided at the close of the discovery period (*see, e.g.*, Doc. 106-3 at 96-101 (injunction motion Ex. A31)), Plaintiffs were able to specify with greater detail the particular districts that reveal the partisan gerrymander. And Plaintiffs did so once the Court decided the previously pending motion to dismiss. *See* Doc. 98 (order on dismissal motion); Doc. 103 at ¶¶ 131, 133-34, 139, 141-42 (amended complaint).

7

Defendants also object (at 6-8) to the use of the PVI and apparently any other index or similar measure of partisan voting. They are in no position, however, to protest that all measures of partisan voting are unworkable because they depend on past voting behavior and do not perfectly predict the future. The State and its helpers at the Democratic Congressional Campaign Committee ("DCCC") used just such a measure of partisan voting to create the Adopted Plan. *See* Doc. 106-3 at 86-89, 102-05 (injunction motion Exs. A28 & A32 describing indices and formulas used by State Democrats and DCCC); Doc. 106-4 at 1-6 (injunction motion Exs. A33 & A34 describing same).

As for the supposed flaws that Defendants perceive in the PVI, none reflects any real problem with that widely used measure. That the PVI changes over time is an attribute, not a flaw, given that partisan leanings in particular geographies change over time. Likewise, the PVI's supposed failure to pick all of the winners in Illinois's 2010 congressional elections is irrelevant, because that is not what it is designed to do. It is designed—and used in Plaintiffs' proposed standard—to measure the relative partisan make-up of differently constituted congressional districts. *See* Doc. 103 at ¶ 75. And the PVI uses presidential races because they are the elections most likely to reflect partisan leanings that can be measured in a consistent way in every precinct throughout a State so that the results can be aggregated for districts of any configuration.

In any event, these matters are best left for trial because Plaintiffs' proposed standard can use any accepted measure of partisan voting, the merits of any particular measure can and should be weighed on the evidence, and nothing Defendants say makes relief on the partisan gerrymander claims implausible. *See Ashcroft v. Iqbal*, 129 S. Ct. 1937, 1950 (2009) ('When there are well-pleaded factual allegations, a court should assume their veracity and then

8

determine whether they plausibly give rise to an entitlement to relief."). Indeed, as Plaintiffs have always maintained (*see* Doc. 67 at 10-12), the partisan gerrymandering in the Adopted Plan is so thorough that any reasonable measure of partisan voting will confirm its existence and effect. *See* Doc. 105 at 28-37. For instance, even though the State and the DCCC have shielded their partisan voting measures from discovery on privilege grounds, there is every reason to believe that those measures, too, would prove the required unconstitutional effect. *See* Doc. 106-3 at 86-89, 96-101 (injunction motion Exs. A28 & A31 describing predictions about additional Democratic leaning districts).

Finally, again echoing the *Vieth* plurality (*see Vieth*, 541 U.S. at 296-97), Defendants absurdly contend (at 9) that Plaintiffs' proposed standard for judging political gerrymanders would simply multiple the number of "unanswerable questions." In reality, the proposed effect requirement is purely objective and depends on straight-forward mathematical calculations. Doc. 103 at ¶¶ 134, 142. And the proposed intent requirement matches the intent requirement already applied to racial gerrymander claims. *See Miller*, 515 U.S. at 916. Nothing is unanswerable about the proposed partisan gerrymander standard. Defendants just don't like the answers.

## II. There Are No Grounds For Dismissing Count V.

Defendants make three arguments for dismissing Count V of the amended complaint, which alleges that the partisan gerrymandering of the Adopted Plan violates the First Amendment. Each of the arguments is meritless.

First, Defendants surprisingly argue (at 2-3, 9-10) that the Court's order on their prior dismissal motion somehow precludes Plaintiffs from pursuing an amended version of Count V. Nothing in the Court's dismissal order supports that argument. To the contrary, the order expressly states, "The plaintiffs may file an amended complaint with respect to their partisan

9

gerrymandering claims on or before November 7, 2011." Doc. 98 at 22. That language plainly left the door open for Plaintiffs to amend their complaint with respect to both partisan gerrymander "claims." Indeed, the Court dismissed Count V because Plaintiffs' original complaint "add[ed] no facts that would make [the First Amendment] allegations plausible." *Id.* at 21. Such a problem can be cured. Thus, the Court concluded only that Counts V and VI "*presently* state no claims upon which relief plausibly could be granted." *Id.* (emphasis added). The Court's dismissal order does not preclude plaintiffs from amending their complaint to cure the perceived deficiencies in Count V.

Second, Defendants maintain (at 10) that Plaintiffs' improperly propose the same standard for adjudicating partisan gerrymander claims under the First Amendment as they propose for adjudicating such claims under the Equal Protection Clause. We have already explained why Defendants' objections to Plaintiffs' proposed standard are baseless. *See supra* Part I. And, even though First Amendment analysis can differ from Equal Protection analysis, when it comes to partisan gerrymander allegations, the focus of both analyses is distinguishing unacceptable burdens on voting and representational rights from acceptable ones. *See Vieth*, 541 U.S. at 313-15 (Kennedy, J. concurring) (assessing "purpose and effect" of districting by measuring "burden" on "representational rights" is object of Fourteenth Amendment analysis and First Amendment analysis). The standard proposed by Plaintiffs accomplishes that task.

Third, Defendants contend (at 10-12) that partisan gerrymandering does not raise any First Amendment concerns. Defendants say that the Supreme Court took that position in *Vieth*. But, once again, Defendants are invoking only the view of the *Vieth* plurality. *See Vieth*, 541 U.S. at 294. Justice Kennedy's controlling concurrence expressly rejects that view:

> The plurality suggests there is no place for the First Amendment in this area. The implication is that under the First Amendment any and all consideration of

10

> political interests in an apportionment would be invalid. That misrepresents the First Amendment analysis. The inquiry is not whether political classifications were used. The inquiry instead is whether political classifications were used to burden a group's representational rights. If a court were to find that a State did impose burdens and restrictions on groups or persons by reason of their views, there would likely be a First Amendment violation, unless the State shows some compelling interest.

*Id.* at 314-15 (internal citations omitted); *see also id.* at 324-26 (Stevens, J., dissenting) (agreeing that partisan gerrymandering violates the First Amendment). Thus, *Vieth* actually supports Plaintiffs' First Amendment claim.

Defendants also invoke two recent district court decisions that dismissed First Amendment partisan gerrymander claims because the plaintiffs in those cases had not plausibly alleged how the claimed partisan gerrymander burdened their First Amendment rights. *See Radogno v. Ill. State Bd. of Elections*, No. 1:11-cv-4884, 2011 WL 5025351, at *7-*8 (N.D. Ill. Oct. 21, 2011); *League of Women Voters v. Quinn*, No. 1:11-cv-5569, 2011 WL 5143044, at *3-*4 (N.D. Ill. Oct. 28, 2011). Plaintiffs have amended their complaint to make precisely those allegations, explaining how the viewpoint discrimination embodied in the partisan gerrymander burdens and penalizes Plaintiffs' exercise of their representational rights. Doc. 103 at ¶ 135. Specifically, the amended complaint alleges that the Adopted Plan "deters potential Republican congressional candidates from exercising their right to run for office by making a Republican candidacy futile, and it deters potential Republican voters from casting ballots that are likely to be meaningless." *Id.* The amended complaint also alleges that "those Democratic members of Congress from Illinois whose election is effectively assured by the Proposed Congressional Plan's partisan gerrymandering will necessarily pay little if any heed to their Republican constituents, effectively depriving them of representation based on their political affiliation." *Id.* Tellingly, Defendants never even mention these new allegations detailing the First Amendment

11

burdens of the Adopted Plan, much less claim that they are so implausible that Count V should be dismissed.

The relevant First Amendment precedents confirm that Plaintiffs' allegations are adequate to state a First Amendment claim. The Supreme Court has long held that even when government action does not actually prohibit protected expression, it can still violate the First Amendment if it deters such expression by imposing unjustified burdens on that expression. *See, e.g.*, *Ariz. Free Enter. Club's Freedom Club PAC v. Bennett*, 131 S. Ct. 2806, 2817-20 (2011) (law that gave a candidate's opponent matching public funding if the candidate spent private funds in excess of a statutory limit violated the First Amendment, even though it did not restrict the candidate's expression, because it burdened that expression by "diminishing the effectiveness" of that expression and by forcing the candidate to "shoulder a special and potentially significant burden"); *Watchtower Bible & Tract Soc'y of N.Y., Inc. v. Vill. of Stratton*, 536 U.S. 150, 165-69 (2002) (ministerial task of obtaining free permit to engage in door-to-door advocacy imposed unconstitutional burden in violation of First Amendment); *Anderson v. Celebrezze*, 460 U.S. 780, 786-89, 806 (1983) (striking down state law requiring presidential candidates to file nominating petitions seven months before general election because "the extent and nature of the burdens . . . placed on the voters' freedom of choice and freedom of association . . . unquestionably outweigh the State's minimal interest in imposing [its] deadline").

Likewise, the Supreme Court has been clear that even when viewpoint neutral burdens on protected expression are safe from First Amendment challenge, similar burdens that are viewpoint discriminatory violate the First Amendment. *See, e.g.*, *Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-837 (1995) (university violated First Amendment by funding some student groups but not a religious newspaper because "the government must

abstain from regulating speech when the specific motivating ideology or the opinion or perspective of the speaker is the rationale for the restriction"); *Anderson*, 460 U.S. at 793 ("it is especially difficult for the State to justify a restriction that limits political participation by an identifiable political group whose members share a particular viewpoint, associational preference, or economic status" and a court must ask "whether the challenged restriction unfairly or unnecessarily burdens the availability of political opportunity"); *see also Protect Marriage Ill. v. Orr*, 463 F.3d 604, 606 (7th Cir. 2006) (recognizing that a state can impose ballot requirements, "provided the requirements are not jiggered in a way that discriminates against particular advocates or viewpoints").

Here, the State's partisan gerrymandering deters Republicans from voting and running for office by placing the unjustified and viewpoint-discriminatory burden of vote dilution on those protected forms of expression. Such circumstances state a First Amendment claim under *Arizona Free Enterprise*, *Anderson*, and the other Supreme Court decisions that recognize that laws that diminish the effectiveness of political expression or place special burdens on certain disfavored candidates violate the First Amendment, especially when they discriminate based on viewpoint.

## CONCLUSION

For the foregoing reasons, Plaintiffs respectfully request that the Court deny Defendants' motion to dismiss Counts V and VI of the amended complaint.

| | |
|---|---|
| Dated: November 15, 2011 | Respectfully submitted, |
| | /s/ Lori E. Lightfoot |
| | Tyrone C. Fahner<br>John A. Janicik<br>Lori E. Lightfoot<br>Joshua D. Yount<br>Dana S. Douglas<br>Thomas V. Panoff<br>Mitchell D. Holzrichter<br>MAYER BROWN LLP<br>71 South Wacker Drive<br>Chicago, Illinois 60606<br>(312) 782-0600<br>(312) 701-7711 – fax |
| | *Attorneys for Plaintiff* |