# MAYER · BROWN

Mayer Brown LLP
71 South Wacker Drive
Chicago, Illinois 60606-4637

Main Tel +1 312 782 0600
Main Fax +1 312 701 7711
www.mayerbrown.com

**Lori E. Lightfoot**
Direct Tel +1 312 701 8680
Direct Fax +1 312 706 8559
llightfoot@mayerbrown.com

November 22, 2011

Michael W. Dobbins, Clerk of Court
Clerk's Office
U.S. District Court for the Northern District of Illinois
219 South Dearborn Street
Chicago, IL 60604

Re:  Citation of Supplemental Authority in *Committee
for a Fair and Balanced Map, et al. v. Illinois
State Board of Elections, et al.*, Case No. 1:11-cv-
5065

Dear Mr. Dobbins:

During trial in the above noted case, Defendants and their expert Allan J. Lichtman represented
that the law requires an analysis of vote dilution to be performed on a "district-specific" basis.
For the convenience of the Court, Plaintiffs wish to direct the Court's attention to the Seventh
Circuit's decision in *Baird v. Consolidated City of Indianapolis*, 976 F.2d 357, 360 (7th Cir.
1992), which held that the reference to a "district specific" inquiry for certain vote dilution
claims in *Thornburg v. Gingles*, 478 U.S. 30, 59 n.28 (1986), "cannot have meant to *foreclose*
examination of electoral patterns in multiple districts—for it is only by looking across multiple
districts and elections that we can see patterns of success or failure." A copy of the *Baird*
decision is attached.

Sincerely,

Lori E. Lightfoot

cc:  Hon. John D. Tinder
     Hon. Robert L. Miller, Jr.
     Hon. Joan H. Lefkow
     Michael Kasper
     Brent D. Stratton
     Carl Bergetz
     Devon C. Bruce
     Joshua D. Yount
     Dana S. Douglas
     Thomas V. Panoff

Mayer Brown LLP operates in combination with other Mayer Brown entities with offices in Europe and Asia
and is associated with Tauil & Chequer Advogados, a Brazilian law partnership.



976 F.2d 357
**(Cite as: 976 F.2d 357)**

United States Court of Appeals,
Seventh Circuit.
David BAIRD, et al., Plaintiffs-Appellants,
v.
The CONSOLIDATED CITY OF INDIANAPOL-
IS, et al., Defendants-Appellees.

No. 91-3700.
Argued May 20, 1992.
Decided Sept. 30, 1992.

Black voters brought action under Voting Rights Act challenging use of four at-large seats on metropolitan government council. The United States District Court for the Southern District of Indiana, Sarah Evans Barker, J., granted summary judgment for defendants, and appeal was taken. The Court of Appeals, Easterbrook, Circuit Judge, held that use of at-large seats did not violate Voting Rights Act, even if it was possible to draw four large single-member districts in such a way that blacks would make up majority in one of those districts.

Affirmed.

West Headnotes

**[1] Elections 144 ⊱12(6)**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k12 Denial or Abridgment on Account of Race
            144k12(2) Discriminatory Practices Proscribed
            144k12(6) k. Apportionment and Reapportionment. Most Cited Cases
Proportional representation does not automatically defeat claims under Voting Rights Act. Voting Rights Act of 1965, § 2 et seq., 42 U.S.C.A. § 1973 et seq.

**[2] Elections 144 ⊱12(6)**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k12 Denial or Abridgment on Account of Race
            144k12(2) Discriminatory Practices Proscribed
            144k12(6) k. Apportionment and Reapportionment. Most Cited Cases
It does not violate Voting Rights Act to have some districts in which black voters form minority and are unlikely to elect candidates of their choice, any more than it violates Act to have districts in which white voters are unlikely to be influential at polls. Voting Rights Act of 1965, §§ 2 et seq., 2(a, b), 42 U.S.C.A. §§ 1973 et seq., 1973(a, b).

**[3] Elections 144 ⊱12(3)**

144 Elections
    144I Right of Suffrage and Regulation Thereof in General
        144k12 Denial or Abridgment on Account of Race
            144k12(2) Discriminatory Practices Proscribed
            144k12(3) k. Dilution of Voting Power. Most Cited Cases
Unless black voters fare poorly compared with white voters in achieving their objectives (election of candidates they prefer), they have not stated claim under subsection of Voting Rights Act providing that Act is violated if, based on totality of circumstances, members of protected minority have less opportunity than other members of electorate to participate in political process and to elect representatives of their choice. Voting Rights Act of 1965, § 2(b), 42 U.S.C.A. § 1973(b).

**[4] Counties 104 ⊱38**

104 Counties

976 F.2d 357
**(Cite as: 976 F.2d 357)**

104II Government

104II(C) County Board

104k38 k. Nature and Constitution in General. Most Cited Cases

**Municipal Corporations 268 ☜80**

268 Municipal Corporations

268IV Proceedings of Council or Other Governing Body

268IV(A) Meetings, Rules, and Proceedings in General

268k80 k. Nature and Constitution of Body in General. Most Cited Cases

Use of four at-large seats on City-County Council of Marion County, Indiana, did not violate Voting Rights Act, even if it was possible to draw four large single-member districts in such a way that blacks would make up majority in one of those districts; there was no showing of intentional discrimination, and blacks were majority in seven of remaining 25 districts represented on council. Voting Rights Act of 1965, § 2(a, b), 42 U.S.C.A. § 1973(a, b).

**\*358** William R. Groth (argued), Fillenwarth, Dennerline, Groth & Towe, Stephen Laudig, Indianapolis, Ind., for plaintiffs-appellants.

Alan W. Becker, George T. Patton, Wayne C. Ponader (argued), Jeffrey S. Koehlinger, Bose, McKinney & Evans, Margo Barber, Marion County Legal Div., Susan L. Williams, David L. Rimstidt, Rimstidt, Yackey & Ladd, Gary R. Landau, Indianapolis, Ind., for defendants-appellees.

Before CUDAHY and EASTERBROOK, Circuit Judges, and WOOD, Jr., Senior Circuit Judge.

EASTERBROOK, Circuit Judge.

There are 29 seats in the City-County Council of Marion County in Indiana, a consolidated government comprising metropolitan Indianapolis. State law requires Marion County to elect 25 persons from single-member districts and the other 4 at

large. Ind.Code §§ 36-3-4-2(a), 36-3-4-3(b). Until recently only four of the single-member districts (13.8% of the 29 seats) had majorities of black voters, although 21.28% of the county's population (and 19.28% of its voting-age population) is black. Five registered black voters in Marion County (three of whom sit on the Council) filed this suit in 1987 under the Voting Rights Act, contending that both "packing" minorities into 4 districts and electing 4 seats at large undermined the influence of black voters. In 1991 the Council adopted a new plan establishing 7 districts in which the black population approximates 60%. Plaintiffs conceded that these single-member districts comply with the Voting Rights Act, because they give black voters dominating influence over 28% of the single-seat districts and 24.14% of all 29 seats. No greater number of minority-dominated districts could have been created, according to data from the 1990 census. Candidates favored by black voters carried all 7 districts in the 1991 elections. Nonetheless the plaintiffs contend that the 4 at-large seats violate § 2 of the Voting Rights Act, 42 U.S.C. § 1973, because it is possible to draw 4 large single-member districts in such a way that blacks would make up a majority in 1. Maintaining multi-member districts when minorities could do better with single-member districts, plaintiffs contend, violates § 2 even if the plan as a whole ensures proportional representation for black voters. The district court disagreed, granting summary judgment for the defendants.

Section 2(a) of the Voting Rights Act makes it illegal to deny or abridge, on account of race, any person's right to vote. Section 2(b), as amended in 1982, adds that a violation of § 2(a) occurs

if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election ... are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

976 F.2d 357
**(Cite as: 976 F.2d 357)**

political process and to elect representatives of their choice. The extent to which members of a protected class have been elected to office in the State or political subdivision is one circumstance which may be considered: *Provided,* That nothing in this section **\*359** establishes a right to have members of a protected class elected in numbers equal to their proportion in the population.

Section 2(b) grew out of a fierce political fight and bears the marks of compromise. Congress wanted to define violations in terms of outcome, not intent, and in so doing to reject the view taken by a plurality in *Mobile v. Bolden,* 446 U.S. 55, 100 S.Ct. 1490, 64 L.Ed.2d 47 (1980), that § 2 required a showing of racially discriminatory intent. See *Thornburg v. Gingles,* 478 U.S. 30, 71, 106 S.Ct. 2752, 2777, 92 L.Ed.2d 25 (1986); *McNeil v. Springfield Park District,* 851 F.2d 937, 940 (7th Cir.1988); *Ketchum v. Byrne,* 740 F.2d 1398, 1403 (7th Cir.1984). But an unvarnished "results" approach can be satisfied only by proportional representation, which would offend the norm that the electoral process ensures equality of opportunity and not equality of outcome. If specified groups are entitled to "their" members in the legislature, why bother with elections? (Minorities may disagree among themselves, but then why not elections in which only members of the specified groups can vote, after the fashion of elections among registered members of Indian tribes?) Concern about the potential for subversion of universal suffrage, coupled with the substantial support in Congress for retaining *Bolden,* produced both the phrasing of § 2(b) requiring equal rights of "participation" (inputs rather than outputs) and the proviso disclaiming entitlement to proportional representation.

Any compromise that seeks to have things both ways, as this one did, produces nightmares in implementation. The Justices divided three ways in *Gingles* on the interpretation of the language. Justice Brennan, writing for a majority in this respect, concluded that plaintiffs seeking to attack a multi-member district must show at least that the minority group is sufficiently large to make up a majority in a single-member district, that the minority is politically cohesive, and that the majority usually votes as a bloc to defeat the minority's preferred candidate. 478 U.S. at 50-51, 106 S.Ct. at 2766. Plaintiffs contend, and we assume, that they can prove these things. Proof along these lines is not enough, however, if other considerations show that the minority has an undiminished right to participate in the political process. The district judge concluded that black voters' strength in seven districts is such a consideration. If these voters are politically cohesive, they will elect candidates of their choice and obtain representation in the Council exceeding their numbers in the electorate; and if they are not cohesive, they cannot satisfy the requirements for relief under *Gingles.*

[1] Plaintiffs challenge the district court's use of their predicted (now, actual) success. We agree with them that proportional representation does not automatically defeat claims under the Voting Rights Act-not only because Justice Brennan's opinion says so, 478 U.S. at 74-76, 106 S.Ct. at 2778-2779, but also because the statute gives *each* person the right to political participation. Congress did not disagree with *Bolden* to the extent it held that intentional discrimination violates both the Act and the Constitution. Having drawn seven districts with secure black majorities, Marion County could not prevent black citizens from voting in the election for the four at-large seats or otherwise discriminate against any class of citizens. A balanced bottom line does not foreclose proof of discrimination along the way. *Connecticut v. Teal,* 457 U.S. 440, 102 S.Ct. 2525, 73 L.Ed.2d 130 (1982). Just as the proviso to § 2(b) ensures that white candidates are free to compete for electoral success that exceeds the ratio of white voters, so blacks must be free to compete for favor; the Voting Rights Act neither sets nor tolerates a cap on their achievements.

[2] Nothing in this record suggests intentional discrimination against black persons, however, and plaintiffs therefore pin their hopes on the outcome

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

976 F.2d 357
**(Cite as: 976 F.2d 357)**

approach of § 2(b). Any approach that depends on outcomes supposes the need to consider multiple electoral contests-the same position over many years, many positions during the same year, or both. States attempt to comply with the Voting Rights Act by creating conditions conducive to success by **\*360** minorities throughout the jurisdiction as a whole. E. g., *Prosser v. Elections Board,* 793 F.Supp. 859 (W.D.Wis.1992) (three-judge court). That it why it does not violate the Act to have some districts in which black voters form a minority and are unlikely to elect candidates of their choice, *Gomez v. Watsonville,* 863 F.2d 1407, 1414 (9th Cir.1988); *Campos v. Baytown,* 840 F.2d 1240, 1244 (5th Cir.1988), any more than it violates the Act to have districts (such as the seven black-majority districts in Marion County) in which white voters are unlikely to be influential at the polls. See *United Jewish Organizations of Williamsburgh, Inc. v. Carey,* 430 U.S. 144, 97 S.Ct. 996, 51 L.Ed.2d 229 (1977). Considerations of this kind persuaded the district court to measure black voters' likely success by reference to all 29 seats rather than just the 4 at-large seats.

Aggregation, according to plaintiffs, offends the majority's statement in *Gingles* that "[t]he inquiry into the existence of vote dilution caused by submergence in a multimember district is district specific." 478 U.S. at 59 n. 28, 106 S.Ct. at 2771 n. 28. See also *id.* at 101, 106 S.Ct. at 2792 (O'Connor, J., concurring in judgment) ("racial voting statistics from one district are ordinarily irrelevant in assessing the totality of the circumstances in another district"). Yet the Justices cannot have meant to *foreclose* examination of electoral patterns in multiple districts-for it is only by looking across multiple districts and elections that we can see patterns of success or failure. See, e.g., *McGhee v. Granville County,* 860 F.2d 110, 118-19 & n. 9 (4th Cir.1988). Every plan that has ever been devised to comply with the statute measures opportunities for electoral success across multiple seats. Section 2(b) expressly requires a court to consider the "totality of circumstances". Cf. *Board of Estimate v. Morris,*

489 U.S. 688, 701 & n. 8, 109 S.Ct. 1433, 1442 & n. 8, 103 L.Ed.2d 717 (1989) (district and at-large representatives must be considered together in determining constitutionality of apportionment scheme). All of the Justices in *Gingles* considered how black candidates fared in multiple elections spread over many districts and many years. References in *Gingles* to district-specific inquiries assume that each multi-member district spans a different part of the state, with different minority populations and, perhaps, different cohesiveness of majority and minority voters. The Court did not consider how to apply § 2(b) to a jurisdiction that, like New York City (the subject of *Morris* ), contains overlapping single- and multi-member districts. The district court did not err in taking the 25 single-member districts into account in assessing plaintiffs' contention that Marion County diluted the political strength of black citizens.

[3][4] Section 2(b) says that "nothing in this section establishes a right to have members of a protected class elected in numbers equal to their proportion in the population." 42 U.S.C. § 1973(b). This means at least that a minority cannot win by proving that it is underrepresented, then resting. *Gingles,* 478 U.S. at 46, 106 S.Ct. at 2764 ("the conjunction of an allegedly dilutive electoral mechanism and the lack of proportional representation alone does not establish a violation"); *McGhee,* 860 F.2d at 119-20. All questions of intentional discrimination to one side, § 2(b) also implies that blacks who have influence proportional to their numbers do not state a claim under § 2(a). Recall what an "outcomes" approach means: it is an opportunity to show what would be called in employment cases a "disparate impact." Unless black voters fare poorly compared with white voters in achieving their objectives (the election of the candidates they prefer), they have not stated a claim *under § 2(b),* although proof of intentional discrimination under § 2(a) remains an option.

Six Justices in *Gingles* reached this conclusion. These six agreed that at-large elections in House

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

Page 5

976 F.2d 357
**(Cite as: 976 F.2d 357)**

District 23 did not violate the Voting Rights Act because "the last six elections have resulted in proportional representation for black residents." 478 U.S. at 77, 106 S.Ct. at 2780. Justice Stevens (joined by Marshall & Blackmun, JJ.), dissented from this part of the judgment, *id.* at 106-08, 106 S.Ct. at 2795-96, but the four Justices who disagreed with **\*361** Justice Brennan's statement of legal principles agreed with his conclusion concerning District 23. *Id.* at 103-05, 106 S.Ct. at 2793-94 (O'Connor, J., joined by Burger, C.J., and Powell & Rehnquist, JJ.). One thing that separated Justice Brennan from Justice O'Connor was the weight to be accorded to minority candidates' success over short periods. Justice Brennan wrote that "[w]here multimember districting generally works to dilute the minority vote, it cannot be defended on the ground that it sporadically and serendipitously benefits minority voters." 478 U.S. at 76, 106 S.Ct. at 2779. On this score he had the support of Justices Marshall, Blackmun, and Stevens. The majority was concerned that black electoral success might be attributable to transient factors such as the pendency of litigation that could lead white voters to throw the minority a bone. See also *Zimmer v. McKeithen,* 485 F.2d 1297, 1307 (5th Cir.1973), affirmed under the name *East Carroll Parish School Board v. Marshall,* 424 U.S. 636, 96 S.Ct. 1083, 47 L.Ed.2d 296 (1976). But Justices Brennan and White (joined by those who signed Justice O'Connor's opinion) went on to hold that "*sustained* success" (emphasis in original) in District 23 negated any claim under § 2(b). 478 U.S. at 77, 106 S.Ct. at 2780. Justices Brennan and White held open the possibility that in some situations "such sustained success does not accurately reflect the minority group's ability to elect its preferred representatives", *ibid.,* but declined to say under what circumstances that might be so.

The outcome of the 1991 elections in Marion County is not the "mere loss of an occasional election". 478 U.S. at 51, 106 S.Ct. at 2766. Plaintiffs acknowledge that black voters are no longer "packed" and will control the outcome in 7 of the 25 districts so long as they remain cohesive. Thus we cannot accept plaintiffs' effort to portray the district court's analysis as based only on "prospective proportionality."

Marion County illustrates Justice White's observation, 478 U.S. at 83, 106 S.Ct. at 2783, that losses by the candidates black voters prefer may have more to do with politics than with race. Marion County is a Republican stronghold. The Republican mayoral candidate won with 56% of the vote in 1991, and his party achieved an 18-11 majority on the Council. All four of the at-large slots went to Republicans (and by comfortable margins). It cannot be surprising that the party with political control opposes a plan that would ensure the loss of at least one of these four seats. Section 2 of the Voting Rights Act forbids the "denial or abridgment of the right ... to vote on account of race or color". It is a balm for racial minorities, not political ones—even though the two often coincide. *Whitcomb v. Chavis,* 403 U.S. 124, 153, 91 S.Ct. 1858, 1873, 29 L.Ed.2d 363 (1971) (a case involving Marion County, Indiana).

Voters in Marion County seem to prefer Republicans but do not necessarily judge their Republicans by color. One of the four victors in the at-large contests of 1991 is black. Plaintiffs scoff, insisting a Republican cannot be a "representative of choice" of a black population that prefers Democrats. Justice Brennan contended in *Gingles* that in determining whether a governmental body has violated § 2(b) a court should disregard the race of the persons elected and ask only whether the minority voters were able to elect the candidates they favored. 478 U.S. at 67-68, 106 S.Ct. at 2774-2775. Justice White disagreed with this conclusion (which therefore did not achieve the support of a majority), observing that a system leading to the election of black Republicans could not be dismissed as discriminatory. To disregard the race of the victors, Justice White concluded, "is interest-group politics rather than a rule hedging against racial discrimination." 478 U.S. at 83, 106 S.Ct. at 2783 (White, J.,

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.

976 F.2d 357
**(Cite as: 976 F.2d 357)**

concurring). Justice O'Connor agreed with Justice White. 478 U.S. at 101, 106 S.Ct. at 2792 (O'Connor, J., concurring in judgment). The Voting Rights Act does not guarantee that nominees of the Democratic Party will be elected, even if black voters are likely to favor that party's candidates.

Notwithstanding their disclaimers, plaintiffs want a rule barring at-large seats whenever there is a cohesive minority and **362** smaller districts can be drawn to increase that minority's success. But the Court has held that at-large districts are not invariably forbidden, under either the statute or the fifteenth amendment. *Rogers v. Lodge,* 458 U.S. 613, 616-17, 102 S.Ct. 3272, 3274-75, 73 L.Ed.2d 1012 (1982); *White v. Regester,* 412 U.S. 755, 765, 93 S.Ct. 2332, 2339, 37 L.Ed.2d 314 (1973); *Fortson v. Dorsey,* 379 U.S. 433, 85 S.Ct. 498, 13 L.Ed.2d 401 (1965). *Gingles* rejected any notion that at-large seats are always illegal under the Voting Rights Act: "[E]lectoral devices, such as at-large elections, may not be considered *per se* violative of § 2. Plaintiffs must demonstrate that, under the totality of the circumstances, the devices result in unequal access to the electoral process." 478 U.S. at 46, 106 S.Ct. at 2764. The "totality of the circumstances" in this case guarantee black voters control over at least seven seats on the Council. The voters of Marion County may give them more, but that success must come at the ballot box.

    AFFIRMED.

C.A.7 (Ind.),1992.
Baird v. Consolidated City of Indianapolis
976 F.2d 357

END OF DOCUMENT

© 2011 Thomson Reuters. No Claim to Orig. US Gov. Works.