UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | | |
|---|---|---|
| COMMITTEE FOR A FAIR AND BALANCED MAP, *et al.*, | ) ) ) | |
| Plaintiffs | ) ) | |
| v. | ) ) | CASE NO. 1:11-CV-5065 |
| ILLINOIS STATE BOARD OF ELECTIONS, *et al.*, | ) ) ) | Hon. John Daniel Tinder Hon. Robert L. Miller, Jr. Hon. Joan Humphrey Lefkow |
| Defendants. | ) | |

<u>OPINION AND ORDER</u>

Before TINDER, *Circuit Judge*, MILLER, *District Judge*, and LEFKOW*, District Judge.*

PER CURIAM. This case involves a challenge to the congressional redistricting plan adopted

by the State of Illinois after the 2010 Census. The plaintiffs are an organization called the Committee

for a Fair and Balanced Map (a not-for-profit organization created by Illinois citizens concerned

about the congressional redistricting process in Illinois), ten incumbent Republican members of

Congress, and six registered voters (including some who identify themselves as Latino voters and

others who assert that they are Republican voters), collectively referred to as "the Committee." The

defendants are the Illinois State Board of Elections (the agency charged with implementing the

results of the redistricting process) and its members, collectively referred to as "the Board of

Elections." The United States Constitution requires Illinois lawmakers to redraw the state's

congressional district boundaries after each decennial census. U.S. CONST. art. I, § 2; *id.* amend.

XIV, §§ 1 & 2; *id* . amend. XV; *Ryan* v. *State Bd. of Elections of State of Ill.*, 661 F.2d 1130, 1132

(7th Cir. 1981). Pursuant to this authority, the Democratic majority in the Illinois General Assembly drafted, debated,[1] and passed the Illinois Congressional Redistricting Act of 2011 (the "Redistricting Act") (P.A. 97-14), thereby creating what we refer to as "the Adopted Map." Based on the 2010 Census results, the State of Illinois lost one congressional seat. The Adopted Map, therefore, eliminates one seat and establishes boundaries for the state's eighteen remaining congressional districts.

The Committee contends that the Adopted Map violates Section 2 of the Voting Rights Act, 42 U.S.C. § 1973(a) (Count I), the Equal Protection Clause of the Fourteenth Amendment, and rights protected by the Fifteenth Amendment, because Congressional Districts 3, 4, and 5 as drawn intentionally dilute the Latino vote (Counts II and III). They also allege violation of the Equal Protection Clause in that Latino ethnicity was the predominant consideration in drawing Adopted District 4 and as such, is an intentional and unjustified racial gerrymander (Count IV). Taking another tack, the Committee alleges that Adopted Districts 11, 13 and 17 demonstrate a blatant partisan gerrymander against Republican voters in violation of the First and Fourteenth Amendments (Counts V and VI).

We held a two-day trial on the Committee's motion for permanent injunction and, after examining the parties' briefs and extensive documentary and testimonial evidence, including the expert reports and testimony, we find in favor of the Board of Elections. As to the partisan gerrymander claims, although we agree with the Committee that the crafting of the Adopted Map was a blatant political move to increase the number of Democratic congressional seats, ultimately we conclude that the Committee failed to present a workable standard by which to evaluate such

---

[1] Albeit briefly, but more about that later.

2

claims, therefore they fail under *Vieth v. Jubelirer,* 541 U.S. 267 (2004). The Committee's vote dilution claims fail because the Committee has not proven by a preponderance of the evidence that the state legislature intentionally discriminated against Latinos in passing the Adopted Map. Again, we acknowledge that Latino ethnicity was a factor in creating District 4 in 1991, but times have changed: the weight of the evidence shows that the predominant intent of the 2011 Illinois legislature in maintaining Adopted District 4 in substantially the same shape as when it was created in 1991 was a desire to enhance Democratic seats in the state as a whole, to keep Democratic incumbents in Districts 3, 4, and 5 with their constituents, to preserve existing district boundaries, and to maintain communities of interest. Because race was not the predominant factor, the Committee failed to meet its burden of proof on its racial gerrymander claims under Section 2 of the Voting Rights Act or the Constitution.

## I. Facts

The Committee's racial vote dilution and gerrymandering claims concern Adopted Districts 3, 4 and 5, and its political gerrymandering claims concern Adopted Districts 11, 13, and 17. We set forth the facts below to provide an overview as necessary to understand the bases of those claims.

### A. Racial Claims: Adopted Districts 3, 4, and 5

This litigation focuses primarily on District 4 in the Adopted Map, so we begin with the history of District 4. Following the 1990 Census, Illinois lost a congressional seat and the Illinois General Assembly was required to draw new district boundaries for the state. When the General Assembly failed to undertake its constitutional obligation to draw a new map, the court in *Hastert*

*v. State Bd. of Elections*, 777 F. Supp. 634, 637 (N.D. Ill. 1991), was called upon to devise one. Hispanic voters also sought the creation of a Latino majority congressional district under Section 2 of the Voting Rights Act. Both parties agreed that, given population and demographic changes within the City of Chicago, a Latino majority district was mandated by Section 2. *See id.* at 640.

The goal of the litigants was to create a new Latino majority district while maintaining the three African-American majority districts, Districts 1, 2, and 7. The result was a bizarre configuration of District 4. *Id.* at 648 n. 24. The court explained that "the Chicago Hispanic community resides principally in two dense enclaves, one on Chicago's near northwest side and one on the near southwest side." *Id.* District 7, one of the African-American majority-minority districts, runs "roughly in an east-west direction along Chicago's central latitudes from Lake Michigan to the western suburbs," and separates the two Hispanic enclaves. *Id.* The parties' proposed plans in that case both connected the "northwest and southwest side Hispanic enclaves by running a narrow corridor around the western end of [District 7], creating a C-shaped configuration." *Id.* The western portion of the proposed plans, specifically, the part west of Central Avenue connecting the northwest and southwest enclaves is referred to as the "connector arm." Both proposed maps shot out rays from the northwest and southwest enclaves to capture additional Latino population. *Id.* The court commented that "[f]ew districts have quite so an extraordinary appearance." *Id.*

The court found that "the Chicago/Cook County Hispanic community [was] 'sufficiently large and geographically compact' to constitute a single district majority." *Id.* at 649 (citation omitted). It noted that the two Latino enclaves are less than one mile apart at their closest point and that this separation resulted from exogenous physical and institutional barriers, and thus did not indicate the existence of two distinct communities. *Id.* & n.25. The court further found that the

4

Latino community was politically cohesive and that voting in the area was racially polarized. *Id.* at

650. The racially polarized voting, the court found, "thwarted the political interests of the Hispanic

community." *Id.* The court reasoned that "[t]he location of the Chicago Hispanic community in two

highly concentrated enclaves on either side of [District 7] on Chicago's near northwest and near

southwest sides necessarily requires an odd configuration to accommodate the creation of an

Hispanic district and the three super-majority African-American districts dictated under the Voting

Rights Act." *Id.* at 650. After considering the totality of circumstances, the court concluded that

Section 2 of the Voting Rights Act mandated a majority-minority Latino district and ultimately

adopted the *Hastert* plan, thereby creating the C-shaped District 4, a district that had 59.18 percent

of the Latino voting age population.[2] *Id.* at 648-50.

In 1996, the court was asked to reexamine whether District 4 violated the constitution, *inter*

*alia*, in light of *Shaw v. Reno*, 509 U.S. 630 (1993) (*Shaw I*) and *Miller v. Johnson*, 515 U.S. 900

(1995), *see King v. State Bd. of Elections*, 979 F. Supp. 582, 586 (N.D. Ill. 1996) (*King I*), which

recognize an equal protection claim based on segregating voters in separate districts based on race.

*King I* addressed "whether in attempting to remedy a Section 2 Voting Rights Act violation, the

*Hastert* court adopted a redistricting plan that apportioned the electorate on the basis of race and

ethnicity in violation of the Fourteenth Amendment's Equal Protection Clause." *Id.* at 599.

The *King I* court found that racial considerations predominated in the creation of District 4.

*Id.* at 605. Indeed, the parties had agreed (in *Hastert*) that a Hispanic majority district was mandated

and had agreed to the proposed configuration of District 4; thus, the "district's bizarre shape was

---

[2] The map of District 4 adopted by the *Hastert* court can be found in *King v. State Bd. of Elections*, 979 F. Supp. 582, 586 n.2 (N.D. Ill. 1996).

effectively determined by the *litigants* and not the court." *Id*. at 606 (emphasis in original). The court added that District 4's "extremely irregular configuration create[d] a strong inference . . . that its shape rationally cannot be understood as anything other than an effort to separate voters into different districts on the basis of race." *Id.* The court further noted that district lines "follow the concentrations of the Hispanic population with 'exquisite' detail." *Id.* at 608-09. The only logical conclusion to be drawn from the shape and demographics of District 4, the court concluded, was "that racial considerations predominated over all other factors in the configuration." *Id.* at 607. Nonetheless, the *King I* court upheld District's 4 odd shape under strict scrutiny upon finding that its configuration was necessary to remedy a violation of Section 2 of the Voting Rights Act. *Id.* at 614-15.

On appeal, the Supreme Court vacated the *King I* judgment and remanded the case for reconsideration in light of two then-recent Supreme Court cases, *Shaw v. Hunt*, 517 U.S. 899 (1996) (*Shaw II*) and *Bush v. Vera*, 517 U.S. 952 (1996). *See King v. Ill. Bd. of Elections*, 519 U.S. 978 (1996). On remand, the *King* court reaffirmed its holding, concluding that District 4 was narrowly tailored to further a compelling state interest of remedying a potential violation or achieving compliance with Section 2. *King v. State Bd. of Elections,* 979 F. Supp. 619, 620, 627 (N.D. Ill. 1997) (*King II*), *summarily aff'd,* 522 U.S. 1087 (1998).

After the 2000 Census, Illinois had to redraw the congressional districts. The legislature kept District 4 in substantially the same shape as the *Hastert* District 4. We refer to this map as the "Current Map."[3] There was no challenge to District 4 as drawn in the Current Map. The next map,

---

[3] The Current Map of Cook County and statewide is attached to this opinion as Appendix A and B.

6

now in litigation, what we call "the Adopted Map," was passed by the 2011 Illinois General Assembly after the 2010 Census.[4]

To comply with the one-person, one-vote requirement after losing a congressional district, the state had to add population (approximately 112,000 people) to District 4. As stated above, when District 4 was created under *Hastert*, it contained 59.2 percent Latino voting-age population. Between 1990 and 2010, the Latinos share of the voting-age population in Cook County increased from 11.5 percent to 20.8. At the time of the 2010 Census, the Latino voting-age population percentage of District 4 stood at 68.1 percent. Adopted District 4 reduces that by 2.2 percent and includes 65.9 percent Latino voting-age population. Adopted District 4 continues to have the C-shaped boundaries surrounding District 7, which remains a majority-minority (African-American) district. According to the Board of Elections' figures, 82 percent of the population from Current District 4 remains in Adopted District 4.

There are certain notable changes in Adopted District 4 compared to *Hastert* District 4. For example, Adopted District 4 splits 40 precincts, compared to 218 in that prior district. *See King I*, 979 F. Supp. at 610.This is likely due in part to the realignment of precincts in 1992. *Id.* at 610 n.52 (stating that District 4 split only 61 of the realigned 1992 precincts). Adopted District 4 is also slightly more compact, and some of the zigzag-shaped edges are smoothed out. The transfer of certain low-percentage Latino areas west of Central Avenue from previous District 3 had the effect of substantially increasing the population in the connector arm, making the district slightly more geographically compact. The connector arm in 1991 contained 5 percent of the total population of the district. Under Adopted District 4, it contains 26 percent.

---

[4] The Adopted Map of Cook County and statewide is attached to this opinion as Appendix C and D.

7

The experts who testified at trial relied on two widely acceptable tests to determine compactness scores: the Polsby-Popper measure and the Reock indicator. The Polsby-Popper score is a perimeter measure that considers how efficiently the area of a district is encompassed by its perimeter and boundary. The Reock score is a geographic dispersion measure that considers how tightly packed the area is in a district. Scores in both tests range from just above zero to one with higher scores indicating more compact districts. The Polsby-Popper score for Adopted District 4 is .05 and the Reock score is .30. The Board of Elections' expert opined that low compactness is equal to or less than .05 on the Polsby-Popper measure and equal or less than .15 on the Reock measure. In 1991, the Polsby-Popper measure for District 4 was .02 and the Reock measure was .20. Accordingly, the compactness of District 4 has increased, but it is still at the threshold level for low compactness on the Polsby-Popper score and still fails the "eyeball test" – based on a visual inspection of the district lines – for compactness. *See King I*, 979 F. Supp. 582 (finding that the *Hastert* District 4 was not "visually compact.").

Adopted Districts 3 and 5 border District 4; District 3 lies to the south and District 5 to the north of Adopted District 4. On the Adopted Map, Latino voting-age population in District 3 is reduced from 29.3 to 24.6 percent and in District 5 from 24.6 to 16.1 percent. Congressman Luis Gutierrez (a Latino member of the Democratic Party), is the incumbent in District 4, and has won every congressional election in that district since it was created. Congressman Dan Lipinski is the incumbent in District 3 and Congressmen Mike Quigley is the incumbent in District 5. Both are members of the Democratic Party; neither is Latino. Adopted Districts 3, 4, and 5 contain substantially the same geographic areas as under the Current Map and, as a result, protect incumbents in those districts.

To address the Committee's belief that the Adopted Map unlawfully "packs" Latinos into Adopted District 4, thereby diluting the Latino vote in Adopted Districts 3 and 5, the Committee proposes an alternative districting plan it calls "the Fair Plan," which we refer to as the "Committee's Map."[5] In general terms, under the Committee's Map, District 4 contains the southern Latino enclave and the northern portion of Adopted District 3, for a total Latino voting-age population of 59.4 percent. The Committee's District 3 includes the northern Latino enclave and portions of Adopted District 5, among other districts, for a total Latino voting-age population of 46.5 percent. District 7 remains a majority-minority African-American district under the Committee's Map. The Latino voting-age population in the Committee's District 5 is reduced from 24.6 percent to 12.4 percent. The Committee's Map also reduces Latino voting-age population in Districts 6, 7, and 9, but such reductions are less than 2 percent. This plan moves Latinos from Adopted District 4 and gives them another plurality district in the Committee's District 3. The Committee's expert, Dr. Peter Morrison, however, testified that the Committee's District 3 will not become a majority-minority Latino district until after the next census. The Committee's District 4 fares better under both the Polsby-Popper (.32) and Reock (.47) measures and passes muster under the "eyeball" test for compactness.

**B. Political Gerrymandering Claims: Adopted Districts 11, 13, and 17**

The racial make-up of the Adopted Map tells only part of the story; political motivations were largely at play in the crafting of the plan. A brief history of the recent political atmosphere in Illinois is helpful to understanding the climate in which the Adopted Map arose. From 1997 to 2003,

---

[5] The Committee's Map of Cook County and statewide is attached to this opinion as Appendix E and F.

9

the Illinois General Assembly was divided, with a Democratic majority in the Illinois House of Representatives and a Republican majority in the Illinois Senate. Since 2003, the Democratic Party has held a majority of seats in the Illinois General Assembly. Today there are 64 Democratic and 54 Republican state representatives and 35 Democratic and 24 Republican state senators. Republicans held the office of Governor from 1977 to 2003, but Democrats have held it from 2003 to the present.

Although Illinois in modern times is considered a "blue state" (that is, the Democratic Party often fares well in statewide and other elections), congressional representation in recent years has been divided. From 1999 to 2005, and again from 2011 to the present, Illinois has been represented in the United States Senate by one Republican and one Democratic senator (approximately 7 years). From 1985 to 1999 and from 2005 to 2010, Illinois has had two Democratic senators (approximately 19 years).

In 2000, Illinois had 20 congressional districts (10 Republican, 10 Democratic) and lost one seat after the 2000 Census. At the time, Republicans controlled the Illinois Senate and the Governor's office and Democrats controlled the Illinois House. A compromise map supported by leaders from both parties dismantled the 19th congressional district held by then Congressman David Phelps (Democrat). In the 2002 congressional elections, Republicans came out ahead, winning 10 seats to Democrats' 9.[6] Republicans lost seats in two subsequent elections once in 2004 (9

---

[6] "In Illinois, in 2002, immediately after redistricting, there was only one competitive Congressional District. It was the 19th in southern and central Illinois, where two incumbents, Representative John Shimkus and Representative David Phelps, were thrown together in a consolidated district. It was a district which by mutual agreement between the leaders of the congressional delegation of the two parties, favored the Republicans and Shimkus won handily, as expected." John S. Jackson & Lourenke Prozensky, *Redistricting in Illinois* (The Simon Review, Occasional Papers of the Paul Simon Public Policy Institute, Paper 2, 2005), http://opensiuc.lib.siu.edu/ppi_papers/2.

Republicans, 10 Democrats) and again in 2008 (7 Republicans, 12 Democrats), but made a comeback in the 2010 elections, gaining 11 seats to the Democrats' 8. Illinois again lost a congressional seat after the 2010 Census, and this time the Democratic Governor and Democratic-controlled General Assembly choose to eliminate the 13th congressional district, held by Congresswoman Judy Biggert (Republican). Evidence indicates that, based on the results of presidential elections, the Adopted Map will give the Democrats an advantage in 12 districts and the Republicans an advantage in only 6. Republicans, for obvious reasons, are unhappy with this design.

The Redistricting Committees in the 2011 Illinois General Assembly contained members of both major political parties. The House Redistricting Committee had 6 Democratic and 5 Republican members and the Senate Redistricting Committee had 11 Democratic and 6 Republican members. These committees held a series of public hearings at locations around the state where members of the public were allowed to comment on the redistricting process. *See* 10 Ill. Comp. Stat. 125/10-5. In the morning of May 27, 2011, the Friday of Memorial Day weekend, the Democratic leadership of the Illinois House and Senate Redistricting Committees released the Adopted Map to the public for the first time; it was posted on their website. On the following Monday (Memorial Day), the Illinois House of Representatives passed the Redistricting Act, and the Illinois Senate followed suit the next day. (It passed along party lines). None of the Republican plaintiffs in this case attended the public hearings nor did they present any plans or suggestions to those committee members because they considered it futile. In fact, it appears that the Committee's Map was not disclosed or released until this litigation was underway.

People outside the Redistricting Committees had significant influence in drawing the Adopted Map. Republicans' attempts to negotiate with these individuals were ineffective because

they were not provided with information needed to properly evaluate the proposed maps. Plaintiff Congressman John Shimkus (Republican) testified that he initially was negotiating with Congressman Jerry Costello (Democrat) to craft a bipartisan map but was unable to negotiate any further when he wasn't provided shape files (the east-west longitude, block by block, house delineation of the lines) of the proposed maps. Congressman Peter Roskam (Republican) testified that Illinois Senate President John Cullerton (Democrat) offered to negotiate, but because Congressman Roskam was only provided a glimpse of his proposed district, he declined Illinois Senator Cullerton's offer.

The Democratic Congressional Campaign Committee (DCCC) was also heavily involved in the creation of the Adopted Map. Several emails between the DCCC and Andy Manar, chief of staff for Illinois Senator Cullerton, reveal that the primary goal in redistricting was to gain more Democratic seats. These emails discuss ideas about how to make various districts "more Democratic" and achieve the "goal" of "maximiz[ing] Democratic performance." The partisan motive is most evident in a memo dated May 24, 2011, from the DCCC to Senator Cullerton describing ways to pick-up Democratic seats, to maximize opportunities for Democrats, to destabilize Republican incumbents, and to gain partisan advantage. This goal was seemingly accomplished in Adopted Districts 11, 13, and 17.

The Committee, through Edward Marshall, presented evidence of the partisan voting index (PVI) for the districts within the Current Map and Adopted Map. PVI is a formula comparing the vote in two presidential races within a congressional district to the same two races on a national level to determine how strongly a congressional district leans toward one political party. The index indicates which party's candidate was more successful in that district, as well as the number of

percentage points by which its results differed from the national average. According to Mr. Marshall's figures, under the Current Map, 9 out of the 19 Illinois congressional districts (47.7%) have Democratic-leaning PVI scores, whereas under the Adopted Map, 12 out of the 18 Illinois congressional districts (66.7%) have Democratic-leaning PVI scores. Under the Committee's Map, on the other hand, 8 districts would be Democratic-leaning, 8 would be Republican-leaning, and two would be neutral.

More specifically, Adopted District 11 has a PVI score of D+5, compared to R+1 in the Current Map; Adopted District 13 has a PVI score of D+1, compared to R+1 under the Current Map; and Adopted District 17 has a PVI score of D+7, compared to D+3 under the Current Map. Mr. Marshall also provides evidence of the discrepancy in incumbency protection between Democrats and Republicans in the Adopted Map. The Adopted Map preserves from 76.4 percent (Congressman Lipinksi) to 100 percent (Congressman Costello) of the Democratic incumbents' constituent populations, whereas it preserves only 20.5 percent (Congressman Adam Kinzinger)[7] to 67.9 percent (Congressman Aaron Schock) of the Republican incumbents' constituent populations.

Under the Adopted Map:

! Congressman Randy Hultgren (Republican), currently in District 14, and Congressman Joe Walsh (Republican), currently in District 8, are collapsed into Adopted District 14.

---

[7] Only 1.3 percent of Congresswoman Biggert's constituents in Current District 13 are placed in Adopted District 5, the district in which she resides under the Adopted Map. But because Congresswoman Biggert's district was eliminated, we believe this number is not as representative as those cited in the text.

! Congressman Robert Dold (Republican), currently in District 10, is moved into Democratic Congresswoman Jan Schakowsky's District 9, which has a PVI score of D+15.

! Congresswoman Judy Biggert (Republican), who currently resides in District 13, will now reside in Democratic Congressman Mike Quigley's District 5, which has a PVI score of D+16.

! Congressman Kinzinger (Republican), who currently resides in District 11, will now reside in Democratic Congressman Jesse Jackson's District 2, which has a PVI score of D+27.

Accordingly, the Adopted Map places three Republican incumbents (Dold, Biggert, and Kinzinger) into heavily Democratic districts with a Democratic incumbent and places two other Republican incumbents (Hultgren and Walsh) into the same district.

The Adopted Map has imperfections. For example, Adopted District 17 links the Quad Cities with the Democratic-leaning parts of Peoria and Rockford, slicing away parts of Republican Congressmen Schock's and Donald Manzullo's districts and splitting the City of Rockford, which has been within a single district since 1850. Incumbent Congressman Bobby Schilling (Republican) remains in District 17 but with only 51.9 percent of his current constituents. Adopted District 11 zigzags across Chicago's southwestern suburbs to link Democratic-leaning populations in Aurora and Joliet. District 11, which was Congressman Kinzinger's district, now has no incumbent, and Kinzinger is moved into Adopted District 2 with only 20.5 percent of his constituents.[8] Finally,

---

[8] That an incumbent need not be a resident of the district to run for election there, *see, e.g., Texas Democratic Party v. Benkiser*, 459 F.3d 582, 590 (5th Cir. 2006), doesn't change the practical effect of redrawing district lines to displace incumbents.

Adopted District 13 pulls together Democratic-leaning parts of Springfield, Bloomington/Normal, and Champaign/Urbana with Decatur by sending arms off toward the east, north, and northwest. It also now includes parts of Collinsville, a town with 22,000 residents that will have three congressional representatives[9] under the Adopted Map.[10]

## II. Analysis

The Committee has asserted claims for racial vote dilution, racial gerrymandering, and political gerrymandering. We begin by addressing political gerrymandering because we agree that politics was the primary motivating factor behind the Adopted Map.

### A. Political Gerrymandering

We have already dismissed, without prejudice, the Committee's claims of political gerrymandering under the First Amendment (Count V) and the Equal Protection Clause of the Fourteenth Amendment (Count VI). We dismissed Count V because the "complaint [did not] make plausible a finding that the [Adopted] Map infringes Republican voters' rights to associate with each other or with anyone else, or a finding that the Map burdens Republican voters' rights of free expression, or that the Map affects Republican voters' rights to petition the government." (*See*

---

[9] The parties dispute whether residents from one town benefit from having more than one representative in the United States House of Representatives.

[10] The Committee's Map also has imperfections. It would move Congressman Gutierrez into Latino plurality District 3, even though he has represented the population in Latino majority District 4 since 1991. The Committee's Map would also move Congressman Lipinksi into District 13, pairing him against Congresswoman Biggert. This would leave Congressman Lipinski with only 4 percent of the population of his previous District 3, while retaining 67 percent of Congresswoman Biggert's current district. The Committee's proposed District 13 is Republican leaning (R+2) and is projected to result in Congressman Lipinski's losing his seat in the next election.

Opinion and Order (Nov. 1, 2011), Dkt. 98, p. 21, 2011 WL 5185567, *11). We held that First Amendment rights are not implicated merely because the Adopted Map makes it more difficult for Republican voters to elect Republican candidates. *Id.*, citing *Washington v. Finlay*, 664 F.2d 913, 927-28 (4th Cir. 1981) and *Radogno v. Illinois State Bd. of Elections*, 2011 WL 5025251, *8 (N.D. Ill. Oct. 21, 2011). We also dismissed Count VI of the Committee's initial complaint because the Committee had not alleged a standard for judging its equal protection claim as required by *Vieth*, 541 U.S. at 306-13 (Kennedy, J., concurring). (*See* Dkt. 98, pp. 16-20, 2011 WL 5185567, *8-11).

The Committee filed an amended complaint again asserting political gerrymandering in violation of the First Amendment and the Equal Protection Clause. The amended complaint adds allegations of a method by which to measure intent and effect (¶¶ 134, 135)[11] and elaborates a bit on the burden the Map places on Republicans' ability to have their political views heard. (Am. Compl. ¶ 135.) The Board of Elections filed a second motion to dismiss the amended partisan gerrymander claims in Counts V and VI [Dkt. No. 122]; we deferred ruling on that motion until after the permanent injunction hearing. We now grant that motion with respect to Count V (the First Amendment claim), and deny the motion with respect to Count VI (the Equal Protection partisan gerrymander claim). We, however, dismiss Count VI on the merits for failure to substantiate a workable and reliable standard.

The First Amendment allegations, which are nothing more than intuitive assumptions, do not change our conclusion, as we stated in the Opinion and Order of November 1, 2011, that the First Amendment claim fails because the Committee has not shown that the Adopted Map restricts protected expression. We take guidance from the *Vieth* plurality, which rejected such a claim,

---

[11]Although alleged in both the First Amendment and equal protection claims, these allegations pertain only to the equal protection claim.

16

reasoning that "a First Amendment claim [for political gerrymandering], if it were sustained, would render unlawful *all* consideration of political affiliation in districting, just as it renders unlawful *all* consideration of political affiliation in hiring for non-policy-level government jobs." *Vieth*, 541 U.S. at 294 (plurality) (emphasis in original). The Supreme Court has emphasized that the "burdening" of partisan viewpoints is an inevitable part of drawing district lines. *See Gaffney v. Cummings*, 412 U.S. 735, 753 (1973) ("Politics and political considerations are inseparable from districting and apportionment. . . . The reality is that districting inevitably has and is intended to have substantial political consequences."). The Committee's First Amendment challenge is similar to the challenge rejected by the three-judge panel in *League of Women Voters*, and following the well reasoned opinion in that case, we similarly grant the Board of Elections' motion to dismiss the Committee's First Amendment challenge to the Adopted Map. *See League of Women Voters v. Quinn*, No. 1:11-cv-5569, 2011 WL 5143044, *4 (N.D. Ill. Oct. 28, 2011)). As was stated in that case, "[t]he redistricting plan [for the General Assembly] does not prevent any LWV member from engaging in any political speech, whether that be expressing a political view, endorsing and campaigning for a candidate, contributing to a candidate, or voting for a candidate." *Id.* Moreover, "while it is true that the redistricting plan undoubtedly means that one party is more likely to be victorious in any given district, the First Amendment . . . 'does not ensure that all points of view are equally likely to prevail.'" *Id.* (quoting *Initiative & Referendum Inst.* v. *Walker*, 450 F.3d 1082, 1101 (10th Cir. 2006). Accordingly, we conclude that the Adopted Map does not unlawfully burden the Committee's First Amendment rights.

Turning now to the Committee's equal protection claim, in ruling on the first motion to dismiss we pointed out that the Supreme Court has not agreed on what the elements of such a claim

17

would be in the context of unlawful discrimination based on partisanship, but we granted leave to amend if the Committee could "articulate a workable and reliable standard for adjudicating their partisan gerrymandering claim and sufficient factual allegations to demonstrate plausibility." (Dkt. 98, p. 20, 2011 WL 5185567, *11).

The Committee's amended complaint postulates a standard that requires a showing of both intent and effect. To establish the intent element of the proposed standard, the plaintiffs would have the burden to prove that the state's mapmakers created one or more congressional districts with the predominant intent to secure partisan advantage. This intent standard parallels the intent standard that applies to racial gerrymandering claims. *See Miller*, 515 U.S. at 916. As the Committee frames its issue, proving the required discriminatory effect would require a showing of three things: (1) that the Adopted Map increases the number of districts that favor Democrats by at least 10 percent according to an accepted measure of partisan voting, which the Committee proposes as PVI; (2) that the Adopted Map keeps at least 10 percent more constituents of Democratic incumbents in the same district as their representative than it does constituents of Republican incumbents; and (3) that at least one of the districts created with the intent to advantage Democrats is among the districts that contributes to the proof of elements 1 and 2.

Ultimately, the Committee's proposed standard is as unworkable as its unworkable forebears, recently summarized in *Radogno:*

- A showing of intent to discriminate, plus denial of a political group's chance to influence the political process as a whole (offered by the plurality in *Bandemer*, 478 U.S. at 132-22 (plurality opinion)) . . .

- Whether boundaries were drawn for partisan ends to the exclusion of fair, neutral factors (offered by Justice Powell's concurrence in *Bandemer*, 478 U.S. at 161, 173 (Powell, J., concurring in part and dissenting in part) . . . .

18

- Whether mapmakers acted with the 'predominant intent' to achieve partisan advantage and subordinated neutral criteria; for example, where the map 'packs' and 'cracks' the rival party's voters and thwarts its ability to translate a majority of votes into a majority of seats (offered by the appellants in *Vieth*, [451 U.S.] at 284-90 . . .).

- Whether, at a district-to-district level, a district's lines are so irrational as to be understood only as an effort to discriminate against a political minority (offered by Justice Stevens's dissent in *Vieth*, *id.* at 321-27 (Stevens, J., dissenting) . . . .

- Application of a five-part test requiring a plaintiff to show (1) that he is a member of a cohesive political group; (2) that the district of his residence paid little or no heed to traditional districting principles; (3) that there were specific correlations between the district's deviations from traditional districting principles and the distribution of the population of his group; (4) that a hypothetical district exists which includes the plaintiff's residence, remedies the 'packing' or 'cracking' of the plaintiff's group, and deviates less from traditional districting principles; and (5) that the defendants acted intentionally to manipulate the shape of the district in order to pack or crack his group (offered by Justice Souter's dissent in *Vieth*, *id.* at 347-51 (Souter, J., dissenting) . . . .

- Whether a statewide plan results in unjustified entrenchment, such that a party's hold on power is purely the result of partisan manipulation and not other factors (offered by Justice Breyer's dissent in *Vieth*, *id.* at 360-62 (Breyer, J., dissenting) . . . .

*See Radogno*, Case No. 1:11-cv-4884, 2011 WL 5868225, *2-3 (N.D. Ill. Nov. 22, 2011) (footnotes omitted).

Rejecting these efforts to show intent and/or effect, the Court in *Vieth* dismissed the complaint even though the plaintiff had alleged that "the districting plan was created solely to effectuate the interests of Republicans, and that the General Assembly relied exclusively on a principle of maximum partisan advantage when drawing the plan, to the exclusion of all other criteria." 541 U.S. at 340 (Stevens, J., dissenting) (internal quotations omitted). The plan, according to the plaintiff, was "so irregular on its face that it rationally [could] be viewed only as an effort

19

. . . to advance the interests of one political party, without regard for traditional redistricting principles and without any legitimate or compelling justification." *Id.* at 340 (internal quotations omitted). Yet, a majority of the Court concluded that these allegations were insufficient to state a claim.

The *Radogno* court further noted that the Supreme Court in *League of United Latin Am. Citizens v. Perry*, 548 U.S. 399, 416-20 (2006) (Kennedy, J., announcing the judgment of the Court) (*LULAC*), effectively rejected a standard requiring a showing that the *sole intent* of the redistricting plan was to pursue partisan advantage. *See Radogno*, 2011 WL 5868225, *3. In *LULAC,* the Texas legislature engaged in mid-decennial redistricting for the purpose of gaining Republican seats. Despite the legislature's blatant attempt to redistrict for political advantage, Justice Kennedy explained that the sole-motivation theory was unworkable because it failed to "show a burden, as measured by a reliable standard, on the complainants' representational rights." *LULAC*, 548 U.S. at 418.

The Supreme Court in *Vieth* criticized the predominant intent test because "the fact that partisan districting is a lawful and common practice means that there is almost *always* room for an election-impeding lawsuit contending that partisan advantage was the predominant motivation." *Vieth*, 541 U.S. at 286 (emphasis in original). Political considerations are a legitimate consideration in redistricting. *See Hunt v. Cromartie*, 526 U.S. 541, 551 (1999) (*Cromartie I*) (parties may engage in constitutional political gerrymandering); *see also Easley v. Cromartie* (*Cromartie II*), 532 U.S. 234, 242 (2001) (politics can be a legitimate explanation for districting decisions). At best, "[t]he relevant question is not whether a partisan gerrymander has occurred, but whether it is so excessive

20

or burdensome as to rise to the level of an actionable equal-protection violation." *See Radogno*, 2011 WL 5868225, *2.

We agree with the Committee that the predominant intent in drawing several of the districts in the Adopted Map was political. DCCC representative Ian Russell sent several emails to Illinois Senator Cullerton's chief of staff, Andy Manar, discussing ways to improve Democratic performance in various districts by fashioning district boundaries to pick up areas that are more heavily Democratic. This is particularly evident in a memo from the DCCC to Illinois Senator Cullerton dated May 24, 2011, which acknowledges the goal of creating Democratic-leaning districts in Illinois. The memo offers suggestions for "increas[ing] our odds of making at least one and probably two downstate seats part of a durable majority in the delegation," including by "pairing the Quad Cities with Peoria." The DCCC stated that "[a] critical part of the remapping process is altering the districts of incumbent Republicans to complicate their paths back to Washington," and proposed "split[ting] Peoria in half, with the Democratic neighborhoods going into a Democratic-leaning district that runs north to the Quad Cities" and Peoria-based Congressman Schock going into a "heavily Republican" district.[12] The shape and political demographics of the districts in the Adopted Map reveal that the Illinois General Assembly followed DCCC's guidance. Based on all the evidence presented, we can conclude that politics was the predominant factor in crafting Adopted Districts 11, 13, and 17.

---

[12] Congressman Donald Manzullo's testimony before us highlighted that in today's world, overly partisan redistricting resounds beyond the major political parties. Congressman Manzullo testified that members of Congress are prohibited from providing constituent services to non-constituents. Today's members of Congress often speak for constituents who are having difficulty negotiating dealings with the executive branch. When redistricting constituents are shifted from one Congressman to another, they face even more difficulties in finding the new Congressman's office, getting to that office, and explaining their problems to people who are unfamiliar with them.

But, as indicated, predominant or even sole intent is not enough. The question is whether the Committee's proposed effects standard is workable. The Committee certainly attempts to heed the directive of the Supreme Court that a workable standard must be one that is objective and measurable, *see Vieth*, 541 U.S. at 291, by formulating a standard based on objective measures. There are, however, several fatal flaws with the Committee's proposed standard.

Under the Committee's proposed standard, the Adopted Map must increase the number of districts that favor Democrats by at least 10 percent according to an accepted measure of partisan voting, such as the PVI, and must keep at least 10 percent more constituents of Democratic incumbents in the same district than it does constituents of Republicans. These 10 percent requirements are inexplicably arbitrary. What accepted principles of equal protection jurisprudence point to the conclusion that 10 percent deviation is the appropriate cut off? *See Radogno*, 2011 WL 5868225, *4 ("[I]t's hard to see how [the proposed test] is implied by the requirements of the Equal Protection Clause, which . . . tolerates some degree of partisanship in redistricting."). For example, what if a state has six seats and loses one? That redistricting plan would necessarily increase the number of districts favoring a political party by more than 10 percent and probably fail the Committee's test altogether, even though there is nothing unconstitutional about considering politics when redrawing district lines. Additionally, from what point in time is the 10 percent increase in Democratic-leaning districts to be measured? As illustrated by the partisan fluctuations in Illinois' congressional delegation, Republicans performed exceptionally well in the 2010 elections, but their average performance over the past ten years is less remarkable.

Further, the Committee uses the PVI to determine which districts "favor" Democrats under the Adopted Map. This standard, however, does not reveal *excessive* political gerrymandering

22

because it might include districts that favor the political party by only a slight margin. Adopted District 13 illustrates this point. District 13 had only a slight change in PVI score: Current Map District 13 had a PVI score of R+1 and the Adopted Map has a PVI score of D+1. (Interestingly, Adopted District 17 is not even Republican leaning according to the PVI: Current Map District 17 had a PVI score of D+3 and Adopted District 17 has a PVI score of D+7). Reliance on the Committee's standard in such circumstances does not reveal political gerrymandering gone too far.

Both prongs of the effects test also fail to acknowledge that "a person's politics is rarely as readily discernible—and *never* as permanently discernible—as a person's race," and that "[p]olitical affiliation is not an immutable characteristic, but may shift from one election to the next; and even within a given election, not all voters follow the party line." *Vieth*, 541 U.S. at 287 (emphasis in original). The plurality in *Vieth* concluded that such "facts make it impossible to assess the effects of partisan gerrymandering." *Id.* The Committee's use of PVI doesn't address this concern; a measurement based on presidential elections is not necessarily telling of a district's political sway in future congressional elections. This is particularly true in Illinois where voters have not consistently favored one political party. The 12 to 6 Democratic advantage predicted for the Adopted Map isn't as jarring when considered in light of Democrats' 12 to 7 edge over Republicans after the 2008 elections. Further, according to the PVI, Democrats were favored to win in District 17 and District 10 prior to the 2010 midterms (the PVI score for Current Map District 17 was D+3 and Current Map District 10 was D+6), yet Republicans won both those seats. Conversely, despite large congressional pick ups for Republicans in 2010 and the Republican win in the U.S. Senate race, the Illinois gubernatorial race in that same election resulted in a victory for incumbent Governor Pat

Quinn, a Democrat,[13] although the margin of victory was slim. Given the unpredictable nature of Illinois voters' political preference, the PVI is not a particularly reliable measure of partisan voting in congressional elections.

The Committee's proposed standard is not so dissimilar from the effects test rejected in *Vieth* that required plaintiffs to "show that the districts systematically 'pack' and 'crack'[14] the rival party's voters" and thwart its ability to translate a majority of votes into a majority of seats. *See Vieth*, 541 U.S. at 286. The Court questioned whether this standard was "judicially discernible in the sense of being relevant to some constitutional violation" because groups do not have a right to proportional representation. *Id.* at 287-88; *see also id.* at 299-300 (rejecting Justice Breyer's standard that partisan gerrymandering can be shown where the party receiving the majority of votes fails to acquire a majority of seats in two successive elections and where there is no "neutral" explanation).

We similarly find that the Committee's standard is not judicially discernible as relevant to a constitutional violation. It could result in the finding of an equal protection violation where Republicans still remain competitive in the district that was created with the intent to advantage Democrats (for example, a district that goes from 51 to 49 percent Republican-leaning). The Committee's standard requires that only one of the districts created with the intent to advantage Democrats be among the ones that contribute to the 10 percent deviations. The Republicans' representational rights are not unfairly burdened where they remain competitive in a district,

---

[13]Gov. Quinn's incumbency was the result of the impeachment of his predecessor, Rod Blagojevich. Mr. Quinn was elected Lt. Governor in 2002, was re-elected to that office in 2006, and as a matter of Illinois law became Governor upon Blagojevich's impeachment in January 2009.

[14] "'Packing' refers to the practice of filling a district with a supermajority of a given group or party. 'Cracking' involves the splitting of a group or party among several districts to deny that group or party a majority in any of those districts." *Id.* at 287 n.7.

particularly if traditional redistricting principles contributed in part to the district's boundaries. The Committee's effects test simply doesn't provide a workable standard to determine when partisan gerrymandering has become unconstitutionally *excessive*. *See, e.g., Radogno*, 2011 WL 5868225, *5 (stating that "the challenge is to locate a standard that identifies unconstitutionally *excessive* partisan discrimination"; "the Plaintiffs have not proposed such a standard, nor can we identify one.") (emphasis in original). For all of these reasons, we reject the Committee's claims that partisan gerrymandering violates its constitutional rights.

### B. Vote Dilution

The plaintiffs also allege in their amended complaint that the congressional redistricting plan adopted by the State of Illinois dilutes the vote of Latinos in Districts 3, 4, and 5, in violation of Section 2 of the Voting Rights Act (Count I), the Equal Protection Clause of the Fourteenth Amendment (Count II), and rights protected by the Fifteenth Amendment (Count III). We begin by addressing Section 2 of the Voting Rights Act, but our conclusion that the Committee hasn't shown intentional discrimination against Latinos dooms all three vote dilution counts.

We have already addressed the standards for these claims in our opinion on the first motion to dismiss, but for clarity, we summarize those standards here. For purposes of Section 2 of the Voting Rights Act, vote dilution is the practice of reducing the potential effectiveness of a group's voting strength by limiting the group's chances to translate that strength into voting power. *See, e.g., Shaw I*, 509 U.S. at 641. Vote dilution most often is attempted either by scattering the minority voters among several districts in which a bloc-voting majority can outvote them regularly, or by centralizing them into one or two districts and leaving the other districts relatively free from their influence. *See Johnson v. De Grandy*, 512 U.S. 997, 1007 (1994). Intentional vote dilution through

the drawing of district lines violates both Section 2 of the Voting Rights Act and the Fourteenth Amendment, *see Rogers v. Lodge*, 458 U.S. 613, 617 (1982), and Section 2 of the Voting Rights Act also forbids facially neutral districting that has the effect of diluting minority votes, 42 U.S.C. § 1973.

Section 2 provides that "[n]o voting qualification or prerequisite to voting or standard, practice, or procedure shall be imposed or applied by any State . . . in a manner which results in a denial or abridgement of the right of any citizen of the United States to vote on account of race or color . . . as provided in subsection (b) of this section." 42 U.S.C. § 1973(a). Subsection (b) provides that a violation of subsection (a) "is established if, based on the totality of circumstances, it is shown that the political processes leading to nomination or election in the State . . . are not equally open to participation by members of a class of citizens protected by subsection (a) of this section in that its members have less opportunity than other members of the electorate to participate in the political process and to elect representatives of their choice." 42 U.S.C. § 1973(b). The 1982 amendments to this statute eliminated the requirement of intentional discrimination by substituting a "results" test for the "purpose" test previously imposed by the Supreme Court. *See Ketchum v. Byrne*, 740 F.2d 1398, 1403 (7th Cir. 1984).

Generally, the Committee must prove three preconditions to succeed on a Section 2 claim: (1) that Latinos are a large enough group and geographically compact enough to be a majority in a single-member district, or in more single-member districts than the redistricting plan created; (2) that the Latino group is "politically cohesive," meaning that its members vote in a similar fashion; and (3) the majority votes as a bloc, allowing them usually to defeat the Latino's preferred candidates. *Thornburg v. Gingles*, 478 U.S. 30, 48-51 (1986). If the plaintiffs satisfy their burden of proving

26

those conditions, the court moves on to decide, based on the totality of the circumstances, whether

a Section 2 violation has occurred, *see De Grandy*, 512 U.S. at 1011, considering (among other

things) the state's history of voting-related discrimination, the degree of racial polarization in voting,

and whether and how the state has used voting practices or procedures that facilitate discrimination

against the plaintiffs' minority group, *Gingles*, 478 U.S. at 44-45.

The Committee has not proved the first *Gingles* precondition that the Latino minority group

is large enough and geographically compact enough to be a *majority* in more single-member districts

than the redistricting plan created. The Committee's Map does not create two majority-minority

Latino districts. District 4 under the Committee's Map has 59.4 percent Latino voting-age

population and District 3 has only 46.5 percent. *See Bartlett v. Strickland*, 556 U.S. 1, 129 S. Ct.

1231, 1246 (2009) (holding "that a party asserting § 2 liability must show by a preponderance of the

evidence that the minority population in the potential election district is greater than 50 percent.").

As we explained in our opinion on the first motion to dismiss, however, if the Committee

shows intentional discrimination, the first *Gingles* factor is relaxed. (*See* Dkt. 98, pp. 5-8, 2011 WL

5185567, *3-4).[15] But, following the Ninth and Eleventh circuits, we stated that without effect,

discriminatory intent will not carry the day. *See Garza v. Cnty. of Los Angeles*, 918 F.2d 763, 771

(9th Cir. 1990) ("Although the showing of injury in cases involving discriminatory intent need not

---

[15] The Court in *Bartlett* limited its holding by noting that the case did not involve allegations of intentional and wrongful conduct, and therefore, the Court did not need to resolve "whether intentional discrimination affects the *Gingles* analysis." 129 S. Ct. at 1246 (Kennedy, J., plurality). The Court expressly stated that its holding in that case "does not apply to cases in which there is intentional discrimination against a racial minority." *Id.*; *see also Baird v. Consol. City of Indianapolis*, 976 F.2d 357, 359 (7th Cir. 1992) (implying that intentional discrimination under Section 2(a) doesn't require the same analysis as an effects-based claim under Section 2(b)); *see also Voinovich v. Quilter*, 507 U.S. 146, 158 (1993) (stating that "the *Gingles* factors cannot be applied mechanically and without regard to the nature of the claim").

27

be as rigorous as in effects cases, *some* showing of injury must be made to assure that the district court can impose a meaningful remedy.") (emphasis in original); *see also Johnson v. DeSoto Cnty. Bd. of Comm'r*, 72 F.3d 1556, 1561-63 (11th Cir. 1996) (stating that Section 2 "expressly requires a showing of discriminatory results, and it admits of no exception for situations in which there is discriminatory intent but no discriminatory results"). Accordingly, we explained that the Committee would still have to show that the Adopted Map lessened the opportunity for Latino voters to elect a candidate of their choice in the challenged district and that the second and third *Gingles* preconditions are established – that the minority group is politically cohesive and that the majority votes as a bloc, allowing the majority voters usually to defeat the minority's preferred candidates. *See Gingles*, 478 U.S. at 50-51.

Failing proof of the first *Gingles* factor, the Committee may show discriminatory effect through circumstantial evidence of discriminatory intent. *See Ketchum*, 740 F.2d at 1406; *Johnson* at 1565 (intent to discriminate is circumstantial evidence of discriminatory results that should be considered in assessing the totality of circumstances). As we stated in our opinion on discovery-related matters (Opinion and Order, Dkt. 77, pp. 7-8 (Oct. 12, 2011), 2011 WL 4837508, *3), such factors include, but are not limited to, bloc voting along racial lines; low minority voter registration; exclusion from the political process; unresponsiveness of elected officials to needs of minorities; and depressed socio-economic status attributable to inferior education and employment and housing discrimination. *See Ketchum*, 749 F.2d at 1406 (citing *Rogers*, 458 U.S. at 622-27). Other factors include the historical background of the decision; the specific sequence of events leading up to the challenged decision; departures from the normal procedural sequence; minority retrogression (*i.e.*, a decrease in the voting strength of a cohesive voting bloc over time); and manipulation of district

boundaries to adjust the relative size of minority groups, including the "packing" of minority votes. *See Vill. of Arlington Heights v. Metro. Housing Dev. Corp.*, 429 U.S. 252, 267-68 (1977)); *see also LULAC*, 548 U.S. at 426 (citing relevant factors under Section 2's "totality of circumstances" test). Yet "[a]nother relevant consideration is whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *LULAC*, 548 U.S. at 426. The court may infer an "invidious discriminatory purpose . . . from the totality of the relevant facts," including the discriminatory effect of the redistricting scheme. *Rogers*, 458 U.S. at 618.

The Committee presented no direct evidence of discriminatory intent, so we turn to the totality of the circumstances. The Committee focuses primarily on how the district boundaries are drawn, asserting that the Adopted Map packs a supermajority of Latinos in District 4 so that the votes of Latinos inside the district are "wasted" and the Latino votes in Districts 3 and 5 are diluted. As explained above, the *Hastert* court created District 4 with 59.2 percent Latino voting-age population to remedy a Section 2 Voting Rights Act violation. Since the creation of District 4, Latino Congressman Gutierrez has won District 4 by large margins and ran unopposed in the last four primaries. As a rule of thumb, "because of both age and the percentage of noncitizens, Latinos must be 65 to 70 percent of the total population in order to be confident of electing a Latino." *Barnett v. City of Chi.*, 141 F.3d 699, 703 (7th Cir. 1998). When considering voting-age population, the rule of thumb is closer to 60 percent. *See Ketchum*, 740 F.2d at 1415 (stating that 60 percent of voting-age population is reasonably required to ensure minorities a fair opportunity to elect a candidate of their choice). As the Committee correctly points out, however, this is merely a rule of

thumb and "should be reconsidered regularly to reflect new information and new statistical data." *Ketchum*, 740 F.2d at 1416.

The Board of Elections' expert does not suggest that the 59.4 percent voting-age population for District 4 in the Committee's Map is insufficient to elect a Latino candidate. This percentage was enough when District 4 was first created to constitute an effective majority-minority district and resulted in Congressman Gutierrez winning the 1992 Democratic primary election against Latino Juan Soliz and going on to win the general election with 78 percent of the vote. But, given the rule of thumb, and the need to account for Latinos within the voting-age population who are not citizens eligible to vote, we do not infer that 65.9 percent voting-age population of Latinos in Adopted District 4 suggests excessive packing. *See id.* at 1415 n.19 (noting that a district court may consider an appropriate corrective for non-citizenship).[16]

A review of the actual boundaries of Adopted District 4 is more telling of the state's intent. At the time of the 2010 Census the percentage of Latino voting-age population in District 4 stood at 68.1 percent. Adopted District 4 reduces that by 2.2 percent even though, according to the Board of Elections' expert, Dr. Allan Lichtman, the state could have further increased the Latino voting-age population to 68.4 percent by merely keeping certain high concentration Latino areas that were in Current District 4 and not bringing in equivalent low Latino voting-age population areas from other districts. We acknowledge that doing so may have required changes to District 3 or 7, but it was nonetheless an available option. The addition of low Latino voting-age population areas to District 4 and exclusion of certain high voting-age population areas suggests that the state's intent was not maximization of Latino voting-age population.

---

[16] We also note that the Adopted Map's 65.9 percent is only about 5 percent higher than the percentage proposed in the Committee's Map.

The boundaries of Adopted District 4 also evidence an intent to keep Latino communities of interest in the northern and southern enclaves within the same district. Latino plaintiffs in this action testified that Latinos have a common heritage and share common core values. The court in *Hastert* found that the two separate Latino enclaves are less than a mile from each other at their closest points and that the communities are not distinct, but compact. *Hastert*, 777 F. Supp. at 649. The Committee's expert, Dr. Morrison, opined that the state could have retained the shape of District 4 and reduced the Latino voting-age population by making more ethnically neutral territorial trades. He concluded that the state added territory with a 47.2 percent Latino voting-age population, while removing territory formerly in District 4 that had a 40.6 percent Latino voting-age population. If the state had been ethnically neutral in adding and subtracting Latino territory, the Latino voting-age population in District 4 would have been reduced by approximately 2 percent. The Committee, however, wasn't able to present evidence that an ethnically neutral exchange was feasible given the one-person, one-vote rule and, considering that the difference is minimal, we do not infer from this evidence an intent to pack Latinos into District 4 for the purpose of diluting their vote.

Further, as the Committee itself argues, the Adopted Map was drawn for predominantly political reasons, and we believe this is evident in Adopted Districts 3, 4 and 5. Maintaining substantially the same boundaries of District 4 allows Congressman Gutierrez to remain in a district with 82.3 percent of his current constituents. This in turn allowed the Democrats to draw Districts 3 and 5 with substantially the same boundaries, resulting in Congressman Lipinski's remaining in a district with 76.4 percent of his constituents and Congressman Quigley in a district with 78.9 percent of his constituents.[17]

_____

[17] In contrast, the Committee's Map would move Congressman Gutierrez to District 3 with only 41.5 percent of his constituents, Congressman Lipinski would move to District 13 with only

The Committee contends that Congressman Gutierrez would likely win in its proposed District 3 because his support has been overwhelming, and thus, he needs no incumbency protection. If the Committee's expert, Dr. Richard Engstrom, is correct, however, that there is polarized voting in the Committee's proposed District 3, whether Congressman Gutierrez would succeed in that district may depend on who runs against him in the primary. Congressman Gutierrez could also run in the Committee's proposed District 4 even though he doesn't reside there, and he would likely win that election. *LULAC*, however, teaches us that incumbency protection can take many forms, one of which is to keep the constituency intact so the officeholder is accountable for promises made or broken. 548 U.S. at 440-41. Maintaining incumbent-constituent relationships is a legitimate redistricting goal and breaking up the northern and southern enclaves into different districts splits up Congressman Gutierrez's constituents and divides a community of interest.

Citing *Larios v. Cox*, 300 F. Supp. 2d 1320, 1347 (N.D. Ga. 2004), *summarily aff'd,* 542 U.S. 947, the Committee argues that the Democrats' selective incumbency protection – the Adopted Map does not protect Republican incumbents – cannot be a legislative redistricting principle. *Larios* is inapposite because it involves the one-person, one-vote requirement of the Equal Protection Clause, not racial vote dilution. As the court in *Larios* stated, "[d]eviations from exact population equality may be allowed in some instances in order to further legitimate state interests," *id.* at 1337, but found that "the creation of population deviations to protect [Democratic] incumbents . . . [did] not qualify as a legitimate state policy," in part, because it "was not applied in a consistent and neutral way," *id.* at 1347. In this case, there has been no assertion that the Adopted Map violates the

---

3.5 percent of his constituents, and Congressman Quigley would stay in District 5, but with only 50.1 percent of his constituents. The fate that awaits Congresswoman Biggert under the Adopted Map would belong to Congressman Lipinski instead under the Committee's Map.

one-person, one-vote requirement. The issue is whether District 4 was drawn to intentionally discriminate against Latinos. If the Democrats in the Illinois General Assembly crafted Adopted District 4 for reasons other than discriminatory intent, whether those reasons are legitimate state interests or not, the Committee cannot succeed.

The parties' experts agree that Latinos in Cook County overwhelmingly vote Democratic, so there is no reason that the Democrats would want to dilute the vote of Latinos, at least not in the general elections. The Committee, however, asserts that because Districts 3, 4, and 5 are safely Democratic, the elections that count are the primaries. The Committee contends that the Democrats want to keep Latinos out of District 3 to preserve Congressman Lipinski's primary win because he has recently lost favor among Latinos on account of his stance on immigration. The state cannot draw district lines to exclude minorities merely because they might oppose an incumbent. *See LULAC*, 548 U.S. at 440-41.

To support its position, the Committee offers a news article from Illinois Coalition for Immigrant and Refugee Rights dated January 31, 2008, titled *Congressman Luis Gutierrez Withdraws his Endorsement of Congressman Lipinski.* Apart from the minimal evidentiary value of such a document, if any,[18] the argument is unpersuasive. The Latino voting-age population in Adopted District 3 only decreased by 4.7 percent (from 29.3 to 24.6 percent) from the Current Map to the Adopted Map. Given that the Latino voting-age population in Cook County has nearly doubled since 1990 and is projected to continue increasing steadily, a 4.7 percent reduction in Latino voting-age population in Adopted District 3 doesn't notably reduce the opportunity for a Latino

---

[18]Although we denied the Board of Elections' motion in limine to exclude this evidence at trial (Dkt. 140, p. 4 (Nov. 16, 2011)), we see now that the document was used solely for the truth of the matter asserted and is unexceptionable hearsay.

candidate of choice to successfully run against Congressman Lipinski in the Democratic primary over the next decade. Additionally, the Committee presented little evidence, and certainly nothing convincing, that Latino voters in District 3 disfavor Congressman Lipinski. For example, the Committee did not offer Congressman Lipinski's voting record on issues important to Latinos, or present examples of Latino organizations opposing his reelection.

Further, the Committee does not dispute Dr. Lichtman's findings that in the 2010 primary election Congressman Lipinski received 57 percent of the Latino vote when running against a Latino candidate. Dr. Engstrom testified that he did not consider this election in his analysis of polarized voting because the losing Latino candidate only garnered 22 percent of the vote in a two-person election and, thus, was "non-competitive." This election result, nonetheless, supports a finding that Congressman Lipinski faces little threat of defection by Latinos in his district.

The Committee also presented evidence of emails in which Congressman Lipinski proposed district lines for District 3, noting the total population, Democratic performance, Latino voting-age population, African-American voting-age population, and overall African-American population. This does not point to intentional discrimination where the Supreme Court has stated that legislators can be race-conscious when redistricting. *See Miller*, 515 U.S. at 916 ("Redistricting legislatures will, for example, almost always be aware of racial demographics; but it does not follow that race predominates in the redistricting process."); *Shaw I*, 509 U.S. at 646 ("[R]edistricting differs from other kinds of state decisionmaking in that the legislature always is *aware* of race when it draws district lines, just as it is aware of . . . other demographic factors. That sort of race consciousness does not lead inevitably to impermissible race discrimination.") (emphasis in original); *Bush*, 517 U.S. at 1001 (Thomas, J., concurring) ("We have said that impermissible racial classifications do

34

not follow inevitably from a legislature's mere awareness of racial demographics."). The emails introduced by the Committee merely show that Congressman Lipinski was conscious of his proposed district's demographics, not that he sought to exclude Latino voters.

In the Adopted Map, Latinos have one majority-minority district (District 4) and three other districts with a Latino voting-age population of 20 percent or more (District 3 with 24.6 percent, District 8 with 22.1 percent, and District 11 with 21.8 percent). The Adopted Map increases the Latino population in District 8 by 8 percent and District 11 by 12 percent. Although the Adopted Map does not ensure that Latino voters have the opportunity to elect a candidate of their choice in Districts 3, 8 and 11, it does provide them with the potential to have an influence in those districts.[19]

In looking at the totality of circumstances, we also consider "whether the number of districts in which the minority group forms an effective majority is roughly proportional to its share of the population in the relevant area." *LULAC*, 548 U.S. at 426. We stated in our opinion on the first motion to dismiss that "the more appropriate inquiry in this case for the proportionality factor, which is analyzed on a statewide basis, is citizen voting-age population." (Dkt. 98, p. 20, 2011 WL 5185567, *5); *see also Barnett*, 141 F.3d at 705 ("[T]he proper benchmark for measuring proportionality is citizen voting-age population." ); *see also LULAC*, 548 U.S. at 436 (relying on citizen voting-age population when determining proportionality). We recognized that it might be

---

[19]Although the Committee's Map would increase the Latino voting-age population in District 3, it would reduce the Latino voting-age population in District 5 from 24.56 to 12.35 percent. Under the Committee's Map, Latinos would have one majority-minority district (District 4) and one plurality district (District 3); only two districts where Latinos have any real influence. It also changes Districts 8 and 11 from Democrat-leaning districts to districts where a Republican is favored to win. We cannot fail to acknowledge that the Committee's Map favors Republicans when compared to the Adopted Map. Because the Latino population in Chicago generally favors Democratic candidates, such a plan, even with a strong Latino plurality district, may not be to the Latinos' advantage as the Latino voters of Illinois understand their interests today.

difficult for the Committee to make this showing because the 2010 Census does not include citizenship, but we indicated that the parties could rely on expert testimony.

Dr. Lichtman testified about citizen voting-age population on a statewide basis derived from the American Community Survey (ACS). ACS is an ongoing survey organized by the U.S. Census Bureau that randomly solicits data from people in every state throughout the year. Dr. Morrison lodged several criticisms of reliance on ACS data. For example, he noted that ACS data only provide estimates of citizenship based on population samples, rather than actual enumeration as with census results. ACS data are also not publicly available at the smallest units of geography as are used in redistricting. He testified, however, that the data were "okay from a scientific standpoint for measuring citizenship at . . the state level."

Because rough proportionality under the totality of circumstances test looks to citizen voting-age population at the statewide level, we find that ACS figures are reliable for this purpose. Dr. Lichtman explained in his report that "[t]he United States Bureau of Census released in late September its 2010 data on citizenship status, based on its American Community Survey. . . . Based on this data the percentage of Latinos in the citizen voting age population in Illinois is 8.7 percent. Multiplied by 18 Congressional districts this percentage equals 1.57 [Latino] Congressional districts . . . ." Dr. Lichtman noted that "[w]hile the ACS citizenship data are based on samples, and not enumeration, so was the Census citizenship data." Because these figures are for the state overall, they do "not require the measurement of citizenship at lower levels of Census geography." Dr. Lichtman testified that even though these data are derived from samples they are accurate on a statewide level within a few tenths of a percentage point.

We find, therefore, that the number of districts in which Latino voters form an effective majority is *roughly* proportional to its share of the population in Illinois. According to ACS figures, 1.57 districts should be Latino majority-minority districts. Although only one district is majority Latino under the Adopted Map, the variance is not so significant as to support a finding of intentional discrimination against Latinos.

Neither do other relevant factors point to intentional discrimination against Latinos. Evidence that the redistricting process was "secretive" and excluded Republicans reveals partisan motivation, not racial discrimination. For purposes of this analysis, we will assume that there is polarized voting between Latinos and the majority voting bloc in the challenged districts. (More on this later). We also note the history of discrimination against Latinos, *see Hastert*, 777 F. Supp. at 650 (finding a definite pattern and practice of electoral discrimination against the Hispanic community in Chicago); *see also Barnett*, 141 F.3d at 702 (noting that voting for alderman in Chicago is polarized and "Latinos are almost never elected in wards that do not contain a Latino majority of citizens of voting age."), and socioeconomic disparities among the Latino community, *see* 20 Ill. Comp. Stat. 3983/5 ("Latinos lag behind in major indicators of well-being relative to education, health, employment, and child welfare, as well as representation throughout the State."); *see also* Pl. Ex. A53 at 8 ("Latinos had lower family incomes than any other major racial or ethnic group in the Chicago region in . . . 2006."). None of these factors, however, leads to the conclusion that Democrats in the Illinois General Assembly intended to discriminate against Latinos.

The Board of Elections presented evidence that all Latinos in the General Assembly voted for the plan and that no Latino advocacy or citizen group has expressed opposition to the Adopted Map. Latinos have also increasingly been elected to public office in Cook County. The Board of

Elections points out that since the last redistricting, Latinos have been elected to the offices of Cook County State's Attorney, Cook County Assessor, and Chicago City Clerk. Latino candidates in Cook County have also been elected to the Illinois House and Senate. According to a survey by the National Association of Latino Elected officials, 113 Latinos were serving in elected office in Illinois in 2010, placing the state seventh in the nation (tied with New Jersey). This represents a 176 percent increase in Latinos holding office in Illinois since 1996.

After considering all the relevant factors, we find that Illinois lawmakers in passing the Adopted Map did not act with the intent to discriminate against Latinos. This finding not only requires dismissal of the Committee's Section 2 claim (Count I), but also its Fourteenth and Fifteenth Amendment vote dilution claims (Counts II and III). *See Reno v. Bossier Parish Sch. Bd.*, 520 U.S. 471, 481 (1997) ("Since 1980, a plaintiff bringing a constitutional vote dilution challenge, whether under the Fourteenth or Fifteenth Amendment, has been required to establish that the state or political subdivision acted with a discriminatory purpose.").

Because we find no intentional discrimination and the Committee cannot show that the first *Gingles* precondition is met, we could end our discussion here. For completeness, however, we find that even if the Committee could show intentional discrimination, it has not presented sufficient evidence to show that the third *Gingles* precondition is met – that the majority votes as bloc, allowing them usually to defeat the Latino's preferred candidates. To prove this, the Committee presented expert analysis of Dr. Engstrom. We are not persuaded by his findings for several reasons. First, Dr. Engstrom only considered Adopted District 4 and the Committee's proposed Districts 3 and 5. His area of interest was limited and excluded portions of Adopted Districts 3 and 5, districts that were challenged by the Committee. The *Gingles* analysis requires a finding that there is

polarized voting in the challenged districts. *See, e.g., Radogno*, No. 1:11-cv-4884, Opinion and Order (Dec. 7, 2011), pp. 19-20 ("[E]lection data relating to House District 23 as it existed in 2010 (i.e., under the previous map) is irrelevant to plaintiffs' claim against RD 23 under the 2011 map . . . ."). When examining evidence to determine polarized voting on a district-specific basis, we are not confined to elections solely within the district but can consider those in surrounding districts to determine voting patterns relevant to the challenged area. *See, e.g., Baird v. Consolidated City of Indianapolis,* 976 F.2d 357, 360 (7th Cir. 1992). While we acknowledge that Dr. Engstrom's area of concern partially overlaps with the challenged districts and is relevant in considering polarized voting in the challenged area, we find that his confined area of analysis resulted in too narrow a scope of review.

We are unpersuaded by the elections Dr. Engstrom chose to consider. Dr. Engstrom analyzed fourteen elections, but two of those elections weren't incorporated into his report. Of the twelve that were incorporated, half were judicial elections. Four of the elections were judicial sub-circuit elections, which we don't find particularly probative. He only analyzed one legislative election (2010 Cook County Board of Commissioners election), but no congressional elections, state senate, or state representative elections. Dr. Engstrom further confined his analysis by excluding elections he considered "non-competitive." For example, he excluded the 2010 primary for District 3 (where Congressman Lipinksi ran against a Latino candidate and won) because he believed the Latino candidate wasn't competitive (he only received 22 percent of the vote). We, however, find this election more probative than sub-circuit judicial elections that were included.

The more significant problem with Dr. Engstrom's analysis is that he didn't examine actual election results to evaluate whether non-Latinos vote as a bloc to usually defeat the Latinos'

candidate of choice. As correctly noted by Dr. Lichtman, proof of vote dilution requires two steps. The Committee must first show that Latinos and non-Latinos prefer different candidates, and second, that the non-Latino voting bloc is sufficiently strong to usually defeat the Latino candidate of choice. Dr. Engstrom fails to make a showing as to this latter requirement. His report, for example, ignores election results that Dr. Lichtman included in his report where Latino candidates of choice won in 15 out of 16 elections in jurisdictions that were 70 percent or more non-Latino in their voting age population, a success rate of 94 percent. When considering the elections included in Dr. Engstrom's and Dr. Lichtman's reports, Latino candidates of choice prevailed in 24 of 29 elections, a success rate of 83 percent. Dr. Lichtman's findings show that as a "practical," rather than theoretical, matter, Latino candidates have won more often than not in the challenged area.

While Dr. Lichtman's assessment of the third *Gingles* prong is also subject to criticism, we do not need to decide the validity of his assessment because it is the Committee's burden to prove the *Gingles* preconditions. Dr. Engstrom's analysis, which doesn't analyze actual election results, is insufficient to meet this burden. *See, e.g., Radogno*, No. 1:11-cv-4884, Opinion and Order (Dec. 7, 2011), pp. 20 (finding that the expert's analysis was flawed where he ignored actual election results and instead based his findings on a showing that white candidates, as a group, *would have won* the election if, "you aggregate all votes for a particular ethnicity.").

### C. Racial Gerrymandering

To succeed on their racial gerrymander claim under the Equal Protection Clause of the Fourteenth Amendment, the Committee must show that race was the predominant factor in creating Adopted District 4. *Miller*, 515 U.S. at 916. When race is the predominant consideration in drawing

40

district lines such that the legislature subordinated race-neutral districting principles to racial considerations, strict scrutiny applies. *Id.* at 920. "Strict scrutiny applies where redistricting legislation . . . is so extremely irregular on its face that it rationally can be viewed only as an effort to segregate the races for purposes of voting, without regard for traditional districting principles, . . . or where race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Bush*, 517 U.S. at 958 (internal quotations and citation omitted). In other words, for strict scrutiny to apply, traditional districting criteria, such as compactness, contiguity, and respect for political subdivisions or communities defined by actual shared interests, must be subordinated to race. *Id.* at 959 & 963; *see also id.* at 993-94 (O'Connor, J., concurring) ("States may intentionally create majority-minority districts, and may otherwise take race into consideration, without coming under strict scrutiny. Only if traditional districting criteria are neglected and that neglect is predominately due to the misuse of race does strict scrutiny apply.").

The shape of a district "is relevant not because bizarreness is a necessary element of . . . proof, but because it may be persuasive circumstantial evidence that race for its own sake, and not other districting principles, was the legislature's dominant and controlling rationale in drawing its district lines." *Miller*, 515 U.S. at 913. The Court has found significant a district's highly irregular and geographically non-compact shape in finding that racial motivations predominated in drawing district boundaries. *Shaw II*, 517 U.S. at 905-06. If a district's shape alone does not make out a strong circumstantial case, racial gerrymandering may be revealed more clearly when its shape is linked to demographics and other factors. *See Miller*, 515 U.S. at 917 ("Although by comparison with other districts the geometric shape of the Eleventh District may not seem bizarre on its face,

41

when its shape is considered in conjunction with its racial and population densities, the story of

racial gerrymandering seen by the District Court becomes much clearer.").

Courts must "exercise extraordinary caution in adjudicating claims that a State has drawn

district lines on the basis of race." *Id.* at 916. "[C]aution is especially appropriate . . . where the State

has articulated a legitimate political explanation for its districting decision, and the voting

population is one in which race and political affiliation are highly correlated." *Cromartie II*, 532

U.S. at 242. The Supreme Court in *Cromartie II* articulated the burden that parties attacking

redistricting boundaries must meet in cases where race correlates with political affiliation:

> In a case such as this one where majority-minority districts (or the approximate
> equivalent) are at issue and where racial identification correlates highly with political
> affiliation, the party attacking the legislatively drawn boundaries must show at the
> least that the legislature could have achieved its legitimate political objectives in
> alternative ways that are comparably consistent with traditional redistricting
> principles. The party must also show that those districting alternatives would have
> brought about significantly greater racial balance.

*Id*. at 258; *see also id.* at 238-40, 257-58 (concluding that an "unusually shaped" "snakelike" district

passed muster under the Equal Protection Clause because other evidence in the case tended to

support the conclusion that politics, not race, predominated."); *Bush*, 517 U.S. at 968 ("If district

lines merely correlate with race because they are drawn on the basis of political affiliation, which

correlates with race, there is no racial classification to justify."). As noted above, incumbency

protection can be a legitimate factor in districting where the justification is to keep the constituency

intact so the officeholder is accountable for promises made or broken, *see LULAC*, 548 U.S. at

440-41, but political characteristics cannot be used as a proxy for race, *Bush*, 517 U.S. at 917.

Because the Board of Elections asserts that politics was the predominant factor in crafting Adopted District 4, it has made no attempt to justify the oddly shaped district under strict scrutiny.[20] Despite the history of District 4, we agree with the Board of Elections that the predominant intent in maintaining the district in the Adopted Map was not race, but a desire to keep Democratic incumbents in Districts 3, 4, and 5 with their constituents, to preserve existing district boundaries, and to maintain communities of interest.

We acknowledge that Adopted District 4 continues to have substantially the same shape as the *Hastert* District 4, which was specifically crafted to remedy a Section 2 Voting Rights Act violation. *See Hastert*, 777 F. Supp. at 650-51. Indeed, the *King I* court concluded "that racial considerations predominated over all other factors in the configuration." 979 F. Supp. at 606–07. There are, however, certain notable changes in Adopted District 4. For example, it splits significantly fewer precincts than the *Hastert* District 4. Adopted District 4 is also slightly more compact and some of the bizarre shaped edges are smoothed out. The inclusion of certain low Latino areas west of Central Avenue had the effect of substantially increasing the population in the connector arm, making the district more geographically compact. While the compactness of District 4 has increased, it is still at the threshold level for low compactness on the Polsby-Popper score and still fails the "eyeball test" for compactness. We note, though, that the compactness of District 4 isn't too far afield from some of the other districts in the Adopted Map. For example, District 4's Reock score is within .02 of the mean for the state (.32), suggesting that it reasonably approximates the plan

---

[20] Compliance with Section 2 of the Voting Rights Act would be a compelling interest to justify the crafting of a majority-minority district, *see King II*, 979 F. Supp. at 622, but the Board of Elections has argued that there is no polarized voting among Latinos in Cook County. *See Gingles*, 478 U.S. at 56 (showing of racial polarization voting is necessary precondition of Section 2 claim); *see also Bush*, 517 U.S. at 978 (stating that strict scrutiny requires a "'strong basis in evidence' for finding that the threshold conditions for § 2 liability are present").

as a whole, at least when considering the Reock measure. *See Radogno*, No. 1:11-cv-4884, Opinion and Order (Dec. 7, 2011), p. 16 & n. 6.

The history and shape of District 4 might ordinarily suggest that race predominated in its design in 2011. But given the facts presented to us, we find that the history of District 4 actually points in the opposition direction. Preserving the core of prior districts and keeping incumbents with their constituents are legitimate redistricting objectives. *See Karcher v. Daggett*, 462 U.S. 725, 740 (1983) and *LULAC*, 548 U.S. at 440-41. "In some circumstances, incumbency protection might explain as well as, or better than, race a State's decision to depart from other traditional districting principles, such as compactness, in the drawing of bizarre district lines." *Bush*, 517 U.S. at 967. District 4 was created in 1991 and since that time, Congressman Gutierrez has been the representative of that district. As previously discussed, *see* Part II. B., *supra*, maintaining District 4 in substantially the same shape protects the incumbency of Illinois' lone Latino congressman, Congressman Gutierrez, and allows Districts 3 and 5 to remain largely unchanged, permitting Congressman Lipinski and Congressman Quigley, respectively, to remain with their constituents. For example, under the Adopted Map, Congressman Gutierrez will retain 82.3 percent of his constituents, Congressman Lipinski will retain 76.4 percent, and Congressman Quigley will retain 78.9 percent.[21]

---

[21]Under the Committee's Map, on the other hand, Congressman Gutierrez would only retain 41.5 percent of his constituents, Congressman Lipinski would retain 3.5 percent, and Congressman Quigley would retain 50.1 percent. The Committee's Map would also require Congressman Lipinski to run against Republican incumbent Congresswomen Biggert in a district that Congressman Lipinski is projected to lose. The Democrats drew the map to avoid this outcome, and doing so is a legitimate goal. *See Bush*, 517 U.S. at 964 ("[I]ncumbency protection, at least in the limited form of avoiding contests between incumbent[s], [is] a legitimate state goal.").

The Committee urges that the Board of Elections cannot rely on preservation of the core as a redistricting principle where "District 4's core is *discriminatory*." As we have already found, however, District 4 is not discriminatory and its original creation in 1991 was constitutional. District 4 dictates, in part, the shape of Districts 3 and 5, among other districts. The existence of District 4 for the last 20 years has now resulted in constituent-incumbent relationships in all three districts that didn't exist when the district was first created by the *Hastert* court and thus, the basis for upholding the oddly shaped district has changed.

Further, as we have already noted, keeping the northern and southern Latino enclaves within District 4 protects Latino communities of interest. (*See supra*, p. 31 (citing *Hastert*, 777 F. Supp. at 649)). As explained in *King I*, "[t]o a certain extent, the clustering of Hispanics into two densely populated enclaves provided map makers with the luxury of resorting to traditional districting principles. It is not surprising to find that a comparatively small district with two densely packed minority enclaves is (excluding the connector) more compact and more respectful of political subdivisions than a larger district drawn to capture a more dispersed minority population." 979 F. Supp. at 608.

No party suggests that these communities no longer have shared interests and, in fact, the Latino plaintiffs testified that Latinos in the area share common core values, and Dr. Engstrom testified that they are politically cohesive. "A State is free to recognize communities that have a particular racial makeup, provided its action is directed toward some common thread of relevant interests." *Miller*, 515 U.S. at 920. "[W]hen members of a racial group live together in one

community, a reapportionment plan that concentrates members of the group in one district and excludes them from others may reflect wholly legitimate purposes." *Id.* (quotations omitted).[22]

We are not suggesting that race had no role in the creation of Adopted District 4. Race undoubtedly played a significant role. In fact, during the redistricting process Dr. Lichtman testified before the Illinois General Assembly and advised lawmakers to maintain District 4 as a majority-minority district, even though voting in Cook County was no longer racially polarized. Dr. Lichtman explained that whether voting in Cook County was still racially polarized would need to be determined by the court through a battle of the experts, and to protect itself from suit, the General Assembly should maintain the Latino majority district of District 4 but make it "less uncouth."

Further, the House sponsor of Adopted District 4, State Representative Barbara Currie, defended the district by stating that "an earlier [district] that did not look dissimilar had been upheld by the federal courts." (Pl. Ex. A43, p.15). Representative Currie, however, also stated that race was not the only factor considered. (*Id.*). She commented, "[w]e certainly looked for opportunities to make sure that members of minority groups have the opportunity for full participation in the electoral process. But we also do look . . . at many other factors . . . . [including] compactness, contiguity, communities of interest, issue of natural boundaries, political boundaries, cities, counties and so forth[,] . . . [p]artisan considerations, incumbency, all of those are legitimate values in map making." (*Id.,* pp. 15-16, 18).

The sponsor of the Adopted Map in the State Senate, Kwame Raoul, explained that the map is "intended to comply with the Federal Voting Rights Act of 1965 with respect to fairness to the

---

[22]Although it is true that the Committee's Map captures Latino communities of interest in its proposed Districts 3 and 4, Adopted District 4 captures the more densely populated Latino areas and keeps these Latinos communities with the representative they have had for more than 20 years. Doing so fosters a non-racial legitimate redistricting goal.

voting rights of racial and language minorities. In accordance therewith, the legislation retains effective African-American and Hispanic majority/minority districts while also achieving population equality, the preservation of the core existing district boundaries, and incumbent constituent relationship, and the maintenance of the parties in composition of these districts." (Pl. Ex. A45, pp. 9-10). He continued that Adopted District 4 was "preserved to be substantially similar to the 4th Congressional District as the 4th Congressional District was presented ten years ago," and that the map was drawn to maintain this core district. (*Id.* at pp. 12, 14).

Accordingly, race was certainly at play in the creation of Adopted District 4, but "[s]tates may intentionally create majority-minority districts, and may otherwise take race into consideration without coming under strict scrutiny." *Bush*, 517 U.S. at 993 (O'Connor, J., concurring). "Only if traditional districting criteria are neglected *and* that neglect is predominantly due to the misuse of race does strict scrutiny apply." *Id.* (emphasis in original). We find, based on all the evidence presented, that in drawing Adopted District 4, race was subordinated to politics, preservation of existing district boundaries and relationships among constituents and their Democratic representatives, and maintenance of Latino communities of interests. These redistricting objectives explain maintaining the odd shape of District 4 as much, if not more, than race. *See Bush*, 517 U.S. at 999 ("Districts not drawn for impermissible reasons or according to impermissible criteria may take any shape, even a bizarre one.").

As illustrated by the Committee's proposed District 4, the state could have drawn a more compact majority-minority Latino district. The test, however, is not whether a better map can be drawn, but rather, whether the Committee has shown that there is a legal reason to set the legislator's map aside. *See Miller*, 515 U.S. 900 ("Although race-based decisionmaking is inherently suspect,

47

until a claimant makes a showing sufficient to support that allegation the good faith of a state legislature must be presumed.") (internal citation omitted); *see also Bush*, 517 U.S. at 962 ("The Constitution does not mandate regularity of district shape, and neglect of traditional districting criteria is merely necessary, not sufficient," to require application of strict scrutiny) (internal citation omitted). The Committee has not made that showing here.

As the *Cromartie II* Court explained, "where racial identification correlates highly with political affiliation, the party attacking the legislatively drawn boundaries must show at the least that the legislature could have achieved its legitimate political objectives in alternative ways that are comparably consistent with traditional redistricting principles." 532 U.S. at 258. Although the odd shape of District 4 cannot be explained by Latinos' political affiliation with the Democratic party (Cook County congressional districts in general are projected as safe Democratic seats, so an oddly shaped district in that area is unnecessary to ensure a Democrat win), it can be explained by other political factors discussed above.[23] We therefore find that the principles expounded in *Cromartie II* apply. "[R]eapportionment is primarily the duty and responsibility of the State through its legislature," *see Voinovich*, 507 U.S. at 156 (quotations omitted), and on the record before us, we will not replace the legislature's enacted plan with one that inhibits its legitimate objectives while advancing the objectives of the minority political party at the time of redistricting.

---

[23]The Committee's Map, instead of advancing the Democrats' legitimate political objectives, would advance Republican objectives. It would displace two Democratic incumbents, require a Democratic incumbent to run against a Republican incumbent in a district he is likely to lose, and change the overall map from Democratic leaning (12 to 6) to evenly bipartisan (8 to 8 with two even districts).

### III. Conclusion

For the reasons stated above, we grant in part the defendants' second motion to dismiss Count V of the amended complaint (the First Amendment claim) and deny their motion as to Count VI (the Equal Protection partisan gerrymander claim) [Dkt. 122], deny the plaintiffs' motion for permanent injunction [Dkt. 104], dismiss this action with prejudice, and instruct the Clerk to enter final judgment in favor of the defendants.


ENTERED: December 15, 2011

<div style="margin-left:50%">

_____/s/ John Daniel Tinder_____
JUDGE JOHN DANIEL TINDER
United States Court of Appeals for the
Seventh Circuit


_____/s/ Robert L. Miller, Jr._____
JUDGE ROBERT L. MILLER, JR.
United States District Court for the
Northern District of Indiana


_____/s/ Joan Humphrey Lefkow_____
JUDGE JOAN HUMPHREY LEFKOW
United States District Court for the
Northern District of Illinois

</div>



Ex. B2

PLAINTIFF'S
EXHIBIT
P-062

Appendix A

P-062.001



PLAINTIFF'S
EXHIBIT
P-061

PENGAD 800-631-6989

Ex. B1

Appendix B

P-061.001



P-064.001



PLAINTIFF'S
EXHIBIT
P-063

Ex. B3

Appendix D

P-063.001



P-075.001



PLAINTIFF'S EXHIBIT
P-074

Ex. B14

Appendix F

P-074.001